## 22-11285

# United States Court of Appeals

*for the*

# Eleventh Circuit

CIERRA GETER,

*Plaintiff/Appellant,*

– v. –

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant/Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:20-cv-01148-SCJ
(Hon. Steve C. Jones)

# INITIAL BRIEF OF APPELLANT

CHERYL B. LEGARE
CAMILLE D. JONES
LEGARE ATTWOOD & WOLFE, LLC
125 Clairmont Avenue, Suite 380
Decatur, Georgia 30030
(470) 823-4000

*Counsel for Plaintiff/Appellant*

Cierra Geter v. Schneider National Carriers, Inc., 22-11285

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that those persons or entities listed below have or may have an interest in the outcome of this case:

Allen, M. Laughlin – Counsel for Appellee

Anand, Hon. Justin S. – Magistrate Judge

Fitzgerald, Matthew A. – Counsel for Appellee

Geter, Cierra – Appellant/Plaintiff below

Jones, Camille D. – Counsel for Appellant

Jones, Hon. Steve C. – Judge, United States District Court

Legare, Attwood & Wolfe, LLC – Counsel for Appellant

Legare, Cheryl B. – Counsel for Appellant

McGuireWoods LLP – Counsel for Appellee

Milianti, Peter A. – Counsel for Appellee

Schneider National Carriers, Inc. – Appellee/Defendant below

Weiss, Melissa M. – Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Cierra Geter requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES .................................................................................v

JURISDICTIONAL STATEMENT ......................................................................ix

STATEMENT OF THE ISSUES.............................................................................1

STATEMENT OF THE CASE.................................................................................3

    I.      Course of Proceedings and Disposition Below....................................4

    II.     Statement of Facts ................................................................................5

         A.      Background ................................................................................5

         B.      The APM Position......................................................................6

         C.      Schneider's Policies ................................................................10

         D.      Remote and Flexible Work at Schneider .................................11

         E.      Ms. Geter's Disabilities and Requests for Reasonable
                   Accommodations ....................................................................12

         F.      Ms. Geter's Continued Need for Accommodation and
                   Schneider's Response ..............................................................14

         G.      Other Accommodations Not Offered.......................................16

         H.      Subsequent Changes at Schneider; All APMs Remote ...........17

    III.    Standard of Review ...........................................................................18

SUMMARY OF ARGUMENT ..............................................................................19

ARGUMENT .........................................................................................................20

    I.      Schneider Failed to Accommodate Ms. Geter's Disabilities .............21

         A.      Ms. Geter is a Qualified Individual with a Disability..............24

1.    Full-time work is not an essential function of the
      APM position ................................................................ 25

      a.    The job description and Schneider's
            "judgment" ........................................................ 26

      b.    Schneider's Flexible Work Arrangement
            policy ................................................................ 28

      c.    The work experience of other APMs .................. 31

      d.    The consequences of allowing Ms. Geter
            to temporarily work reduced hours ..................... 33

2.    In-person work is not an essential function either .......... 35

      a.    The job description and Schneider's
            "judgment" ........................................................ 35

      b.    Schneider's FWA and Remote Work
            policies ............................................................. 36

      c.    The work experience of other APMs .................. 37

      d.    The current work experience of APMs ............... 39

3.    Ms. Geter successfully performed fast-paced,
      high-pressure work throughout her employment .......... 42

4.    Based on all the above, Ms. Geter easily
      establishes that she is a qualified individual ................. 42

B.   Ms. Geter's Accommodation Requests Were
     Reasonable and Would Have Enabled Her to Perform
     the Essential Functions of the APM Job .................................... 44

     1.    Temporarily reduced hours ............................................ 44

     2.    Remote work .................................................................. 46

     3.    Schneider did not offer other accommodations .............. 48

C.   Ms. Geter Was Entitled to a Reasonable
     Accommodation, but Schneider Failed to
     Accommodate Her and Did Not Argue or Prove That
     Accommodating Her Was an Undue Hardship ......................... 49

II.   Schneider Discriminated and Retaliated Against Ms. Geter in
      Violation of the ADA when it Terminated Her Employment.............51

      A.   Ms. Geter Establishes a *Prima Facie* Case of Disability
           Discrimination...........................................................................51

      B.   As Concluded By the R&R and the District Court, Ms.
           Geter Establishes a *Prima Facie* Case of ADA
           Retaliation ...................................................................................52

      C.   Any Alleged Reason for the Termination is Pretext for
           Illegal Discrimination and Retaliation ......................................52

CONCLUSION ........................................................................................................53

## TABLE OF CITATIONS

Page(s)

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................20

*Bank of Am., N.A. v. Mukamai (In re Egidi)*,
  571 F.3d 1156 (11th Cir. 2009) ....................................................50

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................ 19, 32

*Church of Scientology v. City of Clearwater*,
  2 F.3d 1514 (11th Cir. 1993) ................................................. 32-33

*Coker v. Enhanced Senior Living, Inc.*,
  897 F. Supp. 2d 1366 (N.D. Ga. 2012)................................. 43, 50

*Combs v. Plantation Patterns*,
  106 F.3d 1519 (11th Cir. 1997) ....................................................53

*D'Angelo v. Conagra Foods*,
  422 F.3d 1220 (11th Cir. 2005) ....................................................26

*Earl v. Mervyns, Inc.*,
  207 F.3d 1361 (11th Cir. 2000) ....................................................24

*FindWhat Inv. Grp. v. Findwhat.com*,
  658 F.3d 1292 (11th Cir. 2001) ......................................................5

*Garcia-Ayala v. Lederle Parenterals, Inc.*,
  212 F.3d 638 (1st Cir. 2000).......................................... 29-30, 49

*Hill v. Clayton Cnty. Sch. Dist.*,
  619 F. App'x 916 (11th Cir. 2015)..............................................50

*Hollingsworth v. O'Reilly Auto. Stores, Inc.*,
  No. 4:13-CV-01623-KOB, 2015 U.S. Dist. LEXIS 10956
  (N.D. Ala. Jan. 30, 2015)..............................................................21

*Holly v. Clairson Indus., L.L.C.*,
  492 F.3d 1247 (11th Cir. 2007) .......................................... *passim*

*Jernigan v. BellSouth Telecomms., LLC*,
    17 F. Supp. 3d 1317 (N.D. Ga. 2014) ......................................... 22, 24, 43, 50

*Jones v. Dillard's, Inc.*,
    331 F.3d 1259 (11th Cir. 2003) ....................................................................18

*Jones v. UPS Ground Freight*,
    683 F.3d 1283 (11th Cir. 2012) ....................................................................20

*Keith v. Cnty. of Oakland*,
    703 F.3d 918 (6th Cir. 2013) ................................................................. 23, 24

*Kimbro v. Atlantic Richfield Co.*,
    889 F.2d 869 (9th Cir. 1989) ........................................................................49

*LaChance v. Duffy's Draft House, Inc.*,
    146 F.3d 832 (11th Cir. 1998) .....................................................................44

*Lewis v. City of Union City*,
    934 F.3d 1169 (11th Cir. 2019) ........................................................ 22, 43, 51

*Lucas v. Grainger*,
    257 F.3d 1249 (11th Cir. 2001) ............................................................ 22, 44

*Medearis v. CVS Pharm., Inc.*,
    646 F. App'x 891 (11th Cir. 2016) ..............................................................26

*Medearis v. CVS Pharmacy*,
    92 F. Supp. 3d 1294 (N.D. Ga. 2014) .........................................................46

*Monette v. Elec. Data Sys. Corp.*,
    90 F.3d 1173 (6th Cir. 1996) .......................................................................23

*Nadler v. Harvey*,
    No. 06-12692, 2007 U.S. App. LEXIS 20272 (11th Cir. 2007) ............ 21, 44

*Norman v. S. Guar. Ins. Co.*,
    191 F. Supp. 2d 1321 (M.D. Ala. 2002) ......................................................52

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000) ............................................................................. 21, 27

*Rorrer v. City of Stowe*,
    743 F.3d 1025 (6th Cir. 2014) .....................................................................23

*Samson v. Fed. Express Corp.*,
    746 F.3d 1196 (11th Cir. 2014) ........................................................... *passim*

*Smith v. Lockheed-Martin Corp.*,
  644 F.3d 1321 (11th Cir. 2011) ...................................................20

*Snead v. Fla. Agric. & Mech. Univ. Bd. Of Trs.*,
  724 F. App'x 842 (11th Cir. 2018) ..............................................26

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
  117 F.3d 1278 (11th Cir. 1997) ...................................................50

*Terrell v. USAir*,
  132 F.3d 621 (11th Cir. 1998) .....................................................23

*Tolan v. Cotton*,
  572 U.S. 650 (2014).............................................................. 20, 54

*Webb v. Wynne*,
  No. 2:07-cv-471-ID, 2008 WL 4831740
  (M.D. Ala. Nov. 3, 2008) ...................................................... 36, 46

*Wright v. Southland*,
  187 F.3d 1287 (11th Cir. 1999) ...................................................33

*Young v. General Foods Corp.*,
  840 F.2d 825 (11th Cir. 1998) .....................................................53

## Statutes & Other Authorities:

42 U.S.C. § 12101 ...................................................................................3

42 U.S.C. § 12111(8) ..................................................................... 22, 24, 26

42 U.S.C. § 12111(9)(b) ................................................................ 22, 28, 44

42 U.S.C. § 12112 .................................................................................21

42 U.S.C. § 12112(b)(1) ......................................................................51

42 U.S.C. § 12112(b)(5) ......................................................................51

42 U.S.C. § 12112(b)(5)(A) ................................................................23

42 U.S.C. § 1981 ....................................................................................4

42 U.S.C. § 2000e ..................................................................................4

29 C.F.R. § 1630.2(n)(3)(i) ................................................................27

29 C.F.R. § 1630.2(n)(3)(ii) .......................................................... 25, 39

29 C.F.R. § 1630.2(n)(3)(iii)..................................................................... 25, 39

29 C.F.R. § 1630.2(n)(3)(iv)..................................................................... 25, 39

29 C.F.R. § 1630.2(n)(3)(v)...................................................................... 25, 39

29 C.F.R. § 1630.2(n)(3)(vi)..................................................................... 25, 39

29 C.F.R. § 1630.2(n)(3)(vii).................................................................... 25, 39

29 C.F.R. § 1630.2(o) ...................................................................................49

29 C.F.R. § 1630.2(o)(1)(ii)...........................................................................44

29 C.F.R. Part 1630......................................................................................49

Fed. R. Civ. P. 56(c)......................................................................................19

Fed. R. Evid. 803(6)......................................................................................32

iv

## JURISDICTIONAL STATEMENT

This Court has jurisdiction of this matter under 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Northern District of Georgia.

## <u>STATEMENT OF THE ISSUES</u>

I.    Under the Americans with Disabilities Act, an employee establishes a failure to accommodate claim if: (1) she is disabled; (2) she was a "qualified individual" at the relevant time; and (3) Defendant failed or refused to reasonably accommodate her disability. A "qualified individual" is someone who can perform the essential functions of the employment position with or without a reasonable accommodation. Construing the facts and evidence in Ms. Geter's favor, could a reasonable jury conclude that Ms. Geter was a "qualified individual" because she could perform the essential functions of her position with a reasonable accommodation?

II.   Under the Americans with Disabilities Act, an employer's duty to accommodate a qualified individual with a disability is triggered when the employee puts the employer on notice of a disability for which she needs an accommodation and the accommodation she is requesting. Ms. Geter returned to work in January 2019 with a Schneider-approved reasonable accommodation permitting her to work three 10-hour days a week instead of four, and the accommodation was then extended through March 19, 2019. In March 2019, Ms. Geter requested that her reasonable accommodation be extended one more time, through June 5, 2019, and that she be temporarily permitted to work from home one day a week when she worked alone.

1

Schneider did not grant Ms. Geter's final request for a reasonable accommodation and terminated her employment on April 12, 2019, rather than granting her request. Construing the facts and evidence in Ms. Geter's favor, could a reasonable jury conclude that Ms. Geter's requested accommodations were reasonable and that, in refusing to grant Ms. Geter's request and in terminating her employment, Schneider unlawfully failed to accommodate Ms. Geter in violation of the Americans with Disabilities Act?

III.    Construing the facts and evidence in Ms. Geter's favor, could a reasonable jury conclude that, in refusing to grant Ms. Geter's accommodations request and in terminating her employment, Schneider unlawfully discriminated against Ms. Geter because of her disability in violation of the Americans with Disabilities Act?

IV.    Construing the facts and evidence in Ms. Geter's favor, could a reasonable jury conclude that Ms. Geter was capable of performing the essential functions of her job with her requested reasonable accommodations and that Schneider's claim that it terminated Ms. Geter because she could not perform the essential functions of her job is therefore not worthy of belief and is pretext for unlawful discrimination and retaliation under the Americans with Disabilities Act?

2

**Statement of the Case**

In 2018, Plaintiff Cierra Geter took approved Family and Medical Leave Act ("FMLA") leave from her job as an Area Planning Manager ("APM") with Schneider National Carriers, Inc. ("Schneider") for her Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.*, ("ADA")-covered disabilities – major depressive disorder, post-traumatic stress disorder, and anxiety disorder. (Doc. 46-4, pp. 71-72, 84-88, 89; Doc. 47-1, 39:3-41:4, 42:8-43:16, 84:11-23, 87:20-88:8, 89:17-20, 98:2-98:22, 121:20-125:11, 126:4-127:8; Doc. 47-2, 41:16-43:8, 50:15-18; Doc. 47-6, 15:16; Doc. 50-8; Doc 50-19.) The parties do not dispute for purposes of summary judgment that Ms. Geter suffers from an ADA-covered disability.

When she returned to work in January 2019, Ms. Geter did so with a Schneider-approved temporary reasonable accommodation permitting her to work three ten-hour days a week instead of four. (Doc. 46-4, pp. 90, 91; Doc. 47-1, 127:9-129:13, 130:1-132:13, 133:16-134:23; Doc. 47-2, 45:10-22, 48:15-49:19, 51:13-20, 61:2-22, 65:11-23; Doc. 47-3, 10:2-21, 13:7-14:8, 28:13-29:7, 31:2-33:8; Doc. 47-6, 17:24-18:14; Doc. 50-12; Doc. 50-20; Doc. 50-22.) The accommodation was then extended through March 19, 2019. (Doc. 46-4, pp. 92-93; Doc. 47-1, 140:9-144:5, 145:2-24; Doc. 47-2, 51:21-52:5, 62:14-63:3; Doc. 47-3, 29:24-31:1, 33:24-35:3; Doc. 50-11; Doc. 50-13; Doc. 50-21.) In March 2019, Ms. Geter requested that her

reasonable accommodation be extended once more, through June 5, 2019, and that she temporarily be permitted to work from home one day a week when she worked alone. (Doc. 46-4, pp. 94-95, 96-98; Doc. 47-1, 151:16-154:5, 155:3-156:8, 160:10-162:13; Doc. 47-2, 52:6-9; Doc. 47-3, 35:4-36:14, 42:12-25; Doc. 50-14.) Her supervisor, Travis Torrence, told her it was fine to work from home because "everyone did it." (Doc. 47-1, 147:1-151:12, 209:18-210:7, 210:19-211:14; Doc. 47-2, 57:11-21; Doc. 47-4, 14:5-21; Doc. 47-5, 19:1-11; Doc. 50-4, ¶ 14.) Schneider provided the same accommodations to a nondisabled APM, Tiffany Kitchens. (Doc. 47-1, 198:6-199:1, 199:9-203:21, 204:12-205:10, 217:17-218:18; Doc. 47-2, 17:18-21; Doc. 47-5, 8:1-24, 15:15-18:15; Doc. 47-6, 34:21-36:5.) However, rather than temporarily accommodate Ms. Geter, Schneider refused to accommodate her and terminated her on April 12, 2019, in violation of the ADA. (Doc. 46-4, p. 100; Doc. 47-1, 177:10-181:4, 182:13-19; Doc. 47-2, 52:10-13, 56:3-8; Doc. 47-3, 29:8-15, 42:12-44:20; Doc. 47-6, 38:6-22.)

## I.  <u>Course of Proceedings and Disposition Below</u>

Ms. Geter filed her Complaint on March 12, 2020, alleging discrimination, retaliation, and failure to accommodate under the ADA and discrimination under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). (Doc. 1, pp. 1-2.) Schneider answered Ms. Geter's Complaint on June 8, 2020. (Doc. 12.) Discovery ensued, and

at the close of discovery, Schneider moved for summary judgment as to all counts of Ms. Geter's Complaint. (Doc. 46.) Ms. Geter filed her response in opposition to the motion, and Schneider filed its reply brief. (Docs. 50, 51.) On December 10, 2021, the Magistrate Court issued a Report and Recommendation ("R&R") recommending summary judgment be granted as to all counts. (Doc. 53.) On January 10, 2022, Ms. Geter filed her objections to the R&R, and on March 21, 2022, the District Court entered an order affirming the R&R and granting summary judgment to Schneider, and judgment was entered in favor of Schneider. (Docs. 57, 61, 62.) Ms. Geter timely filed her Notice of Appeal to this Court on April 15, 2022 as to the order and judgment in favor of Schneider regarding her ADA claims. (Doc. 63.)

## II.  **Statement of Facts**[1]

### A.    **Background**

Ms. Geter began employment with Schneider in July 2014 as a Dispatch Analyst, and her job title later changed to APM, but her job duties remained the same. (Doc. 46-4, pp. 71-72; Doc. 47-1, 39:3-41:4, 42:8-43:16.) During the relevant time, Ms. Geter reported to Travis Torrence, who was a Team Lead, supervised second and third shift APMs and Driver Team Leaders ("DTL"), and reported to

---

[1] The facts must be construed in favor of Plaintiff Geter for purposes of summary judgment and this appeal, though some are disputed by Defendant Schneider. *FindWhat Inv. Grp. v. Findwhat.com*, 658 F.3d 1292, 1307 (11th Cir. 2001).

Operations Manager Doug Horton, who in turn reported to Director of Operations Marianne Biskey-Rose. (Doc 47-1, 70:4-9, 70:25-71:18; Doc. 47-2, 12:2-8, 13:19-14:14, 15:2-10; Doc. 47-6, 10:1-11:7.) Originally, Ms. Geter worked third shift from 11:00 pm to 7:00 am Wednesday through Sunday, and later her hours changed to 11:00 pm to 10:00 am Wednesday through Friday and Sunday. (Doc. 50-3, ¶ 4; Doc. 47-1, 43:17-44:11, 73:1-12; Doc. 47-2, 46:25-47:14.)

From mid-2018 through Ms. Geter's termination, there were four APMs assigned to third shift. (Doc. 47-1, 71:19-72:22.) When he was Team Lead, Mr. Torrence worked at least part of third shift weekly and sometimes worked remotely. (Doc. 47-2, 58:9-22.) Mr. Torrence spent more time assisting second shift than assisting third shift. (Doc. 50-3, ¶ 9; Doc. 50-4, ¶ 5.) Before Ms. Geter went on medical leave in the fall of 2018, Ms. Geter worked with Audreianna Williams and Desmond Seymour on Sundays, Desmond Seymour on Wednesdays, and Audreianna Williams on Fridays; Desmond Seymour worked third shift Saturdays through Wednesdays; Audreianna Williams worked third shift Fridays through Tuesdays; and Ms. Geter worked alone on Thursday nights. (Doc. 47-1, 76:14-17; Doc. 50-3, ¶¶ 5-8; Doc. 50-4, ¶¶ 3-4.)

### B.    The APM Position

During Ms. Geter's employment, Schneider had a job description for the APM position which set forth the essential functions of the APM job; the job description

6

accurately reflected the APM job duties. (Doc. 46-4, pp. 73-74; Doc. 47-1, 52:5-53:17, 54:11-55:2; Doc. 47-2, 34:2-37:23; Doc. 47-3, 24:6-22; Doc. 50-10; Doc. 50-18.) The following are the Essential Functions of the APM job as set forth in Schneider's job description:

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.

- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.

- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneider's #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.

- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.

- Be technical expert in dispatch utilization tools and analytical planning dashboards.

- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).

- Establish priority and direction for trailer assignment, and assign trailers for dispatch.

- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.

- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).

- Possess an intimate understanding of customers and unique needs.

- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.

- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)

- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.

8

- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).

- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.

- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

(Doc. 46-4, pp. 73-74.)

As an APM in Fairburn, Ms. Geter supported over-the-road drivers that worked from the hubs in Atlanta, Charlotte, Miami, Orlando, Jacksonville, and Savannah by taking calls and messages from drivers and assisting them in resolving issues. (Doc. 47-1, 55:3-12.) The drivers based out of Atlanta – from 100 to 110 of the 2,250 drivers she assisted – were the only drivers Ms. Geter saw face-to-face from time-to-time. (Doc. 47-1, 55:13-56:7; Doc. 50-4, ¶ 11.) Ms. Geter assisted drivers throughout the southeast, and it was not necessary for her to be in the office to support drivers. (Doc. 47-1, 59:2-60:12; Doc. 50-4, ¶ 11.)

APMs located trailers throughout the southeast for drivers at the various hubs using GPS software maintained by Schneider. (Doc. 50-3, ¶ 14; Doc. 50-4, ¶ 12.)

9

For all hubs other than Atlanta, keys to trucks were kept in combination boxes to which the drivers had access. (Doc. 50-3, ¶ 14; Doc. 50-4, ¶ 12.) For drivers outside of Atlanta, Ms. Geter printed driver paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had access, and she could do the same for Atlanta drivers when she worked from home. (Doc. 50-3, ¶ 15; Doc. 50-4, ¶ 13.) Before the pandemic, DTLs and Intermodal Operating Specialists could and would also assist drivers with getting keys and provide drivers with access to the printer. (Doc. 47-4, 26:24-28:2.)

### C.   Schneider's Policies

Once a Schneider associate – like Ms. Geter – submits a request for accommodation through the Human Resources Leave Team, the Leave Team notifies the Human Resources Business Partner and the associate's leaders (here, Mr. Torrence and Ms. Biskey-Rose) of the request for accommodation, and then the Human Resources Business Partner works with the leaders to determine whether to grant the request. (Doc. 47-3, 14:9-16:5.)

Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Doc. 47-3, 17:17-18:7; Doc. 47-6, 33:1-34:7; Doc. 50-6.) Under the FWA Policy, Schneider considers flexible work arrangements including: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary

work schedule']." (Doc. 50-6.) Ms. Biskey-Rose and Mr. Torrence understand the policy to be that Schneider allows its employees to work remotely "on a short-term basis" when something pops up. (Doc. 47-2, 57:16-24; Doc. 47-3, 39:23-40:6; Doc. 47-6, 34:8-20.) APM Sarah Kopf is aware that Schneider employees have been permitted to work reduced hours and remotely. (Doc. 47-4, 13:1-20.)

### D.    Remote and Flexible Work at Schneider

The entire time Ms. Geter worked for Schneider, the entire staff was permitted to work from home as needed, it was common for APMs to work from home, and Schneider employees in Fairburn were not required to document when they worked from home. (Doc. 47-1, 209:18-210:7, 210:19-211:14; Doc. 47-4, 14:5-15:13; Doc. 47-5, 19:1-11; Doc. 50-4, ¶ 14.) Mr. Torrence took off between 80 and 82 days in 2018; Ms. Geter had personal knowledge of this because she viewed the Schneider-created Fairburn calendar to which all employees had viewing access. (Doc. 47-1, 216:17-217:4; Doc. 47-2, 59:22-60:12; Doc. 50-3, ¶ 10; Doc. 50-4, ¶ 6.) APM Tiffany Kitchens sometimes worked from home even before the pandemic and before her mother became ill, worked remotely for at least four months around 2018 while her mother was ill, and is still employed by Schneider. (Doc. 47-1, 198:6-199:1, 199:9-203:21, 204:12-205:10, 217:17-218:18, Doc. 47-2, 16:18-21; Doc. 47-5, 8:1-24, 15:15-18:15, 29:11-21; Doc. 47-6, 34:21-36:5.) Beginning in spring of 2018, APM Kopf, who reported to Mr. Torrence, was also permitted to work from

home one or two days a month, and is still employed by Schneider. (Doc. 47-1, 205:20-206:23, 207:5-209:5, 219:9-23; Doc. 47-2, 18:14-17, 58:24-59:6; Doc. 47-4, 13:7-11.)

### E.    Ms. Geter's Disabilities and Requests for Reasonable Accommodations

While employed as an over-the-road driver for another company in July 2013, Ms. Geter was the victim of an attempted sexual assault at a truck stop. (Doc. 47-1, 29:2-25.) Ms. Geter was diagnosed with post-traumatic stress disorder in October 2018, major depressive disorder in August or September 2015, and panic disorder in October 2018. (Doc. 47-1, 84:11-23, 87:20-88:8, 89:17-20.) On October 15, 2018, Ms. Geter requested FMLA for treatment and was approved for and took FMLA leave through December 31, 2018 to engage in treatment; Mr. Torrence and Ms. Biskey-Rose were notified of the same. (Doc. 46-4, pp. 84-88, 89; Doc. 47-1, 98:2-99:22, 121:20-125:11, 126:4-127:8; Doc. 47-2, 41:16-42:8, 50:15-18; Doc. 47-6, 15:16; Doc. 50-8; Doc. 50-19.) Ms. Geter shared information about her mental health crisis with Mr. Torrence and Ms. Biskey-Rose. (Doc. 47-1, 120:14-121:16, 131:16-133:2; Doc. 47-2, 43:12-44:14; Doc. 47-6, 15:17-17:23.)

On December 15, 2018, Ms. Geter's psychiatrist released her to return to work with a request that she work three ten-hour days per work week until February 14, 2019. (Doc. 46-4, p. 90; Doc. 47-1, 127:9-129:13.) Ms. Geter's request for reasonable accommodation was approved on December 18, 2018 by Mr. Torrence

12

and Ms. Biskey-Rose in consultation with Human Resources Business Partner Senior Ashley Janssen. (Doc. 46-4, p. 91; Doc. 47-1, 130:1-132:13, 133:16-134:23; Doc. 47-2, 45:10-22, 48:15-49:19, 51:13-20, 61:2-22, 65:11-23; Doc. 47-3, 10:2-21, 13:7-14:8, 28:13-29:7, 31:2-33:8; Doc. 47-6, 17:24-18:14; Doc. 50-12; Doc. 50-20; Doc. 50-22.)

On January 19, 2019, Dr. Wanzo extended Ms. Geter's request for accommodation through March 20, 2019, and on January 21, 2019, Schneider approved the extension of the reasonable accommodations through March 19, 2019. (Doc. 46-4, pp. 92-93; Doc. 47-1, 140:9-144:5, 145:2-24; Doc. 47-2, 51:21-52:5, 62:14-63:3; Doc. 47-3, 29:24-31:1, 33:24-35:3; Doc. 50-11; Doc. 50-13; Doc. 50-21.) In February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Doc. 47-1, 147:1-151:12; Doc. 47-2, 57:11-21.) From February to April 2019, Ms. Geter worked from home when she was scheduled to work alone. (Doc. 47-1, 147:1-151:12; Doc. 47-2, 57:11-21.)

Ms. Geter's issue with working alone at night was safety; her issue had more to do with working alone than with working in a fast-paced, high-pressure environment. (Doc. 47-1, 103:22-104:15, 106:2-107:3.) She had trouble working in a fast-paced, high-pressure environment throughout her employment with Schneider, not beginning with her need for accommodations in 2018 and 2019, but

13

she performed well at her job throughout her employment with Schneider and did not have performance issues other than one minor incident. (Doc. 47-1, 189:2-20; Doc. 50-3, ¶¶ 22-24.)

When Ms. Geter was on FMLA, Desmond Seymour and Audreianna Williams primarily covered her shifts, and Mr. Torrence covered them rarely, if at all. (Doc. 50-4, ¶ 9.) When Ms. Geter worked her reduced hours schedule, Mr. Seymour and Ms. Williams covered her Sunday shifts and, occasionally, Mr. Torrence covered the shift. (Doc. 47-1, 137:10-140:4, 182:23-184:17; Doc. 50-4, ¶ 8.) Ms. Geter was not paid by Schneider for hours she did not work while she was on FMLA or while she worked reduced hours. (Doc. 50-3, ¶¶ 16, 17.)

**F.      Ms. Geter's Continued Need for Accommodation and Schneider's Response**

On March 9, 2019, Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to April 30, 2019 and, for the first time, recommended that Ms. Geter be permitted to work from home when she was scheduled alone. (Doc. 46-4, pp. 94-95; Doc. 47-1, 151:16-154:5, 155:3-156:8; Doc. 47-3, 35:4-36:14; Doc. 50-14.) Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Doc. 47-1, 156:9-14, 161:21-162:5, 164:2-22, 165:18-166:5.)

On March 30, 2019. Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019; Dr. Wanzo believed that there was a

14

ninety-five percent chance that Ms. Geter would be able to return to full duty at that time. (Doc. 46-4, pp. 94-95, 96-98; Doc. 47-2, 52:6-9; Doc. 47-3, 42:12-25; Doc. 46-4, pp. 96-98; Doc. 47-1, 160:10-162:13.)

On April 2, 2019, Schneider sent Ms. Geter and Dr. Wanzo reasonable accommodation paperwork to get more information about her accommodation requests, and Ms. Geter provided the paperwork to her doctor. (Doc. 46-4, pp. 99, 101-103; Doc. 47-1, 171:11-173:22, 186:17-187:9.) Ms. Geter communicated back and forth with leave management about the status of the requested additional paperwork through her termination on April 12, 2019. (Doc. 47-1, 159:9-160:2.) Ms. Geter does not know whether Schneider followed up with Dr. Wanzo regarding the paperwork, and Schneider never told Ms. Geter that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo. (Doc. 50-3, ¶ 18.) Ms. Geter would have followed up with Dr. Wanzo regarding the missing paperwork if Schneider had asked her to do so. (Doc. 50-3, ¶ 18.)

On April 12, 2019, although Mr. Torrence told Ms. Geter it was out of his hands, Mr. Torrence and Ms. Biskey-Rose, in consultation with Ms. Janssen, decided that they would no longer accommodate Ms. Geter, and Schneider terminated Ms. Geter. (Doc. 46-4, p. 100; Doc 47-1, 177:10-181:4, 182:13-19; Doc. 47-2, 52:10-13, 56:3-8; Doc 47-3, 29:8-15, 42:12- 44:20; Doc. 47-6, 38:6-22.) Although there was a clear end date – June 5, 2019 – for Ms. Geter's accommodation

15

request, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Doc. 47-2, 52:15-53:16.)

### G.    Other Accommodations Not Offered

Other than one conversation with Ms. Biskey-Rose in which she asked if Ms. Geter could switch her Monday group therapy session and Ms. Geter told her it was not possible, nobody from Schneider discussed any other possible accommodations with Ms. Geter before deciding to no longer accommodate her. (Doc. 50-3, ¶ 19; Doc. 47-2, 55:12-16, 56:9-57:10, 61:23-62:2; Doc 47-3, 27:12-16.) If Schneider had offered Ms. Geter a transfer to second shift as an accommodation, she would have accepted it. (Doc. 50-3, ¶ 20.) During Ms. Geter's employment, Schneider used temporary employees to fill in as APMs; Ms. Geter often trained those employees. (Doc 47-1, 78:16-25, 79:8-19, 132:5-24, 133:6-15, 139:22-25; Doc. 50-3, ¶ 11; Doc. 47-2, 70:2-71:19; Doc 47-3, 9:18-10:1, 44:21-25; Doc. 47-5, 19:12-20:12; Doc. 47-6, 31:15-33:1.) For example, Shannon Bailey started out as a temporary employee, and another employee worked for over a year as a temporary employee. (Doc 47-4, 10:14-11:9, 29:8-16.) No efforts were made to bring in a temporary employee to cover for Ms. Geter. (Doc 47-3, 45:1-14; Doc. 47-6, 38:6-43:20.) Schneider did not consider placing Ms. Geter on leave through June 5, 2019, as an alternative accommodation, and had it offered that alternative to Ms. Geter she would have accepted. (Doc. 47-6, 38:6-43:20; Doc. 50-3, ¶¶ 19, 21.) Schneider produced no

evidence that it performed an undue hardship analysis in determining whether to accommodate Ms. Geter. (Doc. 47-2, 68:2-71:19; Doc 47-3, 16:6-17:4; Doc. 47-6, 38:6-43:20.)

### H.    Subsequent Changes at Schneider; All APMs Remote

Almost immediately after Schneider terminated Ms. Geter, Schneider moved someone from first shift to third shift and hired two new people to work third shift. (Doc 47-1, 181:17-182:4; 211:15-20.) Schneider regularly transferred employees between shifts or had employees cover shifts to which they were not assigned; for example, APM Kopf covered third shift from time-to-time though she was scheduled on second shift, and Ryan Wheeler was moved to third shift from first when APM Williams resigned and Ms. Geter was terminated. (Doc. 47-2, 16:1-24; Doc. 47-4, 9:12-18.)

In March or April 2020, Schneider relocated all its APMs to the corporate headquarters in Green Bay, Wisconsin to centralize resources and "to streamline and band our dispatching system as well as our team." (Doc. 47-2, 15:10-12, 18:22-19:11, 25:15-21; Doc. 47-3, 20:10-21:25, 46:6-47:9; Doc. 47-4, 11:10-14; Doc. 47-5, 12:11-23; Doc. 47-6, 20:3-25:5.) The APMs in Green Bay now work remotely with the southeastern hub and perform the duties APMs previously performed from Fairburn. (Doc. 47-2, 18:22-19:5, 30:8-32:3; Doc. 47-4, 16:17-17:1, 28:11-14.) The APMs in Fairburn were given the options to (1) transfer to Green Bay, (2) take other

positions in Fairburn if they were available, or (3) accept a severance package. (Doc. 47-2, 22:19-25:14; Doc. 47-3, 21:1-25; Doc. 47-5, 12:21-14:9; Doc. 47-6, 20:3-25:5.) Had Ms. Geter been employed with Schneider at the time, she would have been offered the opportunity to relocate to Green Bay and would have been considered for open positions in Fairburn. (Doc. 47-6, 27:6-18.)

Fairburn Schneider employees other than drivers worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Doc. 47-2, 25:22-29:25, 30:14-25; Doc. 47-3, 25:10-16; Doc. 47-4, 17:2-18:2; Doc. 47-5, 14:23-15:14; Doc. 47-6, 29:9-15.) Mr. Torrence worked remotely throughout the pandemic and continues to work from home from time-to-time. (Doc. 47-2, 25:22-26:16.) APM Williams, who reported to Mr. Torrence on third shift, was regularly permitted to work remotely through the later part of her pregnancy, before she went on maternity leave on February 26, 2021. (Doc. 50-4, ¶ 10.) To accommodate the change with the Fairburn staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Doc. 47-5, 22:2-23:8; Doc. 47-6, 28:19-29:8, 29:16-31:1.)

## III.  <u>Standard of Review</u>

This Court reviews a summary judgment decision de novo. *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1262 (11th Cir. 2003). Summary judgment is appropriate only

when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment to Schneider on Ms. Geter's ADA failure to accommodate, discrimination and retaliation claims. First, the District Court improperly construed facts and inferences in favor of Schneider to reach the erroneous conclusion that Ms. Geter was not a qualified individual with a disability. Neither full-time work nor in-person work were essential functions of the APM job, and Ms. Geter's requested accommodations were reasonable and would have allowed her to perform the actual essential functions of her position. Thus, Ms. Geter was a qualified individual with a disability, and Schneider failed to accommodate her in violation of the ADA. A reasonable jury could conclude that Schneider violated the ADA when it failed to accommodate Ms. Geter and instead terminated her employment, and the District Court erred in concluding otherwise.

Similarly, a reasonable jury could conclude that Schneider discriminated and retaliated against Ms. Geter in violation of the ADA when it terminated her employment. While the lower court correctly concluded that Ms. Geter established her prima facie case of ADA retaliation, the District Court erred in concluding that Schneider had a legitimate non-discriminatory reason for terminating Ms. Geter,

because Ms. Geter was capable of performing the essential functions of her job and Schneider's contentions otherwise are disputed and pretextual.

Thus, this Court should reverse the District Court's order as to these claims, reverse the grant of summary judgment, and permit Ms. Geter a jury trial on her ADA claims.

## **ARGUMENT**

Ms. Geter's burden at summary judgment is to present sufficient evidence that would permit a jury to find that Schneider subjected her to illegal discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (a plaintiff "will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the discriminatory intent"). At summary judgment, all facts and inferences must be taken in favor of Ms. Geter, the non-movant. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (noting "the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party"). The court "may not weigh conflicting evidence or make credibility determinations" and if there are "disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter

20

but to determine whether there is a genuine issue for trial").

The District Court erred by failing to adhere to this standard of review. The District Court improperly made credibility determinations, found facts and made inferences in Schneider's favor, and discounted evidence in Ms. Geter's favor. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000) (holding that courts "may not make credibility determinations" and "must disregard all evidence favorable to the moving party that the jury is not required to believe"). In light of the disputed issues of material fact in this case and the substantial evidence, which must be construed in Ms. Geter's favor, supporting Ms. Geter's claims, there are genuine issues for trial. A reasonable jury could conclude that that Defendant Schneider failed to accommodate, discriminated against, and retaliated against Ms. Geter under the ADA, and a jury must hear and decide Ms. Geter's claims.

## I.  Schneider Failed to Accommodate Ms. Geter's Disabilities.

Under the ADA, an employer must make reasonable accommodations for a qualified individual with a disability. 42 U.S.C. § 12112. The *McDonnell Douglas* framework does not govern Ms. Geter's failure to accommodate claim. *Hollingsworth v. O'Reilly Auto. Stores, Inc.*, No. 4:13-CV-01623-KOB, 2015 U.S. Dist. LEXIS 10956, at *13-14 (N.D. Ala. Jan. 30, 2015) (citing *Nadler v. Harvey*, No. 06-12692, 2007 U.S. App. LEXIS 20272, at *9 (11th Cir. 2007)). Rather, Ms. Geter establishes this claim by proving her prima facie case. *Id.* at pp. 36-37.

21

Ms. Geter establishes a prima facie case of disability discrimination if: (1) she is disabled; (2) she was a "qualified individual" at the relevant time; and (3) Schneider failed to accommodate her or unlawfully discriminated against because of her disabilities. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007); *Jernigan v. BellSouth Telecomms., LLC*, 17 F. Supp. 3d 1317, 1321 (N.D. Ga. 2014). For purposes of summary judgment, Schneider does not dispute that Ms. Geter is disabled as defined by the ADA. And, because the totality of the evidence establishes that Ms. Geter was a qualified individual and that Schneider failed to accommodate her disabilities, the District Court improperly granted summary judgment and should be reversed.

A qualified individual is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) (citing 42 U.S.C. § 12111(8)). "An accommodation is 'reasonable' and necessary under the ADA . . . if it enables the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256 (citing *Lucas v. Grainger*, 257 F.3d at 1249, 1259-60 (11th Cir. 2001)). A "'reasonable accommodation' may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations for individuals with disabilities.'" 42 U.S.C. § 12111(9)(b).

Failure to provide a reasonable accommodation is discrimination unless the employer "can demonstrate that the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). Because, contrary to the District Court's conclusion otherwise, Ms. Geter can prove her prima facie failure to accommodate case, the burden shifted to Schneider to prove that "accommodating the plaintiff would impose an undue hardship on the operation of its business." *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998); *Rorrer v. City of Stowe*, 743 F.3d 1025, 1038-39 (6th Cir. 2014) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996); *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)). This Schneider cannot do because it did not produce any evidence that it performed an undue hardship analysis during the interactive process, did not contend that accommodating Ms. Geter would have been an undue hardship on its business and, construing the evidence in favor of Ms. Geter, did not produce sufficient undisputed evidence to show that Ms. Geter's requested accommodations were not reasonable or would have been an undue hardship on the business.

Ms. Geter was a qualified individual with a disability as defined by the ADA, her requested accommodations were reasonable, and Schneider failed to accommodate her disabilities in violation of the ADA.

**A.     Ms. Geter is a Qualified Individual with a Disability.**

The District Court erroneously concluded that Ms. Geter was not a qualified individual with a disability entitled to an accommodation under the ADA. (Doc. 61, pp. 5-18.) A qualified individual is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Holly*, 492 F.3d at 1256.

Essential functions of a job are "'the fundamental job duties of a position that an individual with a disability is actually required to perform.'" *Holly*, 492 F.3d at 1257 (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)). Whether a job function is essential "is evaluated on a case-by-case basis by examining a number of factors" and "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (quoting *Keith*, 703 F.3d at 926); *see also Jernigan*, 17 F. Supp. 3d at 1322. Among the factors a court must consider in determining if a job function is essential are the employer's judgment, "any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience

24

of employees in similar jobs." *Samson*, 746 F.3d at 1201; 29 C.F.R. § 1630.2(n)(3)(ii)-(vii).

Here, where Ms. Geter requested a temporary reduced hours schedule and to temporarily work remotely some days, Schneider insists that working full-time and working in the office were essential functions of Ms. Geter's job, which her requested accommodations would have rendered her unable to perform. Further, because Ms. Geter acknowledged that she has struggled with fast-paced, high-pressure work, Schneider asserts that fast-paced, high-pressure work is an essential function that Ms. Geter's temporary request for accommodations made her unable to perform. However, working full-time and working in the office were not essential functions of the APM job, so Ms. Geter could have still performed the essential functions of the job with her requested accommodations, and Ms. Geter could and did successfully perform fast-paced, high-pressure work both with and without an accommodation through her employment.

## 1. *Full-time work is not an essential function of the APM position.*

In erroneously concluding that Ms. Geter was not a qualified individual, the District Court focused exclusively on whether full-time work was an essential function of the APM position. However, whether full-time work is an essential function of the job is a disputed issue of material fact in this case and is not "suitable for resolution on a motion for summary judgment." *Samson*, 746 F.3d at 1201.

25

Contrary to the District Court's conclusions, when the evidence of record is viewed in its totality and in the light most favorable to Ms. Geter, the evidence establishes that full-time work was not an essential function of Ms. Geter's position.

### a.    The job description and Schneider's "judgment."

The job description written by Schneider does not include full-time work as an essential function of the APM job, and substantial evidence supports that it is not. (Doc. 46-4, pp. 73-74.) As acknowledged by the District Court, this omission weighs in favor of Ms. Geter as evidence of the essential functions of the job because "[t]hat a job description is not exhaustive does not give an employer carte blanche to retroactively expand a position's essential functions." (Doc. 61, pp. 6-7, citing *Snead v. Fla. Agric. & Mech. Univ. Bd. Of Trs.*, 724 Fed. Appx. 842, 845 (11th Cir. 2018)).

Ms. Geter acknowledges that "'consideration shall be given to the employer's judgment as to what functions of a job are essential, **and** if an employer has prepared a written description before advertising or interviewing applicants for the job, **this description shall be considered evidence of the essential functions of the job**.'" *Holly.*, 492 F.3d at 1257 (quoting 42 U.S.C. § 12111(8) (emphasis added); *D'Angelo v. Conagra Foods*, 422 F.3d 1220, 1230 (11th Cir. 2005)). "Because these written descriptions are evidence of the employer's judgment regarding which functions of a job are essential, [the court] must give them substantial weight." *Medearis v. CVS Pharm., Inc.*, 646 Fed. Appx. 891, 896 (11th Cir. 2016) (citations omitted). Here,

26

Schneider has a written job description that controls, the job description does not identify full-time work as an essential function of the APM job, and the job description is strong evidence that Schneider does not consider full-time work an essential function of the APM job. (Doc. 46-4, pp. 73-74.)

Although "[t]he employer's judgment as to which functions are essential" is "entitled to substantial weight in the calculus, the employer's judgment alone is not conclusive." *See Samson*, 746 F.3d at 1201 (citing 29 C.F.R. § 1630.2(n)(3)(i) and *Holly*, 492 F.3d at 1258). If Schneider's judgment was conclusive:

> then an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate that employers 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity.

*Samson*, 746 F.3d at 1201 (citations omitted) (alteration in original).

Although not recognized by the District Court, there is nothing unique about the APM job that necessitates that APMs work full-time. And Schneider has produced no evidence indicating that full-time work is a specific requirement of the APM position – other than its own unsupported assertions, which a jury is not required to believe. *Reeves*, 530 U.S. at 150-51. Reading such a requirement into the APM role when it is specifically absent from the job description and inconsistent with and directly contradicted by Schneider's Flexible Work Arrangement and

Remote Work policies would violate the provision of the ADA describing "reasonable accommodation[s]" as including "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C. § 12111(9)(b).

Because the job description for the APM position prepared by Schneider is substantial evidence that in Schneider's judgment full-time work is not an essential function of the APM position, the District Court erroneously concluded that this factor weighs in Schneider's favor when, in fact, it weighs in favor of the conclusion that Ms. Geter is a qualified individual. (Doc. 61, pp. 7, 14-16.)

### b.   Schneider's Flexible Work Arrangement policy.

That Schneider maintains a FWA policy under which employees are permitted to work reduced hours and remotely is also strong evidence of Schneider's judgment that full-time work is not an essential function of the APM position. (Doc. 47-3, 17:17-18:7; Doc. 47-6, 33:1-34:7; Doc. 50-6.) Under the policy – which is applied on a case-by-case basis just like the ADA in the failure to accommodate context – flexible work arrangements available to employees include: a "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Doc. 50-6.) Reduced hours work is both permissible and possible at Schneider. (*Id.*) The absence of a full-time work requirement in Schneider's APM job description is particularly compelling evidence

28

that in Schneider's judgment full-time work is not required. There is no reason to believe APMs would be exempt from this clear policy permitting flexible work arrangements for reduced hours. Thus, a jury could easily conclude that the existence of this Schneider-drafted policy is strong evidence that Ms. Geter is a qualified individual, and that Schneider could – and should – have granted Ms. Geter's requested accommodation.

However, by making inferences in Schneider's favor, disregarding binding Eleventh Circuit authority as inapplicable, and failing to properly apply the ADA, the District Court erroneously determined that Schneider's FWA policy is, at best, a neutral factor in the essential functions analysis. (Doc. 61, pp. 8-9.) In reaching this erroneous conclusion, the District Court failed to acknowledge or give any weight to the fact that under the ADA, Schneider is required to provide preferences to disabled employees like Ms. Geter to accommodate their disabilities even if the "special treatment" may not benefit Schneider. *Holly*, 492 F.3d at 1262-63. Specifically,

> [b]y definition any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the 'reasonable accommodation' provision could not accomplish its intended objective."

*Id.* at 1262-63 (11th Cir. 2007) (citations omitted); *see also Garcia-Ayala v. Lederle*

*Parenterals, Inc.*, 212 F.3d 638, 647-48 (1st Cir. 2000) (requiring an "individualized assessment" of plaintiff's need for leave beyond that allowed under company's policy); EEOC Enforcement Guidance, Question 22 ("An employer must provide a modified or part-time schedule when required as a reasonable accommodation, absent undue hardship, even if it does not provide such schedules for other employees.") A reasonable accommodation necessarily requires that rules and policies applied to nondisabled employees be adjusted for disabled employees. *Id.* More importantly, the fact that the FWA policy is permissive rather than mandatory as the policy was in *Holly* cuts in favor of Ms. Geter and not against her as the District Court concluded because the FWA policy is applied on a case-by-case basis just as accommodations are under the ADA. And the fact that Schneider allows nondisabled employees flexible work arrangements on a case-by-case basis establishes that the same arrangements could easily be provided to disabled employees like Ms. Geter as a reasonable accommodation under the ADA,

As such, the existence of the FWA policy, which is undisputed, supports Ms. Geter's position that temporary reduced hours are permissible to all employees at Schneider on a case-by-case basis and that working full-time is not an essential function of the APM position. Schneider has failed to explain why, if working full-time was essential to the APM position, it would even have this policy, which contains no carve-out for APMs or any indication that it would not apply to APMs

just as it does to other employees. Further, there is no explanation for Schneider's decision to adopt such a policy if temporarily accommodating reduced hours would be an undue hardship for Schneider; this policy clearly reflects the employer's judgment that full-time work is not an essential function of the job.

### c.    The work experience of other APMs.

The District Court also erroneously concluded that other Schneider employees' work experience cuts in favor of Schneider in the essential functions analysis. (Doc. 61, pp. 8-10.) In doing so, the District Court construed disputed facts in Schneider's favor, claimed that disputed facts were undisputed, and erroneously resolved a hearsay issue.

Rather, the work experiences of other employees working as APMs around the same time as Ms. Geter establishes that full-time work was not an essential function of the position. For example, record evidence establishes that APM Kopf testified that she was aware that Schneider employees were permitted to work part-time, which cuts in favor of the denial of summary judgment. (Doc. 47-4, 13:1-20, 14:5-21, 26:24-28:2.)

And the disputed fact that Ms. Geter's supervisor, Mr. Torrence, took off between 80 and 82 days in 2018 must be presumed true for purposes of summary judgment. (Doc. 47-1, 216:17-217:4; Doc. 47-2, 59:22-60:12; Doc. 50-3, ¶ 10; Doc. 50-4, ¶ 6.) Contrary to the District Court's contention, it is not that Mr. Torrence

31

cannot dispute this evidence, but rather that he has not disputed this evidence other than saying he does not believe it is accurate. (Compare Doc. 61, p. 10 to Doc. 47-1, 216:17-217:4; Doc. 50-3, ¶ 10; Doc. 50-4, ¶ 6; Doc. 47-2, 59:22-60:12; Doc. 52, pp. 86-87.) Certainly if Mr. Torrence was not absent almost 1/3 of the working year, he would be able to dispute this fact head on and be able to provide documentation to the contrary – he did not. Nor did Schneider produce records at summary judgment directly disputing this fact – because likely Schneider's business records would have supported that Mr. Torrence was routinely absent. (*Id.*)

Moreover, contrary to Schneider's contention and the District Court's order, Ms. Geter and APM Williams have personal knowledge of Mr. Torrence's schedule because they viewed the Fairburn office calendar, that is created by Schneider and to which all employees had viewing access, and the calendar noted all employees' days off. (Doc. 50-3, ¶ 10; Doc. 50-4, ¶ 6.) While Schneider contends, and the District Court accepted, that Ms. Geter's and Ms. Williams' statements about what they viewed on a calendar that Schneider itself created and made available to everyone in the office, is hearsay, it is admissible in analyzing summary judgment even if it is hearsay because it can be reduced to admissible evidence at trial through both the testimony of Mr. Torrence and the use of Schneider's business records, which are not hearsay at all under the business records exception to the hearsay rule, Fed. R. Evid. 803(6)). *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Church*

*of Scientology v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993); *Wright v. Southland*, 187 F.3d 1287, 1304 fn. 21 (11th Cir. 1999). And contrary to the District Court's conclusion, this evidence is not offered as comparator evidence, but is simply being offered to show that Schneider's contention that it did not permit employees in the Fairburn hub to work part-time is flatly false.

The District Court's conclusions on this point also ignore that Ms. Geter's request for reduced hours was temporary and that the FWA policy specifically provides for reduced hours as a potential flexible work arrangement. The work experience of APMs working part-time is disputed, and at summary judgment, disputed facts must be taken in Ms. Geter's favor as the non-movant. Record evidence, taken in the light most favorable to Ms. Geter, shows that a jury could reasonably determine that full-time work was not an essential function of the APM position.

> **d.     The consequences of allowing Ms. Geter to temporarily work reduced hours.**

Ms. Geter requested to temporarily work three days (thirty hours) per week instead of four days (forty hours) per week from January 2, 2019 through June 5, 2019. Ms. Geter worked the reduced hours from January 2, 2019 through her termination in April 2019 with no issues. Although Mr. Torrence may have covered for Ms. Geter sporadically, he certainly did not do so on a weekly basis, and his assertion to the contrary is false.

33

Rather, when Ms. Geter was on FMLA, her shifts were primarily covered by Mr. Seymour and Ms. Williams and were rarely, if at all, covered by Mr. Torrence. (Doc. 50-4, ¶ 9.) When Ms. Geter worked her reduced hours schedule, Mr. Seymour and Ms. Williams covered her Sunday shifts and, occasionally, Mr. Torrence would sub in. (Doc. 47-1, 137:10-140:4, 182:23-184:17; Doc. 50-4, ¶ 8.) And Mr. Torrence himself worked part-time throughout 2018 with no repercussions. (Doc. 47-1, 216:17-217:4; Doc. 50-3, ¶ 10; Doc. 47-2, 59:22-60:12.)

While it is undisputed that other employees worked the shifts that Ms. Geter could not while she required a temporary accommodation of seventy-five percent work, there is no evidence in the record at all that any of these employees were required to work overtime to do so or that there was any financial impact to Schneider at all. Rather, there is evidence that employees had to work harder on their scheduled shifts if other employees were absent, not that they worked more. And Schneider routinely transferred or temporarily assigned employees between shifts to cover for each other. (Doc. 47-2, 16:1-24; Doc. 47-4, 9:12-18.) Thus, the District Court's conclusion that this factor weighs in favor of Schneider on whether full-time employment was an essential function of the APM job was erroneous. (Doc. 61, p. 14.)

### 2.    *In-person work is not an essential function either.*

The District Court did not analyze discuss in-person work as an essential function of the APM position, perhaps because the record evidence so overwhelmingly supports that in-person work was not an essential function of the APM job. However, in the interest of caution, Ms. Geter provides the evidence supporting that in-person work is not an essential function of the APM position here.

### a.    The job description and Schneider's "judgment."

For the same reasons that the APM job description is strong evidence that in Schneider's judgment full-time work is not an essential function of the APM position, it also establishes that in-person work is not an essential function of the APM position. (*See* Section I.A.1.a., above.) The job description does not include in-person work as an essential function of the APM job, and substantial evidence supports that it is not.

While the R&R acknowledges that Schneider does not assert anywhere in the APM job description that working in the office is an essential function of the position, it erroneously concluded that it was. (Doc. 53, pp. 43-44.) For the same reasons recognized by the District Court in concluding that the job description weighs in favor of Ms. Geter on the full-time work issue, "the job description is a factor that weighs more in Plaintiff's than Defendant's favor" on this issue. (Doc. 61, p. 7.)

Schneider's judgment that in-person work is not a requirement of the APM position is further supported by the undisputed evidence of Schneider's judgment that came directly from Travis Torrence. Both the R&R and the District Court completely ignored that in February 2019, Mr. Torrence specifically told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because **"everyone did it,"** and Mr. Torrence does not dispute making this statement. (Doc. 47-1, 147:1-151:12, 209:18-210:7, 210:19-211:14; Doc. 47-2, 57:11-21; Doc. 47-4, 14:5-21; Doc. 47-5,19:1-11; Doc. 50-4, ¶ 14.) Because "[w]hen considering the employer's judgment, courts will look to . . . testimony from the plaintiff's supervisor," this evidence supports no other conclusion than that in Schneider's judgment in-person work is not an essential function of the job. *Webb v. Wynne*, No. 2:07-cv-471-ID, 2008 WL 4831740, at *6 (M.D. Ala. Nov. 3, 2008).

### b.    Schneider's FWA and Remote Work policies.

Again, as set forth in full detail in Section I.A.1.b. above, Schneider's FWA and Remote Work policies expressly permit employees to work remotely. (Doc. 47-3, 17:17-18:7; Doc. 47-6, 33:1-34:7; Doc. 50-6.) Thus, the R&R erroneously concluded that Schneider's FWA and Remote Work policies support Schneider's position rather than Ms. Geter's. (Doc. 53, pp. 44-46.) Schneider's policies support that in Schneider's judgment, in-office work was not an essential function of the APM position.

36

### c.    The work experience of other APMs.

Contrary to the R&R's conclusions, substantial record evidence, taken in Ms. Geter's favor, shows that working from the office was not an essential function of the APM position. That evidence includes: (1) as an APM, it was not necessary for Ms. Geter to be in the office to support drivers, because she assisted drivers initially as far away as Canada and, after 2016, throughout the southeast (compare Doc. 47-1, 59:2-60:12; Doc. 50-4, ¶ 11 to Doc. 53, p. 46); (2) as an APM, Ms. Geter supported drivers in Atlanta, Charlotte, Miami, Orlando, Jacksonville, and Savannah by taking calls and messages from drivers (Doc. 47-1, 55:3-12.); (3) the only drivers Ms. Geter ever saw face-to-face from time-to-time were the 0.05 percent based in Atlanta – from 100 to 110 of the 2,250 drivers she assisted (compare Doc. 47-1, 55:13-56:7; Doc. 50-4, ¶ 11 to Doc. 53, pp. 46-47); (4) APMs located trailers throughout the southeast for drivers remotely using GPS software maintained by Schneider (compare Doc. 50-3, ¶ 14; Doc. 50-4, ¶ 12 to Doc. 53, p. 47); (5) for all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access (compare Doc. 50-3, ¶ 14; Doc. 50-4, ¶ 12 to Doc. 53, pp. 47-48); and (6) for drivers outside Atlanta, Ms. Geter printed paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had access, and she could do the same for Atlanta drivers when she worked from home (compare Doc. 50-3, ¶ 15; Doc. 50-4, ¶ 13 to Doc. 53, pp. 47-48).

37

In addition, the entire time Ms. Geter worked for Schneider, everyone was permitted to work from home as needed, and it was common for APMs to work from home. (Doc. 47-1, 209:18-210:7, 210:19-211:14; Doc. 47-4, 14:5-21; Doc, 47-5, 19:1-11; Doc. 50-4, ¶ 14.) The evidence taken in Ms. Geter's favor shows that APM Kitchens was permitted to continuously work remotely for at least four months while her mother was ill and is still employed by Schneider. (Doc. 47-1, 198:6-199:1, 199:9-203:21, 204:12-205:10, 217:17-218:18, Doc. 47-5, 8:1-24, 15:15-18:15; Doc. 47-2, 17:18-21; Doc. 47-6, 34:21-36:5.) The R&R claims Ms. Geter overstated Ms. Kitchens' four months of remote work, but Ms. Kitchens testified to working remotely during this time, and Ms. Biskey-Rose stated only that it was not her recollection. (*Id.*) Thus, that Ms. Kitchens was permitted to work remotely for four months straight, not for four months as needed, is a disputed fact that must be taken in Ms. Geter's favor.

And importantly, Mr. Torrence explicitly told Ms. Geter that it was fine for her to work from home because "everyone did it." (Doc. 47-1, 147:1-151:12, 209:18-210:7, 210:19-211:14; Doc. 47-2, 57:11-21; Doc. 47-4, 14:5-21; Doc. 47-5, 19:1-11; Doc. 50-4, ¶ 14.) Also, APM Kopf testified that she was aware that Schneider employees were permitted to work remotely. (Doc. 47-4, 13:1-20.) Moreover, even before Schneider moved all APMs to Green Bay to perform APM duties for the southeast remotely, APMs could locate trucks remotely by GPS and print driver

paperwork remotely, and drivers had direct access to keys at all the hubs except Fairburn. (Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.)

Regarding the issue of "the consequences of not requiring the employee to perform the function . . . *See* 29 C.F.R. § 1630.2(n)(3)(iv)," the R&R speculated that "the consequences of permitting Plaintiff to work from home as an APM on the third shift when she was scheduled to work alone would be that no one was present in the office to find trucks, obtain keys, or print paperwork for drivers when the need arose." (Doc. 53, p. 49.) However, there is no record evidence that any of these hypothetical issues happened even once, and it is undisputed that, from February to April, Ms. Geter worked from home when she was scheduled to work alone. (Doc. 47-1, 147:1-151:12; Doc. 47-2, 57:11-21.)

### d.    The current work experience of APMs.

The ADA requires that the current experience of employees be considered in determining the essential functions of a position. *Samson*, 746 F.3d at 1201; 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)). The R&R utterly downplays that the evidence that Schneider relocated all APMs to Green Bay to dispatch drivers remotely throughout the country and that APMs worked remotely throughout the pandemic shows that it is possible for APMs to perform their jobs, including all essential functions, remotely. The ADA requires that the current experience of employees be considered, and though the R&R dismisses them, these facts are relevant in determining that

39

summary judgment should have been denied.

Since Ms. Geter's termination, in March or April 2020, Schneider permanently relocated all APMs, including those previously based in Fairburn, to the corporate headquarters in Green Bay, Wisconsin. (Doc. 47-2, 15:10-12, 18:22-19:11, 25:15-21; Doc. 47-3, 20:10-21:25, 46:6-47:9; Doc. 47-4, 11:10-14; Doc. 47-5, 12:11-23; Doc. 47-6, 20:3-25:5.) The move was done to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (*Id.*) Most of the duties APMs like Ms. Geter previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeastern hub. (Doc. 47-2, 18:22-19:5, 30:8-32:3; Doc. 47-4, 16:17-17:1, 28:11-14.) Moreover, as shown above, APMs can locate trucks remotely by GPS, print driver paperwork remotely, and all the hubs except Fairburn gave drivers direct access to keys. (Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.) This evidence cuts in favor of the denial of summary judgment.

In addition, all the employees employed by Schneider in Fairburn (other than the over-the-road drivers), worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and only returned to the office full-time in March 2021. (Doc. 47-2, 25:22-29:25, 30:14-25; Doc. 47-3,

40

25:10-16; Doc. 47-4, 17:2-18:2; Doc. 47-5, 14:23-15:14; Doc. 47-6, 29:9-15.) To accommodate the change with the staff working remotely, the printer has been moved to the driver's lounge and remains in the driver's lounge, and the driver key box is no longer behind locked doors, so the drivers have direct access to the printer and keys at Fairburn just like they have always had at the other southeastern hubs. (Doc. 47-5, 22:2-23:8; Doc. 47-6, 28:19-29:8, 29:16-31:1; Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.)

While the R&R asserts that this is irrelevant to whether Schneider could have accommodated Ms. Geter at the time, there is no record evidence (other than Schneider's supposed preference, which is irrelevant to the analysis, as it does not excuse Schneider's failure to accommodate Ms. Geter) that the printer could not have been moved sooner, just like it was in the other hubs supported by Ms. Geter; no record evidence (other than Schneider simply not doing it) that the keys could not have been relocated to the driver lounge in a combination box just as they were in all the other hubs; and no record evidence that APMs could not locate trucks remotely through GPS, which in fact they always did. (Compare Doc. 50-3, ¶ 14; Doc. 50-4, ¶ 12 to Doc. 53, p. 47). Since one of the factors to be considered in whether job functions are essential is how those functions have been performed in the past and are currently performed, this factor again weighs against Schneider, shows that Ms. Geter was a qualified individual, and weighs in favor of the denial

41

of summary judgment.

### 3.    *Ms. Geter successfully performed fast-paced, high-pressure work throughout her employment.*

To the extent Schneider asserts that Ms. Geter could not perform the essential function of fast-paced, high-pressure work, record evidence shows that this is simply false, and the R&R erroneously concluded otherwise. (Doc. 53, pp. 56-57, fn. 23.) Although Ms. Geter acknowledges that she had trouble working in a fast-paced, high-pressure environment throughout her employment with Schneider, it is undisputed that she did so effectively without an accommodation through 2018 and continued to do so with her accommodations in 2019. (Doc. 47-1, 189:2-20; Doc. 50-3, ¶¶ 22-24.)

### 4.    *Based on all the above, Ms. Geter easily establishes that she is a qualified individual.*

The District Court erroneously concluded that full-time work was an essential function of the APM job and, thus, Ms. Geter was not a qualified individual. The R&R erroneously concluded that both in-person work and full-time work were essential functions of the APM position and, as such, Ms. Geter was not a qualified individual. The R&R improperly emphasized that "Schneider's preference was that the employees work from the office." (Doc. 53, pp. 52.) The District Court similarly focused on the employer's assertions and gave insufficient weight to the other key factors weighing in favor of Ms. Geter or, at the very least, presenting a genuine

issue of fact that a jury should resolve. Taking the facts in Ms. Geter's favor, a jury could reasonably weigh these factors and make credibility determinations differently to determine that full-time and in-person work were not essential functions of the APM position, that Ms. Geter could perform all the actual essential functions of the APM position with her requested accommodations, and that Ms. Geter is therefore a qualified individual with a disability.

As such, based on all the above, and contrary to the R&R's and District Court's conclusions, significant evidence in this case establishes that neither working full-time nor working in the office are essential functions of the APM position. *See Lewis*, 934 F.3d 1169, 1182-83 (reversing district court conclusion that plaintiff was not qualified under the ADA based on job description and other evidence); *Samson*, 746 F.3d at 1202-03 (reversing summary judgment on qualified individual issue); *Holly*, 492 F.3d at 1261 (reversing district court because of genuine issue of fact as to whether punctuality was essential function of job); *Jernigan*, 17 F. Supp. 3d at 1322 (plaintiff qualified based on job description and other evidence); *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1378-79 (N.D. Ga. 2012) (triable issue of fact as to whether plaintiff was qualified under the ADA despite absenteeism). Accordingly, Ms. Geter is a qualified individual with a disability because she can show that she is capable of performing the essential functions of the APM position with her requested accommodations, the R&R should

43

have been rejected, and the District Court should be reversed.

### B.    Ms. Geter's Accommodation Requests Were Reasonable and Would Have Enabled Her to Perform the Essential Functions of the APM Job.

Whether an employee is "qualified" depends on available reasonable accommodations. An accommodation is "reasonable" under the ADA if it enables the employee to perform the essential functions of the job. *Lucas*, 257 F.3d at 1259-60; *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *see also* 29 C.F.R. § 1630.2(o)(1)(ii). What constitutes a reasonable accommodation depends on the circumstances but may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). A failure to accommodate claim "requires no animus" or "discriminatory motivation," and may "result in different treatment for a disabled person than a nondisabled person." *Nadler v. Harvey*, No. 06-12692, 2007 U.S. App. LEXIS 20272, at *4, 8 (11th Cir. 2007).

### 1.    *Temporarily reduced hours.*

Schneider asserts and the R&R accepts that Ms. Geter's request to temporarily work seventy-five percent reduced hours from April 2019 through June 5, 2019 was unreasonable. In asserting that this request was unreasonable, the R&R and Schneider ignore several important considerations. First, and most importantly, as shown above, working full-time was not an essential function of the APM position

44

and, in fact, Schneider has a policy under which its employees may seek permission to work flexible or reduced hours. (Doc. 50-6.) Second, Ms. Geter worked reduced hours from January 2, 2019 through her termination in April 2019 with no issues. Although Mr. Torrence may have covered for Ms. Geter sporadically, he certainly did not do so on a weekly basis, and his assertion to the contrary is false, though it appears that the R&R accepted it. (Doc. 53, p. 58.) Rather, Ms. Geter's shifts were primarily covered by Mr. Seymour and Ms. Williams and were rarely, if at all, covered by Mr. Torrence. (Doc. 50-4, ¶ 9; Doc. 47-1, 137:10-140:4, 182:23-184:17; Doc. 50-4, ¶ 8.) There is absolutely no evidence that Ms. Geter working full-time caused her coworkers to work more than their scheduled 40 hours per week to cover her, so it could not have been a burden to them[2] – any such allegation is purely speculative and unsupported by any documentary evidence. (Doc. 53, pp. 58-59.)

This case is easily distinguished from the cases relied on by the R&R and Schneider in support of the position that temporarily working reduced hours is not a reasonable accommodation. (Doc. 46-1, p. 15; Doc. 53, pp. 58-66.) As working full-time was not an essential function of the APM job, when Ms. Geter temporarily worked reduced hours, she was still performing all the essential functions of her job

---

[2] These arguments are inappropriate in a reasonable accommodation analysis; they would be more appropriate in an undue burden analysis. However, it is undisputed that Schneider never performed an undue burden analysis. Therefore, Schneider does not get the benefit of that affirmative defense at summary judgment.

– contrary to the R&R's conclusions otherwise. Unlike the plaintiff in *Medearis v. CVS Pharmacy*, 92 F. Supp. 3d 1294, 1305 (N.D. Ga. 2014), Ms. Geter did not seek to have a duty removed. Instead, Ms. Geter needed to work reduced hours temporarily until her planned return to full-time work on June 5, 2019.[3] (Doc. 46-4, pp. 94-95, 96-98; Doc. 47-1, 160:10-162:13; Doc. 47-2, 52:6-9; Doc. 47-3, 42:12-25; Doc. 46-4, pp. 96-98.) Thus, Ms. Geter's requested accommodation to continue to work her reduced hours schedule through June 5 was reasonable.

### 2.    *Remote work.*

In February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Doc. 47-1, 147:1-151:12, 209:18-210:7, 210:19-211:14; Doc. 47-2, 57:11-21; Doc. 47-4, 14:5-21; Doc. 47-5, 19:1-11; Doc. 50-4, ¶ 14.) Nowhere in the R&R or the District Court opinion is this statement addressed or even mentioned, even though it is undisputed. In addition, consistent with the standard cited by the R&R, "[w]hen considering the employer's judgment, courts will look to . . . testimony from the plaintiff's supervisor." *Webb v. Wynne*, No. 2:07-cv-471-ID, 2008 WL 4831740, at *6 (M.D. Ala. Nov. 3, 2008).

---

[3] On March 30, 2019. Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019 and believed that there was a ninety-five percent chance that Ms. Geter would then be able to return to full duty. (Doc. 47-2, 52:6-9; Doc. 47-1, 160:10-162:13; Doc. 46-4, pp. 96-98; Doc. 47-3, 42:12-25.)

That Mr. Torrence made this statement is undisputed. It is also undisputed that Ms. Geter worked from home when she was scheduled to work alone from February to April, without issues. (Doc. 47-1, 147:1-151:12; Doc. 47-2, 57:11-21.) The entire time Ms. Geter worked for Schneider, the entire staff was permitted to work from home as needed, and it was common for APMs to do so. Ms. Kitchens worked full-time remotely for at least four months while her mother was ill, APM Williams worked from home regularly throughout the later part of her pregnancy, the APMs all perform their jobs remotely now, and everyone except the drivers worked remotely during the pandemic. (Doc. 47-1, 198:6-199:1, 199:9-203:21, 204:12-205:10, 217:17-218:18, Doc. 47-5, 8:1-24, 12:11-23, 14:23-18:15; Doc. 47-2, 15:10-12, 16:18-21, 18:22-19:15, 25:15-29:25, 30:14-25, 31:8-32:3; Doc. 47-3, 20:10-21:25, 25:10-16, 46:6-47:9; Doc. 47-4, 11:10-14, 16:17-18:2, 28:11-14; Doc. 47-6, 20:3-23:5, 29:9-15, 34:21-36:5; Doc. 50-4, ¶ 10.) To accommodate the change in the staff working remotely, Schneider gave the 100 Atlanta drivers direct access to the printer and truck keys, which the 2,150 other southeastern drivers always had at the other southeastern hubs. (Doc. 47-5, 22:2-23:8; Doc. 47-6, 28:19-29:8, 29:16-31:1; Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.) The substantial evidence that working remotely is a routine practice for APMs and other Schneider employees establishes that a jury could easily conclude that Ms. Geter's request to work from home when she was scheduled to work alone was reasonable, the District Court should have

47

rejected the R&R on this issue, and summary judgment should have been denied.

### 3.    *Schneider did not offer other accommodations.*

Other than one conversation in which Ms. Biskey-Rose asked if Ms. Geter could switch her Monday group therapy session and Ms. Geter told her it was not possible, nobody from Schneider discussed any other possible accommodations with Ms. Geter before deciding to no longer accommodate her. (Doc. 50-3, ¶ 19; Doc. 47-2, 55:12-16, 56:9-57:10, 61:23-62:2; Doc. 47-3, 27:12-16.) Other accommodations were possible and would have been reasonable if Schneider had bothered to consider them.

For example, if Schneider had offered Ms. Geter a transfer to second shift as an accommodation, she would have accepted the offer. (Doc. 50-3, ¶ 20.) Moreover, during Ms. Geter's employment, Schneider used temporary employees to fill in as APMs; Ms. Geter often trained those employees. (Doc 47-1, 78:16-25, 79:8-19, 132:5-24, 133:6-15, 139:22-25; Doc. 47-2, 70:2-71:19; Doc 47-3, 9:18-10:1, 44:21-25; Doc. 47-5, 19:12-20:12; Doc. 47-6, 31:15-33:1; Doc. 50-3, ¶ 11.) Yet, Schneider did not even consider bringing a temporary employee in to cover for Ms. Geter temporarily. (Doc 47-3, 45:1-14; Doc. 47-6, 38:6-43:20.)

Nor did Schneider consider placing Ms. Geter on leave through June 5, 2019 as an alternative accommodation. Had it done so, Ms. Geter would have accepted that accommodation. (Doc. 47-6, 38:6-43:20; Doc. 50-3, ¶¶ 19, 21.) Leave of a

definite duration is an accommodation that would have allowed Ms. Geter to return to full duty on June 5, 2019, so even if Ms. Geter was not qualified because of her temporary need to work thirty hours and to temporarily work from home when she was scheduled to work alone, she was still qualified for her position under the ADA because she could have performed the essential functions of her job with temporary reasonable accommodation, and summary judgment should have been denied. *See* 29 C.F.R. Part 1630, App. (discussing § 1630.2(o)); *Garcia-Ayala*, 212 F.3d at 638; *see also Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 878 (9th Cir. 1989) (leave of absence reasonable where no evidence showed undue hardship on the employer).

### C. Ms. Geter Was Entitled to a Reasonable Accommodation, but Schneider Failed to Accommodate Her and Did Not Argue or Prove That Accommodating Her Was an Undue Hardship.

Although there was a clear end date – June 5, 2019 – for Ms. Geter's accommodations request, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter, and Ms. Geter was terminated as a result. (Doc. 47-2, 52:15-53:16.) Thus, Ms. Geter meets her burden of establishing that Schneider failed to accommodate her when it terminated her employment to avoid accommodating her.

Accordingly, the burden then shifted to Schneider to establish its affirmative defense that it would have been an undue burden to accommodate Ms. Geter. Schneider has produced no evidence that it performed an undue hardship analysis in

determining whether to accommodate Ms. Geter. (Doc. 47-2, 68:2-71:19; Doc 47-3, 16:6-17:4; Doc. 47-6, 38:6-43:20.) Schneider also did not make an undue burden argument in its summary judgment brief. Thus, the argument was waived.

However, the R&R attempted to make the argument on Schneider's behalf. *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009) (*See* Doc. 47-2, 68:2-71:19; Doc. 47-3, 16:6-17:4; Doc. 47-6, 38:6-43:20; Doc. 53, pp. 67-71). The R&R went to great lengths to explain why relocating the APMs and permitting them to work from home required "significant adjustments to Schneider's operations." (*Id.*) But since Schneider failed to meet its burden of proof on this affirmative defense, summary judgment should have been denied. *See Coker v. Enhanced Senior Living, Inc.*, No. 2:11-CV-0091-RWS, 2012 WL 4326429, *9 (N.D. Ga. Sept. 18, 2012) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *Jernigan*, 17 F. Supp. 3d at 1324; *Hill v. Clayton Cnty. Sch. Dist.*, 619 F. App'x 916, 921-22 (11th Cir. 2015) (reversing grant of summary judgment where defendant made "spare assertions" of undue hardship). Rather than rescuing Schneider with an undue burden analysis, the R&R should have denied summary judgment on the failure to accommodate claim.

Because the facts and case law, construed in Ms. Geter's favor as the non-movant, establish that Ms. Geter was a qualified individual at the relevant time and that Schneider unlawfully failed and refused to accommodate her, summary

judgment should have been denied on Ms. Geter's failure to accommodate claim, and the District Court must be reversed.

## II.    Schneider Discriminated and Retaliated Against Ms. Geter in Violation of the ADA when it Terminated Her Employment.

### A.    Ms. Geter Establishes a Prima Facie Case of Disability Discrimination.

In analyzing disability discrimination claims, courts use the same *McDonnell Douglas* burden-shifting analysis used in Title VII cases. *Holly*, 492 F.3d at 1255. Contrary to the District Court's conclusion and as elaborated in detail above, Ms. Geter established a prima facie case of disability discrimination because: (1) it is undisputed that she is disabled; (2) record evidence established that she was a "qualified individual" at the relevant time; and (3) it is undisputed that Ms. Geter was terminated because she needed an accommodation for her disability. *Id.* at 1256; *Lewis*, 934 F.3d 1184; 42 U.S.C. § 12112(b)(1) & (5). For her ADA discrimination claim, Ms. Geter is not required to identify a nondisabled employee who was treated better than she, and the R&R's suggestion otherwise ignores this precedent. (Doc. 53, p. 79.) Because, as shown above, Ms. Geter established that she was a qualified individual with a disability, Ms. Geter establishes her prima facie case, and the District Court must be reversed on this point. (Doc. 61, pp. 18-19.)

51

**B.     As Concluded By the R&R and the District Court, Ms. Geter Establishes a Prima Facie Case of ADA Retaliation.**

The ADA prohibits "retaliation against an employee based on her insistence upon her rights under the ADA." *Norman v. S. Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1336, 1332-33 (M.D. Ala. 2002). As the District Court and R&R concluded, Ms. Geter established a prima facie case of retaliation under the ADA because she established that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. (Doc. 61, p. 19 adopting Doc. 53, pp. 82-87.)

**C.     Any Alleged Reason for the Termination is Pretext for Illegal Discrimination and Retaliation.**

Because Ms. Geter establishes prima facie cases of disability discrimination and retaliation under the ADA, the burden shifted to Schneider to articulate a legitimate reason for its actions. As its excuse for terminating Ms. Geter, Schneider again alleged that Ms. Geter was unable to perform the essential functions of her job because she needed the temporary, short-term accommodations to work reduced hours and to occasionally work remotely. This is simply false as addressed at length above.

Ms. Geter can demonstrate pretext either by showing that a discriminatory reason more than likely motivated the employer or by showing that the proffered

reason for the decision is not worthy of belief. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1998). The former showing relies on evidence of the decision maker's discriminatory or retaliatory motive. As to the latter method,

> [t]he district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct. The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Evidence of pretext bars summary judgment.

Because, as shown above, Ms. Geter was, in fact, capable of performing the essential functions of her job with her requested reasonable accommodations, Ms. Geter has shown that any reason for terminating her employment rather than allowing her the benefit of reasonable accommodations is pretext for discrimination and retaliation, summary judgment should have been denied as to her claims, and the District Court must be reversed.

## CONCLUSION

The District Court mistakenly concludes that a reasonable jury could not as a matter of law find in Ms. Geter's favor on her claims, despite compelling evidence supporting her claims sufficient for a jury to find in her favor. For the reasons set

forth above, Ms. Geter respectfully requests that this Court reverse the District Court's order granting Schneider summary judgment on her failure to accommodate and disability discrimination and retaliation claims under the ADA and, instead, deny summary judgment to Schneider on these claims. Based on the record evidence, as described in detail above, Ms. Geter is entitled to a jury trial because "the witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Tolan v. Cotton*, 134 S. Ct. 1861, 1867 (2014).

      Respectfully submitted this 24th day of June 2022.

                   LEGARE, ATTWOOD & WOLFE, LLC

                   *s/ Cheryl B. Legare*
                   Cheryl B. Legare
                   Georgia Bar No. 038553
                   cblegare@law-llc.com
                   Camille D. Jones
                   Georgia Bar No. 612930
                   cdjones@law-llc.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Appellant hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,671 words. This brief was prepared with MS Word, Times New Roman, 14 point type.

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Camille D. Jones
Georgia Bar No. 612930
cdjones@law-llc.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 24th day of June 2022 served copies of

**Appellant Cierra Geter's Opening Brief** upon the parties listed below by

electronic mail and by depositing copies of the same in the United States mail, with

sufficient postage thereon, addressed to:

M. Laughlin Allen
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534

Peter A. Milianti
Melissa M. Weiss
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601

Matthew A. Fitzgerald
McGuireWoods LLP
Gateway Plaza, 800 East Canal Street
Richmond, VA 23219-3916

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Camille D. Jones
Georgia Bar No. 612930
cdjones@law-llc.com

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212