# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## CASE NO. 22-11285-BB

---

CIERRA GETER,

*Plaintiff-Appellant*,

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

---

## APPELLANT'S APPENDIX – VOL. I

---

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

Eleventh Circuit Court of Appeals Case No. 22-11285-BB

Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B | | | Certificate of Service |

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01148-SCJ

Geter v. Schneider National Carriers, Inc.                   Date Filed: 03/17/2020
Assigned to: Judge Steve C. Jones                            Date Terminated: 03/21/2022
Case in other court:  USCA- 11th Circuit, 22-11285-BB        Jury Demand: Plaintiff
Cause: 42:12101 et seq. Americans with Disabilities Act of 1990   Nature of Suit: 445 Civil Rights: Americans
                                                             with Disabilities - Employment
                                                             Jurisdiction: Federal Question

**Plaintiff**

**Cierra Geter**                          represented by   **Cheryl Barnes Legare**
                                                          Legare, Attwood & Wolfe, LLC
                                                          Suite 380
                                                          125 Clairemont Avenue
                                                          Decatur, GA 30030
                                                          470-823-4000
                                                          Fax: 470-201-1212.
                                                          Email: cblegare@law-llc.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Schneider National Carriers, Inc.**      represented by   **Melissa M. Weiss**
                                                          McGuire Woods-IL
                                                          Suite 4100
                                                          77 West Wacker Drive
                                                          Chicago, IL 60601-1818
                                                          312-849-8185
                                                          Email: mweiss@mcguirewoods.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Peter A. Milianti**
                                                          McGuire Woods-IL
                                                          Suite 4100
                                                          77 West Wacker Drive
                                                          Chicago, IL 60601-1818
                                                          312-849-8100
                                                          Email: pmilianti@mcguirewoods.com
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Meredith Laughlin Allen**
                                                          McGuire Woods LLP-GA

230 Peachtree Street, N.E.
Promenade, Suite 2100
Atlanta, GA 30309-3534
404-443-5738
Fax: 404-443-5773
Email: mlallen@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/12/2020 | 1 | COMPLAINT with Jury Demand filed by Cierra Geter. (Filing fee $400.00, receipt number AGANDC-9473541) (Attachments: # 1 Civil Cover Sheet)(eop) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 03/17/2020) |
| 03/13/2020 | 2 | Electronic Summons Issued as to Schneider National Carriers, Inc.. (eop) (Entered: 03/17/2020) |
| 03/20/2020 | 3 | GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 3/16/2020. (bdb) (Entered: 03/20/2020) |
| 03/23/2020 | 4 | Certificate of Interested Persons by Cierra Geter. (Legare, Cheryl) (Entered: 03/23/2020) |
| 04/01/2020 | 5 | Amended General Order 20-01 re COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 3/30/20. (dgs) (ADI) (Entered: 04/01/2020) |
| 04/14/2020 | 6 | WAIVER OF SERVICE Returned Executed by Cierra Geter. Schneider National Carriers, Inc. waiver mailed on 4/1/2020, answer due 6/1/2020. (Legare, Cheryl) (Entered: 04/14/2020) |
| 05/04/2020 | 7 | SECOND AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 04/30/2020. (dgs) (ADI) (Entered: 05/04/2020) |
| 05/27/2020 | 8 | THIRD AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 05/26/2020. (aaq) (ADI) (Entered: 05/27/2020) |
| 06/04/2020 | 9 | Corporate Disclosure Statement by Schneider National Carriers, Inc. identifying Corporate Parent Schneider National Inc. for Schneider National Carriers, Inc. by Schneider National Carriers, Inc..(Allen, Meredith) (Entered: 06/04/2020) |
| 06/04/2020 | 10 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, by Schneider National Carriers, Inc.. (Attachments: # 1 Text of Proposed Order)(Allen, Meredith) (Entered: 06/04/2020) |
| 06/04/2020 | 11 | ORDER granting 10 Motion for Extension of Time, through and including June 8, 2020, for Defendant Schneider National Carriers, Inc. to respond to 1 Plaintiff's Complaint. Signed by Magistrate Judge Justin S. Anand on 6/4/2020. (ddm) (Entered: 06/05/2020) |
| 06/08/2020 | 12 | ANSWER to 1 COMPLAINT by Schneider National Carriers, Inc.. Discovery ends on 11/5/2020.(Allen, Meredith) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/08/2020) |

| 07/02/2020 | 13 | FOURTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 07/01/2020. (dgs) (ADI) (Entered: 07/02/2020) |
|---|---|---|
| 07/08/2020 | 14 | JOINT PRELIMINARY REPORT AND DISCOVERY PLAN filed by Cierra Geter. (Legare, Cheryl) (Entered: 07/08/2020) |
| 07/08/2020 | 15 | SCHEDULING ORDER approving the parties' 14 Joint Preliminary Report and Discovery Plan. The discovery period, including discovery from third parties, ends on January 8, 2021. The Court extends the deadline for filing a proposed consolidated pretrial order until forty (40) days after the close of the discovery period, or, in the event that any party files a motion for summary judgment, until thirty (30) days after the district court's final ruling on all pending motions for summary judgment, whichever is later. Signed by Magistrate Judge Justin S. Anand on 7/8/2020. (ddm) (Entered: 07/08/2020) |
| 07/13/2020 | 16 | FIFTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 7/10/2020 (ddm) (ADI) (Entered: 07/13/2020) |
| 07/15/2020 | 17 | Initial Disclosures by Cierra Geter.(Legare, Cheryl) (Entered: 07/15/2020) |
| 07/15/2020 | 18 | CERTIFICATE OF SERVICE *Plaintiff's First Interrogatories to Defendant* by Cierra Geter.(Legare, Cheryl) (Entered: 07/15/2020) |
| 07/15/2020 | 19 | CERTIFICATE OF SERVICE *for Plaintiff's First Requests for Production of Documents to Defendant* by Cierra Geter.(Legare, Cheryl) (Entered: 07/15/2020) |
| 07/15/2020 | 20 | CERTIFICATE OF SERVICE *(Defendant's Initial Disclosures)* by Schneider National Carriers, Inc..(Allen, Meredith) (Entered: 07/15/2020) |
| 07/20/2020 | 21 | CERTIFICATE OF SERVICE *of Discovery (First Interrogatories and First Requests for Production to Plaintiff)* by Schneider National Carriers, Inc..(Allen, Meredith) (Entered: 07/20/2020) |
| 08/04/2020 | 22 | SIXTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 08/03/2020. (jpa) (ADI) (Entered: 08/04/2020) |
| 09/02/2020 | 23 | SEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 9/1/2020. (dgs) (ADI) (Entered: 09/02/2020) |
| 09/18/2020 | 24 | CERTIFICATE OF SERVICE *of Discovery* by Schneider National Carriers, Inc..(Allen, Meredith) (Entered: 09/18/2020) |
| 09/22/2020 | 25 | CERTIFICATE OF SERVICE *serving Plaintiff's Answers and Objections to Defendant's Interrogatories* by Cierra Geter.(Legare, Cheryl) (Entered: 09/22/2020) |
| 09/22/2020 | 26 | CERTIFICATE OF SERVICE *serving Plaintiff's Responses and Objections to Requests to Produce* by Cierra Geter.(Legare, Cheryl) (Entered: 09/22/2020) |
| 09/29/2020 | 27 | EIGHTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 09/28/2020. (aaq) (ADI) (Entered: 09/29/2020) |

| | | |
|---|---|---|
| 10/01/2020 | | Case Reassigned to Judge Steve C. Jones. Judge Orinda D. Evans no longer assigned to case. NOTICE TO ALL COUNSEL OF RECORD: The Judge designation in the civil action number assigned to this case has been changed to 1:20-cv-1148-SCJ. Please make note of this change in order to facilitate the docketing of pleadings in this case. (rlb) (Entered: 10/01/2020) |
| 10/20/2020 | 28 | Joint MOTION for Protective Order by Schneider National Carriers, Inc. (Attachments: # 1 Text of Proposed Order Proposed Consent Confidentiality Order)(Allen, Meredith) Modified on 10/20/2020 (rjs). (Entered: 10/20/2020) |
| 10/20/2020 | 29 | CONSENT CONFIDENTIALITY ORDER granting 28 Motion for Protective Order. Signed by Magistrate Judge Justin S. Anand on 10/20/2020. (rjs) (Entered: 10/20/2020) |
| 12/09/2020 | 30 | NINTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 12/08/2020. (ddm) (ADI) (Entered: 12/09/2020) |
| 12/23/2020 | 31 | Joint MOTION for Extension of Time to Complete Discovery by Schneider National Carriers, Inc.. (Attachments: # 1 Exhibit Exhibit A - Proposed Order)(Allen, Meredith) (Entered: 12/23/2020) |
| 12/23/2020 | 32 | ORDER granting 31 Motion for Extension of Time to Complete Discovery. Discovery ends on 4/8/2021. The parties are advised that, absent extraordinary good cause, there will be no further extensions of discovery. Signed by Magistrate Judge Justin S. Anand on 12/23/2020. (rjs) (Entered: 12/23/2020) |
| 12/29/2020 | 33 | APPLICATION for Admission of Peter A. Milianti Pro Hac Vice (Application fee $ 150, receipt number AGANDC-10543289).by Schneider National Carriers, Inc.. (Allen, Meredith) Documents for this entry are not available for viewing outside the courthouse. (Entered: 12/29/2020) |
| 12/31/2020 | | APPROVAL by Clerks Office re: 33 APPLICATION for Admission of Peter A. Milianti Pro Hac Vice (Application fee $ 150, receipt number AGANDC-10543289). Attorney Peter A. Milianti added appearing on behalf of Schneider National Carriers, Inc. (cdg) (Entered: 12/31/2020) |
| 12/31/2020 | 34 | ORDER granting 33 Application for Admission Pro Hac Vice for Peter A. Milianti. Signed by Judge Steve C. Jones on 12/31/2020. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(rjs) (Entered: 12/31/2020) |
| 01/28/2021 | 35 | TENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 01/27/2021. (mmc) (ADI) (Entered: 01/28/2021) |
| 03/10/2021 | 36 | ELEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 03/09/2021 (mmc) (ADI) (Entered: 03/10/2021) |
| 04/02/2021 | 37 | NOTICE to Take Deposition of Ashley Janssen filed by Cierra Geter (Legare, Cheryl) (Entered: 04/02/2021) |
| 04/02/2021 | 38 | NOTICE to Take Deposition of Travis Torrence filed by Cierra Geter (Legare, Cheryl) (Entered: 04/02/2021) |

USCA11 Case: 22-11385    Document: 17    Date Filed: 07/01/2022    Page: 9 of 239

| 04/02/2021 | 39 | APPLICATION for Admission of Melissa M. Weiss Pro Hac Vice (Application fee $ 150, receipt number AGANDC-10875428).by Schneider National Carriers, Inc.. (Allen, Meredith) Documents for this entry are not available for viewing outside the courthouse. (Entered: 04/02/2021) |
|---|---|---|
| 04/06/2021 | | APPROVAL by Clerks Office re: 39 APPLICATION for Admission of Melissa M. Weiss Pro Hac Vice (Application fee $ 150, receipt number AGANDC-10875428).. Attorney Melissa M. Weiss added appearing on behalf of Schneider National Carriers, Inc. (cdg) (Entered: 04/06/2021) |
| 04/08/2021 | 40 | Joint MOTION for Extension of Time to Complete Discovery by Cierra Geter. (Attachments: # 1 Text of Proposed Order)(Legare, Cheryl) (Entered: 04/08/2021) |
| 04/08/2021 | 41 | NOTICE to Take Deposition of Marianne Biskey-Rose filed by Cierra Geter (Legare, Cheryl) (Entered: 04/08/2021) |
| 04/13/2021 | 42 | ORDER granting 40 Motion for Extension of Time to Complete Discovery. Discovery ends on 5/7/2021. The parties are advised that, absent extraordinary good cause, there will be no further extensions of discovery. Signed by Magistrate Judge Justin S. Anand on 4/13/2021. (rjc) (Entered: 04/13/2021) |
| 04/14/2021 | 43 | NOTICE to Take Deposition of Sarah Kopf filed by Cierra Geter (Legare, Cheryl) (Entered: 04/14/2021) |
| 04/14/2021 | 44 | NOTICE to Take Deposition of Tiffany Kitchens filed by Cierra Geter (Legare, Cheryl) (Entered: 04/14/2021) |
| 04/19/2021 | 45 | ORDER granting 39 Application for Admission Pro Hac Vice for Melissa M. Weiss. Signed by Judge Steve C. Jones on 4/19/2021. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(rjc) (Entered: 04/19/2021) |
| 04/19/2021 | | Clerk's Certificate of Mailing to Melissa M. Weiss re 45 Order on Application for Admission PHV. (rjc) (Entered: 04/19/2021) |
| 06/07/2021 | 46 | MOTION for Summary Judgment with Brief In Support by Schneider National Carriers, Inc.. (Attachments: # 1 Brief Memorandum in support of Motion, # 2 Statement of Material Facts Statement of Undisputed Facts, # 3 Exhibit A - Torrence Declaration, # 4 Exhibit B - Geter Deposition Excerpts and Exhibits, # 5 Exhibit C - Biskey-Rose Deposition Excerpts, # 6 Exhibit D - Torrence Deposition Excerpts, # 7 Exhibit E - Kitchens Deposition Excerpts, # 8 Exhibit F - Kopf Deposition Excerpts, # 9 Exhibit G - Christine Schneider Declaration, # 10 Exhibit H - Janssen Deposition Declaration) (Milianti, Peter) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 06/07/2021) |
| 06/07/2021 | 47 | NOTICE Of Filing by Schneider National Carriers, Inc. re 46 MOTION for Summary Judgment (Attachments: # 1 Exhibit A - 3/9/21 C. Geter Deposition Transcript, # 2 Exhibit B - 4/6/21 T. Torrence Deposition Transcript, # 3 Exhibit C - 4/8/21 A. Janssen Deposition Transcript, # 4 Exhibit D - 4/19/21 S. Kopf Deposition Transcript, # 5 Exhibit E - 4/19/21 T. Kitchens Deposition Transcript, # 6 Exhibit F - M. Biskey-Rose Deposition, # 7 Exhibit G - C. Schneider Declaration, # 8 Exhibit H - T. Torrence Declaration)(Milianti, Peter) (Entered: 06/07/2021) |
| 06/22/2021 | 48 | Consent MOTION for Extension of Time Extend Summary Judgment Deadlines re: 46 MOTION for Summary Judgment by Cierra Geter. (Attachments: # 1 Text of Proposed Order)(Legare, Cheryl) (Entered: 06/22/2021) |

| 06/22/2021 | 49 | ORDER granting 48 Plaintiff's Consent Motion to Extend Summary Judgment Deadlines. The deadline for Plaintiff to respond to the Summary Judgment Motion 46 is extended through July 12, 2021, and the deadline for Defendant to file a reply is extended through August 2, 2021. Signed by Magistrate Judge Justin S. Anand on 6/22/2021. (ddm) (Entered: 06/22/2021) |
|---|---|---|
| 07/12/2021 | 50 | RESPONSE in Opposition re 46 MOTION for Summary Judgment filed by Cierra Geter. (Attachments: # 1 Plaintiff's Response to Statement of Material Facts, # 2 Plaintiff's Statement Facts, # 3 Geter Declaration, # 4 Williams Declaration, # 5 Biskey-Rose Depo Excerpts, # 6 Biskey-Rose Depo Ex. 48, # 7 Geter Depo Excerpts, # 8 Geter Depo Ex. 9, # 9 Janssen Depo Excerpts, # 10 Janssen Depo Ex. 4 - Area Planning Manager Job Description, # 11 Janssen Depo Ex. 16 - Return to Work Recommendation, # 12 Janssen Depo Ex. 31- Dec. 17, 2018 Emails, # 13 Janssen Depo Ex. 32 - Jan. 21, 2019 Emails, # 14 Janssen Depo Ex. 34 - March 2019 Emails, # 15 Kitchens Depo Excerpts, # 16 Kopf Depo Excerpts, # 17 Torrence Depo Excerpts, # 18 Torrence Depo Ex. 4 - Area Planning Manager Job Description, # 19 Torrence Depo Ex. 30 Oct. 26, 2018 Email, # 20 Torrence Depo Ex. 31 Dec. 17, 2018 Emails, # 21 Torrence Depo Ex. 32 Jan. 21, 2019 Emails, # 22 Torrence Depo Ex. 46 Defendant's Interrogatory Responses)(Legare, Cheryl) (Entered: 07/12/2021) |
| 08/02/2021 | 51 | REPLY BRIEF re 46 MOTION for Summary Judgment filed by Schneider National Carriers, Inc.. (Milianti, Peter) (Entered: 08/02/2021) |
| 08/02/2021 | 52 | Response to Statement of Material Facts re 46 MOTION for Summary Judgment filed by Schneider National Carriers, Inc.. (Milianti, Peter) Text modified on 8/3/2021 (adg). (Entered: 08/02/2021) |
| 08/03/2021 | | Submission of 46 MOTION for Summary Judgment , to Magistrate Judge Justin S. Anand. (ddm) (Entered: 08/03/2021) |
| 12/10/2021 | 53 | FINAL REPORT AND RECOMMENDATION recommending that 46 Defendant's Motion for Summary Judgment be granted and that judgment be entered in favor of Defendant on all of Plaintiff's claims. Signed by Magistrate Judge Justin S. Anand on 12/10/2021. (ddm) (Entered: 12/13/2021) |
| 12/10/2021 | | FINAL REPORT AND RECOMMENDATION re 1 Complaint. Signed by Magistrate Judge Justin S. Anand on 12/10/2021. (ddm) (Entered: 12/13/2021) |
| 12/10/2021 | 54 | ORDER for Service of 53 Final Report and Recommendation, by Magistrate Judge Justin S. Anand. Each party may file written objections to the Report & Recommendation within 14 days of service. If no objections are filed, the Report & Recommendation may be adopted as the opinion and order of the District Court. Signed by Magistrate Judge Justin S. Anand on 12/10/2021. (ddm) (Entered: 12/13/2021) |
| 12/16/2021 | 55 | Unopposed MOTION for Extension of Time File Objections to Report & Recommendation by Cierra Geter. (Attachments: # 1 R&R Notice of Electronic Filing, # 2 Text of Proposed Order)(Legare, Cheryl) (Entered: 12/16/2021) |
| 12/17/2021 | 56 | ORDER granting 55 Motion for Extension of Time to File Objections to the Report and Recommendation, the court will extend the deadline to File Objections to the Report and Recommendation through and including January 10, 2022. Signed by Judge Steve C. Jones on 12/17/2021. (rsg) (Entered: 12/17/2021) |
| 01/10/2022 | 57 | OBJECTIONS to 53 Report and Recommendation filed by Cierra Geter. (Legare, Cheryl) (Entered: 01/10/2022) |
| 01/18/2022 | 58 | Unopposed MOTION for Extension of Time to File Response re: 57 Objections to Report and Recommendation by Schneider National Carriers, Inc.. (Attachments: # 1 Text of |

| | | |
|---|---|---|
| 01/19/2022 | 59 | ORDER granting 58 Motion for Extension of Time to file objections to the 53 FINAL REPORT AND RECOMMENDATION. The Court extends the deadline for Defendant to file its Response to Plaintiff's Objections to the Report and Recommendation through and including February 7, 2022. Signed by Judge Steve C. Jones on 01/19/2022. (rsg) (Entered: 01/19/2022) |
| 02/07/2022 | 60 | REPLY to Objection to Report and Recommendation re 57 Objections to Report and Recommendation *Defendant's Response to Plaintiff s Objections to Magistrate Judge 's Report and Recommendation* filed by Schneider National Carriers, Inc.. (Milianti, Peter) (Entered: 02/07/2022) |
| 02/10/2022 | | Submission of FINAL REPORT AND RECOMMENDATION re 1 Complaint, filed by Cierra Geter, to District Judge Steve C. Jones. (pdw) (Entered: 02/10/2022) |
| 03/21/2022 | 61 | ORDER adopting the 53 Final Report and Recommendation, granting 46 Defendant's Motion for Summary Judgment and dismissing Plaintiff's case. Signed by Judge Steve C. Jones on 03/21/2022. (ddm) (Entered: 03/21/2022) |
| 03/21/2022 | 62 | CLERK'S JUDGMENT entered in favor of Defendant. (ddm)--Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist-- (Entered: 03/21/2022) |
| 03/21/2022 | | Civil Case Terminated. (ddm) (Entered: 03/21/2022) |
| 04/15/2022 | 63 | NOTICE OF APPEAL as to 62 Clerk's Judgment, 61 Order on Motion for Summary Judgment, Order on Final Report and Recommendation, by Cierra Geter. Filing fee $ 505, receipt number AGANDC-11736349. Transcript Order Form due on 4/29/2022 (Legare, Cheryl) (Entered: 04/15/2022) |
| 04/15/2022 | 64 | USCA Appeal Transmission Letter to 11th Circuit re: 63 Notice of Appeal, filed by Cierra Geter. (pjm) (Entered: 04/15/2022) |
| 04/15/2022 | 65 | Transmission of Certified Copy of Notice of Appeal, USCA Appeal Fees, Judgment, Order, Report and Recommendation and Docket Sheet to US Court of Appeals re: 63 Notice of Appeal. (pjm) (Entered: 04/15/2022) |
| 04/15/2022 | 66 | BILL OF COSTS by Schneider National Carriers, Inc.. (Attachments: # 1 Affidavit of Melissa M Weiss in support of Defendant's Bill of Costs)(Weiss, Melissa) (Entered: 04/15/2022) |
| 04/22/2022 | 67 | USCA Acknowledgment of 63 Notice of Appeal, filed by Cierra Geter. Case Appealed to USCA- 11th Circuit. Case Number 22-11285-BB. (pjm) (Entered: 04/22/2022) |
| 04/22/2022 | | Pursuant to F.R.A.P.11(c), the Clerk certifies that the record is complete for purposes of this appeal, 63 Notice of Appeal. Case Appealed to USCA- 11th Circuit. Case Number 22-11285-BB. The entire record on appeal is available electronically. (pjm) (Entered: 04/22/2022) |
| 04/22/2022 | 68 | TRANSCRIPT ORDER FORM (No Hrgs) re: 63 Notice of Appeal. (Ragan, Amelia) Modified on 4/22/2022 to update text (pjm). (Entered: 04/22/2022) |
| 04/22/2022 | 69 | TRANSCRIPT ORDER FORM (No Hrgs) re: 63 Notice of Appeal. (Legare, Cheryl) Modified on 4/22/2022 to update text (pjm). (Entered: 04/22/2022) |
| 05/12/2022 | 70 | Costs Taxed in amount of $ 3,340.85 against Cierra Geter. (rsg) (Entered: 05/12/2022) |

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiff, | ) | File No. _____ |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL CARRIERS, | ) | |
| INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**

Plaintiff Cierra Geter ("Plaintiff" or "Ms. Geter") files this Complaint for

Equitable Relief and Damages against Defendant Schneider National Carriers, Inc.

("Schneider" or "Defendant") showing the Court the following:

<u>**INTRODUCTION**</u>

1.     Ms. Geter is a former employee of Defendant, having worked for

Defendant from July 14, 2014 through April 12, 2019.

2.     Ms. Geter asserts claims for discrimination, retaliation, and failure to

accommodate under Title I of the Americans with Disabilities Act of 1990, as

amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101 *et*

*seq.*, and for discrimination under 42 U.S.C. § 1981 ("Section 1981") and Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Ms. Geter seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement to a full-time position with commensurate benefits, compensatory damages, punitive damages, and attorney's fees and costs of litigation.

## Jurisdiction and Venue

3.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

4.     Venue is proper in this district and division under 28 U.S.C. § 1391 because Defendant Schneider conducts business in this district and division and the unlawful actions and practices alleged herein were committed within the Northern District of Georgia.

## Exhaustion of Administrative Remedies

5.     On April 18, 2019, Ms. Geter filed a charge of discrimination – Charge No. 410-2098-04552 – with the Equal Employment Opportunity Commission within 180 days of the occurrence of the acts of which she complains.

6.     Ms. Geter received her Dismissal and Notice of Rights on December 17, 2019.

7.     Ms. Geter brings this suit within ninety (90) days of the receipt of her Dismissal and Notice of Rights and, thus, exhausts her administrative remedies.

## **The Parties**

8.     Ms. Geter is a citizen of the United States and a resident of the State of Georgia.

9.     Ms. Geter is and, at all times relevant hereto, was an individual with a disability as that term is defined by 42 U.S.C. § 12102(1).

10.     Ms. Geter is a person with a disability because she has actual mental impairments – major depressive disorder, panic disorder and post-traumatic stress syndrome – causing substantial limitations in one or more major life activities, because she has a record of impairment, and because Defendant regarded her as having an impairment.

11.     Ms. Geter is capable of performing the essential functions of her job as an Area Planning Manager with an accommodation.

12.     Defendant Schneider National Carriers is a for-profit corporation licensed to do business in Georgia and transacts business in the Northern District of Georgia.

13.     Defendant is an employer engaged in commerce or in an industry affecting commerce within the meaning of the ADA and Title VII and has employed

more than 15 persons for each working day in each of 20 calendar weeks in the current or preceding calendar year.

14.     Defendant is subject to the Court's jurisdiction and may be served with process through its registered agent for service of process, CT Corporation System, 289 South Culver Street, Lawrenceville, Georgia 30046.

## Statement of Facts

15.     Ms. Geter, who is African American, began employment with Defendant in July 2014.

16.     At all times relevant to this matter, Ms. Geter was an Area Planning Manager.

17.     At all times relevant to this matter, Ms. Geter worked third shift, Wednesday through Friday and Sunday.

18.     On or around October 6, 2018 Ms. Geter was diagnosed with a ADA-covered disabilities – major depressive disorder, panic disorder and post-traumatic stress disorder (PTSD).

19.     Ms. Geter took short-term disability leave and Family and Medical Leave Act leave from October 2019 to January 2, 2019 for treatment of her ADA-covered disability.

20.     Ms. Geter returned to work on January 2, 2019 and upon her return to work, requested a reasonable accommodation of a partially reduced schedule and that she occasionally be allowed to work from home.

21.     Ms. Geter explained to her managers that she suffered from PTSD and had issues working alone because of her PTSD.

22.     Ms. Geter's supervisor, Travis Torrence, told Ms. Geter that it was okay for her to work from home because everyone did it and Defendant accommodated Ms. Geter's request for accommodation until March 19, 2019.

23.     In March 2019, Ms. Geter requested a reasonable accommodation to return to work full-time but with one day of teleworking.

24.     While Ms. Geter waited for a response to her request for accommodation, Ms. Geter continue to work a reduced schedule and to work from home for time to time.

25.     On April 12, 2019, Defendant terminated Ms. Geter rather than grant her request for reasonable accommodation based on her disability.

26.     At the time Ms. Geter was terminated, Caucasian Area Planning Manager Tiffany Kitchens, had been permitted to work a reduced schedule and to work from home since August 2018.

-5-

27.    In addition, Travis Torrance, and Sarah Kopf (all Caucasian) were routinely permitted to work from home.

28.    In fact, Defendant recently changed its structure such that all Area Planning Managers work remotely.

29.    Thus, Ms. Geter's request to work remotely one day a week to accommodate her disability was reasonable.

30.    Ms. Geter filed a charge of discrimination with the EEOC on April 18, 2019 alleging disability and race discrimination and retaliation for engaging in protected activity by requesting a reasonable accommodation.

31.    Defendant terminated Ms. Geter's employment because of her disability, rather than accommodating her disability, because it regarded her as disabled, and in retaliation for her requesting an accommodation under the ADA.

32.    Defendant treated Ms. Geter differently than her Caucasian peers when it terminated her employment rather than allow her to work remotely as others did.

33.    In discriminating and retaliating against Ms. Geter in violation of the ADA, Title VII, and 42 U.S.C. § 1981, Defendant acted willfully, wantonly, and intentionally to harm Ms. Geter and her federally protected rights.

34.    Additionally, and in the alternative, Defendant acted with reckless

disregard for Ms. Geter and her federally protected rights.

35.     The effect of Defendant's above-stated actions has been to deprive Ms. Geter of employment opportunities, income in the form of wages, prospective employment benefits, including social security and other benefits to which she would have been entitled but for Defendant's illegal actions.

36.     The effect of Defendant's above-stated actions has also caused Ms. Geter to suffer out-of-pocket losses and mental and emotional distress for which she seeks redress.

## COUNT I
## Violation of ADA – Regarded As Disabled

37.     Ms. Geter incorporates by reference all the preceding paragraphs of the Complaint.

38.     At all times relevant hereto, Defendant has been subject to the requirements of Title I of the Americans with Disabilities Act as amended by the ADA.

39.     At all times relevant hereto, Ms. Geter was an individual with a disability as defined under the ADA, 42 U.S.C. § 12102(1)(C) because Defendant regarded her as a person with an impairment as defined by the Act.

40.     Moreover, at all times relevant hereto, Ms. Geter has been a qualified

individual with a disability as that term is defined by 42 U.S.C. § 12111(8) and able to perform the essential functions of the job.

41.   Defendant terminated Ms. Geter because it regarded her as disabled.

42.   Defendant's actions violated Section 102 of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

43.   As a direct and proximate result of Defendant's intentional discrimination, Ms. Geter has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

44.   The actions taken against Ms. Geter by Defendant have caused her to suffer both monetary and non-monetary damages.

45.   Pursuant to the ADA, Ms. Geter is entitled to damages including, back pay and lost benefits, front pay and/or reinstatement, compensatory/emotional damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

46.   Accordingly, Ms. Geter is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendant's violation of her rights under the ADA.

## COUNT II
## Actual Discrimination and Failure to Accommodate in Violation of ADA

47.   Ms. Geter incorporates by reference all the preceding paragraphs of the Complaint.

48.   At all times relevant hereto, Defendant has been subject to the requirements of Title I of the Americans with Disabilities Act as amended by the ADA.

49.   At all times relevant hereto, Ms. Geter was an individual with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(A).

50.   Defendant was aware of Ms. Geter's disabilities and history and record of disability.

51.   At all times relevant hereto, Ms. Geter has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111(8) and able to perform the essential functions of his job.

52.   Ms. Geter's disabilities substantially limited one or more major life activities.

53.   Ms. Geter requested accommodation from Defendant relating to her disabilities: that she be permitted to work from home for certain workdays.

54.   Defendant initially granted the request then refused to grant Ms. Geter's

accommodation request and terminated her employment because of her disability.

55.     Defendant's actions amount to a violation of Section 102 of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability and requires reasonable accommodation for disabilities.

56.     As a direct and proximate result of Defendant's intentional discrimination, Ms. Geter has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

57.     The actions taken against Ms. Geter by Defendant have caused her to suffer both monetary and non-monetary damages.

58.     Pursuant to the ADA, Ms. Geter is entitled to damages including, back pay and lost benefits, front pay and/or reinstatement, compensatory/emotional damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under the ADA.

59.     Accordingly, Ms. Geter is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendant's violation of her rights under the ADA.

## COUNT III
## <u>Retaliation in Violation of the ADA</u>

60.    Ms. Geter incorporates by reference all the preceding paragraphs of the Complaint.

61.    At all times relevant hereto, Defendant has been subject to the requirements of Title I of the ADA.

62.    At all times relevant hereto, Mr. Geter was an individual with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(A).

63.    In January 2019, Ms. Geter engaged in protected activity under the ADA when she requested a reasonable accommodation for her ADA-covered disability.

64.    Defendant refused to grant Ms. Geter's request for accommodation and terminated her employment in retaliation for requesting an accommodation in violation of the ADA.

65.    Defendant's actions in retaliating against Ms. Geter following her requests for reasonable accommodation were committed with reckless disregard for her right to be free from retaliatory treatment in violation of the ADA.

66.    The effect of Defendant's above-mentioned conduct has been to deprive Ms. Geter of equal employment opportunities and benefits due to her

willingness engage in protected activity.

67.     The actions taken against Ms. Geter by Defendant have caused her to

suffer both monetary and non-monetary damages.

68.     Pursuant to the ADA, Ms. Geter is entitled to damages including, back

pay and lost benefits, front pay and/or reinstatement, compensatory/emotional

damages, punitive damages, attorney's fees and costs of litigation, and all other relief

recoverable under the ADA.

69.     Accordingly, Ms. Geter is entitled to the equitable and monetary relief

set forth in the following prayer for relief for Defendant's violation of her rights

under the ADA.

## COUNT IV
### Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq.*

70.     Ms. Geter incorporates by reference all preceding paragraphs of the

Complaint.

71.     Defendant's stated reason for terminating Plaintiff's employment is

pretext for racial discrimination.

72.     Defendant terminated Plaintiff because of her race rather than

permitting her to work remotely as it did her Caucasian comparators.

73.   Defendant's discriminatory termination of Ms. Geter violated Title VII.

74.   Defendant willfully and wantonly disregarded Ms. Geter's rights under Title VII and acted in reckless disregard for her rights under Title VII.

75.   Defendant's discriminatory actions against Ms. Geter were taken in bad faith.

76.   As a result of Defendant's discriminatory termination of Ms. Geter, Ms. Geter has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

77.   Pursuant to Title VII, Plaintiff is entitled to damages including, back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, attorneys' fees and costs of litigation, and all other relief recoverable under Title VII.

## COUNT V
## Discrimination in Violation of 42 U.S.C. § 1981

78.   Ms. Geter incorporates by reference all preceding paragraphs of the Complaint.

79.   Defendant's stated reason for terminating Ms. Geter's employment is pretext for racial discrimination.

80.   Defendant terminated Ms. Geter because of her race.

-13-

81.    Defendant's discriminatory termination of Ms. Geter violated 42 U.S.C. § 1981 ("Section 1981").

82.    Defendant willfully and wantonly disregarded Ms. Geter's rights under Section 1981 and acted in reckless disregard for Ms. Geter's rights under Section 1981.

83.    Defendant's discriminatory actions against Ms. Geter were taken in bad faith.

84.    As a result of Defendant's discriminatory termination of Ms. Geter, Ms. Geter has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation and other indignities.

85.    Pursuant to Section 1981, Ms. Geter is entitled to damages including, back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, attorneys' fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under Section 1981.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and that the following relief be granted:

(a)    A declaration that Defendant has violated the rights of Plaintiff under

-14-

the federal statutes listed above;

(b)    A permanent injunction against Defendant enjoining Defendant from further violations of the federal statutes listed above;

(c)    Judgment in her favor and against Defendant under all counts of this Complaint;

(d)    Order Defendant to make Ms. Geter whole by providing for her out-of-pocket losses as well as back pay in an amount equal to the sum of any wages, salary, employment benefits or other compensation denied or lost as a result of Defendant's unlawful and discriminatory acts, taking into account all raises to which Ms. Geter would have been entitled, together with interest thereon, all in an amount to be proven at trial;

(e)    Order that Ms. Geter be reinstated or, in the alternative, be awarded front pay;

(f)    Grant to Ms. Geter Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(g)    Grant to Ms. Geter punitive damages in an amount to be determined by

-15-

the enlightened conscious of the jury to be sufficient to punish Defendant for its

conduct toward Ms. Geter and deter Defendant from similar conduct in the future

for Defendant's willful and intentional violations of federal law;

(h)    Grant to Ms. Geter a jury trial on all issues so triable;

(i)    Grant to Ms. Geter her reasonable attorney's fees and reasonable expert

witness fees together with any and all other costs associated with this action; and

(j)    Grant such additional monetary and equitable relief as the Court deems

proper and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted this 12th day of March, 2020,

**LEGARE, ATTWOOD & WOLFE, LLC**

s/ Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com

125 Clairemont Ave, Suite 380
Decatur, Georgia 30030
Tel: (470) 823-4000
Fax: (470) 201-1212
Counsel for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| Cierra Geter | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1:20-cv-01148-ODE-JSA |
| | ) | |
| Schneider National Carriers, Inc. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANT SCHNEIDER NATIONAL CARRIERS, INC'S ANSWER AND AFFIRMATIVE AND OTHER DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant, Schneider National Carriers, Inc. ("Schneider"), by and through its attorneys, McGuireWoods LLP, for its Answer and Affirmative and Other Defenses to Plaintiff's Complaint, states as follows. Schneider denies each and every allegation in Plaintiff's Complaint except as expressly admitted herein.

### Introduction

1. Schneider admits the allegations contained in Paragraph 1.

2. Schneider denies the allegations contained in Paragraph 2 of the Complaint, except to admit that Plaintiff purports to state claims under the Americans with Disabilities Act, 42 U.S.C. § 1981, and Title VII and that Plaintiff

seeks injunctive, declaratory and other relief.   Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

**Jurisdiction and Venue**

3.     Schneider denies the allegations contained in Paragraph 3 of the Complaint, except to admit that this Court has jurisdiction over this matter. Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

4.     Schneider denies the allegations contained in Paragraph 4 of the Complaint, except to admit that venue is proper before this Court.   Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

**Exhaustion of Administrative Remedies**

5.     Schneider lacks information sufficient to admit or deny the allegations contained in Paragraph 5 of the Complaint, except to admit that Plaintiff filed a charge of discrimination with the EEOC, styled as Charge Number 410-2098-04552. Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

6.     Schneider lacks information sufficient to admit or deny the allegations

contained in Paragraph 6 of the Complaint, except to admit that the EEOC issued a Dismissal and Notice of Rights dated Decenber 17, 2019.

7.      Schneider lacks information sufficient to admit or deny the allegations contained in Paragraph 7 of the Complaint.

8.      Schneider lacks information sufficient to admit or deny the allegations contained in Paragraph 8 of the Complaint.

9.      Schneider states that the allegations contained in Paragraph 9 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider lacks information sufficient to admit or deny whether Plaintiff has a "disability" within the meaning of the ADA and, on that basis, denies such allegations.

10.      Schneider states that the allegations contained in Paragraph 10 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider lacks information sufficient to admit or deny whether Plaintiff is a person with a "disability" within the meaning of the ADA and, on that basis, denies such allegations.

11.      Schneider denies that Plaintiff is capable of performing the essential functions of an Area Planning Manager with a reasonable accommodation.

12.      Schneider admits the allegations contained in Paragraph 12 of the

3

Complaint.

13.     Schneider denies the allegations contained in Paragraph 13 of the Complaint, except to admit that it is an "employer" engaged in commerce within the meaning of the ADA and Title VII. Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

14.     Schneider denies the allegations contained in Paragraph 14 of the Complaint, except to admit that it is subject to the Court's jurisdiction and that Schneider's registered agent in the State of Georgia is CT Corporation System, 289 S. Culver St., Lawrenceville, GA 30046.  Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

## Statement of Facts

15.     Schneider admits the allegations contained in Paragraph 15 of the Complaint.

16.     Schneider admits the allegation contained in Paragraph 16 of the Complaint.

17.     Schneider denies the allegations contained in Paragraph 17 of the Complaint, except to admit that Plaintiff worked on the third shift and that her full-time schedule including working on Wednesdays, Thursdays, Fridays, and Sundays.

18.     Schneider lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 18 of the Complaint.

19.     Schneider lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 19 of the Complaint, except to admit that Plaintiff took an approved FMLA leave from October 9, 2018 through January 1, 2019.

20.     Schneider denies the allegations contained in Paragraph 20 of the Complaint, except to admit that Plaintiff returned to work on January 2, 2019, and requested a workplace accommodation of a partially reduced schedule.

21.     Schneider denies the allegations contained in Paragraph 21 of the Complaint.

22.     Schneider denies the allegations contained in Paragraph 22 of the Complaint, except to admit that Schneider accommodated Plaintiff's request for a temporary reduced work schedule through April 12, 2019.

23.     Schneider denies the allegations contained in Paragraph 23 of the Complaint.

24.     Schneider denies the allegations contained in Paragraph 24 of the Complaint, except to admit that Schneider accommodated Plaintiff's request for a temporary reduced work schedule through April 12, 2019.

25.     Schneider denies the allegations contained in Paragraph 25 of the Complaint, except to admit it terminated Plaintiff's employment on April 12, 2019 after Plaintiff could not identify a reasonable accommodation that would enable her to perform the essential functions of her position.

26.     Schneider denies the allegations contained in Paragraph 26 of the Complaint.

27.     Schneider denies the allegations contained in Paragraph 27 of the Complaint.

28.     Schneider denies the allegations contained in Paragraph 28 of the Complaint.

29.     Schneider denies the allegations contained in Paragraph 29 of the Complaint.

30.     Schneider denies the allegations contained in Paragraph 30 of the Complaint, except to admit that Plaintiff filed a charge of discrimination with the EEOC on or about April 18, 2019, which document speaks for itself.  Answering further, Schneider denies that it engaged in any unlawful conduct, or that it has any liability to Plaintiff.

31.     Schneider denies the allegations contained in Paragraph 31 of the Complaint.

32.    Schneider denies the allegations contained in Paragraph 32 of the Complaint.

33.    Schneider denies the allegations contained in Paragraph 33 of the Complaint.

34.    Schneider denies the allegations contained in Paragraph 34 of the Complaint.

35.    Schneider denies the allegations contained in Paragraph 35 of the Complaint.

36.    Schneider denies the allegations contained in Paragraph 36 of the Complaint.

## COUNT I

### **Violation of ADA – Regarded As Disabled**

37.    Schneider restates and realleges its answers to Paragraphs 1 through 36 as if fully set forth herein.

38.    Schneider denies the allegations contained in Paragraph 38 of the Complaint, except to admit that Title I of the ADA applies to it.  Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

39.     Schneider states that the allegations contained in Paragraph 39 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider denies the allegations contained in Paragraph 39 of the Complaint.

40.     Schneider states that the allegations contained in Paragraph 40 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider denies the allegations contained in Paragraph 40 of the Complaint.

41.     Schneider denies the allegations contained in Paragraph 41 of the Complaint.

42.     Schneider denies the allegations contained in Paragraph 42 of the Complaint.

43.     Schneider denies the allegations contained in Paragraph 43 of the Complaint.

44.     Schneider denies the allegations contained in Paragraph 44 of the Complaint.

45.     Schneider denies the allegations contained in Paragraph 45 of the Complaint.

46.     Schneider denies the allegations contained in Paragraph 46 of the Complaint.

## COUNT II

## Actual Discrimination and Failure to Accommodate in Violation of ADA

47.     Schneider restates and realleges its answers to Paragraphs 1 through 46 as if fully set forth herein.

48.     Schneider denies the allegations contained in Paragraph 48 of the Complaint, except to admit that Title I of the ADA applies to it.  Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

49.     Schneider states that the allegations contained in Paragraph 49 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider lacks information sufficient to admit or deny whether Plaintiff has a "disability" within the meaning of the ADA and, on that basis, denies such allegations.

50.     Schneider denies the allegations contained in Paragraph 50 of the Complaint.

51.     Schneider states that the allegations contained in Paragraph 51 of the Complaint assert legal conclusions to which no response is required.  To the extent

any response is required, Schneider denies the allegations contained in Paragraph 51 of the Complaint.

52.     Schneider lacks information sufficient to admit or deny whether Plaintiff has a "disability" which substantially limits one or more major life activities and, on that basis, denies such allegations.

53.     Schneider lacks information sufficient to admit or deny whether Plaintiff has a "disability."  Schneider admits that Plaintiff requested that Schneider permit her to work from home for certain workdays.

54.     Schneider denies the allegations contained in Paragraph 54 of the Complaint.

55.     Schneider denies the allegations contained in Paragraph 55 of the Complaint.

56.     Schneider denies the allegations contained in Paragraph 56 of the Complaint.

57.     Schneider denies the allegations contained in Paragraph 57 of the Complaint.

58.     Schneider denies the allegations contained in Paragraph 58 of the Complaint.

59.     Schneider denies the allegations contained in Paragraph 59 of the Complaint.

## COUNT III

## Retaliation in Violation of the ADA

60.     Schneider restates and realleges its answers to Paragraphs 1 through 59 as if fully set forth herein.

61.     Schneider denies the allegations contained in Paragraph 61 of the Complaint, except to admit that Title I of the ADA applies to it.  Answering further, Schneider expressly denies that it engaged in any unlawful conduct or that it has any liability to Plaintiff.

62.     Schneider states that the allegations contained in Paragraph 62 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider lacks information sufficient to admit or deny whether Plaintiff has a "disability" within the meaning of the ADA and, on that basis, denies such allegations.

63.     Schneider states that the allegations contained in Paragraph 63 of the Complaint assert legal conclusions to which no response is required.  To the extent any response is required, Schneider denies the allegations contained in Paragraph 63 of the Complaint.

64.     Schneider denies the allegations contained in Paragraph 64 of the Complaint.

65.     Schneider denies the allegations contained in Paragraph 65 of the Complaint.

66.     Schneider denies the allegations contained in Paragraph 66 of the Complaint.

67.     Schneider denies the allegations contained in Paragraph 67 of the Complaint.

68.     Schneider denies the allegations contained in Paragraph 68 of the Complaint.

69.     Schneider denies the allegations contained in Paragraph 69 of the Complaint.

## COUNT IV

### Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq.*

70.     Schneider restates and realleges its answers to Paragraphs 1 through 69 as if fully set forth herein.

71.     Schneider denies the allegations contained in Paragraph 71 of the Complaint.

72.     Schneider denies the allegations contained in Paragraph 72 of the Complaint.

73.     Schneider denies the allegations contained in Paragraph 73 of the Complaint.

74.     Schneider denies the allegations contained in Paragraph 74 of the Complaint.

75.     Schneider denies the allegations contained in Paragraph 75 of the Complaint.

76.     Schneider denies the allegations contained in Paragraph 76 of the Complaint.

77.     Schneider denies the allegations contained in Paragraph 77 of the Complaint.

## COUNT V

### Discrimination in Violation of 42 U.S.C. § 1981

78.     Schneider restates and realleges its answers to Paragraphs 1 through 77 as if fully set forth herein.

79.     Schneider denies the allegations contained in Paragraph 79 of the Complaint.

80.     Schneider denies the allegations contained in Paragraph 80 of the Complaint.

81.     Schneider denies the allegations contained in Paragraph 81 of the Complaint.

82.     Schneider denies the allegations contained in Paragraph 82 of the Complaint.

83.     Schneider denies the allegations contained in Paragraph 83 of the Complaint.

84.     Schneider denies the allegations contained in Paragraph 84 of the Complaint.

85.     Schneider denies the allegations contained in Paragraph 85 of the Complaint.

## **SCHNEIDER'S AFFIRMATIVE AND OTHER DEFENSES**

Schneider hereby states the following affirmative and other defenses to the Complaint, but does not assume the burden of proof on any such defenses except as required by applicable law with respect to a particular defense asserted.

**First Defense**

All actions by Schneider with regard to Plaintiff were lawful and made in good-faith compliance with applicable provisions of law, rules and regulations.

**Second Defense**

All employment actions regarding Plaintiff were based on legitimate, non-discriminatory and non-retaliatory reasons.

**Third Defense**

Plaintiff did not have a "disability," actual or perceived, or a record of "disability" within the meaning of the ADA.

**Fourth Defense**

Plaintiff's allegations of discrimination are barred because Schneider engaged in the interactive process and/or attempted to reasonably accommodate Plaintiff's alleged medical condition.

**Fifth Defense**

To the extent that Plaintiff's Complaint alleges any failure to accommodate an alleged disability, any recovery is barred in that Plaintiff's alleged disability could not be reasonably accommodated due to job-related reasons and business necessities and/or would have imposed an undue hardship upon Schneider.

**Sixth Defense**

To the extent that Plaintiff's Complaint alleges any failure to accommodate an alleged disability, any recovery is barred in that Plaintiff was not qualified or was otherwise unable to perform her essential job duties even with reasonable accommodation(s).

**Seventh Defense**

To the extent that Plaintiff's Complaint alleges any failure to accommodate an alleged disability, any recovery is barred in that Plaintiff failed to engage in and/or was responsible for the breakdown in the interactive process.

**Eighth Defense**

Plaintiff's claim is not actionable because Plaintiff cannot show that any reason offered by Schneider with respect to Plaintiff's termination of employment was in any way a pretext for purposeful, intentional, and/or legally prohibited discrimination.

**Ninth Defense**

There is no basis of law or fact upon which Plaintiff is entitled to recover damages, including punitive damages, from Schneider.

**Tenth Defense**

To the extent that Plaintiff has failed to diligently search for other employment since her separation of employment from Schneider, her claim to damages is barred, in whole or in part, by her failure to mitigate damages.

**Eleventh Defense**

To the extent Plaintiff is awarded damages, such damages should be reduced by any short-term disability or long-term disability payments made to Plaintiff, by any workers compensation or unemployment compensation awards or payments made to Plaintiff, and by any other amounts earned by Plaintiff since her employment ended.

**Twelfth Defense**

To the extent Plaintiff is awarded compensatory or punitive damages, such awards are limited by the damage cap provisions of 42 U.S.C. § 1981a.

**Thirteenth Defense**

Any alleged emotional distress suffered by Plaintiff was caused by external factors and not by Schneider.

**Fourteenth Defense**

Schneider reserves the right to assert that Plaintiff's claim and/or demand for relief is barred or is otherwise not actionable because of the after-acquired evidence doctrine.

**Fifteenth Defense**

Plaintiff's Complaint fails to state a plausible claim upon which relief may be granted.

**Sixteenth Defense**

Any recovery on Plaintiff's claims is barred because there is no causal link between any protected activity or characteristic and any purported adverse employment action.

**Seventeenth Defense**

Plaintiff's Complaint is barred or limited, in whole or in part, by the equitable doctrines of laches, waiver, estoppel and unclean hands.

**Eighteenth Defense**

Plaintiff's claims are barred to the extent that Plaintiff failed to exhaust her administrative remedies by timely filing a charge of discrimination and receiving a right to sue notice prior to filing the instant lawsuit, as required to recover under Title VII of the Civil Rights Act of 1964.

**Nineteenth Defense**

To the extent that Plaintiff's claims concern matters occurring more than 300 days before the filing of the Charge of Discrimination, such claims are time-barred.

**Twentieth Defense**

Any recovery on Plaintiff's Complaint, and each purported cause of action alleged therein, is barred, in whole or in part, because Schneider maintained policies prohibiting unlawful conduct and providing for a work environment free from discrimination and retaliation.

**Twenty-First Defense**

Schneider has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, defenses available. Schneider reserves the right to assert any additional or affirmative defenses that may become apparent or available during discovery of this matter.

WHEREFORE, having fully answered and responded to the allegations contained in Plaintiff's Complaint, Schneider hereby prays that:

1.    Plaintiff's claim be dismissed with prejudice in its entirety;

2.    Each and every prayer for relief contained in Plaintiff's Complaint be denied;

3.    Judgment be entered in favor of Schneider;

4.      All costs, including reasonable attorneys' fees, be awarded to Schneider and against Plaintiff pursuant to applicable law; and

5.      Schneider be granted such other and further relief as this Court may deem just and proper.

This the 8th day of June, 2020.

/s/ M. Laughlin Allen
M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
Telephone:   (404) 443-5738
Facsimile:    (404) 443-5773
mlallen@mcguirewoods.com
*Counsel for the Defendant Schneider National Carriers, Inc.*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on June 8, 2020, I electronically filed the foregoing *Defendant Schneider National Carriers, Inc.'s Answer and Affirmative and Other Defenses to Plaintiff's Complaint* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

*/s/ M. Laughlin Allen*
M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E.
Suite 2100, Promenade
Atlanta, Georgia 30309-3534
Telephone:   (404) 443-5738
Facsimile:   (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant Schneider National Carriers, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Schneider National Carriers, Inc. ("Schneider"), pursuant to Federal Rule of Civil Procedure 56, N.D. Ga. LR 56, and other applicable law, hereby moves for summary judgment, and requests that the Court dismiss Plaintiff Cierra Geter's claims in their entirety. Schneider contends that there are no genuine issues of material fact in this case and that, Schneider is entitled to judgment as a matter of law. In support of its Motion for Summary Judgment, Schneider relies upon all matters of record and the following materials filed on this date:

1. Defendant's Memorandum of Law in Support of its Motion for Summary Judgment;

2.  Defendant's Statement of Undisputed Material Facts;

3.  Declaration of Travis Torrence;

4.  Excerpts from the Deposition of Plaintiff Cierra Geter (and Exhibits thereto);

5.  Excerpts from the Deposition of Marianne Biskey-Rose;

6.  Excerpts from the Deposition of Travis Torrence;

7.  Excerpts from the Deposition of Tiffany Kitchens;

8.  Excerpts from the Deposition of Sara Kopf;

9.  Declaration of Christine Schneider (and Exhibits thereto); and

10. Excerpts from the Deposition of Ashley Janssen.

Date: June 7, 2021

Respectfully submitted,

By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on June 7, 2021, I electronically filed the foregoing *Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,


By:__/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E

4

Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## I.   __INTRODUCTION__

Cierra Geter's ("Plaintiff") employment with Schneider ended after Plaintiff could not perform the essential functions of her job, despite Schneider's repeated efforts to accommodate her disability. Beginning in October 2018, Plaintiff took FMLA leave for her own serious health condition. After exhausting her twelve weeks of FMLA leave, Plaintiff could not return to work full-time and requested that Schneider accommodate a part-time schedule for a period of six weeks. Because Plaintiff worked the overnight shift, she frequently worked alone and it was difficult for Schneider to cover her shifts. Nonetheless, Schneider agreed to accommodate Plaintiff. Plaintiff then requested an extension of her part-time schedule for another five weeks, which Schneider again granted. Plaintiff subsequently requested a second extension of her part-time schedule for an additional six weeks and that she be permitted to work from home. Schneider continued to accommodate these requests. Then, in early-April 2019, Plaintiff requested to extend the part-time schedule a third time – this time for another two months with the additional request of working from home. By that point, Plaintiff had worked a part-time schedule for nearly four-and-a-half months and, Schneider determined that it could not continue to eliminate two essential functions of Plaintiff's job – full-time work and work in the office. As a result, Schneider explored several alternatives, including asking

Plaintiff if she could work different shifts, but Plaintiff indicated she could not do so. Since Plaintiff could not return to work full-time, Schneider terminated Plaintiff's employment.

Despite Schneider's efforts, Plaintiff claims that Schneider failed to accommodate her disability, discriminated against her due to her disability and race, and retaliated against her for requesting a reasonable accommodation. However, the undisputed evidence shows that Plaintiff could not perform the essential functions of her job, the accommodations she requested were unreasonable, there is no connection between the termination of her employment and any discriminatory or retaliatory animus, and Schneider had a legitimate, non-discriminatory reason for terminating her employment. Indeed, Schneider went above and beyond its obligations under the ADA to accommodate Plaintiff's disability. Consequently, this Court should grant summary judgment in favor of Schneider and dismiss Plaintiff's Complaint in its entirety.

## II. <u>UNDISPUTED FACTS</u>

### A. Plaintiff's Employment with Schneider

Schneider is a transportation and logistics company that operates as a common and contract motor carrier throughout the United States and Canada. (Torrence Decl. ¶ 3). On July 14, 2014, Schneider hired Plaintiff as a full-time Area Planning

2

Manager ("APM") for the third shift at its Fairburn, Georgia location. (Geter Dep. 42:14-43:25, Ex. 2). From mid-2018 until the termination of her employment, Plaintiff was scheduled to work on Wednesday, Thursday, Friday, and Sunday from 11:00 p.m. to 10:00 a.m. (Pl's Dep. 72:2-13). During that time period, Plaintiff reported to Team Lead, Travis Torrence. (Pl's Dep. 69:4-9).

**B. Plaintiff's Essential Job Functions**

As an APM, Plaintiff's primary job was to provide support for Schneider drivers. (Pl's Dep. 54:3-6, Ex. 4). In so doing, Plaintiff would dispatch drivers with customer loads, assist drivers in gathering their paperwork and load information, take calls and messages from drivers, and resolve any driver issues. (Pl's Dep. 48:21-49:16, 54:7-12). In order to meet the business needs, APMs were expected to work full-time because Schneider needed to ensure it had the resources to sufficiently support drivers and dispatch loads at all hours of the day. (Biskey-Rose Dep. 40:2-11; Torrence Decl. ¶ 6). Because Schneider's drivers work all hours of the day, the Fairburn location was staffed 24-hours a day, seven days a week by full-time employees. (Biskey-Rose Dep. 18-20; Torrence Decl. ¶ 7).

Plaintiff understood that she was expected to work full-time. (Pl's Dep. 40:14-17). Mr. Torrence did not supervise any employees who were permitted to work a part-time schedule. (Torrence Dep. 64:24-65:3). In fact, during the entirety of

3

Plaintiff's employment, Schneider did not employ any part-time APMs at the Fairburn location. (Pl's Dep. 83:6-10; Kitchens Dep. 28:5-10; Torrence Decl. ¶ 8).

Plaintiff also understood that certain tasks necessary to assist drivers required her physical presence in the office. (Pl's Dep. 63:7-11). For example, Plaintiff needed to be in the office to interact with drivers who came into the office. (Pl's Dep. 60:6-15). Plaintiff admits that she frequently interacted with drivers face-to-face, and that this interaction was necessary to develop relationships with drivers and better assist them. (Pl's Dep. 55:7-14; 56:8-19; 59:1-24, Ex. 4; Torrence Decl. ¶ 9). Plaintiff further understood that Schneider expected her to have face-to-face interactions with drivers and that Schneider deemed that an important function of her job. (Pl's Dep. 59:13-24). APMs also needed to be in the office to assist drivers in locating available tractors, retrieving keys that were located in a secure lock box, and printing off paperwork. (Pl's Dep. 60:6-62:4, Exs. 4, 5; Torrence Decl. ¶ 10). Plaintiff further understood that having the ability to work in a fast-paced, high pressure environment was an essential function of her position. (Pl's Dep. 57:5-16).

Because there were certain essential tasks that needed to be performed in the office, APMs were not regularly permitted to work remotely. (Torrence Decl. ¶ 22). Rather, employees at the Fairburn location were occasionally permitted to work from home for one-off situations. (Biskey-Rose Dep. 32:8-20, Torrence Dep. 55:16-21).

4

### C. Plaintiff Frequently Worked Alone as an APM on the Third Shift

The third shift APM role was staffed differently from the first and second shifts. Whereas the first shift was normally staffed with four to five APMs, and the second shift was staffed with two to three APMs, the third shift only had one or two APMs. (Pl's Dep. 100:16-19). As a result, Plaintiff frequently worked alone on the third shift, especially on Sundays. (Pl's Dep. 100:16-23, Torrence Decl. ¶ 5). Additionally, unlike first and second shift APMs, third shift APMs did not have additional team members to assist in answering messages or phone calls, dispatching drivers, or dealing with driver issues. (Pl's Dep. 100:18-101:6).

### D. Plaintiff Takes FMLA Leave

In October 2018, Plaintiff was diagnosed with post-traumatic stress disorder and panic disorder by Dr. Cassandra Wanzo, Plaintiff's physician. (Pl's Dep. 86:20-22, 87:5-8, 88:17-20). On October 9, 2018, Plaintiff began a leave of absence under the FMLA for her own serious health condition. (Pl's Dep. 121:17-19, Ex. 11). Plaintiff remained out on approved FMLA leave through December 31, 2018[1], and was expected to return to full-time work on January 2, 2019. (Pl's Dep. 125:1-126, Ex. 13). During the time that Plaintiff was out on FMLA leave, Plaintiff's work was

---

[1] Plaintiff exhausted her twelve weeks of FMLA leave entitlement as of December 31, 2018. (Pl's Dep. 126:3-5).

performed by other APMs and Mr. Torrence. (Torrence Dep. 67:20-23). To ensure coverage while Plaintiff was on FMLA leave, Mr. Torrence worked the overnight shift on Sundays, in addition to his regular duties. (Torrence Dep. 67:24-68:1).

### E. Plaintiff's Initial Accommodation Request

Prior to the expiration of her FMLA leave, Plaintiff submitted a return to work form dated December 15, 2018 and completed by Dr. Wanzo. (Pl's Dep. 126:14-25, Ex. 14). Dr. Wanzo stated that Plaintiff could return to work on January 2, 2019, but with the restriction of working three days a week, ten-hour days. (Pl's Dep. 127:13-17, Ex. 14). Dr. Wanzo indicated that Plaintiff could return to work without restrictions on February 14, 2019. (Pl's Dep. Ex. 14). Schneider agreed to accommodate Plaintiff's request. (Pl's Dep. 133:4-23, Ex. 15).

In addition to only being able to work three days a week, Plaintiff was limited in the days that she could work. (Pl's Dep. 134:24-135:22). Specifically, Plaintiff could not work her Sunday shift (11:00 p.m. – 10:00 a.m.) because she needed to attend counseling sessions on Monday mornings. (Pl's Dep. 134:24-135:22). Mr. Torrence agreed to accommodate Plaintiff's request to not work Sundays. (Pl's Dep. 134:24-135:24). Accordingly, when Plaintiff returned to work on January 2, 2019, she worked Wednesdays, Thursdays, and Fridays. (Pl's Dep. 126:6-8, 135:23-136:3). In order to accommodate Plaintiff's restrictions, Mr. Torrence worked

Plaintiff's Sunday overnight shifts, in addition to his regular duties. (Torrence Dep. 51:24-52:9, 52:23-53:1, 67:3-7; Torrence Decl. ¶ 12). Working this additional overnight shift was difficult for Mr. Torrence as he had already been working 50 hours per week. (Torrence Decl. ¶ 4). Plaintiff acknowledged her inability to work on Sundays impacted the third shift and their workload. (Pl's Dep. 137:9-12).

**F. Plaintiff's Accommodation Extensions and Request to Work from Home**

Plaintiff did not return to full-time work on February 14, 2019. (Pl's Dep. 145:18-22). Instead, on January 21, 2019, Plaintiff submitted another note from Dr. Wanzo requesting an extension of Plaintiff's part-time work schedule of ten hours a day, three days per week, until March 20, 2019. (Pl's Dep. 139:9-140:3, Ex. 16). Schneider again agreed to accommodate Plaintiff's request. (Pl's Dep. 176:10-17, Ex. 22). During this time period, Mr. Torrence continued to work Plaintiff's Sunday overnight shift in the office, in addition to his regular duties. (Torrence Decl. ¶¶ 12-13).

Plaintiff, however, did not return to work full-time on March 20, 2019. (Pl's Dep. 150:13-15). Instead, she sought another extension of her part-time work schedule and additional accommodations. (Pl's Dep. 151:23-152:1). Indeed, on March 9, 2019, Dr. Wanzo submitted documentation to Schneider seeking another extension of Plaintiff's part-time work schedule of three days per week, ten hours

7

per day, until April 30, 2019. (Pl's Dep. 151:23-152:1, Ex. 17). Plaintiff also sought

an additional accommodation of working from home on Thursdays and Fridays, and

anytime she was scheduled to work alone. (Pl's Dep. 154:3-14, Ex. 17).

On March 30, 2019, Dr. Wanzo submitted additional documentation further

extending Plaintiff's restrictions – this time to June 5, 2019. Dr. Wanzo stated that

Plaintiff can only work three days per week, Wednesday, Thursday, and Friday,

working from home two days a week, ten-hour days. (Pl's Dep. 160:18-25, Ex. 19).

### G. Schneider's Efforts to Accommodate Plaintiff

After receiving Plaintiff's third request to extend her part-time schedule – this

time until June 5, 2019 – Mr. Torrence and Ms. Biskey-Rose determined that based

on Schneider's business needs and staffing levels, they could not continue to

accommodate Plaintiff's request to eliminate two essential job functions – full-time

work and working in the office. (Biskey-Rose Dep. 36:14-22; Torrence Decl. ¶¶ 15-

16). Mr. Torrence had been working Plaintiff's Sunday overnight shift for many

months, and he could not continue to absorb Plaintiff's job duties for several more

months. (Torrence Decl. ¶ 16).

Consequently, Schneider explored other potential accommodations for

Plaintiff. On April 2, 2019, Schneider sent Plaintiff a letter requesting that Dr.

Wanzo provide additional information to Schneider by no later than April 8, 2019,

so that it could explore other potential accommodations. (Pl's Dep. 172:9-22, 183:18-186:9; Pl's Dep. Exs. 20, 23). Specifically, Schneider asked Dr. Wanzo if, in addition to working Wednesday, Thursday and Friday, Plaintiff could work another day of the week. (Pl's Dep. Ex. 23). Schneider also asked Dr. Wanzo if she could work a Monday through Friday, eight-hour schedule. (Pl's Dep. Ex. 23). While Plaintiff did not timely respond to Schneider's requests, on April 27, 2019, Dr. Wanzo ultimately stated that Plaintiff could not work any other schedule. (Pl's Dep. Ex. 23).

Ms. Biskey-Rose also asked Plaintiff if she could change her Monday morning counseling session (which prohibited Plaintiff from working her Sunday overnight shift); however, Plaintiff indicated this was not possible as the other available counseling session coincided with another doctor appointment. (Biskey-Rose Dep. 37:8-19). Schneider also considered hiring a temporary employee to cover Plaintiff's Sunday night shift; however, it was not a viable option because the temporary employee would be working the overnight shift by him or herself without the knowledge and background needed to resolve issues that arose. (Biskey-Rose Dep. 40:14-25; Janssen Dep. 40:21-41:18). Finally, Schneider considered reassigning Plaintiff to an open and available position for which she was qualified, but the Fairburn location only had full-time positions. (Torrence Decl. ¶ 17).

After determining that Plaintiff's accommodation requests were not reasonable and that there were no reasonable accommodations that would have enabled Plaintiff to perform the essential functions of her job, Schneider decided to terminate Plaintiff's employment, effective April 12, 2019.[2] (Torrence Decl. ¶ 18).

### III.   <u>ARGUMENT</u>

Plaintiff alleges claims of disability discrimination and retaliation under the ADA and race discrimination under Title VII and Section 1981. Where, as here, Plaintiff has no direct evidence of discrimination or retaliation under the ADA or Title VII, courts apply the burden-shifting framework articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Here, the undisputed facts show that Plaintiff cannot establish even a *prima facie* case of disability or race discrimination, or retaliation under the ADA. Moreover, the undisputed facts show that Schneider had a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

### A.   **Plaintiff's Failure-to-Accommodate Claim Should be Dismissed.**

In order to establish the *prima facie* elements of an ADA discrimination claim, Plaintiff must prove that: "(1) [s]he is disabled; (2) [s]he was a 'qualified individual'

---

[2] As of June 5, 2019, Plaintiff still was not able to return to full-time work. (Pl's Dep. 193:9-13). Instead, on June 26, 2019, Dr. Wanzo completed paperwork stating that Plaintiff continued to only be able to work three days per week, ten hour days, until September 23, 2019. (Pl's Dep. 193:19-194:5, Ex. 24).

at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against because of [her] disability." *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting 42 U.S.C. § 12112(a)). The third *prima facie* element has different requirements for a failure-to-accommodate claim compared to a discriminatory discharge claim. *Roberts v. Martin's Rest. Sys., Inc.,* 2006 WL 8432675, at *17 (N.D. Ga. Aug. 3, 2006). In the failure-to-accommodate context, a defendant unlawfully discriminates against a qualified individual with a disability "when the employer fails to provide 'reasonable accommodations' for the disability–unless doing so would impose undue hardship on the employer." *Id.*

### 1. *Plaintiff Was Not a Qualified Individual with a Disability.*

It is well established that an employer is required to provide reasonable accommodations only for individuals who are qualified for the position. 42 U.S.C. § 12112(a). A qualified individual is one with a disability who, "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). The ADA does not require employers to excuse employees from performing an essential function. *See Williams v. Revco Disc. Drug Centers, Inc.*, 552 F. App'x 919, 922 (11th Cir. 2014). Thus, if Plaintiff cannot perform the

essential functions of her job, then she is not a qualified individual and Schneider has no obligation to provide an accommodation. *See id.*

"Essential functions" are the fundamental job duties of a position that an individual with a disability is actually required to perform. *See* 29 C.F.R. § 1630.2(n)(2)(1). "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas,* 257 F.3d at 1258; *see also* 29 C.F.R. § 1630.2(n)(3). In conducting this analysis, "[t]he ADA directs courts to consider the employer's judgment as to what functions of a job are essential, such as the employer's written description for the job…[and] the testimony of the plaintiff's supervisor." *Spears v. Creel,* 607 F. App'x 943, 949 (11th Cir. 2015) (internal quotation omitted). Courts in the Eleventh Circuit grant substantial weight to employer's judgment as to which functions are essential. *Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 874 (11th Cir. 2016).

It is undisputed that full-time work was an essential function of Plaintiff's job as an APM. Plaintiff admitted that she applied for a full-time position, that Schneider hired her into a full-time position, that Schneider did not employ any part-time APMs, and that Schneider considered full-time work an essential function of Plaintiff's position. (Pl's Dep. 42:8-21; Torrence Decl. ¶¶ 6, 8). Because Plaintiff was not able to perform the essential function of full-time work, she was not a

qualified individual with a disability. *See Webb v. Donley,* 347 F. App'x 443, 446 (11th Cir. 2009) (upholding grant of summary judgment when employer did not provide modified work schedule as full-time presence at the work site was an essential function); *see also Robinson v. Fulton Cnty, Ga.*, 2008 WL 78711, at *22 (N.D. Ga. Jan. 4, 2008) (explaining "[c]ourts have consistently held that the ability to be present on the job and to complete all assigned tasks within a reasonable period of time is essential to any job.").

Working in the office was also an essential function of Plaintiff's third-shift APM position. Plaintiff admitted that there were tasks that she could not perform from home and understood that it was necessary for her to be in the office in order to interact with drivers. (Pl's Dep. 60:6-62:4; 63:7-11). Because Plaintiff needed to work from home at least two days per week (and any time she worked alone), she could not perform the essential functions of the APM position. *See Carlson v. Liberty Mut. Ins. Co.*, 237 F. App'x 446, 448-449 (11th Cir. 2007) (affirming summary judgment because employee was not qualified since she was unable to perform the essential function of at least some presence in the office).

Plaintiff also understood that working in a fast-paced, high pressure environment was a requirement of the APM position. (Pl's Dep. 57:5-16). Plaintiff admitted that she was unable to work well in a fast-paced, high pressure

environment. (Pl's Dep. 187:12-188:5). Because Plaintiff could not meet this essential job requirement, she was not qualified for the APM position. *See Medearis v. CVS Pharmacy,* 92 F.Supp.3d 1294, 1308 (N.D. Ga. 2015) (finding summary judgment was warranted when employee failed to show he was capable of performing the essential functions of his job with or without accommodations and therefore was not a "qualified individual").

### 2. *Plaintiff's Requested Accommodations Were Unreasonable.*

In a failure to accommodate claim, "[t]he plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." *Bagwell v. Morgan Cnty. Comm'n,* 676 F. App'x 863, 865 (11th Cir. 2017) (unpublished, per curiam) (citation and internal quotations omitted). Here, Plaintiff fails to meet her burden as her requested accommodations of part-time work and working from home were not reasonable.

"The ADA does not require the employer to eliminate an essential function of the plaintiff's job." *Medearis*, 92 F.Supp.3d at 1304 (internal citations and quotations omitted); *Webb,* 347 F. App'x at 446 (stating that "an employer is not required to reallocate job duties to change the functions of the job.") (internal citation omitted). Further, employers are not required to create a part-time position, where none exists. *Rabb v. Sch. Bd. of Orange Cnty., Fla.*, 590 F.App'x 849, 853 (11th Cir.

2014) ("Under this circuit's precedent, a part-time position that does not exist is not a 'reasonable' accommodation because the ADA imposes no duty on the employer to create a part-time position to accommodate an employee's disability.") (citing *Terrell v. USAir*, 132 F.3d 621, 626-27 (11th Cir. 1998)).

        i.  Plaintiff's request to work part-time was unreasonable.

Plaintiff's continued requests to work a part-time schedule was not reasonable. Plaintiff's reduced schedule placed an incredible strain on Mr. Torrence who covered Plaintiff's Sunday overnight shift for approximately six months, and by April 2019, Plaintiff indicated that she needed at least another two months of a part-time schedule. (Torrence Decl. ¶ 16). Clearly, it is not reasonable to expect other employees to cover Plaintiff's Sunday overnight shift for such an extended time period. *See Williams v. Cadence Bank,* 2018 WL 7360632, at *6 (N.D. Fl. Oct. 9, 2018) (finding employee's request for a part-time schedule unreasonable because "to accommodate [employee's] proposed part-time schedule, other essential functions of the Branch Manager position would necessarily have been reassigned to existing employees, a result which courts have routinely found to be unreasonable under the ADA."); *see also Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 671-72 (8th Cir. 2019) (finding requested accommodation unreasonable when "it

would require [employer] to reassign other [employees] to shifts that they would not have otherwise been scheduled to work.").

Moreover, Plaintiff's multiple requests to extend her part-time schedule amounted to a request for a permanent part-time schedule and elimination of essential job duties. *Campbell v. KBRwyle Tech. Sols., LLC*, 2019 WL 1353965, at *8 (N.D. Ala. Mar. 26, 2019) (finding it "clear that these restrictions were not temporary" when employee exhausted her FMLA leave, was provided a leave extension for four months, granted a request not to work overtime for one month, and sought to not work overtime for an additional two months).[3] Accordingly, Plaintiff's request to continue working a part-time schedule was unreasonable.

    ii.    Plaintiff's request to work from home was unreasonable.

Similarly, Plaintiff's request for a permanent accommodation (of working from home two days per week and any time she was to work alone) was unreasonable. The undisputed evidence shows that several of Plaintiff's job duties needed to be performed in the office – especially on those occasions when Plaintiff was the only APM scheduled for a shift. (Torrence Decl. ¶ 10). Indeed, Plaintiff

---

[3] Further, the fact that Schneider had accommodated Plaintiff's part-time schedule for a period of more than four months does not make Plaintiff's request to further extend her part-time schedule reasonable. *See Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (holding that providing "prior accommodations do not make an accommodation reasonable.").

herself admitted that the one-on-one interaction with drivers could only be performed in the office. (Pl's Dep. 60:6-15). Since Schneider was not required to eliminate any essential functions to accommodate Plaintiff, this request was unreasonable. *See Abram v. Fulton Cnty. Gov't*, 598 F. App'x 672, 678 (11th Cir. 2015) (affirming summary judgment finding that plaintiff's "physical presence at the front desk was an essential function of her position and her request to work from home (where she would not have been able to perform this essential function of her position), was for no reasonable accommodation.").[4]

   iii. Plaintiff failed to engage in the interactive process.

  Plaintiff's failure to accommodate claim also fails because she caused a breakdown in the interactive process. The undisputed evidence shows that Schneider requested Plaintiff to provide additional medical documentation by April 8, 2019, in support of her accommodation request. Although Plaintiff received the letter, she failed to timely respond. Because Plaintiff did not provide this requested medical documentation in a timely manner, she caused a breakdown in the interactive process

---

[4] Any contention by Plaintiff that other third shift APMs were permitted to work from home on a permanent or consistent basis is specious. Indeed, the undisputed evidence shows that while Schneider permitted APMs to work from home for "one-off" situations (for example, due to illness or to take care of a sick child), there is no evidence in the record that Schneider permitted any APM assigned to the third shift to work from home on a consistent or permanent basis. (Biskey-Rose Dep. 32:8-20, Torrence Dep. 55:16-21)

and her failure to accommodate claim cannot stand. *See Umbarger v. Ga. Dep't of Revenue,* 2007 WL 9700751, at *21 (N.D. Ga. Mar. 30, 2007) (holding "[b]ecause Plaintiff failed to fulfill his obligation to explain the medical necessity of the additional accommodation with supporting medical documentation, his accommodation claim…fails as a matter of law."); *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1288 (11th Cir. 1997) (holding "[l]iability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process.").

## B.   Plaintiff Cannot Establish a *Prima Facie* Disability Discrimination Claim Under the ADA.

Plaintiff also cannot establish that Schneider discriminated against her because of her disability or perceived disability under the ADA. As discussed *supra*, because Plaintiff was not a qualified individual with a disability, she cannot satisfy the second prong of her *prima facie* case and her claim fails for this reason alone. Plaintiff's disability discrimination claim also fails because she cannot show that Schneider treated similarly situated employees outside of her protected class more favorably than she was treated. *Banks v. iGov Techs., Inc.*, 661 F. App'x 638, 644 (11th Cir. 2016) (unpublished, per curiam) (citation omitted); *Lewis v. City of Union*

*City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) ("[A] plaintiff asserting an intentional-discrimination claim under *McDonnell-Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'").

Here, Plaintiff's discrimination claim fails because she has not presented any evidence of a similarly-situated employee who was treated more favorably. Plaintiff argues that APM Tiffany Kitchens received preferential treatment because Schneider granted Ms. Kitchens' 2018 request for intermittent FMLA leave to care for her ill mother, yet denied Plaintiff's third extension request to work part-time. (Pl's Dep. 197:6-13, 200:1-20). Ms. Kitchens is not similarly-situated to Plaintiff.

Ms. Kitchens, unlike Plaintiff, requested intermittent FMLA leave. In this respect, Schneider treated Plaintiff <u>the same</u> as it treated Ms. Kitchens. Both employees requested FMLA leave (Plaintiff – for her own serious health condition; Ms. Kitchens – for the serious health condition of her mother). Schneider reviewed their respective requests, and consistent with its obligations under the FMLA, approved both employees' request for leave. (Pl's Dep. 121:20-25, Pl's Dep. 121:7-25, 125:16-126:5, Exs. 11, 13; Kitchens Dep. 15:17-22).

Unlike Ms. Kitchens, though, Plaintiff exhausted her FMLA leave and then requested a part-time schedule as an accommodation under the ADA.[5] The analysis, then, shifts from whether Plaintiff had available FMLA leave to whether Plaintiff's proposed accommodations were reasonable and would enable her to perform the essential functions of her job. Schneider's obligations to Ms. Kitchens under the FMLA and its obligations to Plaintiff under the ADA, therefore, are "wholly distinct" and involve very different considerations. *See* 29 C.F.R. § 825.702(a) (noting that "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.").

Specifically, the FMLA entitles eligible employees, like Ms. Kitchens, to intermittent leave. 29 U.S.C. § 2612(a)(1)(D). Thus, once Ms. Kitchens notified Schneider that she required a reduced schedule via intermittent leave, the FMLA obliged Schneider to grant her request. *See Brown v. Gestamp of Ala. LLC*, 2018 WL 3455687, at *6 (S.D. Ala. 2018). In contrast, "[w]hether an accommodation [under the ADA] is reasonable depends on specific circumstances." *Terrell,* 132 F.3d at 626. For one, the ADA does not require employers to excuse employees from performing an essential function, even though eligible employees are entitled to FMLA leave even if it prevents them from performing essential job duties. 29 C.F.R.

---

[5] Ms. Kitchens never requested a reduced schedule leave under the ADA.

§§ 825.112, 825.123; *Revco,* 552 F. App'x at 922. In other words, the leave provisions of the FMLA and ADA are different and any attempt to treat them as one in the same is like comparing apples to oranges. They are not similar.

Even if it is possible to compare Ms. Kitchen's request for FMLA leave to Plaintiff's request for an accommodation under the ADA, there are several other reasons why Ms. Kitchens is not similarly situated to Plaintiff. First, as an APM on the first shift, Ms. Kitchens reported to a different supervisor and worked a different schedule than Plaintiff. Ms. Kitchens worked Monday through Friday, generally from 7 a.m. to 4 p.m., and always worked with several other APMs and never worked alone. (Kitchens Dep. 8:24-9:5). Therefore, when Ms. Kitchens was not in the office, there were other APMs in the office who could cover for Ms. Kitchens. In contrast, when Plaintiff was not in the office, there typically was no one who could cover for her because she was the only APM working the third shift. These differences further highlight the dissimilarities between Plaintiff and Ms. Kitchens. *See Galdamez v. DHL Air Exp. USA*, 578 F. App'x 887, 892 (11th Cir. 2014) (in gender discrimination case finding comparators not similarly situated because they had different supervisors than plaintiff); *see also Hartwell v. Spencer*, 792 F. App'x 687, 694 (11th Cir. 2019) (in race discrimination case, finding comparator not similarly

situated because he worked a different shift and had a different immediate supervisor in addition to the fact his conduct was less egregious than plaintiff's).

**C.     Plaintiff's Retaliation Claim Should be Dismissed.**

Plaintiff contends that Schneider retaliated against her in violation of the ADA by denying her workplace accommodation and terminating her employment. (Compl. at ¶ 64). Plaintiff's retaliation claim cannot stand.

As an initial matter, Plaintiff's retaliation claim should be dismissed because the alleged denial of a reasonable accommodation cannot be the basis of a retaliation claim under the ADA. Courts routinely dismiss retaliation claims that simply repackage claims that an employer failed to offer accommodations. *Lucas,* 257 F.3d at 1255 (rejecting plaintiff's attempt to "reclothe[]" a failure to accommodate claim as a retaliation claim under the ADA); *Perez v. Sprint/United Mgmt. Co.,* 2013 WL 6970898, at *11 (N.D. Ga. Dec. 19, 2013) (same). Because Plaintiff's retaliation claim merely restates her accommodation claim, it should be dismissed.

Even assuming Plaintiff could assert an ADA retaliation claim, she is unable to show a causal connection between requesting an accommodation and the termination of her employment. As discussed *supra*, Schneider made every effort to accommodate Plaintiff's alleged disability. Indeed, Schneider agreed to accommodate Plaintiff's multiple requests for extensions of her part-time schedule

and, all told, accommodated Plaintiff's part-time schedule for more than four months. The fact that Schneider repeatedly granted Plaintiff extensions of her requested accommodations belies any argument that Schneider terminated Plaintiff's employment in retaliation for requesting an accommodation. *See Isaac v. Wal-Mart Stores East, LP*, 2017 WL 6061533, at *6 (S.D. Ala. Dec. 7, 2017).

### D.   Plaintiff Cannot Establish a *Prima Facie* Case of Race Discrimination Under Title VII or Section 1981.[6]

Plaintiff argues that Schneider discriminated against her due to her race because it accommodated Ms. Kitchens (who is white) more favorably than Plaintiff (who is black). (Pl's Dep. 216:12-21). Plaintiff, however, cannot establish even a *prima facie* case of race discrimination because, as discussed in Section III(B)(1), *supra*, she cannot show that Ms. Kitchens is similarly situated to Plaintiff. *See Smith v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 819 F. App'x 774, 777 (11th Cir. 2020) (finding court did not err in granting summary judgment when plaintiff failed to identify similarly situated comparators). Therefore, Plaintiff's race discrimination claim should be dismissed.

---

[6] The elements of a claim of race discrimination under 42 U.S.C. § 1981 are the same as a Title VII claim. *Rice-Lamar v. City of Fort Lauderdale, Fla.*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000).

**E.    Schneider Had a Legitimate, Non-Discriminatory Reason To Terminate Plaintiff's Employment That Was Not Pretextual.**

Even if Plaintiff could establish a *prima facie* case, Schneider had a legitimate, non-discriminatory reason for its actions – i.e., Plaintiff could not perform the essential functions of her job. Courts in the Eleventh Circuit have consistently held that the inability of a plaintiff to perform an essential job function is a legitimate, non-discriminatory reason for termination. *See E.E.O.C. v. Eckerd Corp.*, 2012 WL 2568225, at *10 (N.D. Ga. July 2, 2012) (finding employer presented a legitimate reason for terminating plaintiff's employment because she was unable to perform the essential functions of her job).

Because Schneider has presented evidence setting forth its legitimate, nondiscriminatory reason for terminating Plaintiff's employment, the burden shifts to Plaintiff to prove that Schneider's proffered explanation was a pretext for unlawful discrimination. *See Silvestri v. Jupiter Inlet Colony*, 614 F. App'x 983, 984 (11th Cir. 2015) ("[T]o prove that a reason is a pretext for discrimination, the employee must show that the employer's asserted reason is false, and that discrimination was the real reason.").

Here, the only "evidence" Plaintiff has to support her belief that Schneider's actions were pretextual are her conclusory allegations of discrimination. Indeed, Plaintiff claims that she experienced race discrimination because Plaintiff is black

and Ms. Kitchens and the management team are white. (Pl's Dep. 216:12-217:18). This fact alone is not sufficient to establish a race discrimination claim. *See Brooks v. CSX Transp., Inc.*, 555 F. App'x 878, 882 (11th Cir. 2014) (holding that plaintiff could not establish pretext when the only "evidence" plaintiff presented was that the selected candidate was outside plaintiff's protected class); *see also Wilson v. Pepsi Bottling Grp.*, 609 F.Supp.2d 1350, 1368 (N.D. Ga. 2009) ("The fact that the alleged discriminatee's race differs from that of the alleged discriminator is not itself proof of intent to discriminate based on race.").

Finally, the fact that Schneider went above and beyond its legal obligations to accommodate Plaintiff negates any finding of pretext. *See Isaac,* 2017 WL 6061533, at *6 (finding "[t]hese undisputed facts [that employer accommodated employee's disability and went above and beyond its legal obligations] are irreconcilable with any notion of disability discrimination or retaliation, and underscore [plaintiff's] inability to show pretext.").

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Schneider's Motion for Summary Judgment and dismiss all of Plaintiff's claims with prejudice.

Date: June 7, 2021

Respectfully submitted,


By: ___/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on June 7, 2021, I electronically filed the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,


By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E

Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1B(1), Defendant Schneider National Carriers, Inc. ("Schneider") submits its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

**Plaintiff's Employment with Schneider**

1. Schneider is a transportation and logistics company that operates as a common and contract motor carrier throughout the United States and Canada. (Declaration of Travis Torrence attached hereto as Exhibit A, (hereinafter "Torrence Decl.") ¶ 3).

2. Schneider has implemented a Discrimination, Harassment, and Retaliation Prevention Policy, which Plaintiff acknowledged she reviewed, understood, and was able to access via Schneider's intranet. (Deposition of Cierra

Geter, excerpts of which are attached hereto as Exhibit B, (hereinafter "Pl's Dep.") 64:24-65:10, 65:25-66:11, Exs. 6-7).

3.    On July 14, 2014, Schneider hired Plaintiff as a full-time Area Planning Manager ("APM") on the third shift at its Fairburn, Georgia location. (Pl's Dep. 42:14-25, Ex. 2).

4.    The job title of the position at the time Schneider hired Plaintiff was Dispatch Analyst. (Pl's Dep. 41:22-42:7).

5.    The name of Plaintiff's job title changed to APM about a year later, but the job duties remained the same. (Pl's Dep. 42:8-16).

6.    From mid-2018 until the termination of her employment, Plaintiff was scheduled to work on Wednesday, Thursday, Friday and Sunday from 11:00 p.m. to 10:00 a.m. (Pl's Dep. 72:2-13).

7.    During that time period, Plaintiff reported to Team Lead, Travis Torrence.  (Pl's Dep. 69:4-9).

**Plaintiff's Essential Job Functions**

8.    Full time work and working in the office are essential job functions of APMs. (Torrence Decl. ¶¶ 6, 9-10).

9.    As an APM, Plaintiff's primary job was to provide support for Schneider drivers. (Pl's Dep. 54:3-6, Ex. 4).

10.     In providing support to Schneider drivers, APMs, like Plaintiff, would coordinate dispatching drivers with customer loads, assist drivers in gathering their paperwork and load information, take calls and messages from drivers, and resolve any driver issues. (Pl's Dep. 48:21-49:4, 54:7-12; Torrence Decl. ¶¶ 6, 10).

11.     In order to meet the business needs, during the time period that Schneider employed Plaintiff, APMs were expected to work full-time because Schneider needed to ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day. (Deposition of Marianne Biskey-Rose, excerpts of which are attached hereto as Exhibit C, (hereinafter "Biskey-Rose Dep.") 40:2-11; Torrence Decl. ¶ 6).

12.     During the time period that Schneider employed Plaintiff, because Schneider's drivers work all hours of the day, the Fairburn location was staffed 24-hours a day, seven days a week by full-time employees so that Schneider could best meet the needs of the drivers. (Biskey-Rose Dep. 12:18-20; Torrence Decl. ¶ 7).

13.     Plaintiff understood that she was expected to work full-time. (Pl's Dep. 40:14-17).

14.     Mr. Torrence did not have any direct reports that were permitted to work a part-time schedule. (Deposition of Travis Torrence, excerpts of which are attached hereto as Exhibit D (hereinafter "Torrence Dep." 64:24-65:3).

15.    In fact, during the entirety of Plaintiff's employment, Schneider did not employ any part-time APMs at the Fairburn location. (Pl's Dep. 83:6-10; Deposition of Tiffany Kitchens, excerpts of which are attached hereto as Exhibit E, (hereinafter "Kitchens Dep.") 28:5-10; Torrence Decl. ¶ 8).

16.    Plaintiff also understood that certain tasks necessary to assist drivers required her physical presence in the office. (Pl's Dep. 63:7-11).

17.    For example, Plaintiff needed to be in the office to interact with drivers who came into the office. (Pl's Dep. 60:6-15).

18.    Plaintiff admits that she frequently interacted with drivers face-to-face, and that this interaction was necessary in order to develop relationships with drivers and better assist them. (Pl's Dep. 48:21-49:4, 55:7-56:10, 59:13-24, Ex. 4; Torrence Decl. ¶ 9).

19.    Plaintiff further understood that Schneider expected Plaintiff to have face-to-face interaction with drivers and that Schneider deemed that an important function of her job.  (Pl's Dep. 59:13-24).

20.    Plaintiff admitted that the one-on-one interactions with drivers could only be performed in the office. (Pl's Dep. 60:6-15).

21.    APMs also needed to work in the office to assist drivers in locating available tractors, to retrieve keys for drivers that were located in a secure lock box,

4

and to print off paperwork for drivers. (Pl's Dep. 60:6-62:4, Exs. 4, 5; Deposition of Sarah Kopf, excerpts of which are attached hereto as Exhibit F, (hereinafter "Kopf Dep.") 19:19-20:18; Torrence Decl. ¶ 10).

22.     Plaintiff further understood that having the ability to work in a fast-paced, high pressure environment was an essential function of her position. (Pl's Dep. 57:5-16, Ex. 4).

23.     Because there were certain essential tasks that needed to be completed in the office, APMs under Mr. Torrence's supervision were not regularly permitted to work remotely. (Torrence Decl. ¶ 11).

24.     Rather, employees at the Fairburn office location were occasionally permitted to work from home for one-off situations, such as due to illness or to take care of a sick child. (Biskey-Rose Dep. 32:8-20; Torrence Dep. 55:16-21).

25.     Sarah Kopf, an APM on the second shift, was permitted to work from home when her power went out in her home or when she had a family emergency. (Kopf Dep. 6:15-19, 12:5-19).

26.     During the time period of March 5, 2018 through March 8, 2020, Ms. Kopf only worked from home on a few occasions and never consistently worked from home. (Kopf Dep. 6:7-24, 21:18-22:6).

27.     Ms. Kopf never worked a part-time schedule. (Kopf Dep. 21:15-17).

**Plaintiff Frequently Worked Alone as an APM on the Third Shift**

28.     The third shift APM role was staffed differently from the first and second shifts. Whereas the first shift was normally staffed with four to five APMs, and the second shift was staffed with two to three APMs, the third shift only had one or two APMs. (Pl's Dep. 100:16-19).

29.     As a result, Plaintiff frequently worked alone on the third shift, especially on Sundays. (Pl's Dep. 75:14-17, 100:16-23, 142:20-143:1, 146:6-8; Torrence Decl. ¶ 5).

30.     Additionally, unlike first and second shift APMs, third shift APMs did not have additional team members to assist in answering messages or phone calls, dispatching drivers, or dealing with driver issues. (Pl's Dep. 100:18-101:6).

31.     Working in the office was especially important on the third shift, when APMs often worked alone. (Torrence Decl. ¶ 10).

**Plaintiff Takes FMLA Leave**

32.     In October 2018, Plaintiff was diagnosed with post-traumatic stress disorder and panic disorder by Dr. Cassandra Wanzo, Plaintiff's healthcare provider. (Pl's Dep. 86:20-22, 87:5-8, 88:17-20).

33.     On October 9, 2018, Plaintiff began a leave of absence under the FMLA for her own serious health condition. (Pl's Dep. 121:17-19, Ex. 11).

34.     Prior to her FMLA leave, Plaintiff had not communicated with anyone about her diagnosis of post-traumatic stress disorder and panic disorder. (Pl's Dep. 104:15-19).

35.     Schneider approved Plaintiff's FMLA leave from October 9, 2018 to December 31, 2018.  (Pl's Dep. 121:7-25, 125:16-126:5, Exs. 11, 13)

36.     Plaintiff exhausted her twelve weeks of FMLA leave entitlement as of December 31, 2018.  (Pl's Dep. 126:3-5).

37.     Plaintiff was expected to return to full-time work on January 2, 2019. (Pl's Dep. 125:1-126:5, Ex. 13).

38.     During the time that Plaintiff was out on FMLA leave, Plaintiff's work was performed by other APMs and Mr. Torrence. (Torrence Dep. 67:20-23).

39.     To ensure coverage while Plaintiff was out on FMLA leave, Mr. Torrence worked the overnight shift on Sundays, in addition to his regular duties. (Torrence Dep. 67:24-68:1).

40.     Mr. Torrence worked five days per week as Operations Team Leader and approximately 50 hours per week. (Torrence Decl. ¶ 4).

### Plaintiff's Initial Accommodation Request

41.     Prior to the expiration of her FMLA leave, Plaintiff submitted a return to work form dated December 15, 2018 and completed by Dr. Wanzo. (Pl's Dep. 126:14-25, Ex. 14.).

42.     Dr. Wanzo stated that Plaintiff could return to work on January 2, 2019, but with the restriction of working three days a week, ten-hour days. (Pl's Dep. 127:13-17, Ex. 14).

43.     Dr. Wanzo indicated that Plaintiff could return to work without restrictions effective February 14, 2019. (Pl's Dep. Ex. 14).

44.     Schneider agreed to accommodate Plaintiff's request. (Pl's Dep. 133:4-23, Ex. 15).

45.     In addition to only being able to work three days a week, Plaintiff was limited in the days that she could work. (Pl's Dep. 134:24-135:22).

46.     Specifically, Plaintiff could not work her Sunday shift (11:00 p.m. – 10:00 a.m.) because she needed to attend counseling sessions on Monday mornings. (Pl's Dep. 72:2-13, 134:24-135:22).

47.     Mr. Torrence agreed to accommodate Plaintiff's request to not work Sundays. (Pl's Dep. 134:24-135:24).

48.     When Plaintiff returned to work on January 2, 2019, she worked Wednesdays, Thursdays, and Fridays. (Pl's Dep. 126:6-8, 135:23-136:3).

49.     In order to accommodate Plaintiff's restriction of part-time work, Mr. Torrence worked Plaintiff's Sunday overnight shift, in addition to his regular duties. (Torrence Dep. 51:24-52:9, 52:23-53:1, 67:3-7; Torrence Decl. ¶ 12).

50.     Mr. Torrence typically started working the overnight shift at 11 p.m. on Sunday and ending at 7 a.m. on Monday. Mr. Torrence would then come back to work on Monday at 1 p.m. and work to 9 p.m. to perform his regular duties as an Operations Team Leader. During the time he covered Plaintiff's Sunday overnight shift, he worked on average 55-60 hours a week.  (Torrence Decl. ¶ 14).

51.     Plaintiff acknowledged that her inability to work on Sundays impacted the third shift and their workload. (Pl's Dep. 137:9-12).

**Plaintiff's Accommodation Extensions and Request to Work from Home**

52.     Plaintiff did not return to full-time work on February 14, 2019.  (Pl's Dep. 145:18-22).

53.     On January 21, 2019, Plaintiff submitted a medical note from Dr. Wanzo requesting an extension of Plaintiff's part-time work schedule of ten hours a day, three days per week, until March 20, 2019. (Pl's Dep. 139:9-140:3, Ex. 16).

54.   Schneider agreed to accommodate Plaintiff's request for an extension of her part-time work schedule. (Pl's Dep. 176:10-17, Ex. 22).

55.   During this time period, Mr. Torrence continued to work Plaintiff's Sunday overnight shift in the office, in addition to his regular duties. (Torrence Decl. ¶¶ 12-13).

56.   Plaintiff did not return to work full-time on March 20, 2019. (Pl's Dep. 150:13-15).

57.   On March 9, 2019, Dr. Wanzo submitted medical documentation to Schneider seeking another extension of Plaintiff's part-time work schedule of three days per week, ten hours per day, until April 30, 2019. (Pl's Dep. 150:16-151:1, 151:23-152:1, Ex. 17).

58.   Plaintiff also sought an accommodation of working from home on Thursdays and Fridays, and anytime Plaintiff was scheduled to work alone.  (Pl's Dep. 154:3-14; Ex. 17).

59.   On March 18, 2019, Anissa Gauthier, a Leave Analyst, emailed Dr. Wanzo requesting additional information about Plaintiff's requested accommodation. (Declaration of Christine Schneider, attached hereto as Exhibit G (hereinafter "Schneider Decl.") ¶ 10, Ex. 1).

60.    On March 30, 2019, Dr. Wanzo submitted additional medical documentation to Schneider extending Plaintiff's restrictions to June 5, 2019. (Pl's Dep. 159:10-161:17, Ex. 19).

61.    Dr. Wanzo stated that Plaintiff "can only work 3 days per week Wed/Thurs/Fridays: Working from home 2 days/week (10 hour days)." (Pl's Dep. 160:18-25, Ex. 19).

62.    On April 2, 2019, Ms. Gauthier emailed Dr. Wanzo and Plaintiff a copy of a letter that contained additional questions that needed to be answered to determine if Schneider could accommodate Plaintiff's restrictions.  (Schneider Decl. ¶ 10, Ex. 1).

**Schneider's Efforts to Accommodate Plaintiff**

63.    After learning of Plaintiff's request to extend her part-time schedule until June 5, 2019, Mr. Torrence and Ms. Biskey-Rose determined that based on Schneider's business needs and staffing levels, they could not continue to accommodate Plaintiff's request to eliminate two essential job functions – full-time work and working in the office. (Biskey-Rose Dep. 36:14-22; Torrence Decl. ¶¶ 15-16).

64.    By April 12, 2019, Mr. Torrence had been working Plaintiff's Sunday overnight shift for approximately six months and he could no longer absorb

11

Plaintiff's job duties for an additional two months. Working the additional Sunday overnight shift was physically exhausting for Mr. Torrence and it negatively impacted his ability to complete his Operations Team Leader tasks as well as his health. (Torrence Decl. ¶ 16).

65.     Schneider explored other potential accommodations for Plaintiff. On April 2, 2019, Schneider sent Plaintiff a letter requesting that Dr. Wanzo provide additional information to Schneider by no later than April 8, 2019, so that it could explore other potential accommodations.  (Pl's Dep. 172:9-22, 183:18-186:9, Exs. 20, 23).

66.     In the letter, Schneider asked Dr. Wanzo: "[Plaintiff] is currently working on Wednesday, Thursday and Friday. Is there a different day that she is available to work if she can work 4 days?"  (Pl's Dep. Ex. 23).

67.     Schneider also asked Dr. Wanzo: "Can [Plaintiff] work Monday-Friday 8 hour schedule?"(Pl's Dep. Ex. 23).

68.     Plaintiff provided this letter to Dr. Wanzo. (Pl's Dep. 172:20-22, 186:6-9).

69.     Dr. Wanzo did not respond to Schneider's April 2, 2019 letter until April 27, 2019.  (Pl's Dep. Ex. 23).

70.     In Dr. Wanzo's April 27, 2019 response to Schneider's letter, Dr. Wanzo stated that:  "[Plaintiff] is unable to work a Mon-Friday schedule, this was never a part of her schedule (it was Wed, Thurs, Fri and Sunday). Her current schedule is Wed-Fri." (Pl's Dep. Ex. 23).

71.     Dr. Wanzo also wrote: "[Plaintiff] is unable to work well in a fast-paced, high pressure environment." Plaintiff agreed with this assessment. (Pl's Dep. 187:12-188:5, Ex. 23).

72.     Ms. Biskey-Rose also asked Plaintiff if Plaintiff could change her Monday morning counseling session (which prohibited Plaintiff from working her Sunday overnight shift).  (Biskey-Rose Dep. 37:8-19; Pl's Dep. 134:24-135:22).

73. Plaintiff indicated this was not possible as the other available counseling session coincided with another doctor appointment. (Biskey-Rose Dep. 37:8-19).

74.     Schneider also considered hiring a temporary employee to cover Plaintiff's Sunday night shift; however, it was not a viable option because the temporary employee would be working the overnight shift by him or herself without the knowledge and background needed to resolve issues that arose. (Biskey-Rose Dep. 40:14-25; Deposition of Ashley Janssen, excerpts of which are attached hereto as Exhibit H, (hereinafter "Janssen Dep") 40:21-41:18).

75.    Schneider considered reassigning Plaintiff to an open and available position for which she was qualified, but the Fairburn location only had full-time positions. (Torrence Decl. ¶ 17).

76.    After determining that Plaintiff's accommodation requests were not reasonable and that there were no reasonable accommodations that would have enabled Plaintiff to perform the essential functions of her position, Schneider decided to terminate Plaintiff's employment, effective April 12, 2019.  (Torrence Decl. ¶ 18).

77.    As of June 5, 2019, Plaintiff still was not able to return to full-time work. (Pl's Dep. 193:9-13).

78.    On June 26, 2019, Dr. Wanzo completed an Attending Physician's Statement – Progress Report stating that Plaintiff continued to only be able to work three days per week, ten hour days, until September 23, 2019.  (Pl's Dep. 193:19-194:5, Ex. 24).

### Plaintiff Has Not Identified Any Similarly-Situated Employees Treated More Favorably Than Her

79.    Plaintiff asserts that Tiffany Kitchens received preferential treatment because Schneider granted Ms. Kitchens' 2018 request for intermittent FMLA leave to care for her ill mother, yet denied Plaintiff's ADA accommodation requests.  (Pl's Dep. 197:6-13, 200:1-20).

80.     Plaintiff also asserts that Schneider discriminated against her due to her race because it accommodated Ms. Kitchens more favorably than Plaintiff. (Pl's Dep. 216:12-21).

81.     Ms. Kitchens, a white APM, reported to Rodney Dunn and was assigned to the first shift. (Kitchens Dep. 8:18-9:7, 10:5-10, Torrence Dep. 20:6-8).

82.     As an APM, Ms. Kitchens worked Mondays through Fridays, generally from 7 a.m. to 4 p.m. (Kitchens Dep. 8:18-9:7)

83.     Ms. Kitchens always worked with several other APMs and never worked alone. (Kitchens Dep. 8:24-9:5, 27:22-28:4).

84.     In approximately October 2018, Ms. Kitchens requested and was approved for intermittent FMLA leave to care for her ill mother who had suffered a stroke.  (Kitchens Dep. 13:15-16:25).

85.     Ms. Kitchens, however, never actually used any intermittent FMLA leave to care for her mother.  (Kitchens Dep. 15:17-16:25).

86.     Instead, Ms. Kitchens utilized vacation time any time she would have to be out of work. (Kitchens Dep. 16:16-22).

87.     During the 2018 through 2019 time period, Ms. Kitchens worked at least five days per week.  (Kitchens Dep. 29:1-4).

88.     The woman hired to replace Plaintiff's position on the third shift was

African American. (Pl's Dep. 210:21-211:11).

Date: June 7, 2021

                              Respectfully submitted,


                              By:___/s/ Peter A. Milianti_____
                              Peter A. Milianti (admitted *pro hac vice*)
                              Melissa M. Weiss (admitted *pro hac vice*)
                              McGuireWoods LLP
                              77 West Wacker Drive, 41st Floor
                              Chicago, IL 60601
                              T: 312-849-8100
                              F: 312-849-3690
                              pmilianti@mcguirewoods.com
                              mweiss@mcguirewoods.com

                              M. Laughlin Allen, Esq.
                              Georgia Bar No. 901999
                              McGuireWoods LLP
                              1230 Peachtree Street, N.E
                              Suite 2100, Promenade
                              Atlanta, GA 30309-3534
                              T: (404) 443-5738
                              F: (404) 443-5773
                              mlallen@mcguirewoods.com

                              *Counsel for the Defendant*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on June 7, 2021, I electronically filed the foregoing *Defendant's Statement of Undisputed Material Facts* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,


By: __/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E

Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF TRAVIS TORRENCE IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Travis Torrence, depose and state as follows:

1.      My name is Travis Torrence. I am over the age of eighteen and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct based upon my personal knowledge.

2.      I currently serve as Operations Manager for Schneider National Carriers, Inc. ("Schneider").

3.      Schneider is a transportation and logistics company that operates as a common and contract motor carrier throughout the United States and Canada.

1

4.       As an Operations Team Leader, I worked five days per week but the days that I worked varied depending upon the needs of the business. I did not have a set work schedule. I typically worked 50 hours per week in my role as Operations Team Leader.

5.       As an APM on the third shift, Ms. Geter frequently worked alone, especially on Sundays.

6.       Full-time work is an essential function of the APM position. During the time period that Schneider employed Ms. Geter, APMs were needed to work full-time so that Schneider could ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day.

7.       During the time period that Schneider employed Ms. Geter, the Fairburn location was only staffed by full-time employees so that Schneider could best meet the needs of its drivers.

8.       Schneider did not employ any part-time APMs at the Fairburn location during the time period Ms. Geter was employed.

9.       During the time period that I supervised Ms. Geter, it was essential for second and third shift APMs to consistently work in the office so that the APMs could develop relationships with drivers and better assist them.

10.    It was also necessary for APMs to work in the office so they could retrieve keys for drivers that were located in a secure lock box as well as print off paperwork for drivers. This was especially important on the third shift, when APMs often worked alone.

11.    Because there were certain essential tasks that needed to be completed in the office, APMs under my supervision were not regularly permitted to work remotely.

12.    In order to accommodate Ms. Geter's restriction of part-time work, I worked Ms. Geter's Sunday overnight shift, in addition to my regular duties. I typically started working the overnight shift at 11 p.m. on Sunday and ended at approximately 7 a.m. on Monday. I would then come back to work on Monday at approximately 1 p.m. and work to 9 p.m. to perform my regular duties as an Operations Team Leader.

13.    I consistently covered Ms. Geter's Sunday overnight shift from when she went out on FMLA leave in October 2018, until the termination of her employment in mid-April 2019.

14.    During the time period I covered Ms. Geter's Sunday overnight shift, I worked on average 55-60 hours a week.

15.    In early April 2019, after considering Ms. Geter's third request to extend her part-time schedule for another two months as well as her request to work from home two days per week or any time she was to work alone, Marianne Biskey-Rose and I determined that we could no longer accommodate Ms. Geter's requests.

16.    By April 12, 2019, I had been working Ms. Geter's Sunday overnight shift for approximately six months and I could no longer absorb Ms. Geter's job duties for an additional two months, if not longer. Working the additional Sunday overnight shift was physically exhausting, negatively impacted my ability to complete my Operations Team Leader tasks, and negatively impacted my health.

17.    Ms. Biskey-Rose and I discussed the possibility of reassigning Ms. Geter to an open and available position, but the Fairburn location only had full-time positions.

18.    Because Ms. Geter's requests were not reasonable and there were no reasonable accommodations that would have enabled Ms. Geter to perform the essential functions of her position, Ms. Biskey-Rose and I decided to terminate Ms. Geter's employment effective April 12, 2019.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7th, 2021.

Travis Torrence

# EXHIBIT B

Page 1

IN THE UNTIED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

CIERRA GETER,                          ) CASE NO.:
                                       ) 20-CV-01148-SCJ-JSA
   Plaintiff,                          )
                                       )
vs.                                    )
                                       )
SCHNEIDER NATIONAL CARRIERS,           )
INC.,                                  )
                                       )
       Defendants.                     )
_____)


       The video conference deposition of CIERRA
GETER taken pursuant to Notice and agreement of
counsel for any and all purposes allowed under
the Georgia Civil Practice Act; the reading and
signing of the deposition is being reserved;
taken before Morgan Spriggs, Certified Court
Reporter and Certified Verbatim Reporter in and
for the State of Georgia to commence at
10:00 A.M. on the 9th day of March, 2021.  All
parties completely remote.



Page 2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4         CHERYL B. LEGARE, ESQ.
           Legare Attwood & Wolfe, LLC

 5         Two Decatur Town Center
           125 Clairemont Avenue

 6         Suite 380
           Decatur, Georgia 30030

 7         (470) 823-4000
           cblegare@law-llc.com

 8

 9

      ON BEHALF OF THE DEFENDANTS:

10

           PETER A. MILIANTI, ESQ.

11         McGuire Woods, LLP
           77 West Wacker Drive

12         Suite 4100
           Chicago, Illinois 60601

13         (312) 750-2765
           pmilianti@mcguirewoods.com

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 5

```
 1              P R O C E E D I N G S

 2                                    10:00 A.M.

 3              THE COURT REPORTER:  Before I swear in

 4    the witness, I will ask counsel to stipulate on

 5    the record that due to the national pandemic, the

 6    court reporter will swear in the witness, even

 7    though she's not in the physical presence of the

 8    witness and there is no objection at this time,

 9    nor will there be an objection at a further date.

10              MR. MILIANTI:  No objection.

11              THE COURT REPORTER:  Cheryl?

12              MS. LEGARE:  No problem.

13              THE COURT REPORTER:  Thank you.

14              MS. LEGARE:  Sorry.

15              (Whereupon,

16                   CIERRA GETER

17              was called as a witness and

18              having been first duly sworn

19              was examined and testified

20              as follows:)

21              THE WITNESS:  Yes.

22              THE COURT REPORTER:  Thank you.

23              MR. MILIANTI:  Is it possible that you

24    could -- it was hard for me to hear you,

25    Ms. Geter.  I don't know if you could get a
```



Page 40

1    Marianne Biskey-Rose, I believe.

2         Q.  Okay.  All right.  And did you interview

3    with these folks collectively or separately?

4         A.  Separately.

5         Q.  And do you recall what, if anything,

6    they told you about the specific duties for this

7    position?

8         A.  They stated that -- that they were

9    looking for a team player, someone that is

10   enthusiastic about learning, also someone that is

11   willing to work under a high stress environment

12   and be a collective team participant and

13   eventually a leader.

14        Q.  At the time that you interviewed for the

15   position, did you understand it to be a full-time

16   position?

17        A.  Correct.

18        Q.  And do you know who -- obviously you

19   were ultimately hired into the position, right?

20        A.  Yes.

21        Q.  Do you know who hired you?

22        A.  Yes.  Greg Cochran.

23        Q.  Do you know if Marianne recommended you

24   for hire?

25        A.  I do not know.  They did not disclose



1    any of that type of information to me.

2         Q.  Okay.  If you could look at -- it should

3    be the next document in that pile.  It should be

4    Bates-stamped Schneider 506 through 507.

5         A.  Uh-huh, yes.

6         Q.  Do you see that document?

7         A.  Yes.

8         Q.  Okay.  So let's mark this as Plaintiff's

9    Deposition Exhibit number 2.  And Ms. Geter, this

10   is the offer letter that you received from

11   Schneider; is that correct?

12           (Plaintiff's Exhibit 2 was

13             marked and identified.)

14        A.  That is correct.

15        Q.  Okay.  And this document is dated July

16   2, 2014; is that right?

17        A.  Yes.

18        Q.  Okay.  And did you receive this document

19   on or about that date?

20        A.  Yes.  Via e-mail.  Uh-huh.

21   (Affirmative).

22        Q.  Okay.  And is that -- that's your name

23   and address on the first page of this document?

24        A.  Yes.

25        Q.  Okay.  And if you look under position on



1    this first page, it says, dispatch analyst; do

2    you see that?

3         A.  Yes.

4         Q.  Does that refresh your memory as to the

5    title of the position?

6         A.  Yes, it does.  I knew it had dispatch

7    something in it.

8         Q.  And you said -- you testified that the

9    title was changed to area planning manager about

10   a year later; is that right?

11        A.  Yes, sir.  Like a year to a year and a

12   half later, they did a transition of position and

13   titles.

14        Q.  But the job duties remained the same,

15   just a title change; is that right?

16        A.  Correct.

17        Q.  Okay.  And if you look under where it

18   says position it says, dispatch analyst; 3rd

19   shift; full time 40 hours per week; exempt.  Do

20   you see that?

21        A.  Yes.

22        Q.  Okay.  And that was your understanding

23   of the position for which you were hired,

24   correct?

25        A.  Correct.



Page 43

 1      Q.  And it says 3rd shift.  Do you know --
 2  what were your hours when you first started as a
 3  dispatch analyst?
 4      A.  I worked from 11:00 p.m. to 7:00 a.m.
 5  and my days I worked were Wednesday through
 6  Sunday.
 7      Q.  Wednesday through Sunday?
 8      A.  Correct.
 9      Q.  And you worked at the Fairburn location;
10  is that right?
11      A.  Yes, sir.
12      Q.  How far was that location from your
13  home?
14      A.  6.2 miles.
15      Q.  And to whom did you report when you
16  first started?
17      A.  When I first started Shawn Brantley and
18  Greg Cochran.
19      Q.  Do you recall how long you reported to
20  those two individuals?
21      A.  Shawn until he quit in February 2018.
22  February 2018, I think that's the month he quit
23  and the year he quit.
24      Q.  That's when Shawn left Schneider?
25      A.  Yes, sir.  And then I believe Greg



Page 44

1    Cochran left late May, early June right after he

2    got his master's.  I remember that.

3         Q.  Of 2018?

4         A.  Of 2018, correct.  And I just want to

5    make sure it's 2018.  Can I look at the calendar,

6    please?

7         Q.  Sure.

8         A.  I just want to make sure.  I don't want

9    to give any false dates.

10        Q.  No problem.

11        A.  Okay.  So Mr. Tony actually left

12   Schneider -- my surgery was August of 2015 -- I'm

13   sorry.  I just want to be accurate.

14        Okay.  My apologies.  So the year is 2016

15   Shawn left, same month, February.  And then Greg

16   left late May, late June of 2016.  The reason why

17   Mr. Tony left October 2015 while I was on leave

18   for surgery.  That's how I remember that.

19        Q.  Okay.  So when you say that you reported

20   to both Shawn and Greg, was that because -- for

21   different days of the week, or did one of them

22   report up to the other?

23        A.  Yes, sir.  So Shawn was my team lead and

24   he reported to Greg and Shawn was there with the

25   team all the time.  He was there to fill in for



Page 48

1  BY MR. MILIANTI:

2      Q.  So there's 20 to 21 office or cubicle

3  spaces at the Fairburn location?

4      A.  Correct.

5      Q.  It's my understanding that a portion of

6  the Fairburn location was also a driver lounge;

7  is that accurate?

8      A.  Yes.

9      Q.  Okay.  And it's my understanding that

10  drivers would come in and come out and they would

11  sit in the lounge to do whatever they were going

12  to do in the lounge before they started or after

13  they ended their workday; is that accurate?

14      A.  Yes.  And they would come in into the

15  operations office where we are located and then

16  most of the time, they don't sit in the driver

17  lounge because no one is in here.  So they want

18  to talk, so they'll come into the operations side

19  to start their day, get paperwork, get their load

20  information.

21      Q.  And would you help them in getting their

22  paperwork and load information?

23      A.  Yes.  I would definitely help them get

24  all their paperwork.  Once we get that phone call

25  or a message, I would get that prepared for them



1    and ready, so when they come in or I will, you

2    know, start preparing that on the way -- if they

3    walk in and I'm still doing another task, I have

4    it, you know, in preparation for them.

5         Q.   And is there -- is there an approximate

6    number of drivers that would be assigned or

7    dispatched out of the Fairburn location; do you

8    know?

9         A.   Okay.  In reference to which years?

10   Because between 2014 and I believe mid-20 --

11   yeah, 2014 when I started there and mid-2016, we

12   dispatched from Quebec, Canada to Miami, Florida.

13   So our dispatch team on the support shift handled

14   17 to 18 markets at a time at night, so that's

15   approximately 400 to 425 drivers, give or take a

16   few.

17        Q.   And how about after mid-2016?

18        A.   That got cut to 250 and below.

19        Q.   So approximately 250 drivers?

20        A.   Yes, sir.

21        Q.   Out of the Fairburn operating center?

22        A.   Correct.

23        Q.   Was this just -- was Fairburn just

24   intermodal?

25        A.   It's just intermodal, but it also was



```
 1   right?

 2        A.  Yes.

 3        Q.  And would it be accurate to say that one

 4   of your primary duties was supporting the

 5   drivers?

 6        A.  Yes, sir.

 7        Q.  And you would take calls and messages

 8   from drivers; is that right?

 9        A.  Yes, sir.

10        Q.  You would help drivers resolve any

11   issues that they had?

12        A.  Yes, sir.

13        Q.  And you frequently interacted with the

14   drivers face-to-face; is that correct?

15        A.  Yes, sir.  Only the Atlanta drivers

16   face-to-face.

17        Q.  Atlanta drivers.  And you mentioned

18   there were, if I recall correctly, approximately

19   250 Atlanta drivers?

20        A.  No.  That's 2,250 drivers total in the

21   southeast region.

22        Q.  Okay.  How many --

23        A.  Atlanta -- go ahead.

24        Q.  How many Atlanta drivers?

25        A.  I believe it was between a hundred and a
```



Page 55

 1   hundred and ten.  It just fluctuated depending on

 2   the season of trucking.  So they have -- like a

 3   lot of drivers would leave and then some drivers

 4   will come back and then they do a big hiring in

 5   the middle of the year.  So it just depends on

 6   the season.

 7        Q.  Okay.  So you would have -- would it be

 8   accurate to say that you would have frequent

 9   face-to-face interaction with the Atlanta

10   drivers?

11        A.  Correct.

12        Q.  If you turn to the second page of this

13   document --

14        A.  Yes, sir.

15        Q.  -- do you see where it says skills/

16   behaviors necessary to perform job?

17        A.  Uh-huh.  (Affirmative).

18        Q.  Is that a yes?

19        A.  Yes, sir.

20        Q.  Okay.  And it states, abilities or

21   qualities an associate must possess in order to

22   perform the essential job duties listed by core

23   competency; do you see that?

24        A.  Yes.

25        Q.  And under communication it says, ability



1   to develop relationships through interpersonal

2   skills; is that right?

3        A.  Yes.

4        Q.  And you understood that was one of the

5   essential job duties of your position; is that

6   correct?

7        A.  Yes.

8        Q.  Okay.  And who did you need to develop

9   these relationships with?

10       A.  The drivers and with my teammates.

11       Q.  And how would you go about developing

12  the relationships with drivers?

13       A.  Just day-to-day talking with them.  And

14  due to the fact that I was a former driver, I

15  could relate to them with their circumstances,

16  and give them -- give them information from a

17  different perspective, whereas they would not

18  understand it coming from an operation

19  standpoint.

20       Q.  Okay.  And if you look under the other

21  -- one of the core competencies is positive

22  impact; do you see that?

23       A.  Yes.

24       Q.  And the third one down says, take

25  initiative, a self-starter; do you see that?



```
 1          A.  Yes.

 2          Q.  And did you agree that was an essential

 3   job duty for the area planning manager position?

 4          A.  Yes.

 5          Q.  And underneath that, it says ability to

 6   work in a fast-paced, high pressure environment;

 7   do you see that?

 8          A.  Yes.

 9          Q.  And you understood that was one of the

10   essential job duties of an area planning manager?

11          A.  Yes.

12          Q.  You -- you understood that as an area

13   planning manager, you would need to work in a

14   fast-paced, high pressured environment; is that

15   right?

16          A.  Yes.

17          Q.  And would you agree that it was a high

18   -- I'm sorry -- a fast-paced, high pressure

19   environment?

20          A.  Oh, yes.

21          Q.  And would it be accurate to say that as

22   an area planning manager you would need to be in

23   the office to support a driver if they came in

24   with a particular issue?

25          A.  Can you repeat that one more time for
```



1    But my Atlanta drivers, yes, I feel as though

2    that they appreciated us being in the office so

3    they can have face-to-face human interaction, so

4    I can definitely understand that standpoint and

5    that viewpoint as well.

6         However, I know for sure that we dispatch

7    drivers from Quebec.  That's across the

8    international lines, so you know, when they had

9    issues, we were the ones in Atlanta, Georgia that

10   had to help them, but we only were limited to

11   what we could do because of our distance and

12   communication with them at that time.

13        Q.  Would it be accurate to say that

14   Schneider wanted you to have face-to-face

15   interaction with the Atlanta drivers --

16        A.  Yes.

17        Q.  -- in your position as an area planning

18   manager?

19        A.  Yes.

20        Q.  Okay.  And they deemed that -- Schneider

21   deemed that important because they wanted you to

22   develop those relationships with the Atlanta

23   drivers; is that right?

24        A.  Correct.

25        Q.  Would you agree with me that there were



Page 60

1    certain functions of your position as an area

2    planning manager that could only be completed in

3    the office?

4         A.  Could I get a reference point to what

5    you're --

6         Q.  Was there any -- is there any -- any

7    position -- any job duty that you held -- any job

8    duty that you performed as an area planning

9    manager that you believe could only be performed

10   in the office?

11        A.  The only thing and I thought that could

12   be performed or think can is the driver

13   interaction, like the one-on-one with the drivers

14   and management team.  You know, human to human

15   interaction.

16        Q.  Would there ever be occasions where you

17   needed to be in the office to find driver

18   tractors?

19        A.  Yes.

20        Q.  And is that another situation where you

21   would need to be in the office in order to

22   perform your job duties?

23        A.  Yes.  And we had a situation where I

24   remember I was sick and in particular where I

25   worked from home and Travis had to help me



Page 61

1    because he knew I couldn't come up there.  So

2    what he did, he searched for the tractors for me,

3    and the drivers have a key box that's actually in

4    the driver's lounge and we send a message to the

5    drivers that needed the trucks.

6        At the time they would have come in and

7    they'd say, hey, I need a truck, or my truck is

8    down, we'll direct them to the key box and we

9    already had -- the keys had the tractor numbers

10   already attached to them and I said, hey, go to

11   the truck number such and such.  It's located --

12   because the trucks have GPS, so you can locate

13   the tractor and tell them where to go pick up the

14   tractor.

15       And if it was at the OC, which is off -- 23

16   miles away off of Bouldercrest, so we had to

17   locate them there and send them up there to pick

18   up a truck, and then the OC can cut a key for

19   that truck, or they already have a copy of the

20   key because that's where the maintenance

21   department is located.

22       Q.  Okay.  But there were situations where

23   you would need to physically be present in the

24   office in order to locate tractors for drivers?

25       A.  Correct.



Page 62

```
 1        Q.  And that was a key function of your job

 2   responsibility as an area planning manager,

 3   right?

 4        A.  Correct.

 5        Q.  If you could turn -- look to the next

 6   exhibit, which we'll mark as Plaintiff's Exhibit

 7   5 and it's Bates-stamped Schneider 0060.  Do you

 8   see that one?

 9           (Plaintiff's Exhibit 5 was

10            marked and identified.)

11        A.  Yes.

12        Q.  Okay.  All right.  And this appears to

13   be an e-mail that you sent on August 25, 2017 to

14   Doug Horton, Marianne Biskey-Rose, Rodney Dunn,

15   and Travis Torrence; is that correct?

16        A.  Yes.

17        Q.  Okay.  And I just want to direct your

18   attention to the second to last sentence in that

19   first paragraph.

20        A.  Uh-huh.  (Affirmative).

21        Q.  You wrote this morning I had to leave my

22   house, I was working from home, and rush over to

23   the office to find two driver's tractors to use

24   for today.  Did I read that correctly?

25        A.  Correct.
```



 1        Q.   Okay.  And you go on to state, I admit I
 2   was not too happy about stopping my planning and
 3   leaving drivers in the phone query to help those
 4   drivers; however, I had to do what I had to do to
 5   get things done.  Did I read that correctly?
 6        A.   Correct.
 7        Q.   Okay.  And so as reflected in your
 8   e-mail, you understood that for certain tasks you
 9   needed to be in the office to do what you had to
10   do to get things done; is that right?
11        A.   Correct.
12        Q.   Why don't we go to the next exhibit.
13   We'll mark this as number 6, and it's Schneider
14   138 through 140.
15             (Plaintiff's Exhibit 6 was
16               marked and identified.)
17        A.   Uh-huh.  (Affirmative).
18        Q.   I'm sorry.  I don't think I told you at
19   the beginning, so this is totally my fault.
20   Because we have a court reporter who is taking
21   everything down, you have to respond audibly
22   saying --
23        A.   I'm so sorry.
24        Q.   No, it's my fault.  It's not your fault.
25   And you likely will continue to do it because



Page 64

1    it's very common and I will do it as well.

2         A.  I'm so sorry about that.

3         Q.  All right.  Do you have Exhibit number 6

4    in front of you?

5         A.  Yes.

6         Q.  Do you -- and this is -- this is a 2018

7    associate acknowledgement form.  Do you recognize

8    this document?

9         A.  Yes.

10        Q.  Do you recall completing the 2018

11   associate acknowledgement recertification form?

12        A.  Yes.

13        Q.  All right.  And under number one, it

14   states that you acknowledge that the -- and I'll

15   just summarize here, the equal -- the code of

16   conduct, equal opportunity employer, the

17   antitrust discrimination, harassment and

18   retaliation prevention, drug and alcohol policies

19   have been made available to you and you

20   understand, agree, and acknowledge to abide by

21   them during your employment with Schneider; is

22   that right?

23        A.  Yes.

24        Q.  Okay.  And you acknowledge that you

25   reviewed the Schneider policies and understand



Page 65

1    them or that you will promptly review the

2    Schneider policies and agree to immediately bring

3    any questions you have about them to your leader

4    or human resource business partner; is that

5    right?

6          A.  Yes.

7          Q.  Okay.  And if we look down near the end

8    of number one, you clicked the tab that says I

9    agree, right?

10         A.  Yes.

11         Q.  Okay.  I'm going to put that one aside.

12   We can go to the next exhibit, which will be

13   Exhibit number 7, and it's Bates-stamped

14   Schneider -- it has Exhibit A on it, which we can

15   cross off.  But it's Schneider 271 through 274.

16             (Plaintiff's Exhibit 7 was

17              marked and identified.)

18         A.  Yes.

19         Q.  Okay.  So Exhibit 7 is Schneider's

20   discrimination, harassment and retaliation

21   prevention policy; is that right?

22         A.  Yes.

23         Q.  Do you recognize this document?

24         A.  Yes, sir.

25         Q.  And you are aware that throughout your



Page 66

1   employment, Schneider's policies were available

2   to you on its intranet; is that right?

3        A.  Yes.

4        Q.  And was this particular policy, the

5   discrimination, harassment and retaliation

6   prevention policy available to you on Schneider's

7   intranet?

8        A.  Yes.

9        Q.  And have you reviewed this policy

10  before?

11       A.  Yes.

12       Q.  All right.  And if you look under

13  principles it states, it is the policy of

14  Schneider that harassment, discrimination and

15  retaliation are prohibited and will not be

16  tolerated; do you see that?

17       A.  Yes.

18       Q.  And was that your understanding?

19       A.  Yes.

20       Q.  If you turn to the second page under

21  complaint reporting procedures; do you see that?

22       A.  Yes.

23       Q.  All right.  If you look to kind of the

24  middle, I think it's the third sentence, it says,

25  associates who believe they are being subjected



Page 69

1      Q.  All right.  Ms. Geter, are you ready to

2   resume your testimony?

3      A.  Yes, sir.

4      Q.  Okay.  Who is Travis Torrence?

5      A.  He was my team lead at the time.

6      Q.  Do you know when he became your team

7   lead?

8      A.  I believe mid or early -- early to

9   mid-2018.

10      Q.  And prior to him becoming your team

11   lead, do you know what position he held?

12      A.  Yes.  Area planning manager of Atlanta

13   on first shift.

14      Q.  Was he one of your -- one of your peers?

15      A.  Yes, he was one of my peers.

16      Q.  Did you ever work with him when he

17   worked as an area planning manager?

18      A.  Yes.  Travis helped train me.

19      Q.  And do you know to whom Travis reported

20   when he was a team lead?

21      A.  Yes.  Doug Horton.

22      Q.  And do you know who Doug Horton reported

23   to?

24      A.  Marianne Biskey-Rose.

25      Q.  Do you know -- as a team lead, did



Page 72

1    extended hours out of the bunch during this time.

2        Q.  And from mid-2018 through the

3    termination of your employment, what were your

4    hours?

5        A.  11:00 p.m. to 10:00 a.m.

6        Q.  So you worked an 11-hour shift?

7        A.  Yes, sir.

8        Q.  And what days of the week did you work

9    between mid-October mid 2018 through the

10   termination of your employment?

11       A.  Wednesday, Thursday, Friday, and Sunday.

12       Q.  Those were your scheduled days?

13       A.  Yes, sir.

14       Q.  And when did you start working that

15   schedule, Wednesday, Thursday, Friday, Sunday

16   11:00 p.m. to 10:00 a.m.; do you recall?

17       A.  No, I do not recall at this time.

18       Q.  Was it prior to the time that you

19   started reporting to Travis?

20       A.  Yes, sir.  I was under, I believe,

21   Rodney Dunn when they switched those schedules

22   over.  I just can't remember the specific time.

23       Q.  Did you have a good working relationship

24   with Travis?

25       A.  Yes.



 1        Q.  Do you know for Ms. Williams,
 2   Mr. Seymour, and Ms. Young what their work hours
 3   were during the 2018 through 2019 time period?
 4        A.  I believe Desmond Seymour's hours --
 5   because he had -- yeah, his hours was at
 6   10:00 p.m. to 6:00 a.m.  Audrianne's hours was
 7   10:30 p.m. to 8:00 a.m.  Ms. Elaine's hours was
 8   from 11:00 p.m. to 7:00 a.m.
 9        Q.  And do you know what days of the week
10   they worked?
11        A.  I do remember -- I remember -- I
12   remember their off days, so I would have to write
13   it out.  Could I come back to that for you?
14        Q.  They didn't work the same days as you
15   did; is that accurate?
16        A.  Correct.  They did, except for
17   Thursdays.  Thursday night I was by myself.
18        Q.  And when you would request time off,
19   would you -- during the 2018 -- mid-2018 through
20   the date of your termination in 2019, would you
21   request time off from Travis?
22        A.  Yes.  Via e-mail and via our ADP on the
23   portal.
24        Q.  And if you had questions about work,
25   would you reach out to Travis to answer those



1    employment.

2         Q.  Do you know whether Julissa worked

3    reduced hours?

4         A.  No, sir.  She was full-time employment

5    as well.

6         Q.  During your employment at Schneider, are

7    you aware of any area planning managers who were

8    hired for a part-time position?

9         A.  I'm thinking.  Give me one second.  No,

10   sir, not to my knowledge at this time.

11        Q.  In your lawsuit against Schneider you're

12   alleging that you suffer from a disability; is

13   that correct?

14        A.  Yes, sir.

15        Q.  And what disability do you suffer from

16   or disabilities?

17        A.  Post-traumatic stress syndrome, major

18   depression and panic disorder.

19        Q.  And do these all stem from the assault

20   that you suffered in July of 2013?

21        A.  Yes, sir.  And also from my -- I had an

22   incident on the truck when I was in Canada when I

23   was a driver for Con-way.

24        Q.  And why don't you tell me about that.

25        When were you a driver for Con-way?



Page 86

1    don't know how that happened, but my truck

2    bounced back, and I gained my truck control.  I

3    stopped the truck once I gained control and I

4    literally had a meltdown with my dispatcher right

5    then and there with my parents on three-way.

6    They had to calm me down for, like, 45 minutes

7    before I even was able to touch the wheel.

8         And it's hard for me still to kind of drive

9    in inclement weather conditions now where I used

10   to be like, man, come on, let's go.  Now it's a

11   little difficult for me for that.  So even when

12   it was raining, even if I have to even drive to

13   work that was difficult, believe it or not.  And

14   I did not know that I would have that type of

15   experience, you know, but that's where that came

16   from.

17        Q.  Okay.  And this would have been before

18   the assault in July of 2013, correct?

19        A.  Correct.  Yes, sir.

20        Q.  Do you know when you were diagnosed with

21   PTSD?

22        A.  October of 2018.

23        Q.  And do you know when you were diagnosed

24   with major depression?

25        A.  I believe September or August of 2015.



Page 87

1    Yeah, I believe so.

2         Q.  Do you know who diagnosed you with major

3    depression in September of 2015?

4         A.  Dr. Maria Goyco.

5         Q.  And do you know who diagnosed you with

6    PTSD in October of 2018?

7         A.  Dr. Cassandra, C-a-s-s-a-n-d-r-a; Wanzo,

8    W-a-n-z-o.

9         Q.  Are you still seeing Dr. Goyco?

10        A.  No, sir, I'm not.

11        Q.  When did you stop seeing Dr. Goyco?

12        A.  I stopped seeing her, I believe, fall of

13   2016 and I switched physicians.

14        Q.  And who did you start seeing in the fall

15   of 2016?

16        A.  The fall of 2016 I went to -- I went to

17   her and she dropped United Healthcare and I went

18   to -- can you give me one second, please?

19        Q.  Sure.

20        A.  I believe I saw Dr. Goyco -- I'm sorry

21   -- to 2017 because she dropped United Healthcare

22   from her practice, and I could not use her no

23   longer.  And then I had just started going to

24   Dr. Etienne, which was my neurologist at that

25   time, and she had gotten my medication for my



Page 88

```
 1   headaches calibrated properly, and I thought I
 2   was good.  And when Dr. Goyco dropped me due to
 3   the insurance situation I remember just being
 4   like, okay, I have Dr. Etienne and I'll find me
 5   another doctor.
 6       So I didn't have a doctor for probably a
 7   year, like a primary physician, but I had all my
 8   specialty doctors still, like my ear, nose and
 9   throat doctor, my OB, I still had my neurologist,
10   but I didn't have a primary at that time.
11       Q.  Okay.  So you stopped treating with
12   Dr. Goyco in fall of 2017?
13       A.  Yes.
14       Q.  Okay.
15       A.  But not on my own -- my own personal
16   ability.  She stopped taking United Healthcare.
17       Q.  Understood.  And do you know when you
18   were diagnosed with panic disorder?
19       A.  Dr. Wanzo diagnosed me with that as well
20   in October.
21       Q.  And with respect to the PTSD, what are
22   the -- what are your triggers for the
23   post-traumatic stress disorder?
24       A.  So one of my triggers is in -- if I'm in
25   close quarters with males or men I get very
```



Page 100

1          A.   Where I was literally just trying to

2    communicate with my management team to assist me,

3    like I needed an extra teammate there with me at

4    night.  I didn't mind doing the work.  I just

5    couldn't handle the workload of usually two or

6    three people for one person by myself at night.

7    And I just expressed that to them several times,

8    several years, and then it just came to a head at

9    that point.

10         Q.   It sounds like there was -- you believe

11   there was too much work and not enough people to

12   do the work?

13         A.   Correct.  Not more so too much work.

14   Can I correct that?

15         Q.   (Shakes head up and down.)

16         A.   I believe fair is fair, and where first

17   shift would have four area planning managers to

18   five, second shift would have two to three.  They

19   gave us one to two on third shift, but then they

20   also had supporting attributes on those other

21   shifts, such as IOS or a temp agent that come in

22   and actually answered the phone calls and helped

23   them with their messages.

24         Where on third if it's two of you guys,

25   you're doing the workload of that whole shift,



1  whether it's messages, phone calls and

2  dispatching the drivers and dealing with the

3  driver issues and dealing with the one-on-one

4  basis with the drivers.  Where the other

5  instances the other shifts had an actual team of

6  three or more people at a time.

7       Q.  And I believe you testified that you had

8  asked for assistance to deal with the workload

9  for several years?

10       A.  Yes, sir.

11       Q.  Okay.  And how would you -- how would

12  this typically come up?  How would you ask for

13  the assistance?  What would you say?

14       A.  I would bring it up to Doug Horton or

15  Travis or even Marianne, hey, on this night we're

16  a little heavier on phone calls, or on this

17  particular night we're a little heavier with

18  dispatch and we need more drivers to be available

19  on this day.  I made sure I communicated that

20  with my management team.

21       I even volunteered -- and me and Audrianne

22  Williams developed a schedule to help overlap the

23  shifts to help each shift where if someone is out

24  there's always someone there to help cover it.  I

25  presented it to Marianne, and she sent it up to,


MAGNA ▶
LEGAL SERVICES

Page 104

 1   believe.

 2        Q.  Okay.  But as of October 15, 2018, you

 3   didn't tell anybody at Schneider that you

 4   suffered from PTSD, major depression, panic

 5   disorder, anything --

 6        A.  I didn't know -- I didn't know at that

 7   time because I got my diagnosis in that same

 8   month.

 9        Q.  But you didn't mention any type of

10   medical condition to anyone at Schneider prior to

11   October 15, 2018; is that correct?

12        A.  Correct.  Other than my bilateral carpal

13   tunnel that I had to go out of work for.  They

14   know about that.

15        Q.  Okay.  But other than your carpal

16   tunnel, you didn't mention any of your medical

17   conditions prior to October 15, 2018; is that

18   right?

19        A.  That's correct.

20        Q.  And so in 2017 and 2018 when you would

21   tell Schneider management that there was too much

22   work and not enough people, you didn't mention or

23   indicate to -- to anyone that you were suffering

24   from some type of a medical condition and were

25   requesting some type of an accommodation; would



Page 121

```
1        Q.  Okay.  And you received this document

2   from Schneider on or about October 26, 2018; is

3   that right?

4        A.  Yes, sir.

5        Q.  And is that your address top left?

6        A.  Yes, sir.

7        Q.  Okay.  And in this document, Schneider

8   is letting you know that your request for FMLA

9   leave had been approved; is that right?

10       A.  Yes, sir.

11       Q.  And it indicates near -- kind of near

12  the bottom in that bullet that you have been

13  granted seven weeks and one day beginning October

14  9, 2018 and ending on October -- I'm sorry --

15  November 27, 2018; is that right?

16       A.  Yes, sir.

17       Q.  Okay.  And was your first day out, did

18  it start on October 9, 2018?

19       A.  Yes, sir.

20       Q.  And after you -- was it your

21  understanding after you received this letter that

22  Schneider had granted your request for FMLA leave

23  beginning on October 9, 2018 through November 27,

24  2018?

25       A.  Yes, sir.
```



Page 125

1        Q.  All right.  If we can go to the next

2   one, please.  This is Bates-stamped Schneider

3   0413.  It's a one-page document.

4           (Plaintiff's Exhibit 13 was

5              marked and identified.)

6        A.  Yes, sir.

7        Q.  And if you look kind of in the middle

8   it's dated November 28, 2018; do you see that?

9        A.  Yes, sir.

10       Q.  And this document is addressed to you;

11  is that right?

12       A.  Yes, sir.

13       Q.  And did you receive this document on or

14  about November 28, 2018?

15       A.  Yes, sir.

16       Q.  And in this document, Schneider states

17  that your federal FMLA now has a new ending date

18  of December 31, 2018; do you see that?

19       A.  Yes, sir.

20       Q.  And as of that date, your 12 weeks of

21  available federal FMLA will have expired; is that

22  right?

23       A.  Yes, sir.

24       Q.  Okay.  So did you understand this

25  document as Schneider granting you an extension



Page 126

1    of your FMLA leave through December 31, 2018?

2         A.  Yes, sir.

3         Q.  And that your FMLA would be exhausted as

4    of December 31, 2018?

5         A.  Yes, sir.

6         Q.  Okay.  And did you return to work on or

7    about January 2nd?

8         A.  I returned on January 2nd.

9         Q.  Okay.  All right.  And we can go to the

10   next document.  We'll mark this as Plaintiff's

11   Exhibit 14, and it's Bates Schneider 0410.

12          (Plaintiff's Exhibit 14 was

13             marked and identified.)

14        A.  Yes, sir.

15        Q.  All right.  And do you recognize this

16   document?

17        A.  Yes, sir.  It's my return-to-work form.

18        Q.  Okay.  And it looks like this was

19   completed by Dr. Wanzo?

20        A.  Yes, sir.

21        Q.  If you look at the bottom, it's dated

22   December 15, 2018; is that right?

23        A.  Which date?  I'm sorry.

24        Q.  It looks like December 15, 2018.

25        A.  Yes.



Page 127

1          Q.   Do you see that at the bottom?

2          A.   Yes.

3          Q.   All right.  And if you look at section

4    one here it says, patient is able to return to

5    work without restrictions effective February 14,

6    2019; is that right?

7          A.   Yes, sir.

8          Q.   Okay.  And in section two it says,

9    patient is able to return to work with

10   restrictions effective January 2, 2019 three days

11   a week, ten-hour days; is that correct?

12         A.   Yes, sir.

13         Q.   So was it your understanding that you

14   could return to work on January 2, 2019, but with

15   the restriction of three days a week, ten-hour

16   days?

17         A.   Yes, sir.

18         Q.   And you typically worked four days a

19   week, 11-hour days; is that right?

20         A.   Yes, sir.

21         Q.   And in the comments, Dr. Wanzo states

22   that you will be able to work three days per

23   week, ten-hours a day effective on January 2,

24   2019, right?

25         A.   Yes, sir.



Page 133

1        Q.  And it's addressed to you; is that

2   correct?

3        A.  Yes, sir.

4        Q.  And do you recall receiving this

5   document on or about that date?

6        A.  Yes, sir, I did.

7        Q.  Okay.

8        A.  Around that date because it takes a

9   while before it comes through the mail.

10       Q.  Got it.  And in the second paragraph it

11  says, Schneider has agreed -- well, let me start

12  at the first paragraph.  It says, on December 17,

13  2018 we received a return-to-work form from your

14  physician outlining the following work

15  restrictions through February 13, 2019: work

16  three days per week, ten-hour days.  Did I read

17  that correctly?

18       A.  Yes, sir.

19       Q.  Okay.  And Schneider agreed to

20  accommodate those restrictions in your current

21  position effective January 2, 2019 through

22  February 13, 2019; is that right?

23       A.  Yes, sir.

24       Q.  All right.  And then when you -- when

25  you returned to work on January 2nd, did you have



Page 134

1    another discussion with Travis about what days

2    you would be working?

3         A.  I think it was, like, via e-mail or

4    something I discussed with him about -- he was

5    trying to put me off on Wednesdays and that's

6    when I disclosed to him what I was trying to do

7    with my external treatment going to those

8    meetings.  I was like, I just need you to help me

9    out here, but I am able to come to work, it's

10   just that particular day I was just asking for

11   him to just try to help me out with that.

12        Q.  And why didn't you want to work on -- or

13   why didn't you want off on Wednesdays?

14        A.  No.  I was just trying to attend the

15   meeting on Monday.  That's when they offered it

16   at the church that they provided, so I was just

17   trying to make sure I was available on those

18   days.

19        Q.  Okay.  So you told him that you didn't

20   want to work on Mondays because you were going to

21   -- you were going to attend the counseling

22   sessions, right?

23        A.  Yes, sir.

24        Q.  Okay.  Did you discuss what three days

25   you would be working?



Page 135

```
 1         A.  We talked about it and I said, hey, I'll

 2    work Wednesday and whatever day, just Monday

 3    that's the day I just -- and he accommodated it.

 4    That's how I got with the type of schedule I had,

 5    which I had Wednesday, Thursday, Friday, and then

 6    Sunday and Monday off.  That's how that worked

 7    out.

 8         Q.  So did you agree that you would work

 9    Wednesday, Thursday, Friday, or did you ask for

10    those specific days?

11         A.  I agreed to work those days because that

12    was my original -- part of my original four-day

13    schedule as well.

14         Q.  Did you specifically ask to have Sundays

15    off or not work Sundays?

16         A.  Yeah, to go to that Monday morning -- to

17    go to the -- to that meeting.

18         Q.  All right.  So you wanted the Sundays

19    off because your counseling session was on Monday

20    morning?

21         A.  Correct, yes, sir.  Thank you for

22    clarifying.

23         Q.  And Travis agreed to that?

24         A.  Yes, sir.

25         Q.  And when you returned to work on
```



1   January 2, 2019 were you coming into the office

2   on Wednesday, Thursday, Fridays that you worked?

3        A.  Yes, sir.

4        Q.  All right.  And in this letter, Exhibit

5   15, in bold Schneider says, please have your

6   physician complete the attached return-to-work

7   form prior to February 14, 2019 if there are any

8   changes to your restrictions; is that right?

9        A.  Yes, sir.

10       Q.  The day that you were -- the Sunday that

11  you were not working from January 2, 2019 through

12  February 14, 2019, do you know who was covering

13  that day?

14       A.  Yes.  Desmond Seymour.

15       Q.  Desmond Seymour was working the Sunday

16  that you would typically work?

17       A.  Desmond Seymour.  If it wasn't him, it

18  was Audrianne Williams.  Between those two, if my

19  memory serves me correct.

20       Q.  And they didn't typically work on

21  Sundays; is that right?

22       A.  Desmond did.

23       Q.  Do you know if -- was Desmond doing

24  twice as much work then on Sundays?  Do you have

25  any knowledge of that?



Page 137

1          A.   Since why?  Because I wasn't there?

2          Q.   Yes.

3          A.   Any time no one is there everybody does

4     twice as much work, no matter whether it's Sunday

5     through Saturday.  Whoever is on that third shift

6     if they're by their self, they're taking the

7     workload of everybody.  So yes, I do concur with

8     that.

9          Q.   But would you agree then that your

10    inability to work on Sundays impacted the third

11    shift and their workload?

12         A.   Yes.

13         Q.   Do you know if Travis ever worked the

14    Sunday that you were originally assigned to work

15    during the time period that you were off --

16    during the time period of your accommodation?

17         A.   Not to my knowledge.  I thought it was

18    Audrianne and Desmond around that time period.

19         Q.   Do you have any personal knowledge as to

20    who was working on the Sundays that you were not

21    working because of your accommodations --

22    workplace accommodations?

23         A.   Meaning?  Can you rephrase it for me,

24    please?  I'm sorry.

25         Q.   Sure.  Do you know -- are you -- are you



Page 139

1        Q.  Right.  And Travis would fill in for

2    area planning managers who were not able to work,

3    right?

4        A.  Correct.

5        Q.  Okay.  All right.  If we go to the next

6    document, please.  And it's Bates Schneider 0385

7    through 386.  Do you have that in front of you?

8        A.  Yes, sir.

9        Q.  Okay.  Let's mark this as Plaintiff's

10   Deposition Exhibit number 16.  And this appears

11   to be another fax that Dr. Wanzo sent to the HR

12   leave administration team at Schneider on

13   January 19, 2019; is that right?

14       (Plaintiff's Exhibit 16 was

15            marked and identified.)

16       A.  Yes, sir.

17       Q.  Okay.  If you turned to second page,

18   this is a return to work recommendation --

19   attending physician's return to work

20   recommendation; is that right?

21       A.  Yes, sir.

22       Q.  And this appears to be Dr. Wanzo's

23   handwriting; is that right?

24       A.  Yes, sir.

25       Q.  And if you look down at the bottom, it



Page 140

1    appears that she dated it January 19, 2019; is

2    that correct?

3         A.  Yes, sir.

4         Q.  Okay.  And do you recall going over this

5    return to work recommendation with Dr. Wanzo?

6         A.  Yes.  It was a follow-up appointment

7    about --

8         Q.  Okay.

9         A.  -- me returning back to work and how I

10   was doing.  She was checking in on me at that

11   particular --

12        Q.  And was this an in-person appointment

13   that you had with Dr. Wanzo?

14        A.  Yes, sir.

15        Q.  Okay.  And if you look at section two it

16   states, patient is able to return to work with

17   restrictions effective 1/2/19 three days a week,

18   ten-hour days, right?

19        A.  Yes, sir.

20        Q.  Okay.  And then if you look at section

21   one, patient is able to return to work without

22   restrictions effective 3/20/2019; is that right?

23        A.  Yes, sir.

24        Q.  And you understood that Dr. Wanzo was

25   requesting an extension of your --



Page 142

1    temp and then that temp quit, and then we had --

2    the first temp got fired and then the second temp

3    we was preparing her for the maternity leave for

4    Audrianne.  I was telling her how I was stressed

5    out and stuff, but at that time, I do remember

6    that conversation with her.

7         Q.  Okay.

8         A.  And this was a follow-up after three

9    weeks of being at work basically.  Two and a

10   half, three weeks at work.

11        Q.  All right.  So you told Dr. Wanzo that

12   the first temp had -- had quit, I believe, you

13   said?

14        A.  Got fired.

15        Q.  The first temp was fired, Audrianne was

16   about to go out on leave, and you were starting

17   to train a second temp, and you were getting

18   stressed out.  Is that because of the amount of

19   work?

20        A.  Yes.  Because I also had to train the

21   temp while working by myself on certain nights

22   that I had to train the temp and also still do my

23   workload while trying to train the temp by myself

24   without another counterpart there to take up the

25   other part of the workload so I can focus on



Page 143

1    training.

2         Q.  Okay.  And you understood that Dr. Wanzo

3    was requesting about a four-and-a-half-week

4    extension of your modified work schedule, right?

5         A.  Yes, sir.

6         Q.  Okay.  And did you have any discussions

7    with anyone at Schneider about the need for this

8    extended accommodation or extending the

9    accommodation?

10        A.  Like, talking to management or anyone?

11        Q.  Yes.

12        A.  Not to my knowledge.  I just know I kept

13   asking them we need more time to train our temps,

14   and I know we was on crunch time because

15   Audrianne was in her third trimester.

16        Q.  You don't have a specific recollection

17   of talking to Torrence or Marianne or any other

18   Schneider management about extending your

19   modified work schedule for another four and a

20   half weeks?

21        A.  I think Travis probably approached me,

22   but I'm not going to falsify that on record,

23   because I can't speculate.

24        Q.  You just don't recall one way or the

25   other?



Page 145

1    your physician complete the attached

2    return-to-work form prior to March 20, 2019 if

3    there are any changes to your restrictions,

4    right?

5         A.  Yes, sir.

6         Q.  Okay.  Do you know -- with respect to

7    your modified work schedule, do you know who

8    would have approved your requests?

9         A.  HR gets the documents and the leave

10   team, I know that, but then they have to send it

11   over to management to approve so they know it

12   doesn't affect their schedule, I believe, and

13   then management approves it, and then it goes

14   back to HR.

15        Q.  Do you know specifically who would have

16   approved your accommodation requests?

17        A.  No, sir.

18        Q.  And during this time period, March --

19   I'm sorry -- February 14, 2019 through March 19,

20   2019, do you know -- did you continue working the

21   Wednesday, Thursday, Friday schedule?

22        A.  Yes, sir.

23        Q.  Did you continue working that schedule

24   in the office?

25        A.  Yes, sir.



Page 146

1       Q.  Do you recall working from home at all

2   during that time period?

3       A.  Not to my knowledge, but probably so.

4   Well, yes.  For the 20, 30 -- I mean, between

5   February and March, yes, and I can tell you why.

6   Because Audrianne had her baby February 26th and

7   at that time Ms. Elaine quit a week after, and

8   then I was left by myself completely.

9       And I asked Travis on a phone call on our

10  personal phones, I said, hey, he was like, hey, I

11  know you just got the call that Audrianne just

12  had the baby.  I was like, yeah, I do -- I said,

13  man, I'm nervous, man.  I can't work by myself.

14  He said, well, I need you to, you know, come in.

15  I said, well, how about can I work from home?  He

16  was like, you know what, yeah, that should be

17  fine.  See how that goes and if it works good,

18  then we just keep it like that until we get --

19  [inaudible].  And that was the week of the 26th

20  of February because the week Audrianne had her

21  baby.

22      Q.  I'm sorry.  You cut out a little bit.

23  You said --

24      A.  I'm sorry.

25      Q.  No, that's okay.  Travis said -- you



Page 150

1    really could not be off on that time, like away

2    because I was the main person training the temps.

3    And then when Audrianne was able to come into the

4    office she would train the temps with -- like we

5    would alternate training that night.  So one

6    person would be with the temp, the other person

7    would be dealing with all the workload.  And then

8    once we're done with training, then we all would

9    jump in and put the temp on hands-on training at

10    that time.  But the first three to four hours to

11    five hours of that shift we solo on that

12    workload.

13        Q.  All right.  And you did not return to

14    full-time work on March 20, 2019; is that right?

15        A.  Correct.

16        Q.  We can go to the next document, please.

17    It's Bates CG-41 through 45.  Actually, we'll

18    mark this as kind of a group exhibit, 18 CG-41

19    through 45 and Schneider 343 and 344.

20            (Plaintiff's Exhibit 17 was

21              marked and identified.)

22        A.  Okay.  Yes, sir.

23        Q.  Okay.  And this is another medical note

24    that Dr. Wanzo faxed to the Hartford on March 9,

25    2019; is that correct?



Page 151

1        A.  Yes, sir.

2        Q.  And this is -- at least the first

3   several pages of this document you produced in

4   discovery; is that right?

5        A.  Yes, sir.

6        Q.  And do you recognize this document?

7        A.  Yes, sir.

8        Q.  Do you recall going over the progress

9   report, the next two pages, with Dr. Wanzo?

10           (Plaintiff's Exhibit 18 was

11             marked and identified.)

12        A.  Yes, sir.

13        Q.  And if you look on that first page, it

14   asks again is the condition related to

15   environmental and/or interpersonal issues in your

16   workplace and Dr. Wanzo wrote lack of staffing,

17   verbally abusive drivers.  Did I read that

18   correctly?

19        A.  Yes, sir.

20        Q.  Okay.  And was there still, in your

21   view, a lack of staffing?

22        A.  Yes, sir.

23        Q.  Okay.  And you were seeking an

24   accommodation of a continued reduced work

25   schedule because of lack of staffing?



Page 152

1          A.  Yes, sir.

2          Q.  And were drivers still being verbally

3     abusive as of March 9, 2019?

4          A.  I had occasional disgruntled drivers

5     call in.

6          Q.  And if you turn to the next page under

7     functionality --

8          A.  Yes, sir.

9          Q.  -- it asks, specify what activities are

10    impaired and how.  And Dr. Wanzo wrote, only able

11    to work three days part time until April 30th.

12    Did I read that correctly?

13         A.  Yes, sir.

14         Q.  Okay.  And did you discuss that with

15    Dr. Wanzo about extending your modified work

16    schedule until April 30th?

17         A.  Yes, because she was trying to give them

18    time to, you know, hire somebody else and so she

19    was like it'll give you more time to help you

20    process things because this is a little -- it's a

21    lot when you're just coming back out and you --

22    she was like -- it was just a lot, and I was

23    trying to deal with it to the best of my ability

24    at that time.  So she felt as though, like, I

25    needed more time until they can get somebody else



Page 154

1    return to work recommendation with Dr. Wanzo?

2        A.  Yes, sir.

3        Q.  All right.  And if you look at section

4    one, it states, patient is able to return to work

5    without restrictions effective April 30th.  She

6    remains unable to work full time because of her

7    clinical depression, PTSD and panic disorder

8    symptoms.  She will be able to continue present

9    schedule Wednesday, Thursday, Friday, ten hours a

10   day, Thursday and Friday at home or any time

11   solo.  Did I read that correctly?

12       A.  I'm trying to figure out her

13   handwriting.  I'm sorry.  I'm sorry.  Okay.  Yes,

14   sir.  I can -- yeah, I see what you read, yes.

15       Q.  Okay.  And did you discuss these

16   accommodation requests with Dr. Wanzo on March 9,

17   2019?

18       A.  Yes.  I remember speaking with her about

19   the situation with their temps and with Audrianne

20   being out.  And she said why are you working by

21   yourself?  I thought they was going to get some

22   help for you?  I was like, well, they haven't

23   found no one yet.  She was like, so that's not

24   helping you with your treatment.  So what's going

25   on?



1    April 12th, I was just communicating between HR

2    and then Travis.

3        Q.  Up until March 9, 2019, are you aware of

4    any document -- are there other communications

5    from Schneider indicating that it had approved

6    any requests that you work from home when you

7    were solo?

8        A.  No, sir.  Other than the conversation

9    that I stated I had verbally talked with Travis.

10       Q.  If we could look at Exhibit 19,

11   Schneider 321 through 323.

12           (Plaintiff's Exhibit 19 was

13             marked and identified.)

14       A.  Yes, sir.

15       Q.  Okay.  And this is another attending

16   physician's statement that appears to have been

17   completed by Dr. Wanzo; is that right?

18       A.  Yes, sir.

19       Q.  Okay.  And she's still indicating --

20   well, strike that.

21       If you go to the second -- the third page,

22   it appears to be dated March 30, 2019; is that

23   correct?

24       A.  Yes, sir.

25       Q.  Did you have an appointment with



1    Dr. Wanzo on March 30, 2019?  Do you recall?

2        A.  I believe I did.

3        Q.  Do you recall discussing Dr. Wanzo's

4    recommendations for your accommodations as of

5    March 30th of 2019?

6        A.  Yes.  We were talking about me working

7    from home on the days I was solo because I was

8    telling her how it was affecting me, and I told

9    her the conversation me and Travis had.

10        Q.  And according to the first page of this

11    exhibit, Dr. Wanzo was still saying that your

12    condition -- lack of staffing is related to your

13    workplace condition?  I'm sorry.  Strike that.

14        Dr. Wanzo was saying that you still need

15    this accommodation because of lack of staffing;

16    is that right?

17        A.  Yes, sir.

18        Q.  If you turn to the second page of this

19    exhibit, kind of in the middle it says, what are

20    your patient's current abilities, what type of

21    work can your patient perform?  And she writes,

22    you can only work three days per week, Wednesday,

23    Thursday, Friday, working from home two days a

24    week, ten-hour days.  Do you see that?

25        A.  Yes, sir.



Page 161

1         Q.  And did you discuss that with Dr. Wanzo?

2         A.  I didn't discuss that part with her

3    about working from home for those two days.  I

4    remember her saying specifically on the days I

5    was solo.

6         Q.  And she goes on to state that your

7    target date for your return to work was on a full

8    time basis June 5, 2019; is that right?

9         A.  Yes, sir.

10        Q.  And did you agree with that --

11        A.  Yes.

12        Q.  -- assessment from Dr. Wanzo?

13        A.  For the return date, correct.  Due to

14   the fact my uncle was in hospice at the time, and

15   I was really preparing myself for his death

16   because he was a very close, close relative of

17   mine.

18        Q.  So you were requesting a modified work

19   schedule -- or an extension of your modified work

20   schedule from March 30, 2019 through June 5, 2019

21   in part because of your uncle's illness; is that

22   right?

23        A.  Yeah, and due to lack of staffing as

24   well.  Because mind you, we don't have two -- we

25   didn't have two temps at all and Audrianne wasn't



Page 172

1    received?

2         A.  Yes, sir.

3         Q.  Okay.  And Schneider states after these

4    bullet points, with the multiple extensions of

5    partial return to work schedule, this is

6    appearing to be a permanent need.  Did I read

7    that correctly?

8         A.  Yes.

9         Q.  All right.  And then they ask that you

10   provide or that your healthcare provider provide

11   additional information by no later than April 8,

12   2019; is that right?

13        A.  Yes, sir.

14        Q.  Okay.  And do you recall -- I'll show

15   you the exhibit here in a little bit.  Do you

16   recall receiving a document attached to this

17   where they asked -- Schneider had asked your

18   physician for additional information?

19        A.  Yes, sir.

20        Q.  Okay.  And did you take that document to

21   your physician?

22        A.  I had to.  Yes, sir.

23        Q.  Okay.  We can go to Schneider 301.  I'm

24   sorry.  That's out of order.  It'll be CG-261

25   through 262.



Page 176

1    Hartford's policies.

2        Q.  And you received those benefits for

3    approximately one year at 66 percent of your

4    salary?

5        A.  Yes, sir.

6        Q.  If you could go to -- I believe it's the

7    next document in the stack.  It should be

8    Schneider 301.

9        A.  Yes.

10       Q.  We'll mark this is Plaintiff's

11   Deposition Exhibit number 22.  Do you recognize

12   this document?

13           (Plaintiff's Exhibit 22 was

14             marked and identified.)

15       A.  Yes, sir.  It's the termination letter.

16       Q.  Okay.  And did you receive this letter

17   on or about April 12, 2019?

18       A.  I received it April 12th, 11:15 p.m. by

19   Travis Torrence in the on-on-one room.

20       Q.  Okay.  And if you look at that first

21   paragraph, it states were out on a continuous

22   leave of absence due to medical reasons from

23   October 9, 2018 through January 1, 2019 at which

24   time you exhausted your 12 weeks of FMLA; do you

25   agree with that?



Page 183

1    normally perform on that day; is that correct?

2        A.  I don't understand that question.  I'm

3    sorry.

4        Q.  Sure.  If Desmond was scheduled to work

5    on Sunday and you because of your modified

6    schedule we're not working on that Sunday, then

7    Desmond would do his work and the work that was

8    normally assigned to you; is that right?

9        A.  Correct.  Yes.

10       Q.  And same thing with Travis.  If he was

11   either off on that Sunday or already scheduled on

12   that Sunday and he was doing the work that you

13   normally would do on Sundays, he was doing twice

14   as much work as he normally would do, correct?

15       A.  Correct.  And vice versa if they were

16   out on the days I had to work on Wednesday,

17   Thursday and Friday.

18       Q.  Let's go to Exhibit 23, and this is a

19   fax that's dated April 27, 2019.  It looks like

20   it was sent from Dr. Wanzo to Schneider's HR

21   leave administration team; is that correct?

22           (Plaintiff's Exhibit 23 was

23              marked and identified.)

24       A.  Yeah, they had sent this over to her

25   after my termination to get more information from



Page 184

1    her and I took the -- I think they -- no, they

2    faxed this over to her, I believe, or they sent

3    her a packet.

4         Q.  If you can go to Exhibit 20.  Do you

5    have that in front of you?

6         A.  No.  I'm sorry.  What page is that?

7         Q.  Exhibit 20 is Schneider 315.

8         A.  Thank you.  I did not know I was

9    supposed to be writing on --

10        Q.  You're not.  You're not.

11        A.  Okay.

12        Q.  You're not.

13        A.  Okay.  That's the one -- 305.  I think I

14   just saw it.

15        Q.  It's just 315.  It's a letter from

16   Schneider dated April 2, 2019.

17        A.  I'm sorry.  I really just saw it and

18   then my fingers just -- here it is.  I know.

19   That's what I'm mad at because I flipped the

20   whole packet.

21        Okay.  And you said three what again?

22             MS. LEGARE:  Three hundred and fifteen.

23             THE WITNESS:  Yes, I got it.

24   BY MR. MILIANTI:

25        Q.  Okay.



Page 185

1          A.  Yes.

2          Q.  All right.  Okay.  And if you look near

3     the end of that letter, just before the bold it

4     says, please state the below physician statement

5     to your doctor to complete the additional

6     questions that are needed for your accommodation

7     extension requests.

8          A.  Right.

9          Q.  Please provide me with the requested

10    information from you and your health care

11    provider by no later than April 8, 2019, right?

12         A.  Okay.  Yes, sir.

13         Q.  Okay.  And then if you go to Exhibit 22

14    -- I'm sorry -- 23, the document we were just

15    looking at.

16         A.  Yes, sir.

17         Q.  Is this the physician statement that was

18    attached to Schneider's April 2, 2019 letter?

19         A.  April 2nd?  It should have been -- give

20    me one second.

21         Q.  Sure.

22         A.  I guess this was documents -- because

23    remember I didn't get it on the 2nd, so it came

24    like -- any time Schneider sent me anything --

25    I'm going to let you know this now -- it takes



Page 186

1    four days to get to my house.  So on the 2nd, but

2    possibly this was it.  I thought it was, like, a

3    regular return-to-work form that we were looking

4    at earlier.  That's what I was expecting, so my

5    apologies on that.

6         Q.  All right.  And Exhibit 23, do you

7    recall providing this Schneider document with

8    questions for your physician to Dr. Wanzo?

9         A.  I believe I dropped it off to her.

10        Q.  Okay.  Did you go over these questions

11   with Dr. Wanzo?

12        A.  I don't recall at this time.

13        Q.  Did she discuss her responses with you;

14   do you recall?

15        A.  I'm not familiar with this right now, to

16   be honest.

17        Q.  Okay.  All right.  It states at the top,

18   "Dear Physician, on 4/1/2019, you provided a

19   return-to-work form that indicated that Cierra

20   Geter needs to remain working a partial schedule

21   of three days per week through June 5, 2019.  We

22   have been accommodating Cierra working three days

23   per week since January 2, 2019."  Did I read that

24   correctly?

25        A.  Yes, sir.



Page 187

1          Q.   And you agree with those statements?

2          A.   Yes, sir.

3          Q.   Okay.  And then this document goes on to

4     ask your physician specific questions relating to

5     your condition and accommodation requests, right?

6          A.   Yes, sir.

7          Q.   And if you turn the page, this was

8     signed by Dr. Wanzo on April 27, 2019?

9          A.   Yes, sir.

10         Q.   Is that what it looks like to you?

11         A.   Yes, sir.

12         Q.   All right.  And then question two says,

13    provide a statement of any specific duties that

14    Cierra is unable to perform because of a medical

15    condition.  Provide information as to why she

16    cannot return to work full time.  And Dr. Wanzo

17    states, she is unable to work well in a

18    fast-paced, high pressure environment.  Did I

19    read that correctly?

20         A.   Yes, sir.

21         Q.   And do you agree with that statement?

22         A.   Yes, sir.

23         Q.   Did you discuss that with Dr. Wanzo that

24    you had difficulty working in a fast-paced, high

25    pressure environment?



Page 188

1        A.  Yes, sir.

2        Q.  And you had difficulty working in a

3  fast-paced, high pressure environment since the

4  time you returned on January 2, 2019, right?

5        A.  Yes, sir.

6        Q.  And you had difficulty working in a

7  fast-paced, high pressure environment prior to

8  January 2, 2019, correct?

9        A.  Correct.

10       Q.  Okay.  And your difficulty in working in

11  a fast-paced, high pressure environment -- when

12  did that start?  When did you start having

13  difficulty working in a fast-paced, high pressure

14  environment; do you recall?

15       A.  How far back we can go?  When Greg

16  Cochran was my manager.

17       Q.  And what time period would that have

18  been?

19       A.  2014 through the time he was -- 2014

20  through -- yeah, 2014 until February of 2016.

21       Q.  If you turn to the next page --

22       A.  Uh-huh.  (Affirmative).  Yes, sir.

23       Q.  I'm sorry.  If you can go to number

24  three -- question number three, it says that

25  you're currently working Wednesday, Thursday and



1      Q.  And did you agree with her assessment?

2      A.  I agreed with work from home when I told

3   her the circumstances if I was to work by myself

4   as I, you know, stated earlier when I spoke to

5   Travis back in February about that and early

6   March.  So that's what that was based upon, but I

7   didn't tell her to specifically, you know, say

8   that.

9      Q.  Okay.  But did you agree with her that

10   you needed to work -- that your current abilities

11   allowed you to work three days per week, ten-hour

12   days?

13      A.  Correct.

14      Q.  Okay.  And it asks, what is your target

15   date for return to work for your patient, and she

16   said on a part-time basis, August 26, 2019,

17   right?

18      A.  Right.

19      Q.  And then it says, if part time on what

20   date will your patient be able to increase to

21   full time.  And Dr. Wanzo wrote, September 23,

22   2019, right?

23      A.  Yes.

24      Q.  Okay.  And you agree with that statement

25   that as of September 23, 2019 you would be able



1    to return to work in a full-time capacity?

2         A.  I stated to her specifically that I was

3    able to return in June, but I can't go by her

4    assessment because she's the physician, so it's

5    up to her to make that request as well.

6         Q.  Well, did you disagree with her when she

7    said she thought you could return to full-time

8    work on September 23, 2019?

9         A.  I'd be full -- I thought I was going to

10   be full time before then, to be honest.  I

11   didn't --

12        Q.  Did you tell her --

13        A.  Go ahead.  I'm sorry.

14        Q.  Did you tell her not to write in

15   September 23, 2019?

16        A.  I didn't tell her to do nothing because

17   I wasn't in the office when she wrote this one

18   out, specifically, because I don't remember this

19   sheet.  I remember just talking to her and

20   handing her the documents and she was like, okay,

21   I'm going to fill it out.  I'll turn it into

22   Hartford.  Because I know she just have her note

23   -- you know, like her notepad, and she -- you

24   know, she's writing her doctor notes the whole

25   time when I'm sitting there.



Page 197

1    physician wrote that you could return to

2    full-time work on September 23, 2019, did you

3    contact the Hartford and tell them that you

4    disagreed with that?

5        A.  No, sir.

6        Q.  Ms. Geter, are you aware of any area

7    planning managers who requested a reduced work

8    schedule for approximately six months?

9        A.  To my knowledge, yes, sir.

10       Q.  Who?

11       A.  Tiffany Kitchens and the young lady we

12   spoke about earlier with the cancer treatment,

13   Candis Smith.

14       Q.  Anyone else?

15       A.  Other than maternity leave for

16   Audrianne.  She was pregnant twice, so that's a

17   six to eight-week time period on that.  But other

18   than that, that's it.

19       Q.  Okay.  And Audrianne, she was out on

20   leave due to the birth of her children; is that

21   right?

22       A.  Yes, sir.  Correct.

23       Q.  And she was out on a continuous leave of

24   absence for six to eight weeks; is that your

25   understanding?



1      Q.  Do you know why she was out on leave?

2      A.  Her parents were ill, and she was going

3  through a mental distress as well -- mental

4  health distress as well.

5      Q.  Do you know if she took time off under

6  the FMLA?

7      A.  Yeah.  I didn't see her for, like, a

8  good month to two months almost.

9      Q.  Do you know one way or the other whether

10  she took time off under the FMLA?

11      A.  No, sir.  But for that time -- that

12  amount of time, we don't have that amount of time

13  on our time off for personal time off.  We're

14  only allotted -- she was hired -- rehired August

15  of 2014 a month after me, so that's how I know I

16  have the seniority far as time-wise.  How we get

17  our time, we get on that same scale, so we had

18  the same amount of time.  So she wasn't allotted

19  that.  In order to be out that amount of time you

20  have to be on FMLA.

21      Q.  And you said you believe that she was

22  not coming into work a lot beginning in July or

23  August of 2018; is that right?

24      A.  Yes, sir.  She was starting to work

25  reduced hours.  Like her days instead of five



Page 210

1    leave the premise when, like, we have tornado

2    warnings in the area.  They have us move from

3    that location because we're in a triple wide

4    trailer to the hotel, like, two miles away to be

5    in a commercial building instead of going home.

6    So they'll have us probably go there if it's like

7    a storm, but still work remotely.  And if the

8    storm gets too bad, they'll tell everybody to go

9    home once it's permissible.  And then if we had

10   ice or sleet and Atlanta shuts down for that, we

11   can work from home.  And that happened on two

12   occasions -- three occasions while I was employed

13   with Schneider for five years just with the ice

14   alone.

15        Q.  Do you know if your position was

16   replaced or if somebody replaced you?

17        A.  Ryan Wheeler was moved from first shift

18   to third shift to cover me.

19        Q.  How do you know that?

20        A.  Because he told me.

21        Q.  Do you know if anyone was hired to

22   replace your position on third shift?

23        A.  I can't remember her name.  I don't know

24   if she's no longer there, but it was a young lady

25   they hired right after me to cover my shifts.



Page 211

1    She came in at 2:00 a.m., which I requested

2    Travis at that time have somebody come in

3    mid-shift from 2:00 a.m. to 10:00 a.m. to cover

4    the latter part of my shift, which is the

5    eight-hour period of my shift.

6         Q.  Do you know that person's name?

7         A.  I do not know her name because she was

8    not hired when I was there, but I can try to

9    acquire that for you.

10        Q.  Do you know her race?

11        A.  African American.

12        Q.  Do you know how long she worked -- do

13   you know if she's still employed at Schneider?

14        A.  I don't know that specifically.

15        Q.  Do you know who hired her?

16        A.  Travis Torrence and -- she had to go

17   through Travis, Doug and Marianne because that's

18   the hiring process.

19        Q.  And do you have any personal knowledge

20   as to who would have hired her?

21        A.  No, sir.

22        Q.  Can you go to your charge of

23   discrimination?  It's Bates-stamped Schneider

24   252.

25        A.  Yes, sir.



Page 216

1    accommodate for second shift.  So I knew why he

2    was taking a lot of time to, you know, make up

3    that time, but then at same time we're only

4    allotted maybe 25, 35 days a year.

5         Q.   And you said that the management team

6    was permitted to take more time off than all the

7    other area planning managers; is that right?

8         A.   That's correct.

9         Q.   Okay.  And some of those area planning

10   managers were white; is that right?

11        A.   Yes, sir.

12        Q.   Okay.  Other than your belief that your

13   management team was permitted to take more time

14   off than area planning managers, any other ways

15   in which you believe you were discriminated

16   against because of your race?

17        A.   I looked at my circumstances with

18   Tiffany Kitchens because we were hired around the

19   same time and I looked at how she was treated

20   compared to how I was treated.  At the end she's

21   still employed, I'm not.

22        Q.   Why do you believe that's tied to your

23   race?

24        A.   [Inaudible] -- I might not know the

25   circumstances in particular with her specific



Firefox



**EXHIBIT**

**Plaintiff's 2**

July 2, 2014

Cierra Chanel Geter



Dear Cierra,

Congratulations on your successful completion of our interview process! I am very pleased to extend a conditional job offer to you for the position of Dispatch Analyst within the Schneider organization. I am confident that you will find the role both challenging and enjoyable. Below is a summary of the specific offer.

| | |
|---|---|
| **Position:** | Dispatch Analyst; 3rd Shift; Full-time; 40 hours per week; Exempt |
| **Start Date:** | July 14, 2014 |
| **Starting Annual Salary:** | $46,000.00 annually, paid semi-monthly |
| **Profit Share Plan:** | Your profit-share target will be $2,500 appropriately prorated based on eligibility. Actual payouts are based upon company financial performance and are made annually. You will be eligible to participate in this program the 1st of the month following 6 months of employment. Your payout will be pro-rated the first year of employment based on the number of months you are eligible. |
| **Benefits:** | You are eligible for the associate benefit package which will be presented to you on or before your first day of employment. You must enroll in some benefits within 30 days of your start date to be eligible for those benefits for that year. Please consult the benefit plan summary descriptions for more information regarding specific benefit programs for your employment classification. |
| **Vacation:** | You will be granted 1 week(s) of vacation on your first day of employment. You will be granted 2 weeks of vacation on January 1st following your date of hire. |
| **Flex Days:** | You will be eligible for six (6) paid flex days per year (prorated during your first year of employment). |
| **Holidays:** | You will be eligible for seven (7) paid holidays per year (prorated during your first year of employment). |

<u>The above offer is contingent upon successful completion of a number of factors including, without limitation, the following: (a) a pre-employment drug screening, (b) a background check (including criminal record review), (c) your ability to provide us with proof of your identity and authorization to work in the United States, and (d) other relevant considerations which may arise.</u>

Upon acceptance of this offer, you will need to bring on your first day of work, the following items to fill out the appropriate new hire paperwork.

1. Proof of your identity and authorization to work in the United States to satisfy the I-9 form.
2. The original signed social security number card for Payroll purposes.
3. Voided check as all pay is directly deposited in the banking facility of your choice.
4. Any additional benefit agreements that were enclosed in this package should be given to the manager on your first day of employment.

Any employment between you and the Schneider organization which may arise shall be, at all times, employment-at-will.

We are very excited about you joining the Schneider organization. We feel you would be a great addition to the team! Please give our conditional offer serious consideration and contact me directly at 6784792801 if you have any questions.

Gregory Cochran
Operations Manager
6784792801
Schneider

SCHNEIDER 000507

**SCHNEIDER**

EXHIBIT

Plaintiff's 4

Job Description

# MANAGER, AREA PLANNING

**TYPE OF ROLE:**                    Exempt (Salaried)

**DEPARTMENT(s):**                   Bulk, Dedicated, Intermodal, Van Truckload

**REPORTS TO:**                      Various

**JOB SUMMARY:**

The Area Planning Manager is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders.  As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include:  shift direction, priority of freight, load and stage, driver calendar requests, etc.  Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role.  Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention).  All decisions also need to be made in accordance with Schneiders #1 core value:   safety.
- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.
- Exhibit behavior in alignment with our core values at all times.

**SPECIALIZED KNOWLEDGE:**

- Bachelors degree or equivalent work experience in a related field required
- 1-2 years of customer service, dispatch and/or operations experience

**EDUCATION LEVEL:**                       Bachelor or equivalent work experience

**EXPERIENCE:**                       1-3 Years

**SKILLS/BEHAVIORS NECESSARY TO PERFORM JOB**

Abilities or qualities an associate must possess in order to perform the essential job duties - Listed by Core Competency

**COMMUNICATION**

Effective and efficient oral communication skills

Effective and efficient written communication skills

Ability to develop relationships through interpersonal skills

Effective listening skills

**DIVERSITY & INCLUSION/TEAM PLAYER**

Collaboration skills

Ability to work effectively in a team environment

**POSITIVE IMPACT**

Ability to positively impact others

Influencing skills, resulting in a positive outcome

Take initiative, a self-starter

Ability to work well in a fast paced, high pressure environment

**PROBLEM SOLVING & DECISION MAKING**

Problem solving skills

Decision making skills (make best value decisions)

Analytical skills

Strategic thinking skills

Ability to analyze various courses of action and make recommendations

Project Management skills

Sound judgement

**RESULTS ORIENTATION**

Ability to manage multiple priorities and prioritize workload

**FUNCTIONAL & TECHNICAL EXPERTISE**

Customer service skills

Ability to work independently with little supervision

**OTHER**

- Strong financial and analytical skills. Able to identify a root cause from a subset of data and establish a relevant action plan to correct root cause of issue.
- Ability to evaluate a situation and create innovative, balanced solutions
- Strong work ethic.

**Generated:** *2019-03-14 05:07:20.641000*

**Last Updated:** *2017-11-24 15:34:07*

EXHIBIT

Plaintiff's 5

**From:** Geter, Cierra
**Sent:** Friday, August 25, 2017 8:45 AM
**To:** Horton, Doug; Biskey Rose, Marianne; Dunn, Rodney; Torrence, Travis
**Subject:** Concerns on 3rd Shift


Good Morning Everyone,

I know you all do a great deal to help the members of our team, I feel I can turn to you all with several matters that has caused us much personal frustration and even more lost time for support shift. For several weeks now, there has been an increase amount of ATLANTA drivers coming into the office needing a truck to run for the day (I.E. Scott ███ / Kim ███ Esera ███ …etc) . I want to help better the system that we have to issue out trucks to our drivers in the time of need. Especially during one of the most busiest time of our day/shift
0400-0630. Sometimes there are no notes about the driver needing a tractor nor notes about who trucks are at the ATL/OC shop being repaired. We are aware on how to use the tractor/key-code list to help assign the tractors to the driver but knowing who needs one is the issue. This causes drivers who are calling in or sending in messages with their issues to wait for long periods of time. Around that time of morning it feels we like are falling behind in our own work, and our production. This morning I had to leave my house ( I was working from home) and rush over to the office to find two drivers tractors to use for today. I admit I was not too happy about stopping my planning and leaving drivers in the phone query help those drivers, however I had to do what I had to do to get things done.

Also another concern we always have: Who do we need to call in the early morning hours for help on 3rd Shift? Another concern is our safety at night. Are there any security measure being considered?
Would it be possible for the our team ( all three shifts) to come together at a dinner on a Saturday night to have a discussion across the board about any issues and concerns?

I know our team would sincerely appreciate being able to use their time more efficiently. I look forward to your response so I can tell them what to expect.


*Cierra Geter*
**Area Planning Manager**
**Schneider National, Inc.**
www.schneider.com



SCHNEIDER 000060



**SCHNEIDER** Learning Management

🏠 Navigator    💾 Favorites     Home   Logout   Preferences   Help

| Catalog | Resources | Learner | **Content** | Finance | Setup |

Preview Learner Attempt: Geter, Cierra Chanel

**2018 Associate Acknowledgements USA Recert**

> **EXHIBIT**
>
> **Plaintiff's 6**

(Answer all questions in this section)

✓ **1.** I acknowledge that the policies, procedures, rules, and regulations of Schneider National, Inc. and its affiliates    1 Points
and subsidiaries (collectively referred to as "Schneider"), including but not limited to Schneider's Benefits Guide
(which describes its benefit plans), Code of Conduct, Equal Opportunity Employer, Antitrust, Discrimination,
Harassment and Retaliation Prevention, Drug and Alcohol, Code of Conduct, Insider Trading and Acceptable
Use Policies (collectively, the "Schneider Policies"), have been made available to me and I understand,
acknowledge and agree to abide by them in my employment with Schneider. I have reviewed the Schneider
Policies and understand them, or I will promptly review the Schneider Policies and agree to immediately bring
any questions I may have about them to my leader or Human Resource Business Partner *(NOTE: Various
Schneider Policies are available on the Schneider Intranet - under the Company Policies and Guidelines
section)*. I further understand and acknowledge that the Schneider Policies are updated and that new
Schneider Policies are added from time to time. I agree to review and familiarize myself with such new and/or
updated Schneider Policies as they become available.

To the best of my knowledge, neither I nor any member of my immediate family is engaged in any activity or
has any knowledge of past or present activity which represents a present or potential conflict of interest with
respect to my employment with Schneider. Examples of conflicts of interest include (but are not limited to):
being currently employed by, or on the board of directors of, an organization that competes with Schneider;
having an interest in, or being an owner of, an organization which does a substantial amount of business with
Schneider (e.g., a vendor, customer, or other similar relationship); directly investing in other transportation
companies; disclosing or misusing material non-public information for personal financial gain; seeking
reimbursement or payment from a vendor, supplier and/or customer for activities that directly relate to my
Schneider duties; making or approving improper payments to any government or government officials;
accepting or making payments in violation of the Foreign Corrupt Practices Act; or receiving loans or
guarantees of obligations from Schneider). If a potential conflict of interest arises in the future, I agree to
promptly explain such potential conflict of interest to my leader and Human Resource Business Partner. I agree
that if I currently have a potential conflict of interest I will bring it to my leader's and HRBP's attention
immediately.

I have not made and I have not promised to make, nor will I make, any payment to any public official, party
candidate or any other person knowing or having reason to know that any payment would be used to influence
or induce such official, party candidate or any other person to misuse his/her official position to obtain, retain
or direct business for or to Schneider.

I have not, and will not, engage in any activity inconsistent with the various state and federal antitrust laws.
Examples of activities that are inconsistent with state and federal antitrust laws and in which I may not be
engaged include (but are not limited to): engaging in illegal price fixing or collusion with other organizations;
engaging in illegal bid-rigging processes, etc.

   ⦿ I agree (*)
   ○ I do not agree

✓ **2.** I acknowledge that I do not have a right and I do not have a reasonable expectation of personal privacy    1 Points
and/or confidentiality in my use of Schneider E-mail, electronic communications, computers, telephones,
Schneider issued cell phones or other electronic devices, information technology, desks, and office systems, as
noted in the Schneider Policies including, without limitation, the Acceptable Use Policy.

I acknowledge, understand and agree that I have been able to read and review a copy of the current version
of the Schneider Mediation & Arbitration Policy ("SMAP") either in hard copy or through a hyperlink visible and
accessible to me in the Schneider system I am using to make these Associate Acknowledgements at this time
*(and I understand that a copy of the most current version of the SMAP is also available to me on the internal
Schneider website, Transit or Compass, under the Company Policies and Guidelines section)*, and that if any
employment-related disputes now exist or arise in the future between me and Schneider, we are and will be
bound by the terms of the SMAP, under which we each waive our rights to have any "Covered Disputes" (as
defined in the SMAP) be heard or decided through any type of judge or jury trials, administrative hearings, or
through any type of "Representative Action" or "PAGA Action" (as defined in the SMAP), and agree that any
Covered Disputes can only be resolved through voluntary mediation, mandatory individual final and binding

CONFIDENTIAL        SCHNEIDER 000138

understand that I remain bound by any version of the SMAP to the extent I previously had notice of and access to a copy of that version of the SMAP, did not opt out within 30 days of my initial receipt or notice thereof, and have not become bound by a more current version of the SMAP. I understand that, upon my initial receipt or notice of the current version of the SMAP, if I am a new associate who has never had previous notice of and access to a copy of and become bound by that version of the SMAP, I can elect to not be bound by that version of the SMAP by following the procedures in the "Employee Election To Not Be Bound By SMAP" section of the SMAP within 30 days of my *initial* receipt or notice of that version of the SMAP, and if I do not do so or did not do so when *first* provided notice of and access to that version of the SMAP, and have not become bound by a later version of the SMAP, then Schneider and I will be required to arbitrate any Covered Disputes in accordance with the most recent version of the SMAP to which I have become bound. I also acknowledge, understand and agree that, in the event I did not or do not provide a timely and proper Election Notice to not be bound by any version of the SMAP to which I have become bound, that will be deemed to be my exercise of my right under the National Labor Relations Act to not engage in concerted activity, including without limitation as to any Representative Action or PAGA Action.

- ⦿ I agree (*)
- ◯ I do not agree

✓ **3.** If I work or have worked in California, I further acknowledge, understand and agree that if I have or may have    1 Points
claims that can or could be asserted now or in the future under the California Labor Code Private Attorney General Act of 2005 ("PAGA"), I have had a sufficient opportunity to learn and understand the nature and extent of any such PAGA claims, and I knowingly and voluntarily waive any and all rights to bring or participate in any type of PAGA Action to resolve, decide or adjudicate any such Covered Disputes, including but not limited to claimed violations of California laws related to the payment or non-payment of and/or deductions from compensation or wages of any type (including bonuses and commissions), accrual or use or payment of vacation or sick pay or other paid time off, providing or authorizing and permitting meal or rest periods, reimbursement of employment-related expenses, inaccurate wage statements and timely payment of wages.

I also acknowledge, understand and agree that Covered Disputes under the SMAP includes any claims now being or hereafter brought putatively on my behalf as a proposed Representative Action and/or PAGA Action to the extent that certification or permission to proceed as a Representative Action or PAGA Action has not been granted as of the time I am making these Associate Acknowledgements. I further understand that I may obtain information about any such actions now pending by requesting it from my Human Resource Business Partner.

I acknowledge that Schneider may modify, supplement, terminate, or revise any of the Schneider Policies, except those providing that my employment relationship is at-will, at any time and in accordance with applicable law. Except for the Schneider Mediation & Arbitration Policy and any stand-alone agreements between me and Schneider (including but not limited to the Schneider Associate Non-Disclosure and Developments Agreement and the integrated agreement with respect to the at-will nature of my employment relationship set forth below), which constitute binding contracts between me and Schneider, I acknowledge that the Schneider Policies do not, in whole or in part, constitute a guarantee of employment, right, benefit, or contract of employment, expressed or implied.

I acknowledge that nothing in any of Schneider's polices is intended to prevent me from engaging in concerted activity protected by law or to interfere with, restrain, or prevent associate communications regarding wages, hours, or other terms and conditions of employment. I understand that I have the right to engage in or refrain from engaging in such activities during non-working time without influence or interference from management or the Company.

I acknowledge, understand and agree that my employment with Schneider is and continues to be at-will. Nothing in my Associate Acknowledgements being made at this time or in the Schneider Policies changes the at-will status of my employment. My employment and compensation can be terminated, with or without cause, and with or without notice, at any time, by either me or Schneider. Only Schneider's Chief Executive Officer has the authority or legal ability to modify the at-will nature of my employment, which can be modified only if it is expressly stated in a written agreement signed by the Chief Executive Officer and me.

- ⦿ I agree (*)
- ◯ I do not agree

✓ **4.** By completing, submitting and signing (either electronically or by hand) these Associate Acknowledgements, I    1 Points
hereby agree to all of the above statements, and agree to follow all Schneider policies during my employment. I certify by my electronic or hand signature that all entries and information in these Associate Acknowledgements and all other documents I am submitting to Schneider are true and correct. I agree that if I fail to sign or re-sign (upon Schneider's request) these Associate Acknowledgements, it may result in my employment being terminated. I also agree that providing false, misleading or incomplete statements, documents, or data to Schneider may result in termination of my employment, regardless of when it is discovered. I understand that my signing these Associate Acknowledgements does not guarantee me a job

CONFIDENTIAL  SCHNEIDER 000139

with Schneider for any period of time and that my employment can and may be terminated at any time and for any lawful reason by either me or Schneider, with or without cause or notice.

◉ I agree (*)
◯ I do not agree

**Points Scored: 4.0**

**Percentage Scored: 100.0%**

**Total Suggested Points: 4.0**

<u>Return to User Attempts</u>

Catalog   Resources   Learner   Content   Finance   Setup   Home   Logout   Preferences   Help

Copyright (c) 2006, Oracle. All rights reserved.

CONFIDENTIAL           SCHNEIDER 000140

Page 21 of 29

Case 1 **EXHIBIT** SA Document 46-4 Filed 06/07/21 Page 80 of 106
USCA11 Ca **Plaintiff's 7** cument: 17-1 Date Filed: 07/01/2022 Page: 186 of 239

## DISCRIMINATION, HARASSMENT AND RETALIATION PREVENTION POLICY

### DESCRIPTION

Schneider is committed to maintaining a work environment that is characterized by mutual respect, professionalism, and the absence of harassment, discrimination, and retaliation.

### PRINCIPLES

It is the policy of Schneider that harassment, discrimination, and retaliation are prohibited and will not be tolerated. All managers, supervisors, associates, vendors, and customers are expected to adhere to a standard of conduct which exemplifies and supports a professional work environment free from all forms of harassment, discrimination and retaliation. Schneider is committed to compliance with all federal, state, local and other applicable laws related to the prevention of harassment, discrimination, and retaliation.

Harassment or discrimination based on race, color, creed, religion (including religious dress and grooming), sex, (including pregnancy, childbirth, breastfeeding or related medical conditions, gender, gender identity or expression, sex stereotype, transgender), marital status, sexual orientation, genetic background, national origin, age, ancestry, physical or mental disability, handicap, genetic background, military or veteran status or any other classification protected by applicable law (a "Protected Category") is prohibited under this policy and will not be tolerated. Any associate who violates this policy will be subject to disciplinary action up to and including termination of employment. All associates are expected to take prompt and appropriate action to prevent harassment and discrimination in the work place, whether by Company associates, customers, or vendors.

Nothing in this policy is intended to prevent an associate from engaging in concerted activity protected by law or to interfere with, restrain, or prevent associate communications regarding wages, hours, or other terms and conditions of employment. Associates have the right to engage in or refrain from such activities during non-working time without influence or interference from management.

### HARASSMENT

Harassment is defined as unwanted, deliberate or repeated conduct, whether verbal, physical, visual, or through social media, that is based on a person's Protected Category as defined in this policy or as otherwise protected by applicable law. Schneider will not tolerate harassment that affects tangible job benefits, that unreasonably interferes with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment. Jokes between co-workers in the same protected classification can also constitute harassment.

### SEXUAL HARASSMENT

Sexual harassment includes, but is not limited to, unwelcome conduct of a sexual nature, such as sexual advances, sexual flirtations, propositions, displays of sexually suggestive objects or pictures, requests for sexual favors, sexually-oriented teasing or practical jokes, suggestive or insulting sounds, looks, or gestures, or any unwanted physical conduct and other verbal, visual, written or physical conduct of a sexual nature such as comments,

SCHNEIDER 000271



Page 22 of 29

Case 1:20-cv-01148-SCJ-JSA   Document 46-4   Filed 06/07/21   Page 81 of 106
USCA11 Case: 22-11285   Document: 17-1   Date Filed: 07/01/2022   Page: 187 of 239



rewards, teaching, flaming, joking or intimidation. Obviously, more severe forms of harassment, such as sexual assault, are prohibited.

Expressly or impliedly conditioning a job benefit (or the absence of a job detriment) on sexual favors is also considered sexual harassment.  As such, Schneider prohibits unwelcome sexual advances, request for sexual favors, and all other verbal, visual, written, or physical conduct of a sexual or otherwise offensive nature where:

- submission to such conduct is made either explicitly or implicitly a term or condition of employment;
- submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment (i.e., performance appraisals, compensation, advancement, or any other term or condition of employment or career development); or,
- such conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

No associate shall threaten or imply, either explicitly or implicitly, that another associate's or applicant's refusal to submit to sexual advances will adversely affect any condition of that person's employment or career development with Schneider.

## WORKPLACE BULLYING BASED ON PROTECTED CATEGORY

Workplace bullying is defined as "repeated, inappropriate behaviors conducted by one or more persons (the perpetrators) against another or others at the place of work or during the course of employment that take one or more of the following forms":

- Verbal bullying: slandering, ridiculing or maligning a person or his/her family; persistent name calling which is hurtful, insulting or humiliating; using a person as butt of jokes; abusive and offensive remarks.
- Physical bullying: pushing; shoving; kicking; poking; tripping; assault, or threat of physical assault; damage to a person's work area or property.
- Gesture bullying: non-verbal threatening gestures, glances which can convey threatening messages.
- Exclusion: socially or physically excluding or disregarding a person in work-related activities.
- Actual or threat of work interference (sabotage) that prevents work from getting done.

## COMPLAINT REPORTING PROCEDURES

Schneider is aware that conduct, comments, or behavior that may be offensive to some individuals might be considered inoffensive to others.  Because of this, it is difficult for Schneider to learn of and take effective action to halt harassment and discrimination unless the affected individual alerts the appropriate leader or HR Department, both of the occurrence and the fact that the conduct in question is offensive and unwanted. Associates who believe they are being subjected to or have witnessed harassment, discrimination, retaliation, or bullying have several reporting options available. Schneider encourages affected individuals to tell the alleged harasser or discriminator that they find such behavior offensive and ask them to stop.  Regardless of whether you ask that individual to stop, if you feel you have been subjected to conduct that violates this policy you have a duty to promptly notify one of the following individuals:  your leader, an HR Business Partner, or any member of Schneider leadership.  You are not required to report to your direct leader and may instead report concerns to an HR Business Partner.

Leaders in the organization have an additional responsibility above that of other associates. As a leader, if you have learned of or feel that you have witnessed conduct that violates this policy, you have a heightened duty to notify an

Page 23 of 29

Case 1:20-cv-01148-SCJ-JSA   Document 46-4   Filed 06/07/21   Page 82 of 106
USCA11 Case: 22-11285   Document: 17-1   Date Filed: 07/01/2022   Page: 188 of 239



HR Business Partner of the conduct.  Any leader who receives a complaint of harassment, discrimination, retaliation or bullying and fails to immediately report it to HR may be subject to disciplinary action up to and including termination of employment.

## INVESTIGATION PROCEDURES

Schneider will take prompt action to investigate all good faith complaints alleging harassment or discrimination. Persons who raise a concern or complaint or who are interviewed in the course of the investigation are expected to be honest and candid. Interference with investigation efforts (including, without limitation, refusing to cooperate in an investigation or providing a false statement in an investigation) will not be tolerated and may result in disciplinary action, up to and including termination of employment. If Schneider determines that a confidential investigation is necessary to protect its legitimate business interests, confidentiality will be maintained to the extent possible during the investigation, but complete confidentiality cannot be guaranteed.

If an investigation concludes that inappropriate conduct or a violation of this policy has occurred, Schneider will take appropriate remedial action reasonably designed to halt the behavior.  Such remedial measures may include discipline, up to and including terminating the employment.  If an investigation concludes that a Schneider associate was unlawfully harassed by a supplier, client, contractor, customer, or other regular visitor, Schneider will take appropriate action, which may include the termination of the relationship with the supplier, client, contractor, customer, or visitor.

## RETALIATION IS PROHIBITED

Retaliation or discrimination against someone for raising a good faith report of harassment, bullying or discrimination is prohibited and will not be tolerated. Retaliation against witnesses or other individuals who cooperate in a related investigation is also prohibited. If you believe that you have been retaliated against, even if the retaliation is subtle, you should report this fact immediately to your HR Business Partner, or any member of Schneider leadership.  Anyone found to have retaliated against an individual because of a good faith report of harassment or discrimination or because of cooperation in the investigation of a complaint will be subject to discipline, up to and including termination of employment.

## FOR MORE INFORMATION

Contact your HR Business Partner with any questions regarding this policy.

*Owner: CAO/HR/HRLT*
*Created: prior to 2006*
*Last Revised: 9/2018*
*Policy valid date and time printed only = refer to intranet for current version*
*For internal associate use only.  Do not share or distribute externally.*

Page 24 of 29

Case 1:20-cv-01148-SCJ-JSA   Document 46-4   Filed 06/07/21   Page 83 of 106
USCA11 Case: 22-11285   Document: 17-1   Date Filed: 07/01/2022   Page: 189 of 239

**SCHNEIDER POLICY / DISCRIMINATION, HARASSMENT, AND RETALIATION PREVENTION**

SCHNEIDER 000274



```
EXHIBIT

  13
```

**REVISED Designation Notice for Family Medical Leave/FMLA**

*HR-010321-LA*

TO   ███████████
     ███████████
     ███████████

EBS #: ██████
Driver #: NA

DATE: **11/28/2018**

FROM:   Schneider Leave Administration Team - Ruthchenie

You previously received a notice from us stating that your Family Medical Leave/FMLA was approved.  Your FMLA leave began on 10/9/2018.  On 11/27/2018 , **we were informed that** your need for leave was extended through 1/1/2019.

**Based on this updated information, your Federal FMLA now has a new ending date of 12/31/2018**
**As of this new date, 12 weeks have been counted against your Federal leave entitlement.**

**This exhausts your 12 weeks of available Federal FMLA.**

Please refer to the original Designation Notice that was sent to you for more details.  Our team can provide you with an additional copy if needed.  If you have any questions or disagree with the information in this notice, please contact us.  You can also view the FMLA poster located at your location or the FMLA information posted under Company Policies.

*Associates in  certain states may be entitled to other benefits under states laws similar to FMLA.  In the event there is a difference in State and Federal regulations, the regulation most favorable to the associate will apply.*

*California Residents:  Above references to FMLA also include CFRA (California Family Rights Act) designation.*

Travis Torrence **has been notified via email of your eligibility and FMLA approval dates.**

**HR Leave Administration Team**
**Schneider**
**PH: 920-592-4571** *or* **800-558-6701 x592-4571**
**FAX: 920-403-8903**


SCHNEIDER

## Designation Notice of Family Medical Leave

| EXHIBIT |
| --- |
| **Plaintiff's 11** |

*HR-010321-LA*

**TO**   Cierra Geter

▆▆▆▆▆▆▆▆

EBS #: 296995

**DATE:** ▆▆▆▆▆▆
**FROM:**   Schneider Leave Administration Team - Molly

### Designation Notice of Family Medical Leave

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. This form provides employees with the information required by 29 C.F.R. §§ 825.300(c), 825.301, and 825.305(c).

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided.   We received your most recent information on 10/22/2018. We have decided:

- **Your FMLA leave request is approved.  All leave taken for this reason will be designated as FMLA leave.**

**The FMLA requires that you notify us as soon as practical if dates of scheduled leave change or are extended, or were initially unknown. Based on the information we have obtained to date, we are providing the following information about the amount of time that will be counted against your leave entitlement:**

- Provided there is no deviation from your anticipated leave schedule, the following number of days or weeks will be counted against your leave entitlement: **7 weeks and 1 day – beginning** 10/9/2018 **and ending** 11/27/2018.
- **If your need for leave extends beyond the above ending date, you will need to contact us and submit additional FML paperwork.  This must be done <u>prior to</u> the above FML ending date.** Failure to do this could result in your absences beyond the above ending date not being covered under FML.
- If the dates of your leave change, we will send you a revised Designation notice.

**If you disagree with the time designated as FML, or any of the information noted in this Designation notice, you may request a review by contacting the Leave Administration team at 800-558-6701 ext 5924571 to discuss your file.**

**Please be advised:**

FMLA Notice of Eligibility and Rights & Responsibilities to replace Federal Forms WH381/WH382 -

- You are not required to substitute accrued paid time during this leave.  **If you wish to substitute paid time, it is your responsibility to notify your leader of your intention to use available vacation or other paid leave.**
- You will be required to present a Schneider Attending Physician's Return to Work Recommendation form (enclosed) to be restored to employment.  Your return to work may be delayed until certification is provided.  A list of the essential functions of your position **is not** attached.

This letter is to notify you that we are basing your Family Medical Leave off the following FMLA regulations:

**§ 825.113  Serious health condition.**
(a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in §825.114 or continuing treatment by a health care provider as defined in §825.115.
(b) The term "incapacity" means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery there from.

**§ 825.300  Employer notice requirements. (d)**
(2) If the employer has sufficient information to designate the leave as FMLA leave immediately after receiving notice of the employee's need for leave, the employer may provide the employee with the designation notice at that time.

**§ 825.301  Designation of FMLA leave**
(a) Employer responsibilities. The employer's decision to designate leave as FMLA-qualifying must be based only on information received from the employee or the employee's spokesperson (e.g., if the employee is incapacitated, the employee's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave). In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying. Once the employer has acquired knowledge that the leave is being taken for a FMLA-qualifying reason, the employer must notify the employee as provided in §825.300(d).

**Please be advised:**
- Any paid time taken for this reason will count against your FMLA leave entitlement.
- You are not required to substitute accrued paid time during this leave. **If you wish to substitute paid time, it is your responsibility to notify your leader of your intention to use paid time.**

Schneider follows all state and federal regulations.  Associates in certain states may be entitled to other benefits under state laws similar to the FMLA.  In the event there is a difference in State and Federal regulations, the regulation most favorable to the associate will apply.  Leaves or other benefits under Federal and related state FMLA laws run concurrently.

**An associate on an approved personal medical leave of any type is prohibited from outside work. Exceptions will be reviewed by the HR Leave Administration team on a case by case basis based on the healthcare provider medical certification. To approve an exception, the associate must provide a job description for the outside employment. HR Leave Administration will compare that job description with restrictions documented in the medical certification form.

Examples when an exception will be denied include:

- Working for another employer doing the same or similar duties that the employee's medical certification form says he or she is unable to perform.
- Working another job when the employee is supposed to be on leave for a doctor's appointment

If an associate engages in other employment while on a personal medical leave or light duty assignment for Schneider, without the prior written approval HR Leave Administration, the associate's leave may be canceled and his or her employment terminated retroactive to the date the other employment began.

Travis Torrence **has been notified via email of your eligibility and FMLA approval dates.**
Enclosure: Employee Rights and Responsibilities WHD Publication 1420

FMLA Notice of Eligibility and Rights & Responsibilities to replace Federal Forms WH381/WH382

# EMPLOYEE RIGHTS
## UNDER THE FAMILY AND MEDICAL LEAVE ACT

### THE UNITED STATES DEPARTMENT OF LABOR WAGE AND HOUR DIVISION



**LEAVE ENTITLEMENTS**

Eligible employees who work for a covered employer can take up to 12 weeks of unpaid, job-protected leave in a 12-month period for the following reasons:

- The birth of a child or placement of a child for adoption or foster care;
- To bond with a child (leave must be taken within 1 year of the child's birth or placement);
- To care for the employee's spouse, child, or parent who has a qualifying serious health condition;
- For the employee's own qualifying serious health condition that makes the employee unable to perform the employee's job;
- For qualifying exigencies related to the foreign deployment of a military member who is the employee's spouse, child, or parent.

An eligible employee who is a covered servicemember's spouse, child, parent, or next of kin may also take up to 26 weeks of FMLA leave in a single 12-month period to care for the servicemember with a serious injury or illness.

An employee does not need to use leave in one block. When it is medically necessary or otherwise permitted, employees may take leave intermittently or on a reduced schedule.

Employees may choose, or an employer may require, use of accrued paid leave while taking FMLA leave. If an employee substitutes accrued paid leave for FMLA leave, the employee must comply with the employer's normal paid leave policies.

**BENEFITS & PROTECTIONS**

While employees are on FMLA leave, employers must continue health insurance coverage as if the employees were not on leave.

Upon return from FMLA leave, most employees must be restored to the same job or one nearly identical to it with equivalent pay, benefits, and other employment terms and conditions.

An employer may not interfere with an individual's FMLA rights or retaliate against someone for using or trying to use FMLA leave, opposing any practice made unlawful by the FMLA, or being involved in any proceeding under or related to the FMLA.

**ELIGIBILITY REQUIREMENTS**

An employee who works for a covered employer must meet three criteria in order to be eligible for FMLA leave. The employee must:

- Have worked for the employer for at least 12 months;
- Have at least 1,250 hours of service in the 12 months before taking leave;* and
- Work at a location where the employer has at least 50 employees within 75 miles of the employee's worksite.

*Special "hours of service" requirements apply to airline flight crew employees.

**REQUESTING LEAVE**

Generally, employees must give 30-days' advance notice of the need for FMLA leave. If it is not possible to give 30-days' notice, an employee must notify the employer as soon as possible and, generally, follow the employer's usual procedures.

Employees do not have to share a medical diagnosis, but must provide enough information to the employer so it can determine if the leave qualifies for FMLA protection. Sufficient information could include informing an employer that the employee is or will be unable to perform his or her job functions, that a family member cannot perform daily activities, or that hospitalization or continuing medical treatment is necessary. Employees must inform the employer if the need for leave is for a reason for which FMLA leave was previously taken or certified.

Employers can require a certification or periodic recertification supporting the need for leave. If the employer determines that the certification is incomplete, it must provide a written notice indicating what additional information is required.

**EMPLOYER RESPONSIBILITIES**

Once an employer becomes aware that an employee's need for leave is for a reason that may qualify under the FMLA, the employer must notify the employee if he or she is eligible for FMLA leave and, if eligible, must also provide a notice of rights and responsibilities under the FMLA. If the employee is not eligible, the employer must provide a reason for ineligibility.

Employers must notify its employees if leave will be designated as FMLA leave, and if so, how much leave will be designated as FMLA leave.

**ENFORCEMENT**

Employees may file a complaint with the U.S. Department of Labor, Wage and Hour Division, or may bring a private lawsuit against an employer.

The FMLA does not affect any federal or state law prohibiting discrimination or supersede any state or local law or collective bargaining agreement that provides greater family or medical leave rights.

For additional information or to file a complaint:

## 1-866-4-USWAGE
(1-866-487-9243)   TTY: 1-877-889-5627

## www.dol.gov/whd
**U.S. Department of Labor - Wage and Hour Division**



WH1420   REV 04/16

**ASSOCIATES: THIS FORM MUST BE RECEIVED PRIOR TO YOUR RETURN TO WORK**

Schneider
HR Leave Administration Team
P.O. Box 2545 Green Bay WI 54306-2545
FAX: 920-403-8903   Email: HRLeaveAdministrationTeam@Schneider.com

Associate Number _____

## ATTENDING PHYSICIAN'S RETURN TO WORK RECOMMENDATION

**Physician Instructions:**
- ➢ Please complete this form once the patient is released to work.
- ➢ Only complete ONE section – Section I if "NO" restrictions OR Section II WITH restrictions.
- ➢ Do NOT include diagnosis or confidential medical details.
- ➢ Please call 920-592-4571 with any questions.

Patient's Name (First) _____   (Middle Initial) _____   (Last) _____

| Section I | OR | Section II |
|---|---|---|

**Section I**
Patient is able to return to work **without** restrictions effective _____.

**Comments:** _____

_____

_____

_____

**Section II**
Patient is able to return to work **with** restrictions effective _____, outlined below:

1. In a **24 hour day**, patient may work an accumulative of:
   **Stand / Walk:**
   ☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours
   **Sit:** (No more than 11 hrs without a break)
   ☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours
   **Operation of Heavy Machinery:**
   (No more than 11 hrs without a break)
   ☐ 7 Hours or less   ☐ 8-10 Hours   ☐ 11-14 Hours
2. Patient is able to:

| | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |
| Lift: | | | |
| Sedentary   10# max | | | ☐ |
| Light / Heavy   20# max | | | ☐ |
| Medium   50# max | | | ☐ |
| Heavy   100# max | | | ☐ |

******************** **REQUIRED** ********************
**Restrictions in effect until:** _____

**Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?**
YES ☐   NO ☐   N/A ☐

**Is the patient experiencing any side effects which would interfere with their job or with moving around or operating heavy machinery?**
YES ☐   NO ☐
Explain if **YES**: _____

Physician's Name (Printed): _____
Physician's Signature: _____   Date: _____
Physician's Phone Number: (_____)   FAX# _____

Return to Work Form 9.26.14

CONFIDENTIAL



┌─────────────────┐
│   **EXHIBIT**       │
│                 │
│      13         │
│   _____     │
└─────────────────┘

**REVISED Designation Notice for Family Medical Leave/FMLA**

*HR-010321-LA*

**TO**   ███████████
         ███████████
         ███████████

**EBS #:** ███████
**Driver #:** NA

DATE: **11/28/2018**

FROM:   Schneider Leave Administration Team - Ruthchenie

You previously received a notice from us stating that your Family Medical Leave/FMLA was approved.  Your FMLA leave began on 10/9/2018.  On 11/27/2018 , **we were informed that** your need for leave was extended through 1/1/2019.

**Based on this updated information, your Federal FMLA now has a new ending date of 12/31/2018**
**As of this new date, 12 weeks have been counted against your Federal leave entitlement.**

**This exhausts your 12 weeks of available Federal FMLA.**

Please refer to the original Designation Notice that was sent to you for more details.  Our team can provide you with an additional copy if needed.  If you have any questions or disagree with the information in this notice, please contact us.  You can also view the FMLA poster located at your location or the FMLA information posted under Company Policies.

*Associates in  certain states may be entitled to other benefits under states laws similar to FMLA.  In the event there is a difference in State and Federal regulations, the regulation most favorable to the associate will apply.*

*California Residents:  Above references to FMLA also include CFRA (California Family Rights Act) designation.*

Travis Torrence **has been notified via email of your eligibility and FMLA approval dates.**

**HR Leave Administration Team**
**Schneider**
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903

EXHIBIT

Plaintiff's 14

**ASSOCIATES: THIS FORM MUST BE RECEIVED PRIOR TO YOUR RETURN TO WORK**

Schneider
HR Leave Administration Team
P.O. Box 2545 Green Bay WI  54306-2545
**FAX:  920-403-8903**   Email: **HRLeaveAdministrationTeam@Schneider.com**

Associate Number _____

## ATTENDING PHYSICIAN'S RETURN TO WORK RECOMMENDATION

**Physician Instructions:**
➢ Please complete this form once the patient is released to work.
➢ Only complete ONE section – Section I if "NO" restrictions **OR** Section II WITH restrictions.
➢ Do **NOT** include diagnosis or confidential medical details.
➢ Please call 920-592-4571 with any questions.

Patient's Name (First) _Cierra_ (Middle Initial) _C_ (Last) _Gator_

| Section I | OR | Section II |
|---|---|---|

**Section I**
Patient is able to return to work **without** restrictions effective _2/14/19_ .

**Comments:** _She will be able to work three days per week four hours a day effective 1/2/19_

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?
YES ☐   NO ☐   N/A ☑

**Section II**
Patient is able to return to work **with** restrictions effective _1/2/19_ , outlined below:
_3 days / week  4 hours days_

1. In a **24 hour day**, patient may work an accumulative of:
   N/A  **Stand / Walk:**
   ☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours
   N/A  **Sit:**  (No more than 11 hrs without a break)
   ☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours
   **Operation of Heavy Machinery:**
   (No more than 11 hrs without a break)
   N/A ☐ 7 Hours or less  ☐ 8-10 Hours  ☐ 11-14 Hours

2. Patient is able to:   N/A

| | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |

Lift:

| | | Not at All |
|---|---|---|
| Sedentary | 10# max | ☐ |
| Light / Heavy | 20# max | ☐ |
| Medium | 50# max | ☐ |
| Heavy | 100# max | ☐ |

****************** *REQUIRED* ******************
## Restrictions in effect until: _2/13/19_

Is the patient experiencing any side effects which would interfere with their job or with moving around or operating heavy machinery?
YES ☐   NO ☑
Explain if **YES**: _____

Physician's Name (Printed): _Cassandra  Wanzo  MD_
Physician's Signature: _____  Date: _12/15/18_
Physician's Phone Number: (_678_) _566-1440_   FAX# (_678_) _566-1441_

CONFIDENTIAL

SCHNEIDER 000410



**EXHIBIT**

**Plaintiff's 15**

12/18/2018

*HR-010321-LA*

TO:   Cierra Geter

████████████████████
████████████████

RE:   Request for Accommodation

Dear Cierra,

On 12/17/2018, we received a return to work form from your physician outlining the following work restrictions through 2/13/2019:

- Work 3 days per week, 10 hour days

Schneider has agreed to accommodate the above restrictions in your current position effective <u>1/2/2019</u> <u>**through**</u> <u>**2/13/2019.**</u> We are able to accommodate you working 3 days 10 hour days.  The specific days and times will need to be worked out with your leader.

Your physician indicates that you are able to return to work full duty on 2/14/2019.

**<u>Please have your physician complete the attached return to work form prior to 2/14/2019 if there are changes to your restrictions.</u>**

As you meet with your physician, it is your obligation to provide Schneider with periodic updates on your progress toward a return to the essential functions of your current role. If there have been no changes to your restrictions, we will at the expiration of this accommodation approval review your status, and make no promise whatsoever that this accommodation will be extended.

Please feel free to call me with any questions.

Sincerely,

Anissa
Leave Analyst
Schneider - HR Leave Administration Team
Phone: 920-592-4571 Fax: 920-403-8903
HRLeaveAdministrationTeam@Schneider.com

www.schneider.com

3101 S. Packerland Drive | P.O. Box 2545
Green Bay, WI 54306-2545

482-8004 5/2016

CONFIDENTIAL

**EXHIBIT**

**16**

FAX TRANSMISSION COVER SHEET

DATE: 1/19/2019

TO: HR Leave

FAX: 920-403-8903

RE: Cierra Geter

SENDER: Dr. Cassandra Wanzo

YOU SHOULD RECEIVE _____ PAGE(S), INCLUDING THIS COVER SHEET.

2

CONFIDENTIAL

**RECEIVED**
By Anissa Gauthier at 7:00 am, Jan 21, 2019

**ASSOCIATES: THIS FORM MUST BE RECEIVED PRIOR TO YOUR RETURN TO WORK**

Schneider
HR Leave Administration Team                              Associate Number _____
P.O. Box 2545 Green Bay WI 54306-2545
FAX: 920-403-8903  Email: HRLeaveAdministrationTeam@Schneider.com

## ATTENDING PHYSICIAN'S RETURN TO WORK RECOMMENDATION

Physician Instructions:
  ➤ Please complete this form once the patient is released to work.
  ➤ Only complete ONE section – Section I if "NO" restrictions OR Section II WITH restrictions.
  ➤ Do NOT include diagnosis or confidential medical details.
  ➤ Please call 920-592-4571 with any questions.

| Patient's Name (First) | (Middle Initial) | (Last) |
|---|---|---|
| Cierra | C | Geffen |

| **Section I** | OR | **Section II** |
|---|---|---|

**Section I**
Patient is able to return to work ~~without~~ restrictions effective 3/20/19.

she remains unable to work full time because at ~~N/A~~

she will be able to work ten hours a day (3) days per week.

**Section II**
Patient is able to return to work **with** restrictions effective 12/19, outlined below:

1. In a **24 hour day**, patient may work an accumulative of: ten hrs/days 3 days/week

**Stand / Walk:**   N/A
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

**Sit:** (No more than 11 hrs without a break)   N/A
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)   N/A
☐ 7 Hours or less  ☐ 8-10 Hours  ☐ 11-14 Hours

2. Patient is able to:   N/A

| | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☑ | ☐ |

Lift:

| | | |
|---|---|---|
| Sedentary | 10# max | ☑ |
| Light / Heavy | 20# max | |
| Medium | 50# max | ☐ |
| Heavy | 100# max | ☐ |

*********************** **REQUIRED** ***********************
**Restrictions in effect until:** 3/19/19

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?
YES ☐   NO ☑   N/A ☐

Is the patient experiencing any side effects which would interfere with their job or with moving around or operating heavy machinery?
YES ☐   NO ☑
Explain if YES: _____

| Physician's Name (Printed): | Cassandra Wanzo MD |
|---|---|
| Physician's Signature: | C. Elee MD   Date: 1/19/19 |
| Physician's Phone Number: ( 678 ) 566-1440 | FAX# (678) 566-144 |

**EXHIBIT**

**Plaintiff's 17**

| | |
|---|---|
| **From:** | Cassandra Wanzo |
| **To:** | HR Leave Administration Team |
| **Subject:** | C.Geter 3.9.19 |
| **Date:** | Saturday, March 09, 2019 11:42:24 AM |
| **Attachments:** | C.Geter 3.9.19.pdf |

Good Afternoon

Attached is the paperwork for C. Geter. Please let us know if anything else is needed.

Kelly Jordan

Administrative Assistant

Dr. Cassandra Wanzo

602 Bombay Lane

Roswell Georgia 30076

Office: (678) 566-1440

Fax: (678) 566-1442

*****This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*****

SCHNEIDER 000343

**ASSOCIATES: THIS FORM MUST BE RECEIVED PRIOR TO YOUR RETURN TO WORK**

Schneider
HR Leave Administration Team                                    Associate Number _____
P.O. Box 2545 Green Bay WI 54306-2545
FAX: 920-403-8903 Email: HRLeaveAdministrationTeam@Schneider.com

## ATTENDING PHYSICIAN'S RETURN TO WORK RECOMMENDATION

**Physician Instructions:**
> Please complete this form once the patient is released to work.
> Only complete ONE section – Section I if "NO" restrictions OR Section II WITH restrictions.
> Do **NOT** include diagnosis or confidential medical details.
> Please call 920-592-4571 with any questions.

Patient's Name (First) _Corra_    (Middle Initial) _O_    (Last) _Tater_

| Section I | OR | Section II |
|---|---|---|
| Patient is able to return to work **without** restrictions effective ___April 30___ . | | Patient is able to return to work **with** restrictions effective ___N. A___, outlined below: |

_She remains unable to work Fulltime_

1. In a **24 hour day**, patient may work an accumulative of:

**Stand / Walk:**
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

**Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
☐ 7 Hours or less  ☐ 8-10 Hours  ☐ 11-14 Hours

2. Patient is able to:

| | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |

Lift:
| | |
|---|---|
| Sedentary | 10# max |
| Light / Heavy | 20# max |
| Medium | 50# max |
| Heavy | 100# max |

_She will be able_

**Comments:** _to continue present schedule Three hrs/hm left once a day Thursday and Friday at Home or anytime solo_

**************** **REQUIRED** ****************
**Restrictions in effect until:** ___Apr___

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?

YES ☐    NO ☑    N/A ☐

Is the patient experiencing any side effects which would interfere with their job or with moving around or operating heavy machinery?

YES ☐    NO ☑
Explain if **YES:** _____

Physician's Name (Printed): _Cesscentra_
Physician's Signature: _____    Date: _3/4/19_
Physician's Phone Number: _(678) 500-1440_    FAX# _678-566-1441_

CONFIDENTIAL                                    SCHNEIDER 000344

Please fax the completed form to:
Fax Number: 1-866-434-5823
The Hartford
P.O.Box 14301
Lexington, KY 40512-4301
Email: APSupload@thehartford.com

**EXHIBIT**

**Plaintiff's 19**

THE
HARTFORD

**ATTENDING PHYSICIAN'S STATEMENT**
**(For Mental Health Claims)**

**To Be Completed By The Employee**

Patient Name: _Gienra Gefen_

Patient Address (Street, City, State & Zip code):

**To be completed by the Provider - (The patient is responsible for the completion of this form without expense to the company)**

Is the condition related to environmental and/or interpersonal issues in his/her workplace? ☑ Yes ☐ No

If "Yes," explain: _Lack of staffing, verbally abusive_

_inividuals_

If yes, can he / she perform the same job at a different location / employer? ☐ Yes ☑ No

Are these issues causing [redacted]

DIAGNOSIS: [redacted]

Patient Assessment Measures

WHODAS Score:

Domain I ___  Domain II ___  Domain III ___  Domain IV ___  Domain V ___  Domain VI ___
(Provide completed assessment questionnaire)

Other Assessment Measures - please list the measure scale and provide score (attach test results):

Patient Name:                              Date of Birth:              Insured ID Number:

## FUNCTIONALITY:

Did you recommend your patient stop working?   ☐ Yes  ☑ No   If Yes, on what date?

Are the symptoms of such severity to preclude the patient from social / occupational functioning?   ☑ Yes  ☐ No

When did the symptoms become severe enough to preclude social / occupational functioning?   *Oct - 11, 2018*

If Yes, specify what work activities are impaired and how:

What is the expected duration of any work activity impairments?

Have you discussed a return to work goal with your patient?   ☐ Yes  ☐ No   If No, please explain:

What are your patient's current abilities?  What type of work can your patient perform?

*She can only work 3 days per week
Wed / Thurs / Friday. Working from
Home 2 days / week ( 10 hour days)*

What is your target date for return to work for your patient?  *6/5/19*   ☑ Full time   ☐ Part time

If part time, on what date will your patient be able to increase to full time?  *6/5/19*

If appropriate, provide examples of accommodations that would allow your patient to return to work:

*Working from home 2 days
Per week, working 3 days
Per week ( wed, thurs) R (Fri)*

In your opinion is the patient competent to endorse checks and direct the use of the proceeds thereof?  ☑ Yes  ☐ No

Additional comments:

## TREATMENT:

Date of onset of disability:       Date you first treated this patient for any condition:
*Oct 11, 2018*              *10/6/18*

Date you first treated this patient for this condition:   Date of onset of this condition:   Frequency of treatment:
*10/6/18*                  *Oct 2016*        *q 1-3 weeks*

List relevant treatment dates:
*2/1/18, 12/15/18, 1/19/19, 2/23/19, 3/9/19, 3/30/19*

Date of last office visit:   Date of next office visit:
*3/30/19*        *4/20/19*

LC-7592-9                    Page 2 of 3                    08/2016

CONFIDENTIAL                    SCHNEIDER 000322

Patient Name: _____ Date of Birth: _____ Insured ID Number: _____

## TREATMENT CONTINUED:

Has patient been referred to any other mental health providers/physicians? ☐ Yes ☑ No
If "yes", please provide the following information:

Provider Name: _____ Phone Number: ( )

Provider Address: _____

Are you coordinating care with this provider? ☐ Yes ☐ No    *N . A.*

[black redaction bar]

Response to medication:
*Improvement in Migraines*

**STATUS** (Please check one): ☐ In remission ☐ Improved ☐ Unchanged ☑ Retrogressed

Please provide a description of the most significant recent improvement and / or decompensation:

[black redaction bar]

### PROVIDER'S INFORMATION:

Provider's Name: *Cessandra Wanze MD*    Specialty: *Psychiatry*    License Number: *035165*

Address: (Street, City, State & Zip Code) *Bombay Lane Roswell GA 30076*    Telephone number: *(678) 566-1440*

Degree: *MD*    Social Security Number or EIN Number:    Fax Number: *(678) 566-1443*

Office Contact: *Ms Kelly Jordan*    Office Contact Phone: *(678) 566-1440*

Provider's Signature: _____    Date Signed: *3/30/19*

The Hartford® is underwriting companies Hartford Life and Accident Insurance Company and Hartford Life Insurance Company.
The Hartford® is The Hartford Financial Services Group, Inc. and its subsidiaries.

LC-7592-9                    Page 3 of 3                    08/2016

*SCHNEIDER*

| | EXHIBIT |
|---|---|
4/2/2019 | **Plaintiff's 20** |

*HR-010321-LA*
TO:   Cierra Geter

██████████████████
██████████████████

RE:    Request for Accommodation

Dear Cierra,

You are currently approved on an accommodation for your reduced schedule of 3 days through 3/19/2019. Below is the timeline of information that has been received during your leave of absence and your partial return to work.

- Your continuous leave of absence was approved from 10/9/2018 through 12/31/2019 which exhausted your 12 weeks of FML.
- On 12/17/2018, HR leave team received a return to work form from your doctor that indicated you can return to work 3 days per week effective 1/2/2019 through 2/13/2019. HR leave team approved this accommodation on 12/18/2019.
- On 1/21/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 3/19/2019. HR leave team approved this extension on 1/29/2019.
- On 3/11/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 4/30/2019. This extension is under review.
- On 4/1/2019, HR Leave team received updated information from your doctor that indicated your partial schedule of 3 days remains in effect through 6/5/2019. This extension is under review.

With the multiple extensions of partial return to work schedule, this is appearing to be a permanent need.

Please take the below physician statement to your doctor to complete the additional questions that are needed for your accommodation extension request.

***Please provide me with the requested information from you and your health care provider by no later than 4/8/2019.***

Thank you for your cooperation with the above. Please feel free to call me with any questions.

Sincerely,
Anissa
Leave Analyst
Schneider - HR Leave Administration Team
Phone: 920-592-4571 Fax: 920-403-8903
HRLeaveAdministrationTeam@Schneider.com



4/12/2019

┌─────────────────────┐
│     **EXHIBIT**     │
│   Plaintiff's 22    │
└─────────────────────┘

*HR-010321-LA*

TO:     **Cierra Geter**



RE:     Request for Accommodation

Dear Cierra,

As you know you were out on a continuous leave of absence due to medical reasons from 10/9/2018 through 1/1/2019 at which time you exhausted your 12 weeks of FML.  Schneider was able to accommodate you returning to work on a partial schedule starting on 1/2/2019.  We have been accommodating you working 3 out of your scheduled 4 days since that time.

- On 12/18/2019, we approved a partial return to work, working 3 days per week through 2/13/2019.
- On 1/21/2019, we approved an extension of your partial schedule through 3/19/2019.
- On 4/11/2019, we have continued to accommodate this partial schedule through current (4/12/2019).

During this timeframe, Schneider continued to work with you to determine if an accommodation could be made for you and additional information was requested from you and your physician in order to help make that determination.

On 4/1/2019, we received updated information from your physician that indicates that you may be able to return to full time on 6/5/2019 with 3 days in the office and the other day working from home.

Based on this information and after carefully considering your request for us to continue to accommodate you, we are unable to continue accommodating your partial schedule.  Based on the needs of the business, it is not reasonable that we continue to allow you to work a partial schedule and working in the office is an essential function of your role.

Accordingly, your request for continued accommodation is not approved and we are ending the accommodation process. You will be working with your leader and Human Resource Business Partner on the next steps regarding your leave of absence.

Thank you for your cooperation with the above.

Sincerely,
Anissa
Leave Analyst
Schneider - HR Leave Administration Team
Phone: 920-592-4571 Fax: 920-403-8903
HRLeaveAdministrationTeam@Schneider.com

www.schneider.com

3101 S. Packerland Drive | P.O. Box 2545
Green Bay, WI 54306-2545

462-8004 5/2016

EXHIBIT

Plaintiff's 23

FAX TRANSMISSION COVER SHEET

DATE: 4/27/2019

TO: Schneider - Hr Leave Administration Team

FAX: 920-403-8903

RE: C. Geter

SENDER: Dr. Cassandra Wanzo

YOU SHOULD RECEIVE        PAGE(S), INCLUDING THIS COVER SHEET.

3

**SCHNEIDER**

Dear Physician,

On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019. The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.

In order to assist Schneider in evaluating whether it can provide, Cierra Geter, with a reasonable accommodation, Schneider requests that you review the below questions and answer the information specific to the status and need for an accommodation for Cierra.

**Physician's Statement:**

| Patient's/Associate's first and last name: | _____Cierra Geter_____ |

1. Provide a statement indicating the current nature of the condition, as well as a statement of what, if any, specific current or future limitations that condition places on the activities and the ability to engage in work or other functions:

2. Provide a statement [...] that Cierra is unable to perform because of their medical condition (Please see attached job description). Provide information as to why she cannot return to work full time (4 - 10 hour days).

   *She is unable to work well in a fast paced, high pressure environment. She is still recovering from her mental health symptoms —*

3. She is currently working on Wednesday, Thursday and Friday. Is there a different day that she is available to work if she can work 4 days? Can she work Monday-Friday, 8 hour schedule?

   *She is unable to work a Mon-Friday schedule. This was never a part of her schedule. It was Wed, Thurs, Fri and Sunday. Her current schedule is Wed-Fri.*

4. Provide a specific description of what has changed or what went wrong that the partial work schedule (3 days) restriction effective date continues to push out for Cierra.

   *She continues to decline in symso-[?]*

5. Is the patient following the recommended treatment plan to improve their condition? *Yes*

www.schneider.com

3101 S. Packerland Drive | P.O. Box 2545
Green Bay, WI 54306-2545

482-8004 5/2016

**SCHNEIDER**

5. What is the **total** length of time the patient will need to work 3 days per week from this point forward in your best professional estimate?

_____ Permanent restriction ( 2 – 3 ) # of Month(s) _____ # of Week(s)

6. Provide a detailed statement as to whether the patient is making progress toward their return to work and the percentage of likelihood of them returning to their current position <u>full time</u> by **4/10/2019** (this date is 90 days of accommodating a partial schedule of 3 days).

*Note: A statement that the patient will not be able to return to work until "at least" a given date is not helpful in the context of this process.   Such assessment may be deemed the equivalent of a statement that the patient will be unable to return to work full time (4 – 10 hour days) for an indefinite period.*

In a prior work dated 3/25/19 this MD stated that she will be returning to work 6/5/19 because of the severity of clinical symptoms

**Estimated Return to Work Date:** 6/5/19   **Percent Likely of Return:** 95%

Cassandra Wanzo MD
**Physician's Printed Name**

678-566-1440
**Physician's Phone Number**

678-566-1440
**Physician's Fax Number**

**Physician's Signature**   4/27/19
**Date**

**Return to:**
Schneider - HR Leave Administration Team
P.O. Box 2545 Green Bay, WI  54306-2545
Phone: 800-558-6701 ext 592-4571
**Fax: 920-403-8903;**
Email: HRLeaveAdministrationTeam@Schneider.com

CONFIDENTIAL MEDICAL RECORDS

> EXHIBIT
>
> Plaintiff's 24

FAX TRANSMISSION COVER SHEET

DATE: 6/15/2019            (6/26/19)

TO: Hartford

FAX: 877-853-9664

RE: C. Oeter

SENDER: Dr. Wanzo

YOU SHOULD RECEIVE        PAGE(S), INCLUDING THIS COVER SHEET.

(6 pages)

CG000064

CONFIDENTIAL MEDICAL RECORDS

Please fax the completed form to:
Fax Number: 866-411-5613
**The Hartford**
P.O.Box 14301
Lexington, KY 40512-4301

**ATTENDING PHYSICIAN'S STATEMENT - PROGRESS REPORT**
(For Mental Health Claims)


THE HARTFORD

**To Be Completed By The Employee**

| Patient Name: *Cierra Geter* | Date of Birth: | Insured ID Number: |
|---|---|---|

Patient Address: (Street, City, State & Zip Code)

**To be completed by the Provider – Use current information from your patient's most recent office visit or examination to complete this form.** *(The patient is responsible for the completion of this form without expense to the company.)*

Is the condition related to environmental and/or interpersonal issues in his/her workplace? ☑Yes ☐No
If "Yes," explain: *Lack of staffing, verbally abusive Drivers*

If yes, can he / she perform the same job at a different location / employer? ☐Yes ☑No

Are these issues causing a disincentive to return to work with current Employer? ☑Yes ☐No

**DIAGNOSIS:**

Primary Condition:

WHODAS Score:

Domain I_____ Domain II_____ Domain III_____ Domain IV_____ Domain V_____ Domain VI_____
*(Provide completed assessment questionnaire)*

Other Assessment Measures - please list the measure scale and provide score (attach test results):

Please provide a description of the most significant recent improvement and/or decompensation:
*exacerbation of symptoms with Discontinuation of LTD Benefits*

LC-7406-7        Page 1 of 2        CG000065   08/2016

Page: 212 of 239     Date Filed: 07/01/2022     Document: 17-1     USCA11 Case: 22-11285

Patient Name: _____ Date of Birth: _____ Date Claim Filed: 06/01... Claim Number: ...

**FUNCTIONALITY**

Did you recommend your patient stop working?  ☐ Yes  ☑ No   If Yes, on what date? _____

Are the symptoms of such severity to preclude the patient from social/occupational functioning? ☑ Yes ☐ No

If Yes, specify what activities are impaired and how: _Ability to work in fast paced High Pressure environment_

What is the expected duration of any work activity impairments? _____

Have you discussed a return to work goal with your patient? ☑ Yes ☐ No   If No, please explain: _____

What are your patient's current abilities? What type of work can your patient perform? _Work 3 Days per week, Ten Hour Days work 2 Days at the 2 (from Home)_

What is your target date for return to work for your patient? _8/26/19_  ☐ Full time  ☑ Part time

If part time, on what date will your patient be able to increase to full time? _9/23/19_

If appropriate, provide examples of accommodations that would allow your patient to return to work: _Work From Home on days that she has to work sdo (?) days per week_

Additional comments: _She can work Three Days per week Wed / Thurs / Fridays 10 Hour Days_

In your opinion is the patient competent to endorse checks and direct the use of the proceeds thereof? ☑ Yes ☐ No

**TREATMENT**

Date you first treated this patient for any condition: _10/16/18_   Date you first treated this patient for this condition: _10/16/18_

Frequency of treatment: _Every 3-4 weeks_   List relevant treatment dates: _4/27, 3/9, 2/23, 1/19_ ...

Date of last office visit: _6/15/19_   Date of next scheduled office visit: _7/12/19_

(   )

Was patient hospitalized or treated at a higher level of care for this condition since the last report? ☐ Yes ☑ No

If "yes", please provide information about any higher level of care since last report:

Inpatient: Hospital/facility name _____   Phone Number: (   )

Admission date: _____ Discharge date: _____

Partial Hospital/Day Treatment/IOP: Hospital/facility name _____   Phone Number: (   )

Admission date: _____ Discharge date: _____ Number of days per week: _____   Number of hours per day: _____

Residential: Facility name: _____   Phone Number: (   )

Admission date: _____ Discharge date: _____

**PROVIDER'S INFORMATION**

Provider's Name: _Cassandra Wanzo MD_   Telephone number: _678 566-1440_

Address: (Street, City, State & Zip Code) _602 Bombay Lane Roswell GA 30076_   Fax Number: _678 566-1442_

Degree: _MD_   Specialty: _Psych.atry_   Social Security Number or FIN Number: ███████   License Number: _035165_

Office Contact: _Ms Kelly Jordan_   Office Contact Phone: (   )

Provider's Signature: _C. Wanzo MD_   Date Signed: _6/26/19_

The Hartford® is underwriting companies Hartford Life and Accident Insurance Company and Hartford Life Insurance Company. The Hartford® is The Hartford Financial Services Group, Inc. and its subsidiaries.

LC-7406-7

CG000006/2016

# EXHIBIT C

Marianne Biskey-Rose                                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
     CIERRA GETER,                 )
4                                  )
                 Plaintiff,    )  CIVIL ACTION
5                                  )
             vs.                   )  FILE NO.
6                                  )
     SCHNEIDER NATIONAL            )  1:20-cv-01148-SCJ-JSA
7    CARRIERS, INC.,               )
                                   )
8                Defendant.    )
9
10                    - - -
11              DEPOSITION OF
12           MARIANNE BISKEY-ROSE
13        TAKEN BY REMOTE VIDEOCONFERENCE
14
                   April 21, 2021
15
                    9:37 a.m.
16
17        Pamela L. Porter, RPR, CCR-B-2160
18                    - - -
19
20
21
22
23
24
25

Marianne Biskey-Rose                                        April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

```
 1                   A P P E A R A N C E S   O F   C O U N S E L
 2

 3
     On behalf of the Plaintiff:
 4
             CHERYL B. LEGARE, ESQ.
 5           Legare, Attwood & Wolfe, LLC
             Suite 380, Decatur Town Center Two
 6           125 Clairemont Avenue
             Atlanta, Georgia 30030
 7

 8   On behalf of the Defendant:
 9           PETER A. MILIANTI, ESQ.
             McGuire Woods, LLP
10           Suite 2100, Promenade II
             1230 Peachtree Street, NE
11           Atlanta, Georgia 30309
12
13                                    -  -  -
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:20-cv-01148-SCJ-JSA   Document 46-5   Filed 06/07/21   Page 4 of 11

USCA11 Case: 22-11285   Document: 17-2   Date Filed: 07/01/2022   Page: 216 of 239

Marianne Biskey-Rose                                                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

```
                                                           Page 3

 1                         TABLE OF CONTENTS

 2

 3                   EXAMINATION                             PAGE

 4
```

 5   Cross-Examination by Ms. Legare                        5

 6

 7                         - - -

 8

 9   PLAINTIFF'S
       EXHIBIT               DESCRIPTION                    PAGE
10

11    Exhibit 4     Job Description, Manager, Area          17
                    Planning
12
      Exhibit 35    Email from Ashley Janssen to HR         34
13                  Leave Administration Team, 3/25/19

14    Exhibit 36    Email from Ashley Janssen to            35
                    Travis Torrence and others,
15                  3/25/19

16    Exhibit 41    Email from Ashley Janssen to            38
                    Travis Torrence and Marianne
17                  Biskey-Rose, 4/12/19

18    Exhibit 48    Flexible Work Arrangement               31
                    Guidelines
```
19

20

          (Original Exhibits have been attached to the
21   original transcript.)

22

                          - - -

23

24

25
```

Marianne Biskey-Rose                                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 4

```
 1              (Reporter disclosure made pursuant to

 2         Article 10.B of the Rules and Regulations of the

 3         Board of Court Reporting of the Judicial Council

 4         of Georgia.)

 5              (Due to the need for this deposition to

 6         take place remotely, the parties have stipulated

 7         that the court reporter may swear in the witness

 8         over the phone/Veritext Virtual videoconference

 9         and that the witness has verified that he/she is

10         in fact MARIANNE BISKEY-ROSE.)

11              (The witness was duly sworn.)

12              (Off-the-record discussions ensued.)

13         MS. LEGARE:  Again, we're here today in

14         the case that Cierra Geter has brought against

15         Schneider National Carriers, which is currently

16         pending in the Northern District of Georgia, and

17         we're here for all purposes under the Federal

18         Rules of Civil Procedure and Evidence.

19              Are we going to waive objections except to

20         form and privilege today?

21         MR. MILIANTI:  Yes.

22         MS. LEGARE:  Okay.  And I'm assuming you

23         want to read and sign; right?

24         THE WITNESS:  Yes.

25         MS. LEGARE:  Okie-doke.
```

Case 1:20-cv-01148-SCJ-JSA   Document 46-5   Filed 06/07/21   Page 6 of 11

USCA11 Case: 22-11285   Document: 17-2   Date Filed: 07/01/2022   Page: 218 of 239

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 5

 1                   MARIANNE BISKEY-ROSE,

 2    having been first duly sworn, was examined and

 3    testified as follows:

 4                        CROSS-EXAMINATION

 5    BY MS. LEGARE:

 6         Q.    Could you please state your full for the

 7    record.

 8         A.    Yeah.  It's Marianne Biskey-Rose.

 9         Q.    And I apologize.  I didn't introduce

10    myself.  I'm Cheryl Legare, and I represent Cierra

11    Geter in this matter.

12               And you're here because you've been

13    identified as a witness who has some information about

14    the case.

15               I'm going to ask you some questions.

16    You're going to give me some answers.  Pete may ask

17    some follow-up, and then we'll be done.  You know, I

18    expect maybe an hour or two at the most.

19               Have you ever been deposed before,

20    Ms. Biskey-Rose?

21         A.    I have not.

22         Q.    Okay.  I sort of just described the

23    process for you.  If you need a break, just let me

24    know.  Okay?

25         A.    Okay.

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 12

```
 1          A.    He's located in Green Bay, Wisconsin.

 2          Q.    So Mr. Torrence has already been deposed.

 3   And I think I understand his role in Ms. Geter's

 4   employment.  But let me take a step back.  Do you know

 5   Cierra Geter?

 6          A.    I do.

 7          Q.    As operations -- as director of

 8   operations, do you primarily work first shift, or do

 9   you work various times?

10          A.    Primarily first shift.

11          Q.    And does first shift have a general time

12   range, like 9:00 to 5:00 or 8:00 to --

13          A.    Generally -- yeah, generally it's 7:00 to

14   4:00.  But, again, it's a little bit staggered.  So

15   some people come at 6:00.  Some people come at 8:00.

16   But generally speaking it's historically been 7:00 to

17   4:00.

18          Q.    And is Schneider still today a 24/7

19   operation; right?

20          A.    Correct.

21          Q.    Just so that we have it in the record,

22   what does Schneider do?

23          A.    We're a truckload and logistics company.

24          Q.    So I think it's probably just easiest to

25   go sort of chronologically about what happened in this
```

Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 32

 1              THE WITNESS:  So I'm sure I have seen it,

 2        but it isn't something I recall.

 3        Q.    (By Ms. Legare)  What is your --

 4        A.    I can't say --

 5        Q.    Oh, go ahead.

 6        A.    I can't say definitively that I've seen

 7   this.

 8        Q.    Okay.  What is your understanding about

 9   working from home for people in the Fairburn office?

10        A.    Well --

11        Q.    And hold on.  I need to put this on --

12   before Covid, obviously.

13        A.    Yes.  So, you know, we try our best to

14   work with our associates and be flexible.  So, you

15   know, if somebody has something last minute that's

16   come up, like a sick child or someone at home that

17   they need to be there for or a doctor's appointment,

18   then we've allowed some flexibility to work from home.

19              But it's always kind of been a one-off

20   situation and not an ongoing request.

21        Q.    Were you aware that Tiffany Kitchens

22   worked, actually, from the emergency room is what she

23   said on -- or, sorry, from the hospital, and she made

24   it sound to me like for around four months in 2018 and

25   2019?

Marianne Biskey-Rose                                                         April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                                    Page 36

1    the time I believe it was to June 6th.

2              MR. MILIANTI:  Object to the form.

3              THE WITNESS:  I can't specifically

4         remember this conference call, if that's what

5         you're asking.

6         Q.    (By Ms. Legare)  Well, so do you recall

7    having any conversations with Ms. Janssen and

8    Mr. Torrence about Ms. Geter's need for an extended

9    accommodation?

10        A.    I do.

11        Q.    Do you recall how many conversations you

12   may have had with them about it?

13        A.    I do not.

14        Q.    Can you tell me what you recall talking to

15   them about?

16        A.    Yeah.  We discussed, you know, her request

17   to extend and whether or not we were able to continue

18   to accommodate, you know, based on the business needs

19   and our staffing level.

20              And it was determined that we could no

21   longer accommodate, and so we discussed, you know,

22   next steps.

23        Q.    Was there any conversation about changing

24   Ms. Geter's shift?

25        A.    Yes.  So we did discuss a couple of

Page 37

```
 1    different options.  One was changing shifts.  We
 2    offered that up, and it's my memory that,
 3    unfortunately, she wasn't able to do that because of
 4    her doctor and group therapy sessions.
 5              We also talked about a different position
 6    for her, so, like, a first shift position.  I guess
 7    that would have been changing schedules kind of.
 8              And then I also asked Cierra or my memory
 9    is that I asked Cierra if she could change any of her
10    doctor schedules.  So, you know, the Monday group
11    therapy session, I asked if there was an opportunity
12    to -- to go to a different, you know, session.
13              And my memory is that there was a
14    different session that she could attend, but it
15    coincided with one of her other doctor's visits.  So
16    she wasn't able to change that up.
17         Q.    So you recall having this conversation
18    with Ms. Geter?
19         A.    I do.
20         Q.    Were the business needs and the staffing
21    level, did any of that have to do with an APM having
22    to go out on maternity leave?
23         A.    I'm sorry.  Can you ask that question a
24    different way maybe?
25         Q.    Sure.  Isn't it true that at the same time
```

Marianne Biskey-Rose                                  April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

 1        A.    Yes.

 2        Q.    When you say business needs and staffing,

 3   what do you mean?

 4        A.    So just the support that we are able to

 5   give our driving associates and business.  So having

 6   enough resources in order to help those problems be

 7   resolved.

 8        Q.    And so having her only work three days

 9   instead of four days was an issue, in your mind?

10        A.    Yes.  Because we needed somebody there

11   full-time in order to meet those needs.

12        Q.    Did you consider at the time getting a

13   temporary employee to cover that day for Ms. Geter?

14        A.    We discussed it, but it never was, I'll

15   say, a viable option because of, again, the skill

16   level that's kind of needed from a temp perspective,

17   and it was a shift where we didn't have anybody on

18   staff, which is why Travis was having to step in and

19   cover it.

20             And so having a temp person take that role

21   and be in that position is not a great solution

22   because they'd be by themselves and not have the

23   knowledge and background that they need in order to

24   resolve those issues.  So it wasn't a good option for

25   us to consider.

# EXHIBIT D

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF GEORGIA
 3                   ATLANTA DIVISION
 4
 5    CIERRA GETER                   :
                                     : 1:20-cv-01148-SCJ-JSA
 6              Plaintiff(s)   :
                                     :
 7        vs.                        :
                                     :
 8    SCHNEIDER NATIONAL       :
      CARRIERS, INC.           :
 9                                   :
                Defendant(s).   :
10
11                          - - -
12              Tuesday, April 6, 2021
13                          - - -
14          Zoom deposition of TRAVIS TORRENCE, taken
15    pursuant to notice at Atlanta, Georgia, beginning at
16    10:12 a.m., before JULIE C. WILSON, a Georgia
17    Certified Court Reporter and Registered Professional
18    Reporter.
19
20              VERITEXT LEGAL SOLUTIONS
                   SOUTHEAST REGION
21        1075 Peachtree Street NE - Suite 3625
                 Atlanta, Georgia 30309
22
23
24
25
```

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   LEGARE, ATTWOOD & WOLFE, LLC
     BY:  CHERYL B. LEGARE, ESQUIRE
 4   125 Clairemont Avenue
     Suite 380
 5   Decatur, GA 30030
     (470) 823-4000
 6   cblegare@law-llc.com
     Representing the Plaintiff(s)
 7

 8

     MCGUIREWOODS LLP
 9   BY:  PETER A. MILIANTI, ESQUIRE
     77 W. Wacker Drive
10   Suite 4100
     Chicago, IL 60601
11   (312) 750-2765
     pmilianti@mcguirewoods.com
12   Representing the Defendant(s)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 3

1                    I N D E X

2                        - - -

3    TESTIMONY OF:  TRAVIS TORRENCE

4    By MS. LEGARE          6

5

6                        - - -

7                   E X H I B I T S

8    EXHIBIT                                        PAGE

     NUMBER            DESCRIPTION                  MARKED

9

10   Exhibit 4         APM Job Description          32

11   Exhibit 8         FMLA request                 37

12   Exhibit 10        Certificate of Healthcare    38

13                     Provier

14   Exhibit 30        10/26/18 email               39

15   Exhibit 15        Accomodation approval        43

16   Exhibit 22        Accomodation denial          48

17   Exhibit 31        12/17/18 email               58

18   Exhibit 32        1/21/19 email                60

19   Exhibit 46        Answers to Interrogatories   62

20

21

22

23

24

25

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

```
                                                         Page 4

 1                  D E P O S I T I O N   S U P P O R T   I N D E X

 2      INSTRUCTION NOT TO ANSWER

 3      PAGE                                    LINE

 4      NONE.

 5

 6      REQUEST FOR PRODUCTION OF DOCUMENTS

 7      PAGE                                    LINE

 8      NONE.

 9

10      STIPULATIONS

11      PAGE                                    LINE

12      5                                       15

13

14      QUESTIONS MARKED

15      PAGE                                    LINE

16      NONE.

17

18

19

20

21

22

23

24

25
```

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 5

```
 1                    MS. LEGARE:  Mr. Torrence, thank you
 2         for being here today.  I'm Cheryl Legare and I
 3         represent Cierra Geter in the lawsuit she has
 4         brought against Schneider National Carriers.
 5         Is it okay if I call Schneider National
 6         Carriers "Schneider" today?
 7                    THE WITNESS:  Yes.
 8                    MS. LEGARE:  Okay.  And we're here
 9         today in the matter that is currently pending
10         in the Northern District of Georgia.  And this
11         deposition is being taken pursuant to notice
12         and agreement of parties for all purposes under
13         the Federal Rules of Civil Procedure and
14         Federal Rules of Evidence.
15                    Are we reserving objections except to
16         form or privilege, Pete?
17                    MR. MILIANTI:  Yes.
18                    MS. LEGARE:  And did you want to read
19         and sign?
20                    MR. MILIANTI:  Yes, please.
21                    MS. LEGARE:  Can you swear in the
22         witness please, Julie.
23                    THE COURT REPORTER:  Due to the need
24         for this deposition to take place remotely
25         because of the Government's order for social
```

Travis Torrence                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 6

1          distancing, the parties will stipulate that the

2          court reporter may swear in the witness over

3          Veritext virtual videoconference and that the

4          witness has verified that he is, in fact,

5          Travis Torrence.

6                              - - -

7                    TRAVIS TORRENCE, after having been

8          duly sworn, was examined and testified as

9          follows:

10                             - - -

11                         EXAMINATION

12                             - - -

13     BY MS. LEGARE

14     Q.    Mr. Torrence, can you please state your full

15     name for the record.

16     A.    Travis Demino Torrence.

17     Q.    And have you ever been deposed before?

18     A.    No, ma'am.

19     Q.    Have you ever testified in court before?

20     A.    No, ma'am.

21     Q.    You understand that we're here today and you

22     are under oath just as if we were in court under

23     penalty of perjury, right?

24     A.    Yes, ma'am.

25     Q.    And is there any reason other than the passage

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 20

1    Q.    Was her position eliminated when the APMs were

2    moved?

3    A.    Yes.

4    Q.    And what is her race?

5    A.    Black.

6    Q.    And Ms. Kitchens is still employed and her race

7    is white, right?

8    A.    Yes.

9    Q.    And is Quincy Parker still employed?  I think

10   you said yes, right?

11   A.    No.

12   Q.    No.  Was his position eliminated or had he

13   already left?

14   A.    He was a driver team leader, not an area

15   planner.

16   Q.    Oh, got you.  And Sara Kopf is still there and

17   she is white, correct?

18   A.    Yes.

19   Q.    Do you know how it was decided whose positions

20   were eliminated versus who were moved into new

21   positions when the APM position was moved?

22   A.    So the APMs were given the choice to relocate

23   to Green Bay.

24   Q.    Well, some people were given different

25   positions too, right, like Ms. Kitchen, Ms. Kopf?

Travis Torrence                                            April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 51

1    BY MS. LEGARE

2    Q.   Well, based on this letter, the physician

3    indicated that she would be able to return to work

4    on June 5, 2019, right?

5    A.   I'm reading it.

6                MR. MILIANTI:  Go ahead, Travis.

7                THE WITNESS:  I'm reading it as may

8         be able to return to it full time.  Which again

9         is unclear in my mind.  And especially after

10        we've already approved incremental additional

11        accommodations up to that point.

12   BY MS. LEGARE

13   Q.   What do you mean by "incremental additional

14   accommodations"?

15   A.   We approved it through February 13.  Then again

16   through March 19.  Then again through 4/12.

17   Q.   I just want to make sure I understand what you

18   were saying.  Who -- who was the other employee on

19   third shift at the time?  APM to be more specific.

20   A.   Desmond Seymour and Audriana Williams.

21   Q.   So you had three people working third shift at

22   the time?

23   A.   Yes.

24   Q.   And was anyone covering the fourth day that

25   Ms. Geter was not working?

Travis Torrence                                                     April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 52

```
 1    A.    Typically myself.

 2    Q.    So you were working third shift one day a week?

 3    A.    Yes.

 4    Q.    And what day was that?

 5    A.    Sunday nights.

 6    Q.    And were you working from the office Sunday

 7    nights or were you working remotely?

 8    A.    I can't remember a time that I specifically

 9    worked from home on one of those Sunday nights.

10    Q.    Is there any documentation that would show when

11    people were working remotely or when they were

12    working in the office?

13    A.    Not that I'm aware of.

14    Q.    What was your typical schedule when Ms. Geter

15    was not being accommodated?  Actually, let me ask

16    this a different way.  Before she went on medical

17    leave in October of 2018, did you ever work third

18    shift?

19    A.    I spent time on third shift.  I did not act as

20    the only APM in the office prior to that.

21    Q.    You supervised third shift, right?

22    A.    Correct.

23    Q.    So were you -- well, let me ask you this.  Did

24    you work alone on Sunday nights as the APM when

25    Ms. Geter was out?
```

Travis Torrence                                       April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 53

1    A.    Yes.

2    Q.    So Ms. Williams and Mr. Seymour didn't work on

3    Sunday nights?

4    A.    No.

5    Q.    Why not?

6    A.    I would have to go back -- I don't remember

7    specifically what schedule Desmond or Audrey was in

8    at that time.

9    Q.    But you know for sure they weren't working

10   Sunday nights?

11   A.    Yes.

12   Q.    Let me ask you this.  Did anyone ever offer

13   during this accommodation process to transfer

14   Ms. Geter to first or second shift as an

15   accommodation for her disability?

16   A.    I don't recall specifically.

17   Q.    And what shift did Candace Smith work?

18   A.    Second shift.

19   Q.    And did you and Ms. Rose have any meetings

20   regarding Ms. Geter's final request for

21   accommodation when that was extended to June 5,

22   2019?

23   A.    Yes, I believe we did.

24   Q.    Do you know approximately how many times you

25   met about the accommodation issue?

Travis Torrence                                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 55

```
 1    moving her to five-day-a-week schedule?

 2    A.   Yes.

 3    Q.   And were either of these -- and I think that

 4    was a yes, right?

 5    A.   Yes.

 6    Q.   -- and were either of those options presented

 7    to Ms. Geter?  Maybe a better question is were

 8    either of those options discussed with Ms. Geter by

 9    you?

10    A.   I can't remember for sure.

11    Q.   At any point did you tell Ms. Geter that it was

12    okay for her to work from home because everyone did

13    it?

14    A.   Are you asking if those are my exact words?

15    Q.   Well, or something to that effect.

16    A.   It's possible.  When there has been a request

17    to work from home for any associate that has been on

18    my team or even in our office on a short-term basis

19    because something has, you know, popped up or

20    whether it's weather or a family issue at home,

21    we've accommodated that on a short-term basis.

22    Q.   I think you said Tiffany Kitchens did not

23    report to you, right?

24    A.   Correct.

25    Q.   Were you aware that Ms. Kitchens had been
```

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 64

1     Ms. Geter had any request for reasonable

2     accommodation granted or denied?

3                    MR. MILIANTI:  Object to the form of

4        the question.

5     BY MS. LEGARE

6     Q.    You can answer.

7     A.    Can you ask that again.

8     Q.    Sure.  And I'm only asking about employees who

9     reported directly to you.  During your employment

10    with Schneider when you were a supervisor, so after

11    you were promoted to team lead and any time

12    thereafter, has any employee who reported to you

13    other than Ms. Geter requested an accommodation for

14    disability?

15    A.    No.

16    Q.    Have any of the employees who reported to you,

17    the same time frame, once you were a supervisor,

18    taken FMLA leave?

19    A.    Yes.

20    Q.    How -- well, have any of the employees who

21    reported to you taken intermittent FMLA, meaning not

22    all at one time?

23    A.    I can't say for sure.

24    Q.    Other than Ms. Geter, have any of your

25    employees for any period of time worked a reduced

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 65

1     schedule?   And I'm talking about people you

2     supervised.

3     A.    No.

4     Q.    Has any of the employees you supervised other

5     than Ms. Geter -- I understand that you allow people

6     to work remote from time to time, has anyone had to

7     work remote one or more days for an extended period

8     of time, not COVID related?

9     A.    Can you ask that again.

10    Q.    Yes.  Have any of the employees who reported to

11    you -- and now I'm talking pre-pandemic time, had to

12    work from home for an extended period of time?  I

13    guess, let me ask it two ways.  Has anyone had to

14    work from home, anyone who reported to you, had to

15    work from home on a full-time basis for any period

16    of time?

17    A.    No.

18    Q.    Has anyone who worked for you had to work from

19    home at least once a week for any period of time?

20    A.    No.

21    Q.    And I don't think -- sitting here today, can

22    you tell me how often, for example, Ms. Kopf worked

23    from home in 2018?

24    A.    I couldn't say for sure.

25    Q.    Same for 2019?

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 67

 1          full-time positions.  I mean the --

 2     BY MS. LEGARE

 3     Q.   Well, let me -- you raised a couple questions

 4     here.  When you were covering her shift as APM, was

 5     that a part of your full-time duties or in addition

 6     to your full-time duties?

 7     A.   In addition to.

 8     Q.   So were you being forced to work extra hours in

 9     order to cover that shift?

10               MR. MILIANTI:  Object to the form.

11               You can answer.

12               THE WITNESS:  I guess I really don't

13     understand.  Forced by who?

14     BY MS. LEGARE

15     Q.   Well, how many -- when you were an operations

16     team lead and nobody was on FMLA, how many hours a

17     week were you working, approximately?

18     A.   It's hard to say for sure and each week was

19     kind of different.

20     Q.   And while Ms. Geter was on continuous FMLA from

21     October to December, who covered her shift?

22     A.   The work was absorbed by the rest of the team

23     and myself.

24     Q.   Were you actually working any of her shifts

25     while she was on FMLA?

Travis Torrence                                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 68

1    A.    Yes.   On Sundays.

2    Q.    And did Schneider at the time use contractors

3    or temporary employees to cover when other employees

4    were out?

5                    MR. MILIANTI:   Object to the form.

6                    THE WITNESS:   We have utilized

7         temporary associates in the past.

8    BY MS. LEGARE

9    Q.    And did you use any temporary associates during

10   the fall of 2018 when Ms. Geter was on FMLA leave?

11   A.    I can't remember for sure.

12   Q.    Do you know who might know the answer to that

13   question?

14   A.    I can't say for sure.

15   Q.    Would there be documentation of the use of

16   temporary employees?  Let me ask you this.  Do you

17   use an agency for temporary employees?

18   A.    Yes.

19   Q.    What is that agency?

20   A.    Kelly Services.

21   Q.    And I'm assuming you pay Kelly Services when

22   you use the employees, right, temporary employees?

23   Not a trick question.  I mean, the temporary

24   employees are paid, right?

25   A.    Yes.  I would not be the one that would arrange