# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CASE NO. 22-11285-BB

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

**APPELLANT'S APPENDIX – VOL. II**

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

# CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

## Eleventh Circuit Court of Appeals Case No. 22-11285-BB

### Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
|---|---|---|---|
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B | | | Certificate of Service |

# EXHIBIT E

Case 1:20-cv-01148-SCJ-JSA   Document 46-7   Filed 06/07/21   Page 2 of 15

Tiffany Kitchens                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
4    CIERRA GETER,
5             Plaintiff,
6        vs.                   CIVIL ACTION FILE
                               NO. 1:20-CV-01148-SCJ-JSA
7    SCHNEIDER NATIONAL
     CARRIERS, INC,
8
              Defendant.
9
10
11        REMOTE DEPOSITION OF TIFFANY KITCHENS
12
                 Monday, April 19, 2021
13               Commencing at 2:55 p.m.
                 Concluding at 3:35 p.m.
14
15        Witness Located at Personal Residence
                 162 Sunset Ridge Drive
16               Newnan, Georgia  30263
17
18
19         Reported by: Mary Beth Cook, RPR
                    CCR# 5079-8707-4272-4608
20
21
22
23         COMBS COURT REPORTING, INC.
                112 Pierce Avenue
24            Macon, Georgia  31204
                 (478)474-6987
25

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

```
 1   APPEARANCES OF COUNSEL:

 2   On Behalf of the Plaintiff:

 3   CHERYL LEGARE, ESQ.

     Legare, Attwood & Wolfe

 4   125 Clairemont Avenue

     Suite 380

 5   Decatur, Georgia  30030

     cblegare@law-llc.com

 6

 7   On Behalf of the Defendant:

 8   PETER MILIANTI, ESQ.

     McGuire Woods

 9   77 West Wacker Drive

     Suite 4100

10   Chicago, Illinois  60601

     pmilianti@mcguirewoods.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 3

1                               INDEX

2       TIFFANY KITCHENS                                  PAGE

3        Cross-Examination By Ms. Legare                    4

4        Direct Examination By Mr. Milianti               26

5     /   /   /

6     /   /   /

7     /   /   /

8     /   /   /

9     /   /   /

10    /   /   /

11    /   /   /

12    /   /   /

13    /   /   /

14    /   /   /

15    /   /   /

16    /   /   /

17    /   /   /

18    /   /   /

19    /   /   /

20    /   /   /

21    /   /   /

22    /   /   /

23    /   /   /

24    /   /   /

25    /   /   /

Page 4

1          MS. LEGARE:  Hi, Ms. Kitchens.  I'm Cheryl

2      Legare, and I am here representing Cierra

3      against Schneider, and you are a witness in

4      this case.

5          If you wouldn't mind swearing in the

6      witness.

7          (Whereupon, the witness was sworn.)

8

9              TIFFANY KITCHENS,

10     having been produced and first duly sworn,

11             testified as follows:

12

13              CROSS-EXAMINATION

14  BY MS. LEGARE:

15     Q    Ms. Kitchens, can you please state your

16  full name for the record.

17     A    Tiffany Nicole Kitchens.

18     Q    And what is your current address?

19     A    162 Sunset Ridge Drive, Newnan, Georgia

20  30263.

21         MS. LEGARE:  And, Pete, did you want to

22     read and sign?

23         MR. MILIANTI:  Yes, please.

24  BY MS. LEGARE:

25     Q    Ms. Kitchens, have you ever been deposed

Tiffany Kitchens                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 8

1   still -- even though it's still an area planning

2   manager, same position, it's just for different

3   shifts, you know.

4        Q    Were you basically filling in holes in the

5   schedule?

6        A    Essentially, yes.

7        Q    Let me ask you this:  When you were

8   working support shift, is it possible that you could

9   work two or more different shifts in a week?

10       A    Yes.  You would have a primary schedule.

11   If we had gaps in coverage, they would ask us to

12   work to fill in, but I wasn't on first shift when I

13   initially came back.

14       Q    Does Schneider still have a support shift?

15       A    Yes, we do.  It may be called something

16   different now.  The responsibilities are still

17   pretty similar.

18       Q    Did you change from support shift to a

19   different shift at any point after you came back in

20   2014?

21       A    Yes, in 2016.

22       Q    And what did you change to?

23       A    What was that?

24       Q    What shift did you change to at that

25   point?

Tiffany Kitchens                                                            April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 9

```
 1        A     I went from second shift to first shift,
 2   and my schedule was essentially Monday through
 3   Friday.  When I went to first shift, it went to
 4   Monday through Friday.  I believe it was seven to
 5   four.
 6        Q     When you moved to first shift?
 7        A     Yes.
 8        Q     What was your schedule when you were on
 9   second shift?
10        A     When I was on second shift initially for
11   the first two years -- I'm trying to remember what I
12   had.  I think it was Friday through Tuesday, and I
13   would start my day probably either two or three and
14   then work eight to nine hours -- nine hours with the
15   lunch factored in.
16             I mean, since we were salary, that's the
17   base schedule.  I'm going to elaborate.  That's the
18   base schedule, but we're required to finish our work
19   obviously.  If we had something running behind or we
20   had a meeting, it could run longer than that.
21        Q     Understood.
22        A     That's the only caveat I would add.
23        Q     Who did you report to on second shift?
24        A     When I initially came back, that would be
25   Greg Cochran.
```

Tiffany Kitchens                                April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 10

1        Q      And he left after some period of time,

2    right?

3        A      He did.

4        Q      And then who did you report to?

5        A      The only two leaders I have had since I

6    returned in 2014 was Greg Cochran initially, and

7    then when I went to first shift, it's been Rodney

8    Dunn since, and that was in 2016, I believe around

9    this time.  It would either be April -- it was by

10   the summer for sure.

11       Q      And I understand in 2020 that the area

12   planning manager position itself was moved to Green

13   Bay?

14       A      Correct.

15       Q      What position were you holding at the time

16   that happened?

17       A      I was an area planning manager.  They had

18   changed it to another title once again.  It's not

19   initially the same thing, and then it moved to Green

20   Bay.

21       Q      Were you offered the opportunity to move

22   to Green Bay at that time?

23       A      I was.

24       Q      And you turned that down?

25       A      I did, because of my mother.

Tiffany Kitchens                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1    right?

2         A     For the most part.  We had -- let me see.

3    I'm trying to remember.  So -- can you repeat the

4    question just so I'm.

5         Q     Yeah.  The way I understand -- and maybe

6    it's different for your position, but the way that I

7    understood from Mr. Torrance and another witness was

8    that in the beginning of Covid you all worked from

9    home full time, then partway through Covid you began

10   working from home part of the week, and now as of

11   last March --

12        A     Back full time.

13        Q     Right?

14        A     That's correct, yes.

15        Q     Let's go -- I want to rewind a little bit

16   and talk about the reason.  Ms. Geter has identified

17   you as someone who worked a reduced schedule for a

18   period of time in 2018.  Is that true?

19        A     Can you define reduced schedule?

20        Q     Less than 40 hours a week.

21        A     No.

22        Q     So you were full time?

23        A     I was full time.  I had a period of leave

24   initially where I was out of work for I believe it

25   was three weeks.

Tiffany Kitchens                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1       Q      Okay.

2       A      FMLA was approved.  All that was taken

3   care of, and then I returned -- I think that was the

4   end of July it started, and I came back the

5   beginning of August, but that wasn't the exact

6   dates.

7       Q      That's fine.

8       A      And then in -- when was it?  The end of

9   October of that year my mother had a very severe

10  stroke and ended up in ICU at Emory in Atlanta for a

11  very long period of time.  But during that time I

12  was working -- I was working remotely from the

13  hospital, but I didn't -- I was working full time.

14      Q      Were you working Monday through Friday

15  during that time?

16      A      Yes.

17      Q      And how long were you working remotely

18  from the hospital?

19      A      I honestly don't know.  It was in my FMLA

20  that I had filed for just to, you know, cover me to

21  help with mother.  She ended up staying in there a

22  lot longer -- she kept having setbacks, so she ended

23  up staying in there a lot longer than the doctors

24  originally projected, even though it was pretty bad.

25      Q      And I'm sorry that I even have to ask

Tiffany Kitchens                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1   these questions, but was it a few weeks, was it a

2   few months?

3        A    It was months where she was in there, in

4   ICU, and she was back and forth between being

5   intubated and not, and we almost lost her several

6   times, so it was kind of -- and they had issues with

7   the shunt that they put in her skull.

8        Q    That's terrible.  I'm sorry.

9        A    That's okay.  Not my favorite thing to

10  relive, but we will do it.

11       Q    During that time you had permission

12  from -- would it have been from Mr. Dunn to work

13  remotely?

14       A    Yes.  I would run it by Mr. Dunn, Rodney,

15  and then I filed paperwork with HR in Green Bay for

16  that.

17       Q    Now, so you were approved for FMLA during

18  that time, but you were actually not using your

19  FMLA; you were working?

20       A    Yes.  I was approved for it when we

21  thought that maybe she would get out, and I would

22  have to care for her.

23       Q    Right.

24       A    Because my dad can't do it all himself.

25  They're both senior boomers, so he can't do it, and

Case 1:20-cv-01148-SCJ-JSA   Document 46-7   Filed 06/07/21   Page 12 of 15

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1    he needed a break.

2         Q     So you were approved for intermittent FMLA

3    because you thought you were going to assist with

4    her care at home.

5         A     Correct.  And that ended up never

6    occurring.  And, in fact, I want to say -- now, this

7    is a guesstimation.  I want to say she was in ICU

8    for probably four months-ish, and then after that

9    she moved to a long-term care facility, so it was

10   quite an extensive period of time.

11        Q     And when she moved to a long-term care

12   facility, did you continue to work remotely?

13        A     No.

14        Q     You came back to the office at that point?

15        A     I did.

16        Q     And because she was in long-term care, did

17   you need to use your intermittent FMLA at all at

18   that point?

19        A     No.  Anytime that I would know that I

20   would have to be out of work, I would just use

21   vacation since I had that available.  But I was

22   not -- it was not a reduced schedule.

23        Q     And that would have only happened if you

24   had to care for her at home?

25        A     Correct.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 27

1        Q    And you understood that as an APM you were

2   expected to work at least 40 hours a week; is that

3   right?

4        A    Yes.

5        Q    And in the 2018-2019 time period, you

6   worked the first shift as an APM; is that correct?

7        A    Correct.

8        Q    And I think you testified your schedule

9   was Monday through Friday; is that right?

10       A    That is correct.

11       Q    And during that time period of 2018 to

12  2019, what time would you start and finish your day

13  on average?

14       A    So that's where it gets -- sometimes I

15  would do planning from the house.  I worked a lot.

16  My schedule would have been either seven to four or

17  six to three, something like that, but I worked a

18  lot.  Sometimes I would log in, you know, if I

19  couldn't get the planning done I had to go and

20  finish the planning for the morning, whatever was

21  needed.

22       Q    Understood.  And when you worked as an APM

23  in the 2018-2019 time period on the first shift, you

24  worked with other APMs; is that correct?

25       A    That is correct.

Page 28

1        Q       Did you ever work alone as an APM on the

2   first shift during the 2018 through 2019 time

3   period?

4        A       No.

5        Q       During the 2018-2019 time period, did you

6   ever work with other APMs who worked a part-time

7   schedule?

8        A       APMs?

9        Q       Yes.

10       A       No.

11       Q       And as an APM in the 2018-2019 time

12  period, just so the record is clear, you never

13  reported to Travis Torrance; is that correct?

14       A       No, I never reported to Travis.

15       Q       During Ms. Geter's deposition, she claimed

16  that in July and August -- July or August of 2018

17  you started working a reduced schedule, and she

18  believes you were working three or four days per

19  week.  Is her testimony accurate?

20       A       In July?

21       Q       Starting in July or August of 2018,

22  Ms. Geter testified you started working a reduced

23  schedule of three or four days per week.  Is that

24  testimony accurate?

25       A       No.

Case 1:20-cv-01148-SCJ-JSA   Document 46-7   Filed 06/07/21   Page 15 of 15

Tiffany Kitchens                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1        Q    And during that time period, the 2018

2   through 2019 time period, how many days per week

3   were you, in fact, working?

4        A    I was working at least five.

5        Q    You testified about this support shift

6   role, but you don't know what the exact title is; is

7   that right?

8        A    Mm-hmm.  This was an old terminology we

9   used to use to indicate something other than first

10  shift.  The company may have moved away from that.

11  It's just old terminology that kind of gets stuck

12  after a while when you've been somewhere for a long

13  period of time.

14       Q    Understood.  Do you know whether what you

15  call the support shift was in place in the 2018-2019

16  time period?  Do you have any knowledge of that?

17       A    No.

18       Q    Do you have any knowledge as to whether or

19  not anyone at Schneider tried to fill Ms. Geter's

20  absences in the 2018-2019 time period with some

21  position referred to as support shift?  Do you have

22  any knowledge of that?

23       A    I have no knowledge.

24       Q    You mentioned that you're currently an

25  SOS; is that right?

# EXHIBIT F

Case 1:20-cv-01148-SCJ-JSA   Document 46-8   Filed 06/07/21   Page 2 of 11

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4     CIERRA GETER,

 5              Plaintiff,

 6          vs.                    CIVIL ACTION FILE
                                   NO. 1:20-CV-01148-SCJ-JSA
 7     SCHNEIDER NATIONAL
       CARRIERS, INC,

 8
                Defendant.

 9

10

11          REMOTE DEPOSITION OF SARAH KOPF

12

                 Monday, April 19, 2021
13             Commencing at 12:57 p.m.
               Concluding at 1:33 p.m.

14

15       Witness Located at Personal Residence
                 23 Meadow View Street
16             Newnan, Georgia  30263

17

18

19       Reported by: Mary Beth Cook, RPR
                    CCR# 5079-8707-4272-4608
20

21

22

23          COMBS COURT REPORTING, INC.
               112 Pierce Avenue
24          Macon, Georgia  31204
                (478)474-6987

25
```

Sarah Kopf                                         April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2    On Behalf of the Plaintiff:

 3    CHERYL LEGARE, ESQ.
      Legare, Attwood & Wolfe

 4    125 Clairemont Avenue
      Suite 380

 5    Decatur, Georgia  30030
      cblegare@law-llc.com

 6

 7    On Behalf of the Defendant:

 8    PETER MILIANTI, ESQ.
      McGuire Woods

 9    77 West Wacker Drive
      Suite 4100

10    Chicago, Illinois  60601
      pmilianti@mcguirewoods.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sarah Kopf                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 3

1                        INDEX

2        SARAH KOPF                                PAGE

3        Cross-Examination By Ms. Legare              4

4        Direct Examination By Mr. Milianti          18

5        Recross-Examination By Ms. Legare           24

6        Redirect Examination By Mr. Milianti        29

7        Further Recross-Exam By Ms. Legare          29

8     /   /   /

9     /   /   /

10    /   /   /

11    /   /   /

12    /   /   /

13    /   /   /

14    /   /   /

15    /   /   /

16    /   /   /

17    /   /   /

18    /   /   /

19    /   /   /

20    /   /   /

21    /   /   /

22    /   /   /

23    /   /   /

24    /   /   /

25    /   /   /

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 4

1            MS. LEGARE:  I'm Cheryl Legare, and I

2        represent Cierra Geter against Schneider, and

3        you're here just because you've been identified

4        as a witness in the case, and I'm here to ask

5        you what you might know.

6            Are we reserving -- actually can you swear

7        the witness, please.

8            (Whereupon, the witness was sworn.)

9            MS. LEGARE:  Are we reserving objections,

10       Pete?

11           MR. MILIANTI:  Yes, that's fine.

12           MS. LEGARE:  I'm assuming you want to read

13       and sign?

14           MR. MILIANTI:  Yes.

15           MS. LEGARE:  Okay.

16

17                      SARAH KOPF,

18       having been produced and first duly sworn,

19               testified as follows:

20

21                   CROSS-EXAMINATION

22    BY MS. LEGARE:

23       Q    Ms. Kopf, can you state your full for the

24    record, please.

25       A    Yes.  Full name is Sarah Marie Kopf.

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 6

1    Schneider about the issues in Ms. Geter's case

2    outside the presence of your lawyer?

3         A    No, ma'am.

4         Q    And you understand that you're under oath

5    today just as if we were in court?

6         A    Yes, ma'am.

7         Q    All right.  How long have you been

8    employed with Schneider?

9         A    Three years and a little over a month.  My

10   three-year anniversary was March 5th.

11        Q    So does that mean you started in 2018?

12        A    Yes, ma'am.

13        Q    What was your first position with

14   Schneider?

15        A    I was an area planning manager for second

16   shift.

17        Q    When you were hired and began working for

18   Schneider, who did you report to on second shift?

19        A    Travis Torrance.

20        Q    And how long did you hold the second shift

21   area planning manager position?

22        A    I held that for just about exactly two

23   years when I became a driver team leader on

24   March 8th of last year, of 2020.

25        Q    What's the difference -- at a high level,

Page 12

1    Mr. Torrance reported to at that time?

2         A    Doug Horton.

3         Q    And then he reported to Ms. Biskey-Rose?

4         A    Yes, ma'am.

5         Q    So tell me about what you understood about

6    an employee's ability to work from home prior to

7    Covid.  I know Covid is a totally different world.

8         A    So, I mean, I can't speak for other people

9    how they went about getting permission to work from

10   home.  I know the few times that I was able to work

11   from home the power was out at the office.

12   Obviously we couldn't do our job if the power was

13   out.  Another instance would be if I had a family

14   emergency came up, and instead of taking a day I

15   offered to work from home.  But as far as like -- I

16   would have to just go to my manager, to Travis

17   Torrance, say, hey, you know, can I work from home

18   on this day for this reason, like I said, if an

19   emergency came up with the power going out.

20        Q    And so Travis approved it for you?

21        A    Yes, ma'am.

22        Q    Do you know if there's any -- if you were

23   required to document in any way when you were

24   working from home?  For example, if you called

25   Travis and said, hey, I've got a family emergency,

Page 19

1   a 3 p.m. to midnight, and then they needed earlier

2   coverage in the afternoon, so then I would work,

3   like, a one to ten or two to eleven.

4        Q    And it's my understanding that there were

5   occasions that you would work alone as an APM on

6   Saturday and Sunday nights; is that right?

7        A    Yes, sir.

8        Q    Do you recall any instance when you were

9   scheduled to work alone that you asked to work from

10  home?

11       A    No.

12       Q    And if we can just generally talk about

13  your job duties as an area planning manager.  Can

14  you just generally -- were you responsible for any

15  type of drivers or any type of market?

16       A    I was responsible for planning the whole

17  southeast market which was Atlanta, Charlotte,

18  Savannah, Winter Haven, Jacksonville and Miami.

19       Q    And when you were an APM, were there

20  specific job duties that you believe you needed to

21  perform in the office?

22       A    Yes.  At the time if a driver needed an

23  extra key for a truck, that was actually behind a

24  lock box that only office associates were able to

25  get to.  And before Covid the printer to print off

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

1    paperwork was in the office behind -- we had a

2    locked door between the office and the driver

3    lounge, and the printer to print off paperwork was

4    in our office, so we would need to be there to print

5    paperwork off for the drivers.

6        Q    And with respect to getting keys for

7    drivers, how frequently would that come up?

8        A    Pretty frequently.  Every night if there

9    was a breakdown, their truck wouldn't start, we had

10   drivers who shared trucks, so if the previous person

11   was not back at the yard in time, you know, they

12   would need a loaner truck for the night, and we

13   would need to provide a key for that.

14       Q    And would you also consider having face

15   time with the fleet of drivers with whom you

16   interacted to be an important function of your job?

17            MS. LEGARE:  Objection.

18            THE WITNESS:  Yes, it was.

19   BY MR. MILIANTI:

20       Q    And why was that?

21       A    The drivers, if they couldn't get in, you

22   know, through the phone line or through the

23   messages, they would come in the office and ask for

24   help.  Or if an emergency came up and they needed to

25   leave, they would come in and speak to us.  If they

Page 21

```
 1    needed paperwork, they would like to come in and

 2    actually speak to somebody, you know, face to face

 3    in case something happened on the yard or if they

 4    couldn't get through the phones or messages.

 5         Q     And would it be accurate to say that the

 6    drivers expected you and the other APMs to be in the

 7    office so they could ask you questions and get

 8    realtime answers to their questions?

 9         A     Yes.

10         Q     And would it be accurate to say that

11    during the time period you worked as an APM at

12    Fairburn, developing a relationship with the drivers

13    was always an expectation of the APM position?

14         A     Yes.

15         Q     And I believe you testified that you never

16    worked a reduced schedule; is that right?

17         A     Yes.

18         Q     All right.  And during the time period

19    that you worked as an APM, I believe you testified

20    that there were a few occasions when you worked from

21    home; is that correct?

22         A     Yes.

23         Q     You didn't have any kind of a set schedule

24    where you would work from home; is that right?

25         A     No.
```

Sarah Kopf                                                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                                        Page 22

1        Q      For instance, you didn't request to work
2    one day a week at home; is that correct?
3        A      Correct.
4        Q      And you didn't request to work one day a
5    month from home; is that correct?
6        A      Correct.
7        Q      So, in other words, as an APM pre-Covid,
8    of course, you never consistently worked from home;
9    is that right?
10       A      Right.
11       Q      And how many times do you believe
12   pre-Covid, so during -- you started in 2018.  So
13   from March of 2018 until March of 2020, how many
14   times do you believe you worked from home?
15       A      That's really hard to answer because I
16   don't -- it's hard to answer because -- I would say
17   maybe a handful of times, maybe four or five at the
18   most.  It wasn't very common.  I wasn't really a fan
19   of working from home back then.
20       Q      Okay.  During Ms. Geter's deposition she
21   testified that from the spring of 2018 until the
22   spring of 2020, you worked from home to care for
23   your children once or twice per month.  Is
24   Ms. Geter's testimony accurate?
25       A      No, not once or twice a month, no.

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF CHRISTINE SCHNEIDER IN SUPPORT OF**
**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

I, Christine Schneider, depose and state as follows:

1.    My name is Christine Schneider.  I am over the age of eighteen and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct based upon my personal knowledge.

2.    I am currently employed by Schneider National Carriers, Inc. in the role of Benefits Manager – Leave Administration.  I have held this position since 2009.

3.    In my capacity as Benefits Manager – Leave Administration, I am responsible for leading a team of three Leave Analysts and two Administrative Assistants.  My team is referred to as the HR Leave Administration Team.

1

4.     The HR Leave Administration Team is responsible for ensuring that Schneider properly administers federal and state family medical leave to associates. The HR Leave Administration Team is also responsible for engaging in the interactive process with associates when they request workplace accommodations.

5.     In the 2018 and 2019 time period, all associate workplace leave and accommodation requests were administered by the HR Leave Administration Team.

6.     If a Leave Analyst has questions regarding an associate's workplace accommodation request or restrictions, it is the regular practice of the Leave Analyst to communicate with the associate and/or the associate's healthcare provider to obtain additional information or clarification so that Schneider can determine whether it can accommodate a particular request.

7.     During the 2018 through 2019 time period, Leave Analyst Anissa Gauthier was assigned to Cierra Geter's case file.

8.     Ms. Gauthier worked under my direct supervision.

9.     When Ms. Gautier sent email communications to Ms. Geter and/or Ms. Geter's healthcare provider regarding Ms. Geter's accommodation requests, Ms. Gauthier copied the "HR Leave Administration Team," which is an email box that is shared by all members of the HR Leave Administration Team. I have access to all emails sent to or from the "HR Leave Administration Team" address.

2

10.     Attached hereto as Exhibit 1 is a true and accurate copy of email communications that Ms. Gauthier had with Ms. Geter and Ms. Geter's physician, Dr. Cassandra Wanzo, during the March and April 2019 time period. I have reviewed the contexts of Exhibit 1.

11.     The records attached hereto as Exhibit 1 are kept in the course of Schneider's regularly conducted business activity and are maintained in a safe and secure location.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2021.

Christine Schneider

# EXHIBIT 1
# to
# C. Schneider
# Declaration

**Jenquin, Dawn**

| | |
|---|---|
| **From:** | Gauthier, Anissa |
| **Sent:** | Tuesday, April 02, 2019 2:01 PM |
| **To:** | HR Leave Administration Team; Cassandra Wanzo |
| **Cc:** | Geter, Cierra |
| **Subject:** | Cierra Geter additional information needed |
| **Attachments:** | 720-manager-area-planning.docx; Geter, Cierra 296995 2018-1008 Accommodation_follow up on restriction letter.pdf |
| **Importance:** | High |

Dr. Wanzo,

On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019. The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.

There is additional questions that do need to be answered to determine if we can extend an accommodation. I have left a few voicemails in hopes to reach you live to talk through the restrictions. Please see the attached letter and physician statement. I have also attached her job description as well. Please complete and fax back to us by Monday, 4/8.

Thanks,
Anissa

**HR Leave Administration Team - Anissa**
Schneider www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**From:** HR Leave Administration Team
**Sent:** Monday, March 18, 2019 3:05 PM
**To:** 'Cassandra Wanzo' <administrator@DrCassandraWanzo.onmicrosoft.com>
**Cc:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: C.Geter 3.9.19
**Importance:** High

Dr. Wanzo,

I would like to talk to you briefly about Cierra Geter's reduced schedule. Her accommodation ends on 3/19/2019 and we need additional information from you on her schedule availability to work throughout the week.

1

Please call me at 920-592-4571.

Thanks,

**HR Leave Administration Team - Anissa**
Schneider www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the **US & CN BENEFITS PORTAL** for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**From:** Cassandra Wanzo [mailto:administrator@DrCassandraWanzo.onmicrosoft.com]
**Sent:** Saturday, March 09, 2019 11:42 AM
**To:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** C.Geter 3.9.19

Good Afternoon

Attached is the paperwork for C. Geter. Please let us know if anything else is needed.

Kelly Jordan
Administrative Assistant
Dr. Cassandra Wanzo
602 Bombay Lane
Roswell Georgia 30076
Office: (678) 566-1440
Fax: (678) 566-1442

*****This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*****

CONFIDENTIAL                                        SCHNEIDER 000311



Job Description

# MANAGER, AREA PLANNING

**TYPE OF ROLE:**         Exempt (Salaried)

**DEPARTMENT(s):**        Bulk, Dedicated, Intermodal, Van Truckload

**REPORTS TO:**           Various

**JOB SUMMARY:**

The Area Planning Manager is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders. As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneiders #1 core value: safety.
- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.
- Exhibit behavior in alignment with our core values at all times.

**SPECIALIZED KNOWLEDGE:**

- Bachelors degree or equivalent work experience in a related field required
- 1-2 years of customer service, dispatch and/or operations experience

**EDUCATION LEVEL:**               Bachelor or equivalent work experience

**EXPERIENCE:**                    1-3 Years

**SKILLS/BEHAVIORS NECESSARY TO PERFORM JOB**

Abilities or qualities an associate must possess in order to perform the essential job duties - Listed by Core Competency

**COMMUNICATION**

Effective and efficient oral communication skills

Effective and efficient written communication skills

Ability to develop relationships through interpersonal skills

Effective listening skills

**DIVERSITY & INCLUSION/TEAM PLAYER**

Collaboration skills

Ability to work effectively in a team environment

**POSITIVE IMPACT**

Ability to positively impact others

Influencing skills, resulting in a positive outcome

Take initiative, a self-starter

Ability to work well in a fast paced, high pressure environment

**PROBLEM SOLVING & DECISION MAKING**

Problem solving skills

Decision making skills (make best value decisions)

Analytical skills

Strategic thinking skills

Ability to analyze various courses of action and make recommendations

Project Management skills

Sound judgement

**RESULTS ORIENTATION**

Ability to manage multiple priorities and prioritize workload

**FUNCTIONAL & TECHNICAL EXPERTISE**

Customer service skills

Ability to work independently with little supervision

**OTHER**

- Strong financial and analytical skills. Able to identify a root cause from a subset of data and establish a relevant action plan to correct root cause of issue.
- Ability to evaluate a situation and create innovative, balanced solutions
- Strong work ethic.

**Generated:** *2019-03-14 05:07:20.641000*

**Last Updated:** *2017-11-24 15:34:07*



4/2/2019

*HR-010321-LA*
TO:    Cierra Geter
        5008 Lower Elm Street
        Atlanta, GA 30349

RE:    Request for Accommodation

Dear Cierra,

You are currently approved on an accommodation for your reduced schedule of 3 days through 3/19/2019. Below is the timeline of information that has been received during your leave of absence and your partial return to work.

- Your continuous leave of absence was approved from 10/9/2018 through 12/31/2019 which exhausted your 12 weeks of FML.
- On 12/17/2018, HR leave team received a return to work form from your doctor that indicated you can return to work 3 days per week effective 1/2/2019 through 2/13/2019. HR leave team approved this accommodation on 12/18/2019.
- On 1/21/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 3/19/2019. HR leave team approved this extension on 1/29/2019.
- On 3/11/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 4/30/2019. This extension is under review.
- On 4/1/2019, HR Leave team received updated information from your doctor that indicated your partial schedule of 3 days remains in effect through 6/5/2019. This extension is under review.

With the multiple extensions of partial return to work schedule, this is appearing to be a permanent need.

Please take the below physician statement to your doctor to complete the additional questions that are needed for your accommodation extension request.

***Please provide me with the requested information from you and your health care provider by no later than 4/8/2019.***

Thank you for your cooperation with the above. Please feel free to call me with any questions.

Sincerely,
Anissa
Leave Analyst
Schneider - HR Leave Administration Team
Phone: 920-592-4571 Fax: 920-403-8903
HRLeaveAdministrationTeam@Schneider.com

**SCHNEIDER**

Dear Physician,

On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019. The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.

In order to assist Schneider in evaluating whether it can provide, Cierra Geter, with a reasonable accommodation, Schneider requests that you review the below questions and answer the information specific to the status and need for an accommodation for Cierra.

**Physician's Statement:**

| Patient's/Associate's first and last name: _____Cierra Geter_____ |
|---|

1. Provide a statement indicating the current nature of the condition, as well as a statement of what, if any, specific current or future limitations that condition places on the activities and the ability to engage in work or other functions:

2. Provide a statement of any specific job duties that Cierra is unable to perform because of their medical condition (Please see attached job description). Provide information as to why she cannot return to work full time (4 – 10 hour days).

3. She is currently working on Wednesday, Thursday and Friday. Is there a different day that she is available to work if she can work 4 days?   Can she work Monday-Friday, 8 hour schedule?

4. Provide a specific description of what has changed or what went wrong that the partial work schedule (3 days) restriction effective date continues to push out for Cierra.

5. Is the patient following the recommended treatment plan to improve their condition?



5.  What is the **total** length of time the patient will need to work 3 days per week from this point forward in your best professional estimate?

_____ Permanent restriction   _____ # of Month(s) _____ # of Week(s)

6.  Provide a detailed statement as to whether the patient is making progress toward their return to work and the percentage of likelihood of them returning to their current position <u>full time</u> by **4/10/2019** (this date is 90 days of accommodating a partial schedule of 3 days).

    *Note: A statement that the patient will not be able to return to work until "at least" a given date is not helpful in the context of this process.    Such assessment may be deemed the equivalent of a statement that the patient will be unable to return to work full time (4 – 10 hour days) for an indefinite period.*

_____

_____

_____

**Estimated Return to Work Date:** _____ **Percent Likely of Return:** _____

_____     _____     _____
Physician's Printed Name                     Physician's Phone Number                   Physician's Fax Number

_____     _____
Physician's Signature                          Date

**Return to:**
Schneider - HR Leave Administration Team
P.O. Box 2545 Green Bay, WI  54306-2545
Phone: 800-558-6701 ext 592-4571
**Fax:  920-403-8903;**
Email: HRLeaveAdministrationTeam@Schneider.com

SCHNEIDER 000317

# EXHIBIT H

Page 1

1        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    CIERRA GETER,
             Plaintiff,
4
         vs.              Civil Action File No.
5                         1:20-cv-01148-SCJ-JSA
6    SCHNEIDER NATIONAL CARRIERS,
             Defendant.
7
                         - - -
8

9        Deposition of ASHLEY MARIE JANSSEN,

10           Taken by Cheryl B. Legare,

11               Before Shannon E. Jordan,
12           Certified Court Reporter,
13       Via Veritext Virtual Videoconferencing,
             On Thursday, April 8, 2021,
     Beginning at 2:00 p.m. & ending at 3:08 p.m.
14
                         - - -
15

16

17

18

19

20

21

22

23

24

25

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

```
                                                        Page 2

 1   APPEARANCES OF COUNSEL
 2   For the Plaintiff:
 3              CHERYL B. LEGARE
                Legare, Attwood & Wolfe LLC
 4              Suite 380
                125 Clairemont Avenue
 5              Decatur, GA 30030
                470.823.4000
 6              cblegare@law-llc.com
 7   For the Defendant:
 8              PETER A. MILIANTI
                McGuire Woods
 9              Suite 4100
                77 West Wacker Drive
10              Chicago, IL 60601
                312.849.8100
11              pmilianti@mcguirewoods.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 3

1                INDEX TO PROCEEDINGS
2                 EXAMINATION INDEX
3   ASHLEY MARIE JANSSEN
4   Examination by Ms. Legare                    4
5   Certificate Page                            49
6   Errata Sheet                                51
7   _____
8                   EXHIBIT INDEX
9   Exhibit

10  Exhibit 4    Job Description, Manager, Area       21
                 Planner
11
    Exhibit 15   Request for Accommodation,           25
12               12-18-2018
13  Exhibit 16   Fax from Dr. Cassandra Wanzo,        27
                 1-19-2019
14
    Exhiibt 22   Request for Accommodation, 4-12-2019 43
15
    Exhibit 31   Email string, 12-17-2018            29
16
    Exhibit 32   Email string ending 1-21-2019       31
17
    Exhibit 34   Email string ending 3-22-2019       32
18
    Exhibit 35   Email, 3-25-2019                    39
19
20
21  (End of Index)
22
23
24
25

Ashley Marie Janssen                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 4

1             April 8, 2021

2             2:00 p.m.

3       (Whereupon the reporter provided a written

4       disclosure to all counsel pursuant to

5       Article 10.B. of the Rules and Regulations

6       of the Board of Court Reporting.)

7             THE COURT REPORTER:  Due to the need

8  for this deposition to take place remotely

9  because of the government's order for social

10  distancing, the parties will stipulate that the

11  court reporter may swear in the witness over

12  Veritext virtual videoconferencing and that the

13  witness has verified that she is, in fact, Ashley

14  Marie Janssen.

15  ASHLEY MARIE JANSSEN,

16       being first duly sworn, was examined and

17       testified as follows:

18  EXAMINATION

19  BY MS. LEGARE:

20       Q       Good afternoon, Ms. Janssen.  I'm

21  Cheryl Legare, and I represent Cierra Geter in

22  the lawsuit that she brought against Schneider

23  National Carriers in the Northern District of

24  Georgia, and that's why we're here today.  You're

25  a witness in the case.

Ashley Marie Janssen                                       April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 40

1        Q        And it looks like the HR leave team

2    did respond regarding the request for more

3    information from Dr. Wanzo; right?

4        A        Correct.

5        Q        And they were not working until March

6    30, 2019?

7        A        According to that message, yes.

8        Q        According to that.  It looks like you

9    gave that information to Mr. Torrence and just

10   told him you would wait until the 30th; right?

11       A        Correct.

12       Q        Tell me, I think you said you had a

13   call with Ms. Biskey Rose and Mr. Torrence

14   regarding, and I think it was Ms. Geter had

15   requested to continue to work three days a week

16   until June 5th; right?

17       A        Correct.

18       Q        Tell me what you recall about the

19   conversation with Ms. Biskey Rose and

20   Mr. Torrence relating to that?

21       A        I asked them if there was any

22   possible way they could continue the

23   accommodation past -- well, at this point we were

24   already past, so this was the last approval, so

25   continue to approve that schedule until June.

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 41

1              They had said that they are not able

2       to continue to carry the workload and the

3       schedule and all of the work she's not able to do

4       any longer.   And I asked if there was other

5       options for them to fill that work, i.e. a temp.

6              They had said, and I agreed, knowing

7       I've had contingent staffing experience before,

8       that due to the time it would take to get a temp,

9       find a temp, train a temp and then place them on

10      a support shift night by themselves would not be

11      something we would be able to do not knowing if

12      this is going to extend past June, seeing it's

13      already extended three times.

14         Q      Was there some concern that it would

15      take too long to find a temp?

16         A      Not finding the temp, training a

17      temp, and then having a temp by themselves on

18      that schedule.

19         Q      I mean, is there any reason that

20      another employee couldn't have been moved to the

21      solo shift and have the temp work the shift that

22      was not solo?

23         A      If they were available to do so, and

24      my guess is if somebody wasn't available to do

25      so, then we wouldn't have been able to do that.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## <u>NOTICE OF FILING</u>

COMES NOW, Schneider National Carriers, Inc. ("Schneider") and files the following in support of its Motion for Summary Judgment:

1. March 9, 2021 Deposition of Cierra Geter (See Exhibit A);

2. April 6, 2021 Deposition of Travis Torrence (See Exhibit B);

3. April 8, 2021 Deposition of Ashley Janssen (See Exhibit C);

4. April 19, 2021 Deposition of Sarah Kopf (See Exhibit D);

5. April 19, 2021 Deposition of Tiffany Kitchens (See Exhibit E);

6. April 21, 2021 Deposition of Marianne Biskey-Rose (See Exhibit F);

7. Declaration of Christine Schneider (See Exhibit G); and

8. Declaration of Travis Torrence (See Exhibit H).

The Originals are being maintained by counsel because this action is governed by electronic filing. Upon request, McGuireWoods LLP will paper file the originals with the Clerk of Court.

Date: June 7, 2021

Respectfully submitted,

By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

2

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on June 7, 2021, I electronically filed the foregoing *Notice of Filing* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,

By:__/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738

3

F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

# EXHIBIT A

Page 1

IN THE UNTIED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

CIERRA GETER,                    )CASE NO.:
                                 )20-CV-01148-SCJ-JSA
    Plaintiff,                   )
                                 )
vs.                              )
                                 )
SCHNEIDER NATIONAL CARRIERS,     )
INC.,                            )
                                 )
       Defendants.               )
_____ )


     The video conference deposition of CIERRA
GETER taken pursuant to Notice and agreement of
counsel for any and all purposes allowed under
the Georgia Civil Practice Act; the reading and
signing of the deposition is being reserved;
taken before Morgan Spriggs, Certified Court
Reporter and Certified Verbatim Reporter in and
for the State of Georgia to commence at
10:00 A.M. on the 9th day of March, 2021.  All
parties completely remote.



Page 2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4         CHERYL B. LEGARE, ESQ.
           Legare Attwood & Wolfe, LLC

 5         Two Decatur Town Center
           125 Clairemont Avenue

 6         Suite 380
           Decatur, Georgia 30030

 7         (470) 823-4000
           cblegare@law-llc.com

 8

 9

      ON BEHALF OF THE DEFENDANTS:

10

           PETER A. MILIANTI, ESQ.

11         McGuire Woods, LLP
           77 West Wacker Drive

12         Suite 4100
           Chicago, Illinois 60601

13         (312) 750-2765
           pmilianti@mcguirewoods.com

14

15

16

17

18

19

20

21

22

23

24

25
```



1                     C O N T E N T S
2                   E X A M I N A T I O N
3

                                              Page

4

5    Proceedings..................................   5
6    Examination by Mr. Milianti..................   8

7

8

9                     E X H I B I T S

10

11   Plaintiff's                                Page
     Exhibits          Description            Marked
12
13        1    Resume..............................   22
14        2    Letter: July 2, 2014................   41
15        3    Drawing.............................   47
16        4    Job Description.....................   51
17        5    E-mail: August 25, 2017.............   62
18        6    2018 Associate Acknowledgments USA

               Recert..............................   63

19

          7    Discrimination, Harassment, and
20             Retaliation Prevention Policy.......   65
21        8    Family Medical Leave Request form...   96
22        9    Fax.................................  106
23        10   Fax.................................  115
24        11   FMLA Approval Letter................  120
25        12   Medical note: Hartford fax..........  122



Page 4

 1     13   REVISED: Designation Notice for

             Family Medical Leave/FMLA........... 125

 2

       14   Attending Physician's Return to

 3           Work Recommendation................. 126

 4     15   Letter: 12/18/2018.................. 132

 5     16   Fax letter: 1/19/2019............... 139

 6     17   Letter: 1/29/2019................... 150

 7     18   Fax: 3/9/2019...................... 151

 8     19   Attending Physician's Statement..... 159

 9     20   Request for Accommodation........... 170

10     21   Letter: 4/11/2019.................. 173

11     22   Letter: 4/12/2019.................. 176

12     23   4/27/2019.......................... 183

13     24   Confidential Medical Records........ 191

14     25   Charge of Discrimination............ 212

15     26   Complaint.......................... 213

16

17

18

19

20

21

22

23

24

25



```
 1              P R O C E E D I N G S
 2                              10:00 A.M.
 3          THE COURT REPORTER:  Before I swear in
 4  the witness, I will ask counsel to stipulate on
 5  the record that due to the national pandemic, the
 6  court reporter will swear in the witness, even
 7  though she's not in the physical presence of the
 8  witness and there is no objection at this time,
 9  nor will there be an objection at a further date.
10          MR. MILIANTI:  No objection.
11          THE COURT REPORTER:  Cheryl?
12          MS. LEGARE:  No problem.
13          THE COURT REPORTER:  Thank you.
14          MS. LEGARE:  Sorry.
15          (Whereupon,
16                  CIERRA GETER
17          was called as a witness and
18          having been first duly sworn
19          was examined and testified
20          as follows:)
21          THE WITNESS:  Yes.
22          THE COURT REPORTER:  Thank you.
23          MR. MILIANTI:  Is it possible that you
24  could -- it was hard for me to hear you,
25  Ms. Geter.  I don't know if you could get a
```



Page 6

1    little bit closer to the mic.

2              THE WITNESS:  Oh, yes.  Can you hear

3    me?

4              MR. MILIANTI:  Yeah, it's a little

5    faint.  I don't know if you can adjust the

6    volume.

7              THE WITNESS:  Okay.  How about now?

8    Can you hear me now?

9              MR. MILIANTI:  A little bit better, but

10   not much.

11       Morgan, I don't know if you have the same

12   issue.

13             THE COURT REPORTER:  I hear the same

14   thing you do.  Like it's --

15             MR. MILIANTI:  Okay.

16             THE COURT REPORTER:  It seems like

17   she's far away.

18             THE WITNESS:  Okay.  Can you guys hear

19   me now?

20             MR. MILIANTI:  That's better.  Yes.

21             THE WITNESS:  Awesome.

22             MR. MILIANTI:  Okay.  All right.  Let

23   the record reflect that this is the deposition of

24   Cierra Geter taken pursuant to the Federal Rules

25   of Civil Procedure and Notice.



1      Ms. Geter, my name is Pete Milianti.  I'm

2  one of the attorneys representing Schneider

3  National in the lawsuit you have filed against

4  it.  I'm going to be asking you a series of

5  questions here today.

6      Have you ever had your deposition taken

7  before?

8            THE WITNESS:  No.

9            MR. MILIANTI:  Okay.  Well, let me go

10  over some of the ground rules for a deposition,

11  which I'm sure your counsel has already shared

12  with you.

13      If you could please answer each of my

14  questions as fully and carefully as you can.  If

15  for any reason you don't understand a question or

16  you need me to clarify a question, please let me

17  know, and I will do my best to rephrase the

18  question so that you understand it.  I don't want

19  you to understand -- I don't want you to answer a

20  question that you're not clear about; do you

21  understand that?

22            THE WITNESS:  Yes.

23            MR. MILIANTI:  Okay.  The court

24  reporter, Morgan, is taking down everything that

25  is said today during the deposition.  And because



Page 8

 1   we are all remote, it's even more important that

 2   we try not to speak over each other.  So if you

 3   could wait before you answer your question until

 4   I'm finished asking my question, and I will try

 5   and extend that same courtesy to you; is that

 6   fair?

 7             THE WITNESS:  Yes.

 8             MR. MILIANTI:  Okay.  If at any point

 9   in time you need to take a break, just let me

10   know.  The only thing I ask is that you let me

11   finish whatever line of questioning I may have,

12   and then we can go ahead and take a break.

13             THE WITNESS:  Understood.

14             E X A M I N A T I O N

15   BY MR. MILIANTI:

16        Q.  Okay.  Can you please state and spell

17   your full name for the record?

18        A.  Cierra, C-i-e-r-r-a; Chanel,

19   C-h-a-n-e-l; Geter, G-e-t-e-r.

20        Q.  Have you ever provided sworn testimony

21   before?

22        A.  Does fifth grade tribunal account?

23        Q.  I'm sorry.  Can you repeat that?

24        A.  Does my fifth grade tribunal count when

25   I had to be a witness for that?



Page 9

```
 1        Q.   No.  I don't think so.
 2        A.   Okay.  I was a witness, so I did have to
 3   testify.  So I -- that's the only court case I've
 4   ever been in like that.
 5        Q.   Okay.  You haven't appeared before any
 6   type of a judge or arbitrator, where had to raise
 7   your hand like you did today?
 8        A.   Yes.  My divorce -- my divorce -- my
 9   divorce.
10        Q.   Okay.
11        A.   My divorce.
12        Q.   For your divorce proceeding?
13        A.   Yes.
14        Q.   Okay.  And do you recall when you
15   provided that testimony?
16        A.   Yes.  On November 4 -- no.  November 11,
17   2016.
18        Q.   And is that the only time you can recall
19   where you've provided sworn testimony?
20        A.   Does traffic court count?  I was in
21   traffic court when I was 19.
22        Q.   Other than traffic court and the divorce
23   proceeding, any other instance where you provided
24   sworn testimony that you can recall?
25        A.   No, sir.
```



Page 10

```
 1        Q.  Okay.  Have you filed a lawsuit or
 2   arbitration other than the one for which we are
 3   here today?
 4        A.  No, sir.
 5        Q.  Have you filed a charge of
 6   discrimination other than the one that you filed
 7   against Schneider?
 8        A.  No, sir.  This is the only one.
 9        Q.  To the best of your recollection, have
10   you been involved in a lawsuit in any other way
11   other than what you've already testified to?
12        A.  Correct.  This is the only one, to my
13   best recollection.
14        Q.  Have you spoken with anyone in
15   preparation for the deposition here today?
16        A.  Other than my attorney.  That's it.
17        Q.  Okay.  Only your counsel?
18        A.  Yes.
19        Q.  When did you meet with your counsel?
20        A.  Yesterday.
21        Q.  And how long did you meet with your
22   counsel?
23        A.  A few hours almost.
24        Q.  Was anyone else present when you met
25   with your counsel yesterday?
```



Page 11

```
 1        A.  No.
 2        Q.  Did you review any documents to prepare
 3   for the deposition here today?
 4        A.  Yes.
 5        Q.  Okay.  Do you recall which documents you
 6   reviewed?
 7        A.  My complaint, the defense documents as
 8   far as like -- what is it called?  I don't know
 9   the word.  Starts with an I.  You guys use it --
10        Q.  Did you review the defendants' responses
11   to interrogatories?
12        A.  Yes, yes.  Your interrogatories and then
13   your defense responses and also, like, the
14   medical records and all the documents.
15        Q.  Any other documents that you recall
16   reviewing in preparation for the deposition here
17   today?
18        A.  I'm trying to go through -- I'm sorry.
19   And that's it, yeah.  And the text messages and
20   medical records that was provided.
21        Q.  Okay.  Are you currently taking any
22   medications?
23        A.  Yes.
24        Q.  Do any of the medications impair your
25   memory?
```



1      A.  No.

2      Q.  Do any of the medications impair your

3  ability to testify truthfully and honestly here

4  today?

5      A.  No.

6      Q.  Is there any reason why you cannot

7  testify truthfully and honestly here today?

8      A.  No.

9      Q.  Okay.  And what is your date of birth?

10      A.  11/26/1986.

11      Q.  And where were you born?

12      A.  Atlanta, Georgia.

13      Q.  And what is your current address?

14      A.  5008 Lower Elm Street, Atlanta, Georgia

15  30349.

16      Q.  And how long have you lived at that

17  address?

18      A.  Since December 31, 2008.

19      Q.  And does anyone live there with you?

20      A.  No.  Just me at this time.

21      Q.  And do you rent or own that residence?

22      A.  Own.

23      Q.  Are you currently married?

24      A.  No.

25      Q.  And you mentioned at the start of the



Page 13

1    deposition that you participated in a divorce

2    proceeding.  When -- when -- when did you get

3    divorced?

4         A.  It was November 11, 2016 and it was

5    finalized November 14th.  So the courts would

6    have it for November 14th, because it was

7    Veteran's Day.  So she -- she didn't solidify it

8    on that particular day because it was a holiday

9    weekend.  So it was solidified the following

10   business day, which was the 14th.

11        Q.  And how long were you married?

12        A.  From April 4, 2013 to November of 2016,

13   so almost three years.  Three years and some

14   change.

15        Q.  Do you have any children?

16        A.  No.

17        Q.  Have you ever been arrested?

18        A.  No.

19        Q.  Have you ever filed for bankruptcy?

20        A.  Yes.

21        Q.  When did you file for bankruptcy?

22        A.  Bankruptcy, I believe that was October

23   or November of 2012.

24        Q.  And was that a Chapter 7 or Chapter 13;

25   do you recall?



Page 14

1      A.   Chapter 7.

2      Q.   And were you discharged from your debts?

3      A.   Yes.

4      Q.   Do you recall when that Chapter 7

5   proceeding concluded?

6      A.   I believe it was, like, 2015 when I got

7   the notification, but I haven't tried to purchase

8   anything or anything like that after that.  Yeah,

9   I think I got the notification in 2015.

10      Q.   Other than the Chapter 7 bankruptcy that

11   you filed in or around October or November 2012,

12   have you filed any other bankruptcy petitions?

13      A.   No, no.

14      Q.   And what's your highest level of

15   education?

16      A.   A bachelor's degree, concentration in

17   marketing.

18      Q.   I'm sorry.  You broke up just a little

19   bit on my end.  I heard bachelor's degree, but

20   that was it.

21      A.   Concentration in marketing.

22      Q.   And where did you attend school?

23      A.   I attended and finished at Clayton State

24   University in Morrow, Georgia.

25      Q.   And what year did you receive your



Page 15

```
 1   bachelor's degree?
 2        A.   December 10, 2010.   That's my graduation
 3   date.
 4        Q.   Do you hold any other degrees other than
 5   your bachelor's degree from Clayton State
 6   University?
 7        A.   I have an associate's from Georgia
 8   Military College in business administration.
 9        Q.   And when did you receive that degree?
10        A.   Received that October 20 -- October of
11   2000 -- yeah, October of 2008.   I graduated that
12   fall quarter.
13        Q.   Okay.   So you have an associate's degree
14   from Georgia Military College and a bachelor's
15   degree from Clayton State University.   Any other
16   degrees that you hold?
17        A.   No.   That's it.
18        Q.   Do you hold any licenses?
19        A.   I have --
20        Q.   Other than a driver's license.
21        A.   I do have a CDL.
22        Q.   Is that active?
23        A.   Yes.
24        Q.   And when did you receive your CDL?
25        A.   June 14, 2012.
```



Page 16

1        Q.   And has it been active since that date?

2        A.   Yes, sir.

3        Q.   Any other licenses that you possess?

4        A.   No, sir.

5        Q.   Do you have any other forms of

6    educational or vocational training other than

7    what you've already testified to?

8        A.   I am in school now for herbal medicine.

9        Q.   And where -- where are you going to

10   school?

11       A.   4 Cycles of Life and School of

12   Evolutionary Herbalism.

13       Q.   Are those two separate institutions?  4

14   Cycles of Life and the School of Evolutionary --

15   I'm sorry.  What was the last part of that?

16       A.   Herbalism.

17       Q.   Herbalism.  Sorry.  Let me rephrase

18   that.  Are those two separate institutions?

19       A.   Yes.

20       Q.   Okay.  And when did you start attending

21   4 Cycles of Life?

22       A.   May of 2019.

23       Q.   And is that an accredited institution?

24       A.   No.  They will be hopefully by next

25   year.  That's what we're hoping for, but yes,



Page 17

1    they're in that process, but not at this time.

2        Q.  And do you take classes at 4 Cycles of

3    Life?

4        A.  Yes.

5        Q.  And how many classes have you taken

6    since May of 2019?

7        A.  So far, probably 20.

8        Q.  And will you obtain a degree or a

9    certificate upon your completion of schooling at

10   4 Cycles of Life?

11       A.  Yes.  I will obtain a certificate.

12       Q.  And what will the certificate be in?

13       A.  Certifying my credits that I came from

14   an accredited herbalist school, so I can become a

15   practitioner with herbal medicine, or I can go to

16   the next level in my training.

17       Q.  And how many classes do you need to take

18   to obtain a certificate?

19       A.  In this particular course, the 40 that

20   he has posted.

21       Q.  So you need to complete 40 classes in

22   order to obtain this certificate --

23       A.  Uh-huh.  (Affirmative).

24       Q.  -- in herbal medicine?

25       A.  Correct.



Page 18

1          Q.   So you're about halfway through?

2          A.   Yes, sir.

3          Q.   And do you attend classes on a -- how

4     frequently do you attend classes since May of

5     2019?

6          A.   Every Monday via Zoom.

7          Q.   And how long are these classes?

8          A.   Three to four hours.  From 3:00 p.m.

9     Eastern Standard to 6:00 p.m., sometimes 7:00.

10         Q.   And you've been attending these classes

11    every Monday since May of 2019?

12         A.   Yes.  I -- I signed up for the school in

13    May and then courses started in June, but I

14    signed up for the actual school in May.

15         Q.   Do you attend classes on any days other

16    than Mondays at cycles -- 4 Cycles of Life?

17         A.   Sometimes we have, like, special

18    training classes on Thursdays.

19         Q.   And how frequently do you attend classes

20    on Thursdays?

21         A.   Usually, it depends on the instructor if

22    he offers it.  So probably once a month if it's,

23    like, a special course, like dealing with

24    something, like, the class needs to concentrate

25    on more.  Or sometimes twice a month, depending



Page 19

1    on how much the class, of course, needs to

2    concentrate on that subject.

3        Q.  And when would you meet for these

4    classes on Thursdays?  What time?

5        A.  Same time period.  3:00 p.m. Eastern

6    Standard until 6:00 p.m.

7        Q.  And what -- when do you anticipate

8    receiving your certificate from 4 Cycles of Life?

9        A.  I believe by this fall.

10       Q.  Okay.  And you also mentioned that

11   you're attending classes at the School of

12   Evolutionary Herbalism?

13       A.  Correct.

14       Q.  And when did you start attending classes

15   at that school?

16       A.  I started last summer.  I believe last

17   July I signed up for that course, I believe.

18       Q.  July of 2020?

19       A.  Correct.

20       Q.  And are you just taking one course, or

21   is it a series of courses that you're -- you're

22   taking?

23       A.  It's a -- it's a series within the

24   course itself.  So it's literally, like, a

25   15-part series and it's one course.  It's a



1    year-long course.

2         Q.   And when do you take these classes at

3    the School of Evolutionary Herbalism?

4         A.   They're at your own pace, so I usually

5    do those courses on, like, Tuesday and

6    Wednesdays.

7         Q.   And will you receive a degree or a

8    certificate upon the completion of this course

9    that you're -- you're currently taking?

10        A.   It will be a certificate of completion

11   as well.

12        Q.   And do you take these courses via Zoom

13   as well?

14        A.   Yes.

15        Q.   And would you consider yourself a

16   full-time student right now?

17        A.   Yes.

18        Q.   And how long have you been a full-time

19   student?

20        A.   Since last summer of July because I took

21   on the course load of the School of -- sorry --

22   the School Evolutionary Herbalism as well with

23   4 Cycles of Life.  And it's like -- whew, it's a

24   lot.  Reminds me of college.

25        Q.   And have you been voluntarily taking



Page 21

1   these courses since July of 2020?

2       A.  Yes.

3       Q.  Have you held any other -- have you held

4   a job since July of 2020, or have you been

5   exclusively focused on your schooling?

6       A.  I literally was exclusively focused on

7   my schooling in 2020.

8       Q.  Would it be accurate to say that you

9   have not searched for a job since July of 2020

10  because you are a full-time student?

11      A.  Correct.

12      Q.  Have you ever served in the armed

13  forces?

14      A.  No.

15          MR. MILIANTI:  All right.  Cheryl, I

16  don't know if they've been able to print out

17  those documents yet.

18          MS. LEGARE:  Let me go -- let me go

19  look and I'll be right back.

20          MR. MILIANTI:  Okay.  Thank you.

21  (Break taken from 10:25 a.m. to 10:41 a.m.)

22  BY MR. MILIANTI:

23      Q.  All right.  Ms. Geter, if you could look

24  at -- you've been handed a stack of pages that

25  comprise several exhibits that I may show you



Page 22

```
1    today.  And I think on the top is -- if you look

2    down at the bottom right-hand corner, you'll see

3    the word Schneider and then 000192; do you see

4    that?

5         A.  Yes.

6         Q.  Okay.  So for Plaintiff's Deposition

7    Exhibit number 1, it's going to be Schneider

8    00192 through 00195.  Ms. Geter, do you recognize

9    this document?

10           (Plaintiff's Exhibit 1 was

11             marked and identified.)

12        A.  195, you said?

13        Q.  Yes.

14        A.  Yes, uh-huh.

15        Q.  Okay.  It's a four-page document.  Do

16   you have it in front of you?

17        A.  Yes.  Right here.  Uh-huh.

18   (Affirmative).

19        Q.  All right.  And do you recognize this

20   document?

21        A.  Yes.

22        Q.  Okay.  And it's a copy of your resume;

23   is that right?

24        A.  Correct.

25        Q.  Okay.  And do you recall that this is
```



Page  23

 1    the resume that you submitted to Schneider when

 2    you applied for a position at Schneider in 2014?

 3         A.  Yes.

 4         Q.  And why don't you just take a second to

 5    look at this document.  Let me know if -- to the

 6    best you can recall whether the contents

 7    contained in this document are accurate.

 8         A.  Yes.

 9         Q.  Okay.  And do you recall when you would

10    have prepared this resume?

11         A.  Yes.  April of 2014.

12         Q.  Okay.  And as of that time in April of

13    2014, you were looking for a position in customer

14    service requiring a problem-solver with excellent

15    communication skills and an ongoing commitment to

16    customer service and professionalism; is that

17    right?

18         A.  Correct.

19         Q.  If you could turn to the second page of

20    this document.

21         A.  Uh-huh.  (Affirmative).

22         Q.  Do you see where you have the entry

23    Universal Fleet Services --

24         A.  Yes.

25         Q.  -- in Snellville, Georgia?



Page 24

1          A.  Yes.

2          Q.  Okay.  And it looks like you worked for

3   Universal Fleet Services from June 2010 to June

4   2012; is that right?

5          A.  Correct.

6          Q.  And you worked for Universal Fleet

7   Services as a dispatcher and a driver?

8          A.  Yes, like part time.  Uh-huh.

9   (Affirmative).

10          Q.  And were those two separate positions?

11          A.  It actually worked -- like I worked in

12   the office, and if they needed me, they would

13   train me how to drive and send me out in the

14   field.  That's how that worked.

15          Q.  Okay.  Do you recall what your job

16   duties were as a dispatcher for Universal Fleet

17   Services?

18          A.  Yes.  Taking calls, communicating with

19   the drivers and basically making sure I'm taking

20   care of driver services.  So if they break down

21   or anything like that, I was the point of contact

22   for that, and secretarial work as well.

23          Q.  And was this a full-time position that

24   you held for Universal Fleet Services?

25          A.  No.  Part time.



Page 25

```
 1          Q.   And why did you leave that position?
 2          A.   It was basically voluntarily, because I
 3    was just trying to learn the industry and it was
 4    from a friend of mine that owned that business
 5    and they told me, hey, anytime you want to come
 6    in and learn, you come in.  And I gained my skill
 7    set from them to help me.
 8          Q.   Okay.  And then if you look at the top
 9    of that same page, you have listed Brito Produce,
10    Forest Park, Morgan Southern Conley, Con-way
11    Truckload -- I'm sorry.
12          A.   Uh-huh.  (Affirmative).
13          Q.   It looks like you have listed -- are
14    those four trucking companies?
15          A.   Yes, that is correct.
16          Q.   And did you work for four different
17    trucking companies during the time period of June
18    2012 to July 2013?
19          A.   Yes.  Correct.
20          Q.   And you were an -- you were an
21    over-the-road driver for all four of those
22    companies?
23          A.   Correct.
24          Q.   Did you work as an independent
25    contractor at that time?
```



Page 26

```
 1        A.   Only with Con-way in the year of 2013
 2   between March and May of 2013.  I was under their
 3   roster as an owner-operator at that time.  And
 4   Morgan Southern --
 5        Q.   When did you --
 6        A.   I'm sorry.
 7        Q.   Sorry.  Go ahead.
 8        A.   Morgan Southern I was considered a
 9   owner-operator there as well.
10        Q.   And when did start working for Schneider
11   National?
12        A.   I started working for Schneider June of
13   2014 -- I mean -- sorry.  June of 2012.
14        Q.   And do you recall long you worked for
15   Schneider?
16        A.   Yes.  Until September of 2012.
17        Q.   And you were an over-the-road driver for
18   Schneider?
19        A.   Yes.
20        Q.   Do you know what division?
21        A.   Yes.  Team division out of West Memphis,
22   Arkansas.  Operation manager, her name was Donna,
23   I believe.
24        Q.   And why did you only work for Schneider
25   for three or four months?
```



Page 27

1       A.  My mom at that time was very ill and I

2   needed to get home.  And at that time, I was

3   running basically the northeast region and I was

4   -- I needed to just be home and they couldn't

5   find me a route at that time.  And one of my

6   friends suggested to come over to Con-way because

7   they have more routes that were more suitable for

8   my family need at that time.

9       Q.  So you voluntarily left Schneider in or

10  about September 2012?

11      A.  Correct.

12      Q.  And then if you turn to the first

13  page --

14      A.  Uh-huh.  (Affirmative).

15      Q.  -- it shows that you started working at

16  Providence Realty Group in February of 2014; is

17  that right?

18      A.  Correct.

19      Q.  What did you do between July of 2013 and

20  February of 2014?

21      A.  I was at home because I was under mental

22  distress.  I could not find a job at that time.

23  Only in trucking and at that time, I was not

24  taking an employment in that.

25      Q.  And why were you -- what mental distress



Page  28

1   were you suffering from during that time period?

2        A.   In July of 2013 when I was with Brito

3   Produce, LLC on my last run with them I was on

4   85 south heading home on the weekend of July 4th

5   and I was at the Love's truck stop and I was

6   assaulted.  So from that point, I didn't want to

7   be in a truck for a while.

8        Q.   When you say you were assaulted, can you

9   provide a little bit more detail as to the type

10  of assault?

11       A.   Yes.  I was at the truck stop and I was

12  doing a walk-around.  It was around about 8:00 or

13  9:00 p.m. Eastern Standard, and I was doing a

14  walk-around around my truck.  And when I got to

15  the back of my truck, it was a gentleman waiting

16  there for me to try to sexually assault me and I

17  had to fight him off physically.

18       Q.   And did you contact the police?

19       A.   No, because I was afraid.  And at that

20  time, I was just trying to get home and I didn't

21  have nowhere else to go and I just wanted to get

22  home.  I was just too afraid to even do that

23  because I was in a foreign state.  So I just got

24  in my truck and booked it, told my dispatcher

25  when I got back -- [inaudible].



Page 29

1          Q.  Did you suffer any physical injuries as

2     a result of this assault?

3          A.  I had some scrapes from fighting him and

4     a couple bruises.

5               MS. LEGARE:  Pete?

6               MR. MILIANTI:  Yes.

7               MS. LEGARE:  Break real quick?

8               MR. MILIANTI:  Yes, that's fine.

9     (Break taken from 10:52 a.m. to 10:54 a.m.)

10    BY MR. MILIANTI:

11         Q.  I take it that after you suffered this

12    assault, you stopped working for Brito Produce?

13         A.  Yes.

14         Q.  And you stopped working for Brito

15    Produce because of this assault?

16         A.  Correct.

17         Q.  And you mentioned that you were under

18    mental distress.  What symptoms were you

19    suffering from --

20         A.  I was having --

21         Q.  -- at that time?

22         A.  I'm sorry.  A lot of panic attacks and

23    nightmares.

24         Q.  Any other symptoms that you suffered

25    from at that time?



Page 30

1          A.   I remember I had a lot of outbursts and

2    I didn't know why.  I had a lot of, like, angry

3    outbursts.

4          Q.  Did you see a healthcare provider as a

5    result?

6          A.   At that time no, because I didn't have

7    health insurance.

8          Q.  Do you recall the first time that you

9    were treated by a healthcare provider resulting

10   from any symptoms stemming from this assault?

11         A.   I remember when I became employed with

12   Schneider and I got my healthcare benefits I was

13   -- I became a patient with Dr. Maria Goyco at

14   Piedmont and I was telling her about it.  Even

15   though it was a year later, I was telling her and

16   she -- that's when she first put me on, I

17   believe, antidepressants around that time.

18         Q.  I'm sorry.  What was the name of that

19   physician?

20         A.   I'm sorry.  Maria Goyco, G-o-y-c-o.

21         Q.  And she's a physician at Piedmont?

22         A.   Yes, sir.

23         Q.  And you believe you first treated with

24   her about a year after this assault?

25         A.   Correct.  Because I was explaining to



1    her the same thing I just stated to you.

2        Q.  And were you suffering from panic

3    attacks, nightmares and outbursts at the time

4    that you saw Dr. Maria Goyco?

5        A.  Correct.

6        Q.  Do you know what type of physician

7    Dr. Goyco is?

8        A.  Yes.  Internal medicine and family

9    practice.

10       Q.  Was she your general -- just a general

11   practitioner?

12       A.  Yes, sir.

13       Q.  And you mentioned that -- I'm sorry.

14   This would have been approximately July of 2014

15   that you started treating with Dr. Maria Goyco?

16       A.  No, not July of 2014.  I got employed in

17   2014, so my benefits did not kick in until 90

18   days later, so that would've been an issue.  But

19   she became my physician that year, once my

20   benefits kicked in.

21       Q.  Okay.  So the first time that you would

22   have treated with Dr. Goyco was sometime in the

23   latter half of 2014; would that be accurate?

24       A.  Yes, sir.  Correct.

25       Q.  Okay.  And at that time she put you on



Page 32

1    antidepressants; is that -- is that right?

2         A.   Yes, sir.

3         Q.   Any other medications that you can

4    recall that she prescribed for you as a result of

5    the assault that you endured in -- in 2013?

6         A.   Other than the antidepressants for my

7    migraines I was starting to have, she gave me

8    just the pain medicine for my migraines.  All of

9    those were switched over, so I can't recall all

10   of those names of the medication right now.

11        Q.   And did you start experiencing migraines

12   as a result of the assault in 2013, or did that

13   predate the assault?

14        A.   How can I put this?  They -- my episodes

15   started again because I had cluster headaches as

16   a teenager.  So, like, my migraines and cluster

17   headaches as a teenager, so I didn't have that

18   until that assault occurred.  Like I guess it

19   triggered it and that's when they came back, but

20   I did have them prior to the assault when I was a

21   teenager.

22        Q.   Okay.  So if I understand correctly, as

23   a teenager you suffered from cluster headaches.

24   You were able to get that under control, and then

25   they -- and the migraines started -- the episodes


MAGNA ▶
LEGAL SERVICES

Page 33

1    started after the assault in July of 2013; would

2    that be accurate?

3        A.  Yes.

4        Q.  Any other symptoms -- when did you start

5    with the migraines -- I'm sorry -- or restart

6    with migraines?

7        A.  Restart with the migraines?  It was,

8    like, literally, I think, around, like,

9    September, October of 2013.  I remember having

10   one of -- a really, really bad episode.  And I

11   didn't want to go to the doctor at the time

12   because, of course, I didn't have healthcare

13   insurance, so I went -- just -- oh I know what I

14   did.

15       I called the Grady Healthcare hotline here

16   in Atlanta, the main hospital, and I just asked

17   the nurse what I could do for a home remedy for

18   my migraine because I couldn't even go to the

19   doctor and they don't mind, you know, servicing

20   the community.  So I remember that.

21       Q.  So prior to the time that you started

22   employment at Schneider in 2014, would it be

23   accurate to say that you were suffering from

24   panic attacks, nightmares, outbursts, and

25   migraines?



Page 34

1         A.  Yes.

2         Q.  Any other medical conditions from which

3    you were suffering as a result of the assault

4    prior to the time that you started with Schneider

5    in 2014?

6         A.  No, sir.

7         Q.  And from the time of the assault in July

8    of 2013 until the time you started at Schneider

9    in roughly July of 2014, how frequently were you

10   having panic attacks; do you recall?

11        A.  At least -- I know for sure at least

12   once a day.  I was having them a lot.  It could

13   be one little thing and it'd set me off.

14        Q.  And how frequently were you having

15   outbursts during that time period of July 2013 to

16   July 2014?

17        A.  Quite frequent as well.  Not as

18   frequently as, like, a day-to-day thing, but I

19   would say probably once a week, give or take,

20   yeah.

21        Q.  And from the time of the assault until

22   the time you started at Schneider in 2014 -- July

23   of 2014, how frequently were you having

24   nightmares?

25        A.  Weekly.  Every other night, actually.



Page 35

1      Q.  And during the time period from the

2   assault until the time you started at Schneider

3   in July of 2014, how frequently were you having

4   migraines?

5      A.  Probably once a week, twice a week.

6   Once or twice a week.

7      Q.  And did -- you worked at Providence

8   Realty Group as an administrative assistant from

9   February 2014 through May 2014; is that right?

10      A.  Yes.

11      Q.  And why did you only work there for a

12   few months?

13      A.  She only needed me to help her during

14   tax season with her books and she told me to

15   start looking for employment in April.  That's

16   why I started looking for employment and then she

17   let me go on May 1st, because she said I no

18   longer need you, thank you for this season, you

19   know, so I was like, okay.  I appreciate it.

20   I've been unemployed for a while anyway, so thank

21   you for the opportunity.

22      Q.  All right.  And then you started looking

23   for a position in customer service?

24      A.  Customer service and logistics as well.

25   Uh-huh.  (Affirmative).



Page 36

1      Q.  And how did you learn about a position

2   at Schneider?

3      A.  My team driver -- co-driver I had back

4   in 2012, he was at the intermodal division over

5   in Fairburn and I was doing cold calls calling

6   around, passing out my resume, asking people,

7   hey, did you hear about a position open?  I'll

8   call Avery, and then I was like, you know what,

9   I'm going to call Schneider because they told me

10  I could always come back because my manager at

11  the time was Barry McArthur and Michael Pickens

12  over at the Atlanta OC and they told me whenever

13  you're ready to come back, whether you want to be

14  a driver, whatever, we're going to have your

15  back.  I said, okay, no problem.

16      So I called my team driver and I said, hey,

17  does Schneider have a position open?  They was

18  like, well -- his name is Charles Robertson.

19  They was like, well, I don't know.  I know they

20  -- Greg Cochran at the time was the manager and

21  Mr. Tony -- oh, what was Tony's last name?  He

22  was the operation manager at the time.

23      He was like, I will give them your resume.

24  Give me your resume and I'll take it up here.  I

25  don't know if they have a position, but I'll give



Page 37

1   them your resume.  So that's how I ended up

2   passing in my resume to them, and then he called

3   me back and he stated, hey, Greg told me that

4   they actually have positions open.  Go on

5   Schneider's website and type in Fairburn location

6   and that's where I saw the position, and then I

7   applied for it.

8       Q.  So you gave your resume to Tony?

9       A.  Correct.

10      Q.  And Tony was the ops manager of the

11  Atlanta division at that time?

12      A.  Correct.

13      Q.  Okay.  And Tony told you that he would

14  forward your resume to recruiting at Schneider;

15  is that right?

16      A.  Charles Robinson gave Tony my resume and

17  Tony referred it to HR, correct.

18      Q.  Okay.  And then Tony told you that there

19  were some positions open at the Fairview

20  location?

21      A.  Fairburn, correct.  Uh-huh.

22  (Affirmative).

23      Q.  Fairburn.  Sorry.

24      A.  Uh-huh.  (Affirmative).

25      Q.  Okay.  And then did you go on



Page 38

1    Schneider's website?

2         A.  Yes, sir.

3         Q.  All right.  And do you recall the

4    position that was open and available that you

5    applied for?

6         A.  Yes.  The position at the time was a

7    driver manager -- we were called -- we weren't

8    called area planning managers at the time.  We

9    were called something else.  I think it was,

10   like, dispatch managers or something like that.

11   That was the position at that time.  And then,

12   like, a year later they called us area planning

13   managers, like they switched out titles a couple

14   times, so -- but it's the same position as an

15   area planning manager.

16        Q.  Okay.  So you saw a position listed for

17   dispatch manager and you applied for that

18   position; is that right?

19        A.  Correct.

20        Q.  Okay.  All right.  And did you -- how

21   long after you -- let me strike that.

22        Were you interviewed for the position?  Did

23   you interview for the position?

24        A.  Yes.  I had five interviews.

25        Q.  Do you recall whom you interviewed with?


MAGNA
LEGAL SERVICES

1      A.  Yes.  I had two interviews with Greg

2  Cochran, which was the operation manager at the

3  time of Atlanta.  And can I make a correction to

4  the record?

5      Q.  (Shakes head up and down.)

6      A.  Tony was not the operation manager.  He

7  was the regional manager.  He was the region and

8  operation manager.

9      Q.  Did you interview with Tony?

10     A.  Yes.  I had to do one interview with

11  Tony, one interview with Marianne, and then I had

12  to do a phone interview -- he's no longer there,

13  but he created their software at the time they

14  were using for dispatch.  I cannot remember his

15  name per se, but he was my last interview, and I

16  remember it being on the phone.  It was dealing

17  with Oracle and he was the developer, so he

18  wanted to make sure I was familiar with the

19  software of Oracle and how Oracle is used, which

20  I used in banking before.

21     Q.  Okay.  And you said that you interviewed

22  with Marianne?

23     A.  Yes.

24     Q.  Do you recall Marianne's full name?

25     A.  Marianne Rose -- it's hyphenated.  It's


MAGNA
LEGAL SERVICES

Page 40

1    Marianne Biskey-Rose, I believe.

2         Q.  Okay.  All right.  And did you interview

3    with these folks collectively or separately?

4         A.  Separately.

5         Q.  And do you recall what, if anything,

6    they told you about the specific duties for this

7    position?

8         A.  They stated that -- that they were

9    looking for a team player, someone that is

10   enthusiastic about learning, also someone that is

11   willing to work under a high stress environment

12   and be a collective team participant and

13   eventually a leader.

14        Q.  At the time that you interviewed for the

15   position, did you understand it to be a full-time

16   position?

17        A.  Correct.

18        Q.  And do you know who -- obviously you

19   were ultimately hired into the position, right?

20        A.  Yes.

21        Q.  Do you know who hired you?

22        A.  Yes.  Greg Cochran.

23        Q.  Do you know if Marianne recommended you

24   for hire?

25        A.  I do not know.  They did not disclose



Page 41

1    any of that type of information to me.

2        Q.  Okay.  If you could look at -- it should

3    be the next document in that pile.  It should be

4    Bates-stamped Schneider 506 through 507.

5        A.  Uh-huh, yes.

6        Q.  Do you see that document?

7        A.  Yes.

8        Q.  Okay.  So let's mark this as Plaintiff's

9    Deposition Exhibit number 2.  And Ms. Geter, this

10   is the offer letter that you received from

11   Schneider; is that correct?

12           (Plaintiff's Exhibit 2 was

13            marked and identified.)

14       A.  That is correct.

15       Q.  Okay.  And this document is dated July

16   2, 2014; is that right?

17       A.  Yes.

18       Q.  Okay.  And did you receive this document

19   on or about that date?

20       A.  Yes.  Via e-mail.  Uh-huh.

21   (Affirmative).

22       Q.  Okay.  And is that -- that's your name

23   and address on the first page of this document?

24       A.  Yes.

25       Q.  Okay.  And if you look under position on



Page 42

1    this first page, it says, dispatch analyst; do

2    you see that?

3         A.  Yes.

4         Q.  Does that refresh your memory as to the

5    title of the position?

6         A.  Yes, it does.  I knew it had dispatch

7    something in it.

8         Q.  And you said -- you testified that the

9    title was changed to area planning manager about

10   a year later; is that right?

11        A.  Yes, sir.  Like a year to a year and a

12   half later, they did a transition of position and

13   titles.

14        Q.  But the job duties remained the same,

15   just a title change; is that right?

16        A.  Correct.

17        Q.  Okay.  And if you look under where it

18   says position it says, dispatch analyst; 3rd

19   shift; full time 40 hours per week; exempt.  Do

20   you see that?

21        A.  Yes.

22        Q.  Okay.  And that was your understanding

23   of the position for which you were hired,

24   correct?

25        A.  Correct.



Page 43

 1          Q.   And it says 3rd shift.  Do you know --
 2    what were your hours when you first started as a
 3    dispatch analyst?
 4          A.   I worked from 11:00 p.m. to 7:00 a.m.
 5    and my days I worked were Wednesday through
 6    Sunday.
 7          Q.   Wednesday through Sunday?
 8          A.   Correct.
 9          Q.   And you worked at the Fairburn location;
10    is that right?
11          A.   Yes, sir.
12          Q.   How far was that location from your
13    home?
14          A.   6.2 miles.
15          Q.   And to whom did you report when you
16    first started?
17          A.   When I first started Shawn Brantley and
18    Greg Cochran.
19          Q.   Do you recall how long you reported to
20    those two individuals?
21          A.   Shawn until he quit in February 2018.
22    February 2018, I think that's the month he quit
23    and the year he quit.
24          Q.   That's when Shawn left Schneider?
25          A.   Yes, sir.  And then I believe Greg



Page 44

1    Cochran left late May, early June right after he

2    got his master's.  I remember that.

3         Q.  Of 2018?

4         A.  Of 2018, correct.  And I just want to

5    make sure it's 2018.  Can I look at the calendar,

6    please?

7         Q.  Sure.

8         A.  I just want to make sure.  I don't want

9    to give any false dates.

10        Q.  No problem.

11        A.  Okay.  So Mr. Tony actually left

12   Schneider -- my surgery was August of 2015 -- I'm

13   sorry.  I just want to be accurate.

14        Okay.  My apologies.  So the year is 2016

15   Shawn left, same month, February.  And then Greg

16   left late May, late June of 2016.  The reason why

17   Mr. Tony left October 2015 while I was on leave

18   for surgery.  That's how I remember that.

19        Q.  Okay.  So when you say that you reported

20   to both Shawn and Greg, was that because -- for

21   different days of the week, or did one of them

22   report up to the other?

23        A.  Yes, sir.  So Shawn was my team lead and

24   he reported to Greg and Shawn was there with the

25   team all the time.  He was there to fill in for



Page 45

1    teammates that were out on leave or we needed

2    extra help.

3        Q.  Got it.  Okay.  And then May, June of

4    2016 Greg leaves.  And who did you report to

5    after that?

6        A.  Marianne.  She got the position in May

7    to become the new ROM and we reported to her as

8    the ROM and we reported to Doug -- no.  We

9    reported to Rodney Dunn as our new operation

10   manager for third and second shift, which is the

11   collective team.  Together it's called support

12   shift.  And Rodney Dunn became our operation

13   manager at that time.

14       Q.  And what does ROM stand for, R-O-M?

15       A.  Regional operation manager.

16       Q.  During the time period that you reported

17   to Shawn and Greg, was your position a 40-hour a

18   week full-time position?

19       A.  Yes.  We worked --

20       Q.  During the time period -- I'm sorry.  Go

21   ahead.

22       A.  We worked a little bit more than 40, but

23   yes.

24       Q.  On average, how many hours do you think

25   you worked when you reported to Shawn and Greg?



Page 46

```
 1        A.   On average -- for the bi-weekly period
 2   or a week to week?
 3        Q.   Week to week.
 4        A.   Probably around 40.  Forty-two to 43,
 5   give or take.  Depends on the shift, what
 6   happens, so if we had to stay a little longer.
 7        Q.   And how long did you report to Marianne?
 8   You said you started reporting to her in May of
 9   2016.
10        A.   Until the time I was terminated.
11        Q.   And was that a direct report to
12   Marianne?
13        A.   No.  Schneider has an open-door policy
14   where you can talk to all of your managers.  So
15   whether I wanted to talk to Rodney or Rodney
16   wasn't there, I could just go to Marianne and
17   talk to Marianne if he was out because they all
18   are just one collective team.
19        Q.   Okay.  So you reported to Marianne from
20   May 2016 until your termination of employment in
21   April of 2019; is that accurate?
22        A.   Correct.
23        Q.   And how big is the -- the Fairburn
24   location?
25        A.   Triple wide trailer.
```



Page 47

```
 1        Q.   Okay.   How many employees typically work
 2   there; do you know?
 3        A.   As a collective group or -- that's what
 4   I'm trying to -- I'm trying to get.   Like as a
 5   collective?
 6        Q.   Yeah.
 7        A.   Or as a shift-wise?   That's what I'm --
 8        Q.   Well, how many -- well, let me ask a
 9   little bit differently.
10        Did you have an office or a cubicle?
11        A.   Cubicle.
12        Q.   Do you know how many offices roughly or
13   cubicles were at the Fairburn location?
14        A.   Can you give me one second and I can
15   just --
16        Q.   Sure.
17        A.   -- mark it real quick?
18             MS. LEGARE:   Want me to make a
19   photocopy of that and put it in the record?
20             MR. MILIANTI:   Sure.   We can mark it as
21   Exhibit 3.
22             (Plaintiff's Exhibit 3 was
23               marked and identified.)
24        A.   Twenty to 21 total.   And that 21 is
25   another temp that left, but I count her as well.
```



Page 48

```
 1   BY MR. MILIANTI:
 2        Q.  So there's 20 to 21 office or cubicle
 3   spaces at the Fairburn location?
 4        A.  Correct.
 5        Q.  It's my understanding that a portion of
 6   the Fairburn location was also a driver lounge;
 7   is that accurate?
 8        A.  Yes.
 9        Q.  Okay.  And it's my understanding that
10   drivers would come in and come out and they would
11   sit in the lounge to do whatever they were going
12   to do in the lounge before they started or after
13   they ended their workday; is that accurate?
14        A.  Yes.  And they would come in into the
15   operations office where we are located and then
16   most of the time, they don't sit in the driver
17   lounge because no one is in here.  So they want
18   to talk, so they'll come into the operations side
19   to start their day, get paperwork, get their load
20   information.
21        Q.  And would you help them in getting their
22   paperwork and load information?
23        A.  Yes.  I would definitely help them get
24   all their paperwork.  Once we get that phone call
25   or a message, I would get that prepared for them
```



Page 49

1   and ready, so when they come in or I will, you

2   know, start preparing that on the way -- if they

3   walk in and I'm still doing another task, I have

4   it, you know, in preparation for them.

5       Q.   And is there -- is there an approximate

6   number of drivers that would be assigned or

7   dispatched out of the Fairburn location; do you

8   know?

9       A.   Okay.   In reference to which years?

10  Because between 2014 and I believe mid-20 --

11  yeah, 2014 when I started there and mid-2016, we

12  dispatched from Quebec, Canada to Miami, Florida.

13  So our dispatch team on the support shift handled

14  17 to 18 markets at a time at night, so that's

15  approximately 400 to 425 drivers, give or take a

16  few.

17      Q.   And how about after mid-2016?

18      A.   That got cut to 250 and below.

19      Q.   So approximately 250 drivers?

20      A.   Yes, sir.

21      Q.   Out of the Fairburn operating center?

22      A.   Correct.

23      Q.   Was this just -- was Fairburn just

24  intermodal?

25      A.   It's just intermodal, but it also was



1    the region intermodal vocation for the southeast.

2        Q.  Okay.  If you could turn to the second

3    page of Exhibit 2, in the second to last

4    paragraph it says, any employment between you and

5    the Schneider organization which may arise shall

6    be at all times employment at-will; do you see

7    that?

8        A.  Yes.

9        Q.  And did you understand that your

10   employment at Schneider was at-will?

11           MS. LEGARE:  Objection.

12       A.  Yes.

13   BY MR. MILIANTI:

14       Q.  At the Fairburn location, is there also

15   -- are there trucks located at the Fairburn

16   location?

17       A.  Yes.  It's the main drop lot and parking

18   location for the drivers for that division.

19       Q.  And so there would be tractors and

20   trailers in the yard at the Fairburn location?

21       A.  Yes.  And personal vehicles.

22       Q.  And that were the drivers would pick up

23   a tractor and trailer from that location -- from

24   the Fairburn location?

25       A.  Yes.  Far as -- far as empty load --



Page 51

```
 1    like empty containers and loaded containers if
 2    they came from previous customers, we have them
 3    relay it there for another driver to pick it up
 4    to the next destination.
 5         Q.  Okay.  We can go to the next exhibit,
 6    which I -- let's mark as Exhibit 4 and this is
 7    Bates-stamped Schneider 0092 through 0094.
 8              (Plaintiff's Exhibit 4 was
 9               marked and identified.)
10         A.  Yes.
11         Q.  Okay.  You've been -- you have in front
12    of you what we'll mark as Plaintiff's Exhibit
13    number 4 and it's entitled job description
14    manager, area planning; is that right?
15         A.  Yes.
16         Q.  Okay.  And do you recognize this
17    document?
18         A.  Yes.
19         Q.  Okay.  You've seen it before?
20         A.  Yes.
21         Q.  Okay.  And this is the copy of the job
22    description for an area planning manager; is that
23    right?
24         A.  Yes.
25         Q.  And that is the position that you held
```



Page 52

```
 1    while employed at Schneider; is that correct?
 2         A.  Yes.
 3         Q.  Okay.  And if you could just look at the
 4    job summary and read it to yourself and let me
 5    know when you're finished.
 6         A.  Yes.
 7         Q.  Okay.  And does this accurately
 8    summarize your job duties as an area planning
 9    manager?
10         A.  Yes, sir.
11         Q.  That you will be accountable for
12    establishing, communicating, and executing the
13    plan for a specific geographic region or a
14    specific customer by matching an available driver
15    capacity and equipment with customer load
16    tenders; is that right?
17         A.  Yes.
18         Q.  Okay.  And did you work as an -- as an
19    area planning manager, did you work for a
20    specific geographic region?
21         A.  I worked for Atlanta, Charlotte, Miami
22    -- Atlanta, Charlotte, Miami, Orlando -- give me
23    a second.  I'm sorry.  It's been a minute.
24    Jacksonville.  There's one more we had.  And this
25    is just since 2016?
```



Page 53

```
 1        Q.   Yes.

 2        A.   Okay.  Yeah.  So Atlanta, Charlotte,

 3   Miami, Orlando, Jacksonville, and Savannah.

 4        Q.   And that's all for the intermodal

 5   division, right?

 6        A.   For the southeast division that I worked

 7   at, correct.

 8        Q.   All for the southeast intermodal

 9   division?

10        A.   Correct.

11        Q.   Okay.  And if you -- do you see under

12   essential job duties and responsibilities?

13        A.   Yes.

14        Q.   Why don't you take a look at that and

15   let me know when you're done.

16        A.   Okay.  Yes.

17        Q.   Okay.  And as reflected in this document

18   -- strike that.

19        Do the bullet points under essential job

20   duties and responsibilities accurately reflect

21   the position of area planning manager?

22        A.   Yes, sir, to my recollection -- the best

23   of my recollection.

24        Q.   And these were the essential duties and

25   responsibilities for that position; is that
```



Page 54

1    right?

2         A.   Yes.

3         Q.   And would it be accurate to say that one

4    of your primary duties was supporting the

5    drivers?

6         A.   Yes, sir.

7         Q.   And you would take calls and messages

8    from drivers; is that right?

9         A.   Yes, sir.

10        Q.   You would help drivers resolve any

11   issues that they had?

12        A.   Yes, sir.

13        Q.   And you frequently interacted with the

14   drivers face-to-face; is that correct?

15        A.   Yes, sir.  Only the Atlanta drivers

16   face-to-face.

17        Q.   Atlanta drivers.  And you mentioned

18   there were, if I recall correctly, approximately

19   250 Atlanta drivers?

20        A.   No.  That's 2,250 drivers total in the

21   southeast region.

22        Q.   Okay.  How many --

23        A.   Atlanta -- go ahead.

24        Q.   How many Atlanta drivers?

25        A.   I believe it was between a hundred and a



Page 55

1    hundred and ten.  It just fluctuated depending on

2    the season of trucking.  So they have -- like a

3    lot of drivers would leave and then some drivers

4    will come back and then they do a big hiring in

5    the middle of the year.  So it just depends on

6    the season.

7          Q.  Okay.  So you would have -- would it be

8    accurate to say that you would have frequent

9    face-to-face interaction with the Atlanta

10   drivers?

11         A.  Correct.

12         Q.  If you turn to the second page of this

13   document --

14         A.  Yes, sir.

15         Q.  -- do you see where it says skills/

16   behaviors necessary to perform job?

17         A.  Uh-huh.  (Affirmative).

18         Q.  Is that a yes?

19         A.  Yes, sir.

20         Q.  Okay.  And it states, abilities or

21   qualities an associate must possess in order to

22   perform the essential job duties listed by core

23   competency; do you see that?

24         A.  Yes.

25         Q.  And under communication it says, ability



Page 56

1    to develop relationships through interpersonal

2    skills; is that right?

3         A.  Yes.

4         Q.  And you understood that was one of the

5    essential job duties of your position; is that

6    correct?

7         A.  Yes.

8         Q.  Okay.  And who did you need to develop

9    these relationships with?

10         A.  The drivers and with my teammates.

11         Q.  And how would you go about developing

12    the relationships with drivers?

13         A.  Just day-to-day talking with them.  And

14    due to the fact that I was a former driver, I

15    could relate to them with their circumstances,

16    and give them -- give them information from a

17    different perspective, whereas they would not

18    understand it coming from an operation

19    standpoint.

20         Q.  Okay.  And if you look under the other

21    -- one of the core competencies is positive

22    impact; do you see that?

23         A.  Yes.

24         Q.  And the third one down says, take

25    initiative, a self-starter; do you see that?



    1          A.  Yes.

    2          Q.  And did you agree that was an essential

    3    job duty for the area planning manager position?

    4          A.  Yes.

    5          Q.  And underneath that, it says ability to

    6    work in a fast-paced, high pressure environment;

    7    do you see that?

    8          A.  Yes.

    9          Q.  And you understood that was one of the

   10    essential job duties of an area planning manager?

   11          A.  Yes.

   12          Q.  You -- you understood that as an area

   13    planning manager, you would need to work in a

   14    fast-paced, high pressured environment; is that

   15    right?

   16          A.  Yes.

   17          Q.  And would you agree that it was a high

   18    -- I'm sorry -- a fast-paced, high pressure

   19    environment?

   20          A.  Oh, yes.

   21          Q.  And would it be accurate to say that as

   22    an area planning manager you would need to be in

   23    the office to support a driver if they came in

   24    with a particular issue?

   25          A.  Can you repeat that one more time for



Page 58

 1   me, please?  I'm sorry.

 2        Q.   Sure.  Would it -- would it be accurate

 3   to say that in your role as an area planning

 4   manager, it was necessary for you to be in the

 5   office to support a driver if they came in with

 6   an issue?

 7        A.   No.

 8        Q.   Why?

 9        A.   And I can explain.

10        Q.   Why do you believe you didn't need to be

11   in the office?

12        A.   Well, depending on the circumstances

13   most -- from my driving experience, most of my

14   dispatchers from my experience they were in a

15   whole other state.  And then we were dealing with

16   drivers in Miami that had breakdowns, and the

17   only thing we can do is direct them to -- we

18   could take the loads off of them and direct them

19   on what to do, send them to the safety management

20   team, SEM.

21        If they have a breakdown or if it's, like, a

22   driver personal issue, we e-mail their DBL and

23   then the driver will call them the next day or

24   talk to their DBL, which is a driver business

25   leader and then we're putting in the handoff.



Page 59

1   But my Atlanta drivers, yes, I feel as though

2   that they appreciated us being in the office so

3   they can have face-to-face human interaction, so

4   I can definitely understand that standpoint and

5   that viewpoint as well.

6        However, I know for sure that we dispatch

7   drivers from Quebec.  That's across the

8   international lines, so you know, when they had

9   issues, we were the ones in Atlanta, Georgia that

10  had to help them, but we only were limited to

11  what we could do because of our distance and

12  communication with them at that time.

13       Q.  Would it be accurate to say that

14  Schneider wanted you to have face-to-face

15  interaction with the Atlanta drivers --

16       A.  Yes.

17       Q.  -- in your position as an area planning

18  manager?

19       A.  Yes.

20       Q.  Okay.  And they deemed that -- Schneider

21  deemed that important because they wanted you to

22  develop those relationships with the Atlanta

23  drivers; is that right?

24       A.  Correct.

25       Q.  Would you agree with me that there were



1   certain functions of your position as an area

2   planning manager that could only be completed in

3   the office?

4        A.   Could I get a reference point to what

5   you're --

6        Q.   Was there any -- is there any -- any

7   position -- any job duty that you held -- any job

8   duty that you performed as an area planning

9   manager that you believe could only be performed

10  in the office?

11       A.   The only thing and I thought that could

12  be performed or think can is the driver

13  interaction, like the one-on-one with the drivers

14  and management team.  You know, human to human

15  interaction.

16       Q.   Would there ever be occasions where you

17  needed to be in the office to find driver

18  tractors?

19       A.   Yes.

20       Q.   And is that another situation where you

21  would need to be in the office in order to

22  perform your job duties?

23       A.   Yes.  And we had a situation where I

24  remember I was sick and in particular where I

25  worked from home and Travis had to help me



Page 61

```
 1   because he knew I couldn't come up there.  So
 2   what he did, he searched for the tractors for me,
 3   and the drivers have a key box that's actually in
 4   the driver's lounge and we send a message to the
 5   drivers that needed the trucks.
 6        At the time they would have come in and
 7   they'd say, hey, I need a truck, or my truck is
 8   down, we'll direct them to the key box and we
 9   already had -- the keys had the tractor numbers
10   already attached to them and I said, hey, go to
11   the truck number such and such.  It's located --
12   because the trucks have GPS, so you can locate
13   the tractor and tell them where to go pick up the
14   tractor.
15        And if it was at the OC, which is off -- 23
16   miles away off of Bouldercrest, so we had to
17   locate them there and send them up there to pick
18   up a truck, and then the OC can cut a key for
19   that truck, or they already have a copy of the
20   key because that's where the maintenance
21   department is located.
22        Q.  Okay.  But there were situations where
23   you would need to physically be present in the
24   office in order to locate tractors for drivers?
25        A.  Correct.
```



Page 62

1     Q.  And that was a key function of your job

2  responsibility as an area planning manager,

3  right?

4     A.  Correct.

5     Q.  If you could turn -- look to the next

6  exhibit, which we'll mark as Plaintiff's Exhibit

7  5 and it's Bates-stamped Schneider 0060.  Do you

8  see that one?

9          (Plaintiff's Exhibit 5 was

10            marked and identified.)

11     A.  Yes.

12     Q.  Okay.  All right.  And this appears to

13  be an e-mail that you sent on August 25, 2017 to

14  Doug Horton, Marianne Biskey-Rose, Rodney Dunn,

15  and Travis Torrence; is that correct?

16     A.  Yes.

17     Q.  Okay.  And I just want to direct your

18  attention to the second to last sentence in that

19  first paragraph.

20     A.  Uh-huh.  (Affirmative).

21     Q.  You wrote this morning I had to leave my

22  house, I was working from home, and rush over to

23  the office to find two driver's tractors to use

24  for today.  Did I read that correctly?

25     A.  Correct.



Page 63

```
 1        Q.   Okay.  And you go on to state, I admit I
 2   was not too happy about stopping my planning and
 3   leaving drivers in the phone query to help those
 4   drivers; however, I had to do what I had to do to
 5   get things done.  Did I read that correctly?
 6        A.   Correct.
 7        Q.   Okay.  And so as reflected in your
 8   e-mail, you understood that for certain tasks you
 9   needed to be in the office to do what you had to
10   do to get things done; is that right?
11        A.   Correct.
12        Q.   Why don't we go to the next exhibit.
13   We'll mark this as number 6, and it's Schneider
14   138 through 140.
15             (Plaintiff's Exhibit 6 was
16               marked and identified.)
17        A.   Uh-huh.  (Affirmative).
18        Q.   I'm sorry.  I don't think I told you at
19   the beginning, so this is totally my fault.
20   Because we have a court reporter who is taking
21   everything down, you have to respond audibly
22   saying --
23        A.   I'm so sorry.
24        Q.   No, it's my fault.  It's not your fault.
25   And you likely will continue to do it because
```



Page 64

1    it's very common and I will do it as well.

2        A.   I'm so sorry about that.

3        Q.   All right.  Do you have Exhibit number 6

4    in front of you?

5        A.   Yes.

6        Q.   Do you -- and this is -- this is a 2018

7    associate acknowledgement form.  Do you recognize

8    this document?

9        A.   Yes.

10       Q.   Do you recall completing the 2018

11   associate acknowledgement recertification form?

12       A.   Yes.

13       Q.   All right.  And under number one, it

14   states that you acknowledge that the -- and I'll

15   just summarize here, the equal -- the code of

16   conduct, equal opportunity employer, the

17   antitrust discrimination, harassment and

18   retaliation prevention, drug and alcohol policies

19   have been made available to you and you

20   understand, agree, and acknowledge to abide by

21   them during your employment with Schneider; is

22   that right?

23       A.   Yes.

24       Q.   Okay.  And you acknowledge that you

25   reviewed the Schneider policies and understand



Page 65

1    them or that you will promptly review the

2    Schneider policies and agree to immediately bring

3    any questions you have about them to your leader

4    or human resource business partner; is that

5    right?

6         A.  Yes.

7         Q.  Okay.  And if we look down near the end

8    of number one, you clicked the tab that says I

9    agree, right?

10        A.  Yes.

11        Q.  Okay.  I'm going to put that one aside.

12   We can go to the next exhibit, which will be

13   Exhibit number 7, and it's Bates-stamped

14   Schneider -- it has Exhibit A on it, which we can

15   cross off.  But it's Schneider 271 through 274.

16           (Plaintiff's Exhibit 7 was

17            marked and identified.)

18        A.  Yes.

19        Q.  Okay.  So Exhibit 7 is Schneider's

20   discrimination, harassment and retaliation

21   prevention policy; is that right?

22        A.  Yes.

23        Q.  Do you recognize this document?

24        A.  Yes, sir.

25        Q.  And you are aware that throughout your



Page 66

1   employment, Schneider's policies were available

2   to you on its intranet; is that right?

3        A.  Yes.

4        Q.  And was this particular policy, the

5   discrimination, harassment and retaliation

6   prevention policy available to you on Schneider's

7   intranet?

8        A.  Yes.

9        Q.  And have you reviewed this policy

10  before?

11       A.  Yes.

12       Q.  All right.  And if you look under

13  principles it states, it is the policy of

14  Schneider that harassment, discrimination and

15  retaliation are prohibited and will not be

16  tolerated; do you see that?

17       A.  Yes.

18       Q.  And was that your understanding?

19       A.  Yes.

20       Q.  If you turn to the second page under

21  complaint reporting procedures; do you see that?

22       A.  Yes.

23       Q.  All right.  If you look to kind of the

24  middle, I think it's the third sentence, it says,

25  associates who believe they are being subjected



Page 67

1    to or witnessed harassment, discrimination,

2    retaliation, or bullying have several reporting

3    options available.  Schneider encourages affected

4    individuals to tell the alleged harasser or

5    discriminator that they find such behavior

6    offensive and ask them to stop.

7        Regardless of whether you ask that

8    individual to stop, if you feel you have been

9    subjected to conduct that violates this policy

10   you have a duty to promptly notify one of the

11   following individuals: your leader, an HR

12   business partner, or any member of Schneider

13   leadership.  You are not required to report to

14   your direct leader and may instead report

15   concerns to an HR business partner.

16       Did I read that correctly?

17       A.  Correct.

18       Q.  And was that your understanding of

19   Schneider's complaint reporting procedures?

20       A.  Yes.

21       Q.  If you could turn to the next page, do

22   you see where it says, retaliation is prohibited?

23       A.  Yes.

24       Q.  And was it your understanding that

25   retaliation or discrimination against someone for



Page 68

1    raising a good faith report of harassment,

2    bullying or discrimination is prohibited and will

3    not be tolerated pursuant to Schneider policy?

4         A.  Yes.

5         Q.  And was it your understanding that if

6    you had been retaliated against, you should

7    report that fact immediately to your HR business

8    partner or any member of Schneider leadership?

9         A.  Yes.

10             MR. MILIANTI:  Cheryl, I'm sorry.  If

11   you raised an objection, I couldn't hear it.

12             MS. LEGARE:  Sorry.  Is it easier if I

13   raise my hand?  Because I'm muted so that we

14   don't have feedback.

15             MR. MILIANTI:  I just want to make sure

16   you get it on the record, so I didn't hear it.  I

17   don't know if Morgan heard it.

18             MS. LEGARE:  Yeah, I did.  I'll try and

19   be louder.

20             MR. MILIANTI:  Okay.  Why don't we put

21   that away.  Is it okay if we take a five-minute

22   break?

23             MS. LEGARE:  Sure.

24   (Break taken from 11:56 a.m. to 12:05 a.m.)

25   BY MR. MILIANTI:



Page 69

```
 1          Q.  All right.  Ms. Geter, are you ready to
 2     resume your testimony?
 3          A.  Yes, sir.
 4          Q.  Okay.  Who is Travis Torrence?
 5          A.  He was my team lead at the time.
 6          Q.  Do you know when he became your team
 7     lead?
 8          A.  I believe mid or early -- early to
 9     mid-2018.
10          Q.  And prior to him becoming your team
11     lead, do you know what position he held?
12          A.  Yes.  Area planning manager of Atlanta
13     on first shift.
14          Q.  Was he one of your -- one of your peers?
15          A.  Yes, he was one of my peers.
16          Q.  Did you ever work with him when he
17     worked as an area planning manager?
18          A.  Yes.  Travis helped train me.
19          Q.  And do you know to whom Travis reported
20     when he was a team lead?
21          A.  Yes.  Doug Horton.
22          Q.  And do you know who Doug Horton reported
23     to?
24          A.  Marianne Biskey-Rose.
25          Q.  Do you know -- as a team lead, did
```



1    Travis supervise you?

2        A.  Yes, he did.

3        Q.  Let me ask it a different way.  What

4    type of support would Travis provide for you as a

5    team lead?

6        A.  He would support us if someone was out

7    sometimes and cover their shift.  Sometimes he

8    would jump in and help with the calls and the

9    messages if we get bombarded.  But mainly he was

10   supposed to be, like, the floater of the team to

11   basically fill in and help out where the team

12   needed him to be.  That's what -- that was my

13   understanding because of how our previous team

14   lead was as well.

15       Q.  And was he team lead over a specific

16   shift; do you know?

17       A.  Yes.  Second and third shift, which is a

18   collaborative support team.

19       Q.  And do you know how many area planning

20   managers -- during the time period of mid-2018

21   through the termination of your employment, how

22   many area planning managers were on the third

23   shift?

24       A.  Yes.  Four.

25       Q.  And what are -- what are the names of



Page 71

```
 1   those area planning managers?

 2       A.  Excluding myself, Audrianne Williams.

 3   Do you need me to spell her name?

 4       Q.  No.

 5       A.  Okay.

 6       Q.  Well, yes, yes.

 7       A.  To the best of my ability,

 8   A-u-d-r-i-a-n-n-e, I believe, and Williams,

 9   W-i-l-l-i-a-m-s.

10       Q.  Okay.

11       A.  Desmond Seymour.  That's, D-e-s-m-o-n-d;

12   Seymour, S-e-y-m-o-u-r.  And Ms. Elaine Young,

13   that's E-l-a-i-n-e, and Young, Y-o-u-n-g.

14       Q.  Okay.  Do you know Ms. Williams' race?

15       A.  African American.

16       Q.  And Mr. Seymour's race?

17       A.  African American.

18       Q.  And Ms. Young's race?

19       A.  African American.

20       Q.  And did all -- the four of you then

21   worked third shift; is that correct?

22       A.  Correct.

23       Q.  Okay.  And did they work the same hours

24   as you?

25       A.  Yes, they did.  I actually had the
```



Page 72

1   extended hours out of the bunch during this time.

2        Q.   And from mid-2018 through the

3   termination of your employment, what were your

4   hours?

5        A.   11:00 p.m. to 10:00 a.m.

6        Q.   So you worked an 11-hour shift?

7        A.   Yes, sir.

8        Q.   And what days of the week did you work

9   between mid-October mid 2018 through the

10  termination of your employment?

11       A.   Wednesday, Thursday, Friday, and Sunday.

12       Q.   Those were your scheduled days?

13       A.   Yes, sir.

14       Q.   And when did you start working that

15  schedule, Wednesday, Thursday, Friday, Sunday

16  11:00 p.m. to 10:00 a.m.; do you recall?

17       A.   No, I do not recall at this time.

18       Q.   Was it prior to the time that you

19  started reporting to Travis?

20       A.   Yes, sir.  I was under, I believe,

21  Rodney Dunn when they switched those schedules

22  over.  I just can't remember the specific time.

23       Q.   Did you have a good working relationship

24  with Travis?

25       A.   Yes.



Page 73

1      Q.  Did you raise any complaints to anyone

2  about Travis?

3      A.  No.

4      Q.  You never complained to anyone at

5  Schneider about Travis's behavior, conduct,

6  statements, comments, anything along those lines?

7      A.  The only time I ever complained about

8  Travis is his absence at work sometimes, and

9  that's to fellow coworkers.

10      Q.  So you only -- okay.  So the only

11  complaints you would raise about Travis would be

12  his absences from work, and those complaints you

13  raised to your fellow coworkers; is that

14  accurate?

15      A.  Correct.

16      Q.  Do you believe Travis is a truthful and

17  honest person?

18      A.  The best of my recollection, yes.  In

19  the years I spent with him, I trusted him, yes.

20      Q.  How was your working relationship with

21  Marianne?

22      A.  Very cordial.  We were very polite to

23  each other.  I thought we were really good,

24  because I could relate to her.  We have the same

25  birthday.



Page 74

1          Q.  I mean, that's got to count for

2     something.

3          A.  Yeah, and I confided in her a lot.  I

4     thought I had a -- I had built a good rapport

5     with her, even when I was not even on her team

6     when I first started.  I tried to build a rapport

7     with all the management within the office when I

8     first started.

9          Q.  Did you ever raise any complaints to

10    anyone at Schneider about Marianne?

11         A.  No.  Only about her time at work, that's

12    it -- to coworkers, you know, where's she at,

13    that's it.  And then when I did see her, we had

14    great conversations when she was able to come in

15    and -- because sometimes she would travel or

16    wasn't able to come into the office.  And so when

17    she was able to come in, I almost give her, like,

18    a morning briefing of my night, especially when I

19    came back.  So she definitely knew if I had any

20    trials that night prior to as well.

21         Q.  So the only complaints that you ever

22    raised about Marianne would have been about her

23    whereabouts and that was to your coworkers; is

24    that accurate?

25         A.  Yes.



Page 75

1        Q.  Do you know for Ms. Williams,
2   Mr. Seymour, and Ms. Young what their work hours
3   were during the 2018 through 2019 time period?
4        A.  I believe Desmond Seymour's hours --
5   because he had -- yeah, his hours was at
6   10:00 p.m. to 6:00 a.m.  Audrianne's hours was
7   10:30 p.m. to 8:00 a.m.  Ms. Elaine's hours was
8   from 11:00 p.m. to 7:00 a.m.
9        Q.  And do you know what days of the week
10  they worked?
11       A.  I do remember -- I remember -- I
12  remember their off days, so I would have to write
13  it out.  Could I come back to that for you?
14       Q.  They didn't work the same days as you
15  did; is that accurate?
16       A.  Correct.  They did, except for
17  Thursdays.  Thursday night I was by myself.
18       Q.  And when you would request time off,
19  would you -- during the 2018 -- mid-2018 through
20  the date of your termination in 2019, would you
21  request time off from Travis?
22       A.  Yes.  Via e-mail and via our ADP on the
23  portal.
24       Q.  And if you had questions about work,
25  would you reach out to Travis to answer those



Page 76

```
 1   questions?

 2       A.  Yes, most definitely.

 3       Q.  Okay.  You also mentioned that Travis in

 4   addition to supervising you, Ms. Williams,

 5   Mr. Seymour and Ms. Young on third shift, he also

 6   was the supervisor for the second shift --

 7       A.  Yes.

 8       Q.  -- of area planning -- area planning

 9   managers; is that right?

10       A.  Yes.

11       Q.  Okay.  And do you know during mid-2018

12   through your termination in April of 2019 the

13   names of the area planning managers who worked on

14   the second shift?

15       A.  Yes.

16       Q.  What are the -- what are they?

17       A.  Okay.  The first one is Sarah Kopf.

18   Sarah, S-a-r-a-h; Kopf, K-o-p-h.  Quincy Parker;

19   Q-u-i-n-c-y; Parker, P-a-r-k-e-r.  Candis Smith;

20   C-a-n-d-i-s, and Smith, S-m-i-t-h.

21       And also -- her name is, I think, Wakita or

22   Shaquita.  I cannot remember, because she came in

23   towards the end of my employment.  She's another

24   temp, but she was for second shift.  I don't

25   remember her last name.
```



Page 77

```
 1       And Julissa.  I don't remember her last
 2  name, but she is located at the Atlanta
 3  operations center.  She switched departments, but
 4  she was under that team as well.
 5       Q.  And Ms. Kopf, what was her race; do you
 6  know?
 7       A.  Caucasian.
 8       Q.  How about Mr. Parker?
 9       A.  African American.
10       Q.  Ms. Smith?
11       A.  African American.
12       Q.  Wakita?
13       A.  African American.
14       Q.  And Julissa?
15       A.  African American.
16       Q.  Do you know whether the -- I'm sorry.
17       You mentioned that Wakita was a temp?
18       A.  Yes.  At that time.
19       Q.  Okay.  At that time.  Do you know who
20  her employer was?
21       A.  No, sir.
22       Q.  And was Julissa a temp?
23       A.  Yes, sir.
24       Q.  Do you know who her employer was?
25       A.  No, sir.  They did not disclose that to
```



Page 78

1   us.

2        Q.  Do you know whether Ms. Williams ever

3   worked a reduced schedule?

4        A.  No.

5        Q.  Do you know whether Mr. Seymour ever

6   worked a reduced schedule?

7        A.  No.

8        Q.  Do you know whether Ms. Young ever

9   worked a reduced schedule?

10       A.  No.  Can I also add with Ms. Young?

11   She's the temp on third shift.  She was the temp

12   for third.

13       Q.  Okay.  Do you know who employed

14   Ms. Young?

15       A.  No, sir, I did not.  I just came to work

16   that day and she was there.

17       Q.  Do you know when she started as a temp?

18       A.  January of 2018 -- no.  I'm sorry.

19   January 2019.  My correction.  I'm so sorry.

20       Q.  Do you know if Ms. Kopf ever worked a

21   reduced schedule?

22       A.  No, sir.

23       Q.  Do you know whether Mr. Parker ever

24   worked a reduced schedule?

25       A.  No, sir.



1      Q.  Do you know whether Ms. Smith ever

2   worked a reduced schedule?

3      A.  Yes, sir.

4      Q.  When did Ms. Smith work a reduced

5   schedule?

6      A.  She came back -- so I believe she worked

7   a reduced schedule mid-2017 until early 2018 when

8   she came back from her cancer treatment, and then

9   she went back out again in late 2018 in December

10  due to more complications.  She was working from

11  home from that point on, and then she was

12  terminated in April of 2019 as well.

13     Q.  Do you know why she was terminated?

14     A.  Yes.  Due to her condition where she had

15  congestive heart failure and lung failure from

16  her chemo treatment, and she was on oxygen 24/7

17  and she was not able to be able to come into the

18  office no more.  She barely could even breathe on

19  the phone to take calls for drivers.  So I

20  remember speaking with her and talking to her

21  about how she was doing, and she told me -- she

22  was like, yeah, my doctor told me I could not

23  come back to work.

24     Q.  Do you know when she started a reduced

25  schedule in mid-2017?



Page 80

1        A.   I believe it had to be late spring,

2   early summer.

3        Q.   And do you know what her reduced

4   schedule was?

5        A.   Not to my recollection, but I remember

6   some days she wasn't in the office and some days

7   she wasn't -- and some days she was.  And then

8   some days she'd come in late because she had to

9   go to her chemo, you know treatments and stuff,

10  so they reduced her hours to come in, like, at

11  6:00 instead of 2:00 or 3:00 she'll come in.  Or

12  if she couldn't make it in after her cancer

13  treatments because she had to drive an hour to

14  her cancer treatments, if she couldn't make it

15  back in time she'll work from home or just be out

16  for that day.

17       Q.   Do you know if she had a set reduced

18  schedule, or was she just out when she needed to

19  attend her cancer treatments, if you know?

20       A.   I remember -- not specifically, but from

21  my recollection, she was out when she needed to

22  because they were working with her and her --

23       Q.   Out when she needed to receive her

24  cancer treatments?

25       A.   Yes, sir.



Page 81

1        Q.  So to your knowledge, she wasn't out a

2    specific day of a week.  She was just out when

3    needed; is that correct?

4        A.  Correct.  Yes, sir.

5        Q.  Do you know if she was taking -- when

6    she was out when needed if she was taking FMLA

7    time?

8        A.  Yes.  I remember that because she was

9    calling me.  She was like, hey, do you know this

10   person in that department?  She was just talking

11   to me because she was, like, trying to understand

12   who to contact and did we have the same people in

13   the HR department.  And I was like, you can

14   contact this person.

15       I believe I had Bethany or Courtney or

16   something like that.  So I remember her calling

17   me to get advice and, you know, confide in me

18   when she was just really sick on those days and

19   stuff like that.

20       Q.  So it's your -- is it your recollection

21   then when she was taking time off for cancer

22   treatments it was FMLA time?

23       A.  Yes, sir.

24       Q.  And then you mentioned she went back out

25   in late 2018; is that right?



Page 82

```
 1        A.  Yes, sir.
 2        Q.  Okay.  And do you know why she went out
 3   in late 2018?
 4        A.  I believe it's due to her congestive
 5   heart failure diagnosis.
 6        Q.  Did you know if she worked a reduced
 7   work schedule at that time?
 8        A.  Yes.  It was, like, leading up to that.
 9   Like her schedule was fluctuating like that until
10   that point in time.
11        Q.  Do you know if that time was covered
12   under FMLA?
13        A.  Not to my knowledge.  No, sir.  I don't
14   know about that.
15        Q.  Do you know what Wakita's work hours
16   were?
17        A.  I believe she came in at 3:00 and ended
18   at 11:00.  I don't know her specific days, but
19   she did, like, a typical eight-hour shift, 3:00
20   to 8:00 on second shift.
21        Q.  Do you know whether she worked any type
22   of reduced schedule?
23        A.  Not to my knowledge.
24        Q.  Do you know whether -- sorry.  Go ahead.
25        A.  I'm sorry.  I thought she was full-time
```



Page 83

```
 1   employment.
 2        Q.  Do you know whether Julissa worked
 3   reduced hours?
 4        A.  No, sir.  She was full-time employment
 5   as well.
 6        Q.  During your employment at Schneider, are
 7   you aware of any area planning managers who were
 8   hired for a part-time position?
 9        A.  I'm thinking.  Give me one second.  No,
10   sir, not to my knowledge at this time.
11        Q.  In your lawsuit against Schneider you're
12   alleging that you suffer from a disability; is
13   that correct?
14        A.  Yes, sir.
15        Q.  And what disability do you suffer from
16   or disabilities?
17        A.  Post-traumatic stress syndrome, major
18   depression and panic disorder.
19        Q.  And do these all stem from the assault
20   that you suffered in July of 2013?
21        A.  Yes, sir.  And also from my -- I had an
22   incident on the truck when I was in Canada when I
23   was a driver for Con-way.
24        Q.  And why don't you tell me about that.
25        When were you a driver for Con-way?
```



Page 84

```
 1        A.   From October 2013 -- I mean, it's -- I'm

 2   sorry.  October 2012 to May of 2013.  Yeah, May

 3   of 2013.  This was around probably October or

 4   November of 2012 when this incident happened.

 5        I was in Ontario, Canada on the 401 Highway

 6   headed northbound and I ran into a white out

 7   snowstorm, and that was my first time ever

 8   experiencing snow like that ever in my life.  I

 9   was experiencing where the tracks would cover

10   every time when, like, a car would pass the

11   tracks could cover real quick.  And there was no

12   truck stops at that time in sight.  I pulled over

13   at a safe stop where I can get my bearings

14   because I noticed, like, I could not find a

15   location for a safe haven that night within the

16   next 20 minutes or to an hour.

17        So I pulled over and at that time I still

18   could see the road.  I was good, and then after I

19   figured out -- I was like, man, I have another 50

20   miles before I see another truck stop.  I said,

21   okay, well, I'm just going to have to do what I

22   have to do because I can't be on the side of the

23   road, it's illegal to do that.  So I proceeded to

24   that next location and on my way to that

25   location, it got worse.  I could not call my
```



Page 85

1    dispatch at the time.  I messaged them, but

2    because I was in international territory my cell

3    phone would not allow me at that time to contact

4    Con-way.

5          I was able to reach my dad because I had

6    Verizon, and Verizon lets you talk to Verizon if

7    you're international.  So I reached out to my

8    parents and had my dad call my dispatcher and

9    that's how they was able to locate me to that --

10   to the next location safely.  On my way there on

11   that journey I was in a convoy of trucks and

12   three trucks started to, like, try to push me

13   along the way, you know, like hurry up, but I'm

14   trying to find my bearings on the road because at

15   this time cars were swerving in front of me

16   because they didn't even know where the road was

17   to the median or the side of the road.  So I

18   slowed down to be safe, and when I did such,

19   another truck came from two trucks behind me and

20   he floored it and he got in front of -- and he

21   came in front of me.

22         He hit my mirror and basically pushed me --

23   made me correct and pushed me off the road and I

24   went into the ditch with my truck and almost

25   flipped my truck and then I bounced back.  I



Page 86

1    don't know how that happened, but my truck

2    bounced back, and I gained my truck control.  I

3    stopped the truck once I gained control and I

4    literally had a meltdown with my dispatcher right

5    then and there with my parents on three-way.

6    They had to calm me down for, like, 45 minutes

7    before I even was able to touch the wheel.

8        And it's hard for me still to kind of drive

9    in inclement weather conditions now where I used

10   to be like, man, come on, let's go.  Now it's a

11   little difficult for me for that.  So even when

12   it was raining, even if I have to even drive to

13   work that was difficult, believe it or not.  And

14   I did not know that I would have that type of

15   experience, you know, but that's where that came

16   from.

17       Q.  Okay.  And this would have been before

18   the assault in July of 2013, correct?

19       A.  Correct.  Yes, sir.

20       Q.  Do you know when you were diagnosed with

21   PTSD?

22       A.  October of 2018.

23       Q.  And do you know when you were diagnosed

24   with major depression?

25       A.  I believe September or August of 2015.



Page 87

1    Yeah, I believe so.

2         Q.   Do you know who diagnosed you with major

3    depression in September of 2015?

4         A.   Dr. Maria Goyco.

5         Q.   And do you know who diagnosed you with

6    PTSD in October of 2018?

7         A.   Dr. Cassandra, C-a-s-s-a-n-d-r-a; Wanzo,

8    W-a-n-z-o.

9         Q.   Are you still seeing Dr. Goyco?

10        A.   No, sir, I'm not.

11        Q.   When did you stop seeing Dr. Goyco?

12        A.   I stopped seeing her, I believe, fall of

13   2016 and I switched physicians.

14        Q.   And who did you start seeing in the fall

15   of 2016?

16        A.   The fall of 2016 I went to -- I went to

17   her and she dropped United Healthcare and I went

18   to -- can you give me one second, please?

19        Q.   Sure.

20        A.   I believe I saw Dr. Goyco -- I'm sorry

21   -- to 2017 because she dropped United Healthcare

22   from her practice, and I could not use her no

23   longer.  And then I had just started going to

24   Dr. Etienne, which was my neurologist at that

25   time, and she had gotten my medication for my



Page 88

1   headaches calibrated properly, and I thought I

2   was good.  And when Dr. Goyco dropped me due to

3   the insurance situation I remember just being

4   like, okay, I have Dr. Etienne and I'll find me

5   another doctor.

6        So I didn't have a doctor for probably a

7   year, like a primary physician, but I had all my

8   specialty doctors still, like my ear, nose and

9   throat doctor, my OB, I still had my neurologist,

10  but I didn't have a primary at that time.

11        Q.  Okay.  So you stopped treating with

12  Dr. Goyco in fall of 2017?

13        A.  Yes.

14        Q.  Okay.

15        A.  But not on my own -- my own personal

16  ability.  She stopped taking United Healthcare.

17        Q.  Understood.  And do you know when you

18  were diagnosed with panic disorder?

19        A.  Dr. Wanzo diagnosed me with that as well

20  in October.

21        Q.  And with respect to the PTSD, what are

22  the -- what are your triggers for the

23  post-traumatic stress disorder?

24        A.  So one of my triggers is in -- if I'm in

25  close quarters with males or men I get very



Page 89

```
 1   defensive and very -- how can I put it?  I'll be
 2   in like a -- not fight mode, but I'll be very on
 3   edge, like very defensive, really just in a
 4   secured mode in my mind.  So anytime I was in
 5   close contact with men in a very close setting.
 6        And then also if it rained or had really bad
 7   inclement weather, I couldn't drive my car, or I
 8   just have to pull over or take my time getting to
 9   my destinations and -- or I'll have to let the
10   rain settle and then I can get in my car.  If
11   not, I have a full-out panic attack or I freak
12   out, and then my mood is set for that time and I
13   don't know why I'm in that mood at that
14   particular time.
15        Another one of my triggers, believe it or
16   not, is a certain smell.  It's a smell -- if I
17   smell diesel, like -- truck drivers, we have a
18   distinct smell sometimes when we're at diesel
19   pumps and that smell sometimes can make me snap
20   because of that gentleman.  I remember his smell
21   and he was very distinct with diesel on him.
22        Q.  Any other triggers?
23        A.  I'm sorry.  I'm just taking my time
24   here.  I'm so sorry.
25        Q.  It's fine.
```



 1        A.   Feeling that rush, rush, rush feeling.
 2   Not that high -- like high-stress environment to
 3   me is like, you know, you have fire under your
 4   butt and you're moving, but you have a goal, you
 5   know, you're pushing towards something, but --
 6   how can I put this?  When I feel as though it's
 7   not a goal, but you're just putting pressure for
 8   no reason, like when I was in that situation with
 9   that gentleman, that's how it feels, like I'm
10   under -- like I'm fighting for my life in that
11   sense.  Like that high pressure like I'm fighting
12   for something.
13        Even though I might not be in that type of
14   environment, that energy I feel sets me off.  So
15   like when I was by myself working by myself on
16   those nights where I had to cover basically the
17   region by myself, and then drivers start coming
18   in and they're talking to me, I start triggering
19   because I didn't -- I did not know but I would
20   start triggering.  My mood was changed, and I
21   would just what you want?  And be talking all
22   mean and not knowing why, but it was because it
23   was a defense mechanism from my trauma with that
24   gentlemen.
25        Q.  So when you were saying the drivers



Page 91

1   would start talking to you, that's when you

2   worked at Schneider; is that what you're

3   referring to?

4       A.  Yes, sir.

5       Q.  Okay.  So when you would work at

6   Schneider and you would be the only area planning

7   manager at the office at the time and drivers

8   would come in and start talking to you, it could

9   trigger your PTSD?

10      A.  Yes, sir.

11      Q.  And would it be accurate to say that

12  these triggers or the PTSD started before you

13  started employment at Schneider?

14      A.  Yes, sir.

15      Q.  And do these conditions that you've

16  described, the PTSD, major depression and panic

17  disorder, do they impact your daily life

18  activities?

19      A.  Yes.

20      Q.  And how so?

21      A.  Depending on the day -- some days even

22  when it rains, I can't get out of my bed now.

23  We've been working on that one for a while, me

24  and my doctor -- me and Dr. Wanzo.  And then also

25  I learned that working as a -- I can work by



Page 92

1   myself, but then I'll feel better when I'm

2   working with a team or like collective group to

3   help with the security -- to make me feel secure.

4   That helps me out as well.

5       Did I answer your question?  I'm so sorry.

6       Q.  Yeah, yeah, and let me just follow up on

7   some of this.

8       So you said that you have difficulty getting

9   out of bed when it rains.  Are there -- are there

10  any activities that you can't perform because of

11  your medical conditions?

12      A.  No.  I actually could perform -- I was

13  doing quite well when I was working.  It's just

14  when I have those triggers in those instances,

15  that would throw me off.

16      Q.  Okay.  And when you would have these

17  triggers, what activities could you not perform?

18      A.  Communicating effectively to others.  I

19  couldn't do that, and I could not focus on my

20  work at hand.  Especially if I started getting

21  overwhelmed with, like, phone calls.  I could not

22  focus on my task at hand most of the time because

23  then I felt like that overwhelming, like losing

24  control kind of feeling.  And that's only if I

25  was working by myself, not if I had Audrianne,



Page 93

1    Desmond, Ms. Elaine or somebody else was there.
2    Even Travis when he would come in on certain
3    nights.  When I had them there, I felt more
4    secure.
5           Can I also add something?
6           Q.  Yes.
7           A.  The reason why also I want to add this
8    was I also experienced while I was there working
9    by myself at this time -- this is before they
10   installed a fence on the property because I had
11   to beg them to get some type of security.  We
12   used to have drivers that were not Schneider
13   employees just walk off the street, walk through
14   our locked doors and I'll be by myself, and I did
15   not know who these men were coming into the --
16   onto the property and into our building.  When I
17   addressed that with my management team, they took
18   it, but they didn't take it as serious and I was
19   literally frightened at time.
20          Q.  And when was that?
21          A.  That was the year of 2017.  I remember
22   that entire year I was asking them to get a
23   security guard.  The only time they got a
24   security guard is when Ms. Stephanie and I
25   believe Stephanie and Marianne's life was



Page 94

1    threatened by a driver that year.

2        So Ms. Stephanie is the driver's business

3    leader and that's when they started to beef up

4    security and they hired a temporary yard guard

5    person for, like, two or three months maybe.  And

6    then from that point, they started construction

7    of their electronic gate, and that was completed

8    by early 2019.  And the gate didn't work for the

9    first month and a half, so because we had the --

10   when I was there, I think we had three car

11   break-ins where people just walk up to the

12   property off the street.  So I remember just

13   stressing to them how that made me feel and how

14   uneasy I felt.

15       Q.  And when did Schneider hire a security

16   guard?  You said that was in 2017?

17       A.  Yes, sir.  I believe it was late 2017,

18   but I remember that year specifically because we

19   had a couple of car break-ins, and then we had a

20   driver that threatened Ms. Stephanie and

21   Marianne's life because Marianne called the

22   driver while he was on the road and fired him.

23       Q.  And in addition to the security guard,

24   Schneider ultimately implemented an electronic

25   fence; is that right?



Page 95

 1        A.  Yes, sir.

 2        Q.  And that was completed in the beginning

 3   of 2019?

 4        A.  Yes, sir.

 5        Q.  Okay.  Any other activities -- daily

 6   life activities that you can't perform because of

 7   your medical conditions, other than what you've

 8   testified to?

 9        A.  No, sir.  I could do everything else to

10   the best of my ability.

11        Q.  And when you -- when you said you can't

12   communicate, what do you -- specifically what do

13   you mean by that?

14        A.  I get frustrated, and I would not be

15   able to, like, formulate my sentences properly

16   and mainly anger would come out.  So I'm not

17   focused on, like, what needs -- the problem at

18   hand.  I'm focused on what just made me upset.

19   And so I would, like, focus on that point and I'd

20   be yelling, screaming, and mad, like a temper

21   tantrum.

22        Q.  Okay.

23        A.  But other than that, I was able to still

24   do my day-to-day tasks, everything.

25        Q.  So when you -- when you said you can't



Page 96

```
 1   communicate, just so that I'm clear, were you --

 2   were you able -- were you able to do your daily

 3   tasks --

 4        A.  Yes, sir.

 5        Q.  -- or were you --

 6        A.  I'm sorry.  My apologies.

 7        Q.  That's okay.  So the record is clear,

 8   you were able to perform your daily life

 9   activities with your medical conditions?

10        A.  Yes, sir.

11           MR. MILIANTI:  All right.  Why don't we

12   go ahead and see if this is a good stopping

13   point.

14    (Break taken from 12:50 p.m. to 1:36 p.m.)

15   BY MR. MILIANTI:

16        Q.  All right.  Can you turn to -- we're

17   going to skip a couple of pages, about ten or so

18   pages, in the documents that I sent over this

19   morning.  If you could look for Schneider 00433,

20   it's a one-page family medical leave request.

21        A.  Okay.  Yes.  I see that.

22        Q.  All right.  We'll mark this as

23   Plaintiff's Exhibit number 8.  Do you recognize

24   this document?

25           (Plaintiff's Exhibit 8 was
```



1          marked and identified.)

2      A.  Yes, sir.

3      Q.  And this is the family medical leave

4  request form that you submitted to Schneider; is

5  that right?

6      A.  That's correct.

7      Q.  And is that your signature at the bottom

8  of the page?

9      A.  Yes, sir.

10     Q.  And you dated the document 10/15/18; is

11  that correct?

12     A.  Yes, sir.

13     Q.  And is this -- the handwritten portion

14  of this document, is that your handwriting?

15     A.  Yes, sir.

16     Q.  Okay.  And you indicated under the

17  employment data your date of hire was July 14,

18  2014; is that right?

19     A.  Yes, sir.

20     Q.  And that you worked 11 hours per day, 44

21  hours a week; is that an accurate statement?

22     A.  Yes, sir.

23     Q.  And you were requesting leave beginning

24  on October 11, 2018; is that right?

25     A.  Yes.



Page 98

```
 1          Q.  And you indicated that at least as of
 2   October 15, 2018, you did not know the end date
 3   of your leave, right?
 4          A.  Yes, sir.
 5          Q.  And the reason for the FMLA leave you
 6   indicated is for your own serious health
 7   condition; is that correct?
 8          A.  Yes, sir.
 9          Q.  And you also indicated -- I'm sorry.
10          Under the employment date you circled the
11   days that you normally work, and you circled
12   Sunday, Wednesday, Thursday, Friday, right?
13          A.  Correct.
14          Q.  Okay.  And what was your serious health
15   condition at this time?  Why were you -- why were
16   you seeking leave?
17          A.  I tried to commit suicide.
18          Q.  When did you try to commit suicide?
19          A.  The last week of September of that year.
20   I believe it was, like, on the 27th or 26th.
21          Q.  Of 2018?
22          A.  Yes, sir.
23          Q.  And why did you try to commit suicide?
24          A.  I just -- I didn't feel like I belonged
25   anymore.  Like I felt like no one listened to me.
```



Page 99

1    I was very frustrated with my own personal

2    demons, and then also just frustrated with my

3    work environment as well, because I was just

4    trying to communicate with them to just helped me

5    out.  And I just remember everything just came to

6    a head at that particular time of year for me

7    where it felt -- I was uneasy and uncomfortable

8    at home and uneasy and uncomfortable at work and

9    I didn't feel like I belonged anymore.

10        Q.  And you mentioned that you were

11   frustrated with your own personal dealings; is

12   that right?

13        A.  Yes.

14        Q.  And what did you mean by that?

15        A.  Meaning, like, I was trying to figure

16   out why was I so upset internally, and it felt

17   like I could not communicate with others or how

18   to express myself effectively and no one could

19   understand what was going on in my mind at that

20   particular time.

21        Q.  And you mentioned you were frustrated

22   with your work environment?

23        A.  Yes, sir.

24        Q.  And what was the frustration about your

25   work environment?



Page 100

```
 1         A.   Where I was literally just trying to
 2    communicate with my management team to assist me,
 3    like I needed an extra teammate there with me at
 4    night.  I didn't mind doing the work.  I just
 5    couldn't handle the workload of usually two or
 6    three people for one person by myself at night.
 7    And I just expressed that to them several times,
 8    several years, and then it just came to a head at
 9    that point.
10         Q.  It sounds like there was -- you believe
11    there was too much work and not enough people to
12    do the work?
13         A.   Correct.  Not more so too much work.
14    Can I correct that?
15         Q.  (Shakes head up and down.)
16         A.   I believe fair is fair, and where first
17    shift would have four area planning managers to
18    five, second shift would have two to three.  They
19    gave us one to two on third shift, but then they
20    also had supporting attributes on those other
21    shifts, such as IOS or a temp agent that come in
22    and actually answered the phone calls and helped
23    them with their messages.
24         Where on third if it's two of you guys,
25    you're doing the workload of that whole shift,
```



1    whether it's messages, phone calls and

2    dispatching the drivers and dealing with the

3    driver issues and dealing with the one-on-one

4    basis with the drivers.  Where the other

5    instances the other shifts had an actual team of

6    three or more people at a time.

7         Q.  And I believe you testified that you had

8    asked for assistance to deal with the workload

9    for several years?

10        A.  Yes, sir.

11        Q.  Okay.  And how would you -- how would

12   this typically come up?  How would you ask for

13   the assistance?  What would you say?

14        A.  I would bring it up to Doug Horton or

15   Travis or even Marianne, hey, on this night we're

16   a little heavier on phone calls, or on this

17   particular night we're a little heavier with

18   dispatch and we need more drivers to be available

19   on this day.  I made sure I communicated that

20   with my management team.

21        I even volunteered -- and me and Audrianne

22   Williams developed a schedule to help overlap the

23   shifts to help each shift where if someone is out

24   there's always someone there to help cover it.  I

25   presented it to Marianne, and she sent it up to,



Page 102

1    I believe, the district manager to approve it and

2    they kept the schedule as such.

3         Q.  Did you ever contact human resources to

4    advise them that you needed -- that you were --

5    give me one second.

6         A.  Uh-huh.  (Affirmative).

7         Q.  Do you believe there was too much work?

8         A.  No, sir.  Because I thought it could be

9    resolved in the office.

10        Q.  And do you recall -- you said you had

11   asked for this for a couple of years.  Do you

12   recall the first time you would have asked for --

13   or raised with management that there was too much

14   work?

15        A.  It had to be in 20 -- I believe 2018

16   when we saw a sufficient like -- we did a

17   decrease in 2016 when we split the markets from

18   north to south with the regions, so there was a

19   decrease in workload as far as that, but then the

20   responsibility -- they wanted us to have a little

21   bit more responsibility, so that was around 20 --

22   late 2017 or early 2018.  And all I was asking

23   them -- it wasn't for the work because the work I

24   could do.  It was the fact that, hey, I'm a

25   female by myself at night.  I need some type of



Page 103

1   security and I prefer to have an extra teammate

2   there and it would help with the process of

3   working in a safe environment.  That's what I was

4   just asking for that whole time.

5        It wasn't even about the workload.  It was

6   actually about me having someone there with me,

7   like, all of the other two shifts did.  I just

8   wanted it to be, hey, so I can feel a little

9   secure and I could focus on my job and do my job

10  efficiently.

11       Q.  You wanted another teammate working

12  alongside with you whenever you worked?

13       A.  On the shift, correct.  And I wasn't the

14  only one that did solo shifts on that particular

15  shift as well.

16       Q.  At the time that you -- strike that.

17       Prior to the time that you submitted your

18  FMLA leave request, did you advise anyone at

19  Schneider about any of your medical conditions?

20       A.  No, sir.  Prior to that I was just

21  trying to figure out what was going on with me.

22  I was going to doctors trying to figure out what

23  was going on with my -- with my headaches at the

24  time and my panic attacks and stuff like that.

25  That's when I was going to Dr. Etienne, I



Page 104

```
 1    believe.
 2         Q.  Okay.  But as of October 15, 2018, you
 3    didn't tell anybody at Schneider that you
 4    suffered from PTSD, major depression, panic
 5    disorder, anything --
 6         A.  I didn't know -- I didn't know at that
 7    time because I got my diagnosis in that same
 8    month.
 9         Q.  But you didn't mention any type of
10    medical condition to anyone at Schneider prior to
11    October 15, 2018; is that correct?
12         A.  Correct.  Other than my bilateral carpal
13    tunnel that I had to go out of work for.  They
14    know about that.
15         Q.  Okay.  But other than your carpal
16    tunnel, you didn't mention any of your medical
17    conditions prior to October 15, 2018; is that
18    right?
19         A.  That's correct.
20         Q.  And so in 2017 and 2018 when you would
21    tell Schneider management that there was too much
22    work and not enough people, you didn't mention or
23    indicate to -- to anyone that you were suffering
24    from some type of a medical condition and were
25    requesting some type of an accommodation; would
```



 1    that be accurate?

 2        A.   That would be accurate, because I wasn't

 3    diagnosed at that time.   However, I did speak

 4    with Marianne and Doug Horton on several

 5    occasions, and I pulled them to the side as my

 6    managers and if I had a stressful night or that

 7    night was -- it just didn't go right or something

 8    happened, I'd tell them.   I'd debrief them and

 9    let them know, hey, I think we need more people

10    on this side of the team.   That's all I would

11    suggest.   Or hey, you think we could switch this

12    person to over here to help out?   And that's all

13    I was suggesting.

14        It's not the workload per se.   It's really

15    about security because not even myself have

16    mentioned this multiple times to them.   Audrianne

17    Williams mentioned it.   Quincy Parker mentioned

18    it to them.   Desmond Seymour mentioned it to

19    them.   Ryan Wheeler mentioned it to them.

20        Who else?   Sarah Kopf mentioned it to them,

21    and Sarah was hired later in 2018, so that's

22    after this moment.   But those others, they were

23    there.   And we actually had a meeting with our

24    district manager, and we brought it to his

25    attention during a breakfast morning meeting.



Page 106

1   And we was like, hey, we was just wondering could

2   we get an extra teammate.  We just put it out

3   there because it was a casual breakfast meeting.

4        Q.  Okay.  But at no point in time prior to

5   you submitting your FMLA form on October 15, 2018

6   did you go to anyone at Schneider management and

7   say, I need a specific accommodation because of a

8   medical condition that you were -- you were

9   experiencing; is that correct?

10       A.  That's correct.

11       Q.  All right.  If we can go to the next

12  document, and this one is labeled CG-0073 through

13  0076.

14       A.  Oh, there it is.  I was like, okay.

15  Okay.  My apologies.

16       Q.  Do you have that --

17       A.  Yes, sir.

18       Q.  -- in front of you?

19       A.  Yes, sir.

20       Q.  All right.  Let's mark -- let's mark

21  this as Plaintiff's Deposition Exhibit number 9.

22  And this appears to be a fax that Dr. Cassandra

23  Wanzo sent to the Hartford October 22, 2018; is

24  that correct?

25            (Plaintiff's Exhibit 9 was



Page 107

```
 1              marked and identified.)

 2      A.  Yes, sir.

 3      Q.  Okay.  And this is a document that you

 4 produced in discovery; is that right?

 5      A.  Yes, sir.

 6      Q.  And Dr. Cassandra Wanzo you testified

 7 earlier she was one of your treaters?

 8      A.  Yes, sir.

 9      Q.  And you started treating with her in

10 October of 2018?

11      A.  Yes, sir.

12      Q.  And is she a psychiatrist?

13      A.  Yes, sir.

14      Q.  And were you referred to her?

15      A.  Yes, sir.

16      Q.  By whom?

17      A.  One of my friends, they actually do

18 counseling, and I was looking for a counselor and

19 I was like, hey, do you know of a psychiatrist?

20 And they was like, yeah, I have one.  Here's her

21 name.

22      Q.  Okay.

23      A.  And then come to find out one of my

24 relatives used her in the past.

25      Q.  All right.  And if you turn to the next
```



1    page, do you -- first of all, do you know why

2    Dr. Wanzo was filling out this document for the

3    Hartford?

4         A.  Yes.  Because they requested her to do

5    that.  The Hartford had documents for myself, and

6    then they had documents from her.  They needed

7    the documents directly from the doctor.

8         Q.  Was this for -- were you were applying

9    for short-term disability?

10        A.  Correct.

11        Q.  As a result of your suicide attempt and

12   medical conditions?

13        A.  Yes, sir.  Due to that's the procedure

14   -- once you go out on FMLA with Schneider, that's

15   the next step.  You do your -- fill in your

16   paperwork, you send in your request, and then it

17   goes from there.

18        Q.  Okay.  And do you recall whether or not

19   Dr. Wanzo filled this form out in your presence?

20        A.  I do not recall.  I just know that she

21   was writing notes while she was talking to me.

22        Q.  Okay.

23        A.  And then I -- I don't know about the

24   other stuff.

25        Q.  All right.  If you look on the second



Page 109

1    page near the top -- first of all, do you know

2    whose handwriting this is on this -- on this

3    document?

4         A.   That's Dr. Wanzo.

5         Q.   All right.  And the question is, is the

6    condition related to environmental and/or

7    interpersonal issues in his or her workplace, and

8    Dr. Wanzo checked yes.  And then it says, if yes

9    explain.  And she wrote, lack of staffing, verbal

10   abusive driver.  Do you see that?

11        A.   Yes.

12        Q.   And is that what you told Dr. Wanzo?

13        A.   Yes.

14        Q.   What did you mean when you told her lack

15   of staffing?

16        A.   That I --

17        Q.   What we just discussed?

18        A.   Yes.

19        Q.   And as of -- it looks like based on her

20   notes the examination date was October 6, 2018.

21   Do you see that in the middle of the document?

22        A.   Yes, sir.

23        Q.   Okay.  And so as of October 6, 2018 you

24   were advising Dr. Wanzo that you believe there

25   was a lack of staffing at Schneider in your role?



Page 110

```
 1        A.  Correct.

 2        Q.  And did you believe it was more

 3   difficult for you to perform your job if one of

 4   your area planning managers was absent?

 5        A.  Correct.  Yes.

 6        Q.  And you go on to say, verbally abusive

 7   driver.  Do you see that?

 8        A.  Yes.

 9        Q.  What is that in reference to; do you

10   know?

11        A.  Yes.  The driver's attitudes.  When

12   you're dealing with drivers, they don't talk like

13   corporate people.  They are -- they're very

14   upfront and they come off very strong.  So it got

15   to a point where it felt like I was in a

16   defensive mode when I speak to my drivers because

17   some of them did not take very kindly to a woman

18   telling them what to do as their dispatcher.  So

19   I had to deal with those types of men that type

20   of -- in that type of environment by myself at

21   night.

22        Q.  And how were they -- how were the

23   drivers verbally abusive?  Can you give me some

24   examples of what they would say?

25        A.  Okay.  So for example, I might have a
```



Page 111

1    driver come in, I told you to get this load done,

2    and I had talked to Travis two hours ago and he's

3    supposed to -- well, I'm sorry, this is third

4    shift, okay?  I don't see no notes about what

5    they said for you to do on second or first shift.

6    I'm just starting my shift.  And that's how I

7    usually will lead into it.

8        Sometimes it's lack of communication from

9    prior shift leaders not leaving e-mails or notes

10   about their drivers.  So then it causes conflict

11   when the drivers come into the office and it's a

12   whole new team or shift, and mine in particular

13   where we don't have no management at night, no

14   type of support from Green Bay at night, but from

15   the rail team until 2:00 a.m.  So when a driver

16   comes into really bad problems, all we can do is

17   consult, try to resolve to the best of our

18   abilities, and try to resolve and deescalate the

19   situation.

20        And some drivers -- I have to put it to you

21   like this.  We deal with drivers from past

22   veterans, from military active duty to not active

23   duty.  I had a driver that for Fourth of July,

24   because of the fireworks, abandoned a truck, came

25   in there and cussed us out because of his PTSD he



Page 112

```
 1   was dealing with.  He abandoned the truck and
 2   came in there and cussed us out and told us why
 3   we put him on a load even though he knew he was
 4   scheduled he came into work and everything.
 5        And I understood where he was coming from,
 6   and I made sure -- like I tried to calm him down
 7   and deescalate, but also that's me as an employee
 8   taking on that person's stress, and I still have
 9   to deal with my job and function at full capacity
10   and sometimes by myself.  That's a lot.  And all
11   I asked my managers was to, hey -- to help out
12   with those types of situations, just have an
13   extra person here to help with situations where
14   especially a female should not be by herself at
15   night, and where we're located is on a side road,
16   so we had a lot of people, like I stated prior to
17   this, walk in my office that was not Schneider
18   employees.  So those people would come off the --
19   off the streets and, hey, you got to a bathroom
20   or, hey, where is this at?  And they were not
21   nice sometimes when they walk in my building.
22        Q.  Did you report any of these drivers to
23   human resources?
24        A.  No.  I reported them to my managers and
25   their managers because they have their managers
```



1   first, and then you have to report to -- I go

2   through the chain of command.  I never went

3   around nobody to just -- I literally tried to

4   communicate -- if I had problems with a driver, I

5   talked to his manager first, then I would

6   escalate it up to Travis.  Travis, okay, now

7   Sarah or Quincy is not dealing with that driver,

8   Joe is not dealing with that driver let's --

9   okay, let's sit down and do a one-on-one, and if

10  Travis can't handle it, let's take it up to Doug.

11  If Doug can't handle it, let's bring in Marianne.

12  That's what I would do.

13       Q.  When you would raise these concerns to

14  your management, did they address them with the

15  drivers?

16       A.  Yes, they did.  And usually me and the

17  drivers after they talked to their manager they

18  come back and we talk about it and then we go on

19  about our business.  But then we have to -- I

20  have to let them know, hey, you came at me wrong

21  and I'm sorry if I came at you in a defensive

22  mode.

23       Q.  If you turn to the next page Dr. Wanzo

24  indicates that the expected duration of your

25  impairment would be six to eight weeks; do you



Page 114

1     see that?

2          A.   Yes, sir.

3          Q.   And did you agree with her assessment?

4          A.   To the best of my ability.

5          Q.   And it listed -- she listed the

6     tentative return to work date of November 27,

7     2018; is that right?

8          A.   Yes, sir.

9          Q.   Was that your understanding?

10         A.   Yes, sir.  That was my understanding at

11    that time.

12         Q.   Okay.  And it asks, if appropriate,

13    provide examples of accommodations that would

14    allow your patient to return to work.  And it

15    looks like Dr. Wanzo wrote increased staffing to

16    meet the current demands; do you see that?

17         A.   Yes, sir.

18         Q.   And do you agree with that statement?

19         A.   I didn't agree with it, but I do agree

20    that that is what I wanted, correct.

21         Q.   Dr. Wanzo also indicates in this

22    statement -- provider statement that you were

23    having suicidal ideations.  When did you start

24    having suicidal ideations?

25         A.   Around July of 2018, but I didn't tell



Page 115

1    nobody because I didn't think it was, like,

2    something I wanted to really tell anybody because

3    I didn't think nobody cared.

4         Q.  If you could go to the next document.

5    It's Schneider 00425 through 429.

6         A.  Yes, sir.  Uh-huh.  (Affirmative).

7         Q.  We'll mark this as Plaintiff's

8    Exhibit 10.  And this appears to be a fax that

9    Dr. Wanzo sent to Schneider's HR leave

10   administration team on October 22, 2018; is that

11   right?

12        (Plaintiff's Exhibit 10 was

13             marked and identified.)

14        A.  Yes, sir.

15        Q.  And have you seen this document before?

16        A.  Yes, sir.  Because I had to take it to

17   her and then she had to -- she sent me a copy.

18        Q.  Okay.  And did you discuss this document

19   with Dr. Wanzo as she was completing it?

20        A.  No, sir.  I dropped it off to her

21   office.

22        Q.  Did she ask you to review it before she

23   submitted it?

24        A.  No, sir.

25        Q.  And if you look on the second page it


MAGNA ▶
LEGAL SERVICES

Page 116

```
 1    says for medical facts, approximate date the

 2    condition commenced, and she listed September 30,

 3    2018; do you see that?

 4         A.  Yes, sir.

 5         Q.  And she lists the probable duration of

 6    your condition as six to eight weeks; is that

 7    right?

 8         A.  Yes.

 9         Q.  Okay.  And if you turn to the last page

10    of this document --

11         A.  Yes, sir.

12         Q.  -- is that your handwriting on this last

13    page?

14         A.  No.

15         Q.  That's not your handwriting?

16         A.  No, sir.

17         Q.  Okay.  Do you know whose handwriting

18    that is?

19         A.  Dr. Wanzo.

20         Q.  Okay.  All right.  So was it your

21    understanding that based on this document

22    Dr. Wanzo was seeking -- or providing medical

23    documentation in support of your FMLA leave for a

24    period of six to eight weeks?

25         A.  Yes, sir.  That was the purpose of the
```



Page 117

1    document.

2        Q.  Okay.  Did you -- at this time, October

3    22, 2018, did you discuss your medical condition

4    with anyone at Schneider?

5        A.  At that time, I was already out of the

6    office.  I think it was October 1st or 2nd I

7    talked to Doug.  I went to work, and this is,

8    like, a week after I tried to commit suicide and

9    that's after I got in contact with Dr. Wanzo and

10   everything and that's when she saw me and she

11   wrote a letter, which I have provided, I believe,

12   and she told me -- she was like, no, I need you

13   to -- you can't go in right now.  I need to work

14   on you.

15       And I went to work, and then the next day --

16   it was Sunday, because Monday morning Doug came

17   in and I talked to Doug.  I pulled him in the

18   room -- the one-on-one room, and I spoke to Doug

19   about what was going on with me and how I tried

20   to commit suicide the week before.  He confided

21   in me.  He understood where I was coming from

22   because his nephew just went through that

23   process.

24       And he said I could go ahead and -- I gave

25   him a letter from my doctor and he said, go ahead



Page 118

```
 1   and take whatever you need.  And he said,
 2   whenever you need anything, you let me know.  I'm
 3   going to let Travis and Marianne know, send them
 4   an e-mail and I'm going send this over to HR.
 5   That's what happened.  So Doug Horton was the
 6   first person at Schneider to know.
 7        Q.  And you believe that was the first week
 8   of October?
 9        A.  Yes, sir.
10        Q.  And Doug told you that he was going to
11   contact HR on your behalf?
12        A.  Yes, sir.
13        Q.  Okay.  And then did HR reach out to you?
14        A.  Yes, sir.  They actually checked on me
15   and made sure I was doing okay because of the
16   fact they wanted to make sure my wellbeing
17   mentally was okay or was I going to a doctor and
18   everything.  And I was telling them I was seeing
19   Dr. Wanzo at that time.
20        Q.  And did they -- did HR provide you with
21   the FMLA paperwork to complete?
22        A.  Yes, sir.  That's how come the dates are
23   so far down in October because we were waiting on
24   the documents to come through from HR.
25        Q.  Okay.  Other than speaking with
```



Page 119

1   Mr. Horton, did you speak with anyone else at

2   Schneider about your medical condition?

3        A.  The only other person during that time

4   when I first went out I confided in Sarah Kopf,

5   and she started to come by and check on me.  I

6   think in the month of, like, November checked on

7   me and try to get me -- you know, get out of the

8   house and try to make me talk and be around

9   people.  So she was trying to just be a friend,

10  be there for me.

11       Q.  Other than Doug Horton, did you speak

12  with any management-level Schneider employees

13  about your medical condition?

14       A.  No, because I took Doug's word and then

15  -- about him taking everything up to HR.  But I

16  do remember Travis reaching out to me and just

17  saying, you know, how you doing, and checking on

18  me in that sense on my wellbeing.

19       Q.  And when did -- to the best you can

20  recall, when did Travis reach out to you?

21       A.  I think later on in that month, but I

22  can't give you a specific date.

23       Q.  Later in the month of October?

24       A.  Yes, sir.

25       Q.  Of 2018?



Page 120

```
 1        A.  Yes, sir.  My apologies about that.

 2        Q.  And as best you can recall, what -- what

 3   did Travis say to you and what did you say to

 4   him?

 5        A.  I told him that I -- I was suicidal a

 6   few weeks back and I was trying to get myself

 7   back and I just need their prayers and support.

 8   And he was like, no matter what C we got you.

 9   That's all I remember.  Because anytime I was out

10   sick they was always in my corner, so I thought

11   they was in my corner.

12        Q.  And anything else that you can recall

13   about your conversation with Travis in October of

14   2018?

15        A.  No, sir, not at this time.  If I do, I

16   definitely will advise my counsel.

17        Q.  All right.  Let's go to the next

18   exhibit, and it's Schneider 0418 through 0421.

19        A.  Yes, sir.

20        Q.  We'll mark this as Plaintiff's

21   Deposition Exhibit number 11.  Do you recognize

22   this document?

23            (Plaintiff's Exhibit 11 was

24              marked and identified.)

25        A.  Yes.
```



Page 121

```
 1        Q.  Okay.  And you received this document
 2   from Schneider on or about October 26, 2018; is
 3   that right?
 4        A.  Yes, sir.
 5        Q.  And is that your address top left?
 6        A.  Yes, sir.
 7        Q.  Okay.  And in this document, Schneider
 8   is letting you know that your request for FMLA
 9   leave had been approved; is that right?
10        A.  Yes, sir.
11        Q.  And it indicates near -- kind of near
12   the bottom in that bullet that you have been
13   granted seven weeks and one day beginning October
14   9, 2018 and ending on October -- I'm sorry --
15   November 27, 2018; is that right?
16        A.  Yes, sir.
17        Q.  Okay.  And was your first day out, did
18   it start on October 9, 2018?
19        A.  Yes, sir.
20        Q.  And after you -- was it your
21   understanding after you received this letter that
22   Schneider had granted your request for FMLA leave
23   beginning on October 9, 2018 through November 27,
24   2018?
25        A.  Yes, sir.
```



Page 122

```
 1          Q.  All right.  Now you didn't return to
 2     work on November 27, 2018; is that right?
 3          A.  That's correct.
 4          Q.  Okay.  Let's go to the next document.
 5     It's Bates-stamped CG-031 through 033.
 6             (Plaintiff's Exhibit 12 was
 7                marked and identified.)
 8          A.  Yes, sir.
 9          Q.  And this appears to be another medical
10     note that Dr. Wanzo sent to the Hartford via fax
11     on November 17th of 2018; is that correct?
12          A.  Yes, sir.
13          Q.  Okay.  And this is a document that you
14     produced in discovery; is that right?
15          A.  Yes, sir.
16          Q.  And have you seen this document before?
17          A.  Yes, sir.
18          Q.  Okay.  Do you recall whether or not you
19     went over this document with Dr. Wanzo during one
20     of your visits?
21          A.  This one in particular, yes.
22          Q.  You do remember going over it with
23     Dr. Wanzo?
24          A.  I remember giving her the paperwork and
25     I saw her start writing on it, but not going
```



Page 123

 1    verbatim.  She did go over my migraines.  I do
 2    remember us having a discussion about my
 3    migraines, how I was feeling.  I guess you --
 4    because I don't look over at the doctor when they
 5    be, you know, filling out their stuff, so I just
 6    sit there.  But I did give her that paperwork, so
 7    I think she just started working on that then.
 8         Q.  Okay.  If you could turn to the third
 9    page of this document.
10         A.  Yes, sir.
11         Q.  Do you see where it says functionality
12    at the top?
13         A.  Yes, sir.
14         Q.  And it asks what activities are impaired
15    and how, and Dr. Wanzo wrote, unable to perform
16    any duties, another four to six weeks; do you see
17    that?
18         A.  Yes, sir.
19         Q.  Okay.  And she listed your target date
20    for your return to work is January 2, 2019; is
21    that right?
22         A.  Yes, sir.
23         Q.  And did you recall having a discussion
24    with Dr. Wanzo about your target return date
25    being extended to January 2, 2019?



Page 124

1        A.  She was going over -- yes, I do recall

2    that we were going over my progress with my

3    treatment and how I was doing and dealing with my

4    emotions and my triggers at that time.

5        Q.  Okay.  And did you discuss the

6    January 2, 2019 return to work date with

7    Dr. Wanzo?

8        A.  Yes.  She asked me was I comfortable

9    with returning.

10        Q.  And did you -- and you agreed with her?

11        A.  Yes, sir.

12        Q.  All right.  And she indicates here under

13    the section that says, provide examples of

14    accommodations that would allow your patient to

15    return to work she wrote, return to work at three

16    days per week for four weeks, then four days per

17    week work schedule.  Did I read that correctly?

18        A.  Yes, sir.

19        Q.  Okay.  And did you discuss that with

20    Dr. Wanzo?

21        A.  Yes, sir.

22        Q.  And -- and that was the treatment plan

23    that the two of you discussed and agreed upon at

24    that time?

25        A.  Yes, sir.  To return, correct.



Page 125

```
 1        Q.  All right.  If we can go to the next
 2   one, please.  This is Bates-stamped Schneider
 3   0413.  It's a one-page document.
 4           (Plaintiff's Exhibit 13 was
 5             marked and identified.)
 6        A.  Yes, sir.
 7        Q.  And if you look kind of in the middle
 8   it's dated November 28, 2018; do you see that?
 9        A.  Yes, sir.
10        Q.  And this document is addressed to you;
11   is that right?
12        A.  Yes, sir.
13        Q.  And did you receive this document on or
14   about November 28, 2018?
15        A.  Yes, sir.
16        Q.  And in this document, Schneider states
17   that your federal FMLA now has a new ending date
18   of December 31, 2018; do you see that?
19        A.  Yes, sir.
20        Q.  And as of that date, your 12 weeks of
21   available federal FMLA will have expired; is that
22   right?
23        A.  Yes, sir.
24        Q.  Okay.  So did you understand this
25   document as Schneider granting you an extension
```



Page 126

```
 1    of your FMLA leave through December 31, 2018?

 2         A.  Yes, sir.

 3         Q.  And that your FMLA would be exhausted as

 4    of December 31, 2018?

 5         A.  Yes, sir.

 6         Q.  Okay.  And did you return to work on or

 7    about January 2nd?

 8         A.  I returned on January 2nd.

 9         Q.  Okay.  All right.  And we can go to the

10    next document.  We'll mark this as Plaintiff's

11    Exhibit 14, and it's Bates Schneider 0410.

12         (Plaintiff's Exhibit 14 was

13              marked and identified.)

14         A.  Yes, sir.

15         Q.  All right.  And do you recognize this

16    document?

17         A.  Yes, sir.  It's my return-to-work form.

18         Q.  Okay.  And it looks like this was

19    completed by Dr. Wanzo?

20         A.  Yes, sir.

21         Q.  If you look at the bottom, it's dated

22    December 15, 2018; is that right?

23         A.  Which date?  I'm sorry.

24         Q.  It looks like December 15, 2018.

25         A.  Yes.
```



Page 127

1          Q.   Do you see that at the bottom?

2          A.   Yes.

3          Q.   All right.  And if you look at section

4   one here it says, patient is able to return to

5   work without restrictions effective February 14,

6   2019; is that right?

7          A.   Yes, sir.

8          Q.   Okay.  And in section two it says,

9   patient is able to return to work with

10  restrictions effective January 2, 2019 three days

11  a week, ten-hour days; is that correct?

12         A.   Yes, sir.

13         Q.   So was it your understanding that you

14  could return to work on January 2, 2019, but with

15  the restriction of three days a week, ten-hour

16  days?

17         A.   Yes, sir.

18         Q.   And you typically worked four days a

19  week, 11-hour days; is that right?

20         A.   Yes, sir.

21         Q.   And in the comments, Dr. Wanzo states

22  that you will be able to work three days per

23  week, ten-hours a day effective on January 2,

24  2019, right?

25         A.   Yes, sir.



Page 128

1          Q.  And you understood that that's what

2    Dr. Wanzo was requesting, and you agreed with

3    that treatment plan; is that correct?

4          A.  Yes, sir.

5          Q.  Did you tell Dr. Wanzo that you wanted a

6    reduced work schedule?

7          A.  No.  We were talking about it and

8    discussed it and she thought it would be better

9    if I didn't go straight in, like my full schedule

10   at first.  She wanted to ease me back into that

11   environment to make me more comfortable because

12   that is a very intense environment when it comes

13   to dispatching that magnitude.

14         Q.  Did she explain to you what days, or

15   what day -- was there any indication that there

16   was a particular day that you shouldn't work, or

17   was she just more concerned that she didn't want

18   you working four days?

19         A.  She was more concerned working the four

20   days.  I was -- yeah, it was more concerned about

21   not working the four days.  She just wanted me to

22   get in there and just try to keep going with my

23   external treatments and stuff and making sure

24   that I'm just trying to stay positive and

25   focused.



Page 129

```
 1        Q.  And after you received this return to
 2   work note -- well, when did you receive this
 3   return to work note?  Was it on or about December
 4   15, 2018?
 5        A.  Yes, sir, because I had to get it to
 6   Hartford and the leave team as soon as possible
 7   before the deadline.
 8        Q.  Okay.  And you submitted it to
 9   Schneider's leave and accommodations team?
10        A.  Yes.  And the Hartford.  Both always
11   acquire both copies.
12        Q.  And after you submitted this document,
13   this return-to-work form, did you have any
14   discussion with anyone at Schneider about your
15   accommodation request?
16        A.  I talked to Travis and I let him know,
17   hey, I need to have three days off and I let -- I
18   mean, not three days off.  I'm sorry.  The one
19   day due to what my doctor stated, and I let him
20   know specifically on a Monday because I was
21   trying to -- no, not trying.  I was attending a
22   women's PTSD, like an AA kind of meeting for
23   women that's been abused and stuff and it was
24   anonymous kind of thing, and I was going to that
25   on Mondays to help with my treatment so I can
```



Page 130

1    talk out my issue.

2         Q.  Okay.  And did you call Travis, or did

3    you have a face-to-face meeting?

4         A.  We talked to each other on the phone and

5    then I saw him again when we went to work.  When

6    I got back to work that week, I believe he was

7    out of town.  If not, I saw him the week prior,

8    but I remember me and him talking because he

9    wanted to catch up.  How you been?  How's

10   everything going?  How are you feeling?

11        Q.  During this telephone -- you said you

12   had a telephone conversation with him initially;

13   is that right?

14        A.  Yes, sir.  I believe so.

15        Q.  Do you recall the date of that telephone

16   conversation?

17        A.  No, sir.  I do not believe I recall that

18   particular date.

19        Q.  Okay.  And it was just you and him on

20   the phone?

21        A.  Yes, sir.

22        Q.  And as best you can recall, what was

23   said and by whom during that call?

24        A.  I let him know that I was returning back

25   to work by January 2nd, and let me know what I



Page 131

1    need to be prepared for.  And I also wanted to

2    make sure that somebody was there with me because

3    I wasn't able to be by myself at that time,

4    because I was like I just need somebody to be

5    there with me.  Are we going to have somebody on

6    the shift?  And he was like, yeah, don't worry

7    about it.  We good.  We're hiring a temp anyway,

8    because Audrianne was about to leave for

9    maternity leave because she was pregnant at that

10   time, so I was like, okay, cool.

11        So we have somebody to come in?  And he

12   said, yeah, I'm going need you -- matter of fact,

13   my first day back I had to train somebody.

14        Q.  Anything else that you can recall about

15   that conversation with Travis?

16        A.  Yeah, he told me I had to train that

17   person, yeah.  He said, hey, I got a new temp

18   coming in.  I need you to help out Audrianne with

19   that.  I know it's not -- I know it's your first

20   night back, but do you think you can handle that?

21   I said, yeah, I think, but if not, Audrianne is

22   there, and I could just do the best of my

23   ability.  And then I told him about me going to

24   my anonymous meetings on Monday.

25        Q.  Anything else that you can recall about



Page 132

1    that conversation with Travis?

2         A.   That's all I can recall at this time.

3         Q.   Did you take any notes of that

4    conversation?

5         A.   No, sir, I did not.

6         Q.   Did he mention the name of the temp that

7    you would be training?

8         A.   I can see her face, but I do not

9    remember her name, but I know she was from

10   Memphis, Tennessee, she had braces, and she was

11   petite.  She was so -- she was sweet, but she

12   only lasted, like, two weeks, and then right

13   after her Ms. Elaine was hired.

14        Q.   That's Elaine Young?

15        A.   Yes, sir.

16        Q.   If you could turn to the next document.

17   It's Bates Schneider 033 -- 0399.

18        A.   Yes, sir.

19        Q.   It's a one-page document.  We'll mark

20   this as Plaintiff's Exhibit number 15.  And you

21   see this document is dated December 18, 2018; is

22   that right?

23            (Plaintiff's Exhibit 15 was

24              marked and identified.)

25        A.   Yes, sir.



Page 133

```
 1        Q.  And it's addressed to you; is that
 2   correct?
 3        A.  Yes, sir.
 4        Q.  And do you recall receiving this
 5   document on or about that date?
 6        A.  Yes, sir, I did.
 7        Q.  Okay.
 8        A.  Around that date because it takes a
 9   while before it comes through the mail.
10        Q.  Got it.  And in the second paragraph it
11   says, Schneider has agreed -- well, let me start
12   at the first paragraph.  It says, on December 17,
13   2018 we received a return-to-work form from your
14   physician outlining the following work
15   restrictions through February 13, 2019: work
16   three days per week, ten-hour days.  Did I read
17   that correctly?
18        A.  Yes, sir.
19        Q.  Okay.  And Schneider agreed to
20   accommodate those restrictions in your current
21   position effective January 2, 2019 through
22   February 13, 2019; is that right?
23        A.  Yes, sir.
24        Q.  All right.  And then when you -- when
25   you returned to work on January 2nd, did you have
```



Page 134

1   another discussion with Travis about what days

2   you would be working?

3       A.  I think it was, like, via e-mail or

4   something I discussed with him about -- he was

5   trying to put me off on Wednesdays and that's

6   when I disclosed to him what I was trying to do

7   with my external treatment going to those

8   meetings.  I was like, I just need you to help me

9   out here, but I am able to come to work, it's

10  just that particular day I was just asking for

11  him to just try to help me out with that.

12      Q.  And why didn't you want to work on -- or

13  why didn't you want off on Wednesdays?

14      A.  No.  I was just trying to attend the

15  meeting on Monday.  That's when they offered it

16  at the church that they provided, so I was just

17  trying to make sure I was available on those

18  days.

19      Q.  Okay.  So you told him that you didn't

20  want to work on Mondays because you were going to

21  -- you were going to attend the counseling

22  sessions, right?

23      A.  Yes, sir.

24      Q.  Okay.  Did you discuss what three days

25  you would be working?



Page 135

```
 1        A.  We talked about it and I said, hey, I'll
 2   work Wednesday and whatever day, just Monday
 3   that's the day I just -- and he accommodated it.
 4   That's how I got with the type of schedule I had,
 5   which I had Wednesday, Thursday, Friday, and then
 6   Sunday and Monday off.  That's how that worked
 7   out.
 8        Q.  So did you agree that you would work
 9   Wednesday, Thursday, Friday, or did you ask for
10   those specific days?
11        A.  I agreed to work those days because that
12   was my original -- part of my original four-day
13   schedule as well.
14        Q.  Did you specifically ask to have Sundays
15   off or not work Sundays?
16        A.  Yeah, to go to that Monday morning -- to
17   go to the -- to that meeting.
18        Q.  All right.  So you wanted the Sundays
19   off because your counseling session was on Monday
20   morning?
21        A.  Correct, yes, sir.  Thank you for
22   clarifying.
23        Q.  And Travis agreed to that?
24        A.  Yes, sir.
25        Q.  And when you returned to work on
```



1    January 2, 2019 were you coming into the office

2    on Wednesday, Thursday, Fridays that you worked?

3         A.  Yes, sir.

4         Q.  All right.  And in this letter, Exhibit

5    15, in bold Schneider says, please have your

6    physician complete the attached return-to-work

7    form prior to February 14, 2019 if there are any

8    changes to your restrictions; is that right?

9         A.  Yes, sir.

10        Q.  The day that you were -- the Sunday that

11   you were not working from January 2, 2019 through

12   February 14, 2019, do you know who was covering

13   that day?

14        A.  Yes.  Desmond Seymour.

15        Q.  Desmond Seymour was working the Sunday

16   that you would typically work?

17        A.  Desmond Seymour.  If it wasn't him, it

18   was Audrianne Williams.  Between those two, if my

19   memory serves me correct.

20        Q.  And they didn't typically work on

21   Sundays; is that right?

22        A.  Desmond did.

23        Q.  Do you know if -- was Desmond doing

24   twice as much work then on Sundays?  Do you have

25   any knowledge of that?



Page 137

```
 1        A.  Since why?  Because I wasn't there?

 2        Q.  Yes.

 3        A.  Any time no one is there everybody does

 4   twice as much work, no matter whether it's Sunday

 5   through Saturday.  Whoever is on that third shift

 6   if they're by their self, they're taking the

 7   workload of everybody.  So yes, I do concur with

 8   that.

 9        Q.  But would you agree then that your

10   inability to work on Sundays impacted the third

11   shift and their workload?

12        A.  Yes.

13        Q.  Do you know if Travis ever worked the

14   Sunday that you were originally assigned to work

15   during the time period that you were off --

16   during the time period of your accommodation?

17        A.  Not to my knowledge.  I thought it was

18   Audrianne and Desmond around that time period.

19        Q.  Do you have any personal knowledge as to

20   who was working on the Sundays that you were not

21   working because of your accommodations --

22   workplace accommodations?

23        A.  Meaning?  Can you rephrase it for me,

24   please?  I'm sorry.

25        Q.  Sure.  Do you know -- are you -- are you
```



1    just assuming and speculating that your Sunday

2    was covered by Desmond and Audrianne, or do you

3    have any --

4         A.  Like, specifically?

5         Q.  Yes.  To support that --

6         A.  That will be on Schneider's server when

7    it comes to the schedule.

8         Q.  Okay.

9         A.  But from my recollection, because I

10   remember how our team was, some Sundays, I

11   believe, it was Desmond and some Sundays it was

12   Audrianne.  But this is around the time she was

13   about to go out of work for maternity leave, so

14   some Sundays she wasn't there either.  She'd work

15   from home.  So I don't believe, like -- it was

16   one of them.  I just can't remember who

17   specifically, but it was somebody there on

18   Sundays.  And if not -- if Travis did sub in, he

19   probably did, but I remember he was subbing

20   around that time for me, Desmond and Audrianne

21   because Desmond was going out on vacation, I was

22   coming back from leave.  We was training a temp

23   and Audrianne was going into maternity leave at

24   the same time with in the six-week period and we

25   was training two temps at the same time.



Page 139

```
 1        Q.  Right.  And Travis would fill in for
 2   area planning managers who were not able to work,
 3   right?
 4        A.  Correct.
 5        Q.  Okay.  All right.  If we go to the next
 6   document, please.  And it's Bates Schneider 0385
 7   through 386.  Do you have that in front of you?
 8        A.  Yes, sir.
 9        Q.  Okay.  Let's mark this as Plaintiff's
10   Deposition Exhibit number 16.  And this appears
11   to be another fax that Dr. Wanzo sent to the HR
12   leave administration team at Schneider on
13   January 19, 2019; is that right?
14          (Plaintiff's Exhibit 16 was
15             marked and identified.)
16        A.  Yes, sir.
17        Q.  Okay.  If you turned to second page,
18   this is a return to work recommendation --
19   attending physician's return to work
20   recommendation; is that right?
21        A.  Yes, sir.
22        Q.  And this appears to be Dr. Wanzo's
23   handwriting; is that right?
24        A.  Yes, sir.
25        Q.  And if you look down at the bottom, it
```



Page 140

1    appears that she dated it January 19, 2019; is

2    that correct?

3         A.  Yes, sir.

4         Q.  Okay.  And do you recall going over this

5    return to work recommendation with Dr. Wanzo?

6         A.  Yes.  It was a follow-up appointment

7    about --

8         Q.  Okay.

9         A.  -- me returning back to work and how I

10   was doing.  She was checking in on me at that

11   particular --

12        Q.  And was this an in-person appointment

13   that you had with Dr. Wanzo?

14        A.  Yes, sir.

15        Q.  Okay.  And if you look at section two it

16   states, patient is able to return to work with

17   restrictions effective 1/2/19 three days a week,

18   ten-hour days, right?

19        A.  Yes, sir.

20        Q.  Okay.  And then if you look at section

21   one, patient is able to return to work without

22   restrictions effective 3/20/2019; is that right?

23        A.  Yes, sir.

24        Q.  And you understood that Dr. Wanzo was

25   requesting an extension of your --



Page 141

1        A.   Sorry.

2        Q.   Sure.  You understood that Dr. Wanzo was

3   requesting an extension of your accommodation

4   through March 20, 2019; is that right?

5        A.   Yes, sir.

6        Q.   And did you discuss that with Dr. Wanzo

7   as of January 2019?

8        A.   Yes, sir.

9        Q.   And she writes in section one --

10  Dr. Wanzo writes, she remains unable to work full

11  time because of her current clinical depression

12  and post-traumatic stress disorder symptoms.  She

13  will be able to work ten hours a day, three days

14  per week.  Did I read that correctly?

15       A.   Yes, sir.

16       Q.   And you understood that's what Dr. Wanzo

17  was recommending?

18       A.   Correct.

19       Q.   And did you speak with her about that?

20  Did you ask that your accommodation of three days

21  a week be extended?

22       A.   She was going based upon what we was

23  discussing and how I was feeling at work.  And I

24  was telling her about Audrianne is about to go

25  out for maternity leave and we was prepping a



Page 142

1    temp and then that temp quit, and then we had --

2    the first temp got fired and then the second temp

3    we was preparing her for the maternity leave for

4    Audrianne.  I was telling her how I was stressed

5    out and stuff, but at that time, I do remember

6    that conversation with her.

7        Q.  Okay.

8        A.  And this was a follow-up after three

9    weeks of being at work basically.  Two and a

10   half, three weeks at work.

11       Q.  All right.  So you told Dr. Wanzo that

12   the first temp had -- had quit, I believe, you

13   said?

14       A.  Got fired.

15       Q.  The first temp was fired, Audrianne was

16   about to go out on leave, and you were starting

17   to train a second temp, and you were getting

18   stressed out.  Is that because of the amount of

19   work?

20       A.  Yes.  Because I also had to train the

21   temp while working by myself on certain nights

22   that I had to train the temp and also still do my

23   workload while trying to train the temp by myself

24   without another counterpart there to take up the

25   other part of the workload so I can focus on



1  training.

2      Q.  Okay.  And you understood that Dr. Wanzo

3  was requesting about a four-and-a-half-week

4  extension of your modified work schedule, right?

5      A.  Yes, sir.

6      Q.  Okay.  And did you have any discussions

7  with anyone at Schneider about the need for this

8  extended accommodation or extending the

9  accommodation?

10     A.  Like, talking to management or anyone?

11     Q.  Yes.

12     A.  Not to my knowledge.  I just know I kept

13 asking them we need more time to train our temps,

14 and I know we was on crunch time because

15 Audrianne was in her third trimester.

16     Q.  You don't have a specific recollection

17 of talking to Torrence or Marianne or any other

18 Schneider management about extending your

19 modified work schedule for another four and a

20 half weeks?

21     A.  I think Travis probably approached me,

22 but I'm not going to falsify that on record,

23 because I can't speculate.

24     Q.  You just don't recall one way or the

25 other?



Page 144

```
 1          A.   No, not like that.  I'm sorry.

 2          Q.   Okay.  Okay.  If we could go to the next

 3     document.  It's Bates Schneider 377.

 4          A.   Yes, sir.

 5          Q.   Okay.  And it looks like this one is

 6     dated January 29, 2018 -- 2019; is that correct?

 7          A.   Yes, sir.

 8          Q.   And did you receive this letter on or

 9     about that date?

10          A.   Yes, sir.

11          Q.   Okay.  If you look at the first

12     paragraph it says, on January 21, 2019 we

13     received your return to work from your physician

14     outlining the following continuation of your work

15     restrictions through March 19, 2019.  Work three

16     days per week, ten-hour days.  Did I read that

17     correctly?

18          A.   Correct.

19          Q.   And Schneider goes on to state that it

20     has agreed to accommodate these restrictions in

21     your current position effective March -- I'm

22     sorry -- February 14, 2019 through March 19,

23     2019; is that right?

24          A.   Yes, sir.

25          Q.   And then in bold it says, please have
```



Page 145

1    your physician complete the attached

2    return-to-work form prior to March 20, 2019 if

3    there are any changes to your restrictions,

4    right?

5         A.  Yes, sir.

6         Q.  Okay.  Do you know -- with respect to

7    your modified work schedule, do you know who

8    would have approved your requests?

9         A.  HR gets the documents and the leave

10   team, I know that, but then they have to send it

11   over to management to approve so they know it

12   doesn't affect their schedule, I believe, and

13   then management approves it, and then it goes

14   back to HR.

15        Q.  Do you know specifically who would have

16   approved your accommodation requests?

17        A.  No, sir.

18        Q.  And during this time period, March --

19   I'm sorry -- February 14, 2019 through March 19,

20   2019, do you know -- did you continue working the

21   Wednesday, Thursday, Friday schedule?

22        A.  Yes, sir.

23        Q.  Did you continue working that schedule

24   in the office?

25        A.  Yes, sir.



Page 146

```
 1        Q.  Do you recall working from home at all
 2   during that time period?
 3        A.  Not to my knowledge, but probably so.
 4   Well, yes.  For the 20, 30 -- I mean, between
 5   February and March, yes, and I can tell you why.
 6   Because Audrianne had her baby February 26th and
 7   at that time Ms. Elaine quit a week after, and
 8   then I was left by myself completely.
 9        And I asked Travis on a phone call on our
10   personal phones, I said, hey, he was like, hey, I
11   know you just got the call that Audrianne just
12   had the baby.  I was like, yeah, I do -- I said,
13   man, I'm nervous, man.  I can't work by myself.
14   He said, well, I need you to, you know, come in.
15   I said, well, how about can I work from home?  He
16   was like, you know what, yeah, that should be
17   fine.  See how that goes and if it works good,
18   then we just keep it like that until we get --
19   [inaudible].  And that was the week of the 26th
20   of February because the week Audrianne had her
21   baby.
22        Q.  I'm sorry.  You cut out a little bit.
23   You said --
24        A.  I'm sorry.
25        Q.  No, that's okay.  Travis said -- you
```



Page 147

1   asked if you could work from home and that's kind

2   of when you cut out.

3       A.   I'm sorry.  He asked -- I asked him

4   could I work from home due to the fact that now

5   Audrianne had her baby and then a week later,

6   Ms. Elaine quit, so I was left by myself.  So

7   that following week after the 26th, we had

8   another conversation and that's when I brought up

9   to him could I work from home on the days I had

10  to work by myself.  Days I was with Travis or

11  with Desmond I was -- I was fine.  It was the

12  days where I was by myself, I just requested

13  could I just work from my house remotely because

14  we had access to that.

15      Q.   And what did Travis say in response to

16  your question?

17      A.   He stated that at that time due to the

18  fact that we were -- we were short staffed, and

19  he was like, well, I do understand where you're

20  coming from, so he said I don't see it as a

21  problem.  So he's like, yeah, if it's a problem,

22  then we'll go from there.  But he said, go ahead,

23  because I understand where you coming from and

24  that's what I took it like.

25      Q.   So he said he didn't see it as a



Page 148

1  problem.  If it's -- if it is a problem, you'll

2  address it, and go ahead and work from home when

3  you were -- when you were going to be working by

4  yourself?

5       A.  Yes, sir.  He told me that I was able to

6  do that.  And I knew it wasn't going to be

7  forever, but it was just for that time being

8  because Audrianne's due date -- her original due

9  date was March 15th, so they was basing

10  everything upon March 15th and the baby came

11  February 26.  So they was trying to train a temp

12  from January to March, and they lost two temps

13  within that time period for third shift.

14       Q.  So you believe this conversation

15  happened -- was it the first week of March of

16  2019?

17       A.  Yes, sir.

18       Q.  Okay.  And from the first week of March

19  -- prior to the first week of March -- let me

20  rephrase that.

21       From January 2, 2019 until you had this

22  conversation with Travis during the first week of

23  March 2019, do you recall any occasion where you

24  worked from home?

25       A.  On Thursdays sometimes and sometimes



Page 149

1    not.  It's when Audrianne was working from home

2    and we would alternate weeks like that.  She

3    would work from home on Thursdays, or I worked

4    from home on Thursdays.  We would alternate

5    because she was -- she wasn't able to drive in,

6    in her last two or three weeks coming into work

7    because she lived an hour and 20 minutes from

8    Fairburn.  She lived in Dacula.

9         Q.  It sounds like once every two weeks you

10   would work one day from home?

11        A.  That's only --

12        Q.  Is that right?

13        A.  Yes, sir.  That's only if, like, she

14   couldn't make it in or something like that.  And

15   then if she couldn't make it in because she

16   couldn't drive in or something and I'm there, if

17   I arrived at work and she wasn't there, she'll

18   log in and work from home remotely, but she'll

19   work from home if she couldn't come in on that

20   Thursday night.

21        Q.  And Travis would allow you to work from

22   home on this alternating Thursday evening during

23   this January 2019 through March 2019 time period?

24        A.  Yes, sir.  And majority of that time I

25   remember -- it's coming back to me now -- I



Page 150

```
 1    really could not be off on that time, like away

 2    because I was the main person training the temps.

 3    And then when Audrianne was able to come into the

 4    office she would train the temps with -- like we

 5    would alternate training that night.  So one

 6    person would be with the temp, the other person

 7    would be dealing with all the workload.  And then

 8    once we're done with training, then we all would

 9    jump in and put the temp on hands-on training at

10    that time.  But the first three to four hours to

11    five hours of that shift we solo on that

12    workload.

13        Q.  All right.  And you did not return to

14    full-time work on March 20, 2019; is that right?

15        A.  Correct.

16        Q.  We can go to the next document, please.

17    It's Bates CG-41 through 45.  Actually, we'll

18    mark this as kind of a group exhibit, 18 CG-41

19    through 45 and Schneider 343 and 344.

20           (Plaintiff's Exhibit 17 was

21              marked and identified.)

22        A.  Okay.  Yes, sir.

23        Q.  Okay.  And this is another medical note

24    that Dr. Wanzo faxed to the Hartford on March 9,

25    2019; is that correct?
```



Page 151

```
 1        A.  Yes, sir.

 2        Q.  And this is -- at least the first

 3   several pages of this document you produced in

 4   discovery; is that right?

 5        A.  Yes, sir.

 6        Q.  And do you recognize this document?

 7        A.  Yes, sir.

 8        Q.  Do you recall going over the progress

 9   report, the next two pages, with Dr. Wanzo?

10          (Plaintiff's Exhibit 18 was

11            marked and identified.)

12        A.  Yes, sir.

13        Q.  And if you look on that first page, it

14   asks again is the condition related to

15   environmental and/or interpersonal issues in your

16   workplace and Dr. Wanzo wrote lack of staffing,

17   verbally abusive drivers.  Did I read that

18   correctly?

19        A.  Yes, sir.

20        Q.  Okay.  And was there still, in your

21   view, a lack of staffing?

22        A.  Yes, sir.

23        Q.  Okay.  And you were seeking an

24   accommodation of a continued reduced work

25   schedule because of lack of staffing?
```



Page 152

```
 1        A.  Yes, sir.

 2        Q.  And were drivers still being verbally

 3   abusive as of March 9, 2019?

 4        A.   I had occasional disgruntled drivers

 5   call in.

 6        Q.  And if you turn to the next page under

 7   functionality --

 8        A.  Yes, sir.

 9        Q.  -- it asks, specify what activities are

10   impaired and how.  And Dr. Wanzo wrote, only able

11   to work three days part time until April 30th.

12   Did I read that correctly?

13        A.  Yes, sir.

14        Q.  Okay.  And did you discuss that with

15   Dr. Wanzo about extending your modified work

16   schedule until April 30th?

17        A.  Yes, because she was trying to give them

18   time to, you know, hire somebody else and so she

19   was like it'll give you more time to help you

20   process things because this is a little -- it's a

21   lot when you're just coming back out and you --

22   she was like -- it was just a lot, and I was

23   trying to deal with it to the best of my ability

24   at that time.  So she felt as though, like, I

25   needed more time until they can get somebody else
```



Page 153

1    in here to help.

2         Q.  Okay.  And you agreed with her

3    recommendation that you continue to work three

4    days a week until April 30, 2019?

5         A.  Yes, sir.  And also at that time I

6    received -- I believe at that time -- yes, I

7    received at that time my uncle was placed in

8    hospice.  I remember that specifically, and she

9    was trying to prepare me with my treatment to

10   help me with my grieving process, so I wouldn't

11   have a reaction as well to that.

12        Q.  Okay.  If you could turn to the fifth

13   page of this exhibit, it's a return to work

14   recommendation.

15        A.  Yes, sir.

16        Q.  Bates CG-0045.  Do you see that?

17        A.  Yes, sir.

18        Q.  Okay.  And this document is dated

19   March 9, 2019; is that right?

20        A.  Yes, sir.

21        Q.  And if you look at the top it's

22   submitted to Schneider's HR leave administration

23   team; is that correct?

24        A.  Yes, sir.

25        Q.  Okay.  Do you recall discussing this



Page 154

1    return to work recommendation with Dr. Wanzo?

2        A.  Yes, sir.

3        Q.  All right.  And if you look at section

4    one, it states, patient is able to return to work

5    without restrictions effective April 30th.  She

6    remains unable to work full time because of her

7    clinical depression, PTSD and panic disorder

8    symptoms.  She will be able to continue present

9    schedule Wednesday, Thursday, Friday, ten hours a

10   day, Thursday and Friday at home or any time

11   solo.  Did I read that correctly?

12       A.  I'm trying to figure out her

13   handwriting.  I'm sorry.  I'm sorry.  Okay.  Yes,

14   sir.  I can -- yeah, I see what you read, yes.

15       Q.  Okay.  And did you discuss these

16   accommodation requests with Dr. Wanzo on March 9,

17   2019?

18       A.  Yes.  I remember speaking with her about

19   the situation with their temps and with Audrianne

20   being out.  And she said why are you working by

21   yourself?  I thought they was going to get some

22   help for you?  I was like, well, they haven't

23   found no one yet.  She was like, so that's not

24   helping you with your treatment.  So what's going

25   on?



Page 155

1        I was like, well, right now I don't know

2    what's going on, but this is the best that they

3    could do.  And so she was like, well, could they

4    let you work from home on the days you have to

5    work by yourself so you don't feel that type of

6    energy or pressure from your external

7    environment?  And I was like, I hope so.  They've

8    been helping me so far.

9        Q.  Did you -- did you understand that

10   Dr. Wanzo was requesting that you work from home

11   Thursdays and Fridays?

12       A.  No, sir.  Not in the full content of

13   that.  I thought it was only for when we didn't

14   have staffing.

15       Q.  Okay.  If we could go to -- let's skip a

16   few pages.  If you could turn to Schneider 321

17   through 323.

18       A.  Yes, sir.

19       Q.  Did you -- did you speak with anyone

20   about Dr. Wanzo's request that you continue to

21   work a modified work schedule through April 30,

22   2019 and be permitted to work from home Thursdays

23   or Fridays or when you were solo?

24       A.  I remember I talked to Travis, but not

25   in that type of specification.  Does that make



Page 156

1    sense?

2         Q.  What would you -- what do you recall

3    speaking to Travis about?

4         A.  I remember him talking to me and he

5    said, hey, Cierra -- he came into the office one

6    day.  He was like, hey, why are you not here?  He

7    popped me up -- I said you told me to work from

8    home on the days, you know, that I was supposed

9    to be off on solo.  He was like, yeah, but I'm

10   going to need you in the office.  I was like,

11   well, I thought that was our agreement.  He was

12   like, no, I need you in the office.

13        So I came in the office the next night and I

14   would start working from the office from that

15   point, just to accommodate what he stated via

16   chat.  It was a chat message we did because he

17   came into the office and he was like, why are you

18   not at the office?  I was like, you told me to

19   work from home.

20        Q.  Did he tell you why -- I'm sorry.  Go

21   ahead.

22        A.  No, I was just stating when we had our

23   own conversation that's what I took from that

24   phone conversation from him.  And then --

25        Q.  Did he tell you --



Page 157

1          A.   I'm sorry.

2          Q.   Go ahead.  No, it's fine; go ahead.

3          A.   And every week prior -- I mean that led

4    on after that conversation, I would -- the days I

5    worked from home, I sent my handoffs off, I sent

6    all my notes and everything was normal, like to

7    the point it was like almost three weeks later

8    and you just now realized I wasn't in the office

9    after you gave me that permission.  That's how I

10   remember that conversation.  So when he told me I

11   need you in the office, I said, okay, I'll come

12   in.  That's no problem.  I'm just letting you

13   know it's going to be a little difficult for me,

14   but I really need somebody there.

15         Q.   Did he tell you why he wanted you to

16   come into the office?

17         A.   He said because somebody needs to be

18   there.

19         Q.   Anything else that you can recall about

20   that conversation?

21         A.   And he stated that he thought it was

22   going to be for a shorter period of time.  And I

23   just agreed to what he was saying on the phone

24   and just said, okay, I'll see you tomorrow.

25         Q.   And when he said he thought it would be



Page 158

1    for a shorter period of time, that was your

2    request to work from home when you were solo?

3        A.  Yes, sir.  But my understanding was -- I

4    was, like, but didn't you get any notes from HR?

5    That's what was within myself.  That's what I was

6    assuming, and assumptions are not always good.

7        Q.  Do you recall at this time HR approving

8    any requests that you work from home?

9        A.  At the time they were -- they had

10   approved everything from my doctor's notes.  I

11   was getting information from Hartford and from HR

12   about my accommodations being approved.  I even

13   received an e-mail -- I think her name is Anissa

14   HR because Angie Shelow [sic] was my original

15   point of contact and then she got promoted or

16   moved to a different department and then Anissa

17   became my point of contact.

18       And then I remember speaking with her the

19   first week or two -- no, the first week of April

20   because she requested information, some more

21   documents.  I remember e-mailing her over

22   documents the latter part of the first week of

23   April until the beginning of the second part --

24   the second week of April, and then on the 12th I

25   was termed.  So from the time of March 20th to



Page 159

1   April 12th, I was just communicating between HR

2   and then Travis.

3       Q.  Up until March 9, 2019, are you aware of

4   any document -- are there other communications

5   from Schneider indicating that it had approved

6   any requests that you work from home when you

7   were solo?

8       A.  No, sir.  Other than the conversation

9   that I stated I had verbally talked with Travis.

10      Q.  If we could look at Exhibit 19,

11  Schneider 321 through 323.

12          (Plaintiff's Exhibit 19 was

13              marked and identified.)

14      A.  Yes, sir.

15      Q.  Okay.  And this is another attending

16  physician's statement that appears to have been

17  completed by Dr. Wanzo; is that right?

18      A.  Yes, sir.

19      Q.  Okay.  And she's still indicating --

20  well, strike that.

21          If you go to the second -- the third page,

22  it appears to be dated March 30, 2019; is that

23  correct?

24      A.  Yes, sir.

25      Q.  Did you have an appointment with



Page 160

1    Dr. Wanzo on March 30, 2019?  Do you recall?

2         A.  I believe I did.

3         Q.  Do you recall discussing Dr. Wanzo's

4    recommendations for your accommodations as of

5    March 30th of 2019?

6         A.  Yes.  We were talking about me working

7    from home on the days I was solo because I was

8    telling her how it was affecting me, and I told

9    her the conversation me and Travis had.

10        Q.  And according to the first page of this

11   exhibit, Dr. Wanzo was still saying that your

12   condition -- lack of staffing is related to your

13   workplace condition?  I'm sorry.  Strike that.

14        Dr. Wanzo was saying that you still need

15   this accommodation because of lack of staffing;

16   is that right?

17        A.  Yes, sir.

18        Q.  If you turn to the second page of this

19   exhibit, kind of in the middle it says, what are

20   your patient's current abilities, what type of

21   work can your patient perform?  And she writes,

22   you can only work three days per week, Wednesday,

23   Thursday, Friday, working from home two days a

24   week, ten-hour days.  Do you see that?

25        A.  Yes, sir.



Page 161

1          Q.  And did you discuss that with Dr. Wanzo?

2          A.  I didn't discuss that part with her

3     about working from home for those two days.  I

4     remember her saying specifically on the days I

5     was solo.

6          Q.  And she goes on to state that your

7     target date for your return to work was on a full

8     time basis June 5, 2019; is that right?

9          A.  Yes, sir.

10         Q.  And did you agree with that --

11         A.  Yes.

12         Q.  -- assessment from Dr. Wanzo?

13         A.  For the return date, correct.  Due to

14    the fact my uncle was in hospice at the time, and

15    I was really preparing myself for his death

16    because he was a very close, close relative of

17    mine.

18         Q.  So you were requesting a modified work

19    schedule -- or an extension of your modified work

20    schedule from March 30, 2019 through June 5, 2019

21    in part because of your uncle's illness; is that

22    right?

23         A.  Yeah, and due to lack of staffing as

24    well.  Because mind you, we don't have two -- we

25    didn't have two temps at all and Audrianne wasn't



Page 162

1    there still, so we were down technically three

2    people on third.

3        Q.  Right.  And so you were -- you were

4    requesting additional time off during a time

5    period when Schneider was short-staffed, right?

6        A.  Not -- not time off because I was

7    working.

8        Q.  Yeah, you were requesting a modified

9    work schedule during a time period when Schneider

10   was short-staffed, correct?

11       A.  Yes, but I wasn't requesting time off.

12   I was requesting to work from home.

13       Q.  Well, according to this you were

14   requesting to continue to work three days per

15   week, right?

16       A.  Correct.

17       Q.  And your normal full-time schedule would

18   be four days per week, right?

19       A.  Correct.

20       Q.  So you were -- you were requesting a

21   modified, reduced work schedule during a time

22   period when Schneider was short-staffed, correct?

23       A.  Yes.

24       Q.  And the doctor goes on to state, if

25   appropriate provide examples of accommodations



Page 163

1    that will allow your patient to return to work.

2    And Dr. Wanzo wrote, working from home two days

3    per week, working three days per week, Wednesday,

4    Thursday, Friday.  Did I read that correctly?

5          A.  Yes, sir.

6          Q.  Okay.  And that's what's -- is it your

7    testimony that you did not discuss with Dr. Wanzo

8    working from home two days per week as of March

9    30, 2019?

10         A.  I did discuss with her working from home

11   when I was solo.  So whatever the schedule was,

12   whoever wasn't there on those days, that's the

13   days I needed them to accommodate.  So if you

14   were scheduled for a Wednesday and Thursday or

15   Friday schedule, and let's say you called out

16   before a shift, I was thinking like Travis would

17   let me know, like, hey, such and such called out,

18   stay at home tonight or, hey, I'm not able to

19   come in.  You know, that's how I was looking at

20   that, and that's how I talked to him about it,

21   and that's how I talked to Dr. Wanzo about it.

22   But I do understand what you're saying.

23         Q.  All right.  Well, were you disagreeing

24   with Dr. Wanzo -- did you disagree with her when

25   she said she wanted you to work from home two



Page 164

1   days per week as of March 30, 2019?

2        A.  No, I'm not disagreeing with her.  I

3   just don't know specifically who was off on those

4   specific days.

5             MR. MILIANTI:  Okay.  All right.  Why

6   don't we take a -- we've been going for a little

7   bit.  Why don't we take a ten-minute break.

8     (Break taken from 3:20 p.m. to 3:33 p.m.)

9   BY MR. MILIANTI:

10       Q.  As of -- strike that.

11       Ms. Geter, was it your intention to remain

12  on a modified work schedule until you believe

13  Schneider had appropriately staffed the third

14  shift for area planning managers?

15       A.  No, sir.  I was really trying to just

16  get the betterment of my mental health in order

17  and in control mostly.

18       I'd also like to make a correction.  So

19  earlier when you stated that me and Dr. Wanzo

20  discussed the two days off and the three-day work

21  period, that was not my discussion her

22  whatsoever.  I think that's what the implication

23  of what was going on within the office, as far as

24  the situation and with Audrianne's maternity

25  leave and the lack of staffing.  And I was like,



1  hey, I just -- as long as I can work from home

2  those days that's significant.  But as far as

3  requesting the two days off doing that three work

4  -- I do not recall that all within that

5  discussion.

6      Also, I received in March -- mid-March the

7  news about my uncle and -- [inaudible] -- because

8  of the stresses from work and then from that news

9  as well.  So I guess she took it into her -- took

10  it into her hand to write that particular section

11  in the notes.  But my main concern was as long as

12  I could feel safe at work, I could do my job.

13  But my mental health did start to decline a

14  little bit around that time, so I just wanted to

15  correct that.

16      Q.  Well, you were continuing to extend your

17  modified work schedule because of a perceived

18  lack of staffing on behalf of Schneider for the

19  area planning manager position, right?

20      A.  Yes, sir.

21      Q.  And you would not have felt comfortable

22  returning to a full-time role until you believed

23  that Schneider had appropriately staffed the

24  third shift with area planning managers, right?

25          MS. LEGARE:  Objection.



Page 166

```
 1       A.   No, sir.  I was still planning on going
 2  to work, period.  It was just I was trying to
 3  make sure my mental health was on a -- on a good
 4  path in order for me to work efficiently in the
 5  position I was in, and then also effectively with
 6  any type of major distractions to help me with my
 7  treatment.
 8  BY MR. MILIANTI:
 9       Q.   Yeah, I'm not questioning that you were
10  working.  We know you were working three days a
11  week.
12       My question to you is, you didn't have any
13  intention of working four days a week until you
14  believed that the area planning manager position
15  was appropriately staffed for the third shift as
16  reflected in your doctor's notes; isn't that
17  right?
18       A.   Incorrect.  I was even planning on
19  working four days a week if I had to, to even
20  help the team.  That's the type of person that I
21  am, period.  But I sacrificed my mental health in
22  a lot of circumstances to help my team, period.
23       Q.   Was it your intention to work from home
24  anytime another area planning manager could not
25  make it into the office as of March of 2019?
```



Page 167

```
 1        A.  Yes.  It wasn't my full intent, but I
 2   needed that assistance from my management team to
 3   understand that because they allowed my other
 4   teammate to do it.
 5        Q.  So when an area planning manager would
 6   for whatever reason call off and say that he or
 7   she could not come into work, that's when you
 8   would similarly request not to come into work --
 9        A.  Not similarly --
10        Q.  -- if you were scheduled for the same
11   day?
12             MS. LEGARE:  Objection.
13        A.  Not similarly because most of the time
14   when I found out somebody called out, I'm already
15   at work in the office.  So usually I get a text
16   message on the way in or when I set up my
17   computer, by the way, such and such is not coming
18   in.  Or I open up my laptop and I have a nice
19   e-mail that says, hey, such and such will not be
20   in tonight on my work --
21   BY MR. MILIANTI:
22        Q.  And then would you go home?
23        A.  I'm sorry?
24        Q.  Would you then go home?
25        A.  No.  I'd sit there and work.
```



Page 168

1      Q.  Okay.  During the time period of January

2  1, 2019 through March 30, 2019, did you encounter

3  any verbally abusive drivers?

4      A.  Give me one second.  Not per se verbally

5  abusive toward me, but, like, in a circumstance

6  they were heated I took the brunt of it, but they

7  wasn't towards me.  If that make any sense.

8      Q.  Not completely.  Let me rephrase it.

9      So you testified previously that there were

10  occasions in 2018 when a driver would become

11  short or upset and would lash out at either you

12  or your fellow area planning managers when you

13  were at the office, right?

14      A.  Correct.

15      Q.  Okay.  So my question is, during the

16  time period of January 1, 2019 through March 30,

17  2019, did you encounter any drivers who acted in

18  a manner which you found to be verbally abusive

19  towards you?

20      A.  I remember getting into a couple of like

21  conversations, but I can't recall specifically

22  what day and who specifically at this time.

23      Q.  Do you recall what these drivers said to

24  you?

25      A.  This is -- [inaudible] -- their manager.



Page 169

1    Like I said, it would be something -- they're mad

2    at something else and it comes out on me.  So

3    like if their manager didn't set up their pay

4    right, I get that brunt.  If their manager didn't

5    set up them getting the truck to be assigned to

6    them for the next day, which is the first shift

7    and second shift's actual job.

8        It's part of their description for third to

9    be prepared, because technically third shift is

10   basically a cleanup team.  Everything starts with

11   first shift, so all driver managers are majority

12   on first shift.  So if the drivers have issues or

13   had issues, that stems from first shift and then

14   it trickles down to second shift.  And if second

15   shift can't solve the problem, then it trickles

16   down the third shift.  And then that's when -- by

17   that time if the driver is getting off on that

18   shift from third -- I mean from first or second

19   coming out of the third or going into the first

20   shift I'm the first person they see or the last

21   person they see, and I get the brunt of that

22   energy if they did not have a good night or if

23   they did not start the morning properly.

24       Q.   Okay.  If you can just try and answer my

25   question.  Do you recall between January 1, 2019



Page 170

1    and March 30, 2019 any instance where a driver

2    was verbally abusive towards you?

3         A.  Me specifically, no, at this time that I

4    can remember.

5         Q.  Okay.  If you could turn to the next

6    document, which is -- I might be jumping around a

7    little bit.  I'm not sure.  Schneider 315.  It's

8    a one-page document dated March 2nd -- April 2nd,

9    2019.

10        A.  Yes, sir.

11        Q.  Okay.  I'm going to mark this as

12   Plaintiff's Deposition Exhibit number 20.  Do you

13   recognize this document?

14            (Plaintiff's Exhibit 20 was

15               marked and identified.)

16        A.  Yes.

17        Q.  Okay.  And this document is dated

18   April 2, 2019.  Did you receive a document on or

19   about that date?

20        A.  Probably around that time.  Not on that

21   date, but afterwards.

22        Q.  Okay.  And that's your address; is that

23   right?

24        A.  That's correct.

25        Q.  Okay.  And then you see in this first



Page 171

1   paragraph it says, you're currently approved --

2   I'm sorry.  This is a letter that you received

3   from Schneider's HR leave administration team,

4   correct?

5        A.   Correct.

6        Q.   Okay.  And it relates to your request

7   for an accommodation, right?

8        A.   Yes, sir.

9        Q.   And it states, Dear Cierra, you're

10  currently approved on an accommodation for your

11  reduced schedule of three days through March 19,

12  2019.  Below is the timeline of information that

13  has been received during your leave of absence

14  and your partial return to work.  Did I read that

15  correctly?

16       A.   Yes, sir.

17       Q.   Okay.  And then there are four -- I'm

18  sorry -- five bullet points, right?

19       A.   Yes.

20       Q.   Okay.  Can you review those five bullet

21  points and tell me when you're done?

22       A.   Yes.  I'm finished.

23       Q.   Okay.  And do these five bullet points

24  accurately reflect the timeline of your

25  accommodation request and the request that you



Page 172

1   received?

2        A.  Yes, sir.

3        Q.  Okay.  And Schneider states after these

4   bullet points, with the multiple extensions of

5   partial return to work schedule, this is

6   appearing to be a permanent need.  Did I read

7   that correctly?

8        A.  Yes.

9        Q.  All right.  And then they ask that you

10  provide or that your healthcare provider provide

11  additional information by no later than April 8,

12  2019; is that right?

13       A.  Yes, sir.

14       Q.  Okay.  And do you recall -- I'll show

15  you the exhibit here in a little bit.  Do you

16  recall receiving a document attached to this

17  where they asked -- Schneider had asked your

18  physician for additional information?

19       A.  Yes, sir.

20       Q.  Okay.  And did you take that document to

21  your physician?

22       A.  I had to.  Yes, sir.

23       Q.  Okay.  We can go to Schneider 301.  I'm

24  sorry.  That's out of order.  It'll be CG-261

25  through 262.



Page 173

```
 1        A.   Yes.

 2        Q.   Okay.   Before I ask about that, you

 3   mentioned that you were attending counseling

 4   sessions on Monday mornings?

 5        A.   Yeah, at a church.   Uh-huh.

 6   (Affirmative).

 7        Q.   At a church.   Were you continuing to

 8   attend those sessions in March and April 2019

 9   time period?

10        A.   Yes, sir.

11        Q.   Okay.   And that was every Monday?

12        A.   Yes, sir.

13        Q.   And what church was that at?

14        A.   World Changers Church International.

15        Q.   And what time were the counseling

16   sessions?

17        A.   I believe 9:00 to 11:00.   And then also

18   I attended -- give me one second.   I'm trying to

19   give you the other church -- I'm sorry -- that I

20   attended.   I'll have to give that to my counsel.

21   I have another church I was attending as well.

22        Q.   Okay.   If we go to what we'll mark as

23   Plaintiff's Exhibit 21, CG-261 through 262.   Do

24   you have that in front of you?

25             (Plaintiff's Exhibit 21 was
```



Page 174

```
 1               marked and identified.)
 2        A.  Yes, sir.
 3        Q.  Okay.  And this is a letter dated April
 4   11, 2019 that you received from the Hartford; is
 5   that right?
 6        A.  Yes.
 7        Q.  Okay.  And do you recall receiving this
 8   letter?
 9        A.  Yes, sir.
10        Q.  And it appears that you filed for
11   long-term disability benefits on April 3, 2019;
12   is that right?
13        A.  Yes, sir.
14        Q.  Okay.  And do you know if your long-term
15   disability benefits were granted or approved?
16        A.  It was a month and a half later after
17   April I think, or a month after -- [inaudible] --
18   around like -- yeah, the end of April, early May,
19   I believe.  I'm sorry.
20        Q.  So your long-term disability benefits
21   were approved end of April, early May 2019?
22        A.  Yes, sir.
23        Q.  And do you recall what those benefits
24   were?
25        A.  Meaning?  I'm sorry.
```



Page 175

```
 1        Q.  Where you received -- did you receive
 2   money --
 3        A.  Yes, yes.
 4        Q.  -- for your long-term disability
 5   benefits?
 6        A.  Yes.
 7        Q.  And how much?
 8        A.  Sixty-six percent of my salary.
 9        Q.  And you started receiving those benefits
10   end of April, beginning of May 2019?
11        A.  Yes, sir.
12        Q.  And do you recall what your salary was
13   at the time that you started receiving those
14   benefits?
15        A.  $51,780.
16        Q.  And are you currently receiving
17   long-term disability benefits?
18        A.  No, sir.
19        Q.  Okay.  When did you stop receiving
20   long-term disability benefits?
21        A.  I believe fall of 2019 -- no, April of
22   2020 actually.  April 2020.
23        Q.  So you received long-term disability
24   benefits for approximately one year?
25        A.  One year for mental health according to
```



MAGNA
LEGAL SERVICES

Page 176

1    Hartford's policies.

2        Q.  And you received those benefits for

3    approximately one year at 66 percent of your

4    salary?

5        A.  Yes, sir.

6        Q.  If you could go to -- I believe it's the

7    next document in the stack.  It should be

8    Schneider 301.

9        A.  Yes.

10       Q.  We'll mark this is Plaintiff's

11   Deposition Exhibit number 22.  Do you recognize

12   this document?

13           (Plaintiff's Exhibit 22 was

14               marked and identified.)

15       A.  Yes, sir.  It's the termination letter.

16       Q.  Okay.  And did you receive this letter

17   on or about April 12, 2019?

18       A.  I received it April 12th, 11:15 p.m. by

19   Travis Torrence in the on-on-one room.

20       Q.  Okay.  And if you look at that first

21   paragraph, it states were out on a continuous

22   leave of absence due to medical reasons from

23   October 9, 2018 through January 1, 2019 at which

24   time you exhausted your 12 weeks of FMLA; do you

25   agree with that?



Page 177

```
 1          A.  Yes, sir.
 2          Q.  It goes on to state that Schneider was
 3    able to accommodate you returning to work on a
 4    partial schedule starting on January 2, 2019; is
 5    that correct?
 6          A.  Yes, sir.
 7          Q.  And that Schneider had been
 8    accommodating you working three out of your
 9    scheduled four days since January 2, 2019; is
10    that correct?
11          A.  Correct.
12          Q.  And then you see there's three bullets
13    there?
14          A.  Yes, sir.
15          Q.  Did you agree with the timeline and the
16    accommodations that were granted?
17          A.  Yes, sir.
18          Q.  And then it states on April 1, 2019 we
19    received updated information from your physician
20    that indicates you may be able to return to full
21    time on June 5, 2019 with three days in the
22    office and the other day working from home; do
23    you see that?
24          A.  Yes, sir.
25          Q.  And then Schneider goes on to state,
```



Page 178

```
 1    based on this information, carefully considering

 2    your request for us to continue to accommodate

 3    you, we are unable to continue accommodating a

 4    partial schedule, right?

 5         A.  Yes, sir.

 6         Q.  And they denied your request for

 7    additional accommodations, right?

 8         A.  Yes, sir.

 9         Q.  Okay.  And you indicated that you --

10    that Travis provided you with a copy of this

11    letter on April 12, 2019 at 11:15 p.m.?

12         A.  Yes, sir.

13         Q.  Okay.  And you said it was in the

14    one-on-one room?

15         A.  Yes, sir.

16         Q.  And that was in your office -- or at the

17    office facility?

18         A.  Yes, sir.

19         Q.  Okay.  And who was present for that

20    meeting?

21         A.  It was me and Travis in the one-on-one

22    room.  Sarah Kopf was outside in the office area

23    with a driver.  Wendy was in there.  The driver's

24    name is Wendy.

25         Q.  Well, who was in the room when you were
```



Page 179

1    speaking with Travis?  Was it you and Travis?

2         A.   Just me and Travis.

3         Q.   Okay.  And as best you can recall, what

4    was said during that meeting and by whom?

5         A.   He asked me how I was doing, and then I

6    was like, oh -- like we always joke.  Everybody

7    had a little joke when we go into the one-on-one

8    room, like what happened now?  Like that's what

9    we always do.  And so I was like, uh-oh, what's

10   wrong?  He was like, oh, nothing, but I need to

11   talk to you, and he had more of a serious look on

12   his face, and then he handed me this paper.  I

13   read it and he was like so we can no longer

14   accommodate you, so we need you to turn in your

15   laptop and everything tonight.

16        Q.   Did you say anything?

17        A.   Yeah, I said something.  I said how dare

18   you do this to me when you know what predicament

19   I'm going through and then how much I have helped

20   out the team.  And I said it's some bull crap.  I

21   had to call my mom because she had to calm me

22   down, because I was about to go into a manic

23   rage.

24        Q.   Did Travis say anything in response?

25        A.   He said it was out of his hands and out



Page 180

1    of his control, he tried his best.  And I said,

2    no, you didn't.  You didn't try your best because

3    you would've came to me and had another step to

4    help me.

5         Q.  Anything else that you can recall in the

6    conversation you had with Travis on that day?

7         A.  I remember I left my termination letter.

8    I had to come back and get it and he put my

9    termination on a sticky note in a folder on a

10   piece of tape outside the door and locked the

11   door so I wouldn't come back into the front --

12   onto the -- into the office, so I had to pick up

13   the paperwork on the porch.

14        Q.  Anything else that you can recall?

15        A.  I was very upset.  I even had to call my

16   psychiatrist that night at 12 o'clock at night.

17        Q.  Why do you believe Schneider denied your

18   accommodation requests as of April 12, 2019?

19        A.  I don't think they wanted to deal with

20   me.

21        Q.  I'm sorry?

22        A.  I didn't think they wanted to deal with

23   me any longer.

24        Q.  Why not?

25        A.  Because right after I was terminated,



Page 181

1    they moved somebody from first shift to third

2    shift and hired two more people.  I thought they

3    just didn't want to deal with me no more, to be

4    quite honest.

5         Q.  What do you mean when you say they

6    didn't want to deal with you any longer?

7         A.  Deal with my circumstance.

8         Q.  And what do you mean when you say your

9    circumstance?

10        A.  Deal with my mental health situation and

11   my health concerns -- [inaudible] -- me as an

12   employee, a human being.

13        Q.  Do you know who made the decision to

14   deny your continued accommodation requests?

15        A.  Travis told me that night it was out of

16   his control, so I just thought it was just upper

17   management, which is Marianne and I thought it

18   was HR, that's the only way I can think of it at

19   that time.  But specifically, no, sir.

20        Q.  We can go to the next exhibit.  It's

21   Schneider 24 through 26.

22        A.  Yes, sir.

23        Q.  During the time period of February 14,

24   2019 through April 12, 2019, do you -- do you

25   know who was performing the job duties that you



Page 182

```
 1   would typically perform on that fourth day that
 2   you would normally work?
 3        A.  It was probably between, like I stated
 4   earlier, Travis, Audrianne, Desmond.  One of them
 5   three.  And since Audrianne was already out on
 6   leave, it was between Desmond and Travis at that
 7   time.
 8        Q.  And that would have been in addition to
 9   their normal work schedule; is that right?  As
10   far as you know?
11        A.  Not -- not -- I know Desmond
12   specifically that's -- they -- that's his
13   schedule.  Like they moved it around so everybody
14   can accommodate because Audrianne was out and
15   with my predicament as well, so they shift the
16   schedules around.  There's only three people on
17   third shift other than the two temps, so you only
18   was working with three technically if Travis
19   didn't show up.  So if he was working second
20   shift, he wouldn't do third shift sometimes, or
21   sometimes he'll pull a double shift.  If he
22   couldn't cover the third, then we by ourselves.
23        Q.  Okay.  If Travis or Desmond had to work
24   on that Sunday that you would normally work, that
25   would be in addition to the work that they would
```



Page 183

1    normally perform on that day; is that correct?

2        A.   I don't understand that question.  I'm

3    sorry.

4        Q.   Sure.  If Desmond was scheduled to work

5    on Sunday and you because of your modified

6    schedule we're not working on that Sunday, then

7    Desmond would do his work and the work that was

8    normally assigned to you; is that right?

9        A.   Correct.  Yes.

10       Q.   And same thing with Travis.  If he was

11   either off on that Sunday or already scheduled on

12   that Sunday and he was doing the work that you

13   normally would do on Sundays, he was doing twice

14   as much work as he normally would do, correct?

15       A.   Correct.  And vice versa if they were

16   out on the days I had to work on Wednesday,

17   Thursday and Friday.

18       Q.   Let's go to Exhibit 23, and this is a

19   fax that's dated April 27, 2019.  It looks like

20   it was sent from Dr. Wanzo to Schneider's HR

21   leave administration team; is that correct?

22           (Plaintiff's Exhibit 23 was

23              marked and identified.)

24       A.   Yeah, they had sent this over to her

25   after my termination to get more information from



Page 184

```
 1   her and I took the -- I think they -- no, they
 2   faxed this over to her, I believe, or they sent
 3   her a packet.
 4        Q.  If you can go to Exhibit 20.  Do you
 5   have that in front of you?
 6        A.  No.  I'm sorry.  What page is that?
 7        Q.  Exhibit 20 is Schneider 315.
 8        A.  Thank you.  I did not know I was
 9   supposed to be writing on --
10        Q.  You're not.  You're not.
11        A.  Okay.
12        Q.  You're not.
13        A.  Okay.  That's the one -- 305.  I think I
14   just saw it.
15        Q.  It's just 315.  It's a letter from
16   Schneider dated April 2, 2019.
17        A.  I'm sorry.  I really just saw it and
18   then my fingers just -- here it is.  I know.
19   That's what I'm mad at because I flipped the
20   whole packet.
21        Okay.  And you said three what again?
22             MS. LEGARE:  Three hundred and fifteen.
23             THE WITNESS:  Yes, I got it.
24   BY MR. MILIANTI:
25        Q.  Okay.
```



Page 185

1      A.  Yes.

2      Q.  All right.  Okay.  And if you look near

3  the end of that letter, just before the bold it

4  says, please state the below physician statement

5  to your doctor to complete the additional

6  questions that are needed for your accommodation

7  extension requests.

8      A.  Right.

9      Q.  Please provide me with the requested

10 information from you and your health care

11 provider by no later than April 8, 2019, right?

12     A.  Okay.  Yes, sir.

13     Q.  Okay.  And then if you go to Exhibit 22

14 -- I'm sorry -- 23, the document we were just

15 looking at.

16     A.  Yes, sir.

17     Q.  Is this the physician statement that was

18 attached to Schneider's April 2, 2019 letter?

19     A.  April 2nd?  It should have been -- give

20 me one second.

21     Q.  Sure.

22     A.  I guess this was documents -- because

23 remember I didn't get it on the 2nd, so it came

24 like -- any time Schneider sent me anything --

25 I'm going to let you know this now -- it takes



Page 186

1    four days to get to my house.  So on the 2nd, but

2    possibly this was it.  I thought it was, like, a

3    regular return-to-work form that we were looking

4    at earlier.  That's what I was expecting, so my

5    apologies on that.

6         Q.  All right.  And Exhibit 23, do you

7    recall providing this Schneider document with

8    questions for your physician to Dr. Wanzo?

9         A.  I believe I dropped it off to her.

10        Q.  Okay.  Did you go over these questions

11   with Dr. Wanzo?

12        A.  I don't recall at this time.

13        Q.  Did she discuss her responses with you;

14   do you recall?

15        A.  I'm not familiar with this right now, to

16   be honest.

17        Q.  Okay.  All right.  It states at the top,

18   "Dear Physician, on 4/1/2019, you provided a

19   return-to-work form that indicated that Cierra

20   Geter needs to remain working a partial schedule

21   of three days per week through June 5, 2019.  We

22   have been accommodating Cierra working three days

23   per week since January 2, 2019."  Did I read that

24   correctly?

25        A.  Yes, sir.



Page 187

1      Q.   And you agree with those statements?

2      A.   Yes, sir.

3      Q.   Okay.  And then this document goes on to

4  ask your physician specific questions relating to

5  your condition and accommodation requests, right?

6      A.   Yes, sir.

7      Q.   And if you turn the page, this was

8  signed by Dr. Wanzo on April 27, 2019?

9      A.   Yes, sir.

10      Q.   Is that what it looks like to you?

11      A.   Yes, sir.

12      Q.   All right.  And then question two says,

13  provide a statement of any specific duties that

14  Cierra is unable to perform because of a medical

15  condition.  Provide information as to why she

16  cannot return to work full time.  And Dr. Wanzo

17  states, she is unable to work well in a

18  fast-paced, high pressure environment.  Did I

19  read that correctly?

20      A.   Yes, sir.

21      Q.   And do you agree with that statement?

22      A.   Yes, sir.

23      Q.   Did you discuss that with Dr. Wanzo that

24  you had difficulty working in a fast-paced, high

25  pressure environment?



Page 188

```
 1        A.  Yes, sir.
 2        Q.  And you had difficulty working in a
 3   fast-paced, high pressure environment since the
 4   time you returned on January 2, 2019, right?
 5        A.  Yes, sir.
 6        Q.  And you had difficulty working in a
 7   fast-paced, high pressure environment prior to
 8   January 2, 2019, correct?
 9        A.  Correct.
10        Q.  Okay.  And your difficulty in working in
11   a fast-paced, high pressure environment -- when
12   did that start?  When did you start having
13   difficulty working in a fast-paced, high pressure
14   environment; do you recall?
15        A.  How far back we can go?  When Greg
16   Cochran was my manager.
17        Q.  And what time period would that have
18   been?
19        A.  2014 through the time he was -- 2014
20   through -- yeah, 2014 until February of 2016.
21        Q.  If you turn to the next page --
22        A.  Uh-huh.  (Affirmative).  Yes, sir.
23        Q.  I'm sorry.  If you can go to number
24   three -- question number three, it says that
25   you're currently working Wednesday, Thursday and
```



Page 189

1    Friday.  Is there a different day that she is

2    available to work if she can work four days?  Can

3    she work Monday through Friday, eight-hour

4    schedule?  And Dr. Wanzo states, she's unable to

5    work a Monday through Friday schedule; do you see

6    that?

7        A.  Yes, sir.

8        Q.  Did you ever discuss working a Monday

9    through Friday schedule for eight hours with

10   Dr. Wanzo?

11       A.  She asked how come we did not have that

12   type of schedule.  And I stated to her we was on

13   four tens.  We switched to four tens in 2018 as a

14   team, and then some people requested to go back

15   to five days because of some people personal

16   schedules they had conflicts with.  So some

17   people kept a four ten schedule and some people

18   went to a five-day schedule.

19       Q.  Do you believe you could have worked a

20   five-day, eight-hour schedule?

21       A.  I could have did a four-hour -- a

22   four-day, ten-hour day, not five.

23       Q.  If you turn the next page question five,

24   what is the total length of time the patient will

25   need to work three days per week from this point



Page 190

1    forward in your best professional estimate; do

2    you see that?

3         A.  Yes, sir.

4         Q.  And Dr. Wanzo wrote two to three months;

5    is that right?

6         A.  Yes, sir.  I see that.

7         Q.  Did you -- did you discuss that with

8    Dr. Wanzo?

9         A.  No, sir, I did not.

10        Q.  Did you agree with her assessment?

11        A.  For two to three months the length of

12   time total from the beginning of my time period

13   out?

14        Q.  I believe it would be -- from this point

15   forward would be from the date of this letter,

16   4/27/2019, or the day that Dr. Wanzo signed the

17   letter.

18        A.  Okay.  So to the point she was leaving

19   for June 29th, which was the last day she sent in

20   for HR, I believe, so the two months would be

21   accurate from April.  But like I stated earlier,

22   I wasn't requesting to be off or anything.  I was

23   just telling her the circumstances of my

24   environment at work.

25        Q.  If we can go to the next document, it's



 1   Bates CG-64 through 66.

 2         (Plaintiff's Exhibit 24 was

 3           marked and identified.)

 4      A.  Yes, sir.

 5      Q.  Okay.  And this is another fax that

 6   Dr. Wanzo sent to the Hartford; is that right?

 7      A.  Yes, sir.

 8      Q.  And if you turn to the last page of this

 9   document, it appears to be signed by Dr. Wanzo on

10   June 26, 2019; is that right?

11      A.  Yes, sir.

12      Q.  Do you recall going over this attending

13   physician's statement with Dr. Wanzo?

14      A.  Yes, sir.  Because Hartford needed it

15   because I applied for long-term disability back

16   in April.

17      Q.  Okay.

18      A.  So this is a continuation of that

19   process.

20      Q.  All right.  And if you turn to the third

21   page of this exhibit under functionality --

22      A.  Yes, sir.

23      Q.  -- do you see where it says, if yes

24   specify what activities are impaired and how; do

25   you see that?



Page 192

```
 1          A.  Yes, sir.
 2          Q.  And it says ability -- Dr. Wanzo wrote
 3     ability to work in a fast-paced, high pressure
 4     environment, right?
 5          A.  Yes, sir.
 6          Q.  Okay.  And you agree with that
 7     statement?
 8          A.  Yes, sir.
 9          Q.  And as of June 26, 2019, you agreed that
10     you had -- you were impaired in your ability to
11     work in a fast-paced, high pressure environment?
12          A.   I wasn't impaired, but I could work in
13     an environment just not high -- fast-paced.
14     Especially with the circumstances that was
15     presented to me with lack of staffing where I
16     kept requesting my management team to help me and
17     even help themselves as a team during that entire
18     process.
19          Q.  And a little bit -- a couple of
20     questions below that it says, what are your
21     patient's current abilities?  What type of work
22     can your patient perform?  And Dr. Wanzo wrote,
23     work three days per week, ten-hour days, work two
24     days of the three from home; do you see that?
25          A.   Yes, sir.
```



Page 193

1        Q.  And did you agree with her assessment?

2        A.  I agreed with work from home when I told

3   her the circumstances if I was to work by myself

4   as I, you know, stated earlier when I spoke to

5   Travis back in February about that and early

6   March.  So that's what that was based upon, but I

7   didn't tell her to specifically, you know, say

8   that.

9        Q.  Okay.  But did you agree with her that

10  you needed to work -- that your current abilities

11  allowed you to work three days per week, ten-hour

12  days?

13       A.  Correct.

14       Q.  Okay.  And it asks, what is your target

15  date for return to work for your patient, and she

16  said on a part-time basis, August 26, 2019,

17  right?

18       A.  Right.

19       Q.  And then it says, if part time on what

20  date will your patient be able to increase to

21  full time.  And Dr. Wanzo wrote, September 23,

22  2019, right?

23       A.  Yes.

24       Q.  Okay.  And you agree with that statement

25  that as of September 23, 2019 you would be able



Page 194

1    to return to work in a full-time capacity?

2         A.  I stated to her specifically that I was

3    able to return in June, but I can't go by her

4    assessment because she's the physician, so it's

5    up to her to make that request as well.

6         Q.  Well, did you disagree with her when she

7    said she thought you could return to full-time

8    work on September 23, 2019?

9         A.  I'd be full -- I thought I was going to

10   be full time before then, to be honest.  I

11   didn't --

12        Q.  Did you tell her --

13        A.  Go ahead.  I'm sorry.

14        Q.  Did you tell her not to write in

15   September 23, 2019?

16        A.  I didn't tell her to do nothing because

17   I wasn't in the office when she wrote this one

18   out, specifically, because I don't remember this

19   sheet.  I remember just talking to her and

20   handing her the documents and she was like, okay,

21   I'm going to fill it out.  I'll turn it into

22   Hartford.  Because I know she just have her note

23   -- you know, like her notepad, and she -- you

24   know, she's writing her doctor notes the whole

25   time when I'm sitting there.



Page 195

1        Q.  Well, when did you receive this

2    document?

3        A.  This is after I was terminated, so the

4    same week actually I was termed.  I got this,

5    like, on the 10th and I was termed the 12th.

6        Q.  You received this -- this document is

7    dated June 26, 2019.  Do you recall when you

8    would have received this document?

9        A.  Oh, that document in particular.  I'm

10   sorry.  I'd have to look at my e-mail from

11   Hartford and I can get you that date

12   specifically.

13       Q.  Okay.  Well, when you received this

14   document, would you have reviewed it?

15       A.  Excuse you?

16       Q.  When you received this document, would

17   you have reviewed it?

18       A.  Yeah, it wasn't -- it wouldn't have been

19   filled that out.  It'd be blank.  That's what I'm

20   saying.  So it wasn't going to be full when I

21   received it.

22       Q.  When did you receive a completed,

23   filled-out copy of this document?

24       A.  She filled it out on the 26th.  I

25   probably got a copy of it late June or early



Page 196

1    July, but I still would have to go back.  I'm not

2    going to give you a falsified date.

3         Q.  Okay.  So the best you can recall is

4    late June, early July 2019?

5         A.  Yes, sir.

6         Q.  All right. And would you have reviewed

7    your doctor's responses to the questions

8    contained in this document?

9         A.  Correct.

10        Q.  All right.  And when you saw that your

11   doctor indicated that you could return to

12   full-time work as of September 23, 2019, did you

13   call up your doctor and disagree with her?

14        A.  No, sir, because I was already

15   disgruntled.  This is almost two months after I

16   was terminated.  I was highly upset at Schneider.

17        Q.  Did you contact the Hartford and tell

18   them that you didn't think that you thought you

19   could return to full-time work prior to September

20   23, 2019?

21        A.  When I called the Hartford and told them

22   I was terminated, they was dismayed and they

23   couldn't believe I was terminated.  I understand.

24   I understand.

25        Q.  When you received this document and your



Page 197

1    physician wrote that you could return to

2    full-time work on September 23, 2019, did you

3    contact the Hartford and tell them that you

4    disagreed with that?

5         A.   No, sir.

6         Q.   Ms. Geter, are you aware of any area

7    planning managers who requested a reduced work

8    schedule for approximately six months?

9         A.   To my knowledge, yes, sir.

10        Q.   Who?

11        A.   Tiffany Kitchens and the young lady we

12   spoke about earlier with the cancer treatment,

13   Candis Smith.

14        Q.   Anyone else?

15        A.   Other than maternity leave for

16   Audrianne.  She was pregnant twice, so that's a

17   six to eight-week time period on that.  But other

18   than that, that's it.

19        Q.   Okay.  And Audrianne, she was out on

20   leave due to the birth of her children; is that

21   right?

22        A.   Yes, sir.  Correct.

23        Q.   And she was out on a continuous leave of

24   absence for six to eight weeks; is that your

25   understanding?



```
 1        A.   Correct.
 2        Q.   Okay.  And do you know whether or not
 3   those absences were covered under the FMLA?
 4        A.   Yes, they were.
 5        Q.   Okay.  And those are the leaves to which
 6   you're referring with respect to Ms. Williams; is
 7   that correct?
 8        A.   Yes, sir.
 9        Q.   All right.  And Tiffany Kitchens, what
10   job position did she have?
11        A.   Area planning manager, first shift.
12        Q.   First shift?
13        A.   Yes, sir.
14        Q.   And do you know who she reported to?
15        A.   Doug Horton -- I'm sorry.  Rodney Dunn,
16   because she was over Jacksonville.
17        Q.   Rodney Dunn?
18        A.   Yes.  I'm sorry.  R-o-d-n-e-y; D-u-n-n.
19        Q.   And do you know what her regular work
20   hours would be?
21        A.   Her hours she'll come in at 6:30 in the
22   morning and leave at 4:30 in the evening.  3:30
23   to 4:30 depending on what's going on in her
24   market.
25        Q.   And how do you know that?
```



Page 199

```
 1        A.  Because I was on third shift and I had
 2   transferred the markets.  If I had her markets
 3   the night before, I'm the person she has to talk
 4   to.  Third and first shift communicates --
 5        Q.  Do you --
 6        A.  Uh-huh.  (Affirmative).  Go ahead.  I'm
 7   sorry.
 8        Q.  Do you know what days of the week she
 9   would work?
10        A.  It was Monday through Friday because
11   first shift never worked weekends.  They just --
12        Q.  She worked a Monday --
13        A.  I'm sorry.
14        Q.  -- through Friday schedule, 6:30 a.m. to
15   3:30, 4:30 p.m.?
16        A.  Yes, sir.
17        Q.  Okay.  And when -- when do you believe
18   she took a reduced -- or started working a
19   reduced schedule?
20        A.  I believe that was -- I started noticing
21   it around, like, July or August of 2018.
22   Everybody started noticing she wasn't coming to
23   work a lot, and then we just started inquiring is
24   she okay, and then we found out she was out on
25   leave.
```



Page 200

1        Q.  Do you know why she was out on leave?

2        A.  Her parents were ill, and she was going

3    through a mental distress as well -- mental

4    health distress as well.

5        Q.  Do you know if she took time off under

6    the FMLA?

7        A.  Yeah.  I didn't see her for, like, a

8    good month to two months almost.

9        Q.  Do you know one way or the other whether

10   she took time off under the FMLA?

11       A.  No, sir.  But for that time -- that

12   amount of time, we don't have that amount of time

13   on our time off for personal time off.  We're

14   only allotted -- she was hired -- rehired August

15   of 2014 a month after me, so that's how I know I

16   have the seniority far as time-wise.  How we get

17   our time, we get on that same scale, so we had

18   the same amount of time.  So she wasn't allotted

19   that.  In order to be out that amount of time you

20   have to be on FMLA.

21       Q.  And you said you believe that she was

22   not coming into work a lot beginning in July or

23   August of 2018; is that right?

24       A.  Yes, sir.  She was starting to work

25   reduced hours.  Like her days instead of five



Page 201

1    days, you'll see Tiffany three days a week.

2         Q.  And how long was she working a -- do you

3    believe she was working a reduced schedule?

4         A.  For a while.  Even when I came back on

5    July -- in January she was doing at least once a

6    week she wasn't coming in to help with her

7    parents, I believe.

8         Q.  Do you know if she had any time

9    available under the FMLA during the July, August

10   2018 through January 2019 time period?

11        A.  No, sir.  That was none of my business.

12        Q.  Do you know what specific days she was

13   off during the July 2018 through January 2019

14   time period?

15        A.  No, sir, not specifically.

16        Q.  Do you know the specific circumstances

17   of her time off during the July 2018 through

18   January 2019 time period?

19        A.  The reason for her time being off?  Is

20   that the premise of the question?

21        Q.  Do you know the specific -- I'll

22   rephrase it.

23        Do you know the specific days that she would

24   have been off during the July 2018 through

25   January 2019 time period?



Page 202

```
 1          A.  No, sir, I do not recall that, but I do
 2     remember when she first -- when it first started
 3     becoming noticeable, she was missing days, like a
 4     few weeks at a time and we was looking for her,
 5     like making sure she was okay.
 6          Q.  And you believe --
 7          A.  Inquiring as a team.  Uh-huh.
 8     (Affirmative).
 9          Q.  Do you believe Ms. Kitchens returned to
10     a full-time schedule in January of 2019?
11          A.  No, sir.
12          Q.  No, sir?  I'm sorry?
13          A.  No, sir.
14          Q.  When do you believe she returned to a
15     full-time schedule?
16          A.  I just know on certain days until the
17     time I was terminated, Tiffany was allowed to
18     work at home some days and she was off on some
19     days.  So I don't have a specific time period for
20     that.  Travis would definitely know that, and
21     Rodney would know that.
22          Q.  So you don't know when she would have
23     returned to a full-time schedule; would that be
24     an accurate statement?
25          A.  Yes, sir, that's correct.
```



Page 203

```
 1        Q.  You weren't charged with approving any
 2   of her time off, were you?
 3        A.  I'm sorry?
 4        Q.  You weren't charged with approving any
 5   of her time off; is that correct?
 6        A.  No, sir, I was not.
 7        Q.  Okay.  And you wouldn't have access to
 8   her time records as to when she had -- when she
 9   took time off; is that correct?
10        A.  That is correct.  Only management and HR
11   has those abilities.
12        Q.  And is it your understanding that
13   Ms. Kitchens instead of working five days a week
14   was working a set schedule of four days a week or
15   three days per week?
16        A.  Correct.
17        Q.  That was your understanding; it was a
18   set schedule?
19        A.  It wasn't a set schedule, not to my
20   understanding.  It was just when I saw her, I
21   started noticing, oh, she's only here twice a
22   week, oh, she's here three days a week, but it
23   wasn't a set schedule.
24        Q.  Do you know if Ms. Kitchens had
25   requested any type of a workplace accommodation
```



Page 204

```
 1   during the July 2018 through January 2019 time
 2   period?
 3        A.  No, sir, not to my knowledge.
 4        Q.  Do you know who would've approved any
 5   requests by Ms. Kitchens to work a reduced
 6   schedule?
 7        A.  Yes.  Rodney Dunn and Marianne
 8   Biskey-Rose.
 9        Q.  What is Ms. Kitchens' race?
10        A.  Caucasian.
11        Q.  Okay.  Other than Ms. Kitchens -- one
12   second.  You mentioned Ms. Kitchens and Candis
13   Smith --
14        A.  Yes, sir.
15        Q.  -- you believe were permitted to work a
16   reduced schedule, right?
17        A.  Yes, sir.  And also, can I add one more
18   person?  I'm sorry.
19        Q.  Sure.
20        A.  Sarah Kopf, she was allotted to --
21   during her divorce and dealing with her children
22   during that time period, she was allotted to help
23   with her schedule to work from home remotely when
24   she couldn't have childcare if her ex-husband
25   couldn't ascertain the kids at that time.  So she
```



Page 205

1    would request to work from home on those

2    particular days even afterwards after I left.  I

3    know of this because she told me herself.  She

4    was like, yeah, Travis had to let me take off on

5    this day.  I was like, oh, okay.

6        Q.  And we've already discussed Ms. Smith

7    and the circumstances surrounding her time off;

8    is that correct?

9        A.  Yes, sir.

10        Q.  And Sarah Kopf, who did she report to?

11        A.  Travis Torrence, Doug Horton and

12    Marianne Biskey-Rose.  That's her chain of

13    command.

14        Q.  All right.  And you said that she was

15    permitted to work from home?

16        A.  Yes, sir.

17        Q.  Do you know if Ms. Kopf ever worked a

18    reduced schedule?

19        A.  Not a reduced schedule, to my knowledge,

20    but she was -- when days where she needed to work

21    remotely, they granted it to her.

22        Q.  And what shift did she work?

23        A.  Second shift.

24        Q.  Other than Ms. Kitchens and Ms. Smith,

25    any other area planning manager whom you believe



Page 206

```
 1    was permitted to work a reduced schedule?
 2          A.  No other person in the office had any
 3    other medical or any other issues that I remember
 4    that was out like that, so no, sir.
 5          Q.  And you said that Ms. Kopf was permitted
 6    to work from home.  Do you know how long she was
 7    permitted to work from home?  How long this
 8    accommodation was provided?
 9          A.  All the way into COVID.
10          Q.  When did it start?
11          A.  When did she start working?  So it had
12    to be around, I believe, spring -- no, fall of 20
13    -- no.  It was starting spring of 2018 she was
14    having difficulties with her ex-husband around
15    that time with the scheduling with the kids, and
16    then if a scenario popped up with the kids --
17    that was give or take once or twice a month from
18    that point on and then she'll work from home on
19    those days.  Yeah, she'll work from home.
20          Q.  So with respect to Ms. Kopf, it's your
21    testimony that beginning in the spring of 2018,
22    she was permitted to work from home one or two
23    days a month to care for her children?
24          A.  To help accommodate.  Yes, sir.  Working
25    remote from home.  Uh-huh.  (Affirmative).
```



Page 207

1       Q.  She was permitted to work from home one
2   or two days a month from the spring of 2018 until
3   the start of COVID?
4       A.  Yes, sir.  And then the entire staff was
5   remote.
6       Q.  And that would have been the spring of
7   2020 would be the start of COVID?
8       A.  Yes, sir.
9       Q.  Okay.  So it's your testimony that from
10  the spring of 2018 to the spring of 2020 Ms. Kopf
11  was permitted to work from home one or two times
12  a month to care for her children?
13      A.  Yes, sir.
14      Q.  What evidence do you have in support of
15  your contention?
16          MS. LEGARE:  Objection.
17      A.  I spoke with her on the phone
18  personally.  Like she'd checked on me and I'd
19  check on her and the kids, just how we always
20  did, and she'd bring it up in conversation.
21  Yeah, I had to take off on this day or I had to
22  work from home.  I'm like, oh, okay.
23  BY MR. MILIANTI:
24      Q.  So she would tell you in conversations
25  that she would have to work from home?



Page 208

1         A.  Yes, sir.

2         Q.  And you deduced based on those

3    conversations that it was one or two times a

4    month?

5         A.  Yes, sir.  Because she would tell me --

6         Q.  Any other evidence you have in support

7    of your contention that she was permitted to work

8    from home one or two days a month since from the

9    spring of 2018, spring of 2020?

10        A.  No, sir.  The evidence would have to

11   come from Schneider on that part.  Because our

12   logins on our laptop shows where we log in at.

13        Q.  Other than Ms. Kopf, any other area

14   planning managers you believe were permitted to

15   work from home?

16        A.  Due to what circumstance?  Can I ask

17   that question for you?

18        Q.  Sure.  Any area planning managers who

19   were permitted to work from home on any type of a

20   regular basis?

21        A.  The entire staff there.

22        Q.  The entire staff regularly worked from

23   home?

24        A.  Not regularly, but they didn't have a

25   problem if you've called out sick if you didn't



```
 1    want to use your sick leave, or let's say you was

 2    out of town when you couldn't make it back in

 3    town, but you took your laptop with you, which

 4    some people would do, and you'd be like, hey, I

 5    can't make it.  I'm working in North Carolina

 6    this week.  Okay.  And they'd allow them to work

 7    remotely.

 8         Q.  Are you aware of any area planning

 9    managers who were permitted to work from home one

10    day per week?

11         A.  As a schedule?

12         Q.  Yes.

13         A.  No, sir.

14         Q.  Were you aware of any area planning

15    managers who were permitted to work from home one

16    day every two weeks?

17         A.  No, sir.  Other than what I saw from

18    Tiffany Kitchens, like from what I saw, no.

19         Q.  Would it be accurate to say that area

20    planning managers were permitted generally to

21    work from home if they were ill or if some type

22    of an emergent circumstance came up --

23         A.  Yes, sir.

24         Q.  -- would that be accurate?

25         A.  Yes, sir.  Because they even had us
```



Page 210

1   leave the premise when, like, we have tornado

2   warnings in the area.  They have us move from

3   that location because we're in a triple wide

4   trailer to the hotel, like, two miles away to be

5   in a commercial building instead of going home.

6   So they'll have us probably go there if it's like

7   a storm, but still work remotely.  And if the

8   storm gets too bad, they'll tell everybody to go

9   home once it's permissible.  And then if we had

10  ice or sleet and Atlanta shuts down for that, we

11  can work from home.  And that happened on two

12  occasions -- three occasions while I was employed

13  with Schneider for five years just with the ice

14  alone.

15       Q.  Do you know if your position was

16  replaced or if somebody replaced you?

17       A.  Ryan Wheeler was moved from first shift

18  to third shift to cover me.

19       Q.  How do you know that?

20       A.  Because he told me.

21       Q.  Do you know if anyone was hired to

22  replace your position on third shift?

23       A.  I can't remember her name.  I don't know

24  if she's no longer there, but it was a young lady

25  they hired right after me to cover my shifts.



Page 211

1    She came in at 2:00 a.m., which I requested

2    Travis at that time have somebody come in

3    mid-shift from 2:00 a.m. to 10:00 a.m. to cover

4    the latter part of my shift, which is the

5    eight-hour period of my shift.

6         Q.   Do you know that person's name?

7         A.   I do not know her name because she was

8    not hired when I was there, but I can try to

9    acquire that for you.

10        Q.   Do you know her race?

11        A.   African American.

12        Q.   Do you know how long she worked -- do

13   you know if she's still employed at Schneider?

14        A.   I don't know that specifically.

15        Q.   Do you know who hired her?

16        A.   Travis Torrence and -- she had to go

17   through Travis, Doug and Marianne because that's

18   the hiring process.

19        Q.   And do you have any personal knowledge

20   as to who would have hired her?

21        A.   No, sir.

22        Q.   Can you go to your charge of

23   discrimination?  It's Bates-stamped Schneider

24   252.

25        A.   Yes, sir.



Page 212

1          Q.  Let's mark this as Plaintiff's

2     Deposition Exhibit number 25.

3               MS. LEGARE:  Hey, Pete?

4               MR. MILIANTI:  Yes?

5               MS. LEGARE:  Can we take a five-minute

6     break?

7               MR. MILIANTI:  Yes.

8      (Break taken from 4:44 p.m. to 4:59 p.m.)

9     BY MR. MILIANTI:

10          Q.  All right.  Ms. Geter, are you ready to

11     resume your testimony?

12          A.  Yes, sir.

13          Q.  You should have in front of you

14     Schneider 252, which is your charge of

15     discrimination, which is marked -- will be marked

16     as Plaintiff's Deposition Exhibit number 25.  And

17     is that your signature at the bottom?

18          (Plaintiff's Exhibit 25 was

19               marked and identified.)

20          A.  Yes, sir.

21          Q.  And it's dated April 18, 2019?

22          A.  Yes, sir.

23          Q.  Okay.  And if you look in the middle it

24     says, discrimination based on, and you checked

25     the boxes for race and disability; is that right?



Page 213

1      A.   My point of contact at EEOC did, but

2  yes.

3      Q.   Okay.  EEOC checked those two boxes on

4  your behalf?

5      A.   Yes, sir.

6      Q.   Okay.  Who prepared -- well, first of

7  all, do you see the section that states what the

8  particulars are?

9      A.   Yes, sir.

10      Q.   Okay.  Did you draft that?

11      A.   I did a written statement at EEOC office

12  here in Atlanta.

13      Q.   All right.  And did they then take your

14  statement and draft the particulars as reflected

15  here in Exhibit 25?

16      A.   Yes, sir.  Section one and section two,

17  and then, of course, I agree to section three as

18  well.

19      Q.   Okay.  And does this accurately reflect

20  the charges of discrimination that you intended

21  to bring against Schneider as of April 18, 2019?

22      A.   Yes, sir.

23      Q.   You can go to the next exhibit, which is

24  your complaint.

25      A.   Yes, sir.



Page 214

```
 1       Q.  I will mark this as Plaintiff's
 2  Deposition Exhibit number 26.  Did you review
 3  this complaint before it was filed?
 4       (Plaintiff's Exhibit 26 was
 5            marked and identified.)
 6       A.  Yes, sir.
 7       Q.  Okay.  If you'd like, please go ahead
 8  and take some time to look at it, but does this
 9  complaint accurately and truthfully reflect the
10  allegations you've raised against Schneider?
11       A.  Yes, sir.
12       Q.  And one of the claims that you're
13  bringing against Schneider in this lawsuit is
14  that you believe you've been discriminated
15  against because of your race; is that right?
16       A.  Correct.
17       Q.  And what are the facts that you believe
18  support your claim that you were discriminated
19  against because of your race?
20       A.  Because from my experience working there
21  for five years and what I have witnessed with my
22  own two eyes I just saw the discrepancies on how
23  people were treated.  And the year of 2018
24  specifically I can recall -- I remember looking
25  at the calendar and I was like, how come the
```



Page 215

```
 1   management -- even though management -- I know
 2   they are allotted the same amount of time as us
 3   sometimes, like the -- your time is dependent on
 4   your seniority and stuff.
 5        So when I started noticing when my
 6   management team started taking off more and
 7   leaving us, you know, when we needed help
 8   sometimes, and then I started noticing my other
 9   coworkers of other races was taken off more or
10   they had certain circumstances and they were
11   accommodated.  I just took note of that -- mental
12   note of it.
13        Q.  So you believe you were discriminated
14   against because of your race because your
15   management team was permitted to take more time
16   off than you?
17        A.  Not just me, just the entire staff.  I
18   noticed that Travis, I believe, was off that year
19   -- because I looked at the calendar, I looked at
20   the days and I counted one night everybody's time
21   and it was 80 -- I think it was 82 days total
22   around that time.  I knew he was covering for
23   Candis because she was out with her cancer
24   treatment, and then at that time, he was just
25   doing a lot of schedule maneuvering to
```



Page 216

1    accommodate for second shift.  So I knew why he

2    was taking a lot of time to, you know, make up

3    that time, but then at same time we're only

4    allotted maybe 25, 35 days a year.

5        Q.  And you said that the management team

6    was permitted to take more time off than all the

7    other area planning managers; is that right?

8        A.  That's correct.

9        Q.  Okay.  And some of those area planning

10   managers were white; is that right?

11       A.  Yes, sir.

12       Q.  Okay.  Other than your belief that your

13   management team was permitted to take more time

14   off than area planning managers, any other ways

15   in which you believe you were discriminated

16   against because of your race?

17       A.  I looked at my circumstances with

18   Tiffany Kitchens because we were hired around the

19   same time and I looked at how she was treated

20   compared to how I was treated.  At the end she's

21   still employed, I'm not.

22       Q.  Why do you believe that's tied to your

23   race?

24       A.  [Inaudible] -- I might not know the

25   circumstances in particular with her specific



Page 217

1    days off, but from my review of my environment,

2    she was being treated better, in my opinion,

3    because she still has her job.

4         Q.  You believe she still has her job

5    because she's white; is that your testimony?

6         A.  Yeah.

7         Q.  And how do you believe she was treated

8    better than you?

9         A.  She's working, I'm not.  And I saw that

10   when she was off at that time, they accommodated

11   her and they accommodated me, but then in the end

12   I didn't have a job and I was working on my

13   mental health.

14        Q.  So you believe she was treated more

15   favorably than you because she was accommodated

16   and you were not?

17        A.  Correct.  The entire management team is

18   white.

19        Q.  Well, is that your basis for believing

20   you were treated differently because of your race

21   because you're black and the management team is

22   white?

23        A.  Yes, sir.

24        Q.  All right.  And do you have any evidence

25   in support of your position that you were treated



Page 218

1    differently because of your race other than the

2    management team is white?

3         A.  Can you rephrase that for me?  I'm

4    sorry.

5         Q.  Sure.  Do you have any evidence to

6    support of your race discrimination claim other

7    than the fact that the management team is white

8    and you're black?

9         A.  So Tiffany was the main person I was

10   looking at that, and then also how they

11   accommodated Sarah Kopf.  I had way more

12   seniority than Sarah.  I helped train Sarah, and

13   then when she needed anything for her family or

14   her needs, they accommodated her without a

15   question of a doubt.

16        Q.  So you believe you were discriminated

17   against -- strike that.

18        You believe you were discriminated because

19   of your race because Sarah and Tiffany were

20   accommodated for their conditions and you were

21   not; is that your testimony?

22        A.  Yes, sir.  To a certain extent because

23   they accommodated me until April 12th.

24        Q.  Okay.  Any other evidence you have in

25   support of your race discrimination claim other



Page 219

```
 1    than what you've already testified to?

 2         A.   That's the only thing unless I can get

 3    you or you guys can get Schneider copies of their

 4    scheduling.

 5         Q.   As you sit here today, any other

 6    evidence you have in support of your claim that

 7    you were discriminated against by Schneider

 8    because of your race, other than what you've

 9    already testified to?

10         A.   Not at this time, sir, that I can

11    recollect.

12         Q.   You're also claiming in this lawsuit

13    that you believe you were retaliated against in

14    violation of the Americans with Disabilities Act;

15    is that correct?

16         A.   Yes, sir.

17         Q.   How you believe Schneider retaliated

18    against you?

19         A.   Because they fired me.

20         Q.   Why do you believe they fired -- how do

21    they -- you believe Schneider terminated you,

22    why?  Why do you believe Schneider terminated

23    you?

24         A.   I believe they terminated me because

25    they didn't want to deal with my circumstance,
```



Page 220

1  which was my mental health treatment and journey

2  of healing as an employee.

3      Q.  Any other reasons?

4      A.  Other than they didn't care.  That's it.

5      Q.  Other than what you've already testified

6  to here today, any other accommodations that you

7  requested from Schneider because of your medical

8  conditions?

9      A.  The only other accommodation I ever

10  requested from Schneider is when I had my hand

11  surgery in 2015 where I was on FMLA for that.

12  But other than this particular FMLA case as far

13  as mental health, no, sir.

14      Q.  Have you spoken with Ryan Wheeler since

15  the termination of your employment?

16      A.  Yes, sir.

17      Q.  And what have you spoken with him about?

18      A.  What he's doing in his life.

19      Q.  And how many times have you spoken with

20  Mr. Wheeler?

21      A.  I speak to Ryan at least twice -- two to

22  three times a week.

23      Q.  What information do you believe Ryan

24  Wheeler has in support of your claims against

25  Schneider?



Page 221

```
 1        A.   How he was treated on first shift and
 2   third shift and he had tense disagreements with
 3   Doug and Travis.
 4        Q.   And what are those text messages have to
 5   do with your claims against Schneider?
 6        A.   I didn't say text messages.  I'm sorry.
 7   I said tense disagreements.
 8        Q.   How do those disagreements with
 9   management relate to your claims against
10   Schneider?
11        A.   Whereas if another counterpart --
12   another Caucasian counterpart will suggest the
13   same things Ryan would suggest, they'll take that
14   person's word over Ryan's.
15        Q.   And how does that support any of your
16   claims in this lawsuit?
17        A.   Because the other person was Caucasian
18   and Ryan is African American.
19        Q.   Any other ways in which you believe
20   Mr. Wheeler will support your claims in this
21   lawsuit?
22        A.   He would support the claims of the
23   environment of how our work conditions were on
24   third shift.  Because he was hired for third and
25   then he went to the first and then they had to
```



Page 222

```
 1    rearrange the schedule after they terminated me
 2    to put him back on third, because he was one of
 3    the people that understood the shift, as well as
 4    I did and Desmond Seymour.  I was the --
 5         Q.  Any other way --
 6         A.  -- the lead on third shift.
 7         Q.  Any other ways you believe Mr. Wheeler
 8    will support your claims in this lawsuit?
 9         A.  I believe Ryan can just tell his side
10    from his viewpoint and he will -- I think he will
11    concur with the fact that it was some racial
12    tension -- not tension, but you can see the
13    little racial things they played in the office
14    and they thought no one could pay attention to
15    this.
16         Q.  Who is Jowayn Worrell?
17         A.  Jowayn Worrell is my boyfriend.
18         Q.  What information does he have in support
19    of your claims against Schneider?
20         A.  He witnessed me go through my breakdown
21    after I was terminated.
22         Q.  Anything else?
23         A.  He can tell you as from his perspective
24    how he saw things from a driver's perspective.
25         Q.  Is Mr. Worrell still employed by
```



MAGNA ▶
LEGAL SERVICES

Page 223

 1    Schneider?

 2         A.  Yes, sir.

 3         Q.  When did you start dating him?

 4         A.  I started dating him May 14, 2019.

 5         Q.  After your termination of employment?

 6         A.  Yes, sir.

 7         Q.  Did you know him prior to May 14, 2019?

 8         A.  Yes, sir.  He was one of the drivers on

 9    the fleet.

10         Q.  When did you meet him?

11         A.  December 2017, I believe, when he first

12    started at Schneider.

13         Q.  Did you have any text message or any

14    e-mail exchanges with Mr. Worrell relating to

15    your employment at Schneider?

16         A.  I texted him the night I was terminated

17    just letting him know I was no longer his

18    dispatcher because I sent a text message to all

19    my drivers.  And when he responded, he was like,

20    what you mean you're term?  I was like, I'm no

21    longer your dispatcher.  And that's the only

22    thing -- after then, it was all personal after I

23    was terminated.

24         Q.  How about with Mr. Wheeler?  Any

25    communications with Mr. Wheeler relating to your



Page 224

1    employment at Schneider?

2         A.  He thought it was messed up that I was

3    terminated.  My entire team was not happy about

4    that.  He said basically they had to hire the

5    girl, that I can't remember the name right now,

6    to fill in for me.  And then he was telling me

7    that -- he was like, it's still the same crap.

8    He was like, they're not listening.  And I was

9    like, I'm sorry.

10        Q.  So my question was, do you have any

11   communications with him, any text messages or

12   e-mail exchanges with Mr. Wheeler relating to

13   your employment at Schneider?

14        A.  Related, yeah, we were coworkers and

15   we're friends.  But do you mean pertaining --

16        Q.  Do you still have those messages?

17        A.  I'm sorry.  Do you mean pertaining to

18   this case, or pertaining to personal information?

19        Q.  Pertaining to your employment at

20   Schneider.

21        A.  Employment lately, no, sir.  Probably

22   prior to --

23        Q.  At any point in time --

24        A.  Probably so.

25        Q.  -- any communication with Mr. Wheeler



Page 225

1  related to your employment at Schneider?

2      A.  Yeah, I probably so from my old phones

3  and text messages.  As coworkers we do

4  communicate.

5      Q.  Who is Robert Best?

6      A.  A former driver at Schneider.

7      Q.  And what information do you believe

8  Mr. Best has in support of your claims against

9  Schneider?

10      A.  How third shift was ran because he was a

11  third shift driver.  And so he can, you know,

12  concur how if he comes in there's only one person

13  or two people working at night or how the

14  staffing was looking when he comes in to get his

15  paperwork or start his shift or any shift.

16      Q.  Okay.  You were terminated from

17  Schneider on April 12, 2019.  Did you -- would it

18  be accurate to say that -- strike that.

19      Was there any period of time after your

20  termination of employment from Schneider where

21  you were unable to work?

22      A.  No, sir.  I was able to work afterwards.

23      Q.  Did you search for any employment after

24  you were terminated from Schneider?

25      A.  Yes, sir.



Page 226

1      Q.   Did you search for employment during the
2  time period you were receiving long-term
3  disability benefits?
4      A.   Yes, sir.
5      Q.   Where did you look for employment?
6      A.   Amazon and I looked at -- Amazon and I
7  believe two logistics companies, and then I
8  started my school in June officially.  So I was
9  studying -- my first herbalist school, I started
10  that in late May, early June and then I was
11  looking for work, and then around August
12  schoolworkmore intense.
13      I remember my unemployment ended and
14  everything and I was like, you know what, I'm
15  going to focus on school.  And then when I got
16  school under my belt, meaning like I got used to
17  my schedule, I was like, okay, I'm going to go
18  back and see if I can get, like, a part time and
19  that's when COVID hit around, like, January or
20  February of 2020.
21      Q.   Okay.  So you started school in June of
22  2019; is that right?
23      A.   Yes, sir.
24      Q.   And by August of 2019 you decided to
25  focus on your schoolwork?



Page 227

```
 1        A.  Yes, sir.
 2        Q.  Okay.  So you voluntarily chose not to
 3   seek employment beginning in August of 2019; is
 4   that correct?
 5        A.  That's correct.
 6        Q.  Okay.  And then you were going to start
 7   looking for part-time work around the spring of
 8   2020; is that right?
 9        A.  Yes, sir.
10        Q.  Okay.  And then COVID hit; is that
11   right?
12        A.  Yes, sir.
13        Q.  And you now consider yourself a
14   full-time student, right?
15        A.  Yes, sir.
16        Q.  So you've been a full-time student since
17   August of 2019?
18        A.  Yes, sir.
19        Q.  Have you had any -- have you held any
20   job since April 12th of 2019?
21        A.  I'm sorry.  I don't know what --
22        Q.  Have you had any job -- have you held
23   any employment since your termination of
24   employment from Schneider?
25        A.  No, sir.
```



Page 228

```
 1        Q.   And you're not currently looking for a
 2   job; is that correct?
 3        A.   Correct.
 4        Q.   So would it be accurate to say that you
 5   haven't been looking for a full-time position
 6   since at least August of 2019?
 7        A.   That is correct.
 8        Q.   You mentioned you received unemployment
 9   compensation; is that right?
10        A.   Yes, sir.
11        Q.   Okay.  When did you start receiving
12   unemployment compensation?
13        A.   I believe it was June of 2019.  It took
14   about six weeks to eight weeks.
15        Q.   And how much did you receive in
16   unemployment compensation?
17        A.   306 a week.
18        Q.   306 a week?
19        A.   (Shakes head up and down.)
20        Q.   Is that a yes?
21        A.   Yes, sir.  I'm sorry.
22        Q.   And for how long?
23        A.   Until August of 2019.
24        Q.   Until you decided to go to school full
25   time?
```



Page 229

```
 1        A.  Yes, sir.

 2        Q.  And did you receive unemployment

 3   compensation during the same time period that you

 4   were receiving long-term disability benefits?

 5        A.  Yes, sir.  And they adjusted the wages

 6   for that.  Hartford did.

 7            MR. MILIANTI:  Okay.  If you can just

 8   give me a second, I think I might be done.

 9     (Break taken from 5:26 p.m. to 5:27 p.m.)

10   BY MR. MILIANTI:

11        Q.  Ms. Geter, it's my understanding you

12   were on short-term disability until June of 2019;

13   is that correct?

14        A.  Yes, sir.

15        Q.  Okay.  So from the termination of your

16   employment in April of 2019, you received

17   short-term disability benefits until June 2019?

18        A.  Yes, sir.

19        Q.  Do you know what the payment was for

20   those short-term disability benefits?

21        A.  No, sir.  But I can -- I can research

22   that for you and get that to you.

23        Q.  Was it a percentage of your salary?

24        A.  It was.  It was based upon me going back

25   to work in that time period, so it was based upon
```



Page 230

1   that schedule.  So I just can't give you a

2   specific amount.

3        Q.  And I believe you applied for a position

4   at Love Honey in February of 2019; does that

5   sound familiar?

6        A.  Yes.

7        Q.  What's Love Honey?

8        A.  It's a sex toy company.  It's a European

9   sex toy company that's made -- they have a

10  distribution place here in College Park.  And

11  because of their work environment, I was looking

12  for an easier, less stressful work environment to

13  help with the situation if Schneider couldn't

14  accommodate.

15       Q.  And were you interviewed for that

16  position?

17       A.  No, sir.

18       Q.  And did you also look for a position at

19  Canna Bistro?

20       A.  Yes, sir.

21       Q.  And what is Canna Bistro?

22       A.  It's a cannabis-based company here in

23  Atlanta.  It's black-owned and female-owned and

24  is a healthcare provider -- not healthcare

25  provider, but a healthcare supplement provider



Page 231

1    for cancer patients and people with medicinal

2    marijuana cards for the state of Georgia.

3         Q.  And when did you apply for employment?

4         A.  I applied for -- not employment, but to

5    be a distributor for their products and also a

6    consultant.

7         Q.  Did you interview for a position?

8         A.  Yes.  Not a position, but for that

9    particular opportunity.

10        Q.  And were you retained?

11        A.  Yes, but not for a long period of time

12   because it conflicted with my scheduling.

13        Q.  And when did you start working for Canna

14   Bistro?

15        A.  Not working for them, but I started

16   really, like, distributing, like, spring of 2019.

17   I was trying to -- that's when I was doing, like,

18   my research and obtaining information and going

19   to their events.

20        Q.  So you were an independent contractor

21   for Canna Bistro?

22        A.  Yes, sir.

23        Q.  As a distributor/consultant?

24        A.  Yes, sir.

25        Q.  And that started in the spring of 2019?



Page 232

```
 1        A.  Yes, sir.

 2        Q.  Were you still employed at Schneider at

 3   the time?

 4        A.  Yes, sir.

 5        Q.  And what days did you work or perform

 6   work for Canna Bistro?

 7        A.  I didn't perform work for them.  I was

 8   just signed up with that company so I could learn

 9   from them, and then if they needed my expertise

10   as far as like -- they make treats and stuff.  I

11   had a baking company, so they would call me and

12   say, hey, what would you suggest to go with this

13   type of flavor, and I would help them with that.

14        Q.  Well, how frequently would you help them

15   in the spring of 2019?

16        A.  Probably, like, three times that whole

17   time.

18        Q.  Did you earn any income from Canna

19   Bistro?

20        A.  No.

21             MR. MILIANTI:  Okay.  So that's all the

22   questions I have.  Thank you very much for your

23   time, Ms. Geter.

24             THE WITNESS:  Thank you.

25             MS. LEGARE:  Morgan, how do I tell you
```



Page 233

 1   what we want for the transcript?

 2           THE COURT REPORTER:  So usually I just

 3   ask if you want an e-Tran or a hard copy.

 4           MS. LEGARE:  I don't need a hard copy

 5   and I don't need a mini, I hate them.  Yeah, just

 6   an e-Tran and the exhibits, full-sized.

 7           THE COURT REPORTER:  Peter, is an

 8   e-Tran original okay with you?

 9           MR. MILIANTI:  Yeah, I do want a mini,

10   though.

11

12       (Deposition concluded at 5:34 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 234

```
 1              E R R A T A  S H E E T
 2
 3  IN RE:   CIERRA GETER,
 4           Plaintiff,
 5           vs.
 6           SCHNEIDER NATIONAL CARRIERS, INC.,
 7           Defendants.
 8
 9  CASE NO. 20-CV-01148-SCJ-JSA
10
    DEPOSITION TAKEN ON: 3/9/2021
11
12  I have read the transcript of my deposition and
    find that no changes are necessary.
13
    _____
14  CIERRA GETER
15
    Having read the transcript of my deposition,
16  I wish to make the following changes:
    (Please state reason.)
17
18  Page / Line /    Change       /      Reason
19
    _____/_____/_____/_____
20
    _____/_____/_____/_____
21
    _____/_____/_____/_____
22
    _____/_____/_____/_____
23
    _____/_____/_____/_____
24
    _____/_____/_____/_____
25
```



Page 235

1
_____/_____/_____/_____

2
_____/_____/_____/_____

3
_____/_____/_____/_____

4
_____/_____/_____/_____

5
_____/_____/_____/_____

6
_____/_____/_____/_____

7
_____/_____/_____/_____

8
_____/_____/_____/_____

9
_____/_____/_____/_____

10
_____/_____/_____/_____

11
_____/_____/_____/_____

12
_____/_____/_____/_____

13
_____/_____/_____/_____

14
15
_____
CIERRA GETER

16
17
18
Sworn to and subscribed before me,

19
this _____ day of _____, ____.

20
21
_____
Notary Public

22
My commission expires: _____

23
24
25



Page 236

```
 1                D I S C L O S U R E
 2    STATE OF GEORGIA
 3    COUNTY OF CHEROKEE
 4    SCHEDULED DEPOSITION OF:  CIERRA GETER
 5
          Pursuant to Article 10.B of the Rules and
 6    Regulations of the Board of Court Reporting of
      the Judicial Council of Georgia, I make the
 7    following disclosure:
 8        I am a Georgia Certified Court Reporter. I
      am here as a representative of Magna Legal
 9    Services.  I am not disqualified for a
      relationship of interest under provisions of
10    O.C.G.A. §9-11-28(c).
11        Magna Legal Services was contacted by the
      office of McGuire Woods, LLP to provide court
12    reporting services for this deposition.
13        Magna Legal Services will not be taking this
      deposition under any contract that is prohibited
14    by O.C.G.A. §15-47-37 (a) and (b).
15        Magna Legal Services has no Exclusive
      contract to provide reporting services with any
16    party to the case, any counsel in the case, or
      any reporter or reporting agency from whom a
17    referral might have been made to cover this
      deposition.
18
          Magna Legal Services will charge its usual
19    and customary rates to all parties in the case,
      and a financial discount will not be given to any
20    party to this litigation.
21
22        This, the 9th day of March, 2021.
23
24    _____
          Morgan Spriggs, CCR/CVR
25        CCR number GA: 5920-2001-3003-5712
```



Page 237

1                  C E R T I F I C A T E

2    STATE OF GEORGIA   )

3    CHEROKEE COUNTY    )

4

5         I hereby certify that the foregoing

6    transcript was taken down as stated in the

7    caption, and the proceedings were reduced to

8    print under my direction and control.

9         I further certify that the transcript is a

10   true and correct record of the evidence given at

11   the said proceedings.

12        I further certify that I am neither a

13   relative or employee or attorney or counsel to

14   any of the parties, nor financially or otherwise

15   interested in this matter.

16

17        This, the 22nd day of March, 2021.

18

19        _____

     Morgan Spriggs, CCR/CVR

20   CCR No. GA: 5920-2001-3003-5712

21

22

23

24

25

