# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. 22-11285-BB

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

## APPELLANT'S APPENDIX – VOL. III

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

# CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

## Eleventh Circuit Court of Appeals Case No. 22-11285-BB

### Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
|---|---|---|---|
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
|----|-----|------------|------------------------------------------------------------------|
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B  |     |            | Certificate of Service |

Page 175

1       Q.   Where you received -- did you receive

2   money --

3       A.   Yes, yes.

4       Q.   -- for your long-term disability

5   benefits?

6       A.   Yes.

7       Q.   And how much?

8       A.   Sixty-six percent of my salary.

9       Q.   And you started receiving those benefits

10  end of April, beginning of May 2019?

11      A.   Yes, sir.

12      Q.   And do you recall what your salary was

13  at the time that you started receiving those

14  benefits?

15      A.   $51,780.

16      Q.   And are you currently receiving

17  long-term disability benefits?

18      A.   No, sir.

19      Q.   Okay.  When did you stop receiving

20  long-term disability benefits?

21      A.   I believe fall of 2019 -- no, April of

22  2020 actually.  April 2020.

23      Q.   So you received long-term disability

24  benefits for approximately one year?

25      A.   One year for mental health according to



Page 176

1    Hartford's policies.

2        Q.  And you received those benefits for

3    approximately one year at 66 percent of your

4    salary?

5        A.  Yes, sir.

6        Q.  If you could go to -- I believe it's the

7    next document in the stack.  It should be

8    Schneider 301.

9        A.  Yes.

10       Q.  We'll mark this is Plaintiff's

11   Deposition Exhibit number 22.  Do you recognize

12   this document?

13          (Plaintiff's Exhibit 22 was

14             marked and identified.)

15       A.  Yes, sir.  It's the termination letter.

16       Q.  Okay.  And did you receive this letter

17   on or about April 12, 2019?

18       A.  I received it April 12th, 11:15 p.m. by

19   Travis Torrence in the on-on-one room.

20       Q.  Okay.  And if you look at that first

21   paragraph, it states were out on a continuous

22   leave of absence due to medical reasons from

23   October 9, 2018 through January 1, 2019 at which

24   time you exhausted your 12 weeks of FMLA; do you

25   agree with that?



Page 177

```
 1        A.  Yes, sir.
 2        Q.  It goes on to state that Schneider was
 3   able to accommodate you returning to work on a
 4   partial schedule starting on January 2, 2019; is
 5   that correct?
 6        A.  Yes, sir.
 7        Q.  And that Schneider had been
 8   accommodating you working three out of your
 9   scheduled four days since January 2, 2019; is
10   that correct?
11        A.  Correct.
12        Q.  And then you see there's three bullets
13   there?
14        A.  Yes, sir.
15        Q.  Did you agree with the timeline and the
16   accommodations that were granted?
17        A.  Yes, sir.
18        Q.  And then it states on April 1, 2019 we
19   received updated information from your physician
20   that indicates you may be able to return to full
21   time on June 5, 2019 with three days in the
22   office and the other day working from home; do
23   you see that?
24        A.  Yes, sir.
25        Q.  And then Schneider goes on to state,
```



1    based on this information, carefully considering

2    your request for us to continue to accommodate

3    you, we are unable to continue accommodating a

4    partial schedule, right?

5         A.  Yes, sir.

6         Q.  And they denied your request for

7    additional accommodations, right?

8         A.  Yes, sir.

9         Q.  Okay.  And you indicated that you --

10   that Travis provided you with a copy of this

11   letter on April 12, 2019 at 11:15 p.m.?

12        A.  Yes, sir.

13        Q.  Okay.  And you said it was in the

14   one-on-one room?

15        A.  Yes, sir.

16        Q.  And that was in your office -- or at the

17   office facility?

18        A.  Yes, sir.

19        Q.  Okay.  And who was present for that

20   meeting?

21        A.  It was me and Travis in the one-on-one

22   room.  Sarah Kopf was outside in the office area

23   with a driver.  Wendy was in there.  The driver's

24   name is Wendy.

25        Q.  Well, who was in the room when you were



Page 179

1    speaking with Travis?  Was it you and Travis?

2         A.  Just me and Travis.

3         Q.  Okay.  And as best you can recall, what

4    was said during that meeting and by whom?

5         A.  He asked me how I was doing, and then I

6    was like, oh -- like we always joke.  Everybody

7    had a little joke when we go into the one-on-one

8    room, like what happened now?  Like that's what

9    we always do.  And so I was like, uh-oh, what's

10   wrong?  He was like, oh, nothing, but I need to

11   talk to you, and he had more of a serious look on

12   his face, and then he handed me this paper.  I

13   read it and he was like so we can no longer

14   accommodate you, so we need you to turn in your

15   laptop and everything tonight.

16        Q.  Did you say anything?

17        A.  Yeah, I said something.  I said how dare

18   you do this to me when you know what predicament

19   I'm going through and then how much I have helped

20   out the team.  And I said it's some bull crap.  I

21   had to call my mom because she had to calm me

22   down, because I was about to go into a manic

23   rage.

24        Q.  Did Travis say anything in response?

25        A.  He said it was out of his hands and out



1   of his control, he tried his best.  And I said,

2   no, you didn't.  You didn't try your best because

3   you would've came to me and had another step to

4   help me.

5        Q.  Anything else that you can recall in the

6   conversation you had with Travis on that day?

7        A.  I remember I left my termination letter.

8   I had to come back and get it and he put my

9   termination on a sticky note in a folder on a

10  piece of tape outside the door and locked the

11  door so I wouldn't come back into the front --

12  onto the -- into the office, so I had to pick up

13  the paperwork on the porch.

14       Q.  Anything else that you can recall?

15       A.  I was very upset.  I even had to call my

16  psychiatrist that night at 12 o'clock at night.

17       Q.  Why do you believe Schneider denied your

18  accommodation requests as of April 12, 2019?

19       A.  I don't think they wanted to deal with

20  me.

21       Q.  I'm sorry?

22       A.  I didn't think they wanted to deal with

23  me any longer.

24       Q.  Why not?

25       A.  Because right after I was terminated,



Page 181

1    they moved somebody from first shift to third

2    shift and hired two more people.  I thought they

3    just didn't want to deal with me no more, to be

4    quite honest.

5         Q.  What do you mean when you say they

6    didn't want to deal with you any longer?

7         A.  Deal with my circumstance.

8         Q.  And what do you mean when you say your

9    circumstance?

10        A.  Deal with my mental health situation and

11   my health concerns -- [inaudible] -- me as an

12   employee, a human being.

13        Q.  Do you know who made the decision to

14   deny your continued accommodation requests?

15        A.  Travis told me that night it was out of

16   his control, so I just thought it was just upper

17   management, which is Marianne and I thought it

18   was HR, that's the only way I can think of it at

19   that time.  But specifically, no, sir.

20        Q.  We can go to the next exhibit.  It's

21   Schneider 24 through 26.

22        A.  Yes, sir.

23        Q.  During the time period of February 14,

24   2019 through April 12, 2019, do you -- do you

25   know who was performing the job duties that you



1    would typically perform on that fourth day that

2    you would normally work?

3         A.  It was probably between, like I stated

4    earlier, Travis, Audrianne, Desmond.  One of them

5    three.  And since Audrianne was already out on

6    leave, it was between Desmond and Travis at that

7    time.

8         Q.  And that would have been in addition to

9    their normal work schedule; is that right?  As

10   far as you know?

11        A.  Not -- not -- I know Desmond

12   specifically that's -- they -- that's his

13   schedule.  Like they moved it around so everybody

14   can accommodate because Audrianne was out and

15   with my predicament as well, so they shift the

16   schedules around.  There's only three people on

17   third shift other than the two temps, so you only

18   was working with three technically if Travis

19   didn't show up.  So if he was working second

20   shift, he wouldn't do third shift sometimes, or

21   sometimes he'll pull a double shift.  If he

22   couldn't cover the third, then we by ourselves.

23        Q.  Okay.  If Travis or Desmond had to work

24   on that Sunday that you would normally work, that

25   would be in addition to the work that they would



Page 183

1    normally perform on that day; is that correct?

2        A.  I don't understand that question.  I'm

3    sorry.

4        Q.  Sure.  If Desmond was scheduled to work

5    on Sunday and you because of your modified

6    schedule we're not working on that Sunday, then

7    Desmond would do his work and the work that was

8    normally assigned to you; is that right?

9        A.  Correct.  Yes.

10       Q.  And same thing with Travis.  If he was

11   either off on that Sunday or already scheduled on

12   that Sunday and he was doing the work that you

13   normally would do on Sundays, he was doing twice

14   as much work as he normally would do, correct?

15       A.  Correct.  And vice versa if they were

16   out on the days I had to work on Wednesday,

17   Thursday and Friday.

18       Q.  Let's go to Exhibit 23, and this is a

19   fax that's dated April 27, 2019.  It looks like

20   it was sent from Dr. Wanzo to Schneider's HR

21   leave administration team; is that correct?

22           (Plaintiff's Exhibit 23 was

23               marked and identified.)

24       A.  Yeah, they had sent this over to her

25   after my termination to get more information from



Page 184

```
 1   her and I took the -- I think they -- no, they
 2   faxed this over to her, I believe, or they sent
 3   her a packet.
 4        Q.  If you can go to Exhibit 20.  Do you
 5   have that in front of you?
 6        A.  No.  I'm sorry.  What page is that?
 7        Q.  Exhibit 20 is Schneider 315.
 8        A.  Thank you.  I did not know I was
 9   supposed to be writing on --
10        Q.  You're not.  You're not.
11        A.  Okay.
12        Q.  You're not.
13        A.  Okay.  That's the one -- 305.  I think I
14   just saw it.
15        Q.  It's just 315.  It's a letter from
16   Schneider dated April 2, 2019.
17        A.  I'm sorry.  I really just saw it and
18   then my fingers just -- here it is.  I know.
19   That's what I'm mad at because I flipped the
20   whole packet.
21        Okay.  And you said three what again?
22            MS. LEGARE:  Three hundred and fifteen.
23            THE WITNESS:  Yes, I got it.
24   BY MR. MILIANTI:
25        Q.  Okay.
```



Page 185

1       A.  Yes.

2       Q.  All right.  Okay.  And if you look near

3  the end of that letter, just before the bold it

4  says, please state the below physician statement

5  to your doctor to complete the additional

6  questions that are needed for your accommodation

7  extension requests.

8       A.  Right.

9       Q.  Please provide me with the requested

10 information from you and your health care

11 provider by no later than April 8, 2019, right?

12      A.  Okay.  Yes, sir.

13      Q.  Okay.  And then if you go to Exhibit 22

14 -- I'm sorry -- 23, the document we were just

15 looking at.

16      A.  Yes, sir.

17      Q.  Is this the physician statement that was

18 attached to Schneider's April 2, 2019 letter?

19      A.  April 2nd?  It should have been -- give

20 me one second.

21      Q.  Sure.

22      A.  I guess this was documents -- because

23 remember I didn't get it on the 2nd, so it came

24 like -- any time Schneider sent me anything --

25 I'm going to let you know this now -- it takes



Page 186

1    four days to get to my house.  So on the 2nd, but

2    possibly this was it.  I thought it was, like, a

3    regular return-to-work form that we were looking

4    at earlier.  That's what I was expecting, so my

5    apologies on that.

6          Q.  All right.  And Exhibit 23, do you

7    recall providing this Schneider document with

8    questions for your physician to Dr. Wanzo?

9          A.  I believe I dropped it off to her.

10         Q.  Okay.  Did you go over these questions

11   with Dr. Wanzo?

12         A.  I don't recall at this time.

13         Q.  Did she discuss her responses with you;

14   do you recall?

15         A.  I'm not familiar with this right now, to

16   be honest.

17         Q.  Okay.  All right.  It states at the top,

18   "Dear Physician, on 4/1/2019, you provided a

19   return-to-work form that indicated that Cierra

20   Geter needs to remain working a partial schedule

21   of three days per week through June 5, 2019.  We

22   have been accommodating Cierra working three days

23   per week since January 2, 2019."  Did I read that

24   correctly?

25         A.  Yes, sir.



Page 187

1      Q.   And you agree with those statements?

2      A.   Yes, sir.

3      Q.   Okay.  And then this document goes on to

4   ask your physician specific questions relating to

5   your condition and accommodation requests, right?

6      A.   Yes, sir.

7      Q.   And if you turn the page, this was

8   signed by Dr. Wanzo on April 27, 2019?

9      A.   Yes, sir.

10      Q.   Is that what it looks like to you?

11      A.   Yes, sir.

12      Q.   All right.  And then question two says,

13   provide a statement of any specific duties that

14   Cierra is unable to perform because of a medical

15   condition.  Provide information as to why she

16   cannot return to work full time.  And Dr. Wanzo

17   states, she is unable to work well in a

18   fast-paced, high pressure environment.  Did I

19   read that correctly?

20      A.   Yes, sir.

21      Q.   And do you agree with that statement?

22      A.   Yes, sir.

23      Q.   Did you discuss that with Dr. Wanzo that

24   you had difficulty working in a fast-paced, high

25   pressure environment?



Page 188

1  A.  Yes, sir.

2  Q.  And you had difficulty working in a

3 fast-paced, high pressure environment since the

4 time you returned on January 2, 2019, right?

5  A.  Yes, sir.

6  Q.  And you had difficulty working in a

7 fast-paced, high pressure environment prior to

8 January 2, 2019, correct?

9  A.  Correct.

10  Q.  Okay.  And your difficulty in working in

11 a fast-paced, high pressure environment -- when

12 did that start?  When did you start having

13 difficulty working in a fast-paced, high pressure

14 environment; do you recall?

15  A.  How far back we can go?  When Greg

16 Cochran was my manager.

17  Q.  And what time period would that have

18 been?

19  A.  2014 through the time he was -- 2014

20 through -- yeah, 2014 until February of 2016.

21  Q.  If you turn to the next page --

22  A.  Uh-huh.  (Affirmative).  Yes, sir.

23  Q.  I'm sorry.  If you can go to number

24 three -- question number three, it says that

25 you're currently working Wednesday, Thursday and



Page 189

1    Friday.  Is there a different day that she is

2    available to work if she can work four days?  Can

3    she work Monday through Friday, eight-hour

4    schedule?  And Dr. Wanzo states, she's unable to

5    work a Monday through Friday schedule; do you see

6    that?

7        A.  Yes, sir.

8        Q.  Did you ever discuss working a Monday

9    through Friday schedule for eight hours with

10   Dr. Wanzo?

11       A.  She asked how come we did not have that

12   type of schedule.  And I stated to her we was on

13   four tens.  We switched to four tens in 2018 as a

14   team, and then some people requested to go back

15   to five days because of some people personal

16   schedules they had conflicts with.  So some

17   people kept a four ten schedule and some people

18   went to a five-day schedule.

19       Q.  Do you believe you could have worked a

20   five-day, eight-hour schedule?

21       A.  I could have did a four-hour -- a

22   four-day, ten-hour day, not five.

23       Q.  If you turn the next page question five,

24   what is the total length of time the patient will

25   need to work three days per week from this point



Page 190

1    forward in your best professional estimate; do

2    you see that?

3          A.   Yes, sir.

4          Q.   And Dr. Wanzo wrote two to three months;

5    is that right?

6          A.   Yes, sir.  I see that.

7          Q.   Did you -- did you discuss that with

8    Dr. Wanzo?

9          A.   No, sir, I did not.

10         Q.   Did you agree with her assessment?

11         A.   For two to three months the length of

12   time total from the beginning of my time period

13   out?

14         Q.   I believe it would be -- from this point

15   forward would be from the date of this letter,

16   4/27/2019, or the day that Dr. Wanzo signed the

17   letter.

18         A.   Okay.  So to the point she was leaving

19   for June 29th, which was the last day she sent in

20   for HR, I believe, so the two months would be

21   accurate from April.  But like I stated earlier,

22   I wasn't requesting to be off or anything.  I was

23   just telling her the circumstances of my

24   environment at work.

25         Q.   If we can go to the next document, it's



Page 191

1   Bates CG-64 through 66.

2           (Plaintiff's Exhibit 24 was

3            marked and identified.)

4       A.  Yes, sir.

5       Q.  Okay.  And this is another fax that

6   Dr. Wanzo sent to the Hartford; is that right?

7       A.  Yes, sir.

8       Q.  And if you turn to the last page of this

9   document, it appears to be signed by Dr. Wanzo on

10  June 26, 2019; is that right?

11      A.  Yes, sir.

12      Q.  Do you recall going over this attending

13  physician's statement with Dr. Wanzo?

14      A.  Yes, sir.  Because Hartford needed it

15  because I applied for long-term disability back

16  in April.

17      Q.  Okay.

18      A.  So this is a continuation of that

19  process.

20      Q.  All right.  And if you turn to the third

21  page of this exhibit under functionality --

22      A.  Yes, sir.

23      Q.  -- do you see where it says, if yes

24  specify what activities are impaired and how; do

25  you see that?



Page 192

```
 1        A.  Yes, sir.

 2        Q.  And it says ability -- Dr. Wanzo wrote

 3   ability to work in a fast-paced, high pressure

 4   environment, right?

 5        A.  Yes, sir.

 6        Q.  Okay.  And you agree with that

 7   statement?

 8        A.  Yes, sir.

 9        Q.  And as of June 26, 2019, you agreed that

10   you had -- you were impaired in your ability to

11   work in a fast-paced, high pressure environment?

12        A.   I wasn't impaired, but I could work in

13   an environment just not high -- fast-paced.

14   Especially with the circumstances that was

15   presented to me with lack of staffing where I

16   kept requesting my management team to help me and

17   even help themselves as a team during that entire

18   process.

19        Q.  And a little bit -- a couple of

20   questions below that it says, what are your

21   patient's current abilities?  What type of work

22   can your patient perform?  And Dr. Wanzo wrote,

23   work three days per week, ten-hour days, work two

24   days of the three from home; do you see that?

25        A.   Yes, sir.
```



Page 193

```
 1        Q.   And did you agree with her assessment?
 2        A.   I agreed with work from home when I told
 3   her the circumstances if I was to work by myself
 4   as I, you know, stated earlier when I spoke to
 5   Travis back in February about that and early
 6   March.  So that's what that was based upon, but I
 7   didn't tell her to specifically, you know, say
 8   that.
 9        Q.   Okay.  But did you agree with her that
10   you needed to work -- that your current abilities
11   allowed you to work three days per week, ten-hour
12   days?
13        A.   Correct.
14        Q.   Okay.  And it asks, what is your target
15   date for return to work for your patient, and she
16   said on a part-time basis, August 26, 2019,
17   right?
18        A.   Right.
19        Q.   And then it says, if part time on what
20   date will your patient be able to increase to
21   full time.  And Dr. Wanzo wrote, September 23,
22   2019, right?
23        A.   Yes.
24        Q.   Okay.  And you agree with that statement
25   that as of September 23, 2019 you would be able
```



Page 194

```
 1    to return to work in a full-time capacity?
 2         A.  I stated to her specifically that I was
 3    able to return in June, but I can't go by her
 4    assessment because she's the physician, so it's
 5    up to her to make that request as well.
 6         Q.  Well, did you disagree with her when she
 7    said she thought you could return to full-time
 8    work on September 23, 2019?
 9         A.  I'd be full -- I thought I was going to
10    be full time before then, to be honest.  I
11    didn't --
12         Q.  Did you tell her --
13         A.  Go ahead.  I'm sorry.
14         Q.  Did you tell her not to write in
15    September 23, 2019?
16         A.  I didn't tell her to do nothing because
17    I wasn't in the office when she wrote this one
18    out, specifically, because I don't remember this
19    sheet.  I remember just talking to her and
20    handing her the documents and she was like, okay,
21    I'm going to fill it out.  I'll turn it into
22    Hartford.  Because I know she just have her note
23    -- you know, like her notepad, and she -- you
24    know, she's writing her doctor notes the whole
25    time when I'm sitting there.
```



Page 195

```
 1        Q.  Well, when did you receive this
 2   document?
 3        A.  This is after I was terminated, so the
 4   same week actually I was termed.  I got this,
 5   like, on the 10th and I was termed the 12th.
 6        Q.  You received this -- this document is
 7   dated June 26, 2019.  Do you recall when you
 8   would have received this document?
 9        A.  Oh, that document in particular.  I'm
10   sorry.  I'd have to look at my e-mail from
11   Hartford and I can get you that date
12   specifically.
13        Q.  Okay.  Well, when you received this
14   document, would you have reviewed it?
15        A.  Excuse you?
16        Q.  When you received this document, would
17   you have reviewed it?
18        A.  Yeah, it wasn't -- it wouldn't have been
19   filled that out.  It'd be blank.  That's what I'm
20   saying.  So it wasn't going to be full when I
21   received it.
22        Q.  When did you receive a completed,
23   filled-out copy of this document?
24        A.  She filled it out on the 26th.  I
25   probably got a copy of it late June or early
```



Page 196

1    July, but I still would have to go back.  I'm not

2    going to give you a falsified date.

3         Q.  Okay.  So the best you can recall is

4    late June, early July 2019?

5         A.  Yes, sir.

6         Q.  All right. And would you have reviewed

7    your doctor's responses to the questions

8    contained in this document?

9         A.  Correct.

10        Q.  All right.  And when you saw that your

11   doctor indicated that you could return to

12   full-time work as of September 23, 2019, did you

13   call up your doctor and disagree with her?

14        A.  No, sir, because I was already

15   disgruntled.  This is almost two months after I

16   was terminated.  I was highly upset at Schneider.

17        Q.  Did you contact the Hartford and tell

18   them that you didn't think that you thought you

19   could return to full-time work prior to September

20   23, 2019?

21        A.  When I called the Hartford and told them

22   I was terminated, they was dismayed and they

23   couldn't believe I was terminated.  I understand.

24   I understand.

25        Q.  When you received this document and your



Page 197

1    physician wrote that you could return to

2    full-time work on September 23, 2019, did you

3    contact the Hartford and tell them that you

4    disagreed with that?

5         A.   No, sir.

6         Q.   Ms. Geter, are you aware of any area

7    planning managers who requested a reduced work

8    schedule for approximately six months?

9         A.   To my knowledge, yes, sir.

10        Q.   Who?

11        A.   Tiffany Kitchens and the young lady we

12   spoke about earlier with the cancer treatment,

13   Candis Smith.

14        Q.   Anyone else?

15        A.   Other than maternity leave for

16   Audrianne.  She was pregnant twice, so that's a

17   six to eight-week time period on that.  But other

18   than that, that's it.

19        Q.   Okay.  And Audrianne, she was out on

20   leave due to the birth of her children; is that

21   right?

22        A.   Yes, sir.  Correct.

23        Q.   And she was out on a continuous leave of

24   absence for six to eight weeks; is that your

25   understanding?



1     A.  Correct.

2     Q.  Okay.  And do you know whether or not

3  those absences were covered under the FMLA?

4     A.  Yes, they were.

5     Q.  Okay.  And those are the leaves to which

6  you're referring with respect to Ms. Williams; is

7  that correct?

8     A.  Yes, sir.

9     Q.  All right.  And Tiffany Kitchens, what

10  job position did she have?

11     A.  Area planning manager, first shift.

12     Q.  First shift?

13     A.  Yes, sir.

14     Q.  And do you know who she reported to?

15     A.  Doug Horton -- I'm sorry.  Rodney Dunn,

16  because she was over Jacksonville.

17     Q.  Rodney Dunn?

18     A.  Yes.  I'm sorry.  R-o-d-n-e-y; D-u-n-n.

19     Q.  And do you know what her regular work

20  hours would be?

21     A.  Her hours she'll come in at 6:30 in the

22  morning and leave at 4:30 in the evening.  3:30

23  to 4:30 depending on what's going on in her

24  market.

25     Q.  And how do you know that?



1       A.   Because I was on third shift and I had

2    transferred the markets.   If I had her markets

3    the night before, I'm the person she has to talk

4    to.   Third and first shift communicates --

5       Q.   Do you --

6       A.   Uh-huh.  (Affirmative).  Go ahead.  I'm

7    sorry.

8       Q.   Do you know what days of the week she

9    would work?

10      A.   It was Monday through Friday because

11   first shift never worked weekends.   They just --

12      Q.   She worked a Monday --

13      A.   I'm sorry.

14      Q.   -- through Friday schedule, 6:30 a.m. to

15   3:30, 4:30 p.m.?

16      A.   Yes, sir.

17      Q.   Okay.  And when -- when do you believe

18   she took a reduced -- or started working a

19   reduced schedule?

20      A.   I believe that was -- I started noticing

21   it around, like, July or August of 2018.

22   Everybody started noticing she wasn't coming to

23   work a lot, and then we just started inquiring is

24   she okay, and then we found out she was out on

25   leave.



Page 200

1          Q.  Do you know why she was out on leave?

2          A.  Her parents were ill, and she was going

3     through a mental distress as well -- mental

4     health distress as well.

5          Q.  Do you know if she took time off under

6     the FMLA?

7          A.  Yeah.  I didn't see her for, like, a

8     good month to two months almost.

9          Q.  Do you know one way or the other whether

10    she took time off under the FMLA?

11         A.  No, sir.  But for that time -- that

12    amount of time, we don't have that amount of time

13    on our time off for personal time off.  We're

14    only allotted -- she was hired -- rehired August

15    of 2014 a month after me, so that's how I know I

16    have the seniority far as time-wise.  How we get

17    our time, we get on that same scale, so we had

18    the same amount of time.  So she wasn't allotted

19    that.  In order to be out that amount of time you

20    have to be on FMLA.

21         Q.  And you said you believe that she was

22    not coming into work a lot beginning in July or

23    August of 2018; is that right?

24         A.  Yes, sir.  She was starting to work

25    reduced hours.  Like her days instead of five



Page 201

 1   days, you'll see Tiffany three days a week.

 2        Q.  And how long was she working a -- do you

 3   believe she was working a reduced schedule?

 4        A.  For a while.  Even when I came back on

 5   July -- in January she was doing at least once a

 6   week she wasn't coming in to help with her

 7   parents, I believe.

 8        Q.  Do you know if she had any time

 9   available under the FMLA during the July, August

10   2018 through January 2019 time period?

11        A.  No, sir.  That was none of my business.

12        Q.  Do you know what specific days she was

13   off during the July 2018 through January 2019

14   time period?

15        A.  No, sir, not specifically.

16        Q.  Do you know the specific circumstances

17   of her time off during the July 2018 through

18   January 2019 time period?

19        A.  The reason for her time being off?  Is

20   that the premise of the question?

21        Q.  Do you know the specific -- I'll

22   rephrase it.

23        Do you know the specific days that she would

24   have been off during the July 2018 through

25   January 2019 time period?



Page 202

1       A.   No, sir, I do not recall that, but I do

2   remember when she first -- when it first started

3   becoming noticeable, she was missing days, like a

4   few weeks at a time and we was looking for her,

5   like making sure she was okay.

6       Q.   And you believe --

7       A.   Inquiring as a team.  Uh-huh.

8   (Affirmative).

9       Q.   Do you believe Ms. Kitchens returned to

10   a full-time schedule in January of 2019?

11       A.   No, sir.

12       Q.   No, sir?  I'm sorry?

13       A.   No, sir.

14       Q.   When do you believe she returned to a

15   full-time schedule?

16       A.   I just know on certain days until the

17   time I was terminated, Tiffany was allowed to

18   work at home some days and she was off on some

19   days.  So I don't have a specific time period for

20   that.  Travis would definitely know that, and

21   Rodney would know that.

22       Q.   So you don't know when she would have

23   returned to a full-time schedule; would that be

24   an accurate statement?

25       A.   Yes, sir, that's correct.



Page 203

```
 1        Q.  You weren't charged with approving any
 2   of her time off, were you?
 3        A.  I'm sorry?
 4        Q.  You weren't charged with approving any
 5   of her time off; is that correct?
 6        A.  No, sir, I was not.
 7        Q.  Okay.  And you wouldn't have access to
 8   her time records as to when she had -- when she
 9   took time off; is that correct?
10        A.  That is correct.  Only management and HR
11   has those abilities.
12        Q.  And is it your understanding that
13   Ms. Kitchens instead of working five days a week
14   was working a set schedule of four days a week or
15   three days per week?
16        A.  Correct.
17        Q.  That was your understanding; it was a
18   set schedule?
19        A.  It wasn't a set schedule, not to my
20   understanding.  It was just when I saw her, I
21   started noticing, oh, she's only here twice a
22   week, oh, she's here three days a week, but it
23   wasn't a set schedule.
24        Q.  Do you know if Ms. Kitchens had
25   requested any type of a workplace accommodation
```



Page 204

1    during the July 2018 through January 2019 time

2    period?

3         A.   No, sir, not to my knowledge.

4         Q.   Do you know who would've approved any

5    requests by Ms. Kitchens to work a reduced

6    schedule?

7         A.   Yes.   Rodney Dunn and Marianne

8    Biskey-Rose.

9         Q.   What is Ms. Kitchens' race?

10        A.   Caucasian.

11        Q.   Okay.   Other than Ms. Kitchens -- one

12   second.   You mentioned Ms. Kitchens and Candis

13   Smith --

14        A.   Yes, sir.

15        Q.   -- you believe were permitted to work a

16   reduced schedule, right?

17        A.   Yes, sir.   And also, can I add one more

18   person?   I'm sorry.

19        Q.   Sure.

20        A.   Sarah Kopf, she was allotted to --

21   during her divorce and dealing with her children

22   during that time period, she was allotted to help

23   with her schedule to work from home remotely when

24   she couldn't have childcare if her ex-husband

25   couldn't ascertain the kids at that time.   So she



Page 205

1    would request to work from home on those

2    particular days even afterwards after I left.  I

3    know of this because she told me herself.  She

4    was like, yeah, Travis had to let me take off on

5    this day.  I was like, oh, okay.

6         Q.  And we've already discussed Ms. Smith

7    and the circumstances surrounding her time off;

8    is that correct?

9         A.  Yes, sir.

10        Q.  And Sarah Kopf, who did she report to?

11        A.  Travis Torrence, Doug Horton and

12   Marianne Biskey-Rose.  That's her chain of

13   command.

14        Q.  All right.  And you said that she was

15   permitted to work from home?

16        A.  Yes, sir.

17        Q.  Do you know if Ms. Kopf ever worked a

18   reduced schedule?

19        A.  Not a reduced schedule, to my knowledge,

20   but she was -- when days where she needed to work

21   remotely, they granted it to her.

22        Q.  And what shift did she work?

23        A.  Second shift.

24        Q.  Other than Ms. Kitchens and Ms. Smith,

25   any other area planning manager whom you believe



Page 206

1    was permitted to work a reduced schedule?

2        A.  No other person in the office had any

3    other medical or any other issues that I remember

4    that was out like that, so no, sir.

5        Q.  And you said that Ms. Kopf was permitted

6    to work from home.  Do you know how long she was

7    permitted to work from home?  How long this

8    accommodation was provided?

9        A.  All the way into COVID.

10       Q.  When did it start?

11       A.  When did she start working?  So it had

12   to be around, I believe, spring -- no, fall of 20

13   -- no.  It was starting spring of 2018 she was

14   having difficulties with her ex-husband around

15   that time with the scheduling with the kids, and

16   then if a scenario popped up with the kids --

17   that was give or take once or twice a month from

18   that point on and then she'll work from home on

19   those days.  Yeah, she'll work from home.

20       Q.  So with respect to Ms. Kopf, it's your

21   testimony that beginning in the spring of 2018,

22   she was permitted to work from home one or two

23   days a month to care for her children?

24       A.  To help accommodate.  Yes, sir.  Working

25   remote from home.  Uh-huh.  (Affirmative).



1      Q.  She was permitted to work from home one

2   or two days a month from the spring of 2018 until

3   the start of COVID?

4      A.  Yes, sir.  And then the entire staff was

5   remote.

6      Q.  And that would have been the spring of

7   2020 would be the start of COVID?

8      A.  Yes, sir.

9      Q.  Okay.  So it's your testimony that from

10  the spring of 2018 to the spring of 2020 Ms. Kopf

11  was permitted to work from home one or two times

12  a month to care for her children?

13     A.  Yes, sir.

14     Q.  What evidence do you have in support of

15  your contention?

16         MS. LEGARE:  Objection.

17     A.  I spoke with her on the phone

18  personally.  Like she'd checked on me and I'd

19  check on her and the kids, just how we always

20  did, and she'd bring it up in conversation.

21  Yeah, I had to take off on this day or I had to

22  work from home.  I'm like, oh, okay.

23  BY MR. MILIANTI:

24     Q.  So she would tell you in conversations

25  that she would have to work from home?



1  A.  Yes, sir.

2  Q.  And you deduced based on those

3 conversations that it was one or two times a

4 month?

5  A.  Yes, sir.  Because she would tell me --

6  Q.  Any other evidence you have in support

7 of your contention that she was permitted to work

8 from home one or two days a month since from the

9 spring of 2018, spring of 2020?

10  A.  No, sir.  The evidence would have to

11 come from Schneider on that part.  Because our

12 logins on our laptop shows where we log in at.

13  Q.  Other than Ms. Kopf, any other area

14 planning managers you believe were permitted to

15 work from home?

16  A.  Due to what circumstance?  Can I ask

17 that question for you?

18  Q.  Sure.  Any area planning managers who

19 were permitted to work from home on any type of a

20 regular basis?

21  A.  The entire staff there.

22  Q.  The entire staff regularly worked from

23 home?

24  A.  Not regularly, but they didn't have a

25 problem if you've called out sick if you didn't



1  want to use your sick leave, or let's say you was

2  out of town when you couldn't make it back in

3  town, but you took your laptop with you, which

4  some people would do, and you'd be like, hey, I

5  can't make it.  I'm working in North Carolina

6  this week.  Okay.  And they'd allow them to work

7  remotely.

8      Q.  Are you aware of any area planning

9  managers who were permitted to work from home one

10 day per week?

11     A.  As a schedule?

12     Q.  Yes.

13     A.  No, sir.

14     Q.  Were you aware of any area planning

15 managers who were permitted to work from home one

16 day every two weeks?

17     A.  No, sir.  Other than what I saw from

18 Tiffany Kitchens, like from what I saw, no.

19     Q.  Would it be accurate to say that area

20 planning managers were permitted generally to

21 work from home if they were ill or if some type

22 of an emergent circumstance came up --

23     A.  Yes, sir.

24     Q.  -- would that be accurate?

25     A.  Yes, sir.  Because they even had us



Page 210

```
 1   leave the premise when, like, we have tornado
 2   warnings in the area.  They have us move from
 3   that location because we're in a triple wide
 4   trailer to the hotel, like, two miles away to be
 5   in a commercial building instead of going home.
 6   So they'll have us probably go there if it's like
 7   a storm, but still work remotely.  And if the
 8   storm gets too bad, they'll tell everybody to go
 9   home once it's permissible.  And then if we had
10   ice or sleet and Atlanta shuts down for that, we
11   can work from home.  And that happened on two
12   occasions -- three occasions while I was employed
13   with Schneider for five years just with the ice
14   alone.
15        Q.  Do you know if your position was
16   replaced or if somebody replaced you?
17        A.  Ryan Wheeler was moved from first shift
18   to third shift to cover me.
19        Q.  How do you know that?
20        A.  Because he told me.
21        Q.  Do you know if anyone was hired to
22   replace your position on third shift?
23        A.  I can't remember her name.  I don't know
24   if she's no longer there, but it was a young lady
25   they hired right after me to cover my shifts.
```



Page 211

1    She came in at 2:00 a.m., which I requested

2    Travis at that time have somebody come in

3    mid-shift from 2:00 a.m. to 10:00 a.m. to cover

4    the latter part of my shift, which is the

5    eight-hour period of my shift.

6         Q.  Do you know that person's name?

7         A.  I do not know her name because she was

8    not hired when I was there, but I can try to

9    acquire that for you.

10        Q.  Do you know her race?

11        A.  African American.

12        Q.  Do you know how long she worked -- do

13   you know if she's still employed at Schneider?

14        A.  I don't know that specifically.

15        Q.  Do you know who hired her?

16        A.  Travis Torrence and -- she had to go

17   through Travis, Doug and Marianne because that's

18   the hiring process.

19        Q.  And do you have any personal knowledge

20   as to who would have hired her?

21        A.  No, sir.

22        Q.  Can you go to your charge of

23   discrimination?  It's Bates-stamped Schneider

24   252.

25        A.  Yes, sir.



Page 212

1      Q.  Let's mark this as Plaintiff's

2  Deposition Exhibit number 25.

3          MS. LEGARE:  Hey, Pete?

4          MR. MILIANTI:  Yes?

5          MS. LEGARE:  Can we take a five-minute

6  break?

7          MR. MILIANTI:  Yes.

8   (Break taken from 4:44 p.m. to 4:59 p.m.)

9  BY MR. MILIANTI:

10     Q.  All right.  Ms. Geter, are you ready to

11  resume your testimony?

12     A.  Yes, sir.

13     Q.  You should have in front of you

14  Schneider 252, which is your charge of

15  discrimination, which is marked -- will be marked

16  as Plaintiff's Deposition Exhibit number 25.  And

17  is that your signature at the bottom?

18         (Plaintiff's Exhibit 25 was

19             marked and identified.)

20     A.  Yes, sir.

21     Q.  And it's dated April 18, 2019?

22     A.  Yes, sir.

23     Q.  Okay.  And if you look in the middle it

24  says, discrimination based on, and you checked

25  the boxes for race and disability; is that right?



Page 213

1        A.   My point of contact at EEOC did, but

2    yes.

3        Q.   Okay.  EEOC checked those two boxes on

4    your behalf?

5        A.   Yes, sir.

6        Q.   Okay.  Who prepared -- well, first of

7    all, do you see the section that states what the

8    particulars are?

9        A.   Yes, sir.

10       Q.   Okay.  Did you draft that?

11       A.   I did a written statement at EEOC office

12   here in Atlanta.

13       Q.   All right.  And did they then take your

14   statement and draft the particulars as reflected

15   here in Exhibit 25?

16       A.   Yes, sir.  Section one and section two,

17   and then, of course, I agree to section three as

18   well.

19       Q.   Okay.  And does this accurately reflect

20   the charges of discrimination that you intended

21   to bring against Schneider as of April 18, 2019?

22       A.   Yes, sir.

23       Q.   You can go to the next exhibit, which is

24   your complaint.

25       A.   Yes, sir.



Page 214

1          Q.  I will mark this as Plaintiff's

2     Deposition Exhibit number 26.  Did you review

3     this complaint before it was filed?

4          (Plaintiff's Exhibit 26 was

5               marked and identified.)

6          A.  Yes, sir.

7          Q.  Okay.  If you'd like, please go ahead

8     and take some time to look at it, but does this

9     complaint accurately and truthfully reflect the

10    allegations you've raised against Schneider?

11         A.  Yes, sir.

12         Q.  And one of the claims that you're

13    bringing against Schneider in this lawsuit is

14    that you believe you've been discriminated

15    against because of your race; is that right?

16         A.  Correct.

17         Q.  And what are the facts that you believe

18    support your claim that you were discriminated

19    against because of your race?

20         A.  Because from my experience working there

21    for five years and what I have witnessed with my

22    own two eyes I just saw the discrepancies on how

23    people were treated.  And the year of 2018

24    specifically I can recall -- I remember looking

25    at the calendar and I was like, how come the



```
 1   management -- even though management -- I know
 2   they are allotted the same amount of time as us
 3   sometimes, like the -- your time is dependent on
 4   your seniority and stuff.
 5        So when I started noticing when my
 6   management team started taking off more and
 7   leaving us, you know, when we needed help
 8   sometimes, and then I started noticing my other
 9   coworkers of other races was taken off more or
10   they had certain circumstances and they were
11   accommodated.  I just took note of that -- mental
12   note of it.
13        Q.  So you believe you were discriminated
14   against because of your race because your
15   management team was permitted to take more time
16   off than you?
17        A.  Not just me, just the entire staff.  I
18   noticed that Travis, I believe, was off that year
19   -- because I looked at the calendar, I looked at
20   the days and I counted one night everybody's time
21   and it was 80 -- I think it was 82 days total
22   around that time.  I knew he was covering for
23   Candis because she was out with her cancer
24   treatment, and then at that time, he was just
25   doing a lot of schedule maneuvering to
```



Page 216

1    accommodate for second shift.  So I knew why he

2    was taking a lot of time to, you know, make up

3    that time, but then at same time we're only

4    allotted maybe 25, 35 days a year.

5         Q.  And you said that the management team

6    was permitted to take more time off than all the

7    other area planning managers; is that right?

8         A.  That's correct.

9         Q.  Okay.  And some of those area planning

10   managers were white; is that right?

11        A.  Yes, sir.

12        Q.  Okay.  Other than your belief that your

13   management team was permitted to take more time

14   off than area planning managers, any other ways

15   in which you believe you were discriminated

16   against because of your race?

17        A.  I looked at my circumstances with

18   Tiffany Kitchens because we were hired around the

19   same time and I looked at how she was treated

20   compared to how I was treated.  At the end she's

21   still employed, I'm not.

22        Q.  Why do you believe that's tied to your

23   race?

24        A.  [Inaudible] -- I might not know the

25   circumstances in particular with her specific



1  days off, but from my review of my environment,

2  she was being treated better, in my opinion,

3  because she still has her job.

4       Q.  You believe she still has her job

5  because she's white; is that your testimony?

6       A.  Yeah.

7       Q.  And how do you believe she was treated

8  better than you?

9       A.  She's working, I'm not.  And I saw that

10  when she was off at that time, they accommodated

11  her and they accommodated me, but then in the end

12  I didn't have a job and I was working on my

13  mental health.

14       Q.  So you believe she was treated more

15  favorably than you because she was accommodated

16  and you were not?

17       A.  Correct.  The entire management team is

18  white.

19       Q.  Well, is that your basis for believing

20  you were treated differently because of your race

21  because you're black and the management team is

22  white?

23       A.  Yes, sir.

24       Q.  All right.  And do you have any evidence

25  in support of your position that you were treated



Page 218

```
 1   differently because of your race other than the
 2   management team is white?
 3        A.  Can you rephrase that for me?  I'm
 4   sorry.
 5        Q.  Sure.  Do you have any evidence to
 6   support of your race discrimination claim other
 7   than the fact that the management team is white
 8   and you're black?
 9        A.  So Tiffany was the main person I was
10   looking at that, and then also how they
11   accommodated Sarah Kopf.  I had way more
12   seniority than Sarah.  I helped train Sarah, and
13   then when she needed anything for her family or
14   her needs, they accommodated her without a
15   question of a doubt.
16        Q.  So you believe you were discriminated
17   against -- strike that.
18        You believe you were discriminated because
19   of your race because Sarah and Tiffany were
20   accommodated for their conditions and you were
21   not; is that your testimony?
22        A.  Yes, sir.  To a certain extent because
23   they accommodated me until April 12th.
24        Q.  Okay.  Any other evidence you have in
25   support of your race discrimination claim other
```



Page 219

1    than what you've already testified to?

2         A.   That's the only thing unless I can get

3    you or you guys can get Schneider copies of their

4    scheduling.

5         Q.   As you sit here today, any other

6    evidence you have in support of your claim that

7    you were discriminated against by Schneider

8    because of your race, other than what you've

9    already testified to?

10        A.   Not at this time, sir, that I can

11   recollect.

12        Q.   You're also claiming in this lawsuit

13   that you believe you were retaliated against in

14   violation of the Americans with Disabilities Act;

15   is that correct?

16        A.   Yes, sir.

17        Q.   How you believe Schneider retaliated

18   against you?

19        A.   Because they fired me.

20        Q.   Why do you believe they fired -- how do

21   they -- you believe Schneider terminated you,

22   why?  Why do you believe Schneider terminated

23   you?

24        A.   I believe they terminated me because

25   they didn't want to deal with my circumstance,



1   which was my mental health treatment and journey

2   of healing as an employee.

3       Q.  Any other reasons?

4       A.  Other than they didn't care.  That's it.

5       Q.  Other than what you've already testified

6   to here today, any other accommodations that you

7   requested from Schneider because of your medical

8   conditions?

9       A.  The only other accommodation I ever

10  requested from Schneider is when I had my hand

11  surgery in 2015 where I was on FMLA for that.

12  But other than this particular FMLA case as far

13  as mental health, no, sir.

14      Q.  Have you spoken with Ryan Wheeler since

15  the termination of your employment?

16      A.  Yes, sir.

17      Q.  And what have you spoken with him about?

18      A.  What he's doing in his life.

19      Q.  And how many times have you spoken with

20  Mr. Wheeler?

21      A.  I speak to Ryan at least twice -- two to

22  three times a week.

23      Q.  What information do you believe Ryan

24  Wheeler has in support of your claims against

25  Schneider?



Page 221

```
 1        A.  How he was treated on first shift and
 2   third shift and he had tense disagreements with
 3   Doug and Travis.
 4        Q.  And what are those text messages have to
 5   do with your claims against Schneider?
 6        A.  I didn't say text messages.  I'm sorry.
 7   I said tense disagreements.
 8        Q.  How do those disagreements with
 9   management relate to your claims against
10   Schneider?
11        A.  Whereas if another counterpart --
12   another Caucasian counterpart will suggest the
13   same things Ryan would suggest, they'll take that
14   person's word over Ryan's.
15        Q.  And how does that support any of your
16   claims in this lawsuit?
17        A.  Because the other person was Caucasian
18   and Ryan is African American.
19        Q.  Any other ways in which you believe
20   Mr. Wheeler will support your claims in this
21   lawsuit?
22        A.  He would support the claims of the
23   environment of how our work conditions were on
24   third shift.  Because he was hired for third and
25   then he went to the first and then they had to
```



Page 222

```
 1   rearrange the schedule after they terminated me
 2   to put him back on third, because he was one of
 3   the people that understood the shift, as well as
 4   I did and Desmond Seymour.  I was the --
 5        Q.   Any other way --
 6        A.   -- the lead on third shift.
 7        Q.   Any other ways you believe Mr. Wheeler
 8   will support your claims in this lawsuit?
 9        A.   I believe Ryan can just tell his side
10   from his viewpoint and he will -- I think he will
11   concur with the fact that it was some racial
12   tension -- not tension, but you can see the
13   little racial things they played in the office
14   and they thought no one could pay attention to
15   this.
16        Q.   Who is Jowayn Worrell?
17        A.   Jowayn Worrell is my boyfriend.
18        Q.   What information does he have in support
19   of your claims against Schneider?
20        A.   He witnessed me go through my breakdown
21   after I was terminated.
22        Q.   Anything else?
23        A.   He can tell you as from his perspective
24   how he saw things from a driver's perspective.
25        Q.   Is Mr. Worrell still employed by
```



Page 223

1     Schneider?

2          A.  Yes, sir.

3          Q.  When did you start dating him?

4          A.  I started dating him May 14, 2019.

5          Q.  After your termination of employment?

6          A.  Yes, sir.

7          Q.  Did you know him prior to May 14, 2019?

8          A.  Yes, sir.  He was one of the drivers on

9     the fleet.

10         Q.  When did you meet him?

11         A.  December 2017, I believe, when he first

12    started at Schneider.

13         Q.  Did you have any text message or any

14    e-mail exchanges with Mr. Worrell relating to

15    your employment at Schneider?

16         A.  I texted him the night I was terminated

17    just letting him know I was no longer his

18    dispatcher because I sent a text message to all

19    my drivers.  And when he responded, he was like,

20    what you mean you're term?  I was like, I'm no

21    longer your dispatcher.  And that's the only

22    thing -- after then, it was all personal after I

23    was terminated.

24         Q.  How about with Mr. Wheeler?  Any

25    communications with Mr. Wheeler relating to your



Page 224

1    employment at Schneider?

2         A.  He thought it was messed up that I was

3    terminated.  My entire team was not happy about

4    that.  He said basically they had to hire the

5    girl, that I can't remember the name right now,

6    to fill in for me.  And then he was telling me

7    that -- he was like, it's still the same crap.

8    He was like, they're not listening.  And I was

9    like, I'm sorry.

10        Q.  So my question was, do you have any

11   communications with him, any text messages or

12   e-mail exchanges with Mr. Wheeler relating to

13   your employment at Schneider?

14        A.  Related, yeah, we were coworkers and

15   we're friends.  But do you mean pertaining --

16        Q.  Do you still have those messages?

17        A.  I'm sorry.  Do you mean pertaining to

18   this case, or pertaining to personal information?

19        Q.  Pertaining to your employment at

20   Schneider.

21        A.  Employment lately, no, sir.  Probably

22   prior to --

23        Q.  At any point in time --

24        A.  Probably so.

25        Q.  -- any communication with Mr. Wheeler



Page 225

 1    related to your employment at Schneider?

 2         A.  Yeah, I probably so from my old phones

 3    and text messages.  As coworkers we do

 4    communicate.

 5         Q.  Who is Robert Best?

 6         A.  A former driver at Schneider.

 7         Q.  And what information do you believe

 8    Mr. Best has in support of your claims against

 9    Schneider?

10         A.  How third shift was ran because he was a

11    third shift driver.  And so he can, you know,

12    concur how if he comes in there's only one person

13    or two people working at night or how the

14    staffing was looking when he comes in to get his

15    paperwork or start his shift or any shift.

16         Q.  Okay.  You were terminated from

17    Schneider on April 12, 2019.  Did you -- would it

18    be accurate to say that -- strike that.

19         Was there any period of time after your

20    termination of employment from Schneider where

21    you were unable to work?

22         A.  No, sir.  I was able to work afterwards.

23         Q.  Did you search for any employment after

24    you were terminated from Schneider?

25         A.  Yes, sir.



Page 226

1      Q.   Did you search for employment during the
2   time period you were receiving long-term
3   disability benefits?
4      A.   Yes, sir.
5      Q.   Where did you look for employment?
6      A.   Amazon and I looked at -- Amazon and I
7   believe two logistics companies, and then I
8   started my school in June officially.  So I was
9   studying -- my first herbalist school, I started
10   that in late May, early June and then I was
11   looking for work, and then around August
12   schoolworkmore intense.
13      I remember my unemployment ended and
14   everything and I was like, you know what, I'm
15   going to focus on school.  And then when I got
16   school under my belt, meaning like I got used to
17   my schedule, I was like, okay, I'm going to go
18   back and see if I can get, like, a part time and
19   that's when COVID hit around, like, January or
20   February of 2020.
21      Q.   Okay.  So you started school in June of
22   2019; is that right?
23      A.   Yes, sir.
24      Q.   And by August of 2019 you decided to
25   focus on your schoolwork?



Page 227

```
 1        A.  Yes, sir.
 2        Q.  Okay.  So you voluntarily chose not to
 3   seek employment beginning in August of 2019; is
 4   that correct?
 5        A.  That's correct.
 6        Q.  Okay.  And then you were going to start
 7   looking for part-time work around the spring of
 8   2020; is that right?
 9        A.  Yes, sir.
10        Q.  Okay.  And then COVID hit; is that
11   right?
12        A.  Yes, sir.
13        Q.  And you now consider yourself a
14   full-time student, right?
15        A.  Yes, sir.
16        Q.  So you've been a full-time student since
17   August of 2019?
18        A.  Yes, sir.
19        Q.  Have you had any -- have you held any
20   job since April 12th of 2019?
21        A.  I'm sorry.  I don't know what --
22        Q.  Have you had any job -- have you held
23   any employment since your termination of
24   employment from Schneider?
25        A.  No, sir.
```



Page 228

```
 1        Q.   And you're not currently looking for a
 2   job; is that correct?
 3        A.   Correct.
 4        Q.   So would it be accurate to say that you
 5   haven't been looking for a full-time position
 6   since at least August of 2019?
 7        A.   That is correct.
 8        Q.   You mentioned you received unemployment
 9   compensation; is that right?
10        A.   Yes, sir.
11        Q.   Okay.  When did you start receiving
12   unemployment compensation?
13        A.   I believe it was June of 2019.  It took
14   about six weeks to eight weeks.
15        Q.   And how much did you receive in
16   unemployment compensation?
17        A.   306 a week.
18        Q.   306 a week?
19        A.   (Shakes head up and down.)
20        Q.   Is that a yes?
21        A.   Yes, sir.  I'm sorry.
22        Q.   And for how long?
23        A.   Until August of 2019.
24        Q.   Until you decided to go to school full
25   time?
```



Page 229

```
 1        A.  Yes, sir.

 2        Q.  And did you receive unemployment

 3   compensation during the same time period that you

 4   were receiving long-term disability benefits?

 5        A.  Yes, sir.  And they adjusted the wages

 6   for that.  Hartford did.

 7            MR. MILIANTI:  Okay.  If you can just

 8   give me a second, I think I might be done.

 9    (Break taken from 5:26 p.m. to 5:27 p.m.)

10   BY MR. MILIANTI:

11        Q.  Ms. Geter, it's my understanding you

12   were on short-term disability until June of 2019;

13   is that correct?

14        A.  Yes, sir.

15        Q.  Okay.  So from the termination of your

16   employment in April of 2019, you received

17   short-term disability benefits until June 2019?

18        A.  Yes, sir.

19        Q.  Do you know what the payment was for

20   those short-term disability benefits?

21        A.  No, sir.  But I can -- I can research

22   that for you and get that to you.

23        Q.  Was it a percentage of your salary?

24        A.  It was.  It was based upon me going back

25   to work in that time period, so it was based upon
```



MAGNA
LEGAL SERVICES

Page 230

1    that schedule.  So I just can't give you a

2    specific amount.

3         Q.  And I believe you applied for a position

4    at Love Honey in February of 2019; does that

5    sound familiar?

6         A.  Yes.

7         Q.  What's Love Honey?

8         A.  It's a sex toy company.  It's a European

9    sex toy company that's made -- they have a

10   distribution place here in College Park.  And

11   because of their work environment, I was looking

12   for an easier, less stressful work environment to

13   help with the situation if Schneider couldn't

14   accommodate.

15        Q.  And were you interviewed for that

16   position?

17        A.  No, sir.

18        Q.  And did you also look for a position at

19   Canna Bistro?

20        A.  Yes, sir.

21        Q.  And what is Canna Bistro?

22        A.  It's a cannabis-based company here in

23   Atlanta.  It's black-owned and female-owned and

24   is a healthcare provider -- not healthcare

25   provider, but a healthcare supplement provider



Page 231

1    for cancer patients and people with medicinal

2    marijuana cards for the state of Georgia.

3         Q.  And when did you apply for employment?

4         A.  I applied for -- not employment, but to

5    be a distributor for their products and also a

6    consultant.

7         Q.  Did you interview for a position?

8         A.  Yes.  Not a position, but for that

9    particular opportunity.

10        Q.  And were you retained?

11        A.  Yes, but not for a long period of time

12   because it conflicted with my scheduling.

13        Q.  And when did you start working for Canna

14   Bistro?

15        A.  Not working for them, but I started

16   really, like, distributing, like, spring of 2019.

17   I was trying to -- that's when I was doing, like,

18   my research and obtaining information and going

19   to their events.

20        Q.  So you were an independent contractor

21   for Canna Bistro?

22        A.  Yes, sir.

23        Q.  As a distributor/consultant?

24        A.  Yes, sir.

25        Q.  And that started in the spring of 2019?



Page 232

```
 1        A.  Yes, sir.

 2        Q.  Were you still employed at Schneider at

 3   the time?

 4        A.  Yes, sir.

 5        Q.  And what days did you work or perform

 6   work for Canna Bistro?

 7        A.  I didn't perform work for them.  I was

 8   just signed up with that company so I could learn

 9   from them, and then if they needed my expertise

10   as far as like -- they make treats and stuff.  I

11   had a baking company, so they would call me and

12   say, hey, what would you suggest to go with this

13   type of flavor, and I would help them with that.

14        Q.  Well, how frequently would you help them

15   in the spring of 2019?

16        A.  Probably, like, three times that whole

17   time.

18        Q.  Did you earn any income from Canna

19   Bistro?

20        A.  No.

21            MR. MILIANTI:  Okay.  So that's all the

22   questions I have.  Thank you very much for your

23   time, Ms. Geter.

24            THE WITNESS:  Thank you.

25            MS. LEGARE:  Morgan, how do I tell you
```



Page 233

1    what we want for the transcript?

2              THE COURT REPORTER:  So usually I just

3    ask if you want an e-Tran or a hard copy.

4              MS. LEGARE:  I don't need a hard copy

5    and I don't need a mini, I hate them.  Yeah, just

6    an e-Tran and the exhibits, full-sized.

7              THE COURT REPORTER:  Peter, is an

8    e-Tran original okay with you?

9              MR. MILIANTI:  Yeah, I do want a mini,

10   though.

11

12       (Deposition concluded at 5:34 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 234

```
 1              E R R A T A   S H E E T
 2
 3   IN RE:   CIERRA GETER,
 4            Plaintiff,
 5            vs.
 6            SCHNEIDER NATIONAL CARRIERS, INC.,
 7            Defendants.
 8
 9   CASE NO. 20-CV-01148-SCJ-JSA
10
     DEPOSITION TAKEN ON: 3/9/2021
11
12   I have read the transcript of my deposition and
     find that no changes are necessary.
13
     _____
14   CIERRA GETER
15
     Having read the transcript of my deposition,
16   I wish to make the following changes:
     (Please state reason.)
17
18   Page / Line /    Change      /      Reason
19
     _____/_____/_____/_____
20
     _____/_____/_____/_____
21
     _____/_____/_____/_____
22
     _____/_____/_____/_____
23
     _____/_____/_____/_____
24
     _____/_____/_____/_____
25
```



Page 235

1
     _____/_____/_____/_____

2
     _____/_____/_____/_____

3
     _____/_____/_____/_____

4
     _____/_____/_____/_____

5
     _____/_____/_____/_____

6
     _____/_____/_____/_____

7
     _____/_____/_____/_____

8
     _____/_____/_____/_____

9
     _____/_____/_____/_____

10
     _____/_____/_____/_____

11
     _____/_____/_____/_____

12
     _____/_____/_____/_____

13
     _____/_____/_____/_____

14
15
     _____
     CIERRA GETER

16
17
18
     Sworn to and subscribed before me,

19
     this _____ day of _____, ____.

20
21
     _____
     Notary Public
22
     My commission expires: _____
23
24
25



Page 236

```
 1              D I S C L O S U R E
 2   STATE OF GEORGIA
 3   COUNTY OF CHEROKEE
 4   SCHEDULED DEPOSITION OF:  CIERRA GETER
 5
          Pursuant to Article 10.B of the Rules and
 6   Regulations of the Board of Court Reporting of
     the Judicial Council of Georgia, I make the
 7   following disclosure:
 8        I am a Georgia Certified Court Reporter. I
     am here as a representative of Magna Legal
 9   Services.  I am not disqualified for a
     relationship of interest under provisions of
10   O.C.G.A. §9-11-28(c).
11        Magna Legal Services was contacted by the
     office of McGuire Woods, LLP to provide court
12   reporting services for this deposition.
13        Magna Legal Services will not be taking this
     deposition under any contract that is prohibited
14   by O.C.G.A. §15-47-37 (a) and (b).
15        Magna Legal Services has no Exclusive
     contract to provide reporting services with any
16   party to the case, any counsel in the case, or
     any reporter or reporting agency from whom a
17   referral might have been made to cover this
     deposition.
18
          Magna Legal Services will charge its usual
19   and customary rates to all parties in the case,
     and a financial discount will not be given to any
20   party to this litigation.
21
22        This, the 9th day of March, 2021.
23
24   _____
     Morgan Spriggs, CCR/CVR
25   CCR number GA: 5920-2001-3003-5712
```



Page 237

1                C E R T I F I C A T E

2   STATE OF GEORGIA   )

3   CHEROKEE COUNTY    )

4

5        I hereby certify that the foregoing

6   transcript was taken down as stated in the

7   caption, and the proceedings were reduced to

8   print under my direction and control.

9        I further certify that the transcript is a

10  true and correct record of the evidence given at

11  the said proceedings.

12       I further certify that I am neither a

13  relative or employee or attorney or counsel to

14  any of the parties, nor financially or otherwise

15  interested in this matter.

16

17       This, the 22nd day of March, 2021.

18

19       _____

         Morgan Spriggs, CCR/CVR

20       CCR No. GA: 5920-2001-3003-5712

21

22

23

24

25



# EXHIBIT B



Deposition of:

**Travis Torrence**

*April 6, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF GEORGIA

3                          ATLANTA DIVISION

4

5      CIERRA GETER                    :

                                       : 1:20-cv-01148-SCJ-JSA

6               Plaintiff(s)    :

                                       :

7          vs.                         :

                                       :

8      SCHNEIDER NATIONAL        :

       CARRIERS, INC.                  :

9                                      :

                Defendant(s).   :

10

11                                  - - -

12                    Tuesday, April 6, 2021

13                                  - - -

14            Zoom deposition of TRAVIS TORRENCE, taken

15      pursuant to notice at Atlanta, Georgia, beginning at

16      10:12 a.m., before JULIE C. WILSON, a Georgia

17      Certified Court Reporter and Registered Professional

18      Reporter.

19

20                    VERITEXT LEGAL SOLUTIONS

                         SOUTHEAST REGION

21            1075 Peachtree Street NE - Suite 3625

                     Atlanta, Georgia 30309

22

23

24

25

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   LEGARE, ATTWOOD & WOLFE, LLC
     BY:  CHERYL B. LEGARE, ESQUIRE
 4   125 Clairemont Avenue
     Suite 380
 5   Decatur, GA 30030
     (470) 823-4000
 6   cblegare@law-llc.com
     Representing the Plaintiff(s)
 7
 8
     MCGUIREWOODS LLP
 9   BY:  PETER A. MILIANTI, ESQUIRE
     77 W. Wacker Drive
10   Suite 4100
     Chicago, IL 60601
11   (312) 750-2765
     pmilianti@mcguirewoods.com
12   Representing the Defendant(s)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 3

1                        I N D E X

2                           - - -

3      TESTIMONY OF:   TRAVIS TORRENCE

4      By MS. LEGARE          6

5

6                           - - -

7                    E X H I B I T S

8      EXHIBIT                                      PAGE

       NUMBER            DESCRIPTION               MARKED

9

10     Exhibit 4         APM Job Description        32

11     Exhibit 8         FMLA request              37

12     Exhibit 10        Certificate of Healthcare  38

13                       Provier

14     Exhibit 30        10/26/18 email            39

15     Exhibit 15        Accomodation approval     43

16     Exhibit 22        Accomodation denial       48

17     Exhibit 31        12/17/18 email            58

18     Exhibit 32        1/21/19 email             60

19     Exhibit 46        Answers to Interrogatories 62

20

21

22

23

24

25

Page 4

1                    D E P O S I T I O N   S U P P O R T   I N D E X

2     INSTRUCTION NOT TO ANSWER

3     PAGE                                      LINE

4     NONE.

5

6     REQUEST FOR PRODUCTION OF DOCUMENTS

7     PAGE                                      LINE

8     NONE.

9

10    STIPULATIONS

11    PAGE                                      LINE

12    5                                         15

13

14    QUESTIONS MARKED

15    PAGE                                      LINE

16    NONE.

17

18

19

20

21

22

23

24

25

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 5

1                    MS. LEGARE:  Mr. Torrence, thank you

2          for being here today.  I'm Cheryl Legare and I

3          represent Cierra Geter in the lawsuit she has

4          brought against Schneider National Carriers.

5          Is it okay if I call Schneider National

6          Carriers "Schneider" today?

7                    THE WITNESS:  Yes.

8                    MS. LEGARE:  Okay.  And we're here

9          today in the matter that is currently pending

10         in the Northern District of Georgia.  And this

11         deposition is being taken pursuant to notice

12         and agreement of parties for all purposes under

13         the Federal Rules of Civil Procedure and

14         Federal Rules of Evidence.

15                   Are we reserving objections except to

16         form or privilege, Pete?

17                   MR. MILIANTI:  Yes.

18                   MS. LEGARE:  And did you want to read

19         and sign?

20                   MR. MILIANTI:  Yes, please.

21                   MS. LEGARE:  Can you swear in the

22         witness please, Julie.

23                   THE COURT REPORTER:  Due to the need

24         for this deposition to take place remotely

25         because of the Government's order for social

Travis Torrence                                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 6

1          distancing, the parties will stipulate that the

2          court reporter may swear in the witness over

3          Veritext virtual videoconference and that the

4          witness has verified that he is, in fact,

5          Travis Torrence.

6                              - - -

7                    TRAVIS TORRENCE, after having been

8          duly sworn, was examined and testified as

9          follows:

10                             - - -

11                        EXAMINATION

12                             - - -

13     BY MS. LEGARE

14     Q.    Mr. Torrence, can you please state your full

15     name for the record.

16     A.    Travis Demino Torrence.

17     Q.    And have you ever been deposed before?

18     A.    No, ma'am.

19     Q.    Have you ever testified in court before?

20     A.    No, ma'am.

21     Q.    You understand that we're here today and you

22     are under oath just as if we were in court under

23     penalty of perjury, right?

24     A.    Yes, ma'am.

25     Q.    And is there any reason other than the passage

Page 7

1    of time that you couldn't give complete and accurate

2    testimony here today?

3    A.    No, ma'am.

4    Q.    Are you taking any medications that might

5    affect your memory or make you sleepy?

6    A.    No, ma'am.

7    Q.    There are just a few ground rules.  I'm sure

8    that Pete shared these with you.  But if you don't

9    understand a question I ask you, just ask me to

10   rephrase it.  I'm happy to do that, okay?

11   A.    Okay.

12   Q.    It's particularly hard on these remote

13   depositions for the court reporter to get everything

14   down.  So it's really important that we don't talk

15   over each other, okay?

16   A.    Yes, ma'am.

17   Q.    If you need a break, just let me know, okay?

18   A.    Okay.

19   Q.    I don't anticipate more than a few hours.

20              MS. LEGARE:  Pete, if you think we

21         need lunch, that's fine.  But I'm happy to plug

22         through because I'm thinking two or three at

23         the most.

24              MR. MILIANTI:  That works for me.

25

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 8

1    BY MS. LEGARE
2    Q.   Mr. Torrence, can you state your full name for
3    the record, which has already been used.
4         Are you currently employed by Schneider?
5    A.   Yes, ma'am.
6    Q.   What did you do to prepare for your deposition
7    today?  And I don't want to know about any
8    conversations that you had with your lawyer or any
9    of his associates.
10   A.   I'm sorry.  Can you ask that again.
11   Q.   Yeah.  Did you do anything outside of meet with
12   your lawyer to prepare for the deposition today?
13   A.   No, ma'am.
14   Q.   Did you review any documents to prepare for
15   today?
16   A.   Yes.
17   Q.   Can you tell me sitting here today, whether you
18   know if the documents you looked at had numbers down
19   in the right-hand corner?
20   A.   I believe so, yes.
21   Q.   Did you look at any documents that haven't been
22   turned over to the lawyers?
23   A.   Not that I'm aware.
24   Q.   And did you review the deposition transcript
25   from Ms. Geter's deposition?

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 9

1      A.    No, ma'am.

2      Q.    Did you talk outside of the presence of the

3      lawyers to any other Schneider employees about your

4      deposition here today?

5      A.    No, ma'am.

6      Q.    I find we can go a little faster if I just ask

7      some of those early questions broadly.  Can you tell

8      me about your employment history with Schneider.

9      A.    Sure.  I started with Schneider in an IOS role

10     in 2012.  Was in that role for a little over a year.

11     And then I was in the dispatch analyst, later

12     renamed area planning analyst role for about three

13     years.

14          Since promoted to operations team leader, which

15     I was in for about three years.  And I have been in

16     my current role as operations manager since summer

17     of last year.

18     Q.    Have you had, and specifically in your

19     management roles -- well, let me ask you this.

20          When you were an area dispatch analyst, area

21     planning manager, did you have any supervisory

22     responsibilities?

23     A.    No, ma'am.

24     Q.    But when you became a team lead, did that

25     change?

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 10

1    A.    Yes.

2    Q.    Tell me what your supervisor responsibilities

3    were as a team lead.

4    A.    My direct reports were the area planning

5    managers and driver leaders that were second and

6    third shift in our office.

7    Q.    Did you say driver leaders?

8    A.    Yes.

9    Q.    And I'm not -- this is not to discount the

10   position at all.  But is an area planning manager or

11   was an area planning manager essentially a

12   dispatcher?

13   A.    Yes.

14                 MR. MILIANTI:  Object to the form.

15   BY MS. LEGARE

16   Q.    And as operations team leader, I think you said

17   you were responsible for second and third -- why

18   don't we do this.

19        What are the shifts, or at least at the time in

20   2018 and 2019, what were the shifts at Schneider?

21   A.    We ran three shifts in our office.

22   Q.    What were the times of the shifts?

23   A.    The actual start times varied a little bit.

24   But we will say 7:00 to 4:00, 3:00 to 11:00, and

25   11:00 to 8:00 a.m.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 11

1    Q.    And 7:00 to 4:00 was first shift?

2    A.    Yes.

3    Q.    3:00 to 11:00 was second?

4    A.    Yep.

5    Q.    And then 11:00 to 8:00 was third?

6    A.    Yes, ma'am.

7    Q.    Who was operations team lead or was there

8    operations team lead responsible for first shift?

9    A.    No.

10   Q.    No.  Do you know why?

11   A.    The area planning managers and other support

12   folks and driver leaders reported to the operations

13   manager on first shift.

14   Q.    Reported directly to operations manager.  Do

15   you still work in Georgia?

16   A.    Yes.

17   Q.    And where are you located?

18   A.    Fairburn.

19   Q.    Can you tell me -- I'm going to ask you two

20   questions.  What organizational structure of the

21   Fairburn location was in 2019 and what it is now.

22   So let me start with 2019.

23   A.    So there was a ramp operations manager who had

24   the accountability over the entire southeast

25   intermodal operations.  Two operations managers

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 12

1    reported to the ramp operations manager.  Those two

2    operations managers split the accountability of the

3    different rail hubs in the southeast.

4         My team lead role reported to one of the OMs.

5    Then the second and third shifts' area planning

6    managers and the one driver leader on second shift

7    reported to me.

8    Q.   Who in 2019 was the ramp operations manager?

9    A.   Mary Ann Rose.

10   Q.   And who were the two operations managers before

11   you got promoted?

12   A.   Doug Horton and Rodney Dunn.

13   Q.   Who did you report to?

14   A.   Doug Horton.

15   Q.   When you say southeast intermodal -- what did

16   you call it?  Sorry.

17   A.   So we have six different hubs in the southeast

18   that our office has accountability for.

19   Q.   And what -- are they the same now as they were

20   in 2019?

21   A.   Yes.

22   Q.   And what are they?

23   A.   Atlanta, Charlotte, Savannah, Jacksonville,

24   Winter Haven, Miami.

25   Q.   Can you tell me what the organizational

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1    structure is now.

2    A.    So there is still a ramp operations -- the

3    title has changed since then, I believe.  So it's

4    the director who has accountability over the entire

5    southeast.  There are two operations managers that

6    report directly to that director role.  And then all

7    of the area -- or all of the driver leaders and

8    support folks in our office report to the two

9    operations managers.

10   Q.    So there is no team lead anymore?

11   A.    No.  And we no longer have area planning

12   managers in our office.

13   Q.    Who were the area planning managers before

14   Ms. Geter was terminated?  So she was one of them.

15   A.    All of them in our office?

16   Q.    Yeah.  If you remember?

17   A.    Desmond Seymour, Audriana Williams, Candace

18   Smith, Marshall Mock, Quincy Parker and Sara Kopf.

19   Q.    How about Tiffany Parker?

20   A.    Tiffany -- there is no Tiffany Parker that has

21   worked in our office.

22   Q.    Tiffany -- is there any Tiffany in your office?

23   A.    Yes.  Tiffany Kitchens.

24   Q.    And she's an area claim manager, right?

25   A.    Yes.

Page 14

1   Q.   After Ms. Geter was terminated, was she

2   replaced?

3   A.   Yes.

4   Q.   And who was she replaced with?

5   A.   Jalisa Simpson.

6   Q.   What is Ms. Simpson's race, if you know?

7   A.   She is black.

8   Q.   And is Desmond Seymour still employed?

9   A.   Yes, ma'am.

10  Q.   What is his title now?

11  A.   Senior operations specialist.

12  Q.   And Audriana Williams is no longer employed,

13  right?

14  A.   Correct.

15  Q.   Do you know why she left?

16  A.   She resigned, I believe, to spend more time

17  with her family.

18  Q.   Was she replaced?

19  A.   Yes.

20  Q.   And who replaced her?

21  A.   To fill her role we moved somebody from first

22  shift to third shift.

23  Q.   And who was that?

24  A.   Ryan Wheeler.

25  Q.   And did anyone replace Ryan on first shift?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1    A.    Yes.

2    Q.    Who?

3    A.    Joon Hyung.

4    Q.    And Mr.Ryan -- or Mr. Wheeler is no longer

5    employed, right?

6    A.    Correct.

7    Q.    Did he quit or was he fired?

8    A.    His role was eliminated.

9    Q.    So he was not replaced when he left?

10   A.    Correct.

11   Q.    What is Mr. Wheeler's race?

12   A.    He is black.

13   Q.    Is Ms. Hyung still employed?

14   A.    No.

15   Q.    And why is she not employed?

16   A.    The role was eliminated.  I'm sorry.  Joon was

17   a guy.

18   Q.    Joon was a guy.  Sorry.  Bad assumption on my

19   part.

20         And Candace Smith left right before Ms. Geter

21   was terminated, right?

22   A.    Correct.

23   Q.    Was she fired?

24   A.    Yes.

25   Q.    Was she replaced?

Travis Torrence                                         April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1    A.   I don't recall specifically.

2    Q.   And Marshall, I think you said Mock, right?  Is

3    he still employed?

4    A.   No.

5    Q.   And why did he leave, if you know?

6    A.   He trans -- he got a new role within Schneider

7    and moved to a different office.  And so after that

8    I'm unaware of any details or following him leaving

9    our office.

10   Q.   Got it.  Was he replaced at the time he left?

11   A.   Yes.

12   Q.   Who replaced him?

13   A.   I can't recall to be certain.

14   Q.   And Sara Kopf is still employed, right?

15   A.   Correct.

16   Q.   What's her title now?

17   A.   Driver team leader.

18   Q.   And is Tiffany Kitchens still employed?

19   A.   Yes, ma'am.

20   Q.   And what is her title?

21   A.   Senior operations specialist.

22   Q.   And some of the people -- I understand the

23   planning area managers were moved outside of Atlanta

24   and do dispatch for Atlanta from someplace else, am

25   I right?

Travis Torrence                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1    A.   That's correct.

2    Q.   Where are they located?

3    A.   Green Bay.

4    Q.   That's the corporate office?

5    A.   Yes, ma'am.

6    Q.   At the time, do you remember when the area

7    planning managers were relocated to Green Bay?

8    A.   End of first quarter, beginning of second

9    quarter last year.

10   Q.   2020?

11   A.   Yes.

12   Q.   And at the time, do you recall how many area

13   planning managers were employed at that time in

14   Fairburn?

15   A.   Around ten.

16   Q.   And if you know, how many were let go versus

17   being offered other positions?

18            MR. MILIANTI:  Object to question.

19        Calls for speculation.

20            THE WITNESS:  I'm sorry, Pete was

21        breaking up.  I couldn't hear what --

22   BY MS. LEGARE

23   Q.   He just got an objection on the record.  You

24   can still answer.

25   A.   Okay.  Can you repeat the question, please.

Case 1:20-cv-01148-SCJ-JSA  Document 47-2  Filed 06/07/21  Page 20 of 77
Travis Torrence                                           April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 18

1    Q.   Yeah.  So you've got ten area planning managers

2    when the area planning managers were -- when the

3    position was moved to Green Bay.  Do you know how

4    many people were let go at that time?

5                    MR. MILIANTI:  Same objection.

6                    THE WITNESS:  Yeah, I don't know an

7         exact amount.

8    BY MS. LEGARE

9    Q.   Tell me who the ten were.  We've got Sara Kopf,

10   Quincy Parker, Tiffany Kitchens --

11   A.   Cheryl Joseph.  Can I write it on my --

12   Q.   Sure.

13   A.   Give me a second.  I'll run through it.

14   Tiffany Kitchens, Cheryl Joseph, Joon, Austin

15   Ottinger, Robert Turner, Sara Kopf, Ryan Wheeler,

16   Cierra Geter, Audriana Williams were the APMs that

17   were in our office.

18   Q.   And Cierra had already been terminated when

19   people were moved, right?

20   A.   Yes.

21   Q.   And Audriana had already quit?

22   A.   Yes.

23   Q.   Is Robert Turner still employed?

24   A.   Yes.

25   Q.   And what is his position?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 19

1    A.    Driver team leader.

2    Q.    And what is his race?

3    A.    White.

4    Q.    And Ryan Wheeler, I think you said his position

5    was eliminated, right?

6    A.    Yes.

7    Q.    And he is black?

8    A.    Yes.

9    Q.    Austin Ottinger, is he still employed?

10   A.    Yes.

11   Q.    And what is his position?

12   A.    Area planning manager.

13   Q.    Did he move to Green Bay?

14   A.    Yes, ma'am.

15   Q.    He actually physically moved?

16   A.    Mm-hm.

17   Q.    And I think you said Joon Hyung, the position

18   was eliminated?

19   A.    Yes.

20   Q.    And what is Mr. Hyung's race?

21   A.    Asian.

22   Q.    What is Mr. Ottinger's race?

23   A.    It's white.

24   Q.    And is Cheryl Joseph still employed?

25   A.    No.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

1    Q.   Was her position eliminated when the APMs were

2    moved?

3    A.   Yes.

4    Q.   And what is her race?

5    A.   Black.

6    Q.   And Ms. Kitchens is still employed and her race

7    is white, right?

8    A.   Yes.

9    Q.   And is Quincy Parker still employed?  I think

10   you said yes, right?

11   A.   No.

12   Q.   No.  Was his position eliminated or had he

13   already left?

14   A.   He was a driver team leader, not an area

15   planner.

16   Q.   Oh, got you.  And Sara Kopf is still there and

17   she is white, correct?

18   A.   Yes.

19   Q.   Do you know how it was decided whose positions

20   were eliminated versus who were moved into new

21   positions when the APM position was moved?

22   A.   So the APMs were given the choice to relocate

23   to Green Bay.

24   Q.   Well, some people were given different

25   positions too, right, like Ms. Kitchen, Ms. Kopf?

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 21

1    A.   Yes.

2    Q.   Can you tell me how that all came about -- were

3    you involved in the process of reassigning people to

4    different positions?

5    A.   Yes.  I was part of that process.

6    Q.   And how were those decisions made at the time?

7                 MR. MILIANTI:  Object to the form.

8    BY MS. LEGARE

9    Q.   You can answer.

10   A.   Can you ask that differently.

11   Q.   Yeah, sure.  Were there only a certain number

12   of positions open in Fairburn to transfer people

13   into?

14   A.   Yes.

15   Q.   And how did you decide -- and I'm not

16   suggesting you made the decisions alone.  But how

17   was it decided who would be given an operations

18   specialist position, for example, or driver team

19   lead position versus being asked to relocate to

20   Green Bay?

21                 MR. MILIANTI:  Object to form.

22                 THE WITNESS:  There was a lot of time

23       and effort that went into mixing those

24       decisions from our leadership group.  And I'm

25       not sure that I can fully explain each -- there

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 22

 1          is not a single criteria that would qualify
 2          someone to remain with us or not.
 3     BY MS. LEGARE
 4     Q.    Who was the leadership group that made the
 5     decisions?
 6     A.    Myself, Rodney Dunn, Doug Horton, and Mary Ann
 7     Rose.
 8     Q.    And was each person, were all of the current
 9     area planning managers at the time the decisions
10     were made considered for the openings in Fairburn?
11     A.    I'm sorry.  Can you rephrase that.
12     Q.    Yes.  When you were considering who to offer
13     positions in Fairburn versus who to offer the
14     opportunity to move to Green Bay, did you consider
15     everyone?
16     A.    Yes.
17     Q.    For the open positions in Fairburn?
18     A.    Yes.
19     Q.    So if Ms. Geter had still been employed, she
20     would have been considered for the openings in
21     Fairburn; is that fair to say?
22                    MR. MILIANTI:  Objection.  Calls for
23          speculation.
24     BY MS. LEGARE
25     Q.    You can answer the question.

Case 1:20-cv-01148-SCJ-JSA   Document 47-2   Filed 06/07/21   Page 25 of 77

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 23

1                MR. MILIANTI:   Incomplete

2         hypothetical.

3      BY MS. LEGARE

4      Q.   If Ms. Geter was still employed as an area

5      planning manager at the time the area planning

6      managers were moved to Green Bay, since all the area

7      planning managers were considered for the open

8      positions in Fairburn, would Ms. Geter also have

9      been considered for one of the open positions in

10     Fairburn?

11               MR. MILIANTI:   Same objection.

12     BY MS. LEGARE

13     Q.   You can answer.

14     A.   Yes.

15     Q.   And did the movement of the area planning

16     managers to Green Bay happen before or after COVID

17     hit?

18     A.   I was notified of the changes in the beginning

19     of February.  So my understanding is that it was in

20     the works.  Our office did not actually make that

21     transition until mid-April.

22     Q.   At any point during the pandemic, have you been

23     working remotely?

24     A.   Yes.

25     Q.   When did you start working remotely?

Travis Torrence                                                     April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 24

1    A.    I can't be sure of an exact date.  It was

2    towards the end of March or beginning of April of

3    2020.

4    Q.    And are you still working remotely?

5    A.    Not on a regular basis, no.

6    Q.    Do you work remotely from time to time?

7    A.    Yes.

8    Q.    How often would you say you work remotely?

9    A.    I'm not sure I would be able to put a number on

10   it.

11   Q.    Would you say that you work remotely every

12   month?

13   A.    Yes.

14   Q.    Would you say that you work remotely every

15   week?

16   A.    No.

17   Q.    And did everyone in the Fairburn office -- I

18   mean, obviously not the drivers, but did everyone in

19   the Fairburn office go remote during the pandemic?

20                    MR. MILIANTI:  Object to form.  Calls

21        for speculation.

22   BY MS. LEGARE

23   Q.    Let me ask it this way so it is not speculative

24   at all.  So you report to who?

25   A.    Mary Ann Rose.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1    Q.    And did Ms. Rose work remotely at all during

2    the pandemic?

3    A.    Yes.

4    Q.    Did she work remotely full time for a period of

5    time during the pandemic?

6    A.    Yes.

7    Q.    Has she returned to the Fairburn office or is

8    she still working full time remotely?

9    A.    She is not working full time remotely.

10   Q.    Does she still work remotely from time to time?

11   A.    Yes.

12   Q.    And is Doug Horton still at the Fairburn

13   location?

14   A.    No, ma'am.

15   Q.    Where is he now?

16   A.    He accepted another role, I believe it was in

17   the second quarter of 2020.

18   Q.    Has he left Schneider altogether?

19   A.    No.  He is still with the organization.

20   Q.    Do you know where he works out of?

21   A.    I can't say for sure.

22   Q.    So the current organization is Mary Ann Rose,

23   you, and did you say Rodney Dunn?

24   A.    Yes.

25   Q.    What is Mr. Dunn's race?

Travis Torrence                                     April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    A.    White.

2    Q.    And he is your peer, correct?

3    A.    Correct.

4    Q.    And do you know if he worked full time remotely

5    at all during the pandemic?

6    A.    He did.

7    Q.    And has he returned to the office?

8    A.    He's not working full time from home.

9    Q.    He is working part time from home?

10                  MR. MILIANTI:  Objection to form.

11        Calls for speculation.

12   BY MS. LEGARE

13   Q.    Like, when you go to the office, do you see him

14   there?

15   A.    Sometimes.

16   Q.    So would the assumption be that some of the

17   time he may be working from home and sometimes he

18   might be off?

19                  MR. MILIANTI:  Object to the form.

20        Calls for speculation.  If you know.

21                  THE WITNESS:  I'm sorry, can you ask

22        it differently, please.

23   BY MS. LEGARE

24   Q.    Yeah.  If you don't see him there when you're

25   there --well, let me ask you this.

Page 27

```
 1        As operations managers, do both of you work for

 2   a shift?

 3   A.   Yes.

 4   Q.   He's not there when you go in every time,

 5   right?

 6   A.   Correct.

 7   Q.   Do you know if the times that he is not

 8   there -- and if you don't know, that's fine --

 9   whether he is taking a day off or whether he is

10   working remotely?

11   A.   I'm sorry.  Can you ask that differently.

12   Q.   Yeah.  I mean, if you're there and he's not,

13   there are only two choices right?  He is either

14   working remotely or he is off, right?

15   A.   He could be traveling.

16   Q.   Do you travel with your job?

17   A.   My accountability is over Atlanta.  So I'm on

18   site with my drivers.  That's different depending

19   on -- it's not the same case for everybody.

20   Q.   So Mr. Dunn may have some responsibility for

21   other hubs; is that what you're saying?

22   A.   Yes.

23   Q.   And he may travel to those hubs from time to

24   time?

25   A.   Yes.
```

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

```
 1    Q.   Who reports to you now?

 2    A.   You would like a list of names?

 3    Q.   Well, let me ask you this.  Does Tiffany

 4    Kitchens report to you?

 5    A.   No, ma'am.

 6    Q.   Did Ms. Kitchens report to you when she was an

 7    area planning manager?

 8    A.   No, ma'am.

 9    Q.   Is that because she was first shift?

10    A.   Correct.

11    Q.   So she reported directly to Doug Horton?

12    A.   I can't say for sure if it was Rodney or Doug

13    at the time.

14    Q.   And did Sara Kopf report to you when you were a

15    team lead?  What shift did Ms. Kopf work?

16    A.   Second.

17    Q.   Does she report to you now?

18    A.   Yes.

19    Q.   And during the pandemic, did Ms. Kopf work

20    remotely for a period of time?

21    A.   Yes.

22    Q.   Is she currently working remotely at all?

23    A.   Yes.

24    Q.   Do you know how often?

25    A.   It would be hard to say for sure.
```

Case 1:20-cv-01148-SCJ-JSA   Document 47-2   Filed 06/07/21   Page 31 of 77

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1    Q.    Let me ask you this.  I haven't seen it.  But

2    is there a work-from-home policy for Schneider, a

3    written one?

4                   MR. MILIANTI:  Object to the form of

5         the question.

6                   THE WITNESS:  Not that I'm aware.

7    BY MS. LEGARE

8    Q.    Do the area planning managers in Green Bay

9    still work with the southeast hub?

10   A.    Yes.

11   Q.    So they are actually managing the southeast

12   hubs from Green Bay?

13                  MR. MILIANTI:  Object to the form of

14        the question.

15                  THE WITNESS:  Can you reword that

16        question, please.

17   BY MS. LEGARE

18   Q.    Yeah.  So if you know, and you may not, do they

19   have the same job description that they had when

20   they were working at Fairburn?

21   A.    I can't be sure it's exactly the same.

22   Q.    Do they still, if you know, have some of the

23   same job duties that they had when they were working

24   from Fairburn?

25   A.    Our drivers are being dispatched from Green

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 30

1    Bay.  It is difficult for me to say how that's --

2    how their role is different there than it was in our

3    office.

4    Q.   And would it be fair to say that operations

5    specialists and/or driver team leads have taken over

6    some of the duties that were performed directly from

7    Fairburn that the APMs performed?  Or are their jobs

8    completely different?  And that's okay too.

9    A.   I'm sorry, ask that again, please.

10   Q.   Yeah.  Were there any job duties that the APMs

11   performed while they were employed in Fairburn that

12   different employees currently employed in Fairburn

13   are now performing?

14   A.   Yes.

15   Q.   And what positions have taken over those

16   duties?

17   A.   The operations specialists role and the driver

18   team lead role.

19              MS. LEGARE:  Hey, Pete, I think on

20        that email you were never actually set up for

21        Exhibit Share.  And that was the problem.  So

22        you may have had a private chat and an email.

23        If we can take a five-minute break, you can try

24        and fix that.

25              MR. MILIANTI:  Yeah, I think I'm good

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 31

1      to go.

2                  MS. LEGARE:  Can we take a

3      five-minute break anyway and then we'll come

4      back.

5                  MR. MILIANTI:  Sure.

6                        - - -

7                  (Proceeding in recess from 11:02 a.m.

8      until 11:08 a.m.)

9                        - - -

10  BY MS. LEGARE

11  Q.    Do you know how many employees Schneider

12  currently has approximately?

13  A.    I do not.

14  Q.    And as part of -- well, at any time during your

15  employment with Schneider, have you had any training

16  on the Family and Medical Leave Act?

17  A.    Not that I remember, no.

18  Q.    Have you had any training on the Americans with

19  Disabilities Act?

20  A.    Not that I remember, no.

21  Q.    And have you had any training on federal

22  employment discrimination laws like Title VII?

23  A.    Not that I remember, no.

24  Q.    Are you aware of any employees in Fairburn who

25  are currently working part time?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 32

1    A.    No.

2    Q.    All right.  If you can pull up Exhibit Share,

3    let's get started and let's look at Exhibit 4.

4    A.    I have got it up.

5                         - - -

6                (Whereupon, Exhibit 4 was marked for

7         identification.)

8                         - - -

9    BY MS. LEGARE

10   Q.    Have you seen Exhibit 4 before, Mr. Torrence?

11   A.    Yes.

12   Q.    And what is Exhibit 4?

13   A.    It looks like the APM job description last

14   updated in 2017.

15   Q.    Do you know if there are any other versions of

16   the job description or more current versions of the

17   job description?

18   A.    I wouldn't be able to say for sure.

19   Q.    This version of the job description was

20   produced by Schneider.  Do you know, sitting here

21   today, if this was the version that was in effect

22   when Ms. Geter was an area planning manager?

23   A.    The date would lead me to believe so.  But

24   again, I'm not sure if there was anything more

25   current than this.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 33

1    Q.   Fair enough.  Were employees provided copies of

2    their job description during their employment?

3                  MR. MELLON:  Object to the form of

4        the question.  Calls for speculation.

5    BY MS. LEGARE

6    Q.   Let me ask you this way.  You were an APM when

7    the position was changed from dispatch analyst to

8    area planning manager.  Were you given copy of the

9    job description?

10   A.   I can't remember for sure.

11   Q.   Do you know where the job descriptions are

12   maintained at Fairburn?  And that may be a stupid

13   question.  Are these things maintained

14   electronically for the company?

15   A.   Yes.

16   Q.   And do all employees have access to the

17   electronic documents?

18   A.   I believe so, yes.

19   Q.   Do you know if this was the job description for

20   the position at the time that it was moved -- as the

21   position existed at Fairburn at the time that it was

22   transferred to Green Bay?

23   A.   I would guess so based on the date.  But I

24   can't be sure.

25   Q.   No, that's fine.  Can you tell me what, if any,

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 34

1    of those job duties are still being performed in

2    Fairburn?  Let me step back.

3         I'm assuming you did not create this job

4    description, right?

5    A.   Correct.

6    Q.   Let's go through the essential job duties.  And

7    if you can just tell me if anyone in Fairburn is

8    currently performing the duty.  How does that work?

9    If you know?

10   A.   Okay.

11   Q.   You would establish the market plan to include

12   shift directions, priority of freight, load and

13   stage, driver calendar requests, et cetera.

14   Continually assess market conditions and performance

15   adjust plan accordingly.

16        Is that being performed in Fairburn currently?

17   A.   No.

18   Q.   The next one is B, Recognize expert in role,

19   provide expertise on new opportunities and

20   proactively identify potential solutions that

21   maximize overall value for Schneider.

22        And I'm assuming that means being a recognized

23   expert in the APM role.  So I would assume that is

24   not being performed in Fairburn right now?

25   A.   Correct.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 35

1    Q.   Assign freight to drivers in accordance with

2    the market plan to maximize all aspects of the value

3    triangle.

4         Is that being performed in Fairburn right now?

5    A.   No.

6    Q.   And actually, why don't you just read through

7    these and tell me if any of these are being

8    performed in Fairburn right now.

9    A.   So I think I'm having a difficult time

10   understanding what you're asking for.

11   Q.   The only thing I'm really asking is if any of

12   these job duties are currently being performed out

13   of Fairburn?

14   A.   So I'll say assigning trailers for dispatch is

15   a yes.  Collaborating to successfully onboard new

16   customers would be a yes.  Intimate understanding of

17   customers' unique needs would be a yes.  I think

18   this description is not an exhaustive or

19   comprehensive list of all job responsibilities,

20   tasks and duties would be a yes.

21   Q.   Well, that's for everyone, right?

22   A.   And then the same with the other duties and

23   responsibilities may be assigned.

24   Q.   Let me ask you this.  Who is performing the

25   assigning trailers for dispatch function now in

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 36

1    Fairburn?

2    A.    The SOS and the details.

3    Q.    So senior operations specialists and driving

4    planning?

5    A.    Driver planning.

6    Q.    And what about collaborating to onboard new

7    customers?

8    A.    Same.  The SOS and the details.

9    Q.    And that would also be true of intimate

10   understanding of customers' unique needs?

11   A.    Yes.

12   Q.    Do any of the senior operations specialists

13   work on third shift?

14   A.    Yes.

15   Q.    Who is that?

16   A.    Desmond Seymour and Lancelot Lewis.

17   Q.    Do they work the same shifts?  Actually better

18   question.  You are a 24/7 operation, right?

19   A.    Yes.

20   Q.    Is there any overlap in the days that

21   Mr. Seymour and Mr. Lewis work?

22   A.    Yes.

23   Q.    And do any of the driver team leads work third

24   shift?

25   A.    No.

Travis Torrence                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 37

1    Q.   So are there days where Mr. Seymour or

2    Mr. Lewis might be there alone?

3    A.   Yes.

4    Q.   And I don't want to waste a lot of your time.

5    So a lot of the documents I have are related to FMLA

6    requests and medical records requesting short term

7    disability.  Did you see any of Ms.~Geter's FMLA

8    requests, the actual request when she was taking

9    FMLA in the fall of 2018?

10   A.   I can't remember for sure.

11   Q.   And do you know if you saw any of her doctor's

12   documentation relating to her request for

13   accommodation in late 2018 and first quarter 2019?

14   A.   You are asking about the actual documents that

15   the doctor provided?

16   Q.   Correct.

17   A.   I can't be sure.

18   Q.   Okay.  So let me go through these.  If you will

19   click on Exhibit 8.

20                         - - -

21             (Whereupon, Exhibit 8 was marked for

22        identification.)

23                         - - -

24

25             THE WITNESS:  I have got it up.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 38

1    BY MS. LEGARE

2    Q.    And can you tell me if you have seen that

3    before, Mr. Torrence.

4    A.    I don't believe so.

5    Q.    And maybe this will help.  So if an employee

6    has FMLA in Fairburn, what is the process for a

7    request for family and medical leave activated?

8    A.    We would ask them to contact our HR lead team.

9    Q.    And is the HR lead team in Fairburn or are they

10   located outside of Fairburn?

11   A.    Outside of Fairburn.

12   Q.    Are they in Green Bay?

13   A.    Yes.

14   Q.    In 2019 were there any HR human resources

15   employees employed in Fairburn?

16   A.    No.

17   Q.    So is Ashley Jansen located in Green Bay?

18   A.    Yes.

19   Q.    If you'll look at Exhibit 10.

20                          - - -

21              (Whereupon, Exhibit 10 was marked for

22        identification.)

23                          - - -

24              THE WITNESS:  I have got it up.

25

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 39

1      BY MS. LEGARE

2      Q.    Can you tell me if you have ever seen this

3      document before, if you recall seeing this document

4      before?

5      A.    I do not recall.

6      Q.    If you look at what is marked as Exhibit 30.

7                              - - -

8                  (Whereupon, Exhibit 30 was marked for

9           identification.)

10                             - - -

11                 THE WITNESS:   I've got it up.

12     BY MS. LEGARE

13     Q.    If you take a minute to read that, I just have

14     a few questions.

15     A.    Okay.

16     Q.    Exhibit 30 appears to be an email from HR

17     administration to you dated October 26, 2018,

18     correct?

19     A.    Yes, ma'am.

20     Q.    And it looks like this email notifies you that

21     Ms. Geter has been approved for FMLA leave, right?

22     A.    Yes.

23     Q.    Is this typically how you would be notified

24     that an employee is approved for FMLA leave?

25     A.    Yes.

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

1    Q.    Let me ask you this and take a step back.  At

2    some point in the fall of 2018, did you learn that

3    Ms. Geter needed to take FMLA leave?

4    A.    Yes.

5    Q.    Do you recall how you learned that she needed

6    to take FMLA leave?

7    A.    I believe it was through this notification from

8    our lead team.

9    Q.    Ms. Geter believes she spoke with you directly

10   about her mental health crisis in the fall of 2018.

11   Do you have any specific recollection of whether she

12   shared with you that she had been suicidal?

13   A.    I don't believe that she shared that with me.

14   Q.    And she believed that she shared with you that

15   she suffered from PTSD.  Do you have any

16   recollection of whether she shared that with you?

17   A.    No, ma'am.

18   Q.    I mean, does that mean it didn't happen or you

19   just don't recall it happening?

20   A.    I'm sorry, ask that again, please.

21   Q.    Sure.  No problem.  When you say you don't --

22   is it possible she shared with you that she had PTSD

23   and you just don't remember?  Or are you saying that

24   it didn't happen?

25   A.    I don't believe she shared that with me in the

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 41

1    fall of 2018.

2    Q.   Do you think that she shared that with you at

3    any point in time?

4                    MR. MILIANTI:  Travis --

5                    THE WITNESS:  Yeah.  The dogs are

6         acting up.

7                    MS. LEGARE:  That's okay.  I've got

8         them.  I understand.

9                    THE WITNESS:  All right.  Sorry.

10        What was the question?

11   BY MS. LEGARE

12   Q.   Yeah.  The question is, do you recall at any

13   point in time whether Ms. Geter shared with you that

14   she had been suicidal?

15   A.   Yes.

16   Q.   But you don't remember when she shared that

17   with you?

18   A.   I believe it was after she returned from her

19   FMLA leave in 2019.

20   Q.   Okay.  So she came back with accommodation on

21   or around January 1 or January 2nd of 2019, right?

22   A.   Yes.

23   Q.   And you think she may have shared that with

24   you, the fact she had been suicidal after she

25   returned from FMLA leave?

Travis Torrence                                                   April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 42

1    A.    Yes.

2    Q.    And did she also share with you after she

3    returned from FMLA leave that she suffered from

4    PTSD?

5    A.    No.

6    Q.    Did she share with you after she -- well, let

7    me ask you this.  Did she share with you that she

8    suffered from depression?

9    A.    I don't believe she used those words.

10   Q.    Do you recall what words she may have used?

11   A.    I mean, she told me about the suicidal

12   thoughts.  But to the best of my recollection, I

13   don't remember there being any -- being told any

14   circumstances around why that was.

15   Q.    Do you recall whether she shared with you that

16   she had been attacked at some point when she was

17   working for another company?

18   A.    I don't believe so.

19   Q.    Did she share with you her fear of working

20   alone on third shift?

21   A.    When?

22   Q.    Well, I understand she raised some issues about

23   safety earlier before she went out on leave.  Did

24   she raise any safety issues after she returned from

25   leave?

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 43

1    A.    No.

2    Q.    But you did understand, did you not, that she

3    was still -- one of the reasons she needed

4    accommodation was that she was still in treatment?

5                     MR. MILIANTI:  Object to the form of

6         the question.

7                     THE WITNESS:  Can you ask that

8         differently, please.

9    BY MS. LEGARE

10   Q.    When she returned from leave, from FMLA leave,

11   Ms. Geter was not released to return to work four

12   days a week, right?

13   A.    Right.

14   Q.    And that was because she was still in therapy?

15                     MR. MILIANTI:  Object to the form of

16        the question.  Calls for speculation.  If you

17        know.

18   BY MS. LEGARE

19   Q.    Well, let me ask it this way.  What did she

20   tell you about why she couldn't work full time?

21   A.    She said that she could not work Sunday nights

22   because she had doctors' appointments on Monday.

23   Q.    Let's look at Exhibit 15.

24                          - - -

25                     (Whereupon, Exhibit 15 was marked for

Travis Torrence                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 44

1        identification.)

2                          - - -

3                MS. LEGARE:  And, Pete, just so that

4        you know, I used the same exhibit numbers that

5        you used for the documents that you used in

6        Cierra's deposition.

7                MR. MILIANTI:  Great.  Thank you.

8                MS. LEGARE:  And I started later with

9        new documents at Exhibit 30.

10               MR. MILIANTI:  Understood.

11               THE WITNESS:  I have got Exhibit 15

12       up.

13   BY MS. LEGARE

14   Q.   Can you tell me if you have seen that document

15   before.

16   A.   I don't believe that I have.

17   Q.   Okay.  But you understood when Ms. Geter

18   returned to work in January that, at least

19   temporarily, she was approved to work part time?

20   A.   Yes.

21   Q.   And was a typical APM work week four days?

22   A.   No.

23   Q.   For second and third shift, was it four days?

24   A.   No.

25   Q.   How is it that Ms.~Geter prior to going on

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 45

1    leave had a schedule of four ten-hour days?  Was it

2    just third shift?

3    A.    It was just Cierra.

4    Q.    It was just Cierra.  Tell me how that happened.

5    A.    Her schedule was a bit untraditional.  So she

6    got split off days.  And there wasn't at the time a

7    great need for someone on third shift on Saturday.

8    So kind of to off balance the split off days, that

9    schedule was created as a four-day schedule to make

10   it a little more desirable of a schedule.

11   Q.    Okay.  But that -- I don't think what you're

12   telling me is that was specifically done for Cierra,

13   right?

14   A.    No.

15   Q.    When she was replaced after she left, did that

16   person also work the four-day workweek?

17   A.    No.

18   Q.    No.  So was that four-day, four ten-hour day

19   workweek eliminated once Ms. Geter was no longer

20   employed?

21   A.    Yes.

22   Q.    And then, so was it five days at that point?

23   A.    Yes.

24   Q.    And, for example, if you have Desmond Seymour

25   and Lancelot Lewis each working five days because

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 46

1      there are seven days in a week, they overlap certain

2      days, right?

3      A.    Yes.

4      Q.    And they, I assume, don't have the same off

5      days; is that right?  That was a weird question.  Do

6      they have the same days off?

7      A.    Lance and Desmond, the same as each other?

8      Q.    Yes, as each other.

9      A.    No.

10     Q.    And what is Desmond's current schedule?  I know

11     it changed from time to time.

12     A.    He works a consistent schedule that has changed

13     over the years that he has been with us.

14     Q.    Currently, what is Mr. Seymour's schedule?

15     A.    Sunday through Thursday.

16     Q.    And currently what is Mr. Lewis' schedule?

17     A.    Thursday through Monday.

18     Q.    Is there a process that an employee normally

19     goes through if they need an accommodation, a

20     reasonable accommodation based on a disability?

21     A.    We would ask them to contact the HR lead time.

22     Q.    So that also at least initiates with the HR

23     lead team?

24     A.    Correct.

25     Q.    And I understand in this case that decisions

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 47

1    about whether an employee could be reasonably

2    accommodated were made by you and Ms. Rose in

3    consultation with Ms. Jansen who works in human

4    resources, right?

5    A.   Yes.

6    Q.   Can human resources tell you what to do?  Or

7    can they only advise you what to do as a manager in

8    Fairburn?

9                   MR. MILIANTI:  Object to the form of

10        the question.

11   BY MS. LEGARE

12   Q.   I'll be more specific.  In this case I think

13   the decision to accommodate was made by you and

14   Ms. Rose in conjunction with Ms. Jansen, right?

15   A.   Right.

16   Q.   And then the decision to no longer accommodate

17   Ms. Geter was also made by you and Ms. Rose in

18   consultation with Ms. Jansen, right?

19   A.   Correct.

20   Q.   Was there a policy that you all consulted in

21   determining whether to make an accommodation for

22   Ms. Geter?

23                   MR. MILIANTI:  Object to the form.

24                   THE WITNESS:  I don't know that I

25        understand the question.

Travis Torrence                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 48

 1    BY MS. LEGARE
 2    Q.    Sure.  Do you know if the company has a policy
 3    relating to reasonable accommodations under the ADA?
 4    A.    I'm not sure.
 5    Q.    If you will look at Exhibit 22.
 6                              - - -
 7                 (Whereupon, Exhibit 22 was marked for
 8         identification.)
 9                              - - -
10                 THE WITNESS:  I have got it up.
11    BY MS. LEGARE
12    Q.    Okay.  Have you seen this document before,
13    Mr. Torrence?
14    A.    I believe so, yes.
15    Q.    And is it fair to say that Ms. Geter was out on
16    leave continuously from October 9, 2018 to
17    January 1, 2019?
18    A.    Yes.
19    Q.    Do you know one way or the other if at the time
20    of her termination, if she had any FMLA leave
21    available to her?
22    A.    My understanding of FMLA is that it's 12 weeks
23    within a rolling 12-month period.  So I do not
24    believe she had FMLA at the time of her termination.
25    Q.    But rolling -- and you mean --

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                              Page 49

1              MS. LEGARE:  And I know you're going

2        to object, Pete.

3    BY MS. LEGARE

4    Q.    -- but rolling means it accumulates basically

5    per pay period, right?

6                 MR. MILIANTI:  Object to the form of

7        the question.  Calls for speculation.

8                 THE WITNESS:  I couldn't be sure.

9    BY MS. LEGARE

10   Q.    And who would have answer to that, the HR lead

11   administration?

12   A.    The HR lead team, yes.

13   Q.    And according to this on December 18, 2019,

14   Schneider approved Ms. Geter for a partial return to

15   work working three days per week through February 13

16   2019, right?

17   A.    Correct.

18   Q.    And is that your recollection of the initial

19   accommodation?

20   A.    Yes.

21   Q.    And then on January 1, 2019, Ms. Geter was

22   approved for an extension of her accommodations

23   through March 19, 2019, right?

24   A.    I think you just said January 1.  But on

25   January 21 --

Page 50

1    Q.    January 21.  I'm sorry, if I did, I apologize.

2    A.    I don't know if it was the Zoom or --

3    Q.    No.  I'm sorry.

4    A.    January 21, an extension through the 19th of

5    March.

6    Q.    And Ms. Geter's physician then requested that

7    her accommodation be extended to June 5, 2019,

8    right?

9    A.    Yes.

10   Q.    And at that point, you and Ms. Rose in

11   consultation with Ms. Jansen determined that

12   Ms. Geter could no longer be terminated, right?

13   A.    Correct.

14   Q.    Can you tell me how that all happened.

15   A.    From my perspective, at that point we've been

16   accommodating for, you know, over three months at

17   that point, which is taxing on myself, the rest of

18   our team, our drivers, and continuing to extend that

19   over and over again without there being a clear end

20   date.  I just didn't believe that it was reasonable

21   to continue to accommodate that at that point.

22   Q.    But there was a clear end date given to you by

23   the doctor, right, June 5, 2019?

24              MR. MILIANTI:  Object to the form of

25       the question.  And calls for speculation.

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 51

1    BY MS. LEGARE

2    Q.   Well, based on this letter, the physician

3    indicated that she would be able to return to work

4    on June 5, 2019, right?

5    A.   I'm reading it.

6                MR. MILIANTI:  Go ahead, Travis.

7                THE WITNESS:  I'm reading it as may

8        be able to return to it full time.  Which again

9        is unclear in my mind.  And especially after

10       we've already approved incremental additional

11       accommodations up to that point.

12   BY MS. LEGARE

13   Q.   What do you mean by "incremental additional

14   accommodations"?

15   A.   We approved it through February 13.  Then again

16   through March 19.  Then again through 4/12.

17   Q.   I just want to make sure I understand what you

18   were saying.  Who -- who was the other employee on

19   third shift at the time?  APM to be more specific.

20   A.   Desmond Seymour and Audriana Williams.

21   Q.   So you had three people working third shift at

22   the time?

23   A.   Yes.

24   Q.   And was anyone covering the fourth day that

25   Ms. Geter was not working?

Travis Torrence                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 52

1    A.    Typically myself.

2    Q.    So you were working third shift one day a week?

3    A.    Yes.

4    Q.    And what day was that?

5    A.    Sunday nights.

6    Q.    And were you working from the office Sunday

7    nights or were you working remotely?

8    A.    I can't remember a time that I specifically

9    worked from home on one of those Sunday nights.

10   Q.    Is there any documentation that would show when

11   people were working remotely or when they were

12   working in the office?

13   A.    Not that I'm aware of.

14   Q.    What was your typical schedule when Ms. Geter

15   was not being accommodated?  Actually, let me ask

16   this a different way.  Before she went on medical

17   leave in October of 2018, did you ever work third

18   shift?

19   A.    I spent time on third shift.  I did not act as

20   the only APM in the office prior to that.

21   Q.    You supervised third shift, right?

22   A.    Correct.

23   Q.    So were you -- well, let me ask you this.  Did

24   you work alone on Sunday nights as the APM when

25   Ms. Geter was out?

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 53

1    A.    Yes.

2    Q.    So Ms. Williams and Mr. Seymour didn't work on

3    Sunday nights?

4    A.    No.

5    Q.    Why not?

6    A.    I would have to go back -- I don't remember

7    specifically what schedule Desmond or Audrey was in

8    at that time.

9    Q.    But you know for sure they weren't working

10   Sunday nights?

11   A.    Yes.

12   Q.    Let me ask you this.  Did anyone ever offer

13   during this accommodation process to transfer

14   Ms. Geter to first or second shift as an

15   accommodation for her disability?

16   A.    I don't recall specifically.

17   Q.    And what shift did Candace Smith work?

18   A.    Second shift.

19   Q.    And did you and Ms. Rose have any meetings

20   regarding Ms. Geter's final request for

21   accommodation when that was extended to June 5,

22   2019?

23   A.    Yes, I believe we did.

24   Q.    Do you know approximately how many times you

25   met about the accommodation issue?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 54

1   A.   It would be hard for me to say for sure at this

2   point.

3   Q.   Was it your decision alone not to accommodate

4   Ms. Geter?  Or was it you and Ms. Rose?  Or was it

5   Ms. Rose with your input?  I'm just asking how it

6   happened.

7   A.   I would say we came to an agreement together

8   along with Ashley's consultation.

9   Q.   Did you talk about what other ways you might

10  have been able to accommodate Ms. Geter besides

11  working three days a week until June 5?

12  A.   Yes.

13  Q.   What other options did you talk about?

14  A.   I believe we discussed changing the day of

15  week, if she was able to move back into a full-time

16  schedule.  I believe we also considered a five-day

17  schedule, both of those being full time but changing

18  the days of the week.

19  Q.   And when you say "changing the days of the

20  week," was one possibility to make sure that she

21  never had to work alone on third shift?

22  A.   I don't believe that was a consideration at the

23  time.  My understanding was that she could not work

24  Sunday nights because of her appointments on Monday.

25  Q.   And the other you said was possibility of

Travis Torrence                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 55

1    moving her to five-day-a-week schedule?

2    A.   Yes.

3    Q.   And were either of these -- and I think that

4    was a yes, right?

5    A.   Yes.

6    Q.   -- and were either of those options presented

7    to Ms. Geter?  Maybe a better question is were

8    either of those options discussed with Ms. Geter by

9    you?

10   A.   I can't remember for sure.

11   Q.   At any point did you tell Ms. Geter that it was

12   okay for her to work from home because everyone did

13   it?

14   A.   Are you asking if those are my exact words?

15   Q.   Well, or something to that effect.

16   A.   It's possible.  When there has been a request

17   to work from home for any associate that has been on

18   my team or even in our office on a short-term basis

19   because something has, you know, popped up or

20   whether it's weather or a family issue at home,

21   we've accommodated that on a short-term basis.

22   Q.   I think you said Tiffany Kitchens did not

23   report to you, right?

24   A.   Correct.

25   Q.   Were you aware that Ms. Kitchens had been

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 56

1    working, at the time Ms. Geter was terminated, had

2    been working a reduced schedule and been permitted

3    to work from home since August 2018?

4                    MR. MELLON:  Object to form of

5        question.  Assumes facts not in evidence.

6    BY MS. LEGARE

7    Q.   You can answer.

8    A.   I couldn't say for sure.

9    Q.   When you were the operation team lead for

10   second and third shift, what was your schedule?

11   A.   It varied based on the needs of the team and

12   the business.

13   Q.   How often sort of routinely would you work at

14   least part of third shift?

15   A.   Weekly.

16   Q.   And did you sometimes do that remotely?

17   A.   It's hard to say for sure if any of those were

18   during third shift.

19   Q.   But you sometimes worked from home, even in

20   2018, right?

21   A.   Yes.

22   Q.   And 2019?

23   A.   Yes.

24   Q.   And you said Sara Kopf reported to you, right?

25   A.   Yes.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 57

1    Q.    And she sometimes worked from home, right?

2                    MR. MILIANTI:  Object to the form of

3        the question.

4    BY MS. LEGARE

5    Q.    In 2018?

6    A.    I believe so.

7    Q.    Do you know one way or the other whether the

8    area planning managers in Green Bay are working from

9    the office or working remotely right now?

10   A.    I couldn't say for sure.

11   Q.    Do you know who would know the answer to that

12   question?

13   A.    I couldn't say for sure.

14   Q.    Do you recall one way or the other whether you

15   personally were out of the office for over 80 days

16   between May and December 2018?

17                   MR. MILIANTI:  Object to the form of

18       the question.

19                   THE WITNESS:  Can you ask this

20       differently.

21   BY MS. LEGARE

22   Q.    Yes.  If Ms. Geter says you were out of the

23   office somewhere between 85 and 87 days between May

24   and December of 2018, is she right about that?

25   A.    That sounds like an awfully high number.  I

Travis Torrence                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 58

1    don't believe that's accurate.

2    Q.   But you said there is no paperwork that shows

3    when you worked remotely or when you worked in the

4    office, right?

5    A.   There is nothing that I document.

6    Q.   Is there anything that anyone documents when

7    they work remotely?

8                     MR. MILIANTI:  Object to the form of

9         the question.  Calls for speculation.

10   BY MS. LEGARE

11   Q.   That you know of?

12   A.   Not that I'm aware of.

13   Q.   So there is nothing that I could look at that

14   Schneider in Fairburn has showing, for example,

15   which days Ms. Kopf may have been working remotely,

16   for example?

17   A.   Not that I'm aware of.

18   Q.   If you will look at Exhibit 31.

19                          - - -

20                     (Whereupon, Exhibit 31 was marked for

21        identification.)

22                          - - -

23   BY MS. LEGARE

24   Q.   I can probably run through most of these pretty

25   quickly.

Case 1:20-cv-01148-SCJ-JSA   Document 47-2   Filed 06/07/21   Page 61 of 77

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 59

1   A.   I have got it up.

2   Q.   And this looks like this is an email from

3   Ms. Jansen to you on December 17, 2018, right?

4   A.   Yes.

5   Q.   It says, "Hello, Travis.  You can call her and

6   let her know the lead team will be calling her.  And

7   you also want to let her know you can accommodate

8   her return to work for the three days.  And here are

9   the three days she would be working.  You will be in

10  touch with her once the return to work info has been

11  processed."

12       Right?

13  A.   Yes.

14  Q.   So you were communicating and Ms. Jansen told

15  you you could communicate with Ms. Geter about what

16  her schedule would be when she returned to work,

17  right?

18  A.   Correct.

19  Q.   And the only issue she had with working third

20  shift on Sundays was that she had doctors'

21  appointments on Monday morning; is that right?

22  A.   Right.

23  Q.   At any point did you ask her to move her

24  doctors' appointments to a different day?

25  A.   She understood that there was a need for her to

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 60

1    work Sunday nights.  I don't believe that I asked

2    her to move her doctors' appointments.

3    Q.   Okay.  Tell me what you remember about the

4    conversation.

5    A.   I'm not sure how much more detail I can provide

6    from a conversation that long ago.

7    Q.   Okay.  If you look at Exhibit 32.

8                          -  -  -

9                (Whereupon, Exhibit 32 was marked for

10        identification.)

11                         -  -  -

12                THE WITNESS:  I have got it up.

13   BY MS. LEGARE

14   Q.   So it looks like this is an email again from

15   Ms. Jansen to you on January 21, 2019 and she cc'd

16   Mr. Horton because they had refused a request to

17   continue three days a week through 3/19/2019, right?

18   A.   Yes.

19   Q.   I have a couple questions about this.  One is

20   she said something about light duty three days a

21   week.  Do you have any idea what "light duty" means

22   in respect to this issue?

23                MR. MILIANTI:  Object to the form.

24   BY MS. LEGARE

25   Q.   Let me ask you this.  Was Ms. Geter working

Case 1:20-cv-01148-SCJ-JSA Document 47-2 Filed 06/07/21 Page 63 of 77

Travis Torrence                                            April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 61

1    light duty?  I mean, did she have a lifting

2    restriction or anything like that?

3    A.   No, not that I was aware of.

4    Q.   And do you know if the company has a light duty

5    policy?

6    A.   That's a question I would defer to the lead

7    team.

8    Q.   No problem.  And Mr. Horton was cc'd on this

9    email.  Was he involved at all -- he was your

10   supervisor at the time, right?

11   A.   Correct.

12   Q.   Was he involved at all in the decisions of

13   whether or not to accommodate Ms. Geter?

14   A.   I can't remember for sure.

15              MR. MILIANTI:  Cheryl, can we take a

16        break when it is convent for you?

17              MS. LEGARE:  Sure.  Let's go for it.

18        How long do you need?

19              MR. MELLON:  Why don't we take a

20        ten-minute if that's okay.

21              MS. LEGARE:  Yeah.  No problem.

22                        - - -

23              (Proceeding in recess from 12:17 p.m.

24        until 12:29 p.m.)

25                        - - -

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 62

1    BY MS. LEGARE

2    Q.   Mr. Torrence, at some point Ms.~Geter filed a

3    charge of discrimination with the EEOC and Schneider

4    responded.  Were you involved at all in preparing

5    Schneider's response?

6    A.   No, ma'am.

7    Q.   Have you seen Schneider's response?

8    A.   I don't believe so.

9    Q.   Okay.  If you will look at Exhibit 46.

10                       - - -

11               (Whereupon, Exhibit 46 was marked for

12          identification.)

13                       - - -

14               THE WITNESS:  I've got it up.

15   BY MS. LEGARE

16   Q.   And I do believe you assisted with this.  These

17   are Schneider's answers to the interrogatories that

18   Ms. Geter propounded.  So basically they are

19   questions Schneider answered.  And you signed some

20   verification.  Did you review this before you signed

21   the verification?

22   A.   Yes.  This looks familiar now.

23   Q.   Okay.  I just want to ask you a few questions.

24   But I think we've covered most of it.  Let me ask

25   you that, though.  You can't recall one way or the

Case 1:20-cv-01148-SCJ-JSA  Document 47-2  Filed 06/07/21  Page 65 of 77

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 63

1    other whether Doug Horton was involved in any of the

2    conversations regarding Ms. Geter's accommodations;

3    is that fair to say?

4    A.    Correct.

5    Q.    As her supervisor, is it likely you would have

6    been involved in the discussions?

7                   MR. MILIANTI:  Object to the form.

8                   THE WITNESS:  I just can't say for

9        sure.

10   BY MS. LEGARE

11   Q.    Okay.  No problem.  I think we have already

12   covered this.  Question five was, "Who participated,

13   reviewed, approved or was otherwise involved in the

14   decision to deny the request for reasonable

15   accommodation?"

16       And I think the answer is you along with

17   Ms. Rose considered the request and in consultation

18   with Ashley Jansen made the decision to deny the

19   request; correct?

20   A.    Yes.

21   Q.    And that's also true with respect to the

22   termination of Ms. Geter's employment?

23   A.    Yes.

24   Q.    Have you, during your employment with Schneider

25   had any employees who reported to you other than

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 64

1    Ms. Geter had any request for reasonable

2    accommodation granted or denied?

3                  MR. MILIANTI:  Object to the form of

4        the question.

5    BY MS. LEGARE

6    Q.    You can answer.

7    A.    Can you ask that again.

8    Q.    Sure.  And I'm only asking about employees who

9    reported directly to you.  During your employment

10   with Schneider when you were a supervisor, so after

11   you were promoted to team lead and any time

12   thereafter, has any employee who reported to you

13   other than Ms. Geter requested an accommodation for

14   disability?

15   A.    No.

16   Q.    Have any of the employees who reported to you,

17   the same time frame, once you were a supervisor,

18   taken FMLA leave?

19   A.    Yes.

20   Q.    How -- well, have any of the employees who

21   reported to you taken intermittent FMLA, meaning not

22   all at one time?

23   A.    I can't say for sure.

24   Q.    Other than Ms. Geter, have any of your

25   employees for any period of time worked a reduced

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 65

1    schedule?  And I'm talking about people you

2    supervised.

3    A.    No.

4    Q.    Has any of the employees you supervised other

5    than Ms. Geter -- I understand that you allow people

6    to work remote from time to time, has anyone had to

7    work remote one or more days for an extended period

8    of time, not COVID related?

9    A.    Can you ask that again.

10   Q.    Yes.  Have any of the employees who reported to

11   you -- and now I'm talking pre-pandemic time, had to

12   work from home for an extended period of time?  I

13   guess, let me ask it two ways.  Has anyone had to

14   work from home, anyone who reported to you, had to

15   work from home on a full-time basis for any period

16   of time?

17   A.    No.

18   Q.    Has anyone who worked for you had to work from

19   home at least once a week for any period of time?

20   A.    No.

21   Q.    And I don't think -- sitting here today, can

22   you tell me how often, for example, Ms. Kopf worked

23   from home in 2018?

24   A.    I couldn't say for sure.

25   Q.    Same for 2019?

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 66

1    A.    Same.

2    Q.    In your conversations with Ms. Jansen about

3    Ms. Geter's request for accommodation, did she ever

4    discuss with you whether it would be an undue burden

5    on Schneider to allow Ms. Geter to work reduced

6    hours until June 5, 2019?

7                    MR. MILIANTI:  Object to form of

8           question.  Calls for legal conclusion.

9    BY MS. LEGARE

10   Q.    You can answer.

11   A.    I don't know that I understand the question.

12   Q.    And it may be that only Ms. Jansen can answer

13   this question.  But I mean, do you know whether any

14   analysis was done other than we don't know how much

15   longer this is going to go on?

16                   MR. MILIANTI:  I am going to object.

17                   Travis, go ahead and answer if you

18          can.

19                   THE WITNESS:  I mean, myself and Mary

20          Ann and along with Ashley carefully considered

21          the request.  I mean, it's something that I

22          thought about a lot during the end of Q4,

23          beginning of Q1 because of the burden it places

24          on myself, the rest of the team, the business

25          of her being out.  And not being enough

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 67

1      full-time positions.  I mean the --

2    BY MS. LEGARE

3    Q.   Well, let me -- you raised a couple questions

4    here.  When you were covering her shift as APM, was

5    that a part of your full-time duties or in addition

6    to your full-time duties?

7    A.   In addition to.

8    Q.   So were you being forced to work extra hours in

9    order to cover that shift?

10                   MR. MILIANTI:  Object to the form.

11                   You can answer.

12                   THE WITNESS:  I guess I really don't

13        understand.  Forced by who?

14    BY MS. LEGARE

15    Q.   Well, how many -- when you were an operations

16    team lead and nobody was on FMLA, how many hours a

17    week were you working, approximately?

18    A.   It's hard to say for sure and each week was

19    kind of different.

20    Q.   And while Ms. Geter was on continuous FMLA from

21    October to December, who covered her shift?

22    A.   The work was absorbed by the rest of the team

23    and myself.

24    Q.   Were you actually working any of her shifts

25    while she was on FMLA?

Travis Torrence                                               April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 68

1    A.    Yes.  On Sundays.

2    Q.    And did Schneider at the time use contractors

3    or temporary employees to cover when other employees

4    were out?

5                    MR. MILIANTI:  Object to the form.

6                    THE WITNESS:  We have utilized

7         temporary associates in the past.

8    BY MS. LEGARE

9    Q.    And did you use any temporary associates during

10   the fall of 2018 when Ms. Geter was on FMLA leave?

11   A.    I can't remember for sure.

12   Q.    Do you know who might know the answer to that

13   question?

14   A.    I can't say for sure.

15   Q.    Would there be documentation of the use of

16   temporary employees?  Let me ask you this.  Do you

17   use an agency for temporary employees?

18   A.    Yes.

19   Q.    What is that agency?

20   A.    Kelly Services.

21   Q.    And I'm assuming you pay Kelly Services when

22   you use the employees, right, temporary employees?

23   Not a trick question.  I mean, the temporary

24   employees are paid, right?

25   A.    Yes.  I would not be the one that would arrange

Case 1:20-cv-01148-SCJ-JSA   Document 47-2   Filed 06/07/21   Page 71 of 77

Travis Torrence                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 69

1     that.  So I'm not really sure how that's set up.

2     Q.    Who arranged that, Ms. Rose?

3     A.    No.  I don't believe it would be her either.

4     Q.    Who gives you permission to use temporary

5     associates?

6     A.    I believe that would have to come from our VP.

7     Q.    And who is that?

8     A.    At the time, it was Max Peach.

9     Q.    Is he in Green Bay?

10    A.    Yes.

11    Q.    So if you were down a number of employees -- or

12    actually, strike that.

13        If someone was going to be out for a long

14    extended period of time, could you request

15    permission to bring in a temp?

16    A.    We could, yes.

17    Q.    You just can't recall whether or not you did

18    when Ms. Geter was on leave in the fall of 2018?

19    A.    I can't remember for sure.

20    Q.    Do you know one way or the other whether you

21    had ever used temporary associates to fill in for

22    anyone in Fairburn on a part-time basis?

23    A.    Sorry.  Can you ask that differently.

24    Q.    Yeah.  Do you know if any of the temporary

25    associates that you have fill in for employees

Case 1:20-cv-01148-SCJ-JSA  Document 47-2  Filed 06/07/21  Page 72 of 77

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 70

```
 1    worked less than five days a week?

 2                    MR. MILIANTI:  Object to the form of

 3          the question.  Calls for speculation.

 4                    THE WITNESS:  I can't say for sure.

 5                    MS. LEGARE:  I think that's all I

 6          have, Pete.

 7                    MR. MILIANTI:  Okay.  I have no

 8          questions.

 9                              - - -

10                    (Deposition concluded at 12:51 p.m.)

11                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Travis Torrence                                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 71

1            The following reporter and firm
    disclosures were presented at this proceeding for
2    review by counsel:
3                    REPORTER DISCLOSURES
4            The following representation and
    disclosures are made in compliance with Georgia Law,
5    more specifically:
6    Article 10(B) of the Rules and Regulations of the
    Board of Court Reporting (disclosure forms)
7
    OCGA 9-11-28(c) (disqualification of reporter for
8    financial interest)
9    OCGA 15-14-37(a) and (b) (prohibitions against
    contracts except on a case-by-case basis).
10
    -  I am a certified reporter in the State of
11    Georgia.
12    -  I am a subcontractor for Veritext Legal
    Solutions.
13
    -  I have been assigned to make a complete and
14    accurate record of these proceedings.
15    -  I have no relationship of interest in the matter
    on which I am about to report which would disqualify
16    me from making a verbatim record or maintaining my
    obligation of impartiality in compliance with the
17    Code of Professional Ethics.
18    -  I have no direct contract with any party in this
    action and my compensation is determined solely by
19    the terms of my subcontractor agreement.
20                    FIRM DISCLOSURES
21    - Veritext Legal Solutions was contacted to provide
    reporting services by the noticing or taking
22    attorney in this matter.
23    -  There is no agreement in place that is prohibited
    by OCGA 15-14-37(a) and (b).  Any case-specific
24    discounts are automatically applied to all parties,
    at such time as any party receives a discount.
25                    Page 1

Travis Torrence                                           April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                            Page 72

1    Transcripts:  The transcript of this proceeding as
     produced will be a true, correct, and complete
2    record of the colloquies, questions, and answers as
     submitted by the certified court reporter.
3
     Exhibits:  No changes will be made to the exhibits
4    as submitted by the reporter, attorneys, or
     witnesses.
5
     -  Password-Protected Access:  Transcripts and
6    exhibits relating to this proceeding will be
     uploaded to a password-protected repository, to
7    which all ordering parties will have access.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                          Page 2

                    Veritext Legal Solutions

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 73

1                    C E R T I F I C A T E
2        STATE OF GEORGIA:
         COUNTY OF FULTON:
3
4              I hereby certify that the foregoing
         transcript was taken down, as stated in the caption,
5        and the colloquies, questions, and answers were
         reduced to typewriting under my direction; that the
6        transcript is a true and correct record of the
         evidence given under said proceeding.
7
               I further certify that I am not a relative
8        or employee or attorney of any party, nor am I
         financially interested in the outcome of this
9        action.
10             I have no relationship of interest in this
         matter which would disqualify me from maintaining my
11       obligation of impartiality in compliance with the
         Code of Professional Ethics.
12
               I have no direct contract with any party
13       in this action and my compensation is based solely
         on the terms of my subcontractor agreement.
14
               Nothing in the arrangements made for this
15       proceeding impacts my absolute commitment to serve
         all parties as an impartial officer of the court.
16
               This 6th day of April, 2021      .
17
18
19
                    _____
20
                    JULIE C. WILSON, CRR, RPR
21                  CCR # 5243-5949-0338-8160
22
23
24
25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT C



Deposition of:

**Ashley Marie Janssen**

*April 8, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION
 3   CIERRA GETER,
             Plaintiff,
 4
         vs.               Civil Action File No.
 5                         1:20-cv-01148-SCJ-JSA
 6   SCHNEIDER NATIONAL CARRIERS,
             Defendant.
 7
                         - - -
 8

         Deposition of ASHLEY MARIE JANSSEN,
 9
             Taken by Cheryl B. Legare,
10
                Before Shannon E. Jordan,
11            Certified Court Reporter,
12      Via Veritext Virtual Videoconferencing,
13           On Thursday, April 8, 2021,
     Beginning at 2:00 p.m. & ending at 3:08 p.m.
14
                         - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES OF COUNSEL
 2   For the Plaintiff:
 3             CHERYL B. LEGARE
               Legare, Attwood & Wolfe LLC
 4             Suite 380
               125 Clairemont Avenue
 5             Decatur, GA 30030
               470.823.4000
 6             cblegare@law-llc.com
 7   For the Defendant:
 8             PETER A. MILIANTI
               McGuire Woods
 9             Suite 4100
               77 West Wacker Drive
10             Chicago, IL 60601
               312.849.8100
11             pmilianti@mcguirewoods.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ashley Marie Janssen                                        April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 3

1              INDEX TO PROCEEDINGS
2                EXAMINATION INDEX
3    ASHLEY MARIE JANSSEN
4    Examination by Ms. Legare                    4
5    Certificate Page                            49
6    Errata Sheet                                51
7    _____
8                  EXHIBIT INDEX
9    Exhibit
10   Exhibit 4    Job Description, Manager, Area      21
                  Planner
11
     Exhibit 15   Request for Accommodation,          25
12                12-18-2018
13   Exhibit 16   Fax from Dr. Cassandra Wanzo,       27
                  1-19-2019
14
     Exhiibt 22   Request for Accommodation, 4-12-2019  43
15
     Exhibit 31   Email string, 12-17-2018            29
16
     Exhibit 32   Email string ending 1-21-2019       31
17
     Exhibit 34   Email string ending 3-22-2019       32
18
     Exhibit 35   Email, 3-25-2019                    39
19
20
21   (End of Index)
22
23
24
25

Veritext Legal Solutions
800.808.4958                                        770.343.9696

Page 4

1                  April 8, 2021

2                  2:00 p.m.

3          (Whereupon the reporter provided a written

4          disclosure to all counsel pursuant to

5          Article 10.B. of the Rules and Regulations

6          of the Board of Court Reporting.)

7                  THE COURT REPORTER:  Due to the need

8     for this deposition to take place remotely

9     because of the government's order for social

10    distancing, the parties will stipulate that the

11    court reporter may swear in the witness over

12    Veritext virtual videoconferencing and that the

13    witness has verified that she is, in fact, Ashley

14    Marie Janssen.

15    ASHLEY MARIE JANSSEN,

16          being first duly sworn, was examined and

17          testified as follows:

18    EXAMINATION

19    BY MS. LEGARE:

20          Q       Good afternoon, Ms. Janssen.  I'm

21    Cheryl Legare, and I represent Cierra Geter in

22    the lawsuit that she brought against Schneider

23    National Carriers in the Northern District of

24    Georgia, and that's why we're here today.  You're

25    a witness in the case.

```
                                                    Page 5
 1      A        Yep.
 2              MS. LEGARE:  So let's see.  The
 3   deposition is being taken pursuant to notice and
 4   for all purposes under the Federal Rules of Civil
 5   Procedure and evidence.  And are we waiving
 6   objections except as to form and privilege, Pete?
 7              MR. MILIANTI:  Yes.
 8              MS. LEGARE:  And did you want to read
 9   and sign?
10              MR. MILIANTI:  Yes.
11   BY MS. LEGARE:
12      Q        Ms. Janssen, can you please state
13   your full name for the record?
14      A        Ashley Marie Janssen.
15      Q        And what is your current address?
16      A        W2345, County Road Uu, Freedom,
17   Wisconsin 54913.
18      Q        Great.  And have you ever been
19   deposed before?
20      A        No, I have not.
21      Q        I'm sure Pete has told you how it's
22   going to go today.  I'm just going to ask you
23   some questions, show you some documents related
24   to the case, that's essentially what will happen.
25              There's a few ground rules.  Just
```

Ashley Marie Janssen                                        April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 6

1   it's important in every deposition, but

2   particularly important in remote depositions that

3   we let each other finish our answers and

4   questions so we're not talking over each other.

5   Is that okay?

6        A        Yes.

7        Q        And it's important that you give

8   verbal answers to questions.  All right?

9        A        Yes.

10       Q        And I don't think we'll be here more

11  than a couple of hours today, but if you need a

12  break, just let me know, I'm happy to take a

13  break.  Okay?

14       A        Yes.

15       Q        What did you do to prepare for your

16  deposition today?  And I don't want to know about

17  any conversations that you had where your lawyer

18  or any other lawyers from his firm were present.

19       A        I met with Pete and we discussed how

20  the day was going to go.

21       Q        Okay.  Any conversations that you had

22  with Pete are privileged.  Did you talk to any of

23  the other witnesses in the case without Pete

24  present?

25       A        No.

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 7

1        Q        Okay.  Are you on any medications
2    that might affect your memory or make you sleepy?
3        A        No.
4        Q        And have you seen Ms. Geter's
5    deposition transcript?
6        A        Yes.
7        Q        Okay.  Have you read the whole thing?
8        A        I have only read the first couple of
9    pages.
10       Q        And you actually don't know
11   Ms. Geter; right?
12       A        No, I've never met her.
13       Q        She said the same thing.  I just
14   wanted to confirm.  Let's see.
15                Are you still employed with
16   Schneider?
17       A        Yes, I am.
18       Q        And tell me your employment history
19   with Schneider?
20       A        I started with Schneider in 2012.  I
21   started as a corporate recruiter, and I did full
22   cycle recruiting for intermodal and other areas,
23   and also was the relationship partner for our
24   contingent staffing firm, Kelly Services, so over
25   many different temps, temps throughout the US as

Page 8

1    well.  I did that for two years.

2              Then I moved into an associate HR

3    business partner role.  I did that for about four

4    years, worked specifically on human capital,

5    performance management, associate relations,

6    accommodations.  I had about 3,000 plus

7    associates throughout the US and Canada that I

8    supported, but our total group had about 5,800

9    drivers and about 800 office associates that I

10   helped indirectly support.

11             And then in 2018 I took the role I'm

12   in today as a HR business partner senior, a

13   promotional role from --

14             (Audio distortion.)

15             THE COURT REPORTER:  I'm sorry.  The

16   audio cut.  The last part I heard was, "a

17   promotional role from."

18             THE WITNESS:  Took the HR business

19   partner senior role as a promotional role from

20   the associate HR business partner role or my

21   previous role.

22   BY MS. LEGARE:

23        Q       And, Ms. Janssen, what are your job

24   duties in your current role?

25        A       So I work with the team, I support

Page 9

1   our senior vice president of intermodal, and

2   about 3,000, a little less than 3,000 office and

3   driver associates working through human capital,

4   head count management, organizational design,

5   staffing, associate relation concerns, any

6   investigations, associate accommodations, work

7   through some compensation and a little bit of

8   training development.

9        Q       How many employees does, and I'm

10  talking about W-2 employees, does Schneider have

11  now?

12              MR. MILIANTI:  Object to the form.

13  Calls for speculation.  If you know.

14              THE WITNESS:  I do not know the exact

15  number.

16  BY MS. LEGARE:

17       Q       I mean, just based on the number that

18  you told me -- well, do you know, are the drivers

19  W-2 employees?

20       A       Yes.

21       Q       And I think you said in your last

22  role, not in this one, you had responsibilities

23  for, did you say, 5,800 drivers and 800 office

24  associates?

25       A       That was our total line of business.

Ashley Marie Janssen                                        April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                             Page 10

1   I directly supported a little over 3,000 office

2   and driver.

3          Q        And that's currently also; right?

4          A        Yep.  Currently we have a little less

5   than 3,000 in intermodal in the line of business

6   I work in today of office and driver.

7          Q        And when you say office, are you

8   referring to roles, for example, Ms. Geter's

9   former role of -- and now, I'm drawing a blank --

10  APM?

11         A        Yes.

12         Q        What does APM stand for?

13         A        Area planning manager.

14         Q        So in 2019 -- well, actually, who do

15  you report to now?

16         A        I report to Laurie Smith, our human

17  resources director.

18         Q        And before your promotion, who did

19  you report to?

20         A        Jackie LeFever.

21         Q        I think I have this timing right.

22  You were promoted before Ms. Geter's termination;

23  right?

24         A        Yes.

25         Q        Okay.  Do you play any role with

Page 11

1    respect to leave management?

2                    MR. MILIANTI:  Object to the form.

3                    THE WITNESS:  I am involved once

4    family medical leave has expired, but we have an

5    HR leave team that handles all of our leaves.

6    BY MS. LEGARE:

7        Q        So is it fair to say that you become

8    involved once FMLA is expired and employees might

9    need accommodations under the Americans with

10   Disabilities Act?

11       A        Correct.

12       Q        All right.  When is the first time,

13   understanding that you have never met Ms. Geter,

14   when is the first time that you became involved

15   with Ms. Geter's employment with Schneider?

16       A        First time I was involved with her

17   was in January of 2019.

18       Q        So would that have been related to

19   her first request for accommodation?

20       A        Correct.

21       Q        And what is your role with respect to

22   employee requests for accommodations?

23       A        I specifically work with the leaders

24   to understand if we can accommodate the

25   associates.

Page 12

1       Q        Do you consider yourself a

2  decisionmaker with respect to whether an employee

3  can be accommodated?

4       A        No.

5       Q        Would it be fair to say that you

6  offer advisory services to the leaders with

7  respect to accommodations?

8       A        Yes.

9       Q        And what is the request for

10  accommodation process at Schneider?

11              MR. MILIANTI:  Just object to the

12  form of the question.

13  BY MS. LEGARE:

14       Q        You can answer.

15       A        Once the accommodation -- once the

16  associate requests an accommodation, the human

17  resources leave team will inform the leaders and

18  the HR business partner, and then I will work

19  with the leaders on multiple questions I'll ask

20  them, to understand different forms or ways that

21  we could possibly accommodate the associate, and

22  we do that through a conversation.

23              And then once that's determined, the

24  leaders would go back to the leave team and let

25  them know if they can or cannot accommodate.

Page 13

1      Q       Do you or does anyone in the

2  accommodation process consult with any in-house

3  lawyers or outside lawyers with respect to what

4  the legal obligations are concerning a specific

5  accommodation?

6           MR. MILIANTI:  I'm just going to

7  object to the form of the question.  It's an

8  incomplete hypothetical.

9           MS. LEGARE:  I'm not really sure how

10  it's incomplete, but let me see if I can make it

11  complete.

12  BY MS. LEGARE:

13      Q       Once you receive a request for

14  accommodation from an employee and it's either

15  sent to you -- well, it's sent to you, let's say

16  in this case, by the leave management team, in

17  providing advice on the accommodation in

18  question, do you or the leaders or anyone that

19  you're aware of consult with an in-house legal

20  team or outside legal regarding the

21  accommodation?

22           MR. MILIANTI:  Object to the form.

23  Go ahead and answer.

24           THE WITNESS:  In some cases.

25  BY MS. LEGARE:

Case 1:20-cv-01148-SCJ-JSA   Document 47-3   Filed 06/07/21   Page 16 of 54

Ashley Marie Janssen                        April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1       Q       Okay.  Do you recall sitting here

2    today whether, with respect to Ms. Geter, you

3    consulted with in-house legal or outside legal on

4    her accommodations?

5       A       I do not recall.

6       Q       And as HR business partner, do you

7    perform an undue burden analysis to determine

8    whether an accommodation can be made?

9               MR. MILIANTI:  Object to the form of

10   the question.  Legal conclusion as to undue

11   burden.  You can answer if you understand the

12   question.

13              THE WITNESS:  I don't understand the

14   question.

15   BY MS. LEGARE:

16      Q       Well, under the ADA, if an employee

17   needs an accommodation, the only way it can be

18   rejected is if it's an undue burden on the

19   business and that analysis has to be done.  Do

20   you know if that was done in this case?

21              MR. MILIANTI:  Object to the form of

22   the question.  Calls for legal conclusion and

23   misstates the ADA and the accommodation process.

24              MS. LEGARE:  Not in the 11th Circuit

25   it doesn't, but go ahead.

Ashley Marie Janssen                              April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

```
 1   BY MS. LEGARE:
 2        Q        You can answer to the extent you
 3   know.
 4        A        I'm not aware.
 5        Q        And I think you said you have
 6   discussions with the leaders about whether an
 7   employee can be accommodated.  Do you take notes
 8   of the conversations with the leaders?
 9        A        I will take my own personal notes,
10   yes.
11        Q        Do you know if you took any notes
12   during your conversations with Mr. Torrence or
13   Ms. Biskey Rose in this case?
14        A        I don't have any in this case other
15   than whatever I had in an email chain back and
16   forth.
17        Q        Do you know whether Schneider has a
18   remote work policy?  And I'm talking about in
19   2019, not now.  Obviously COVID has changed
20   everything.
21        A        I don't recall 2019 if we did or not.
22        Q        Do you currently have a
23   work-from-home policy?
24        A        We currently have a flexible work
25   schedule policy.
```

Page 16

```
 1        Q        And what is the policy now?

 2        A        I don't have it in front of me right

 3   now.

 4        Q        Does that flexible work schedule

 5   policy also include provisions for working less

 6   than 40 hours a week?

 7        A        Yes.

 8        Q        But you don't know if that policy was

 9   in effect in 2019?

10        A        I do not.

11        Q        In your role, and I'm going to

12   apologize, you said is it senior --

13        A        Yep, human resources business

14   partner.

15        Q        Okay.  Do you play any role in

16   drafting job descriptions?

17        A        I do.  I do.

18        Q        And what role do you play in drafting

19   job descriptions?

20        A        We -- I review the job descriptions

21   for the ADA and type of job that it is.

22        Q        When you say you review it for ADA,

23   what do you mean?

24        A        I review it to ensure that the

25   essential functions of the job are something that
```

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1   associates can do as well as what type of job it

2   is.  If it's an office job, a driver job,

3   sometimes it has to have different qualifications

4   in it.

5        Q        I understand.  Got it.  Do you assign

6   the essential functions in the job description?

7        A        No, I do not.

8        Q        Who does that, if you know?

9        A        The leaders.

10       Q        In your role I think you said you

11  have some training responsibilities?

12       A        Yes.

13       Q        What are those responsibilities?

14       A        It is my job to ensure that the

15  leaders are educated on specific processes and

16  they know where to find policies and tools they

17  need to do their job.

18       Q        When you say processes, what do you

19  mean exactly?

20       A        An example is I teach and help

21  educate associates on where to find performance

22  review appraisals, how to put in goals,

23  objectives into our system, where to find

24  trainings that are coming up each month.  I

25  assist senior leaders in new rollouts that we

Page 18

1    have within the organization, and inform them if

2    processes or policies have changed.

3         Q        Do you do any training for leaders on

4    FMLA or Schneider's FMLA policies?

5         A        I do not.

6         Q        Do you do any training for the

7    leaders on request for accommodation under the

8    Americans with Disabilities Act?

9         A        I do not do specific training, no.

10        Q        And I believe in 2020, somewhere in

11   the first or second quarter, the APMs that were

12   based out in the field were brought back to Green

13   Bay to work.  Were you involved in that at all?

14        A        Yes.

15        Q        What was your role?

16        A        My role was to partner with the

17   leaders to put together communication plans,

18   change management plans, timelines, understand

19   what other jobs are available for associates,

20   what options are available for associates as we

21   make that transition throughout the next six

22   months.

23        Q        So it was a six-month process?

24        A        Correct.

25        Q        And I understand, I spoke with

Case 1:20-cv-01148-SCJ-JSA   Document 47-3   Filed 06/07/21   Page 21 of 54

Ashley Marie Janssen                              April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 19

1   Mr. Torrence a couple of days ago, and I

2   understand that at least with respect to

3   Fairburn, which is, you know, the relevant area

4   here, all of the APMs were considered for open

5   positions, and if they were not put in the open

6   positions, then they were offered transfers to

7   Green Bay.

8                    Is that the process as far as you

9   understood it?

10       A       Correct.  They were actually offered

11  Green Bay roles first because that is the same

12  role they were doing.  And then if they weren't

13  able to do that job or relocate, because we

14  wanted to keep them in their roles, then we would

15  offer them available roles within their location,

16  and if that wouldn't work, we would look at other

17  locations.

18                    And if they weren't able to relocate

19  or there were no roles available in other

20  locations, yes, then we would work through a

21  separation package.

22       Q       Were there people whose positions,

23  who were unable to be placed without relocation,

24  were they given severance packages?

25       A       Correct.

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                            Page 20

1        Q        Do you know whether there -- is there

2    a separate policy in place that dictated what the

3    amount paid in severance was?

4        A        We have a process, we have a graph

5    that -- that we do have something we follow

6    consistently within the organization, but I don't

7    know any of those numbers off the top of my head.

8        Q        Okay.  Got it.  Did you personally

9    play any role with the leaders in selecting

10   people for open positions in the locations,

11   meaning in Fairburn in this case?

12       A        I did not in that case, no.

13       Q        And currently are the area planning

14   managers employed by Schneider working from the

15   office in Green Bay or are they working remotely?

16               MR. MILIANTI:  Object to the form of

17   the question.  Calls for speculation.  If you

18   know.

19               THE WITNESS:  Due to the pandemic we

20   have some in office and some out of office, but

21   they will all be returning in office in the next

22   two months.

23   BY MS. LEGARE:

24       Q        All right.  Are you familiar with a

25   former area planning manager, she's now -- she

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 21

1    has a different position in Fairburn, named

2    Tiffany Kitchens.

3         A         I know her name.  I've never met her.

4         Q         Were you involved in any part of her

5    work-from-home for Schneider?

6         A         No.

7                   MR. MILIANTI:  Object to the form of

8    the question.

9    BY MS. LEGARE:

10        Q         Did you say no?

11        A         No.

12        Q         And I'm going to get into more detail

13   on Ms. Geter's request for accommodation.  In

14   Schneider's discovery responses, Schneider has

15   said that the decision was made by Travis

16   Torrence and Marianne Biskey Rose in consultation

17   with you.

18                  Do you know if Doug Horton

19   participated in any of the conversations

20   regarding accommodations for Ms. Geter?

21        A         I don't recall him in the email.

22        (Whereupon a document was identified as

23        Exhibit 4.)

24   BY MS. LEGARE:

25        Q         All right.  I think Lauren told you

Page 22

1    how to use exhibit share, all you need to do is

2    go on the marked exhibit share and click on the

3    exhibit as I tell you number.  If you will look

4    at Exhibit 4.

5           A        Okay.

6           Q        Are you familiar with Exhibit 4?

7           A        Yes.

8           Q        And what is Exhibit 4?

9           A        The job description of the area

10   planning manager.

11          Q        And I understand this is the job

12   description that was in effect when Ms. Geter was

13   employed.

14                   Do you know if this job description

15   has changed since the area planning manager

16   position has been transferred to Green Bay?

17          A        I believe so.

18          Q        But this, as far as you know, is the

19   one that was in effect when you were assisting

20   with her request for accommodation; is that

21   right?

22          A        This was the one in effect, correct.

23          Q        If you'd take a minute to read

24   through that.

25          A        Okay.

Page 23

```
 1      Q       I understand you said you did not
 2  draft this job description; right?
 3      A       Correct.
 4      Q       Is it also true that you did not
 5  approve the job description?
 6      A       Correct.
 7      Q       Is there any way in looking at this
 8  to tell who drafted this job description?
 9      A       No.
10      Q       And do you know sitting here today
11  when it is that the area planning managers began
12  working from home because of the pandemic?
13      A       Late March, April.
14      Q       Sort of around the same time as
15  everyone; right?
16      A       Yeah, 2020.
17      Q       Have you been working from home
18  because of the pandemic?
19      A       I have.  I just recently came back in
20  the office in 2021.
21      Q       When did you start coming back in?
22      A       A couple of weeks end of 2020 and
23  then beginning January 2021.
24      Q       And do you work from the office every
25  day?
```

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 24

1        A        I will be at the end of April.

2        Q        Right now how many days a week are

3    you working from the office?

4        A        Four.

5        Q        And one from home?

6        A        Correct.

7        Q        Do you know, and you may not, but do

8    you have any idea whether, when these job

9    descriptions are being drafted, whether the

10   people drafting them consult with the people

11   actually doing the jobs to see if these are the

12   jobs that they're doing?

13               MR. MILIANTI:  Object to the form of

14   the question.  Calls for speculation.

15               THE WITNESS:  I can't confirm

16   conversations.

17   BY MS. LEGARE:

18       Q        Do you know, I understand that you're

19   not part of leave management, at some point do

20   you -- are medical-related -- let's just talk

21   specifically in this instance.

22               The medical records with respect to

23   Ms. Geter's request for accommodation, were those

24   sent to you when she started requesting

25   accommodations or to somebody else?

Page 25

```
 1      A       It was sent to the leave team.

 2      Q       To the leave team?

 3      A       (Nods head affirmatively.)

 4      Q       Does the leave team share them with

 5   you?

 6      A       The leave team will share with me

 7   what restrictions the associate has so we can

 8   understand what we can accommodate.

 9      Q       Does the leave team share the

10   specific serious health condition or disability?

11      A       No.

12      Q       And I understand, and you did not

13   have any specific conversations with Ms. Geter

14   with respect to what her disability was or what

15   her accommodation needs were?

16      A       No.  I still do not know.

17      (Whereupon a document was identified as

18      Exhibit 15.)

19   BY MS. LEGARE:

20      Q       Okay.  If you'll look at Exhibit 15.

21      A       Okay.

22      Q       Would you have seen -- so Exhibit 15

23   looks to be a letter to Ms. Geter about her

24   request for accommodation, approving it through

25   February 13, 2019.  Did you play any role in
```

Ashley Marie Janssen                              April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    drafting this letter?

2         A        No.

3         Q        Would you have seen this letter at

4    the time that it was sent to Ms. Geter?

5         A        No.

6         Q        In December of 2018 Ms. Geter

7    requested an accommodation.  Do you recall that?

8         A        I only got involved in January of

9    2019.

10        Q        Okay.  So you were not involved in

11   the initial approval for her request for

12   accommodations?

13        A        The only thing that I recall is once

14   her FMLA expired, Travis had reached out to me to

15   ask if he could accommodate.  I would have to

16   find the information to see if that was before

17   January or after January.

18        Q        So you said Travis reached out to

19   you.  What do you -- was that like by telephone

20   or by email?

21        A        Typically we do telephone or email.

22        Q        Okay.  If you recall, you may not, do

23   you recall off the top of your head any specific

24   conversations that you had with Mr. Torrence

25   about accommodating Ms. Geter early in the

Page 27

1   process?

2       A       All I recall is that he wanted to do

3   everything he could to keep her employed and work

4   through her accommodation, and I know he said he

5   would approve the first accommodation, and then I

6   know we did go through a second accommodation.

7   That's what I'm aware of.

8       Q       Okay.  Did you personally have any

9   conversations with Ms. Biskey Rose about

10  Ms. Geter's accommodations?

11      A       Not until the decision to -- that we

12  couldn't continue to accommodate.  So the last

13  conversation she was involved with me, Travis,

14  and herself.

15      Q       Okay.

16      A       I do not know the conversations she

17  had with Travis and Marianne.

18      (Whereupon a document was identified as

19      Exhibit 16.)

20  BY MS. LEGARE:

21      Q       Right.  If you will look at Exhibit

22  16.

23      A       Okay.

24      Q       Can you tell me if you've seen this

25  document, Ms. Janssen?

Ashley Marie Janssen                                  April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

 1      A        Yes.

 2      Q        Do you know when the first time you

 3  saw this was?

 4      A        I do not.

 5      Q        Do you know if it would have been

 6  while Ms. Geter was employed?

 7      A        Yes.

 8      Q        Okay.  And in this document

 9  Ms. Geter's doctor says that she has clinical

10  depression and posttraumatic stress disorder;

11  right?

12      A        Correct.

13      Q        And I believe this is the request to

14  extend her accommodation through March; right?

15      A        Until March 19th, correct.

16      Q        I think you said, and I don't want to

17  put words in your mouth, but so at this point in

18  time you would have been communicating with

19  Mr. Torrence?

20      A        What do you mean?

21      Q        I think you said you only spoke with

22  Ms. Biskey Rose after the last request?

23      A        Right.

24      Q        This request to extend through March

25  was approved; correct?

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

 1       A       Correct.

 2       (Whereupon a document was identified as

 3       Exhibit 31.)

 4  BY MS. LEGARE:

 5       Q       So let's look at Exhibit 31.

 6       A       Okay.

 7       Q       Does this refresh your recollection

 8  about when you first learned about Ms. Geter's

 9  need for accommodation when she returned to work?

10       A       Yes.

11       Q       It looks like the request was

12  December 17, 2018; right?

13       A       Yes.

14       Q       It looks to me like this is the

15  process you're talking about, HR leave management

16  gets it and then sends it to you and to

17  Mr. Torrence?

18       A       Correct.

19       Q       Do you recall one way or the other

20  whether you had any conversations with

21  Mr. Torrence?  Because it looks like he replied

22  pretty quickly that they could accommodate the

23  restrictions; right?

24       A       Correct.

25       Q       Did he talk to you about that before

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 30

1  he did it?

2       A       I don't recall.  We typically have

3  phone conversations.

4       Q       Got it.  But at least in this case it

5  looks like you learned of the request for

6  accommodation around 8:47 in the morning and the

7  accommodation was approved pretty quickly, you

8  know, around lunchtime on that day?

9                MR. MILIANTI:  Object to the form.

10                THE WITNESS:  I'm not 100 percent

11  sure because I don't have the recollection of our

12  conversation.

13  BY MS. LEGARE:

14       Q       Okay.  But at least according to this

15  email, though, at 1:33 p.m., you were talking

16  about letting Ms. Geter know that her request had

17  been granted; right?

18       A       At that time I gave Travis the okay

19  to communicate if he would like to accommodate.

20  I can't confirm when that happened after that.

21       Q       Right.  Right.  Right.  That's not

22  what I'm asking.  All that I'm saying is at least

23  as of Travis's email to you at 12:57 p.m., he

24  said that they were able to accommodate; right?

25       A       Correct.  I have a different time in

Ashley Marie Janssen                                         April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 31

1    my document, but I have 1:33 that we said we

2    would be able to communicate with her.

3         Q       Right.  But if you scroll down to

4    emails below that, there is an email from

5    Mr. Torrence to you at December 17, 2018, at

6    12:57 p.m. saying we're able to accommodate the

7    restrictions outlined below?

8         A       Correct.

9         (Whereupon a document was identified as

10        Exhibit 32.)

11   BY MS. LEGARE:

12        Q       And then if you will look at Exhibit

13   32?

14        A       Okay.

15        Q       Are you familiar with Exhibit 32?

16        A       Yes.

17        Q       And this email chain is -- the top

18   two emails are dated January 21, 2019; right?

19        A       Correct.

20        Q       And the email from Anissa, is it

21   Gauthier?  Do you know how to pronounce her last

22   name?

23        A       Gauthier.

24        Q       Gauthier.  Okay.  The email from

25   Ms. Gauthier to you and Mr. Torrence notified you

Page 32

1    that they received an updated return-to-work form

2    that indicates a continuation of light duty three

3    days per week through 3-19-2019; right?

4           A        Correct.

5           Q        Do you know what she meant by light

6    duty?  Is part-time work light duty?

7           A        I do not know what she meant by that.

8           Q        Okay.  Do you know if Schneider has a

9    light-duty policy?

10          A        I do not know off the top of my head.

11          Q        It looks like you emailed

12   Mr. Torrence and cc'd Doug Horton at 10:30 a.m.

13   asking their thoughts; right?

14          A        Correct.

15          Q        Do you know if they responded to you?

16          A        They more than likely -- actually,

17   Travis more than likely picked up the phone and

18   had a conversation with me, but this was back in

19   '19, so I don't have the specifics.

20          (Whereupon a document was identified as

21          Exhibit 34.)

22   BY MS. LEGARE:

23          Q        If you'll look at Exhibit 34.

24   Actually let me ask you a question before you

25   look at that.  Based on everything I've seen, the

Ashley Marie Janssen                                        April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 33

1    accommodation was extended to March 19, 2019, for

2    Ms. Geter; right?

3          A          Correct.

4          Q          And if you will look at Exhibit 34,

5    please.

6          A          Okay.

7          Q          And this looks like an email from

8    Mr. Torrence to you on March 22, 2019; right?

9          A          Correct.

10         Q          And in the email Mr. Torrence wrote,

11   "On Monday Anissa said that Cierra's doctor

12   wanted to extend the 3-day restriction.  She set

13   up a call for us to discuss since we don't

14   typically accommodate a restriction like that

15   beyond 90 days."

16                     Is there a policy that says certain

17   accommodations will only be granted for 90 days?

18         A       Not -- I'm not for sure.  I'm not 100

19   percent sure.

20         Q          And do you know if it's -- if, in

21   fact, there was a policy that said these

22   restrictions would only be granted for 90 days,

23   that's compliant with the ADA?

24                     MR. MILIANTI:  Object to the form of

25   the question.  Calls for a legal conclusion.  I

Ashley Marie Janssen                          April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 34

1    believe misstates her testimony as well.

2    BY MS. LEGARE:

3         Q        You can answer.

4         A        Can you rephrase the question?

5         Q        Yeah.  Well, do you have any

6    knowledge about whether if Schneider actually has

7    a policy that allows certain types of

8    accommodations for only 90 days, whether that

9    policy is compliant with the Americans with

10   Disabilities Act?

11             MR. MILIANTI:  Object to the form of

12   the question.  Calls for a legal conclusion.

13             THE WITNESS:  I do not know off the

14   top of my head.

15   BY MS. LEGARE:

16        Q        This reports that Anissa was going to

17   speak to see Cierra's doctor and see if there is

18   truly a need for a 3-day restriction or if Cierra

19   would be able to work a fourth day a different

20   day of the week temporarily, or if a 5-day

21   schedule would work.

22             Do you know if anyone ever spoke with

23   Ms. Geter's doctor about her need for continued

24   accommodations?

25        A        I know that Anissa was going to reach

Ashley Marie Janssen                                      April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 35

1   out.

2        Q        Do you know if any connection was

3   actually made between Anissa and Ms. Geter's

4   provider?

5        A        I do not believe --

6               MR. MILIANTI:  Just object to the

7   form.  As to what?  I'm sorry, I'm not --

8   BY MS. LEGARE:

9        Q        Regarding the accommodation?

10       A        Can you --

11              MR. MILIANTI:  Yeah, I'm sorry.

12  Object to the form.  I'm not following.

13  BY MS. LEGARE:

14       Q        Yes.  I think you said that you

15  thought somebody was going to reach out to

16  Ms. Geter's provider; right?

17       A        Anissa, the HR leave was going to

18  reach out to the doctor.

19       Q        And do you know if she did?

20       A        I trust her word.

21       Q        Have you personally seen anything

22  that shows that she did?

23       A        I have seen a letter of her

24  requesting that information.

25       Q        And do you know if anyone, you may

Page 36

1    not, asked Ms. Geter whether there were any other

2    accommodations that would work other than the one

3    that she was -- that her doctor was requesting

4    for her?

5         A       It is our typical practice to first

6    ask the associate if we can make any other type

7    of accommodations.  So myself and the leader

8    would have that conversation, and the leader

9    would go back, in this case, to Ms. Geter and

10   say, is there any other shifts, any other type of

11   work.

12            And I know that that conversation was

13   had between Anissa and Ms. Geter before she sent

14   the information to the doctor, I believe.

15        Q       You say you know.  How do you know?

16   Were you on that conversation?

17        A       Anissa had shared that she was going

18   to talk to Ms. Geter and then follow-up with

19   Ms. Geter's doctor.

20        Q       Do you know --

21        A       I was not in the conversation.

22        Q       Okay.  So you don't know if it

23   actually happened or not?

24        A       Correct.

25        Q       Do you know if Ms. Geter was ever

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 37

```
 1    offered a transfer to a different shift at the

 2    time she needed an accommodation?

 3         A       I was told she was offered different

 4    shifts as well as different days of the week in

 5    order to see if she would be able to work

 6    something out.

 7         Q       Who told you that?

 8         A       That would be her leader.

 9         Q       Travis?

10         A       Yes, in a phone conversation, I

11    believe.

12         Q       At some point did you learn that one

13    of the possibilities was for Ms. Geter to work

14    from home from time to time?

15              MR. MILIANTI:  Object to the form.

16    Misstates facts in evidence.

17    BY MS. LEGARE:

18         Q       Schneider is saying that Ms. Geter

19    requested to work from home as a part of her

20    accommodation.  Do you know whether that, in

21    fact, happened?

22         A       I do not.

23         Q       And do you personally know how often

24    employees in Fairburn worked from home?

25         A       I do know the leaders have discretion
```

Ashley Marie Janssen                                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 38

1   to allow folks to work from home based on

2   business needs, but I did not get involved in

3   those decisions, the conversations, or the

4   amounts of time that that happened.  I know it's

5   not consistent though.  They're strictly one-off

6   situations.

7        Q       Were you aware that Mr. Torrence

8   worked from home somewhere between 80 and 87 days

9   in 2018?

10              MR. MILIANTI:  Object to the form of

11  the question.  Assumes facts not in evidence.

12  BY MS. LEGARE:

13       Q       You can answer.

14              MR. MILIANTI:  That's a -- Cheryl,

15  that's an inappropriate question.  Go ahead.

16              MS. LEGARE:  It's not an

17  inappropriate question.

18              MR. MILIANTI:  It is and you know it

19  is, but go ahead.  You can answer the question to

20  the extent you know it based on nothing in the

21  record.

22              THE WITNESS:  I do not have

23  visibility to Travis's schedule.

24  BY MS. LEGARE:

25       Q       Do you know personally, either

Page 39

1    through your work from home or any information

2    you've gotten as a senior HR business partner,

3    how Schneider keeps track of when people are

4    working from home versus working in the office?

5              MR. MILIANTI:  Just object to the

6    form of the question.

7              THE WITNESS:  That is something that

8    is discussed with their leader, and their leader

9    would handle.  I would not have visibility to

10   that.

11   BY MS. LEGARE:

12       Q       Do you document, prior to COVID, I'm

13   not talking about now, but prior to COVID when

14   you were working from home, was it documented

15   anywhere either in a calendar or someplace else

16   when you were working from home?

17       A       I don't have directs, so I do not

18   know what my leader does with that information.

19       (Whereupon a document was identified as

20       Exhibit 35.)

21   BY MS. LEGARE:

22       Q       If you would look at Exhibit 35.

23       A       Okay.

24       Q       Have you seen Exhibit 35 before?

25       A       Yes.

Case 1:20-cv-01148-SCJ-JSA  Document 47-3  Filed 06/07/21  Page 42 of 54

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

1      Q      And it looks like the HR leave team
2   did respond regarding the request for more
3   information from Dr. Wanzo; right?
4      A      Correct.
5      Q      And they were not working until March
6   30, 2019?
7      A      According to that message, yes.
8      Q      According to that.  It looks like you
9   gave that information to Mr. Torrence and just
10  told him you would wait until the 30th; right?
11     A      Correct.
12     Q      Tell me, I think you said you had a
13  call with Ms. Biskey Rose and Mr. Torrence
14  regarding, and I think it was Ms. Geter had
15  requested to continue to work three days a week
16  until June 5th; right?
17     A      Correct.
18     Q      Tell me what you recall about the
19  conversation with Ms. Biskey Rose and
20  Mr. Torrence relating to that?
21     A      I asked them if there was any
22  possible way they could continue the
23  accommodation past -- well, at this point we were
24  already past, so this was the last approval, so
25  continue to approve that schedule until June.

Page 41

1              They had said that they are not able

2     to continue to carry the workload and the

3     schedule and all of the work she's not able to do

4     any longer.  And I asked if there was other

5     options for them to fill that work, i.e. a temp.

6              They had said, and I agreed, knowing

7     I've had contingent staffing experience before,

8     that due to the time it would take to get a temp,

9     find a temp, train a temp and then place them on

10    a support shift night by themselves would not be

11    something we would be able to do not knowing if

12    this is going to extend past June, seeing it's

13    already extended three times.

14        Q      Was there some concern that it would

15    take too long to find a temp?

16        A      Not finding the temp, training a

17    temp, and then having a temp by themselves on

18    that schedule.

19        Q      I mean, is there any reason that

20    another employee couldn't have been moved to the

21    solo shift and have the temp work the shift that

22    was not solo?

23        A      If they were available to do so, and

24    my guess is if somebody wasn't available to do

25    so, then we wouldn't have been able to do that.

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 42

1       Q        Do you know if --

2       A        We always look internally before we

3    would talk about a temp if we can rearrange

4    schedules.

5       Q        Do you know if any efforts were made

6    to rearrange schedules?

7       A        I do not personally know, but that is

8    our best practice, that is what we do.

9       Q        Are you saying that's what you

10   generally do if someone either needs leave or an

11   accommodation?

12      A        Yeah, we put the option out there to

13   see if there's possibilities for others to cover,

14   which they already all were taking turns trying

15   to cover.

16      Q        Well, were you aware that

17   Mr. Torrence said nobody was covering, that he

18   was doing it?

19      A        I was aware he was covering the

20   majority.

21      Q        And I'd like to understand how temp

22   employees work at Schneider.  So does Schneider

23   use temp employees from time to time to cover for

24   office positions?

25      A        Yes.

Page 43

1        Q        Do you know, and I understand that
2    you may not, but do you know if there is any
3    documentation of any efforts made to get other
4    APMs to cover for Ms. Geter?
5        A        I don't -- I don't have that
6    information.
7        Q        Can you tell me if you know, and,
8    again, I understand you may not, why no efforts
9    were made to bring a temp in sooner so that they
10   would be trained?
11       A        Because we believed Ms. Geter would
12   be back to work full duty on February 14th and
13   then again on March 20th, and we were expecting
14   her to be back to work.
15       (Whereupon a document was identified as
16       Exhibit 22.)
17   BY MS. LEGARE:
18       Q        If you will look at Exhibit 22.
19       A        Okay.
20       Q        Have you seen Exhibit 22 before?
21       A        I don't recall this one.
22       Q        So fair to say you did not draft that
23   letter; correct?
24       A        No.
25       Q        Do you recall any -- when you spoke

Ashley Marie Janssen                                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 44

1    with Ms. Biskey Rose and Mr. Torrence, do you

2    recall in that conversation discussing

3    Ms. Geter's request to work from home at all?

4         A       No.  Our conversation was about being

5    able to continue to accommodate through June.

6         Q       Okay.  Do you know why the area

7    planning managers were relocated from, assuming

8    not only Fairburn, but other locations to Green

9    Bay?

10        A       Yes.  So it was a centralized

11   approach we took.  We've done it in other areas.

12   It's been successful.  We had a new software

13   called IMD that we use, and all of the resources

14   that help update and work in that system are

15   located here.  The collaboration that's needed

16   between customer service is here, as well as a

17   lot of the network leadership is here.

18               So to be able to streamline and band

19   our dispatching system as well as our team, we

20   needed to have it centralized.

21        Q       So some of the job duties of the area

22   planning manager or one of the job duties

23   includes working with customer service personnel;

24   right?

25        A       Correct.

Ashley Marie Janssen                                 April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 45

1      Q       And the customer service personnel is

2    centralized in Green Bay?

3      A        Correct.

4      Q       And when you say some of the

5    leadership is in Green Bay, what kind of

6    leadership are you talking about?

7      A        Our network directors, which would be

8    the dotted line to the APM were located in Green

9    Bay.

10     Q       So did APMs when they were throughout

11   the country have a dotted line to the network

12   directors in Green Bay or has that changed?

13     A        When they were in the field, they

14   would then partner with -- they wouldn't have a

15   dotted line to the directors.  The operation

16   directors would have that partnership with the

17   network directors because the area planning

18   managers reported up through operations at that

19   point, which was another group that the APMs have

20   to collaborate with.

21     Q       Got it.  And the operations people

22   remained in the field; right?

23     A        Correct.

24             MS. LEGARE:  That's all I have, Pete.

25   That's all I have, Ms. Janssen.

Ashley Marie Janssen                                     April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 46

 1              MR. MILIANTI:  Okay.  I won't push

 2    you to ask any more.

 3              MS. LEGARE:  I mean, I can if you

 4    want me to.

 5              MR. MILIANTI:  I mean, you're welcome

 6    to ask any questions you'd like.

 7              MS. LEGARE:  I know.

 8              THE COURT REPORTER:  Who wants a copy

 9    of the transcript?

10              MS. LEGARE:  Yeah, we have order on

11    file.  Thanks.

12              MR. MILIANTI:  I'll take a mini with

13    ASCII, please.

14        (Proceedings adjourned, 3:08 p.m.)

15        (Signature reserved.)

16

17

18

19

20

21

22

23

24

25

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                                   Page 47

1          The following reporter and firm
   disclosures were presented by me at this
2  proceeding for review by counsel:
3                REPORTER DISCLOSURES
4          The following representations and
   disclosures are made in compliance with Georgia
5  Law, more specifically:
              Article 10 (B) of the Rules and
6  Regulations of the Board of Court Reporting
   (disclosure forms)
7              OCGA Section 9-11-28 (c)
   (disqualification of reporter for financial
8  interest)
              OCGA Section 15-14-37 (a) and (b)
9  (prohibitions against contracts except on a
   case-by-case basis).
10
   - I am a certified court reporter in the State of
11 Georgia.
   - I am a subcontractor for Veritext.
12 - I have been assigned to make a complete and
   accurate record of these proceedings.
13 - I have no relationship of interest in the
   matter on which I am about to report which would
14 disqualify me from making a verbatim record or
   maintaining my obligation of impartiality in
15 compliance with the Code of Professional Ethics.
   - I have no direct contract with any party in
16 this action, and my compensation is determined
   solely by the terms of my subcontractor
17 agreement.
18
                   FIRM DISCLOSURES
19
   - Veritext was contacted to provide reporting
20 services by the noticing or taking attorney in
   this matter.
21 - There is no agreement in place that is
   prohibited by OCGA 15-14-37 (a) and (b).  Any
22 case-specific discounts are automatically applied
   to all parties at such time as any party receives
23 a discount.
   - Transcripts:  The transcript of this proceeding
24 as produced will be a true, correct, and complete
   record of the colloquies, and answers as
25 submitted by the certified court reporter.

Ashley Marie Janssen                           April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 48

1    - Exhibits:  No changes will be made to the
     exhibits as submitted by the reporter, attorneys,
2    or witnesses.
     - Password-Protected Access:  Transcripts and
3    exhibits relating to this proceeding will be
     uploaded to a password-protected repository, to
4    which all ordering parties will have access.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ashley Marie Janssen                                      April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 49

1                        CERTIFICATE
2    STATE OF GEORGIA:
     COUNTY OF COBB:
3
4              I hereby certify that the foregoing
     deposition was taken down, as stated in the
5    caption, and the colloquies, questions and
     answers were reduced to typewriting under my
6    direction; that the transcript is a true and
     correct record of the evidence given upon said
7    proceeding.
               That the witness's right to read and
8    sign the deposition was reserved;
               I further certify that I am not a
9    relative or employee or attorney of any party,
     nor am I financially interested in the outcome of
10   this action.
               I have no relationship of interest in
11   this matter which would disqualify me from
     maintaining my obligation of impartiality in
12   compliance with the Code of Professional Ethics.
               I have no direct contract with any party
13   in this action and my compensation is based
     solely on the terms of my subcontractor
14   agreement.
               Nothing in the arrangements made for
15   this proceeding impacts my absolute commitment to
     serve all parties as an impartial officer of the
16   court.
               This 22nd day of April, 2021.
17
18
19
20           _Shannon E. Jordan_
21
22           SHANNON E. JORDAN, RPR, CCR-B-2126
23
24
25

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT D



Deposition of:

**Sarah Kopf**

*April 19, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 1:20-cv-01148-SCJ-JSA  Document 47-4  Filed 06/07/21  Page 3 of 37

Sarah Kopf
April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

 4    CIERRA GETER,

 5            Plaintiff,

 6         vs.                   CIVIL ACTION FILE
                                 NO. 1:20-CV-01148-SCJ-JSA
 7    SCHNEIDER NATIONAL
      CARRIERS, INC,

 8
              Defendant.

 9

10

11           REMOTE DEPOSITION OF SARAH KOPF

12

                  Monday, April 19, 2021
13               Commencing at 12:57 p.m.
                 Concluding at 1:33 p.m.

14

15       Witness Located at Personal Residence
                23 Meadow View Street
16             Newnan, Georgia  30263

17

18

19       Reported by: Mary Beth Cook, RPR
                    CCR# 5079-8707-4272-4608
20

21

22

23         COMBS COURT REPORTING, INC.
                112 Pierce Avenue
24           Macon, Georgia  31204
                (478)474-6987

25
```

Page 2

```
 1   APPEARANCES OF COUNSEL:

 2   On Behalf of the Plaintiff:

 3   CHERYL LEGARE, ESQ.

     Legare, Attwood & Wolfe

 4   125 Clairemont Avenue

     Suite 380

 5   Decatur, Georgia  30030

     cblegare@law-llc.com

 6

 7   On Behalf of the Defendant:

 8   PETER MILIANTI, ESQ.

     McGuire Woods

 9   77 West Wacker Drive

     Suite 4100

10   Chicago, Illinois  60601

     pmilianti@mcguirewoods.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sarah Kopf                                         April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 3

1                         INDEX

2      SARAH KOPF                                   PAGE

3        Cross-Examination By Ms. Legare              4

4        Direct Examination By Mr. Milianti          18

5        Recross-Examination By Ms. Legare           24

6        Redirect Examination By Mr. Milianti        29

7        Further Recross-Exam By Ms. Legare          29

8      /  /  /

9      /  /  /

10     /  /  /

11     /  /  /

12     /  /  /

13     /  /  /

14     /  /  /

15     /  /  /

16     /  /  /

17     /  /  /

18     /  /  /

19     /  /  /

20     /  /  /

21     /  /  /

22     /  /  /

23     /  /  /

24     /  /  /

25     /  /  /

Sarah Kopf                                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 4

1            MS. LEGARE:  I'm Cheryl Legare, and I

2       represent Cierra Geter against Schneider, and

3       you're here just because you've been identified

4       as a witness in the case, and I'm here to ask

5       you what you might know.

6            Are we reserving -- actually can you swear

7       the witness, please.

8            (Whereupon, the witness was sworn.)

9            MS. LEGARE:  Are we reserving objections,

10      Pete?

11           MR. MILIANTI:  Yes, that's fine.

12           MS. LEGARE:  I'm assuming you want to read

13      and sign?

14           MR. MILIANTI:  Yes.

15           MS. LEGARE:  Okay.

16

17                    SARAH KOPF,

18      having been produced and first duly sworn,

19              testified as follows:

20

21                 CROSS-EXAMINATION

22    BY MS. LEGARE:

23      Q    Ms. Kopf, can you state your full for the

24    record, please.

25      A    Yes.  Full name is Sarah Marie Kopf.

```
                                              Page 5

 1       Q     And what is your current address?

 2       A     23 Meadow View Street, Newnan, Georgia

 3   30263.

 4       Q     Are you currently employed by Schneider?

 5       A     Yes, ma'am.

 6       Q     Have you ever been deposed before?

 7       A     No.

 8       Q     Okay.  I'm sure Pete's filled you in.

 9   It's a pretty simple process.  I ask you questions,

10   you answer my questions, and the court reporter

11   writes it all down for us, okay?

12       A     Yes, ma'am.

13       Q     If you don't understand anything I ask

14   you, just ask me to rephrase.  I'm happy to do so.

15       A     Okay.

16       Q     And if you need a break, that's fine.

17   Like I said, I'm going to be shocked if we're here

18   more than an hour or even more than 30 minutes.

19             And what did you do to prepare for the

20   deposition today?  And I don't want to know about

21   anything you talked to Pete about.

22       A     Nothing really.  Just tried to remember

23   back, you know, a couple years ago, but that's

24   nothing.

25       Q     Got it.  Did you talk to any employees of
```

                                                    Page 6

1    Schneider about the issues in Ms. Geter's case

2    outside the presence of your lawyer?

3         A    No, ma'am.

4         Q    And you understand that you're under oath

5    today just as if we were in court?

6         A    Yes, ma'am.

7         Q    All right.  How long have you been

8    employed with Schneider?

9         A    Three years and a little over a month.  My

10   three-year anniversary was March 5th.

11        Q    So does that mean you started in 2018?

12        A    Yes, ma'am.

13        Q    What was your first position with

14   Schneider?

15        A    I was an area planning manager for second

16   shift.

17        Q    When you were hired and began working for

18   Schneider, who did you report to on second shift?

19        A    Travis Torrance.

20        Q    And how long did you hold the second shift

21   area planning manager position?

22        A    I held that for just about exactly two

23   years when I became a driver team leader on

24   March 8th of last year, of 2020.

25        Q    What's the difference -- at a high level,

Sarah Kopf                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 7

1  not in a lot of detail -- but between an area

2  planning manager position and a driver team lead

3  position?

4       A    Area planning manager we route the drivers

5  with pickups and deliveries, help with any questions

6  regarding loads between us and customer service.

7  Driver team lead we manage their pay, their

8  regulatory safety.  It's more of a managerial, like

9  a supervisor position.

10      Q    You actually supervise drivers now?

11      A    Yes.

12      Q    Okay.  Were you always on second shift as

13  an area planning manager?

14      A    I did from time to time cover a third

15  shift, and for one week I did cover a first shift.

16      Q    Would you cover third shift if people were

17  out?

18      A    Yes, ma'am.

19      Q    What days of the week did you work on

20  second shift?

21      A    My schedule was Friday through Tuesday and

22  off Wednesday, Thursday.

23      Q    How many area planning managers were

24  scheduled on second shift at a time?

25      A    We had -- when I first started it was me

Sarah Kopf                                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 8

1    and one other area planning manager during second

2    shift.  Later there was a third area planning

3    manager hired, so it usually -- consistently there

4    was two area planning managers on the second shift.

5         Q    When was the third person brought on?

6         A    I don't recall the exact date.  I would

7    say I was there at least a year after he came on

8    board.

9         Q    Prior to the third person coming on, there

10   would have been days during the week that you worked

11   alone, right?

12        A    Yes, after a certain period of me working

13   there.

14        Q    Tell me about how it is that you came to

15   take the driver team lead position.

16        A    I was there for two years.  I had voiced

17   interest to my manager that I would be interested,

18   and that would be my next role in my career with

19   Schneider.  And I had -- my predecessor, Shannon,

20   she had given me information that she was going to a

21   different position with Schneider, and she wanted to

22   recommend me for the job.

23        Q    What's Shannon's last name?

24        A    Bailey.

25        Q    Was she at the Fairburn facility too?

Sarah Kopf                                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 9

1       A    Yes, ma'am.

2       Q    And did she work on second shift with you?

3       A    No, she worked first shift, the same days

4   though, Friday through Tuesday.

5       Q    As an area planning manager and then she

6   took a different position?

7       A    No.  She started out as a temp, I believe.

8   I don't know the exact position, but then she became

9   a driver team lead.

10      Q    And I understand in March of 2020 or

11  sometime around there all the area planning managers

12  were being transferred to Green Bay; is that right?

13      A    Yes, the position was being transferred to

14  Green Bay.

15      Q    Were you offered a position in Green Bay

16  before you took a driver team lead position?

17      A    No.

18      Q    Were you a driver team lead -- did your

19  promotion to driver team lead happen before the area

20  planning managers were moved?

21      A    It was right about the same time.  I knew

22  about the position -- I knew about the position

23  opening after we found out the positions were moving

24  up to Green Bay.

25      Q    I understand at least one person

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 10

 1   transferred to Green Bay.

 2        A    Yes.

 3        Q    Some people took positions in Fairburn --

 4   other positions in Fairburn, and then some people

 5   got a severance package; is that your recollection?

 6        A    Yes, ma'am.

 7        Q    Based on your own personal knowledge --

 8   and I understand, you know, you weren't -- you may

 9   not know, but what I'm asking is do you understand

10   how that process worked about who was assigned where

11   and who got a package?

12        A    I only know about the one transfer back to

13   Green Bay.  That was Austin.  As far as who got a

14   severance package, I don't know the details.

15        Q    And Austin I understand made the choice to

16   go to Green Bay, right?

17        A    Yes.

18        Q    Do you know if he's actually moved up

19   there?

20        A    Yes.

21        Q    And who supervises you now?

22        A    Travis Torrance.

23        Q    And last week there was a deposition, and

24   the person deposed mentioned that Schneider has a

25   flexible work policy.  Are you aware of that policy?

Page 11

```
 1      A    Not as to details.  I guess I would need a

 2   more specific question, I guess, like in regards to

 3   what area, I guess.

 4      Q    Yeah.  She said it's a policy that covers

 5   both work from home and -- so remote work and

 6   part-time work or reduced-hour schedules.

 7      A    I know I've been able to work from home

 8   post-Covid, and I know it was an option before Covid

 9   happened.  As far as the reduced schedules, I know

10   that there were people that were able to have them.

11   I don't know specifics though.

12      Q    Let's start with that.  Based on your own

13   personal knowledge, who had a reduced schedule?

14      A    I know when Cierra came back she had a

15   reduced schedule.  I didn't know this before, but I

16   know Tiffany had a reduced schedule when she came

17   back as well.  I didn't know the details though

18   because I didn't work with her on first shift.

19      Q    She was on first shift?

20      A    Yes.

21      Q    And I want to make sure I understand the

22   structure.  So you reported to Travis?

23      A    Yes, ma'am.

24      Q    And I'm talking now when you were an area

25   planning manager, not now.  Do you know who
```

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 12

1    Mr. Torrance reported to at that time?

2         A     Doug Horton.

3         Q     And then he reported to Ms. Biskey-Rose?

4         A     Yes, ma'am.

5         Q     So tell me about what you understood about

6    an employee's ability to work from home prior to

7    Covid.  I know Covid is a totally different world.

8         A     So, I mean, I can't speak for other people

9    how they went about getting permission to work from

10   home.  I know the few times that I was able to work

11   from home the power was out at the office.

12   Obviously we couldn't do our job if the power was

13   out.  Another instance would be if I had a family

14   emergency came up, and instead of taking a day I

15   offered to work from home.  But as far as like -- I

16   would have to just go to my manager, to Travis

17   Torrance, say, hey, you know, can I work from home

18   on this day for this reason, like I said, if an

19   emergency came up with the power going out.

20        Q     And so Travis approved it for you?

21        A     Yes, ma'am.

22        Q     Do you know if there's any -- if you were

23   required to document in any way when you were

24   working from home?  For example, if you called

25   Travis and said, hey, I've got a family emergency,

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1   but I can work as long as I can work from home, was

2   that documented in any way that you had worked from

3   home that day instead of from the office?

4            MR. MILIANTI:  Object to the form of the

5        question.  Go ahead and answer.

6            THE WITNESS:  I guess they could be able

7        to tell through our computer when we would have

8        to log in from the remote BPN.

9   BY MS. LEGARE:

10       Q    But you personally weren't required to

11  write it down in any way that this Monday I worked

12  from home?

13       A    No, I wasn't.

14       Q    Since the APMs were moved to Green Bay, do

15  you think their job duties have changed at all from

16  your observation?  I know you're not in the job, but

17  just from what you've watched.

18           MR. MILIANTI:  Object to the form of the

19       question, calls for speculation.  If you know.

20           THE WITNESS:  I don't know specifically if

21       their job duties have changed.

22  BY MS. LEGARE:

23       Q    Did the things that -- did the duties that

24  you used to perform as an area planning manager in

25  your observation are those duties still being

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1  performed?

2       A     The only -- well, because I work with

3  first-shift planners now, and I'm on first shift.

4  As far as when I was on second shift, I had to

5  answer phone calls and messages from drivers.  I

6  don't know if they have to do the same on second

7  shift with second-shift planners.  I know first

8  shift is different.  Area planning managers did not

9  have to do that on first shift as well.

10      Q     So they never had to do that in your

11  experience?

12      A     Right.

13      Q     On first shift?

14      A     Correct.  Second shift it was part of the

15  job to answer phone calls and messages.  I don't

16  know if they have to do that now.

17      Q     With respect to the duties that you had

18  other than answering the phone call, based on your

19  observations still working with the drivers, are the

20  duties that you performed as an area planning

21  manager still being performed by the area planning

22  managers that you work with?

23      A     Yes.

24      Q     They're just happening remotely from Green

25  Bay?

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                            Page 15

1       A    Yes.

2       Q    So let's switch to Covid.  Have you been

3   working from home during Covid?

4       A    Yes, ma'am.

5       Q    Full time or do you go into the office

6   from time to time?

7       A    When Covid first happened, it was full

8   time.  Then it was we split up our five days that we

9   worked a week, so we would work three days at home,

10  two days in the office.  Then when things started to

11  open up a little bit more, now we just recently came

12  back full time in the office.

13      Q    Do you recall when you came back full time

14  to the office?

15      A    Full time March 15th.

16      Q    So almost a year?

17      A    Yes.

18      Q    I think you said it was full time at first

19  from home?

20      A    Yes.

21      Q    Then three days at home and two days in

22  the office?

23      A    Yes, ma'am.

24      Q    Was that so you didn't have overlap?

25      A    Yes, ma'am, less people in the office.

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 16

1        Q     And now full time back at the office?

2        A     Yes, ma'am.

3        Q     Do you still have the ability to work from

4    home, for example, if you had a family emergency?

5        A     Yes, ma'am.

6        Q     Who would have to approve that now?

7    Travis?

8        A     Travis, yes, ma'am.

9        Q     How did you learn that Ms. Geter had been

10   terminated?

11       A     I was working second shift the night she

12   was terminated.

13       Q     Were you present at the time she was

14   terminated?

15       A     Yes, ma'am.

16       Q     Did you witness her termination?

17       A     They went into an office, a separate

18   office.  I didn't witness it directly.

19       Q     When Ms. Geter left that night, did you

20   talk to her at all?

21       A     When she had come out, she had, you know,

22   told me what had happened, and she was visibly

23   upset.  After that she'd gone home.  We didn't talk

24   later that night.  I just knew what had happened.

25       Q     So she talked to you about it before she

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1   left?

2       A    Well, she'd come out of the office and

3   said, you know, kind of out in the open what they

4   had just -- that she had just gotten fired.

5       Q    And have you talked to Ms. Geter at all

6   since she was terminated?

7       A    Yes.

8       Q    How often do you talk to her?

9       A    We were friends.  Maybe once every couple

10  of weeks, every couple of months I would check in on

11  her.  With Covid we obviously didn't see each other.

12  We would talk and check in every now and then.  Last

13  time I actually saw her face to face was

14  October 3rd of last year, but before that we

15  didn't see each other during Covid.

16      Q    So did you actually hang out with her on

17  October 3rd?

18      A    Yes.  It was my daughter's birthday.

19      Q    Okay.  So you still keep in touch with

20  Cierra, right?

21      A    Yes, ma'am.

22      Q    Do you consider her a friend?

23      A    I do.

24           MS. LEGARE:  I think that's all I have.  I

25      told you it would be short.  Pete?

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 18

 1                    DIRECT EXAMINATION

 2    BY MR. MILIANTI:

 3        Q    Let me ask some questions if that's okay.

 4             Ms. Kopf, you understood that when you

 5    applied for the area planning manager position that

 6    it was a full-time position; is that right?

 7        A    Yes, sir.

 8        Q    And did you understand that you were

 9    expected to work at least 40 hours per week; is that

10    right?

11        A    Yes, sir.

12        Q    And during the time period that you worked

13    as an area planning manager, did you ever work with

14    any other area planning managers who worked a

15    part-time schedule?

16        A    No.

17        Q    And you testified that you worked the

18    second shift as an APM, right?

19        A    Yes, sir.

20        Q    And what were you -- and you may have

21    already testified to this.  I'm sorry if you did for

22    asking again, but what were your general work hours

23    as an APM on the second shift?

24        A    The general work hours varied.  The first

25    set was, like, 4 p.m. to 1 a.m.  I also switched to

Page 19

1    a 3 p.m. to midnight, and then they needed earlier

2    coverage in the afternoon, so then I would work,

3    like, a one to ten or two to eleven.

4         Q    And it's my understanding that there were

5    occasions that you would work alone as an APM on

6    Saturday and Sunday nights; is that right?

7         A    Yes, sir.

8         Q    Do you recall any instance when you were

9    scheduled to work alone that you asked to work from

10   home?

11        A    No.

12        Q    And if we can just generally talk about

13   your job duties as an area planning manager.  Can

14   you just generally -- were you responsible for any

15   type of drivers or any type of market?

16        A    I was responsible for planning the whole

17   southeast market which was Atlanta, Charlotte,

18   Savannah, Winter Haven, Jacksonville and Miami.

19        Q    And when you were an APM, were there

20   specific job duties that you believe you needed to

21   perform in the office?

22        A    Yes.  At the time if a driver needed an

23   extra key for a truck, that was actually behind a

24   lock box that only office associates were able to

25   get to.  And before Covid the printer to print off

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

1   paperwork was in the office behind -- we had a

2   locked door between the office and the driver

3   lounge, and the printer to print off paperwork was

4   in our office, so we would need to be there to print

5   paperwork off for the drivers.

6        Q    And with respect to getting keys for

7   drivers, how frequently would that come up?

8        A    Pretty frequently.  Every night if there

9   was a breakdown, their truck wouldn't start, we had

10  drivers who shared trucks, so if the previous person

11  was not back at the yard in time, you know, they

12  would need a loaner truck for the night, and we

13  would need to provide a key for that.

14       Q    And would you also consider having face

15  time with the fleet of drivers with whom you

16  interacted to be an important function of your job?

17            MS. LEGARE:  Objection.

18            THE WITNESS:  Yes, it was.

19  BY MR. MILIANTI:

20       Q    And why was that?

21       A    The drivers, if they couldn't get in, you

22  know, through the phone line or through the

23  messages, they would come in the office and ask for

24  help.  Or if an emergency came up and they needed to

25  leave, they would come in and speak to us.  If they

Sarah Kopf                                            April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 21

1    needed paperwork, they would like to come in and

2    actually speak to somebody, you know, face to face

3    in case something happened on the yard or if they

4    couldn't get through the phones or messages.

5         Q    And would it be accurate to say that the

6    drivers expected you and the other APMs to be in the

7    office so they could ask you questions and get

8    realtime answers to their questions?

9         A    Yes.

10        Q    And would it be accurate to say that

11   during the time period you worked as an APM at

12   Fairburn, developing a relationship with the drivers

13   was always an expectation of the APM position?

14        A    Yes.

15        Q    And I believe you testified that you never

16   worked a reduced schedule; is that right?

17        A    Yes.

18        Q    All right.  And during the time period

19   that you worked as an APM, I believe you testified

20   that there were a few occasions when you worked from

21   home; is that correct?

22        A    Yes.

23        Q    You didn't have any kind of a set schedule

24   where you would work from home; is that right?

25        A    No.

Page 22

```
 1      Q    For instance, you didn't request to work

 2   one day a week at home; is that correct?

 3      A    Correct.

 4      Q    And you didn't request to work one day a

 5   month from home; is that correct?

 6      A    Correct.

 7      Q    So, in other words, as an APM pre-Covid,

 8   of course, you never consistently worked from home;

 9   is that right?

10      A    Right.

11      Q    And how many times do you believe

12   pre-Covid, so during -- you started in 2018.  So

13   from March of 2018 until March of 2020, how many

14   times do you believe you worked from home?

15      A    That's really hard to answer because I

16   don't -- it's hard to answer because -- I would say

17   maybe a handful of times, maybe four or five at the

18   most.  It wasn't very common.  I wasn't really a fan

19   of working from home back then.

20      Q    Okay.  During Ms. Geter's deposition she

21   testified that from the spring of 2018 until the

22   spring of 2020, you worked from home to care for

23   your children once or twice per month.  Is

24   Ms. Geter's testimony accurate?

25      A    No, not once or twice a month, no.
```

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 23

1        Q    Do you ever recall telling Ms. Geter that

2    you were working from home once or twice per month?

3        A    No.

4        Q    And you testified that when Covid hit you

5    were a driver team lead; is that correct?

6        A    Yes.  It happened almost exactly the same

7    time.

8        Q    Okay.  So when Covid started, you were not

9    in the APM position; is that correct?

10       A    Correct.

11       Q    All right.  And when you were a driver

12   team lead, you testified that for a period of time

13   you worked from home, and then there was a period of

14   time that you came in a couple of times a week, and

15   then starting on March 15th you were full time

16   back in the office; is that accurate?

17       A    Yes.

18       Q    Okay.  Was it your understanding that the

19   expectation of your position was to be in the

20   office?

21       A    Yes.

22       Q    So, in other words, if Covid -- if the

23   pandemic had not hit, your expectation was that you

24   would be in the office full time as a driver team

25   lead just like you were prior to the pandemic; is

Sarah Kopf                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 24

1    that correct?

2         A    Yes.

3         Q    Okay.  You also testified that you believe

4    that Tiffany Kitchens had a reduced schedule; is

5    that correct?

6         A    I believe she did.  I don't know the

7    details.  I don't know what days, what times.

8         Q    Okay.  Do you have any personal knowledge

9    as to Ms. Tiffany Kitchens' schedule?

10        A    Right now or?

11        Q    I'm sorry.  During the time period that

12   she was an APM and you believe that she was out of

13   the office, do you have any personal knowledge as to

14   any time off that she had or any reduced schedule

15   that she may have worked?

16        A    I don't know the details of the reduced

17   schedule.

18        Q    Okay.  Give me one second, please.

19             MR. MILIANTI:  That's all the questions I

20        have.  Thank you, Sarah.

21

22                    RECROSS-EXAMINATION

23   BY MS. LEGARE:

24        Q    I have just a few.  So where are the extra

25   keys for the drivers kept now?

Sarah Kopf                                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1      A     They're in the same place.  They're in the

2   communications room in a lock box.  It's like a

3   little metal box that it's in.

4      Q     So how do the drivers have access to them

5   now that the APMs are in Green Bay?

6      A     We have the positions of the SOS, other

7   associates as well as other driver team leads that

8   are in the office.

9      Q     Were driver team leads and SOSs in the

10  office prior to Covid?

11     A     We did not have the position of SOS.  They

12  were previously -- I think the position was called

13  an IOS or APMs, and, yes, they were in the office.

14     Q     What was IOS?

15     A     Intermodal operating specialist.

16     Q     And SOS is what?

17     A     Senior operating specialist.

18     Q     And the intermodal operating specialist

19  would have been in the office and able to assist

20  drivers to get keys pre-Covid?

21     A     Yes.

22     Q     And driver team leads could also assist

23  drivers in getting keys pre-Covid?

24     A     Yes, ma'am.

25     Q     Is that also true with respect to access

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    to the printer?

2         A    Yes.

3         Q    And is it fair to say that the company's

4    not worried about APMs having face time with drivers

5    since they moved all the APMs to Green Bay?

6              MR. MILIANTI:  Object to the form of the

7         question.

8    BY MS. LEGARE:

9         Q    You can answer.

10        A    I don't know.

11        Q    I mean, the company chose to move all the

12   APMs to providing their services remotely from Green

13   Bay, right?

14        A    Correct.

15        Q    And I forgot to ask you.  You said that

16   you covered third shift sometimes.  Did you cover

17   any of the Sundays that Cierra was out when she came

18   back from leave?

19        A    I don't recall exact days, but I do know

20   when I did cover she wasn't there.

21        Q    And once a third person was hired on

22   second shift, did that mean that you never had to

23   work alone on a shift?

24        A    No.  Saturdays usually the system would go

25   down at ten, and I would be there from five to ten

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 27

1    by myself.

2         Q    Even when you had three APMs on the shift?

3         A    It would be -- there was the first APM

4    that was there before me she left the company.  Then

5    it was down to me and Austin.  So for a time period,

6    yes, there were three, and then it was down to two

7    again.

8         Q    During the time you were an APM, were

9    temps ever brought in to work as an APM, temporary

10   employees?

11        A    Yes.

12        Q    How often would you say that happened?

13        A    We had one temp come in.  She worked for a

14   while as a temp.  I want to say a little over a

15   year, and then we had an intern as well that came in

16   that did duties as an APM as well as an IOS.

17        Q    Do you remember when that was?

18        A    I don't recall exact dates.

19        Q    Do you know who they were covering for as

20   a temporary employee?

21        A    I don't know if they were necessarily

22   covering for anyone.

23        Q    Got it.  And would it be a true statement

24   that since the drivers expect that there are people

25   in the office to answer questions for them that now

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

1   that's the driver team leads and the SOSs?

2        A    Yes.

3        Q    And pre-Covid even when there were APMs

4   there, could the driver team leads or the IOSs

5   answer questions for the drivers?

6        A    There were only IOSs and driver team

7   leads.  There's only one driver team lead on second

8   shift.  There wasn't one on third shift, and the

9   IOSs were on first shift.

10       Q    So are there driver team leads on all

11  shifts now?

12       A    No.

13       Q    Are there SOSs on all shifts now?

14       A    Yes.

15       Q    Based on your observation, do you have any

16  idea how often Mr. Torrance worked from home in

17  2018?

18            MR. MILIANTI:  Object to the form of the

19       question, calls for speculation.  If you know.

20            THE WITNESS:  I don't recall exact dates.

21  BY MS. LEGARE:

22       Q    Ms. Geter says he worked from home

23  somewhere in the neighborhood of 80 days in 2018.

24  Would that have been your observation?

25       A    I can't recall.

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1        MS. LEGARE:  That's all I have.

2

3                REDIRECT EXAMINATION

4    BY MR. MILIANTI:

5        Q    Just a few, Sarah, if you can bear with

6    me.  When you were scheduled to work alone as an APM

7    during the 2018 through 2019 time period, whose

8    responsibility was it to get keys to drivers if they

9    needed them?

10       A    When I worked alone?

11       Q    Yes.

12       A    It would be me.

13       Q    When you worked alone as an APM during the

14   2018-2019 time period, whose responsibility was it

15   to print out documents for drivers?

16       A    Myself as well.

17           MR. MILIANTI:  That's all I have.

18

19               FURTHER RECROSS-EXAMINATION

20   BY MS. LEGARE:

21       Q    Did you ever attempt to switch shifts or

22   did you prefer to stay on second shift?

23       A    I only switched shifts when I gained the

24   role as driver team lead because it was a

25   first-shift position.

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 30

1      Q    Could you have transferred to a

2  first-shift position as an APM before they were

3  moved to Green Bay?

4      A    It was offered, but it was given to

5  Austin.

6      Q    I want to make sure I understand.  They

7  picked between you and Austin to move to first

8  shift.

9      A    Yes.  It was available, and we both went

10  out for it, and he was given the position for first

11  shift.

12      Q    Prior to that had there been any openings

13  on first shift?

14          MR. MILIANTI:  Object to the form.

15          THE WITNESS:  There were openings, yes.

16  BY MS. LEGARE:

17      Q    Did you only ask for it that one time?

18      A    Correct, yes.

19      Q    And with respect to the time Ms. Geter was

20  there, it sounds like you did have some openings on

21  second shift, right?

22      A    Yes.

23          MS. LEGARE:  That's all I have.

24          MR. MILIANTI:  Thank you, Sarah.

25          (Deposition concluded at 1:33 p.m.)

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 31

```
 1                      DISCLOSURE
 2    STATE OF GEORGIA:
 3    COUNTY OF PUTNAM:
 4
              Pursuant to Article 10.B of the Rules and
 5    Regulations of the Board of Court Reporting of the
      Judicial Council of Georgia, I make the following
 6    disclosure:
              Combs Court Reporting, Inc. was contacted
 7    by the party taking the deposition to provide court
      reporting services for this deposition, and there is
 8    no contract that is prohibited by O.C.G.A.
      15-14-37(a) and (b) or Article 7.C of the Rules and
 9    Regulations of the Board for the taking of this
      deposition.
10            There is no contract to provide reporting
      services between Combs Court Reporting, Inc. or any
11    person with whom Combs Court Reporting, Inc. has a
      principal and agency relationship, nor any
12    attorney-at-law in this action, party to this
      action, party having a financial interest in this
13    action, or agent for an attorney-at-law in this
      action, party to this action, or party having a
14    financial interest in this action.  Normal and
      customary rates will be charged, and a financial
15    discount will not be given to any party in this
      litigation.
16
17
18
19
20            _____
21            Mary Beth Cook, RPR
              CCR# 5079-8707-4272-4608
22
23
24
25
```

Sarah Kopf                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 32

                          CERTIFICATE

STATE OF GEORGIA:

COUNTY OF PUTNAM:

         I, Mary Beth Cook, Certified Court
Reporter, State of Georgia, Certificate No.
5079-8707-4272-4608, CERTIFY that acting in such
capacity, I reported the testimony herein, and on
the foregoing pages have transcribed a true and
correct transcript thereof.
         I FURTHER CERTIFY that I am not counsel
for, nor am I related to any party to the above
case; nor am I interested in the event or outcome.
         WITNESS my hand and official seal as
Certified Court Reporter, State of Georgia,
Certificate No. 5079-8707-4272-4608 this 23rd day of
April, 2021.




                        _____
                        Mary Beth Cook, RPR, CCR
                        CCR# 5079-8707-4272-4608

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.