# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CASE NO. 22-11285-BB

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

**APPELLANT'S APPENDIX – VOL. IV**

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

Eleventh Circuit Court of Appeals Case No. 22-11285-BB

Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
|------|-----|------------|-------------------------------------------|
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| | | | |
|---|---|---|---|
| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B | | | Certificate of Service |

# EXHIBIT E



Deposition of:

**Tiffany Kitchens**

*April 19, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
4    CIERRA GETER,
5              Plaintiff,
6         vs.                    CIVIL ACTION FILE
                                 NO. 1:20-CV-01148-SCJ-JSA
7    SCHNEIDER NATIONAL
     CARRIERS, INC,
8
               Defendant.
9
10
11        REMOTE DEPOSITION OF TIFFANY KITCHENS
12
                  Monday, April 19, 2021
13                Commencing at 2:55 p.m.
                  Concluding at 3:35 p.m.
14
15       Witness Located at Personal Residence
                 162 Sunset Ridge Drive
16               Newnan, Georgia  30263
17
18
19        Reported by: Mary Beth Cook, RPR
                     CCR# 5079-8707-4272-4608
20
21
22
23         COMBS COURT REPORTING, INC.
                112 Pierce Avenue
24            Macon, Georgia  31204
                 (478)474-6987
25

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 2

```
 1    APPEARANCES OF COUNSEL:
 2    On Behalf of the Plaintiff:
 3    CHERYL LEGARE, ESQ.
      Legare, Attwood & Wolfe
 4    125 Clairemont Avenue
      Suite 380
 5    Decatur, Georgia  30030
      cblegare@law-llc.com
 6
 7    On Behalf of the Defendant:
 8    PETER MILIANTI, ESQ.
      McGuire Woods
 9    77 West Wacker Drive
      Suite 4100
10    Chicago, Illinois  60601
      pmilianti@mcguirewoods.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                                     INDEX

2       TIFFANY KITCHENS                                 PAGE

3         Cross-Examination By Ms. Legare                  4

4         Direct Examination By Mr. Milianti              26

5     /   /   /

6     /   /   /

7     /   /   /

8     /   /   /

9     /   /   /

10    /   /   /

11    /   /   /

12    /   /   /

13    /   /   /

14    /   /   /

15    /   /   /

16    /   /   /

17    /   /   /

18    /   /   /

19    /   /   /

20    /   /   /

21    /   /   /

22    /   /   /

23    /   /   /

24    /   /   /

25    /   /   /

Page 4

1              MS. LEGARE:  Hi, Ms. Kitchens.  I'm Cheryl

2         Legare, and I am here representing Cierra

3         against Schneider, and you are a witness in

4         this case.

5              If you wouldn't mind swearing in the

6         witness.

7              (Whereupon, the witness was sworn.)

8

9                   TIFFANY KITCHENS,

10        having been produced and first duly sworn,

11                  testified as follows:

12

13                  CROSS-EXAMINATION

14   BY MS. LEGARE:

15        Q    Ms. Kitchens, can you please state your

16   full name for the record.

17        A    Tiffany Nicole Kitchens.

18        Q    And what is your current address?

19        A    162 Sunset Ridge Drive, Newnan, Georgia

20   30263.

21              MS. LEGARE:  And, Pete, did you want to

22        read and sign?

23              MR. MILIANTI:  Yes, please.

24   BY MS. LEGARE:

25        Q    Ms. Kitchens, have you ever been deposed

Tiffany Kitchens                                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                                Page 5

1   before?

2        A     Have I ever been to what?

3        Q     Deposed before?  Have you ever had your

4   deposition taken?

5        A     Not that I recall.

6        Q     Okay.

7        A     I'd remember this.

8        Q     Is there any reason you couldn't give

9   complete and accurate testimony here today?

10       A     No, no reason.

11       Q     And you understand that you're under oath

12   today just as if we were in court, right?

13       A     Yes, ma'am.

14       Q     Okay.  I think I'll be surprised if this

15   takes more than half an hour, but if you need a

16   break, just let me know, okay?

17       A     Okay, will do.

18       Q     And if you don't understand something that

19   I've asked, just ask me to rephrase it, okay?

20       A     Okay.

21       Q     All right.  Did you do anything to prepare

22   for your deposition today?

23       A     No.  Just tried to recall as many events

24   of the time period as I could which it's been a

25   while.

Tiffany Kitchens                                  April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 6

1        Q    Are you still employed with Schneider

2    National Carriers?

3        A    I am.

4        Q    What's your current position?

5        A    My current position is called a senior

6    operations specialist.

7        Q    And how long have you had that position?

8        A    Since -- I want to say it was around March

9    or April of 2020.  I want to say it was April of

10   2020.  It was one of the two, so about a year.

11       Q    Who do you report to?

12       A    I report to Rodney Dunn.

13       Q    What are your job duties as a senior

14   operations specialist?

15       A    Answering the phone, checking driver

16   messages, basically just processing any issues or

17   obstacles for the driver to get them moving about

18   their day, communicating a great deal with the

19   planners and whomever is needed, the box team,

20   functions like that.  Basically just to keep

21   transportation going.

22       Q    When did you start with Schneider?

23       A    Originally I started with Schneider in

24   2005.

25       Q    And did you leave for a period of time?

Tiffany Kitchens                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 7

1        A    I did.  I left in -- I believe it was June

2   of 2012, and I returned in August of 2014, so I was

3   gone for two years.

4        Q    When you came back in 2014, what position

5   did you come back in to?

6        A    I came back in to -- I don't know what it

7   was called at the time, but it was area planning

8   manager.

9        Q    It may have had a different title before

10  that?

11       A    Yes.  That might not have been the title

12  that I came back as but same functions really.

13       Q    And I think -- I don't remember when, but

14  I do believe the title changed to area planning

15  manager at some point, right?

16       A    Right.

17       Q    And did you hold that position when the

18  title changed?

19       A    Yes.  I was just on support shift at the

20  time.  When I originally came back, I was working

21  support shift, so that was second shift, third shift

22  and weekends is what support shift encompasses.

23       Q    That's the first I've heard of support

24  shift.

25       A    It's a support role.  Even though it's

Tiffany Kitchens                                 April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 8

1    still -- even though it's still an area planning

2    manager, same position, it's just for different

3    shifts, you know.

4         Q    Were you basically filling in holes in the

5    schedule?

6         A    Essentially, yes.

7         Q    Let me ask you this:  When you were

8    working support shift, is it possible that you could

9    work two or more different shifts in a week?

10        A    Yes.  You would have a primary schedule.

11   If we had gaps in coverage, they would ask us to

12   work to fill in, but I wasn't on first shift when I

13   initially came back.

14        Q    Does Schneider still have a support shift?

15        A    Yes, we do.  It may be called something

16   different now.  The responsibilities are still

17   pretty similar.

18        Q    Did you change from support shift to a

19   different shift at any point after you came back in

20   2014?

21        A    Yes, in 2016.

22        Q    And what did you change to?

23        A    What was that?

24        Q    What shift did you change to at that

25   point?

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 9

1      A    I went from second shift to first shift,
2   and my schedule was essentially Monday through
3   Friday.  When I went to first shift, it went to
4   Monday through Friday.  I believe it was seven to
5   four.
6      Q    When you moved to first shift?
7      A    Yes.
8      Q    What was your schedule when you were on
9   second shift?
10     A    When I was on second shift initially for
11  the first two years -- I'm trying to remember what I
12  had.  I think it was Friday through Tuesday, and I
13  would start my day probably either two or three and
14  then work eight to nine hours -- nine hours with the
15  lunch factored in.
16          I mean, since we were salary, that's the
17  base schedule.  I'm going to elaborate.  That's the
18  base schedule, but we're required to finish our work
19  obviously.  If we had something running behind or we
20  had a meeting, it could run longer than that.
21     Q    Understood.
22     A    That's the only caveat I would add.
23     Q    Who did you report to on second shift?
24     A    When I initially came back, that would be
25  Greg Cochran.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 10

1        Q    And he left after some period of time,

2   right?

3        A    He did.

4        Q    And then who did you report to?

5        A    The only two leaders I have had since I

6   returned in 2014 was Greg Cochran initially, and

7   then when I went to first shift, it's been Rodney

8   Dunn since, and that was in 2016, I believe around

9   this time.  It would either be April -- it was by

10  the summer for sure.

11       Q    And I understand in 2020 that the area

12  planning manager position itself was moved to Green

13  Bay?

14       A    Correct.

15       Q    What position were you holding at the time

16  that happened?

17       A    I was an area planning manager.  They had

18  changed it to another title once again.  It's not

19  initially the same thing, and then it moved to Green

20  Bay.

21       Q    Were you offered the opportunity to move

22  to Green Bay at that time?

23       A    I was.

24       Q    And you turned that down?

25       A    I did, because of my mother.

Page 11

1      Q     And then was it after that that you were

2      then offered a different position?

3      A     Correct.

4      Q     Tell me how that came about.

5      A     So we knew that the role was going away.

6      I think management was still waiting to hear at that

7      time how many positions they were going to have or

8      be approved for, so how many fleet manager -- that's

9      what it used to be called.  So it sounds confusing.

10     It's now called a DTL, so driver team leader, but

11     it's essentially the fleet manager role.  They were

12     trying to figure out how many of those positions we

13     were going to get in the office, and then how many

14     of senior operations specialist positions we were

15     going to be approved for.

16           So I found out -- I was offered the

17     position pretty close to the end of that window

18     where my job -- where they said, okay, this is the

19     deadline.  Your current position is going to be

20     moved to Green Bay, and by that time, you know,

21     either we'll offer you a position or essentially let

22     you go.  So basically I was just presented kind of

23     towards the end very close to that window, okay,

24     this is the positions that we have.  I was only

25     offered senior operations specialist, and I took it

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                         Page 12

1    because it was around the time of Covid.  It had

2    just started.

3         Q    Right.  And I understand that people

4    either agreed to move to Green Bay.

5         A    Yeah.

6         Q    Were offered other positions or were -- if

7    there were not enough positions, then they were let

8    go and got a severance; is that right?

9         A    Correct.

10             MR. MILIANTI:  Object to the form.

11   BY MS. LEGARE:

12        Q    By any chance do you know what the

13   severance was going to be if they hadn't been able

14   to find a new position for you?

15        A    They gave me a number.  I cannot remember

16   what that number was.

17        Q    Got it.  But they did find you a position,

18   and you stayed as a senior operations specialist,

19   right?

20        A    Correct.

21        Q    And you've had that position since?

22        A    Yes, ma'am.

23        Q    And I think what I have heard in a couple

24   of the depositions is when Covid hit you started

25   working from home in March of last year full time,

Tiffany Kitchens                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1   right?

2        A     For the most part.  We had -- let me see.

3   I'm trying to remember.  So -- can you repeat the

4   question just so I'm.

5        Q     Yeah.  The way I understand -- and maybe

6   it's different for your position, but the way that I

7   understood from Mr. Torrance and another witness was

8   that in the beginning of Covid you all worked from

9   home full time, then partway through Covid you began

10  working from home part of the week, and now as of

11  last March --

12       A     Back full time.

13       Q     Right?

14       A     That's correct, yes.

15       Q     Let's go -- I want to rewind a little bit

16  and talk about the reason.  Ms. Geter has identified

17  you as someone who worked a reduced schedule for a

18  period of time in 2018.  Is that true?

19       A     Can you define reduced schedule?

20       Q     Less than 40 hours a week.

21       A     No.

22       Q     So you were full time?

23       A     I was full time.  I had a period of leave

24  initially where I was out of work for I believe it

25  was three weeks.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1        Q     Okay.

2        A     FMLA was approved.  All that was taken

3     care of, and then I returned -- I think that was the

4     end of July it started, and I came back the

5     beginning of August, but that wasn't the exact

6     dates.

7        Q     That's fine.

8        A     And then in -- when was it?  The end of

9     October of that year my mother had a very severe

10    stroke and ended up in ICU at Emory in Atlanta for a

11    very long period of time.  But during that time I

12    was working -- I was working remotely from the

13    hospital, but I didn't -- I was working full time.

14       Q     Were you working Monday through Friday

15    during that time?

16       A     Yes.

17       Q     And how long were you working remotely

18    from the hospital?

19       A     I honestly don't know.  It was in my FMLA

20    that I had filed for just to, you know, cover me to

21    help with mother.  She ended up staying in there a

22    lot longer -- she kept having setbacks, so she ended

23    up staying in there a lot longer than the doctors

24    originally projected, even though it was pretty bad.

25       Q     And I'm sorry that I even have to ask

Tiffany Kitchens                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1    these questions, but was it a few weeks, was it a

2    few months?

3         A    It was months where she was in there, in

4    ICU, and she was back and forth between being

5    intubated and not, and we almost lost her several

6    times, so it was kind of -- and they had issues with

7    the shunt that they put in her skull.

8         Q    That's terrible.  I'm sorry.

9         A    That's okay.  Not my favorite thing to

10   relive, but we will do it.

11        Q    During that time you had permission

12   from -- would it have been from Mr. Dunn to work

13   remotely?

14        A    Yes.  I would run it by Mr. Dunn, Rodney,

15   and then I filed paperwork with HR in Green Bay for

16   that.

17        Q    Now, so you were approved for FMLA during

18   that time, but you were actually not using your

19   FMLA; you were working?

20        A    Yes.  I was approved for it when we

21   thought that maybe she would get out, and I would

22   have to care for her.

23        Q    Right.

24        A    Because my dad can't do it all himself.

25   They're both senior boomers, so he can't do it, and

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1   he needed a break.

2        Q    So you were approved for intermittent FMLA

3   because you thought you were going to assist with

4   her care at home.

5        A    Correct.  And that ended up never

6   occurring.  And, in fact, I want to say -- now, this

7   is a guesstimation.  I want to say she was in ICU

8   for probably four months-ish, and then after that

9   she moved to a long-term care facility, so it was

10  quite an extensive period of time.

11       Q    And when she moved to a long-term care

12  facility, did you continue to work remotely?

13       A    No.

14       Q    You came back to the office at that point?

15       A    I did.

16       Q    And because she was in long-term care, did

17  you need to use your intermittent FMLA at all at

18  that point?

19       A    No.  Anytime that I would know that I

20  would have to be out of work, I would just use

21  vacation since I had that available.  But I was

22  not -- it was not a reduced schedule.

23       Q    And that would have only happened if you

24  had to care for her at home?

25       A    Correct.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1      Q     And my understanding is that with respect

2   to work from home that Schneider is relatively

3   flexible on that issue if there's emergencies.  You

4   get permission from your supervisor?

5      A     Correct.

6      Q     Do you have to take it up the chain at

7   all, or is it your direct manager who makes the

8   decision?

9      A     It's typically direct leader unless he's

10   out, and then I would go up the chain of command to

11   his leader.

12      Q     Have you worked with any temporary

13   employees at Schneider either while you were an area

14   planning manager or now that you're an SOS?

15      A     Any temporary?

16      Q     Yeah.

17      A     Yes.

18      Q     Can you tell me how often that has

19   happened?

20      A     Just for periods of time especially when

21   we're doing system updates.  Now, this is over the

22   course of 14 years cumulatively.  So over that

23   period of time or do you just want me to talk about

24   since I came back in 2014?

25      Q     How about just more recently, maybe in the

Tiffany Kitchens                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 18

 1  last four or five years.

 2      A    I don't remember all the particulars

 3  around why we added temporary staffing, even though,

 4  I mean, I know there was really good reason.  We

 5  obviously needed the assistance, but we actually

 6  have -- I'll use this person as an example.  We

 7  actually have an employee now that was a temporary

 8  employee that ended up being made a long-term --

 9  full-time employee with the company.

10      Q    And as an SOS I think you said you work

11  with the area planning managers now?

12      A    I do.

13      Q    Are the area planning managers working,

14  the ones who are based in Green Bay, are they doing

15  a lot of the job duties that you did when you were

16  an area planning manager in Fairburn?

17           MR. MILIANTI:  Object to the form.

18           THE WITNESS:  It's different now.  So

19       they're completely removed from, like, driver

20       functions now:  Meeting with the drivers,

21       talking to the drivers.  None of that is

22       something that occurs now, but before it did.

23  BY MS. LEGARE:

24      Q    Who is responsible for those duties now?

25      A    It's a combination of the driver team

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 19

1   leader and the senior operations specialist.

2        Q    And let me ask you this because I know

3   that one of the duties that has come up of the area

4   planning managers was helping drivers get keys.  I

5   don't know whether they lost keys or whether they're

6   sharing a truck or whatever, and those keys are

7   locked up, right?

8        A    Well, I don't know if they were prior to

9   Covid.  Obviously our operational situation changed

10  a little bit with Covid, but prior to Covid I can't

11  remember if they were locked up or not.  We did have

12  a key box for them.  So essentially what happens now

13  and then would be if a truck goes down, a driver

14  needs a loaner truck, we would check the schedule to

15  see the driver that would normally be assigned to a

16  certain truck, and if they were off that would be a

17  potential truck that we could put them in which

18  would require us to give them the key.

19          Now, it's a little bit different -- it was

20  a little bit different on first shift because we had

21  driver team leaders available at that time, and that

22  would be a function that would fall under them, to

23  get them the keys.  And I wasn't the only one on

24  first shift as far as area planning managers, and we

25  had multiple DTLs that were working as well, but

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

1    that would be a function that fell under them at the

2    time.  Now it's pretty much just whoever is

3    available.  If you get a driver on the phone, you

4    find him a truck, so that's one of the things that's

5    changed.

6         Q    And I also understand there's a printer

7    that they need to print their paperwork on that was

8    locked up?

9         A    At the time, yes.

10        Q    It's not locked up anymore?

11        A    No.  Since Covid we have moved it into the

12   drivers' lounge where the drivers have access to,

13   and we can print remotely from wherever we are.

14        Q    Could you have printed remotely prior to

15   Covid?

16        A    I assume we could.  I don't know all the

17   technical things behind it, but I would think that

18   we could have moved the printer.

19        Q    For the time that you were working

20   remotely, did you ever have to assist with any of

21   that?

22        A    What do you mean?

23        Q    Like printing documents for drivers.

24        A    For the most part at the time, on first

25   shift the planners really weren't so much into the

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 21

1    phones, so if we were on the phone, if we had to

2    help out, if we were, say, short-handed and we got a

3    driver on the phone, if I didn't have anyone to

4    transfer them to I would go ahead and do it for

5    them, but it wasn't a normal function at the time.

6         Q    But it was something you could do remotely

7    if you had to?

8         A    Correct.

9         Q    I have a couple of questions about the

10   support shift.  So if an employee called out sick or

11   if an area planning manager called out sick, for

12   example, is that something a support shift would

13   cover, or was it planned absences that you covered

14   for?

15        A    A mixture.  So can you repeat the question

16   just so I give you the best answer I can?

17        Q    Yeah.  So it seems like what you said, and

18   if I've got it wrong tell me.  But I think you said

19   support shift you'd have kind of a set schedule, but

20   you'd also be the fill-in person on second and third

21   shift and weekends?

22        A    Well, they would ask us if we were

23   available to work.  It wasn't like a mandatory

24   thing, but it wouldn't be completely uncommon if we

25   were really short-handed or had an emergency come up

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 22

1    with another staff member that we would be asked to

2    cover a shift that, you know, like on a weekend,

3    something like that.

4        Q    Right.  Do you know -- since you held the

5    position, you might.  Was it the support shift

6    people that the managers asked first if they needed

7    a shift covered?

8            MR. MILIANTI:  Object to the form, lack of

9        foundation, calls for speculation.  If you

10       know.  You can answer, Tiffany, if you know.

11           THE WITNESS:  Sorry.  That threw me off.

12       What was the question?

13   BY MS. LEGARE:

14       Q    So basically what I'm asking is when you

15   were assigned to support shift, was it the

16   expectation that the managers would come to you

17   first before they'd come to anyone else to cover a

18   shift?  And by you I mean you or anyone else who was

19   assigned as support shift.

20           MR. MILIANTI:  Same objection.

21           THE WITNESS:  I would say that they would

22       ask anyone who wasn't scheduled until they

23       found someone -- found coverage.  Now, it

24       wasn't overtime or anything, so, you know, they

25       may have to go through a few people before they

Case 1:20-cv-01148-SCJ-JSA  Document 47-5  Filed 06/07/21  Page 25 of 38

Tiffany Kitchens                               April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 23

1         got coverage, or the manager would be

2         ultimately responsible for that coverage if

3         they couldn't find another associate to work.

4    BY MS. LEGARE:

5         Q    I guess what I'm trying to figure out what

6    the point of support shift is.

7              MR. MILIANTI:  Objection.  I just want to

8         clarify.  This is for the 2014 through 2016

9         time period?

10   BY MS. LEGARE:

11        Q    I think what you said is they still have

12   support shift, right?

13        A    I don't know if it's called that anymore.

14   It's just other shifts.  The company --

15             MR. MILIANTI:  One second, Tiffany.  I

16        just want to lodge an objection to the extent

17        you're asking her questions about support shift

18        during a time period that she was not in that

19        role.

20             Go ahead and answer if you can.

21             THE WITNESS:  Sorry.  I lost my train of

22        thought.  It's been a long day.  Can you repeat

23        the question?

24   BY MS. LEGARE:

25        Q    Yes.  Why is it that people were assigned

Case 1:20-cv-01148-SCJ-JSA   Document 47-5   Filed 06/07/21   Page 26 of 38

Tiffany Kitchens                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 24

1   to support shift instead of first or second or third

2   shift?

3       A    I call it support shift.  It's just --

4   usually -- it's just something that we used to refer

5   to it as so I still call it that.  I've been there

6   for a long time.  It's not called that anymore, and

7   I don't know if it's called -- I don't know if it

8   was called that when I returned in 2014, but it was

9   basically just to not cause division or anything but

10  just kind of, okay, well, I worked nights and

11  weekends.  You know what I mean?

12          Now we have many first-shift associates,

13  DTLs and senior operations specialists that work

14  through the weekend.  My days off are Thursday and

15  Friday, so it's a mixture.  There's very few --

16  there's a few associates that are still Monday

17  through Friday, but for the most part it's, you

18  know, the schedules are spaced out to where we have

19  maximum coverage with the associates that we have.

20      Q    Got it.  Do you ever work -- are you still

21  on first shift?

22      A    I'm on first shift.  I work a first shift

23  schedule, but I work the weekends.

24      Q    Got it.  And do you ever work alone?

25      A    Sometimes with -- now I do.  Like, where

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 25

1    we have a gap in the morning where I come in at six

2    or 6:30, the next associate -- third shift would be

3    ending at 7:00 and then the next associate wouldn't

4    be in until, you know, seven or eight, you know,

5    depending on how the day is.  So we're not really

6    scheduled to be the only person in the office, but

7    it does occur.

8        Q    Do you know if -- and you may not because

9    I know you're not a second or third shift, but do

10   you know if second or third shift if anybody's ever

11   scheduled alone anymore?

12            MR. MILIANTI:  Object to the form of the

13       question, calls for speculation.  If you know.

14            THE WITNESS:  I don't know what the

15       schedules are.

16   BY MS. LEGARE:

17       Q    And how did you learn that Ms. Geter was

18   terminated?

19       A    I honestly don't remember.  I mean, I'm

20   sure there might have been an email that went out.

21   That's what typically happens.  When someone is no

22   longer with the organization, an email will go out

23   this person is no longer with the organization, just

24   mostly as an alert that this person does not work

25   here anymore.  I don't recall exactly how I was

Tiffany Kitchens                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    notified, but I'm guessing that that probably would

2    have been how I found out.

3        Q    Did anyone at Schneider talk to you about

4    why Ms. Geter was terminated?

5        A    No.

6        Q    And have you spoken with Ms. Geter since

7    she left Schneider?

8        A    I have not.

9            MS. LEGARE:  That's all I have.

10

11                   DIRECT EXAMINATION

12   BY MR. MILIANTI:

13       Q    Ms. Kitchens, I just have a few questions.

14       A    Okay.

15       Q    When you were rehired in August of 2014,

16   did you understand the position in which you were

17   hired into to be a full-time position?

18       A    Yes.

19       Q    You understood you were being hired into a

20   full-time position back in August of 2014?

21       A    Yes.

22       Q    And you understood that the area planning

23   manager position that you held until the spring of

24   2020 was a full-time position; is that right?

25       A    Yes.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 27

1      Q    And you understood that as an APM you were

2    expected to work at least 40 hours a week; is that

3    right?

4      A    Yes.

5      Q    And in the 2018-2019 time period, you

6    worked the first shift as an APM; is that correct?

7      A    Correct.

8      Q    And I think you testified your schedule

9    was Monday through Friday; is that right?

10     A    That is correct.

11     Q    And during that time period of 2018 to

12   2019, what time would you start and finish your day

13   on average?

14     A    So that's where it gets -- sometimes I

15   would do planning from the house.  I worked a lot.

16   My schedule would have been either seven to four or

17   six to three, something like that, but I worked a

18   lot.  Sometimes I would log in, you know, if I

19   couldn't get the planning done I had to go and

20   finish the planning for the morning, whatever was

21   needed.

22     Q    Understood.  And when you worked as an APM

23   in the 2018-2019 time period on the first shift, you

24   worked with other APMs; is that correct?

25     A    That is correct.

Tiffany Kitchens                           April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

1      Q      Did you ever work alone as an APM on the

2   first shift during the 2018 through 2019 time

3   period?

4      A      No.

5      Q      During the 2018-2019 time period, did you

6   ever work with other APMs who worked a part-time

7   schedule?

8      A      APMs?

9      Q      Yes.

10     A      No.

11     Q      And as an APM in the 2018-2019 time

12  period, just so the record is clear, you never

13  reported to Travis Torrance; is that correct?

14     A      No, I never reported to Travis.

15     Q      During Ms. Geter's deposition, she claimed

16  that in July and August -- July or August of 2018

17  you started working a reduced schedule, and she

18  believes you were working three or four days per

19  week.  Is her testimony accurate?

20     A      In July?

21     Q      Starting in July or August of 2018,

22  Ms. Geter testified you started working a reduced

23  schedule of three or four days per week.  Is that

24  testimony accurate?

25     A      No.

Tiffany Kitchens                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1      Q     And during that time period, the 2018

2   through 2019 time period, how many days per week

3   were you, in fact, working?

4      A     I was working at least five.

5      Q     You testified about this support shift

6   role, but you don't know what the exact title is; is

7   that right?

8      A     Mm-hmm.  This was an old terminology we

9   used to use to indicate something other than first

10  shift.  The company may have moved away from that.

11  It's just old terminology that kind of gets stuck

12  after a while when you've been somewhere for a long

13  period of time.

14     Q     Understood.  Do you know whether what you

15  call the support shift was in place in the 2018-2019

16  time period?  Do you have any knowledge of that?

17     A     No.

18     Q     Do you have any knowledge as to whether or

19  not anyone at Schneider tried to fill Ms. Geter's

20  absences in the 2018-2019 time period with some

21  position referred to as support shift?  Do you have

22  any knowledge of that?

23     A     I have no knowledge.

24     Q     You mentioned that you're currently an

25  SOS; is that right?

Tiffany Kitchens                                April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 30

1          A     That is correct.

2          Q     Okay.  And are there some job duties that

3     you currently perform as an SOS that you used to

4     perform as an area planning manager?

5          A     Can you repeat the question?  Sorry.

6          Q     Sure, sure.  Are there some job duties

7     that you currently perform as an SOS that you used

8     to perform as an area planning manager during the

9     2018 through 2020 time period?

10         A     Yes.

11         Q     Okay.  And what are those job duties that

12    you currently perform as an SOS that you used to

13    perform as an APM?

14         A     Just event work, updating drivers, doing

15    messages, you know, things like that.

16         Q     Do you currently meet with drivers as an

17    SOS?

18         A     Define meet.

19         Q     Sure.  Do you have any face-to-face

20    interaction?  Is that part of your responsibility to

21    have interaction with the drivers?

22         A     Yes.

23         Q     Okay.  So that function that was performed

24    in Fairburn in the 2018-2019 time period as an APM

25    is now performed by SOSs; is that an accurate

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 31

1    statement?

2         A     That is correct.

3               MR. MILIANTI:  I think that's all the

4         questions I have.  Thank you, Ms. Kitchens.

5               THE WITNESS:  Thank you.

6               MS. LEGARE:  Thank you.

7               (Deposition concluded at 3:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tiffany Kitchens                                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 32

1                          DISCLOSURE
2      STATE OF GEORGIA:
3      COUNTY OF PUTNAM:
4
                Pursuant to Article 10.B of the Rules and
5      Regulations of the Board of Court Reporting of the
       Judicial Council of Georgia, I make the following
6      disclosure:
                  Combs Court Reporting, Inc. was contacted
7      by the party taking the deposition to provide court
       reporting services for this deposition, and there is
8      no contract that is prohibited by O.C.G.A.
       15-14-37(a) and (b) or Article 7.C of the Rules and
9      Regulations of the Board for the taking of this
       deposition.
10              There is no contract to provide reporting
       services between Combs Court Reporting, Inc. or any
11     person with whom Combs Court Reporting, Inc. has a
       principal and agency relationship, nor any
12     attorney-at-law in this action, party to this
       action, party having a financial interest in this
13     action, or agent for an attorney-at-law in this
       action, party to this action, or party having a
14     financial interest in this action.  Normal and
       customary rates will be charged, and a financial
15     discount will not be given to any party in this
       litigation.
16
17
18
19
                            _____
20
21                          Mary Beth Cook, RPR
                            CCR# 5079-8707-4272-4608
22
23
24
25

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 33

                              CERTIFICATE

     STATE OF GEORGIA:

     COUNTY OF PUTNAM:

              I, Mary Beth Cook, Certified Court
     Reporter, State of Georgia, Certificate No.
     5079-8707-4272-4608, CERTIFY that acting in such
     capacity, I reported the testimony herein, and on
     the foregoing pages have transcribed a true and
     correct transcript thereof.
              I FURTHER CERTIFY that I am not counsel
     for, nor am I related to any party to the above
     case; nor am I interested in the event or outcome.
              WITNESS my hand and official seal as
     Certified Court Reporter, State of Georgia,
     Certificate No. 5079-8707-4272-4608 this 24th day of
     April, 2021.


     _____
     Mary Beth Cook, RPR, CCR
     CCR# 5079-8707-4272-4608

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
         COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT F



Deposition of:
## Marianne Biskey-Rose

*April 21, 2021*

In the Matter of:

## Geter, Cierra v. Schneider National Carriers Inc.

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

    CIERRA GETER,                )
4                                 )
               Plaintiff,    )  CIVIL ACTION
5                                 )
          vs.                )  FILE NO.
6                                 )
    SCHNEIDER NATIONAL        )  1:20-cv-01148-SCJ-JSA
7   CARRIERS, INC.,           )
                                  )
8              Defendant.     )

9

10                    - - -

11               DEPOSITION OF

12             MARIANNE BISKEY-ROSE

13        TAKEN BY REMOTE VIDEOCONFERENCE

14

                  April 21, 2021

15

                  9:37 a.m.

16

17     Pamela L. Porter, RPR, CCR-B-2160

18                    - - -

19

20

21

22

23

24

25

Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 2

1
                    APPEARANCES OF COUNSEL
2

3

  On behalf of the Plaintiff:
4
          CHERYL B. LEGARE, ESQ.
5         Legare, Attwood & Wolfe, LLC
          Suite 380, Decatur Town Center Two
6         125 Clairemont Avenue
          Atlanta, Georgia 30030
7

8  On behalf of the Defendant:

9         PETER A. MILIANTI, ESQ.
          McGuire Woods, LLP
10        Suite 2100, Promenade II
          1230 Peachtree Street, NE
11        Atlanta, Georgia 30309

12

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                    TABLE OF CONTENTS
 2
 3                EXAMINATION                      PAGE
 4
 5    Cross-Examination by Ms. Legare                 5
 6
 7                       - - -
 8
 9    PLAINTIFF'S
       EXHIBIT              DESCRIPTION           PAGE
10
11     Exhibit 4    Job Description, Manager, Area    17
                    Planning
12
       Exhibit 35   Email from Ashley Janssen to HR  34
13                  Leave Administration Team, 3/25/19
14     Exhibit 36   Email from Ashley Janssen to     35
                    Travis Torrence and others,
15                  3/25/19
16     Exhibit 41   Email from Ashley Janssen to     38
                    Travis Torrence and Marianne
17                  Biskey-Rose, 4/12/19
18     Exhibit 48   Flexible Work Arrangement        31
                    Guidelines
19
20
          (Original Exhibits have been attached to the
21    original transcript.)
22
                       - - -
23
24
25
```

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 4

1            (Reporter disclosure made pursuant to
2       Article 10.B of the Rules and Regulations of the
3       Board of Court Reporting of the Judicial Council
4       of Georgia.)
5            (Due to the need for this deposition to
6       take place remotely, the parties have stipulated
7       that the court reporter may swear in the witness
8       over the phone/Veritext Virtual videoconference
9       and that the witness has verified that he/she is
10      in fact MARIANNE BISKEY-ROSE.)
11           (The witness was duly sworn.)
12           (Off-the-record discussions ensued.)
13           MS. LEGARE:  Again, we're here today in
14      the case that Cierra Geter has brought against
15      Schneider National Carriers, which is currently
16      pending in the Northern District of Georgia, and
17      we're here for all purposes under the Federal
18      Rules of Civil Procedure and Evidence.
19           Are we going to waive objections except to
20      form and privilege today?
21           MR. MILIANTI:  Yes.
22           MS. LEGARE:  Okay.  And I'm assuming you
23      want to read and sign; right?
24           THE WITNESS:  Yes.
25           MS. LEGARE:  Okie-doke.

Page 5

```
1                   MARIANNE BISKEY-ROSE,

2       having been first duly sworn, was examined and

3       testified as follows:

4                         CROSS-EXAMINATION

5       BY MS. LEGARE:

6            Q.    Could you please state your full for the

7       record.

8            A.    Yeah.  It's Marianne Biskey-Rose.

9            Q.    And I apologize.  I didn't introduce

10      myself.  I'm Cheryl Legare, and I represent Cierra

11      Geter in this matter.

12                  And you're here because you've been

13      identified as a witness who has some information about

14      the case.

15                  I'm going to ask you some questions.

16      You're going to give me some answers.  Pete may ask

17      some follow-up, and then we'll be done.  You know, I

18      expect maybe an hour or two at the most.

19                  Have you ever been deposed before,

20      Ms. Biskey-Rose?

21           A.    I have not.

22           Q.    Okay.  I sort of just described the

23      process for you.  If you need a break, just let me

24      know.  Okay?

25           A.    Okay.
```

```
                                                        Page 6

 1          Q.     Probably the most important thing in these

 2     remote depositions is that we don't talk over each

 3     other.  So if you haven't finished, just let me know,

 4     and I will let you finish your answer.  Okay?

 5          A.     Okay.

 6          Q.     Thanks.  Is there any reason you can't

 7     give complete and accurate testimony here today?

 8          A.     No.

 9          Q.     Okay.  And are you taking any medications

10     that might interfere with your memory or make you

11     sleepy?

12          A.     No.

13          Q.     And you understand that you're under oath

14     today just as if we were in court; right?

15          A.     I do.

16          Q.     Can you tell me what you did to prepare

17     for the deposition?  And I don't want to know about

18     any conversations you might have had with Pete or any

19     of his associates.

20          A.     Yeah.  I met with Pete, and I also went

21     through any old documents that I had.  That was it.

22          Q.     Do you know if the documents you went

23     through, were they documents that have already been

24     produced in this matter?  And the way to tell is the

25     numbers down in the corner.
```

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 7

 1        A.    Yes.

 2        Q.    Okay.  Got it.  Did you talk to anyone at

 3   Schneider about the facts underlying this matter

 4   without Pete present?

 5        A.    No.

 6        Q.    And have you seen a copy of any of the

 7   deposition transcripts in this case?

 8        A.    I have not.

 9        Q.    All righty.  And I ask in the beginning,

10   just so you know, some broad questions just because I

11   think it's easier and makes it move faster.

12             Can you just tell me about your employment

13   with Schneider?

14        A.    Yeah, sure.  So I have been working with

15   Schneider for almost 20 years.  I started in July of

16   2001 at our Dallas operating center as -- it was a

17   service team leader role, which is now something we

18   call a driver team leader role or DTL for short.

19             I was there for about two-and-a-half

20   years, and then I moved to Atlanta in the same role

21   and was in a -- that sort of role for approximately,

22   I'll say, five to six years.  I'm not sure exactly how

23   long.

24             And then I moved into an operations

25   manager role and did that for several years.  Roughly,

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 8

1    I don't know, nine to ten years maybe.  And then I've

2    been in my director of operations role for the last

3    five, started sometime at the beginning of 2016.

4          Q.    Could you tell me sort of what the

5    leadership chain is in your facility?  Are you the top

6    leader in the facility?

7          A.    I am.  Yeah.  So it's -- my role, the

8    director of operations, and then reporting to me I

9    have operations managers.  And currently I have two.

10               And then at the time of Ms. Geter's

11   employment we also had a support shift team leader

12   role, and then we also have -- at that time we had

13   area planning managers, or APMs, as well as DTLs.

14               Today we no longer have the APM roles.  We

15   do have some SOS roles in addition to the DTL role

16   that we have.  And we no longer have anybody in the

17   support shift team leader role.

18         Q.    And I think when Ms. Geter was there,

19   there were team leads that supervised the APMs; right?

20         A.    We had one team leader.  And that was only

21   on support --

22         Q.    I'm sorry.

23         A.    Yeah, it was on support shift.  He was the

24   only one.  Otherwise, the operations managers for our

25   first shift team would oversee the APMs and the DTLs

Page 9

1    on their teams.

2         Q.    And at that time, was Doug Horton an

3    operations manager?

4         A.    He was.

5         Q.    So was he the person that Travis Torrence

6    reported directly to?

7         A.    Yes.

8         Q.    Okay.  And Mr. Horton is no longer -- he's

9    still with the company; right?

10        A.    He is.

11        Q.    He's just not in --

12        A.    He works in a different department.  He

13   works in a different department, and he works

14   remotely.

15        Q.    Got it.  And I think you said you have two

16   operations managers now.  That's Travis Torrence and

17   Rodney Dunn?

18        A.    That's correct.

19        Q.    And just so that the record is clear, APM

20   stands for area planning manager; right?

21        A.    That is correct.

22        Q.    And DTL is a driver team lead; right?

23        A.    That is correct.

24        Q.    And SOS is -- what is it?  I'm drawing a

25   blank.

Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 10

```
 1        A.    It's -- I want to say service operations
 2   support, but I'm not sure exactly.  It's -- we've
 3   called it an IOS, which is an intermodal operations
 4   support, and then we changed it to an SOS.
 5              It's the same role.  It's just a matter of
 6   terminology within our organization.  We wanted to
 7   align all of the different lines of businesses; so we
 8   changed some of the names of the roles.
 9        Q.    And I think you're going to be able to
10   clear something up for me that I was clearly confused
11   about the other day.  What is support shift?
12        A.    Support shift is anybody that works second
13   or third shift.  And we -- we use it interchangeably.
14   So sometimes we say support shift.  Sometimes we say
15   second or third shift.
16              But as a generalization, whenever we're
17   talking about second and third shift, we use the
18   terminology support shift.  You could say extended
19   shift.
20        Q.    And I don't -- I think it's fair to say,
21   right, that there aren't necessarily set times for
22   shifts.  There may be staggered times for people
23   working a specific shift?
24        A.    Yes.  But they are set.  So, like, if --
25   if you work second shift and your schedule is 1400 to
```

Page 11

1   2300, you work that every day.  Whereas mine might be

2   1500 to midnight.

3          So we may not start exactly at the same

4   time but we start at the same time every day or during

5   our workday.

6          Q.   Right.  And that's sort of what I

7   understood from a couple of the witnesses earlier this

8   week that, you know, I started out working 3:00 to

9   whatever, but then I was moved to 2:00 to whatever

10  and --

11         A.   Yeah.

12         Q.   You know, based on the needs of the

13  business.

14         A.   Exactly.  I was just about to say that.

15  So based on the needs of the business, we may change

16  days or times slightly.  We look at, you know, call

17  volume or the number of drivers we have staffed during

18  those windows in order to make those determinations if

19  we need to make those moves.

20         Q.   Who do you report to?

21         A.   I report to our VP of operations.  His

22  name is Rob Bulick.  It's Robert.  He goes by Rob.

23         Q.   How do I spell his last name?

24         A.   B-u-l-i-c-k.

25         Q.   And where is he located?

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 12

1        A.    He's located in Green Bay, Wisconsin.

2        Q.    So Mr. Torrence has already been deposed.

3   And I think I understand his role in Ms. Geter's

4   employment.  But let me take a step back.  Do you know

5   Cierra Geter?

6        A.    I do.

7        Q.    As operations -- as director of

8   operations, do you primarily work first shift, or do

9   you work various times?

10        A.    Primarily first shift.

11        Q.    And does first shift have a general time

12   range, like 9:00 to 5:00 or 8:00 to --

13        A.    Generally -- yeah, generally it's 7:00 to

14   4:00.  But, again, it's a little bit staggered.  So

15   some people come at 6:00.  Some people come at 8:00.

16   But generally speaking it's historically been 7:00 to

17   4:00.

18        Q.    And is Schneider still today a 24/7

19   operation; right?

20        A.    Correct.

21        Q.    Just so that we have it in the record,

22   what does Schneider do?

23        A.    We're a truckload and logistics company.

24        Q.    So I think it's probably just easiest to

25   go sort of chronologically about what happened in this

Page 13

1    case.

2              How did you learn that Ms. Geter needed

3    FMLA in the fall?

4              MR. MILIANTI:  Just --

5         Q.   (By Ms. Legare)  The second time in 2018.

6              MR. MILIANTI:  Thank you.

7              MS. LEGARE:  Sorry.

8              MR. MILIANTI:  No.  That's fine.  Just a

9         clear record.

10             THE WITNESS:  I can't recall exactly.  My

11        memory is that Doug Horton let me know that, you

12        know, she was going to be out and working with

13        the leave team.

14        Q.   (By Ms. Legare)  And leave is coordinated

15   from Green Bay; right?

16        A.   That is correct.

17        Q.   At some point did you learn what

18   Ms. Geter's diagnosis was?

19        A.   I did.

20        Q.   When did you learn what her diagnosis was?

21        A.   It was after she came back from FMLA, I

22   believe, is when I heard from her.  When she went out

23   on FMLA and we were working with the leave team, I

24   understood some of the circumstances behind it.  But I

25   can't say clearly if I knew what her diagnosis was at

Page 14

1    that time.

2         Q.    When you say that you understood some of

3    the circumstances behind it when you were working with

4    the leave time, were you aware that she was suicidal?

5         A.    Yes.  That's what I was made aware of.

6         Q.    Okay.  But you didn't have any specific

7    conversations with Ms. Geter herself at that time.  Is

8    that fair to say?

9         A.    Not that I can recall.

10        Q.    Okay.  But you recall specifically having

11   a conversation with her when she came back from FMLA?

12        A.    I do.

13        Q.    Tell me about that conversation.

14        A.    Well, Cierra and I were -- we were pretty

15   friendly.  We were pretty close.  We share the same

16   birthday.  We had a lot in common, and I always kind

17   of looked at her as, you know, a younger version of

18   myself in some regards.

19             So, you know, when she came back, I was

20   obviously very worried about her and wanted to check

21   in and see how she was doing.

22             So we had just, you know, some

23   conversation, and she shared with me some of the

24   struggles that she had been going through and kind of

25   what her treatment process was and different things

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1    like that.

2         Q.    Did she share with you that she had been

3    assaulted in the past and was suffering from PTSD as a

4    result of that assault?

5         A.    I was aware of her assault.  I don't

6    recall a conversation regarding PTSD.  I do recall us

7    talking about her having depression and having, you

8    know, the -- obviously the suicide attempts and some

9    anxiety associated.  But I can't specifically recall

10   any PTSD discussions.

11        Q.    Did she share with you the treatment that

12   she was going through that resulted in her requesting

13   an accommodation?

14        A.    She did.  She told me that she was

15   seeking -- had sought out different kinds of therapy

16   and she was doing some holistic therapies that she

17   felt were really working for her, and she really liked

18   the doctor and kind of the facilities that she was

19   using.

20              And then she also mentioned that she was

21   going to like -- I think it was a peer group therapy

22   on Monday mornings, which is why she was unable to --

23   to work the Sunday night shift.

24        Q.    And did you play any role -- in the

25   beginning, you know, she requested accommodations and

Marianne Biskey-Rose                        April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1   then extended her request for accommodations.  When

2   she first requested the accommodation to work a

3   reduced schedule, did you play any role in approving

4   that?

5          A.    Not really.  So, you know, Travis was able

6   to accommodate the leave by working the shift or, you

7   know, working with his team when he was unable or if

8   they were able, he was able to step in.

9                So, you know, there wasn't a whole lot

10  involved in that decision-making since we were able to

11  accommodate.

12         Q.    But he did share with you or talk to you

13  about it?

14         A.    He did.  He did.

15         Q.    Did Cierra talk to you about it too?

16         A.    I can't recall specifically.  I would

17  imagine she would have, but I don't remember that

18  conversation.

19         Q.    I mean, I got the impression just at some

20  of the various depositions that the people who worked

21  for Schneider were pretty close.  Is that a fair

22  statement?

23         A.    Yeah.  Especially in our office.  It's

24  small, and, you know, we kind of have worked together

25  for a long time.  So, yeah, we're fairly close.

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1          Q.    Let's look at some exhibits.  Look at

2     Exhibit 4.

3                 (Plaintiff's Exhibit 4 was marked for

4          identification.)

5                 THE WITNESS:  Okay.  That's the job

6          description?

7          Q.    (By Ms. Legare)  Right.  Can you tell me,

8     have you seen this before, Ms. Biskey-Rose?

9          A.    Yes.

10         Q.    It would be okay to say no, by the way.

11    I'm not suggesting that everyone always looks at the

12    job description.

13                But do you know if this was the job

14    description for area planning manager at the time

15    Ms. Geter was employed?

16         A.    I do not.

17         Q.    Okay.  And you did not write this job

18    description; right?

19         A.    No, I did not.

20         Q.    Were you involved in creating this job

21    description?

22         A.    Not that I recall.

23         Q.    And I understand --

24         A.    It's unlikely that I would have been.

25         Q.    I'm sorry.  You said it's unlikely you

Page 18

1    would have been?

2          A.    Yes.

3          Q.    Okay.  Can you tell me what is your -- I

4    understand the area planning managers were relocated

5    to Green Bay in the spring last year; right?

6          A.    That's correct.

7          Q.    Tell me what you remember about that

8    process.  And, actually, let me ask you one question

9    first.  That decision was made, at least started,

10   pre-Covid; right?

11         A.    Correct, yes.

12         Q.    But it just happened to coincide, sort of?

13         A.    Yes, sort of.  So the decision was made by

14   our leadership team in Green Bay.  Well, I was made

15   aware of the decision sometime in the fall of 2019.

16               And so kind of the way the process worked

17   was, you know, I understood that all of the dispatch

18   APMs on all shifts would be relocated to Green Bay.

19               And so I had to look at our team and

20   determine if anybody was, you know, willing or able or

21   wanting to relocate to Green Bay.

22               And then those that were left, I knew I

23   was going to have to build a -- we would still need a

24   support shift team.  So we would still need the

25   assistance on second and third shift in order to

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 19

1    assist our drivers.

2              So I had to look and see -- unfortunately,

3    that was a -- it was not an equal move for those

4    associates.  So they were salaried employees, and they

5    moved to an hourly position through that transition.

6              So not everybody was willing to, first of

7    all, change the work because the APM role is very

8    different than the SOS role in a lot of cases.

9    Although, less so for our second and third shift folks

10   because they were already doing some of the SOS work

11   that we now just have today.

12             Whereas the first shift APMs weren't doing

13   that work on a regular basis as part of their

14   day-to-day.

15             So some of the first shift APMs had

16   decided that, you know, it was not a position that

17   they wanted to move into.  We -- so we looked at all

18   of the staff and said, you know, hey, are you

19   interested in taking on one of these positions?  We

20   looked at performance to see if there was anybody that

21   wasn't a good fit and that we no longer wanted to keep

22   within the organization.

23             And then we had some additional moves that

24   were taking place on our team; so we were able to move

25   some folks into DTL roles.

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

```
 1              So I think in the end we had, I don't
 2    know, maybe five or six that we were able to keep
 3    within the organization.  We had one person that
 4    relocated to Green Bay, and the rest either were in
 5    DTLs or SOS roles.  And then we probably had roughly
 6    the same amount that are no longer with the
 7    organization.
 8         Q.    So were there any people who moved to
 9    Green Bay?
10         A.    Yes.  We had one associate that moved to
11    Green Bay.
12         Q.    And who was that?
13         A.    His name is Austin Oddender.
14         Q.    And was anyone -- I understand that
15    everyone was offered the opportunity to transfer to
16    Green Bay if they wanted; right?
17         A.    That's correct.  We also tried to find
18    roles within the organization at either locally or in
19    different parts of the country.  You know, some people
20    are willing to relocate to other areas.
21              And so, you know, we did try to find other
22    positions within the organization for associates that
23    wanted to stay but didn't want to move into the SOS
24    role or didn't want to relocate to Green Bay.
25         Q.    Were any of the APMs -- excuse me.
```

Page 21

1    Because I think you said you looked at performance and

2    whether they would be a fit in some of these roles,

3    was there anyone that you just let go without

4    offering --

5            A.    Not an APM.  We had a DTL that we let go.

6    And so then we were able to backfill that role with

7    one of the APMs, but he was not an APM.

8            Q.    Who is the DTL that you let go?

9            A.    His name was Quincy.

10           Q.    And then I think was it Sara Kopf who was

11   promoted to DTL?

12           A.    She was promoted to a DTL on first shift,

13   but she was replacing a DTL that moved over to

14   customer service by the name of Shannon Bailey.  So

15   Robert Turner took Quincy's position.

16           Q.    So is it true then that Sara's move to a

17   DTL position, I think she perceived it as a promotion.

18   Is it a promotion?

19           A.    Technically it's not.  So an APM and a DTL

20   are both level one manager roles.  So technically, no,

21   it would be a lateral move.

22           Q.    And would her move have happened

23   regardless of the APM move?

24           A.    Yes.

25           Q.    So are there two driver team leads, or are

Page 22

1    there more than two?

2           A.    That moved from APM roles?

3           Q.    Just in total that work.

4           A.    Oh, there are more than two.

5           Q.    Okay.  And I think I may have

6    misunderstood something you said.  So the driver team

7    lead role is still a salaried role?

8           A.    Yes.

9           Q.    So the hourly role was the SOS position?

10          A.    That's correct.

11          Q.    Is that considered a demotion for the

12   people who took it?

13          A.    Technically it is because, you know, they

14   are going from a salary to an admin role.  And their

15   scope of work is reduced.  So technically, yes, it's

16   seen as a demotion, but it wasn't a demotion based on

17   performance like typical demotions are.

18          Q.    Right.  And I think probably for some

19   people and I got the sense from Ms. Kitchens it was,

20   like, I was just happy to have a job in Covid.

21          A.    Yeah.  Some people.  But, you know, these

22   discussions started well before Covid.

23          Q.    Right.

24          A.    So, you know, there were some people that

25   made the decision to not take the role before Covid

Page 23

1   was even an issue or even a known entity.  So --

2        Q.    And for the people who left that didn't --

3   decided not to take the role, they got a severance

4   package; right?

5        A.    They did.

6        Q.    Do you know what the severance package

7   was?  Was it based on years of service?

8        A.    It was based on years of service, but I

9   don't remember all the specifics of it.

10       Q.    And so the title was SOS that people

11  took --

12       A.    Correct.

13       Q.    -- right?

14       A.    Well, I say that.  I don't know if we

15  changed it from IOS to SOS at that time or if that was

16  done at a later time.  But it's the same role.

17       Q.    So IOS was a position that existed prior

18  to the decision to move the APMs to Green Bay?

19       A.    Yes.  But we didn't have them on our

20  second and third shift.

21       Q.    So they only worked first shift?

22       A.    At that time I'm not even sure we had any

23  on first shift.  But it was a position within the

24  organization.

25       Q.    So you added more of this position once

Marianne Biskey-Rose                                        April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 24

1    the APMs moved?

2          A.    Yes.

3          Q.    How many SOSs do you have now?

4          A.    Well --

5          Q.    Obviously I'm talking in Fairburn.

6          A.    Yeah.  We just lost one this week.  So we

7    have five.

8          Q.    Were there six total at the time of the

9    APM move?

10         A.    I believe so.

11         Q.    And were any of those positions already

12   filled, or were they all given to APMs who were losing

13   their jobs because they weren't moving to Green Bay?

14         A.    They were all given to APMs.

15         Q.    Was it -- I understand it went from salary

16   to hourly, but was it also a pay cut for them, or was

17   the pay similar?

18         A.    We made their pay similar.

19         Q.    Go ahead.

20         A.    And, Cheryl, I think I was wrong on the

21   number of SOS because --

22         Q.    Oh, it's fine.

23         A.    -- I think we only had four instead of

24   six.

25         Q.    At some point did it go up to six or just

Marianne Biskey-Rose                                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1   five?

2        A.    Yeah.  Well, yes.  So we have -- we have

3   had six for probably almost the last year, but we were

4   at five prior to that.  And we will be back up at six

5   once we hire a replacement.

6        Q.    And if Ms. Geter had still been employed

7   with Schneider at the time of the APM move, she would

8   have been offered the opportunity to transfer to Green

9   Bay; right?

10       A.    Yes.

11       Q.    And if she had turned down a transfer to

12  Green Bay, she would have been in the mix of the

13  people considered for the SOS positions?

14       A.    Correct.

15       Q.    And is it possible, based on her tenure,

16  that she may also have been considered for one of the

17  DTL positions?

18       A.    Yes.

19       Q.    In Schneider's discovery responses,

20  they -- the company has said that the decisions on the

21  request for accommodation were made by you and

22  Mr. Torrence in consultation with Ms. Janssen, Ashley

23  Janssen.

24             Do you recall if Mr. Horton was involved

25  in any of the decision-making around the request for

Page 26

1   accommodation?

2          A.    I do not recall him being involved.

3          Q.    What days of the week -- well, let me ask

4   you this.  Are there any -- actually -- I'm going in

5   circles.

6               Did the SOS -- did the people who took the

7   positions of SOS when APM -- the APM move happened

8   take over some of the duties of -- the local duties of

9   APMs?

10         A.    So the traditional APM role, no.  So that

11  work was transferred to Green Bay.  The work -- the

12  additional work that our second and third shift APMs

13  were doing as far as, you know, answering phone calls

14  and messages and, you know, bill of ladings and all of

15  the day-to-day activities that incur, yes, that's --

16  that's the role that they took over.  So that portion

17  of our second and third shift role is what they

18  currently do.

19         Q.    And there's been some testimony in

20  depositions about basically -- so the driver keys,

21  keys for the trucks were kept behind -- in a locked

22  office; right?

23         A.    Uh-huh (affirmative).

24         Q.    Are they still kept in a locked office?

25         A.    They are.

Marianne Biskey-Rose                          April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 27

1      Q.    So during Covid while nobody -- while

2   people were working remotely, if a driver needed a

3   key, what did they do?

4      A.    We had to leave the office unlocked.

5      Q.    Okay.  And so did you leave the office

6   unlocked for a period of time while everyone was

7   working from home for Covid?

8      A.    Yes.

9      Q.    And I understand from other witnesses that

10  starting in March the company was fully remote.  At

11  some point in time people went back two days a week

12  and three days remote, and then now as of March people

13  are back in the office full-time; is that accurate?

14     A.    For the most part.  Yeah, for the most

15  part.

16     Q.    And I also understand that the other issue

17  for the drivers was that the printer was in a locked

18  office as well; right?

19     A.    That's correct.

20     Q.    But now it's been moved to the driver

21  lounge?

22     A.    Yes.

23     Q.    Is there some reason it wasn't in the

24  drivers' lounge the whole time?

25     A.    Well, unfortunately, with it being in the

Page 28

1   driver lounge, we don't have the same capabilities

2   that we have with it being in the office.

3              There's some faxing and scanning

4   capabilities that we're having challenges with being

5   in the driver lounge just from a technology

6   standpoint.

7              It's our -- also our only printer in the

8   office.  So anytime I have to print confidential

9   information, it being in the driver lounge is not an

10  ideal location.

11             So that's, I think, why it's historically

12  always been in the office area.  But currently it is

13  in the driver lounge.

14      Q.    Do you know why corporate hasn't given you

15  two printers?  You might not.  I mean --

16      A.    I think just the cost.  You know, cost and

17  probably some, again, some of the IT challenges that

18  we have being in a small office.

19             We're in a trailer so it's -- you know,

20  it's not as probably up to technical standards as, you

21  know, a larger office would be.

22      Q.    And I believe from what other witnesses

23  have said that you-all have the capacity to print to

24  the printer remotely when you're working from home;

25  right?

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

```
 1        A.    We do now, yes.

 2              MR. MILIANTI:  Object to the form.

 3        Q.    (By Ms. Legare)  And currently are there

 4   specific days of the week and/or shifts where the SOSs

 5   are working alone and there aren't two of them

 6   scheduled on a shift?

 7        A.    Yes.

 8        Q.    And what are those shifts?

 9        A.    I'm not sure off the top of my head.

10        Q.    Do they change from time to time?

11        A.    The only thing that would make a change

12   is, you know, vacations or time off or unexpected

13   absences, that sort of thing.  Otherwise, it's a set

14   schedule.

15        Q.    And there's been some testimony about your

16   ability to use temporary employees if employees have

17   to be out.  Can you tell me how that works in

18   Fairburn?

19              MR. MILIANTI:  Just object to the form of

20         the question.

21              THE WITNESS:  Yeah.  So -- sorry.

22        Q.    (By Ms. Legare)  You can still answer.

23   It's okay.

24        A.    Okay.  We have used temp support in the

25   past.  We currently don't have anybody from a temp
```

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 30

1    perspective.  We've had mixed success with temps.  Our

2    systems are -- we have many of them, and they're not

3    easy to learn, and it takes time.

4              So we only utilize a temp when we, you

5    know, really have the need and we're going to have it

6    for a while because of the time that it takes to get

7    them up to speed where they can actually provide some

8    support.

9         Q.    Have you had any temps that worked

10   part-time?

11        A.    No.

12              MR. MILIANTI:  Just object to the form.

13        Q.    (By Ms. Legare)  Or a reduced-hour

14   schedule?

15        A.    No, not that I'm aware of.

16        Q.    Do you know if you could have asked -- I

17   understand you use an agency; right?

18        A.    We do.

19        Q.    What's the name of the agency?

20        A.    It was Kelly.  Like I said, we haven't had

21   a temp in a while.  So I'm not sure if that's still

22   the agency we use, but that was the one we were using.

23        Q.    And do you know if Kelly provides

24   part-time employment, temporary help to companies?

25              MR. MILIANTI:  Object to the form.

Marianne Biskey-Rose                                  April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 31

1              THE WITNESS:  I do not know.

2         Q.    (By Ms. Legare)  All right.  If we will

3    look at what's marked as Exhibit 48.

4              (Plaintiff's Exhibit 48 was marked for

5         identification.)

6              THE WITNESS:  Okay.  I have it open.

7         Q.    (By Ms. Legare)  Have you seen this

8    document before, Ms. Biskey-Rose?

9              MR. MILIANTI:  I'm sorry.  I don't have 48

10        on my list.  Can you just tell me what it is,

11        Cheryl?

12             MS. LEGARE:  It's the flexible work

13        policy.  Are you not in Exhibit Share, Pete?

14             MR. MILIANTI:  I am, but for some reason

15        mine stop at 47.

16             MS. LEGARE:  Refresh your screen.  It will

17        probably pop up because I added it, like, right

18        before we started.

19             MR. MILIANTI:  Got it.  Thank you.

20             MS. LEGARE:  You're welcome.  Sorry about

21        that.

22             MR. MILIANTI:  No.  That's fine.

23             MS. LEGARE:  I was out of the office when

24        I got it yesterday; so --

25             MR. MILIANTI:  No problem.

Marianne Biskey-Rose                        April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 32

 1              THE WITNESS:  So I'm sure I have seen it,

 2       but it isn't something I recall.

 3       Q.    (By Ms. Legare)  What is your --

 4       A.    I can't say --

 5       Q.    Oh, go ahead.

 6       A.    I can't say definitively that I've seen

 7   this.

 8       Q.    Okay.  What is your understanding about

 9   working from home for people in the Fairburn office?

10       A.    Well --

11       Q.    And hold on.  I need to put this on --

12   before Covid, obviously.

13       A.    Yes.  So, you know, we try our best to

14   work with our associates and be flexible.  So, you

15   know, if somebody has something last minute that's

16   come up, like a sick child or someone at home that

17   they need to be there for or a doctor's appointment,

18   then we've allowed some flexibility to work from home.

19              But it's always kind of been a one-off

20   situation and not an ongoing request.

21       Q.    Were you aware that Tiffany Kitchens

22   worked, actually, from the emergency room is what she

23   said on -- or, sorry, from the hospital, and she made

24   it sound to me like for around four months in 2018 and

25   2019?

Page 33

1       A.    Yes.   Tiffany did.  She had some

2   intermittent FMLA in order to care for her mother who

3   was in the hospital.  So she did work from home or the

4   hospital, depending on where her mother was at the

5   time in order to assist with her but then also to

6   assist with the team and the workload that we had.

7             But it was not an every day working from

8   the hospital or from home.  It was as needed.  She

9   shared some of the responsibilities with her dad in

10  order to care for her mom.

11            So we were, you know, working with her and

12  through the FMLA process for her to do that work.

13      Q.    So she said she didn't actually end up

14  using her intermittent FMLA.  Is that your

15  recollection?

16      A.    It's not.  But I wouldn't know for certain

17  how many days she used.

18      Q.    And, rather, her recollection was that she

19  worked from the hospital every day for about four

20  months.  Did you know that that was going on?

21            MR. MILIANTI:  I'm just going to object.

22        I think that misstates Ms. Kitchens' testimony.

23        But go ahead.

24            THE WITNESS:  No, I don't believe that to

25        be the case.

Page 34

1        Q.    (By Ms. Legare)  So even if she says it

2   is, you're saying you didn't know that it was?

3              MR. MILIANTI:  Same objection.

4              THE WITNESS:  That's not what my memory is

5        of the situation.

6        Q.    (By Ms. Legare)  Did you approve her work

7   from home, or was that just with Rodney Dunn?

8        A.    That would be Rodney.

9        Q.    Okay.  Let's see.  I will tell you what I

10  am not going to do is show you a lot of emails that

11  you're not cc'd on.

12             But I am assuming that Mr. Torrence was

13  keeping in communication with you about Ms. Geter's

14  needs for accommodations; right?

15       A.    Correct.

16       Q.    And Ms. Geter herself may have spoken with

17  you about them?

18       A.    Yes.  That's correct.

19       Q.    I'm looking -- and you're not really not

20  cc'd -- oh, here we go.  All right.  If you will look

21  at Exhibit 35.

22             (Plaintiff's Exhibit 35 was marked for

23        identification.)

24             THE WITNESS:  Okay.

25       Q.    (By Ms. Legare)  And it looks like -- so

Marianne Biskey-Rose                     April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 35

1   if you scroll all the way down, it doesn't look like

2   you're cc'd on the first email from -- and I can't

3   remember how you pronounce Anissa's last name -- but

4   that Mr. Torrence forwarded you an email on March

5   18th.

6               And is that a schedule to have a call, a

7   conference call?

8        A.   So at the bottom of mine, I don't see

9   that.  All I see is, "Any update on this, question

10  mark.  Anissa was going to go back to the doctor and

11  ask for more specifics.  Thanks.  Ashley."

12              That's the very bottom of my document.

13       Q.   Are we in the right -- Exhibit 36?

14       A.   Oh, you said 35, I thought.

15       Q.   I'm sorry.  I thought I said 36.

16       A.   That's okay.

17       Q.   My bad.

18              (Plaintiff's Exhibit 36 was marked for

19       identification.)

20              THE WITNESS:  Okay.  Let's see.  Okay.  So

21       I have it open.  Yeah, looks like it's a

22       conference call.

23       Q.   (By Ms. Legare)  And do you recall a

24  conference call about Ms. Geter's doctor requesting

25  that her reasonable accommodations be extended?  At

Case 1:20-cv-01148-SCJ-JSA   Document 47-6   Filed 06/07/21   Page 38 of 49
Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 36

1    the time I believe it was to June 6th.

2                    MR. MILIANTI:  Object to the form.

3                    THE WITNESS:  I can't specifically

4         remember this conference call, if that's what

5         you're asking.

6         Q.    (By Ms. Legare)  Well, so do you recall

7    having any conversations with Ms. Janssen and

8    Mr. Torrence about Ms. Geter's need for an extended

9    accommodation?

10        A.    I do.

11        Q.    Do you recall how many conversations you

12   may have had with them about it?

13        A.    I do not.

14        Q.    Can you tell me what you recall talking to

15   them about?

16        A.    Yeah.  We discussed, you know, her request

17   to extend and whether or not we were able to continue

18   to accommodate, you know, based on the business needs

19   and our staffing level.

20                    And it was determined that we could no

21   longer accommodate, and so we discussed, you know,

22   next steps.

23        Q.    Was there any conversation about changing

24   Ms. Geter's shift?

25        A.    Yes.  So we did discuss a couple of

Page 37

```
 1   different options.  One was changing shifts.  We

 2   offered that up, and it's my memory that,

 3   unfortunately, she wasn't able to do that because of

 4   her doctor and group therapy sessions.

 5              We also talked about a different position

 6   for her, so, like, a first shift position.  I guess

 7   that would have been changing schedules kind of.

 8              And then I also asked Cierra or my memory

 9   is that I asked Cierra if she could change any of her

10   doctor schedules.  So, you know, the Monday group

11   therapy session, I asked if there was an opportunity

12   to -- to go to a different, you know, session.

13              And my memory is that there was a

14   different session that she could attend, but it

15   coincided with one of her other doctor's visits.  So

16   she wasn't able to change that up.

17        Q.    So you recall having this conversation

18   with Ms. Geter?

19        A.    I do.

20        Q.    Were the business needs and the staffing

21   level, did any of that have to do with an APM having

22   to go out on maternity leave?

23        A.    I'm sorry.  Can you ask that question a

24   different way maybe?

25        Q.    Sure.  Isn't it true that at the same time
```

Page 38

1   this was all going on, there was another APM who was

2   going to be out because she was having a baby?

3         A.    Yes.   That is true.

4         Q.    And is that something that affected the

5   staffing levels at the time?

6         A.    I can't remember if Audrey was already out

7   on maternity leave or not.   So I'm not sure if it

8   impacted staffing levels.

9         Q.    And I understand that there were maybe one

10  or two people who were brought on that Ms. Geter was

11  training but who didn't last very long; is that true?

12        A.    I don't recall that.

13        Q.    Did you have conversations with Ms. Geter

14  about changing her shift?

15        A.    Not that I remember.

16        Q.    But you thought someone may have had those

17  conversations with her?

18        A.    Yeah.   I believe that Travis had those

19  conversations, but I'm not a hundred percent positive.

20        Q.    Then -- let's see.   Look at Exhibit 41.

21              (Plaintiff's Exhibit 41 was marked for

22        identification.)

23              THE WITNESS:   Okay.

24        Q.    (By Ms. Legare)   If you will scroll down

25  to -- it says, Schneider 81, in the bottom, right-hand

Marianne Biskey-Rose                     April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 39

 1   corner.

 2        A.    Okay.  That's blank for me.  Well,

 3   besides --

 4        Q.    Right.  It's the bottom -- like, a

 5   signature block; right?

 6        A.    Right.

 7        Q.    And then just scroll up and read the

 8   conversation.  I just wanted to make sure we started

 9   at the bottom of the conversation.

10        A.    Okay.  Okay.

11        Q.    So was your understanding at the time that

12   the decision was made to terminate Ms. Geter that she

13   was requesting to continue to work part-time until

14   June and then to work one day a week from home when

15   she returned to work full-time?

16        A.    I'm sorry.  Could you repeat that one more

17   time?

18        Q.    Yeah.  So looks like on this email what

19   you-all were saying was you had been letting her work

20   three days a week.  We are unable to continue to

21   accommodate a part-time schedule and that you had

22   gotten updated information that she couldn't return

23   full-time until June, and even then she was going to

24   have a one-day-a-week work-from-home restriction

25   temporarily; right?

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

1        A.    Yes.

2        Q.    When you say business needs and staffing,

3   what do you mean?

4        A.    So just the support that we are able to

5   give our driving associates and business.  So having

6   enough resources in order to help those problems be

7   resolved.

8        Q.    And so having her only work three days

9   instead of four days was an issue, in your mind?

10        A.    Yes.  Because we needed somebody there

11   full-time in order to meet those needs.

12        Q.    Did you consider at the time getting a

13   temporary employee to cover that day for Ms. Geter?

14        A.    We discussed it, but it never was, I'll

15   say, a viable option because of, again, the skill

16   level that's kind of needed from a temp perspective,

17   and it was a shift where we didn't have anybody on

18   staff, which is why Travis was having to step in and

19   cover it.

20              And so having a temp person take that role

21   and be in that position is not a great solution

22   because they'd be by themselves and not have the

23   knowledge and background that they need in order to

24   resolve those issues.  So it wasn't a good option for

25   us to consider.

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 41

1          Q.     Well, if you had moved Ms. Geter to a

2     different shift, how would you have covered that time

3     in that case?

4          A.     Yeah.  We -- we would have probably had to

5     move somebody else from their shift in order to

6     accommodate that.  So we would have, you know,

7     potentially had to offer them a different shift or,

8     you know, potentially create a new position.

9          Q.     And that's something you considered?

10          A.     It's something that we would have

11     considered if she would have been able to move it, but

12     because it wasn't something that she could do, we

13     didn't have to get into the details as far as what

14     that would look like.

15          Q.     And was there any consideration of putting

16     Ms. Geter on leave until she could return to work

17     full-time?

18          A.     That would have been done -- or made by

19     the leave team.  So I don't know if they considered

20     that or not.

21          Q.     I don't think you were involved in the

22     unemployment process for Ms. Geter; right?

23          A.     I was not.

24          Q.     And when she filed her EEOC charge, were

25     you involved in any way in assisting with responding

Page 42

1    to the charge of discrimination she filed with the

2    Equal Employment Opportunity Commission?

3            A.    I was not.

4                  MS. LEGARE:  That is all I have.

5                  MR. MILIANTI:  Great.  I don't have any

6            questions.

7                  (Deposition concluded at 10:38 a.m.)

8                  (Pursuant to Rule 30(e) of the Federal

9            Rules of Civil Procedure and/or O.C.G.A.

10           9-11-30(e), signature of the witness has been

11           reserved.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 43

```
 1              The following reporter and firm
         disclosures were presented at this proceeding
 2       for review by counsel:
 3                   REPORTER DISCLOSURES
 4              The following representations and
         disclosures are made in compliance with Georgia Law,
 5       more specifically:
         Article 10(B) of the Rules and Regulations of the
 6             Board of Court Reporting (disclosure forms)
         OCGA 9-11-28(c) (disqualification of reporter for
 7             financial interest)
         OCGA 15-14-37(a) and (b) (prohibitions against
 8             contracts except on a case-by-case basis).
         - I am a certified reporter in the State of Georgia.
 9       - I am a subcontractor for Veritext Legal Solutions.
         - I have been assigned to make a complete and accurate
10         record of these proceedings.
         - I have no relationship of interest in the matter on
11         which I am about to report which would disqualify me
           from making a verbatim record or maintaining my
12         obligation of impartiality in compliance with the
           Code of Professional Ethics.
13       - I have no direct contract with any party in this
           action and my compensation is determined solely by
14         the terms of my subcontractor agreement.
15                     FIRM DISCLOSURES
16       - Veritext Legal Solutions was contacted to provide
           reporting services by the noticing or taking
17         attorney in this matter.
         - There is no agreement in place that is prohibited
18         by OCGA 15-14-37(a) and (b).  Any case-specific
           discounts are automatically applied to all parties,
19         at such time as any party receives a discount.
         - Transcripts:  The transcript of this proceeding as
20         produced will be a true, correct, and complete
           record of the colloquies, questions, and answers as
21         submitted by the certified court reporter.
         - Exhibits:  No changes will be made to the exhibits
22         as submitted by the reporter, attorneys, or
           witnesses.
23       - Password-Protected Access:  Transcripts and exhibits
           relating to this proceeding will be uploaded to a
24         password-protected repository, to which all ordering
           parties will have access.
25
```

Page 44

```
 1                    C E R T I F I C A T E
 2
 3    STATE OF GEORGIA:
      COUNTY OF FULTON:
 4
 5            I hereby certify that the foregoing
      transcript was taken down, as stated in the
 6    caption, and the colloquies, questions, and
      answers were reduced to typewriting under my
 7    direction; that the transcript is a true and
      correct record of the evidence given upon said
 8    proceeding.
              I further certify that I am not a relative
 9    or employee or attorney of any party, nor am I
      financially interested in the outcome of this
10    action.
              I have no relationship of interest in this
11    matter which would disqualify me from
      maintaining my obligation of impartiality in
12    compliance with the Code of Professional Ethics.
              I have no direct contract with any party
13    in this action and my compensation is based
      solely on the terms of my subcontractor
14    agreement.
              Nothing in the arrangements made for this
15    proceeding impacts my absolute commitment to
      serve all parties as an impartial officer of the
16    court.
17            This, the 4th day of May, 2021.
18
19
20            PAMELA L. PORTER, CCR-B-2160
21
22
23
24
25
```

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF CHRISTINE SCHNEIDER IN SUPPORT OF**
**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

I, Christine Schneider, depose and state as follows:

1.      My name is Christine Schneider.  I am over the age of eighteen and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct based upon my personal knowledge.

2.      I am currently employed by Schneider National Carriers, Inc. in the role of Benefits Manager – Leave Administration.  I have held this position since 2009.

3.      In my capacity as Benefits Manager – Leave Administration, I am responsible for leading a team of three Leave Analysts and two Administrative Assistants.  My team is referred to as the HR Leave Administration Team.

4.     The HR Leave Administration Team is responsible for ensuring that Schneider properly administers federal and state family medical leave to associates. The HR Leave Administration Team is also responsible for engaging in the interactive process with associates when they request workplace accommodations.

5.     In the 2018 and 2019 time period, all associate workplace leave and accommodation requests were administered by the HR Leave Administration Team.

6.     If a Leave Analyst has questions regarding an associate's workplace accommodation request or restrictions, it is the regular practice of the Leave Analyst to communicate with the associate and/or the associate's healthcare provider to obtain additional information or clarification so that Schneider can determine whether it can accommodate a particular request.

7.     During the 2018 through 2019 time period, Leave Analyst Anissa Gauthier was assigned to Cierra Geter's case file.

8.     Ms. Gauthier worked under my direct supervision.

9.     When Ms. Gautier sent email communications to Ms. Geter and/or Ms. Geter's healthcare provider regarding Ms. Geter's accommodation requests, Ms. Gauthier copied the "HR Leave Administration Team," which is an email box that is shared by all members of the HR Leave Administration Team. I have access to all emails sent to or from the "HR Leave Administration Team" address.

10. Attached hereto as Exhibit 1 is a true and accurate copy of email communications that Ms. Gauthier had with Ms. Geter and Ms. Geter's physician, Dr. Cassandra Wanzo, during the March and April 2019 time period. I have reviewed the contexts of Exhibit 1.

11. The records attached hereto as Exhibit 1 are kept in the course of Schneider's regularly conducted business activity and are maintained in a safe and secure location.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __7__, 2021.


_Christine Schneider_
Christine Schneider

3

EXHIBIT 1
to
C. Schneider
Declaration

**Jenquin, Dawn**

| | |
|---|---|
| **From:** | Gauthier, Anissa |
| **Sent:** | Tuesday, April 02, 2019 2:01 PM |
| **To:** | HR Leave Administration Team; Cassandra Wanzo |
| **Cc:** | Geter, Cierra |
| **Subject:** | Cierra Geter additional information needed |
| **Attachments:** | 720-manager-area-planning.docx; Geter, Cierra 296995 2018-1008 Accommodation_follow up on restriction letter.pdf |

**Importance:** High

Dr. Wanzo,

On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019. The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.

There is additional questions that do need to be answered to determine if we can extend an accommodation. I have left a few voicemails in hopes to reach you live to talk through the restrictions. Please see the attached letter and physician statement. I have also attached her job description as well. Please complete and fax back to us by Monday, 4/8.

Thanks,
Anissa

**HR Leave Administration Team - Anissa**
Schneider www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**From:** HR Leave Administration Team
**Sent:** Monday, March 18, 2019 3:05 PM
**To:** 'Cassandra Wanzo' <administrator@DrCassandraWanzo.onmicrosoft.com>
**Cc:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: C.Geter 3.9.19
**Importance:** High

Dr. Wanzo,

I would like to talk to you briefly about Cierra Geter's reduced schedule. Her accommodation ends on 3/19/2019 and we need additional information from you on her schedule availability to work throughout the week.

1

SCHNEIDER 000310

Please call me at 920-592-4571.

Thanks,

**HR Leave Administration Team - Anissa**
Schneider www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the **US & CN BENEFITS PORTAL** for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**From:** Cassandra Wanzo [mailto:administrator@DrCassandraWanzo.onmicrosoft.com]
**Sent:** Saturday, March 09, 2019 11:42 AM
**To:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** C.Geter 3.9.19

Good Afternoon

Attached is the paperwork for C. Geter. Please let us know if anything else is needed.

Kelly Jordan
Administrative Assistant
Dr. Cassandra Wanzo
602 Bombay Lane
Roswell Georgia 30076
Office: (678) 566-1440
Fax: (678) 566-1442

*****This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*****

CONFIDENTIAL                                    SCHNEIDER 000311



Job Description

# MANAGER, AREA PLANNING

**TYPE OF ROLE:**          Exempt (Salaried)

**DEPARTMENT(s):**      Bulk, Dedicated, Intermodal, Van Truckload

**REPORTS TO:**           Various

**JOB SUMMARY:**

The Area Planning Manager is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders. As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneiders #1 core value: safety.
- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.
- Exhibit behavior in alignment with our core values at all times.

**SPECIALIZED KNOWLEDGE:**

- Bachelors degree or equivalent work experience in a related field required
- 1-2 years of customer service, dispatch and/or operations experience

**EDUCATION LEVEL:**                    Bachelor or equivalent work experience

**EXPERIENCE:**                         1-3 Years

**SKILLS/BEHAVIORS NECESSARY TO PERFORM JOB**

Abilities or qualities an associate must possess in order to perform the essential job duties - Listed by Core Competency

**COMMUNICATION**

Effective and efficient oral communication skills

Effective and efficient written communication skills

Ability to develop relationships through interpersonal skills

Effective listening skills

**DIVERSITY & INCLUSION/TEAM PLAYER**

Collaboration skills

Ability to work effectively in a team environment

**POSITIVE IMPACT**

Ability to positively impact others

Influencing skills, resulting in a positive outcome

Take initiative, a self-starter

Ability to work well in a fast paced, high pressure environment

**PROBLEM SOLVING & DECISION MAKING**

Problem solving skills

Decision making skills (make best value decisions)

Analytical skills

Strategic thinking skills

                    SCHNEIDER 000313

Ability to analyze various courses of action and make recommendations

Project Management skills

Sound judgement

**RESULTS ORIENTATION**

Ability to manage multiple priorities and prioritize workload

**FUNCTIONAL & TECHNICAL EXPERTISE**

Customer service skills

Ability to work independently with little supervision

**OTHER**

- Strong financial and analytical skills. Able to identify a root cause from a subset of data and establish a relevant action plan to correct root cause of issue.
- Ability to evaluate a situation and create innovative, balanced solutions
- Strong work ethic.

**Generated:** *2019-03-14 05:07:20.641000*

**Last Updated:** *2017-11-24 15:34:07*



4/2/2019

*HR-010321-LA*

TO:   Cierra Geter
      5008 Lower Elm Street
      Atlanta, GA 30349

RE:   Request for Accommodation

Dear Cierra,

You are currently approved on an accommodation for your reduced schedule of 3 days through 3/19/2019. Below is the timeline of information that has been received during your leave of absence and your partial return to work.

- Your continuous leave of absence was approved from 10/9/2018 through 12/31/2019 which exhausted your 12 weeks of FML.
- On 12/17/2018, HR leave team received a return to work form from your doctor that indicated you can return to work 3 days per week effective 1/2/2019 through 2/13/2019. HR leave team approved this accommodation on 12/18/2019.
- On 1/21/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 3/19/2019. HR leave team approved this extension on 1/29/2019.
- On 3/11/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 4/30/2019. This extension is under review.
- On 4/1/2019, HR Leave team received updated information from your doctor that indicated your partial schedule of 3 days remains in effect through 6/5/2019. This extension is under review.

With the multiple extensions of partial return to work schedule, this is appearing to be a permanent need.

Please take the below physician statement to your doctor to complete the additional questions that are needed for your accommodation extension request.

***Please provide me with the requested information from you and your health care provider by no later than 4/8/2019.***

Thank you for your cooperation with the above. Please feel free to call me with any questions.

Sincerely,
Anissa
Leave Analyst
Schneider - HR Leave Administration Team
Phone: 920-592-4571 Fax: 920-403-8903
HRLeaveAdministrationTeam@Schneider.com



Dear Physician,

On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019.   The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.

In order to assist Schneider in evaluating whether it can provide, Cierra Geter, with a reasonable accommodation, Schneider requests that you review the below questions and answer the information specific to the status and need for an accommodation for Cierra.

**Physician's Statement:**

| Patient's/Associate's first and last name: | _____Cierra Geter_____ |
| --- | --- |

1. Provide a statement indicating the current nature of the condition, as well as a statement of what, if any, specific current or future limitations that condition places on the activities and the ability to engage in work or other functions:

2. Provide a statement of any specific job duties that Cierra is unable to perform because of their medical condition (Please see attached job description).  Provide information as to why she cannot return to work full time (4 – 10 hour days).

3. She is currently working on Wednesday, Thursday and Friday.  Is there a different day that she is available to work if she can work 4 days?   Can she work Monday-Friday, 8 hour schedule?

4. Provide a specific description of what has changed or what went wrong that the partial work schedule (3 days) restriction effective date continues to push out for Cierra.

5. Is the patient following the recommended treatment plan to improve their condition?



5.  What is the **total** length of time the patient will need to work 3 days per week from this point forward in your best professional estimate?

_____ Permanent restriction  _____ # of Month(s) _____ # of Week(s)

6.  Provide a detailed statement as to whether the patient is making progress toward their return to work and the percentage of likelihood of them returning to their current position <u>full time</u> by **4/10/2019** (this date is 90 days of accommodating a partial schedule of 3 days).

> *Note: A statement that the patient will not be able to return to work until "at least" a given date is not helpful in the context of this process.    Such assessment may be deemed the equivalent of a statement that the patient will be unable to return to work full time (4 – 10 hour days) for an indefinite period.*

---

**Estimated Return to Work Date:** _____  **Percent Likely of Return:** _____

_____    _____    _____
Physician's Printed Name                    Physician's Phone Number              Physician's Fax Number

_____    _____
Physician's Signature                       Date

**Return to:**
Schneider - HR Leave Administration Team
P.O. Box 2545 Green Bay, WI  54306-2545
Phone: 800-558-6701 ext 592-4571
**Fax:  920-403-8903;**
Email: HRLeaveAdministrationTeam@Schneider.com

SCHNEIDER 000317

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF TRAVIS TORRENCE IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Travis Torrence, depose and state as follows:

1.     My name is Travis Torrence. I am over the age of eighteen and am otherwise competent to testify to the facts set forth in this Declaration. All statements contained in this Declaration are true and correct based upon my personal knowledge.

2.     I currently serve as Operations Manager for Schneider National Carriers, Inc. ("Schneider").

3.     Schneider is a transportation and logistics company that operates as a common and contract motor carrier throughout the United States and Canada.

1

4.     As an Operations Team Leader, I worked five days per week but the days that I worked varied depending upon the needs of the business.  I did not have a set work schedule.  I typically worked 50 hours per week in my role as Operations Team Leader.

5.     As an APM on the third shift, Ms. Geter frequently worked alone, especially on Sundays.

6.     Full-time work is an essential function of the APM position.  During the time period that Schneider employed Ms. Geter, APMs were needed to work full-time so that Schneider could ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day.

7.     During the time period that Schneider employed Ms. Geter, the Fairburn location was only staffed by full-time employees so that Schneider could best meet the needs of its drivers.

8.     Schneider did not employ any part-time APMs at the Fairburn location during the time period Ms. Geter was employed.

9.     During the time period that I supervised Ms. Geter, it was essential for second and third shift APMs to consistently work in the office so that the APMs could develop relationships with drivers and better assist them.

10.     It was also necessary for APMs to work in the office so they could retrieve keys for drivers that were located in a secure lock box as well as print off paperwork for drivers. This was especially important on the third shift, when APMs often worked alone.

11.     Because there were certain essential tasks that needed to be completed in the office, APMs under my supervision were not regularly permitted to work remotely.

12.     In order to accommodate Ms. Geter's restriction of part-time work, I worked Ms. Geter's Sunday overnight shift, in addition to my regular duties. I typically started working the overnight shift at 11 p.m. on Sunday and ended at approximately 7 a.m. on Monday. I would then come back to work on Monday at approximately 1 p.m. and work to 9 p.m. to perform my regular duties as an Operations Team Leader.

13.     I consistently covered Ms. Geter's Sunday overnight shift from when she went out on FMLA leave in October 2018, until the termination of her employment in mid-April 2019.

14.     During the time period I covered Ms. Geter's Sunday overnight shift, I worked on average 55-60 hours a week.

15.     In early April 2019, after considering Ms. Geter's third request to extend her part-time schedule for another two months as well as her request to work from home two days per week or any time she was to work alone, Marianne Biskey-Rose and I determined that we could no longer accommodate Ms. Geter's requests.

16.     By April 12, 2019, I had been working Ms. Geter's Sunday overnight shift for approximately six months and I could no longer absorb Ms. Geter's job duties for an additional two months, if not longer. Working the additional Sunday overnight shift was physically exhausting, negatively impacted my ability to complete my Operations Team Leader tasks, and negatively impacted my health.

17.     Ms. Biskey-Rose and I discussed the possibility of reassigning Ms. Geter to an open and available position, but the Fairburn location only had full-time positions.

18.     Because Ms. Geter's requests were not reasonable and there were no reasonable accommodations that would have enabled Ms. Geter to perform the essential functions of her position, Ms. Biskey-Rose and I decided to terminate Ms. Geter's employment effective April 12, 2019.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7th, 2021.


Travis Torrence

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In the fall of 2018, Plaintiff Cierra Geter took approved Family and Medical Leave Act Leave for her Americans with Disabilities Act-covered disabilities – Major Depressive Disorder ("MDD"), Post Traumatic Stress Disorder ("PTSD"), and anxiety disorder. When she returned to work in January 2019, Ms. Geter did so with a Schneider National Carriers, Inc. ("Schneider") approved reasonable accommodation that she be permitted to work three 10-hour days a week instead of four so that she could continue to receive treatment for her disabilities. Shortly thereafter, Ms. Geter's reasonable accommodation was extended and approved through March 19, 2019.

In March 2019, Ms. Geter requested that her reasonable accommodation be

1

extended one more time, through June 5, 2019, and that she be permitted to work from home one day a week. The accommodations requested by Ms. Geter were those Schneider provided to a Caucasian APM, Tiffany Kitchens. However, rather than continue to accommodate Ms. Geter, on April 12, 2019, Schneider terminated Ms. Geter in violation of the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA"), 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Schneider also retaliated against Ms. Geter in violation of the ADA. Because Ms. Geter has presented substantial evidence that Schneider's actions were discriminatory and retaliatory and violated the ADA, Title VII and 42 U.S.C. § 1981, Defendant's Motion fails.

## I.     Ms. Geter Created Genuine Issues of Fact

Ms. Geter incorporates herein her Response to Defendant's Statement of Facts and her Statement of Disputed Material Facts as to Which There Exist Genuine Issues to be Tried.

## II.     Schneider Violated the ADA. [1]

[1] The only lawful approach at summary judgment is this: "The court may not weigh evidence to resolve factual disputes – if a genuine issue of fact is found, summary judgment **must** be denied." *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993) (emphasis added). The Court "must draw all reasonable inferences

Ms. Geter establishes a prima facie case of disability discrimination if: (1) she is disabled; (2) she was a "qualified individual" at the relevant time, meaning that she could perform the essential functions of the job with or without reasonable accommodation; and (3) she was unlawfully discriminated against because of her disability or Schneider failed to accommodate her because of her disability. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1256 (11th Cir. 2007); *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001); *Beatty v. Hudco Indus. Products, Inc.*, 2:10–CV–3051–JHH, 2012 WL 3030100, at *9 (N.D. Ala. July 23, 2012); *Jernigan v. BellSouth Telecomms., LLC*, 17 F. Supp. 3d 1317, 1321 (N.D. Ga. 2014).

## A.   Schneider failed to accommodate Ms. Geter.

The *McDonnell* Douglas framework does not govern Ms. Geter's failure to accommodate claim. *See Hollingsworth v. O'Reilly Auto. Stores, Inc.*, No. 4:13-CV-01623-KOB, 2015 U.S. Dist. LEXIS 10956, at *25 (N.D. Ala. Jan. 30, 2015) (citing

---

in favor of [Plaintiff]." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The Court "should give credence to the evidence favoring [the Plaintiff]" and may only credit evidence supporting the Defendant "that is uncontradicted and unimpeached," and, even then, only "to the extent that that evidence comes from disinterested witnesses." *Id.* Ultimately, in employment discrimination cases, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

*Nadler v. Harvey*, No. 06-12692, 2007 U.S. App. LEXIS 20272, 2007 WL 2404705, *9 (11th Cir. Aug. 24, 2007) ("[W]e . . . hold that *McDonnell Douglas* burden-shifting is not applicable to reasonable accommodation cases."). Rather, Ms. Geter establishes her failure to accommodate claim by proving her prima facie case. *Id.* If Ms. Geter establishes a prima facie case of failure to accommodate, the burden then shifts to Schneider to prove that "accommodating the plaintiff would impose an undue hardship on the operation of its business." *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998); *Rorrer v. City of Stowe*, 743 F.3d 1025, 1038-39 (6th Cir. 2014) (quoting *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir. 1996); *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013)).

In its Motion for Summary Judgment, Schneider does not assert that Ms. Geter is not disabled by virtue of her MDD, PTSD, and anxiety disorder.[2] Rather, Schneider contends that Ms. Geter is not a qualified individual with a disability as defined by the ADA and that her requested accommodations were unreasonable. Schneider's assertions are wrong, as will be addressed in turn, and summary

---

[2] Under the amended ADA, the term "disability" is meant to be construed in favor of broad coverage. 42 U.S.C. § 12102(4)(A); *see also Tate v. Sam's E., Inc.,* No. 3:11-CV-87, 2013 WL 1320634, at *10 (E.D. Tenn. Mar. 29, 2013). Under the EEOC's implementing regulations, "substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i) and (iii). "An impairment need not prevent, or significantly restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(ii).

judgment must be denied.

### 1.    *Ms. Geter is a qualified individual with a disability.*

A qualified individual is, someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) (citing 42 U.S.C. § 12111(8)); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005). Essential job functions are duties fundamental to the "employment position [that] the [disabled employee] holds" and identifying such functions requires "a factual inquiry to be conducted on a case-by-case basis." 29 C.F.R. § 1630.2(n)(1); *Lucas*, 257 F.3d at 1258. Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (quoting *Keith,* 703 F.3d at 926); *Jernigan*, 17 F. Supp. 3d at 1322.

### a.    The essential functions of the APM job

Although "[t]he employer's judgment as to which functions are essential" is "entitled to substantial weight in the calculus," the employer's judgment alone is not conclusive. *Samson*, 746 F.3d at 1201 (citing 29 C.F.R. § 1630.2(n)(3)(i) and *Holly*, 492 F.3d at 1258). "Because if it were conclusive:

then an employer that did not wish to be *inconvenienced* by making a
reasonable accommodation could, simply by asserting that the function
is 'essential,' avoid the clear congressional mandate that employers
'mak[e] reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a disability who is
an applicant or employee, unless such covered entity can demonstrate
that the accommodation would impose an *undue hardship* on the
operation of the business of such covered entity.

*Samson*, 746 F.3d at 1201 (quoting and citing *Holly*, 492 F.3d at 1258 and 42

U.S.C. § 12112(b)(5)(A)) (alteration in original).

Courts must also consider:

any written job description prepared before advertising or interviewing
applicants for the job; the amount of time spent on the job performing
the function; the consequences of not requiring the employee to
perform the function; the terms of any collective bargaining agreement;
the work experience of past employees in the job; and the current work
experience of employees in similar jobs.

*Lewis*, 934 F.3d at 1182 (quoting *Samson*, 746 F.3d at 1201, 29 C.F.R. §

1630.2(n)(3)(ii)-(vii)).

Here, Schneider falsely asserts that it "is undisputed that full-time work" and

"working in the office" are essential functions of Ms. Geter's APM position that she

was unable to perform as a result of her temporary request to work three rather than

four 10-hour shifts per week between January 2, 2019 and June 5, 2019. (Torrence

Dep. 50:6-9; Geter Dep. 159:10-161:13; Geter Dep. Ex. 19; Janssen Dep. 40:12-25;

Geter Dep. Ex. 3, p. 3.) Whether full-time work and working from are essential

functions of the APM job is disputed issue of material fact not "suitable for resolution on a motion for summary judgment." *Samson*, 746 F.3d at 1201.

As an initial matter, nowhere in the Area Planning Manager ("APM") job description does Schneider assert that full-time work and working in the office are essential functions of the APM position, because they are not. (Geter Dep. Ex. 4.) As close as Schneider comes in the nineteen essential functions it identifies, is a single essential function requiring that APMs must "[m]aintain regular and consistent attendance and timeliness. (Geter Dep. Ex. 4.) However, part-time and remote employees are perfectly capable of maintaining regular and consistent attendance and timeliness and there is no assertion that Ms. Geter did not consistently and timely work the three shifts to which she was scheduled while she was temporarily being accommodated.

Moreover, Schneider explicitly maintains a Flexible Work Arrangement Policy ("FWA") under which employees are permitted to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.) As such, part-time work is permissible at

Schneider and Ms. Geter's supervisor, Travis Torrence, himself, worked part-time in 2018 when he was absent at least 82 days out of 260 days in a work year. (Geter Dep. 215:17-216:4; Geter Decl. ¶ 10; Torrence Dep. 57:22-58:12.)

In addition, the entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed and it was common for APMs to work from home. (Geter Dep. 208:18-209:7, 209:19-210:14; Kitchens Dep. 17:1-11; Kopf Dep. 12:5-21; Williams Decl. ¶ 14.) In fact, APM Tiffany Kitchens was permitted to work full-time remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

Also, since Ms. Geter's termination, in March or April 2020, Schneider permanently relocated all APMs, including those in Fairburn, to the corporate headquarters in Green Bay, Wisconsin. (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The move was done to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed

to have it centralized." (*Id.*) The duties APMs like Ms. Geter previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14; Torrence Dep. 16:22-17:5, 29:8-30:3.)

Finally, all the employees employed by Schneider in Fairburn (other than the over-the-road drivers), worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then only returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) To accommodate the change in the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors, so the drivers have direct access to printer and keys just like they always have at the other southeast hubs. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 12, 13.)

As such, and based on all the above, the significant evidence in this case establishes that neither full-time work nor working in the office are essential functions of the APM position. *See Lewis*, 934 F.3d 1169, 1182-83 (reversing district court conclusion that plaintiff was not qualified under the ADA based on job description and other evidence); *Samson*, 746 F.3d at 1202-03 (reversing summary

judgment on qualified individual issue); *Holly*, 492 F.3d at 1261 (reversing district court because genuine issue of fact as to whether punctuality was essential function of job); *Jernigan*, 17 F. Supp. 3d at 1322 (plaintiff determined qualified based on job description and other evidence); *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1378-79 (N.D. Ga. 2012) (triable issue of fact as to whether plaintiff was qualified under the ADA based on absenteeism). Accordingly, Ms. Geter is a qualified individual with a disability because she can show that she is capable of performing the essential functions of the APM position with her requested accommodations of temporary reduced hours and the ability to work from home if she is scheduled to work alone on a shift.[3]

    **b.**    **Ms. Geter's accommodation requests were reasonable.**

Whether an employee is "qualified" requires consideration of available reasonable accommodations. An accommodation is "reasonable" under the ADA if

---

[3] Schneider also appears to assert that Ms. Geter cannot perform the essential function of fast-paced, high-pressure work. This is simply not true. As acknowledged by Ms. Geter, Ms. Geter had trouble working in a fast-paced high-pressure environment throughout her employment with Schneider, it did not begin with her need for accommodations in 2018 and 2019. (Geter Dep. 188:2-20; Geter Decl. ¶ 22.) Despite her difficulties working in a fast-paced high-pressure environment, Ms. Geter performed well at her job throughout her employment with Schneider. (Geter Decl. ¶ 23.) Other than one minor incident before her medical leave, Ms. Geter did not have performance issues while employed by Schneider. (Geter Decl. ¶ 24.)

it enables the employee to perform the essential functions of the job. *Lucas*, 257 F.3d at 1259-60; *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *see also* 29 C.F.R. § 1630.2(o)(1)(ii). What constitutes a reasonable accommodation depends on the circumstances, but it may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). "[A] failure to make reasonable accommodation claim requires no animus" or "discriminatory motivation," and may "result in different treatment for a disabled person than a nondisabled person." *Nadler v. Harvey*, No. 06-12692, 2007 U.S. App. LEXIS 20272, at *4, 8 (11th Cir. 2007).

### i.    Temporary reduced hours

Schneider asserts that Ms. Geter's request to temporarily work three days (thirty hours) per week instead of four days (forty hours) per week from January 2, 2019 through June 5, 2019 was unreasonable. In asserting that this request was unreasonable, Schneider ignores several important considerations. First, and most importantly, as shown above, working full-time at Schneider was not an essential function of the APM position and, in fact, Schneider has a policy under which its employees may seek permission to work flexible or reduced hours. (Biskey-Rose Dep. Ex. 48.)

Second, Ms. Geter worked reduced hours from January 2nd through her

termination in April with no issues. Although Mr. Torrence may have covered for Ms. Geter sporadically, he certainly did not do so on a weekly basis and his assertion to the contrary is false. When Ms. Geter was on medical leave, her shifts were primarily covered by Desmond Seymour and Audreianna Williams and were rarely, if at all, covered by Mr. Torrence. (Williams Decl. ¶ 9.) When Ms. Geter worked her reduced hours schedule, Desmond Seymour and Audreianna Williams covered her Sunday shifts and, occasionally, Mr. Torrence would sub in on the shift. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶ 8.) And Mr. Torrence himself worked part-time throughout 2018 with no repercussions. (Geter Dep. 215:17-216:4; Geter Decl. ¶ 10; Torrence Dep. 57:22-58:12.)

This case is easily distinguished from the cases relied on by Schneider in support of its position that temporarily working reduced hours is not a reasonable accommodation. (Doc. 46-1, p. 15.) When Ms. Geter temporarily worked reduced hours, she was still performing all of the essential functions of her job. She was not seeking to have any of her duties removed as was the plaintiff in *Medearis v. CVS Pharmacy*, 92 F. Supp. 3d 1294, 1305 (N.D. Ga. 2014) who was seeking to have a lifting restriction removed from his essential duties. Nor was Ms. Geter seeking to have Schneider create a permanent part-time position for her as did the plaintiff in *Rabb v. Sch. Bd. of Orange Cty.*, 590 F. App'x 849, 852 (11th Cir. 2014), who had

12

been accommodated with a part-time position for two years before she was fired. Instead, Ms. Geter needed to work reduced hours for a brief period until June 5, 2019, at which time she would have returned full-time.[4]

### ii.    Remote work

In February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Torrence Dep. 55:11-21; Geter Dep. 146:1-150:12, 208:18-209:7, 209:19-210:14; Kitchens Dep. 17:1-11; Kopf Dep. 12:5-21; Williams Decl. ¶ 14.) On March 9, 2019, Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to April 30, 2019 and, for the first time, recommended that Ms. Geter be permitted to work from home anytime she was scheduled alone. (Geter Dep. 150:16-153:5, 154:3-155:8; Geter Dep. Ex. 17; Janssen Dep. 33:4-34:14; Janssen Dep. Ex. 34.) Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Geter Dep. 155:9-14,

---

[4] Any allegation that Ms. Geter would have not been able to return to work based on her health decline after her termination is misplaced. On March 30, 2019. Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019 and believed that there was a 95% chance that Ms. Geter would be able to return to full duty at that time. (Torrence Dep. 50:6-9; Geter Dep. 159:10-161:13; Geter Dep. Ex. 19; Janssen Dep. 40:12-25; Geter Dep. Ex. 3, p. 3.) Unfortunately, after Ms. Geter was terminated, her health declined because of the termination. (Geter Dep. 196:6-16, 196:21-24, 222:20-21; Geter Decl. ¶ 25.)

160:21-161:5, 163:2-22, 164:18-165:5.) Ms. Geter's request to work from home if she was scheduled alone on a shift was reasonable.

As shown above, there was absolutely no reason APMs on any shift could not perform their job duties remotely. In fact, Schneider maintained a Flexible Work Arrangement Policy for just such purposes. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) The entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed and it was common for APMs to work from home.

Moreover, Ms. Kitchens worked full-time remotely for at least four months while her mother was ill, third shift APM Audreianna Williams worked from home regularly throughout the later part of her pregnancy, the APMs all perform their jobs remotely now, and everyone except the drivers worked remotely during COVID. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 10:11-23, 12:23-16:15; Torrence Dep. 13:10-12, 14:18-21, 16:22-17:11, 23:15-27:25, 28:14-25, 29:8-30:3; Biskey-Rose Dep. 18:3-23:5, 27:9-15, 32:21-34:5; Janssen Dep. 18:10-19:25, 23:10-16, 44:6-45:9; Kopf Dep. 9:10-14, 14:17-16:2, 26:11-14; Torrence Dep. 16:22-17:5; Williams Decl. ¶ 10.) To accommodate the change in the staff working remotely, Schneider did something it could easily have done years ago, it moved the printer to the driver's lounge, and the

driver key box is no longer behind locked doors. Now the 100 Atlanta drivers have direct access to the printer and truck keys just like the 2,150 other southeast drivers always have at the other southeast hubs. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 12, 13.)

The substantial evidence that working remotely is a routine practice for APMs and other Schneider employees establishes there is a material issue of fact for the jury regarding whether Ms. Geter's request to work from home when she was scheduled to work alone was reasonable.

### iii.    The interactive process

There is no evidence in the record that there was any breakdown in the interactive accommodation process that was caused by Ms. Geter. Rather, the record evidence shows that on April 2, 2019, Schneider sent Ms. Geter's doctor – Dr. Wanzo – reasonable accommodation paperwork to get more information about Ms. Geter's accommodation requests, and Ms. Geter also provided the paperwork to her doctor. (Geter Dep. 170:11-172:22, 185:17-186:9; Geter Dep. Exs. 20 & 23.) Ms. Geter communicated back and forth with leave management about the status of the requested additional paperwork through her termination on April 12, 2019. (Geter Dep. 158:9-159:2.) However, Ms. Geter has no knowledge whether Schneider followed up with Dr. Wanzo regarding the paperwork provided to Dr. Wanzo on

April 2, 2019, and Schneider never told Ms. Geter that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo. (Geter Decl. ¶ 18.) In fact, had Schneider asked Ms. Geter to follow up with Dr. Wanzo regarding the missing paperwork, she would have done so. (Geter Decl. ¶ 18.)

Because Ms. Geter was capable of performing the essential functions of the APM job with an accommodation, and because her requested accommodations were reasonable, she has established that she is a qualified individual with a disability under the ADA for purposes of denying Schneider's Motion for Summary Judgment.[5]

### 2. *Schneider did not accommodate Ms. Geter despite no evidence that it would be an undue burden.*

On April 12, 2019, Mr. Torrence and Ms. Biskey-Rose, in consultation with

---

[5] Even if Ms. Geter was not qualified because of her temporary need to work 30 hours and her need to work from home when she was scheduled to work alone, since leave of a definite duration is an accommodation that would have allowed Ms. Geter to return to full duty on June 5, 2019, Ms. Geter was still qualified for her job under the ADA and summary judgment must be denied. *See* 29 C.F.R. Part 1630, App. (discussing § 1630.2(o)); *See Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999); *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601 (7th Cir.1998); *see also Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 878 (9th Cir.1989) (leave of absence reasonable where no evidence showed undue hardship on the employer).

Ms. Janssen, decided that they would no longer accommodate Ms. Geter, and Schneider terminated Ms. Geter, although when he terminated Ms. Geter, Mr. Torrence told her it was out of his hands. (Torrence Dep. 50:10-13, 54:3-8; Geter Dep. 176:10-180:4, 181:13-19; Geter Dep. Ex. 22; Janssen Dep. 27:8-15, 40:12-42:20; Biskey-Rose Dep. 36:6-22.) Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019 – Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Torrence Dep. 50:15-51:16.) Thus, Ms. Geter easily meets her burden of establishing that Schneider failed to accommodate her when they refused to allow her to work reduced hours through June 5, 2019, refused to allow her to work from home if she was scheduled to work alone, and instead terminated her employment on April 12, 2019. Accordingly, the burden shifts to Schneider to establish its affirmative defense that it would have been an undue burden to accommodate Ms. Geter. They have not attempted to do so during discovery and do not do so in their summary judgment brief.[6] (*See* Torrence Dep. 66:2-69:19; Janssen Dep. 14:6-15:4; Biskey-Rose Dep. 36:6-41:20). As such,

---

[6] Any argument not raised in Schneider's initial brief has been waived and will not be properly before this Court if raised for the first time in their reply brief. *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005); *Hein v. IMS Gear Holding, Inc.*, No. 2:16-CV-00081-RWS-JCF, 2018 U.S. Dist. LEXIS 112965, at *63-66 (N.D. Ga. Jan. 31, 2018).

Schneider has failed to meet its burden of proof on this affirmative defense and summary judgment must be denied. *See Coker v. Enhanced Senior Living, Inc.*, No. 2:11-CV-0091-RWS, 2012 WL 4326429, \*9 (N.D. Ga. Sept. 18, 2012) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *Jernigan*, 17 F. Supp. 3d at 1324 (denying summary judgment and noting that "the Defendant at this juncture presented sufficient concrete, specific evidence to prove this undue burden"); *Hill v. Clayton Cnty. Sch. Dist.*, 619 F. App'x 916, 921-22 (11th Cir. 2015) (reversing grant of summary judgment where defendant made "spare assertions" of undue hardship).

**B.     Schneider Discriminated against Ms. Geter in Violation of the ADA.**

With respect to Ms. Geter's disability discrimination claim, courts use the same *McDonnell Douglas* burden-shifting analysis used in Title VII cases to evaluate claims under the ADA.  *Holly*, 492 F.3d at 1255. Ms. Geter establishes a prima facie case of disability discrimination if: (1) she is disabled; (2) she was a "qualified individual" at the relevant time; and (3) she was unlawfully discriminated against because of her disability. *Holly*, 492 F.3d at 1256.

Schneider does not assert that Ms. Geter is not disabled as defined by the ADA and Ms. Geter has met this element of her claim. Also, as shown above, Ms. Geter establishes the second element of her claim because she is a qualified individual with

18

a disability.

Finally, Ms. Geter establishes the third element of her prima facie disability discrimination claim by showing that Schneider took an adverse action against her because of her disability. 42 U.S.C. § 12112(b)(1) & (5); *Lewis*, 934 F.3d 1184.[7] She is not required to identify a similarly situated comparator under the ADA as asserted by Schneider. Because here, as shown above, Schneider terminated Ms. Geter because of her disability, Ms. Geter establishes a prima facie case of disability discrimination, and the burden shifts to Schneider to articulate a legitimate reason for its actions. *Id.*

Schneider makes no efforts to articulate a legitimate reason for its discriminatory actions in terminating Ms. Geter because of her disability. Thus, this argument is waived, and summary judgment must be denied on Ms. Geter's disability discrimination claim. *Bank of Am., N.A.*, 571 F.3d at 1162; *Herring*, 397 F.3d at 1342; *Hein*, No. 2:16-CV-00081-RWS-JCF, 2018 U.S. Dist. LEXIS 112965, at *63-66.

### C.  Ms. Geter Establishes a Prima Facie Case of Retaliation Under the ADA.

The ADA prohibits "retaliation against an employee based on her insistence

---

[7] Defendant cites to an earlier iteration of the *Lewis v. Union City* case. The controlling opinion is that at 934 F.3d 1169.

upon her rights under the ADA." *Norman v. S. Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1336, 1332-33 (M.D. Ala. 2002). To establish a prima facie case of ADA retaliation, Ms. Geter must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002); *Norman v. S. Gaur. Ins. Co.*, 191 F. Supp. 2d 1335; *Hulbert v. St. Mary's Health Care Sys. Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). To satisfy the causation element, the plaintiff need only show that the protected activity and the adverse action were not "wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). "Once a prima facie case has been demonstrated, the defendant must proffer a legitimate nondiscriminatory reason for the adverse employment action." *Id*. If the employer meets its burden, the burden shifts back to the employee to show the preferred reason is a pretext for retaliation. *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998).

Schneider first asserts that Ms. Geter cannot allege both failure to accommodate and retaliation claims. The cases cited by Schneider do not stand for that proposition at all and this assertion is without merit.

Schneider does not dispute that Ms. Geter engaged in protected activity under

the ADA or that she suffered an adverse employment action. Rather, it asserts that there is no causal connection between Ms. Geter's protected activity and her termination.

Ms. Geter's termination on April 12, 2019 was causally connected to her request that her accommodation be extended on March 9, 2019. Causation requires only that Ms. Geter's protected activity and the adverse employment action are not "wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008); *Weeks*, 291 F.3d at 1311. To show this, Ms. Geter need only show that the decision makers were aware of her protected conduct or that her protected activities were temporally proximate to the adverse actions. *Id.*; *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000); *Norman*, 191 F. Supp. 2d at 1332. Here it is undisputed that Ms. Biskey-Rose and Mr. Torrence knew that Ms. Geter sought to temporarily extend her reasonable accommodations. Here that request for accommodation was also temporally proximate to her termination and Ms. Geter has established causation. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268 (2001); *Brungart,* 231 F.3d at 798.

Because Ms. Geter establishes a prima facie case of ADA retaliation, the burden shifted to Schneider to articulate a legitimate non-retaliatory reason for its termination of Ms. Geter. In its brief, Schneider skips this step, has waived this

argument, and summary judgment must be denied. *Bank of Am., N.A.*, 571 F.3d at 1162; *Herring*, 397 F.3d at 1342; *Hein*, No. 2:16-CV-00081-RWS-JCF, 2018 U.S. Dist. LEXIS 112965, at *63-66.

### III.   Ms. Geter was Discriminated Against Because of her Race.

Ms. Geter establishes her claim of race discrimination through either direct or circumstantial evidence. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921-22 (11th Cir. 2018); *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1347-48 (11th Cir. 2005). Under the familiar *McDonnell-Douglas* framework of proof for a disparate treatment discrimination case, plaintiff first must prove a prima facie case. The defendant must then articulate a legitimate non-discriminatory reason for the adverse action to avoid a finding of discrimination. In that event, plaintiff must then show the articulated reason or reasons are a mere pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 502-505 (1973). Ms. Geter establishes her prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) she was terminated; and (4) she was treated differently than a similarly situated employee. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280-85 (1976); *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir. 1992); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991); *see also Breech v. Alabama Power Co.*, 962 F. Supp.

1447, 1457 (S.D. Ala. 1997).

Schneider does not asset that Ms. Geter cannot establish elements 1 though 3 of her prima facie case. Schneider asserts only that Ms. Kitchens is not similarly situated to Ms. Geter. However, in asserting that Ms. Kitchens and Ms. Geter are not similarly situated, Schneider ignores that Ms. Kitchens and Ms. Geter were subject to the same policy of general application, the Flexible Work Arrangement Policy, that they held the exact same job that was governed by the exact same job description, and that they ultimately reported to the same second-level supervisor, Marianne Biskey-Rose. (*See* Geter Dep. Ex. 4, Biskey-Rose Dep. Ex. 48, Torrence Dep. 11:19-12:14, 13:2-10; Biskey-Rose Dep. 8:1-9:7; Geter Dep. 69:4-9, 69:25-70:18.) Accordingly, when Ms. Geter was denied a flexible work arrangement and Ms. Kitchens was granted a flexible work arrangement, Ms. Kitchens was treated better than Ms. Geter because of her race. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

Because Ms. Geter establishes a prima facie case of race discrimination, "the defendant must proffer a legitimate nondiscriminatory reason for the adverse employment action." *McDonnell Douglas Corp.*, 411 U.S. at 502-505. Here, Schneider articulates that it terminated Ms. Geter because, it asserts, she could not

perform the essential functions of her APM job. So, the burden shifts to Ms. Geter

to show that the proffered reason is a pretext for discrimination. *Berman v. Orkin*

*Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998).

Ms. Geter demonstrates pretext by showing that a discriminatory reason more

than likely motivated the employer, or by showing that the proffered reason for the

decision is not worthy of belief. *Young v. General Foods Corp.*, 840 F.2d 825, 828

(11th Cir. 1998). The former showing relies on evidence of the decision maker's

discriminatory or retaliatory motive.  As to the latter method,

> [t]he district court must, in view of all the evidence, determine whether
> the plaintiff has cast sufficient doubt on the defendant's proffered
> nondiscriminatory reasons to permit a reasonable factfinder to conclude
> that the employer's proffered legitimate reasons were not what actually
> motivated its conduct.  The district court must evaluate whether the
> plaintiff has demonstrated such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a reasonable factfinder
> could find them unworthy of credence.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Evidence of

pretext bars summary judgment.

Because, as shown above, Ms. Geter was, in fact, capable of performing the

essential functions of her job with her requested reasonable accommodations, Ms.

Geter has shown that Schneider's reason for terminating her employment rather than

allowing her the benefit of the flexible work arrangement given to Ms. Kitchens is

pretext for discrimination and summary judgment must be denied.

## IV.     Conclusion

Schneider failed to accommodate Ms. Geter and discriminated against her because of her disabilities. Schneider further retaliated against Ms. Geter when it terminated her employment in retaliation for exercising her rights under the ADA. Schneider also discriminated against Ms. Geter because of her race when it denied her the benefit of the flexible work arrangement policy that it provided to her Caucasian comparator and, thereby, violated Title VII and 42 U.S.C. ¶ 1981. As such, summary judgment must be denied.

<div align="right">

**LEGARE, ATTWOOD & WOLFE, LLC**

**<u>Cheryl B. Legare</u>**
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com

</div>

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000

Counsel for Plaintiff

## CERTIFICATE OF COMPLIANCE

The undersigned certify that the foregoing has been prepared in the Times New Roman 14 font, as approved by the Court in LR 5.1B.

**LEGARE ATTWOOD & WOLFE, LLC**

**Cheryl B. Legare**
Cheryl B. Legare

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2021, I electronically filed the foregoing

**Plaintiff's Response in Opposition to Defendant's Motion for Summary**

**Judgment** with the Clerk of the Court using the CM/ECF system which will

automatically send e-mail notification of such filing to the following attorneys of

record:

Melissa Weiss – mweiss@mcguirewoods.com
Meredith Allen – mlallen@mcguirewoods.com
Peter Milianti – pmilianti@mcguirewoods.com


**LEGARE ATTWOOD & WOLFE, LLC**

**Cheryl B. Legare**
Cheryl B. Legare
Georgia Bar No. 038553

27

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

CIERRA GETER,                            )
                                         )     Civil Action File No.
        Plaintiff,                       )     1:20-cv-01148-ODE-JSA
                                         )
v.                                       )     **JURY TRIAL DEMANDED**
                                         )
SCHNEIDER NATIONAL                       )
CARRIERS, INC.                           )
                                         )
        Defendant.                       )

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56 and LR 56.1, NDGa., Plaintiff Cierra Geter submits her Responses and Objections to Defendant's Statement of Undisputed Material Facts, showing the Court as follows:

### Plaintiff's Employment with Schneider

1.      Schneider is a transportation and logistics company that operates as a common and contract motor carrier throughout the United States and Canada. (Declaration of Travis Torrence attached hereto as Exhibit A, (hereinafter "Torrence Decl.") ¶ 3).

**RESPONSE:** Admitted.

2.      Schneider has implemented a Discrimination, Harassment, and

1

Retaliation Prevention Policy, which Plaintiff acknowledged she reviewed, understood, and was able to access via Schneider's intranet. (Deposition of Cierra Geter, excerpts of which are attached hereto as Exhibit B, (hereinafter "Pl's Dep.") 64:24-65:10, 65:25-66:11, Exs. 6-7).

**RESPONSE:** Admitted.

3.     On July 14, 2014, Schneider hired Plaintiff as a full-time Area Planning Manager ("APM") on the third shift at its Fairburn, Georgia location. (Pl's Dep. 42:14-25, Ex. 2).

**RESPONSE:** On July 14, 2014, Schneider hired Ms. Geter as a full-time Dispatch Analyst, a position that was later renamed Area Planning Manager ("APM") on the third shift at its Fairburn, Georgia location. (Geter Dep. 42:8-16.)

4.     The job title of the position at the time Schneider hired Plaintiff was Dispatch Analyst. (Pl's Dep. 41:22-42:7).

**RESPONSE:** Admitted.

5.     The name of Plaintiff's job title changed to APM about a year later, but the job duties remained the same. (Pl's Dep. 42:8-16).

**RESPONSE:** Admitted.

6.     From mid-2018 until the termination of her employment, Plaintiff was scheduled to work on Wednesday, Thursday, Friday and Sunday from 11:00 p.m. to

10:00 a.m. (Pl's Dep. 72:2-13).

**RESPONSE:** Disputed. From January 1, 2019 through April 12, 2019, Ms. Geter was scheduled to work 10 hour shifts on Wednesday, Thursday, and Friday. (Torrence Dep. 43:10-22, 46:15-47:19, 49:13-20, 59:2-22, 63:11-23; Torrence Dep. Exs. 31 & 46; Geter Dep. 129:1-131:13, 132:16-133:23; Geter Dep. Ex. 15; Janssen Dep. 8:2-21, 11:7-12:8, 26:13-27:7, 29:2-31:8; Janssen Dep. Ex. 31; Biskey-Rose Dep. 15:24-16:14.)

7.    During that time period, Plaintiff reported to Team Lead, Travis Torrence.  (Pl's Dep. 69:4-9).

**RESPONSE:** Admitted.

### Plaintiff's Essential Job Functions

8.    Full time work and working in the office are essential job functions of APMs. (Torrence Decl. ¶¶ 6, 9-10).

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) The following are the Essential Functions of the APM job set forth in the position description:

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.

- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.

- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneider's #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.

- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.

- Be technical expert in dispatch utilization tools and analytical planning dashboards.

- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).

- Establish priority and direction for trailer assignment, and assign trailers for dispatch.

- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.

- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).

- Possess an intimate understanding of customers and unique needs.

- Identify root cause of poor service trends and collaborate with

Operations and Customer Service to develop action plans to restore service to desired levels.

- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)

- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.

- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).

- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned, and the scope of the job may change as necessitated by business demands.

- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

(Geter Dep. Ex. 4.)

9.     As an APM, Plaintiff's primary job was to provide support for Schneider drivers. (Pl's Dep. 54:3-6, Ex. 4).

**RESPONSE:** Ms. Geter admits that one of her primary job duties as APM was to provide support for Schneider drivers, not **THE** primary job duty. (Geter Dep. 54:3-6; Geter Dep. Ex. 4.) Supporting drivers was achieved by performing the

following essential functions of the APM job:

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.

- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.

- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneider's #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.

- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.

- Be technical expert in dispatch utilization tools and analytical planning dashboards.

- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).

- Establish priority and direction for trailer assignment, and assign trailers for dispatch.

- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.

- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).

- Possess an intimate understanding of customers and unique

needs.

- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.

- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)

- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.

- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).

- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned, and the scope of the job may change as necessitated by business demands.

- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

(Geter Dep. Ex. 4.)

10.     In providing support to Schneider drivers, APMs, like Plaintiff, would coordinate dispatching drivers with customer loads, assist drivers in gathering their paperwork and load information, take calls and messages from drivers, and resolve any driver issues. (Pl's Dep. 48:21-49:4, 54:7-12; Torrence Decl. ¶¶ 6, 10).

**RESPONSE:**  Ms. Geter admits that the above were some of the duties she performed as an APM.

11.    In order to meet the business needs, during the time period that Schneider employed Plaintiff, APMs were expected to work full-time because Schneider needed to ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day. (Deposition of Marianne Biskey-Rose, excerpts of which are attached hereto as Exhibit C, (hereinafter "Biskey-Rose Dep.") 40:2-11; Torrence Decl. ¶ 6).

**RESPONSE:** Disputed. Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.)

12.    During the time period that Schneider employed Plaintiff, because Schneider's drivers work all hours of the day, the Fairburn location was staffed 24-hours a day, seven days a week by full-time employees so that Schneider could best meet the needs of the drivers. (Biskey-Rose Dep. 12:18-20; Torrence Decl. ¶ 7).

8

**RESPONSE:** Disputed. Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.) APM Sarah Kopf is aware that Schneider employees have been permitted to work reduced hours and remotely. (Kopf Dep. 11:1-20.)

13.     Plaintiff understood that she was expected to work full-time. (Pl's Dep. 40:14-17).

**RESPONSE:** Ms. Geter admits that she understood at the time she was interviewed for the Dispatch Analyst position that it was a full-time position. Ms. Geter disputes that the APM position can only be performed full-time. (*See* Position Description – Geter Dep. Ex. 4 and Schneider's Flexible Work Arrangement Policy – Biskey-Rose Dep. Ex. 48.) The position description for Area Planning Managers does not even mention full-time work. (Geter Dep. Ex. 4.) And Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose

Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.)

14.    Mr. Torrence did not have any direct reports that were permitted to work a part-time schedule. (Deposition of Travis Torrence, excerpts of which are attached hereto as Exhibit D (hereinafter "Torrence Dep." 64:24-65:3).

**RESPONSE:** Disputed. Ms. Geter worked reduced hours as an accommodation for her ADA-covered disabilities from January 1, 2019 through her termination on April 12, 2019. (Torrence Dep. 43:10-22, 46:15-47:19, 49:13-50:5, 59:2-22, 60:14-61:3, 63:11-23; Torrence Dep. Exs. 31, 32 & 46; Geter Dep. 129:1-131:13, 132:16-133:23, 139:9-143:5, 144:2-24; Geter Dep. Exs. 15 & 16; Janssen Dep. 8:2-21, 11:7-12:8, 26:13-27:7, 27:24-29:1, 29:2-31:8, 31:24-33:3; Janssen Dep. Exs. 16, 31 & 32; Biskey-Rose Dep. 15:24-16:14.)

15.    In fact, during the entirety of Plaintiff's employment, Schneider did not employ any part-time APMs at the Fairburn location. (Pl's Dep. 83:6-10; Deposition of Tiffany Kitchens, excerpts of which are attached hereto as Exhibit E, (hereinafter "Kitchens Dep.") 28:5-10; Torrence Decl. ¶ 8).

**RESPONSE:** Disputed. Ms. Geter worked reduced hours as an

accommodation for her ADA-covered disabilities from January 1, 2019 through her termination on April 12, 2019. (Torrence Dep. 43:10-22, 46:15-47:19, 49:13-50:5, 59:2-22, 60:14-61:3, 63:11-23; Torrence Dep. Exs. 31, 32 & 46; Geter Dep. 129:1-131:13, 132:16-133:23, 139:9-143:5, 144:2-24; Geter Dep. Exs. 15 & 16; Janssen Dep. 8:2-21, 11:7-12:8, 26:13-27:7, 27:24-29:1, 29:2-31:8, 31:24-33:3; Janssen Dep. Exs. 16, 31 & 32; Biskey-Rose Dep. 15:24-16:14.)

16.    Plaintiff also understood that certain tasks necessary to assist drivers required her physical presence in the office. (Pl's Dep. 63:7-11).

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) Moreover, since Ms. Geter's termination, in March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9;

Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The duties APMs previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.) The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.) In addition, employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) To accommodate the change in the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1.)

17.    For example, Plaintiff needed to be in the office to interact with drivers who came into the office. (Pl's Dep. 60:6-15.)

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.)

Moreover, since Ms. Geter's termination, in March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The duties APMs previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.) The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.) In addition, employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) To accommodate the change in the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8,

27:16-29:1.)

18.    Plaintiff admits that she frequently interacted with drivers face-to-face, and that this interaction was necessary in order to develop relationships with drivers and better assist them. (Pl's Dep. 48:21-49:4, 55:7-56:10, 59:13-24, Ex. 4; Torrence Decl. ¶ 9).

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) In fact, only 100 to 110 of the 2,250 drivers Ms. Geter supported were based out of the Atlanta hub. (Geter Dep. 54:13-55:7.) Moreover, since Ms. Geter's termination, in March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The duties APMs previously performed from Fairburn are being performed remotely by

the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.) The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.) In addition, employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) To accommodate the change in the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1.)

19.    Plaintiff further understood that Schneider expected Plaintiff to have face-to-face interaction with drivers and that Schneider deemed that an important function of her job.  (Pl's Dep. 59:13-24).

**RESPONSE:**   Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) In fact, only 100 to 110 of the 2,250 drivers Ms. Geter supported were based out of the

Atlanta hub. (Geter Dep. 54:13-55:7.) Moreover, since Ms. Geter's termination, in

March or April 2020, Schneider relocated all its Area Planning Managers to the

corporate headquarters in Green Bay, Wisconsin to centralize resources and because

the "collaboration that's needed between customer service is [in Green Bay], as well

as a lot of the network leadership is [in Green Bay]. So to be able to streamline and

band our dispatching system as well as our team, we needed to have it centralized."

(Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen

Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The

duties APMs previously performed from Fairburn are being performed remotely by

the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.)

The APMs in Green Bay work remotely with the southeast hub and perform dispatch

for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.)

    20.    Plaintiff admitted that the one-on-one interactions with drivers could

only be performed in the office. (Pl's Dep. 60:6-15.)

**RESPONSE:** In response to the question: "Was there any – is there any – any

position – any job duty that you held – any job duty that you performed as an Area

Planning Manager that you believe could only be performed in the office?" Ms.

Geter said, "The only thing and I thought that could be performed or think can is the

driver interaction, like the one-on-one with the drivers and management team. You

know, human to human interaction."

21.    APMs also needed to work in the office to assist drivers in locating available tractors, to retrieve keys for drivers that were located in a secure lock box, and to print off paperwork for drivers. (Pl's Dep. 60:6-62:4, Exs. 4, 5; Deposition of Sarah Kopf, excerpts of which are attached hereto as Exhibit F, (hereinafter "Kopf Dep.") 19:19-20:18; Torrence Decl. ¶ 10).

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) APMs locate trailers throughout the southeast for drivers at the various hubs using GPS software maintained by Schneider. (Geter Decl. ¶ 14; Williams Decl. ¶ 12.) Pre-COVID, in addition to the Area Planning Managers, Driver Team Leads, and Intermodal Operating Specialists could and would also assist drivers with getting keys if they needed a loaner and provide drivers access to the printer. (Kopf Dep. 24:24-26:2.) In addition, to accommodate the change in the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors (something that could have been done pre-COVID). (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1.)

22.     Plaintiff further understood that having the ability to work in a fast-paced, high pressure environment was an essential function of her position. (Pl's Dep. 57:5-16, Ex. 4).

**RESPONSE:** Admitted.

23.     Because there were certain essential tasks that needed to be completed in the office, APMs under Mr. Torrence's supervision were not regularly permitted to work remotely. (Torrence Decl. ¶ 11).

**RESPONSE:** Disputed. Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.) The entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed. (Geter Dep. 208:18-209:7, 209:19-210:14; Kitchens Dep. 17:1-11; Kopf Dep. 12:5-21.) In addition, during the pandemic, employees other than drivers employed by Schneider in Fairburn, including Mr. Torrence, worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then

returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) Audreianna Williams, a third shift APM who reported to Mr. Torrence, was regularly permitted to work remotely through the latter part of her pregnancy. (Williams Decl. ¶ 10.)

24.     Rather, employees at the Fairburn office location were occasionally permitted to work from home for one-off situations, such as due to illness or to take care of a sick child. (Biskey-Rose Dep. 32:8-20; Torrence Dep. 55:16-21).

**RESPONSE:** Disputed. Tiffany Kitchens (Caucasian), who was an APM at all times relevant, was permitted to work remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.) Audreianna Williams, a third shift APM who reported to Mr. Torrence, was regularly permitted to work remotely through the latter part of her pregnancy. (Williams Decl. ¶ 10.) Moreover, employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-

Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) Beginning in spring of 2018, Sarah Kopf (Caucasian), who reported to Mr. Torrence, was also permitted to work from home one or two days a month, worked from home during COVID, and has continued to work from home from time-to-time post-COVID. (Geter Dep. 204:20-205:23, 206:5-208:5, 218:9-23; Torrence Dep. 56:24-57:6; Kopf Dep. 11:7-11, 16:3-8.)

25.    Sarah Kopf, an APM on the second shift, was permitted to work from home when her power went out in her home or when she had a family emergency. (Kopf Dep. 6:15-19, 12:5-19).

**RESPONSE:** Admitted that beginning in spring of 2018, Ms. Kopf, who reported to Mr. Torrence, was also permitted to work from home one or two days a month, worked from home during COVID, and has continued to work from home from time-to-time post-COVID. (Geter Dep. 204:20-205:23, 206:5-208:5, 218:9-23; Torrence Dep. 56:24-57:6; Kopf Dep. 11:7-11, 16:3-8.)

26.    During the time period of March 5, 2018 through March 8, 2020, Ms. Kopf only worked from home on a few occasions and never consistently worked from home. (Kopf Dep. 6:7-24, 21:18-22:6).

**RESPONSE:** Disputed. Ms. Kopf told Ms. Geter that Mr. Torrence permitted her to work from home one or two times a month. (Geter Dep. 204:20-205:23, 206:5-208:5, 218:9-23.)

27.     Ms. Kopf never worked a part-time schedule. (Kopf Dep. 21:15-17).

**RESPONSE:** Admitted.

**Plaintiff Frequently Worked Alone as an APM on the Third Shift**

28.     The third shift APM role was staffed differently from the first and second shifts. Whereas the first shift was normally staffed with four to five APMs, and the second shift was staffed with two to three APMs, the third shift only had one or two APMs. (Pl's Dep. 100:16-19).

**RESPONSE:** Disputed. From mid-2018 through her termination, there were four APMs assigned to third shift. (Geter Dep. 70:19-71:22.)

29.     As a result, Plaintiff frequently worked alone on the third shift, especially on Sundays. (Pl's Dep. 75:14-17, 100:16-23, 142:20-143:1, 146:6-8; Torrence Decl. ¶ 5).

**RESPONSE:** Disputed. Ms. Geter worked alone once per week on Thursdays. (Geter Dep. 75:14-17.)

30.     Additionally, unlike first and second shift APMs, third shift APMs did not have additional team members to assist in answering messages or phone calls, dispatching drivers, or dealing with driver issues. (Pl's Dep. 100:18-101:6).

**RESPONSE:** Admitted that no Driver Team Leads or Intermodal Operations Specialists were assigned to third shift.

31.     Working in the office was especially important on the third shift, when APMs often worked alone. (Torrence Decl. ¶ 10).

**RESPONSE:** Disputed. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.) Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.) Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.) The entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed. (Geter Dep. 208:18-209:7, 209:19-210:14; Kitchens Dep. 17:1-11; Kopf Dep. 12:5-21.) Moreover, since Ms. Geter's termination, in March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be

able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.) The duties APMs previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.) The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.) In addition, during the pandemic, employees other than drivers employed by Schneider in Fairburn, including Mr. Torrence, worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.) Audreianna Williams, who reported to Mr. Torrence on third shift, was regularly permitted to work remotely through the latter part of her pregnancy. (Williams Decl. ¶ 10.)

**Plaintiff Takes FMLA Leave**

32.    In October 2018, Plaintiff was diagnosed with post-traumatic stress disorder and panic disorder by Dr. Cassandra Wanzo, Plaintiff's healthcare provider. (Pl's Dep. 86:20-22, 87:5-8, 88:17-20).

**RESPONSE:** Admitted.

33.     On October 9, 2018, Plaintiff began a leave of absence under the FMLA for her own serious health condition. (Pl's Dep. 121:17-19, Ex. 11).

**RESPONSE:** Admitted.

34.     Prior to her FMLA leave, Plaintiff had not communicated with anyone about her diagnosis of post-traumatic stress disorder and panic disorder. (Pl's Dep. 104:15-19).

**RESPONSE:** Admitted.

35.     Schneider approved Plaintiff's FMLA leave from October 9, 2018 to December 31, 2018.  (Pl's Dep. 121:7-25, 125:16-126:5, Exs. 11, 13)

**RESPONSE:** Admitted.

36.     Plaintiff exhausted her twelve weeks of FMLA leave entitlement as of December 31, 2018.  (Pl's Dep. 126:3-5).

**RESPONSE:** Admitted.

37.     Plaintiff was expected to return to full-time work on January 2, 2019. (Pl's Dep. 125:1-126:5, Ex. 13).

**RESPONSE:** Ms. Geter admits that she was initially expected to return to work full-time on January 2, 2019, but later requested reasonable accommodations.

38.     During the time that Plaintiff was out on FMLA leave, Plaintiff's work was performed by other APMs and Mr. Torrence. (Torrence Dep. 67:20-23).

**RESPONSE:** Admitted.

39.     To ensure coverage while Plaintiff was out on FMLA leave, Mr. Torrence worked the overnight shift on Sundays, in addition to his regular duties. (Torrence Dep. 67:24-68:1).

**RESPONSE:** Disputed. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶¶ 8, 9.)

40.     Mr. Torrence worked five days per week as Operations Team Leader and approximately 50 hours per week. (Torrence Decl. ¶ 4).

**RESPONSE:** Admitted that Mr. Torrance so states.

**Plaintiff's Initial Accommodation Request**

41.     Prior to the expiration of her FMLA leave, Plaintiff submitted a return to work form dated December 15, 2018 and completed by Dr. Wanzo. (Pl's Dep. 126:14-25, Ex. 14.).

**RESPONSE:** Admitted.

42.     Dr. Wanzo stated that Plaintiff could return to work on January 2, 2019, but with the restriction of working three days a week, ten-hour days. (Pl's Dep. 127:13-17, Ex. 14).

**RESPONSE:** Admitted.

43.    Dr. Wanzo indicated that Plaintiff could return to work without restrictions effective February 14, 2019. (Pl's Dep. Ex. 14).

**RESPONSE:** Admitted.

44.    Schneider agreed to accommodate Plaintiff's request. (Pl's Dep. 133:4-23, Ex. 15).

**RESPONSE:** Admitted.

45.    In addition to only being able to work three days a week, Plaintiff was limited in the days that she could work. (Pl's Dep. 134:24-135:22).

**RESPONSE:** Admitted.

46.    Specifically, Plaintiff could not work her Sunday shift (11:00 p.m. – 10:00 a.m.) because she needed to attend counseling sessions on Monday mornings. (Pl's Dep. 72:2-13, 134:24-135:22).

**RESPONSE:** Admitted.

47.    Mr. Torrence agreed to accommodate Plaintiff's request to not work Sundays. (Pl's Dep. 134:24-135:24).

**RESPONSE:** Admitted.

48.    When Plaintiff returned to work on January 2, 2019, she worked Wednesdays, Thursdays, and Fridays. (Pl's Dep. 126:6-8, 135:23-136:3).

**RESPONSE:** Admitted.

49.    In order to accommodate Plaintiff's restriction of part-time work, Mr. Torrence worked Plaintiff's Sunday overnight shift, in addition to his regular duties. (Torrence Dep. 51:24-52:9, 52:23-53:1, 67:3-7; Torrence Decl. ¶ 12).

**RESPONSE:** Disputed. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶¶ 8, 9.)

50.    Mr. Torrence typically started working the overnight shift at 11 p.m. on Sunday and ending at 7 a.m. on Monday. Mr. Torrence would then come back to work on Monday at 1 p.m. and work to 9 p.m. to perform his regular duties as an Operations Team Leader. During the time he covered Plaintiff's Sunday overnight shift, he worked on average 55-60 hours a week.  (Torrence Decl. ¶ 14).

**RESPONSE:** Admitted that Mr. Torrence so states. Disputed that Mr. Torrence covered the Sunday shift on more than a handful of occasions. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶¶ 8, 9.)

51.    Plaintiff acknowledged that her inability to work on Sundays impacted the third shift and their workload. (Pl's Dep. 137:9-12).

**RESPONSE:** Ms. Geter admitted that, "Any time no one is there everybody does twice as much work, no matter whether it's Sunday through Saturday. Whoever

is on that third shift if they're by their self, they're taking the workload of everybody. So yes, I do concur with that."

**Plaintiff's Accommodation Extensions and Request to Work from Home**

52.    Plaintiff did not return to full-time work on February 14, 2019.  (Pl's Dep. 145:18-22).

**RESPONSE:** Ms. Geter admits that she continued to work thirty hours per week after February 14, 2019.

53.    On January 21, 2019, Plaintiff submitted a medical note from Dr. Wanzo requesting an extension of Plaintiff's part-time work schedule of ten hours a day, three days per week, until March 20, 2019. (Pl's Dep. 139:9-140:3, Ex. 16).

**RESPONSE:** Admitted.

54.    Schneider agreed to accommodate Plaintiff's request for an extension of her part-time work schedule. (Pl's Dep. 176:10-17, Ex. 22).

**RESPONSE:** Admitted.

55.    During this time period, Mr. Torrence continued to work Plaintiff's Sunday overnight shift in the office, in addition to his regular duties. (Torrence Decl. ¶¶ 12-13).

**RESPONSE:** Admitted that Mr. Torrence so states. Disputed that Mr. Torrence covered the Sunday shift on more than a handful of occasions. (Geter Dep.

136:10-139:4, 181:23-183:17; Williams Decl. ¶¶ 8, 9.)

56.     Plaintiff did not return to work full-time on March 20, 2019. (Pl's Dep. 150:13-15).

**RESPONSE:** Ms. Geter admits that she continued to work thirty hours per week after March 20, 2019.

57.     On March 9, 2019, Dr. Wanzo submitted medical documentation to Schneider seeking another extension of Plaintiff's part-time work schedule of three days per week, ten hours per day, until April 30, 2019. (Pl's Dep. 150:16-151:1, 151:23-152:1, Ex. 17).

**RESPONSE:** Admitted.

58.     Plaintiff also sought an accommodation of working from home on Thursdays and Fridays, and anytime Plaintiff was scheduled to work alone.  (Pl's Dep. 154:3-14; Ex. 17).

**RESPONSE:** Disputed. Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Geter Dep. 155:9-14, 160:21-161:5, 163:2-22, 164:18-165:5.)

59.     On March 18, 2019, Anissa Gauthier, a Leave Analyst, emailed Dr. Wanzo requesting additional information about Plaintiff's requested

accommodation. (Declaration of Christine Schneider, attached hereto as Exhibit G (hereinafter "Schneider Decl.") ¶ 10, Ex. 1).

**RESPONSE:** Admitted.

60.    On March 30, 2019, Dr. Wanzo submitted additional medical documentation to Schneider extending Plaintiff's restrictions to June 5, 2019. (Pl's Dep. 159:10-161:17, Ex. 19).

**RESPONSE:** Admitted.

61.    Dr. Wanzo stated that Plaintiff "can only work 3 days per week Wed/Thurs/Fridays: Working from home 2 days/week (10 hour days)." (Pl's Dep. 160:18-25, Ex. 19).

**RESPONSE:** Admitted. However, Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Geter Dep. 155:9-14, 160:21-161:5, 163:2-22, 164:18-165:5.)

62.    On April 2, 2019, Ms. Gauthier emailed Dr. Wanzo and Plaintiff a copy of a letter that contained additional questions that needed to be answered to determine if Schneider could accommodate Plaintiff's restrictions.  (Schneider Decl. ¶ 10, Ex. 1).

**RESPONSE:** Admitted.

**Schneider's Efforts to Accommodate Plaintiff**

63.     After learning of Plaintiff's request to extend her part-time schedule until June 5, 2019, Mr. Torrence and Ms. Biskey-Rose determined that based on Schneider's business needs and staffing levels, they could not continue to accommodate Plaintiff's request to eliminate two essential job functions – full-time work and working in the office. (Biskey-Rose Dep. 36:14-22; Torrence Decl. ¶¶ 15-16).

**RESPONSE:** Disputed. Full-time work and working from home were not essential functions of the APM job. (Geter Dep. Ex. 4; Geter Dep. 54:13-55:7, 58:2-59:12, 208:18-209:7, 209:19-210:14; Geter Decl. ¶¶ 14, 15; Williams Decl. ¶¶ 11, 12, 13; Kopf Dep. 11:1-20, 12:5-21, 24:24-26:2; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48; Janssen Dep. 15:17-16:7; Kitchens Dep. 17:1-11.)

64.     By April 12, 2019, Mr. Torrence had been working Plaintiff's Sunday overnight shift for approximately six months and he could no longer absorb Plaintiff's job duties for an additional two months. Working the additional Sunday overnight shift was physically exhausting for Mr. Torrence and it negatively impacted his ability to complete his Operations Team Leader tasks as well as his health. (Torrence Decl. ¶ 16).

**RESPONSE:** Disputed. When Ms. Geter worked her reduced hours schedule,

Desmond Seymour and Audrianna Williams covered her Sunday shifts and, occasionally, Mr. Torrence would sub in on the shift. (Geter Dep. 136:10-139:4, 181:23-183:17.) Mr. Torrence covered the Sunday shift on only a handful of occasions. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶¶ 8, 9.)

65. Schneider explored other potential accommodations for Plaintiff. On April 2, 2019, Schneider sent Plaintiff a letter requesting that Dr. Wanzo provide additional information to Schneider by no later than April 8, 2019, so that it could explore other potential accommodations. (Pl's Dep. 172:9-22, 183:18-186:9, Exs. 20, 23).

**RESPONSE:** Ms. Geter admits that Schneider sent a letter to Dr. Wanzo seeking more information regarding her request for reasonable accommodation on April 2, 2019. Ms. Geter has no knowledge whether Schneider followed up with Dr. Wanzo regarding the paperwork provided to Dr. Wanzo on April 2, 2019, and Schneider never told Ms. Geter that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo. (Geter Decl. ¶ 18.) Had Schneider asked Ms. Geter to follow up with Dr. Wanzo regarding the missing paperwork, she would have done so. (Geter Decl. ¶ 18.)

66. In the letter, Schneider asked Dr. Wanzo: "[Plaintiff] is currently working on Wednesday, Thursday and Friday. Is there a different day that she is

available to work if she can work 4 days?"  (Pl's Dep. Ex. 23).

**RESPONSE:** Admitted.

67.    Schneider also asked Dr. Wanzo: "Can [Plaintiff] work Monday-Friday 8 hour schedule?"(Pl's Dep. Ex. 23).

**RESPONSE:** Admitted.

68.    Plaintiff provided this letter to Dr. Wanzo. (Pl's Dep. 172:20-22, 186:6-9).

**RESPONSE:** Admitted. As did Schneider.

69.    Dr. Wanzo did not respond to Schneider's April 2, 2019 letter until April 27, 2019.  (Pl's Dep. Ex. 23).

**RESPONSE:** Admitted.

70.    In Dr. Wanzo's April 27, 2019 response to Schneider's letter, Dr. Wanzo stated that: "[Plaintiff] is unable to work a Mon-Friday schedule, this was never a part of her schedule (it was Wed, Thurs, Fri and Sunday). Her current schedule is Wed-Fri." (Pl's Dep. Ex. 23).

**RESPONSE:** Admitted.

71.    Dr. Wanzo also wrote: "[Plaintiff] is unable to work well in a fast-paced, high pressure environment." Plaintiff agreed with this assessment. (Pl's Dep. 187:12-188:5, Ex. 23).

**RESPONSE:** Admitted but not material or relevant. As acknowledged by Ms. Geter, Ms. Geter had trouble working in a fast-paced high-pressure environment throughout her employment with Schneider, it did not begin with her need for accommodations in 2018 and 2019. (Geter Dep. 188:2-20; Geter Decl. ¶ 22.) Despite her difficulties working in a fast-paced high-pressure environment, Ms. Geter performed well at her job throughout her employment with Schneider. (Geter Decl. ¶ 23.) Other than one minor incident before her medical leave, Ms. Geter did not have performance issues while employed by Schneider. (Geter Decl. ¶ 24.)

72.   Ms. Biskey-Rose also asked Plaintiff if Plaintiff could change her Monday morning counseling session (which prohibited Plaintiff from working her Sunday overnight shift).  (Biskey-Rose Dep. 37:8-19; Pl's Dep. 134:24-135:22).

**RESPONSE:** Admitted.

73.   Plaintiff indicated this was not possible as the other available counseling session coincided with another doctor appointment. (Biskey-Rose Dep. 37:8-19).

**RESPONSE:** Admitted.

74.   Schneider also considered hiring a temporary employee to cover Plaintiff's Sunday night shift; however, it was not a viable option because the temporary employee would be working the overnight shift by him or herself without

the knowledge and background needed to resolve issues that arose. (Biskey-Rose Dep. 40:14-25; Deposition of Ashley Janssen, excerpts of which are attached hereto as Exhibit H, (hereinafter "Janssen Dep") 40:21-41:18).

**RESPONSE:** Disputed. Ms. Geter did not work alone on Sunday nights. (Geter Decl. ¶ __; Torrence Dep. 36:16-37:3, 46:14-17.)

75.    Schneider considered reassigning Plaintiff to an open and available position for which she was qualified, but the Fairburn location only had full-time positions. (Torrence Decl. ¶ 17).

**RESPONSE:** Disputed. Ms. Geter was scheduled to return to work full-time June 5, 2019 and was terminated anyway. (Geter Decl. ¶¶ 5, 6; Torrence Dep. 53:12-16, 54:9-55:10, 59:23-60:2; Janssen Dep. 25:12-16.) Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Torrence Dep. 50:15-51:16.)

76.    After determining that Plaintiff's accommodation requests were not reasonable and that there were no reasonable accommodations that would have enabled Plaintiff to perform the essential functions of her position, Schneider decided to terminate Plaintiff's employment, effective April 12, 2019.  (Torrence Decl. ¶ 18).

**RESPONSE:** Disputed. Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Torrence Dep. 50:15-51:16.) Nobody from Schneider discussed with Ms. Geter other possible accommodations – such as switching shifts or days off or taking a short leave of absence through June 5, 2019 – before deciding to no longer accommodate her. (Geter Decl. ¶ 19; Torrence Dep. 53:12-16, 54:9-55:10, 59:23-60:2; Janssen Dep. 25:12-16.) During Ms. Geter's employment, Schneider used temporary employees to fill in as APMs, and Ms. Geter often trained those employees. (Geter Dep. 77:16-25, 78:8-19, 131:5-24, 132:6-15, 138:22-25; Geter Decl. ¶ 11; Kitchens Dep. 17:12-18:12; Torrence Dep. 68:2-69:19; Janssen Dep. 7:18-8:1, 42:21-25; Biskey-Rose Dep. 29:15-31:1.) No efforts were made to bring in a temporary employee to cover for Ms. Geter during her medical leave or during the time she needed a reasonable accommodation. (Janssen Dep. 43:1-14; Biskey-Rose Dep. 36:6-41:20.) Nobody considered placing Ms. Geter on leave through June 5, 2019 as an alternative accommodation, and nobody offered that alternative to Ms. Geter. (Biskey-Rose Dep. 36:6-41:20; Geter Decl. ¶¶ 19, 21.) Schneider has produced no evidence in this case that it performed an undue burden analysis in determining whether to accommodate Ms. Geter. (Torrence Dep. 66:2-69:19; Janssen Dep. 14:6-15:4; Biskey-Rose Dep. 36:6-41:20.)

77.     As of June 5, 2019, Plaintiff still was not able to return to full-time work. (Pl's Dep. 193:9-13).

**RESPONSE:** Disputed. Had Ms. Geter not been terminated, which caused a setback in Ms. Geter's mental health treatment, there was a 95% chance Ms. Geter would have returned to work full-time beginning June 5, 2019. (Geter Dep. 196:6-16, 196:21-24, 222:20-21; Geter Decl. ¶ 25; Geter Dep. Ex. 19.)

78.     On June 26, 2019, Dr. Wanzo completed an Attending Physician's Statement – Progress Report stating that Plaintiff continued to only be able to work three days per week, ten hour days, until September 23, 2019.  (Pl's Dep. 193:19-194:5, Ex. 24).

**RESPONSE:** Admitted that following Schneider's termination of Ms. Geter's employment, Ms. Geter suffered a setback in her recovery as a result of the termination. (Geter Dep. 196:6-16, 196:21-24, 222:20-21; Geter Decl. ¶ 25.)

### Plaintiff Has Not Identified Any Similarly-Situated Employees Treated More Favorably Than Her

79.     Plaintiff asserts that Tiffany Kitchens received preferential treatment because Schneider granted Ms. Kitchens' 2018 request for intermittent FMLA leave to care for her ill mother, yet denied Plaintiff's ADA accommodation requests.  (Pl's Dep. 197:6-13, 200:1-20).

**RESPONSE:** Admitted. Answering further, unlike Ms. Geter, who was

37

terminated rather than being permitted to work reduced hours through June 5, 2019 and work one day remotely, Ms. Kitchens (Caucasian), who was an APM at all relevant times, was permitted to work remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

80.     Plaintiff also asserts that Schneider discriminated against her due to her race because it accommodated Ms. Kitchens more favorably than Plaintiff. (Pl's Dep. 216:12-21).

**RESPONSE:** Admitted. Unlike Ms. Geter, who was terminated rather than being permitted to work reduced hours through June 5, 2019 and work one day remotely, Ms. Kitchens (Caucasian), who was an APM at all relevant times, was permitted to work remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

81.     Ms. Kitchens, a white APM, reported to Rodney Dunn and was assigned to the first shift. (Kitchens Dep. 8:18-9:7, 10:5-10, Torrence Dep. 20:6-8).

**RESPONSE:** Ms. Geter objects to Fact No. 81 because it is not material.  LR

56.1(B)(2)(a)(2)(iii), NDGa. Subject to this objection, admitted that Ms. Kitchens reported to Mr. Dunn and Ms. Biskey-Rose and was subject to the same Flexible Work Arrangement Policy as Ms. Geter.

82.     As an APM, Ms. Kitchens worked Mondays through Fridays, generally from 7 a.m. to 4 p.m. (Kitchens Dep. 8:18-9:7)

**RESPONSE:** Ms. Geter objects to Fact No. 82 because it is not material.  LR 56.1(B)(2)(a)(2)(iii), NDGa. Subject to this objection, admitted.

83.     Ms. Kitchens always worked with several other APMs and never worked alone. (Kitchens Dep. 8:24-9:5, 27:22-28:4).

**RESPONSE:** Ms. Geter objects to Fact No. 83 because Defendant's citations do not support Fact No. 83 as written. LR 56.1(B)(2)(a)(2)(iii), NDGa. Ms. Geter also objects to Fact No. 83 because it is not material. LR 56.1(B)(2)(a)(2)(iii), NDGa.

84.     In approximately October 2018, Ms. Kitchens requested and was approved for intermittent FMLA leave to care for her ill mother who had suffered a stroke.  (Kitchens Dep. 13:15-16:25).

**RESPONSE:** Admitted.

85.     Ms. Kitchens, however, never actually used any intermittent FMLA leave to care for her mother.  (Kitchens Dep. 15:17-16:25).

**RESPONSE:** Admitted.

86.     Instead, Ms. Kitchens utilized vacation time any time she would have to be out of work. (Kitchens Dep. 16:16-22).

**RESPONSE:** Admitted.

87.     During the 2018 through 2019 time period, Ms. Kitchens worked at least five days per week.  (Kitchens Dep. 29:1-4).

**RESPONSE:** Admitted.

88.     The woman hired to replace Plaintiff's position on the third shift was African American. (Pl's Dep. 210:21-211:11).

**RESPONSE:** Ms. Geter objects to Fact No. 88 because it is not material. LR 56.1(B)(2)(a)(2)(iii), NDGa.

**LEGARE, ATTWOOD & WOLFE, LLC**

<u>**Cheryl B. Legare**</u>
Georgia Bar No. 038553
cblegare@law-llc.com

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Tel: (470) 823-4000
Fax: (470) 201-1212

Counsel for Plaintiff Cierra Geter

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-ODE-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I certify that on July 12, 2021, I electronically filed the foregoing **Plaintiff's**

**Responses and Objections to Defendant's Statement of Undisputed Material**

**Facts** with the Clerk of Court using the CM/ECF system, which will automatically

send e-mail notification of such filing to the following attorneys of record:

Peter Milianti – pmilianti@mcguirewoods.com
Melissa Weiss – mweiss@mcguirewoods.com
Meredith Allen – mlallen@mcguirewoods.com

**LEGARE ATTWOOD & WOLFE, LLC**

**Cheryl B. Legare**
Cheryl B. Legare
Georgia Bar No. 038553

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000

41

Facsimile: (470) 201-1212

Counsel for Plaintiff Cierra Geter

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS AS TO
WHICH THERE EXIST GENUINE ISSUES TO BE TRIED**</u>

Pursuant to LR 56.1(B)(2), NDGa., Plaintiff Cierra Geter submits this

Statement of Disputed Material Facts as to Which There Exist Genuine Issues to Be

Tried.

**I.    Ms. Geter's Employment with Schneider**

1.    Ms. Geter began employment with Schneider National Carriers, Inc. in

July 2014 as a Dispatch Analyst. (Deposition of Cierra Geter ("Geter Dep.") 38:3-

40:4, 41:8-42:7; Geter Dep. Ex. 2.)

2.    The Dispatch Analyst position title later changed to Area Planning

Manager ("APM"), but the job duties remained the same. (Geter Dep. 42:8-16.)

3.    During the relevant time frame, Ms. Geter reported to Team Lead

Travis Torrence, who reported to Operations Manager Doug Horton, who reported to Director of Operations Marianne Biskey-Rose. (Deposition of Travis Torrence ("Torrence Dep.") Torrence Dep. 11:19-12:14, 13:2-10; Deposition of Marianne Biskey-Rose ("Biskey-Rose Dep.") 8:1-9:7; Geter Dep. 69:4-9, 69:25-70:18.)

4.     Mr. Torrence has been employed by Schneider since 2012, worked his way up, and is currently employed as Operations Manager. (Torrence Dep. 9:9-17.)

5.     When Mr. Torrence was a Team Lead, he supervised second and third shift APMs and Driver Team Leaders ("DTL"). (Torrence Dep. 10:2-8.)

6.     When he was Team Lead, Mr. Torrence worked at least part of third shift weekly, and sometimes worked remotely. (Torrence Dep. 56:9-22.)

7.     Mr. Torrence spent more time assisting second shift than third shift. (*See* Declaration of Cierra Geter ("Geter Decl.") ¶ 9 – attached hereto as Ex. 1; Declaration of Audreianna Williams (Williams Decl.") ¶ 5 – attached hereto as Ex. 2.)

8.     From 2016 through her termination, as an APM, Ms. Geter was assigned to the Southeast Intermodal Division that was accountable for the six southeast hubs, including Atlanta, Charlotte, Miami, Orlando (Winter Haven), Jacksonville, and Savannah. (Geter Dep. 52:18-53:10; Torrence Dep. 12:15-24.)

9.     Originally, Ms. Geter worked third shift from 11:00 pm to 7:00 am

Wednesday through Sunday at the Fairburn location. (Geter Dep. 42:17-43:11.)

10.    At some point, Ms. Geter's hours changed to 11:00 pm to 10:00 am, Wednesday through Friday and Sunday. (Geter Decl. ¶ 4; Geter Dep. 72:1-12; Torrence Dep. 44:25-45:14.)

11.    Before taking medical leave in fall 2018, Ms. Geter worked with Audreianna Williams and Desmond Seymour on Sundays, Desmond Seymour on Wednesdays, and Audreianna Williams on Fridays. (Geter Decl. ¶ 5; Williams Decl. ¶ 4.)

12.    Before Ms. Geter went on medical leave in the fall of 2018, Desmond Seymour worked third shift Saturdays through Wednesdays. (Geter Decl. ¶ 7.)

13.    Before Ms. Geter went on medical leave in the fall of 2018, Audreianna Williams worked third shift Fridays through Tuesdays. (Geter Decl. ¶ 8; Williams Decl. ¶ 3.)

14.    Before taking medical leave in the fall of 2018, Ms. Geter worked alone on Thursday nights. (Geter Decl. ¶ 6; Geter Dep. 75:14-17.)

## II.    Essential Functions of the APM Job

15.    During Ms. Geter's employment, Schneider had a job description for the APM position which set forth the essential functions of the APM job. (Deposition of Ashley Janssen ("Janssen Dep.") 22:6-22; Janssen Dep. Ex. 4; Torrence Dep.

32:2-35:23; Torrence Dep. Ex. 4.)

16.    The following are the Essential Functions of the APM job set forth in

the position description:

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.

- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.

- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneider's #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.

- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.

- Be technical expert in dispatch utilization tools and analytical planning dashboards.

- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).

- Establish priority and direction for trailer assignment, and assign trailers for dispatch.

- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.

4

- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).

- Possess an intimate understanding of customers and unique needs.

- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.

- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)

- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.

- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).

- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.

- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

(Geter Dep. Ex. 4.)

17.   The job duties set forth in the Schneider-created job description accurately reflect the APM job duties. (Geter Dep. 51:5-52:17, 53:11-54:2; Geter

Dep. Ex. 4.)

18.    As an APM, Ms. Geter supported over-the-road drivers that worked from the hubs in Atlanta, Charlotte, Miami, Orlando, Jacksonville, and Savannah by taking calls and messages from drivers and assisting them in resolving issues that might arise. (Geter Dep. 54:3-12.)

19.    The only drivers Ms. Geter saw face-to-face from time-to-time were those based out of Atlanta – from 100 to 110 of the 2,250 drivers she assisted. (Geter Dep. 54:13-55:7; Williams Decl. ¶ 11.)

20.    As an APM, it was not necessary for Ms. Geter to be in the office to support drivers, because she assisted drivers initially as far away as Canada and, after 2016, throughout the southeast. (Geter Dep. 58:2-59:12; Williams Decl. ¶ 11.)

21.    APMs located trailers throughout the southeast for drivers at the various hubs using GPS software maintained by Schneider. (Geter Decl. ¶ 14; Williams Decl. ¶ 12.)

22.    For all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access. (Geter Decl. ¶ 14; Williams Decl. ¶ 12.)

23.    For drivers outside Atlanta, Ms. Geter printed driver paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had

6

access and she could do the same for Atlanta drivers when she worked from home. (Geter Decl. ¶ 15; Williams Decl. ¶ 13.)

24.　Pre-COVID, in addition to the APMs, DTLs and Intermodal Operating Specialists could and would also assist drivers with getting keys if they needed a loaner and provide drivers access to the printer. (Deposition of Sarah Kopf ("Kopf Dep.") 24:24-26:2.)

25.　From mid-2018 through Ms. Geter's termination, there were 4 APMs assigned to third shift. (Geter Dep. 70:19-71:22.)

### III.　Schneider's Flexible Work Policies

26.　Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.)

27.　Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.)

28.　Ms. Biskey-Rose and Mr. Torrence understand the policy to be that Schneider allows its employees to work remotely "on a short-term basis" when something pops up. (Torrence Dep. 55:16-24; Janssen Dep. 37:23-38:6; Biskey-

7

Rose Dep. 32:8-20.)

29.     The entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed and it was common for APMs to work from home. (Geter Dep. 208:18-209:7, 209:19-210:14; Deposition of Tiffany Kitchens ("Kitchens Dep.") 17:1-11; Kopf Dep. 12:5-21; Williams Decl. ¶ 14.)

30.     APM Sarah Kopf is aware that Schneider employees have been permitted to work reduced hours and remotely. (Kopf Dep. 11:1-20.)

31.     Schneider employees in Fairburn were not required to document when they were working from home. (Kopf Dep. 12:22-13:13.)

## IV.   Ms. Geter's Disabilities

32.     While employed as an over-the-road driver for Brito Produce in July 2013, Ms. Geter was the victim of an attempted sexual assault at a truck stop (Geter Dep. 28:2-25.)

33.     As a result of the assault, from the time of the assault through when she began employment with Schneider, Ms. Geter suffered from nightmares every other night, daily panic attacks, and weekly outbursts. (Geter Dep. 29:11-30:17, 31:2-12, 34:7-35:6.)

34.     After the assault, Ms. Geter also began suffering from migraines again approximately once or twice a week. (Geter Dep. 32:3-33:20, 35:1-6.)

35.     Approximately a year later when Ms. Geter became employed by Schneider and became insured, Ms. Geter was treated with antidepressants. (Geter Dep. 30:8-17.)

36.     Ms. Geter was diagnosed with Post-Traumatic Stress Disorder in October 2018, major depressive disorder in August or September 2015, and panic disorder in October 2018. (Geter Dep. 83:11-23, 86:20-87:8, 88:17-20.)

## V.     Ms. Geter's Request for Reasonable Accommodation

37.     On October 15, 2018, Ms. Geter became suicidal, requested FMLA leave for treatment, was approved for and took FMLA leave through December 31, 2018 to engage in treatment, and her leaders, Mr. Torrence and Ms. Biskey-Rose, were notified of the same. (Geter Dep. 97:2-98:22, 120:20-124:11, 125:4-126:8; Geter Dep. Exs. 8, 9, 11, 13; Torrence Dep. 39:16-40:8; 48:15-18; Torrence Dep. Ex. 30; Biskey-Rose Dep. 13:16.)

38.     Ms. Geter shared information about her mental health crisis with Mr. Horton, Mr. Torrence, and Ms. Biskey-Rose. (Geter Dep. 119:14-120:16, 130:16-132:2; Torrence Dep. 41:12-42:14; Biskey-Rose Dep. 13:17-15:23.)

39.     On December 15, 2018, Ms. Geter's psychiatrist released her to return to work with a request that she work three ten-hour days per work week until February 14, 2019. (Geter Dep. 126:9-128:13; Geter Dep. Ex. 14.)

9

40.    Once a Schneider associate – like Ms. Geter – requests an accommodation through the Human Resources Leave Team, the Leave Team notifies the Human Resources Business Partner and the associate's leaders (here Mr. Torrence and Ms. Biskey-Rose) of the request for accommodation, and then the Human Resources Business Partner works with the leaders to determine whether or not the associate's request for accommodation can be granted. (Janssen Dep. 12:9-14:5.)

41.    Ms. Geter's original request for reasonable accommodation was approved on December 18, 2018 by Mr. Torrence and Ms. Biskey-Rose in consultation with Human Resources Business Partner Senior Ashley Janssen. (Torrence Dep. 43:10-22, 46:15-47:19, 49:13-20, 59:2-22, 63:11-23; Torrence Dep. Exs. 31 & 46; Geter Dep. 129:1-131:13, 132:16-133:23; Geter Dep. Ex. 15; Janssen Dep. 8:2-21, 11:7-12:8, 26:13-27:7, 29:2-31:8; Janssen Dep. Ex. 31; Biskey-Rose Dep. 15:24-16:14.)

42.    Ms. Geter was not paid by Schneider for her FMLA leave and was not paid for hours she did not work while she was receiving reasonable accommodations. (Geter Decl. ¶¶ 16, 17.)

43.    When Ms. Geter was on medical leave, her shifts were primarily covered by Desmond Seymour and Audreianna Williams and were rarely, if at all,

covered by Mr. Torrence. (Williams Decl. ¶ 9.)

44.    When Ms. Geter worked her reduced hours schedule, Desmond Seymour and Audreianna Williams covered her Sunday shifts and, occasionally, Mr. Torrence would sub in on the shift. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶ 8.)

45.    On January 19, 2019, Dr. Wanzo extended Ms. Geter's request for accommodation through March 20, 2019 and on January 21, 2019, Schneider approved the extension of the reasonable accommodations through March 19, 2019. (Geter Dep. 139:9-143:5, 144:2-24; Geter Dep. Ex. 16; Torrence Dep. 49:21-50:5, 60:14-61:3; Torrence Dep. Ex. 32; Janssen Dep. 27:24-29:1, 31:24-33:3; Janssen Dep. Exs. 16, 32.)

46.    In addition, in February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Geter Dep. 146:1-150:12; Torrence Dep. 55:11-21.)

47.    On March 9, 2019, Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to April 30, 2019 and, for the first time, recommended that Ms. Geter be permitted to work from home anytime she was scheduled alone. (Geter Dep. 150:16-153:5, 154:3-155:8; Geter Dep. Ex. 17; Janssen Dep. 33:4-34:14; Janssen Dep. Ex. 34.)

48.     Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Geter Dep. 155:9-14, 160:21-161:5, 163:2-22, 164:18-165:5.)

49.     On March 30, 2019. Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019 and believed that there was a 95% chance that Ms. Geter would be able to return to full duty at that time. (Torrence Dep. 50:6-9; Geter Dep. 159:10-161:13; Geter Dep. Ex. 19; Janssen Dep. 40:12-25; Geter Dep. Ex. 3, p. 3.)

50.     On April 2, 2019, Schneider sent Ms. Geter and Dr. Wanzo reasonable accommodation paperwork to get more information about her accommodation requests, and Ms. Geter provided the paperwork to her doctor. (Geter Dep. 170:11-172:22, 185:17-186:9; Geter Dep. Exs. 20 & 23.)

51.     Ms. Geter communicated back and forth with leave management about the status of the requested additional paperwork through her termination on April 12, 2019. (Geter Dep. 158:9-159:2.)

52.     Ms. Geter has no knowledge whether Schneider followed up with Dr. Wanzo regarding the paperwork provided to Dr. Wanzo on April 2, 2019, and Schneider never told Ms. Geter that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo. (Geter Decl. ¶ 18.)

53.     Had Schneider asked Ms. Geter to follow up with Dr. Wanzo regarding the missing paperwork, she would have done so. (Geter Decl. ¶ 18.)

54.     On April 12, 2019, Mr. Torrence and Ms. Biskey-Rose, in consultation with Ms. Janssen, decided that they would no longer accommodate Ms. Geter, and Schneider terminated Ms. Geter, although when he terminated Ms. Geter, Mr. Torrence told her it was out of his hands. (Torrence Dep. 50:10-13, 54:3-8; Geter Dep. 176:10-180:4, 181:13-19; Geter Dep. Ex. 22; Janssen Dep. 27:8-15, 40:12-42:20; Biskey-Rose Dep. 36:6-22.)

55.     Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Torrence Dep. 50:15-51:16.)

56.     Other than one conversation with Ms. Biskey-Rose in which she asked if Ms. Geter could switch her Monday group therapy session and Ms. Geter told her that was not possible, nobody from Schneider discussed with Ms. Geter other possible accommodations – such as switching shifts or taking a short leave of absence through June 5, 2019 – before deciding to no longer accommodate her. (Geter Decl. ¶ 19; Torrence Dep. 53:12-16, 54:9-55:10, 59:23-60:2; Janssen Dep. 25:12-16.)

57.     If Schneider had offered Ms. Geter a transfer to second shift as an

accommodation, she would have accepted it. (Geter Decl. ¶ 20.)

58.　During Ms. Geter's employment, Schneider used temporary employees to fill in as APMs, and Ms. Geter often trained those employees. (Geter Dep. 77:16-25, 78:8-19, 131:5-24, 132:6-15, 138:22-25; Geter Decl. ¶ 11; Kitchens Dep. 17:12-18:12; Torrence Dep. 68:2-69:19; Janssen Dep. 7:18-8:1, 42:21-25; Biskey-Rose Dep. 29:15-31:1.)

59.　For example, Shannon Bailey started out with Schneider as a temporary employee. (Kopf Dep. 8:14-9:9.)

60.　Another temp worked for over a year as a temporary employee. (Kopf Dep. 27:8-16.)

61.　No efforts were made to bring in a temporary employee to cover for Ms. Geter during her medical leave or during the time she needed a reasonable accommodation. (Janssen Dep. 43:1-14; Biskey-Rose Dep. 36:6-41:20.)

62.　Nobody considered placing Ms. Geter on leave through June 5, 2019 as an alternative accommodation, and nobody offered that alternative to Ms. Geter. (Biskey-Rose Dep. 36:6-41:20; Geter Decl. ¶ 19.)

63.　If Schneider had put Ms. Geter on leave through June 5, 2019 when she could return to work full-time, she would have accepted it. (Geter Decl. ¶ 21.)

64.　Schneider has produced no evidence in this case that it performed an

14

undue burden analysis in determining whether to accommodate Ms. Geter. (Torrence Dep. 66:2-69:19; Janssen Dep. 14:6-15:4; Biskey-Rose Dep. 36:6-41:20.)

65.   Almost immediately after Ms. Geter was terminated, Schneider moved someone from first shift to third shift and hired two new people to work third shift. (Geter Dep. 180:17-181:4, Geter Dep. 210:15-20.)

66.   Schneider regularly transferred employees between shifts or used employees to cover shifts to which they were not assigned. (Torrence Dep. 14:1-24; Deposition of Kopf Dep. 7:12-18.)

67.   For example, Ryan Wheeler was moved to third shift from first when APM Audreianna Williams resigned, and Ms. Geter was terminated. (Torrence Dep. 14:1-24; Deposition of Kopf Dep. 7:12-18.)

68.   While scheduled on second shift, APM Sarah Kopf covered third shift from time-to-time. (Kopf Dep. 7:12-18.)

69.   Ms. Geter's issue with working alone at night was safety. (Geter Dep. 102:22-103:15, 105:2-106:3.)

70.   Ms. Geter had trouble working in a fast-paced high-pressure environment throughout her employment with Schneider; it did not begin with her need for accommodations in 2018 and 2019. (Geter Dep. 188:2-20; Geter Decl. ¶ 22.)

71.     Moreover, the issue Ms. Geter had had more to do with working alone than the fast-paced environment. (Geter Decl. ¶ 22.)

72.     Despite her difficulties working in a fast-paced high-pressure environment, Ms. Geter performed well at her job throughout her employment with Schneider. (Geter Decl. ¶ 23.)

73.     Other than one minor incident before her medical leave, Ms. Geter did not have performance issues while employed by Schneider. (Geter Decl. ¶ 24.)

74.     After Schneider terminated Ms. Geter's employment, Ms. Geter had a setback in her mental health treatment and a recovery as a result of the termination. (Geter Dep. 196:6-16, 196:21-24, 222:20-21; Geter Decl. ¶ 25.)

75.     Ms. Geter's panic attacks and outbursts increased after her termination due to the pressure of being unemployed. (Geter Decl. ¶ 25.)

## VI.     APMs now all Dispatch Remotely from Green Bay, Wisconsin

76.     In March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens

16

Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.)

77.    The duties APMs previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.)

78.    The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.)

79.    During the relevant time period, the APMs employed in Fairburn were Ms. Geter (African American), Tiffany Kitchens (Caucasian), Cheryl Joseph (African American), Joon Hyung (Asian), Austin Ottinger (Caucasian), Robert Turner (Caucasian), Sara Kopf (Caucasian), Ryan Wheeler (African American), Desmond Seymour (African American), and Audreianna Williams (African American). (Torrence Dep. 18:1-20:18)

80.    The APMs in Fairburn were given the options to (1) transfer to Green Bay, (2) were offered other positions in Fairburn if they were available, or (3) were given a severance package. (Kitchens Dep. 10:21-12:9; Torrence Dep. 20:19-23:14; Janssen Dep. 19:1-25; Biskey-Rose Dep. 18:3-23:5.)

81.    After the APM relocation, Ms. Kitchens (Caucasian) was retained in Fairburn as a Senior Operations Specialist ("SOS"), Ms. Joseph's (African

American) position was eliminated, Mr. Hyung's (Asian) position was eliminated, Mr. Ottinger (Caucasian) transferred to Green Bay, Mr. Turner (Caucasian) was retained as a DTL, Ms. Kopf (Caucasian) was retained as a DTL, Mr. Wheeler's (African American) position was eliminated, Ms. Williams (African American) had already resigned, Mr. Seymour ("African American") was retained as a SOS, and Ms. Geter (African American) had already been terminated. (Torrence Dep. 18:1-20:18.)

82.    Had Ms. Geter been employed with Schneider at the time of the APM relocation, she would have been offered the opportunity to relocate to Green Bay and would have been considered for open positions in Fairburn. (Biskey-Rose Dep. 25:6-18.)

**VII.   Employees Dispatched Drivers Remotely Throughout the Pandemic**

83.    The employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.)

84.    Mr. Torrence worked remotely throughout the pandemic and continues to work from home from time-to-time. (Torrence Dep. 23:22-24:16.)

18

85. To accommodate the change with the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1.)

## VIII.  Ms. Geter's Comparators

86. Tiffany Kitchens (Caucasian), who was an APM at all relevant times, was permitted to work remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

87. Even before COVID and before her mother became ill, Ms. Kitchens sometimes worked from home. (Kitchens Dep. 27:11-21.)

88. Beginning in spring of 2018, Sarah Kopf (Caucasian), who reported to Mr. Torrence, was also permitted to work from home one or two days a month, worked from home during COVID, and has continued to work from home from time-to-time post-COVID. (Geter Dep. 204:20-205:23, 206:5-208:5, 218:9-23; Torrence Dep. 56:24-57:6; Kopf Dep. 11:7-11, 16:3-8.)

89. Ms. Kopf is still employed by Schneider and, on March 8, 2020, was given a DTL position when the APMs were moved to Green Bay. (Torrence Dep.

16:14-17; Kopf Dep. 6:17-24.)

90.     Audreianna Williams, who reported to Mr. Torrence on third shift, was regularly permitted to work remotely through the latter part of her pregnancy. (Williams Decl. ¶ 10.)

91.     Mr. Torrence took off between 80 and 82 days in 2018 and Ms. Geter had personal knowledge of this because she viewed the Fairburn calendar to which all employees had viewing access. (Geter Dep. 215:17-216:4; Geter Decl. ¶ 10; Williams Decl. ¶ 6; Torrence Dep. 57:22-58:12.)

<div style="margin-left: 40%;">

LEGARE, ATTWOOD & WOLFE, LLC

**<u>Cheryl B. Legare</u>**
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com

</div>

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (470) 823-4000

Counsel for Plaintiff Cierra Geter

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on July 12 , 2021, I electronically filed the foregoing

**Plaintiff's Statement of Disputed Material Facts as to Which There Exist**

**Genuine Issues to be Tried** with the Clerk of the Court using the CM/ECF system

which will automatically send e-mail notification of such filing to the following

attorneys of record:

Peter Milianti – pmilianti@mcguirewoods.com
Melissa Weiss – mweiss@mcguirewoods.com
Meredith Allen – mlallen@mcguirewoods.com

**LEGARE ATTWOOD & WOLFE, LLC**

**Cheryl B. Legare**
Cheryl B. Legare
Georgia Bar No. 038553

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030

21

Telephone: (470) 823-4000
Facsimile: (470) 201-1212

Counsel for Plaintiff Cierra Geter

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**Declaration of Cierra Geter**</u>

Pursuant to 28 U.S.C. § 1746, I, Cierra Geter, declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.     All statements are true and correct to the best of my knowledge.  I am over 18 years of age; am suffering from no mental disability; and am competent to testify on matters contained in this Declaration. This Declaration is based on first-hand knowledge.

2.     I began employment with Schneider National Carriers, Inc. in July 2014 as a Dispatch Analyst

3.     The Dispatch Analyst position title later changed to Area Planning Manager ("APM"), but the job duties remained the same.

4.      Before taking medical leave from October through December 2018, I was scheduled to work third shift Sundays and Wednesdays through Fridays.

5.      Before taking medical leave in fall 2018, I worked with Audreianna Williams and Desmond Seymour on Sundays, Desmond Seymour on Wednesdays, and Audreianna Williams on Fridays.

6.      Before taking medical leave in the fall of 2018, the only shift I was scheduled to work alone was Thursday.

7.      Before I went on medical leave in the fall of 2018, Desmond Seymour worked third shift Saturdays through Wednesdays.

8.      Before I went on medical leave in the fall of 2018, Audreianna Williams worked third shift Fridays through Tuesdays.

9.      Before I went on medical leave in the fall of 2018, in my observation, when I was at work, Travis was rarely there. Based on my observations, he primarily helped on second shift.

10.     Travis Torrence took at least 82 days off in 2018 and I have personal knowledge of this because I viewed the Fairburn calendar to which all employees had viewing access.

11.     During my employment, Schneider used temporary employees to fill in as APMs, and I often trained those employees.

Doc ID: e2d3b7747edbaabef454986b2995059ebf7b805b

12.    When I returned to work after medical leave in January 2019, I worked 10 hour shifts Wednesday through Friday.

13.    When I returned to work after medical leave in January 2019, I continued to be scheduled to work alone on Thursdays.

14.    It was not necessary for me to be in the office to perform my APM duties. For all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access. I would locate trucks for drivers throughout the southeast through GPS and could do the same thing for Atlanta drivers when I worked from home.

15.    For drivers outside Atlanta, I printed driver paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had access. I could do the same for Atlanta drivers when I worked from home.

16.    While I was on medical leave in 2018, I received short-term disability benefits from the Hartford, I was not paid by Schneider.

17.    When I returned to work reduced 30 hours per week, Hartford continued to pay partial disability benefits, but Schneider did not pay me for the time I did not work.

18.    On April 2, 2019, Schneider provided me and Dr. Wanzo paperwork to give to Dr. Wanzo for more information on my requests for accommodation. I gave

the paperwork to Dr. Wanzo and heard nothing further. I assumed that Dr. Wanzo had completed the paperwork and sent it back to Schneider. I do not know if Schneider followed up with Dr. Wanzo about the paperwork. Schneider never told me that the paperwork had not been returned and did not ask me to follow up with Dr. Wanzo. Had Schneider asked me to follow up with Dr. Wanzo, I would have.

19.    Other than one conversation with Marianne Biskey-Rose when she asked if I could switch my Monday group therapy session and I told her that I could not, nobody from Schneider discussed with me other possible accommodations – such as switching shifts or taking a short leave of absence through June 5, 2019 – before Schneider terminated me.

20.    If Schneider had offered me a transfer to second shift as an accommodation, I would have accepted it.

21.    If Schneider had put me on leave through June 5, 2019 when I could return to work full-time, I would have accepted it.

22.    Although I did have trouble working in a fast-paced high-pressure environment throughout her employment with Schneider; it did not begin with my need for accommodations in 2018 and 2019. Moreover, the issue I had had more to do with working alone than the fast-paced environment.

Doc ID: e2d3b7747edbaabef454986b2995059ebf7b805b

23.     Despite my difficulties working in a fast-paced high-pressure environment, I performed my job well throughout my employment with Schneider, and nobody told me I was not performing my job to expectations.

24.     Other than one minor incident before my medical leave, I did not have performance issues while employed by Schneider.

25.     After Schneider terminated me, I had a setback in my mental health treatment and a recovery. My panic attacks and outbursts increased after my termination due to the pressure of being unemployed.

Executed this 12th day of July 2021.

*Cierra Geter*
_____
Cierra Geter

 **HELLOSIGN**

## Audit Trail

| | |
|---|---|
| **TITLE** | Hello |
| **FILE NAME** | 1626115192-2021.0..._Declaration.docx |
| **DOCUMENT ID** | e2d3b7747edbaabef454986b2995059ebf7b805b |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

This document was requested on law-llc.cliogrow.com and signed on law-llc.cliogrow.com

## Document History

| | | |
|---|---|---|
| **SENT** | **07 / 12 / 2021**<br>18:40:28 UTC | Sent for signature to Cierra Geter (cierra.geter1@gmail.com)<br>from lrpetmecky@law-llc.com<br>IP: 69.247.142.66 |
| **VIEWED** | **07 / 12 / 2021**<br>21:37:06 UTC | Viewed by Cierra Geter (cierra.geter1@gmail.com)<br>IP: 174.209.101.139 |
| **SIGNED** | **07 / 12 / 2021**<br>21:41:11 UTC | Signed by Cierra Geter (cierra.geter1@gmail.com)<br>IP: 174.209.101.139 |
| **COMPLETED** | **07 / 12 / 2021**<br>21:41:11 UTC | The document has been completed. |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### <u>Declaration of Audreianna Williams</u>

Pursuant to 28 U.S.C. § 1746, I, Audreianna Williams, declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.     All statements are true and correct to the best of my knowledge. I am over 18 years of age; am suffering from no mental disability; and am competent to testify on matters contained in this Declaration. This Declaration is based on my personal, first-hand knowledge and observations.

2.     I began employment with Schneider National Carriers, Inc. as an Area Planning Manager beginning in January 2018.

3.     I worked third shift, Friday through Tuesday and reported to Operations Team Lead Travis Torrence.

4. I worked third shift with Cierra Geter and Desmond Seymour on Sundays.

5. In my observation, when I was at work, Travis was rarely there. Based on my observations, he primarily helped on second shift.

6. Travis took at least 82 days off in 2018 and I have personal knowledge of this because I viewed the Fairburn calendar with Cierra. Everyone had access to the calendar showing office employees days off.

7. In October 2018, Cierra took medical leave. While Cierra was on leave, Desmond and I covered most of her work.

8. Based on my observations, while Cierra was on medical leave and after she returned from medical leave, Travis may have helped cover Sundays on third shift, at most, a handful of times.

9. While Cierra was on medical leave, I did not see Travis covering for her other days when I was at work except maybe a few times, if at all.

10. I went on maternity leave on February 26, 2021. Prior to going on maternity leave, I was regularly permitted by Travis to work remotely throughout the later part of my pregnancy.

11. It was not necessary for me to be in the office to perform my APM duties. I had very little face-to-face interaction with the drivers. Most of my

communication with drivers was by phone, Qualcomm, or through the company's tablet which is located in drivers' trucks.

12.    For all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access. I would locate trucks for drivers outside Atlanta through GPS and could do the same thing for Atlanta drivers when I worked from home.

13.    For drivers outside Atlanta, I printed driver paperwork remotely to printers in the hubs or to truck stops. I could do the same for Atlanta drivers when I worked from home.

14.    Working from home was common for APMs in the Fairburn office.

Executed this 12th day of July 2021.

_Audreianna Williams_
Audreianna Williams

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Hello |
| **FILE NAME** | 1626111416-2021.0..._Declaration.docx |
| **DOCUMENT ID** | a2dd9fb604c194e34e50ad4e1d9ae69a1fdf6558 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

This document was requested on law-llc.cliogrow.com and signed on law-llc.cliogrow.com

## Document History

| | | |
|---|---|---|
| **SENT** | **07 / 12 / 2021**<br>17:37:44 UTC | Sent for signature to Audreianna Williams (audreianna.williams@gmail.com) from lrpetmecky@law-llc.com IP: 69.247.142.66 |
| **VIEWED** | **07 / 12 / 2021**<br>17:59:02 UTC | Viewed by Audreianna Williams (audreianna.williams@gmail.com) IP: 174.63.229.22 |
| **SIGNED** | **07 / 12 / 2021**<br>18:00:03 UTC | Signed by Audreianna Williams (audreianna.williams@gmail.com) IP: 174.63.229.22 |
| **COMPLETED** | **07 / 12 / 2021**<br>18:00:03 UTC | The document has been completed. |