# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CASE NO. 22-11285-BB

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

**APPELLANT'S APPENDIX – VOL. V**

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

# CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

## Eleventh Circuit Court of Appeals Case No. 22-11285-BB

### Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
|---|---|---|---|
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
|----|-----|------------|---------------------------------------------------------------|
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B  |     |            | Certificate of Service |



Deposition of:

# Marianne Biskey-Rose

*April 21, 2021*

In the Matter of:

# Geter, Cierra v. Schneider National Carriers Inc.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 8

1   I don't know, nine to ten years maybe.  And then I've

2   been in my director of operations role for the last

3   five, started sometime at the beginning of 2016.

4          Q.    Could you tell me sort of what the

5   leadership chain is in your facility?  Are you the top

6   leader in the facility?

7          A.    I am.  Yeah.  So it's -- my role, the

8   director of operations, and then reporting to me I

9   have operations managers.  And currently I have two.

10              And then at the time of Ms. Geter's

11  employment we also had a support shift team leader

12  role, and then we also have -- at that time we had

13  area planning managers, or APMs, as well as DTLs.

14              Today we no longer have the APM roles.  We

15  do have some SOS roles in addition to the DTL role

16  that we have.  And we no longer have anybody in the

17  support shift team leader role.

18         Q.    And I think when Ms. Geter was there,

19  there were team leads that supervised the APMs; right?

20         A.    We had one team leader.  And that was only

21  on support --

22         Q.    I'm sorry.

23         A.    Yeah, it was on support shift.  He was the

24  only one.  Otherwise, the operations managers for our

25  first shift team would oversee the APMs and the DTLs

Page 9

1   on their teams.

2        Q.    And at that time, was Doug Horton an

3   operations manager?

4        A.    He was.

5        Q.    So was he the person that Travis Torrence

6   reported directly to?

7        A.    Yes.

8        Q.    Okay.  And Mr. Horton is no longer -- he's

9   still with the company; right?

10       A.    He is.

11       Q.    He's just not in --

12       A.    He works in a different department.  He

13  works in a different department, and he works

14  remotely.

15       Q.    Got it.  And I think you said you have two

16  operations managers now.  That's Travis Torrence and

17  Rodney Dunn?

18       A.    That's correct.

19       Q.    And just so that the record is clear, APM

20  stands for area planning manager; right?

21       A.    That is correct.

22       Q.    And DTL is a driver team lead; right?

23       A.    That is correct.

24       Q.    And SOS is -- what is it?  I'm drawing a

25  blank.

Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1    case.

2              How did you learn that Ms. Geter needed

3    FMLA in the fall?

4              MR. MILIANTI:  Just --

5         Q.   (By Ms. Legare)  The second time in 2018.

6              MR. MILIANTI:  Thank you.

7              MS. LEGARE:  Sorry.

8              MR. MILIANTI:  No.  That's fine.  Just a

9         clear record.

10             THE WITNESS:  I can't recall exactly.  My

11        memory is that Doug Horton let me know that, you

12        know, she was going to be out and working with

13        the leave team.

14        Q.   (By Ms. Legare)  And leave is coordinated

15   from Green Bay; right?

16        A.   That is correct.

17        Q.   At some point did you learn what

18   Ms. Geter's diagnosis was?

19        A.   I did.

20        Q.   When did you learn what her diagnosis was?

21        A.   It was after she came back from FMLA, I

22   believe, is when I heard from her.  When she went out

23   on FMLA and we were working with the leave team, I

24   understood some of the circumstances behind it.  But I

25   can't say clearly if I knew what her diagnosis was at

Page 14

1    that time.

2         Q.    When you say that you understood some of

3    the circumstances behind it when you were working with

4    the leave time, were you aware that she was suicidal?

5         A.    Yes.  That's what I was made aware of.

6         Q.    Okay.  But you didn't have any specific

7    conversations with Ms. Geter herself at that time.  Is

8    that fair to say?

9         A.    Not that I can recall.

10        Q.    Okay.  But you recall specifically having

11   a conversation with her when she came back from FMLA?

12        A.    I do.

13        Q.    Tell me about that conversation.

14        A.    Well, Cierra and I were -- we were pretty

15   friendly.  We were pretty close.  We share the same

16   birthday.  We had a lot in common, and I always kind

17   of looked at her as, you know, a younger version of

18   myself in some regards.

19             So, you know, when she came back, I was

20   obviously very worried about her and wanted to check

21   in and see how she was doing.

22             So we had just, you know, some

23   conversation, and she shared with me some of the

24   struggles that she had been going through and kind of

25   what her treatment process was and different things

Page 15

1    like that.

2         Q.    Did she share with you that she had been

3    assaulted in the past and was suffering from PTSD as a

4    result of that assault?

5         A.    I was aware of her assault.  I don't

6    recall a conversation regarding PTSD.  I do recall us

7    talking about her having depression and having, you

8    know, the -- obviously the suicide attempts and some

9    anxiety associated.  But I can't specifically recall

10   any PTSD discussions.

11        Q.    Did she share with you the treatment that

12   she was going through that resulted in her requesting

13   an accommodation?

14        A.    She did.  She told me that she was

15   seeking -- had sought out different kinds of therapy

16   and she was doing some holistic therapies that she

17   felt were really working for her, and she really liked

18   the doctor and kind of the facilities that she was

19   using.

20              And then she also mentioned that she was

21   going to like -- I think it was a peer group therapy

22   on Monday mornings, which is why she was unable to --

23   to work the Sunday night shift.

24        Q.    And did you play any role -- in the

25   beginning, you know, she requested accommodations and

Marianne Biskey-Rose                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1    then extended her request for accommodations.  When

2    she first requested the accommodation to work a

3    reduced schedule, did you play any role in approving

4    that?

5         A.    Not really.  So, you know, Travis was able

6    to accommodate the leave by working the shift or, you

7    know, working with his team when he was unable or if

8    they were able, he was able to step in.

9              So, you know, there wasn't a whole lot

10   involved in that decision-making since we were able to

11   accommodate.

12        Q.    But he did share with you or talk to you

13   about it?

14        A.    He did.  He did.

15        Q.    Did Cierra talk to you about it too?

16        A.    I can't recall specifically.  I would

17   imagine she would have, but I don't remember that

18   conversation.

19        Q.    I mean, I got the impression just at some

20   of the various depositions that the people who worked

21   for Schneider were pretty close.  Is that a fair

22   statement?

23        A.    Yeah.  Especially in our office.  It's

24   small, and, you know, we kind of have worked together

25   for a long time.  So, yeah, we're fairly close.

Page 18

1   would have been?

2          A.     Yes.

3          Q.     Okay.  Can you tell me what is your -- I

4   understand the area planning managers were relocated

5   to Green Bay in the spring last year; right?

6          A.     That's correct.

7          Q.     Tell me what you remember about that

8   process.  And, actually, let me ask you one question

9   first.  That decision was made, at least started,

10  pre-Covid; right?

11         A.     Correct, yes.

12         Q.     But it just happened to coincide, sort of?

13         A.     Yes, sort of.  So the decision was made by

14  our leadership team in Green Bay.  Well, I was made

15  aware of the decision sometime in the fall of 2019.

16                And so kind of the way the process worked

17  was, you know, I understood that all of the dispatch

18  APMs on all shifts would be relocated to Green Bay.

19                And so I had to look at our team and

20  determine if anybody was, you know, willing or able or

21  wanting to relocate to Green Bay.

22                And then those that were left, I knew I

23  was going to have to build a -- we would still need a

24  support shift team.  So we would still need the

25  assistance on second and third shift in order to

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 19

1    assist our drivers.

2              So I had to look and see -- unfortunately,

3    that was a -- it was not an equal move for those

4    associates.  So they were salaried employees, and they

5    moved to an hourly position through that transition.

6              So not everybody was willing to, first of

7    all, change the work because the APM role is very

8    different than the SOS role in a lot of cases.

9    Although, less so for our second and third shift folks

10   because they were already doing some of the SOS work

11   that we now just have today.

12             Whereas the first shift APMs weren't doing

13   that work on a regular basis as part of their

14   day-to-day.

15             So some of the first shift APMs had

16   decided that, you know, it was not a position that

17   they wanted to move into.  We -- so we looked at all

18   of the staff and said, you know, hey, are you

19   interested in taking on one of these positions?  We

20   looked at performance to see if there was anybody that

21   wasn't a good fit and that we no longer wanted to keep

22   within the organization.

23             And then we had some additional moves that

24   were taking place on our team; so we were able to move

25   some folks into DTL roles.

Page 20

1          So I think in the end we had, I don't

2     know, maybe five or six that we were able to keep

3     within the organization.  We had one person that

4     relocated to Green Bay, and the rest either were in

5     DTLs or SOS roles.  And then we probably had roughly

6     the same amount that are no longer with the

7     organization.

8          Q.    So were there any people who moved to

9     Green Bay?

10         A.    Yes.  We had one associate that moved to

11    Green Bay.

12         Q.    And who was that?

13         A.    His name is Austin Oddender.

14         Q.    And was anyone -- I understand that

15    everyone was offered the opportunity to transfer to

16    Green Bay if they wanted; right?

17         A.    That's correct.  We also tried to find

18    roles within the organization at either locally or in

19    different parts of the country.  You know, some people

20    are willing to relocate to other areas.

21              And so, you know, we did try to find other

22    positions within the organization for associates that

23    wanted to stay but didn't want to move into the SOS

24    role or didn't want to relocate to Green Bay.

25         Q.    Were any of the APMs -- excuse me.

Marianne Biskey-Rose                          April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 21

1    Because I think you said you looked at performance and

2    whether they would be a fit in some of these roles,

3    was there anyone that you just let go without

4    offering --

5         A.   Not an APM.  We had a DTL that we let go.

6    And so then we were able to backfill that role with

7    one of the APMs, but he was not an APM.

8         Q.   Who is the DTL that you let go?

9         A.   His name was Quincy.

10        Q.   And then I think was it Sara Kopf who was

11   promoted to DTL?

12        A.   She was promoted to a DTL on first shift,

13   but she was replacing a DTL that moved over to

14   customer service by the name of Shannon Bailey.  So

15   Robert Turner took Quincy's position.

16        Q.   So is it true then that Sara's move to a

17   DTL position, I think she perceived it as a promotion.

18   Is it a promotion?

19        A.   Technically it's not.  So an APM and a DTL

20   are both level one manager roles.  So technically, no,

21   it would be a lateral move.

22        Q.   And would her move have happened

23   regardless of the APM move?

24        A.   Yes.

25        Q.   So are there two driver team leads, or are

Page 22

1    there more than two?

2         A.    That moved from APM roles?

3         Q.    Just in total that work.

4         A.    Oh, there are more than two.

5         Q.    Okay.  And I think I may have

6    misunderstood something you said.  So the driver team

7    lead role is still a salaried role?

8         A.    Yes.

9         Q.    So the hourly role was the SOS position?

10        A.    That's correct.

11        Q.    Is that considered a demotion for the

12   people who took it?

13        A.    Technically it is because, you know, they

14   are going from a salary to an admin role.  And their

15   scope of work is reduced.  So technically, yes, it's

16   seen as a demotion, but it wasn't a demotion based on

17   performance like typical demotions are.

18        Q.    Right.  And I think probably for some

19   people and I got the sense from Ms. Kitchens it was,

20   like, I was just happy to have a job in Covid.

21        A.    Yeah.  Some people.  But, you know, these

22   discussions started well before Covid.

23        Q.    Right.

24        A.    So, you know, there were some people that

25   made the decision to not take the role before Covid

Marianne Biskey-Rose                           April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 23

1   was even an issue or even a known entity.  So --

2          Q.    And for the people who left that didn't --

3   decided not to take the role, they got a severance

4   package; right?

5          A.    They did.

6          Q.    Do you know what the severance package

7   was?  Was it based on years of service?

8          A.    It was based on years of service, but I

9   don't remember all the specifics of it.

10         Q.    And so the title was SOS that people

11  took --

12         A.    Correct.

13         Q.    -- right?

14         A.    Well, I say that.  I don't know if we

15  changed it from IOS to SOS at that time or if that was

16  done at a later time.  But it's the same role.

17         Q.    So IOS was a position that existed prior

18  to the decision to move the APMs to Green Bay?

19         A.    Yes.  But we didn't have them on our

20  second and third shift.

21         Q.    So they only worked first shift?

22         A.    At that time I'm not even sure we had any

23  on first shift.  But it was a position within the

24  organization.

25         Q.    So you added more of this position once

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1   five?

2          A.    Yeah.  Well, yes.  So we have -- we have

3   had six for probably almost the last year, but we were

4   at five prior to that.  And we will be back up at six

5   once we hire a replacement.

6          Q.    And if Ms. Geter had still been employed

7   with Schneider at the time of the APM move, she would

8   have been offered the opportunity to transfer to Green

9   Bay; right?

10         A.    Yes.

11         Q.    And if she had turned down a transfer to

12  Green Bay, she would have been in the mix of the

13  people considered for the SOS positions?

14         A.    Correct.

15         Q.    And is it possible, based on her tenure,

16  that she may also have been considered for one of the

17  DTL positions?

18         A.    Yes.

19         Q.    In Schneider's discovery responses,

20  they -- the company has said that the decisions on the

21  request for accommodation were made by you and

22  Mr. Torrence in consultation with Ms. Janssen, Ashley

23  Janssen.

24             Do you recall if Mr. Horton was involved

25  in any of the decision-making around the request for

Page 26

1    accommodation?

2         A.    I do not recall him being involved.

3         Q.    What days of the week -- well, let me ask

4    you this.  Are there any -- actually -- I'm going in

5    circles.

6              Did the SOS -- did the people who took the

7    positions of SOS when APM -- the APM move happened

8    take over some of the duties of -- the local duties of

9    APMs?

10        A.    So the traditional APM role, no.  So that

11   work was transferred to Green Bay.  The work -- the

12   additional work that our second and third shift APMs

13   were doing as far as, you know, answering phone calls

14   and messages and, you know, bill of ladings and all of

15   the day-to-day activities that incur, yes, that's --

16   that's the role that they took over.  So that portion

17   of our second and third shift role is what they

18   currently do.

19        Q.    And there's been some testimony in

20   depositions about basically -- so the driver keys,

21   keys for the trucks were kept behind -- in a locked

22   office; right?

23        A.    Uh-huh (affirmative).

24        Q.    Are they still kept in a locked office?

25        A.    They are.

Marianne Biskey-Rose                                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                           Page 27

1        Q.    So during Covid while nobody -- while

2   people were working remotely, if a driver needed a

3   key, what did they do?

4        A.    We had to leave the office unlocked.

5        Q.    Okay.  And so did you leave the office

6   unlocked for a period of time while everyone was

7   working from home for Covid?

8        A.    Yes.

9        Q.    And I understand from other witnesses that

10   starting in March the company was fully remote.  At

11   some point in time people went back two days a week

12   and three days remote, and then now as of March people

13   are back in the office full-time; is that accurate?

14        A.    For the most part.  Yeah, for the most

15   part.

16        Q.    And I also understand that the other issue

17   for the drivers was that the printer was in a locked

18   office as well; right?

19        A.    That's correct.

20        Q.    But now it's been moved to the driver

21   lounge?

22        A.    Yes.

23        Q.    Is there some reason it wasn't in the

24   drivers' lounge the whole time?

25        A.    Well, unfortunately, with it being in the

Page 28

```
 1    driver lounge, we don't have the same capabilities

 2    that we have with it being in the office.

 3              There's some faxing and scanning

 4    capabilities that we're having challenges with being

 5    in the driver lounge just from a technology

 6    standpoint.

 7              It's our -- also our only printer in the

 8    office.  So anytime I have to print confidential

 9    information, it being in the driver lounge is not an

10    ideal location.

11              So that's, I think, why it's historically

12    always been in the office area.  But currently it is

13    in the driver lounge.

14        Q.    Do you know why corporate hasn't given you

15    two printers?  You might not.  I mean --

16        A.    I think just the cost.  You know, cost and

17    probably some, again, some of the IT challenges that

18    we have being in a small office.

19              We're in a trailer so it's -- you know,

20    it's not as probably up to technical standards as, you

21    know, a larger office would be.

22        Q.    And I believe from what other witnesses

23    have said that you-all have the capacity to print to

24    the printer remotely when you're working from home;

25    right?
```

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1        A.    We do now, yes.

2              MR. MILIANTI:  Object to the form.

3        Q.    (By Ms. Legare)  And currently are there

4   specific days of the week and/or shifts where the SOSs

5   are working alone and there aren't two of them

6   scheduled on a shift?

7        A.    Yes.

8        Q.    And what are those shifts?

9        A.    I'm not sure off the top of my head.

10       Q.    Do they change from time to time?

11       A.    The only thing that would make a change

12  is, you know, vacations or time off or unexpected

13  absences, that sort of thing.  Otherwise, it's a set

14  schedule.

15       Q.    And there's been some testimony about your

16  ability to use temporary employees if employees have

17  to be out.  Can you tell me how that works in

18  Fairburn?

19             MR. MILIANTI:  Just object to the form of

20       the question.

21             THE WITNESS:  Yeah.  So -- sorry.

22       Q.    (By Ms. Legare)  You can still answer.

23  It's okay.

24       A.    Okay.  We have used temp support in the

25  past.  We currently don't have anybody from a temp

Page 30

1   perspective.  We've had mixed success with temps.  Our

2   systems are -- we have many of them, and they're not

3   easy to learn, and it takes time.

4              So we only utilize a temp when we, you

5   know, really have the need and we're going to have it

6   for a while because of the time that it takes to get

7   them up to speed where they can actually provide some

8   support.

9        Q.    Have you had any temps that worked

10  part-time?

11       A.    No.

12             MR. MILIANTI:  Just object to the form.

13       Q.    (By Ms. Legare)  Or a reduced-hour

14  schedule?

15       A.    No, not that I'm aware of.

16       Q.    Do you know if you could have asked -- I

17  understand you use an agency; right?

18       A.    We do.

19       Q.    What's the name of the agency?

20       A.    It was Kelly.  Like I said, we haven't had

21  a temp in a while.  So I'm not sure if that's still

22  the agency we use, but that was the one we were using.

23       Q.    And do you know if Kelly provides

24  part-time employment, temporary help to companies?

25             MR. MILIANTI:  Object to the form.

Page 31

1              THE WITNESS:  I do not know.

2         Q.    (By Ms. Legare)  All right.  If we will

3    look at what's marked as Exhibit 48.

4              (Plaintiff's Exhibit 48 was marked for

5         identification.)

6              THE WITNESS:  Okay.  I have it open.

7         Q.    (By Ms. Legare)  Have you seen this

8    document before, Ms. Biskey-Rose?

9              MR. MILIANTI:  I'm sorry.  I don't have 48

10        on my list.  Can you just tell me what it is,

11        Cheryl?

12             MS. LEGARE:  It's the flexible work

13        policy.  Are you not in Exhibit Share, Pete?

14             MR. MILIANTI:  I am, but for some reason

15        mine stop at 47.

16             MS. LEGARE:  Refresh your screen.  It will

17        probably pop up because I added it, like, right

18        before we started.

19             MR. MILIANTI:  Got it.  Thank you.

20             MS. LEGARE:  You're welcome.  Sorry about

21        that.

22             MR. MILIANTI:  No.  That's fine.

23             MS. LEGARE:  I was out of the office when

24        I got it yesterday; so --

25             MR. MILIANTI:  No problem.

Page 32

```
 1              THE WITNESS:  So I'm sure I have seen it,

 2      but it isn't something I recall.

 3      Q.    (By Ms. Legare)  What is your --

 4      A.    I can't say --

 5      Q.    Oh, go ahead.

 6      A.    I can't say definitively that I've seen

 7  this.

 8      Q.    Okay.  What is your understanding about

 9  working from home for people in the Fairburn office?

10      A.    Well --

11      Q.    And hold on.  I need to put this on --

12  before Covid, obviously.

13      A.    Yes.  So, you know, we try our best to

14  work with our associates and be flexible.  So, you

15  know, if somebody has something last minute that's

16  come up, like a sick child or someone at home that

17  they need to be there for or a doctor's appointment,

18  then we've allowed some flexibility to work from home.

19              But it's always kind of been a one-off

20  situation and not an ongoing request.

21      Q.    Were you aware that Tiffany Kitchens

22  worked, actually, from the emergency room is what she

23  said on -- or, sorry, from the hospital, and she made

24  it sound to me like for around four months in 2018 and

25  2019?
```

Page 33

1          A.    Yes.   Tiffany did.  She had some

2     intermittent FMLA in order to care for her mother who

3     was in the hospital.  So she did work from home or the

4     hospital, depending on where her mother was at the

5     time in order to assist with her but then also to

6     assist with the team and the workload that we had.

7               But it was not an every day working from

8     the hospital or from home.  It was as needed.  She

9     shared some of the responsibilities with her dad in

10    order to care for her mom.

11              So we were, you know, working with her and

12    through the FMLA process for her to do that work.

13         Q.    So she said she didn't actually end up

14    using her intermittent FMLA.  Is that your

15    recollection?

16         A.    It's not.  But I wouldn't know for certain

17    how many days she used.

18         Q.    And, rather, her recollection was that she

19    worked from the hospital every day for about four

20    months.  Did you know that that was going on?

21              MR. MILIANTI:  I'm just going to object.

22         I think that misstates Ms. Kitchens' testimony.

23         But go ahead.

24              THE WITNESS:  No, I don't believe that to

25         be the case.

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 34

1        Q.    (By Ms. Legare)  So even if she says it

2    is, you're saying you didn't know that it was?

3              MR. MILIANTI:  Same objection.

4              THE WITNESS:  That's not what my memory is

5        of the situation.

6        Q.    (By Ms. Legare)  Did you approve her work

7    from home, or was that just with Rodney Dunn?

8        A.    That would be Rodney.

9        Q.    Okay.  Let's see.  I will tell you what I

10   am not going to do is show you a lot of emails that

11   you're not cc'd on.

12             But I am assuming that Mr. Torrence was

13   keeping in communication with you about Ms. Geter's

14   needs for accommodations; right?

15       A.    Correct.

16       Q.    And Ms. Geter herself may have spoken with

17   you about them?

18       A.    Yes.  That's correct.

19       Q.    I'm looking -- and you're not really not

20   cc'd -- oh, here we go.  All right.  If you will look

21   at Exhibit 35.

22             (Plaintiff's Exhibit 35 was marked for

23        identification.)

24             THE WITNESS:  Okay.

25       Q.    (By Ms. Legare)  And it looks like -- so

Marianne Biskey-Rose                                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 36

1    the time I believe it was to June 6th.

2              MR. MILIANTI:  Object to the form.

3              THE WITNESS:  I can't specifically

4        remember this conference call, if that's what

5        you're asking.

6         Q.    (By Ms. Legare)  Well, so do you recall

7    having any conversations with Ms. Janssen and

8    Mr. Torrence about Ms. Geter's need for an extended

9    accommodation?

10        A.    I do.

11        Q.    Do you recall how many conversations you

12   may have had with them about it?

13        A.    I do not.

14        Q.    Can you tell me what you recall talking to

15   them about?

16        A.    Yeah.  We discussed, you know, her request

17   to extend and whether or not we were able to continue

18   to accommodate, you know, based on the business needs

19   and our staffing level.

20              And it was determined that we could no

21   longer accommodate, and so we discussed, you know,

22   next steps.

23        Q.    Was there any conversation about changing

24   Ms. Geter's shift?

25        A.    Yes.  So we did discuss a couple of

Marianne Biskey-Rose                    April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 37

1   different options.  One was changing shifts.  We

2   offered that up, and it's my memory that,

3   unfortunately, she wasn't able to do that because of

4   her doctor and group therapy sessions.

5            We also talked about a different position

6   for her, so, like, a first shift position.  I guess

7   that would have been changing schedules kind of.

8            And then I also asked Cierra or my memory

9   is that I asked Cierra if she could change any of her

10  doctor schedules.  So, you know, the Monday group

11  therapy session, I asked if there was an opportunity

12  to -- to go to a different, you know, session.

13           And my memory is that there was a

14  different session that she could attend, but it

15  coincided with one of her other doctor's visits.  So

16  she wasn't able to change that up.

17       Q.    So you recall having this conversation

18  with Ms. Geter?

19       A.    I do.

20       Q.    Were the business needs and the staffing

21  level, did any of that have to do with an APM having

22  to go out on maternity leave?

23       A.    I'm sorry.  Can you ask that question a

24  different way maybe?

25       Q.    Sure.  Isn't it true that at the same time

Page 38

1    this was all going on, there was another APM who was

2    going to be out because she was having a baby?

3         A.    Yes.   That is true.

4         Q.    And is that something that affected the

5    staffing levels at the time?

6         A.    I can't remember if Audrey was already out

7    on maternity leave or not.   So I'm not sure if it

8    impacted staffing levels.

9         Q.    And I understand that there were maybe one

10   or two people who were brought on that Ms. Geter was

11   training but who didn't last very long; is that true?

12        A.    I don't recall that.

13        Q.    Did you have conversations with Ms. Geter

14   about changing her shift?

15        A.    Not that I remember.

16        Q.    But you thought someone may have had those

17   conversations with her?

18        A.    Yeah.   I believe that Travis had those

19   conversations, but I'm not a hundred percent positive.

20        Q.    Then -- let's see.   Look at Exhibit 41.

21              (Plaintiff's Exhibit 41 was marked for

22        identification.)

23              THE WITNESS:  Okay.

24        Q.    (By Ms. Legare)  If you will scroll down

25   to -- it says, Schneider 81, in the bottom, right-hand

Page 39

```
1   corner.

2        A.    Okay.  That's blank for me.  Well,

3   besides --

4        Q.    Right.  It's the bottom -- like, a

5   signature block; right?

6        A.    Right.

7        Q.    And then just scroll up and read the

8   conversation.  I just wanted to make sure we started

9   at the bottom of the conversation.

10       A.    Okay.  Okay.

11       Q.    So was your understanding at the time that

12  the decision was made to terminate Ms. Geter that she

13  was requesting to continue to work part-time until

14  June and then to work one day a week from home when

15  she returned to work full-time?

16       A.    I'm sorry.  Could you repeat that one more

17  time?

18       Q.    Yeah.  So looks like on this email what

19  you-all were saying was you had been letting her work

20  three days a week.  We are unable to continue to

21  accommodate a part-time schedule and that you had

22  gotten updated information that she couldn't return

23  full-time until June, and even then she was going to

24  have a one-day-a-week work-from-home restriction

25  temporarily; right?
```

Marianne Biskey-Rose                                April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

1          A.     Yes.

2          Q.     When you say business needs and staffing,

3     what do you mean?

4          A.     So just the support that we are able to

5     give our driving associates and business.  So having

6     enough resources in order to help those problems be

7     resolved.

8          Q.     And so having her only work three days

9     instead of four days was an issue, in your mind?

10         A.     Yes.  Because we needed somebody there

11    full-time in order to meet those needs.

12         Q.     Did you consider at the time getting a

13    temporary employee to cover that day for Ms. Geter?

14         A.     We discussed it, but it never was, I'll

15    say, a viable option because of, again, the skill

16    level that's kind of needed from a temp perspective,

17    and it was a shift where we didn't have anybody on

18    staff, which is why Travis was having to step in and

19    cover it.

20                And so having a temp person take that role

21    and be in that position is not a great solution

22    because they'd be by themselves and not have the

23    knowledge and background that they need in order to

24    resolve those issues.  So it wasn't a good option for

25    us to consider.

Marianne Biskey-Rose                              April 21, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 41

1       Q.    Well, if you had moved Ms. Geter to a

2  different shift, how would you have covered that time

3  in that case?

4       A.    Yeah.  We -- we would have probably had to

5  move somebody else from their shift in order to

6  accommodate that.  So we would have, you know,

7  potentially had to offer them a different shift or,

8  you know, potentially create a new position.

9       Q.    And that's something you considered?

10      A.    It's something that we would have

11  considered if she would have been able to move it, but

12  because it wasn't something that she could do, we

13  didn't have to get into the details as far as what

14  that would look like.

15      Q.    And was there any consideration of putting

16  Ms. Geter on leave until she could return to work

17  full-time?

18      A.    That would have been done -- or made by

19  the leave team.  So I don't know if they considered

20  that or not.

21      Q.    I don't think you were involved in the

22  unemployment process for Ms. Geter; right?

23      A.    I was not.

24      Q.    And when she filed her EEOC charge, were

25  you involved in any way in assisting with responding

**Exhibit 48**

# FLEXIBLE WORK ARRANGEMENT GUIDELINES

## DESCRIPTION

A Flexible Work Arrangement describes a work arrangement other than full time on-site, that has been agreed to by the associate and leader, and continues to meet the business needs of the position.

Flexible work arrangements can:

- Increase productivity
- Increase associate job satisfaction
- Improve associate retention
- Reduce absenteeism
- Allow for greater flexibility in scheduling associates to meet business needs
- Save valuable workspace
- Expand the pool of potential job candidates

While flexible work arrangements must meet business needs, they also allow associates to balance their work responsibilities and personal lives at the same time.  Flexible work arrangements are at the sole discretion of Schneider.

## PRINCIPLES

Based on the benefits to the organization and associates, Schneider supports flexible work arrangements and manages them under the following guiding principles:

- The arrangement must be a win-win situation for the organization and associate in that it meets both business and associate needs.  An arrangement may be ended if the needs of the business or associate change.  Flexible work arrangements are at the sole discretion of Schneider.
- Flexible work arrangements require a relationship of trust and mutual respect between an associate and leader.
- An associate being considered for a flexible work arrangement must currently be a good performer and must maintain a high level of performance during the flexible work arrangement.
- Each arrangement will be evaluated on its own merits taking into account the needs of the business and associate on a case-by-case basis.
- Consideration for flexible work arrangement is open to both exempt and non-exempt associates.
- Unsuccessful arrangements will not preclude associate participation in similar programs in the future.
- Flexible work arrangements will not be used to solve performance issues.
- The benefit to the organization should outweigh the cost, if any, of implementing the arrangement.  At worst, the arrangement should be cost neutral.

**SCHNEIDER GUIDELINE/ FLEXIBLE WORK ARRANGEMENT**

## TYPES

Types of flexible work arrangements include:

- Compressed work week
- Flexible start/end times
- Job share
- Part-time
- Telecommuting – There are additional guidelines and an agreement required to be signed if Telecommuting is the primary work schedule. Please talk with your leader for more information. Leaders, you can find additional resources on the LRG.

## CONSIDERATIONS

1. Which flexible work arrangement meets the needs of the business and associate? Is the associate's need for a flexible work arrangement temporary?
2. What work does the associate perform?
   - What are the needs of internal and external customers?
   - What are the needs of co-workers?
   - What are the needs of direct reports and leaders?
3. Can the arrangement be structured so that it is transparent to external and internal customers?
   - Are there certain days or hours of work that are critical to meeting the above needs?
   - Is the associate flexible to changes in the arrangement for critical meetings or emergencies?
   - How will the associate identify and cover critical needs or emergencies when out of the office?
4. Is the associate likely to be successful in the flexible work arrangement?
   - Is the associate a proven performer with a strong performance track record?
   - Is there a high degree of trust between the associate and leader(s)?
   - Does the associate have a strong commitment to make the arrangement work from a business and personal perspective?
5. How will the associate and leader ensure productivity?
   - How will productivity be measured in the flexible work arrangement?
   - What productivity standards exist?
   - Is it possible that productivity may even increase?
6. How will the arrangement be communicated?
   - Who will communicate it and how?
   - Who needs to know of the arrangement?
7. How will the flexible work arrangement be evaluated?
   - What is the appropriate trial period?
   - How often should evaluations be scheduled during and after the trial period?
   - Will feedback from others be solicited?

SCHNEIDER 000517

## SCHNEIDER GUIDELINE/ FLEXIBLE WORK ARRANGEMENT

## ACCOUNTABILITY: ORGANIZATION

The organization's accountability for the planning, implementation and evaluation of flexible work arrangements, includes the following:

- Provide and communicate flexible work arrangement guidelines
- Support equipment and other resource needs, as appropriate
- Demonstrate flexibility to associate needs
- Support leaders implementing flexible work arrangements

## ACCOUNTABILITY: LEADER

The leader's accountability for the planning, implementation and evaluation of flexible work arrangements, includes the following:

- Consider each flexible work arrangement proposal on its own merits.
- Predetermine trial period.  Set objectives and performance standards to determine success.
- Actively participate and support the planning, implementation and evaluation of flexible work arrangements.
- Ensure that an appropriate balance exists between business and associate needs.
- Focus on productivity and results of associates versus "face time".
- Consider associate input in determining the needs and terms for the flexible work arrangement.
- Ask for advice and guidance from your HR Business Partner or others who have implemented similar arrangements.
- Be open minded and supportive of associates working a flexible arrangement.
- If multiple requests are received at the same time, evaluate each request on its own merit.

## ACCOUNTABILITY: ASSOCIATE

The associate's accountability for the planning, implementation and evaluation of flexible work arrangements, includes the following:

- Think through which option makes sense and whether that option meets business needs as well as personal needs.
- Consider how the arrangement may impact his/her work and the work of colleagues.
- Submit written request to leader including the items listed in Request Process below.
- Follow normal administrative requirements such as recording of hours worked, scheduling time off, performance appraisals.
- Keep leader informed of changes or issues that may impact the effectiveness of the arrangement.
- Meet all the requirements of the job and the flexible work arrangement.
- Be flexible in the work arrangement.
- Acknowledge that at times it may be necessary to work outside the parameters of the flexible work arrangement.
- Inform others within the organization of the work schedule and who to contact outside of those hours (email and audix messages, etc.).

**SCHNEIDER GUIDELINE/ FLEXIBLE WORK ARRANGEMENT**

## FLEXIBLE WORK ARRANGEMENT MANAGEMENT

To ensure the success of a flexible work arrangement, leaders should:

- Provide appropriate and timely feedback.
- Manage by measuring results; not "face time".
- Communicate regularly. Schedule regular business partnerships.
- Expect changes, as the arrangement is refined.
- Be flexible and creative to achieve optimum results from the arrangement.
- Delegate assignments appropriately among associates working a traditional schedule and those working a flexible arrangement.
- Develop the associate working a flexible arrangement.  Take time to plan.
- Plan meetings, when possible, at times when associates working flexible arrangements can attend.
- Remember that one unsuccessful flexible arrangement does not mean all arrangements will fail.
- Be prepared if the arrangement does not work to change the arrangement or to have the associate return to a traditional work schedule.
- Help the associate remain visible.  Recognize the associate's contributions.

## REQUEST PROCESS

1. Associate requests for flexible work arrangements should follow this process: Associate submits a written proposal to his/her leader including, at a minimum, the following:
   - Name/role of associate
   - Type of flexible work arrangement requested
   - Proposed start date
   - Defined trial period
   - Detailed work schedule including hours and days of week
   - Description of how arrangement matches the needs of the business unit
   - Description of how job duties will be accomplished under arrangement
   - Advantages of request from a business perspective
   - Disadvantages of request from a business perspective
   - Process to address and resolve disadvantages
   - Process to meet the needs of customers and colleagues
   - Equipment and supplies needed, if applicable
   - Work location, if applicable
   - Productivity measurements
   - Anticipated issues to be resolved
2. Leader reviews proposal and meets with associate to discuss the flexible work arrangement proposal.
3. Leader and associate discuss terms and conditions of the arrangement. If the arrangement is not workable, the reasons should be discussed with the associate.
4. Leader and associate prepare a written document describing the terms and conditions. (If Telecommuting is the primary work schedule, there is a separate agreement that needs to be signed. Leaders, please refer to the LRG for that agreement.)
5. Arrangement is communicated to others, as appropriate.

                                           SCHNEIDER 000519

**SCHNEIDER GUIDELINE/ FLEXIBLE WORK ARRANGEMENT**

6.   Leader makes update in HR System (EBS), if appropriate.

## FOR MORE INFORMATION

Leaders should guide and support associates through the process of assessing the feasibility, implementation and evaluation of flexible work arrangements.  If you have questions regarding this process, contact your HR Business Partner.

*Owner: CAO/HR/HRLT*
*Created:  7/2001*
*Last Revised: 9/19/2017*
*Guideline valid date and time printed only – refer to intranet for current version*
*For internal associate use only.  Do not share or distribute externally.*

# REMOTE WORK POLICY

## DESCRIPTION

" Remote Work" is a work arrangement that, if leader-approved, allows an associate to consistently conduct work from home or in a remote location for all or part of the associate's workweek. This Policy, however is not intended to apply to situations where associates work from home in remote locations on an occasional, inconsistent, or temporary basis.

## PRINCIPLES

### Compensation and Work Hours

The associate's compensation, benefits, work status and work responsibilities (including core hours/availability) will not change as a result of Remote Work arrangement.

The amount of time an associate is expected to work per day or pay period will not change as a result of the Remote Work arrangement.

Non-exempt associates must accurately record all of the time they work regardless of the physical location where the work is performed, per Schneider's Timecard Reporting Policy.  At the end of each pay period non-exempt associates are required to certify that they have completely and accurately logged all hours worked during that pay period.

Non-exempt associates must also take all required meal and rest breaks in compliance with applicable law.

### Equipment/Tools

For remote work, the associate and Leader shall determine the minimum equipment and software necessary for the associate to complete assignments from the remote location in a timely, efficient, and professional manner. The Company will provide such necessary equipment, as applicable.

For approval of a remote work arrangement, the associate needs to have an internet connection and should ensure that the connection provides adequate speed and quality to efficiently complete their duties.

Only authorized Schneider associates may use equipment, software, and data supplies provided by the Company to the associate for business use at the remote work location.  The Company will provide for repairs to Company equipment.

All work conducted for or relating to Schneider, regardless of location, is subject to and covered under Schneider's technology policies and guidelines.

### Expense Reimbursement

Eligible expenses, if any, will be reimbursed in alignment with Schneider's Associate Expense Reporting and Reimbursement Policy.  Eligible expenses and amounts, if any, will be detailed in the associate's Remote Work Acknowledgement.

SCHNEIDER 000521

## REMOTE WORK POLICY (CONTINUED)

Workspace

Any Remote Work subject to this policy should be performed in a separate, designated workspace, clearly distinguishing between work and personal space.  The associate shall maintain this workspace in a safe condition.

An associate working remotely is responsible for providing office furniture for his or her home office.

Any Company materials, documents, data, and/or information taken home are subject to the Non-Disclosure & Developments Agreement.

Remote Workers are never allowed to host in-person business visits or meetings in the associate's home.  All in-person meetings with business customers, vendors, or co-workers must be conducted at a Schneider facility, a customer facility, or in an appropriate public place (e.g. a restaurant, coffee shop).  Remote Work, however, shall not be performed in a public place unless adequate steps are taken to protect the confidentiality of any work-related discussions and Company materials.

The associate's home address in our HR system will be their primary remote work location.  Leader's approval of continued remote work arrangement is required if the associate changes their state of residence.

Professionalism

At Schneider we strive for a professional workplace where our associates can be comfortable and enjoy the atmosphere while they deliver value to the business.  Due to this, associates working remote are expected to abide by our Smart Casual Dress Code Policy.  Associates should also ensure they have a professional Schneider background as they are conducting internal and external video calls.

Office Supplies

Office supplies will be provided to associates by the Company as needed.  Out-of-pocket expenses for other supplies will not be reimbursed unless by prior authorization from the associate's leader.

Worker's Compensation

Any work-related injuries incurred by associates while performing Remote Work will be covered under Schneider's workers' compensation insurance.  However, workers' compensation insurance coverage is limited to injuries that result directly from an associate's work and will only be covered if the associate's injury occurs in the designated work area during the associate's work hours.  Any claims for work-related injuries incurred while an associate is performing Remote Work will be handled according to the normal procedure for Workers' Compensation claims. Associates *must immediately report* any work-related injuries to their leader and by calling TriageNow at 855-244-0164 (in situations where an associate has already received medical treatment the associate should call 920-592-2700).

Liability

The Company is not liable for loss, destruction, or injury that may occur in or to the associate's home.  This includes family members, visitors, or others that may become injured within or around the associate's home.

## REMOTE WORK POLICY (CONTINUED)

### Dependent Care

Remote Work is not a substitute for dependent care.  Associates who work remote on a regular basis (full-time or part-time) must have dependent care arrangements.  Regardless of the associate's scheduled hours, the associate will be expected to devote his/her full work time entirely to his/her Schneider duties and will not be permitted to engage in dependent care during work hours.

Leaders may make temporary exceptions to the dependent care expectations when remote work is directed due to a natural disaster, pandemic, etc. In these instances, the company will communicate the start and end date in which this arrangement is allowed.

### Income Tax

It is the associate's responsibility to determine any income tax implications of maintaining a home office area.  The Company will not provide tax guidance, nor will the Company assume any additional tax liabilities.  Associates are encouraged to consult with a qualified tax professional to discuss income tax implications.

### Communication

Associates must be available by phone, video conference and email during scheduled work time.  Associates must also be available for staff meetings and other meetings deemed necessary by leadership. Depending on location and role, the associate may be required to travel for business partnerships, customer visits, etc.  Schneider leaders, at their discretion, may require an associate (even one allowed to work remotely) to report to a Schneider location for in-person meetings or events.  Remote workers must comply with such leadership directives. Failure to do so may result in the termination of the associate's Remote Work arrangement as well as other disciplinary action.

### Termination of Remote Work Arrangement

Remote Work is available only to eligible associates, at the Company's sole discretion.  Remote Work is not an associate benefit, nor is it intended to be available to the entire organization.  As such, no associate is entitled to, or guaranteed the opportunity to, work remotely (or to continue doing so).  Schneider may end an associate's participation in the Remote Work program, with or without cause, at any time.  Schneider will not be held responsible for costs, damages or losses resulting from cessation of participation in remote work.

### Company Policies, Guidelines and Key Processes

The associate remains obligated to comply with all Company policies, guidelines and key processes.

This policy does not alter the at-will nature of employment and nothing contained herein shall be construed as a contract of employment or a right to any guaranteed benefit.

## FOR MORE INFORMATION

If you have questions regarding this policy, speak with your direct Leader or contact your HR Business Partner.

*Owner: CAO/HR/HRLT*
*Created:  10/1/2014*
*Last Revised: 9/29/2020*
*Last Reviewed: 9/29/2020*
*Valid date and time printed/saved only – refer to Compass for current version.  For internal associate use only.  Do not share or distribute externally.*



# Teleworking Guidelines

**Definition**
Teleworking is a work arrangement that allows an associate to consistently conduct work from home, on the road or in a remote location for all or part of the associate's workweek.  Application of this guideline is not required in situations where associates work from home, on the road or in remote locations on an intermittent or inconsistent basis.

**Overview**
Schneider considers teleworking to be a viable alternative work arrangement in cases in which the characteristics of the job lend themselves to it and the associate and leader agree that teleworking is an appropriate approach. Teleworking is a voluntary work alternative that may be appropriate for some associates and some jobs.  It is not a Company-wide benefit, and it in no way changes the associate's terms and conditions of employment with Schneider**.**  Schneider reserves the right to refuse to make teleworking available to an associate and to terminate a teleworking arrangement at any time.  Schneider's guidelines for teleworking are as follows:

**Compensation and Work Hours**
The associate's compensation, benefits, work status and work responsibilities will not change as a result of teleworking arrangement.

The amount of time the associate is expected to work per day or pay period will not change as a result of teleworking arrangement.

Non exempt associates must accurately document their hours worked per Schneider's Timecard Reporting Policy.

**Eligibility**
Associates will be selected for teleworking based on a variety of factors, some of which include: job description, location from the office, current performance levels, and required frequency of daily communication with others located in the office, an evaluation of the likelihood of the associate being a successful teleworker, evaluation of the associate's leader's ability to manage remote workers, etc.

The arrangement must be a win-win situation for the organization and associate in that it meets both business and associate needs.  An arrangement may be ended if the needs of the business or associate change.  Telework arrangements are at the sole discretion of Schneider.  An associate being considered for a telework arrangement must currently be a good performer and must maintain a high level of performance during the arrangement.  Each department will make its own selections.  All teleworkers must sign a Teleworking Agreement.

**Equipment/Tools**
The Company may provide specific tools/equipment for the associate to perform his/her duties.  This may include computer hardware, computer software, phone, email, voice-mail, connectivity to host applications, and other applicable equipment as deemed necessary.

The use of equipment, software, and data supplies when provided by the Company for use at the remote work location is limited to authorized persons and for purposes relating to Company business.  The Company will provide for repairs to Company equipment.  When the associate uses her/his own equipment, the associate is responsible for maintenance and repair of his/her equipment.

All work conducted for or relating to Schneider, regardless of location, is subject to and covered under Schneider's technology policies and guidelines.

**Expense Reimbursement**
Eligible Expenses will be reimbursed in alignment with Schneider's Associate Expense Reimbursement Policy. Eligible expenses and amounts will be detailed in the associate's Teleworking Agreement.

Confidential                                                                     SCHNEIDER 000524



## Workspace
A separate, designated workspace is required, clearly distinguishing between work and personal space.  The associate shall maintain this workspace in a safe condition.

The teleworker is responsible for providing office furniture.  Any Company materials taken home are subject to the Non-Disclosure & Recognition of Intellectual Property Rights Policy.

The teleworker is not permitted to hold business visits or in person meetings with business customers or co-workers at the telework site.

## Office Supplies
Office supplies will be provided by the Company as needed.  Out-of-pocket expenses for other supplies will not be reimbursed unless by prior approval of the associate's leader.

## Worker's Compensation
The Company will be responsible for any work-related injuries under the associate's state's Workers Compensation laws, but this liability is limited to injuries resulting directly from work and only if the injury occurs in the designated work area during the associate's work hours.  Any claims will be handled according to the normal procedure for Worker's Compensation claims.

## Liability
The Company is not liable for loss, destruction, or injury that may occur in or to the associate's home.  This includes family members, visitors, or others that may become injured within or around the associate's home.

## Dependent Care
Teleworking is not a substitute for dependent care.  Regardless of the associate's scheduled hours, the associate will be expected to devote his/her time entirely to his/her work and will not be permitted to engage in dependent care during those scheduled hours.

## Income Tax
It will be the associate's responsibility to determine any income tax implications of maintaining a home office area. The Company will not provide tax guidance nor will the Company assume any additional tax liabilities.  Associates are encouraged to consult with a qualified tax professional to discuss income tax implications.

## Communication
Associates must be available by phone and email during scheduled hours, and be available for staff meetings and other meetings deemed necessary by leadership. Depending on location and role, the associate may be required to travel for business partnerships, customer visits, etc.

## Termination of Teleworking Arrangement
Teleworking is available only to eligible associates, at the Company's sole discretion.  Teleworking is not an associate benefit intended to be available to the entire organization.  As such, no associate is entitled to, or guaranteed the opportunity to, telework.  Either party may terminate an Associate's participation in the program, with or without cause, upon reasonable notice, in writing, to the other party.  Schneider will not be held responsible for costs, damages or losses resulting from cessation of participation in the teleworking program.

## Company Policies, Guidelines and Key Processes
The associate remains obligated to comply with all Company policies, guidelines and key processes.  Teleworking in no way impacts at will employment.

*Owner: CAO/HR/HRLT*
*Created:  10/2014*
*Revised: 12/1/2014*
*Guideline valid date and time printed only – refer to Leader Resource Guide for current version*

Confidential                                                                                                    SCHNEIDER 000525

Page 1

IN THE UNTIED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

CIERRA GETER,                    )CASE NO.:
                                 )20-CV-01148-SCJ-JSA
   Plaintiff,                    )
                                 )
vs.                              )
                                 )
SCHNEIDER NATIONAL CARRIERS,     )
INC.,                            )
                                 )
      Defendants.                )
_____)


      The video conference deposition of CIERRA
GETER taken pursuant to Notice and agreement of
counsel for any and all purposes allowed under
the Georgia Civil Practice Act; the reading and
signing of the deposition is being reserved;
taken before Morgan Spriggs, Certified Court
Reporter and Certified Verbatim Reporter in and
for the State of Georgia to commence at
10:00 A.M. on the 9th day of March, 2021.  All
parties completely remote.



1   were you suffering from during that time period?

2       A.   In July of 2013 when I was with Brito

3   Produce, LLC on my last run with them I was on

4   85 south heading home on the weekend of July 4th

5   and I was at the Love's truck stop and I was

6   assaulted.  So from that point, I didn't want to

7   be in a truck for a while.

8       Q.   When you say you were assaulted, can you

9   provide a little bit more detail as to the type

10  of assault?

11      A.   Yes.  I was at the truck stop and I was

12  doing a walk-around.  It was around about 8:00 or

13  9:00 p.m. Eastern Standard, and I was doing a

14  walk-around around my truck.  And when I got to

15  the back of my truck, it was a gentleman waiting

16  there for me to try to sexually assault me and I

17  had to fight him off physically.

18      Q.   And did you contact the police?

19      A.   No, because I was afraid.  And at that

20  time, I was just trying to get home and I didn't

21  have nowhere else to go and I just wanted to get

22  home.  I was just too afraid to even do that

23  because I was in a foreign state.  So I just got

24  in my truck and booked it, told my dispatcher

25  when I got back -- [inaudible].



Page 29

1       Q.  Did you suffer any physical injuries as

2   a result of this assault?

3       A.  I had some scrapes from fighting him and

4   a couple bruises.

5           MS. LEGARE:  Pete?

6           MR. MILIANTI:  Yes.

7           MS. LEGARE:  Break real quick?

8           MR. MILIANTI:  Yes, that's fine.

9   (Break taken from 10:52 a.m. to 10:54 a.m.)

10  BY MR. MILIANTI:

11      Q.  I take it that after you suffered this

12  assault, you stopped working for Brito Produce?

13      A.  Yes.

14      Q.  And you stopped working for Brito

15  Produce because of this assault?

16      A.  Correct.

17      Q.  And you mentioned that you were under

18  mental distress.  What symptoms were you

19  suffering from --

20      A.  I was having --

21      Q.  -- at that time?

22      A.  I'm sorry.  A lot of panic attacks and

23  nightmares.

24      Q.  Any other symptoms that you suffered

25  from at that time?



Page 30

1          A.  I remember I had a lot of outbursts and
2     I didn't know why.  I had a lot of, like, angry
3     outbursts.
4          Q.  Did you see a healthcare provider as a
5     result?
6          A.  At that time no, because I didn't have
7     health insurance.
8          Q.  Do you recall the first time that you
9     were treated by a healthcare provider resulting
10    from any symptoms stemming from this assault?
11         A.  I remember when I became employed with
12    Schneider and I got my healthcare benefits I was
13    -- I became a patient with Dr. Maria Goyco at
14    Piedmont and I was telling her about it.  Even
15    though it was a year later, I was telling her and
16    she -- that's when she first put me on, I
17    believe, antidepressants around that time.
18         Q.  I'm sorry.  What was the name of that
19    physician?
20         A.  I'm sorry.  Maria Goyco, G-o-y-c-o.
21         Q.  And she's a physician at Piedmont?
22         A.  Yes, sir.
23         Q.  And you believe you first treated with
24    her about a year after this assault?
25         A.  Correct.  Because I was explaining to



Page 31

1    her the same thing I just stated to you.

2        Q.   And were you suffering from panic

3    attacks, nightmares and outbursts at the time

4    that you saw Dr. Maria Goyco?

5        A.   Correct.

6        Q.   Do you know what type of physician

7    Dr. Goyco is?

8        A.   Yes.   Internal medicine and family

9    practice.

10       Q.   Was she your general -- just a general

11   practitioner?

12       A.   Yes, sir.

13       Q.   And you mentioned that -- I'm sorry.

14   This would have been approximately July of 2014

15   that you started treating with Dr. Maria Goyco?

16       A.   No, not July of 2014.   I got employed in

17   2014, so my benefits did not kick in until 90

18   days later, so that would've been an issue.   But

19   she became my physician that year, once my

20   benefits kicked in.

21       Q.   Okay.   So the first time that you would

22   have treated with Dr. Goyco was sometime in the

23   latter half of 2014; would that be accurate?

24       A.   Yes, sir.   Correct.

25       Q.   Okay.   And at that time she put you on



Page 32

1  antidepressants; is that -- is that right?

2      A.  Yes, sir.

3      Q.  Any other medications that you can

4  recall that she prescribed for you as a result of

5  the assault that you endured in -- in 2013?

6      A.  Other than the antidepressants for my

7  migraines I was starting to have, she gave me

8  just the pain medicine for my migraines.  All of

9  those were switched over, so I can't recall all

10  of those names of the medication right now.

11      Q.  And did you start experiencing migraines

12  as a result of the assault in 2013, or did that

13  predate the assault?

14      A.  How can I put this?  They -- my episodes

15  started again because I had cluster headaches as

16  a teenager.  So, like, my migraines and cluster

17  headaches as a teenager, so I didn't have that

18  until that assault occurred.  Like I guess it

19  triggered it and that's when they came back, but

20  I did have them prior to the assault when I was a

21  teenager.

22      Q.  Okay.  So if I understand correctly, as

23  a teenager you suffered from cluster headaches.

24  You were able to get that under control, and then

25  they -- and the migraines started -- the episodes



Page 33

1  started after the assault in July of 2013; would

2  that be accurate?

3     A.  Yes.

4     Q.  Any other symptoms -- when did you start

5  with the migraines -- I'm sorry -- or restart

6  with migraines?

7     A.  Restart with the migraines?  It was,

8  like, literally, I think, around, like,

9  September, October of 2013.  I remember having

10  one of -- a really, really bad episode.  And I

11  didn't want to go to the doctor at the time

12  because, of course, I didn't have healthcare

13  insurance, so I went -- just -- oh I know what I

14  did.

15     I called the Grady Healthcare hotline here

16  in Atlanta, the main hospital, and I just asked

17  the nurse what I could do for a home remedy for

18  my migraine because I couldn't even go to the

19  doctor and they don't mind, you know, servicing

20  the community.  So I remember that.

21     Q.  So prior to the time that you started

22  employment at Schneider in 2014, would it be

23  accurate to say that you were suffering from

24  panic attacks, nightmares, outbursts, and

25  migraines?



Page 34

```
 1        A.  Yes.

 2        Q.  Any other medical conditions from which

 3   you were suffering as a result of the assault

 4   prior to the time that you started with Schneider

 5   in 2014?

 6        A.  No, sir.

 7        Q.  And from the time of the assault in July

 8   of 2013 until the time you started at Schneider

 9   in roughly July of 2014, how frequently were you

10   having panic attacks; do you recall?

11        A.  At least -- I know for sure at least

12   once a day.  I was having them a lot.  It could

13   be one little thing and it'd set me off.

14        Q.  And how frequently were you having

15   outbursts during that time period of July 2013 to

16   July 2014?

17        A.  Quite frequent as well.  Not as

18   frequently as, like, a day-to-day thing, but I

19   would say probably once a week, give or take,

20   yeah.

21        Q.  And from the time of the assault until

22   the time you started at Schneider in 2014 -- July

23   of 2014, how frequently were you having

24   nightmares?

25        A.  Weekly.  Every other night, actually.
```



Page 35

1       Q.   And during the time period from the
2   assault until the time you started at Schneider
3   in July of 2014, how frequently were you having
4   migraines?
5       A.   Probably once a week, twice a week.
6   Once or twice a week.
7       Q.   And did -- you worked at Providence
8   Realty Group as an administrative assistant from
9   February 2014 through May 2014; is that right?
10      A.   Yes.
11      Q.   And why did you only work there for a
12  few months?
13      A.   She only needed me to help her during
14  tax season with her books and she told me to
15  start looking for employment in April.  That's
16  why I started looking for employment and then she
17  let me go on May 1st, because she said I no
18  longer need you, thank you for this season, you
19  know, so I was like, okay.  I appreciate it.
20  I've been unemployed for a while anyway, so thank
21  you for the opportunity.
22      Q.   All right.  And then you started looking
23  for a position in customer service?
24      A.   Customer service and logistics as well.
25  Uh-huh.  (Affirmative).



Page  38

1    Schneider's website?

2         A.  Yes, sir.

3         Q.  All right.  And do you recall the

4    position that was open and available that you

5    applied for?

6         A.  Yes.  The position at the time was a

7    driver manager -- we were called -- we weren't

8    called area planning managers at the time.  We

9    were called something else.  I think it was,

10   like, dispatch managers or something like that.

11   That was the position at that time.  And then,

12   like, a year later they called us area planning

13   managers, like they switched out titles a couple

14   times, so -- but it's the same position as an

15   area planning manager.

16        Q.  Okay.  So you saw a position listed for

17   dispatch manager and you applied for that

18   position; is that right?

19        A.  Correct.

20        Q.  Okay.  All right.  And did you -- how

21   long after you -- let me strike that.

22        Were you interviewed for the position?  Did

23   you interview for the position?

24        A.  Yes.  I had five interviews.

25        Q.  Do you recall whom you interviewed with?



```
 1          A.  Yes.  I had two interviews with Greg
 2    Cochran, which was the operation manager at the
 3    time of Atlanta.  And can I make a correction to
 4    the record?
 5          Q.  (Shakes head up and down.)
 6          A.  Tony was not the operation manager.  He
 7    was the regional manager.  He was the region and
 8    operation manager.
 9          Q.  Did you interview with Tony?
10          A.  Yes.  I had to do one interview with
11    Tony, one interview with Marianne, and then I had
12    to do a phone interview -- he's no longer there,
13    but he created their software at the time they
14    were using for dispatch.  I cannot remember his
15    name per se, but he was my last interview, and I
16    remember it being on the phone.  It was dealing
17    with Oracle and he was the developer, so he
18    wanted to make sure I was familiar with the
19    software of Oracle and how Oracle is used, which
20    I used in banking before.
21          Q.  Okay.  And you said that you interviewed
22    with Marianne?
23          A.  Yes.
24          Q.  Do you recall Marianne's full name?
25          A.  Marianne Rose -- it's hyphenated.  It's
```



Page 40

 1    Marianne Biskey-Rose, I believe.

 2         Q.  Okay.  All right.  And did you interview

 3    with these folks collectively or separately?

 4         A.  Separately.

 5         Q.  And do you recall what, if anything,

 6    they told you about the specific duties for this

 7    position?

 8         A.  They stated that -- that they were

 9    looking for a team player, someone that is

10    enthusiastic about learning, also someone that is

11    willing to work under a high stress environment

12    and be a collective team participant and

13    eventually a leader.

14         Q.  At the time that you interviewed for the

15    position, did you understand it to be a full-time

16    position?

17         A.  Correct.

18         Q.  And do you know who -- obviously you

19    were ultimately hired into the position, right?

20         A.  Yes.

21         Q.  Do you know who hired you?

22         A.  Yes.  Greg Cochran.

23         Q.  Do you know if Marianne recommended you

24    for hire?

25         A.  I do not know.  They did not disclose



Page 41

1    any of that type of information to me.

2        Q.  Okay.  If you could look at -- it should

3    be the next document in that pile.  It should be

4    Bates-stamped Schneider 506 through 507.

5        A.  Uh-huh, yes.

6        Q.  Do you see that document?

7        A.  Yes.

8        Q.  Okay.  So let's mark this as Plaintiff's

9    Deposition Exhibit number 2.  And Ms. Geter, this

10   is the offer letter that you received from

11   Schneider; is that correct?

12          (Plaintiff's Exhibit 2 was

13            marked and identified.)

14       A.  That is correct.

15       Q.  Okay.  And this document is dated July

16   2, 2014; is that right?

17       A.  Yes.

18       Q.  Okay.  And did you receive this document

19   on or about that date?

20       A.  Yes.  Via e-mail.  Uh-huh.

21   (Affirmative).

22       Q.  Okay.  And is that -- that's your name

23   and address on the first page of this document?

24       A.  Yes.

25       Q.  Okay.  And if you look under position on



Page 42

1   this first page, it says, dispatch analyst; do

2   you see that?

3        A.  Yes.

4        Q.  Does that refresh your memory as to the

5   title of the position?

6        A.  Yes, it does.  I knew it had dispatch

7   something in it.

8        Q.  And you said -- you testified that the

9   title was changed to area planning manager about

10  a year later; is that right?

11       A.  Yes, sir.  Like a year to a year and a

12  half later, they did a transition of position and

13  titles.

14       Q.  But the job duties remained the same,

15  just a title change; is that right?

16       A.  Correct.

17       Q.  Okay.  And if you look under where it

18  says position it says, dispatch analyst; 3rd

19  shift; full time 40 hours per week; exempt.  Do

20  you see that?

21       A.  Yes.

22       Q.  Okay.  And that was your understanding

23  of the position for which you were hired,

24  correct?

25       A.  Correct.



Page 43

1      Q.  And it says 3rd shift.  Do you know --
2  what were your hours when you first started as a
3  dispatch analyst?
4      A.  I worked from 11:00 p.m. to 7:00 a.m.
5  and my days I worked were Wednesday through
6  Sunday.
7      Q.  Wednesday through Sunday?
8      A.  Correct.
9      Q.  And you worked at the Fairburn location;
10  is that right?
11      A.  Yes, sir.
12      Q.  How far was that location from your
13  home?
14      A.  6.2 miles.
15      Q.  And to whom did you report when you
16  first started?
17      A.  When I first started Shawn Brantley and
18  Greg Cochran.
19      Q.  Do you recall how long you reported to
20  those two individuals?
21      A.  Shawn until he quit in February 2018.
22  February 2018, I think that's the month he quit
23  and the year he quit.
24      Q.  That's when Shawn left Schneider?
25      A.  Yes, sir.  And then I believe Greg



MAGNA ▶
LEGAL SERVICES

Page 51

```
1   like empty containers and loaded containers if
2   they came from previous customers, we have them
3   relay it there for another driver to pick it up
4   to the next destination.
5        Q.  Okay.  We can go to the next exhibit,
6   which I -- let's mark as Exhibit 4 and this is
7   Bates-stamped Schneider 0092 through 0094.
8             (Plaintiff's Exhibit 4 was
9              marked and identified.)
10       A.  Yes.
11       Q.  Okay.  You've been -- you have in front
12  of you what we'll mark as Plaintiff's Exhibit
13  number 4 and it's entitled job description
14  manager, area planning; is that right?
15       A.  Yes.
16       Q.  Okay.  And do you recognize this
17  document?
18       A.  Yes.
19       Q.  Okay.  You've seen it before?
20       A.  Yes.
21       Q.  Okay.  And this is the copy of the job
22  description for an area planning manager; is that
23  right?
24       A.  Yes.
25       Q.  And that is the position that you held
```



Page 52

1    while employed at Schneider; is that correct?

2         A.  Yes.

3         Q.  Okay.  And if you could just look at the

4    job summary and read it to yourself and let me

5    know when you're finished.

6         A.  Yes.

7         Q.  Okay.  And does this accurately

8    summarize your job duties as an area planning

9    manager?

10        A.  Yes, sir.

11        Q.  That you will be accountable for

12   establishing, communicating, and executing the

13   plan for a specific geographic region or a

14   specific customer by matching an available driver

15   capacity and equipment with customer load

16   tenders; is that right?

17        A.  Yes.

18        Q.  Okay.  And did you work as an -- as an

19   area planning manager, did you work for a

20   specific geographic region?

21        A.  I worked for Atlanta, Charlotte, Miami

22   -- Atlanta, Charlotte, Miami, Orlando -- give me

23   a second.  I'm sorry.  It's been a minute.

24   Jacksonville.  There's one more we had.  And this

25   is just since 2016?



Page 53

1      Q.  Yes.

2      A.  Okay.  Yeah.  So Atlanta, Charlotte,

3  Miami, Orlando, Jacksonville, and Savannah.

4      Q.  And that's all for the intermodal

5  division, right?

6      A.  For the southeast division that I worked

7  at, correct.

8      Q.  All for the southeast intermodal

9  division?

10     A.  Correct.

11     Q.  Okay.  And if you -- do you see under

12  essential job duties and responsibilities?

13     A.  Yes.

14     Q.  Why don't you take a look at that and

15  let me know when you're done.

16     A.  Okay.  Yes.

17     Q.  Okay.  And as reflected in this document

18  -- strike that.

19     Do the bullet points under essential job

20  duties and responsibilities accurately reflect

21  the position of area planning manager?

22     A.  Yes, sir, to my recollection -- the best

23  of my recollection.

24     Q.  And these were the essential duties and

25  responsibilities for that position; is that



Page 54

1   right?

2        A.   Yes.

3        Q.   And would it be accurate to say that one

4   of your primary duties was supporting the

5   drivers?

6        A.   Yes, sir.

7        Q.   And you would take calls and messages

8   from drivers; is that right?

9        A.   Yes, sir.

10        Q.   You would help drivers resolve any

11   issues that they had?

12        A.   Yes, sir.

13        Q.   And you frequently interacted with the

14   drivers face-to-face; is that correct?

15        A.   Yes, sir.  Only the Atlanta drivers

16   face-to-face.

17        Q.   Atlanta drivers.  And you mentioned

18   there were, if I recall correctly, approximately

19   250 Atlanta drivers?

20        A.   No.  That's 2,250 drivers total in the

21   southeast region.

22        Q.   Okay.  How many --

23        A.   Atlanta -- go ahead.

24        Q.   How many Atlanta drivers?

25        A.   I believe it was between a hundred and a



Page 55

1   hundred and ten.  It just fluctuated depending on

2   the season of trucking.  So they have -- like a

3   lot of drivers would leave and then some drivers

4   will come back and then they do a big hiring in

5   the middle of the year.  So it just depends on

6   the season.

7        Q.  Okay.  So you would have -- would it be

8   accurate to say that you would have frequent

9   face-to-face interaction with the Atlanta

10  drivers?

11       A.  Correct.

12       Q.  If you turn to the second page of this

13  document --

14       A.  Yes, sir.

15       Q.  -- do you see where it says skills/

16  behaviors necessary to perform job?

17       A.  Uh-huh.  (Affirmative).

18       Q.  Is that a yes?

19       A.  Yes, sir.

20       Q.  Okay.  And it states, abilities or

21  qualities an associate must possess in order to

22  perform the essential job duties listed by core

23  competency; do you see that?

24       A.  Yes.

25       Q.  And under communication it says, ability



Page 58

1   me, please?  I'm sorry.

2        Q.  Sure.  Would it -- would it be accurate

3   to say that in your role as an area planning

4   manager, it was necessary for you to be in the

5   office to support a driver if they came in with

6   an issue?

7        A.  No.

8        Q.  Why?

9        A.  And I can explain.

10       Q.  Why do you believe you didn't need to be

11   in the office?

12       A.  Well, depending on the circumstances

13   most -- from my driving experience, most of my

14   dispatchers from my experience they were in a

15   whole other state.  And then we were dealing with

16   drivers in Miami that had breakdowns, and the

17   only thing we can do is direct them to -- we

18   could take the loads off of them and direct them

19   on what to do, send them to the safety management

20   team, SEM.

21       If they have a breakdown or if it's, like, a

22   driver personal issue, we e-mail their DBL and

23   then the driver will call them the next day or

24   talk to their DBL, which is a driver business

25   leader and then we're putting in the handoff.



Page 59

1    But my Atlanta drivers, yes, I feel as though

2    that they appreciated us being in the office so

3    they can have face-to-face human interaction, so

4    I can definitely understand that standpoint and

5    that viewpoint as well.

6         However, I know for sure that we dispatch

7    drivers from Quebec.  That's across the

8    international lines, so you know, when they had

9    issues, we were the ones in Atlanta, Georgia that

10   had to help them, but we only were limited to

11   what we could do because of our distance and

12   communication with them at that time.

13        Q.  Would it be accurate to say that

14   Schneider wanted you to have face-to-face

15   interaction with the Atlanta drivers --

16        A.  Yes.

17        Q.  -- in your position as an area planning

18   manager?

19        A.  Yes.

20        Q.  Okay.  And they deemed that -- Schneider

21   deemed that important because they wanted you to

22   develop those relationships with the Atlanta

23   drivers; is that right?

24        A.  Correct.

25        Q.  Would you agree with me that there were



Page 64

1    it's very common and I will do it as well.

2         A.   I'm so sorry about that.

3         Q.   All right.  Do you have Exhibit number 6

4    in front of you?

5         A.   Yes.

6         Q.   Do you -- and this is -- this is a 2018

7    associate acknowledgement form.  Do you recognize

8    this document?

9         A.   Yes.

10        Q.   Do you recall completing the 2018

11   associate acknowledgement recertification form?

12        A.   Yes.

13        Q.   All right.  And under number one, it

14   states that you acknowledge that the -- and I'll

15   just summarize here, the equal -- the code of

16   conduct, equal opportunity employer, the

17   antitrust discrimination, harassment and

18   retaliation prevention, drug and alcohol policies

19   have been made available to you and you

20   understand, agree, and acknowledge to abide by

21   them during your employment with Schneider; is

22   that right?

23        A.   Yes.

24        Q.   Okay.  And you acknowledge that you

25   reviewed the Schneider policies and understand



Page 65

1   them or that you will promptly review the

2   Schneider policies and agree to immediately bring

3   any questions you have about them to your leader

4   or human resource business partner; is that

5   right?

6          A.  Yes.

7          Q.  Okay.  And if we look down near the end

8   of number one, you clicked the tab that says I

9   agree, right?

10         A.  Yes.

11         Q.  Okay.  I'm going to put that one aside.

12  We can go to the next exhibit, which will be

13  Exhibit number 7, and it's Bates-stamped

14  Schneider -- it has Exhibit A on it, which we can

15  cross off.  But it's Schneider 271 through 274.

16         (Plaintiff's Exhibit 7 was

17           marked and identified.)

18         A.  Yes.

19         Q.  Okay.  So Exhibit 7 is Schneider's

20  discrimination, harassment and retaliation

21  prevention policy; is that right?

22         A.  Yes.

23         Q.  Do you recognize this document?

24         A.  Yes, sir.

25         Q.  And you are aware that throughout your



Page 66

1    employment, Schneider's policies were available

2    to you on its intranet; is that right?

3         A.  Yes.

4         Q.  And was this particular policy, the

5    discrimination, harassment and retaliation

6    prevention policy available to you on Schneider's

7    intranet?

8         A.  Yes.

9         Q.  And have you reviewed this policy

10   before?

11        A.  Yes.

12        Q.  All right.  And if you look under

13   principles it states, it is the policy of

14   Schneider that harassment, discrimination and

15   retaliation are prohibited and will not be

16   tolerated; do you see that?

17        A.  Yes.

18        Q.  And was that your understanding?

19        A.  Yes.

20        Q.  If you turn to the second page under

21   complaint reporting procedures; do you see that?

22        A.  Yes.

23        Q.  All right.  If you look to kind of the

24   middle, I think it's the third sentence, it says,

25   associates who believe they are being subjected



1     Q.  All right.  Ms. Geter, are you ready to

2  resume your testimony?

3     A.  Yes, sir.

4     Q.  Okay.  Who is Travis Torrence?

5     A.  He was my team lead at the time.

6     Q.  Do you know when he became your team

7  lead?

8     A.  I believe mid or early -- early to

9  mid-2018.

10     Q.  And prior to him becoming your team

11  lead, do you know what position he held?

12     A.  Yes.  Area planning manager of Atlanta

13  on first shift.

14     Q.  Was he one of your -- one of your peers?

15     A.  Yes, he was one of my peers.

16     Q.  Did you ever work with him when he

17  worked as an area planning manager?

18     A.  Yes.  Travis helped train me.

19     Q.  And do you know to whom Travis reported

20  when he was a team lead?

21     A.  Yes.  Doug Horton.

22     Q.  And do you know who Doug Horton reported

23  to?

24     A.  Marianne Biskey-Rose.

25     Q.  Do you know -- as a team lead, did



1    Travis supervise you?

2        A.  Yes, he did.

3        Q.  Let me ask it a different way.  What

4    type of support would Travis provide for you as a

5    team lead?

6        A.  He would support us if someone was out

7    sometimes and cover their shift.  Sometimes he

8    would jump in and help with the calls and the

9    messages if we get bombarded.  But mainly he was

10   supposed to be, like, the floater of the team to

11   basically fill in and help out where the team

12   needed him to be.  That's what -- that was my

13   understanding because of how our previous team

14   lead was as well.

15       Q.  And was he team lead over a specific

16   shift; do you know?

17       A.  Yes.  Second and third shift, which is a

18   collaborative support team.

19       Q.  And do you know how many area planning

20   managers -- during the time period of mid-2018

21   through the termination of your employment, how

22   many area planning managers were on the third

23   shift?

24       A.  Yes.  Four.

25       Q.  And what are -- what are the names of



Page 71

1       those area planning managers?

2              A.  Excluding myself, Audrianne Williams.

3       Do you need me to spell her name?

4              Q.  No.

5              A.  Okay.

6              Q.  Well, yes, yes.

7              A.  To the best of my ability,

8       A-u-d-r-i-a-n-n-e, I believe, and Williams,

9       W-i-l-l-i-a-m-s.

10             Q.  Okay.

11             A.  Desmond Seymour.  That's, D-e-s-m-o-n-d;

12      Seymour, S-e-y-m-o-u-r.  And Ms. Elaine Young,

13      that's E-l-a-i-n-e, and Young, Y-o-u-n-g.

14             Q.  Okay.  Do you know Ms. Williams' race?

15             A.  African American.

16             Q.  And Mr. Seymour's race?

17             A.  African American.

18             Q.  And Ms. Young's race?

19             A.  African American.

20             Q.  And did all -- the four of you then

21      worked third shift; is that correct?

22             A.  Correct.

23             Q.  Okay.  And did they work the same hours

24      as you?

25             A.  Yes, they did.  I actually had the



1    extended hours out of the bunch during this time.

2         Q.  And from mid-2018 through the

3    termination of your employment, what were your

4    hours?

5         A.  11:00 p.m. to 10:00 a.m.

6         Q.  So you worked an 11-hour shift?

7         A.  Yes, sir.

8         Q.  And what days of the week did you work

9    between mid-October mid 2018 through the

10   termination of your employment?

11        A.  Wednesday, Thursday, Friday, and Sunday.

12        Q.  Those were your scheduled days?

13        A.  Yes, sir.

14        Q.  And when did you start working that

15   schedule, Wednesday, Thursday, Friday, Sunday

16   11:00 p.m. to 10:00 a.m.; do you recall?

17        A.  No, I do not recall at this time.

18        Q.  Was it prior to the time that you

19   started reporting to Travis?

20        A.  Yes, sir.  I was under, I believe,

21   Rodney Dunn when they switched those schedules

22   over.  I just can't remember the specific time.

23        Q.  Did you have a good working relationship

24   with Travis?

25        A.  Yes.



Page 75

1        Q.  Do you know for Ms. Williams,
2    Mr. Seymour, and Ms. Young what their work hours
3    were during the 2018 through 2019 time period?
4        A.  I believe Desmond Seymour's hours --
5    because he had -- yeah, his hours was at
6    10:00 p.m. to 6:00 a.m.  Audrianne's hours was
7    10:30 p.m. to 8:00 a.m.  Ms. Elaine's hours was
8    from 11:00 p.m. to 7:00 a.m.
9        Q.  And do you know what days of the week
10   they worked?
11       A.  I do remember -- I remember -- I
12   remember their off days, so I would have to write
13   it out.  Could I come back to that for you?
14       Q.  They didn't work the same days as you
15   did; is that accurate?
16       A.  Correct.  They did, except for
17   Thursdays.  Thursday night I was by myself.
18       Q.  And when you would request time off,
19   would you -- during the 2018 -- mid-2018 through
20   the date of your termination in 2019, would you
21   request time off from Travis?
22       A.  Yes.  Via e-mail and via our ADP on the
23   portal.
24       Q.  And if you had questions about work,
25   would you reach out to Travis to answer those



Page 77

```
 1        And Julissa.  I don't remember her last
 2   name, but she is located at the Atlanta
 3   operations center.  She switched departments, but
 4   she was under that team as well.
 5        Q.  And Ms. Kopf, what was her race; do you
 6   know?
 7        A.  Caucasian.
 8        Q.  How about Mr. Parker?
 9        A.  African American.
10        Q.  Ms. Smith?
11        A.  African American.
12        Q.  Wakita?
13        A.  African American.
14        Q.  And Julissa?
15        A.  African American.
16        Q.  Do you know whether the -- I'm sorry.
17        You mentioned that Wakita was a temp?
18        A.  Yes.  At that time.
19        Q.  Okay.  At that time.  Do you know who
20   her employer was?
21        A.  No, sir.
22        Q.  And was Julissa a temp?
23        A.  Yes, sir.
24        Q.  Do you know who her employer was?
25        A.  No, sir.  They did not disclose that to
```



Page 78

1   us.

2        Q.  Do you know whether Ms. Williams ever

3   worked a reduced schedule?

4        A.  No.

5        Q.  Do you know whether Mr. Seymour ever

6   worked a reduced schedule?

7        A.  No.

8        Q.  Do you know whether Ms. Young ever

9   worked a reduced schedule?

10       A.  No.  Can I also add with Ms. Young?

11   She's the temp on third shift.  She was the temp

12   for third.

13       Q.  Okay.  Do you know who employed

14   Ms. Young?

15       A.  No, sir, I did not.  I just came to work

16   that day and she was there.

17       Q.  Do you know when she started as a temp?

18       A.  January of 2018 -- no.  I'm sorry.

19   January 2019.  My correction.  I'm so sorry.

20       Q.  Do you know if Ms. Kopf ever worked a

21   reduced schedule?

22       A.  No, sir.

23       Q.  Do you know whether Mr. Parker ever

24   worked a reduced schedule?

25       A.  No, sir.


MAGNA ▶
LEGAL SERVICES

Page 83

1   employment.

2       Q.  Do you know whether Julissa worked

3   reduced hours?

4       A.  No, sir.  She was full-time employment

5   as well.

6       Q.  During your employment at Schneider, are

7   you aware of any area planning managers who were

8   hired for a part-time position?

9       A.  I'm thinking.  Give me one second.  No,

10  sir, not to my knowledge at this time.

11      Q.  In your lawsuit against Schneider you're

12  alleging that you suffer from a disability; is

13  that correct?

14      A.  Yes, sir.

15      Q.  And what disability do you suffer from

16  or disabilities?

17      A.  Post-traumatic stress syndrome, major

18  depression and panic disorder.

19      Q.  And do these all stem from the assault

20  that you suffered in July of 2013?

21      A.  Yes, sir.  And also from my -- I had an

22  incident on the truck when I was in Canada when I

23  was a driver for Con-way.

24      Q.  And why don't you tell me about that.

25      When were you a driver for Con-way?



Page 87

1    Yeah, I believe so.

2         Q.  Do you know who diagnosed you with major

3    depression in September of 2015?

4         A.  Dr. Maria Goyco.

5         Q.  And do you know who diagnosed you with

6    PTSD in October of 2018?

7         A.  Dr. Cassandra, C-a-s-s-a-n-d-r-a; Wanzo,

8    W-a-n-z-o.

9         Q.  Are you still seeing Dr. Goyco?

10        A.  No, sir, I'm not.

11        Q.  When did you stop seeing Dr. Goyco?

12        A.  I stopped seeing her, I believe, fall of

13   2016 and I switched physicians.

14        Q.  And who did you start seeing in the fall

15   of 2016?

16        A.  The fall of 2016 I went to -- I went to

17   her and she dropped United Healthcare and I went

18   to -- can you give me one second, please?

19        Q.  Sure.

20        A.  I believe I saw Dr. Goyco -- I'm sorry

21   -- to 2017 because she dropped United Healthcare

22   from her practice, and I could not use her no

23   longer.  And then I had just started going to

24   Dr. Etienne, which was my neurologist at that

25   time, and she had gotten my medication for my



Page 88

1    headaches calibrated properly, and I thought I

2    was good.  And when Dr. Goyco dropped me due to

3    the insurance situation I remember just being

4    like, okay, I have Dr. Etienne and I'll find me

5    another doctor.

6         So I didn't have a doctor for probably a

7    year, like a primary physician, but I had all my

8    specialty doctors still, like my ear, nose and

9    throat doctor, my OB, I still had my neurologist,

10   but I didn't have a primary at that time.

11        Q.  Okay.  So you stopped treating with

12   Dr. Goyco in fall of 2017?

13        A.  Yes.

14        Q.  Okay.

15        A.  But not on my own -- my own personal

16   ability.  She stopped taking United Healthcare.

17        Q.  Understood.  And do you know when you

18   were diagnosed with panic disorder?

19        A.  Dr. Wanzo diagnosed me with that as well

20   in October.

21        Q.  And with respect to the PTSD, what are

22   the -- what are your triggers for the

23   post-traumatic stress disorder?

24        A.  So one of my triggers is in -- if I'm in

25   close quarters with males or men I get very



Page 89

```
 1   defensive and very -- how can I put it?  I'll be
 2   in like a -- not fight mode, but I'll be very on
 3   edge, like very defensive, really just in a
 4   secured mode in my mind.  So anytime I was in
 5   close contact with men in a very close setting.
 6        And then also if it rained or had really bad
 7   inclement weather, I couldn't drive my car, or I
 8   just have to pull over or take my time getting to
 9   my destinations and -- or I'll have to let the
10   rain settle and then I can get in my car.  If
11   not, I have a full-out panic attack or I freak
12   out, and then my mood is set for that time and I
13   don't know why I'm in that mood at that
14   particular time.
15        Another one of my triggers, believe it or
16   not, is a certain smell.  It's a smell -- if I
17   smell diesel, like -- truck drivers, we have a
18   distinct smell sometimes when we're at diesel
19   pumps and that smell sometimes can make me snap
20   because of that gentleman.  I remember his smell
21   and he was very distinct with diesel on him.
22        Q.  Any other triggers?
23        A.  I'm sorry.  I'm just taking my time
24   here.  I'm so sorry.
25        Q.  It's fine.
```



Page 97

1                marked and identified.)

2        A.  Yes, sir.

3        Q.  And this is the family medical leave

4    request form that you submitted to Schneider; is

5    that right?

6        A.  That's correct.

7        Q.  And is that your signature at the bottom

8    of the page?

9        A.  Yes, sir.

10       Q.  And you dated the document 10/15/18; is

11   that correct?

12       A.  Yes, sir.

13       Q.  And is this -- the handwritten portion

14   of this document, is that your handwriting?

15       A.  Yes, sir.

16       Q.  Okay.  And you indicated under the

17   employment data your date of hire was July 14,

18   2014; is that right?

19       A.  Yes, sir.

20       Q.  And that you worked 11 hours per day, 44

21   hours a week; is that an accurate statement?

22       A.  Yes, sir.

23       Q.  And you were requesting leave beginning

24   on October 11, 2018; is that right?

25       A.  Yes.



Page 98

1        Q.  And you indicated that at least as of
2   October 15, 2018, you did not know the end date
3   of your leave, right?
4        A.  Yes, sir.
5        Q.  And the reason for the FMLA leave you
6   indicated is for your own serious health
7   condition; is that correct?
8        A.  Yes, sir.
9        Q.  And you also indicated -- I'm sorry.
10       Under the employment date you circled the
11  days that you normally work, and you circled
12  Sunday, Wednesday, Thursday, Friday, right?
13       A.  Correct.
14       Q.  Okay.  And what was your serious health
15  condition at this time?  Why were you -- why were
16  you seeking leave?
17       A.  I tried to commit suicide.
18       Q.  When did you try to commit suicide?
19       A.  The last week of September of that year.
20  I believe it was, like, on the 27th or 26th.
21       Q.  Of 2018?
22       A.  Yes, sir.
23       Q.  And why did you try to commit suicide?
24       A.  I just -- I didn't feel like I belonged
25  anymore.  Like I felt like no one listened to me.



Page 102

```
 1    I believe, the district manager to approve it and
 2    they kept the schedule as such.
 3        Q.  Did you ever contact human resources to
 4    advise them that you needed -- that you were --
 5    give me one second.
 6        A.  Uh-huh.  (Affirmative).
 7        Q.  Do you believe there was too much work?
 8        A.  No, sir.  Because I thought it could be
 9    resolved in the office.
10        Q.  And do you recall -- you said you had
11    asked for this for a couple of years.  Do you
12    recall the first time you would have asked for --
13    or raised with management that there was too much
14    work?
15        A.  It had to be in 20 -- I believe 2018
16    when we saw a sufficient like -- we did a
17    decrease in 2016 when we split the markets from
18    north to south with the regions, so there was a
19    decrease in workload as far as that, but then the
20    responsibility -- they wanted us to have a little
21    bit more responsibility, so that was around 20 --
22    late 2017 or early 2018.  And all I was asking
23    them -- it wasn't for the work because the work I
24    could do.  It was the fact that, hey, I'm a
25    female by myself at night.  I need some type of
```



Page 103

 1   security and I prefer to have an extra teammate
 2   there and it would help with the process of
 3   working in a safe environment.  That's what I was
 4   just asking for that whole time.
 5       It wasn't even about the workload.  It was
 6   actually about me having someone there with me,
 7   like, all of the other two shifts did.  I just
 8   wanted it to be, hey, so I can feel a little
 9   secure and I could focus on my job and do my job
10   efficiently.
11       Q.  You wanted another teammate working
12   alongside with you whenever you worked?
13       A.  On the shift, correct.  And I wasn't the
14   only one that did solo shifts on that particular
15   shift as well.
16       Q.  At the time that you -- strike that.
17       Prior to the time that you submitted your
18   FMLA leave request, did you advise anyone at
19   Schneider about any of your medical conditions?
20       A.  No, sir.  Prior to that I was just
21   trying to figure out what was going on with me.
22   I was going to doctors trying to figure out what
23   was going on with my -- with my headaches at the
24   time and my panic attacks and stuff like that.
25   That's when I was going to Dr. Etienne, I



Page 104

 1   believe.

 2        Q.  Okay.  But as of October 15, 2018, you

 3   didn't tell anybody at Schneider that you

 4   suffered from PTSD, major depression, panic

 5   disorder, anything --

 6        A.  I didn't know -- I didn't know at that

 7   time because I got my diagnosis in that same

 8   month.

 9        Q.  But you didn't mention any type of

10   medical condition to anyone at Schneider prior to

11   October 15, 2018; is that correct?

12        A.  Correct.  Other than my bilateral carpal

13   tunnel that I had to go out of work for.  They

14   know about that.

15        Q.  Okay.  But other than your carpal

16   tunnel, you didn't mention any of your medical

17   conditions prior to October 15, 2018; is that

18   right?

19        A.  That's correct.

20        Q.  And so in 2017 and 2018 when you would

21   tell Schneider management that there was too much

22   work and not enough people, you didn't mention or

23   indicate to -- to anyone that you were suffering

24   from some type of a medical condition and were

25   requesting some type of an accommodation; would



1   that be accurate?

2        A.   That would be accurate, because I wasn't

3   diagnosed at that time.   However, I did speak

4   with Marianne and Doug Horton on several

5   occasions, and I pulled them to the side as my

6   managers and if I had a stressful night or that

7   night was -- it just didn't go right or something

8   happened, I'd tell them.   I'd debrief them and

9   let them know, hey, I think we need more people

10  on this side of the team.   That's all I would

11  suggest.   Or hey, you think we could switch this

12  person to over here to help out?   And that's all

13  I was suggesting.

14       It's not the workload per se.   It's really

15  about security because not even myself have

16  mentioned this multiple times to them.   Audrianne

17  Williams mentioned it.   Quincy Parker mentioned

18  it to them.   Desmond Seymour mentioned it to

19  them.   Ryan Wheeler mentioned it to them.

20       Who else?   Sarah Kopf mentioned it to them,

21  and Sarah was hired later in 2018, so that's

22  after this moment.   But those others, they were

23  there.   And we actually had a meeting with our

24  district manager, and we brought it to his

25  attention during a breakfast morning meeting.



Page 106

1    And we was like, hey, we was just wondering could

2    we get an extra teammate.  We just put it out

3    there because it was a casual breakfast meeting.

4         Q.  Okay.  But at no point in time prior to

5    you submitting your FMLA form on October 15, 2018

6    did you go to anyone at Schneider management and

7    say, I need a specific accommodation because of a

8    medical condition that you were -- you were

9    experiencing; is that correct?

10        A.  That's correct.

11        Q.  All right.  If we can go to the next

12   document, and this one is labeled CG-0073 through

13   0076.

14        A.  Oh, there it is.  I was like, okay.

15   Okay.  My apologies.

16        Q.  Do you have that --

17        A.  Yes, sir.

18        Q.  -- in front of you?

19        A.  Yes, sir.

20        Q.  All right.  Let's mark -- let's mark

21   this as Plaintiff's Deposition Exhibit number 9.

22   And this appears to be a fax that Dr. Cassandra

23   Wanzo sent to the Hartford October 22, 2018; is

24   that correct?

25             (Plaintiff's Exhibit 9 was



Page 119

1   Mr. Horton, did you speak with anyone else at

2   Schneider about your medical condition?

3       A.  The only other person during that time

4   when I first went out I confided in Sarah Kopf,

5   and she started to come by and check on me.  I

6   think in the month of, like, November checked on

7   me and try to get me -- you know, get out of the

8   house and try to make me talk and be around

9   people.  So she was trying to just be a friend,

10  be there for me.

11      Q.  Other than Doug Horton, did you speak

12  with any management-level Schneider employees

13  about your medical condition?

14      A.  No, because I took Doug's word and then

15  -- about him taking everything up to HR.  But I

16  do remember Travis reaching out to me and just

17  saying, you know, how you doing, and checking on

18  me in that sense on my wellbeing.

19      Q.  And when did -- to the best you can

20  recall, when did Travis reach out to you?

21      A.  I think later on in that month, but I

22  can't give you a specific date.

23      Q.  Later in the month of October?

24      A.  Yes, sir.

25      Q.  Of 2018?



Page 120

```
 1        A.  Yes, sir.  My apologies about that.
 2        Q.  And as best you can recall, what -- what
 3   did Travis say to you and what did you say to
 4   him?
 5        A.  I told him that I -- I was suicidal a
 6   few weeks back and I was trying to get myself
 7   back and I just need their prayers and support.
 8   And he was like, no matter what C we got you.
 9   That's all I remember.  Because anytime I was out
10   sick they was always in my corner, so I thought
11   they was in my corner.
12        Q.  And anything else that you can recall
13   about your conversation with Travis in October of
14   2018?
15        A.  No, sir, not at this time.  If I do, I
16   definitely will advise my counsel.
17        Q.  All right.  Let's go to the next
18   exhibit, and it's Schneider 0418 through 0421.
19        A.  Yes, sir.
20        Q.  We'll mark this as Plaintiff's
21   Deposition Exhibit number 11.  Do you recognize
22   this document?
23            (Plaintiff's Exhibit 11 was
24               marked and identified.)
25        A.  Yes.
```



Page 121

1          Q.   Okay.  And you received this document
2     from Schneider on or about October 26, 2018; is
3     that right?
4          A.   Yes, sir.
5          Q.   And is that your address top left?
6          A.   Yes, sir.
7          Q.   Okay.  And in this document, Schneider
8     is letting you know that your request for FMLA
9     leave had been approved; is that right?
10         A.   Yes, sir.
11         Q.   And it indicates near -- kind of near
12    the bottom in that bullet that you have been
13    granted seven weeks and one day beginning October
14    9, 2018 and ending on October -- I'm sorry --
15    November 27, 2018; is that right?
16         A.   Yes, sir.
17         Q.   Okay.  And was your first day out, did
18    it start on October 9, 2018?
19         A.   Yes, sir.
20         Q.   And after you -- was it your
21    understanding after you received this letter that
22    Schneider had granted your request for FMLA leave
23    beginning on October 9, 2018 through November 27,
24    2018?
25         A.   Yes, sir.



Page 122

1        Q.  All right.  Now you didn't return to

2   work on November 27, 2018; is that right?

3        A.  That's correct.

4        Q.  Okay.  Let's go to the next document.

5   It's Bates-stamped CG-031 through 033.

6           (Plaintiff's Exhibit 12 was

7               marked and identified.)

8        A.  Yes, sir.

9        Q.  And this appears to be another medical

10  note that Dr. Wanzo sent to the Hartford via fax

11  on November 17th of 2018; is that correct?

12       A.  Yes, sir.

13       Q.  Okay.  And this is a document that you

14  produced in discovery; is that right?

15       A.  Yes, sir.

16       Q.  And have you seen this document before?

17       A.  Yes, sir.

18       Q.  Okay.  Do you recall whether or not you

19  went over this document with Dr. Wanzo during one

20  of your visits?

21       A.  This one in particular, yes.

22       Q.  You do remember going over it with

23  Dr. Wanzo?

24       A.  I remember giving her the paperwork and

25  I saw her start writing on it, but not going



1  verbatim.  She did go over my migraines.  I do

2  remember us having a discussion about my

3  migraines, how I was feeling.  I guess you --

4  because I don't look over at the doctor when they

5  be, you know, filling out their stuff, so I just

6  sit there.  But I did give her that paperwork, so

7  I think she just started working on that then.

8       Q.  Okay.  If you could turn to the third

9  page of this document.

10      A.  Yes, sir.

11      Q.  Do you see where it says functionality

12  at the top?

13      A.  Yes, sir.

14      Q.  And it asks what activities are impaired

15  and how, and Dr. Wanzo wrote, unable to perform

16  any duties, another four to six weeks; do you see

17  that?

18      A.  Yes, sir.

19      Q.  Okay.  And she listed your target date

20  for your return to work is January 2, 2019; is

21  that right?

22      A.  Yes, sir.

23      Q.  And did you recall having a discussion

24  with Dr. Wanzo about your target return date

25  being extended to January 2, 2019?



Page 124

1      A.  She was going over -- yes, I do recall

2  that we were going over my progress with my

3  treatment and how I was doing and dealing with my

4  emotions and my triggers at that time.

5      Q.  Okay.  And did you discuss the

6  January 2, 2019 return to work date with

7  Dr. Wanzo?

8      A.  Yes.  She asked me was I comfortable

9  with returning.

10     Q.  And did you -- and you agreed with her?

11     A.  Yes, sir.

12     Q.  All right.  And she indicates here under

13  the section that says, provide examples of

14  accommodations that would allow your patient to

15  return to work she wrote, return to work at three

16  days per week for four weeks, then four days per

17  week work schedule.  Did I read that correctly?

18     A.  Yes, sir.

19     Q.  Okay.  And did you discuss that with

20  Dr. Wanzo?

21     A.  Yes, sir.

22     Q.  And -- and that was the treatment plan

23  that the two of you discussed and agreed upon at

24  that time?

25     A.  Yes, sir.  To return, correct.



Page 125

1          Q.  All right.  If we can go to the next

2    one, please.  This is Bates-stamped Schneider

3    0413.  It's a one-page document.

4          (Plaintiff's Exhibit 13 was

5              marked and identified.)

6          A.  Yes, sir.

7          Q.  And if you look kind of in the middle

8    it's dated November 28, 2018; do you see that?

9          A.  Yes, sir.

10         Q.  And this document is addressed to you;

11   is that right?

12         A.  Yes, sir.

13         Q.  And did you receive this document on or

14   about November 28, 2018?

15         A.  Yes, sir.

16         Q.  And in this document, Schneider states

17   that your federal FMLA now has a new ending date

18   of December 31, 2018; do you see that?

19         A.  Yes, sir.

20         Q.  And as of that date, your 12 weeks of

21   available federal FMLA will have expired; is that

22   right?

23         A.  Yes, sir.

24         Q.  Okay.  So did you understand this

25   document as Schneider granting you an extension



Page 126

1    of your FMLA leave through December 31, 2018?

2         A.  Yes, sir.

3         Q.  And that your FMLA would be exhausted as

4    of December 31, 2018?

5         A.  Yes, sir.

6         Q.  Okay.  And did you return to work on or

7    about January 2nd?

8         A.  I returned on January 2nd.

9         Q.  Okay.  All right.  And we can go to the

10   next document.  We'll mark this as Plaintiff's

11   Exhibit 14, and it's Bates Schneider 0410.

12           (Plaintiff's Exhibit 14 was

13              marked and identified.)

14        A.  Yes, sir.

15        Q.  All right.  And do you recognize this

16   document?

17        A.  Yes, sir.  It's my return-to-work form.

18        Q.  Okay.  And it looks like this was

19   completed by Dr. Wanzo?

20        A.  Yes, sir.

21        Q.  If you look at the bottom, it's dated

22   December 15, 2018; is that right?

23        A.  Which date?  I'm sorry.

24        Q.  It looks like December 15, 2018.

25        A.  Yes.



Page 127

1          Q.  Do you see that at the bottom?

2          A.  Yes.

3          Q.  All right.  And if you look at section

4    one here it says, patient is able to return to

5    work without restrictions effective February 14,

6    2019; is that right?

7          A.  Yes, sir.

8          Q.  Okay.  And in section two it says,

9    patient is able to return to work with

10   restrictions effective January 2, 2019 three days

11   a week, ten-hour days; is that correct?

12         A.  Yes, sir.

13         Q.  So was it your understanding that you

14   could return to work on January 2, 2019, but with

15   the restriction of three days a week, ten-hour

16   days?

17         A.  Yes, sir.

18         Q.  And you typically worked four days a

19   week, 11-hour days; is that right?

20         A.  Yes, sir.

21         Q.  And in the comments, Dr. Wanzo states

22   that you will be able to work three days per

23   week, ten-hours a day effective on January 2,

24   2019, right?

25         A.  Yes, sir.



1          Q.  And you understood that that's what

2     Dr. Wanzo was requesting, and you agreed with

3     that treatment plan; is that correct?

4          A.  Yes, sir.

5          Q.  Did you tell Dr. Wanzo that you wanted a

6     reduced work schedule?

7          A.  No.  We were talking about it and

8     discussed it and she thought it would be better

9     if I didn't go straight in, like my full schedule

10    at first.  She wanted to ease me back into that

11    environment to make me more comfortable because

12    that is a very intense environment when it comes

13    to dispatching that magnitude.

14         Q.  Did she explain to you what days, or

15    what day -- was there any indication that there

16    was a particular day that you shouldn't work, or

17    was she just more concerned that she didn't want

18    you working four days?

19         A.  She was more concerned working the four

20    days.  I was -- yeah, it was more concerned about

21    not working the four days.  She just wanted me to

22    get in there and just try to keep going with my

23    external treatments and stuff and making sure

24    that I'm just trying to stay positive and

25    focused.



Page 129

1      Q.  And after you received this return to
2  work note -- well, when did you receive this
3  return to work note?  Was it on or about December
4  15, 2018?
5      A.  Yes, sir, because I had to get it to
6  Hartford and the leave team as soon as possible
7  before the deadline.
8      Q.  Okay.  And you submitted it to
9  Schneider's leave and accommodations team?
10      A.  Yes.  And the Hartford.  Both always
11  acquire both copies.
12      Q.  And after you submitted this document,
13  this return-to-work form, did you have any
14  discussion with anyone at Schneider about your
15  accommodation request?
16      A.  I talked to Travis and I let him know,
17  hey, I need to have three days off and I let -- I
18  mean, not three days off.  I'm sorry.  The one
19  day due to what my doctor stated, and I let him
20  know specifically on a Monday because I was
21  trying to -- no, not trying.  I was attending a
22  women's PTSD, like an AA kind of meeting for
23  women that's been abused and stuff and it was
24  anonymous kind of thing, and I was going to that
25  on Mondays to help with my treatment so I can



Page 130

1    talk out my issue.

2         Q.  Okay.  And did you call Travis, or did

3    you have a face-to-face meeting?

4         A.  We talked to each other on the phone and

5    then I saw him again when we went to work.  When

6    I got back to work that week, I believe he was

7    out of town.  If not, I saw him the week prior,

8    but I remember me and him talking because he

9    wanted to catch up.  How you been?  How's

10   everything going?  How are you feeling?

11        Q.  During this telephone -- you said you

12   had a telephone conversation with him initially;

13   is that right?

14        A.  Yes, sir.  I believe so.

15        Q.  Do you recall the date of that telephone

16   conversation?

17        A.  No, sir.  I do not believe I recall that

18   particular date.

19        Q.  Okay.  And it was just you and him on

20   the phone?

21        A.  Yes, sir.

22        Q.  And as best you can recall, what was

23   said and by whom during that call?

24        A.   I let him know that I was returning back

25   to work by January 2nd, and let me know what I



1    need to be prepared for.  And I also wanted to

2    make sure that somebody was there with me because

3    I wasn't able to be by myself at that time,

4    because I was like I just need somebody to be

5    there with me.  Are we going to have somebody on

6    the shift?  And he was like, yeah, don't worry

7    about it.  We good.  We're hiring a temp anyway,

8    because Audrianne was about to leave for

9    maternity leave because she was pregnant at that

10   time, so I was like, okay, cool.

11        So we have somebody to come in?  And he

12   said, yeah, I'm going need you -- matter of fact,

13   my first day back I had to train somebody.

14        Q.  Anything else that you can recall about

15   that conversation with Travis?

16        A.  Yeah, he told me I had to train that

17   person, yeah.  He said, hey, I got a new temp

18   coming in.  I need you to help out Audrianne with

19   that.  I know it's not -- I know it's your first

20   night back, but do you think you can handle that?

21   I said, yeah, I think, but if not, Audrianne is

22   there, and I could just do the best of my

23   ability.  And then I told him about me going to

24   my anonymous meetings on Monday.

25        Q.  Anything else that you can recall about



Page 132

```
 1   that conversation with Travis?

 2        A.   That's all I can recall at this time.

 3        Q.   Did you take any notes of that

 4   conversation?

 5        A.   No, sir, I did not.

 6        Q.   Did he mention the name of the temp that

 7   you would be training?

 8        A.   I can see her face, but I do not

 9   remember her name, but I know she was from

10   Memphis, Tennessee, she had braces, and she was

11   petite.  She was so -- she was sweet, but she

12   only lasted, like, two weeks, and then right

13   after her Ms. Elaine was hired.

14        Q.   That's Elaine Young?

15        A.   Yes, sir.

16        Q.   If you could turn to the next document.

17   It's Bates Schneider 033 -- 0399.

18        A.   Yes, sir.

19        Q.   It's a one-page document.  We'll mark

20   this as Plaintiff's Exhibit number 15.  And you

21   see this document is dated December 18, 2018; is

22   that right?

23             (Plaintiff's Exhibit 15 was

24                marked and identified.)

25        A.   Yes, sir.
```



Page 133

```
 1        Q.  And it's addressed to you; is that
 2   correct?
 3        A.  Yes, sir.
 4        Q.  And do you recall receiving this
 5   document on or about that date?
 6        A.  Yes, sir, I did.
 7        Q.  Okay.
 8        A.  Around that date because it takes a
 9   while before it comes through the mail.
10        Q.  Got it.  And in the second paragraph it
11   says, Schneider has agreed -- well, let me start
12   at the first paragraph.  It says, on December 17,
13   2018 we received a return-to-work form from your
14   physician outlining the following work
15   restrictions through February 13, 2019: work
16   three days per week, ten-hour days.  Did I read
17   that correctly?
18        A.  Yes, sir.
19        Q.  Okay.  And Schneider agreed to
20   accommodate those restrictions in your current
21   position effective January 2, 2019 through
22   February 13, 2019; is that right?
23        A.  Yes, sir.
24        Q.  All right.  And then when you -- when
25   you returned to work on January 2nd, did you have
```



Page 136

1    January 2, 2019 were you coming into the office

2    on Wednesday, Thursday, Fridays that you worked?

3        A.  Yes, sir.

4        Q.  All right.  And in this letter, Exhibit

5    15, in bold Schneider says, please have your

6    physician complete the attached return-to-work

7    form prior to February 14, 2019 if there are any

8    changes to your restrictions; is that right?

9        A.  Yes, sir.

10       Q.  The day that you were -- the Sunday that

11   you were not working from January 2, 2019 through

12   February 14, 2019, do you know who was covering

13   that day?

14       A.  Yes.  Desmond Seymour.

15       Q.  Desmond Seymour was working the Sunday

16   that you would typically work?

17       A.  Desmond Seymour.  If it wasn't him, it

18   was Audrianne Williams.  Between those two, if my

19   memory serves me correct.

20       Q.  And they didn't typically work on

21   Sundays; is that right?

22       A.  Desmond did.

23       Q.  Do you know if -- was Desmond doing

24   twice as much work then on Sundays?  Do you have

25   any knowledge of that?



Page 137

1        A.  Since why?  Because I wasn't there?

2        Q.  Yes.

3        A.  Any time no one is there everybody does

4   twice as much work, no matter whether it's Sunday

5   through Saturday.  Whoever is on that third shift

6   if they're by their self, they're taking the

7   workload of everybody.  So yes, I do concur with

8   that.

9        Q.  But would you agree then that your

10  inability to work on Sundays impacted the third

11  shift and their workload?

12       A.  Yes.

13       Q.  Do you know if Travis ever worked the

14  Sunday that you were originally assigned to work

15  during the time period that you were off --

16  during the time period of your accommodation?

17       A.  Not to my knowledge.  I thought it was

18  Audrianne and Desmond around that time period.

19       Q.  Do you have any personal knowledge as to

20  who was working on the Sundays that you were not

21  working because of your accommodations --

22  workplace accommodations?

23       A.  Meaning?  Can you rephrase it for me,

24  please?  I'm sorry.

25       Q.  Sure.  Do you know -- are you -- are you



Page 138

```
 1    just assuming and speculating that your Sunday
 2    was covered by Desmond and Audrianne, or do you
 3    have any --
 4         A.  Like, specifically?
 5         Q.  Yes.  To support that --
 6         A.  That will be on Schneider's server when
 7    it comes to the schedule.
 8         Q.  Okay.
 9         A.  But from my recollection, because I
10    remember how our team was, some Sundays, I
11    believe, it was Desmond and some Sundays it was
12    Audrianne.  But this is around the time she was
13    about to go out of work for maternity leave, so
14    some Sundays she wasn't there either.  She'd work
15    from home.  So I don't believe, like -- it was
16    one of them.  I just can't remember who
17    specifically, but it was somebody there on
18    Sundays.  And if not -- if Travis did sub in, he
19    probably did, but I remember he was subbing
20    around that time for me, Desmond and Audrianne
21    because Desmond was going out on vacation, I was
22    coming back from leave.  We was training a temp
23    and Audrianne was going into maternity leave at
24    the same time with in the six-week period and we
25    was training two temps at the same time.
```



Page 139

1        Q.  Right.  And Travis would fill in for

2   area planning managers who were not able to work,

3   right?

4        A.  Correct.

5        Q.  Okay.  All right.  If we go to the next

6   document, please.  And it's Bates Schneider 0385

7   through 386.  Do you have that in front of you?

8        A.  Yes, sir.

9        Q.  Okay.  Let's mark this as Plaintiff's

10  Deposition Exhibit number 16.  And this appears

11  to be another fax that Dr. Wanzo sent to the HR

12  leave administration team at Schneider on

13  January 19, 2019; is that right?

14       (Plaintiff's Exhibit 16 was

15            marked and identified.)

16       A.  Yes, sir.

17       Q.  Okay.  If you turned to second page,

18  this is a return to work recommendation --

19  attending physician's return to work

20  recommendation; is that right?

21       A.  Yes, sir.

22       Q.  And this appears to be Dr. Wanzo's

23  handwriting; is that right?

24       A.  Yes, sir.

25       Q.  And if you look down at the bottom, it



Page 140

1    appears that she dated it January 19, 2019; is

2    that correct?

3         A.  Yes, sir.

4         Q.  Okay.  And do you recall going over this

5    return to work recommendation with Dr. Wanzo?

6         A.  Yes.  It was a follow-up appointment

7    about --

8         Q.  Okay.

9         A.  -- me returning back to work and how I

10   was doing.  She was checking in on me at that

11   particular --

12        Q.  And was this an in-person appointment

13   that you had with Dr. Wanzo?

14        A.  Yes, sir.

15        Q.  Okay.  And if you look at section two it

16   states, patient is able to return to work with

17   restrictions effective 1/2/19 three days a week,

18   ten-hour days, right?

19        A.  Yes, sir.

20        Q.  Okay.  And then if you look at section

21   one, patient is able to return to work without

22   restrictions effective 3/20/2019; is that right?

23        A.  Yes, sir.

24        Q.  And you understood that Dr. Wanzo was

25   requesting an extension of your --



Page 141

1      A.  Sorry.

2      Q.  Sure.  You understood that Dr. Wanzo was

3  requesting an extension of your accommodation

4  through March 20, 2019; is that right?

5      A.  Yes, sir.

6      Q.  And did you discuss that with Dr. Wanzo

7  as of January 2019?

8      A.  Yes, sir.

9      Q.  And she writes in section one --

10  Dr. Wanzo writes, she remains unable to work full

11  time because of her current clinical depression

12  and post-traumatic stress disorder symptoms.  She

13  will be able to work ten hours a day, three days

14  per week.  Did I read that correctly?

15      A.  Yes, sir.

16      Q.  And you understood that's what Dr. Wanzo

17  was recommending?

18      A.  Correct.

19      Q.  And did you speak with her about that?

20  Did you ask that your accommodation of three days

21  a week be extended?

22      A.  She was going based upon what we was

23  discussing and how I was feeling at work.  And I

24  was telling her about Audrianne is about to go

25  out for maternity leave and we was prepping a



1  temp and then that temp quit, and then we had --

2  the first temp got fired and then the second temp

3  we was preparing her for the maternity leave for

4  Audrianne.  I was telling her how I was stressed

5  out and stuff, but at that time, I do remember

6  that conversation with her.

7      Q.  Okay.

8      A.  And this was a follow-up after three

9  weeks of being at work basically.  Two and a

10  half, three weeks at work.

11      Q.  All right.  So you told Dr. Wanzo that

12  the first temp had -- had quit, I believe, you

13  said?

14      A.  Got fired.

15      Q.  The first temp was fired, Audrianne was

16  about to go out on leave, and you were starting

17  to train a second temp, and you were getting

18  stressed out.  Is that because of the amount of

19  work?

20      A.  Yes.  Because I also had to train the

21  temp while working by myself on certain nights

22  that I had to train the temp and also still do my

23  workload while trying to train the temp by myself

24  without another counterpart there to take up the

25  other part of the workload so I can focus on



Page 143

1    training.

2         Q.  Okay.  And you understood that Dr. Wanzo

3    was requesting about a four-and-a-half-week

4    extension of your modified work schedule, right?

5         A.  Yes, sir.

6         Q.  Okay.  And did you have any discussions

7    with anyone at Schneider about the need for this

8    extended accommodation or extending the

9    accommodation?

10        A.  Like, talking to management or anyone?

11        Q.  Yes.

12        A.  Not to my knowledge.  I just know I kept

13   asking them we need more time to train our temps,

14   and I know we was on crunch time because

15   Audrianne was in her third trimester.

16        Q.  You don't have a specific recollection

17   of talking to Torrence or Marianne or any other

18   Schneider management about extending your

19   modified work schedule for another four and a

20   half weeks?

21        A.  I think Travis probably approached me,

22   but I'm not going to falsify that on record,

23   because I can't speculate.

24        Q.  You just don't recall one way or the

25   other?



Page 144

```
 1        A.  No, not like that.  I'm sorry.
 2        Q.  Okay.  Okay.  If we could go to the next
 3   document.  It's Bates Schneider 377.
 4        A.  Yes, sir.
 5        Q.  Okay.  And it looks like this one is
 6   dated January 29, 2018 -- 2019; is that correct?
 7        A.  Yes, sir.
 8        Q.  And did you receive this letter on or
 9   about that date?
10        A.  Yes, sir.
11        Q.  Okay.  If you look at the first
12   paragraph it says, on January 21, 2019 we
13   received your return to work from your physician
14   outlining the following continuation of your work
15   restrictions through March 19, 2019.  Work three
16   days per week, ten-hour days.  Did I read that
17   correctly?
18        A.  Correct.
19        Q.  And Schneider goes on to state that it
20   has agreed to accommodate these restrictions in
21   your current position effective March -- I'm
22   sorry -- February 14, 2019 through March 19,
23   2019; is that right?
24        A.  Yes, sir.
25        Q.  And then in bold it says, please have
```



MAGNA
LEGAL SERVICES

```
 1        Q.  Do you recall working from home at all
 2   during that time period?
 3        A.  Not to my knowledge, but probably so.
 4   Well, yes.  For the 20, 30 -- I mean, between
 5   February and March, yes, and I can tell you why.
 6   Because Audrianne had her baby February 26th and
 7   at that time Ms. Elaine quit a week after, and
 8   then I was left by myself completely.
 9        And I asked Travis on a phone call on our
10   personal phones, I said, hey, he was like, hey, I
11   know you just got the call that Audrianne just
12   had the baby.  I was like, yeah, I do -- I said,
13   man, I'm nervous, man.  I can't work by myself.
14   He said, well, I need you to, you know, come in.
15   I said, well, how about can I work from home?  He
16   was like, you know what, yeah, that should be
17   fine.  See how that goes and if it works good,
18   then we just keep it like that until we get --
19   [inaudible].  And that was the week of the 26th
20   of February because the week Audrianne had her
21   baby.
22        Q.  I'm sorry.  You cut out a little bit.
23   You said --
24        A.  I'm sorry.
25        Q.  No, that's okay.  Travis said -- you
```



1  asked if you could work from home and that's kind

2  of when you cut out.

3      A.  I'm sorry.  He asked -- I asked him

4  could I work from home due to the fact that now

5  Audrianne had her baby and then a week later,

6  Ms. Elaine quit, so I was left by myself.  So

7  that following week after the 26th, we had

8  another conversation and that's when I brought up

9  to him could I work from home on the days I had

10  to work by myself.  Days I was with Travis or

11  with Desmond I was -- I was fine.  It was the

12  days where I was by myself, I just requested

13  could I just work from my house remotely because

14  we had access to that.

15      Q.  And what did Travis say in response to

16  your question?

17      A.  He stated that at that time due to the

18  fact that we were -- we were short staffed, and

19  he was like, well, I do understand where you're

20  coming from, so he said I don't see it as a

21  problem.  So he's like, yeah, if it's a problem,

22  then we'll go from there.  But he said, go ahead,

23  because I understand where you coming from and

24  that's what I took it like.

25      Q.  So he said he didn't see it as a



Page 148

1   problem.  If it's -- if it is a problem, you'll

2   address it, and go ahead and work from home when

3   you were -- when you were going to be working by

4   yourself?

5        A.  Yes, sir.  He told me that I was able to

6   do that.  And I knew it wasn't going to be

7   forever, but it was just for that time being

8   because Audrianne's due date -- her original due

9   date was March 15th, so they was basing

10  everything upon March 15th and the baby came

11  February 26.  So they was trying to train a temp

12  from January to March, and they lost two temps

13  within that time period for third shift.

14       Q.  So you believe this conversation

15  happened -- was it the first week of March of

16  2019?

17       A.  Yes, sir.

18       Q.  Okay.  And from the first week of March

19  -- prior to the first week of March -- let me

20  rephrase that.

21       From January 2, 2019 until you had this

22  conversation with Travis during the first week of

23  March 2019, do you recall any occasion where you

24  worked from home?

25       A.  On Thursdays sometimes and sometimes



Page 149

```
 1    not.  It's when Audrianne was working from home
 2    and we would alternate weeks like that.  She
 3    would work from home on Thursdays, or I worked
 4    from home on Thursdays.  We would alternate
 5    because she was -- she wasn't able to drive in,
 6    in her last two or three weeks coming into work
 7    because she lived an hour and 20 minutes from
 8    Fairburn.  She lived in Dacula.
 9         Q.  It sounds like once every two weeks you
10    would work one day from home?
11         A.  That's only --
12         Q.  Is that right?
13         A.  Yes, sir.  That's only if, like, she
14    couldn't make it in or something like that.  And
15    then if she couldn't make it in because she
16    couldn't drive in or something and I'm there, if
17    I arrived at work and she wasn't there, she'll
18    log in and work from home remotely, but she'll
19    work from home if she couldn't come in on that
20    Thursday night.
21         Q.  And Travis would allow you to work from
22    home on this alternating Thursday evening during
23    this January 2019 through March 2019 time period?
24         A.  Yes, sir.  And majority of that time I
25    remember -- it's coming back to me now -- I
```



Page 150

1    really could not be off on that time, like away

2    because I was the main person training the temps.

3    And then when Audrianne was able to come into the

4    office she would train the temps with -- like we

5    would alternate training that night.  So one

6    person would be with the temp, the other person

7    would be dealing with all the workload.  And then

8    once we're done with training, then we all would

9    jump in and put the temp on hands-on training at

10   that time.  But the first three to four hours to

11   five hours of that shift we solo on that

12   workload.

13        Q.  All right.  And you did not return to

14   full-time work on March 20, 2019; is that right?

15        A.  Correct.

16        Q.  We can go to the next document, please.

17   It's Bates CG-41 through 45.  Actually, we'll

18   mark this as kind of a group exhibit, 18 CG-41

19   through 45 and Schneider 343 and 344.

20        (Plaintiff's Exhibit 17 was

21           marked and identified.)

22        A.  Okay.  Yes, sir.

23        Q.  Okay.  And this is another medical note

24   that Dr. Wanzo faxed to the Hartford on March 9,

25   2019; is that correct?



Page 151

```
 1        A.  Yes, sir.

 2        Q.  And this is -- at least the first

 3   several pages of this document you produced in

 4   discovery; is that right?

 5        A.  Yes, sir.

 6        Q.  And do you recognize this document?

 7        A.  Yes, sir.

 8        Q.  Do you recall going over the progress

 9   report, the next two pages, with Dr. Wanzo?

10          (Plaintiff's Exhibit 18 was

11             marked and identified.)

12        A.  Yes, sir.

13        Q.  And if you look on that first page, it

14   asks again is the condition related to

15   environmental and/or interpersonal issues in your

16   workplace and Dr. Wanzo wrote lack of staffing,

17   verbally abusive drivers.  Did I read that

18   correctly?

19        A.  Yes, sir.

20        Q.  Okay.  And was there still, in your

21   view, a lack of staffing?

22        A.  Yes, sir.

23        Q.  Okay.  And you were seeking an

24   accommodation of a continued reduced work

25   schedule because of lack of staffing?
```



Page 152

```
 1        A.  Yes, sir.
 2        Q.  And were drivers still being verbally
 3   abusive as of March 9, 2019?
 4        A.  I had occasional disgruntled drivers
 5   call in.
 6        Q.  And if you turn to the next page under
 7   functionality --
 8        A.  Yes, sir.
 9        Q.  -- it asks, specify what activities are
10   impaired and how.  And Dr. Wanzo wrote, only able
11   to work three days part time until April 30th.
12   Did I read that correctly?
13        A.  Yes, sir.
14        Q.  Okay.  And did you discuss that with
15   Dr. Wanzo about extending your modified work
16   schedule until April 30th?
17        A.  Yes, because she was trying to give them
18   time to, you know, hire somebody else and so she
19   was like it'll give you more time to help you
20   process things because this is a little -- it's a
21   lot when you're just coming back out and you --
22   she was like -- it was just a lot, and I was
23   trying to deal with it to the best of my ability
24   at that time.  So she felt as though, like, I
25   needed more time until they can get somebody else
```



Page 153

1    in here to help.

2        Q.  Okay.  And you agreed with her

3    recommendation that you continue to work three

4    days a week until April 30, 2019?

5        A.  Yes, sir.  And also at that time I

6    received -- I believe at that time -- yes, I

7    received at that time my uncle was placed in

8    hospice.  I remember that specifically, and she

9    was trying to prepare me with my treatment to

10   help me with my grieving process, so I wouldn't

11   have a reaction as well to that.

12       Q.  Okay.  If you could turn to the fifth

13   page of this exhibit, it's a return to work

14   recommendation.

15       A.  Yes, sir.

16       Q.  Bates CG-0045.  Do you see that?

17       A.  Yes, sir.

18       Q.  Okay.  And this document is dated

19   March 9, 2019; is that right?

20       A.  Yes, sir.

21       Q.  And if you look at the top it's

22   submitted to Schneider's HR leave administration

23   team; is that correct?

24       A.  Yes, sir.

25       Q.  Okay.  Do you recall discussing this



Page 154

1    return to work recommendation with Dr. Wanzo?

2          A.   Yes, sir.

3          Q.   All right.  And if you look at section

4    one, it states, patient is able to return to work

5    without restrictions effective April 30th.  She

6    remains unable to work full time because of her

7    clinical depression, PTSD and panic disorder

8    symptoms.  She will be able to continue present

9    schedule Wednesday, Thursday, Friday, ten hours a

10   day, Thursday and Friday at home or any time

11   solo.  Did I read that correctly?

12         A.   I'm trying to figure out her

13   handwriting.  I'm sorry.  I'm sorry.  Okay.  Yes,

14   sir.  I can -- yeah, I see what you read, yes.

15         Q.   Okay.  And did you discuss these

16   accommodation requests with Dr. Wanzo on March 9,

17   2019?

18         A.   Yes.  I remember speaking with her about

19   the situation with their temps and with Audrianne

20   being out.  And she said why are you working by

21   yourself?  I thought they was going to get some

22   help for you?  I was like, well, they haven't

23   found no one yet.  She was like, so that's not

24   helping you with your treatment.  So what's going

25   on?



1        I was like, well, right now I don't know

2    what's going on, but this is the best that they

3    could do.  And so she was like, well, could they

4    let you work from home on the days you have to

5    work by yourself so you don't feel that type of

6    energy or pressure from your external

7    environment?  And I was like, I hope so.  They've

8    been helping me so far.

9        Q.  Did you -- did you understand that

10   Dr. Wanzo was requesting that you work from home

11   Thursdays and Fridays?

12       A.  No, sir.  Not in the full content of

13   that.  I thought it was only for when we didn't

14   have staffing.

15       Q.  Okay.  If we could go to -- let's skip a

16   few pages.  If you could turn to Schneider 321

17   through 323.

18       A.  Yes, sir.

19       Q.  Did you -- did you speak with anyone

20   about Dr. Wanzo's request that you continue to

21   work a modified work schedule through April 30,

22   2019 and be permitted to work from home Thursdays

23   or Fridays or when you were solo?

24       A.  I remember I talked to Travis, but not

25   in that type of specification.  Does that make



1    for a shorter period of time, that was your

2    request to work from home when you were solo?

3          A.  Yes, sir.  But my understanding was -- I

4    was, like, but didn't you get any notes from HR?

5    That's what was within myself.  That's what I was

6    assuming, and assumptions are not always good.

7          Q.  Do you recall at this time HR approving

8    any requests that you work from home?

9          A.  At the time they were -- they had

10   approved everything from my doctor's notes.  I

11   was getting information from Hartford and from HR

12   about my accommodations being approved.  I even

13   received an e-mail -- I think her name is Anissa

14   HR because Angie Shelow [sic] was my original

15   point of contact and then she got promoted or

16   moved to a different department and then Anissa

17   became my point of contact.

18          And then I remember speaking with her the

19   first week or two -- no, the first week of April

20   because she requested information, some more

21   documents.  I remember e-mailing her over

22   documents the latter part of the first week of

23   April until the beginning of the second part --

24   the second week of April, and then on the 12th I

25   was termed.  So from the time of March 20th to



1    April 12th, I was just communicating between HR

2    and then Travis.

3        Q.  Up until March 9, 2019, are you aware of

4    any document -- are there other communications

5    from Schneider indicating that it had approved

6    any requests that you work from home when you

7    were solo?

8        A.  No, sir.  Other than the conversation

9    that I stated I had verbally talked with Travis.

10       Q.  If we could look at Exhibit 19,

11   Schneider 321 through 323.

12           (Plaintiff's Exhibit 19 was

13               marked and identified.)

14       A.  Yes, sir.

15       Q.  Okay.  And this is another attending

16   physician's statement that appears to have been

17   completed by Dr. Wanzo; is that right?

18       A.  Yes, sir.

19       Q.  Okay.  And she's still indicating --

20   well, strike that.

21       If you go to the second -- the third page,

22   it appears to be dated March 30, 2019; is that

23   correct?

24       A.  Yes, sir.

25       Q.  Did you have an appointment with



Page 160

1  Dr. Wanzo on March 30, 2019?  Do you recall?

2       A.  I believe I did.

3       Q.  Do you recall discussing Dr. Wanzo's

4  recommendations for your accommodations as of

5  March 30th of 2019?

6       A.  Yes.  We were talking about me working

7  from home on the days I was solo because I was

8  telling her how it was affecting me, and I told

9  her the conversation me and Travis had.

10       Q.  And according to the first page of this

11  exhibit, Dr. Wanzo was still saying that your

12  condition -- lack of staffing is related to your

13  workplace condition?  I'm sorry.  Strike that.

14       Dr. Wanzo was saying that you still need

15  this accommodation because of lack of staffing;

16  is that right?

17       A.  Yes, sir.

18       Q.  If you turn to the second page of this

19  exhibit, kind of in the middle it says, what are

20  your patient's current abilities, what type of

21  work can your patient perform?  And she writes,

22  you can only work three days per week, Wednesday,

23  Thursday, Friday, working from home two days a

24  week, ten-hour days.  Do you see that?

25       A.  Yes, sir.



Page 161

1          Q.  And did you discuss that with Dr. Wanzo?

2          A.  I didn't discuss that part with her

3    about working from home for those two days.  I

4    remember her saying specifically on the days I

5    was solo.

6          Q.  And she goes on to state that your

7    target date for your return to work was on a full

8    time basis June 5, 2019; is that right?

9          A.  Yes, sir.

10         Q.  And did you agree with that --

11         A.  Yes.

12         Q.  -- assessment from Dr. Wanzo?

13         A.  For the return date, correct.  Due to

14   the fact my uncle was in hospice at the time, and

15   I was really preparing myself for his death

16   because he was a very close, close relative of

17   mine.

18         Q.  So you were requesting a modified work

19   schedule -- or an extension of your modified work

20   schedule from March 30, 2019 through June 5, 2019

21   in part because of your uncle's illness; is that

22   right?

23         A.  Yeah, and due to lack of staffing as

24   well.  Because mind you, we don't have two -- we

25   didn't have two temps at all and Audrianne wasn't



Page 162

1  there still, so we were down technically three

2  people on third.

3      Q.  Right.  And so you were -- you were

4  requesting additional time off during a time

5  period when Schneider was short-staffed, right?

6      A.  Not -- not time off because I was

7  working.

8      Q.  Yeah, you were requesting a modified

9  work schedule during a time period when Schneider

10  was short-staffed, correct?

11      A.  Yes, but I wasn't requesting time off.

12  I was requesting to work from home.

13      Q.  Well, according to this you were

14  requesting to continue to work three days per

15  week, right?

16      A.  Correct.

17      Q.  And your normal full-time schedule would

18  be four days per week, right?

19      A.  Correct.

20      Q.  So you were -- you were requesting a

21  modified, reduced work schedule during a time

22  period when Schneider was short-staffed, correct?

23      A.  Yes.

24      Q.  And the doctor goes on to state, if

25  appropriate provide examples of accommodations



MAGNA
LEGAL SERVICES

Page 163

1    that will allow your patient to return to work.

2    And Dr. Wanzo wrote, working from home two days

3    per week, working three days per week, Wednesday,

4    Thursday, Friday.  Did I read that correctly?

5         A.  Yes, sir.

6         Q.  Okay.  And that's what's -- is it your

7    testimony that you did not discuss with Dr. Wanzo

8    working from home two days per week as of March

9    30, 2019?

10         A.  I did discuss with her working from home

11    when I was solo.  So whatever the schedule was,

12    whoever wasn't there on those days, that's the

13    days I needed them to accommodate.  So if you

14    were scheduled for a Wednesday and Thursday or

15    Friday schedule, and let's say you called out

16    before a shift, I was thinking like Travis would

17    let me know, like, hey, such and such called out,

18    stay at home tonight or, hey, I'm not able to

19    come in.  You know, that's how I was looking at

20    that, and that's how I talked to him about it,

21    and that's how I talked to Dr. Wanzo about it.

22    But I do understand what you're saying.

23         Q.  All right.  Well, were you disagreeing

24    with Dr. Wanzo -- did you disagree with her when

25    she said she wanted you to work from home two



Page 164

1    days per week as of March 30, 2019?

2         A.  No, I'm not disagreeing with her.  I

3    just don't know specifically who was off on those

4    specific days.

5              MR. MILIANTI:  Okay.  All right.  Why

6    don't we take a -- we've been going for a little

7    bit.  Why don't we take a ten-minute break.

8     (Break taken from 3:20 p.m. to 3:33 p.m.)

9    BY MR. MILIANTI:

10        Q.  As of -- strike that.

11        Ms. Geter, was it your intention to remain

12   on a modified work schedule until you believe

13   Schneider had appropriately staffed the third

14   shift for area planning managers?

15        A.  No, sir.  I was really trying to just

16   get the betterment of my mental health in order

17   and in control mostly.

18        I'd also like to make a correction.  So

19   earlier when you stated that me and Dr. Wanzo

20   discussed the two days off and the three-day work

21   period, that was not my discussion her

22   whatsoever.  I think that's what the implication

23   of what was going on within the office, as far as

24   the situation and with Audrianne's maternity

25   leave and the lack of staffing.  And I was like,



Page 165

1   hey, I just -- as long as I can work from home

2   those days that's significant.  But as far as

3   requesting the two days off doing that three work

4   -- I do not recall that all within that

5   discussion.

6        Also, I received in March -- mid-March the

7   news about my uncle and -- [inaudible] -- because

8   of the stresses from work and then from that news

9   as well.  So I guess she took it into her -- took

10  it into her hand to write that particular section

11  in the notes.  But my main concern was as long as

12  I could feel safe at work, I could do my job.

13  But my mental health did start to decline a

14  little bit around that time, so I just wanted to

15  correct that.

16       Q.  Well, you were continuing to extend your

17  modified work schedule because of a perceived

18  lack of staffing on behalf of Schneider for the

19  area planning manager position, right?

20       A.  Yes, sir.

21       Q.  And you would not have felt comfortable

22  returning to a full-time role until you believed

23  that Schneider had appropriately staffed the

24  third shift with area planning managers, right?

25            MS. LEGARE:  Objection.



Page 170

1    and March 30, 2019 any instance where a driver

2    was verbally abusive towards you?

3         A.  Me specifically, no, at this time that I

4    can remember.

5         Q.  Okay.  If you could turn to the next

6    document, which is -- I might be jumping around a

7    little bit.  I'm not sure.  Schneider 315.  It's

8    a one-page document dated March 2nd -- April 2nd,

9    2019.

10        A.  Yes, sir.

11        Q.  Okay.  I'm going to mark this as

12   Plaintiff's Deposition Exhibit number 20.  Do you

13   recognize this document?

14            (Plaintiff's Exhibit 20 was

15                marked and identified.)

16        A.  Yes.

17        Q.  Okay.  And this document is dated

18   April 2, 2019.  Did you receive a document on or

19   about that date?

20        A.  Probably around that time.  Not on that

21   date, but afterwards.

22        Q.  Okay.  And that's your address; is that

23   right?

24        A.  That's correct.

25        Q.  Okay.  And then you see in this first



Page 171

1   paragraph it says, you're currently approved --

2   I'm sorry.  This is a letter that you received

3   from Schneider's HR leave administration team,

4   correct?

5       A.  Correct.

6       Q.  Okay.  And it relates to your request

7   for an accommodation, right?

8       A.  Yes, sir.

9       Q.  And it states, Dear Cierra, you're

10  currently approved on an accommodation for your

11  reduced schedule of three days through March 19,

12  2019.  Below is the timeline of information that

13  has been received during your leave of absence

14  and your partial return to work.  Did I read that

15  correctly?

16      A.  Yes, sir.

17      Q.  Okay.  And then there are four -- I'm

18  sorry -- five bullet points, right?

19      A.  Yes.

20      Q.  Okay.  Can you review those five bullet

21  points and tell me when you're done?

22      A.  Yes.  I'm finished.

23      Q.  Okay.  And do these five bullet points

24  accurately reflect the timeline of your

25  accommodation request and the request that you



Page 172

1    received?

2          A.  Yes, sir.

3          Q.  Okay.  And Schneider states after these

4    bullet points, with the multiple extensions of

5    partial return to work schedule, this is

6    appearing to be a permanent need.  Did I read

7    that correctly?

8          A.  Yes.

9          Q.  All right.  And then they ask that you

10   provide or that your healthcare provider provide

11   additional information by no later than April 8,

12   2019; is that right?

13         A.  Yes, sir.

14         Q.  Okay.  And do you recall -- I'll show

15   you the exhibit here in a little bit.  Do you

16   recall receiving a document attached to this

17   where they asked -- Schneider had asked your

18   physician for additional information?

19         A.  Yes, sir.

20         Q.  Okay.  And did you take that document to

21   your physician?

22         A.  I had to.  Yes, sir.

23         Q.  Okay.  We can go to Schneider 301.  I'm

24   sorry.  That's out of order.  It'll be CG-261

25   through 262.



Page 176

 1    Hartford's policies.

 2        Q.  And you received those benefits for

 3    approximately one year at 66 percent of your

 4    salary?

 5        A.  Yes, sir.

 6        Q.  If you could go to -- I believe it's the

 7    next document in the stack.  It should be

 8    Schneider 301.

 9        A.  Yes.

10        Q.  We'll mark this is Plaintiff's

11    Deposition Exhibit number 22.  Do you recognize

12    this document?

13           (Plaintiff's Exhibit 22 was

14              marked and identified.)

15        A.  Yes, sir.  It's the termination letter.

16        Q.  Okay.  And did you receive this letter

17    on or about April 12, 2019?

18        A.  I received it April 12th, 11:15 p.m. by

19    Travis Torrence in the on-on-one room.

20        Q.  Okay.  And if you look at that first

21    paragraph, it states were out on a continuous

22    leave of absence due to medical reasons from

23    October 9, 2018 through January 1, 2019 at which

24    time you exhausted your 12 weeks of FMLA; do you

25    agree with that?



Page 177

1          A.  Yes, sir.

2          Q.  It goes on to state that Schneider was

3    able to accommodate you returning to work on a

4    partial schedule starting on January 2, 2019; is

5    that correct?

6          A.  Yes, sir.

7          Q.  And that Schneider had been

8    accommodating you working three out of your

9    scheduled four days since January 2, 2019; is

10   that correct?

11         A.  Correct.

12         Q.  And then you see there's three bullets

13   there?

14         A.  Yes, sir.

15         Q.  Did you agree with the timeline and the

16   accommodations that were granted?

17         A.  Yes, sir.

18         Q.  And then it states on April 1, 2019 we

19   received updated information from your physician

20   that indicates you may be able to return to full

21   time on June 5, 2019 with three days in the

22   office and the other day working from home; do

23   you see that?

24         A.  Yes, sir.

25         Q.  And then Schneider goes on to state,



Page 178

1    based on this information, carefully considering

2    your request for us to continue to accommodate

3    you, we are unable to continue accommodating a

4    partial schedule, right?

5         A.  Yes, sir.

6         Q.  And they denied your request for

7    additional accommodations, right?

8         A.  Yes, sir.

9         Q.  Okay.  And you indicated that you --

10   that Travis provided you with a copy of this

11   letter on April 12, 2019 at 11:15 p.m.?

12        A.  Yes, sir.

13        Q.  Okay.  And you said it was in the

14   one-on-one room?

15        A.  Yes, sir.

16        Q.  And that was in your office -- or at the

17   office facility?

18        A.  Yes, sir.

19        Q.  Okay.  And who was present for that

20   meeting?

21        A.  It was me and Travis in the one-on-one

22   room.  Sarah Kopf was outside in the office area

23   with a driver.  Wendy was in there.  The driver's

24   name is Wendy.

25        Q.  Well, who was in the room when you were



Page 179

1   speaking with Travis?  Was it you and Travis?

2        A.   Just me and Travis.

3        Q.   Okay.  And as best you can recall, what

4   was said during that meeting and by whom?

5        A.   He asked me how I was doing, and then I

6   was like, oh -- like we always joke.  Everybody

7   had a little joke when we go into the one-on-one

8   room, like what happened now?  Like that's what

9   we always do.  And so I was like, uh-oh, what's

10  wrong?  He was like, oh, nothing, but I need to

11  talk to you, and he had more of a serious look on

12  his face, and then he handed me this paper.  I

13  read it and he was like so we can no longer

14  accommodate you, so we need you to turn in your

15  laptop and everything tonight.

16       Q.   Did you say anything?

17       A.   Yeah, I said something.  I said how dare

18  you do this to me when you know what predicament

19  I'm going through and then how much I have helped

20  out the team.  And I said it's some bull crap.  I

21  had to call my mom because she had to calm me

22  down, because I was about to go into a manic

23  rage.

24       Q.   Did Travis say anything in response?

25       A.   He said it was out of his hands and out



Page 180

1    of his control, he tried his best.  And I said,

2    no, you didn't.  You didn't try your best because

3    you would've came to me and had another step to

4    help me.

5         Q.  Anything else that you can recall in the

6    conversation you had with Travis on that day?

7         A.  I remember I left my termination letter.

8    I had to come back and get it and he put my

9    termination on a sticky note in a folder on a

10   piece of tape outside the door and locked the

11   door so I wouldn't come back into the front --

12   onto the -- into the office, so I had to pick up

13   the paperwork on the porch.

14        Q.  Anything else that you can recall?

15        A.  I was very upset.  I even had to call my

16   psychiatrist that night at 12 o'clock at night.

17        Q.  Why do you believe Schneider denied your

18   accommodation requests as of April 12, 2019?

19        A.  I don't think they wanted to deal with

20   me.

21        Q.  I'm sorry?

22        A.  I didn't think they wanted to deal with

23   me any longer.

24        Q.  Why not?

25        A.  Because right after I was terminated,


MAGNA
LEGAL SERVICES

Page 181

1    they moved somebody from first shift to third

2    shift and hired two more people.  I thought they

3    just didn't want to deal with me no more, to be

4    quite honest.

5        Q.  What do you mean when you say they

6    didn't want to deal with you any longer?

7        A.  Deal with my circumstance.

8        Q.  And what do you mean when you say your

9    circumstance?

10       A.  Deal with my mental health situation and

11   my health concerns -- [inaudible] -- me as an

12   employee, a human being.

13       Q.  Do you know who made the decision to

14   deny your continued accommodation requests?

15       A.  Travis told me that night it was out of

16   his control, so I just thought it was just upper

17   management, which is Marianne and I thought it

18   was HR, that's the only way I can think of it at

19   that time.  But specifically, no, sir.

20       Q.  We can go to the next exhibit.  It's

21   Schneider 24 through 26.

22       A.  Yes, sir.

23       Q.  During the time period of February 14,

24   2019 through April 12, 2019, do you -- do you

25   know who was performing the job duties that you



Page 182

1    would typically perform on that fourth day that

2    you would normally work?

3         A.  It was probably between, like I stated

4    earlier, Travis, Audrianne, Desmond.  One of them

5    three.  And since Audrianne was already out on

6    leave, it was between Desmond and Travis at that

7    time.

8         Q.  And that would have been in addition to

9    their normal work schedule; is that right?  As

10   far as you know?

11        A.  Not -- not -- I know Desmond

12   specifically that's -- they -- that's his

13   schedule.  Like they moved it around so everybody

14   can accommodate because Audrianne was out and

15   with my predicament as well, so they shift the

16   schedules around.  There's only three people on

17   third shift other than the two temps, so you only

18   was working with three technically if Travis

19   didn't show up.  So if he was working second

20   shift, he wouldn't do third shift sometimes, or

21   sometimes he'll pull a double shift.  If he

22   couldn't cover the third, then we by ourselves.

23        Q.  Okay.  If Travis or Desmond had to work

24   on that Sunday that you would normally work, that

25   would be in addition to the work that they would



Page 183

1    normally perform on that day; is that correct?

2        A.  I don't understand that question.  I'm

3    sorry.

4        Q.  Sure.  If Desmond was scheduled to work

5    on Sunday and you because of your modified

6    schedule we're not working on that Sunday, then

7    Desmond would do his work and the work that was

8    normally assigned to you; is that right?

9        A.  Correct.  Yes.

10       Q.  And same thing with Travis.  If he was

11   either off on that Sunday or already scheduled on

12   that Sunday and he was doing the work that you

13   normally would do on Sundays, he was doing twice

14   as much work as he normally would do, correct?

15       A.  Correct.  And vice versa if they were

16   out on the days I had to work on Wednesday,

17   Thursday and Friday.

18       Q.  Let's go to Exhibit 23, and this is a

19   fax that's dated April 27, 2019.  It looks like

20   it was sent from Dr. Wanzo to Schneider's HR

21   leave administration team; is that correct?

22           (Plaintiff's Exhibit 23 was

23               marked and identified.)

24       A.  Yeah, they had sent this over to her

25   after my termination to get more information from



Page 188

```
 1        A.  Yes, sir.
 2        Q.  And you had difficulty working in a
 3   fast-paced, high pressure environment since the
 4   time you returned on January 2, 2019, right?
 5        A.  Yes, sir.
 6        Q.  And you had difficulty working in a
 7   fast-paced, high pressure environment prior to
 8   January 2, 2019, correct?
 9        A.  Correct.
10        Q.  Okay.  And your difficulty in working in
11   a fast-paced, high pressure environment -- when
12   did that start?  When did you start having
13   difficulty working in a fast-paced, high pressure
14   environment; do you recall?
15        A.  How far back we can go?  When Greg
16   Cochran was my manager.
17        Q.  And what time period would that have
18   been?
19        A.  2014 through the time he was -- 2014
20   through -- yeah, 2014 until February of 2016.
21        Q.  If you turn to the next page --
22        A.  Uh-huh.  (Affirmative).  Yes, sir.
23        Q.  I'm sorry.  If you can go to number
24   three -- question number three, it says that
25   you're currently working Wednesday, Thursday and
```


MAGNA
LEGAL SERVICES

Page 196

1    July, but I still would have to go back.  I'm not

2    going to give you a falsified date.

3         Q.  Okay.  So the best you can recall is

4    late June, early July 2019?

5         A.  Yes, sir.

6         Q.  All right. And would you have reviewed

7    your doctor's responses to the questions

8    contained in this document?

9         A.  Correct.

10        Q.  All right.  And when you saw that your

11   doctor indicated that you could return to

12   full-time work as of September 23, 2019, did you

13   call up your doctor and disagree with her?

14        A.  No, sir, because I was already

15   disgruntled.  This is almost two months after I

16   was terminated.  I was highly upset at Schneider.

17        Q.  Did you contact the Hartford and tell

18   them that you didn't think that you thought you

19   could return to full-time work prior to September

20   23, 2019?

21        A.  When I called the Hartford and told them

22   I was terminated, they was dismayed and they

23   couldn't believe I was terminated.  I understand.

24   I understand.

25        Q.  When you received this document and your



Page 197

1   physician wrote that you could return to

2   full-time work on September 23, 2019, did you

3   contact the Hartford and tell them that you

4   disagreed with that?

5         A.  No, sir.

6         Q.  Ms. Geter, are you aware of any area

7   planning managers who requested a reduced work

8   schedule for approximately six months?

9         A.  To my knowledge, yes, sir.

10        Q.  Who?

11        A.  Tiffany Kitchens and the young lady we

12  spoke about earlier with the cancer treatment,

13  Candis Smith.

14        Q.  Anyone else?

15        A.  Other than maternity leave for

16  Audrianne.  She was pregnant twice, so that's a

17  six to eight-week time period on that.  But other

18  than that, that's it.

19        Q.  Okay.  And Audrianne, she was out on

20  leave due to the birth of her children; is that

21  right?

22        A.  Yes, sir.  Correct.

23        Q.  And she was out on a continuous leave of

24  absence for six to eight weeks; is that your

25  understanding?



Page 198

1      A.  Correct.

2      Q.  Okay.  And do you know whether or not

3  those absences were covered under the FMLA?

4      A.  Yes, they were.

5      Q.  Okay.  And those are the leaves to which

6  you're referring with respect to Ms. Williams; is

7  that correct?

8      A.  Yes, sir.

9      Q.  All right.  And Tiffany Kitchens, what

10  job position did she have?

11      A.  Area planning manager, first shift.

12      Q.  First shift?

13      A.  Yes, sir.

14      Q.  And do you know who she reported to?

15      A.  Doug Horton -- I'm sorry.  Rodney Dunn,

16  because she was over Jacksonville.

17      Q.  Rodney Dunn?

18      A.  Yes.  I'm sorry.  R-o-d-n-e-y; D-u-n-n.

19      Q.  And do you know what her regular work

20  hours would be?

21      A.  Her hours she'll come in at 6:30 in the

22  morning and leave at 4:30 in the evening.  3:30

23  to 4:30 depending on what's going on in her

24  market.

25      Q.  And how do you know that?



Page 199

```
 1        A.  Because I was on third shift and I had
 2    transferred the markets.  If I had her markets
 3    the night before, I'm the person she has to talk
 4    to.  Third and first shift communicates --
 5        Q.  Do you --
 6        A.  Uh-huh.  (Affirmative).  Go ahead.  I'm
 7    sorry.
 8        Q.  Do you know what days of the week she
 9    would work?
10        A.  It was Monday through Friday because
11    first shift never worked weekends.  They just --
12        Q.  She worked a Monday --
13        A.  I'm sorry.
14        Q.  -- through Friday schedule, 6:30 a.m. to
15    3:30, 4:30 p.m.?
16        A.  Yes, sir.
17        Q.  Okay.  And when -- when do you believe
18    she took a reduced -- or started working a
19    reduced schedule?
20        A.  I believe that was -- I started noticing
21    it around, like, July or August of 2018.
22    Everybody started noticing she wasn't coming to
23    work a lot, and then we just started inquiring is
24    she okay, and then we found out she was out on
25    leave.
```



Page 200

1      Q.  Do you know why she was out on leave?

2      A.  Her parents were ill, and she was going

3   through a mental distress as well -- mental

4   health distress as well.

5      Q.  Do you know if she took time off under

6   the FMLA?

7      A.  Yeah.  I didn't see her for, like, a

8   good month to two months almost.

9      Q.  Do you know one way or the other whether

10   she took time off under the FMLA?

11      A.  No, sir.  But for that time -- that

12   amount of time, we don't have that amount of time

13   on our time off for personal time off.  We're

14   only allotted -- she was hired -- rehired August

15   of 2014 a month after me, so that's how I know I

16   have the seniority far as time-wise.  How we get

17   our time, we get on that same scale, so we had

18   the same amount of time.  So she wasn't allotted

19   that.  In order to be out that amount of time you

20   have to be on FMLA.

21      Q.  And you said you believe that she was

22   not coming into work a lot beginning in July or

23   August of 2018; is that right?

24      A.  Yes, sir.  She was starting to work

25   reduced hours.  Like her days instead of five



Page 201

1   days, you'll see Tiffany three days a week.

2        Q.  And how long was she working a -- do you

3   believe she was working a reduced schedule?

4        A.  For a while.  Even when I came back on

5   July -- in January she was doing at least once a

6   week she wasn't coming in to help with her

7   parents, I believe.

8        Q.  Do you know if she had any time

9   available under the FMLA during the July, August

10  2018 through January 2019 time period?

11       A.  No, sir.  That was none of my business.

12       Q.  Do you know what specific days she was

13  off during the July 2018 through January 2019

14  time period?

15       A.  No, sir, not specifically.

16       Q.  Do you know the specific circumstances

17  of her time off during the July 2018 through

18  January 2019 time period?

19       A.  The reason for her time being off?  Is

20  that the premise of the question?

21       Q.  Do you know the specific -- I'll

22  rephrase it.

23       Do you know the specific days that she would

24  have been off during the July 2018 through

25  January 2019 time period?



Page 202

```
 1        A.  No, sir, I do not recall that, but I do
 2   remember when she first -- when it first started
 3   becoming noticeable, she was missing days, like a
 4   few weeks at a time and we was looking for her,
 5   like making sure she was okay.
 6        Q.  And you believe --
 7        A.  Inquiring as a team.  Uh-huh.
 8   (Affirmative).
 9        Q.  Do you believe Ms. Kitchens returned to
10   a full-time schedule in January of 2019?
11        A.  No, sir.
12        Q.  No, sir?  I'm sorry?
13        A.  No, sir.
14        Q.  When do you believe she returned to a
15   full-time schedule?
16        A.  I just know on certain days until the
17   time I was terminated, Tiffany was allowed to
18   work at home some days and she was off on some
19   days.  So I don't have a specific time period for
20   that.  Travis would definitely know that, and
21   Rodney would know that.
22        Q.  So you don't know when she would have
23   returned to a full-time schedule; would that be
24   an accurate statement?
25        A.  Yes, sir, that's correct.
```



Page 203

```
 1        Q.  You weren't charged with approving any
 2   of her time off, were you?
 3        A.  I'm sorry?
 4        Q.  You weren't charged with approving any
 5   of her time off; is that correct?
 6        A.  No, sir, I was not.
 7        Q.  Okay.  And you wouldn't have access to
 8   her time records as to when she had -- when she
 9   took time off; is that correct?
10        A.  That is correct.  Only management and HR
11   has those abilities.
12        Q.  And is it your understanding that
13   Ms. Kitchens instead of working five days a week
14   was working a set schedule of four days a week or
15   three days per week?
16        A.  Correct.
17        Q.  That was your understanding; it was a
18   set schedule?
19        A.  It wasn't a set schedule, not to my
20   understanding.  It was just when I saw her, I
21   started noticing, oh, she's only here twice a
22   week, oh, she's here three days a week, but it
23   wasn't a set schedule.
24        Q.  Do you know if Ms. Kitchens had
25   requested any type of a workplace accommodation
```



Page 204

1    during the July 2018 through January 2019 time

2    period?

3         A.  No, sir, not to my knowledge.

4         Q.  Do you know who would've approved any

5    requests by Ms. Kitchens to work a reduced

6    schedule?

7         A.  Yes.  Rodney Dunn and Marianne

8    Biskey-Rose.

9         Q.  What is Ms. Kitchens' race?

10        A.  Caucasian.

11        Q.  Okay.  Other than Ms. Kitchens -- one

12   second.  You mentioned Ms. Kitchens and Candis

13   Smith --

14        A.  Yes, sir.

15        Q.  -- you believe were permitted to work a

16   reduced schedule, right?

17        A.  Yes, sir.  And also, can I add one more

18   person?  I'm sorry.

19        Q.  Sure.

20        A.  Sarah Kopf, she was allotted to --

21   during her divorce and dealing with her children

22   during that time period, she was allotted to help

23   with her schedule to work from home remotely when

24   she couldn't have childcare if her ex-husband

25   couldn't ascertain the kids at that time.  So she


MAGNA
LEGAL SERVICES

Page 205

1    would request to work from home on those

2    particular days even afterwards after I left.  I

3    know of this because she told me herself.  She

4    was like, yeah, Travis had to let me take off on

5    this day.  I was like, oh, okay.

6         Q.  And we've already discussed Ms. Smith

7    and the circumstances surrounding her time off;

8    is that correct?

9         A.  Yes, sir.

10        Q.  And Sarah Kopf, who did she report to?

11        A.  Travis Torrence, Doug Horton and

12   Marianne Biskey-Rose.  That's her chain of

13   command.

14        Q.  All right.  And you said that she was

15   permitted to work from home?

16        A.  Yes, sir.

17        Q.  Do you know if Ms. Kopf ever worked a

18   reduced schedule?

19        A.  Not a reduced schedule, to my knowledge,

20   but she was -- when days where she needed to work

21   remotely, they granted it to her.

22        Q.  And what shift did she work?

23        A.  Second shift.

24        Q.  Other than Ms. Kitchens and Ms. Smith,

25   any other area planning manager whom you believe



Page 206

1    was permitted to work a reduced schedule?

2         A.  No other person in the office had any

3    other medical or any other issues that I remember

4    that was out like that, so no, sir.

5         Q.  And you said that Ms. Kopf was permitted

6    to work from home.  Do you know how long she was

7    permitted to work from home?  How long this

8    accommodation was provided?

9         A.  All the way into COVID.

10        Q.  When did it start?

11        A.  When did she start working?  So it had

12   to be around, I believe, spring -- no, fall of 20

13   -- no.  It was starting spring of 2018 she was

14   having difficulties with her ex-husband around

15   that time with the scheduling with the kids, and

16   then if a scenario popped up with the kids --

17   that was give or take once or twice a month from

18   that point on and then she'll work from home on

19   those days.  Yeah, she'll work from home.

20        Q.  So with respect to Ms. Kopf, it's your

21   testimony that beginning in the spring of 2018,

22   she was permitted to work from home one or two

23   days a month to care for her children?

24        A.  To help accommodate.  Yes, sir.  Working

25   remote from home.  Uh-huh.  (Affirmative).



Page 207

1        Q.  She was permitted to work from home one

2   or two days a month from the spring of 2018 until

3   the start of COVID?

4        A.  Yes, sir.  And then the entire staff was

5   remote.

6        Q.  And that would have been the spring of

7   2020 would be the start of COVID?

8        A.  Yes, sir.

9        Q.  Okay.  So it's your testimony that from

10  the spring of 2018 to the spring of 2020 Ms. Kopf

11  was permitted to work from home one or two times

12  a month to care for her children?

13       A.  Yes, sir.

14       Q.  What evidence do you have in support of

15  your contention?

16            MS. LEGARE:  Objection.

17       A.  I spoke with her on the phone

18  personally.  Like she'd checked on me and I'd

19  check on her and the kids, just how we always

20  did, and she'd bring it up in conversation.

21  Yeah, I had to take off on this day or I had to

22  work from home.  I'm like, oh, okay.

23  BY MR. MILIANTI:

24       Q.  So she would tell you in conversations

25  that she would have to work from home?



Page 208

1        A.  Yes, sir.

2        Q.  And you deduced based on those

3  conversations that it was one or two times a

4  month?

5        A.  Yes, sir.  Because she would tell me --

6        Q.  Any other evidence you have in support

7  of your contention that she was permitted to work

8  from home one or two days a month since from the

9  spring of 2018, spring of 2020?

10        A.  No, sir.  The evidence would have to

11  come from Schneider on that part.  Because our

12  logins on our laptop shows where we log in at.

13        Q.  Other than Ms. Kopf, any other area

14  planning managers you believe were permitted to

15  work from home?

16        A.  Due to what circumstance?  Can I ask

17  that question for you?

18        Q.  Sure.  Any area planning managers who

19  were permitted to work from home on any type of a

20  regular basis?

21        A.  The entire staff there.

22        Q.  The entire staff regularly worked from

23  home?

24        A.  Not regularly, but they didn't have a

25  problem if you've called out sick if you didn't


MAGNA
LEGAL SERVICES

Page 209

1  want to use your sick leave, or let's say you was

2  out of town when you couldn't make it back in

3  town, but you took your laptop with you, which

4  some people would do, and you'd be like, hey, I

5  can't make it.  I'm working in North Carolina

6  this week.  Okay.  And they'd allow them to work

7  remotely.

8      Q.  Are you aware of any area planning

9  managers who were permitted to work from home one

10 day per week?

11     A.  As a schedule?

12     Q.  Yes.

13     A.  No, sir.

14     Q.  Were you aware of any area planning

15 managers who were permitted to work from home one

16 day every two weeks?

17     A.  No, sir.  Other than what I saw from

18 Tiffany Kitchens, like from what I saw, no.

19     Q.  Would it be accurate to say that area

20 planning managers were permitted generally to

21 work from home if they were ill or if some type

22 of an emergent circumstance came up --

23     A.  Yes, sir.

24     Q.  -- would that be accurate?

25     A.  Yes, sir.  Because they even had us


MAGNA
LEGAL SERVICES

Page 210

1    leave the premise when, like, we have tornado

2    warnings in the area.  They have us move from

3    that location because we're in a triple wide

4    trailer to the hotel, like, two miles away to be

5    in a commercial building instead of going home.

6    So they'll have us probably go there if it's like

7    a storm, but still work remotely.  And if the

8    storm gets too bad, they'll tell everybody to go

9    home once it's permissible.  And then if we had

10   ice or sleet and Atlanta shuts down for that, we

11   can work from home.  And that happened on two

12   occasions -- three occasions while I was employed

13   with Schneider for five years just with the ice

14   alone.

15        Q.  Do you know if your position was

16   replaced or if somebody replaced you?

17        A.  Ryan Wheeler was moved from first shift

18   to third shift to cover me.

19        Q.  How do you know that?

20        A.  Because he told me.

21        Q.  Do you know if anyone was hired to

22   replace your position on third shift?

23        A.  I can't remember her name.  I don't know

24   if she's no longer there, but it was a young lady

25   they hired right after me to cover my shifts.



Page 215

1    management -- even though management -- I know

2    they are allotted the same amount of time as us

3    sometimes, like the -- your time is dependent on

4    your seniority and stuff.

5         So when I started noticing when my

6    management team started taking off more and

7    leaving us, you know, when we needed help

8    sometimes, and then I started noticing my other

9    coworkers of other races was taken off more or

10   they had certain circumstances and they were

11   accommodated.  I just took note of that -- mental

12   note of it.

13        Q.  So you believe you were discriminated

14   against because of your race because your

15   management team was permitted to take more time

16   off than you?

17        A.  Not just me, just the entire staff.  I

18   noticed that Travis, I believe, was off that year

19   -- because I looked at the calendar, I looked at

20   the days and I counted one night everybody's time

21   and it was 80 -- I think it was 82 days total

22   around that time.  I knew he was covering for

23   Candis because she was out with her cancer

24   treatment, and then at that time, he was just

25   doing a lot of schedule maneuvering to



Page 216

1   accommodate for second shift.  So I knew why he

2   was taking a lot of time to, you know, make up

3   that time, but then at same time we're only

4   allotted maybe 25, 35 days a year.

5       Q.  And you said that the management team

6   was permitted to take more time off than all the

7   other area planning managers; is that right?

8       A.  That's correct.

9       Q.  Okay.  And some of those area planning

10  managers were white; is that right?

11      A.  Yes, sir.

12      Q.  Okay.  Other than your belief that your

13  management team was permitted to take more time

14  off than area planning managers, any other ways

15  in which you believe you were discriminated

16  against because of your race?

17      A.  I looked at my circumstances with

18  Tiffany Kitchens because we were hired around the

19  same time and I looked at how she was treated

20  compared to how I was treated.  At the end she's

21  still employed, I'm not.

22      Q.  Why do you believe that's tied to your

23  race?

24      A.  [Inaudible] -- I might not know the

25  circumstances in particular with her specific



Page 217

1  days off, but from my review of my environment,

2  she was being treated better, in my opinion,

3  because she still has her job.

4      Q.  You believe she still has her job

5  because she's white; is that your testimony?

6      A.  Yeah.

7      Q.  And how do you believe she was treated

8  better than you?

9      A.  She's working, I'm not.  And I saw that

10 when she was off at that time, they accommodated

11 her and they accommodated me, but then in the end

12 I didn't have a job and I was working on my

13 mental health.

14     Q.  So you believe she was treated more

15 favorably than you because she was accommodated

16 and you were not?

17     A.  Correct.  The entire management team is

18 white.

19     Q.  Well, is that your basis for believing

20 you were treated differently because of your race

21 because you're black and the management team is

22 white?

23     A.  Yes, sir.

24     Q.  All right.  And do you have any evidence

25 in support of your position that you were treated



Page 218

1 differently because of your race other than the

2 management team is white?

3    A.  Can you rephrase that for me?  I'm

4 sorry.

5    Q.  Sure.  Do you have any evidence to

6 support of your race discrimination claim other

7 than the fact that the management team is white

8 and you're black?

9    A.  So Tiffany was the main person I was

10 looking at that, and then also how they

11 accommodated Sarah Kopf.  I had way more

12 seniority than Sarah.  I helped train Sarah, and

13 then when she needed anything for her family or

14 her needs, they accommodated her without a

15 question of a doubt.

16    Q.  So you believe you were discriminated

17 against -- strike that.

18    You believe you were discriminated because

19 of your race because Sarah and Tiffany were

20 accommodated for their conditions and you were

21 not; is that your testimony?

22    A.  Yes, sir.  To a certain extent because

23 they accommodated me until April 12th.

24    Q.  Okay.  Any other evidence you have in

25 support of your race discrimination claim other



Page 222

1    rearrange the schedule after they terminated me

2    to put him back on third, because he was one of

3    the people that understood the shift, as well as

4    I did and Desmond Seymour.  I was the --

5        Q.  Any other way --

6        A.  -- the lead on third shift.

7        Q.  Any other ways you believe Mr. Wheeler

8    will support your claims in this lawsuit?

9        A.  I believe Ryan can just tell his side

10   from his viewpoint and he will -- I think he will

11   concur with the fact that it was some racial

12   tension -- not tension, but you can see the

13   little racial things they played in the office

14   and they thought no one could pay attention to

15   this.

16       Q.  Who is Jowayn Worrell?

17       A.  Jowayn Worrell is my boyfriend.

18       Q.  What information does he have in support

19   of your claims against Schneider?

20       A.  He witnessed me go through my breakdown

21   after I was terminated.

22       Q.  Anything else?

23       A.  He can tell you as from his perspective

24   how he saw things from a driver's perspective.

25       Q.  Is Mr. Worrell still employed by



EXHIBIT

9

FAX TRANSMISSION COVER SHEET

DATE: October 22, 2018

TO: The Hartford

FAX: 1-866-411-5613

RE: Cierra Geter

SENDER: Dr. Cassandra Wanzo

YOU SHOULD RECEIVE 4 PAGE(S), INCLUDING THIS COVER SHEET.

CG000073

**CONFIDENTIAL MEDICAL RECORDS**

Please fax the completed form to:
Fax Number: 866-411-5613
The Hartford
P.O.Box 14301
Lexington, KY 40512-4301
Email: APSupload@thehartford.com

**ATTENDING PHYSICIAN'S STATEMENT**
**(For Mental Health Claims)**


THE HARTFORD

**To Be Completed By The Employee**

Patient Name: Cierra Geter

Date of Birth:

Insured ID Number:

Patient Address: (Street, City, State & Zip Code)

**To be completed by the Provider** - (The patient is responsible for the completion of this form without expense to the company)

Is the condition related to environmental and/or interpersonal issues in his/her workplace? ☑ Yes ☐ No
If "Yes," explain: Lack of staffing, verbally abusive Driver
If yes, can he / she perform the same job at a different location / employer? ☐ Yes ☑ No
Are these issues causing a disincentive to return to work with current Employer? ☑ Yes ☐ No

**DIAGNOSIS:**
Primary Condition: Major Depressive Disorder DSM or ICD Code: 296.23
Secondary Condition: _____ DSM or ICD Code: _____
**Patient Assessment Measures**

**WHODAS Score:** _____

Domain I ____ Domain II ____ Domain III ____ Domain IV ____ Domain V ____ Domain VI ____
(Provide completed assessment questionnaire)

Other Assessment Measures - please list the measure scale and provide score (attach test results):

Current Self Reported Symptoms: impaired memory and concentration, anorexia, anergia (+) anhedonia, irritability, suicidal ideation (with plan again)

Current Observed Symptoms (Clinical presentation, frequency, severity, examples): depressed mood, psychomotor retardation / crying spells

Examination Date: 10/6/18

**CURRENT MENTAL STATUS EXAMINATION**
*(Please circle or check current status or explain in "Comments")*

| Category | Description | | | | Comments |
|---|---|---|---|---|---|
| Appearance | ☐ Well groomed | ☑ Disheveled | | | |
| Attitude | ☑ Cooperative | ☐ Guarded | ☐ Suspicious | ☐ Uncooperative ☐ Belligerent | |
| Speech | ☐ Normal | ☑ Halted | ☐ Pressured | ☐ Slurred ☐ Incoherent | |
| Thought Process | ☐ Logical/Coherent | ☐ Tangential | ☐ Flight of ideas | ☑ Circumstantial | |
| Mood | ☐ WNL | ☑ Depressed | ☐ Anxious | ☐ Irritable ☐ Euphoric | |
| Affect | ☐ Congruent | ☐ Incongruent | ☑ Blunted | ☐ Flat ☐ Labile | |
| Insight into Illness | ☐ Absent | ☐ Fair | ☑ Good | | |
| Psychomotor Activity | ☐ WNL | ☐ Agitation | ☑ Retardation | | |

| | | | | Please check the statement that indicates how this was assessed? | |
|---|---|---|---|---|---|
| Attention | ☐ Intact ☐ Impaired: | ☐ mild | ☐ moderate ☑ severe | ☑ Observed ☐ Tested ☑ Self-Reported | |
| Concentration | ☐ Intact ☐ Impaired: | ☐ mild | ☐ moderate ☑ severe | ☑ Observed ☐ Tested ☑ Self-Reported | |
| Memory | ☐ Intact ☐ Impaired: | ☐ mild | ☐ moderate ☑ severe | ☑ Observed ☐ Tested ☑ Self-Reported | |

**CHANGES:**
Indicate how this is a change from the patient's baseline. If the condition is chronic or long term, what and when did change occur?
Previously able to function on job, interact with others, socially active. Previously not suicidal.

LC-7592-9

Page 1 of 3

08/2016

CG000074

**Patient Name:** Cierra Geter   **Date of Birth:** _____   **Insured ID Number:** _____

## FUNCTIONALITY:

Did you recommend your patient stop working? ☑ Yes ☐ No   If Yes, on what date? 10/11/28

Are the symptoms of such severity to preclude the patient from social / occupational functioning? ☑ Yes ☐ No

When did the symptoms become severe enough to preclude social / occupational functioning? Sept. 30, 2018

If Yes, specify what work activities are impaired and how: unable to perform duties as a dispatcher, unable to interact with others, unable to operate keyboard or answer phones

What is the expected duration of any work activity impairments? 6-8 weeks

Have you discussed a return to work goal with your patient? ☑ Yes ☐ No   If No, please explain: Tentative return to work date 11/27/18

What are your patient's current abilities? What type of work can your patient perform? Unable to perform any duties (currently)

What is your target date for return to work for your patient? 10/27/18 ☑ Full time ☐ Part time

If part time, on what date will your patient be able to increase to full time? _____

If appropriate, provide examples of accommodations that would allow your patient to return to work: Increased staffing to meet the current demands

In your opinion is the patient competent to endorse checks and direct the use of the proceeds thereof? ☑ Yes ☐ No

Additional comments: _____

## TREATMENT:

| Date of onset of disability: | Date you first treated this patient for any condition: |
|---|---|
| 9/30/18 | 10/6/18 |

| Date you first treated this patient for this condition: | Date of onset of this condition: | Frequency of treatment: |
|---|---|---|
| 10/6/18 | 9/30/18 | 1-2 weeks |

List relevant treatment dates: 10/6/18

| Date of last office visit: | Date of next office visit: | |
|---|---|---|
| 10/6/18 | 10/27/18 | phone consultation 10/31/18 |

CG000075

claim # _____

*Living Center*

Patient Name: _____ Date of Birth: _____

*to Be completed or Return to work*

**TREATMENT CONTINUED:**

Has patient been referred to any other mental health providers/physicians? ☐
If "yes", please provide the following information:

Provider Name: _____ Phone number: ( )

Provider Address: _____

Are you coordinating care with this provider? ☐ Yes ☐ No

Was patient hospitalized or treated at a higher level of care for this condition? ☐ Yes ☑ No
If "yes", please provide information about any higher level of care:

**Inpatient:** Hospital/facility name _____ Phone Number: ( )
　Admission date: _____ Discharge date: _____

**Partial Hospital/Day Treatment/IOP:** Hospital/facility name _____ Phone Number: ( )
　Admission date: _____ Discharge date: _____ Number of days per week: _____ Number of hours per day: _____

**Residential:** Facility name: _____ Phone Number: ( )
　Admission date: _____ Discharge date: _____

Medication (dose, change, date of change):
10/6/08 ① Wellbutrin SR (50mg for seven days, Then 300mg) it am
10/6/08 ② Ambien 5mg at bedtime

Response to medication:
① Able to sleep with Ambien
② slight decrease in depressed Mood

**STATUS (Please check one):** ☐ In remission ☑ Improved ☐ Unchanged ☐ Retrogressed
Please provide a description of the most significant recent improvement and / or decompensation:
Sleep improved, slight improvement in Mood

**PROVIDER'S INFORMATION:**

Provider's Name: Cassandra Alonzo MD　Specialty: Psychiatry　License Number: 035/65
Address: (Street, City, State & Zip Code) 602 Bombay Lane Roswell 30076 CA
Telephone number: 678 566-1440
Degree: MD　Social Security Number or EIN Number: 58-2166 381　Fax Number: 678 566-1442
Office Contact: Ms Kelly Jordan　Office Contact Phone: 678 566-1440
Provider's Signature: C. Alonzo MD　Date Signed: 10/22/08

The Hartford® is underwriting companies Hartford Life and Accident Insurance Company and Hartford Life Insurance Company.
The Hartford® is The Hartford Financial Services Group, Inc. and its subsidiaries.

CG000076



Deposition of:

**Ashley Marie Janssen**

*April 8, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Ashley Marie Janssen                         April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                              Page 7

1       Q       Okay.  Are you on any medications

2    that might affect your memory or make you sleepy?

3       A       No.

4       Q       And have you seen Ms. Geter's

5    deposition transcript?

6       A       Yes.

7       Q       Okay.  Have you read the whole thing?

8       A       I have only read the first couple of

9    pages.

10      Q       And you actually don't know

11   Ms. Geter; right?

12      A       No, I've never met her.

13      Q       She said the same thing.  I just

14   wanted to confirm.  Let's see.

15              Are you still employed with

16   Schneider?

17      A       Yes, I am.

18      Q       And tell me your employment history

19   with Schneider?

20      A       I started with Schneider in 2012.  I

21   started as a corporate recruiter, and I did full

22   cycle recruiting for intermodal and other areas,

23   and also was the relationship partner for our

24   contingent staffing firm, Kelly Services, so over

25   many different temps, temps throughout the US as

Ashley Marie Janssen                                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 8

1   well.  I did that for two years.

2                   Then I moved into an associate HR

3   business partner role.  I did that for about four

4   years, worked specifically on human capital,

5   performance management, associate relations,

6   accommodations.  I had about 3,000 plus

7   associates throughout the US and Canada that I

8   supported, but our total group had about 5,800

9   drivers and about 800 office associates that I

10  helped indirectly support.

11                  And then in 2018 I took the role I'm

12  in today as a HR business partner senior, a

13  promotional role from --

14                  (Audio distortion.)

15                  THE COURT REPORTER:  I'm sorry.  The

16  audio cut.  The last part I heard was, "a

17  promotional role from."

18                  THE WITNESS:  Took the HR business

19  partner senior role as a promotional role from

20  the associate HR business partner role or my

21  previous role.

22  BY MS. LEGARE:

23      Q       And, Ms. Janssen, what are your job

24  duties in your current role?

25      A       So I work with the team, I support

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 11

```
 1   respect to leave management?

 2              MR. MILIANTI:  Object to the form.

 3              THE WITNESS:  I am involved once

 4   family medical leave has expired, but we have an

 5   HR leave team that handles all of our leaves.

 6   BY MS. LEGARE:

 7       Q       So is it fair to say that you become

 8   involved once FMLA is expired and employees might

 9   need accommodations under the Americans with

10   Disabilities Act?

11       A       Correct.

12       Q       All right.  When is the first time,

13   understanding that you have never met Ms. Geter,

14   when is the first time that you became involved

15   with Ms. Geter's employment with Schneider?

16       A       First time I was involved with her

17   was in January of 2019.

18       Q       So would that have been related to

19   her first request for accommodation?

20       A       Correct.

21       Q       And what is your role with respect to

22   employee requests for accommodations?

23       A       I specifically work with the leaders

24   to understand if we can accommodate the

25   associates.
```

Ashley Marie Janssen                                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 12

1        Q        Do you consider yourself a

2    decisionmaker with respect to whether an employee

3    can be accommodated?

4        A        No.

5        Q        Would it be fair to say that you

6    offer advisory services to the leaders with

7    respect to accommodations?

8        A        Yes.

9        Q        And what is the request for

10   accommodation process at Schneider?

11                MR. MILIANTI:  Just object to the

12   form of the question.

13   BY MS. LEGARE:

14       Q        You can answer.

15       A        Once the accommodation -- once the

16   associate requests an accommodation, the human

17   resources leave team will inform the leaders and

18   the HR business partner, and then I will work

19   with the leaders on multiple questions I'll ask

20   them, to understand different forms or ways that

21   we could possibly accommodate the associate, and

22   we do that through a conversation.

23                And then once that's determined, the

24   leaders would go back to the leave team and let

25   them know if they can or cannot accommodate.

Ashley Marie Janssen                                  April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1       Q       Do you or does anyone in the

2    accommodation process consult with any in-house

3    lawyers or outside lawyers with respect to what

4    the legal obligations are concerning a specific

5    accommodation?

6               MR. MILIANTI:  I'm just going to

7    object to the form of the question.  It's an

8    incomplete hypothetical.

9               MS. LEGARE:  I'm not really sure how

10   it's incomplete, but let me see if I can make it

11   complete.

12   BY MS. LEGARE:

13      Q       Once you receive a request for

14   accommodation from an employee and it's either

15   sent to you -- well, it's sent to you, let's say

16   in this case, by the leave management team, in

17   providing advice on the accommodation in

18   question, do you or the leaders or anyone that

19   you're aware of consult with an in-house legal

20   team or outside legal regarding the

21   accommodation?

22              MR. MILIANTI:  Object to the form.

23   Go ahead and answer.

24              THE WITNESS:  In some cases.

25   BY MS. LEGARE:

Ashley Marie Janssen                              April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1      Q       Okay.  Do you recall sitting here

2   today whether, with respect to Ms. Geter, you

3   consulted with in-house legal or outside legal on

4   her accommodations?

5      A       I do not recall.

6      Q       And as HR business partner, do you

7   perform an undue burden analysis to determine

8   whether an accommodation can be made?

9              MR. MILIANTI:  Object to the form of

10  the question.  Legal conclusion as to undue

11  burden.  You can answer if you understand the

12  question.

13             THE WITNESS:  I don't understand the

14  question.

15  BY MS. LEGARE:

16     Q       Well, under the ADA, if an employee

17  needs an accommodation, the only way it can be

18  rejected is if it's an undue burden on the

19  business and that analysis has to be done.  Do

20  you know if that was done in this case?

21             MR. MILIANTI:  Object to the form of

22  the question.  Calls for legal conclusion and

23  misstates the ADA and the accommodation process.

24             MS. LEGARE:  Not in the 11th Circuit

25  it doesn't, but go ahead.

Ashley Marie Janssen                                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1   BY MS. LEGARE:

2        Q        You can answer to the extent you

3   know.

4        A        I'm not aware.

5        Q        And I think you said you have

6   discussions with the leaders about whether an

7   employee can be accommodated.  Do you take notes

8   of the conversations with the leaders?

9        A        I will take my own personal notes,

10  yes.

11       Q        Do you know if you took any notes

12  during your conversations with Mr. Torrence or

13  Ms. Biskey Rose in this case?

14       A        I don't have any in this case other

15  than whatever I had in an email chain back and

16  forth.

17       Q        Do you know whether Schneider has a

18  remote work policy?  And I'm talking about in

19  2019, not now.  Obviously COVID has changed

20  everything.

21       A        I don't recall 2019 if we did or not.

22       Q        Do you currently have a

23  work-from-home policy?

24       A        We currently have a flexible work

25  schedule policy.

Ashley Marie Janssen                                   April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 16

1          Q          And what is the policy now?

2          A          I don't have it in front of me right

3     now.

4          Q          Does that flexible work schedule

5     policy also include provisions for working less

6     than 40 hours a week?

7          A          Yes.

8          Q          But you don't know if that policy was

9     in effect in 2019?

10         A          I do not.

11         Q          In your role, and I'm going to

12    apologize, you said is it senior --

13         A          Yep, human resources business

14    partner.

15         Q          Okay.  Do you play any role in

16    drafting job descriptions?

17         A          I do.  I do.

18         Q          And what role do you play in drafting

19    job descriptions?

20         A          We -- I review the job descriptions

21    for the ADA and type of job that it is.

22         Q          When you say you review it for ADA,

23    what do you mean?

24         A          I review it to ensure that the

25    essential functions of the job are something that

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 18

1    have within the organization, and inform them if

2    processes or policies have changed.

3          Q        Do you do any training for leaders on

4    FMLA or Schneider's FMLA policies?

5          A        I do not.

6          Q        Do you do any training for the

7    leaders on request for accommodation under the

8    Americans with Disabilities Act?

9          A        I do not do specific training, no.

10         Q        And I believe in 2020, somewhere in

11   the first or second quarter, the APMs that were

12   based out in the field were brought back to Green

13   Bay to work.  Were you involved in that at all?

14         A        Yes.

15         Q        What was your role?

16         A        My role was to partner with the

17   leaders to put together communication plans,

18   change management plans, timelines, understand

19   what other jobs are available for associates,

20   what options are available for associates as we

21   make that transition throughout the next six

22   months.

23         Q        So it was a six-month process?

24         A        Correct.

25         Q        And I understand, I spoke with

Page 19

1   Mr. Torrence a couple of days ago, and I

2   understand that at least with respect to

3   Fairburn, which is, you know, the relevant area

4   here, all of the APMs were considered for open

5   positions, and if they were not put in the open

6   positions, then they were offered transfers to

7   Green Bay.

8                 Is that the process as far as you

9   understood it?

10      A       Correct.  They were actually offered

11  Green Bay roles first because that is the same

12  role they were doing.  And then if they weren't

13  able to do that job or relocate, because we

14  wanted to keep them in their roles, then we would

15  offer them available roles within their location,

16  and if that wouldn't work, we would look at other

17  locations.

18                And if they weren't able to relocate

19  or there were no roles available in other

20  locations, yes, then we would work through a

21  separation package.

22      Q       Were there people whose positions,

23  who were unable to be placed without relocation,

24  were they given severance packages?

25      A       Correct.

Ashley Marie Janssen                          April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 22

1    how to use exhibit share, all you need to do is

2    go on the marked exhibit share and click on the

3    exhibit as I tell you number.  If you will look

4    at Exhibit 4.

5            A       Okay.

6            Q       Are you familiar with Exhibit 4?

7            A       Yes.

8            Q       And what is Exhibit 4?

9            A       The job description of the area

10   planning manager.

11           Q       And I understand this is the job

12   description that was in effect when Ms. Geter was

13   employed.

14                   Do you know if this job description

15   has changed since the area planning manager

16   position has been transferred to Green Bay?

17           A       I believe so.

18           Q       But this, as far as you know, is the

19   one that was in effect when you were assisting

20   with her request for accommodation; is that

21   right?

22           A       This was the one in effect, correct.

23           Q       If you'd take a minute to read

24   through that.

25           A       Okay.

Page 22

1    how to use exhibit share, all you need to do is

2    go on the marked exhibit share and click on the

3    exhibit as I tell you number.  If you will look

4    at Exhibit 4.

5          A        Okay.

6          Q        Are you familiar with Exhibit 4?

7          A        Yes.

8          Q        And what is Exhibit 4?

9          A        The job description of the area

10   planning manager.

11         Q        And I understand this is the job

12   description that was in effect when Ms. Geter was

13   employed.

14                  Do you know if this job description

15   has changed since the area planning manager

16   position has been transferred to Green Bay?

17         A        I believe so.

18         Q        But this, as far as you know, is the

19   one that was in effect when you were assisting

20   with her request for accommodation; is that

21   right?

22         A        This was the one in effect, correct.

23         Q        If you'd take a minute to read

24   through that.

25         A        Okay.

Page 24

```
 1      A       I will be at the end of April.

 2      Q       Right now how many days a week are

 3  you working from the office?

 4      A       Four.

 5      Q       And one from home?

 6      A       Correct.

 7      Q       Do you know, and you may not, but do

 8  you have any idea whether, when these job

 9  descriptions are being drafted, whether the

10  people drafting them consult with the people

11  actually doing the jobs to see if these are the

12  jobs that they're doing?

13              MR. MILIANTI:  Object to the form of

14  the question.  Calls for speculation.

15              THE WITNESS:  I can't confirm

16  conversations.

17  BY MS. LEGARE:

18      Q       Do you know, I understand that you're

19  not part of leave management, at some point do

20  you -- are medical-related -- let's just talk

21  specifically in this instance.

22              The medical records with respect to

23  Ms. Geter's request for accommodation, were those

24  sent to you when she started requesting

25  accommodations or to somebody else?
```

Page 26

1    drafting this letter?

2         A       No.

3         Q       Would you have seen this letter at

4    the time that it was sent to Ms. Geter?

5         A       No.

6         Q       In December of 2018 Ms. Geter

7    requested an accommodation.  Do you recall that?

8         A       I only got involved in January of

9    2019.

10        Q       Okay.  So you were not involved in

11   the initial approval for her request for

12   accommodations?

13        A       The only thing that I recall is once

14   her FMLA expired, Travis had reached out to me to

15   ask if he could accommodate.  I would have to

16   find the information to see if that was before

17   January or after January.

18        Q       So you said Travis reached out to

19   you.  What do you -- was that like by telephone

20   or by email?

21        A       Typically we do telephone or email.

22        Q       Okay.  If you recall, you may not, do

23   you recall off the top of your head any specific

24   conversations that you had with Mr. Torrence

25   about accommodating Ms. Geter early in the

Ashley Marie Janssen                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 27

1  process?

2       A       All I recall is that he wanted to do

3  everything he could to keep her employed and work

4  through her accommodation, and I know he said he

5  would approve the first accommodation, and then I

6  know we did go through a second accommodation.

7  That's what I'm aware of.

8       Q       Okay.  Did you personally have any

9  conversations with Ms. Biskey Rose about

10  Ms. Geter's accommodations?

11       A       Not until the decision to -- that we

12  couldn't continue to accommodate.  So the last

13  conversation she was involved with me, Travis,

14  and herself.

15       Q       Okay.

16       A       I do not know the conversations she

17  had with Travis and Marianne.

18       (Whereupon a document was identified as

19       Exhibit 16.)

20  BY MS. LEGARE:

21       Q       Right.  If you will look at Exhibit

22  16.

23       A       Okay.

24       Q       Can you tell me if you've seen this

25  document, Ms. Janssen?

Ashley Marie Janssen                                          April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

```
 1        A        Yes.

 2        Q        Do you know when the first time you

 3   saw this was?

 4        A        I do not.

 5        Q        Do you know if it would have been

 6   while Ms. Geter was employed?

 7        A        Yes.

 8        Q        Okay.  And in this document

 9   Ms. Geter's doctor says that she has clinical

10   depression and posttraumatic stress disorder;

11   right?

12        A        Correct.

13        Q        And I believe this is the request to

14   extend her accommodation through March; right?

15        A        Until March 19th, correct.

16        Q        I think you said, and I don't want to

17   put words in your mouth, but so at this point in

18   time you would have been communicating with

19   Mr. Torrence?

20        A        What do you mean?

21        Q        I think you said you only spoke with

22   Ms. Biskey Rose after the last request?

23        A        Right.

24        Q        This request to extend through March

25   was approved; correct?
```

Ashley Marie Janssen                         April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 29

1       A        Correct.

2       (Whereupon a document was identified as

3       Exhibit 31.)

4   BY MS. LEGARE:

5       Q        So let's look at Exhibit 31.

6       A        Okay.

7       Q        Does this refresh your recollection

8   about when you first learned about Ms. Geter's

9   need for accommodation when she returned to work?

10      A        Yes.

11      Q        It looks like the request was

12  December 17, 2018; right?

13      A        Yes.

14      Q        It looks to me like this is the

15  process you're talking about, HR leave management

16  gets it and then sends it to you and to

17  Mr. Torrence?

18      A        Correct.

19      Q        Do you recall one way or the other

20  whether you had any conversations with

21  Mr. Torrence?  Because it looks like he replied

22  pretty quickly that they could accommodate the

23  restrictions; right?

24      A        Correct.

25      Q        Did he talk to you about that before

Page 30

1  he did it?

2      A      I don't recall.  We typically have

3  phone conversations.

4      Q      Got it.  But at least in this case it

5  looks like you learned of the request for

6  accommodation around 8:47 in the morning and the

7  accommodation was approved pretty quickly, you

8  know, around lunchtime on that day?

9              MR. MILIANTI:  Object to the form.

10             THE WITNESS:  I'm not 100 percent

11  sure because I don't have the recollection of our

12  conversation.

13  BY MS. LEGARE:

14     Q      Okay.  But at least according to this

15  email, though, at 1:33 p.m., you were talking

16  about letting Ms. Geter know that her request had

17  been granted; right?

18     A      At that time I gave Travis the okay

19  to communicate if he would like to accommodate.

20  I can't confirm when that happened after that.

21     Q      Right.  Right.  Right.  That's not

22  what I'm asking.  All that I'm saying is at least

23  as of Travis's email to you at 12:57 p.m., he

24  said that they were able to accommodate; right?

25     A      Correct.  I have a different time in

Ashley Marie Janssen                                April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 31

1    my document, but I have 1:33 that we said we

2    would be able to communicate with her.

3         Q       Right.  But if you scroll down to

4    emails below that, there is an email from

5    Mr. Torrence to you at December 17, 2018, at

6    12:57 p.m. saying we're able to accommodate the

7    restrictions outlined below?

8         A       Correct.

9         (Whereupon a document was identified as

10        Exhibit 32.)

11   BY MS. LEGARE:

12        Q       And then if you will look at Exhibit

13   32?

14        A       Okay.

15        Q       Are you familiar with Exhibit 32?

16        A       Yes.

17        Q       And this email chain is -- the top

18   two emails are dated January 21, 2019; right?

19        A       Correct.

20        Q       And the email from Anissa, is it

21   Gauthier?  Do you know how to pronounce her last

22   name?

23        A       Gauthier.

24        Q       Gauthier.  Okay.  The email from

25   Ms. Gauthier to you and Mr. Torrence notified you

Ashley Marie Janssen                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 32

1    that they received an updated return-to-work form

2    that indicates a continuation of light duty three

3    days per week through 3-19-2019; right?

4         A        Correct.

5         Q        Do you know what she meant by light

6    duty?  Is part-time work light duty?

7         A        I do not know what she meant by that.

8         Q        Okay.  Do you know if Schneider has a

9    light-duty policy?

10        A        I do not know off the top of my head.

11        Q        It looks like you emailed

12   Mr. Torrence and cc'd Doug Horton at 10:30 a.m.

13   asking their thoughts; right?

14        A        Correct.

15        Q        Do you know if they responded to you?

16        A        They more than likely -- actually,

17   Travis more than likely picked up the phone and

18   had a conversation with me, but this was back in

19   '19, so I don't have the specifics.

20        (Whereupon a document was identified as

21        Exhibit 34.)

22   BY MS. LEGARE:

23        Q        If you'll look at Exhibit 34.

24   Actually let me ask you a question before you

25   look at that.  Based on everything I've seen, the

Page 33

1    accommodation was extended to March 19, 2019, for

2    Ms. Geter; right?

3         A        Correct.

4         Q        And if you will look at Exhibit 34,

5    please.

6         A        Okay.

7         Q        And this looks like an email from

8    Mr. Torrence to you on March 22, 2019; right?

9         A        Correct.

10        Q        And in the email Mr. Torrence wrote,

11   "On Monday Anissa said that Cierra's doctor

12   wanted to extend the 3-day restriction.  She set

13   up a call for us to discuss since we don't

14   typically accommodate a restriction like that

15   beyond 90 days."

16                 Is there a policy that says certain

17   accommodations will only be granted for 90 days?

18        A        Not -- I'm not for sure.  I'm not 100

19   percent sure.

20        Q        And do you know if it's -- if, in

21   fact, there was a policy that said these

22   restrictions would only be granted for 90 days,

23   that's compliant with the ADA?

24                 MR. MILIANTI:  Object to the form of

25   the question.  Calls for a legal conclusion.  I

Case 1:20-cv-01148-SCJ-JSA   Document 50-9   Filed 07/12/21   Page 23 of 31

Ashley Marie Janssen                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 34

1   believe misstates her testimony as well.

2   BY MS. LEGARE:

3        Q        You can answer.

4        A        Can you rephrase the question?

5        Q        Yeah.  Well, do you have any

6   knowledge about whether if Schneider actually has

7   a policy that allows certain types of

8   accommodations for only 90 days, whether that

9   policy is compliant with the Americans with

10  Disabilities Act?

11             MR. MILIANTI:  Object to the form of

12  the question.  Calls for a legal conclusion.

13             THE WITNESS:  I do not know off the

14  top of my head.

15  BY MS. LEGARE:

16       Q        This reports that Anissa was going to

17  speak to see Cierra's doctor and see if there is

18  truly a need for a 3-day restriction or if Cierra

19  would be able to work a fourth day a different

20  day of the week temporarily, or if a 5-day

21  schedule would work.

22             Do you know if anyone ever spoke with

23  Ms. Geter's doctor about her need for continued

24  accommodations?

25       A        I know that Anissa was going to reach

Case 1:20-cv-01148-SCJ-JSA  Document 50-9  Filed 07/12/21  Page 24 of 31

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 37

1   offered a transfer to a different shift at the

2   time she needed an accommodation?

3        A       I was told she was offered different

4   shifts as well as different days of the week in

5   order to see if she would be able to work

6   something out.

7        Q       Who told you that?

8        A       That would be her leader.

9        Q       Travis?

10       A       Yes, in a phone conversation, I

11  believe.

12       Q       At some point did you learn that one

13  of the possibilities was for Ms. Geter to work

14  from home from time to time?

15              MR. MILIANTI:  Object to the form.

16  Misstates facts in evidence.

17  BY MS. LEGARE:

18       Q       Schneider is saying that Ms. Geter

19  requested to work from home as a part of her

20  accommodation.  Do you know whether that, in

21  fact, happened?

22       A       I do not.

23       Q       And do you personally know how often

24  employees in Fairburn worked from home?

25       A       I do know the leaders have discretion

Page 38

```
 1   to allow folks to work from home based on

 2   business needs, but I did not get involved in

 3   those decisions, the conversations, or the

 4   amounts of time that that happened.  I know it's

 5   not consistent though.  They're strictly one-off

 6   situations.

 7        Q       Were you aware that Mr. Torrence

 8   worked from home somewhere between 80 and 87 days

 9   in 2018?

10             MR. MILIANTI:  Object to the form of

11   the question.  Assumes facts not in evidence.

12   BY MS. LEGARE:

13        Q       You can answer.

14             MR. MILIANTI:  That's a -- Cheryl,

15   that's an inappropriate question.  Go ahead.

16             MS. LEGARE:  It's not an

17   inappropriate question.

18             MR. MILIANTI:  It is and you know it

19   is, but go ahead.  You can answer the question to

20   the extent you know it based on nothing in the

21   record.

22             THE WITNESS:  I do not have

23   visibility to Travis's schedule.

24   BY MS. LEGARE:

25        Q       Do you know personally, either
```

Page 40

1      Q       And it looks like the HR leave team

2   did respond regarding the request for more

3   information from Dr. Wanzo; right?

4      A       Correct.

5      Q       And they were not working until March

6   30, 2019?

7      A       According to that message, yes.

8      Q       According to that.  It looks like you

9   gave that information to Mr. Torrence and just

10  told him you would wait until the 30th; right?

11     A       Correct.

12     Q       Tell me, I think you said you had a

13  call with Ms. Biskey Rose and Mr. Torrence

14  regarding, and I think it was Ms. Geter had

15  requested to continue to work three days a week

16  until June 5th; right?

17     A       Correct.

18     Q       Tell me what you recall about the

19  conversation with Ms. Biskey Rose and

20  Mr. Torrence relating to that?

21     A       I asked them if there was any

22  possible way they could continue the

23  accommodation past -- well, at this point we were

24  already past, so this was the last approval, so

25  continue to approve that schedule until June.

Page 41

 1                   They had said that they are not able
 2       to continue to carry the workload and the
 3       schedule and all of the work she's not able to do
 4       any longer.  And I asked if there was other
 5       options for them to fill that work, i.e. a temp.
 6                   They had said, and I agreed, knowing
 7       I've had contingent staffing experience before,
 8       that due to the time it would take to get a temp,
 9       find a temp, train a temp and then place them on
10       a support shift night by themselves would not be
11       something we would be able to do not knowing if
12       this is going to extend past June, seeing it's
13       already extended three times.
14            Q     Was there some concern that it would
15       take too long to find a temp?
16            A     Not finding the temp, training a
17       temp, and then having a temp by themselves on
18       that schedule.
19            Q     I mean, is there any reason that
20       another employee couldn't have been moved to the
21       solo shift and have the temp work the shift that
22       was not solo?
23            A     If they were available to do so, and
24       my guess is if somebody wasn't available to do
25       so, then we wouldn't have been able to do that.

Ashley Marie Janssen                              April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 42

1        Q        Do you know if --

2        A        We always look internally before we

3    would talk about a temp if we can rearrange

4    schedules.

5        Q        Do you know if any efforts were made

6    to rearrange schedules?

7        A        I do not personally know, but that is

8    our best practice, that is what we do.

9        Q        Are you saying that's what you

10   generally do if someone either needs leave or an

11   accommodation?

12       A        Yeah, we put the option out there to

13   see if there's possibilities for others to cover,

14   which they already all were taking turns trying

15   to cover.

16       Q        Well, were you aware that

17   Mr. Torrence said nobody was covering, that he

18   was doing it?

19       A        I was aware he was covering the

20   majority.

21       Q        And I'd like to understand how temp

22   employees work at Schneider.  So does Schneider

23   use temp employees from time to time to cover for

24   office positions?

25       A        Yes.

Page 43

1      Q      Do you know, and I understand that
2   you may not, but do you know if there is any
3   documentation of any efforts made to get other
4   APMs to cover for Ms. Geter?
5      A      I don't -- I don't have that
6   information.
7      Q      Can you tell me if you know, and,
8   again, I understand you may not, why no efforts
9   were made to bring a temp in sooner so that they
10  would be trained?
11     A      Because we believed Ms. Geter would
12  be back to work full duty on February 14th and
13  then again on March 20th, and we were expecting
14  her to be back to work.
15     (Whereupon a document was identified as
16     Exhibit 22.)
17  BY MS. LEGARE:
18     Q      If you will look at Exhibit 22.
19     A      Okay.
20     Q      Have you seen Exhibit 22 before?
21     A      I don't recall this one.
22     Q      So fair to say you did not draft that
23  letter; correct?
24     A      No.
25     Q      Do you recall any -- when you spoke

Ashley Marie Janssen                                         April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 44

1    with Ms. Biskey Rose and Mr. Torrence, do you

2    recall in that conversation discussing

3    Ms. Geter's request to work from home at all?

4         A      No.  Our conversation was about being

5    able to continue to accommodate through June.

6         Q      Okay.  Do you know why the area

7    planning managers were relocated from, assuming

8    not only Fairburn, but other locations to Green

9    Bay?

10        A      Yes.  So it was a centralized

11   approach we took.  We've done it in other areas.

12   It's been successful.  We had a new software

13   called IMD that we use, and all of the resources

14   that help update and work in that system are

15   located here.  The collaboration that's needed

16   between customer service is here, as well as a

17   lot of the network leadership is here.

18             So to be able to streamline and band

19   our dispatching system as well as our team, we

20   needed to have it centralized.

21        Q      So some of the job duties of the area

22   planning manager or one of the job duties

23   includes working with customer service personnel;

24   right?

25        A      Correct.

Ashley Marie Janssen                                    April 8, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 45

1        Q        And the customer service personnel is

2   centralized in Green Bay?

3        A        Correct.

4        Q        And when you say some of the

5   leadership is in Green Bay, what kind of

6   leadership are you talking about?

7        A        Our network directors, which would be

8   the dotted line to the APM were located in Green

9   Bay.

10       Q        So did APMs when they were throughout

11  the country have a dotted line to the network

12  directors in Green Bay or has that changed?

13       A        When they were in the field, they

14  would then partner with -- they wouldn't have a

15  dotted line to the directors.  The operation

16  directors would have that partnership with the

17  network directors because the area planning

18  managers reported up through operations at that

19  point, which was another group that the APMs have

20  to collaborate with.

21       Q        Got it.  And the operations people

22  remained in the field; right?

23       A        Correct.

24                MS. LEGARE:  That's all I have, Pete.

25  That's all I have, Ms. Janssen.



Job Description

**Exhibit 0004**

# MANAGER, AREA PLANNING

**TYPE OF ROLE:**                    Exempt (Salaried)

**DEPARTMENT(s):**              Bulk, Dedicated, Intermodal, Van Truckload

**REPORTS TO:**                      Various

**JOB SUMMARY:**

The Area Planning Manager is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders.  As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include:  shift direction, priority of freight, load and stage, driver calendar requests, etc.  Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role.  Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention).  All decisions also need to be made in accordance with Schneiders #1 core value:  safety.
- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.
- Exhibit behavior in alignment with our core values at all times.

**SPECIALIZED KNOWLEDGE:**

- Bachelors degree or equivalent work experience in a related field required
- 1-2 years of customer service, dispatch and/or operations experience

**EDUCATION LEVEL:**                                  Bachelor or equivalent work experience

**EXPERIENCE:**                                         1-3 Years

**SKILLS/BEHAVIORS NECESSARY TO PERFORM JOB**

Abilities or qualities an associate must possess in order to perform the essential job duties - Listed by Core Competency

**COMMUNICATION**

Effective and efficient oral communication skills

Effective and efficient written communication skills

Ability to develop relationships through interpersonal skills

Effective listening skills

**DIVERSITY & INCLUSION/TEAM PLAYER**

Collaboration skills

Ability to work effectively in a team environment

**POSITIVE IMPACT**

Ability to positively impact others

Influencing skills, resulting in a positive outcome

Take initiative, a self-starter

Ability to work well in a fast paced, high pressure environment

**PROBLEM SOLVING & DECISION MAKING**

Problem solving skills

Decision making skills (make best value decisions)

Analytical skills

Strategic thinking skills

Ability to analyze various courses of action and make recommendations

Project Management skills

Sound judgement

**RESULTS ORIENTATION**

Ability to manage multiple priorities and prioritize workload

**FUNCTIONAL & TECHNICAL EXPERTISE**

Customer service skills

Ability to work independently with little supervision

**OTHER**

- Strong financial and analytical skills. Able to identify a root cause from a subset of data and establish a relevant action plan to correct root cause of issue.
- Ability to evaluate a situation and create innovative, balanced solutions
- Strong work ethic.

**Generated:** *2019-03-14 05:07:20.641000*

**Last Updated:** *2017-11-24 15:34:07*

FAX TRANSMISSION COVER SHEET

DATE: 1/19/2019

TO: HR Leave

FAX: 920-403-8903

RE: Cierra Geter

SENDER: Dr. Cassandra Wanzo

YOU SHOULD RECEIVE        PAGE(S), INCLUDING THIS COVER SHEET.

2

CONFIDENTIAL                                    SCHNEIDER 000385

RECEIVED
By Anissa Gauthier at 7:00 am, Jan 21, 2019

**ASSOCIATES: THIS FORM MUST BE RECEIVED** ~~PRIOR TO YOUR RETURN TO WORK~~

Schneider
HR Leave Administration Team                                    Associate Number _____
P.O. Box 2545 Green Bay WI 54306-2545
**FAX: 920-403-8903  Email: HRLeaveAdministrationTeam@Schneider.com**

## ATTENDING PHYSICIAN'S RETURN TO WORK RECOMMENDATION

**Physician Instructions:**
> Please complete this form once the patient is released to work.
> Only complete ONE section – Section I if "NO" restrictions OR Section II WITH restrictions.
> Do NOT include diagnosis or confidential medical details.
> Please call 920-592-4571 with any questions.

Patient's Name (First)              (Middle Initial)              (Last)
_Cierra_                            _C_                           _Geffen_

|  | OR |  |
|---|---|---|
| **Section I** | | **Section II** |

**Section I**
Patient is able to return to work ~~without~~ restrictions effective _3/20/19_

she remains unable
to work full
time because at

[redacted]

she will be able to
work ten hours
a day (3) days
per week.

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?
YES ☐    NO ☑    N/A ☐

**Section II**
Patient is able to return to work **with** restrictions effective _12/19_, outlined below:
~3 days / week  Ten hrs/days

1. In a **24 hour** day, patient may work an accumulative of:
**Stand / Walk:**
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours
**Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours
**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
☐ 7 Hours or less  ☐ 8-10 Hours  ☐ 11-14 Hours

2. Patient is able to:

|  | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☑ | ☐ |

Lift:
| | | |
|---|---|---|
| Sedentary | 10# max | |
| Light / Heavy | 20# max | ☑ |
| Medium | 50# max | ☐ |
| Heavy | 100# max | ☐ |

************ *REQUIRED* ******************
**Restrictions in effect until:** _3/19/19_

Is the patient experiencing any side effects which would interfere with their job or with moving around or operating heavy machinery?
YES ☐    NO ☑
Explain if YES: _____

Physician's Name (Printed): _Cassandra Wanzo MD_
Physician's Signature: _Cassandra [illegible] MD_    Date: _1/19/19_
Physician's Phone Number: ( _678_ )  _566-1440_    FAX# _(678) 566-144_

**From:**        Janssen, Ashley
**Sent:**        Monday, December 17, 2018 1:33 PM
**To:**          Torrence, Travis
**Subject:**     RE: RTW with restrictions partial return - Cierra Geter

Hello Travis
You can call her and let her know the leave team will be calling her and you also wanted to let her know you can accommodate her return to work for the 3 days and here are the 3 days she would be working. You will be in touch with her once her RTW info has been processed.
Thanks
Ashley

---

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 1:31 PM
**To:** Janssen, Ashley <JanssenA@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Should I communicate with her what days that will be or will the HR Leave team do that when they notify her that we will accommodate the restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



---

**From:** Janssen, Ashley
**Sent:** Monday, December 17, 2018 2:00 PM
**To:** Torrence, Travis <TorrenceT@schneider.com>; HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Yes, because it does not specify below.

---

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 12:57 PM
**To:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good Morning,

**Exhibit 31**

1

We're able to accommodate the restrictions outlined below.

Ashley, am I able to decide which three days Cierra works under these restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



---

**From:** HR Leave Administration Team
**Sent:** Monday, December 17, 2018 8:47 AM
**To:** Torrence, Travis <TorrenceT@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>; HR Leave Administration Team
<HRLeaveAdministrationTeam@schneider.com>
**Subject:** RTW with restrictions partial return - Cierra Geter

Good morning,

We received the below RTW form for Cierra Geter. She is able to return to work on 1/2/2019 working 3 days per week 10 hour days through 2/13/2019.

Are you able to accommodate these restrictions?

CONFIDENTIAL

SCHNEIDER 000121

Patient's Name (First) _Cierra_   (Middle Initial) _C_   (Last) _Geter_

|  | OR |  |
|---|---|---|
| **Section I** | | **Section II** |

**Section I**
Patient is able to return to work **without** restrictions effective _2/14/19_ .

**Section II**
Patient is able to return to work **with** restrictions effective _(12/19)_ , outlined below:

_3 days / week   Ten hours day_

1. In a **24 hour day**, patient may work an accumulative of:

N. A **Stand / Walk:**
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

N. A **Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
N. A ☐ 7 Hours or less   ☐ 8-10 Hours   ☐ 11-14 Hours

2. Patient is able to:

N. A

|  | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |
| Lift: | | | |
| Sedentary | 10# max | | ☐ |
| Light / Heavy | 20# max | | ☐ |
| Medium | 50# max | | ☐ |
| Heavy | 100# max | | ☐ |

**Comments:** _She will be able to want three days per week Ten hours a day effective (1/2/19)_

******************** REQUIRED ********************
**Restrictions in effect until:** _2/3/19_

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?

Is the patient experiencing any side effects which would interfere with their job or with

---

**HR Leave Administration Team - Anissa**
Schneider www.schneider.com
**PH:** 920-592-4571 _or_ 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distr bution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

CONFIDENTIAL                    SCHNEIDER 000122

| | |
|---|---|
| **From:** | Janssen, Ashley |
| **Sent:** | Monday, January 21, 2019 10:32 AM |
| **To:** | Torrence, Travis |
| **Cc:** | Horton, Doug |
| **Subject:** | FW: RTW with restrictions partial return - Cierra Geter |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Thoughts on the below?

---

**From:** Gauthier, Anissa
**Sent:** Monday, January 21, 2019 7:04 AM
**To:** Janssen, Ashley <JanssenA@schneider.com>; Torrence, Travis <TorrenceT@schneider.com>; HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good morning ,

We received an updated return to work form that indicates a continuation of light duty 3 days per week through 3/19/2019.

Are you able to continue to accommodate this schedule?

Please advise.

Thanks,

**HR Leave Administration Team - Anissa**
**Schneider** www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distr bution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

---

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 12:57 PM
**To:** HR Leave Administration Team
**Cc:** Janssen, Ashley
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good Morning,

**Exhibit 32**

CONFIDENTIAL                                        SCHNEIDER 000065

We're able to accommodate the restrictions outlined below.

Ashley, am I able to decide which three days Cierra works under these restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



**From:** HR Leave Administration Team
**Sent:** Monday, December 17, 2018 8:47 AM
**To:** Torrence, Travis <TorrenceT@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>; HR Leave Administration Team
<HRLeaveAdministrationTeam@schneider.com>
**Subject:** RTW with restrictions partial return - Cierra Geter

Good morning,

We received the below RTW form for Cierra Geter. She is able to return to work on 1/2/2019 working 3 days per week 10 hour days through 2/13/2019.

Are you able to accommodate these restrictions?

CONFIDENTIAL                                    SCHNEIDER 000066

Patient's Name (First) _Cierra_   (Middle Initial) _C_   (Last) _Geter_

| Section I | OR | Section II |
|---|---|---|
| Patient is able to return to work **without** restrictions effective _2/14/19_. | | Patient is able to return to work **with** restrictions effective _(1/2/19)_, outlined below: |

3 days / week   Ten hours Day

1. In a **24 hour day**, patient may work an accumulative of:

N. A  **Stand / Walk:**
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

N. A  **Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
N. A ☐ 7 Hours or less   ☐ 8-10 Hours   ☐ 11-14 Hours

2. Patient is able to:

N. A

|  | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |
| Lift: | | | |
| Sedentary   10# max | | | ☐ |
| Light / Heavy   20# max | | | ☐ |
| Medium   50# max | | | ☐ |
| Heavy   100# max | | | ☐ |

**Comments:** She will be able to went three days per week Ten hours a day effective (1/2/19)

*********** **REQUIRED** ***********
Restrictions in effect until: _2/3/19_

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?

Is the patient experiencing any side effects which would interfere with their job or with

**HR Leave Administration Team - Anissa**
**Schneider** www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

CONFIDENTIAL                    SCHNEIDER 000067

**From:**       Torrence, Travis <TorrenceT@schneider.com>
**Sent:**       Friday, March 22, 2019 9:18 AM
**To:**         Janssen, Ashley
**Subject:**    FW: Anything new on Cierra since we spoke Monday?

On Monday Anissa said that Cierra's doctor wanted to extend the three-day restriction.

She set up a call for us to discuss since we don't typically accommodate a restriction like that beyond 90 days. Anissa was going to speak to Cierra's doctor and see if there as truly a need for the 3 day restriction or if Cierra would be able to work a 4th day a different day of the week temporarily (Tuesday-Friday schedule – currently "She does have medical appointments every Monday morning which would not allow her to work the Sunday night shift" from Anissa on 1/28) or if a 5 day schedule would work.

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



**From:** Torrence, Travis
**Sent:** Wednesday, March 20, 2019 7:58 AM
**To:** Gauthier, Anissa <GauthierA@Schneider.Com>; Janssen, Ashley <JanssenA@schneider.com>; Biskey Rose, Marianne <Rosem@schneider.com>
**Subject:** Anything new on Cierra since we spoke Monday?



Get Outlook for iOS

**Exhibit
34**

1



Deposition of:

**Tiffany Kitchens**

*April 19, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Tiffany Kitchens                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 6

1       Q    Are you still employed with Schneider

2    National Carriers?

3       A    I am.

4       Q    What's your current position?

5       A    My current position is called a senior

6    operations specialist.

7       Q    And how long have you had that position?

8       A    Since -- I want to say it was around March

9    or April of 2020.  I want to say it was April of

10   2020.  It was one of the two, so about a year.

11      Q    Who do you report to?

12      A    I report to Rodney Dunn.

13      Q    What are your job duties as a senior

14   operations specialist?

15      A    Answering the phone, checking driver

16   messages, basically just processing any issues or

17   obstacles for the driver to get them moving about

18   their day, communicating a great deal with the

19   planners and whomever is needed, the box team,

20   functions like that.  Basically just to keep

21   transportation going.

22      Q    When did you start with Schneider?

23      A    Originally I started with Schneider in

24   2005.

25      Q    And did you leave for a period of time?

Page 8

1    still -- even though it's still an area planning

2    manager, same position, it's just for different

3    shifts, you know.

4         Q    Were you basically filling in holes in the

5    schedule?

6         A    Essentially, yes.

7         Q    Let me ask you this:  When you were

8    working support shift, is it possible that you could

9    work two or more different shifts in a week?

10        A    Yes.  You would have a primary schedule.

11   If we had gaps in coverage, they would ask us to

12   work to fill in, but I wasn't on first shift when I

13   initially came back.

14        Q    Does Schneider still have a support shift?

15        A    Yes, we do.  It may be called something

16   different now.  The responsibilities are still

17   pretty similar.

18        Q    Did you change from support shift to a

19   different shift at any point after you came back in

20   2014?

21        A    Yes, in 2016.

22        Q    And what did you change to?

23        A    What was that?

24        Q    What shift did you change to at that

25   point?

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 9

1     A     I went from second shift to first shift,

2    and my schedule was essentially Monday through

3    Friday.  When I went to first shift, it went to

4    Monday through Friday.  I believe it was seven to

5    four.

6     Q     When you moved to first shift?

7     A     Yes.

8     Q     What was your schedule when you were on

9    second shift?

10    A     When I was on second shift initially for

11   the first two years -- I'm trying to remember what I

12   had.  I think it was Friday through Tuesday, and I

13   would start my day probably either two or three and

14   then work eight to nine hours -- nine hours with the

15   lunch factored in.

16           I mean, since we were salary, that's the

17   base schedule.  I'm going to elaborate.  That's the

18   base schedule, but we're required to finish our work

19   obviously.  If we had something running behind or we

20   had a meeting, it could run longer than that.

21    Q     Understood.

22    A     That's the only caveat I would add.

23    Q     Who did you report to on second shift?

24    A     When I initially came back, that would be

25   Greg Cochran.

Tiffany Kitchens                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 10

```
 1      Q     And he left after some period of time,
 2   right?
 3      A     He did.
 4      Q     And then who did you report to?
 5      A     The only two leaders I have had since I
 6   returned in 2014 was Greg Cochran initially, and
 7   then when I went to first shift, it's been Rodney
 8   Dunn since, and that was in 2016, I believe around
 9   this time.  It would either be April -- it was by
10   the summer for sure.
11      Q     And I understand in 2020 that the area
12   planning manager position itself was moved to Green
13   Bay?
14      A     Correct.
15      Q     What position were you holding at the time
16   that happened?
17      A     I was an area planning manager.  They had
18   changed it to another title once again.  It's not
19   initially the same thing, and then it moved to Green
20   Bay.
21      Q     Were you offered the opportunity to move
22   to Green Bay at that time?
23      A     I was.
24      Q     And you turned that down?
25      A     I did, because of my mother.
```

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 11

1       Q     And then was it after that that you were

2   then offered a different position?

3       A     Correct.

4       Q     Tell me how that came about.

5       A     So we knew that the role was going away.

6   I think management was still waiting to hear at that

7   time how many positions they were going to have or

8   be approved for, so how many fleet manager -- that's

9   what it used to be called.  So it sounds confusing.

10  It's now called a DTL, so driver team leader, but

11  it's essentially the fleet manager role.  They were

12  trying to figure out how many of those positions we

13  were going to get in the office, and then how many

14  of senior operations specialist positions we were

15  going to be approved for.

16          So I found out -- I was offered the

17  position pretty close to the end of that window

18  where my job -- where they said, okay, this is the

19  deadline.  Your current position is going to be

20  moved to Green Bay, and by that time, you know,

21  either we'll offer you a position or essentially let

22  you go.  So basically I was just presented kind of

23  towards the end very close to that window, okay,

24  this is the positions that we have.  I was only

25  offered senior operations specialist, and I took it

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 12

1    because it was around the time of Covid.  It had

2    just started.

3         Q    Right.  And I understand that people

4    either agreed to move to Green Bay.

5         A    Yeah.

6         Q    Were offered other positions or were -- if

7    there were not enough positions, then they were let

8    go and got a severance; is that right?

9         A    Correct.

10             MR. MILIANTI:  Object to the form.

11   BY MS. LEGARE:

12        Q    By any chance do you know what the

13   severance was going to be if they hadn't been able

14   to find a new position for you?

15        A    They gave me a number.  I cannot remember

16   what that number was.

17        Q    Got it.  But they did find you a position,

18   and you stayed as a senior operations specialist,

19   right?

20        A    Correct.

21        Q    And you've had that position since?

22        A    Yes, ma'am.

23        Q    And I think what I have heard in a couple

24   of the depositions is when Covid hit you started

25   working from home in March of last year full time,

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                      Page 13

 1    right?

 2         A     For the most part.  We had -- let me see.

 3    I'm trying to remember.  So -- can you repeat the

 4    question just so I'm.

 5         Q     Yeah.  The way I understand -- and maybe

 6    it's different for your position, but the way that I

 7    understood from Mr. Torrance and another witness was

 8    that in the beginning of Covid you all worked from

 9    home full time, then partway through Covid you began

10    working from home part of the week, and now as of

11    last March --

12         A     Back full time.

13         Q     Right?

14         A     That's correct, yes.

15         Q     Let's go -- I want to rewind a little bit

16    and talk about the reason.  Ms. Geter has identified

17    you as someone who worked a reduced schedule for a

18    period of time in 2018.  Is that true?

19         A     Can you define reduced schedule?

20         Q     Less than 40 hours a week.

21         A     No.

22         Q     So you were full time?

23         A     I was full time.  I had a period of leave

24    initially where I was out of work for I believe it

25    was three weeks.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

```
 1        Q     Okay.

 2        A     FMLA was approved.  All that was taken

 3    care of, and then I returned -- I think that was the

 4    end of July it started, and I came back the

 5    beginning of August, but that wasn't the exact

 6    dates.

 7        Q     That's fine.

 8        A     And then in -- when was it?  The end of

 9    October of that year my mother had a very severe

10    stroke and ended up in ICU at Emory in Atlanta for a

11    very long period of time.  But during that time I

12    was working -- I was working remotely from the

13    hospital, but I didn't -- I was working full time.

14        Q     Were you working Monday through Friday

15    during that time?

16        A     Yes.

17        Q     And how long were you working remotely

18    from the hospital?

19        A     I honestly don't know.  It was in my FMLA

20    that I had filed for just to, you know, cover me to

21    help with mother.  She ended up staying in there a

22    lot longer -- she kept having setbacks, so she ended

23    up staying in there a lot longer than the doctors

24    originally projected, even though it was pretty bad.

25        Q     And I'm sorry that I even have to ask
```

Tiffany Kitchens                              April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1    these questions, but was it a few weeks, was it a
2    few months?
3         A    It was months where she was in there, in
4    ICU, and she was back and forth between being
5    intubated and not, and we almost lost her several
6    times, so it was kind of -- and they had issues with
7    the shunt that they put in her skull.
8         Q    That's terrible.  I'm sorry.
9         A    That's okay.  Not my favorite thing to
10   relive, but we will do it.
11        Q    During that time you had permission
12   from -- would it have been from Mr. Dunn to work
13   remotely?
14        A    Yes.  I would run it by Mr. Dunn, Rodney,
15   and then I filed paperwork with HR in Green Bay for
16   that.
17        Q    Now, so you were approved for FMLA during
18   that time, but you were actually not using your
19   FMLA; you were working?
20        A    Yes.  I was approved for it when we
21   thought that maybe she would get out, and I would
22   have to care for her.
23        Q    Right.
24        A    Because my dad can't do it all himself.
25   They're both senior boomers, so he can't do it, and

Page 16

1    he needed a break.

2         Q    So you were approved for intermittent FMLA

3    because you thought you were going to assist with

4    her care at home.

5         A    Correct.  And that ended up never

6    occurring.  And, in fact, I want to say -- now, this

7    is a guesstimation.  I want to say she was in ICU

8    for probably four months-ish, and then after that

9    she moved to a long-term care facility, so it was

10   quite an extensive period of time.

11        Q    And when she moved to a long-term care

12   facility, did you continue to work remotely?

13        A    No.

14        Q    You came back to the office at that point?

15        A    I did.

16        Q    And because she was in long-term care, did

17   you need to use your intermittent FMLA at all at

18   that point?

19        A    No.  Anytime that I would know that I

20   would have to be out of work, I would just use

21   vacation since I had that available.  But I was

22   not -- it was not a reduced schedule.

23        Q    And that would have only happened if you

24   had to care for her at home?

25        A    Correct.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 17

1        Q      And my understanding is that with respect

2    to work from home that Schneider is relatively

3    flexible on that issue if there's emergencies.  You

4    get permission from your supervisor?

5        A      Correct.

6        Q      Do you have to take it up the chain at

7    all, or is it your direct manager who makes the

8    decision?

9        A      It's typically direct leader unless he's

10   out, and then I would go up the chain of command to

11   his leader.

12       Q      Have you worked with any temporary

13   employees at Schneider either while you were an area

14   planning manager or now that you're an SOS?

15       A      Any temporary?

16       Q      Yeah.

17       A      Yes.

18       Q      Can you tell me how often that has

19   happened?

20       A      Just for periods of time especially when

21   we're doing system updates.  Now, this is over the

22   course of 14 years cumulatively.  So over that

23   period of time or do you just want me to talk about

24   since I came back in 2014?

25       Q      How about just more recently, maybe in the

Tiffany Kitchens                                      April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 18

1    last four or five years.

2         A    I don't remember all the particulars

3    around why we added temporary staffing, even though,

4    I mean, I know there was really good reason.  We

5    obviously needed the assistance, but we actually

6    have -- I'll use this person as an example.  We

7    actually have an employee now that was a temporary

8    employee that ended up being made a long-term --

9    full-time employee with the company.

10        Q    And as an SOS I think you said you work

11   with the area planning managers now?

12        A    I do.

13        Q    Are the area planning managers working,

14   the ones who are based in Green Bay, are they doing

15   a lot of the job duties that you did when you were

16   an area planning manager in Fairburn?

17             MR. MILIANTI:  Object to the form.

18             THE WITNESS:  It's different now.  So

19        they're completely removed from, like, driver

20        functions now:  Meeting with the drivers,

21        talking to the drivers.  None of that is

22        something that occurs now, but before it did.

23   BY MS. LEGARE:

24        Q    Who is responsible for those duties now?

25        A    It's a combination of the driver team

Tiffany Kitchens                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 20

1    that would be a function that fell under them at the

2    time.  Now it's pretty much just whoever is

3    available.  If you get a driver on the phone, you

4    find him a truck, so that's one of the things that's

5    changed.

6         Q    And I also understand there's a printer

7    that they need to print their paperwork on that was

8    locked up?

9         A    At the time, yes.

10        Q    It's not locked up anymore?

11        A    No.  Since Covid we have moved it into the

12   drivers' lounge where the drivers have access to,

13   and we can print remotely from wherever we are.

14        Q    Could you have printed remotely prior to

15   Covid?

16        A    I assume we could.  I don't know all the

17   technical things behind it, but I would think that

18   we could have moved the printer.

19        Q    For the time that you were working

20   remotely, did you ever have to assist with any of

21   that?

22        A    What do you mean?

23        Q    Like printing documents for drivers.

24        A    For the most part at the time, on first

25   shift the planners really weren't so much into the

Tiffany Kitchens                          April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 21

1   phones, so if we were on the phone, if we had to

2   help out, if we were, say, short-handed and we got a

3   driver on the phone, if I didn't have anyone to

4   transfer them to I would go ahead and do it for

5   them, but it wasn't a normal function at the time.

6       Q    But it was something you could do remotely

7   if you had to?

8       A    Correct.

9       Q    I have a couple of questions about the

10  support shift.  So if an employee called out sick or

11  if an area planning manager called out sick, for

12  example, is that something a support shift would

13  cover, or was it planned absences that you covered

14  for?

15      A    A mixture.  So can you repeat the question

16  just so I give you the best answer I can?

17      Q    Yeah.  So it seems like what you said, and

18  if I've got it wrong tell me.  But I think you said

19  support shift you'd have kind of a set schedule, but

20  you'd also be the fill-in person on second and third

21  shift and weekends?

22      A    Well, they would ask us if we were

23  available to work.  It wasn't like a mandatory

24  thing, but it wouldn't be completely uncommon if we

25  were really short-handed or had an emergency come up

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 27

1        Q    And you understood that as an APM you were

2    expected to work at least 40 hours a week; is that

3    right?

4        A    Yes.

5        Q    And in the 2018-2019 time period, you

6    worked the first shift as an APM; is that correct?

7        A    Correct.

8        Q    And I think you testified your schedule

9    was Monday through Friday; is that right?

10       A    That is correct.

11       Q    And during that time period of 2018 to

12   2019, what time would you start and finish your day

13   on average?

14       A    So that's where it gets -- sometimes I

15   would do planning from the house.  I worked a lot.

16   My schedule would have been either seven to four or

17   six to three, something like that, but I worked a

18   lot.  Sometimes I would log in, you know, if I

19   couldn't get the planning done I had to go and

20   finish the planning for the morning, whatever was

21   needed.

22       Q    Understood.  And when you worked as an APM

23   in the 2018-2019 time period on the first shift, you

24   worked with other APMs; is that correct?

25       A    That is correct.

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

1       Q     Did you ever work alone as an APM on the

2  first shift during the 2018 through 2019 time

3  period?

4       A     No.

5       Q     During the 2018-2019 time period, did you

6  ever work with other APMs who worked a part-time

7  schedule?

8       A     APMs?

9       Q     Yes.

10       A     No.

11       Q     And as an APM in the 2018-2019 time

12  period, just so the record is clear, you never

13  reported to Travis Torrance; is that correct?

14       A     No, I never reported to Travis.

15       Q     During Ms. Geter's deposition, she claimed

16  that in July and August -- July or August of 2018

17  you started working a reduced schedule, and she

18  believes you were working three or four days per

19  week.  Is her testimony accurate?

20       A     In July?

21       Q     Starting in July or August of 2018,

22  Ms. Geter testified you started working a reduced

23  schedule of three or four days per week.  Is that

24  testimony accurate?

25       A     No.



Deposition of:

**Sarah Kopf**

*April 19, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 6

1    Schneider about the issues in Ms. Geter's case

2    outside the presence of your lawyer?

3          A    No, ma'am.

4          Q    And you understand that you're under oath

5    today just as if we were in court?

6          A    Yes, ma'am.

7          Q    All right.  How long have you been

8    employed with Schneider?

9          A    Three years and a little over a month.  My

10   three-year anniversary was March 5th.

11         Q    So does that mean you started in 2018?

12         A    Yes, ma'am.

13         Q    What was your first position with

14   Schneider?

15         A    I was an area planning manager for second

16   shift.

17         Q    When you were hired and began working for

18   Schneider, who did you report to on second shift?

19         A    Travis Torrance.

20         Q    And how long did you hold the second shift

21   area planning manager position?

22         A    I held that for just about exactly two

23   years when I became a driver team leader on

24   March 8th of last year, of 2020.

25         Q    What's the difference -- at a high level,

Page 7

1    not in a lot of detail -- but between an area

2    planning manager position and a driver team lead

3    position?

4         A    Area planning manager we route the drivers

5    with pickups and deliveries, help with any questions

6    regarding loads between us and customer service.

7    Driver team lead we manage their pay, their

8    regulatory safety.  It's more of a managerial, like

9    a supervisor position.

10        Q    You actually supervise drivers now?

11        A    Yes.

12        Q    Okay.  Were you always on second shift as

13   an area planning manager?

14        A    I did from time to time cover a third

15   shift, and for one week I did cover a first shift.

16        Q    Would you cover third shift if people were

17   out?

18        A    Yes, ma'am.

19        Q    What days of the week did you work on

20   second shift?

21        A    My schedule was Friday through Tuesday and

22   off Wednesday, Thursday.

23        Q    How many area planning managers were

24   scheduled on second shift at a time?

25        A    We had -- when I first started it was me

Page 8

1    and one other area planning manager during second

2    shift.  Later there was a third area planning

3    manager hired, so it usually -- consistently there

4    was two area planning managers on the second shift.

5         Q    When was the third person brought on?

6         A    I don't recall the exact date.  I would

7    say I was there at least a year after he came on

8    board.

9         Q    Prior to the third person coming on, there

10   would have been days during the week that you worked

11   alone, right?

12        A    Yes, after a certain period of me working

13   there.

14        Q    Tell me about how it is that you came to

15   take the driver team lead position.

16        A    I was there for two years.  I had voiced

17   interest to my manager that I would be interested,

18   and that would be my next role in my career with

19   Schneider.  And I had -- my predecessor, Shannon,

20   she had given me information that she was going to a

21   different position with Schneider, and she wanted to

22   recommend me for the job.

23        Q    What's Shannon's last name?

24        A    Bailey.

25        Q    Was she at the Fairburn facility too?

Page 9

1       A     Yes, ma'am.

2       Q     And did she work on second shift with you?

3       A     No, she worked first shift, the same days

4  though, Friday through Tuesday.

5       Q     As an area planning manager and then she

6  took a different position?

7       A     No.  She started out as a temp, I believe.

8  I don't know the exact position, but then she became

9  a driver team lead.

10      Q     And I understand in March of 2020 or

11 sometime around there all the area planning managers

12 were being transferred to Green Bay; is that right?

13      A     Yes, the position was being transferred to

14 Green Bay.

15      Q     Were you offered a position in Green Bay

16 before you took a driver team lead position?

17      A     No.

18      Q     Were you a driver team lead -- did your

19 promotion to driver team lead happen before the area

20 planning managers were moved?

21      A     It was right about the same time.  I knew

22 about the position -- I knew about the position

23 opening after we found out the positions were moving

24 up to Green Bay.

25      Q     I understand at least one person

                                                     Page 11

1       Q     And then was it after that that you were

2   then offered a different position?

3       A     Correct.

4       Q     Tell me how that came about.

5       A     So we knew that the role was going away.

6   I think management was still waiting to hear at that

7   time how many positions they were going to have or

8   be approved for, so how many fleet manager -- that's

9   what it used to be called.  So it sounds confusing.

10  It's now called a DTL, so driver team leader, but

11  it's essentially the fleet manager role.  They were

12  trying to figure out how many of those positions we

13  were going to get in the office, and then how many

14  of senior operations specialist positions we were

15  going to be approved for.

16          So I found out -- I was offered the

17  position pretty close to the end of that window

18  where my job -- where they said, okay, this is the

19  deadline.  Your current position is going to be

20  moved to Green Bay, and by that time, you know,

21  either we'll offer you a position or essentially let

22  you go.  So basically I was just presented kind of

23  towards the end very close to that window, okay,

24  this is the positions that we have.  I was only

25  offered senior operations specialist, and I took it

Tiffany Kitchens                           April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 12

1    because it was around the time of Covid.  It had

2    just started.

3         Q    Right.  And I understand that people

4    either agreed to move to Green Bay.

5         A    Yeah.

6         Q    Were offered other positions or were -- if

7    there were not enough positions, then they were let

8    go and got a severance; is that right?

9         A    Correct.

10             MR. MILIANTI:  Object to the form.

11   BY MS. LEGARE:

12        Q    By any chance do you know what the

13   severance was going to be if they hadn't been able

14   to find a new position for you?

15        A    They gave me a number.  I cannot remember

16   what that number was.

17        Q    Got it.  But they did find you a position,

18   and you stayed as a senior operations specialist,

19   right?

20        A    Correct.

21        Q    And you've had that position since?

22        A    Yes, ma'am.

23        Q    And I think what I have heard in a couple

24   of the depositions is when Covid hit you started

25   working from home in March of last year full time,

Tiffany Kitchens                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 13

1    right?

2         A    For the most part.  We had -- let me see.

3    I'm trying to remember.  So -- can you repeat the

4    question just so I'm.

5         Q    Yeah.  The way I understand -- and maybe

6    it's different for your position, but the way that I

7    understood from Mr. Torrance and another witness was

8    that in the beginning of Covid you all worked from

9    home full time, then partway through Covid you began

10   working from home part of the week, and now as of

11   last March --

12        A    Back full time.

13        Q    Right?

14        A    That's correct, yes.

15        Q    Let's go -- I want to rewind a little bit

16   and talk about the reason.  Ms. Geter has identified

17   you as someone who worked a reduced schedule for a

18   period of time in 2018.  Is that true?

19        A    Can you define reduced schedule?

20        Q    Less than 40 hours a week.

21        A    No.

22        Q    So you were full time?

23        A    I was full time.  I had a period of leave

24   initially where I was out of work for I believe it

25   was three weeks.

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 14

1    performed?

2        A     The only -- well, because I work with

3    first-shift planners now, and I'm on first shift.

4    As far as when I was on second shift, I had to

5    answer phone calls and messages from drivers.  I

6    don't know if they have to do the same on second

7    shift with second-shift planners.  I know first

8    shift is different.  Area planning managers did not

9    have to do that on first shift as well.

10       Q     So they never had to do that in your

11   experience?

12       A     Right.

13       Q     On first shift?

14       A     Correct.  Second shift it was part of the

15   job to answer phone calls and messages.  I don't

16   know if they have to do that now.

17       Q     With respect to the duties that you had

18   other than answering the phone call, based on your

19   observations still working with the drivers, are the

20   duties that you performed as an area planning

21   manager still being performed by the area planning

22   managers that you work with?

23       A     Yes.

24       Q     They're just happening remotely from Green

25   Bay?

Sarah Kopf                                           April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                          Page 15

1        A    Yes.

2        Q    So let's switch to Covid.  Have you been

3   working from home during Covid?

4        A    Yes, ma'am.

5        Q    Full time or do you go into the office

6   from time to time?

7        A    When Covid first happened, it was full

8   time.  Then it was we split up our five days that we

9   worked a week, so we would work three days at home,

10  two days in the office.  Then when things started to

11  open up a little bit more, now we just recently came

12  back full time in the office.

13       Q    Do you recall when you came back full time

14  to the office?

15       A    Full time March 15th.

16       Q    So almost a year?

17       A    Yes.

18       Q    I think you said it was full time at first

19  from home?

20       A    Yes.

21       Q    Then three days at home and two days in

22  the office?

23       A    Yes, ma'am.

24       Q    Was that so you didn't have overlap?

25       A    Yes, ma'am, less people in the office.

Sarah Kopf                                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 16

1        Q     And now full time back at the office?

2        A     Yes, ma'am.

3        Q     Do you still have the ability to work from

4   home, for example, if you had a family emergency?

5        A     Yes, ma'am.

6        Q     Who would have to approve that now?

7   Travis?

8        A     Travis, yes, ma'am.

9        Q     How did you learn that Ms. Geter had been

10  terminated?

11       A     I was working second shift the night she

12  was terminated.

13       Q     Were you present at the time she was

14  terminated?

15       A     Yes, ma'am.

16       Q     Did you witness her termination?

17       A     They went into an office, a separate

18  office.  I didn't witness it directly.

19       Q     When Ms. Geter left that night, did you

20  talk to her at all?

21       A     When she had come out, she had, you know,

22  told me what had happened, and she was visibly

23  upset.  After that she'd gone home.  We didn't talk

24  later that night.  I just knew what had happened.

25       Q     So she talked to you about it before she

Sarah Kopf                                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                              Page 24

1    that correct?

2         A    Yes.

3         Q    Okay.  You also testified that you believe

4    that Tiffany Kitchens had a reduced schedule; is

5    that correct?

6         A    I believe she did.  I don't know the

7    details.  I don't know what days, what times.

8         Q    Okay.  Do you have any personal knowledge

9    as to Ms. Tiffany Kitchens' schedule?

10        A    Right now or?

11        Q    I'm sorry.  During the time period that

12   she was an APM and you believe that she was out of

13   the office, do you have any personal knowledge as to

14   any time off that she had or any reduced schedule

15   that she may have worked?

16        A    I don't know the details of the reduced

17   schedule.

18        Q    Okay.  Give me one second, please.

19             MR. MILIANTI:  That's all the questions I

20        have.  Thank you, Sarah.

21

22                  RECROSS-EXAMINATION

23   BY MS. LEGARE:

24        Q    I have just a few.  So where are the extra

25   keys for the drivers kept now?

Sarah Kopf                                        April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1       A     They're in the same place.  They're in the

2    communications room in a lock box.  It's like a

3    little metal box that it's in.

4       Q     So how do the drivers have access to them

5    now that the APMs are in Green Bay?

6       A     We have the positions of the SOS, other

7    associates as well as other driver team leads that

8    are in the office.

9       Q     Were driver team leads and SOSs in the

10   office prior to Covid?

11      A     We did not have the position of SOS.  They

12   were previously -- I think the position was called

13   an IOS or APMs, and, yes, they were in the office.

14      Q     What was IOS?

15      A     Intermodal operating specialist.

16      Q     And SOS is what?

17      A     Senior operating specialist.

18      Q     And the intermodal operating specialist

19   would have been in the office and able to assist

20   drivers to get keys pre-Covid?

21      A     Yes.

22      Q     And driver team leads could also assist

23   drivers in getting keys pre-Covid?

24      A     Yes, ma'am.

25      Q     Is that also true with respect to access

Sarah Kopf                                    April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    to the printer?

2         A    Yes.

3         Q    And is it fair to say that the company's

4    not worried about APMs having face time with drivers

5    since they moved all the APMs to Green Bay?

6              MR. MILIANTI:  Object to the form of the

7         question.

8    BY MS. LEGARE:

9         Q    You can answer.

10        A    I don't know.

11        Q    I mean, the company chose to move all the

12   APMs to providing their services remotely from Green

13   Bay, right?

14        A    Correct.

15        Q    And I forgot to ask you.  You said that

16   you covered third shift sometimes.  Did you cover

17   any of the Sundays that Cierra was out when she came

18   back from leave?

19        A    I don't recall exact days, but I do know

20   when I did cover she wasn't there.

21        Q    And once a third person was hired on

22   second shift, did that mean that you never had to

23   work alone on a shift?

24        A    No.  Saturdays usually the system would go

25   down at ten, and I would be there from five to ten

Sarah Kopf                                            April 19, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 27

1    by myself.

2         Q     Even when you had three APMs on the shift?

3         A     It would be -- there was the first APM

4    that was there before me she left the company.  Then

5    it was down to me and Austin.  So for a time period,

6    yes, there were three, and then it was down to two

7    again.

8         Q     During the time you were an APM, were

9    temps ever brought in to work as an APM, temporary

10   employees?

11        A     Yes.

12        Q     How often would you say that happened?

13        A     We had one temp come in.  She worked for a

14   while as a temp.  I want to say a little over a

15   year, and then we had an intern as well that came in

16   that did duties as an APM as well as an IOS.

17        Q     Do you remember when that was?

18        A     I don't recall exact dates.

19        Q     Do you know who they were covering for as

20   a temporary employee?

21        A     I don't know if they were necessarily

22   covering for anyone.

23        Q     Got it.  And would it be a true statement

24   that since the drivers expect that there are people

25   in the office to answer questions for them that now