# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. 22-11285-BB

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

## APPELLANT'S APPENDIX – VOL. VI

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

# CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

## Eleventh Circuit Court of Appeals Case No. 22-11285-BB

### Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B | | | Certificate of Service |



Deposition of:

**Travis Torrence**

*April 6, 2021*

In the Matter of:

**Geter, Cierra v. Schneider National Carriers Inc.**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 9

1    A.    No, ma'am.

2    Q.    Did you talk outside of the presence of the

3    lawyers to any other Schneider employees about your

4    deposition here today?

5    A.    No, ma'am.

6    Q.    I find we can go a little faster if I just ask

7    some of those early questions broadly.  Can you tell

8    me about your employment history with Schneider.

9    A.    Sure.  I started with Schneider in an IOS role

10   in 2012.  Was in that role for a little over a year.

11   And then I was in the dispatch analyst, later

12   renamed area planning analyst role for about three

13   years.

14        Since promoted to operations team leader, which

15   I was in for about three years.  And I have been in

16   my current role as operations manager since summer

17   of last year.

18   Q.    Have you had, and specifically in your

19   management roles -- well, let me ask you this.

20        When you were an area dispatch analyst, area

21   planning manager, did you have any supervisory

22   responsibilities?

23   A.    No, ma'am.

24   Q.    But when you became a team lead, did that

25   change?

Travis Torrence                                     April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 10

1    A.    Yes.

2    Q.    Tell me what your supervisor responsibilities

3    were as a team lead.

4    A.    My direct reports were the area planning

5    managers and driver leaders that were second and

6    third shift in our office.

7    Q.    Did you say driver leaders?

8    A.    Yes.

9    Q.    And I'm not -- this is not to discount the

10   position at all.  But is an area planning manager or

11   was an area planning manager essentially a

12   dispatcher?

13   A.    Yes.

14              MR. MILIANTI:  Object to the form.

15   BY MS. LEGARE

16   Q.    And as operations team leader, I think you said

17   you were responsible for second and third -- why

18   don't we do this.

19         What are the shifts, or at least at the time in

20   2018 and 2019, what were the shifts at Schneider?

21   A.    We ran three shifts in our office.

22   Q.    What were the times of the shifts?

23   A.    The actual start times varied a little bit.

24   But we will say 7:00 to 4:00, 3:00 to 11:00, and

25   11:00 to 8:00 a.m.

Page 11

1    Q.    And 7:00 to 4:00 was first shift?

2    A.    Yes.

3    Q.    3:00 to 11:00 was second?

4    A.    Yep.

5    Q.    And then 11:00 to 8:00 was third?

6    A.    Yes, ma'am.

7    Q.    Who was operations team lead or was there

8    operations team lead responsible for first shift?

9    A.    No.

10   Q.    No.  Do you know why?

11   A.    The area planning managers and other support

12   folks and driver leaders reported to the operations

13   manager on first shift.

14   Q.    Reported directly to operations manager.  Do

15   you still work in Georgia?

16   A.    Yes.

17   Q.    And where are you located?

18   A.    Fairburn.

19   Q.    Can you tell me -- I'm going to ask you two

20   questions.  What organizational structure of the

21   Fairburn location was in 2019 and what it is now.

22   So let me start with 2019.

23   A.    So there was a ramp operations manager who had

24   the accountability over the entire southeast

25   intermodal operations.  Two operations managers

Page 12

1    reported to the ramp operations manager.  Those two

2    operations managers split the accountability of the

3    different rail hubs in the southeast.

4        My team lead role reported to one of the OMs.

5    Then the second and third shifts' area planning

6    managers and the one driver leader on second shift

7    reported to me.

8    Q.   Who in 2019 was the ramp operations manager?

9    A.   Mary Ann Rose.

10   Q.   And who were the two operations managers before

11   you got promoted?

12   A.   Doug Horton and Rodney Dunn.

13   Q.   Who did you report to?

14   A.   Doug Horton.

15   Q.   When you say southeast intermodal -- what did

16   you call it?  Sorry.

17   A.   So we have six different hubs in the southeast

18   that our office has accountability for.

19   Q.   And what -- are they the same now as they were

20   in 2019?

21   A.   Yes.

22   Q.   And what are they?

23   A.   Atlanta, Charlotte, Savannah, Jacksonville,

24   Winter Haven, Miami.

25   Q.   Can you tell me what the organizational

Page 13

```
 1    structure is now.

 2    A.    So there is still a ramp operations -- the

 3    title has changed since then, I believe.  So it's

 4    the director who has accountability over the entire

 5    southeast.  There are two operations managers that

 6    report directly to that director role.  And then all

 7    of the area -- or all of the driver leaders and

 8    support folks in our office report to the two

 9    operations managers.

10    Q.    So there is no team lead anymore?

11    A.    No.  And we no longer have area planning

12    managers in our office.

13    Q.    Who were the area planning managers before

14    Ms. Geter was terminated?  So she was one of them.

15    A.    All of them in our office?

16    Q.    Yeah.  If you remember?

17    A.    Desmond Seymour, Audriana Williams, Candace

18    Smith, Marshall Mock, Quincy Parker and Sara Kopf.

19    Q.    How about Tiffany Parker?

20    A.    Tiffany -- there is no Tiffany Parker that has

21    worked in our office.

22    Q.    Tiffany -- is there any Tiffany in your office?

23    A.    Yes.  Tiffany Kitchens.

24    Q.    And she's an area claim manager, right?

25    A.    Yes.
```

Page 14

1    Q.   After Ms. Geter was terminated, was she

2    replaced?

3    A.   Yes.

4    Q.   And who was she replaced with?

5    A.   Jalisa Simpson.

6    Q.   What is Ms. Simpson's race, if you know?

7    A.   She is black.

8    Q.   And is Desmond Seymour still employed?

9    A.   Yes, ma'am.

10   Q.   What is his title now?

11   A.   Senior operations specialist.

12   Q.   And Audriana Williams is no longer employed,

13   right?

14   A.   Correct.

15   Q.   Do you know why she left?

16   A.   She resigned, I believe, to spend more time

17   with her family.

18   Q.   Was she replaced?

19   A.   Yes.

20   Q.   And who replaced her?

21   A.   To fill her role we moved somebody from first

22   shift to third shift.

23   Q.   And who was that?

24   A.   Ryan Wheeler.

25   Q.   And did anyone replace Ryan on first shift?

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 15

1    A.    Yes.

2    Q.    Who?

3    A.    Joon Hyung.

4    Q.    And Mr.Ryan -- or Mr. Wheeler is no longer

5    employed, right?

6    A.    Correct.

7    Q.    Did he quit or was he fired?

8    A.    His role was eliminated.

9    Q.    So he was not replaced when he left?

10   A.    Correct.

11   Q.    What is Mr. Wheeler's race?

12   A.    He is black.

13   Q.    Is Ms. Hyung still employed?

14   A.    No.

15   Q.    And why is she not employed?

16   A.    The role was eliminated.  I'm sorry.  Joon was

17   a guy.

18   Q.    Joon was a guy.  Sorry.  Bad assumption on my

19   part.

20         And Candace Smith left right before Ms. Geter

21   was terminated, right?

22   A.    Correct.

23   Q.    Was she fired?

24   A.    Yes.

25   Q.    Was she replaced?

Page 16

```
 1    A.    I don't recall specifically.

 2    Q.    And Marshall, I think you said Mock, right?  Is

 3    he still employed?

 4    A.    No.

 5    Q.    And why did he leave, if you know?

 6    A.    He trans -- he got a new role within Schneider

 7    and moved to a different office.  And so after that

 8    I'm unaware of any details or following him leaving

 9    our office.

10    Q.    Got it.  Was he replaced at the time he left?

11    A.    Yes.

12    Q.    Who replaced him?

13    A.    I can't recall to be certain.

14    Q.    And Sara Kopf is still employed, right?

15    A.    Correct.

16    Q.    What's her title now?

17    A.    Driver team leader.

18    Q.    And is Tiffany Kitchens still employed?

19    A.    Yes, ma'am.

20    Q.    And what is her title?

21    A.    Senior operations specialist.

22    Q.    And some of the people -- I understand the

23    planning area managers were moved outside of Atlanta

24    and do dispatch for Atlanta from someplace else, am

25    I right?
```

Page 17

1    A.    That's correct.

2    Q.    Where are they located?

3    A.    Green Bay.

4    Q.    That's the corporate office?

5    A.    Yes, ma'am.

6    Q.    At the time, do you remember when the area

7    planning managers were relocated to Green Bay?

8    A.    End of first quarter, beginning of second

9    quarter last year.

10   Q.    2020?

11   A.    Yes.

12   Q.    And at the time, do you recall how many area

13   planning managers were employed at that time in

14   Fairburn?

15   A.    Around ten.

16   Q.    And if you know, how many were let go versus

17   being offered other positions?

18                 MR. MILIANTI:  Object to question.

19        Calls for speculation.

20                 THE WITNESS:  I'm sorry, Pete was

21        breaking up.  I couldn't hear what --

22   BY MS. LEGARE

23   Q.    He just got an objection on the record.  You

24   can still answer.

25   A.    Okay.  Can you repeat the question, please.

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 18

1    Q.   Yeah.  So you've got ten area planning managers

2    when the area planning managers were -- when the

3    position was moved to Green Bay.  Do you know how

4    many people were let go at that time?

5                    MR. MILIANTI:  Same objection.

6                    THE WITNESS:  Yeah, I don't know an

7        exact amount.

8    BY MS. LEGARE

9    Q.   Tell me who the ten were.  We've got Sara Kopf,

10   Quincy Parker, Tiffany Kitchens --

11   A.   Cheryl Joseph.  Can I write it on my --

12   Q.   Sure.

13   A.   Give me a second.  I'll run through it.

14   Tiffany Kitchens, Cheryl Joseph, Joon, Austin

15   Ottinger, Robert Turner, Sara Kopf, Ryan Wheeler,

16   Cierra Geter, Audriana Williams were the APMs that

17   were in our office.

18   Q.   And Cierra had already been terminated when

19   people were moved, right?

20   A.   Yes.

21   Q.   And Audriana had already quit?

22   A.   Yes.

23   Q.   Is Robert Turner still employed?

24   A.   Yes.

25   Q.   And what is his position?

Travis Torrence                                                  April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 19

 1   A.    Driver team leader.

 2   Q.    And what is his race?

 3   A.    White.

 4   Q.    And Ryan Wheeler, I think you said his position

 5   was eliminated, right?

 6   A.    Yes.

 7   Q.    And he is black?

 8   A.    Yes.

 9   Q.    Austin Ottinger, is he still employed?

10   A.    Yes.

11   Q.    And what is his position?

12   A.    Area planning manager.

13   Q.    Did he move to Green Bay?

14   A.    Yes, ma'am.

15   Q.    He actually physically moved?

16   A.    Mm-hm.

17   Q.    And I think you said Joon Hyung, the position

18   was eliminated?

19   A.    Yes.

20   Q.    And what is Mr. Hyung's race?

21   A.    Asian.

22   Q.    What is Mr. Ottinger's race?

23   A.    It's white.

24   Q.    And is Cheryl Joseph still employed?

25   A.    No.

Page 20

1   Q.   Was her position eliminated when the APMs were

2   moved?

3   A.   Yes.

4   Q.   And what is her race?

5   A.   Black.

6   Q.   And Ms. Kitchens is still employed and her race

7   is white, right?

8   A.   Yes.

9   Q.   And is Quincy Parker still employed?  I think

10  you said yes, right?

11  A.   No.

12  Q.   No.  Was his position eliminated or had he

13  already left?

14  A.   He was a driver team leader, not an area

15  planner.

16  Q.   Oh, got you.  And Sara Kopf is still there and

17  she is white, correct?

18  A.   Yes.

19  Q.   Do you know how it was decided whose positions

20  were eliminated versus who were moved into new

21  positions when the APM position was moved?

22  A.   So the APMs were given the choice to relocate

23  to Green Bay.

24  Q.   Well, some people were given different

25  positions too, right, like Ms. Kitchen, Ms. Kopf?

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                        Page 21

1    A.    Yes.

2    Q.    Can you tell me how that all came about -- were

3    you involved in the process of reassigning people to

4    different positions?

5    A.    Yes.  I was part of that process.

6    Q.    And how were those decisions made at the time?

7              MR. MILIANTI:  Object to the form.

8    BY MS. LEGARE

9    Q.    You can answer.

10   A.    Can you ask that differently.

11   Q.    Yeah, sure.  Were there only a certain number

12   of positions open in Fairburn to transfer people

13   into?

14   A.    Yes.

15   Q.    And how did you decide -- and I'm not

16   suggesting you made the decisions alone.  But how

17   was it decided who would be given an operations

18   specialist position, for example, or driver team

19   lead position versus being asked to relocate to

20   Green Bay?

21             MR. MILIANTI:  Object to form.

22             THE WITNESS:  There was a lot of time

23        and effort that went into mixing those

24        decisions from our leadership group.  And I'm

25        not sure that I can fully explain each -- there

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 22

1          is not a single criteria that would qualify

2          someone to remain with us or not.

3     BY MS. LEGARE

4     Q.   Who was the leadership group that made the

5     decisions?

6     A.   Myself, Rodney Dunn, Doug Horton, and Mary Ann

7     Rose.

8     Q.   And was each person, were all of the current

9     area planning managers at the time the decisions

10    were made considered for the openings in Fairburn?

11    A.   I'm sorry.  Can you rephrase that.

12    Q.   Yes.  When you were considering who to offer

13    positions in Fairburn versus who to offer the

14    opportunity to move to Green Bay, did you consider

15    everyone?

16    A.   Yes.

17    Q.   For the open positions in Fairburn?

18    A.   Yes.

19    Q.   So if Ms. Geter had still been employed, she

20    would have been considered for the openings in

21    Fairburn; is that fair to say?

22                    MR. MILIANTI:  Objection.  Calls for

23         speculation.

24    BY MS. LEGARE

25    Q.   You can answer the question.

Page 23

1          MR. MILIANTI:  Incomplete

2      hypothetical.

3  BY MS. LEGARE

4  Q.   If Ms. Geter was still employed as an area

5  planning manager at the time the area planning

6  managers were moved to Green Bay, since all the area

7  planning managers were considered for the open

8  positions in Fairburn, would Ms. Geter also have

9  been considered for one of the open positions in

10  Fairburn?

11          MR. MILIANTI:  Same objection.

12  BY MS. LEGARE

13  Q.   You can answer.

14  A.   Yes.

15  Q.   And did the movement of the area planning

16  managers to Green Bay happen before or after COVID

17  hit?

18  A.   I was notified of the changes in the beginning

19  of February.  So my understanding is that it was in

20  the works.  Our office did not actually make that

21  transition until mid-April.

22  Q.   At any point during the pandemic, have you been

23  working remotely?

24  A.   Yes.

25  Q.   When did you start working remotely?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 23

1              MR. MILIANTI:  Incomplete

2         hypothetical.

3    BY MS. LEGARE

4    Q.   If Ms. Geter was still employed as an area

5    planning manager at the time the area planning

6    managers were moved to Green Bay, since all the area

7    planning managers were considered for the open

8    positions in Fairburn, would Ms. Geter also have

9    been considered for one of the open positions in

10   Fairburn?

11             MR. MILIANTI:  Same objection.

12   BY MS. LEGARE

13   Q.   You can answer.

14   A.   Yes.

15   Q.   And did the movement of the area planning

16   managers to Green Bay happen before or after COVID

17   hit?

18   A.   I was notified of the changes in the beginning

19   of February.  So my understanding is that it was in

20   the works.  Our office did not actually make that

21   transition until mid-April.

22   Q.   At any point during the pandemic, have you been

23   working remotely?

24   A.   Yes.

25   Q.   When did you start working remotely?

Page 24

1    A.   I can't be sure of an exact date.  It was

2    towards the end of March or beginning of April of

3    2020.

4    Q.   And are you still working remotely?

5    A.   Not on a regular basis, no.

6    Q.   Do you work remotely from time to time?

7    A.   Yes.

8    Q.   How often would you say you work remotely?

9    A.   I'm not sure I would be able to put a number on

10   it.

11   Q.   Would you say that you work remotely every

12   month?

13   A.   Yes.

14   Q.   Would you say that you work remotely every

15   week?

16   A.   No.

17   Q.   And did everyone in the Fairburn office -- I

18   mean, obviously not the drivers, but did everyone in

19   the Fairburn office go remote during the pandemic?

20                  MR. MILIANTI:  Object to form.  Calls

21        for speculation.

22   BY MS. LEGARE

23   Q.   Let me ask it this way so it is not speculative

24   at all.  So you report to who?

25   A.   Mary Ann Rose.

Travis Torrence                                                        April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 25

1    Q.    And did Ms. Rose work remotely at all during

2    the pandemic?

3    A.    Yes.

4    Q.    Did she work remotely full time for a period of

5    time during the pandemic?

6    A.    Yes.

7    Q.    Has she returned to the Fairburn office or is

8    she still working full time remotely?

9    A.    She is not working full time remotely.

10   Q.    Does she still work remotely from time to time?

11   A.    Yes.

12   Q.    And is Doug Horton still at the Fairburn

13   location?

14   A.    No, ma'am.

15   Q.    Where is he now?

16   A.    He accepted another role, I believe it was in

17   the second quarter of 2020.

18   Q.    Has he left Schneider altogether?

19   A.    No.  He is still with the organization.

20   Q.    Do you know where he works out of?

21   A.    I can't say for sure.

22   Q.    So the current organization is Mary Ann Rose,

23   you, and did you say Rodney Dunn?

24   A.    Yes.

25   Q.    What is Mr. Dunn's race?

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 26

1    A.    White.

2    Q.    And he is your peer, correct?

3    A.    Correct.

4    Q.    And do you know if he worked full time remotely

5    at all during the pandemic?

6    A.    He did.

7    Q.    And has he returned to the office?

8    A.    He's not working full time from home.

9    Q.    He is working part time from home?

10                 MR. MILIANTI:  Objection to form.

11        Calls for speculation.

12   BY MS. LEGARE

13   Q.    Like, when you go to the office, do you see him

14   there?

15   A.    Sometimes.

16   Q.    So would the assumption be that some of the

17   time he may be working from home and sometimes he

18   might be off?

19                 MR. MILIANTI:  Object to the form.

20        Calls for speculation.  If you know.

21                 THE WITNESS:  I'm sorry, can you ask

22        it differently, please.

23   BY MS. LEGARE

24   Q.    Yeah.  If you don't see him there when you're

25   there --well, let me ask you this.

Page 27

```
 1        As operations managers, do both of you work for

 2    a shift?

 3    A.    Yes.

 4    Q.    He's not there when you go in every time,

 5    right?

 6    A.    Correct.

 7    Q.    Do you know if the times that he is not

 8    there -- and if you don't know, that's fine --

 9    whether he is taking a day off or whether he is

10    working remotely?

11    A.    I'm sorry.  Can you ask that differently.

12    Q.    Yeah.  I mean, if you're there and he's not,

13    there are only two choices right?  He is either

14    working remotely or he is off, right?

15    A.    He could be traveling.

16    Q.    Do you travel with your job?

17    A.    My accountability is over Atlanta.  So I'm on

18    site with my drivers.  That's different depending

19    on -- it's not the same case for everybody.

20    Q.    So Mr. Dunn may have some responsibility for

21    other hubs; is that what you're saying?

22    A.    Yes.

23    Q.    And he may travel to those hubs from time to

24    time?

25    A.    Yes.
```

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 28

1    Q.   Who reports to you now?

2    A.   You would like a list of names?

3    Q.   Well, let me ask you this.  Does Tiffany

4    Kitchens report to you?

5    A.   No, ma'am.

6    Q.   Did Ms. Kitchens report to you when she was an

7    area planning manager?

8    A.   No, ma'am.

9    Q.   Is that because she was first shift?

10   A.   Correct.

11   Q.   So she reported directly to Doug Horton?

12   A.   I can't say for sure if it was Rodney or Doug

13   at the time.

14   Q.   And did Sara Kopf report to you when you were a

15   team lead?  What shift did Ms. Kopf work?

16   A.   Second.

17   Q.   Does she report to you now?

18   A.   Yes.

19   Q.   And during the pandemic, did Ms. Kopf work

20   remotely for a period of time?

21   A.   Yes.

22   Q.   Is she currently working remotely at all?

23   A.   Yes.

24   Q.   Do you know how often?

25   A.   It would be hard to say for sure.

Case 1:20-cv-01148-SCJ-JSA   Document 50-17   Filed 07/12/21   Page 23 of 58

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 30

1   Bay.  It is difficult for me to say how that's --

2   how their role is different there than it was in our

3   office.

4   Q.   And would it be fair to say that operations

5   specialists and/or driver team leads have taken over

6   some of the duties that were performed directly from

7   Fairburn that the APMs performed?  Or are their jobs

8   completely different?  And that's okay too.

9   A.   I'm sorry, ask that again, please.

10  Q.   Yeah.  Were there any job duties that the APMs

11  performed while they were employed in Fairburn that

12  different employees currently employed in Fairburn

13  are now performing?

14  A.   Yes.

15  Q.   And what positions have taken over those

16  duties?

17  A.   The operations specialists role and the driver

18  team lead role.

19            MS. LEGARE:  Hey, Pete, I think on

20       that email you were never actually set up for

21       Exhibit Share.  And that was the problem.  So

22       you may have had a private chat and an email.

23       If we can take a five-minute break, you can try

24       and fix that.

25            MR. MILIANTI:  Yeah, I think I'm good

Page 32

```
 1    A.    No.

 2    Q.    All right.  If you can pull up Exhibit Share,

 3    let's get started and let's look at Exhibit 4.

 4    A.    I have got it up.

 5                            - - -

 6                  (Whereupon, Exhibit 4 was marked for

 7         identification.)

 8                            - - -

 9    BY MS. LEGARE

10    Q.    Have you seen Exhibit 4 before, Mr. Torrence?

11    A.    Yes.

12    Q.    And what is Exhibit 4?

13    A.    It looks like the APM job description last

14    updated in 2017.

15    Q.    Do you know if there are any other versions of

16    the job description or more current versions of the

17    job description?

18    A.    I wouldn't be able to say for sure.

19    Q.    This version of the job description was

20    produced by Schneider.  Do you know, sitting here

21    today, if this was the version that was in effect

22    when Ms. Geter was an area planning manager?

23    A.    The date would lead me to believe so.  But

24    again, I'm not sure if there was anything more

25    current than this.
```

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 33

1     Q.   Fair enough.  Were employees provided copies of

2     their job description during their employment?

3                    MR. MELLON:  Object to the form of

4        the question.  Calls for speculation.

5     BY MS. LEGARE

6     Q.   Let me ask you this way.  You were an APM when

7     the position was changed from dispatch analyst to

8     area planning manager.  Were you given copy of the

9     job description?

10    A.   I can't remember for sure.

11    Q.   Do you know where the job descriptions are

12    maintained at Fairburn?  And that may be a stupid

13    question.  Are these things maintained

14    electronically for the company?

15    A.   Yes.

16    Q.   And do all employees have access to the

17    electronic documents?

18    A.   I believe so, yes.

19    Q.   Do you know if this was the job description for

20    the position at the time that it was moved -- as the

21    position existed at Fairburn at the time that it was

22    transferred to Green Bay?

23    A.   I would guess so based on the date.  But I

24    can't be sure.

25    Q.   No, that's fine.  Can you tell me what, if any,

Page 34

1    of those job duties are still being performed in

2    Fairburn?  Let me step back.

3         I'm assuming you did not create this job

4    description, right?

5    A.   Correct.

6    Q.   Let's go through the essential job duties.  And

7    if you can just tell me if anyone in Fairburn is

8    currently performing the duty.  How does that work?

9    If you know?

10   A.   Okay.

11   Q.   You would establish the market plan to include

12   shift directions, priority of freight, load and

13   stage, driver calendar requests, et cetera.

14   Continually assess market conditions and performance

15   adjust plan accordingly.

16        Is that being performed in Fairburn currently?

17   A.   No.

18   Q.   The next one is B, Recognize expert in role,

19   provide expertise on new opportunities and

20   proactively identify potential solutions that

21   maximize overall value for Schneider.

22        And I'm assuming that means being a recognized

23   expert in the APM role.  So I would assume that is

24   not being performed in Fairburn right now?

25   A.   Correct.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 35

1    Q.    Assign freight to drivers in accordance with
2    the market plan to maximize all aspects of the value
3    triangle.
4         Is that being performed in Fairburn right now?
5    A.    No.
6    Q.    And actually, why don't you just read through
7    these and tell me if any of these are being
8    performed in Fairburn right now.
9    A.    So I think I'm having a difficult time
10   understanding what you're asking for.
11   Q.    The only thing I'm really asking is if any of
12   these job duties are currently being performed out
13   of Fairburn?
14   A.    So I'll say assigning trailers for dispatch is
15   a yes.  Collaborating to successfully onboard new
16   customers would be a yes.  Intimate understanding of
17   customers' unique needs would be a yes.  I think
18   this description is not an exhaustive or
19   comprehensive list of all job responsibilities,
20   tasks and duties would be a yes.
21   Q.    Well, that's for everyone, right?
22   A.    And then the same with the other duties and
23   responsibilities may be assigned.
24   Q.    Let me ask you this.  Who is performing the
25   assigning trailers for dispatch function now in

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

                                                    Page 39

1    BY MS. LEGARE

2    Q.   Can you tell me if you have ever seen this

3    document before, if you recall seeing this document

4    before?

5    A.   I do not recall.

6    Q.   If you look at what is marked as Exhibit 30.

7                           - - -

8              (Whereupon, Exhibit 30 was marked for

9         identification.)

10                          - - -

11             THE WITNESS:  I've got it up.

12   BY MS. LEGARE

13   Q.   If you take a minute to read that, I just have

14   a few questions.

15   A.   Okay.

16   Q.   Exhibit 30 appears to be an email from HR

17   administration to you dated October 26, 2018,

18   correct?

19   A.   Yes, ma'am.

20   Q.   And it looks like this email notifies you that

21   Ms. Geter has been approved for FMLA leave, right?

22   A.   Yes.

23   Q.   Is this typically how you would be notified

24   that an employee is approved for FMLA leave?

25   A.   Yes.

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 40

1    Q.    Let me ask you this and take a step back.  At

2    some point in the fall of 2018, did you learn that

3    Ms. Geter needed to take FMLA leave?

4    A.    Yes.

5    Q.    Do you recall how you learned that she needed

6    to take FMLA leave?

7    A.    I believe it was through this notification from

8    our lead team.

9    Q.    Ms. Geter believes she spoke with you directly

10   about her mental health crisis in the fall of 2018.

11   Do you have any specific recollection of whether she

12   shared with you that she had been suicidal?

13   A.    I don't believe that she shared that with me.

14   Q.    And she believed that she shared with you that

15   she suffered from PTSD.  Do you have any

16   recollection of whether she shared that with you?

17   A.    No, ma'am.

18   Q.    I mean, does that mean it didn't happen or you

19   just don't recall it happening?

20   A.    I'm sorry, ask that again, please.

21   Q.    Sure.  No problem.  When you say you don't --

22   is it possible she shared with you that she had PTSD

23   and you just don't remember?  Or are you saying that

24   it didn't happen?

25   A.    I don't believe she shared that with me in the

Page 41

1   fall of 2018.

2   Q.   Do you think that she shared that with you at

3   any point in time?

4                    MR. MILIANTI:   Travis --

5                    THE WITNESS:   Yeah.   The dogs are

6        acting up.

7                    MS. LEGARE:   That's okay.   I've got

8        them.   I understand.

9                    THE WITNESS:   All right.   Sorry.

10       What was the question?

11  BY MS. LEGARE

12  Q.   Yeah.   The question is, do you recall at any

13  point in time whether Ms. Geter shared with you that

14  she had been suicidal?

15  A.   Yes.

16  Q.   But you don't remember when she shared that

17  with you?

18  A.   I believe it was after she returned from her

19  FMLA leave in 2019.

20  Q.   Okay.   So she came back with accommodation on

21  or around January 1 or January 2nd of 2019, right?

22  A.   Yes.

23  Q.   And you think she may have shared that with

24  you, the fact she had been suicidal after she

25  returned from FMLA leave?

Page 42

```
 1    A.    Yes.

 2    Q.    And did she also share with you after she

 3    returned from FMLA leave that she suffered from

 4    PTSD?

 5    A.    No.

 6    Q.    Did she share with you after she -- well, let

 7    me ask you this.  Did she share with you that she

 8    suffered from depression?

 9    A.    I don't believe she used those words.

10    Q.    Do you recall what words she may have used?

11    A.    I mean, she told me about the suicidal

12    thoughts.  But to the best of my recollection, I

13    don't remember there being any -- being told any

14    circumstances around why that was.

15    Q.    Do you recall whether she shared with you that

16    she had been attacked at some point when she was

17    working for another company?

18    A.    I don't believe so.

19    Q.    Did she share with you her fear of working

20    alone on third shift?

21    A.    When?

22    Q.    Well, I understand she raised some issues about

23    safety earlier before she went out on leave.  Did

24    she raise any safety issues after she returned from

25    leave?
```

Page 43

```
 1    A.    No.

 2    Q.    But you did understand, did you not, that she

 3    was still -- one of the reasons she needed

 4    accommodation was that she was still in treatment?

 5                      MR. MILIANTI:  Object to the form of

 6         the question.

 7                      THE WITNESS:  Can you ask that

 8         differently, please.

 9    BY MS. LEGARE

10    Q.    When she returned from leave, from FMLA leave,

11    Ms. Geter was not released to return to work four

12    days a week, right?

13    A.    Right.

14    Q.    And that was because she was still in therapy?

15                      MR. MILIANTI:  Object to the form of

16         the question.  Calls for speculation.  If you

17         know.

18    BY MS. LEGARE

19    Q.    Well, let me ask it this way.  What did she

20    tell you about why she couldn't work full time?

21    A.    She said that she could not work Sunday nights

22    because she had doctors' appointments on Monday.

23    Q.    Let's look at Exhibit 15.

24                             - - -

25                      (Whereupon, Exhibit 15 was marked for
```

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 44

 1      identification.)

 2                        - - -

 3                  MS. LEGARE:  And, Pete, just so that

 4      you know, I used the same exhibit numbers that

 5      you used for the documents that you used in

 6      Cierra's deposition.

 7                  MR. MILIANTI:  Great.  Thank you.

 8                  MS. LEGARE:  And I started later with

 9      new documents at Exhibit 30.

10                  MR. MILIANTI:  Understood.

11                  THE WITNESS:  I have got Exhibit 15

12      up.

13      BY MS. LEGARE

14      Q.   Can you tell me if you have seen that document

15      before.

16      A.   I don't believe that I have.

17      Q.   Okay.  But you understood when Ms. Geter

18      returned to work in January that, at least

19      temporarily, she was approved to work part time?

20      A.   Yes.

21      Q.   And was a typical APM work week four days?

22      A.   No.

23      Q.   For second and third shift, was it four days?

24      A.   No.

25      Q.   How is it that Ms.~Geter prior to going on

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 45

1    leave had a schedule of four ten-hour days?  Was it

2    just third shift?

3    A.   It was just Cierra.

4    Q.   It was just Cierra.  Tell me how that happened.

5    A.   Her schedule was a bit untraditional.  So she

6    got split off days.  And there wasn't at the time a

7    great need for someone on third shift on Saturday.

8    So kind of to off balance the split off days, that

9    schedule was created as a four-day schedule to make

10   it a little more desirable of a schedule.

11   Q.   Okay.  But that -- I don't think what you're

12   telling me is that was specifically done for Cierra,

13   right?

14   A.   No.

15   Q.   When she was replaced after she left, did that

16   person also work the four-day workweek?

17   A.   No.

18   Q.   No.  So was that four-day, four ten-hour day

19   workweek eliminated once Ms. Geter was no longer

20   employed?

21   A.   Yes.

22   Q.   And then, so was it five days at that point?

23   A.   Yes.

24   Q.   And, for example, if you have Desmond Seymour

25   and Lancelot Lewis each working five days because

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 46

1    there are seven days in a week, they overlap certain

2    days, right?

3    A.   Yes.

4    Q.   And they, I assume, don't have the same off

5    days; is that right?  That was a weird question.  Do

6    they have the same days off?

7    A.   Lance and Desmond, the same as each other?

8    Q.   Yes, as each other.

9    A.   No.

10   Q.   And what is Desmond's current schedule?  I know

11   it changed from time to time.

12   A.   He works a consistent schedule that has changed

13   over the years that he has been with us.

14   Q.   Currently, what is Mr. Seymour's schedule?

15   A.   Sunday through Thursday.

16   Q.   And currently what is Mr. Lewis' schedule?

17   A.   Thursday through Monday.

18   Q.   Is there a process that an employee normally

19   goes through if they need an accommodation, a

20   reasonable accommodation based on a disability?

21   A.   We would ask them to contact the HR lead time.

22   Q.   So that also at least initiates with the HR

23   lead team?

24   A.   Correct.

25   Q.   And I understand in this case that decisions

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 47

1    about whether an employee could be reasonably

2    accommodated were made by you and Ms. Rose in

3    consultation with Ms. Jansen who works in human

4    resources, right?

5    A.   Yes.

6    Q.   Can human resources tell you what to do?  Or

7    can they only advise you what to do as a manager in

8    Fairburn?

9                    MR. MILIANTI:  Object to the form of

10       the question.

11   BY MS. LEGARE

12   Q.   I'll be more specific.  In this case I think

13   the decision to accommodate was made by you and

14   Ms. Rose in conjunction with Ms. Jansen, right?

15   A.   Right.

16   Q.   And then the decision to no longer accommodate

17   Ms. Geter was also made by you and Ms. Rose in

18   consultation with Ms. Jansen, right?

19   A.   Correct.

20   Q.   Was there a policy that you all consulted in

21   determining whether to make an accommodation for

22   Ms. Geter?

23                    MR. MILIANTI:  Object to the form.

24                    THE WITNESS:  I don't know that I

25       understand the question.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 48

1    BY MS. LEGARE

2    Q.    Sure.  Do you know if the company has a policy

3    relating to reasonable accommodations under the ADA?

4    A.    I'm not sure.

5    Q.    If you will look at Exhibit 22.

6                             - - -

7                  (Whereupon, Exhibit 22 was marked for

8         identification.)

9                             - - -

10                 THE WITNESS:  I have got it up.

11   BY MS. LEGARE

12   Q.    Okay.  Have you seen this document before,

13   Mr. Torrence?

14   A.    I believe so, yes.

15   Q.    And is it fair to say that Ms. Geter was out on

16   leave continuously from October 9, 2018 to

17   January 1, 2019?

18   A.    Yes.

19   Q.    Do you know one way or the other if at the time

20   of her termination, if she had any FMLA leave

21   available to her?

22   A.    My understanding of FMLA is that it's 12 weeks

23   within a rolling 12-month period.  So I do not

24   believe she had FMLA at the time of her termination.

25   Q.    But rolling -- and you mean --

Travis Torrence                                                 April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 49

1              MS. LEGARE:  And I know you're going

2         to object, Pete.

3    BY MS. LEGARE

4    Q.   -- but rolling means it accumulates basically

5    per pay period, right?

6              MR. MILIANTI:  Object to the form of

7         the question.  Calls for speculation.

8              THE WITNESS:  I couldn't be sure.

9    BY MS. LEGARE

10   Q.   And who would have answer to that, the HR lead

11   administration?

12   A.   The HR lead team, yes.

13   Q.   And according to this on December 18, 2019,

14   Schneider approved Ms. Geter for a partial return to

15   work working three days per week through February 13

16   2019, right?

17   A.   Correct.

18   Q.   And is that your recollection of the initial

19   accommodation?

20   A.   Yes.

21   Q.   And then on January 1, 2019, Ms. Geter was

22   approved for an extension of her accommodations

23   through March 19, 2019, right?

24   A.   I think you just said January 1.  But on

25   January 21 --

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 50

1    Q.    January 21.  I'm sorry, if I did, I apologize.

2    A.    I don't know if it was the Zoom or --

3    Q.    No.  I'm sorry.

4    A.    January 21, an extension through the 19th of

5    March.

6    Q.    And Ms. Geter's physician then requested that

7    her accommodation be extended to June 5, 2019,

8    right?

9    A.    Yes.

10   Q.    And at that point, you and Ms. Rose in

11   consultation with Ms. Jansen determined that

12   Ms. Geter could no longer be terminated, right?

13   A.    Correct.

14   Q.    Can you tell me how that all happened.

15   A.    From my perspective, at that point we've been

16   accommodating for, you know, over three months at

17   that point, which is taxing on myself, the rest of

18   our team, our drivers, and continuing to extend that

19   over and over again without there being a clear end

20   date.  I just didn't believe that it was reasonable

21   to continue to accommodate that at that point.

22   Q.    But there was a clear end date given to you by

23   the doctor, right, June 5, 2019?

24            MR. MILIANTI:  Object to the form of

25       the question.  And calls for speculation.

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 51

1     BY MS. LEGARE

2     Q.    Well, based on this letter, the physician

3     indicated that she would be able to return to work

4     on June 5, 2019, right?

5     A.    I'm reading it.

6                    MR. MILIANTI:  Go ahead, Travis.

7                    THE WITNESS:  I'm reading it as may

8          be able to return to it full time.  Which again

9          is unclear in my mind.  And especially after

10         we've already approved incremental additional

11         accommodations up to that point.

12    BY MS. LEGARE

13    Q.    What do you mean by "incremental additional

14    accommodations"?

15    A.    We approved it through February 13.  Then again

16    through March 19.  Then again through 4/12.

17    Q.    I just want to make sure I understand what you

18    were saying.  Who -- who was the other employee on

19    third shift at the time?  APM to be more specific.

20    A.    Desmond Seymour and Audriana Williams.

21    Q.    So you had three people working third shift at

22    the time?

23    A.    Yes.

24    Q.    And was anyone covering the fourth day that

25    Ms. Geter was not working?

Case 1:20-cv-01148-SCJ-JSA   Document 50-17   Filed 07/12/21   Page 41 of 58

Travis Torrence                                          April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 52

1    A.    Typically myself.

2    Q.    So you were working third shift one day a week?

3    A.    Yes.

4    Q.    And what day was that?

5    A.    Sunday nights.

6    Q.    And were you working from the office Sunday

7    nights or were you working remotely?

8    A.    I can't remember a time that I specifically

9    worked from home on one of those Sunday nights.

10    Q.    Is there any documentation that would show when

11    people were working remotely or when they were

12    working in the office?

13    A.    Not that I'm aware of.

14    Q.    What was your typical schedule when Ms. Geter

15    was not being accommodated?  Actually, let me ask

16    this a different way.  Before she went on medical

17    leave in October of 2018, did you ever work third

18    shift?

19    A.    I spent time on third shift.  I did not act as

20    the only APM in the office prior to that.

21    Q.    You supervised third shift, right?

22    A.    Correct.

23    Q.    So were you -- well, let me ask you this.  Did

24    you work alone on Sunday nights as the APM when

25    Ms. Geter was out?

Travis Torrence                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 53

1    A.    Yes.

2    Q.    So Ms. Williams and Mr. Seymour didn't work on

3    Sunday nights?

4    A.    No.

5    Q.    Why not?

6    A.    I would have to go back -- I don't remember

7    specifically what schedule Desmond or Audrey was in

8    at that time.

9    Q.    But you know for sure they weren't working

10   Sunday nights?

11   A.    Yes.

12   Q.    Let me ask you this.  Did anyone ever offer

13   during this accommodation process to transfer

14   Ms. Geter to first or second shift as an

15   accommodation for her disability?

16   A.    I don't recall specifically.

17   Q.    And what shift did Candace Smith work?

18   A.    Second shift.

19   Q.    And did you and Ms. Rose have any meetings

20   regarding Ms. Geter's final request for

21   accommodation when that was extended to June 5,

22   2019?

23   A.    Yes, I believe we did.

24   Q.    Do you know approximately how many times you

25   met about the accommodation issue?

Page 54

1    A.   It would be hard for me to say for sure at this
2    point.
3    Q.   Was it your decision alone not to accommodate
4    Ms. Geter?  Or was it you and Ms. Rose?  Or was it
5    Ms. Rose with your input?  I'm just asking how it
6    happened.
7    A.   I would say we came to an agreement together
8    along with Ashley's consultation.
9    Q.   Did you talk about what other ways you might
10   have been able to accommodate Ms. Geter besides
11   working three days a week until June 5?
12   A.   Yes.
13   Q.   What other options did you talk about?
14   A.   I believe we discussed changing the day of
15   week, if she was able to move back into a full-time
16   schedule.  I believe we also considered a five-day
17   schedule, both of those being full time but changing
18   the days of the week.
19   Q.   And when you say "changing the days of the
20   week," was one possibility to make sure that she
21   never had to work alone on third shift?
22   A.   I don't believe that was a consideration at the
23   time.  My understanding was that she could not work
24   Sunday nights because of her appointments on Monday.
25   Q.   And the other you said was possibility of

Travis Torrence                                      April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 55

1    moving her to five-day-a-week schedule?

2    A.    Yes.

3    Q.    And were either of these -- and I think that

4    was a yes, right?

5    A.    Yes.

6    Q.    -- and were either of those options presented

7    to Ms. Geter?  Maybe a better question is were

8    either of those options discussed with Ms. Geter by

9    you?

10   A.    I can't remember for sure.

11   Q.    At any point did you tell Ms. Geter that it was

12   okay for her to work from home because everyone did

13   it?

14   A.    Are you asking if those are my exact words?

15   Q.    Well, or something to that effect.

16   A.    It's possible.  When there has been a request

17   to work from home for any associate that has been on

18   my team or even in our office on a short-term basis

19   because something has, you know, popped up or

20   whether it's weather or a family issue at home,

21   we've accommodated that on a short-term basis.

22   Q.    I think you said Tiffany Kitchens did not

23   report to you, right?

24   A.    Correct.

25   Q.    Were you aware that Ms. Kitchens had been

Page 56

1    working, at the time Ms. Geter was terminated, had

2    been working a reduced schedule and been permitted

3    to work from home since August 2018?

4                    MR. MELLON:  Object to form of

5         question.  Assumes facts not in evidence.

6    BY MS. LEGARE

7    Q.   You can answer.

8    A.   I couldn't say for sure.

9    Q.   When you were the operation team lead for

10   second and third shift, what was your schedule?

11   A.   It varied based on the needs of the team and

12   the business.

13   Q.   How often sort of routinely would you work at

14   least part of third shift?

15   A.   Weekly.

16   Q.   And did you sometimes do that remotely?

17   A.   It's hard to say for sure if any of those were

18   during third shift.

19   Q.   But you sometimes worked from home, even in

20   2018, right?

21   A.   Yes.

22   Q.   And 2019?

23   A.   Yes.

24   Q.   And you said Sara Kopf reported to you, right?

25   A.   Yes.

Travis Torrence                                     April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 57

1    Q.   And she sometimes worked from home, right?

2                  MR. MILIANTI:   Object to the form of

3         the question.

4    BY MS. LEGARE

5    Q.   In 2018?

6    A.   I believe so.

7    Q.   Do you know one way or the other whether the

8    area planning managers in Green Bay are working from

9    the office or working remotely right now?

10   A.   I couldn't say for sure.

11   Q.   Do you know who would know the answer to that

12   question?

13   A.   I couldn't say for sure.

14   Q.   Do you recall one way or the other whether you

15   personally were out of the office for over 80 days

16   between May and December 2018?

17                  MR. MILIANTI:   Object to the form of

18        the question.

19                  THE WITNESS:   Can you ask this

20        differently.

21   BY MS. LEGARE

22   Q.   Yes.  If Ms. Geter says you were out of the

23   office somewhere between 85 and 87 days between May

24   and December of 2018, is she right about that?

25   A.   That sounds like an awfully high number.  I

Page 58

1    don't believe that's accurate.

2    Q.   But you said there is no paperwork that shows

3    when you worked remotely or when you worked in the

4    office, right?

5    A.   There is nothing that I document.

6    Q.   Is there anything that anyone documents when

7    they work remotely?

8                    MR. MILIANTI:  Object to the form of

9         the question.  Calls for speculation.

10   BY MS. LEGARE

11   Q.   That you know of?

12   A.   Not that I'm aware of.

13   Q.   So there is nothing that I could look at that

14   Schneider in Fairburn has showing, for example,

15   which days Ms. Kopf may have been working remotely,

16   for example?

17   A.   Not that I'm aware of.

18   Q.   If you will look at Exhibit 31.

19                         - - -

20                    (Whereupon, Exhibit 31 was marked for

21        identification.)

22                         - - -

23   BY MS. LEGARE

24   Q.   I can probably run through most of these pretty

25   quickly.

Page 59

1    A.   I have got it up.

2    Q.   And this looks like this is an email from

3    Ms. Jansen to you on December 17, 2018, right?

4    A.   Yes.

5    Q.   It says, "Hello, Travis.  You can call her and

6    let her know the lead team will be calling her.  And

7    you also want to let her know you can accommodate

8    her return to work for the three days.  And here are

9    the three days she would be working.  You will be in

10   touch with her once the return to work info has been

11   processed."

12        Right?

13   A.   Yes.

14   Q.   So you were communicating and Ms. Jansen told

15   you you could communicate with Ms. Geter about what

16   her schedule would be when she returned to work,

17   right?

18   A.   Correct.

19   Q.   And the only issue she had with working third

20   shift on Sundays was that she had doctors'

21   appointments on Monday morning; is that right?

22   A.   Right.

23   Q.   At any point did you ask her to move her

24   doctors' appointments to a different day?

25   A.   She understood that there was a need for her to

Page 60

1    work Sunday nights.  I don't believe that I asked

2    her to move her doctors' appointments.

3    Q.   Okay.  Tell me what you remember about the

4    conversation.

5    A.   I'm not sure how much more detail I can provide

6    from a conversation that long ago.

7    Q.   Okay.  If you look at Exhibit 32.

8                            - - -

9               (Whereupon, Exhibit 32 was marked for

10        identification.)

11                           - - -

12              THE WITNESS:  I have got it up.

13   BY MS. LEGARE

14   Q.   So it looks like this is an email again from

15   Ms. Jansen to you on January 21, 2019 and she cc'd

16   Mr. Horton because they had refused a request to

17   continue three days a week through 3/19/2019, right?

18   A.   Yes.

19   Q.   I have a couple questions about this.  One is

20   she said something about light duty three days a

21   week.  Do you have any idea what "light duty" means

22   in respect to this issue?

23              MR. MILIANTI:  Object to the form.

24   BY MS. LEGARE

25   Q.   Let me ask you this.  Was Ms. Geter working

Page 60

1    work Sunday nights.  I don't believe that I asked

2    her to move her doctors' appointments.

3    Q.   Okay.  Tell me what you remember about the

4    conversation.

5    A.   I'm not sure how much more detail I can provide

6    from a conversation that long ago.

7    Q.   Okay.  If you look at Exhibit 32.

8                        - - -

9              (Whereupon, Exhibit 32 was marked for

10        identification.)

11                       - - -

12              THE WITNESS:  I have got it up.

13   BY MS. LEGARE

14   Q.   So it looks like this is an email again from

15   Ms. Jansen to you on January 21, 2019 and she cc'd

16   Mr. Horton because they had refused a request to

17   continue three days a week through 3/19/2019, right?

18   A.   Yes.

19   Q.   I have a couple questions about this.  One is

20   she said something about light duty three days a

21   week.  Do you have any idea what "light duty" means

22   in respect to this issue?

23              MR. MILIANTI:  Object to the form.

24   BY MS. LEGARE

25   Q.   Let me ask you this.  Was Ms. Geter working

Page 61

1    light duty?  I mean, did she have a lifting

2    restriction or anything like that?

3    A.   No, not that I was aware of.

4    Q.   And do you know if the company has a light duty

5    policy?

6    A.   That's a question I would defer to the lead

7    team.

8    Q.   No problem.  And Mr. Horton was cc'd on this

9    email.  Was he involved at all -- he was your

10   supervisor at the time, right?

11   A.   Correct.

12   Q.   Was he involved at all in the decisions of

13   whether or not to accommodate Ms. Geter?

14   A.   I can't remember for sure.

15                MR. MILIANTI:  Cheryl, can we take a

16        break when it is convent for you?

17                MS. LEGARE:  Sure.  Let's go for it.

18        How long do you need?

19                MR. MELLON:  Why don't we take a

20        ten-minute if that's okay.

21                MS. LEGARE:  Yeah.  No problem.

22                        - - -

23                (Proceeding in recess from 12:17 p.m.

24        until 12:29 p.m.)

25                        - - -

Page 63

1    other whether Doug Horton was involved in any of the

2    conversations regarding Ms. Geter's accommodations;

3    is that fair to say?

4    A.    Correct.

5    Q.    As her supervisor, is it likely you would have

6    been involved in the discussions?

7                      MR. MILIANTI:  Object to the form.

8                      THE WITNESS:  I just can't say for

9         sure.

10   BY MS. LEGARE

11   Q.    Okay.  No problem.  I think we have already

12   covered this.  Question five was, "Who participated,

13   reviewed, approved or was otherwise involved in the

14   decision to deny the request for reasonable

15   accommodation?"

16        And I think the answer is you along with

17   Ms. Rose considered the request and in consultation

18   with Ashley Jansen made the decision to deny the

19   request; correct?

20   A.    Yes.

21   Q.    And that's also true with respect to the

22   termination of Ms. Geter's employment?

23   A.    Yes.

24   Q.    Have you, during your employment with Schneider

25   had any employees who reported to you other than

Page 64

1    Ms. Geter had any request for reasonable

2    accommodation granted or denied?

3                    MR. MILIANTI:  Object to the form of

4        the question.

5    BY MS. LEGARE

6    Q.    You can answer.

7    A.    Can you ask that again.

8    Q.    Sure.  And I'm only asking about employees who

9    reported directly to you.  During your employment

10   with Schneider when you were a supervisor, so after

11   you were promoted to team lead and any time

12   thereafter, has any employee who reported to you

13   other than Ms. Geter requested an accommodation for

14   disability?

15   A.    No.

16   Q.    Have any of the employees who reported to you,

17   the same time frame, once you were a supervisor,

18   taken FMLA leave?

19   A.    Yes.

20   Q.    How -- well, have any of the employees who

21   reported to you taken intermittent FMLA, meaning not

22   all at one time?

23   A.    I can't say for sure.

24   Q.    Other than Ms. Geter, have any of your

25   employees for any period of time worked a reduced

Page 65

```
 1    schedule?  And I'm talking about people you

 2    supervised.

 3    A.   No.

 4    Q.   Has any of the employees you supervised other

 5    than Ms. Geter -- I understand that you allow people

 6    to work remote from time to time, has anyone had to

 7    work remote one or more days for an extended period

 8    of time, not COVID related?

 9    A.   Can you ask that again.

10    Q.   Yes.  Have any of the employees who reported to

11    you -- and now I'm talking pre-pandemic time, had to

12    work from home for an extended period of time?  I

13    guess, let me ask it two ways.  Has anyone had to

14    work from home, anyone who reported to you, had to

15    work from home on a full-time basis for any period

16    of time?

17    A.   No.

18    Q.   Has anyone who worked for you had to work from

19    home at least once a week for any period of time?

20    A.   No.

21    Q.   And I don't think -- sitting here today, can

22    you tell me how often, for example, Ms. Kopf worked

23    from home in 2018?

24    A.   I couldn't say for sure.

25    Q.   Same for 2019?
```

Case 1:20-cv-01148-SCJ-JSA   Document 50-17   Filed 07/12/21   Page 55 of 58

Travis Torrence                                              April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 66

1    A.    Same.

2    Q.    In your conversations with Ms. Jansen about

3    Ms. Geter's request for accommodation, did she ever

4    discuss with you whether it would be an undue burden

5    on Schneider to allow Ms. Geter to work reduced

6    hours until June 5, 2019?

7                    MR. MILIANTI:  Object to form of

8         question.  Calls for legal conclusion.

9    BY MS. LEGARE

10   Q.    You can answer.

11   A.    I don't know that I understand the question.

12   Q.    And it may be that only Ms. Jansen can answer

13   this question.  But I mean, do you know whether any

14   analysis was done other than we don't know how much

15   longer this is going to go on?

16                   MR. MILIANTI:  I am going to object.

17                   Travis, go ahead and answer if you

18        can.

19                   THE WITNESS:  I mean, myself and Mary

20        Ann and along with Ashley carefully considered

21        the request.  I mean, it's something that I

22        thought about a lot during the end of Q4,

23        beginning of Q1 because of the burden it places

24        on myself, the rest of the team, the business

25        of her being out.  And not being enough

Travis Torrence                                                    April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 67

1       full-time positions.  I mean the --

2    BY MS. LEGARE

3    Q.   Well, let me -- you raised a couple questions

4    here.  When you were covering her shift as APM, was

5    that a part of your full-time duties or in addition

6    to your full-time duties?

7    A.   In addition to.

8    Q.   So were you being forced to work extra hours in

9    order to cover that shift?

10                   MR. MILIANTI:  Object to the form.

11                   You can answer.

12                   THE WITNESS:  I guess I really don't

13        understand.  Forced by who?

14    BY MS. LEGARE

15    Q.   Well, how many -- when you were an operations

16    team lead and nobody was on FMLA, how many hours a

17    week were you working, approximately?

18    A.   It's hard to say for sure and each week was

19    kind of different.

20    Q.   And while Ms. Geter was on continuous FMLA from

21    October to December, who covered her shift?

22    A.   The work was absorbed by the rest of the team

23    and myself.

24    Q.   Were you actually working any of her shifts

25    while she was on FMLA?

Travis Torrence                                                                April 6, 2021
Geter, Cierra v. Schneider National Carriers Inc.

Page 68

1    A.    Yes.  On Sundays.

2    Q.    And did Schneider at the time use contractors

3    or temporary employees to cover when other employees

4    were out?

5                    MR. MILIANTI:  Object to the form.

6                    THE WITNESS:  We have utilized

7         temporary associates in the past.

8    BY MS. LEGARE

9    Q.    And did you use any temporary associates during

10   the fall of 2018 when Ms. Geter was on FMLA leave?

11   A.    I can't remember for sure.

12   Q.    Do you know who might know the answer to that

13   question?

14   A.    I can't say for sure.

15   Q.    Would there be documentation of the use of

16   temporary employees?  Let me ask you this.  Do you

17   use an agency for temporary employees?

18   A.    Yes.

19   Q.    What is that agency?

20   A.    Kelly Services.

21   Q.    And I'm assuming you pay Kelly Services when

22   you use the employees, right, temporary employees?

23   Not a trick question.  I mean, the temporary

24   employees are paid, right?

25   A.    Yes.  I would not be the one that would arrange

Page 69

1    that.  So I'm not really sure how that's set up.

2    Q.   Who arranged that, Ms. Rose?

3    A.   No.  I don't believe it would be her either.

4    Q.   Who gives you permission to use temporary

5    associates?

6    A.   I believe that would have to come from our VP.

7    Q.   And who is that?

8    A.   At the time, it was Max Peach.

9    Q.   Is he in Green Bay?

10   A.   Yes.

11   Q.   So if you were down a number of employees -- or

12   actually, strike that.

13       If someone was going to be out for a long

14   extended period of time, could you request

15   permission to bring in a temp?

16   A.   We could, yes.

17   Q.   You just can't recall whether or not you did

18   when Ms. Geter was on leave in the fall of 2018?

19   A.   I can't remember for sure.

20   Q.   Do you know one way or the other whether you

21   had ever used temporary associates to fill in for

22   anyone in Fairburn on a part-time basis?

23   A.   Sorry.  Can you ask that differently.

24   Q.   Yeah.  Do you know if any of the temporary

25   associates that you have fill in for employees



**Exhibit
0004**

Job Description

# MANAGER, AREA PLANNING

| | |
|---|---|
| **TYPE OF ROLE:** | Exempt (Salaried) |
| **DEPARTMENT(s):** | Bulk, Dedicated, Intermodal, Van Truckload |
| **REPORTS TO:** | Various |

**JOB SUMMARY:**

The Area Planning Manager is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders.  As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include:  shift direction, priority of freight, load and stage, driver calendar requests, etc.  Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role.  Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention).  All decisions also need to be made in accordance with Schneiders #1 core value:   safety.
- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.
- Exhibit behavior in alignment with our core values at all times.

**SPECIALIZED KNOWLEDGE:**

- Bachelors degree or equivalent work experience in a related field required
- 1-2 years of customer service, dispatch and/or operations experience

**EDUCATION LEVEL:**                    Bachelor or equivalent work experience

**EXPERIENCE:**                         1-3 Years

**SKILLS/BEHAVIORS NECESSARY TO PERFORM JOB**

Abilities or qualities an associate must possess in order to perform the essential job duties - Listed by Core Competency

**COMMUNICATION**

Effective and efficient oral communication skills

Effective and efficient written communication skills

Ability to develop relationships through interpersonal skills

Effective listening skills

**DIVERSITY & INCLUSION/TEAM PLAYER**

Collaboration skills

Ability to work effectively in a team environment

**POSITIVE IMPACT**

Ability to positively impact others

Influencing skills, resulting in a positive outcome

Take initiative, a self-starter

Ability to work well in a fast paced, high pressure environment

**PROBLEM SOLVING & DECISION MAKING**

Problem solving skills

Decision making skills (make best value decisions)

Analytical skills

Strategic thinking skills

Ability to analyze various courses of action and make recommendations

Project Management skills

Sound judgement

**RESULTS ORIENTATION**

Ability to manage multiple priorities and prioritize workload

**FUNCTIONAL & TECHNICAL EXPERTISE**

Customer service skills

Ability to work independently with little supervision

**OTHER**

- Strong financial and analytical skills. Able to identify a root cause from a subset of data and establish a relevant action plan to correct root cause of issue.
- Ability to evaluate a situation and create innovative, balanced solutions
- Strong work ethic.

**Generated:** *2019-03-14 05:07:20.641000*

**Last Updated:** *2017-11-24 15:34:07*

## Shier, Molly

**From:** HR Leave Administration Team
**Sent:** Friday, October 26, 2018 9:12 AM
**To:** Torrence, Travis
**Subject:** Important Notice Family Medical Leave Approval

**EBS Number:** 296995

You are receiving this notice because your associate, **Cierra Geter**, has requested Family Medical Leave for their own serious health condition.

**We reviewed their eligibility for Family Medical Leave and have approved their leave from 10/9/2018 through 11/27/2018.**

**In total as of the end of this approval they have used 7 WEEKS / 1 DAY of FML.** If their need for leave extends beyond the above ending date, they will need to submit new or additional FML paperwork.

**Leader Responsibilities:**
- **Prior to making any employment decisions, you should contact your HRBP and our team to discuss next steps.**
- It is important that you still reach out to the associate for status updates and to ensure you maintain contact with them while on leave.
- It is important that you do **not** discuss medical related details but remind your associate of the importance of getting our team all requested information so we can determine if we can continue to accommodate their need for additional leave.
- **Our team is the only team that can update their status back to active and we will do so once we have received and reviewed a Schneider Return to Work Form completed by their physician clearing them to work.**

If you have any questions or concerns about FML, please contact the HR Leave Administration Team at 920-592-4571.

Thank you,

**HR Leave Administration Team - Molly**
Schneider - www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
Mail Stop: US.GRB.01.03.21

Schneider associates, visit the US Benefits Portal or the Canadian Benefits Page for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**Exhibit 30**

CONFIDENTIAL                                    SCHNEIDER 000422

**From:** Janssen, Ashley
**Sent:** Monday, December 17, 2018 1:33 PM
**To:** Torrence, Travis
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Hello Travis
You can call her and let her know the leave team will be calling her and you also wanted to let her know you can accommodate her return to work for the 3 days and here are the 3 days she would be working. You will be in touch with her once her RTW info has been processed.
Thanks
Ashley

---

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 1:31 PM
**To:** Janssen, Ashley <JanssenA@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Should I communicate with her what days that will be or will the HR Leave team do that when they notify her that we will accommodate the restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



---

**From:** Janssen, Ashley
**Sent:** Monday, December 17, 2018 2:00 PM
**To:** Torrence, Travis <TorrenceT@schneider.com>; HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Yes, because it does not specify below.

---

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 12:57 PM
**To:** HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good Morning,

**Exhibit 31**

1

CONFIDENTIAL                                    SCHNEIDER 000120

We're able to accommodate the restrictions outlined below.

Ashley, am I able to decide which three days Cierra works under these restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



**From:** HR Leave Administration Team
**Sent:** Monday, December 17, 2018 8:47 AM
**To:** Torrence, Travis <TorrenceT@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>; HR Leave Administration Team
<HRLeaveAdministrationTeam@schneider.com>
**Subject:** RTW with restrictions partial return - Cierra Geter

Good morning,

We received the below RTW form for Cierra Geter. She is able to return to work on 1/2/2019 working 3 days per week 10 hour days through 2/13/2019.

Are you able to accommodate these restrictions?

CONFIDENTIAL                                          SCHNEIDER 000121

Patient's Name (First) *Cierra* (Middle Initial) *C* (Last) *Geter*

| Section I | OR | Section II |
|---|---|---|

**Section I**

Patient is able to return to work **without** restrictions effective _2/14/19_ .

**Section II**

Patient is able to return to work **with** restrictions effective _1/2/19_ , outlined below:

*3 days/week Ten hours day*

1. In a **24 hour day**, patient may work an accumulative of:

N.A **Stand / Walk:**
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

N.A **Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours  ☐ 5-8 Hours  ☐ 9-12 Hours  ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
N.A ☐ 7 Hours or less  ☐ 8-10 Hours  ☐ 11-14 Hours

2. Patient is able to:

N.A

|  | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |
| Lift: | | | |
| Sedentary     10# max | | | ☐ |
| Light / Heavy    20# max | | | ☐ |
| Medium     50# max | | | ☐ |
| Heavy     100# max | | | ☐ |

**Comments:** She will be able to work three days per week Ten hours a day effective 1/2/19

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **REQUIRED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Restrictions in effect until:** _2/3/19_

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?

Is the patient experiencing any side effects which would interfere with their job or with

**HR Leave Administration Team - Anissa**
**Schneider** www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

CONFIDENTIAL                                                                 SCHNEIDER 000122

| | |
|---|---|
| **From:** | Janssen, Ashley |
| **Sent:** | Monday, January 21, 2019 10:32 AM |
| **To:** | Torrence, Travis |
| **Cc:** | Horton, Doug |
| **Subject:** | FW: RTW with restrictions partial return - Cierra Geter |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Thoughts on the below?

**From:** Gauthier, Anissa
**Sent:** Monday, January 21, 2019 7:04 AM
**To:** Janssen, Ashley <JanssenA@schneider.com>; Torrence, Travis <TorrenceT@schneider.com>; HR Leave Administration Team <HRLeaveAdministrationTeam@schneider.com>
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good morning ,

We received an updated return to work form that indicates a continuation of light duty 3 days per week through 3/19/2019.

Are you able to continue to accommodate this schedule?

Please advise.

Thanks,

**HR Leave Administration Team - Anissa**
**Schneider** www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distr bution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

**From:** Torrence, Travis
**Sent:** Monday, December 17, 2018 12:57 PM
**To:** HR Leave Administration Team
**Cc:** Janssen, Ashley
**Subject:** RE: RTW with restrictions partial return - Cierra Geter

Good Morning,

**Exhibit 32**

1

We're able to accommodate the restrictions outlined below.

Ashley, am I able to decide which three days Cierra works under these restrictions?

Thanks,

Travis Torrence
Operations Team Leader
Schneider National, Inc.
www.schneider.com



---

**From:** HR Leave Administration Team
**Sent:** Monday, December 17, 2018 8:47 AM
**To:** Torrence, Travis <TorrenceT@schneider.com>
**Cc:** Janssen, Ashley <JanssenA@schneider.com>; HR Leave Administration Team
<HRLeaveAdministrationTeam@schneider.com>
**Subject:** RTW with restrictions partial return - Cierra Geter

Good morning,

We received the below RTW form for Cierra Geter. She is able to return to work on 1/2/2019 working 3 days per week 10 hour days through 2/13/2019.

Are you able to accommodate these restrictions?

CONFIDENTIAL                                    SCHNEIDER 000066

Patient's Name (First)  _Cierra_      (Middle Initial)  _C_      (Last)  _Geter_

| Section I | OR | Section II |
|---|---|---|

**Section I**

Patient is able to return to work **without** restrictions effective _2/14/19_ .

**Section II**

Patient is able to return to work **with** restrictions effective _(12/19)_ , outlined below:

_3 days / week  Ten hours Day_

1. In a **24 hour day**, patient may work an accumulative of:

N.A **Stand / Walk:**
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

N.A **Sit:** (No more than 11 hrs without a break)
☐ 1-4 Hours   ☐ 5-8 Hours   ☐ 9-12 Hours   ☐ 13+ Hours

**Operation of Heavy Machinery:**
(No more than 11 hrs without a break)
N.A ☐ 7 Hours or less   ☐ 8-10 Hours   ☐ 11-14 Hours

2. Patient is able to:

|  | Frequently | Occasionally | Not at All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ |
| Twist | ☐ | ☐ | ☐ |
| Reach | ☐ | ☐ | ☐ |

N.A

| Lift: | | Not at All |
|---|---|---|
| Sedentary | 10# max | ☐ |
| Light / Heavy | 20# max | ☐ |
| Medium | 50# max | ☐ |
| Heavy | 100# max | ☐ |

**Comments:** _She will be able to work three days per week Ten hours a day effective (12/19)_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **REQUIRED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Restrictions in effect until: _2/13/19_

Is the patient taking any medications that could interfere with their ability to operate or work around heavy machinery?

Is the patient experiencing any side effects which would interfere with their job or with

**HR Leave Administration Team - Anissa**
**Schneider** www.schneider.com
**PH:** 920-592-4571 *or* 800-558-6701 x592-4571
**FAX:** 920-403-8903
**mail stop:** US.GRB.01.03.21

Schneider associates, visit the US & CN BENEFITS PORTAL for important benefit information.

The information contained in this email message may be privileged, confidential and protected from disclosure, and no waiver of any privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender and delete all copies.

3

**Exhibit 46**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-ODE-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT SCHNEIDER NATIONAL CARRIERS, INC.'S ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT

Defendant, SCHNEIDER NATIONAL CARRIERS, INC. ("Schneider" or "Defendant"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 33 answers Plaintiff Cierra Geter's (hereinafter "Geter" or "Plaintiff") First Interrogatories to Defendant as follows:

## PRELIMINARY STATEMENT

Schneider has not fully completed its investigation, discovery, analysis, legal research and preparation for trial. The responses contained herein are based only upon the information and documentation presently available and known to Schneider. It is possible that further investigation, discovery, analysis, legal research and/or preparation may result in the ascertainment of additional information or

documentation, or provide additional meaning to known factual conclusions and legal contentions, all of which may result in the modification of these responses. Accordingly, Schneider reserves the right to modify its responses herein based upon subsequently ascertained or developed information, documentation, facts and contentions. Subject to the objections asserted herein, Schneider's responses are made in a good faith effort to reasonably respond to Plaintiff's Interrogatories based upon presently available information and documentation. These responses and objections should not be construed to prejudice Schneider's right to conduct further investigation, discovery, analysis, legal research and/or preparation, or to limit Schneider's right to utilize any additional evidence that may be developed.

By making these responses, Schneider does not concede that the information sought is relevant. Each of these responses or objections is based on Schneider's understanding of each individual interrogatory herein. To the extent that Plaintiff asserts an interpretation of any interrogatory that is inconsistent with Schneider's understanding, Schneider reserves the right to supplement or amend its responses and objections as appropriate.

These responses and objections are made without intending to waive or waiving but, on the contrary, intending to preserve and preserving: 1) the right to raise in any subsequent proceeding or in the trial of this or any other action all

questions of relevancy, materiality, privilege, and evidentiary admissibility of any response herein; 2) the right to object on any grounds to the use or introduction into evidence of such responses in any subsequent proceeding or in the trial of this or any other action; 3) the right to object on any grounds at any time to interrogatories or other discovery involving said interrogatory responses or the subject matter thereof; and 4) the right to seek entry of an appropriate protective order.

## **INTERROGATORIES**

1.      Identify, including name, address, and employment position, each and every individual who has provided you with information which served, either in whole or in part, as the basis for your answer(s) to these Interrogatories, including identifying each and every custodian of documents requested herein or which are submitted pursuant to Rule 33(d) or are intended to be incorporated within or relied upon as your response, in whole or in part, to any Interrogatory.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving its objections, the responses to these Interrogatories were prepared by Schneider's counsel of record, McGuireWoods LLP, based on documents and information provided by Schneider.

2.     Identify each individual whom you believe has knowledge, information, or documents relevant to the subject matter of this litigation, or that supports, negates, or is otherwise relevant to any of the claims or defenses asserted in this action and, with respect to each, provide a detailed description of the knowledge, information, or documents you believe each such individual possesses. For everyone identified, provide contact information including home addresses, business, cellular and home telephone numbers, and email addresses.

**ANSWER**: Schneider objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and seeks information that is not proportional to the needs of the case.  Plaintiff asserts five claims in a Complaint that is 85 paragraphs in length and contains many broad allegations including the fact that Plaintiff is a former employee of Defendant and citizen of the United States. Innumerable people could have some general knowledge of these and other general allegations, but the identify of such persons would not be reasonably calculated to lead to the discovery of admissible evidence. Schneider further objects that this Interrogatory seeks information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving its objections, see Defendant's Initial Disclosures previously served upon Plaintiff.  Investigation continues.

4

3.     Identify all statements, affidavits, transcripts, videos, and tape or audio recordings you have made, obtained or secured from any person having, or claiming to have, knowledge of facts or circumstances relevant to the subject matter of this litigation. Your response should include, but not be limited, to:

a.     The identity of the individual from whom the statement, affidavit, transcript or recording was secured;

b.     The date the statement, affidavit, transcript or recording was made;

c.     The form of the statement, affidavit, transcript or recording (e.g., a written statement, audio recording, etc.); and

d.     A summary of the contents of the statement or recording.

**ANSWER**: Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory on the grounds that the terms "statements," "made," "obtained," "subject matter" and "secured" are vague and ambiguous and fail to specify with particularity the information requested.

Subject to and without waiving its objections, Schneider states that it does not possess any witness statements, affidavits, transcripts, videos, or audio or tape recordings in its possession, custody, or control.

4.    Identify each individual with whom any manager, supervisor, human resources employee, agent, or representative of Defendant has discussed the subject matter of this litigation (other than conversations with outside counsel). Separately, with respect to each such correspondence, conversation or other communication:

a.    State the identity of the individuals who participated in, or received, the correspondence, conversation or other communication;

b.    State the date of the correspondence, conversation or other communication;

c.    Provide a detailed description of the substance of the correspondence, conversation or other communication; and

d.    Identify all documents concerning or reflecting the correspondence, conversation or other communication.

**ANSWER**: Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory on the grounds that the phrase "subject matter of this litigation" and the terms "agent" and "representative" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome in that Plaintiff asks for what amounts to a narrative account of any communication that any individual had with any "manager, supervisor, human resources employee,

agent, or representative" regarding the "subject matter of this litigation," especially when Plaintiff has not specified what she means by "subject matter of this litigation"

Subject to and without waiving its objections, and pursuant to Fed. R. Civ. P. 33(d), Schneider will produce documents upon entry of a protective order reflecting communications between Plaintiff and Schneider associates regarding Plaintiff's request for accommodations.

5.    Identify each individual who made, participated in, reviewed, approved, or was otherwise involved in, the decision to deny Plaintiff's request for reasonable accommodation and, separately for each such individual, describe in full detail his or her role with respect to that decision.

**ANSWER**:  Schneider objects to this Interrogatory on the grounds that the phrase "or was otherwise involved in" is vague and ambiguous and fails to specify with particularity the information requested.   Schneider also objects to this Interrogatory on the grounds that it calls for a legal conclusion as to what constitutes a "reasonable accommodation."  Schneider further objects to this Interrogatory on the ground that it assumes Plaintiff requested a "reasonable accommodation," which assumption is incorrect.

Subject to and without waiving its objection, Schneider answers as follows: Travis Torrence and Marianne Biskey Rose considered Plaintiff's multiple requests

for a reduced work schedule and Plaintiff's request to work from home at least one day a week on an indefinite basis. In consultation with Ashley Janssen, Travis Torrence and Marianne Biskey Rose made the decision to deny Plaintiff's accommodation request. Mr. Torrence communicated the decision to Plaintiff. Answering further, and pursuant to Fed. R. Civ. P. 33(d), upon entry of a protective order, Schneider will produce documents from which the information requested in this Interrogatory can be derived or ascertained.

6.     Identify each individual who made, participated in, reviewed, approved, or was otherwise involved in, the decision to terminate Plaintiff and, separately for each such individual, describe in full detail his or her role with respect to that decision.

**ANSWER**:   Schneider objects to this Interrogatory because the phrase "otherwise involved in" is vague and ambiguous and fails to specify with particularity the information requested.

Subject to and without waiving its objection, Schneider answers as follows: Travis Torrence and Marianne Biskey Rose reviewed and considered Plaintiff's multiple requests for a reduced work schedule and Plaintiff's request to work from home at least one day a week on an indefinite basis.  In consultation with Ashley

Janssen, Travis Torrence and Marianne Biskey Rose made the decision to deny Plaintiff's accommodation request and terminate Plaintiff's employment.

7.     Identify all individuals, including managers, supervisors, employees, representatives, and/or agents who have spoken with Plaintiff or have knowledge of her medical/mental health conditions, requests for accommodations, and/or termination. For each individual identified, provide a detailed description of the content of the communication or knowledge, the date of the communication, and contact information (including home address, cellular and home telephone numbers, and email addresses).

**ANSWER**:  Schneider objects to this Interrogatory on the grounds that the terms "representatives," "agents," and "medical/mental health conditions" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome in that Plaintiff asks for what amounts to a narrative account of each and every communication that any individual had regarding Plaintiff's request for an accommodation and/or "medical condition." Schneider further objects to this Interrogatory on the grounds that it seeks information that not relevant to the subject matter of this action and/or seeks information that is not proportionate to the

needs of the case.   Schneider further objects to this Interrogatory because it requests information equally available to Plaintiff.

Subject to and without waiving its objections, please see Schneider's Rule 26(a) Disclosures for the identities of the individuals who possess knowledge regarding Plaintiff's request for an accommodation and Plaintiff's termination of employment.  See also Schneider's response to Interrogatory Nos. 5 and 6.

8.     If any documents relevant to any aspect of or issues in this lawsuit have been lost, misplaced, or destroyed, please identify fully each such document and describe how it was lost, misplaced, or destroyed.

**ANSWER**:  Schneider objects to this Interrogatory on the grounds that the phrase "relevant to any aspect of or issues in this lawsuit" is vague and ambiguous and fails to specify with particularity the information requested.

Subject to and without waiving its objection, Schneider answers as follows: Schneider is not aware of any document relevant to the claims or defenses in this lawsuit that has been lost, misplaced, or destroyed.

9.     Identify each current or former employee who was permitted to work remotely for any period of time during the covered period and, separately for each such individual, identify the individual's title and race.

10

**ANSWER**: Schneider objects to this Interrogatory on the grounds that the phrases "permitted" and "any period of time" are vague and ambiguous and fail to specify with particularity the information requested. Schneider also objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and harassing as it seeks information spanning over a five-year time period of time on a nationwide basis without regard to the employees' job location, supervisor, position or reason for working remotely. Schneider further objects to this Interrogatory on the grounds that it seeks information that is not relevant to the subject matter of this action and/or seeks information that is not proportionate to the needs of the case, particularly as it is not even limited to requests to work remotely that are similar to those alleged by Plaintiff in this action.  Schneider further objects to this Interrogatory on the grounds that it seeks information that infringes upon the privacy interests of individuals who are not parties to this matter, which outweighs the probative value, if any, of the requested information. The identities of other individuals and whether they were permitted to work remotely are unrelated to this case and have no bearing on Plaintiff's claims or Schneider's defenses.

Subject to and without waiving its objections, Schneider states that no Area Planning Manager supervised by Travis Torrence was permitted to work remotely for at least one day a week on an indefinite basis.

10.    Identify each current or former employee who has requested a reasonable accommodation for an ADA-covered disability during the covered period and, separately for each such individual, describe the individual's specific request and the resolution of the request for reasonable accommodation.

**ANSWER**: Schneider objects to this Interrogatory on the grounds that it calls for a legal conclusion as to what constitutes a "reasonable accommodation" and "an ADA-covered disability."   Schneider also objects to this Interrogatory on the grounds that the terms "requested" and "resolution" are vague and ambiguous and fails to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and harassing as it seeks information spanning over a five-year time period on a nationwide basis without regard to the employees' job location, supervisor, or position. Schneider further objects that the requested information is not relevant to the subject matter of this this action and has no probative value to Plaintiff's claims, so the burden of providing a complete answer outweighs the value, if any, of the information to the litigation.   Schneider further objects to this Interrogatory on the grounds that it seeks information that infringes upon the privacy interests of individuals who are not parties to this matter, which outweighs the probative value, if any, of the requested information. The identities of other individuals and whether

they "requested a reasonable accommodation for an ADA-covered disability" is unrelated to this case and has no bearing on Plaintiff's claims or Schneider's defenses.

Subject to and without waiving its objections, Schneider states that other than Plaintiff, no Area Planning Manager supervised by Travis Torrence requested a reduced work schedule and/or requested to work remotely for at least one day per week on an indefinite basis.

11.   Identify each person whom you expect to call as an expert witness at trial and for each state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory on the grounds that it is premature. Schneider has not yet made a decision as to whether it will call an expert witness to testify in any proceeding on this matter. Schneider reserves the right to supplement this answer and its expert disclosures consistent with the Federal Rules of Civil Procedure, the Local Rules of the Court, and any applicable Court order.

12.     Identify any correspondence, conversations or other communications (whether oral, written or by electronic data transfer) between Plaintiff and Defendant or between Defendant and any other person regarding the subject matter of this action, and provide a description of the contents of each such correspondence, conversation, or communication.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it seeks information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on the grounds that the phrases "other communication" and "regarding the subject matter of this action" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome in that it asks for a narrative account of any communication between Defendant and any individual regarding "the subject matter of this action," especially when Plaintiff has not specified what she means by "subject matter of this litigation." Schneider further objects that this Interrogatory is duplicative of Interrogatory No. 4.

Subject to and without waiving its objections, Schneider refers Plaintiff to its answer to Interrogatory No. 4.

13.    Please state the amount that you contend Plaintiff was earning at the time of her termination and the value of any benefits to which she was entitled, and the value of any raises to which she would have been entitled and any benefits changes had she not been terminated by Defendant through the date of trial. Regarding compensation that was paid periodically, please state the amount of such compensation for each quarter year of Plaintiff's employment, specifying the quarter and year in question. Regarding other items of compensation and/or benefits of employment, your response should include, without being limited to, the value of such compensation in dollars and whether Plaintiff remains entitled to such compensation and/or benefit(s) of employment. Please include in your answer an identification of all documents that are evidence of, or which contain any reference to or record of such earnings or value.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on the grounds that the phrases "value of any benefits," "value of any raises," and "other items of compensation" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that the requested information is not relevant to the

subject matter of this this action and has no probative value to Plaintiff's claims, so the burden of providing a complete answer outweighs the value, if any, of the information to the litigation. Schneider further objects to this Interrogatory because it requests information equally available to Plaintiff and/or information in the exclusive domain of Plaintiff.

Subject to and without waiving its objections, Schneider states as follows: Pursuant to Fed. R. Civ. P. 33(d), upon entry of a protective order, Schneider will produce copies of Plaintiff's earning statements and W-2s from which the information requested in this Interrogatory can be derived or ascertained. Answering further, Schneider states that it eliminated the Area Planning Manager position out of the field office locations, including the Fairburn, Georgia location, in April 2020.

14.     Identify all present or former employees who have, at any time since January 1, 2015:

   a.     complained of, reported, or otherwise communicated allegations of disability discrimination, failure to accommodate a disability, or race discrimination; or

   b.     complained of, reported, or otherwise communicated allegations of retaliation in response to any conduct protected by the ADA or Title VII.

**ANSWER**: Schneider objects to this Interrogatory on the grounds that the terms "complained of," "reported," "communicated" and "allegations" are vague

and ambiguous and fail to specify with particularity the information requested. Schneider also objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that it is not relevant to the parties' claims and defenses in this action and is not proportional to the needs of the case. Indeed, Plaintiff seeks information for over a five-year time period on a nationwide basis regarding employees who worked in locations other than the location where Plaintiff worked, in positions other than the position in which Plaintiff was employed, and under supervisors other than those who made any employment decisions regarding Plaintiff. This lawsuit is between Plaintiff and Schneider. Internal complaints or communications by other individuals unrelated to this case have no bearing on Plaintiff's claims or Schneider's defenses in this action. *See McCrimmon v. Georgia Community Support & Solutions, Inc.*, 2010 WL 11507675, at *5 (N.D. Ga. Jan. 19, 2010) (denying motion to compel plaintiff's request for production of documents related to lawsuits and complaints filed by other employees against defendant). Schneider further objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on the grounds that it is an invasion of privacy of those associates who have made complaints or communicated any allegations, and states that the privacy

interests of the individuals who brought any such complaints outweigh the probative value of the requested information.

Subject to and without waiving its objections, Schneider states that other than the instant action, it is not aware of any lawsuits, internal complaints, administrative charges, or claims of disability discrimination, failure to accommodate a disability, race discrimination, or retaliation for engaging in a protected activity under the ADA or Title VII filed at any time since January 1, 2015 against Travis Torrence or Marianne Biskey Rose, the decisionmakers in this case.

15.   Identify each administrative or judicial claim of disability discrimination, failure to accommodate a disability, race discrimination, or retaliation for engaging in protected activity under the ADA or Title VII filed against you at any time since January 1, 2015 and, separately for each such claim:

   a.   identify the charging party/ plaintiff;

   b.   identify the EEOC charge number, administrative agency number, or civil action number assigned to the claim, and state the tribunal, jurisdiction, and venue in which each such claim was filed (e.g., "U.S. EEOC, Atlanta District Office," or "United States District Court, Northern District of Georgia, Atlanta Division").

**ANSWER**:  Schneider objects to this Interrogatory on the grounds that the phrase "administrative or judicial claim" is vague and ambiguous and fails to specify with particularity the information requested.   Schneider also objects to this

Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that it is not relevant to the parties' claims and defenses in this action and is not proportional to the needs of the case. Indeed, Plaintiff seeks information for over a five-year time period on a nationwide basis regarding employees who worked in locations other than the location where Plaintiff worked, in positions other than the position in which Plaintiff was employed, and under supervisors other than those who made any employment decisions regarding Plaintiff. This lawsuit is between Plaintiff and Schneider. Lawsuits and administrative actions filed by other individuals unrelated to this case have no bearing on Plaintiff's claims or Schneider's defenses in this action. *See McCrimmon v. Georgia Community Support & Solutions, Inc.*, 2010 WL 11507675, at *5 (N.D. Ga. Jan. 19, 2010) (denying motion to compel plaintiff's request for production of documents related to lawsuits and complaints filed by other employees against defendant). Schneider further objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on the grounds that it is an invasion of privacy of those associates who have brought complaints or filed charges with state, federal or local discrimination agencies and lawsuits in state and federal court, and states that

the privacy interests of the individuals who brought any such complaints outweigh the probative value of the requested information.

Subject to and without waiving its objections, Schneider refers Plaintiff to its answer to Interrogatory No. 14.

16.   If you maintain that Plaintiff did not suffer from an ADA-covered disability or did not otherwise qualify for an accommodation, please set forth all reasons that support your contention to that effect.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on the grounds that the terms "suffer" and "qualify" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it calls for a legal conclusion as to what constitutes "an ADA-covered disability." Schneider further objects to this Interrogatory because it is a premature contention interrogatory. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Subject to and without waiving its objections, Schneider refers Plaintiff to its Answer and Affirmative and Other Defenses to Plaintiff's Complaint. Answering further, Schneider states that Plaintiff's request to work remotely at least one day a week on an indefinite basis, and Plaintiff's continuing requests to work a reduced schedule, was unreasonable. Schneider could not eliminate essential job functions of Plaintiff's position (working in the office and working full time). Schneider reserves the right to timely supplement this response as discovery progresses.

17.   To the extent you contend Plaintiff did not request a "reasonable accommodation," please identify and describe what rendered her request unreasonable.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory on the grounds that the term "render" is vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory on the grounds that it calls for a legal conclusion as to what constitutes a "reasonable accommodation." Schneider further objects to this Interrogatory because it is a premature contention interrogatory. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention

that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Subject to and without waiving its objections, Schneider states that it carefully considered Plaintiff's request to work remotely at least one day a week on an indefinite basis, and Plaintiff's continuing requests to work a reduced schedule. Schneider determined that Plaintiff's requests were unreasonable as Schneider could not eliminate essential job functions of Plaintiff's position (working in the office and working full time). Answering further, Schneider refers Plaintiff to its Answer and Affirmative and Other Defenses to Plaintiff's Complaint. Schneider reserves the right to timely supplement this response as discovery progresses.

18.    To the extent you contend Plaintiff's request to work remotely was an undue hardship for Defendant, please identify all efforts made by you to conduct an undue hardship analysis, on what dates the analysis was conducted, and what documents and communications support that you performed an undue hardship analysis.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider also objects to this Interrogatory on

the grounds that it calls for a legal conclusion as to what constitutes an "undue hardship." Schneider further objects to this Interrogatory on the grounds that the terms "conduct" and "undue hardship analysis" are vague and ambiguous and fail to specify with particularity the information requested.

Subject to and without waiving its objections, Schneider states that it denied Plaintiff's request to work remotely at least one day a week on an indefinite basis because it determined that it could not permanently eliminate one of Plaintiff's essential job functions (working in the office).

19.    State in full detail the factual basis upon which you rely for all your defenses and affirmative defenses.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory because it is a premature contention interrogatory. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time."). Schneider further objects to this

Interrogatory to the extent it calls for a lengthy narrative response more appropriate for a deposition.

Subject to and without waiving its defenses, and pursuant to Fed. R. Civ. P. 33(d), see documents produced with Schneider's Objections and Responses to Plaintiff's First Requests for Production of Documents, Schneider's Answer and Affirmative and Other Defenses to Plaintiff's Complaint as well as Schneider's Initial Disclosures, which were previously or contemporaneously served upon Plaintiff. Schneider reserves the right to timely supplement this response as discovery progresses.

20.    Identify the number employees employed by Defendant in 2018 and 2019.

**ANSWER**:  Schneider objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that it is not relevant to the parties' claims and defenses in this action and is not proportional to the needs of the case. Indeed, Plaintiff seeks information on a nationwide basis regarding employees who worked in locations other than the location where Plaintiff worked, in positions other than the position in which Plaintiff was employed, and under supervisors other than those who made any employment decisions regarding Plaintiff.

Subject to and without waiving its objections, Schneider answers as follows: During the time period of January 1, 2018 – December 31, 2019, Travis Torrence supervised approximately fourteen Area Planning Managers at its Georgia operating center.

21.     To the extent you contend Plaintiff failed to mitigate her damages, please identify and describe each and every additional effort you contend Plaintiff was obligated to expend in order to use reasonable efforts to locate comparable employment or otherwise mitigate her damages and what substantially comparable employment was available to Plaintiff that she failed to seek out. Please include in your answer, the date you believe Plaintiff would have found comparable employment had she used reasonable efforts to do so and the additional amount by which such efforts would have further mitigated her damages.

**ANSWER**:  Schneider objects to this Interrogatory to the extent it requests information that is shielded from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Schneider further objects to this Interrogatory on the grounds that the terms "additional effort" and "seek out" are vague and ambiguous and fail to specify with particularity the information requested. Schneider further objects to this Interrogatory because it requests information equally available to Plaintiff and/or information in the exclusive domain of Plaintiff. Schneider further

objects to this Interrogatory because it assumes that Plaintiff undertook some effort to locate comparable employment or otherwise mitigate damages, which assumption may be incorrect. Schneider further objects to this Interrogatory because it is a premature contention interrogatory. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Subject to and without waiving its defenses, Schneider refers Plaintiff to its Answer and Affirmative and Other Defenses to Plaintiff's Complaint. Schneider reserves the right to timely supplement this response as discovery progresses.

Dated:  September 18, 2020.

*/s/ M. Laughlin Allen*
M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
Telephone:   (404) 443-5738
Facsimile:    (404) 443-5773
mlallen@mcguirewoods.com
*Counsel for the Defendant*
*Schneider National Carriers,*
*Inc.*

26

## VERIFICATION

I, Travis Torrence, declare as follows:

I am an authorized representative of Schneider National Carriers, Inc. ("Schneider") and have read the foregoing **DEFENDANT SCHNEIDER NATIONAL CARRIERS, INC.'S ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT** (the "Answers").  The information set forth in said Answers was gathered and collated by persons regularly in the employ of Schneider and from files kept by Schneider in the regular and ordinary course of its business and with the assistance of counsel. Said persons have directly or indirectly reported to me that said Answers truly and correctly reflect the contents of said records with respect to the subject matter, to the best of their knowledge, wherefore, I state upon information and belief that said Answers are true and correct to the best of my knowledge according to and based upon the records and files of Schneider and information reported to me as set forth above.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on ___September 3rd___, 2020.

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 18, 2020, a copy of *Defendant Schneider National Carriers, Inc.'s Responses to Plaintiff's First Interrogatories to Defendant* was served via e-mail upon the following individuals:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

*/s/ M. Laughlin Allen*
M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E.
Suite 2100, Promenade
Atlanta, Georgia 30309-3534
Telephone:   (404) 443-5738
Facsimile:    (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*
*Schneider National Carriers,*
*Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Nothing Plaintiff raises in her Response brief entitles her to a trial on her claims. After Plaintiff exhausted her twelve weeks of continuous FMLA leave, Schneider accommodated Plaintiff for an additional four-and-a-half months by permitting her to work a part-time schedule. After Plaintiff sought to extend her part-time schedule for another two months, and requested to permanently work from home two days per week and any time she worked alone, Schneider denied her requests because full-time work and working in the office were essential functions of her position. Schneider attempted to engage in the interactive process with Plaintiff to explore other potential accommodations, but she did not timely provide requested medical documentation thereby causing a breakdown in the process.

Plaintiff attempts to manufacture disputed facts regarding the APM position by substituting her own judgment for that of Schneider's, misrepresenting testimony, proffering inadmissible evidence, and improperly disputing uncontested facts. But none of Plaintiff's arguments create a genuine issue of material fact regarding the essential functions of the APM position.  Since it is undisputed that Plaintiff could not perform two *essential* job duties, Plaintiff is not a qualified individual with a disability and her failure to accommodate claim fails as a matter of law.

Plaintiff's retaliation claim also fails as she completely ignores binding precedent holding that a failure to accommodate claim repackaged as an ADA

retaliation claim - which is precisely what Plaintiff did here - cannot stand as a matter of law. In any event, Plaintiff does not any advance any pretext arguments to dispute Schneider's legitimate, non-retaliatory reason for terminating Plaintiff.

Finally, Plaintiff's disability and race discrimination claims fail because she cannot point to any similarly situated individual who was permitted to work a part-time schedule for six months and/or permanently work from home at least two days per week. Additionally, Plaintiff has not advanced any pretext arguments to dispute Schneider's legitimate, non-discriminatory reasons for terminating her employment.

## I.      Plaintiff's Failure to Accommodate Claim Should be Dismissed.

### A. It is Undisputed that Plaintiff Was Not A Qualified Individual Because She Could Not Perform the Essential Function of Working Full-Time.

Plaintiff has not identified any material issue of fact as to whether full-time work is an essential function of the APM position. As Plaintiff acknowledges, Schneider's "judgment as to which functions are essential is entitled to substantial weight." *See Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 874 (11th Cir. 2016). It is undisputed that the Fairburn location operates 24 hours a day, 7 days a week and that Schneider needed the APM position (the job Plaintiff held) to be staffed full-time to ensure that it had the resources to sufficiently support its drivers and dispatch loads at all hours of the day. (Dkt. 46-5, 40:2-11; Dkt. 46-3, ¶ 6).

In addition to Schneider's judgment, courts also look at the work experience

of past incumbents in the job and the work experience of incumbents in similar jobs to determine which functions are essential. *See Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000). Here, other APMs testified that they never worked a part-time schedule and they could not identify any APMs who worked a part-time schedule. (Dkt. 47-4, 18:12-16, 21:15-17; Dkt. 47-5, 28:5-25; Dkt. 50-1, ¶¶ 27, 87). It is also undisputed that during Plaintiff's five years of employment, Schneider did not employ any part-time APMs in Fairburn and Torrence did not have any direct reports that worked part-time. (Dkt. 46-2, ¶¶ 14, 15).

Plaintiff's argument that full-time work is not essential because the phrase "full-time position" is not explicitly referenced in the APM job description is disingenuous. The job description expressly states that it is an "Exempt (Salaried)" position, which indicates the position is full time. (Dkt. 46-4, Ex. 4).[1] In any event, Plaintiff admitted that she understood she was interviewing for a full-time position, received an offer letter indicating the APM position was full-time, and cannot point to any APM during her five years of employment (other than herself) who worked a part-time schedule.  (Dkt. 46-4, Ex. 2; Dkt. 50-1, ¶¶ 3, 13, 15)

Plaintiff also argues that full-time work is not essential because Schneider has

---

[1] Even if an essential function is not listed in a job description, it is not dispositive. *See Davis,* 205 F.3d at 1306 (finding overtime to be an essential job function despite it not being in the job description).

a Flexible Work Arrangement (FWA) policy. (Dkt. 50, p. 7-8). This argument is non-sensical. The fact that Schneider has a company-wide FWA policy is not at all relevant to whether full-time work is an essential function of the APM position. Indeed, the policy expressly states that "[e]ach [flexible] arrangement will be evaluated on its own merits taking into account the needs of the business and associate on a case-by-case basis." Moreover, there is no evidence that Schneider approved any APM's request to work a part-time schedule pursuant to the policy. The mere fact that the policy exists and that any Schneider employee, in any position, is entitled to *apply for* a FWA in no way suggests that full-time work is not an essential function of the APM position.

The undisputed evidence establishes that full-time work was an essential function of Plaintiff's job. Because Plaintiff could not work full-time, she was not a qualified individual with a disability. *See Jerome v. Barcelo Crestline, Inc.*, 2009 WL 10657334, at \*4 (N.D. Ga. June 17, 2009) (finding plaintiff was not qualified under the ADA when he was unable to return to his position full-time).

## B. Plaintiff's Request to Work Part-Time Was Unreasonable.

Plaintiff's request to work a part-time schedule for more than six months was unreasonable. As explained above, full-time work was an essential function of the APM position and Schneider was not obligated to eliminate an essential function or

create a part-time APM position. *See Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir. 1998) (holding that defendant was not required to *create* a part-time position).[2]

Plaintiff argues that part-time work was reasonable because Torrence only "sporadically" covered Plaintiff's Sunday overnight shift, and that APMs Williams and Seymour "primarily" covered Plaintiff's Sunday shift (Dkt. 50, p. 12). Plaintiff's argument misses the mark. First, Plaintiff lacks personal knowledge of who was covering her Sunday shift as she was not present. Accordingly, her testimony is inadmissible. *See Tishcon Corp. v. Soundview Comm'n, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge."). Williams similarly lacks personal knowledge of whether Torrence covered Plaintiff's Sunday overnight because she claims that she "regularly" worked remotely "throughout the later part of [her] pregnancy" and went out on maternity leave on February 26, 2019 – the very time period that Torrence covered Plaintiff's shift. (Dkt. 50-4, ¶ 10). Since Williams

---

[2] Moreover, Plaintiff's three requests to extend her part-time schedule amounted to a request for a permanent part-time schedule. *Campbell v. KBRwyle Tech. Sols., LLC*, 2019 WL 1353965, at *8 (N.D. Ala. Mar. 26, 2019) (finding accommodation requests unreasonable where it was "clear that these restrictions were not temporary" when employee exhausted her FMLA leave, was provided a leave extension for four months, granted a request not to work overtime for one month, and sought to not work overtime for an additional two months).

"regularly" worked remotely and was out on pregnancy leave for more than six of the weeks that Torrence covered Plaintiff's shift (from February 26, 2019 – April 12, 2019), she too lacks personal knowledge of Torrence's work schedule and her statements are inadmissible. *See Tishcon,* 2005 WL 6038743 at *5.

In any event, it is immaterial who covered Plaintiff's Sunday overnight shift. The fact that any employee – whether it was Torrence, Williams, or other APMs – had to cover Plaintiff's shift for more than six months establishes that Plaintiff's part-time accommodation request was unreasonable. Indeed, Schneider is not required to reallocate Plaintiff's job duties to other employees or hire additional employees. *Spears v. Creel,* 607 F. App'x 943, 948-49 (11th Cir. 2015) ("[T]he ADA does not require an employer to reallocate job duties in order to change the essential functions of a job."); *Medearis v. CVS Pharmacy,* 92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job.").

Plaintiff also argues that part-time work is reasonable because Torrence allegedly worked a part-time schedule in 2018. (Dkt. 50, p. 8). Plaintiff's argument is baseless as she has not proffered any admissible evidence to dispute Torrence's testimony that he worked an average of 55-60 hours a week during the time period

that he covered for Plaintiff. (Dkt. 50-1, ¶ 50).[3] While Plaintiff and Williams contend that "Torrence took at least 82 days off in 2018" (Dkt. 50-3, ¶ 10; Dkt. 50-4, ¶ 6), both lack personal knowledge of Torrence's work schedule. Plaintiff and Williams worked the third shift; however, they admit that Torrence regularly covered the second shift. (Dkt. 50-3, ¶ 9; Dkt. 50-4, ¶ 5). As such, they lack any personal knowledge regarding the time Torrence spent working on the second shift. Additionally, Plaintiff was out on medical leave for the last three months of 2018 (Dkt. 50-1, ¶¶ 33, 48) and, therefore, could not have any personal knowledge of Torrence's schedule during that time.

Plaintiff also argues that Torrence worked a part-time schedule in 2018 based on her and Williams' review of a "Fairburn calendar." (Dkt. 50-3, ¶ 10; Dkt. 50-4, ¶ 6). Neither, however, attached the alleged "Fairburn calendar" to their declaration and it is not otherwise contained in the record. Additionally, neither provided any details about this "Fairburn calendar" including who created it or how it was created. In short, the "Fairburn calendar" cannot be authenticated by Plaintiff or Williams and cannot be relied on to establish personal knowledge. *See McGowan v. AME Financial Corp.,* 2009 WL 10666307, at *15 (N.D. Ga. Dec. 18, 2009) (finding

---

[3] The testimony upon which Plaintiff relies is misleading as Torrence testified he "[didn't] believe [it was] accurate" that he was "out of the office somewhere between 85 and 87 days between May and December of 2018[.]" (Dkt. 47-2, 57:22-58:12).

paragraphs of affidavit relying on document not attached to the affidavit to constitute hearsay). As such, these statements cannot be considered on summary judgment.

### C. Plaintiff Could Not Perform the Essential Function of Working in the Office and Her Request for Remote Work Was Unreasonable.

Plaintiff's failure to accommodate claim also fails for the separate and independent reason that she needed to *permanently* work from home. In her Response, Plaintiff completely misrepresents the remote work accommodation she was seeking – claiming she only requested to work from home when she was scheduled to work alone. (Dkt. 50, p. 14). It is undisputed, however, that *in addition to* requesting remote work when she was scheduled to work alone, Plaintiff needed to "work[] from home 2 days/week (10 hour days)." (Dkt. 50-1, ¶ 61). Thus, Plaintiff requested an accommodation to permanently work two days from home and potentially a third day if she was scheduled to work alone. Plaintiff utterly fails to address her request to work from home two days per week. Because working in the office was an essential function of the APM position, and it was not reasonable for Plaintiff to permanently work from home, her accommodation claim fails.

### 1. Plaintiff Was Not a Qualified Individual Because She Could Not Perform the Essential Function of Working in the Office.

It is undisputed that working in the office was an essential function of Plaintiff's third-shift APM position.  As Torrence explained, Schneider believed that

several of Plaintiff's essential job duties needed to be performed in the office –
especially when Plaintiff was the only APM scheduled for a shift. (Dkt. 46-3, ¶¶ 9-
11).  Indeed, Plaintiff herself admitted that there were certain tasks she could not
perform from home and she needed to be in the office to interact with drivers. (Dkt.
46-4, 60:6-62:4; 63:7-11).[4] Because Plaintiff needed to permanently work from
home, she could not perform the essential functions of the APM position. *See
Carlson v. Liberty Mut. Ins. Co.,* 237 F. App'x 446, 448-449 (11th Cir. 2007).

> ## 2. *Plaintiff's Arguments that Working in the Office Was Not Essential and That Remote Work Was Reasonable are Baseless.*

Plaintiff claims that the entire staff was permitted to work from home so
working in the office was not an essential function and it was reasonable for Plaintiff
to work remotely. (Dkt. 50, p. 8). Plaintiff misstates the record testimony. While
APMs were permitted to work from home on one-off occasions (e.g., due to a short
illness or child care issues), it is undisputed that APMs did not regularly work
remotely, and certainly not on a permanent or regular basis, e.g. two days per week,
or anytime an APM was scheduled to work alone.  (Dkt. 46-5, 32:8-20; Dkt. 46-6,
55:16-21; Dkt. 47-1, 208:18-209:25).

---

[4] Incredibly, Plaintiff disputes that certain tasks required her physical presence in the office. However, during her deposition, when asked: "you understood that for certain tasks you needed to be in the office to do what you had to do to get things done," Plaintiff responded "Correct". (Dkt. 46-4 63:7-11; Dkt. 50-1, ¶ 16).

Plaintiff also argues that it was not essential to work in the office and that working from home was reasonable because Kitchens (an APM on the first shift) was permitted to work remotely. Kitchens, however, worked remotely for four months to care for her mother. Plaintiff, on the other hand, requested a *permanent* accommodation of working from home. (Dkt. 46-4, Ex. 19).

Plaintiff also argues that the transfer of the APM position to Green Bay a year after her termination establishes that working in the office was not an essential function of the third-shift APM position and remote work was reasonable. Plaintiff, however, ignores that Schneider reallocated certain essential functions of the APM position to the Service Operation Support ("SOS") position based in Fairburn. For example, Schneider reallocated the essential job function of interacting face-to-face with drivers from the APM position to the SOS position. (Dkt. 47-6, 26:6-18). Consequently, Plaintiff's assertion that Schneider transferred the essential functions of the APM position to Green Bay is misleading and not supported by the record.[5]

Plaintiff also argues that remote work was reasonable because Schneider permitted employees to work remotely during the COVID-19 pandemic.  (Dkt. 50, p. 9). Plaintiff's argument is baseless. To protect the health and safety of its

---

[5] Plaintiff also points to the FWA to dispute that working in the office was an essential function. As discussed *supra*, the existence of the FWA does not mean that working in the office was not an essential function of the APM position.

employees, Schneider permitted much of its workforce in Fairburn to temporarily work from home. As Plaintiff acknowledges, Schneider has since returned Fairburn employees to the office. (Dkt. 50-2, ¶ 83). Moreover, even the EEOC has stated that "[t]he fact that an employer temporarily excused performance of one or more essential functions when it closed the workplace and enabled employees to telework…does not mean that the employer permanently changed a job's essential functions [or] that telework is always a feasible accommodation…"[6]

Because Plaintiff's request to permanently work from home two days per week and anytime she worked alone was unreasonable, her claim fails.[7]

### D. Plaintiff Caused the Breakdown of the Interactive Process.

It is undisputed that Plaintiff failed to timely engage in the interactive process. (Dkt. 50-1, ¶ 69). Plaintiff admits that Schneider sent Plaintiff and Dr. Wanzo a letter on April 2, 2019 requesting additional information so that Schneider could assess whether it could provide alternative accommodations to Plaintiff. (Dkt. 50-1, ¶ 62). Schneider requested the information by April 8, 2019, and it is undisputed that

---

[6] EEOC Guidance, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, Technical Assistance Questions and Answers (Updated June 28, 2021) (D.15).

[7] Plaintiff's failure to accommodate claim should also be dismissed because it is undisputed that Plaintiff could not perform the essential function of working in a fast-paced, high pressure environment.  (Dkt. 50-1, ¶ 71; *see also* Dkt. 46-1, p. 13-14).

Plaintiff did not provide the information until two weeks after her termination. (Dkt. 50-1, ¶¶ 69, 76). In her Response, Plaintiff attempts to shift the burden to Schneider, claiming that if Schneider had asked Plaintiff to follow up with Dr. Wanzo, Plaintiff would have done so. But the burden to provide medical documentation supporting her need for an accommodation rests solely with Plaintiff – not Schneider. *See Umbarger v. Ga. Dep't of Revenue,* 2007 WL 9700751, at *20-21 (N.D. Ga. Mar. 30, 2007). Because Plaintiff did not timely provide the documentation, she caused a breakdown in the interactive process and her failure to accommodate claim should be dismissed. *See Brown v. McHugh,* 2011 WL 13168836, at *29 (N.D. Ga. Aug. 31, 2011) (granting summary judgment when employee failed to engage in the interactive process where the record contained no evidence that plaintiff provided additional medical documentation to support her accommodation request).[8]

## II.   <u>Plaintiff's ADA Discriminatory Discharge Claim Should Be Dismissed.</u>

Plaintiff cannot establish even a *prima facie* case of disability discrimination.

---

[8] Plaintiff incorrectly states that Schneider had an obligation to conduct an undue burden analysis. (Dkt. 50, p. 16). An employer is only required to conduct such an analysis if an employee identifies a "reasonable accommodation." Since Plaintiff has not done so, Schneider was not required to conduct any such analysis. *Scott v. Postmaster Gen. U.S. Postal Serv.*, 818 F. App'x. 914, 917 (11th Cir. 2020) ("[Defendant] was not required to affirmatively assert undue hardship before [plaintiff] proved that there was a reasonable accommodation that [defendant] could give her.").

As detailed *supra*, Plaintiff was not a qualified individual. Moreover, Plaintiff has not set forth any evidence establishing that Schneider unlawfully discriminated against her because of her disability. She does not identify any similarly-situated employee without a disability who was treated more favorably, or any other evidence to support her claim. Plaintiff merely claims that "Schneider terminated [her] because of her disability." (Dkt. 50, p. 19). This conclusory assertion cannot establish causation. *Lockaby v. United Testing Grp., Inc.*, 986 F.Supp. 1400, 1404 (N.D. Ga. 1997) ("employee's…conclusory statements are insufficient to show intent to discriminate[.]"). Plaintiff has failed to meet her burden.

Plaintiff argues that "Schneider makes no effort to articulate a legitimate reason" for terminating Plaintiff's employment. (Dkt. 50, p. 19). Schneider's brief, however, contains an entire section detailing its legitimate reason for terminating Plaintiff, i.e., that Plaintiff could not perform the essential functions of her job. (*See* Dkt. 46-1, p. 24-25). Plaintiff has not contested Schneider's arguments or asserted any facts establishing pretext in her Response. As a result, her discrimination claim must fail. *Chambers v. Florida Dept. of Transp.*, 620 F. App'x. 872, 879 (11th Cir. 2015) (affirming summary judgment finding no evidence sufficient to create a genuine issue of fact on pretext).

### III.   <u>Plaintiff's Retaliation Claim Should be Dismissed</u>.

In both Plaintiff's retaliation claim and failure to accommodate claim, Plaintiff alleges that Schneider refused to approve her request for an accommodation and instead terminated her employment. Courts in the Eleventh Circuit have routinely dismissed ADA retaliation claims when it constitutes a "repackaging or duplication" of a reasonable accommodation claim. *Brown v. Delta Air Lines,* 2021 WL 2479091, at *18 (N.D. Ga. March 9, 2021) (finding plaintiff's retaliation claim failed because it is a "repackaging or duplication" of her reasonable accommodation claim"). In her Response, Plaintiff did not confront the cases cited by Schneider. Rather, Plaintiff summarily states that Schneider's "assertion is without merit" without citation to any authority. Plaintiff's retaliation claim should be dismissed.

Even assuming that Plaintiff could bring a retaliation claim, Schneider has articulated a legitimate, non-retaliatory reason for terminating Plaintiff – her inability to perform the essential functions of her job.[9] As a result, the burden shifts back to Plaintiff to prove that Schneider's proffered explanation was a pretext for retaliation. Plaintiff, again, fails to advance any pretext argument – nor can she. The fact that Schneider repeatedly granted Plaintiff extensions of her requested

---

[9] Plaintiff again incorrectly states that Schneider has not articulated a legitimate, non-retaliatory reason for its decision, even though Schneider devoted a section of its opening brief to this argument. (*See* Dkt. 46-1, p. 24-25).

accommodations belies any argument that Schneider terminated Plaintiff's employment in retaliation for requesting an accommodation. Since Plaintiff has not put forth any evidence to establish pretext, her retaliation claim must be dismissed.

## IV.   **Plaintiff's Race Discrimination Claims Should be Dismissed.**

Plaintiff cannot establish a *prima facie* case of race discrimination because she has failed to identify any similarly situated employee who was treated more favorably, i.e., permitted to work a part-time schedule for six months and permanently work from home two-days per week. While Plaintiff argues that Kitchens was similarly situated to Plaintiff, Kitchens is not a proper comparator. It is undisputed that Kitchens worked a different shift, reported to a different supervisor, never worked part-time, and never permanently worked from home two days per week. (*See* Dkt. 46-1, p. 19-22). As a result, Plaintiff's race claims fail.

Even if Plaintiff could establish a *prima facie* case, Plaintiff has not established pretext. Plaintiff merely advances her belief that she could perform the essential functions of the APM position, but this assertion is not sufficient to establish pretext. "[T]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." *Ostrow v. GlobeCast America Inc.*, 489 F. App'x. 433, 436 (11th Cir. Sept. 17, 2012). In short, Plaintiff has not advanced any evidence demonstrating that her race factored into Schneider's termination decision.

15

## **Conclusion**

For these reasons and the reasons set forth in Defendant's Memorandum in Support of its Motion for Summary Judgment, the Court should grant Defendant's Motion for Summary Judgment and dismiss all of Plaintiff's claims with prejudice.

Date: August 2, 2021

Respectfully submitted,

By:___/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

16

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on August 2, 2021, I electronically filed the foregoing *Reply in Support of Defendant's Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,

By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade

17

Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-ODE-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SCHNEIDER NATIONAL CARRIERS, INC.'S RESPONSE
TO PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1B(3), Defendant Schneider National Carriers, Inc. ("Schneider") submits its response to Plaintiff's Statement of Disputed Material Facts as to Which There Exist Genuine Issues to Be Tried ("SDMF"). Schneider incorporates by reference its Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("SUMF"). (Dkt. 46-2). In response to the Paragraphs of Plaintiff's SDMF, Schneider states as follows:

**I.   Ms. Geter's Employment with Schneider**

1.   Ms. Geter began employment with Schneider National Carriers, Inc. in July 2014 as a Dispatch Analyst. (Deposition of Cierra Geter ("Geter Dep.") 38:3-40:4, 41:8-42:7; Geter Dep. Ex. 2.)

**RESPONSE:   Schneider does not dispute the statements in Paragraph 1**

**for purposes of summary judgment.**

2.     The Dispatch Analyst position title later changed to Area Planning Manager ("APM"), but the job duties remained the same. (Geter Dep. 42:8-16.)

**RESPONSE:   Schneider does not dispute the statements in Paragraph 2**

**for purposes of summary judgment.**

3.     During the relevant time frame, Ms. Geter reported to Team Lead Travis Torrence, who reported to Operations Manager Doug Horton, who reported to Director of Operations Marianne Biskey-Rose. (Deposition of Travis Torrence ("Torrence Dep.") Torrence Dep. 11:19-12:14, 13:2-10; Deposition of Marianne Biskey-Rose ("Biskey-Rose Dep.") 8:1-9:7; Geter Dep. 69:4-9, 69:25-70:18.)

**RESPONSE:   Schneider does not dispute the statements in Paragraph 3**

**for purposes of summary judgment.**

4.     Mr. Torrence has been employed by Schneider since 2012, worked his way up, and is currently employed as Operations Manager. (Torrence Dep. 9:9-17.)

**RESPONSE:   Schneider does not dispute the statements in Paragraph 4**

**for purposes of summary judgment. Schneider adds that Mr. Torrence started**

**with Schneider in an Intermodal Operations Specialists role and was in that**

**role for a little over a year. He subsequently worked as a Dispatch Analyst.**

**After working as a Dispatch Analyst for three years, he was promoted to the**

**Operations Team Leader position and remained in that position for about three**

years. He was promoted in summer of 2020 to the Operations Manager position.

(Torrence Dep. 9:9-17[1]).

5.      When Mr. Torrence was a Team Lead, he supervised second and third shift APMs and Driver Team Leaders ("DTL"). (Torrence Dep. 10:2-8.)

**RESPONSE**:   Schneider does not dispute the statements in Paragraph 5 **for purposes of summary judgment.**

6.      When he was Team Lead, Mr. Torrence worked at least part of third shift weekly, and sometimes worked remotely. (Torrence Dep. 56:9-22.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 6 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Mr. Torrence worked remotely during the third shift. Specifically, Mr. Torrence's testimony reflects that he was unsure if he worked remotely during the third shift. (Torrence Dep. 56:13-18).**

**Schneider further objects to the extent that the statements in Paragraph 6 are construed to suggest that Mr. Torrence's schedule while Plaintiff was on leave was to "work[ ] at least part of third shift weekly," on the basis that the statements in Paragraph 6 are not supported by Plaintiff's citation to the**

---

**[1] A true and correct copy of the deposition of Travis Torrence has been filed as ECF No. 47-2.**

record. Specifically, Mr. Torrence's testimony reflects his general schedule prior to Plaintiff's leave. In fact, Mr. Torrence's Declaration states that in addition to his regular duties, Mr. Torrence consistently covered Plaintiff's Sunday overnight shift from when she went out on FMLA leave in October 2018 until the termination of her employment in mid-April 2019. (Torrence Decl. ¶¶ 12-13[2]).

7.     Mr. Torrence spent more time assisting second shift than third shift. (See Declaration of Cierra Geter ("Geter Decl.") ¶ 9 – attached hereto as Ex. 1; Declaration of Audreianna Williams (Williams Decl.") ¶ 5 – attached hereto as Ex. 2.)

**RESPONSE:   Schneider objects to this statement to the extent that it is construed to suggest Mr. Torrence spent more time assisting second shift than third shift throughout Plaintiff's and Ms. Williams' employment, on the basis that this statement is not supported by admissible evidence as both Plaintiff and Ms. Williams lack personal knowledge. Specifically, Plaintiff lacks personal knowledge as to whether Mr. Torrence assisted the second or third shift while she was out on leave or not working. Similarly, Ms. Williams admitted she "was**

---

[2] **A true and correct copy of the declaration of Travis Torrence has been filed as ECF No. 46-3.**

regularly permitted to work remotely throughout the later part of [her] pregnancy" and went out on maternity leave on February 26, 2019. (Williams Decl. ¶ 10). Ms. Williams, therefore, lacks personal knowledge of the shifts worked by Mr. Torrence when she was not present. As such, these statements are inadmissible on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 7 are not material to Schneider's Motion for Summary Judgment. Specifically, how frequently Mr. Torrence assisted with second shift compared to third shift prior to Plaintiff's leave is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.

Schneider further objects on the basis that the statements in Paragraph 7 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that throughout Plaintiff's and Ms. Williams'

employment, Mr. Torrence spent more time assisting second shift than third shift. Rather, Mr. Torrence testified that he consistently covered Plaintiff's overnight shift from when she went out on FMLA leave in October 2018 until the termination of her employment in mid-April 2019. (Torrence Decl. ¶ 13).

8. From 2016 through her termination, as an APM, Ms. Geter was assigned to the Southeast Intermodal Division that was accountable for the six southeast hubs, including Atlanta, Charlotte, Miami, Orlando (Winter Haven), Jacksonville, and Savannah. (Geter Dep. 52:18-53:10; Torrence Dep. 12:15-24.)

**RESPONSE:** **Schneider objects on the basis that the statements in Paragraph 8 are not material to Schneider's Motion for Summary Judgment. Specifically, the fact that Plaintiff was assigned to the Southeast Intermodal Division which is accountable for the six southeast hubs is not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or permanently working from home two days per week and anytime she was scheduled to work alone were reasonable accommodations.**

9. Originally, Ms. Geter worked third shift from 11:00 pm to 7:00 am Wednesday through Sunday at the Fairburn location. (Geter Dep. 42:17-43:11.)

**RESPONSE:** **Schneider does not dispute that Plaintiff understood she was interviewing for a full-time position, received an offer letter indicating the**

APM position was full-time, and was scheduled to work full-time on the third shift from 11:00 p.m. to 7:00 a.m. Wednesday through Sunday at the Fairburn location.  (Geter Dep. Ex. 2[3]; Dkt. 50-1, ¶¶ 3, 13).

10.    At some point, Ms. Geter's hours changed to 11:00 pm to 10:00 am, Wednesday through Friday and Sunday. (Geter Decl. ¶ 4; Geter Dep. 72:1-12; Torrence Dep. 44:25-45:14.)

**RESPONSE**:  **Schneider does not dispute the statements in Paragraph 10 for purposes of summary judgment.**

11.    Before taking medical leave in fall 2018, Ms. Geter worked with Audreianna Williams and Desmond Seymour on Sundays, Desmond Seymour on Wednesdays, and Audreianna Williams on Fridays. (Geter Decl. ¶ 5; Williams Decl. ¶ 4.)

**RESPONSE**:  **Schneider objects on the basis that the statements in Paragraph 11 are not material to Schneider's Motion for Summary Judgment. Specifically, who Plaintiff worked with on different days prior to going out on leave is not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or**

---

[3] **True and correct copies of relevant deposition exhibits to the deposition of Cierra Geter have been filed as ECF No. 46-4.**

permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations.

12.    Before Ms. Geter went on medical leave in the fall of 2018, Desmond Seymour worked third shift Saturdays through Wednesdays. (Geter Decl. ¶ 7.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 12 are not supported by admissible evidence. Specifically, Plaintiff's Declaration fails to provide any foundation to establish that Plaintiff has personal knowledge of Mr. Seymour's schedule. As such, these statements are inadmissible on summary judgment.** *See Tishcon Corp. v. Soundview Commn's, Inc.*, **2005 WL 6038743, at \*5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").**

**Schneider objects on the basis that the statements in Paragraph 12 are not material to Schneider's Motion for Summary Judgment. Specifically, the days that Mr. Seymour worked are not relevant to whether full-time work or working in the office were essential functions of Plaintiff's job or whether part-time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations.**

13.    Before Ms. Geter went on medical leave in the fall of 2018, Audreianna Williams worked third shift Fridays through Tuesdays. (Geter Decl. ¶ 8; Williams Decl. ¶ 3.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 13 are not material to Schneider's Motion for Summary Judgment. Specifically, the days that Ms. Williams worked before Ms. Geter went on medical leave in the fall of 2018 are not relevant to whether full-time work or working in the office were essential functions of Plaintiff's job or whether part-time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations.**

14.    Before taking medical leave in the fall of 2018, Ms. Geter worked alone on Thursday nights. (Geter Decl. ¶ 6; Geter Dep. 75:14-17).

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 14 are not supported by Plaintiff's citation to the record to the extent they are intended to suggest that Thursday nights were the only nights Plaintiff worked alone. Rather, Plaintiff frequently worked alone on the third shift, especially on Sunday nights. (Geter Dep. 75:14-17, 100:16-23, 142:20-132:1, 146:6-8[4]; Torrence Decl. ¶ 5).**

_____

**[4] A true and correct copy of the deposition of Cierra Geter has been filed as ECF No. 47-1.**

9

**Schneider further objects on the basis that the statements in Paragraph 14 are not material to Schneider's Motion for Summary Judgment. Specifically, Plaintiff's schedule prior to Plaintiff's leave is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

## II.    Essential Functions of the APM Job

15.    During Ms. Geter's employment, Schneider had a job description for the APM position which set forth the essential functions of the APM job. (Deposition of Ashley Janssen ("Janssen Dep.") 22:6-22; Janssen Dep. Ex. 4; Torrence Dep. 32:2-35:23; Torrence Dep. Ex. 4.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 15 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that *all* of the essential functions of the APM position are contained in the job description. While the job description contains essential functions of the APM position, not all of the essential functions of the APM position are explicitly detailed in the job description, such as full-time work and work in the office. (*See* Schneider's Reply in Support of**

its Motion for Summary Judgment ("Reply")[5], at p. 2-4, 8-11). The job description states that the APM position is an "Exempt (Salaried)" position, which indicates the position is full time. Further, the job description also explicitly states: "This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties. Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands." (Geter Dep. Ex. 4). Ms. Biskey-Rose also testified that there were additional duties that the second and third-shift APMs performed, such as answering phone calls and messages, bill of ladings, and day-to-day activities that were not part of the "traditional APM role." (Biskey-Rose Dep. 26:6-18). Similarly, Plaintiff testified that other functions not specified in the job description, such as locating tractors for drivers, were key functions of her job as an APM. (Geter Dep. 61:22-62:4).

16.   The following are the Essential Functions of the APM job set forth in the position description:

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc.

---

[5] Schneider's Reply is being filed contemporaneously with its Response to Plaintiff's SDMF.

11

Continually assess market conditions and performance, and adjust plan accordingly.

- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.

- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer satisfaction, and driver retention). All decisions also need to be made in accordance with Schneider's #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.

- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.

- Be technical expert in dispatch utilization tools and analytical planning dashboards.

- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).

- Establish priority and direction for trailer assignment, and assign trailers for dispatch.

- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.

- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).

12

- Possess an intimate understanding of customers and unique needs.

- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.

- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)

- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.

- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).

- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.

- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.

- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

(Geter Dep. Ex. 4.)

**RESPONSE:** **Schneider objects on the basis that the statements in Paragraph 16 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that all of the essential functions of the APM position are contained in the job description. While the job description contains essential functions of the APM position, not all of the essential functions of the APM position are explicitly detailed in the job description, such as full-time work and work in the office. (*See* Reply at p. 2-4, 8-11). The job description states that the APM position is an "Exempt (Salaried)" position, which indicates the position is full time. Further, as noted in this Paragraph, the job description explicitly states "This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties. Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands." (Geter Dep. Ex. 4). Ms. Biskey-Rose also testified that there were additional duties that the second and third-shift APMs performed, such as answering phone calls and messages, bill of ladings, and day-to-day activities that were not part of the "traditional APM role." (Biskey-Rose Dep. 26:6-18). Similarly, Plaintiff testified that other functions not**

specified in the job description, such as locating tractors for drivers, were key functions of her job as an APM. (Geter Dep. 61:22-62:4).

17. The job duties set forth in the Schneider-created job description accurately reflect the APM job duties. (Geter Dep. 51:5-52:17, 53:11-54:2; Geter Dep. Ex. 4.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 17 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that the job description accurately reflects *all* of the APM job duties. While the job description contains essential functions of the APM position, not all of the essential functions of the APM position are explicitly detailed in the job description, such as full-time work and work in the office. (*See* Reply at p. 2-4, 8-11). The job description states that the APM position is an "Exempt (Salaried)" position, which indicates the position is full time. Further, the job description also explicitly states "This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties. Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands." (Geter Dep. Ex. 4). Ms. Biskey-Rose also testified that there were additional duties that the second and third-shift APMs performed, such as answering phone calls and messages, bill of ladings, and day-to-day activities that were not part of the "traditional APM**

15

**role." (Biskey-Rose Dep. 26:6-18). Similarly, Plaintiff testified that other functions not specified in the job description, such as locating tractors for drivers, were key functions of her job as an APM. (Geter Dep. 61:22-62:4).**

18.    As an APM, Ms. Geter supported over-the-road drivers that worked from the hubs in Atlanta, Charlotte, Miami, Orlando, Jacksonville, and Savannah by taking calls and messages from drivers and assisting them in resolving issues that might arise. (Geter Dep. 54:3-12.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 18 are not supported by Plaintiff's citation to the record. The cited testimony discusses Plaintiff's duties, including that "one of her primary duties was supporting drivers[,]" "[she] would take calls and messages from drivers[,]" and "[she] would help drivers resolve any issues that they had[.]" (Geter Dep. 54:3-12). The testimony does not discuss the hubs out of which the over-the-road drivers Plaintiff assisted were assigned. Moreover, the testimony does not state that this was the only manner in which she assisted over-the-road drivers. In fact, Plaintiff's Declaration indicates that she also printed driver paperwork and located keys for drivers. (Geter Decl. ¶¶ 14-15).**

19.    The only drivers Ms. Geter saw face-to-face from time-to-time were those based out of Atlanta – from 100 to 110 of the 2,250 drivers she assisted. (Geter Dep. 54:13-55:7; Williams Decl. ¶ 11.)

**RESPONSE**:  **Schneider objects on the basis that the statements in Paragraph 19 are not material to Schneider's Motion for Summary Judgment. Specifically, Plaintiff admitted that she interacted with drivers "frequently." (Geter Dep. 54:13-16). Therefore, the number of over-the-road drivers that Plaintiff interacted with face-to-face, and hubs out of which they were assigned, are not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations.**

**Schneider further objects on the basis that the statement that Plaintiff "from time-to-time" saw drivers "face-to-face" in Paragraph 19 is not supported by Plaintiff's citation to the record and, in fact, is directly contradicted by Plaintiff's sworn testimony. Specifically, during her deposition, Plaintiff was asked "And you frequently interacted with drivers face-to-face; is that correct?" Plaintiff responded "Yes, sir. Only the Atlanta drivers face-to-face." (Geter Dep. 54:13-16).**

17

**Schneider further objects on the basis that the statements in Paragraph 19 are not supported by admissible evidence. Specifically, Ms. Williams' Declaration provides information about the frequency with which Ms. Williams interacted with drivers, not Plaintiff.  Ms. Williams' Declaration does not provide a foundation of any personal knowledge she has regarding the frequency with which Plaintiff interacted with over-the-road drivers or the hubs to which the drivers were assigned. Further, as noted above, Plaintiff's declaration contradicts Plaintiff's previously sworn testimony on this issue, and therefore, should be stricken by the Court. (Geter Dep. 54:13-16).**

20.    As an APM, it was not necessary for Ms. Geter to be in the office to support drivers, because she assisted drivers initially as far away as Canada and, after 2016, throughout the southeast. (Geter Dep. 58:2-59:12; Williams Decl. ¶ 11.)

**<u>RESPONSE</u>:  Schneider objects on the basis that the statements in Paragraph 20 are not supported by Plaintiff's citation to the record. Specifically, the cited testimony does not discuss when Plaintiff assisted drivers in Canada or throughout the southeast. Further, Plaintiff did not testify that "it was not necessary for [her] to be in the office."  Rather, Plaintiff admitted that the Atlanta drivers "appreciated us being in the office." (Geter Dep. 59:1-5). Plaintiff further testified that Schneider wanted APMs to have face-to-face**

interactions with drivers (Geter Dep. 59:13-16) and that several of her job duties needed to be performed in the office. (Geter Dep. 60:6-62:4; 63:7-11 (When asked: "you understood that for certain tasks you needed to be in the office to do what you had to do to get things done," Plaintiff responded "Correct")).

21.    APMs located trailers throughout the southeast for drivers at the various hubs using GPS software maintained by Schneider. (Geter Decl. ¶ 14; Williams Decl. ¶ 12.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 21 are not material to Schneider's Motion for Summary Judgment. Specifically, the fact that APMs located trailers throughout the southeast for drivers at various hubs is not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations. Rather, Plaintiff admitted that there were instances where it was necessary for her to be in the office to locate a trailer for a driver. (Geter Dep. 60:16-19, 61:22-25 (When asked: "But there were situations where you would need to physically**

be present in the office in order to locate tractors for drivers," Plaintiff responded, "Correct.")).

22.    For all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access. (Geter Decl. ¶ 14; Williams Decl. ¶ 12.)

**RESPONSE**:  Schneider objects to the statements in Paragraph 22 as they are not supported by admissible evidence. Specifically, Plaintiff's and Williams' Declarations fail to provide any foundation to establish that either Plaintiff or Williams have personal knowledge of the practices of "hubs outside Atlanta," including where keys to the trucks were kept. As such, these statements are inadmissible on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 22 are not material to Schneider's Motion for Summary Judgment. Specifically, the practices of hubs other than those to which Plaintiff was assigned are not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or permanently

20

working from home two days per week and anytime Plaintiff was scheduled to work alone were reasonable accommodations. Plaintiff testified that there were certain functions of her APM position that required Plaintiff's presence in the office. (Geter Dep. 63:7-11 (When asked: And so as reflected in your e-mail, you understood that for certain tasks you needed to be in the office to do what you had to do to get things done; is that right?" Plaintiff responded: "Correct."), 61:22-25 (When asked: "But there were situations where you would need to physically be present in the office in order to locate tractors for drivers," Plaintiff responded, "Correct.")). Further, this statement does not establish that Plaintiff did not need to be in the office to locate keys for Atlanta drivers. To the contrary, Ms. Kopf testified that it was necessary for APMs to be in the office to locate keys for drivers. (Kopf Dep. 19:19-20:13[6]).

23.    For drivers outside Atlanta, Ms. Geter printed driver paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had access and she could do the same for Atlanta drivers when she worked from home. (Geter Decl. ¶ 15; Williams Decl. ¶ 13.)

---

[6] **A true and correct copy of the deposition of Sarah Kopf has been filed as ECF No. 47-4.**

**RESPONSE:** Schneider objects on the basis that the statements in Paragraph 23 are not supported by Plaintiff's citation to the record as Ms. Williams' declaration discusses her own practices and not those of Plaintiff.

Schneider further objects on the basis that the statements in Paragraph 23 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Atlanta drivers were able to obtain the printed documents if Plaintiff printed them remotely when she worked from home. Rather, the printer was located in a locked office and APMs need to be in the office to provide the paperwork to drivers. (Kopf Dep. 19:22-20:5).

24.     Pre-COVID, in addition to the APMs, DTLs and Intermodal Operating Specialists could and would also assist drivers with getting keys if they needed a loaner and provide drivers access to the printer. (Deposition of Sarah Kopf ("Kopf Dep.") 24:24-26:2.)

**RESPONSE:** Schneider objects on the basis that the statements in Paragraph 24 are not supported by admissible evidence to the extent they are construed to suggest that DTLs and Intermodal Operating Specialists could assist APMs who worked on the third shift. Ms. Kopf worked on the second shift. (Kopf Dep. 6:13-16). Ms. Kopf did not provide any testimony indicating that DTLs and Intermodal Operating Specialists could assist APMs who

worked the *third shift*.  **Further, Plaintiff testified that she frequently worked alone on the third shift. (Geter Dep. 75:14-17 ("Thursday night I was by myself."), 100:16-23, 142:20-143:1, 146:6-8).**

**Schneider further objects on the basis that the statements in Paragraph 24 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that DTLs and Intermodal Operating Specialists worked the third shift and were available to "assist drivers with getting keys if they needed a loaner and provide drivers access to the printer" as no Intermodal Operating Specialists worked on the third shift. (Biskey-Rose Dep. 23:17-20[7]). Moreover, Plaintiff testified that from mid-2018 through the termination of her employment (April 12, 2019), she worked the third shift by herself on Thursdays.  (Geter Dep. 72:2-73:17; 75:14-17).**

**Similarly, Schneider objects on the basis that the statements in Paragraph 24 are not material to Schneider's Motion for Summary Judgment. Whether DTLs and Intermodal Operating Specialists could assist drivers on the first and second shift is not relevant to whether working in the office was an**

---

[7] **A true and correct copy of the deposition of Marianne Biskey-Rose has been filed as ECF No. 47-6.**

essential function of Plaintiff's third-shift APM position or whether working from home two days per week and anytime she was scheduled to work alone were reasonable accommodations as Schneider is not required to reallocate essential job functions. *Spears v. Creel,* 607 F. App'x 943, 948-49 (11th Cir. 2015) ("[T]he ADA does not require an employer to reallocate job duties in order to change the essential functions of a job.")

25.    From mid-2018 through Ms. Geter's termination, there were 4 APMs assigned to third shift. (Geter Dep. 70:19-71:22.)

**RESPONSE:   Schneider objects on the basis that the statements in Paragraph 25 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that there were four APMs who worked together on the third shift or that all four APMs did not take a leave of absence during the time period of mid-2018 through Plaintiff's termination of employment (April 12, 2019).   First, Plaintiff claims that she worked alone on Thursdays. (*See* SDMF, ¶ 14). Second, APM Williams went out on maternity leave on February 26, 2021 – prior to Plaintiff's termination. (Williams Decl. ¶ 10). Similarly, Plaintiff was out on medical leave from October 9, 2018 to January 2, 2019 (*See* Dkt. 50-1, ¶¶ 33, 48). When Plaintiff returned from her**

medical leave, Schneider granted her request for an accommodation and Plaintiff worked a part-time schedule. (*See* Dkt. 50-1, ¶¶ 42-48).

### III.   Schneider's Flexible Work Policies

26.     Schneider has a Flexible Work Arrangement Policy ("FWA") under which employees are allowed to work reduced hours and work remotely. (Janssen Dep. 15:17-16:7; Biskey-Rose Dep. 31:1-32:7; Biskey-Rose Dep. Ex. 48.)

**RESPONSE**:  **Schneider objects on the basis that the statements in Paragraph 26 are not material to Schneider's Motion for Summary Judgment. Specifically, as detailed in the Reply (*see* p. 3-4), whether Schneider had a company-wide FWA is not relevant to determining whether full-time work and work from home were essential functions of Plaintiff's third shift APM position or whether part-time work or permanently working from home two days per week and anytime Plaintiff was scheduled to work alone were reasonable accommodations for Plaintiff.**

**Schneider further objects on the basis that the statements in Paragraph 26 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that APMs could work reduced hours and work remotely. The policy itself expressly states that "[e]ach [flexible] arrangement will be evaluated on its own merits taking into account the needs of the business and**

**associate on a case-by-case basis." Simply because Schneider had a company-wide FWA, does not mean it was reasonable for any employee to work reduced hours and/or work remotely. Indeed, no APM at the Fairburn location worked a part-time schedule. (Torrence Dep. 64:24-65:3; Geter Dep. 83:6-10, Kitchens Dep. 28:5-10[8]; Kopf Dep. 18:12-16; Torrence Decl. ¶ 8).  Further, remote work was only permitted in one-off situations and not ongoing requests. (Biskey-Rose Dep. 32:13-20).**

27.    Under the FWA policy, the types of flexible work arrangements considered by Schneider include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Biskey-Rose Dep. Ex. 48.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 27 are not material to Schneider's Motion for Summary Judgment. Specifically, as detailed in the Reply (*see* p. 3-4), whether Schneider had a FWA is not relevant to determining whether full-time work or working in the office were essential functions of Plaintiff's third shift APM position or whether part-**

---

[8] **A true and correct copy of the deposition of Tiffany Kitchens has been filed as ECF No. 47-5.**

time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations.

Schneider further objects on the basis that the statements in Paragraph 27 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that APMs were permitted to have a "compressed work week, flexible start/end times, job share, part-time, and telecommuting." The policy itself expressly states that "[e]ach [flexible] arrangement will be evaluated on its own merits taking into account the needs of the business and associate on a case-by-case basis." Simply because Schneider had a FWA, does not mean it was reasonable for any employee to work reduced hours and/or remotely. Indeed, no APM at the Fairburn location worked a part-time schedule. (Torrence Dep. 64:24-65:3; Geter Dep. 83:6-10, Kitchens Dep. 28:5-10; Kopf Dep. 18:12-16; Torrence Decl. ¶ 8).  Further, remote work was only permitted in one-off situations and not ongoing requests. (Biskey-Rose Dep. 32:13-20).

Schneider further objects on the basis that the statements in Paragraph 27 are not supported by Plaintiff's citation to the record in that the FWA does not state that teleworking on a temporary basis was a flexible work

arrangement under the FWA. Rather, it states "Telecommuting – There are additional guidelines and an agreement required to be signed if Telecommuting is the primary work schedule." (Biskey-Rose Dep. Ex. 48)[9].

28.    Ms. Biskey-Rose and Mr. Torrence understand the policy to be that Schneider allows its employees to work remotely "on a short-term basis" when something pops up. (Torrence Dep. 55:16-24; Janssen Dep. 37:23-38:6; Biskey Rose Dep. 32:8-20.)

**RESPONSE**:  **Schneider objects on the basis that the statements in Paragraph 28 are not material to Schneider's Motion for Summary Judgment. Specifically, whether APMs were permitted to work from home on a short-term basis is not relevant to whether Plaintiff's request to work a part-time schedule for more than six months, and Plaintiff's request to *permanently* work from home two days per week and anytime was scheduled to work alone, were reasonable accommodations. (Geter Dep. Ex. 17 ("[Plaintiff] will be able to continue present schedule wed, thurs, fri ten hours/day Thursday and Friday at home _or_ anytime solo")). Therefore, whether an APM was permitted to work from home on a "short-term basis" is immaterial.**

---

[9] **A true and correct copy of Biskey-Rose Dep. Ex. 48 has been filed as ECF 50-6.**

Schneider further objects on the basis that the statements in Paragraph 28 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Ms. Biskey-Rose or Mr. Torrence understood the FWA to permit employees to work remotely on a short-term basis. Rather, Ms. Biskey-Rose testified that her understanding about working from home was that "it's always been a one-off situation and not an ongoing request." (Biskey-Rose 32:8-20). Moreover, the citation attributed to Mr. Torrence is not even related to Schneider's FWA policy.  Rather. Mr. Torrence testified that "[w]hen there has been a request to work from home…on a short-term basis because something has, you know, popped up or whether it's weather or a family issue at home, we've accommodated that on a short-term basis." Moreover, Ms. Janssen's testimony does not reflect Ms. Biskey-Rose's nor Mr. Torrence's understanding of the policy.

29.    The entire time Ms. Geter worked for Schneider the entire staff was permitted to work from home as needed and it was common for APMs to work from home. (Geter Dep. 208:18-209:7, 209:19-210:14; Deposition of Tiffany Kitchens ("Kitchens Dep.") 17:1-11; Kopf Dep. 12:5-21; Williams Decl. ¶ 14.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 29 are not supported by admissible evidence. Specifically, Ms.**

Williams' declaration fails to provide a foundation for her assertion that "working from home was common for APMs in the Fairburn office." (Williams Decl. ¶ 14). Similarly, Plaintiff's cited testimony does not establish a foundation regarding how frequently employees other than herself worked from home. As such, neither Ms. Williams nor Plaintiff have personal knowledge regarding how frequently other employees worked from home and these statements cannot be considered on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 29 are not supported by Plaintiff's citation to the record. Specifically, Plaintiff testified that APMs could work from home "if they were ill or if some type of an emergent circumstance came up," but that they did not "regularly" work from home. (Geter Dep. 208:18-209:25). Similarly, Ms. Kitchens testified that Schneider was flexible on working from home "if there's emergencies." (Kitchens Dep. 17:1-5). Ms. Kopf testified that she was able to work from home

"when the power was out at the office" or "if [she] had a family emergency." (Kopf Dep. 12:5-21).

Schneider further objects on the basis that the statements in Paragraph 29 are not material to Schneider's Motion for Summary Judgment. Whether APMs were permitted to work from home in one-off situations is immaterial to whether Plaintiff's request to *permanently* work from home two days per week and anytime she was scheduled to work alone was reasonable. (Geter Dep. Exs. 17, 19).

30.    APM Sarah Kopf is aware that Schneider employees have been permitted to work reduced hours and remotely. (Kopf Dep. 11:1-20.)

**RESPONSE**:  Schneider objects on the basis that the statements in Paragraph 30 are not supported by admissible evidence as there is no foundation in Ms. Kopf's cited testimony to establish she has personal knowledge regarding whether other employees were permitted to work a reduced schedule or work remotely. As such, this testimony is inadmissible on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

**Schneider further objects on the basis that the statements in Paragraph 30 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that employees other than Plaintiff worked a part-time schedule. Specifically, Plaintiff does not identify an APM (other than herself) that worked a part-time schedule. (Dkt. 50-1, ¶¶ 14-15).**

31.    Schneider employees in Fairburn were not required to document when they were working from home. (Kopf Dep. 12:22-13:13.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 31 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that no Schneider employee in Fairburn was required to document when they were working from home. Specifically, Ms. Kopf was asked whether she was required to document when she worked from home, and she indicated she did not have to do so.  She did not testify about whether other employees were required to document when they were working from home, nor could she, as she would have no personal knowledge regarding requirements of other employees.**

**Schneider further objects on the basis that the statements in Paragraph 31 are not material to Schneider's Motion for Summary Judgment. Whether APMs were required to document when they worked from home is immaterial**

32

to whether Plaintiff's request to *permanently* work from home two days per week and anytime she was scheduled to work alone was reasonable. (Geter Dep. Exs. 17, 19).

## IV.   Ms. Geter's Disabilities

32.     While employed as an over-the-road driver for Brito Produce in July 2013, Ms. Geter was the victim of an attempted sexual assault at a truck stop (Geter Dep. 28:2-25.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 32 are not material to Schneider's Motion for Summary Judgment.**

33.     As a result of the assault, from the time of the assault through when she began employment with Schneider, Ms. Geter suffered from nightmares every other night, daily panic attacks, and weekly outbursts. (Geter Dep. 29:11-30:17, 31:2-12, 34:7-35:6.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 33 are not material to Schneider's Motion for Summary Judgment.**

34.     After the assault, Ms. Geter also began suffering from migraines again approximately once or twice a week. (Geter Dep. 32:3-33:20, 35:1-6.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 34 are not material to Schneider's Motion for Summary Judgment.**

35.    Approximately a year later when Ms. Geter became employed by Schneider and became insured, Ms. Geter was treated with antidepressants. (Geter Dep. 30:8-17.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 35 are not material to Schneider's Motion for Summary Judgment.**

36.    Ms. Geter was diagnosed with Post-Traumatic Stress Disorder in October 2018, major depressive disorder in August or September 2015, and panic disorder in October 2018. (Geter Dep. 83:11-23, 86:20-87:8, 88:17-20.)

**RESPONSE:  Schneider does not dispute the statements in Paragraph 36 for purposes of summary judgment.**

**V.    Ms. Geter's Request for Reasonable Accommodation**

37.    On October 15, 2018, Ms. Geter became suicidal, requested FMLA leave for treatment, was approved for and took FMLA leave through December 31, 2018 to engage in treatment, and her leaders, Mr. Torrence and Ms. Biskey-Rose, were notified of the same. (Geter Dep. 97:2-98:22, 120:20-124:11, 125:4-126:8; Geter Dep. Exs. 8, 9, 11, 13; Torrence Dep. 39:16-40:8; 48:15-18; Torrence Dep. Ex. 30; Biskey-Rose Dep. 13:16.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 37 are not material to Schneider's Motion for Summary Judgment. Specifically, the reasons why Plaintiff took FMLA leave are not relevant to the issue of whether Schneider reasonably accommodated Plaintiff, retaliated**

**against Plaintiff, or discriminated against Plaintiff based on any protected characteristic.**

**Schneider further objects on the grounds that the statements in Paragraph 37 are not supported by Plaintiff's citation to the record. Specifically, Plaintiff admitted that prior to her FMLA leave, she had not communicated with anyone about her diagnosis. (Dkt. 50-1, ¶ 34).**

38.    Ms. Geter shared information about her mental health crisis with Mr. Horton, Mr. Torrence, and Ms. Biskey-Rose. (Geter Dep. 119:14-120:16, 130:16-132:2; Torrence Dep. 41:12-42:14; Biskey-Rose Dep. 13:17-15:23.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 38 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Plaintiff disclosed information about her medical conditions is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

**Schneider further objects on the grounds that the statements in Paragraph 38 are not supported by Plaintiff's citation to the record as the**

**citations to the record do not support that Plaintiff shared information about her medical conditions with Mr. Horton.**

39.     On December 15, 2018, Ms. Geter's psychiatrist released her to return to work with a request that she work three ten-hour days per work week until February 14, 2019. (Geter Dep. 126:9-128:13; Geter Dep. Ex. 14.)

**RESPONSE: Schneider admits it received a Return to Work Recommendation that Dr. Wanzo completed on December 15, 2018 stating that Plaintiff "is able to return to work with restrictions effective 1/2/19, outlined below: 3 days/week ten hour days." (Geter Dep. Ex. 14).**

40.     Once a Schneider associate – like Ms. Geter – requests an accommodation through the Human Resources Leave Team, the Leave Team notifies the Human Resources Business Partner and the associate's leaders (here Mr. Torrence and Ms. Biskey-Rose) of the request for accommodation, and then the Human Resources Business Partner works with the leaders to determine whether or not the associate's request for accommodation can be granted. (Janssen Dep. 12:9-14:5.)

**RESPONSE:  Schneider does not dispute the statements in Paragraph 40 for purposes of summary judgment.**

41.     Ms. Geter's original request for reasonable accommodation was approved on December 18, 2018 by Mr. Torrence and Ms. Biskey-Rose in consultation with Human Resources Business Partner Senior Ashley Janssen. (Torrence Dep. 43:10-22, 46:15-47:19, 49:13-20, 59:2-22, 63:11-23; Torrence Dep. Exs. 31 & 46; Geter Dep. 129:1-131:13, 132:16-133:23; Geter Dep. Ex. 15; Janssen

Dep. 8:2-21, 11:7-12:8, 26:13-27:7, 29:2-31:8; Janssen Dep. Ex. 31; Biskey-Rose Dep. 15:24-16:14.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 41 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Plaintiff's requested accommodation was "reasonable." Rather, the citations support that Schneider agreed to "accommodate [work 3 days per week, 10 hour days] in [her] current position effective 1/2/2019 through 2/13/2019." (Geter Dep. Ex. 15). Further, as described in the Reply, Plaintiff's request to work a reduced schedule for more than six months was not reasonable. (*see* Reply p. 4-8).**

42.    Ms. Geter was not paid by Schneider for her FMLA leave and was not paid for hours she did not work while she was receiving reasonable accommodations. (Geter Decl. ¶¶ 16, 17.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 42 are not material to Schneider's Motion for Summary Judgment.**

43.    When Ms. Geter was on medical leave, her shifts were primarily covered by Desmond Seymour and Audreianna Williams and were rarely, if at all, covered by Mr. Torrence. (Williams Decl. ¶ 9.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 43 are not supported by admissible evidence as Ms. Williams'**

37

Declaration fails to establish that she has personal knowledge of who was covering Plaintiff's shift. Ms. Williams admits that she "was regularly permitted to work remotely throughout the later part of [her] pregnancy" and went out on maternity leave on February 26, 2019 – the very time period that Mr. Torrence covered Plaintiff's shift. (Williams Decl. ¶ 10). As such, Ms. Williams lacks personal knowledge regarding who was covering Plaintiff's shifts when Ms. Williams worked remotely and when she was out on pregnancy leave for more than six of the weeks that Mr. Torrence covered Plaintiff's shift (from February 26, 2019 – April 12, 2019). As such, Ms. Williams' statements cannot be considered on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 43 are not material to Schneider's Motion for Summary Judgment. Indeed, it is immaterial who covered Plaintiff's shifts. The fact that any employee – whether it was Mr. Torrence, Ms. Williams, or other APMs – had to cover

Plaintiff's shift for more than six months establishes that Plaintiff's part-time accommodation request was unreasonable. (*See* Reply at p. 6).

44.     When Ms. Geter worked her reduced hours schedule, Desmond Seymour and Audreianna Williams covered her Sunday shifts and, occasionally, Mr. Torrence would sub in on the shift. (Geter Dep. 136:10-139:4, 181:23-183:17; Williams Decl. ¶ 8.)

**RESPONSE:** **Schneider objects on the basis that the statements in Paragraph 44 are not supported by admissible evidence as Ms. Williams' Declaration fails to establish that she has personal knowledge of who was covering Plaintiff's shift. Ms. Williams admits that she "was regularly permitted to work remotely throughout the later part of [her] pregnancy" and went out on maternity leave on February 26, 2019 – the very time period that Mr. Torrence covered Plaintiff's shift. (Williams Decl. ¶ 10). As such, Ms. Williams lacks personal knowledge regarding who was covering Plaintiff's shift when Ms. Williams worked remotely and when she was out on pregnancy leave for more than six of the weeks that Mr. Torrence covered Plaintiff's shift (from February 26, 2019 – April 12, 2019). Additionally, Plaintiff fails to establish a foundation for personal knowledge of who was covering her shift. Specifically, she cannot have personal knowledge regarding who was covering the shift when**

she was not present. As such, Ms. Williams' and Plaintiff's statements cannot be considered on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 44 are not material to Schneider's Motion for Summary Judgment. Indeed, it is immaterial who covered Plaintiff's Sunday overnight shift. The fact that any employee – whether it was Mr. Torrence, Ms. Williams, or other APMs – had to cover Plaintiff's shift for more than six months establishes that Plaintiff's part-time accommodation request was unreasonable. (*See* Reply at p. 6).

45.    On January 19, 2019, Dr. Wanzo extended Ms. Geter's request for accommodation through March 20, 2019 and on January 21, 2019, Schneider approved the extension of the reasonable accommodations through March 19, 2019. (Geter Dep. 139:9-143:5, 144:2-24; Geter Dep. Ex. 16; Torrence Dep. 49:21-50:5, 60:14-61:3; Torrence Dep. Ex. 32; Janssen Dep. 27:24-29:1, 31:24-33:3; Janssen Dep. Exs. 16, 32.)

**RESPONSE**:  **Schneider does not dispute that it received a Return to Work Recommendation completed by Dr. Wanzo on January 19, 2019 that stated Plaintiff "will be able to work ten hours a day 3 days per week" and that**

the restrictions were to remain in effect until March 19, 2019. (Geter Dep. Ex. 16).

Schneider objects on the basis that the statements in Paragraph 45 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Plaintiff's requested accommodation was "reasonable." Rather, the citations support that Schneider agreed to "accommodate these restrictions[.]" (Geter Dep. 144:2-24). Further, as described in the Reply, Plaintiff's request to work a reduced schedule for more than six months was not reasonable. (*See* Reply p. 4-8).

46.    In addition, in February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Geter Dep. 146:1-150:12; Torrence Dep. 55:11-21.)

**RESPONSE:** Schneider objects on the basis that the statements in Paragraph 46 are not supported by Plaintiff's citation to the record. Specifically, Plaintiff's testimony does not mention that Mr. Torrence told her that she could work from home because "everyone did it." Further, Mr. Torrence's testimony does not reflect that he told Plaintiff she could work from home in February 2019 "because everyone did it." Specifically, Mr. Torrence was asked: "At any point did you tell Ms. Geter that it was okay for her to work

**from home because everyone did it?" He responded "It's possible. When there has been a request to work from home for any associate that has been on my team or even in our office on a short-term basis because something has, you know, popped up or whether it's weather or a family issue at home, we've accommodated that on a short-term basis." (Torrence Dep. 55:11-21). Mr. Torrence's testimony does not suggest that he told Plaintiff she could work from home in February 2019 if she was working alone because "everyone did it."**

47.    On March 9, 2019, Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to April 30, 2019 and, for the first time, recommended that Ms. Geter be permitted to work from home anytime she was scheduled alone. (Geter Dep. 150:16-153:5, 154:3-155:8; Geter Dep. Ex. 17; Janssen Dep. 33:4-34:14; Janssen Dep. Ex. 34.)

**RESPONSE:** **Schneider admits that it received a Return to Work Recommendation completed by Dr. Wanzo on March 9, 2019 stating that "[Plaintiff] will be able to continue present schedule wed, thurs, fri ten hours/day Thursday and Friday at home or anytime solo." (Geter Dep. Ex. 17).**

**Schneider objects on the basis that the statements in Paragraph 47 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Dr. Wanzo recommended that Plaintiff be permitted to work from home *only* when Plaintiff was schedule to work alone. Rather, Dr.**

Wanzo's Return to Work form stated: "[Plaintiff] will be able to continue present schedule wed, thurs, fri ten hours/day Thursday and Friday at home _or anytime solo_." (Geter Dep. Ex. 17) (emphasis added).

Schneider further objects on the basis that the statements in Paragraph 47 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Plaintiff's requested accommodation was "reasonable." Specifically, none of the cited testimony establishes that the request to continue working a modified schedule or request to work from home was reasonable. Rather, as detailed in the Reply, Plaintiff's request to work a reduced schedule for more than six months and her request to _permanently_ work from home two days per week and anytime she was scheduled to work alone was not reasonable. (_See_ Reply p. 4-11).

48.    Ms. Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week. (Geter Dep. 155:9-14, 160:21-161:5, 163:2-22, 164:18-165:5.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 48 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Plaintiff "understood" that Dr. Wanzo was requesting that Plaintiff work from home two days a week is irrelevant to whether Plaintiff**

was a qualified individual with a disability or requested a reasonable accommodation. It is undisputed that on March 9, 2019, Dr. Wanzo submitted medical documentation stating that "[Plaintiff] will be able to continue present schedule wed, thurs, fri ten hours/day Thursday and Friday at home or anytime solo." (Dkt. 50-1, ¶ 57; Geter Dep. Ex. 17). It is further undisputed that on March 30, 2019, Dr. Wanzo submitted a medical note to Schneider stating that Plaintiff could "only work 3 days per week Wed/Thurs/Fridays: Working from home 2 days/week (10 hour days)." (Dkt. 50-1, ¶¶ 60, 61). Plaintiff testified that she did *not* disagree with Dr. Wanzo's March 30, 2019 note. (Geter Dep. 163:23-164:4) (When asked: "Well, were you disagreeing with Dr. Wanzo – did you disagree with her when she said she wanted you to work from home two days per week as of March 30, 2019?" Plaintiff responded: "No, I'm not disagreeing with her. I just don't know specifically who was off on those specific days."). It is also undisputed that Schneider received and relied upon these medical notes in evaluating Plaintiff's accommodation requests. *Hurt v. Phifer Inc.,* 2008 WL 11383474, at *2 (N.D. Ala. April 15, 2008) (finding that "this Court cannot agree with Plaintiff's reasoning that an employer may not rely on a medical restriction placed on an employee by his doctor simply because the employee

**has 'decided' he feels well enough to ignore the doctor's restriction."). Plaintiff**

**cannot attempt to create a material question of fact by claiming, after the fact,**

**that she "misunderstood" medical notes that are clear on their face.**

**Additionally, Plaintiff has not submitted any evidence from Dr. Wanzo**

**indicating that Dr. Wanzo did not mean exactly what she said in her March 9,**

**2019 and March 30, 2019 medical notes. (Geter Dep. Exs. 17, 19).**

49.    On March 30, 2019, Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019 and believed that there was a 95% chance that Ms. Geter would be able to return to full duty at that time. (Torrence Dep. 50:6-9; Geter Dep. 159:10-161:13; Geter Dep. Ex. 19; Janssen Dep. 40:12-25; Geter Dep. Ex. 3, p. 3.)

**RESPONSE: Schneider does not dispute that on March 30, 2019, Dr.**

**Wanzo again requested – *for the third time* – to extend Plaintiff's**

**accommodation requests, this time for an additional five weeks. Schneider**

**objects on the basis that the statements in Paragraph 49 are not supported by**

**admissible evidence as Dr. Wanzo's suggestion that Plaintiff could return to**

**full-time work on June 5, 2019 was pure speculation and inadmissible on**

**summary judgment. *Atakora v. Franklin*, 601 F. App'x 764, 766 (11th Cir. 2015)**

**("Guesses or speculation which raise merely a conjecture or possibility are not**

**sufficient to create even an inference of fact for consideration on summary**

judgment."). Indeed, on June 26, 2019, Dr. Wanzo completed an Attending Physician's Statement indicating that Plaintiff could not return to full time work until September 23, 2019. (Geter Dep. Ex. 24).

Schneider further objects on the basis that the statements in Paragraph 49 are not material to Schneider's Motion for Summary Judgment. Specifically, Dr. Wanzo's belief that Plaintiff had a 95% chance to return to full-time work is not relevant to whether Plaintiff was a qualified individual with a disability or requested a reasonable accommodation. Schneider had already granted multiple extensions of Plaintiff's accommodations despite the fact that Dr. Wanzo believed the part-time restriction could be removed on February 13, 2019 (Geter Dep. Ex. 14), March 19, 2019 (Geter Dep. Ex. 16), and April 30, 2019 (Geter Dep. Ex. 17).   Plaintiff's three requests to extend her part-time schedule amounted to a request for a permanent part-time schedule. *Campbell v. KBRwyle Tech. Sols., LLC*, 2019 WL 1353965, at *8 (N.D. Ala. Mar. 26, 2019) (finding accommodation requests unreasonable where it was "clear that these restrictions were not temporary" when employee exhausted her FMLA leave, was provided a leave extension for four months, granted a request not to work

overtime for one month, and sought to not work overtime for an additional two months).

Schneider also objects on the basis that the statements in Paragraph 49 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Plaintiff's requested accommodation was "reasonable." Specifically, none of the cited testimony establishes that the request to continue working a modified schedule or request to work from home was reasonable. Rather, Plaintiff's request to work a part-time schedule for more than six months and her request to *permanently* work from home two days per week and anytime she was scheduled to work alone was not a reasonable accommodation. (*See* Reply p. 4-11).

50.    On April 2, 2019, Schneider sent Ms. Geter and Dr. Wanzo reasonable accommodation paperwork to get more information about her accommodation requests, and Ms. Geter provided the paperwork to her doctor. (Geter Dep. 170:11-172:22, 185:17-186:9; Geter Dep. Exs. 20 & 23.)

**RESPONSE:**   Schneider does not dispute that on April 2, 2019, it sent a letter to Plaintiff and Dr. Wanzo requesting that Plaintiff "Please take the below physician statement to [her] doctor to complete the additional questions that are needed for [her] accommodation extension request." (Geter Dep. Ex.

20). Responding further, Schneider requested that the information be provided by no later than April 8, 2019. (Geter Dep. Ex. 20; *see also* Schneider Decl. Ex. 1[10]).

51.     Ms. Geter communicated back and forth with leave management about the status of the requested additional paperwork through her termination on April 12, 2019. (Geter Dep. 158:9-159:2.)

**RESPONSE**: Schneider objects on the basis that the statements in Paragraph 51 are not supported by the record evidence. It is undisputed that Schneider sent Plaintiff and Dr. Wanzo a letter on April 2, 2019 requesting additional information needed for Plaintiff's accommodation extension request and requesting a response by April 8, 2019. (*See* SDMF, ¶ 50). It is further undisputed that Dr. Wanzo did not respond to Schneider's April 2, 2019 letter until April 27, 2019, approximately two weeks after the termination of Plaintiff's employment. (Dkt. 50-1, ¶ 69). As a result, Plaintiff failed to engage in the interactive process. (*See* Reply at p. 11-12).

Schneider further objects on the basis that the statements in Paragraph 51 are not material to Schneider's Motion for Summary Judgment. Specifically,

---

[10] A true and correct copy of the declaration of Christine Schneider has been filed as ECF No. 47-7.

**whether Plaintiff communicated with leave management is not material as to whether Plaintiff caused a breakdown in the interactive process. The burden to provide the additional information is on Plaintiff. Although Schneider provided both Plaintiff and Dr. Wanzo the paperwork, Plaintiff has presented no evidence that she inquired about the paperwork with either Schneider or Dr. Wanzo. Because Schneider did not receive the paperwork, it had no information to dispute the belief that her accommodation was becoming a permanent need nor did it have information to determine whether other possible accommodations were possible. (*See also* Reply at p. 11-12).**

52.    Ms. Geter has no knowledge whether Schneider followed up with Dr. Wanzo regarding the paperwork provided to Dr. Wanzo on April 2, 2019, and Schneider never told Ms. Geter that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo. (Geter Decl. ¶ 18.)

**<u>RESPONSE</u>:  Schneider objects on the basis that the statements in Paragraph 52 are not material to Schneider's Motion for Summary Judgment. The burden to provide medical documentation supporting an accommodation rests with Plaintiff, not Schneider. *See Williams v. Revco Discount Drug Centers, Inc.*, 552 F. App'x 919, 922 (11th Cir. 2014) (finding employer did not cause breakdown in the interactive process when Plaintiff admitted his physician**

never submitted any paperwork outlining the types of accommodations plaintiff required). It is undisputed that on April 2, 2019, Schneider sent both Plaintiff and Dr. Wanzo a letter requesting that Plaintiff "Please take the below physician statement to [her] doctor to complete the additional questions that are needed for [her] accommodation extension request." (Geter Dep. Ex. 20). It is also undisputed that Plaintiff did not provide the requested information until April 27, 2019, two weeks after the termination of Plaintiff's employment. Plaintiff has presented no evidence that she inquired about the status of the paperwork with either Schneider or Dr. Wanzo. Because Schneider did not receive the requested medical documentation in a timely manner, it had no information to dispute its belief that Plaintiff's accommodation was becoming a permanent need, nor did it have information to determine whether other potential accommodations were possible. (*See also* Reply at p. 11-12).

53.     Had Schneider asked Ms. Geter to follow up with Dr. Wanzo regarding the missing paperwork, she would have done so. (Geter Decl. ¶ 18.)

**RESPONSE:**   Schneider objects to the statements in Paragraph 53 as the statement and evidence upon which it relies is entirely speculative and, as such, is inadmissible. *Atakora v. Franklin,* 601 F. App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which raise merely a conjecture or possibility are not

sufficient to create even an inference of fact for consideration on summary judgment.").

Schneider further objects on the basis that the statements in Paragraph 53 are not material to Schneider's Motion for Summary Judgment. The burden to provide medical documentation supporting an accommodation request rests solely with Plaintiff, not Schneider. It is undisputed that on April 2, 2019, Schneider sent both Plaintiff and Dr. Wanzo a letter requesting that Plaintiff "Please take the below physician statement to [her] doctor to complete the additional questions that are needed for [her] accommodation extension request." (Geter Dep. Ex. 20). It is also undisputed that Plaintiff did not provide the requested information until April 27, 2019, two weeks after the termination of Plaintiff's employment. Plaintiff has presented no evidence that she inquired about the status of the paperwork with either Schneider or Dr. Wanzo. Because Schneider did not receive the requested medical documentation in a timely manner, it had no information to dispute its belief that Plaintiff's accommodation was becoming a permanent need, nor did it have information to determine whether other potential accommodations were possible. (*See also* Reply at p. 11-12).

54.     On April 12, 2019, Mr. Torrence and Ms. Biskey-Rose, in consultation with Ms. Janssen, decided that they would no longer accommodate Ms. Geter, and Schneider terminated Ms. Geter, although when he terminated Ms. Geter, Mr. Torrence told her it was out of his hands. (Torrence Dep. 50:10-13, 54:3-8; Geter Dep. 176:10-180:4, 181:13-19; Geter Dep. Ex. 22; Janssen Dep. 27:8-15, 40:12-42:20; Biskey-Rose Dep. 36:6-22.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 54 are not material to Schneider's Motion for Summary Judgment. Whether Mr. Torrence told Plaintiff that the termination decision was "out of his hands" is not relevant to the issue of whether Plaintiff was a qualified individual with a disability or requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

**Schneider further objects on the basis that the statements in Paragraph 54 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Schneider determined it could not accommodate Plaintiff as of April 12, 2019. Rather, Plaintiff's termination was effective on April 12, 2019. (Geter Dep. Ex. 22).**

55.    Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019, Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter. (Torrence Dep. 50:15-51:16.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 55 are not supported by Plaintiff's citation to the record. Specifically, Mr. Torrence testified there was no clear end date and that he interpreted the medical paperwork as indicating that Plaintiff "*may* be able to return to [work] full time." (Torrence Dep. 50:15-51:16) (emphasis added). Further, Schneider had already granted Plaintiff multiple extensions of her accommodation requests despite the fact that Dr. Wanzo believed the part-time restriction could be removed on February 13, 2019 (Geter Dep. Ex. 14), then again on March 19, 2019 (Geter Dep. Ex. 16), and then again on April 30, 2019 (Geter Dep. Ex. 17).  Moreover, Schneider terminated Plaintiff's employment not because it was too "taxing" on Mr. Torrence, but because it could no longer eliminate Plaintiff's essential job functions of working full time and working in the office. (*See* Reply at p. 2-4, 8-11, 13).**

56.    Other than one conversation with Ms. Biskey-Rose in which she asked if Ms. Geter could switch her Monday group therapy session and Ms. Geter told her that was not possible, nobody from Schneider discussed with Ms. Geter other possible accommodations – such as switching shifts or taking a short leave of absence through June 5, 2019 – before deciding to no longer accommodate her.

(Geter Decl. ¶ 19; Torrence Dep. 53:12-16, 54:9-55:10, 59:23-60:2; Janssen Dep. 25:12-16.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 56 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider had conversations with Plaintiff about other possible accommodations is not relevant to whether Schneider appropriately accommodated Plaintiff as the burden rests with Plaintiff to identify accommodations and there is no evidence in the record that Plaintiff requested a transfer to second shift as an accommodation. *See Puckett v. Bd. of Trustees of First Baptist Church of Gainesville, Inc.*, 17 F. Supp. 3d 1339, 1343 (N.D. Ga. 2014) ("The plaintiff bears the burden of identifying an accommodation[.]").**

**Schneider further objects on the basis that the statements in Paragraph 56 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that Schneider failed to consider other potential accommodations for Plaintiff. Specifically, it is undisputed that Schneider sent both Plaintiff and Dr. Wanzo correspondence on April 2, 2019 (10 days before Schneider terminated Plaintiff's employment) inquiring whether Plaintiff could work a different day of the week if Plaintiff could only work four days per week. (Geter Dep. Ex. 23). Schneider also asked Plaintiff if she could work**

54

a Monday-Friday, eight-hour schedule. (Geter Dep. Ex. 23). It is undisputed, however, that Plaintiff did not provide the requested information until April 27, 2019, two weeks after the termination of Plaintiff's employment. Schneider also considered hiring a temporary employee; however, it was not a viable option because the temporary employee would be working the overnight shift by him or herself without any knowledge and background needed to resolve issues that arose. (Biskey-Rose Dep. 40:14-25; Janssen Dep. 40:21-41:18[11]). Schneider also considered reassigning Plaintiff to an open and available position for which she was qualified, but the Fairburn location only had full-time positions available. (Torrence Decl. ¶ 17).

57.    If Schneider had offered Ms. Geter a transfer to second shift as an accommodation, she would have accepted it. (Geter Decl. ¶ 20.)

**RESPONSE:**   Schneider objects to the statements in Paragraph 57 as the statement and evidence upon which it relies is entirely speculative and, as such, is inadmissible. *Atakora v. Franklin,* 601 F. App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary

---

[11] **A true and correct copy of the deposition of Ashley Janssen has been filed as ECF No. 47-3.**

judgment."). Moreover, there is no evidence whatsoever in the record (Plaintiff's Declaration or otherwise) indicating that there was an open and available position on the second shift for which Plaintiff was qualified to perform. *Sons v. Federal Express Corp.*, 2012 WL 13135311, at \*10 (N.D. Ga. Sept. 10, 2012) (stating that it is Plaintiff's burden to identify "any open position that he could have performed given his physical limitations, with or without a reasonable accommodations."). Indeed, since there were no part-time APM positions available, a transfer to the second-shift would not have enabled Plaintiff to perform the essential functions of the APM position (i.e., full-time work) and there is nothing in the record establishing that Plaintiff would have been able to return to work full-time had she been transferred to the second shift.

58.    During Ms. Geter's employment, Schneider used temporary employees to fill in as APMs, and Ms. Geter often trained those employees. (Geter Dep. 77:16-25, 78:8-19, 131:5-24, 132:6-15, 138:22-25; Geter Decl. ¶ 11; Kitchens Dep. 17:12-18:12; Torrence Dep. 68:2-69:19; Janssen Dep. 7:18-8:1, 42:21-25; Biskey-Rose Dep. 29:15-31:1.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 58 are not material to Schneider's Motion for Summary Judgment. Specifically, whether or not Plaintiff used temporary employees during**

Plaintiff's employment is not relevant to whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider is not required to hire additional employees to perform Plaintiff's job duties. *Medearis v. CVS Pharmacy*, 92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job."). (*See* Reply at p. 6).

59.   For example, Shannon Bailey started out with Schneider as a temporary employee. (Kopf Dep. 8:14-9:9.)

**RESPONSE:**  Schneider objects on the basis that the statement in Paragraph 59 is not supported by admissible evidence. Ms. Kopf was an APM who worked on the second shift and there is no foundation for Ms. Kopf's assertion that Ms. Bailey started out with Schneider as a temporary employee.

Schneider further objects on the basis that the statements in Paragraph 59 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Ms. Bailey started working with Schneider as a temporary employee is not relevant to whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any

protected characteristic. Schneider is not required to hire additional employees to perform Plaintiff's job duties. *Medearis v. CVS Pharmacy,* 92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job."). (*See* Reply at p. 6).

60.    Another temp worked for over a year as a temporary employee. (Kopf Dep. 27:8-16.)

<u>RESPONSE</u>:  **Schneider objects on the basis that the statement in Paragraph 60 is not supported by admissible evidence. Ms. Kopf was an APM who worked on the second shift and there is no foundation for her assertion that "another temp worked for over a year as a temporary employee."**

**Schneider objects on the basis that the statements in Paragraph 60 are not material to Schneider's Motion for Summary Judgment. Specifically, whether an unidentified individual worked as a temporary employee for Schneider for over a year on an unidentified shift is not relevant to whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider is not required to hire additional employees to perform Plaintiff's job duties.**

*Medearis v. CVS Pharmacy,* **92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job."). (*See* Reply at p. 6).**

61.    No efforts were made to bring in a temporary employee to cover for Ms. Geter during her medical leave or during the time she needed a reasonable accommodation. (Janssen Dep. 43:1-14; Biskey-Rose Dep. 36:6-41:20.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 61 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider hired a temporary employee to "cover" for Plaintiff during her medical leave of absence or during the time period she requested an accommodation is not relevant to whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider is not required to hire additional employees to perform Plaintiff's job duties.** *Medearis v. CVS Pharmacy,* **92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job."). (*See* Reply at p. 6). Moreover, Schneider also considered hiring a temporary employee to cover Plaintiff's Sunday night shift; however, it was not a viable option because the temporary employee**

**would be working the overnight shift by him or herself without the knowledge and background needed to resolve issues that arose. (Biskey-Rose Dep. 40:14-25; Janssen Dep. 40:21-41:18).**

62.    Nobody considered placing Ms. Geter on leave through June 5, 2019 as an alternative accommodation, and nobody offered that alternative to Ms. Geter. (Biskey-Rose Dep. 36:6-41:20; Geter Decl. ¶ 19.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 62 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider considered placing Plaintiff on leave is not relevant to whether Schneider reasonably accommodated Plaintiff as the burden rests with Plaintiff to identify potential accommodations and there is no evidence in the record that Plaintiff, or her health care provider, requested that Plaintiff be placed on leave through June 5, 2019. *See Puckett v. Bd. of Trustees of First Baptist Church of Gainesville, Inc.*, 17 F. Supp. 3d 1339, 1343 (N.D. Ga. 2014) ("The plaintiff bears the burden of identifying an accommodation[.]").**

**Schneider further objects on the basis that the statements in Paragraph 62 are not supported by the record citations. Specifically, when Ms. Biskey-Rose was asked whether "there was any consideration of putting Ms. Geter on leave until she could return to work full-time," she responded: "That would**

**have been done – or made by the leave team. So I don't know if they considered**

**that or not." (Biskey-Rose Dep. 41:15-20).**

63.    If Schneider had put Ms. Geter on leave through June 5, 2019 when she could return to work full-time, she would have accepted it. (Geter Decl. ¶ 21.)

**RESPONSE:   Schneider objects to the statement in Paragraph 63 as the**

**statement and evidence upon which it relies is entirely speculative and, as such,**

**is inadmissible and not to be considered on summary judgment.** *Atakora v.*

*Franklin,* **601 F. App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which**

**raise merely a conjecture or possibility are not sufficient to create even an**

**inference of fact for consideration on summary judgment."). Indeed, on June**

**26, 2019, Dr. Wanzo submitted a medical note stating that Plaintiff continued**

**to only be able to work three days per week, ten hour days, until September 23,**

**2019. (Geter Dep. 193:19-194:4, Ex. 24). Further, Plaintiff's Declaration fails to**

**provide any foundation to establish that placement on leave would have been a**

**reasonable accommodation.**

**Schneider further objects on the basis that the statement in Paragraph**

**63 is not material to Schneider's Motion for Summary Judgment.  Specifically,**

**whether Schneider placed Plaintiff on leave is not relevant to whether**

**Schneider reasonably accommodated Plaintiff, as the burden rests with**

**Plaintiff to identify potential accommodations and there is no evidence in the record that Plaintiff, or her health care provider, requested that Plaintiff be placed on leave through June 5, 2019.** *See Puckett v. Bd. of Trustees of First Baptist Church of Gainesville, Inc.***, 17 F. Supp. 3d 1339, 1343 (N.D. Ga. 2014) ("The plaintiff bears the burden of identifying an accommodation[.]").**

64. Schneider has produced no evidence in this case that it performed an undue burden analysis in determining whether to accommodate Ms. Geter. (Torrence Dep. 66:2-69:19; Janssen Dep. 14:6-15:4; Biskey-Rose Dep. 36:6-41:20.)

**RESPONSE: Schneider objects on the basis that the statement in Paragraph 64 is not material to Schneider's Motion for Summary Judgment. Specifically, since Plaintiff did not identify a reasonable accommodation, Schneider was under no obligation to conduct an undue burden analysis in determining whether to accommodate Plaintiff.** *See Scott v. Postmaster Gen. U.S. Postal Serv.***, 818 F. App'x. 914, 917 (11th Cir. 2020) ("[Defendant] was not required to affirmatively assert undue hardship before [plaintiff] proved that there was a reasonable accommodation that [defendant] could give her.").** (*See* **Reply at p. 4-12).**

**Schneider further objects on the ground that this fact does not otherwise comply with LR 56.1(B)(1) in that it is set out as a legal conclusion.**

62

Schneider further objects on the basis that the statement in Paragraph 64 is not supported by Plaintiff's citation to the record. Specifically, Ms. Biskey-Rose was not asked about an undue burden analysis.

65.    Almost immediately after Ms. Geter was terminated, Schneider moved someone from first shift to third shift and hired two new people to work third shift. (Geter Dep. 180:17-181:4, Geter Dep. 210:15-20.)

**RESPONSE:**  Schneider objects on the basis that the statements in Paragraph 65 are not supported by admissible evidence. Specifically, Plaintiff does not provide any foundation to establish that she had personal knowledge that "[a]lmost immediately after" her termination, "Schneider hired two new people to work third shift." As such, these statements cannot be considered on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge."). Further, Plaintiff's assertion that "Schneider moved someone from first shift to third shift" is inadmissible hearsay. *MaCuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.") (internal quotations omitted).

**Schneider further objects on the basis that the statements in Paragraph 65 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider moved someone from first shift to third shift and/or hired two new people to work third shift is not relevant to whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider is not required to hire additional employees to perform Plaintiff's job duties.** *Medearis v. CVS Pharmacy,* **92 F.Supp.3d 1294, 1304 (N.D. Ga. 2015) ("As a matter of law, an employer is not required…to hire another employee to perform essential functions of the ADA plaintiff's job."). (***See*** Reply at p. 6). Moreover, the record evidence establishes that one individual was hired to replace Plaintiff and Schneider moved someone from the first shift to third shift after Ms. Williams resigned. (Torrence Dep. 14:1-24).**

66.   Schneider regularly transferred employees between shifts or used employees to cover shifts to which they were not assigned. (Torrence Dep. 14:1-24; Deposition of Kopf Dep. 7:12-18.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 66 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider transferred employees between shifts or used**

64

employees to cover shifts is not relevant to the issue of whether Schneider reasonably accommodated Plaintiff, retaliated against Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider was not required to reassign Plaintiff's job duties to other employees. (*See* Reply at p. 6).

Schneider further objects on the basis that the statements in Paragraph 66 are not supported by Plaintiff's citation to the record. First, while Mr. Torrence testified that employees were moved to replace employees who left, this does not mean that employees were "regularly transferred" or "used to cover shifts." Similarly, Ms. Kopf testified that she "did from time to time cover a third shift, and for one week I did cover a first shift." (Kopf Dep. 7:12-18). Her testimony does not support the statements in Paragraph 66.

67.    For example, Ryan Wheeler was moved to third shift from first when APM Audreianna Williams resigned, and Ms. Geter was terminated. (Torrence Dep. 14:1-24; Deposition of Kopf Dep. 7:12-18.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 67 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider moved Mr. Wheeler is not relevant to the issue of whether Schneider reasonably accommodated Plaintiff, retaliated against**

Plaintiff, or discriminated against Plaintiff based on any protected characteristic. Schneider was not required to reassign Plaintiff's job duties to other employees. *See Spears v. Creel,* 607 F. App'x 943, 948-49 (11th Cir. 2015) ("[T]he ADA does not require an employer to reallocate job duties in order to change the essential functions of a job."). (*See* Reply at p. 6).

Schneider further objects on the basis that the statements in Paragraph 67 are not supported by Plaintiff's citation to the record. Specifically, Mr. Torrence's cited testimony does not state that Schneider reassigned Mr. Wheeler to the third shift after Plaintiff's termination. Further, Ms. Kopf's testimony does not discuss Ms. Williams.

68.    While scheduled on second shift, APM Sarah Kopf covered third shift from time-to-time. (Kopf Dep. 7:12-18.)

**RESPONSE**: Schneider objects on the basis that the statements in Paragraph 68 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Ms. Kopf covered third shift from "time-to-time" is not relevant to whether Plaintiff was a qualified individual with a disability, whether Plaintiff requested a reasonable accommodation, or whether Schneider retaliated against Plaintiff or discriminated against Plaintiff based on any protected characteristic. Schneider was not required to reassign

Plaintiff's job duties to other employees. *See Spears v. Creel,* 607 F. App'x 943, 948-49 (11th Cir. 2015) ("[T]he ADA does not require an employer to reallocate job duties in order to change the essential functions of a job."). (*See* Reply at p. 6).

69.    Ms. Geter's issue with working alone at night was safety. (Geter Dep. 102:22-103:15, 105:2-106:3.)

**RESPONSE: Schneider objects on the basis that the statement in Paragraph 69 is not material to Schneider's Motion for Summary Judgment. Specifically, the fact that Plaintiff's "issue with working alone at night was safety" is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

70.    Ms. Geter had trouble working in a fast-paced high-pressure environment throughout her employment with Schneider; it did not begin with her need for accommodations in 2018 and 2019. (Geter Dep. 188:2-20; Geter Decl. ¶ 22.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 70 are not material to Schneider's Motion for Summary Judgment. Specifically, when Plaintiff began having difficulty working in a fast-paced high**

pressure environment is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Dr. Wanzo cited Plaintiff's inability to work in a fast-paced, high pressure environment as the reason she could not return to work full-time. (Geter Dep. Ex. 23). Specifically, when asked to "[p]rovide a statement of any specific job duties that Cierra is unable to perform because of [her] medical condition[,]" Dr. Wanzo wrote, "she is unable to work well in a fast paced, high pressure environment." (Geter Dep. Ex. 23).

71.   Moreover, the issue Ms. Geter had had more to do with working alone than the fast-paced environment. (Geter Decl. ¶ 22.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 71 are not supported by admissible evidence as it is an improper opinion under Federal Rule of Evidence ("FRE") 701 since Plaintiff is not qualified to give an opinion on what caused her PTSD and depression. *United States v. Umbach,* 708 F. App'x 533, 545 (11th Cir. 2017) ("Under Federal Rule of Evidence 701, a lay witness may give testimony in the form of an opinion as long as the opinion is '(a) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a**

68

fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'").

Schneider further objects on the basis that the statements in Paragraph 71 are not material to Schneider's Motion for Summary Judgment. Specifically, Dr. Wanzo cited Plaintiff's inability to work in a fast-paced, high pressure environment as the reason she could not return to work full-time. (Geter Dep. Ex. 23). The fact that Plaintiff also had an issue with working alone is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.

72.    Despite her difficulties working in a fast-paced high-pressure environment, Ms. Geter performed well at her job throughout her employment with Schneider. (Geter Decl. ¶ 23.)

RESPONSE: Schneider objects on the basis that the statements in Paragraph 72 are not supported by admissible evidence as it is an improper unproper opinion under FRE 701.

Schneider further objects on the basis that the statements in Paragraph 72 are not material to Schneider's Motion for Summary Judgment. Indeed,

whether Plaintiff performed "well" is immaterial to whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Moreover, the statements in Paragraph 72 are too vague, speculative, and conclusory to create a material dispute of fact.

73.    Other than one minor incident before her medical leave, Ms. Geter did not have performance issues while employed by Schneider. (Geter Decl. ¶ 24.)

**RESPONSE**: Schneider objects on the basis that the statements in Paragraph 73 are not supported by admissible evidence as it is an improper opinion under FRE 701.

Schneider further objects on the basis that the statements in Paragraph 73 are not material to Schneider's Motion for Summary Judgment. Indeed, Plaintiff's performance is immaterial to whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Moreover, the statements in Paragraph 73 are too vague, speculative, and conclusory to create a material dispute of fact.

74.    After Schneider terminated Ms. Geter's employment, Ms. Geter had a setback in her mental health treatment and a recovery as a result of the termination. (Geter Dep. 196:6-16, 196:21-24, 222:20-21; Geter Decl. ¶ 25.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 74 are not supported by admissible evidence. Specifically, none of the evidence cited contains any foundation to establish that the alleged "setback in [Plaintiff's] mental health treatment" was "as a result of the termination." As such, this statement is an improper opinion under FRE 701.**

**Schneider further objects on the basis that the statements in Paragraph 74 are not material to Schneider's Motion for Summary Judgment.**

75.    Ms. Geter's panic attacks and outbursts increased after her termination due to the pressure of being unemployed. (Geter Decl. ¶ 25.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 75 are not supported by admissible evidence. Specifically, Plaintiff's Declaration fails to provide any foundation to establish that her alleged "panic attacks and outbursts increased after [her] termination due to the pressure of being unemployed."  As such, this statement is an improper opinion under FRE 701.**

**Schneider further objects on the basis that the statements in Paragraph 75 are not material to Schneider's Motion for Summary Judgment.**

**VI.   APMs now all Dispatch Remotely from Green Bay, Wisconsin**

76.    In March or April 2020, Schneider relocated all its Area Planning Managers to the corporate headquarters in Green Bay, Wisconsin to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (Torrence Dep. 13:10-12, 16:22-17:11, 23:15-21; Kitchens Dep. 10:11-23; Janssen Dep. 18:10-19:25, 44:6-45:9; Biskey-Rose Dep. 18:3-23:5; Kopf Dep. 9:10-14.)

**RESPONSE:** **Schneider objects on the basis that the statements in Paragraph 76 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that *all* of the essential functions of the Fairburn APM position were transferred to Green Bay. Rather, while the dispatch functions of the APM position were reallocated to Green Bay, "all of the [additional] day-to-day activities" of the Fairburn APMs who worked on the second and third shift – including assisting Schneider drivers – were reallocated to the Service Operation Support position in Fairburn.  (Biskey-Rose Dep. 18:13-19:1; 26:6-18). Plaintiff testified that assisting drivers was one of the essential functions of her APM position. (Geter Dep. 54:3-6 (When asked: "And would it be accurate to say that one of your primary duties was supporting the drivers?" Plaintiff responded: "Yes, sir.")).**

77. The duties APMs previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Kopf Dep. 14:17-15:1, 26:11-14.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 77 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that *all* of the functions of the Fairburn APM position were transferred to Green Bay. Rather, while the dispatch functions of the APM position were reallocated to Green Bay, "all of the [additional] day-to-day activities" of the Fairburn APMs who worked on the second and third shift – including assisting Schneider drivers – were reallocated to the Service Operation Support position in Fairburn. (Biskey-Rose Dep. 18:13-19:1; 26:6-18). Plaintiff testified that assisting drivers was one of the essential functions of her APM position. (Geter Dep. 54:3-6 (When asked: "And would it be accurate to say that one of your primary duties was supporting the drivers?" Plaintiff responded: "Yes, sir.")).**

78. The APMs in Green Bay work remotely with the southeast hub and perform dispatch for the southeast hub. (Torrence Dep. 16:22-17:5, 29:8-30:3.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 78 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that *all* of the essential functions of the**

Fairburn APM position were transferred to Green Bay. Rather, while the dispatch functions of the APM position were reallocated to Green Bay, "all of the [additional] day-to-day activities" of the Fairburn APMs who worked on the second and third shift – including assisting Schneider drivers – were reallocated to the Service Operation Support position in Fairburn. (Biskey-Rose Dep. 18:13-19:1; 26:6-18). Plaintiff testified that assisting drivers was one of the essential functions of her APM position. (Geter Dep. 54:3-6 (When asked: "And would it be accurate to say that one of your primary duties was supporting the drivers?" Plaintiff responded: "Yes, sir.")).

Schneider also objects on the basis that the statements in Paragraph 78 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that APMs in Green Bay are working remotely. While Mr. Torrence's testimony states that the APMs in Green Bay are dispatching drivers for the southeast hub, he does not testify regarding where they perform their work. In fact, APMs in Green Bay are required to work in the office in Green Bay. (Janseen Dep. 20:13-22).

79.    During the relevant time period, the APMs employed in Fairburn were Ms. Geter (African American), Tiffany Kitchens (Caucasian), Cheryl Joseph (African American), Joon Hyung (Asian), Austin Ottinger (Caucasian), Robert Turner (Caucasian), Sara Kopf (Caucasian), Ryan Wheeler (African American), Desmond Seymour (African American), and Audreianna Williams (African American). (Torrence Dep. 18:1-20:18)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 79 are not material to Schneider's Motion for Summary Judgment. Specifically, the names and races of the APMs employed in Fairburn are not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

**Schneider further objects on the basis that the statements in Paragraph 79 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that there were no other APMs employed in Fairburn. Specifically, additional APMs employed in Fairburn prior to Plaintiff's termination include Candace Smith and Marshall Mock. (Torrence Dep. 13:13-18). Further, the testimony cited does not reference Desmond Seymour or his race, nor does it mention the race of Ms. Williams and Plaintiff.**

80.    The APMs in Fairburn were given the options to (1) transfer to Green Bay, (2) were offered other positions in Fairburn if they were available, or (3) were given a severance package. (Kitchens Dep. 10:21-12:9; Torrence Dep. 20:19-23:14; Janssen Dep. 19:1-25; Biskey-Rose Dep. 18:3-23:5.)

**RESPONSE**:  **Schneider objects on the basis that the statements in Paragraph 80 are not material to Schneider's Motion for Summary Judgment. Specifically, the options given to the APMs in Fairburn when the dispatch function of the APM position was relocated to Green Bay – approximately one year after Plaintiff's termination of employment – is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.**

81.    After the APM relocation, Ms. Kitchens (Caucasian) was retained in Fairburn as a Senior Operations Specialist ("SOS"), Ms. Joseph's (African American) position was eliminated, Mr. Hyung's (Asian) position was eliminated, Mr. Ottinger (Caucasian) transferred to Green Bay, Mr. Turner (Caucasian) was retained as a DTL, Ms. Kopf (Caucasian) was retained as a DTL, Mr. Wheeler's (African American) position was eliminated, Ms. Williams (African American) had already resigned, Mr. Seymour ("African American") was retained as a SOS, and Ms. Geter (African American) had already been terminated. (Torrence Dep. 18:1-20:18.)

**RESPONSE:** Schneider objects on the basis that the statements in Paragraph 81 are not material to Schneider's Motion for Summary Judgment. Specifically, whether employees were retained or their position was eliminated is not relevant to whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.

Schneider objects on the basis that the statements in Paragraph 81 are not supported by Plaintiff's citation to the record to the extent they are construed to suggest that *all* of the essential functions of the Fairburn APM position were transferred to Green Bay. Rather, while the dispatch functions of the APM position were reallocated to Green Bay, "all of the [additional] day-to-day activities" of the Fairburn APMs who worked on the second and third shift – including assisting Schneider drivers – were reallocated to the Service Operation Support position in Fairburn.  (Biskey-Rose Dep. 18:13-19:1; 26:6-18).  Plaintiff testified that assisting drivers was one of the essential functions of her APM position. (Geter Dep. 54:3-6 (When asked: "And would it be accurate to say that one of your primary duties was supporting the drivers?" Plaintiff responded: "Yes, sir.")).

**Schneider further objects on the basis that the statements in Paragraph 81 are not supported by Plaintiff's citation to the record. Specifically, the testimony cited does not establish that Ms. Kitchens was retained as an SOS, that Ms. Kopf was retained as a DTL, or that Mr. Seymour was African American or retained as a SOS.**

82.    Had Ms. Geter been employed with Schneider at the time of the APM relocation, she would have been offered the opportunity to relocate to Green Bay and would have been considered for open positions in Fairburn. (Biskey-Rose Dep. 25:6-18.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 82 are not supported by admissible evidence as it is pure speculation whether Plaintiff "would have been offered the opportunity to relocate." Thus, it may not be considered on summary judgment. *Atakora v. Franklin,* 601 F. App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment.").**

**Schneider further objects on the basis that the statements in Paragraph 82 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Plaintiff "would have been offered the opportunity to relocate" is not**

relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic.

## VII.   Employees Dispatched Drivers Remotely Throughout the Pandemic

83.    The employees other than drivers employed by Schneider in Fairburn worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and then returned to the office full-time in March 2021. (Torrence Dep. 23:22-27:25, 28:14-25; Kitchens Dep. 12:23-13:14; Janssen Dep. 23:10-16; Biskey-Rose Dep. 27:9-15; Kopf Dep. 15:2-16:2.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 83 are not material to Schneider's Motion for Summary Judgment. Specifically, whether APMs worked remotely during the global pandemic is not relevant to whether in-office work was an essential function of the job or whether Plaintiff's request to *permanently* work from home two days per week and anytime she was scheduled to work alone was reasonable. (*See* Reply at p. 10-11).**

84.    Mr. Torrence worked remotely throughout the pandemic and continues to work from home from time-to-time. (Torrence Dep. 23:22-24:16.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 84 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Mr. Torrence worked remotely during the pandemic is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. During the pandemic, Mr. Torrence has worked as a Driver Business Leader and Operations Manager – not an APM. Thus, whether Mr. Torrence worked remotely during the pandemic is irrelevant as his job duties are different than the APM job duties. (*See* Reply at p. 10-11).**

85.    To accommodate the change with the staff working remotely, the printer has been moved to the driver's lounge, and the driver key box is no longer behind locked doors. (Kitchens Dep. 20:2-21:8; Biskey-Rose Dep. 26:19-27:8, 27:16-29:1.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 85 are not material to Schneider's Motion for Summary Judgment. Specifically, the actions Schneider took during the global pandemic are not relevant to the issue of whether Plaintiff was a qualified individual with a**

disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. (*See* Reply at p. 10-11).

Schneider further objects on the basis that the statements in Paragraph 85 are not supported by Plaintiff's citation to the record. To the contrary, Ms. Biskey-Rose testified that the driver keys are currently kept in a locked office; however, for a period of time during the global pandemic, Schneider had to leave the office unlocked. (Biskey-Rose Dep. 26:19-27:8).

Schneider further objects on the basis that the statements in Paragraph 85 are not supported by Plaintiff's citation to the extent they are construed to suggest that prior to the global pandemic, it would have been reasonable to keep the door unlocked or move the printer. Specifically, as Ms. Biskey-Rose testified, the keys are currently kept in a locked office. (Biskey-Rose Dep. 26:19-27:8). Further, Ms. Biskey-Rose testified that "[t]here's some faxing and scanning capabilities that we're having challenges with [the printer] being in the driver lounge just from a technology standpoint…anytime I have to print confidential information, it being in the driver lounge is not an ideal location." (Biskey-Rose Dep. 28:3-10).

## VIII. Ms. Geter's Comparators

86.     Tiffany Kitchens (Caucasian), who was an APM at all relevant times, was permitted to work remotely for at least four months while her mother was ill and is still employed by Schneider. (Geter Dep. 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Kitchens Dep. 6:1-24, 13:15-16:15; Torrence Dep. 14:18-21; Biskey-Rose Dep. 32:21-34:5.)

**RESPONSE: Schneider objects on the basis that the statements in Paragraph 86 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Ms. Kitchens was permitted to temporarily work remotely to care for her ill mother is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider discriminated against Plaintiff based on any protected characteristic. Ms. Kitchens is not an appropriate comparator as she worked a different shift, reported to a different supervisor, never worked a part-time schedule, and never requested to permanently work from home two days per week or anytime she was scheduled to work alone. (*See* Reply at p. 10, 15).**

87.     Even before COVID and before her mother became ill, Ms. Kitchens sometimes worked from home. (Kitchens Dep. 27:11-21.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 87 are not supported by Plaintiff's citation to the record. Ms. Kitchens testified as follows: "So that's where it gets – sometimes I would do planning from the house. I worked a lot. My schedule would have been either seven to four or six to three, something like that, but I worked a lot. Sometimes I would log in, you know, if I couldn't get the planning done I had to go and finish the planning for the morning, whatever was needed." (Kitchens Dep. 27:11-21). Ms. Kitchens' testimony suggests that she would complete additional work at her home outside of her shift – not work from home during her shift.**

**Schneider further objects on the basis that the statements in Paragraph 87 are not material to Schneider's Motion for Summary Judgment. Specifically, even if Ms. Kitchens "sometimes worked from home," it is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider discriminated against Plaintiff based on any protected characteristic. Ms. Kitchens is not an appropriate comparator as she worked a different shift, reported to a different supervisor, never worked a part-time schedule, and never requested to**

**permanently work from home two days per week or anytime she was scheduled to work alone. (*See* Reply at p. 10, 15).**

88.    Beginning in spring of 2018, Sarah Kopf (Caucasian), who reported to Mr. Torrence, was also permitted to work from home one or two days a month, worked from home during COVID, and has continued to work from home from time-to-time post-COVID. (Geter Dep. 204:20-205:23, 206:5-208:5, 218:9-23; Torrence Dep. 56:24-57:6; Kopf Dep. 11:7-11, 16:3-8.)

**RESPONSE**: **Schneider objects on the basis that the statements in Paragraph 88 are not supported by admissible evidence as Plaintiff's testimony regarding Ms. Kopf is inadmissible hearsay. *MaCuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.") (internal quotations omitted).**

**Schneider further objects on the basis that the statements in Paragraph 88 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Ms. Kopf worked remotely during the global pandemic is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Ms. Kopf is not an appropriate comparator as she worked a different shift, never worked**

**a part-time schedule, and never requested to permanently work from home two days per week or anytime she was scheduled to work alone.**

**Schneider further objections on the basis that the statements in Paragraph 88 are not supported by Plaintiff's citation to the record. Specifically, Plaintiff does not provide a record citation that Ms. Kopf is Caucasian.**

89.    Ms. Kopf is still employed by Schneider and, on March 8, 2020, was given a DTL position when the APMs were moved to Green Bay. (Torrence Dep. 16:14-17; Kopf Dep. 6:17-24.)

**<u>RESPONSE</u>:  Schneider objects on the basis that the statements in Paragraph 89 are not material to Schneider's Motion for Summary Judgment. Specifically, the fact that Ms. Kopf is still employed is not relevant to the issue of whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation, or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Plaintiff has not identified Ms. Kopf as a comparator, nor is she an appropriate one as she worked a different shift than Plaintiff, never worked a part-time schedule, and never requested to permanently work from home two days per week or anytime she was scheduled to work alone.  (Kopf Dep. 21:15-22:10).**

90.     Audreianna Williams, who reported to Mr. Torrence on third shift, was regularly permitted to work remotely through the latter part of her pregnancy. (Williams Decl. ¶ 10.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 90 are not material to Schneider's Motion for Summary Judgment. Specifically, whether Schneider permitted Ms. Williams to temporarily work remotely during the latter part of her pregnancy is not relevant to the issue of whether Plaintiff is a qualified individual with a disability, requested a reasonable accommodation, or Schneider discriminated against Plaintiff based on any protected characteristic. First, Ms. Williams is also African-American. (*See* SDMF, ¶ 79). Moreover, Ms. Williams never worked a part-time schedule and never requested to permanently work from home two days per week or anytime she was scheduled to work alone. (Torrence Dep. 64:24-65:20).**

91.     Mr. Torrence took off between 80 and 82 days in 2018 and Ms. Geter had personal knowledge of this because she viewed the Fairburn calendar to which all employees had viewing access. (Geter Dep. 215:17-216:4; Geter Decl. ¶ 10; Williams Decl. ¶ 6; Torrence Dep. 57:22-58:12.)

**RESPONSE:  Schneider objects on the basis that the statements in Paragraph 91 are not supported by admissible evidence. Specifically, both Plaintiff's and Ms. Williams' Declarations fail to provide any foundation to**

86

establish any personal knowledge regarding Mr. Torrence's schedule. Indeed, both Plaintiff and Ms. Williams worked the third shift; however, they admit that Mr. Torrence regularly covered the second shift. (Geter Decl. ¶ 9; Williams Decl. ¶ 5). Plaintiff also was out on medical leave from October 9, 2018 – January 2, 2019 (Dkt. 50-1, ¶¶ 33, 48), and therefore does not have any personal knowledge of the time Mr. Torrence worked while she was on leave. Both Plaintiff and Ms. Williams refer to a "Fairburn calendar" but they do not provide any details about the calendar including who created it, how it was created, what data it relied upon, or whether it accurately reflected Mr. Torrence's schedule. As such, neither Plaintiff nor Ms. Williams has personal knowledge regarding Mr. Torrence's schedule and their statements cannot be considered on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.*, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Schneider further objects on the basis that the statements in Paragraph 91 are not supported by Plaintiff's citation to the record. Specifically, when Mr. Torrence was asked whether he was "out of the office somewhere between 85

87

and 87 days between May and December of 2018" he responded, "I don't believe that's accurate." (Torrence Dep. 57:22-58:12). Moreover, being "out of the office" does not mean that he "took off" those days.

Schneider further objects on the basis that the statements in Paragraph 91 are not material to Schneider's Motion for Summary Judgment. Specifically, the amount of time Mr. Torrence took off in 2018 is not relevant to whether Plaintiff was a qualified individual with a disability, requested a reasonable accommodation or whether Schneider retaliated or discriminated against Plaintiff based on any protected characteristic. Mr. Torrence worked in a completely different position than Plaintiff, the Operations Team Leader position. (Torrence Dep. 7:9-17). The functions of an Operations Team Leader are different than those of an APM and whether Mr. Torrence worked part-time as an Operations Team Leader is irrelevant to Plaintiff's claims.

Date: August 2, 2021

Respectfully submitted,

By: /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor

88

Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1B</u>

I certify that on August 2, 2021, I electronically filed the foregoing *Response*

*To Plaintiff's Statement Of Disputed Material Facts* with the Clerk of Court using

the CM/ECF system, which will automatically send email notification of such

filing to the following attorneys of record:

Cheryl B. Legare

cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman

font and complied with the margin and type requirements of this Court.

Respectfully submitted,

By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP

1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*