# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## CASE NO. 22-11285-BB

---

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE STEVE C. JONES
CASE NO. 1:20-cv-01148-SCJ

---

## APPELLANT'S APPENDIX – VOL. VII

---

**CHERYL B. LEGARE**
**Georgia Bar No. 038553**
**CAMILLE D. JONES**
**Georgia Bar No. 612930**
**LEGARE, ATTWOOD & WOLFE, LLC**
**125 Clairemont Avenue, Suite 380**
**Decatur, Georgia 30030**
**(470) 823-4000 | cblegare@law-llc.com**

**Counsel for Appellant Cierra Geter**

CIERRA GETER v. SCHNEIDER NATIONAL CARRIERS, INC.

Eleventh Circuit Court of Appeals Case No. 22-11285-BB

Index of Exhibits

| USDC Docket-Tab No. | Volume | Date | Description |
|---|---|---|---|
| Index | I | | |
| A | I | | US District Court Docket Sheet |
| 1 | I | 03/12/2020 | Complaint |
| 12 | I | 06/08/2020 | Answer |
| 46 | I | 06/07/2021 | Defendant's Motion for Summary Judgment |
| 46-1 | I | 06/07/2021 | Defendant's Summary Judgment Brief |
| 46-2 | I | 06/07/2021 | Defendant's Statement of Material Facts |
| 46-3 | I | 06/07/2021 | Declaration of Travis Torrence |
| 46-4 | I | 06/07/2021 | Deposition Excerpts and Exhibits 2, 4, 5, 6, 7, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24 of Cierra Geter |
| 46-5 | I | 06/07/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 46-6 | I | 06/07/2021 | Deposition Excerpts of Travis Torrence |
| 46-7 | II | 06/07/2021 | Deposition Excerpts of Tiffany Kitchens |
| 46-8 | II | 06/07/2021 | Deposition Excerpts of Sarah Kopf |
| 46-9 | II | 06/07/2021 | Declaration of Christine Schneider |
| 46-10 | II | 06/07/2022 | Deposition Excerpts of Ashley Marie Janssen |
| 47 | II | 06/07/2021 | Notice of Filing Deposition Transcripts |
| 47-1 | II | 06/07/2021 | Deposition Transcript of Cierra Geter: Part 1 (Pages 1-174) |
| 47-1 | III | 06/07/2021 | Deposition Transcript of Cierra Geter Part 2 (Pages 175-237) |
| 47-2 | III | 06/07/2021 | Deposition Transcript of Travis Torrence |
| 47-3 | III | 06/07/2021 | Deposition Transcript of Ashley Marie Janssen |
| 47-4 | III | 06/07/2021 | Deposition Transcript of Sarah Kopf |

| 47-5 | IV | 06/07/2021 | Deposition Transcript of Tiffany Kitchens |
| 47-6 | IV | 06/07/2021 | Deposition Transcript of Marianne Biskey-Rose |
| 47-7 | IV | 06/07/2021 | Declaration of Christine Schneider |
| 47-8 | IV | 06/07/2021 | Declaration of Travis Torrence |
| 50 | IV | 07/12/2021 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment |
| 50-1 | IV | 07/12/2021 | Plaintiff's Response and Objections to Defendant's Statement of Material Facts |
| 50-2 | IV | 07/12/2021 | Plaintiff's Statement of Material Facts |
| 50-3 | IV | 07/12/2021 | Declaration of Cierra Geter |
| 50-4 | IV | 07/12/2021 | Declaration of Audreianna Williams |
| 50-5 | V | 07/12/2021 | Deposition Excerpts of Marianne Biskey-Rose |
| 50-6 | V | 07/12/2021 | Biskey-Rose Deposition Exhibit 48 |
| 50-7 | V | 07/12/2021 | Deposition Excerpts of Cierra Geter |
| 50-8 | V | 07/12/2021 | Cierra Geter Deposition Exhibit 9 |
| 50-9 | V | 07/12/2021 | Deposition Excerpts of Ashley Marie Janssen |
| 50-10 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 4 |
| 50-11 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 16 |
| 50-12 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 31 |
| 50-13 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 32 |
| 50-14 | V | 07/12/2021 | Ashley Marie Janssen Deposition Exhibit 34 |
| 50-15 | V | 07/12/2021 | Deposition Excerpts of Tiffany Kitchens |
| 50-16 | V | 07/12/2021 | Deposition Excerpts of Sarah Kopf |
| 50-17 | VI | 07/12/2021 | Deposition Excerpts of Travis Torrence |
| 50-18 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 4 |
| 50-19 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 30 |
| 50-20 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 31 |
| 50-21 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 32 |
| 50-22 | VI | 07/12/2021 | Travis Torrence Deposition Exhibit 46 |

| 51 | VI | 08/02/2021 | Defendant's Reply in Support of its Motion for Summary Judgment |
| 52 | VI | 08/02/2021 | Defendant's Response to Plaintiff's Statement of Material Facts |
| 53 | VII | 12/10/2021 | Final Report and Recommendation |
| 57 | VII | 01/10/2022 | Plaintiff's Objections to Report and Recommendation |
| 60 | VII | 02/07/2022 | Defendant's Response to Plaintiff's Objections to Report and Recommendation |
| 61 | VII | 03/21/2022 | Order Adopting Report and Recommendation |
| B |  |  | Certificate of Service |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | : | CIVIL ACTION NO. |
| | : | 1:20-CV-1148-SCJ-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SCHNEIDER NATIONAL | : | **FINAL   REPORT   AND** |
| CARRIERS, INC.,  | : | **RECOMMENDATION ON A MOTION** |
| | : | **FOR SUMMARY JUDGMENT** |
| Defendant. | | |

Plaintiff Cierra Geter filed this action on March 12, 2020. Plaintiff brings

claims against Defendant Schneider National Carriers, Inc. ("Defendant" or

"Schneider"), her former employer, for disability discrimination, retaliation, and

failure to accommodate under Title I of the Americans with Disabilities Act of 1990

("ADA"), as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101,

*et seq.*, and for race discrimination under Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981 ("§ 1981").

The action is before the Court on the Defendant's Motion for Summary

Judgment [46]. For the reasons set forth below, the undersigned **RECOMMENDS**

that Defendant's Motion for Summary Judgment [46] be **GRANTED** and that

judgment be entered in favor of Defendant on all of Plaintiff's claims.

## I.  FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's "Statement of Undisputed Material Facts" [46-2] ("Def. SUMF"), Plaintiff's "Statement of Disputed Material Facts as to Which There Exist Genuine Issues to be Tried" [50-2] ("Pl. SDMF"), and their associated exhibits. Some facts may also be taken from Plaintiff's "Responses and Objections to Defendant's Statement of Undisputed Material Facts" [50-1] ("Pl. Resp. SUMF") and Defendant's "Response to Plaintiff's Statement of Disputed Material Facts" [52] ("Def. Resp. SDMF"). The parties' responses to each other's statements of fact include numerous objections, which will be resolved, as necessary, in the forthcoming summary of facts or analysis.

For those facts submitted by Defendant that are supported by citations to record evidence, and which Plaintiff has not expressly disputed with her own citations to record evidence or opposed with a valid objection, the Court must deem those facts admitted, pursuant to Local Rule 56.1(B). *See* LR 56.1(B)(2)(a)(2), NDGa. ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the

movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1)."). Accordingly, for those facts submitted by Defendant that Plaintiff has failed to dispute, the Court must accept the facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 (N.D. Ga. Feb. 16, 2007).

Similarly, the Court accepts as true any facts offered by Plaintiff that Defendant has not disputed with a valid objection to the admissibility or sufficiency of the supporting evidence, or by correctly pointing out that the fact is immaterial or fails to comply with the provisions of the Local Rules. LR 56.1(B)(3), NDGa. To be sure, the Court has excluded assertions of fact by either party that are clearly immaterial or presented as arguments or legal conclusions, as well as assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in a party's brief and not in its statement of facts.[1] *See* LR 56.1(B)(1), NDGa.; *see also* LR 56.1(B)(2)(b), NDGa. (requiring that respondent's statement of facts also

---

[1] "A fact is material if proof of its existence or nonexistence would affect the outcome of the case under controlling substantive law." *Philadelphia Indem. Ins. Co. v. Manitou Constr., Inc.*, 115 F. Supp. 3d 1378, 1382 (N.D. Ga. 2015) (citation omitted).

comply with LR 56.1(B)(1)). The Court has nevertheless viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Plaintiff Cierra Geter, an African American woman, began her employment with Schneider, a transportation and logistics company, in July 2014 as a full-time Dispatch Analyst. Def. SUMF ¶¶ 1, 3-4; Pl. SDMF ¶¶ 1, 79; Pl.'s Dep. [47-1] at 40, 42 (testifying that when she interviewed for the position, she understood that it would be full-time). The job title for the position of Dispatch Analyst was changed to Area Planning Manager ("APM") about a year later, but the job duties remained the same. Def. SUMF ¶¶ 4-5; Pl. SDMF ¶ 2. In this position, Plaintiff worked the third shift at Schneider's Fairburn, Georgia location on Wednesday, Thursday, Friday, and Sunday from 11:00 p.m. to 10:00 a.m. Def. SUMF ¶¶ 3, 6; *see also* Pl. Resp. SUMF ¶¶ 6, 9-10.[2] Plaintiff reported to Operations Team Lead Travis Torrence ("Torrence"), who supervised the second and third shift APMs and Driver Team Leads ("DTL") and reported to Operations Manager Doug Horton, who in turn

---

[2] Schneider operates twenty-four hours a day, seven days a week. Biskey-Rose Dep. [47-6] at 12.

reported to Director of Operations Marianne Biskey-Rose ("Biskey-Rose"). Def. SUMF ¶¶ 7, 40; Pl. SDMF ¶¶ 3, 5.

During the relevant time, the APMs working at the Fairburn location included Plaintiff, Tiffany Kitchens ("Kitchens"), Sarah Kopf ("Kopf"), Desmond Seymour ("Seymour"), and Audreianna Williams ("Williams"), among others. Pl. SDMF ¶ 79; Pl.'s Dep. at 70-71, 76-77. On the third shift, from at least the middle of 2018 through April 2019, Plaintiff worked with APM Williams, APM Seymour, and Elaine Young ("Young"), a temporary worker. Pl.'s Dep. at 70-71, 78.[3] Williams declared that she worked the third shift on Friday through Tuesday. Williams Decl. [50-4] ¶ 3. Plaintiff attested that she would work with Williams and Seymour on Sundays, with Seymour on Wednesdays, and with Williams on Fridays, and that the only shift she worked alone was on Thursday. Pl.'s Decl. [50-3] ¶¶ 5-6. However,

---

[3] Defendant argues that "who Plaintiff worked with on different days prior to going out on leave is not relevant to the issue of whether full-time work or working in the office were essential functions of her job or whether part-time work or permanently working from home two days per week or anytime she was scheduled to work alone were reasonable accommodations." Def. Resp. SDMF ¶ 11 (emphasis omitted). The Court disagrees. In particular, as discussed in greater detail in the analysis of Plaintiff's failure to accommodate claim, how many individuals worked on the third shift and whether Plaintiff was ever scheduled to work alone are each relevant to Defendant's very own arguments that Plaintiff's requested accommodations were not reasonable because working part-time required the other third shift employees to cover her work and because working remotely when she was scheduled to work alone would have meant that no employees would be in the office to assist drivers with tasks that could not be performed remotely. Accordingly, the Court overrules this objection.

Torrence averred that APMs on third shift often worked alone and therefore, as an APM working on third shift, Plaintiff frequently worked alone, especially on Sundays. Torrence Decl. [46-3] ¶¶ 5, 10.

APMs provided support to Schneider truck drivers, including by coordinating dispatching drivers with customer loads, assisting drivers in gathering their paperwork and load information, taking calls and messages from drivers, and resolving any driver issues. Def. SUMF ¶ 10. The job description for the APM position specifies that it is an "Exempt (Salaried)" position and provides the following, in pertinent part:

**JOB SUMMARY:**

The [APM] is accountable for establishing, communicating and executing the plan for a specific geographic region or a specific customer by matching available driver capacity and equipment with customer load tenders. As the recognized expert on freight flows for that customer, the APM collaborates with Operations, Sales, Pricing, and Customer Service to ensure overall key factor success.

**ESSENTIAL JOB DUTIES AND RESPONSIBILITIES:**

- Establish the market plan to include: shift direction, priority of freight, load and stage, driver calendar requests, etc. Continually assess market conditions and performance, and adjust plan accordingly.
- Be recognized expert in role. Provide expertise on new opportunities and proactively identify potential solutions that maximize overall value for Schneider.
- Assign freight to drivers in accordance with the market plan to maximize all aspects of the value triangle (profitability, customer

satisfaction, and driver retention). All decisions also need to be made in accordance with Schneiders [sic] #1 core value: safety.

- Generate actions to improve key factor results such as: service, unused hours and unbilled miles.
- Communicate market plan to Customer Service, Operations, and support shift Transportation Planners.
- Be technical expert in dispatch utilization tools and analytical planning dashboards.
- Provide solicitation guidance to Customer Service and Inside Sales and make decisions on load acceptance (including unique situations or same day requests).
- Establish priority and direction for trailer assignment, and assign trailers for dispatch.
- Set trailer plans with customer and proactively address poorly utilized trailers or inefficient trailer pools.
- Collaborate with CS and Operations to successfully onboard new customers (to include participation in start-up calls).
- Possess an intimate understanding of customers and unique needs.
- Identify root cause of poor service trends and collaborate with Operations and Customer Service to develop action plans to restore service to desired levels.
- Coach CS, Operations, Box associates, and Transportation Planners on opportunities for key factor improvement in market (i.e. load creation or appointment guidance, driver availability direction, chronic customer or driver trends, etc.)
- Make spot pricing decisions, and provide recommendations to pricing managers on long-term pricing opportunities and market strength indicator based on observed market trends.
- Provide feedback to Pricing Managers / Sales / CS / MM on long-term challenges and opportunities in assigned market (i.e. flows needed for driver calendars, needed lanes, day of week variability, etc.).
- This description is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties.
- Other duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands.
- Maintain regular and consistent attendance and timeliness.

- Exhibit behavior in alignment with our core values at all times.

Jansen Dep. Ex. 4 [50-10] at 1-2.

Plaintiff testified that one of her primary duties was supporting drivers and that she frequently interacted with drivers from Atlanta face-to-face. Pl.'s Dep.at 54-55.[4] She added that the Fairburn location had a driver lounge where truck drivers would spend time before or after their workday, and that drivers would also come into the operations office where the APMs worked to get their paperwork and load information,[5] and that as an APM, she would assist them with this. *Id.* at 48-49. While Plaintiff did not believe it was necessary for her to be in the office to support a driver if they came in with an issue, as most of the dispatchers for Schneider were located in a different state, she acknowledged that the Atlanta drivers appreciated them being in the office for face-to-face interactions and that Schneider desired the APMs to be in the office for this purpose. *Id.* at 58-59; *see also* Pl.'s Decl. ¶¶ 14-15; Kopf Dep. [47-4] at 20-21 (explaining that having face time with the fleet of drivers

---

[4] She averred that as an APM working in the Fairburn office, she supported drivers from throughout the southeast, which included drivers in and outside of Atlanta. *See* Pl.'s Decl. ¶¶ 14-15.

[5] The printer that was used by APMs to print off paperwork for drivers was located behind a locked door between their office and the driver's lounge, and Kopf testified that APMs needed to be present to access that printer for the drivers. Kopf Dep. at 19-20. However, Plaintiff attested that she was able to print to this printer remotely when she worked from home. Pl.'s Decl. ¶ 15.

was an important function of her work as an APM, and that drivers expected the APMs to be in the office so they could ask questions and obtain answers in real time). Additionally, being in the office was necessary when she needed to help drivers find trucks or to give them keys. Pl.'s Dep. at 60-62. Kopf similarly testified that APMs needed to be in the office to obtain keys for drivers, which happened "[p]retty frequently." Kopf Dep. at 19-20.

In October 2018, Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") and panic disorder by her psychiatrist, Dr. Cassandra Wanzo ("Dr. Wanzo"). Def. SUMF ¶ 32; Pl. SDMG ¶ 36. Plaintiff had also previously been diagnosed with major depressive disorder by another healthcare provider in 2015. Pl. SDMF ¶ 36; Pl.'s Dep. at 86-87. After persistently struggling with associated symptoms and ultimately attempting suicide in September 2018,[6] Plaintiff sought a leave of absence under the Family and Medical Leave Act ("FMLA"), and Schneider approved her FMLA leave beginning on October 9 and ending on December 31, 2018. Def. SUMF ¶¶ 33, 35; Pl. SDMF ¶ 37; Pl.'s Dep. at 98-100; *see also* Pl.'s Dep. at 29-31, 33-34, 88-94. During that time, Plaintiff's work was performed by other APMs and Torrence. Def. SUMF ¶ 38. Specifically, Williams attested that she and

---

[6] Plaintiff testified that she had tried to commit suicide after becoming frustrated with her personal demons and her work environment, as she had been trying to get management to give her an extra teammate at night, since she could not handle the workload of two or three people by herself. Pl.'s Dep. at 99-100.

Seymour covered most of Plaintiff's work while she was on leave in October 2018, with Torrence helping to cover her Sunday shifts a handful of times. Williams Decl. ¶¶ 7-8. However, Torrence attested that he consistently covered Plaintiff's Sunday night shift when she was out on FMLA leave. Torrence Decl. ¶¶ 12-13.

Plaintiff was initially expected to return to full-time work on January 2, 2019. Def. SUMF ¶ 37; Pl. Resp. ¶ 37. Prior to the expiration of her FMLA leave, Plaintiff submitted a Return-to-Work Form completed by Dr. Wanzo on December 15, 2018, which indicated that Plaintiff could return to work on January 2, 2019, but with a restriction to working a reduced schedule of three days per week, ten hours per day, and that Plaintiff could return to work with no restrictions on February 14, 2019. Def. SUMF ¶¶ 41-43; *see also* Jansen Dep. Ex. 31 [50-12]. Additionally, Plaintiff requested that she not be scheduled to work her Sunday shift so she could attend a weekly women's PTSD support group session on Monday mornings. Def. SUMF ¶¶ 45-46; Pl.'s Dep. at 129-30, 134-35. Schneider agreed to accommodate this request. Def. SUMF ¶¶ 44, 47. Plaintiff returned to work on January 2, 2019, working Wednesdays, Thursdays, and Fridays. Def. SUMF ¶ 48. Her inability to work on Sundays impacted the third shift and its workload. Def. SUMF ¶ 51; Pl. Resp. SUMF ¶ 51.

Schneider maintains a Human Resources Leave Administration Team that is responsible for managing requests for accommodation under the ADA and engaging in the interactive process with employees. Schneider Decl. [46-9] ¶¶ 3-4. Once an employee requests an accommodation through the Leave Team, the Leave Team then notifies the Human Resources Business Partner and the employee's supervisors about the request, and the Business Partner and supervisors work together to determine whether the accommodation can be provided. Pl. SDMF ¶ 40. Leave Analyst Anissa Gauthier ("Gauthier") was assigned to Plaintiff's file. Schneider Decl. ¶ 7. Human Resources Business Partner Ashley Jansen ("Jansen") would get involved with leave requests after the expiration of FMLA leave, and thus, became involved with Plaintiff's employment in January 2019 with her first request for ADA accommodation. Jansen Dep. [47-3] at 8, 10-11.

Schneider has a Flexible Work Accommodation ("FWA") Policy that provides the following, in pertinent part:

**FLEXIBLE WORK ARRANGEMENT GUIDELINES**

**DESCRIPTION**
A Flexible Work Arrangement describes a work arrangement other than full time on-site, that has been agreed to by the associate and leader, and continues to meet the business needs of the position.

. . . .

While flexible work arrangements must meet business needs, they also allow associates to balance their work responsibilities and personal lives at the same time. Flexible work arrangements are at the sole discretion of Schneider.

**PRINCIPLES**

Based on the benefits to the organization and associates, Schneider supports flexible work arrangements and manages them under the following guiding principles:

- The arrangement must be a win-win situation for the organization and associate in that it meets both business and associate needs. An arrangement may be ended if the needs of the business or associate change. Flexible work arrangements are at the sole discretion of Schneider.
- Flexible work arrangements require a relationship of trust and mutual respect between an associate and leader.
- An associate being considered for a flexible work arrangement must currently be a good performer and must maintain a high level of performance during the flexible work arrangement.
- Each arrangement will be evaluated on its own merits taking into account the needs of the business and associate on a case-by-case basis.
- Consideration for flexible work arrangement is open to both exempt and non-exempt associates.
- Unsuccessful arrangements will not preclude associate participation in similar programs in the future.
- Flexible work arrangements will not be used to solve performance issues.
- The benefit to the organization should outweigh the cost, if any, of implementing the arrangement. At worst, the arrangement should be cost neutral.

**TYPES**

Types of flexible work arrangements include:
- Compressed work week
- Flexible start/end times
- Job share

- Part-time
- Telecommuting – There are additional guidelines and an agreement required to be signed if Telecommuting is the primary work schedule. Please talk with your leader for more information. Leaders, you can find additional resources on the LRG.

**CONSIDERATIONS**

1. Which flexible work arrangement meets the needs of the business and associate? Is the associate's need for a flexible work arrangement temporary?
2. What work does the associate perform?
   - What are the needs of internal and external customers?
   - What are the needs of co-workers?
   - What are the needs of direct reports and leaders?
3. Can the arrangement be structured so that it is transparent to external and internal customers?
   - Are there certain days or hours of work that are critical to meeting the above needs?
   - Is the associate flexible to changes in the arrangement for critical meetings or emergencies?
   - How will the associate identify and cover critical needs or emergencies when out of the office?
4. Is the associate likely to be successful in the flexible work arrangement?
   - Is the associate a proven performer with a strong performance track record?
   - Is there a high degree of trust between the associate and leader(s)?
   - Does the associate have a strong commitment to make the arrangement work from a business and personal perspective?
5. How will the associate and leader ensure productivity?
   - How will productivity be measured in the flexible work arrangement?
   - What productivity standards exist?
   - Is it possible that productivity may even increase?
6. How will the arrangement be communicated?

- Who will communicate it and how?
- Who needs to know of the arrangement?

7.  How will the flexible work arrangement be evaluated?
- What is the appropriate trial period?
- How often should evaluations be scheduled during and after the trial period?
- Will feedback from others be solicited?

. . . .

**REMOTE WORK POLICY**

**DESCRIPTION**
" Remote Work" is a work arrangement that, if leader-approved, allows an associate to consistently conduct work from home or in a remote location for all or part of the associate's workweek. This Policy, however is not intended to apply to situations where associates work from home in remote locations on an occasional, inconsistent, or temporary basis.

. . . .

**Teleworking Guidelines**

. . . .
<u>**Overview**</u>
Schneider considers teleworking to be a viable alternative work arrangement in cases in which the characteristics of the job lend themselves to it and the associate and leader agree that teleworking is an appropriate approach. Teleworking is a voluntary work alternative that may be appropriate for some associates and some jobs. It is not a Company-wide benefit, and it in in no way changes the associate's terms and conditions of employment with Schneider. Schneider reserves the right to refuse to make teleworking available to an associate and to terminate a teleworking arrangement at any time. Schneider's guidelines for teleworking are as follows:

. . . .

**Eligibility**

Associates will be selected for teleworking based on a variety of factors, some of which include: job description, location from the office, current performance levels, and required frequency of daily communication with others located in the office, an evaluation of the likelihood of the associate being a successful teleworker, evaluation of the associate's leader's ability to manage remote workers, etc.

The arrangement must be a win-win situation for the organization and associate in that it meets both business and associate needs. An arrangement may be ended if the needs of the business or associate change. Telework arrangements are at the sole discretion of Schneider. An associate being considered for a telework arrangement must currently be a good performer and must maintain a high level of performance during the arrangement. Each department will make its own selections. All teleworkers must sign a Teleworking Agreement.

. . . .

Biskey-Rose Dep. Ex. 48 [50-6] at 1-2, 6, 9; *see also* Jansen Dep. at 15. Jansen testified that Schneider's leaders have discretion to allow employees on their team to work from home, but these were typically one-off situations. Jansen Dep. at 37-38. Additionally, Biskey-Rose testified that they did their best to work with employees who needed to work from home at the last minute, such as because of a doctor's appointment or having a sick child, but this was always "a one-off situation and not an ongoing request." Biskey-Rose Dep. at 32.

On January 21, 2019, Plaintiff submitted a medical note from Dr. Wanzo requesting an extension of her part-time work schedule until March 20, 2019, which

15

Schneider agreed to. Def. SUMF ¶¶ 53-54. Then, on March 9, 2019, Dr. Wanzo submitted additional medical documentation seeking further extension of Plaintiff's part-time work schedule until April 30, 2019. Def. SUMF ¶ 57; Schneider Decl. Ex. 1 at 2. This request also stated that Plaintiff would be able to continue her present schedule of working Wednesday, Thursday, and Friday, ten hours a day, and added working from home on Thursday and Friday or any time solo. Pl.'s Dep. at 154; *see also* Def. SUMF ¶ 58; Pl. Resp. SUMF ¶¶ 47, 58.

On March 18, 2019, Gauthier emailed Dr. Wanzo requesting additional information about the most recent request for accommodation. Def. SUMF ¶ 59. Gauthier noted that Plaintiff's accommodation was scheduled to end on March 19, 2019 and that Schneider needed additional information on her schedule availability to work throughout the week. Schneider Decl. Ex. 1 at 1-2. Dr. Wanzo submitted additional medical documentation on March 30, 2019, which requested an extension of Plaintiff's restrictions until June 5, 2019, stating that plaintiff could only work three days per week on Wednesday, Thursday, and Fridays, ten-hour days, and working from home two days per week. Def. SUMF ¶¶ 60-61. On April 2, 2019, Gauthier emailed Dr. Wanzo and Plaintiff a copy of a letter containing additional questions that needed to be answered to determine whether Schneider could continue

16

to accommodate these restrictions. Def. SUMF ¶ 62. Specifically, Gauthier's email

stated:

> On 4/1/2019, you provided a return to work form that indicated that Cierra Geter needs to remain working a partial schedule of 3 days per week through 6/5/2019. We have been accommodating Cierra working 3 days per week since 1/2/2019. The end date of this restriction has been extended 4 times and is appearing to be a permanent restriction.
>
> There is [sic] additional questions that do need to be answered to determine if we can extend an accommodation. I have left a few voicemails in hopes to reach you live to talk through the restrictions. Please see the attached letter and physician statement. I have also attached her job description as well. Please complete and fax back to us by Monday, 4/8.

Schneider Decl. Ex. 1 at 1. The letter attached to this email provided:

> Dear Cierra,
>
> You are currently approved on an accommodation for your reduced schedule of 3 days through 3/19/2019. Below is the timeline of information that has been received during your leave of absence and your partial return to work.
>
> - Your continuous leave of absence was approved from 10/9/2018 through 12/31/2019 which exhausted your 12 weeks of FML.
> - On 12/17/2018, HR leave team received a return to work form from your doctor that indicated you can return to work 3 days per week effective 1/2/2019 through 2/13/2019. HR leave team approved this accommodation on 12/18/2019.
> - On 1/21/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3 days remains in effect through 3/19/2019. HR leave team approved this extension on 1/29/2019.
> - On 3/11/2019, HR leave team received an updated return to work form from your doctor that indicated your partial schedule of 3

days remains in effect through 4/30/2019. This extension is under review.

- On 4/1/2019, HR leave team received updated information from your doctor that indicated your partial schedule of 3 days remains in effect through 6/5/2019. This extension is under review.[7]

With multiple extensions of partial return to work schedule, this is appearing to be a permanent need.

Please take the below physician statement to your doctor to complete the additional requests that are needed for your accommodation extension request.

***Please provide me with the requested information from you and your health care provider by no later than 4/8/2019.***

Thank you for your cooperation with the above. Please feel free to call me with any questions.

*Id.* at 6 (footnote added). The accompanying physician's statement provided that "[i]n order to assist Schneider in evaluating whether it can provide[] Cierra Geter[] with a reasonable accommodation, Schneider requests that you review the below questions and answer the information specific to the status and need for an accommodation for Cierra," and asked the following: (1) "Provide a statement indicating the current nature of the condition, as well as a statement of what, if any, specific current or future limitations that condition places on the activities and the ability to engage in work or other functions"; (2) "Provide a statement of any specific job duties that Cierra is unable to perform because of their medical condition (Please

_____

[7] At her deposition, Plaintiff confirmed this timeline of events. *See* Pl.'s Dep. at 177.

18

see attached job description). Provide information as to why she cannot return to work full time (4-10 hour days)"; (3) "She is currently working on Wednesday, Thursday and Friday. Is there a different day that she is available to work if she can work 4 days? Can she work Monday-Friday, 8 hour schedule?"; (4) Provide a specific description of what has changed or what went wrong that the partial work schedule (3 days) restriction effective date continues to push out for Cierra"; (5) "Is the patient following the recommended treatment plan to improve their condition?"; (6) "What is the **total** length of time the patient will need to work 3 days per week from this point forward in your best professional estimate?"; (7) "Provide a detailed statement as to whether the patient is making progress toward their return to work and the percentage of likelihood of them returning to their current position <u>full time</u> by <u>4/10/2019</u> (this date is 90 days of accommodating a partial schedule of 3 days)," and noted that "*A statement that the patient will not be able to return to work until "at least" a given date is not helpful in the context of this process,*" as "*such assessment may be deemed the equivalent of a statement that the patient will be unable to return to work full time (4 – 10 hour days) for an indefinite period.*" *Id.* at 7-8. Plaintiff provided the letter to Dr. Wanzo. Def. SUMF ¶ 68; Pl. SDMF ¶ 50.

In assessing whether Plaintiff's request for accommodation could be granted, Biskey-Rose, Torrence, and Jansen said that they considered alternative

accommodations. Biskey-Rose asked Plaintiff if she could switch her Monday morning appointment so she could work the Sunday overnight shift, but Plaintiff indicated that this was not possible as the other available session conflicted with another scheduled doctor's appointment. Def. SUMF ¶¶ 72-73; Biskey-Rose Dep. at 36-37. Torrence asserts that they also discussed reassigning Plaintiff to another position, but ultimately could not do so because Fairburn only had full-time positions. Torrence Decl. ¶ 17. Additionally, Jansen and Biskey-Rose testified that they discussed the possibility of hiring a temporary employee to fill in and cover the extra work, but due to the time it would take to hire and train someone new and the challenges associated with placing someone new on third shift by themselves, this was not a viable option. Jansen Dep. at 41-42; Biskey-Rose Dep. at 40; *see also* Jansen Dep. at 43 (explaining that they had not previously made an effort to bring in a temporary worker sooner because they previously believed Plaintiff would be returning to work on February 14 and then on March 20, 2019); Biskey-Rose Dep. at 29-30 (noting that Schneider had only utilized temporary workers when there was a great need for someone to fill in for a while because of the significant time that it takes to get a new employee up to speed on the many complicated systems they work with).

Torrence maintains that in order to accommodate Plaintiff working a reduced work schedule, he worked her Sunday night shift in addition to his regular duties. Torrence Decl. ¶ 12; Torrence Dep. [47-2] at 51-52, 67-68; *see also* Biskey-Rose Dep. at 16 (explaining that Torrence was able to accommodate Plaintiff's leave by working extra shifts or working with his team to ensure the work was completed). Thus, from the time Plaintiff originally went out on leave in October 2018, he would frequently work the overnight shift on Sunday from 11:00 p.m. to 7:00 a.m., and then return to work at 1:00 p.m. until 9:00 p.m., working an average of 55-60 hours weekly. Torrence Decl. ¶¶ 12-14. Torrence testified that on the Sunday nights that he covered for Plaintiff, he worked alone, and Seymour and Williams did not work those Sundays. Torrence Dep. at 52-53. Plaintiff acknowledged that as a Team lead, Travis would sometimes cover a shift when an APM was out of the office and provided additional support where needed. Pl.'s Dep. 69-70, 139. Additionally, she agreed that her inability to work on Sundays impacted the third shift and its workload. Pl.'s Dep. at 137.

Torrence and Biskey-Rose, in consultation with Jansen, made the decision to terminate Plaintiff's employment effective April 12, 2019. Def. SUMF ¶ 76; Pl. SDMF ¶ 54. Torrence attested that full-time work was an essential function of the APM position, as this ensured that Schneider had the resources necessary to

sufficiently support drivers and dispatch loads at all hours of the day. Torrence Decl. ¶ 6. Torrence also attested that while Plaintiff was employed by Schneider, it was an essential function for second and third shift APMs to consistently work in the office, rather than remotely, so they could develop relationships with drivers and better assist them, as well as to retrieve spare keys for drivers from a secure lock box on the premises as needed and to print paperwork for drivers. *Id.* ¶¶ 9-10. Therefore, he maintains that in April 2019, when he and Biskey-Rose evaluated Plaintiff's request to extend her part time schedule for another two months and work from home two days per week or whenever she worked alone, they determined that they could no longer accommodate her and made the decision to terminate her. *Id.* ¶¶ 15, 18. In particular, he felt that he personally could no longer cover the additional work for another two months or longer, as his team had already been accommodating her and picking up the extra work for over three months, which was taxing on himself and the rest of their team and the drivers. *Id.* ¶ 16; Torrence Dep. at 50; *see also* Torrence Dep. at 66-67 (testifying that he, along with Biskey-Rose and Jansen, carefully considered Plaintiff's accommodation request, but because of the burden it placed on him and the rest of the team by her absence, especially since they already lacked a sufficient number of full-time positions, they decided they could not accommodate her anymore).

After Plaintiff's termination, Schneider hired Jalisa Simpson, who was African American, to replace Plaintiff's position on third shift. Def. SUMF ¶ 88; *see also* Torrence Dep. at 14.[8] Dr. Wanzo responded to Gauthier's letter on April 27, 2019, stating that Plaintiff was unable to work a Monday-Friday schedule and that she was unable to work in a fast-paced, high pressure environment. Def. SUMF ¶¶ 69-71.[9]

Plaintiff has identified several other Schneider employees who were either permitted to take time off from work or work remotely for various reasons. First, she identifies Kitchens, a Caucasian APM, who reported to Rodney Dunn ("Dunn") and worked first shift, Monday through Friday from 7:00 a.m. to 4:00 p.m. Def SUMF ¶¶ 81-82; *see also* Torrence Dep. at 28 (explaining that Kitchens did not report to

---

[8] Plaintiff objects to Defendant's reliance on this fact, arguing that it is immaterial. Pl. Resp. SUMF ¶ 88. However, the Court overrules this objection, as one method of proving a *prima facie* case on a discriminatory termination claim, which here encompasses two counts of Plaintiff's complaint, includes establishing that the Plaintiff was replaced by someone outside of her protected class. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (citation omitted).

[9] Plaintiff admits these facts, but objects that it is not material or relevant that Dr. Wanzo stated she was unable to work well in a fast-paced, high pressure environment. Pl. Resp. SUMF ¶¶ 69-71. The Court overrules this objection, as Defendant argues that working in a fast-paced, high pressure environment was an essential function of Plaintiff's position, which she was unable to perform with or without reasonable accommodation, and thus, this fact is both material and relevant to resolving Plaintiff's failure to accommodate claim.

Torrence because she was an APM on first shift).[10] Kitchens testified that while

working on first shift, she always worked with other APMs and was never scheduled

to work alone. Kitchens Dep. [47-5] at 27-28. At one point during her employment,

Kitchens requested and was approved for three weeks of continuous FMLA leave.

Kitchens Dep. at 13-14. That same year, after her mother suffered a stroke, she was

also approved for intermittent FMLA leave, as she anticipated that she would need

to take time off to care for her mother, but she did not wind up using this leave and

instead obtained permission from Dunn to work remotely as needed while her

mother was in the hospital so she did not need to take any time off and simply used

vacation time on the few days that she did need off. *Id.* at 14-16; *see also* Biskey-

Rose Dep. at 32-33 (clarifying that while Kitchens worked remotely for a period of

about four months in 2018 and 2019, this was not an every day occurrence, but rather

was only as needed, since Kitchens shared some of the responsibilities of caring for

---

[10] Plaintiff objects that it is not material that Kitchens reported to a different supervisor or which days/hours she worked. Pl. Resp. SUMF ¶¶ 81-82; *see also id.* ¶ 83. However, because Plaintiff has identified Kitchens as a comparator in support of her claims, these facts are certainly material to determining whether Kitchens was similarly situated to her in all material respects. *See Robinson v. RockTenn CP, LLC*, 986 F. Supp. 2d 1287, 1305 n.17 (N.D. Ala. 2013) (concluding that a proffered comparator was not similarly situated to plaintiff in all material respects, as is required by the Eleventh Circuit, because "he worked in a different department, on a different shift, and had a different supervisor"). Thus, the Court will consider these facts in evaluating whether Kitchens is a proper comparator in the forthcoming analysis.

her mother with her father). After about four months, her mother was moved from the hospital to long-term care, and at this point, Kitchens returned to working from the office exclusively. Kitchens Dep. at 16.[11]

Kopf, a Caucasian APM, worked the second shift and reported to Torrence. Torrence Dep. at 28; Kopf Dep. [47-4] at 6; *see also* Pl. SDMF ¶ 88. Kopf testified that there were usually two APMs scheduled to work on second shift at a time, but she occasionally worked alone. Kopf Dep. at 7-8, 19. She also testified that Torrence had permitted her to work from home in urgent circumstances, such as when the power was out at the office or when she had a family emergency, but she never had a set schedule of working from home on specific days, nor did she ever request to work from home on a consistent basis. *Id.* at 11-12, 21-22. She estimated that before the Covid-19 pandemic, she worked from home about four or five times at most, explaining that this was not very common. *Id.* at 22.[12]  Kopf clarified that she never

---

[11]  Plaintiff testified that in July or August 2018, Kitchens began working a reduced schedule of three days per week instead of five, Pl.'s Dep. at 200-01, but when Kitchens was asked about this, she stated that this was not true, as she was working at least five days per week from 2018-19, Kitchens Dep. at 28-29.

[12]  Plaintiff had testified that from Spring 2018 through Spring 2020, Kopf worked from home to care for her children approximately once or twice per month, contending that Kopf had told her this, Pl.'s Dep. at 204-05, but when Kopf was asked about this testimony at her deposition, she stated that this was not accurate, Kopf Dep. at 22-23.

worked a reduced schedule. *Id.* at 21. Kopf did not recall any instances where she was scheduled to work alone and asked to work from home. *Id.* at 19.

Williams, an African American APM on the third shift who also reported to Torrence, declared that she was regularly permitted by Torrence to work remotely throughout the latter part of her pregnancy. Williams Decl. ¶¶ 2-3, 10. Williams went out on maternity leave on February 26, 2019. *See id.* ¶ 10.[13] This absence was covered under the FMLA. Pl.'s Dep. at 198.

In the spring of 2020, due to the Covid-19 pandemic, Schneider, like countless other businesses, made necessary adjustments for the safety of its employees. Toward the end of March and early April, the Schneider staff, including APMs but excluding drivers, transitioned to working remotely full-time. Torrence Dep. at 23-24; Jansen Dep. at 23. They initially worked remotely full-time, then there was a transition where the employees would split their time, working two days in the office and three days at home, and then in March 2021, they returned to full-time in the

---

[13] Although Williams' declaration states that she left for maternity leave on February 26, *2021*, Williams' Decl. ¶ 10, this appears to be a typographical error, as the other evidence in this case places her maternity leave in 2019, around the time that Plaintiff was requesting the accommodations at issue in this case, *see, e.g.*, Pl.'s Dep. at 130-31 (testifying that when she planned to return initially on January 2, 2019, she spoke with Torrence to see whether someone else would be able to work from the office with her, noting that they were in the process of hiring a temporary worker because Williams was about to go on maternity leave); *see also* Resp. SDMF ¶ 43.

office. Kopf Dep. at 15; Kitchens Dep. at 13. Another pandemic-related change was that the printer was moved to the driver lounge, so employees could print paperwork for drivers remotely. Kitchens Dep. at 20; *see also* Biskey-Rose Dep. at 27-28 (explaining that moving the printer was not ideal, since they are now having some trouble with their scanning and faxing abilities, and there is the additional problem of printing confidential information to the driver lounge, since there is only one printer available for this small office). Additionally, for a brief time during the pandemic, the office was left unlocked for drivers to get keys while everyone was working from home, but ever since the return to working in person, the office has locked. Biskey-Rose Dep. at 26-27.

Beginning in April 2020, Schneider moved all of its APMs to Green Bay where the corporate office was located, and dispatch services for Atlanta drivers were performed from there. Torrence Dep. at 16-17; Biskey-Rose Dep. at 18.[14] Kitchens testified that since the APMs moved to Green Bay, they were removed from the in-person driver functions. Kitchens Dep. at 18-19. Around this time, the position of Intermodal Operating Specialist ("IOS") became the Senior Operating Specialist ("SOS") position, and the SOS remained in Fairburn to assist drivers with getting keys from the lock box when needed, since the APMs were now located in

---

[14] Torrence and Biskey-Rose testified that this transition had been planned prior to the onset of the Covid-19 pandemic. Torrence Dep. at 23; Biskey-Rose Dep. at 18.

Green Bay. Kopf Dep. at 25; Biskey-Rose Dep. at 10.[15] The traditional work of the APM role was transferred to Green Bay, but the additional work that second and third shift APMs did, which included answering calls and messages, and the functions that used to be performed by APMs face-to-face with the drivers are now performed by a combination of the DTLs and SOSs. Kitchens Dep. at 18-19, 30-31; Biskey-Rose Dep. at 26.

On March 12, 2020, Plaintiff brought the instant action against Defendant, asserting claims for failure to accommodate, disability discrimination, and retaliation under the ADA, and claims for race discrimination under Title VII and § 1981. Compl. [1]. Defendant moves for summary judgment on each of Plaintiff's claims. Motion [46]. Plaintiff opposes Defendant's motion, Response [50], and Defendant has filed a reply in support of summary judgment, Reply [51].

---

[15] Kopf testified that even before Covid-19, there were IOS workers in the office who would have been able to assist drivers with getting keys on first shift, and there was a DTL who could help out on second shift, but neither the IOS nor team lead worked on third shift. Kopf Dep. at 25, 28; Pl. Resp. SUMF ¶ 30 (admitting that no DTLs or IOSs were assigned to the third shift); *see also* Biskey-Rose Dep. at 23 (explaining that before Schneider moved the APMs to Green Bay, the IOS position existed, but did not work second or third shift). After Covid-19, there was an IOS on all shifts. Kopf Dep. at 28.

## II.   DISCUSSION

### A.   *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence

of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id*.

B.    *Plaintiff's Claims*

In the Complaint, Plaintiff asserts claims for disability discrimination, failure to accommodate, and retaliation in violation of the ADA, and race discrimination in violation of Title VII and § 1981. Compl. [1]. Specifically, she alleges that Schneider violated the ADA when it failed to accommodate her request to extend her part-time work schedule and work from home, and when it terminated her because of her disability and in retaliation for requesting an accommodation, and that Schneider violated Title VII and § 1981 by terminating her because of her race. *Id.* ¶¶ 37-85.

Defendant moves for summary judgment on all of Plaintiff's claims. *See* Motion [46]. First, Defendant argues that her failure to accommodate claim fails because she was not a qualified individual with a disability, as she could not perform

the essential job functions of working full-time, working in the office, and working in a fast-paced, high pressure environment; her requested accommodations were not reasonable, as her part-time work placed additional strain on the other staff who had to cover for her work and her request to work from home would have precluded her from performing several essential job duties; and she failed to engage in the interactive process as she did not timely return the additional requested medical records. Def. Brief [46-1] at 11-19. Next, Defendant argues that Plaintiff cannot establish a *prima facie* case of disability discrimination under the ADA, as she was not a qualified individual with a disability and she cannot identify any similarly-situated employees who were treated more favorably. *Id.* at 19-23. As for Plaintiff's retaliation claim, Defendant argues that the denial of accommodation is not actionable as retaliation and Plaintiff cannot show the requisite causation between her request for accommodation and termination. *Id.* at 23-24.

Defendant also argues that Plaintiff cannot establish a *prima facie* case of race discrimination under Title VII and § 1981 because she cannot identify any similarly situated employees outside of her protected class who were treated more favorably. *Id.* at 24. Finally, Defendant argues that it had a legitimate, non-discriminatory reason for terminating her that was not pretextual: Plaintiff could not perform the essential functions of her job. *Id.* at 25-26.

Plaintiff opposes Defendant's motion. *See* Response [50]. First, Plaintiff argues that Defendant violated the ADA by failing to accommodate her disability. *Id.* at 3-18. Specifically, she argues that she was a qualified individual under the ADA because the functions identified by Defendant—full-time work and working from the office—were not "essential," as they were not part of the job description for the position and Schneider maintains a FWA policy that permits employees to work reduced schedules or work remotely; that her requests for accommodation were reasonable, as she only temporarily requested to work reduced hours and work remotely, the latter of which was widely permitted across Schneider for other employees and was subsequently accommodated for all employees during the Covid-19 pandemic; that she did not cause a breakdown in the interactive process, as she communicated back and forth with the Leave Team about her accommodations through her termination and, instead, it was Schneider that failed to follow up regarding the requested information from Dr. Wanzo; and that Schneider failed to accommodate her without first undergoing an undue burden analysis. *Id.* at 5-18.

Next, Plaintiff argues that she established a *prima facie* case of disability discrimination under the ADA because she is a qualified individual with a disability and Schneider took an adverse action against her on the basis of her disability when

it terminated her employment and therefore, she is not required to identify a similarly situated comparator. *Id.* at 18-19. She similarly argues that she has established a *prima facie* case of retaliation under the ADA, as her April 12, 2019 termination was causally connected to her request to extend her accommodation in March 2019, as shown by the fact that the decision-makers were aware of her protected conduct and the temporal proximity between these events. *Id.* at 20-22.[16] Finally, Plaintiff argues that she established a *prima facie* case of discrimination because Kitchens, who was similarly situated to her, was granted a flexible work arrangement, and that Defendant's proffered legitimate reason for terminating her was pretext for unlawful discrimination as she has shown that she was capable of performing the essential functions of her job with the requested accommodations. *Id.* at 22-25.

### 1.    ADA Failure to Accommodate Claim

The ADA was "designed to prohibit discrimination against disabled persons and enable those persons 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not

---

[16] Plaintiff also argued that Schneider failed to argue that it had a legitimate, non-discriminatory reason for terminating her as regards her ADA discrimination and retaliation claims. Response [50] at 19, 21-22. However, as Defendant points out in its reply, the section of its initial brief in support of summary judgment arguing that it had a legitimate, non-discriminatory reason for her termination was intended to apply to each of her discrimination and retaliation claims. Reply [51] at 14-16 & n.9; *see also* Def. Brief [46-1] at 25-26. Thus, the Court will consider these arguments by Defendant.

disabled.'" *Paleologos v. Rehab Consultants, Inc.*, 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (quoting *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995)). Title I of the ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

The definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of that individual with a disability. 42 U.S.C. § 12112(b)(5)(A) ("[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."). For those cases in which an employee claims that an employer violated the ADA by failing to provide a reasonable accommodation for the employee's disability, the Eleventh Circuit has held that the burden-shifting framework set forth by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply. *Nadler v.*

*Harvey*, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007)

(emphasis in original) ("An employer *must* reasonably accommodate an otherwise

qualified employee with a known disability unless the accommodation would

impose an undue hardship in the operation of the business. . . . Thus, applying

*McDonnell Douglas* to reasonable accommodation cases would be superfluous,

since there is no need to prove discriminatory motivation."); *see also Holly v.*

*Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007) (explaining that in an

ADA failure-to-accommodate case, there are no additional burdens on defendant to

show that it had a legitimate nondiscriminatory reason for terminating plaintiff, or

on plaintiff to establish that defendant's proffered reasons were pretextual); *Jones v.*

*Ga. Dep't of Corrs.*, No. 1:07-CV-1228-RLV, 2008 WL 779326, at *6 (N.D. Ga.

Mar. 18, 2008) ("The Eleventh Circuit came to the logical conclusion that the

*McDonnell Douglas* test does not apply to reasonable accommodation claims in

[*Nadler*], but it inexplicably did not publish the opinion and provide trial courts with

a clear answer to this previously unaddressed issue.").

   To show discrimination based on a failure to accommodate, Plaintiff must

demonstrate that: (1) she is disabled; (2) she was a "qualified individual" when she

suffered the adverse employment action; and (3) that she was discriminated against

because of her disability by being denied a reasonable accommodation to allow her to keep working. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997). "When an employee requests an accommodation, it may be necessary for an employer and the employee to engage in an informal, interactive process to determine whether and which reasonable accommodations are feasible." *Umbarger v. Ga. Dep't of Revenue*, CIVIL ACTION NO. 1:05-CV-1881-CC, 2007 WL 9700751, at *21 (N.D. Ga. Mar. 30, 2007), *aff'd*, 262 F. App'x 982 (11th Cir. 2008) (*per curiam*) (citation and internal marks omitted).

As noted above, the ADA expressly provides that an employer unlawfully discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations" for the employee, unless "the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010) (*per curiam*) ("An employer impermissibly discriminates against a qualified individual when the employer does not reasonably accommodate the individual's disability."). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant

position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(b).

But "an employer is not required to accommodate an employee in any manner in which that employee desires." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (*per curiam*) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)). Unless the appropriate accommodation is obvious to both parties,[17] EEOC interpretive guidance recommends a "flexible, interactive process" between the employer and employee in which the employer considers factors such as the limitations faced by the employee and how an accommodation might overcome those limitations. *See* 29 C.F.R. pt. 1630 App. § 1630.9.

Although the ADA lists examples of possible accommodations, the listed accommodations are not necessarily "reasonable" under the statute. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). The accommodation must be reasonable based on the specific facts and circumstances of the case. *Id.*; *Stewart*, 117 F.3d at

---

[17] "In many instances, the appropriate reasonable accommodation may be so obvious to either or both the employer and the individual with a disability that it may not be necessary to proceed in this step-by-step fashion." 29 C.F.R. pt. 1630 App. § 1630.9.

1285. "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1259–60. "In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." *Holly*, 492 F.3d at 1256 (citation and internal marks omitted).

In this case, Plaintiff asserts a claim against Defendant for failure to accommodate under the ADA. *See* Compl. [1] ¶¶ 47-59.[18] Defendant challenges the second and third elements of Plaintiff's failure to accommodate claim, arguing that Plaintiff was not a qualified individual because she could not perform the essential functions of the APM position, and that she was not discriminated against when her accommodation request was denied because the request was not reasonable, and Defendant also argues that Plaintiff caused a breakdown in the interactive process and thus, her failure to accommodate claim fails. Def. Brief [46-1] at 12-19.

---

[18] As an initial matter, the Court notes that Plaintiff entitles Count II of her Complaint, "Actual Discrimination and Failure to Accommodate in Violation of the ADA." *See* Compl. [1] at 9. Despite the confusing wording of this title, it appears that Plaintiff only asserts a claim under this count for failure to accommodate. Indeed, in the remaining counts of the Complaint, Plaintiff asserts only one claim per count, as is normally required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense."); *see also Brazil v. Janssen Rsch. & Dev. LLC*, 249 F. Supp. 3d 1321, 1336 (N.D. Ga. 2016) (noting that Rule 10(b) requires each claim to be asserted in a separate count).

a.    Essential Functions

To prevail on her failure to accommodate claim, Plaintiff must show that she is a qualified individual, which means that "with or without reasonable accommodation, [she] can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly*, 492 F.3d at 1257 (citations and internal marks omitted). The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "When considering the employer's judgment, courts will look to both the employer's 'official position,' as well as testimony from the plaintiff's supervisor." *Webb v. Wynne*, No. 2:07-cv-471-ID, 2008 WL 4831740, at *6 (M.D. Ala. Nov. 3, 2008), *aff'd sub nom. Webb v. Donley*, 347 F. App'x 443 (11th Cir. 2009) (*per curiam*) (citation omitted).

In addition to evidence of the employer's judgment and any written job descriptions, other factors relevant to this analysis include the amount of time spent on the job performing the function, the consequences of not requiring the employee

to perform the function, the terms of any collective bargaining agreement, the work experience of past employees in the job, and the current work experience of employees in similar jobs. *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)). Whether a particular function is "essential" to a job is determined on a case-by-case basis. *Calvo v. Walgreens Corp.*, 340 F. App'x 618, 622 (11th Cir. 2009) (*per curiam*) (citation omitted).

Defendant argues that Plaintiff was not a qualified individual with a disability because she was not able to perform the essential functions of her job as an APM on the third shift, namely, working full-time, in the office, and in a fast-paced, high pressure environment. Def. Brief. [46-1] at 13-15. As for the alleged essential function of full-time work, Defendant relies on evidence that Plaintiff admitted she applied for and was hired into a full-time position, that Defendant did not employ part-time APMs, and that Defendant considered full-time work to be an essential function of the APM position. *Id.* at 13 (citing Pl.'s Dep. at 42; Torrence Decl. ¶¶ 6, 8). To support its argument that working from the office was an essential function, Defendant relies on Plaintiff's testimony that there were certain tasks she could not perform from home, and the necessity of working in the office in order to interact with drivers. *Id.* (citing Pl.'s Dep. at 60-63). Finally, Defendant cites Plaintiff's testimony that she understood working in a fast-paced, high pressure environment

to be a requirement of the APM position, and her admission that she was unable to do so. *Id.* (citing Pl.'s Dep. at 57, 187).

Plaintiff disputes that these were essential functions of her APM position. *See* Response [50] at 6-7. First, she argues that the job description for the APM position lists nineteen essential functions, none of which include full-time work or working in the office, and that Schneider maintains a FWA policy "under which employees are permitted to work reduced hours and work remotely." *Id.* at 7. Additionally, she asserts that "the entire time [she] worked for Schneider the entire staff was permitted to work from home as needed and it was common for APMs to work from home," and that "Kitchens was permitted to work full-time remotely for at least four months while her mother was ill and is still employed by Schneider." *Id.* at 8. Plaintiff also relies on evidence showing that after her termination, in March or April 2020, Defendant relocated all APMs to the corporate headquarters in Green Bay, Wisconsin, which resulted in many of the APM duties being performed remotely, and that around the same time, all employees worked remotely for a period of time during the pandemic, which she argues shows that her job could have been done remotely and thus, working in the office was not an essential function of her job. *Id.* at 8-9. Finally, Plaintiff argues that she was able to perform the essential function of working in a fast-paced, high pressure environment, as her trouble with this began

even before her need for accommodations arose in 2018 and 2019 and she was nonetheless able to perform well at her job. *Id.* at 10 n.3.[19]

The Court here summarizes the evidence of record to determine the essential functions of Plaintiff's position as an APM on third shift at Fairburn. First, Schneider's judgment, which carries substantial weight, is that working full-time and working from the office were essential functions of Plaintiff's position. The Court next examines the job description for this position, which is also due substantial weight in this analysis as evidence of Schneider's judgement regarding which functions are essential. *See Medearis v. CVS Pharmacy, Inc.,* 646 F. App'x 891, 896 (11th Cir. 2016) (*per curiam*) (citations omitted) ("Because these written descriptions are evidence of the employer's judgment regarding which functions of a job are essential, we must give them substantial weight."). To be sure, while the job description provides a list of "Essential Job Duties and Responsibilities," which are listed fully in the summary of facts above, it does not specifically include full-

_____

[19] Plaintiff does not dispute that working in a fast-paced, high pressure environment was an essential function of her job, and instead challenges only Defendant's position that she could not perform this function. *See* Response [50] at 10 n.3; *see also* Def. SUMF ¶ 22 ("Plaintiff [] understood that having the ability to work in a fast-paced, high pressure environment was an essential function of her position."); Pl. Resp. SUMF ¶ 22 (admitted). Accordingly, the Court will begin this analysis by determining whether working full-time and working from the office are essential functions and will then consider working in a fast-paced, high-pressure environment when it proceeds to determine whether Plaintiff was capable of performing the essential functions of her job with or without reasonable accommodation.

time work or working in the office. *See generally* Jansen Dep. Ex. 4. However, it does explicitly provide that this "is not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties" and that "[o]ther duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands." *Id.* at 1-2. Additionally, the description identifies the position as an "Exempt (Salaried)" role. *Id.* at 1.

Next, the Court considers Schneider's FWA Policy. While Plaintiff suggests that this policy permits employees to work reduced hours and work remotely outright, and therefore, working full-time and from the office were not essential functions, *see* Response [50] at 7, the policy itself reveals that it is not quite so simple. Specifically, the FWA policy defines an FWA as "a work arrangement other than full-time on-site, that has been agreed to by the associate and leader, and *continues to meet the business needs of the position*," and states that these arrangements "must meet business needs" and "are at the sole discretion of Schneider." Biskey-Rose Dep. Ex. 48 at 1 (emphasis added). The policy also identifies several guiding principals, including that FWAs are provided "[b]ased on the benefits to the organization and associates"; the arrangement "must be a win-win situation for the organization and associate in that it meets both business needs and associate needs"; each arrangement "will be evaluated on its own merits taking into

account the needs of the business and associate on a case-by-case basis"; and the "benefit to the organization should outweigh the cost, if any, of implementing the arrangement" and "[a]t worst, the arrangement should be cost neutral." *Id.* Among the relevant considerations listed are whether the arrangement meets the needs of the business and the associate; whether the arrangement is temporary; what work the employee performs; what are the needs of the employee's co-workers, direct reports, and leaders; and whether there are certain days or hours of work that are critical to meeting those needs. *Id.* at 2.

Additionally, Schneider has a separate included Remote Work Policy for FWAs that permit an employee to consistently conduct work from home or in another remote location, which provides that teleworking "may be appropriate for some associates and some jobs," but "is not a Company-wide benefit"; that "Schneider reserves the right to refuse to make teleworking available to an associate"; that employees will be eligible for teleworking based on several factors, including their job description and "required frequency of daily communication with others located in the office"; and that the "arrangement must be a win-win situation for the organization and associate in that it meets both business and associate needs" and "are at the sole discretion of Schneider." *Id.* at 6, 9.

Thus, FWAs, including permission to work remotely, at Schneider are not guaranteed, as Plaintiff's characterization of this policy suggests, but rather are provided on a case-by-case basis, taking into consideration such factors as the needs of the business, the employee's specific job role, and the impact the arrangement will have on the employee's co-workers to determine whether it is feasible and mutually beneficial under the circumstances. As such, these policies do little to support Plaintiff's argument that working full-time or from the office are not essential functions.

The Court also considers the work Plaintiff actually performed in this role, as well as the experiences of other APMs at the Fairburn location. Beginning with Plaintiff's experience, she testified at her deposition to the aspects of her job that could not be performed remotely. She explained that the Fairburn location, where she worked, included a driver lounge where drivers would spend time before or after their workday, and they would also come into the operations office where the APMs worked to get their paperwork and load information, which Plaintiff, as an APM, would prepare and print out for the drivers. Pl.'s Dep at 48. Plaintiff stated that one of her primary responsibilities was to support drivers, *id.* at 54, but she opined that it was not necessary to be in the office to support drivers if they came in with an issue, since they performed dispatch services for drivers located outside of Atlanta

as well, although she noted that the Atlanta-based drivers appreciated the APMs being in the office for face-to-face interactions and that Schneider wanted APMs to have that face-to-face time with drivers, *id.* at 58-59. Additionally, Plaintiff explained that her responsibilities included locating trucks and retrieving keys for drivers, and that this function needed to be performed from the office. *Id.* at 54, 60-62.[20]

Kopf, another APM in the Fairburn office, testified that having face time with the fleet of drivers was an important function of her work as an APM, and she added

_____

[20] Plaintiff testified as follows:

> Q. Was there any -- is there any -- any position -- any job duty that you held -- any job duty that you performed as an area planning manager that you believe could only be performed in the office?
> A. The only thing and I thought that could be performed or think can is the driver interaction, like the one-on-one with drivers and management team. You know, human to human interaction.
> Q. Would there ever be occasions where you needed to be in the office to find driver tractors?
> A. Yes.
> Q. And is that another situation where you would need to be in the office in order to perform your job duties?
> A. Yes. . . .
> Q. Okay. But there were situations where you would need to be physically present in the office in order to locate tractors for drivers?
> A. Correct.
> Q. And that was a key function of your responsibility as an area planning manager, right?
> A. Correct.

Pl.'s Dep. at 60-62.

that drivers expected APMs to be in the office so they could ask questions in person. Kopf Dep. at 20-21. She also testified that it was necessary for APMs to be in the office to obtain extra keys and to print out paperwork for the drivers. *Id.* at 19-20. Kopf explained that the keys were located in a lock box that only office employees could access and that the printer was located in a locked office that was not accessible to drivers, and she stated that getting keys for drivers was needed "[p]retty frequently" for situations where a driver would need a loaner truck for the night because there was a breakdown, a truck would not start, or a truck that was being shared between drivers was not back in the yard in time. *Id.* Additionally, Torrence averred that it was necessary for APMs to work in the office to retrieve keys for drivers from the secure lock box and to print paperwork for drivers, and that this was particularly important on the third shift, when APMs often worked alone. Torrence Decl. ¶ 10.[21]

---

[21] Plaintiff averred that for all drivers located outside of Atlanta, she could print paperwork remotely to printers that the drivers had access to and that she could do the same for the Atlanta drivers when she worked from home. Pl.'s Decl. ¶ 15. However, whether Plaintiff could have accessed the printer remotely, the uncontroverted evidence of record reflects that the printer was located in a locked office and inaccessible to drivers until it was moved after Plaintiff's termination to the driver's lounge during the Covid-19 pandemic. Kopf. Dep. at 19-20, Kitchens Dep. at 20; Biskey-Rose Dep. at 27-28. Thus, while Plaintiff was employed as an APM, even if she could access the printer remotely, she has not shown that the drivers would have been able to obtain the printed paperwork from the locked office when no one else was working third shift at the time.

As previously noted, among the relevant factors that the Court must consider are the consequences of not requiring the employee to perform the function. *See* 29 C.F.R. § 1630.2(n)(3)(iv). This factor also favors a finding that working from the office was an essential function, as the consequences of permitting Plaintiff to work from home as an APM on the third shift when she was scheduled to work alone would be that no one was present in the office to find trucks, obtain keys, or print paperwork for drivers when the need arose. *See Webb*, 2008 WL 4831740, at *6 (deeming "physical presence at the office on a full-time schedule" to be an essential function of Plaintiff's position as Chief Project Manager in light of her supervisor's declaration, which described "the position as one that requires a significant amount of responsive and reactive actions based upon unexpected problems or issues that occur").

Although the parties dispute which days Plaintiff was scheduled to work alone, it is undisputed that on the third shift, only APMs and no other positions were scheduled to work and that there regularly would be shifts that Plaintiff was scheduled to work by herself. *See* Def. SUMF ¶ 29; Pl. Resp. SUMF ¶ 29 ("Geter worked alone once per week on Thursdays."); Kopf Dep. at 25, 28; Biskey-Rose Dep. at 23. Indeed, Plaintiff's requested accommodation at issue in this case includes, in part, that she be permitted to work from home whenever she was

scheduled to work alone. *See* Def. SUMF ¶ 58 ("Plaintiff [] sought an accommodation of working from home on Thursdays and Fridays, and anytime Plaintiff was scheduled to work alone."); Pl. Resp. SUMF ¶ 58 ("Geter understood that Dr. Wanzo was requesting that she work from home only when she was scheduled to work alone, not two days a week.").[22]

Plaintiff points out that in the spring of 2020, Schneider relocated all of the APMs to the corporate headquarters in Green Bay, suggesting that since their work is now being performed from another location, it was not necessary for her to work from the office while she was employed in Fairburn. Response [50] at 8-9. However, this argument overlooks the other significant changes that accompanied the APMs' move to Green Bay, including that the functions of APMs that previously needed to be performed in the office—namely, interacting with drivers, obtaining keys, locating trucks, and printing paperwork—were re-assigned to the SOS and DTL roles, which are now scheduled on each shift and remain in Fairburn. *See* Kopf Dep. at 25, 28; Biskey-Rose Dep. at 10. At the time Plaintiff was an APM, the third shift did not employ these positions, and the responsibility for printing driver paperwork and obtaining spare keys was held by the APMs exclusively on that shift. Kopf Dep.

---

[22] This requested accommodation is discussed in greater detail in the following section.

at 25, 28; Biskey-Rose Dep. at 23. Accordingly, this does not support Plaintiff's argument.

Similarly, Plaintiff argues that because all of Schneider's office employees worked remotely full-time for a period during the Covid-19 pandemic, and then later worked remotely three days per week until they returned to the office full-time in March 2021, this shows that working from the office was not essential at the time she worked for Schneider. Response [50] at 9. The Court disagrees. Schneider made significant changes to its operation out of necessity due to the pandemic and in order to permit employees to work from home for their safety, which included that the office was left unlocked for a brief time so drivers could access the keys, and the printer was moved to the driver lounge so employees could print to it remotely and provide paperwork for drivers without needing to be in the office. *See* Kitchens Dep. at 20; Biskey-Rose Dep. at 26-28 (discussing the practical challenges associated with moving the printer to the driver's lounge). These pandemic-related changes do not show that regularly working from home as an APM on the third shift was not in conflict with the essential functions of that role. *See* EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, Technical Assistance Questions and Answers* (Updated October 28, 2021) (explaining that the "fact that an employer temporarily excused performance of one

51

or more essential functions when it closed the workplace and enabled employees to telework for the purpose of protecting their safety from COVID-19, or otherwise chose to permit telework, does not mean that the employer permanently changed a job's essential functions, that telework is always a feasible accommodation, or that it does not pose an undue hardship," as these "are fact-specific determinations"). In any event, the company-wide return to work even after a period of exclusively working from home evidences that while working from home may have been feasible with these extra measures in place, Schneider's preference was that the employees work from the office.

Considering all of this evidence, it is clear that APMs on the third shift needed to be in the office, at a minimum, on days when only one APM was scheduled, as under those circumstances there would be no one else available to locate trucks or retrieve keys or paperwork for drivers when needed, including in cases of unanticipated emergencies. *See Garrison v. City of Tallahassee*, 664 F. App'x 823, 826 (11th Cir. 2016) (*per curiam*) (concluding that "full-time physical attendance" was an essential function of plaintiff's job because the employer's judgment was that this was an essential function, and her own testimony established that "her job required her to communicate regularly—both in person and over the phone—with internal department representatives and with external vendors, some of whom would

arrive at the office without prior notice"); *Williams v. Cadence Bank*, Case No. 5:16cv266/MCR/GRJ, 2018 WL 7360632, at \*4-5 (N.D. Fla. Oct. 9, 2018) (finding full-time physical presence during regular business hours to be an essential function of plaintiff's Branch Manager position where her own testimony established that this position required full-time physical presence during her tenure in that role; she "knew of no management level employee . . . who had ever worked a part-time schedule"; and the consequences of allowing her to work part-time also favored a finding that this was an essential function).

As for working full-time, it is undisputed that the position Plaintiff applied for was a full-time position and that Schneider did not employ any part-time APMs in Fairburn, aside from Plaintiff while she was being accommodated for her disability. *See* Def. SUMF ¶¶ 3, 15; Pl. Resp. SUMF ¶¶ 3, 15; *see also Garrison*, 664 F. App'x at 826 (concluding that full-time physical attendance was an essential function of plaintiff's job and noting that "[c]ontrary to [Plaintiff's] assertions . . ., nothing evidences that other similarly-situated Purchasing Agents were permitted to telecommute or to work outside regular business hours," nor had plaintiff "identified a single employee who was permitted to telecommute on the kind of regular, unscheduled, and long-term basis that [she] had requested"). It is also undisputed that while Plaintiff was out on FMLA leave from October to December 2018, as well

as when she was working part-time from January through April 2019, the other APMs working on third shift, as well as Torrence, had to cover the work that she was not able to perform. *See* Def. SUMF ¶ 38; Williams Decl. ¶¶ 7-8; Torrence Decl. ¶¶ 12-14; Torrence Dep. at 51-53, 67-68; Biskey-Rose Dep. at 16; Pl.'s Dep. at 69-70, 139, 137. Additionally, the Court finds persuasive Torrence's reasoning that it was essential for APMs to work full-time "so that Schneider could ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day," Torrence Decl. ¶ 6, especially considering the insufficient staffing that Schneider had on the third shift at the time, *see* Pl.'s Dep. at 100-03, 109, 114, 146-48, 151-52, 154, 160, 162, 165; Pl.'s Dep. Ex. 9 [50-8] at 1-2, and the fact that APMs on the third shift often worked alone, *see* Torrence Decl. ¶¶ 5, 10; Pl.'s Decl. ¶ 6 (conceding that she worked alone at least as often as every Thursday).

Plaintiff argues that full-time work could not have been an essential function of her position, as she contends that her supervisor, Torrence, "worked part-time in 2018 when he was absent at least 82 days out of 260 days in a work year." Response [50] at 7-8. However, Plaintiff's citations do not support this claim. First, her testimony that she "looked at the calendar . . . and [] counted one night everybody's time and . . . [she thought] it was 82 days total" that Torrence had taken off, and her statement in her declaration that Torrence took at least 82 days off in 2018 per the

calendar do not establish sufficient personal knowledge for this information. *See* Pl.'s Dep. at 215-16; Pl.'s Decl. ¶ 10. Indeed, she has not provided this calendar as an exhibit to her declaration and she provides no information about this calendar, how data is input, or any facts that would support the reliability of this information and appears to rely solely on her memory that it was around 82 days in total. Thus, this information is not based on Plaintiff's personal knowledge and constitutes hearsay. *See McGowan v. AME Fin. Corp.*, Civil Action No. 1:08-CV_896-BBM-LTW, 2009 WL 10666307, at *15 (N.D. Ga. Dec. 18, 2009), adopted by 2010 WL 11507154, at *1 (N.D. Ga. Feb. 5, 2010) (finding paragraphs of an affidavit that relied on a document that was not attached as an exhibit to the affidavit were hearsay). Plaintiff also cites to Torrence's deposition on this subject, but this portion of his deposition, where he was asked whether he had taken off this many days in 2018, states that he did not believe this number was accurate. Torrence Dep. at 59-60.

In any event, Torrence, who was not an APM and who held a supervisory role over Plaintiff, was not similarly situated to her. *See Mathis v. Wachovia Bank*, 255 F. App'x 425, 431 (11th Cir. 2007) (*per curiam*) (finding plaintiff, a bank teller, and her comparator, a teller supervisor, were not similarly situated in all relevant respects); *Jackson v. Blue Bird Corp.*, CIVIL ACTION NO. 5:17-cv-00101-TES,

2018 WL 4169074, at *4 (M.D. Ga. Aug. 30, 2018), *aff'd*, 792 F. App'x 706 (11th Cir. 2019) (*per curiam*) (concluding that Plaintiff's supervisor was "not an appropriate comparator"). And, again, it is undisputed that Schneider did not employ any part-time APMs. Def. SUMF ¶ 15; Pl. Resp. SUMF ¶ 15. Accordingly, the Court concludes that Plaintiff has not presented sufficient evidence to dispute that working full-time was an essential function of being an APM on the third shift.

Having identified working full-time, from the office, and in a fast-paced, high pressure environment as essential functions of Plaintiff's position, the Court turns to the question whether Plaintiff could perform those essential functions with or without a reasonable accommodation. Plaintiff does not dispute that she could not perform these functions without accommodation, arguing instead that she "is a qualified individual with a disability because she can show that she is capable of performing the essential functions of the APM position with her requested accommodations of temporary reduced hours and the ability to work from home if she is scheduled to work alone on a shift." Response [50] at 10 (footnote omitted).[23]

---

[23] On the other hand, Plaintiff does challenge Defendant's assertion that she cannot perform the essential function of working in a fast-paced, high pressure environment. *See* Response [50] at 10 n.3. However, it is undisputed that Dr. Wanzo opined that Plaintiff could not return to work full-time because she was "unable to work well in a fast-paced, high pressure environment" and that Plaintiff agreed with this assessment. Def. SUMF ¶ 71; Pl. Resp. SUMF ¶ 71; *see also* Pl.'s Dep. at 187. Moreover, Plaintiff averred that although she had "trouble working in a fast-paced high-pressure environment throughout her employment with Schneider; it did not

Accordingly, the Court will proceed to the next step of this analysis in order to determine whether Plaintiff's requested accommodations were reasonable.

b.    Reasonable Accommodation

If a plaintiff cannot perform the essential functions of the position without a reasonable accommodation, she must make a *prima facie* showing that a reasonable accommodation is possible, and that such an accommodation would enable her to perform those essential functions. *See Lucas*, 257 F.3d at 1255–56; *Jackson v. Veterans Admin.*, 22 F.3d 277, 281 (11th Cir. 1994). "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367 (citation omitted); *see also Bagwell v. Morgan Cty. Cmm'n*, 676 F. App'x 863, 865 (11th Cir. 2017) (*per curiam*) (citation omitted) ("The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions."); *Puckett v. Board of Trs. of First Baptist Church of Gainesville, Inc.*, 17 F. Supp. 3d 1339, 1343 (N.D. Ga. 2014) (citation omitted). "An accommodation can qualify as 'reasonable,'

_____

begin with her need for accommodations in 2018 and 2019." Pl.'s Decl. ¶ 22. Despite Plaintiff's argument to the contrary, her own admission establishes that she was not capable of working in a fast-paced, high pressure environment without accommodation.

and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1255 (citation omitted).

"An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer." *Earl*, 207 F.3d at 1365 (citation omitted). Thus, if a plaintiff can meet her burden, the defendant must produce evidence of an affirmative defense that the accommodation requested is unreasonable or that it would cause an undue hardship on the employer. *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).

Defendant argues that "Plaintiff's reduced schedule placed an incredible strain on Mr. Torrence who covered Plaintiff's Sunday overnight shift for approximately six months, and by April 2019, Plaintiff indicated that she needed at least another two months of a part-time schedule," and that "it is not reasonable to expect other employees to cover [her] Sunday overnight shift for such an extended period." Def. Brief [46-1] at 16. Defendant maintains that her "multiple requests to extend her part-time schedule amounted to a request for a permanent part-time schedule and elimination of essential job duties." *Id.* at 17. Additionally, Defendant argues that Plaintiff's request for an accommodation of working from home two days per week and any time she was to work alone was unreasonable, as the "undisputed evidence shows that several of Plaintiff's job duties needed to be performed in the office—

especially on those occasions when Plaintiff was the only APM scheduled for a shift." *Id.*

In response, Plaintiff argues that her request to temporarily work three days per week instead of four from January 2, 2019 through June 5, 2019 was not unreasonable, especially considering that Schneider has an FWA policy. Response [50] at 11. Plaintiff also argues that her request to work remotely was not unreasonable, as working remotely was common at Schneider and she understood her doctor's request to be only that she work from home when she was scheduled alone, not two days a week every week. *Id.* at 13-14.

Prior to requesting any leave or accommodations, Plaintiff worked as an APM on the third shift overnight from 11:00 p.m. to 10:00 a.m. on Wednesday, Thursday, Friday, and Sunday. Def. SUMF ¶¶ 3, 6. Plaintiff went out on continuous FMLA leave from October 9 through December 31, 2018, and before the expiration of her leave, she submitted a Return-to-Work form completed by her psychiatrist, Dr. Wanzo, which requested her first accommodation under the ADA. Def. SUMF ¶¶ 33, 35, 41; Pl. SDMF ¶ 37; Pl.'s Dep. at 98-100; *see also* Pl.'s Dep. at 29-31, 33-34, 88-94. Specifically, this form indicated that Plaintiff could return to work as planned on January 2, 2019, but with a restriction to working a reduced schedule of three days per week, ten hours per day until February 14, 2019, at which time she would

return to work with no restrictions. Def. SUMF ¶¶ 42-43; Jansen Dep. Ex. 31. Plaintiff also requested that she no longer be scheduled on Sundays so that she could attend a weekly PTSD support group. Def. SUMF ¶¶ 45-46; Pl.'s Dep. at 129-30, 134-35. Schneider agreed to this request. Def. SUMF ¶¶ 44, 47. On January 21, 2019, Plaintiff submitted a request from Dr. Wanzo to extend her part-time schedule until March 20, 2019, and Schneider agreed. *Id.* ¶¶ 53-54.

Then, on March 9, 2019, Dr. Wanzo submitted another request to extend Plaintiff's part-time work schedule until April 30, 2019 and added a request that Plaintiff work from home on Thursday and Friday or any time she was scheduled to work alone. Pl.'s Dep. at 154 (confirming that Dr. Wanzo's request read that "[Plaintiff] will be able to continue present schedule Wednesday, Thursday, Friday, ten hours a day, Thursday and Friday at home or any time solo."); *see also* Def. SUMF ¶ 58; Pl. Resp. SUMF ¶¶ 47, 58. Plaintiff testified that she understood this request to mean that she would only work from home on the days that she was scheduled to work alone and not necessarily every Thursday and Friday as well. Pl.'s Dep. at 155.

Gauthier emailed Dr. Wanzo on March 18, 2019, requesting additional information on the most recent request for accommodation, specifically as pertained to Plaintiff's schedule availability to work throughout the week. Def. SUMF ¶ 59;

Schneider Decl. Ex. 1 at 1-2. On March 30, 2019, Dr. Wanzo submitted additional documentation and requested an extension of Plaintiff's restrictions until June 5, 2019, again requesting that Plaintiff be permitted to work three days per week on Wednesday, Thursday, and Friday, and "[w]orking from home 2 days/week (10 hour days)." Def. SUMF ¶¶ 60-61. In response, Gauthier again emailed Dr. Wanzo on April 2, 2019 and attached a copy of a letter containing additional questions that needed to be answered before Schneider could determine whether it could continue to accommodate these restrictions. *Id.* ¶ 62. In particular, Gauthier noted that the "end date of this restriction has been extended 4 times and is appearing to be a permanent restriction," and she requested that Dr. Wanzo respond to the attached letter by April 8, 2019. Schneider Decl. Ex. 1 at 1. Dr. Wanzo did not return her response until April 27, 2019. Def. SUMF ¶ 69.

Among the reasons identified by Dr. Wanzo for why Plaintiff needed these accommodations was a lack of staffing, as Plaintiff felt that she needed other people to work with her on her shifts so that she would feel more comfortable given her disabilities. Pl.'s Dep. at 103, 109, 114, 151-52, 154, 160, 162, 165; Pl.'s Dep. Ex. 9 at 1-2. Plaintiff testified that insufficient staffing was a problem before she even went on FMLA leave and that once Williams went on maternity leave in February 2019 and Young quit about a week later, Plaintiff was frequently working by herself

between February and March 2019. Pl.'s Dep. at 100-03, 146-48. Throughout her employment, there regularly were shifts that Plaintiff worked alone as an APM on the third shift. *See* Pl.'s Decl. ¶ 6 (attesting that before taking medical leave in the fall of 2018, she was scheduled to work alone on Thursdays); Torrence Decl. ¶¶ 5, 10 (declaring that APMs on the third shift frequently worked alone and that Plaintiff, in particular, often worked alone on Sundays).

At her deposition, Plaintiff agreed that her inability to work on Sundays impacted the third shift and their workload. Pl.'s Dep. at 137.[24] Additionally, Torrence averred that when he, Biskey-Rose, and Jansen made the decision to terminate Plaintiff, they concluded that she could no longer be accommodated because of the burden her part-time schedule placed on himself and the rest of his team, which had been picking up extra work to cover for Plaintiff for months, which was especially challenging given the insufficient full-time staffing at the Fairburn location. Torrence Dep. at 66-67; *see also* Torrence Decl. ¶¶ 15-16, 18.

Plaintiff disputes that it was Torrence who covered for her while she was unable to work Sundays, asserting that while he "may have covered for [her ]

---

[24] Biskey-Rose asked Plaintiff whether she could reschedule her Monday morning support group meetings so that she could work the Sunday shift, but Plaintiff responded that this was not possible as the only other support group meeting time conflicted with another doctor appointment. Def. SUMF ¶¶ 72-73; Biskey-Rose Dep. at 36-37.

sporadically, he certainly did not do so on a weekly basis," and instead, "her shifts were primarily covered by [] Seymour and [] Williams and were rarely, if at all, covered by [] Torrence." Response [50] at 12. Notwithstanding this dispute, it is clear that Schneider's employees needed to cover for Plaintiff while she was working a reduced schedule, which is what is important to this analysis, instead of *who* was the specific person covering for her at any given time. This fact favors a finding that her requested accommodation was not reasonable. *See Spears v. Creel*, 607 F. App'x 943, 949 (11th Cir. 2015) *(per curiam)* (citations omitted) ("We have held that the ADA does not require an employer to reallocate job duties in order to change the essential functions of a job."); *Williams*, 2018 WL 7360632, at *6 (citations omitted) ("[T]o accommodate [plaintiff's] proposed part-time schedule, other essential functions of the Branch Manager position would necessarily have been reassigned to existing employees, a result which courts have routinely found to be unreasonable under the ADA."); *Mize v. Centura Fin. Servs. (RBC)*, Civil Action No. 08-0645-CG-C, 2009 WL 3419586, at *10 (S.D. Ala. Oct. 21, 2009) (alteration, citations, and internal marks omitted) ("[C]ourts have routinely found that requiring an employer to reassign an existing employee to help a disabled employee with an essential function of his or her job is an unreasonable accommodation as a matter of law because it creates an undue burden on the employer.").

While Jansen and Biskey-Rose testified that they considered hiring a temporary employee to cover the extra work, they deemed this alternative to be infeasible. Jansen Dep. at 41-43; Biskey-Rose Dep. at 40. In any event, "[a]s a matter of law, an employer is not required, under the guise of a reasonable accommodation, to hire another employee to perform essential functions of the ADA plaintiff's job." *Medearis*, 92 F. Supp. 3d at 1308 (citation and internal marks omitted). "The ADA was not intended to force the employer to subsidize disabled people by keeping them in their paid positions while still having to hire someone else to actually do their jobs." *Id.* (citation and internal marks omitted). The fact that hiring new employees may have been necessary to compensate for Plaintiff's accommodation similarly supports a conclusion that her requested accommodation was not reasonable. *See Webb*, 2008 WL 4831740, at *6 (noting that plaintiff's requested accommodation of working only a four-hour day would, in her supervisor's view, "require other employees to assume some of [her] responsibilities, or the hiring of additional personnel, to complete unfinished tasks due to [her] absence").

Additionally, Plaintiff's request to work from home at least whenever she was scheduled to work alone was not reasonable under the circumstances.[25] Schneider

---

[25] Plaintiff insists that she understood Dr. Wanzo's request to mean that she would only need to work from home when she was scheduled by herself. Response [50] at 13. Plaintiff's understanding is not controlling in this analysis, as Defendant was entitled to rely on the restriction imposed by her psychiatrist, and here, Dr. Wanzo

could not predict in advance when there would be issues with drivers' trucks that would necessitate the APM on schedule to obtain a key to a spare truck, which Plaintiff acknowledged was part of her responsibility and required her presence in the office. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (concluding that although the employer, a police department, had previously accommodated plaintiff, a former police detective, with a shuffling of case assignments as he was not able to perform the essential function of collecting evidence from crime scenes, the department was not *required* under the ADA to accommodate him with regard to the essential functions he could not perform without assistance, noting that while the types of criminal investigations that plaintiff could not perform alone had occurred with relative infrequency in the past, the police

---

specifically requested that Plaintiff be permitted to work "Thursday and Friday at home or any time solo" and work "from home 2 days/week." Pl.'s Dep. at 154; Def. SUMF ¶¶ 60-61; *see also Hurt v. Phifer Inc.*, 7:06-CV-04827-LSC, 2008 WL 11383474, at *2 (N.D. Ala. Apr. 15, 2008) ("[T]his Court cannot agree with Plaintiff's reasoning that an employer may not rely on a medical restriction placed on an employee by his doctor simply because the employee has 'decided' he feels well enough to ignore the doctor's restriction."). However, the Court need not decide whether the evidence unequivocally reflects that Plaintiff requested to work from home two days per week or only when she was scheduled by herself because Plaintiff agrees that, at a minimum, she was requesting to work from home whenever she was scheduled alone, which, as this analysis shows, renders her requested accommodation unreasonable since the shifts that Plaintiff was working alone were the shifts where it was crucial that she be in the office to assist drivers.

department could not predict in advance what crimes would be committed in any given week or what evidence would appear at any given crime scene).

As previously noted, it is undisputed that, with the exception of Plaintiff, there were no part-time APM positions at the Fairburn location. *See* Def. SUMF ¶¶ 14-15; Pl. Resp. SUMF ¶¶ 14-15. "[E]ven [though Plaintiff] is disabled, [Schneider] has no obligation to transform a full-time position to part-time." *Hayes v. Voestalpine Nortrak, Inc.*, 185 F. Supp. 3d 1314, 1320 (N.D. Ala. 2016) (citation omitted).

Moreover, Gauthier's emails to Dr. Wanzo reflect Defendant's reasonable fear that the continued requests for extension indicated that the accommodation was becoming permanent. *See Campbell v. KBRwyle Tech. Sols., LLC*, Case No.: 1:17-cv-00744-ACA, 2019 WL 1353965, at *8 (N.D. Ala. Mar. 26, 2019) (noting that while defendant attempted to accommodate plaintiff's restrictions by "providing her a temporary position consisting of only some of the responsibilities of an order filler," "[a]s time passed, it became increasingly clear that these restrictions were not temporary"). And the mere fact that Defendant had previously granted Plaintiff's similar accommodation requests does not show that the accommodation was reasonable. *See Webb*, 347 F. App'x at 446 (citation omitted) ("Although the Air Force previously had allowed Webb to work a modified schedule, the fact that an employer previously has granted a requested accommodation does not render that

accommodation reasonable."); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("[P]rior accommodations do not make an accommodation reasonable.").

Plaintiff argues that because all of the APMs work "remotely" from the drivers after the relocation to Green Bay, there was no need for them to work from the office when they were located in Fairburn. Response [50] at 14. Similarly, she relies on the changes that accompanied the Covid-19 pandemic, noting that for a period of time, all staff, aside from drivers, worked remotely, and that "[t]o accommodate the change in the staff working remotely, Schneider did something it could easily have done years ago, it moved the printer to the driver's lounge, and the driver key box is no longer behind locked doors." *Id.* at 14-15. However, the evidence of record reflects that each of these changes—relocating the APMs and permitting employees to work from home during the pandemic—required significant adjustments to Schneider's operations, and it would not be reasonable to require Schneider to make those adjustments to accommodate Plaintiff. Specifically, the APM responsibilities that were previously required to be performed in the office—getting keys for drivers, printing paperwork, face-to-face interactions—are now no longer part of the APM role and are instead performed by an SOS or DTL, who remain in Fairburn and are now scheduled on every shift. *See* Kopf Dep. at 25; Kitchens Dep. at 18-19, 30-31; Biskey-Rose Dep. at 10. Additionally, the operations office was left unlocked only

for a brief period during the pandemic while the staff were working from home, and the printer was permanently moved to the driver lounge so that drivers could access paperwork that was printed remotely by the employees. Biskey-Rose Dep. at 26-27; Kitchens Dep. at 20. Biskey-Rose testified that moving the printer created additional problems associated with printing confidential information, since there was only one printer for the entire office and it is now accessible by the drivers, Biskey-Rose Dep. at 27-28, and it is evident that keeping the office door unlocked for key retrieval similarly poses security concerns. Accordingly, the fact that these system-wide and necessity-driven changes were made after Plaintiff's termination does not support Plaintiff's argument that it would have been reasonable to make these changes to accommodate her before she was terminated.

Finally, Plaintiff argues that the "substantial evidence that working remotely is a routine practice for APMs and other Schneider employees establishes that there is a material issue of fact for the jury regarding whether [her ] request to work from home when she was schedule to work alone was reasonable." Response [50] at 15. For support, she cites Schneider's FWA Policy and asserts that Kitchens worked full-time remotely for at least four months while her mother was sick and that Williams worked from home regularly throughout the later part of her pregnancy. *Id.* at 14 (citations omitted). However, Plaintiff again mischaracterizes the evidence,

which reflects that while Schneider employees were generally permitted to work from home on one-off occasions due to emergency situations, they were not permitted to work from home routinely. Additionally, as the Court discusses in greater detail hereinafter with respect to Plaintiff's race discrimination claims, the evidence does not reflect that Kitchens in fact worked remotely full-time for a period of four months or that she was similarly situated to Plaintiff. And, although Williams attested that she "was regularly permitted by [Torrence] to work remotely throughout the later part of [her] pregnancy," Williams Decl. ¶ 10, this sparse assertion that contains no detail regarding the frequency of her permission to work from home does little to support Plaintiff's argument that her request to work from home at least every time she was scheduled to work alone, which occurred weekly, was reasonable. Instead, given all of the above considerations, Plaintiff's requested accommodations were not reasonable under the circumstances.

Plaintiff argues that she "easily meets her burden of establishing that Schneider failed to accommodate her when they refused to allow her to work reduced hours through June 5, 2019, refused to allow her to work from home if she was scheduled to work alone, and instead terminated her employment on April 12, 2019," and thus, "the burden shifts to Schneider to establish its affirmative defense that it would have been an undue burden to accommodate [her]," and because they failed

to do so, "Schneider has failed to meet its burden of proof on this affirmative defense and summary judgment must be denied." Response [50] at 17-18. However, Plaintiff mischaracterizes the burdens in this case. As previously noted, Plaintiff's burden is to identify "an accommodation that would allow [her] . . . to perform the essential functions of her job" and show "that such accommodation is reasonable," and if Plaintiff "cannot prove that an accommodation is reasonable, the employer does not have to investigate [the] reasonable accommodation or show undue hardship." *Scott v. Postmaster Gen. U.S. Postal Serv.*, 818 F. App'x 914, 917-18 (11th Cir. 2020) (*per curiam*) (concluding that defendant "was not required to affirmatively assert undue hardship before [plaintiff] proved that there was a reasonable accommodation that [defendant] could give her," and that because plaintiff "failed to show that there was an available position that could accommodate her or that any other reasonable accommodation existed," she "failed to meet her burden that would have triggered [defendant']s requirement to show undue hardship"). As discussed, Plaintiff has not shown that her requested accommodations were reasonable and therefore, Defendant was not required to show undue burden in this case.

Accordingly, because Plaintiff has not shown that she could perform the essential functions of her position with or without a reasonable accommodation, it is

**RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED** as to her ADA failure to accommodate claim.[26]

> 2.   ADA, Title VII, and § 1981 Discrimination Claims and ADA Retaliation Claim

To prevail on a claim for discrimination or retaliation, a plaintiff must prove that the defendant subjected her to an adverse employment action with unlawful discriminatory or retaliatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Discriminatory or retaliatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged burden-shifting test set out for Title VII cases in *McDonnell Douglas*. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*); *Smith v. Library Board of*

---

[26] Defendant also argues that Plaintiff's failure to accommodate claim fails because she caused a breakdown in the interactive process, since Schneider sent an email to Plaintiff and Dr. Wanzo on April 2, 2019, requesting additional information regarding her accommodation request no later than April 8, 2019, but Dr. Wanzo did not timely return the information. Def. Brief [46-1] at 18-19. Plaintiff argues in response that she did not cause any breakdown in the interactive process, but rather the evidence reflects that she "communicated back and forth with leave management about the status of the requested additional paperwork through her termination," and she "has no knowledge whether Schneider followed up with Dr. Wanzo regarding the paperwork provided" and "Schneider never told [her ] that it had not received the requested information from Dr. Wanzo or asked her to follow up with Dr. Wanzo." Response [50] at 15-16. Because the Court has already concluded that Plaintiff's claim fails for the reasons discussed, the Court need not resolve this issue.

*Homewood*, Case No.: 2:15-cv-02094-MHH, 2018 WL 2011026, at *4 (N.D. Ala. Apr. 30, 2018) (citation omitted); *Cribbs v. NFI Network Log. Sols., LLC*, No. CV411-263, 2014 WL 4805328, at *4 (S.D. Ga. Sept. 26, 2014) (citation omitted).

Direct evidence is evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Evidence, Black's Law Dictionary* 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *See Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996). "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–42 (11th Cir. 1998). Evidence that merely "suggests discrimination, leaving the trier of fact to infer

discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990).

In the absence of direct evidence,[27] Plaintiff can prove her claims of retaliation under the ADA and discrimination under the ADA, Title VII, and § 1981 by relying on circumstantial evidence to prove discriminatory intent, which can be done using *McDonnell Douglas* burden-shifting framework referenced above. *See Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018) (citation omitted) ("Where . . . an employee alleges retaliation under the . . . ADA without direct evidence of the employer's intent, we apply the burden shifting framework established in *McDonnell Douglas*[.]"); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (explaining that the *McDonnell Douglas* framework generally applies to disability discrimination claims under the ADA); *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1226; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997).

Under the *McDonnell Douglas* standard, a plaintiff may generally establish a *prima facie* case of disparate treatment discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action

---

[27] In this case, Plaintiff has not offered any direct evidence in support of her discrimination or retaliation claims. *See generally* Response [50].

by her employer; (3) she was qualified to do the job in question, and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *Evans v. Books-A-Million*, 762 F.3d 1288, 1297 (11th Cir. 2014); *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562. To establish a *prima facie* case of illegal retaliation under the *McDonnell Douglas* framework, a plaintiff generally must show that: (1) she engaged in a protected activity or expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g.*, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established under the *McDonnell Douglas* framework, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir. 1986); *Wilson v. Lowe's Home Ctr., LLC*, 415 F. Supp. 3d 1060, 1067 (S.D. Ala. 2019). If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the

evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01.

However, the *McDonnell Douglas* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984), *abrogated on other grounds by Lewis*, 918 F.3d at 1226. Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Thus, a plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted); *see also Palermo v. Grunau Co.*, 220 F. Supp. 3d 1300, 1307 (M.D.

Fla. 2016) (evaluating whether plaintiff presented a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination on an ADA discrimination claim). As such, the Eleventh Circuit has held that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis*, 934 F.3d at 1185 (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will survive summary judgment if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis*, 934 F.3d at 1185. This can "be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent may be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)).[28] The plaintiff retains the ultimate burden of proving that the defendant is guilty of

---

[28] "Nonetheless, the convincing-mosaic method of establishing an employer's discriminatory intent is not a substitute for an ADA plaintiff's burden to demonstrate a triable issue of fact as to her being covered by the ADA, i.e., being a 'qualified individual.'" *Change v. Midtown Neurology, P.C.*, CIVIL ACTION FILE No. 1:19-cv-00885-SCJ-AJB, 2021 WL 2483368, at *22 (N.D. Ga. Feb. 3, 2021), adopted by 2021 WL 2492470, at *5 (N.D. Ga. Mar. 26, 2021).

intentional discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

(1981).[29]

a.    Disability Discrimination Under the ADA

Plaintiff asserts a claim against Defendant for disability discrimination in

violation of the ADA.[30] Compl. [1] ¶¶ 37-46. "To establish a prima facie case of

---

[29] As previously noted, on each of Plaintiff's remaining discrimination and retaliation claims, Defendant argues that it is due summary judgment because Plaintiff cannot establish a *prima facie* case of discrimination or retaliation and because Defendant had a legitimate, non-discriminatory reason for Plaintiff's termination—that Plaintiff could not perform the essential functions of her job— which Plaintiff cannot show was pretextual. *See generally* Def. Brief [46-1]. Because the parties' arguments concerning Schneider's alleged legitimate, non-discriminatory reason for Plaintiff's termination apply equally to Plaintiff's disability and race discrimination claims and her retaliation claim, the Court will first consider separately whether Plaintiff has established a prima facie case for each of these claims, and then analyze the remaining arguments concerning Schneider's legitimate reason and pretext together. *See Woodard v. Jim Hudson Luxury Cars, Inc.*, CV 118-032, 2019 WL 4793058, at *12 (S.D. Ga. Sept. 30, 2019).

[30] The Court notes that Plaintiff titles this count of her Complaint as "Violation of ADA – Regarded As Disabled," Compl. [1] at 7, and asserts thereunder that at all relevant times, she "was an individual with a disability as defined under the ADA" and "Defendant terminated [her ] because it regarded her as disabled," *id.* ¶¶ 39; *see also Williamson v. Clarke Cty. Dep't of Hum. Res.*, 834 F. Supp. 2d 1310, 1322 n.17 (S.D. Ala. 2011) (quoting 42 U.S.C. § 121102(1)) ("[A] plaintiff qualifies for ADA protection even if he is not disabled (*i.e.*, even if he does not have 'a physical or mental impairment that substantially limits one or more major life activities of such individual'), where he has 'a record of such an impairment' or is 'regarded as having such an impairment.'"). Despite the confusing wording of the Complaint, it appears that Plaintiff's claim is based on actual disability discrimination. Indeed, the parties do not dispute that Plaintiff suffered from an actual disability in the form of her PTSD, panic disorder, and major depressive disorder. Accordingly, the Court will evaluate this as an actual disability claim.

discrimination under the ADA, a plaintiff must show: (1) [s]he is disabled; (2) [s]he is a qualified individual; and (3) [s]he was subjected to unlawful discrimination because of [her] disability." *Holly*, 492 F.3d at 1255-56 (citation omitted); *see also Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Rossbach v. City of Miami*, 371 F.3d 1354, 1356–57 (11th Cir. 2004) (*per curiam*); *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998).

Defendant argues that Plaintiff cannot establish a *prima facie* case of disability discrimination because she was not a qualified individual, as she could not perform the essential functions of her job. Def. Brief [46-1] at 19. Additionally, Defendant argues that her disability discrimination claim also fails because she cannot show that it treated any similarly situated employees outside of her protected class more favorably. *Id.* at 19-20. Plaintiff argues in response that she is in fact a qualified individual who can perform the essential functions of her job, and that she is not required to identify a similarly situated comparator under the ADA. Response [50] at 18-19. In reply, Defendant again argues that Plaintiff was not a qualified individual and insists that "Plaintiff has not set forth any evidence establishing that Schneider unlawfully discriminated against her because of her disability," as she has not identified "any similarly-situated employee without a disability who was treated

more favorably, or any other evidence to support her claim," and thus, she has failed to establish causation. Reply [51] at 14.

First, as the Court concluded with respect to Plaintiff's failure to accommodate claim, she has not shown that she was a qualified individual within the meaning of the ADA because she was not able to perform the essential functions of her APM position with or without a reasonable accommodation. This is fatal to her disability discrimination claim. *See Tetteh v. Waff Television*, 638 F. App'x 986, 988-89 (11th Cir. 2016) (*per curiam*) (concluding that the district court correctly granted summary judgment on plaintiff's ADA disability discrimination claim because she failed to show that she was a qualified individual).

Next, without citing any legal authorities to support her position, Plaintiff conclusorily asserts that "[s]he is not required to identify a similarly situated comparator under the ADA as asserted by Schneider." Response [50] at 19. Although a lack of comparator evidence will not defeat a failure to accommodate claim, which does not require evidence of disparate treatment, *see Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1277-78 (N.D. Ala. 2009), the "requirement that the employer treated similarly situated employees outside of [Plaintiff's] protected class more favorably is recognized as an element of each prima facie case for disparate treatment," *Woodard*, 2019 WL 4793058, at *7

(citation and internal marks omitted).[31] Indeed, when a plaintiff relies on circumstantial evidence to prove her disability discrimination claim, the causation element of her *prima facie* case generally requires comparator evidence. *Id.* at *11; *see also Campbell v. Boies, Schiller, Flexner LLP*, Case No. 0:19-cv-63067-KMM, 2021 WL 2410588, at *5-6 (S.D. Fla. June 10, 2021) (citation and internal marks omitted) (granting summary judgment for defendant on plaintiff's disability discrimination claim where plaintiff "failed to produce evidence that she was treated less favorably than similarly situated individuals outside her protected class as is [] required at the prima facie stage").

Plaintiff has not attempted to identify any similarly situated comparators in support of her disability discrimination claim. *See generally* Response [50] at 18-19. However, as previously explained, in the absence of comparator evidence, Plaintiff can also survive summary judgment if she presents "'a convincing mosaic of circumstantial evidence[ that ] would allow a jury to infer intentional discrimination by the decisionmaker.'" *Hill v. Branch Banking & Tr. Co.*, 264 F. Supp. 3d 1247,

---

[31] Although Plaintiff does not explicitly characterize her claim as such in her complaint or brief opposing summary judgment, this is clearly a disparate treatment claim, as she alleges that Defendant treated her less favorably because of her disability. *See generally* Compl. [1]; Response [50]. "Therefore, this is a circumstantial evidence case proceeding under a theory of disparate treatment and therefore requires Plaintiff to demonstrate intentional disability discrimination to succeed on [her] claim." *Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1268 (S.D. Fla. 2020).

1263 (N.D. Ala. 2017) (quoting *Smith*, 644 F.3d at 1328). Such "inferences must be reasonable and not speculation." *Id.* (citation omitted). 'The evidence presented under the convincing mosaic must be sufficient enough to overcome the lack of comparator evidence." *Woodard*, 2019 WL 4793058, at *8 (citations and internal marks omitted).

In this case, Plaintiff has not attempted to identify a convincing mosaic of circumstantial evidence supporting her claim of disability discrimination and, instead, makes a conclusory assertion that she has shown "Schneider terminated [her ] because of her disability." Response [50] at 19. "The court cannot construct the picture for her." *Hill*, 264 F. Supp. 3d at 1263 (citations omitted); *see also Murphee v. Colvin*, No. CV-12-BE-1888-M, 2015 WL 631185, at *8 (N.D. Ala. Feb. 13, 2015) ("To the extent [plaintiff] relies on a mosaic of discrimination theory, he must present the tiles and create the mosaic instead of expecting the court to piece it together for him."). Even after *Smith*, "the Eleventh Circuit continues to apply the *McDonnell–Douglas* framework and affirm grants of summary judgment when plaintiffs do not meet their *prima facie* case under it and when plaintiffs do not present a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination or retaliation." *Murphee*, 2015 WL 631185, at *8 (citing *Giles v. Daytona State Coll., Inc.*, 542 F. App'x 869, 872–73 (11th Cir. 2013)

(*per curiam*); *Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 832–33 (11th Cir. 2013) (*per curiam*)). Because Plaintiff has not presented sufficient evidence to show that she was a qualified individual within the meaning of the ADA or that she was discriminated against because of her disability, her ADA discrimination claim fails.

b.      Retaliation Under the ADA

The "anti-retaliation provision of the ADA prohibits discrimination against an individual because that individual 'opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' conducted under the statute." *Higdon v. Jackson*, 393 F.3d 1211, 1218 (11th Cir. 2004) (alteration in original) (quoting 42 U.S.C. § 12203(a)).[32] To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show the same elements generally required for a claim of illegal retaliation under Title VII: (1) that she engaged in statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that there is some causal connection between the expression and the adverse

---

[32] The Eleventh Circuit has held that, because this provision creates a prohibition on retaliation under the ADA that is similar to the prohibition on retaliation found in Title VII, courts should evaluate ADA retaliation claims under the same framework used for Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1075–77 (11th Cir. 1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case).

employment action. *Stewart*, 117 F.3d at 1287. The third element of a plaintiff's *prima facie* case of disability retaliation requires the plaintiff to present evidence suggesting a causal link between the protected activity and the adverse employment action. In the Title VII context, the Supreme Court has ruled that "retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. This standard is equally applicable to ADA retaliation claims. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016); *see also Gilliard v. Ga. Dep't of Corrs.*, 500 F. App'x 860, 869 (11th Cir. 2012) (*per curiam*) (citation omitted) ("We assess ADA retaliation claims under the same framework used for Title VII retaliation claims.").

Plaintiff asserts a claim for retaliation in violation of the ADA, alleging that she engaged in protected activity when she requested accommodations under the ADA and that "Defendant refused to grant [her ] request for accommodation and terminated her employment in retaliation for requesting an accommodation in violation of the ADA." Compl. [1] ¶¶ 60-69. Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation under the ADA because she cannot show a causal connection between her request for accommodation and the termination of

her employment. Def. Brief [46-1] at 23. Specifically, Defendant argues that it "made every effort to accommodate Plaintiff's alleged disability," agreeing to accommodate multiple requests for extension of her part-time schedule for more than four months in total, which "belies any argument that [it] terminated [her] employment in retaliation for requesting an accommodation." *Id.* at 23-24.

Plaintiff responds that her "termination on April 12, 2019 was causally connected to her request that accommodation be extended on March 9, 2019," as she has shown that the decision makers were aware of her protected activity and that this activity was temporally proximate to the adverse employment action. Response [50] at 21.[33] In its reply, Defendant does not reply to Plaintiff's argument that the

---

[33] Defendant also argues that "the alleged denial of a reasonable accommodation cannot be the basis of a retaliation claim under the ADA." Def. Brief [46-1] at 23. Plaintiff, perhaps misunderstanding Defendant's argument, contends that Defendant incorrectly claims that she "cannot allege both failure to accommodate and retaliation claims." Response [50] at 20. In any event, she has not produced any argument reflecting that she is pursuing a retaliation claim based on the adverse employment action of denying her request for accommodation, and instead appears to proceed only on the theory that she was retaliated against through her termination. Accordingly, to the extent that any such claim was originally raised in her complaint, it is now waived, *see Clark v. City of Atlanta*, 544 F. App'x 848, 856 (11th Cir. 2013) (*per curiam*); *see also Shoots v. City of Mobile*, Civil Action No. 13-455-CG-N, 2015 WL 1243232, at *3 (S.D. Ala. Mar. 18, 2015) (citations omitted) ("Plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of her claims."), and the Court agrees with Defendant that such a claim would be an improper duplicate of Plaintiff's failure to accommodate claim, *see Lucas*, 257 F.3d at 1261 (rejecting plaintiff's contention that defendant retaliated against him "by failing to reasonably accommodate him, by refusing to maintain him on light duty work, and by failing to engage him in an

temporal proximity between her protected activity and termination establish the requisite causation to support her *prima facie* case of retaliation. *See* Reply [51] at 15-16.

Indeed, a plaintiff may establish an inference of causation merely by showing that she suffered the adverse action shortly after she engaged in the protected activity. *Higdon*, 393 F.3d at 1220; *Bass v. Bd. of Cty. Comm., Orange Cty., Fla*., 256 F.3d 1095, 1119 (11th Cir. 2001); *Brungart v. BellSouth Telecomm., Inc*., 231 F.3d 791, 798 (11th Cir. 2000). "The Eleventh Circuit has clearly stated . . . that 'temporal proximity *alone* is sufficient to establish an inference of retaliation' when that proximity is 'very close.'" *Gross-Jones v. Mercy Med.*, 874 F. Supp. 2d 1319, 1344 (S.D. Ala. 2012) (citations omitted); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal marks omitted) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close."). Although a "three to four month disparity between the [protected activity ] and the

_____

interactive process," as "this contention merely reclothe[d] [his] ADA discrimination claim"); *Perez v. Sprint/United Mgmt. Co.*, Civil Action No. 1:12-CV-3161-MHS, 2013 WL 6970898, at *11 (N.D. Ga. Dec. 19, 2013) (finding plaintiff's retaliation claim was merely "a duplicate of his discrimination claim under the ADA" as the acts he described "relate[d] to his discrimination and reasonable accommodation claims, not to any retaliation claim").

adverse employment action is not enough," *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted), a gap of several weeks "satisfies the 'very close' standard," *Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, No. 5:11-CV-290 (CAR), 2013 WL 3964908, at *2 (M.D. Ga. July 31, 2013).

In this case, Plaintiff's last request for accommodation under the ADA was dated March 30, 2019, requesting an extension of her restrictions through June 5, 2019. Def. SUMF ¶ 60. Approximately two weeks later, on April 12, 2019, Plaintiff was terminated. Def. SUMF ¶ 76; Pl. SDMF ¶ 54. This gap is sufficient to show causation in this case. *See Atta v. Cisco Sys., Inc.*, CIVIL ACTION FILE NO. 1:18-cv-1558-CC-JKL, 2020 WL 7384689, at *21 (N.D. Ga. Aug. 3, 2020), adopted by 2020 WL 7022450, at *3 (N.D. Ga. Nov. 30, 2020) (second alteration in original) (citations and internal marks omitted) (explaining that "[a]ny time an employee requests an accommodation, she engages in protected activity so long as she had a good faith, objectively reasonable belief that [s]he was entitled to those accommodations under the ADA," and measuring the temporal proximity from the date of plaintiff's last request for accommodation under the ADA that met this standard); *Perry v. Walmart Inc.*, Case No: 2:18-cv-606-FtM-29NPM, 2020 WL 1158719, at *13 (M.D. Fla. Mar. 10, 2020) (finding a gap of less than two weeks between the protected activity and adverse employment action was sufficient

temporal proximity to show causation). Accordingly, the Court concludes that Plaintiff has established a *prima facie* case of retaliation and will proceed on in the analysis to consider whether Defendant has sufficiently articulated a legitimate, non-retaliatory reason for her termination and whether Plaintiff has shown that this reason is pretextual.

> c.    Race Discrimination Under Title VII and § 1981

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim for discrimination based on disparate treatment, a plaintiff must prove that the defendant acted with discriminatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983).

Similarly, § 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981. It is well-settled law that § 1981 prohibits race discrimination in both the public and private employment context. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is

well-established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts."); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts.").

In cases in which a plaintiff has asserted a claim under § 1981 as a remedy for race discrimination in the employment context, the elements required to establish a claim under § 1981 generally mirror those required for a Title VII claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994); *Brown*, 939 F.2d at 949. Accordingly, the standards of proof for Plaintiff's claim of race discrimination under Title VII also generally apply to her claim of race discrimination brought under § 1981. To establish a *prima facie* case of racially discriminatory termination under these statutes, Plaintiff must

establish that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was replaced by a person outside of her protected class or her employer treated similarly-situated employees outside of her protected class more favorably; and (4) she was qualified to perform her job. *Stinson v. Pub. Serv. Tel. Co.*, 486 F. App'x 8, 10 (11th Cir. 2012) (*per curiam*) (citation omitted); *Wells v. CRST Malone, Inc.*, Case No.: 2:15-CV-01884-RDP, 2017 WL 6619153, at *5 (N.D. Ala. Dec. 28, 2017) (citations omitted).

Plaintiff asserts a claim for racially discriminatory termination under Title VII and § 1981. Compl. [1] ¶¶ 70-77. She alleges that "Defendant terminated [her] because of her race rather than permitting her to work remotely as it did her Caucasian comparators." *Id.* ¶ 72. Specifically, she alleges that Kitchens, a Caucasian APM, was permitted to work a reduced schedule and work from home since August 2018, and that Torrence and Kopf, who were also Caucasian, were "routinely permitted to work from home." *Id.* ¶¶ 26-27.

Defendant argues that Plaintiff cannot establish a *prima facie* case of race discrimination because she cannot show that any similarly-situated individuals outside of her protected class were treated more favorably.[34] *See* Def. Brief. [46-1]

---

[34] Plaintiff cannot establish her *prima facie* case of discriminatory termination by showing that she was replaced by someone outside of her protected class, since the individual who was hired to replace her was also African American. *See* Def. SUMF ¶ 88; Torrence Dep. at 14; *see also Hudson v. Middle Flint Behav. Healthcare*, 522

at 24. Defendant contends that Kitchens is not similarly-situated to Plaintiff because she requested FMLA leave, not an accommodation under the ADA, and in any event, she was an APM on a different shift from Plaintiff (first shift), she reported to a different supervisor, and she worked a different schedule that never required her to work alone and therefore, if she was not in the office, there were other APMs working in the office who could cover for her, whereas when Plaintiff would be scheduled to work alone and was not in the office, there would not be anyone available to cover for her. *Id.* at 20-22, 24. Plaintiff responds that Kitchens was similarly-situated to her because they were subject to the same policies, held the same job governed by the same job description and reported to the same upper-level supervisor, Biskey-Rose, and that while she was denied her final request for accommodation and was terminated, Kitchens was permitted a flexible work arrangement and thus, was treated better than Plaintiff because of her race. Response [50] at 23.

Plaintiff "must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1218. The Court will begin with Kitchens, a Caucasian APM. Kitchens reported to a different supervisor

---

F. App'x 594, 596 (11th Cir. 2013) (*per curiam*) (citation omitted) ("Rather than demonstrate that she was replaced by someone outside of her protected class, a plaintiff may instead demonstrate that her employer treated similarly situated employees outside of her class more favorably.").

and worked on the first shift, which was staffed differently from the third shift that Plaintiff worked on. *See Hartwell v. Spencer*, 792 F. App'x 687, 694 (11th Cir. 2019) (*per curiam*) (concluding that plaintiff's comparator was differently situated to him where he worked on a different shift and had a different immediate supervisor); *Stephens v. Bd. of Trs. of Auburn Univ.*, 774 F. Supp. 2d 1202, 1211-12 (M.D. Ala. 2011) ("The fact that employees work for different supervisors is also relevant to the similarly situated analysis."). Whereas the first shift typically employed a greater number of APMs and also had an IOS scheduled, APMs on the third shift often worked alone. *See* Kitchens Dep. 27-28 (testifying that as an APM on the first shift, she always worked with other APMs and was never scheduled by herself); Kopf Dep. at 28 (explaining that there would be an IOS scheduled on the first shift in addition to the APM). Therefore, if Kitchens was permitted to work a reduced schedule or remotely as Plaintiff contends, unlike in Plaintiff's case, there would have been other individuals scheduled on the first shift to perform essential functions from the office, such as obtaining keys or printing paperwork for drivers.

Kitchens testified that during her employment, she was approved for and took three weeks of continuous FMLA leave and that she subsequently requested and was approved for intermittent FMLA leave, as she anticipated that she would need time off to care for her mother, but she did not use this leave and instead obtained

permission from her immediate supervisor, Dunn, to work remotely as needed for the four months that her mother was in the hospital, after which she returned to working from the office exclusively. Kitchens Dep. at 13-16. Biskey-Rose, who was Kitchens' upper-level supervisor, testified that Kitchens only worked remotely as needed and that this was not an every day occurrence. Biskey-Rose Dep. at 32-33.

Considering Kitchens' requests for FMLA leave, in this regard she was treated *the same* as Plaintiff, who was granted and exhausted her FMLA leave. Moreover, the "FMLA leave provisions are 'wholly distinct' from the reasonable accommodation employers are obligated to provide under the [ADA]." *Yoosun Han v. Emory Univ.*, 658 F. App'x 543, 547 (11th Cir. 2016) (*per curiam*) (citing 29 C.F.R. § 825.702(a)). Whereas employers under the FMLA are obligated to provide requested FMLA leave for which the employee is eligible, *see Brown v. Gestamp of Ala. LLC*, CIVIL ACTION NOS. 2:16-CV-1862-KOB, 2:17-CV-1411-KOB, 2018 WL 3455687, at *6 (N.D. Ala. July 18, 2018) (citation omitted) ("The FMLA prohibits an employer from interfering with, restraining, or denying an eligible employee the exercise of any right to leave under the Act."), the ADA only requires employers to grant *reasonable* accommodations, which "depends on specific circumstances," *Terrell*, 132 F.3d at 626.

Plaintiff testified that Kitchens was permitted to work a reduced schedule between August 2018 and January 2019, where she was out of the office at least once, and possibly twice, per week. Pl.'s Dep. at 200-02. She stated that she had personal knowledge of this because, as a third shift APM, she would communicate with the first shift staff, which would come in the following morning. *Id.* at 198-99. Plaintiff acknowledged that she did not have access to Kitchens' time records showing when she took time off and that her understanding that she was in the office fewer days per week was just based on her observations that Kitchens was not present when she expected her to be. *Id.* at 202-03.

The Court accepts that Plaintiff had personal knowledge that Kitchens was not always present with the first shift when Plaintiff would happen to need to speak with her. But Plaintiff does not appear to have personal knowledge of Kitchens's schedule as a general matter. Plaintiff's speculation in that regard is not sufficient evidence on summary judgment. *See Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (citation omitted) ("A party's mere 'belief' and/or speculation is not based upon personal knowledge and is not competent summary judgment evidence."). Moreover, when asked about this at her deposition, Kitchens disputed Plaintiff's characterization of her schedule and insisted that from 2018-19, she was working at least five days per week. Kitchens

Dep. at 28-29. She added that on the few days that she needed to take off, she used vacation days. *Id.* at 16.

There are other crucial differences between Plaintiff's and Kitchens's situations. Even though Kitchens may have been sporadically allowed to work remotely, Defendant has shown that this only occurred in circumstances where the shift was otherwise covered with others present in the office. This situation is fundamentally different from the arrangement that Plaintiff proposed, by which she would be allowed to work remotely without anyone else physically present in the office to cover the needs of drivers. Plaintiff and Kitchens also reported to different supervisors, which further mitigates the probativeness of any comparison between the terms of their employment.

Accordingly, based on all the foregoing considerations, Kitchens is not a proper comparator as she was not similarly-situated to Plaintiff in all material respects.

Next, Plaintiff's complaint cites Torrence and Kopf as potential comparators, asserting that they were "routinely permitted to work from home."[35] *See* Compl. [1] ¶ 27. As previously discussed in the analysis of Plaintiff's failure to accommodate

---

[35] Although Plaintiff does not rely on these comparators in her response brief, *see* Response [50] at 23, the Court will briefly consider whether these individuals are similarly situated to her.

claim, however, Plaintiff has not presented sufficient evidence to support her contention that Torrence routinely worked from home and regardless, he is not a proper comparator as he held a supervisory role over Plaintiff. *See Mathis*, 255 F. App'x at 431.

As for Kopf, who was another Caucasian APM, she also worked a different shift from Plaintiff—second shift—which apparently did not suffer from the same staffing deficiencies as the third shift, since Kopf testified that there was a DTL scheduled to work with the APMs on second shift. *See* Kopf Dep. at 28. Plaintiff testified that Kopf told her that she was permitted to work remotely as needed when her ex-husband was unable to provide care for their children during the workday, and she estimated that Kopf was permitted to do so approximately once or twice per month. Pl.'s Dep. at 204-07.

Defendant rightfully objects to Plaintiff's testimony as inadmissible hearsay. Def. Resp. SDMF ¶ 88. Indeed, the statements Kopf allegedly made to her concerning her permission to work from home are being offered for their truth, and no apparent exception to the hearsay rule applies. *See Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013) (*per curiam*) (citing Fed. R. Evid. 801(c)) ("Hearsay is an out-of-court statement offered to prove the truth of the matter asserted."); *Ashley v. S. Tool Inc.*, 201 F. Supp. 2d 1158, 1164 (N.D. Ala. 2002),

*aff'd*, 62 F. App'x 318 (11th Cir. 2003) (finding "the deposition testimony of Ms. Ashley, insofar as it recounts the alleged conversation she had with Mr. Wesley, inadmissible hearsay" and excluding it from consideration). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote, citation, and internal marks omitted).

In any event, Kopf's own testimony, which is based on her personal knowledge, refutes this fact. When Kopf was asked about this, she denied working from home as frequently as Plaintiff stated and insisted that, prior to the Covid-19 pandemic, she worked from home about four or five times at most, and she did not recall any instances where she asked to work from home when she was scheduled to work alone. Kopf Dep. at 21-23. Working from home only on rare occasions as needed and never when she was scheduled to work alone is much different from working from home every week whenever she was scheduled to work alone, which is what Plaintiff requested. For these reasons, Kopf was not similarly situated to Plaintiff in all material respects and is not a proper comparator.

Therefore, because Plaintiff has not identified any similarly-situated employees who were treated better than her on the basis of their race, nor has she

presented a convincing mosaic of circumstantial evidence that would create an inference of race discrimination, her race discrimination claim fails.

> d.   Legitimate Non-Discriminatory or -Retaliatory Reason for Plaintiff's Termination and Pretext

Defendant asserts that even if Plaintiff could establish a *prima facie* case of discrimination or retaliation for her ADA, Title VII, and § 1981 claims, it is still entitled to summary judgment because it had a legitimate, non-discriminatory reason for terminating Plaintiff: she could not perform the essential functions of her APM position. Def. Brief [46-1] at 25.[36] Plaintiff argues that this reason is pretextual because she was "capable of performing the essential functions of her job with her requested reasonable accommodations," but Schneider terminated her employment "rather than allowing her the benefit of the flexible work arrangement given to [] Kitchens[.]" Response [50] at 24-25. Defendant replies that Plaintiff's argument "merely advances her belief that she could perform the essential functions of the APM position," which is insufficient because the proper inquiry into pretext concerns the employer's beliefs. Reply [51] at 16.

---

[36] *See Quitto v. Bay Colony Golf Club, Inc.*, No. 2:06-cv-286-FtM-29DNF, 2007 WL 2002537, at *10 (M.D. Fla. July 5, 2007) (deeming defendant's conclusion that plaintiff could no longer perform the essential functions of his position to be a legitimate, non-discriminatory basis for his termination, and proceeding on in the analysis to determine whether plaintiff carried his burden of establishing pretext).

"To demonstrate pretext, the plaintiff may not simply 'recast an employer's proffered [] reason[ ] or substitute [her] business judgment for that of the employer.'" *Thomas v. CVS/Pharmacy*, 336 Fed. App'x 913, 914 (11th Cir. 2009) (*per curiam*) (second alteration in original) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Instead, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. This is because "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted).

In order to show that the employer's reason is false, a plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs*, 106 F.3d at 1538). In addition to showing that the reason was false, a plaintiff must also show

that discrimination or retaliation was the real reason for the employment decision. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020).

Defendant has presented evidence that in evaluating Plaintiff's latest request for accommodation—requesting an extension of her part-time schedule and permission to work from home two days per week or at least whenever she worked alone until June 5, 2019—Torrence, Biskey-Rose, and Jansen concluded that her request could not be fulfilled due to the burden it placed on the other staff and drivers. Torrence averred that full-time work was essential to the APM position because it ensured that Schneider had the resources to support drivers and dispatch loads at all hours of the day, since Schneider was a 24-hour operation, and that because there were certain essential tasks that needed to be performed in the office, APMs under his supervision were not regularly permitted to work remotely. Torrence Decl. ¶¶ 6, 11; *see also* Biskey-Rose Dep. at 12. He added that although Schneider had been accommodating Plaintiff for several months, he determined that they could no longer sustain the accommodation because of the added burden it placed on him and his team, which had been picking up her extra work during that time. *Id.* ¶ 16; *see also* Torrence Dep. at 66-67.[37]

_____

[37] Torrence attested that he personally covered Plaintiff's Sunday overnight shift in addition to his regular duties, which included his usual Monday afternoon shift and required him to work an average of 55-60 hours per work. Torrence Decl. ¶¶ 12-14. Plaintiff disputes that Torrence covered her shift more than a handful of times,

The decisionmakers also contend that they evaluated alternatives that would have enabled them to grant Plaintiff's requested accommodation or some other accommodation, including whether Plaintiff could switch her Monday morning appointment so that she could work the Sunday shift; reassigning Plaintiff to another position; and hiring a temporary employee to cover the extra work, but none of these alternatives were deemed to be viable. Def. SUMF ¶¶ 72-73; Biskey-Rose Dep. at 36-37, 40; Torrence Decl. ¶ 17; Jansen Dep. at 41-42. Thus, Torrence attested that they ultimately decided to terminate Plaintiff's employment upon concluding that no reasonable accommodations would have enabled her to perform the essential functions of her position. Torrence Decl. ¶ 18.

In her response brief, Plaintiff merely asserts that Defendant's articulated reason for her termination was pretextual because she has shown that she was capable of performing the essential functions of her job with her requested accommodations. Response [50] at 24-25. Notwithstanding the Court's prior conclusion to the contrary, as Defendant correctly notes, the "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and . . . not on reality

---

relying in part on Williams' declaration, averring that she and Seymour covered most of Plaintiff's work while she was out on leave and that Torrence only covered the Sunday shift a handful of times. Pl. Resp. SUMF ¶ 50 (citing Williams Decl. ¶¶ 8-9); *see also* Williams Decl. ¶ 7. Nevertheless, it is clear, as discussed, that Plaintiff's reduced schedule impacted the workload of each of these individuals.

as it exists outside of the decision maker's head." *Ostrow v. GlobeCast Am. Inc.*, 489 F. App'x 433, 436 (11th Cir. 2012) (*per curiam*) (alteration in original) (citation and internal marks omitted). "The question to be resolved is not the wisdom or accuracy of [the decision-makers'] conclusion that [Plaintiff could not perform the essential functions of her job], or whether the decision to fire her was 'prudent or fair'"; instead, the Court's "sole concern is whether unlawful discriminatory [or retaliatory] animus motivate[d] the decision." *Alvarez*, 610 F.3d at 1266 (last alteration in original) (citation omitted). Title VII, § 1981, and the ADA do "not require the employer's needs and expectations to be objectively reasonable; [they] simply prohibit[] the employer from discriminating on the basis of membership in a protected class" and from retaliating on the basis of protected activity. *Id.* Thus, Plaintiff must do more than argue that, contrary to Defendant's beliefs, she was capable of performing the essential functions of her job; rather, she must show that unlawful discrimination or retaliation was the true reason for her termination. *See id.* at 1267 (citation omitted).

"The Court concludes that Plaintiff has not submitted significantly probative evidence showing that [Defendant's] asserted reason was false and merely a pretext for discrimination" or retaliation. *Blom v. Wellstar Health Sys. Inc.*, CIVIL ACTION FILE NO. 1:10-CV-00773-JOF-AJB, 2013 WL 12099355, at *10 (N.D. Ga. Feb.

19, 2013), adopted by 2013 WL 12099357, at *10 (N.D. Ga. Mar. 28, 2013), *aff'd*, 560 F. App'x 950 (11th Cir. 2014) (*per curiam*) (citations omitted); *see also Sanders v. Wal-Mart Stores E., LP*, CASE NO.: 2:16-cv-637-WKW-BMB [WO], CASE NO.: 2:17-cv-31-WKW-GMB, 2018 WL 3190915, at *16 (M.D. Ala. Jan. 19, 2018), adopted by 2018 WL 1336052, at *2 (M.D. Mar. 15, 2018), *aff'd*, 754 F. App'x 935 (11th Cir. 2019) (*per curiam*) (citations and internal marks omitted) (concluding that plaintiff's mere speculation regarding the decision to terminate him did not meet his obligation "to provide concrete evidence in the form of specific facts instead of mere conclusory allegations and assertions," and his failure to meet defendant's reason head on and rebut it was fatal to his ADA retaliation claim). Therefore, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED** as to Plaintiff's ADA, Title VII, and § 1981 discrimination claims, as well as her ADA retaliation claim.

## III.   RECOMMENDATION

For the reasons discussed above, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [46] be **GRANTED** and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 10th day of December, 2021.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OBJECTIONS TO THE**
**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.     Introduction[1]

In 2018, Plaintiff Cierra Geter took approved FMLA leave from her job as an Area Planning Manager ("APM") with Schneider National Carriers, Inc. ("Schneider") for her Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA")-covered disabilities – Major Depressive Disorder ("MDD"), Post Traumatic Stress Disorder ("PTSD"), and anxiety disorder. The parties do not dispute for purposes of summary judgment that Ms. Geter suffers from an ADA-covered disability.

When she returned to work in January 2019, Ms. Geter did so with a Schneider-approved reasonable accommodation, which was then extended through March 19, 2019, permitting her to work three 10-hour days a week instead of four (75% time).

In March 2019, Ms. Geter requested that her reasonable accommodation be extended one more time, through June 5, 2019, and that she be permitted to work from home one day a week. When she initially made this request, her supervisor, Travis Torrance, told her it was fine to work from home because "everyone did it." Schneider provided the same accommodations to a nondisabled Caucasian APM,

---

[1] Plaintiff does not object to the R&R's conclusion on her race discrimination claim, although she does believe it is in error.

1

Tiffany Kitchens. However, rather than continue to accommodate Ms. Geter, on April 12, 2019, Schneider terminated Ms. Geter in violation of the ADA, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Schneider also retaliated against Ms. Geter in violation of the ADA.

The Magistrate Judge's Report and Recommendation (R&R) (Doc. 53) recommending summary judgment contains many legal and factual errors. Ms. Geter objects to the R&R's errors and requests that the Court conduct a de novo review of the identified portions and reverse the identified erroneous findings. 28 U.S.C. § 636(b)(1).[2]

Despite disputed issues of material fact and substantial evidence establishing that summary judgment should be denied in full, the R&R recommends that this Court grant Schneider's motion for summary judgment on all of Ms. Geter's claims.

---

[2] Upon proper objections to an R&R, "the Court must 'make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Scarbary v. Georgia Dep't of Natural Res.*, 245 F. Supp. 3d 1328, 1330 n. 2 (N.D. Ga. 2017) (Jones, J.) (quoting 28 U.S.C. § 636(b)(1)). "After conducting this review, the Court 'may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. … The Court may also 'receive further evidence or recommit the matter to the magistrate judge with instructions.'" *Id.* At summary judgment, all evidence and factual inferences "must be viewed 'in the light most favorable to the non-moving party,' and 'all reasonable doubts' resolved in her favor.'" *Scarbary*, 245 F. Supp. 3d at 1335.

Plaintiff respectfully objects and submits that the R&R errs as follows:

- First, with respect to Ms. Geter's failure to accommodate claim, in concluding that Ms. Geter is not a qualified individual with a disability, could not perform the essential functions of her job, and did not request a reasonable accommodation, the R&R (a) improperly construes the facts in the light most favorable to Defendant; (b) disregards evidence supporting Plaintiff's claim; (c) fails to follow the Supreme Court's guidance that "...the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); and (d) ignores that the ADA requires that employers accommodate employees even if doing so is inconvenient.

- Second, with respect to the disability discrimination and retaliation claims, in concluding that Ms. Geter failed to establish a prima facie case of discrimination, the R&R relies on the wrong standard, improperly addresses pretext even though Schneider failed to articulate any alleged "legitimate" reasons for its actions and relies in the pretext analysis on the same errors underlying the erroneous conclusion that Ms. Geter could not perform the essential functions of her job.

## II.   Ms. Geter's Specific Objections to the R&R's Interpretation or Exclusion of Facts and Conclusions

In granting summary judgment on Ms. Geter's claims, the R&R cherry-picked the evidence it relied on to support the result it was seeking – summary judgment – and ignored substantial evidence and disputed issues of material fact supporting that summary judgment should be denied. The R&R violated the Supreme Court's basic admonition that courts may not weigh the evidence at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because key evidence raised by Ms. Geter, construed in Ms. Geter's favor as required, shows that a reasonable jury

3

could conclude that Defendant failed to accommodate, discriminated against, and retaliated against Ms. Geter under the ADA, the R&R should be rejected, and summary judgment should be denied.

### A.    The evidence of record was sufficient for a jury to conclude that Schneider denied Ms. Geter a reasonable accommodation.

Ms. Geter establishes a prima facie case of disability discrimination if: (1) she is disabled;[3] (2) she was a "qualified individual" at the relevant time; and (3) she was unlawfully discriminated against because of her disability or Schneider failed to accommodate her because of her disability. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d at 1256; *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001); *Beatty v. Hudco Indus. Products, Inc.*, 2:10–CV–3051–JHH, 2012 WL 3030100, at *9 (N.D. Ala. July 23, 2012); *Jernigan v. BellSouth Telecomms., LLC*, 17 F. Supp. 3d 1317, 1321 (N.D. Ga. 2014). As recognized by the R&R:

> The ADA expressly provides that an employer unlawfully discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations" for the employee, unless "the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010) (*per curiam*) ("An employer impermissibly discriminates against a qualified individual when the employer does not reasonably accommodate the individual's disability."). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or

---

[3] At summary judgment, Schneider does not assert that Ms. Geter is not disabled.

modification of equipment or devices, appropriate adjustment or
modifications of examinations, training materials or policies, the
provision of qualified readers or interpreters, and other similar
accommodations for individuals with disabilities." 42 U.S.C. §
12111(9)(b).

(Doc. 53, pp. 37-38.)

Also, as recognized by the R&R, the *McDonnell Douglas* framework does not
govern Ms. Geter's failure to accommodate claim. (Doc. 53 at, pp. 35-36.) Rather,
Ms. Geter establishes this claim by proving her prima facie case. *Id.* If she does, the
burden then shifts to Schneider to prove that "accommodating the plaintiff would
impose an undue hardship on the operation of its business." *Terrell v. USAir*, 132
F.3d 621, 624 (11th Cir. 1998); *Rorrer v. City of Stowe*, 743 F.3d 1025, 1038-39 (6th
Cir. 2014) (quoting *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.
1996); *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013)).

Schneider's and the R&R's assertions that Ms. Geter was not a qualified
individual with a disability as defined by the ADA and that her requested
accommodations were unreasonable are wrong and must be rejected.

### 1.   *The R&R erroneously concludes that Ms. Geter is not a qualified individual with a disability.*

A qualified individual is someone with a disability who, "with or without
reasonable accommodation, can perform the essential functions of the employment
position that such individual holds or desires." *Lewis v. City of Union City*, 934 F.3d

5

1169, 1182 (11th Cir. 2019) (citing 42 U.S.C. § 12111(8)); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005). Essential job functions are duties fundamental to the employment position and identifying them requires "a factual inquiry to be conducted on a case-by-case basis." 29 C.F.R. § 1630.2(n)(1); *Lucas*, 257 F.3d at 1258. Whether a job function is essential **is a question of fact that is typically not suitable for resolution on a motion for summary judgment."** *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (quoting *Keith*, 703 F.3d at 926) (emphasis added); *Jernigan*, 17 F. Supp. 3d at 1322.

### a.    The essential functions of the APM job

Here, Schneider falsely asserted, and the R&R accepted that it "is undisputed that full-time work" and "working in the office" are essential functions of Ms. Geter's APM position that her temporary request for accommodations made her unable to perform. (Doc. 47-2 50:6-9; Doc. 47-1; Doc. 47-1 Ex. 3, p. 3 & Ex. 19; Doc. 47-3 40:12-25.) However, whether full-time work and working from the office are essential functions of the job is a disputed issue of material fact not "suitable for resolution on a motion for summary judgment." *Samson*, 746 F.3d at 1201.

While the R&R recognized that "[t]he employer's judgment as to which functions are essential" is "entitled to substantial weight in the calculus" (Doc. 53, pp.43-44), the R&R ignored and never mentioned that "**the employer's judgment**

6

alone is not conclusive." *See Samson*, 746 F.3d at 1201 (citing 29 C.F.R. § 1630.2(n)(3)(i) and *Holly*, 492 F.3d at 1258). The R&R repeatedly and erroneously treated Schneider's preferences as conclusive, but if they were:

> then an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate that employers 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity.

*Samson*, 746 F.3d at 1201 (citations omitted) (alteration in original).

The R&R failed to recognize that courts must also consider:

> any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; **the work experience of past employees in the job**; and **the current work experience of employees in similar jobs**.

*Lewis*, 934 F.3d at 1182 (quoting *Samson*, 746 F.3d at 1201, 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)). The R&R discounted that the job description written by Schneider does not include full-time work and in-person work as essential functions of the APM job and that substantial evidence supports that they are not.

### i.    The job description

The job description weighs in favor of Ms. Geter as evidence of the essential functions of the job. The R&R acknowledges that Schneider does not assert

7

anywhere in the APM job description that full-time work and working in the office are essential functions of the APM position. However, without citing any authority, the R&R relies on the catchall "any other duties" statement to improperly weigh the job description in Schneider's favor. (Doc. 53, pp. 33, 42-44.)

### ii. Flexible Work Arrangement and Remote Work Policies

Schneider maintains a Flexible Work Arrangement Policy ("FWA") under which employees are permitted to work reduced hours and work remotely. (Doc. 47-3, 15:17-16:7; Doc. 47-6, 31:1-32:7; Doc. 47-6, Ex. 48.) Under this policy, flexible work arrangements include: "compressed work week, flexible start/end times, job share, part-time, and telecommuting [either temporarily or as a 'primary work schedule']." (Doc. 47-6, Ex. 48.) Part-time work and remote work are permissible and possible at Schneider. Ms. Geter's supervisor, Travis Torrence, worked part-time when he was absent at least 82 days out of 260 work days in 2018. (Doc. 47-1, 215:17-216:4; Doc. 50-3, ¶ 10; Doc. 47-2, 57:22-58:12; Doc. 50-4, ¶ 6.)

The R&R bends over backwards to make inferences in Schneider's favor and, failing to properly apply the ADA, erroneously determines that Schneider's FWA and Remote Work Policies support Schneider's position at summary judgment and not Ms. Geter's. (Doc. 53, pp. 44-46.) Under the ADA, Schneider is required to provide preferences to disabled employees like Ms. Geter to accommodate their

8

disabilities even if the "special treatment" may not benefit Schneider. "By definition any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the 'reasonable accommodation' provision could not accomplish its intended objective." *Holly*, 492 F.3d 1247, 1262-63 (11th Cir. 2007) (citations omitted); see also *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647-48 (1st Cir. 2000) (requiring an "individualized assessment" of plaintiff's need for leave beyond that allowed under company's policy); EEOC Enforcement Guidance, Question 17 ("If an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its 'no-fault' leave policy . . . unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship. Modifying workplace policies, including leave policies, is a form of reasonable accommodation."); id., Question 22 ("An employer must provide a modified or part-time schedule when required as a reasonable accommodation, absent undue hardship, even if it does not provide such schedules for other employees."). As such, these policies cut in favor of Ms. Geter's position

that work from home and part-time work are permissible and are not essential functions of the APM position, and the R&R should be rejected on this issue.

### iii.    The work experience of past employees in the job.

Despite substantial evidence of disputed issues of fact on this point, the R&R concludes that the work experience of employees in the job cuts against Ms. Geter and in favor of Schneider on the essential functions issue. The R&R again ignores summary judgment precedent requiring that disputed facts be taken in Ms. Geter's favor as the non-movant and must be rejected.

As an initial matter, the R&R construed disputed facts in Schneider's favor or did not even consider material facts that show that working from the office and working full-time were not essential functions of the APM position: (1) as an APM, it was not necessary for Ms. Geter to be in the office to support drivers, because she assisted drivers initially as far away as Canada and, after 2016, throughout the southeast (compare Doc. 50-2, ¶ 20 to Doc. 53, p. 46); (2) as an APM, Ms. Geter supported drivers in Atlanta, Charlotte, Miami, Orlando, Jacksonville, and Savannah by taking calls and messages from drivers (Doc. 50-2, ¶ 18); (3) the only drivers Ms. Geter ever saw face-to-face from time-to-time were the **0.05 percent** based in Atlanta – from 100 to 110 of the 2,250 drivers she assisted (compare Doc. 50-2, ¶ 19 to Doc. 53, pp. 46-47); (4) APMs located trailers throughout the southeast for

10

drivers remotely using GPS software maintained by Schneider (compare Doc. 50-2, ¶ 21 to Doc. 53, p. 47); (5) for all hubs outside Atlanta, keys to the trucks were kept in combination boxes to which the drivers had access (compare Doc. 50-2, ¶ 22 to Doc. 53, pp. 47-48); and (6) for drivers outside Atlanta, Ms. Geter printed paperwork remotely to printers in the hubs or to printers in truck stops to which the drivers had access and she could do the same for Atlanta drivers when she worked from home (compare Doc. 50-2, ¶ 23 to Doc. 53, pp. 47-48).

In addition, it is undisputed that the entire time Ms. Geter worked for Schneider everyone was permitted to work from home as needed and that it was common for APMs to work from home. (Doc. 47-1, 208:18-209:7, 209:19-210:14; Doc, 47-5, 17:1-11; Doc. 47-4, 12:5-21; Doc. 50-4, ¶ 14.) In fact, APM Tiffany Kitchens was permitted to work full-time remotely for at least four months while her mother was ill and is still employed by Schneider. (Doc. 47-1, 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Doc. 47-5, 6:1-24, 13:15-16:15; Doc. 47-2, 14:18-21; Doc. 47-6, 32:21-34:5.) The R&R accuses Plaintiff of overstating Ms. Kitchens' 4 months of remote work, but Ms. Kitchens testified as such, and Ms. Biskey-Rose stated only that it was not her recollection. (*Id.*) Thus, at best, this is a disputed fact that must be taken in Ms. Geter's favor – i.e., Ms. Kitchens was permitted to work remotely for four months straight, not for four months as-needed.

Again, the R&R erroneously concluded that "among the relevant factors that the Court must consider are the consequences of not requiring the employee to perform the function. *See* 29 C.F.R. § 1630.2(n)(3)(iv). This factor also favors a finding that working from the office was an essential function, as the consequences of permitting Plaintiff to work from home as an APM on the third shift when she was scheduled to work alone would be that no one was present in the office to find trucks, obtain keys, or print paperwork for drivers when the need arose." (Doc. 53, p. 49.) This requires a determination in the movant's favor on a disputed issue of fact because there is absolutely no record evidence that any of these speculative issues happened even once and it is undisputed that Ms. Geter worked from home when she was scheduled alone from February to April. (Doc. 50-2, ¶ 46.)

iv.   **The current work experience of employees in similar jobs.**

The R&R completely downplays that the evidence that Schneider relocated all APMs to Green Bay to dispatch drivers remotely throughout the country and that APMs worked remotely during the pandemic shows that it is possible for APMs to perform their jobs, including all essential functions, remotely. The ADA requires that the current experience of employees be considered, and though the R&R dismisses them, these facts are relevant in determining that summary judgment should have been denied.

Since Ms. Geter's termination, in March or April 2020, Schneider permanently relocated all APMs, including those in Fairburn, to the corporate headquarters in Green Bay, Wisconsin. (Doc. 47-2, 13:10-12, 16:22-17:11, 23:15-21; Doc. 47-5,10:11-23; Doc. 47-3, 18:10-19:25, 44:6-45:9; Doc. 47-6, 18:3-23:5; Doc. 47-4, 9:10-14.) The move was done to centralize resources and because the "collaboration that's needed between customer service is [in Green Bay], as well as a lot of the network leadership is [in Green Bay]. So to be able to streamline and band our dispatching system as well as our team, we needed to have it centralized." (*Id.*) Most of the duties APMs like Ms. Geter previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeast hub. (Doc. 47-4, 14:17-15:1, 26:11-14; Doc. 47-2, 16:22-17:5, 29:8-30:3.) Moreover, as shown above, APMs can locate trucks remotely by GPS, print driver paperwork remotely, and all the hubs except Fairburn gave drivers direct access to key. (Doc. 50-2, ¶¶ 22, 23.) This evidence cuts in favor of the denial of summary judgment.

Finally, all the employees employed by Schneider in Fairburn (other than the over-the-road drivers), worked remotely full-time beginning in March 2020 due to the pandemic, later worked remotely three days a week, and only returned to the office full-time in March 2021. (Doc. 47-2, 23:22-27:25, 28:14-25; Doc. 47-5,12:23-13:14; Doc. 47-3, 23:10-16; Doc. 47-6, 27:9-15; Doc. 47-4, 15:2-16:2.) To

accommodate the change of the staff working remotely, the printer has been moved to the driver's lounge and remains in the driver's lounge, and the driver key box is no longer behind locked doors (there is no record evidence that the doors have been locked again), so the drivers have direct access to printer and keys just like they always have at the other southeastern hubs. (Doc. 47-5,20:2-21:8; Doc. 47-6, 26:19-27:8, 27:16-29:1; Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.) While the R&R asserts that this is irrelevant to whether Schneider could have accommodated Ms. Geter at the time, there is no record evidence (other than Schneider's irrelevant preference) that the printer could not have been moved sooner just like it was in the other hubs supported by Ms. Geter, no record evidence (other than Schneider simply not doing it) that the keys could not have been relocated to the driver lounge in a combination box just as they were in all the other hubs, and no record evidence that APMs could not locate trucks through GPS remotely as they always did. Since one of the factors to be considered in whether job functions are essential is how those functions have been performed in the past and are currently performed, this factor again weighs against Schneider and in favor of the denial of summary judgment.

As such, based on all the above, and contrary to the R&R's conclusion, significant evidence in this case establishes that neither working full-time nor working in the office are essential functions of the APM position. *See Lewis*, 934

14

F.3d 1169, 1182-83 (reversing district court conclusion that plaintiff was not qualified under the ADA based on job description and other evidence); *Samson*, 746 F.3d at 1202-03 (reversing summary judgment on qualified individual issue); *Holly*, 492 F.3d at 1261 (reversing district court because of genuine issue of fact as to whether punctuality was essential function of job); *Jernigan*, 17 F. Supp. 3d at 1322 (plaintiff qualified based on job description and other evidence); *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1378-79 (N.D. Ga. 2012) (triable issue of fact as to whether plaintiff was qualified under the ADA despite absenteeism)[4]. Accordingly, Ms. Geter is a qualified individual with a disability because she can show that she is capable of performing the essential functions of the APM position with her requested accommodations, and the R&R should be rejected.

### v.   Miscellaneous errors in the R&R.

To the extent Schneider asserts that Ms. Geter cannot perform the essential function of fast-paced, high-pressure work, record evidence shows that this is simply not true, and the R&R erroneously concluded otherwise. (Doc. 53, pp. 56-57, fn. 23.) Although Ms. Geter acknowledges that she had trouble working in a fast-paced, high-pressure environment throughout her employment with Schneider, she did so

---

[4] The R&R made no efforts to distinguish this binding Eleventh Circuit precedent and instead went out of its way to cite district court cases in which summary judgment was granted against plaintiffs.

effectively without an accommodation until 2018. (Doc. 47-1, 188:2-20; Doc. 50-3, ¶ 22.) Ms. Geter's difficulties working in a fast-paced, high-pressure environment did not affect her performance, and she performed well throughout her employment with Schneider – there is no record evidence that she did not. (Doc. 50-3, ¶ 23.)

In addition, the R&R states that "[a]s for working full-time, it is undisputed that the position Plaintiff applied for was a full-time position and that Schneider did not employ any part-time APMs in Fairburn, aside from Plaintiff while she was being accommodated for her disability." (Doc. 53, p. 52.) This is disputed and ignores the fact that Ms. Geter's request for part-time work was temporary.

Moreover, her supervisor, Torrence was absent at least 82 days in 2018 and cannot dispute that fact (he simply does not recall if it is true and produced no records showing that it was not). (Compare Doc. 50-2, ¶ 91 to Doc. 53, p. 55.) This is offered to show that Schneider permitted employees to work part-time, not to provide a comparator. In addition, the R&R erroneously attempts to exclude this evidence as hearsay, but because (1) Torrence cannot dispute it, and (2) because it is reducible to admissible evidence at trial through the calendars that are exclusively in Schneider's control, it is admissible at summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). (*See also* Doc. 47-3, Ex. 4 – FWA.) Finally, APM Kopf testified that she was aware that Schneider employees were permitted to work

16

part-time and remotely, a fact that cuts in favor of the denial of summary judgment but that was ignored by the R&R. (Doc. 50-2, ¶ 4.)

> **b.** **Ms. Geter's could perform the essential functions of her job with an accommodation, and her accommodation requests were reasonable.** [5]

Whether an employee is "qualified" depends on available reasonable accommodations. An accommodation is "reasonable" under the ADA if it enables the employee to perform the essential functions of the job. *Lucas*, 257 F.3d at 1259-60; *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *see also* 29 C.F.R. § 1630.2(o)(1)(ii). What constitutes a reasonable accommodation depends on the circumstances but may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). A failure to accommodate claim "requires no animus" or "discriminatory motivation," and may "result in different treatment for a disabled person than a nondisabled person." *Nadler v. Harvey*, No. 06-12692, 2007 U.S. App.

---

[5] Leave of a definite duration is an accommodation that would have allowed Ms. Geter to return to full duty on June 5, 2019, so even if Ms. Geter was not qualified because of her temporary need to work 30 hours and to work from home when she was scheduled to work alone, she was still qualified for her job under the ADA, and summary judgment must be denied. *See* 29 C.F.R. Part 1630, App. (discussing § 1630.2(o)); *See Garcia-Ayala*, 212 F.3d at 638; *see also Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 878 (9th Cir.1989) (leave of absence reasonable where no evidence showed undue hardship on the employer).

LEXIS 20272, at *4, 8 (11th Cir. 2007).

### i.     Temporary reduced hours

Schneider asserts and the R&R accepts that Ms. Geter's request to temporarily work 75% time or three days (thirty hours) per week instead of four days (forty hours) per week from January 2, 2019 through June 5, 2019 was unreasonable. In asserting that this request was unreasonable, the R&R and Schneider ignore several important considerations. First, and most importantly, as shown above, working full-time was not an essential function of the APM position and, in fact, Schneider has a policy under which its employees may seek permission to work flexible or reduced hours. (Doc. 47-6, Ex. 48.) Second, Ms. Geter worked reduced hours from January 2nd through her termination in April with no issues. Although Mr. Torrence may have covered for Ms. Geter sporadically, he certainly did not do so on a weekly basis, and his assertion to the contrary is false, though it appears that the R&R accepted it. (Doc. 53, p. 58.) When Ms. Geter was on medical leave, her shifts were primarily covered by Desmond Seymour and Audreianna Williams and were rarely, if at all, covered by Mr. Torrence. (Doc. 50-4, ¶ 9.) When Ms. Geter worked her reduced hours schedule, Desmond Seymour and Audreianna Williams covered her Sunday shifts and, occasionally, Mr. Torrence subbed in on the shift. (Doc. 47-1, 136:10-139:4, 181:23-183:17; Doc. 50-4, ¶ 8.) There is absolutely no evidence that

Ms. Geter working full-time caused her coworkers to work more than their scheduled 40 hours per week to cover her, so it could not have been a burden to them[6] – any such allegation is purely speculative and unsupported by any documentary evidence. (Doc. 53, pp. 58-59.)

This case is easily distinguished from the cases relied on by the R&R and Schneider in support of the position that temporarily working reduced hours is not a reasonable accommodation. (Doc. 46-1, p. 15; Doc. 53. 58-66.) When Ms. Geter temporarily worked reduced hours, she was still performing all the essential functions of her job – contrary to the R&R's statements otherwise. Unlike the plaintiff in *Medearis v. CVS Pharmacy*, 92 F. Supp. 3d 1294, 1305 (N.D. Ga. 2014), she was not seeking to have a duty removed. Unlike the plaintiff in *Rabb v. Sch. Bd. of Orange Cty.*, 590 F. App'x 849, 852 (11th Cir. 2014), she was not asking for a permanent part-time position. Instead, Ms. Geter needed to work reduced hours temporarily until her planned return to full-time work on June 5, 2019.[7]

---

[6] These arguments are inappropriate in a reasonable accommodation analysis; they would be more appropriate in an undue burden analysis. However, it is undisputed that Schneider never performed an undue burden analysis. Therefore, Schneider does not get the benefit of that affirmative defense at summary judgment.

[7] On March 30, 2019. Dr. Wanzo requested to extend Ms. Geter's request for reasonable accommodation to June 5, 2019 and believed that there was a 95% chance that Ms. Geter would then be able to return to full duty. (Doc. 47-2, 50:6-9; Doc. 47-1, 159:10-161:13; Doc. 47-1, Ex. 19; Doc. 47-3, 40:12-25; Doc. 47-1, Ex. 3, p. 3.)

### ii.    Remote work

**In February 2019, Mr. Torrence told Ms. Geter that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it."** (Doc. 47-2, 55:11-21; Doc. 47-1, 146:1-150:12, 208:18-209:7, 209:19-210:14; Doc. 47-5,17:1-11; Doc. 47-4, 12:5-21; Doc. 50-4, ¶ 14.) Nowhere in the R&R is this statement addressed or even mentioned, even though it is undisputed. In addition, consistent with the standard cited by the R&R, "[w]hen considering the employer's judgment, courts will look to . . . testimony from the plaintiff's supervisor." *Webb v. Wynne*, No. 2:07-cv-471-ID, 2008 WL 4831740, at *6 (M.D. Ala. Nov. 3, 2008).

The entire time Ms. Geter worked for Schneider, the entire staff was permitted to work from home as needed, and it was common for APMs to do so. Ms. Kitchens worked full-time remotely for at least four months while her mother was ill, APM Audreianna Williams worked from home regularly throughout the later part of her pregnancy, the APMs all perform their jobs remotely now, and everyone except the drivers worked remotely during the pa. (Doc. 47-1, 197:6-198:1, 198:9-202:21, 203:12-204:10, 216:17-217:18, Doc. 47-5,6:1-24, 10:11-23, 12:23-16:15; Doc. 47-2, 13:10-12, 14:18-21, 16:22-17:11, 23:15-27:25, 28:14-25, 29:8-30:3; Doc. 47-6, 18:3-23:5, 27:9-15, 32:21-34:5; Doc. 47-3, 18:10-19:25, 23:10-16, 44:6-45:9; Doc. 47-4, 9:10-14, 14:17-16:2, 26:11-14; Doc. 47-2, 16:22-17:5; Doc. 50-4, ¶ 10.) To

accommodate the change in the staff working remotely, Schneider gave the 100 Atlanta drivers direct access to the printer and truck keys, which the 2,150 other southeast drivers always had at the other southeast hubs. (Doc. 47-5,20:2-21:8; Doc. 47-6, 26:19-27:8, 27:16-29:1; Doc. 50-3, ¶¶ 14, 15; Doc. 50-4, ¶¶ 12, 13.) The substantial evidence that working remotely is a routine practice for APMs and other Schneider employees establishes that a jury could easily conclude that Ms. Geter's request to work from home when she was scheduled to work alone was reasonable, and the R&R should be rejected on this issue.[8]

### 2. Schneider did not accommodate Ms. Geter but presented no evidence that it would have been an undue burden.

Although there was a clear end date for Ms. Geter's accommodation request – June 5, 2019 – Mr. Torrence believed it was too "taxing" to continue to accommodate Ms. Geter, and Ms. Geter was terminated. (Doc. 47-2, 50:15-51:16.) Thus, Ms. Geter easily meets her burden of establishing that Schneider failed to accommodate her when it terminated her employment to avoid accommodating her.

Accordingly, the burden then shifted to Schneider to establish its affirmative defense that it would have been an undue burden to accommodate Ms. Geter.

---

[8] The R&R chose not to address Schneider's argument that Ms. Geter somehow impeded the interactive process and, as such, Ms. Geter does not address it but refers the Court back to her Brief in Opposition to Summary Judgment. (Doc. 50, pp. 15-16.)

Schneider has not attempted to do so during discovery and did not do so in its summary judgment brief. Thus, the argument was waived. However, the R&R attempts to make the argument on Schneider's behalf. *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009) (*See* Doc. 47-2, 66:2-69:19; Doc. 47-3, 14:6-15:4; Doc. 47-6, 36:6-41:20; Doc. 53, pp.67-71). The R&R goes to great lengths to explain why relocating the APMs and permitting them to work from home required "significant adjustments to Schneider's operations." (*Id.*) However, Schneider failed to meet its burden of proof on this affirmative defense, and summary judgment should have been denied. *See Coker v. Enhanced Senior Living, Inc.*, No. 2:11-CV-0091-RWS, 2012 WL 4326429, *9 (N.D. Ga. Sept. 18, 2012) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *Jernigan*, 17 F. Supp. 3d at 1324; *Hill v. Clayton Cnty. Sch. Dist.*, 619 F. App'x 916, 921-22 (11th Cir. 2015) (reversing grant of summary judgment where defendant made "spare assertions" of undue hardship). Rather than rescuing Schneider with an undue burden analysis, the R&R should have denied summary judgment on the failure to accommodate claim.

**B.   The R&R errs in recommending summary judgment on Ms. Geter's discriminatory termination claim.**

With respect to Ms. Geter's disability discrimination claim, courts use the same *McDonnell Douglas* burden-shifting analysis used in Title VII cases to

evaluate claims under the ADA. *Holly*, 492 F.3d at 1255. Ms. Geter establishes a prima facie case of disability discrimination if: (1) she is disabled; (2) she was a "qualified individual" at the relevant time; and (3) she was unlawfully discriminated against because of her disability. *Id.* at 1256. By its very terms, this prima facie case does not require the identification of a comparator, and the R&R's suggestion otherwise ignores this precedent. (Doc. 53, p. 79.)

Again, Schneider does not assert that Ms. Geter is not disabled as defined by the ADA. Also, as shown above in detail, Ms. Geter establishes that she is a qualified individual with a disability. Finally, Ms. Geter establishes the third element of her prima facie disability discrimination claim by showing that Schneider took an adverse action against her because of her disability. 42 U.S.C. § 12112(b)(1) & (5); *Lewis*, 934 F.3d 1184. Because, as shown above, Schneider terminated Ms. Geter because of her disability, Ms. Geter establishes a prima facie case of disability discrimination, and the burden shifts to Schneider to articulate a legitimate reason for its actions. Schneider did not do so in its brief, though the R&R tried to do so for it. *Id.* (Doc. 46-1, pp. 18-21.) Because Schneider did not articulate any legitimate reason for its actions, summary judgment was erroneously granted.

**C.     Schneider retaliated against Ms. Geter in violation of the ADA.**

The R&R properly concluded that Ms. Geter established a prima facie case of

ADA retaliation. (Doc. 53, pp. 82-87.) "Once a prima facie case has been demonstrated, the defendant must proffer a legitimate nondiscriminatory reason for the adverse employment action." *Id*. Because Ms. Geter established a prima facie case of ADA retaliation, the burden shifted to Schneider to articulate a legitimate non-retaliatory reason for its termination of Ms. Geter. In its brief, Schneider skipped this step and has waived the argument, and summary judgment should have been denied. *Bank of Am., N.A.*, 571 F.3d at 1162; *Herring*, 397 F.3d at 1342; *Hein*, No. 2:16-CV-00081-RWS-JCF, 2018 U.S. Dist. LEXIS 112965, at *63-66.

### D. The alleged legitimate reason articulated by the R&R on Schneider's behalf.

Schneider failed to articulate any alleged legitimate reasons for its ADA discrimination and retaliation against Ms. Geter and thus waived those arguments. However, the R&R asserted reasons on Schneider's behalf, and thus Ms. Geter addresses them here. The R&R asserts that Schneider terminated Ms. Geter because she could not perform the essential functions of her APM job. This is simply false as addressed in great length above.

Ms. Geter can demonstrate pretext either by showing that a discriminatory reason more than likely motivated the employer or by showing that the proffered reason for the decision is not worthy of belief. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1998). The former showing relies on evidence of the

decision maker's discriminatory or retaliatory motive.  As to the latter method,

> [t]he district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct. The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Evidence of pretext bars summary judgment.

Because, as shown above, Ms. Geter was, in fact, capable of performing the essential functions of her job with her requested reasonable accommodations, Ms. Geter has shown that Schneider's reason for terminating her employment rather than allowing her the benefit of the flexible work arrangement given to Ms. Kitchens is pretext for discrimination, and summary judgment must be denied.

## III.   Conclusion

For these reasons and based on these objections, Ms. Geter respectfully requests that this Court reject the R&R and deny summary judgment to Schneider on her failure to accommodate, discrimination, and retaliation claims under the ADA. Ms. Geter is entitled to a jury trial because "the witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is

in part for that reason that genuine disputes are generally resolved by juries in our

adversarial system." *Tolan v. Cotton*, 134 S. Ct. 1861, 1867 (2014).

LEGARE, ATTWOOD & WOLFE, LLC

**Cheryl B. Legare**
Georgia Bar No. 038553
cblegare@law-llc.com
Camille D. Jones
Georgia Bar No. 612930
cdjones@law-llc.com

125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: 470.823.4000
Facsimile: 470.201.1212

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2022, I electronically filed **Plaintiff's**

**Objections to the Magistrate Judge's Report and Recommendation** with the

Clerk of Court using the CM/ECF system which will automatically notify the

following attorneys of record:

Peter A. Milianti: pmilianti@mcguirewoods.com
Melissa M. Weiss: mweiss@mcguirewoods.com
M. Laughlin Allen: mlallen@mcguirewoods.com

LEGARE, ATTWOOD & WOLFE, LLC

**<u>Cheryl B. Legare</u>**
Georgia Bar No. 038553
cblegare@law-llc.com

27

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CIERRA GETER, | ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) | 1:20-cv-01148-SCJ-JSA |
| | ) | |
| v. | ) | |
| | ) | |
| SCHNEIDER NATIONAL | ) | |
| CARRIERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS

Defendant, Schneider National Carriers, Inc. ("Schneider"), by and through its attorneys, respectfully submits this Response to Plaintiff's Objections to Magistrate Judge Justin S. Anand's December 10, 2021 Report and Recommendation ("R&R") (Dkt. 53). For the reasons in the R&R, those in Schneider's Motion for Summary Judgment (Dkt. 46 and 46-1), and those discussed below, this Court should accept Judge Anand's recommendation that Defendant's Motion for Summary Judgment be granted.

1

**INTRODUCTION**

Judge Anand correctly concluded that summary judgment be granted in favor of Schneider on all of Plaintiff's claims.

Plaintiff worked as a third-shift Area Planning Manager ("APM") at Schneider's Fairburn, Georgia facility. The undisputed facts establish that Plaintiff could not perform the essential functions of her job despite Schneider's significant efforts to accommodate her medical condition. Because Plaintiff worked the overnight shift, she frequently worked alone supporting drivers and it was difficult for Schneider to cover her shifts. Nonetheless, Schneider accommodated Plaintiff by permitting her to work a part-time schedule for four-and-a-half months, including two extensions of her accommodation request. After Plaintiff sought to extend her part-time schedule a third time – this time for an additional two months – and additionally requested to *permanently* work from home two days per week *and* any time she worked alone, Schneider determined it could not eliminate the essential functions of Plaintiff's third shift APM position. After discussing alternatives with Plaintiff, it became clear she could not return to work full-time and in the office and, consequently, Schneider terminated her employment.

In his R&R, Judge Anand properly recommended dismissal of Plaintiff's failure to accommodate claim concluding that Plaintiff could not perform the

2

essential functions of her job with or without reasonable accommodations.[1] Judge Anand further properly recommended dismissal of Plaintiff's disability and race discrimination claims finding that Plaintiff could neither establish a *prima facie* case of either claim, nor establish that Schneider's legitimate non-discriminatory reason for termination was pretextual. Judge Anand also correctly recommended dismissal of Plaintiff's retaliation claim finding that Plaintiff could not establish that Schneider's legitimate non-retaliatory reason for Plaintiff's dismissal was pretextual.

In her Objections to Judge Anand's R&R, Plaintiff misrepresents testimony, mischaracterizes Judge Anand's reasoning (and Schneider's arguments), proffers inadmissible evidence, attempts to manufacture disputed facts by substituting her own judgment for that of Schneider's, and improperly disputes uncontested facts. However, as thoroughly noted in Judge Anand's R&R, none of Plaintiff's arguments create a genuine issue of material fact entitling her to a trial on her claims. Thus, this Court should adopt the R&R and grant summary judgment in favor of Schneider on

---

[1] Plaintiff was required to present sufficient evidence that *both* working full time and in-office work were not essential functions *and* that *both* her requests – to work part-time and to work remotely two days a week and anytime solo – were reasonable. Since Plaintiff cannot do so, Judge Anand properly recommended dismissal of her claim.

all of Plaintiff's claims.[2]

## **ARGUMENT**

**I.    The R&R Does Not Err in Recommending Dismissal of Plaintiff's Failure to Accommodate Claim Because Plaintiff Could Not Perform the Essential Functions of her Job.**

It is well established that an employer is required to provide reasonable accommodations only for individuals who are qualified for the position. 42 U.S.C. § 12112(a). A qualified individual is one with a disability who, "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). An essential function is a fundamental job duty of a position that an individual with a disability is actually required to perform. *See* 29 C.F.R § 1630.2(n). The ADA does not require employers to excuse employees from performing an essential function. *See Williams v. Revco Disc. Drug Centers, Inc.*, 552 F. App'x 919, 922 (11th Cir. 2014). Thus, if Plaintiff cannot perform the essential functions of her job, she is not a qualified individual and Schneider has no obligation to provide an accommodation. *See id.* Courts in this Circuit grant

---

[2] Since Plaintiff does not object to Judge Anand's recommendation of dismissal of Plaintiff's race discrimination claim, Schneider does not address it. However, Schneider notes that Judge Anand properly recommended dismissal of that claim.

substantial weight to an employer's judgment as to which functions are essential.[3]

*Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 874 (11th Cir. 2016).

As detailed below, after considering all of the record evidence, Judge Anand correctly concluded that Plaintiff has not presented sufficient evidence to dispute that full-time work, working in the office, and working in a fast-paced, high-pressure environment were essential functions of Plaintiff's third shift APM position.  (Dkt. 53 at 52, 56, 56-57[4] fn. 23).[5]

---

[3] Plaintiff criticizes Judge Anand for "erroneously treat[ing] Schneider's preferences as conclusive" and relies on *Samson v. Fed. Express Corp.*, 746 F.3d 1196 (11th Cir. 2014) for the proposition that "the employer's judgment alone is not conclusive." (Dkt. 57 at 7-8). However, as detailed in Judge Anand's R&R, he did not rely solely on Schneider's judgment of what it believes are the essential functions of Plaintiff's third-shift APM position – he also considered Plaintiff's own testimony and admissions, the offer letter Plaintiff received, the experiences of other APMs, the consequences of Plaintiff not performing the functions, and the job description. (*See* Dkt. 53 at 43-53).

[4] Citations to the record include a citation to the ECF Page ID number rather than the page number noted in the document or deposition transcript.

[5] While Plaintiff argues that determining whether a job is an essential function is typically a question of fact, courts in this circuit are in no way precluded from adjudicating this issue on summary judgment. *See Webb v. Donley,* 347 F. App'x 443, 446 (11th Cir. 2009) (affirming grant of summary judgment when employer did not provide modified work schedule as full-time presence at the work site was an essential function); *Robinson v. Fulton Cnty., Ga.,* 2008 WL 78711, at *22 (N.D. Ga. Jan. 4, 2008) (finding plaintiff not a qualified individual, explaining "[c]ourts have consistently held that the ability to be present on the job and to complete all assigned tasks within a reasonable period of time is essential to any job.").

### a. The R&R correctly concluded that working full-time was an essential function of the APM position.

Judge Anand correctly concluded that Plaintiff has not identified any material issue of fact as to whether full-time work was an essential function of the APM position. Indeed, Plaintiff understood she interviewed for a full-time position, received an offer letter indicating the APM position was full-time, and cannot point to any APM during her five years of employment (other than herself) who worked a part-time schedule. (Dkt. 46-4 at 71-72; Dkt. 50-1 at ¶¶ 3, 13, 15).  It is also undisputed that the Fairburn location operates 24 hours a day, 7 days a week, and that Schneider considered full-time work to be an essential function of the APM position because it needed to ensure that it had the resources to sufficiently support its drivers and dispatch loads at all hours of the day. (Dkt. 46-5 at 11:2-11; Dkt. 46-3 at ¶ 6).  Moreover, Travis Torrence, Plaintiff's direct supervisor, did not have any direct reports that worked a part-time schedule (Dkt. 46-6 at 13:24-14:3), and other APMs testified that they *never* worked a part-time schedule and that they were not aware of Schneider employing any part-time APMs at the Fairburn location.[6] (Dkt.

---

[6] While Plaintiff claims that Sarah Kopf (a second shift APM) was aware of APMs who worked part-time, Ms. Kopf only identified Plaintiff and Tiffany Kitchens (a first shift APM).  However, Ms. Kopf also testified that she "didn't know the details" of Ms. Kitchens' schedule and Ms. Kitchens testified that she did not work a reduced schedule. (Dkt. 47-4 at 13:12-18; Dkt. 46-7 at 30:21-31:4).

47-4 at 20:12-16, 23:15-17; Dkt. 47-5 at 30:5-25; Dkt. 50-1 at ¶¶ 15, 27, 87).

Further, while the APM job description does not explicitly state that the position was

full-time, Judge Anand correctly noted that it does explicitly provide that this "is not

an exhaustive or comprehensive list of all job responsibilities, tasks, and duties" and

identifies the position as an "Exempt (Salaried)" position, which indicates the

position is full-time. (Dkt. 46-4 at 73-75).[7]

Plaintiff cites to Mr. Torrence's purported absences as evidence that other

employees worked part-time (Dkt. 57 at 17), but this argument is baseless.  As an

initial matter, Plaintiff has not presented any admissible evidence to support her

contention that Mr. Torrence worked part-time.[8]  Moreover, Plaintiff

mischaracterizes Mr. Torrence's testimony. Specifically, when asked whether he

was "out of the office somewhere between 85 and 87 days between May and

December 2018," he responded that he did not believe it was accurate. (Dkt. 47-2 at

---

[7] For these same reasons, Plaintiff's claim that in-office work is not an essential function of the job because it is not explicitly stated in the job description is a non-starter. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) (finding overtime to be an essential function of the position despite it not being included in the job description).

[8] As Judge Anand correctly noted, Plaintiff's "statement in her declaration that Mr. Torrence took at least 82 days off in 2018 per the calendar do not establish sufficient personal knowledge for this information." (Dkt. 53 at 54-55). Plaintiff has not provided the calendar upon which she allegedly relies, identified who created the calendar or how the data was input, or any other facts to support her claim. Thus, the information is not based on Plaintiff's personal knowledge and constitutes hearsay.

59:22-60:12).  Even if Mr. Torrence did work a part-time schedule, it is immaterial

as Mr. Torrence was Plaintiff's direct supervisor (not an APM) and, therefore, was

not similarly situated to Plaintiff.

Plaintiff also argues that Schneider's company-wide Flexible Work

Arrangement ("FWA") policy demonstrates that full-time work was not an essential

function of the APM position.  As Judge Anand correctly noted, this policy does

"little to support Plaintiff's argument" as "FWAs, including permission to work

remotely at Schneider are not guaranteed…but rather are provided on a case-by-case

basis[.]" (Dkt. 53 at 46). Moreover, there is no evidence in the record that Schneider

approved any APM's request to work part-time pursuant to the FWA policy. The

mere fact that the policy exists and that any Schneider employee, in any position,

was able to apply for a FWA in no way suggests that full-time work is not an

essential function of the APM position.[9]

Accordingly, Judge Anand was correct in concluding that full-time work was

an essential function of Plaintiff's job. Because Plaintiff could not work full-time,

she was not a qualified individual with a disability. *See Jerome v. Barcelo Crestline,*

---

[9] For these same reasons, the existence of the Remote Work Policy ("RWP") is
immaterial and is not evidence that in-office work was not an essential function of
Plaintiff's job.

*Inc.*, 2009 WL 10657334, at *4 (N.D. Ga. June 17, 2009) (finding plaintiff was not qualified under the ADA when he was unable to return to his position full-time).

> **b. The R&R correctly concluded that working in the office was an essential function of the APM position.**

Judge Anand also correctly concluded that working in the office was an essential function of Plaintiff's third-shift APM position noting that "it is clear that APMs on the third shift needed to be in the office, at a minimum, on days when only one APM was scheduled ... [because] there would be no one else available to locate trucks or retrieve keys or paperwork for drivers when needed, including in cases of unanticipated emergencies." (Dkt. 53 at 52).

Plaintiff argues that Judge Anand erred in concluding that in-office work was an essential function because Plaintiff could support drivers remotely "by taking calls and messages" and could "locate[] trailers throughout the southeast...using GPS software." (Dkt. 57 at 11-12). Plaintiff, however, ignores her own testimony where she admitted that there were instances where it was necessary for her to be in the office to locate a trailer for a driver. (Dkt. 46-4 at 17:16-19, 18:22-25) (when asked: "But there were situations where you would need to physically be present in the office in order to locate tractors for drivers?" Plaintiff responded, "Correct.")). Plaintiff also admitted that there were certain tasks she could not perform from home

and she needed to be in the office to interact with drivers. (Dkt. 46-4 at 17:6-19:4, 20:7-11).

Plaintiff's assertion that she remotely supported drivers in other locations is immaterial as she admits she supported drivers in Atlanta. (Dkt. 57 at 11; Dkt. 46-4 at 13:7-11; Dkt. 46-4 at 76).   While Plaintiff claims that she only saw a small percentage of the drivers she supported, she testified that she interacted face-to-face with the Atlanta drivers "frequently." (Dkt. 46-4 at 12:13-16; 13:7-11). And, this ignores Plaintiff's own testimony that drivers "appreciated [APMs] being in the office" and that Schneider wanted APMs to have face-to-face interactions with drivers. (Dkt. 46-4 at 16:1-5, 16:13-24).

Plaintiff also argues that Judge Anand erred in not crediting the practices of hubs outside of Atlanta that allegedly kept keys to trucks in combination boxes to which drivers had access and that paperwork could be printed remotely.   Plaintiff, however, has not established that she has any personal knowledge of the practices of "hubs outside Atlanta." As such, these statements are inadmissible on summary judgment. *See Tishcon Corp. v. Soundview Commn's, Inc.,* 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) ("[O]n summary judgment, the Court does not accept testimony that is not based on personal knowledge.").

Nevertheless, Plaintiff's unsupported assertion is immaterial to the analysis of whether in-office work was essential for Plaintiff's APM position *in Fairburn*. Indeed, Ms. Kopf (a second shift APM) testified that it was necessary for APMs to be in the office to locate keys for drivers, that the printer was located in a locked office, and that APMs needed to be in the office to provide the paperwork for drivers. (Dkt. 46-8 at 8:19-9:13).

Plaintiff further claims that there is "absolutely no record evidence that these speculative events [that no one would be present in the office to find trucks, obtain keys, or print paperwork for drivers] happened even once[.]" (Dkt. 57 at 13). Plaintiff again ignores the record evidence. Indeed, Plaintiff *herself* testified that these tasks needed to be performed in the office, even recalling a time in which she could not perform these tasks because she was working from home. (Dkt. 46-4 at 17:6-19:3, 76) (email stating: "This morning I had to leave my house (I was working from home) and rush over to the office to find two drivers tractors to use for today.").

Plaintiff also argues the in-office work was not essential because "everyone was permitted to work from home as needed" and "it was common for APMs to work from home." Plaintiff misconstrues the record. (Dkt. 57 at 12). While APMs were permitted to work from home on one-off occasions (e.g., due to a short illness or child care issues), it is undisputed that APMs did not "commonly" work remotely,

11

and certainly not on a permanent or regular basis, e.g. two days per week, or anytime an APM was scheduled to work alone. (Dkt. 46-5 at 8:8-20; Dkt. 46-6 at 12:16-21; Dkt. 47-1 at 209:18-211:14).

Further, the fact that Ms. Kitchens (an APM on the first shift who reported to a different supervisor) was permitted to work remotely for a *temporary* period of four months on an as needed basis does not establish that working in the office was not an essential function of the third shift APM position. Unlike Ms. Kitchens, Plaintiff requested to *permanently* work remotely two days per week and anytime she worked alone. (Dkt. 46-4 at 96-98). Moreover, there were many differences between the first and third shift.  On the first shift, Ms. Kitchens worked with several other APMs and she was never scheduled to work alone. (Dkt. 46-7 at 13:22-14:4). Plaintiff, however, requested to permanently work remotely when she was scheduled to work alone; meaning there would be no APM on-site to find trucks, obtain keys, print paperwork, or respond to emergencies.  (Dkt. 46-4 at 18:6-20:4, 73-76)

Plaintiff argues that Judge Anand "downplay[ed]" evidence that Schneider transferred the APM position to Green Bay a year after Plaintiff's termination of employment, and that this establishes that in-office work was not essential. (Dkt. 57 at 13). Once again, Plaintiff ignores key evidence. As Judge Anand correctly noted, Schneider reallocated certain essential functions of the second and third shift APM

position that previously needed to be performed in the office – namely, interacting face-to-face with drivers, obtaining keys, locating trailers, and printing paperwork – to the Service Operation Support ("SOS") position based in Fairburn. (Dkt. 53 at 50; Dkt. 47-6 at 20:13-21:1, 28:6-18, Dkt. 47-4 at 27:4-8, 30:3-14).

Finally, Plaintiff asserts that in-office work was not essential because APMs worked remotely during the COVID-19 pandemic. Plaintiff's argument misses the mark. To protect the health and safety of its employees, Schneider permitted much of its workforce in Fairburn to temporarily work from home; however, as Plaintiff acknowledges, employees have since returned to working in the office. (Dkt. 57 at 14). The fact that Schneider excused the essential job functions during the COVID-19 pandemic does not mean that it permanently eliminated an essential job function. *See* EEOC Guidance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, Technical Assistance Questions and Answers* (Updated December 14, 2021) (D.15); *see Maffett v. City of Columbia*, 2021 WL 4596659, at *19 (D.S.C. April 19, 2021) (citing to the EEOC Guidance and stating "The pandemic-era excusing of certain essential functions does not, however, mean that the essential functions have somehow changed."). And, the fact that Schneider made significant adjustments to the work environment, including temporarily unlocking the office door to permit access to the keys and moving the

13

printer, has no bearing on whether in-office work was an essential function. Moreover, Plaintiff's contention that the "driver key box is no longer behind locked doors" is simply incorrect.  (Dkt. 57 at 15).  Marianne Biskey-Rose (Director of Operations) testified that the keys are currently stored in a locked office and that were significant challenges with respect to moving the printer, including technological challenges and confidentiality concerns. (Dkt. 47-6 at 28:24-30:13).

Accordingly, Judge Anand was correct in concluding that working in the office was an essential function of Plaintiff's job. Because Plaintiff could not do so, she was not a qualified individual with a disability. *See Carlson v. Liberty Mut. Ins. Co.,* 237 F. App'x 446, 448-449 (11th Cir. 2007) (affirming summary judgment because employee was not qualified since she was unable to perform the essential function of at least some presence in the office).[10]

---

[10] In her Objections, Plaintiff criticizes Judge Anand claiming that he "made no efforts to distinguish binding Eleventh Circuit precedent" that she cites for the proposition that "significant evidence in this case establishes that neither working full-time nor working in the office are essential functions of the APM position." (Dkt. 57 at 16-17, fn. 4). But Plaintiff herself does not explain how these cases are applicable to this matter. Indeed, none of the cited cases address whether full-time work or working in the office were essential functions of the at-issue positions.

### c. The R&R correctly concluded that Plaintiff could not work in a fast-paced, high-pressure environment.

Judge Anand correctly found that Plaintiff could not perform the essential function of working in a fast-paced environment. (Dkt. 53 at 56, fn. 23).  As Judge Anand noted, it is undisputed that Plaintiff's own physician opined that Plaintiff could not return to work full-time because she was "unable to work well in a fast-paced, high pressure environment" (*Id.*) and Plaintiff agreed with her physician's assessment. (Dkt. 46-4 at 62:12-63:5, 101-103).  Plaintiff also admitted that working in a fast-paced, high pressure environment was a requirement of the APM position. (Dkt. 46-4 at 15:5-16).

Plaintiff argues that Judge Anand's finding is erroneous because while Plaintiff admits she had difficulty working in a fast-paced, high-pressure environment, it did not affect her performance. (Dkt. 57 at 16-17).  Plaintiff's argument is non-sensical.  Plaintiff requested to change the essential functions of her job (i.e., by working part-time and remotely) because she could not work in a fast-paced, high-pressure environment. (Dkt. 46-4 at 101-103). Because Plaintiff's own admissions establish she was not capable of working in a fast-paced, high-pressure environment, she was not qualified for the APM position. *See Medearis v. CVS Pharmacy,* 92 F.Supp.3d 1294, 1308 (N.D. Ga. 2015) (finding summary judgment was warranted when employee failed to show he was capable of performing the

essential function of his job with or without accommodations and therefore was not

a "qualified individual").

> **d.  The R&R correctly concluded that Plaintiff's request to work part-time was unreasonable.[11]**

Judge Anand correctly concluded that Plaintiff's request to work a part-time

schedule for more than six months was unreasonable. (Dkt. 53 at 69). As detailed in

Section I(a), *supra*, full-time work was an essential function of Plaintiff's APM

position and Schneider was not obligated to eliminate an essential function or create

a part-time APM position to accommodate Plaintiff. *See Terrell v. USAir,* 132 F.3d

621, 625 (11th Cir. 1998) (holding that defendant was not required to *create* a part-

time position).

While Plaintiff argues that her request for a part-time schedule was only

temporary, she again mischaracterizes the evidence.  Plaintiff's physician repeatedly

extended Plaintiff's return to work date – first stating Plaintiff could return to full-

---

[11] Plaintiff claims that a leave of absence would have allowed Plaintiff to return to full duty on June 5, 2019 and, therefore, Plaintiff was a qualified individual. However, neither Plaintiff nor her physician ever requested such an accommodation. Moreover, this argument is completely speculative and there is no evidence that Plaintiff would have been able to return to full duty on June 5, 2019. Since it is entirely speculative, it cannot be considered for purposes of summary judgment. *Atakora v. Franklin,* 601 F. App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment.").

time work on February 14, 2019 (Dkt. 46-4 at 90), then extending to March 20, 2019 (Dkt. 46-4 at 92-93), then extending to April 30, 2019 (Dkt. 46-4 at 94-95), and then again to June 5, 2019 (Dkt. 46-4 at 96-98).   Moreover, there is nothing in the record to suggest that Plaintiff could, in fact, return on June 5, 2019. Indeed, Plaintiff agreed with her physician that as of June 26, 2019, she was still unable to return to work full-time and her physician stated her restrictions were in place until September 23, 2019. (Dkt. 46-4 at 64:9-23, 104-106).

Plaintiff also argues that her request to work a part-time schedule for at least six months was reasonable because while Mr. Torrence "may have covered for [Plaintiff] sporadically," he did not do so on a weekly basis.  (Dkt. 57 at 19).  Rather, Plaintiff asserts that her shifts were primarily covered by Desmond Seymour and Audreianna Williams – two other APMs who worked the third shift.  *Id*.  Plaintiff's argument misses the mark.   It is immaterial who covered Plaintiff's Sunday overnight shift. The fact that *any* employee had to cover Plaintiff's shift for more than six months establishes that Plaintiff's request was unreasonable. Indeed, Schneider was not required to reallocate Plaintiff's job duties to other employees. *Spears v. Creel,* 607 F. App'x 943, 948-49 (11th Cir. 2015) ("[T]he ADA does not

17

require an employer to reallocate job duties in order to change the essential functions of a job.").[12]

### e.  The R&R correctly concluded that Plaintiff's request for remote work was unreasonable.

As an initial matter, Plaintiff misrepresents the nature of her work-from-home accommodation request.  At times, Plaintiff asserts that she requested to work from home "one day a week" (Dkt. 57 at 2), and at other times "when she was scheduled to work alone." (Dkt. 57 at 22). However, it is undisputed that Plaintiff requested to *permanently* work from home two days per week or anytime she was scheduled to work alone. (Dkt. 46-4 at Ex. 94-98).

As discussed above, working in the office was an essential function of Plaintiff's job. As Judge Anand correctly found, Plaintiff's request to permanently work from home two days per week and anytime she was solo was unreasonable. *Abram v. Fulton Cnty. Gov't,* 598 F. App'x 672, 678 (11th Cir. 2015) (affirming summary judgment finding that plaintiff's "physical presence at the front desk was an essential function of her position and her request to work from home (where she

---

[12] Relatedly, any claim that Plaintiff's accommodation was reasonable because Mr. Torrence was permitted to work part-time is incorrect and immaterial. As discussed, *supra*, Plaintiff worked in a supervisory position. His work schedule is completely immaterial to the analysis of whether Plaintiff requested a reasonable accommodation.

would not have been able to perform this essential function of her position), was for no reasonable accommodation.").

Plaintiff argues that her request to permanently work from home was reasonable because Mr. Torrence allegedly told her in February 2019 that if she was scheduled to work alone, it was fine for her to work from home because "everyone did it." (Dkt. 57 at 21). Yet, none of the testimony Plaintiff cites supports her contention.   In any event, this alleged statement occurred *prior to* Plaintiff's physician requesting that Plaintiff be permitted to work from home two days per week, *in addition to anytime she was scheduled to work alone*.   Further, Mr. Torrence testified that if he made this statement, it would have been akin to permitting others to work from home on a short-term basis. (Dkt. 46-6 at 12:11-21). Thus, this alleged comment in February 2019 does not establish that working from home anytime she was scheduled to work alone *and* two days per week on a permanent basis was a reasonable accommodation.

Plaintiff also claims that her request was reasonable because working remotely was a "routine practice." (Dkt. 57 at 22). However, as discussed *supra*, this is contradicted by the evidence that employees were permitted to work from home only in one-off situations. (Dkt. 47-5 at 19:1-5; Dkt. 47-4 at 14:5-21). Relatedly, the fact that Ms. Kitchens was permitted to work remotely on a short-term basis does

not establish that Plaintiff's accommodation was reasonable. As discussed *supra*, Plaintiff requested a permanent accommodation whereas Ms. Kitchens worked remotely for a period of only four months as needed. Moreover, Ms. Kitchens worked on the first shift and never worked alone, whereas Plaintiff specifically requested to work remotely on a permanent basis when her presence was needed in the office most – when she was scheduled to work alone.[13]

Finally, Plaintiff argues that her request to work-from-home was reasonable because "the APMs all perform their jobs remote now." (Dkt. 57 at 21). As discussed *supra,* Plaintiff misconstrues the record regarding the current APM position. While Schneider decided to reallocate portions of the APM position to Green Bay after the termination of Plaintiff's employment, many of the essential functions of the third shift APM position were reallocated to the SOS role in Fairburn. (Dkt. 47-6 at 20:13-21:1, 28:6-18, Dkt. 47-4 at 27:4-8, 30:3-14). And, the allegation that everyone worked remotely during the pandemic is immaterial since,

---

[13] Plaintiff also claims that because Ms. Williams "worked from home regularly throughout the later part of her pregnancy," Plaintiff's request to work remotely was reasonable. (Dkt. 57 at 21). However, as Judge Anand acknowledged, "[Ms. Williams'] sparse assertion that contains no detail regarding the frequency of her permission to work from home does little to support Plaintiff's argument that her request to work from home at least every time she was scheduled to work alone, which occurred weekly, was reasonable." (Dkt. 53 at 69). In any event, Ms. Williams' request was for a limited period of time – throughout the "later part of her pregnancy." (Dkt. 50-4 at ¶ 10).

as discussed, employees have since returned to the office and significant adjustments to the facility were required in order to protect the safety of staff during the COVID-19 pandemic.

Accordingly, Judge Anand correctly found that Plaintiff's request to permanently work from home two days a week and anytime she was scheduled to work alone was unreasonable.

### f. Schneider Was Not Required to Conduct an Undue Burden Analysis.

Plaintiff makes a great deal of the fact that Schneider did not conduct an undue burden analysis. (Dkt. 57 at 22-23). However, Schneider was not required to do so because Plaintiff never requested a reasonable accommodation. *See Scott v. Postmaster Gen. U.S. Postal Serv.,* 818 F. App'x 914, 917 (11th Cir. 2020) ("[Defendant] was not required to affirmatively assert undue hardship before [plaintiff] proved that there was a reasonable accommodation that [defendant] could give her."). While Plaintiff contends that Judge Anand conducted an undue burden analysis for Schneider, this claim is inaccurate. Judge Anand appropriately recognized that "Plaintiff mischaracterizes the burden in this case." (Dkt. 53 at 70). Therefore, the fact that Schneider did not conduct an undue burden analysis has no bearing on this case.

21

**II.      The R&R Does Not Err in Recommending Dismissal of Plaintiff's ADA Discrimination Claim.**

To establish a *prima facie* case of disability discrimination, Plaintiff must establish that: "(1) [s]he is disabled; (2) [s]he was a 'qualified individual' at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against because of [her] disability." *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting 42 U.S.C. § 12112(a)). Judge Anand correctly concluded that Plaintiff cannot establish the second and third element.

As detailed *supra*, Plaintiff is not a qualified individual and her claim fails for this reason alone.  Additionally, as Judge Anand correctly concluded, Plaintiff does not have any evidence to support her contention that Schneider terminated her employment because of her disability. (Dkt. 53 at 82). Indeed, Plaintiff does not present *any* direct or circumstantial evidence that would allow a jury to infer intentional discrimination. Rather, Plaintiff merely alleges that she established this element "by showing that Schneider took an adverse action against her because of her disability." (Dkt. 57 at 24). However, this conclusory assertion cannot establish causation. *Lockaby v. United Testing Grp., Inc.*, 986 F. Supp. 1400, 1404 (N.D. Ga. 1997) ("employee's…conclusory statements are insufficient to show intent to discriminate[.]"). Plaintiff has failed to meet her burden.

22

Even if Plaintiff could establish a *prima facie* case, as discussed *infra*, Judge Anand correctly concluded that Plaintiff could not establish pretext. Therefore, the Court should adopt the R&R and dismiss Plaintiff's discrimination claim.

## III.   The R&R Does Not Err in Finding Plaintiff Cannot Establish Pretext for her ADA Discrimination and Retaliation Claims.

Plaintiff cannot establish that Schneider's legitimate, non-retaliatory and non-discriminatory reason for terminating her employment – her inability to perform the essential functions of her job – was pretextual. As an initial matter, Plaintiff asserts that Judge Anand erred in dismissing her discrimination and retaliation claims because Schneider failed to articulate a legitimate, non-retaliatory reason for its termination of Plaintiff and that instead, Judge Anand "asserted reasons on Schneider's behalf." (Dkt. 57 at 25). Plaintiff's claim is absurd.  As Judge Anand recognized, Schneider devoted a whole section of its opening brief to the argument that it had a legitimate reason to terminate Plaintiff's employment. (*See* Dkt. 46-1 at 25-26; Dkt. 51 at 14-16; Dkt. 53 at 34, fn. 16).

Moreover, Plaintiff does not dispute that an inability to perform the essential functions of her job is a legitimate reason for dismissal. Rather, Plaintiff claims that because *she* believed she could perform the essential functions of the job, she has established pretext. (Dkt. 57 at 26). However, Plaintiff's subjective beliefs are not evidence of pretext. *See Ostrow v. GlobeCast America, Inc.,* 489 F. App'x 433, 436

(11th Cir. Sept. 17, 2012) ("[T]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs…"). Plaintiff must establish not only that Schneider's reason was false, but that discrimination or retaliation was the real motive. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020). Plaintiff has failed to do so. Because Plaintiff has no evidence of pretext, her discrimination and retaliation claims should be dismissed. *See Chambers v. Fla. Dept. of Transp.,* 620 F. App'x 872, 879 (11th Cir. 2015) (affirming summary judgment finding no evidence sufficient to create a genuine issue of fact on pretext).

## CONCLUSION

Accordingly, for the reasons stated above and in Judge Anand's Report and Recommendation, Schneider asks this Court to grant its motion for summary judgment and dismiss Plaintiff's claims with prejudice.

Date: February 7, 2022

Respectfully submitted,

By:___/s/ Peter A. Milianti_____
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

24

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP
1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

<u>**CERTIFICATE OF SERVICE AND**</u>
<u>**COMPLIANCE WITH LOCAL RULE 5.1B**</u>

I certify that on February 7, 2022, I electronically filed the foregoing *Defendant's Response to Plaintiff's Objections to the Magistrate Judge's Report and Recommendations* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Cheryl B. Legare
cblegare@law-llc.com

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted,


By:   /s/ Peter A. Milianti
Peter A. Milianti (admitted *pro hac vice*)
Melissa M. Weiss (admitted *pro hac vice*)
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: 312-849-8100
F: 312-849-3690
pmilianti@mcguirewoods.com
mweiss@mcguirewoods.com

M. Laughlin Allen, Esq.
Georgia Bar No. 901999
McGuireWoods LLP

26

1230 Peachtree Street, N.E
Suite 2100, Promenade
Atlanta, GA 30309-3534
T: (404) 443-5738
F: (404) 443-5773
mlallen@mcguirewoods.com

*Counsel for the Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CIERRA GETER,

    **Plaintiff,**

v.

**SCHNEIDER NAT'L CARRIERS, INC.,**

    **Defendant.**

CIVIL ACTION FILE

No. 1:20-CV-1148-SCJ

## ORDER

This matter appears before the Court on Defendant's Motion for Summary Judgment (Doc. No. [46]), the Magistrate Judge's Report and Recommendation ("R&R") granting it (Doc. No. [53]), and Plaintiff's Objections to the same (Doc. No. [57]).[1]

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

## I.   BACKGROUND

Defendant filed a Motion for Summary Judgment (Doc. No. [46]) and statement of undisputed material facts (Doc. No. [46-2]). Plaintiff responded in opposition to both. Doc. Nos. [50]; [50-1]. Defendant replied. Doc. No. [51]. Plaintiff also filed her own additional statement of undisputed material facts (Doc. No. [50-2]) to which Defendant responded (Doc. No. [52]).

The Magistrate Judge issued a R&R granting Defendant's Motion for Summary Judgment. Doc. No. [53].[2] Plaintiff timely objected to the R&R's dismissal of her claims for failure to accommodate, discrimination, and retaliation under the Americans with Disabilities Act of 1990, as amended, 42

---

[2] Unless otherwise objected to, the Court adopts the facts as set forth in the R&R. Any factual issues raised in the Plaintiff's Objections and Defendant's Response shall be addressed concurrently with their application to the law, as discussed infra III.

Pursuant to Local Rule 56.1(B), the Court will deem a fact admitted unless it is directly refuted with concise responses supported by specific citations to evidence, a party lodges a valid objection to admissibility, or the citation does not support the fact. When a fact is undisputed, the Court includes the fact.

For disputed facts, the Court reviews the record to determine if a material dispute exists. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the record.

U.S.C. § 12101 *et seq.* ("ADA"). Doc. No. [57]. Defendant responded. Doc. No. [60].

## II.     LEGAL STANDARD

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. <u>Williams v. Wainwright</u>, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam) (quoting <u>Nettles v. Wainwright</u>, 677 F.2d 404, 408 (5th Cir. Unit B 1982)).[3] The Court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). After conducting this review, the Court "may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge." <u>Id.</u> The Court may also "receive further evidence or recommit the matter to the magistrate judge with instructions." <u>Id.</u> Those portions of the R&R to which no objection is made need only be reviewed for "clear error." <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006) (per curiam).

---

[3] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

3

## III.   ANALYSIS

The Court notes that Plaintiff does not specifically object to any of the R&R's conclusions regarding her race discrimination claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981 (Counts IV-V of Plaintiff's Complaint). Doc. No. [57]. Finding no clear error, the Court **ADOPTS** that portion of the R&R. <u>Lattimore v. Bank of Am., N.A.</u>, 2014 WL 11456272, *1 (N.D. Ga. Feb. 10, 2014), <u>aff'd sub nom.</u> <u>Lattimore v. Bank of Am. Home Loans</u>, 591 F. App'x 693 (11th Cir. 2015) (noting that R&R findings to which no specific objection is made are reviewed by the district court for clear error).

Plaintiff does, however, object to the R&R's conclusions concerning her ADA failure to accommodate, discrimination, and retaliation claims (Counts I-III of Plaintiff's Complaint). Doc. No. [57], 4. The Court conducts a *de novo* review of these claims, and any applicable objections and facts associated with them, as follows.

### A.   <u>Plaintiff's Failure to Accommodate Claims</u>

To establish a failure to accommodate claim under the ADA, Plaintiff must show that: (1) she has a disability that was known to Defendant; (2) she was

qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) Defendant refused to reasonably accommodate her disability. <u>Pritchard v. S. Co. Servs.</u>, 92 F.3d 1130, 1132 (11th Cir. 1996). That Plaintiff has a disability is not in dispute so the "first task is to identify the essential functions of [her] job." <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1258 (11th Cir. 2001).

Plaintiff claims that the R&R erred in concluding that she "is not a qualified individual with a disability, could not perform the essential functions of her job, and did not request a reasonable accommodation" by construing the facts in the light most favorable to the movant Defendant, disregarding evidence supporting her claim, not considering dishonesty as affirmative evidence of guilt, and ignoring that the ADA requires employers to accommodate employees even when it is inconvenient. Doc. No. [57], 4. Specifically, Plaintiff claims the R&R focused too heavily on Defendant's own judgment about the job's essential functions and paid short shrift to the actual job description, Defendant's remote and flexible work policies, and work experience of past employees and others in similar jobs. Doc. No. [57], 8-9. On *de novo* review, the Court carefully parses the undisputed material facts concerning written job description, time spent

5

performing the function, consequences of not requiring the employee to perform the function, experience of other past or current individuals performing a similar function to determine if full-time, in-person, fast-paced work was an essential function of Plaintiff's APM role. See Samson v. Fed. Express Corp., 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(ii-vii)).

### 1. *Plaintiff's Job Description*

Plaintiff claims that the R&R erred by finding that "full-time work" was an essential function of her job. Doc. No. [57], 7. Defendant responds that Plaintiff understood, when she applied for and accepted the position, that it was full-time. Doc. No. [60], 6, 8. This is undisputed. Doc. No. [50-1], ¶ 13.

It is also undisputed that Plaintiff could not work more than three ten-hour days a week, on Sunday, or on Monday. Doc. No. [50-1], ¶¶ 42-43, 45-46. However, Plaintiff disputes that her APM position can only be performed full-time because the term "full-time" is not in the job description. Id. Plaintiff claims that, without citation to authority, the R&R allowed Defendant to circumvent the job description's dearth of any "full-time" requirement by relying on the "other duties as assigned" and "not exhaustive or comprehensive list" catchall language. Doc. No. [57], 9 (citing Doc. No. [53] 33, 42-44)]. That a job description

6

is not exhaustive does not give an employer carte blanche to retroactively expand a position's essential functions. See Snead v. Fla. Agric. & Mech. Univ. Bd. of Trs., No. 17-10338, 724 F. App'x 842, 845 (11th Cir. Feb. 21, 2018) (defendant's argument that functions absent from plaintiff's written job description were essential because the description was "not exhaustive" failed because "[a] reasonable jury could have . . . decided that the form's plain labeling outweighed any other evidence presented" in testimony by defendant's officials). As a result, the job description is a factor that weighs more in Plaintiff's than Defendant's favor.

### 2. *Defendant's Work Policies*

Plaintiff also claims that the R&R construed all the inferences from Defendant's Flexible Work Arrangement Policy ("FWP") in Defendant's favor. Doc. No. [57], 9. The R&R concluded that the FWP does not support Plaintiff's argument that full-time work was not an essential function of her job because her characterization of it inaccurately suggested that she was guaranteed part-time or remote work. Doc. No. [53], 46. As the R&R noted, under the FWP, the implementation of a "work arrangement other than full time" is on a "case-by-case basis" and guided by the principles that any "benefit to the organization

7

should outweigh the cost" and produce a "win-win situation to the organization and associate[.]" Doc. No. [53], 44-45. Further, the FWP's considerations include business needs, the duration, the type of work the employee performs, the needs or co-workers, direct reports, and leaders, critical hours and days for meeting those needs. Id. at 45. Plaintiff claims that the R&R should have considered that, under the ADA and EEOC Guidance, Defendant was required to preferentially apply the FWP to accommodate Plaintiff's disabilities. Doc. No. [57], 10 (citing Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1262-3 (11th Cir. 2007); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647-48 (1st Cir. 2000); U.S. Equal Emp. Opportunity Comm'n., EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA, Questions 17, 22 (Oct. 17, 2002)). These authorities are neither applicable[4] nor binding and do not illuminate whether full-time work was an essential aspect of Plaintiff's position so much as whether her accommodation request was reasonable. Consequently, the FWP does little to clarify whether full-time work was an

---

[4] While Holly was in this Circuit, the case is distinguishable because the court examined whether defendant failed to accommodate plaintiff's disability by applying its objective, no-fault tardiness policy to him. 492 F.3d 1247, 1254. Here, Plaintiff claims a failure to accommodate based on Defendant's application of its *case-by-case* FWP. The two situations are not analogous, and Plaintiff's Objection offers no reason to rely on them.

8

essential function of the APM position and, if construed with the inferences in Plaintiff's favor, is a neutral factor.

### 3. Defendants' Other Employees

The R&R also examined the experience of other employees in Plaintiff's role. Plaintiff's objection that another employee testified that she was aware of other employees permitted to work part-time is not supported by the record. Doc. No. [57], 17-18 (citing Doc. No. [50-2], ¶ 4).[5] Likewise, it is undisputed that Defendant had no part-time employees in Plaintiff's position at her location. Doc. Nos. [53], 56; [60], 6, 8. Consequently, the experiences of other APMs are a factor that weighs in Defendant's favor.

Plaintiff also claims that part-time work was possible because her supervisor, Travis Torrence, effectively worked part-time and the R&R erred by excluding this evidence as hearsay. Doc. No. [57], 17 (citing Doc. No. [52-2], ¶ 91). Specifically, Plaintiff's declaration and statement of undisputed material facts assert that "Torrence took off between 80 and 83 days in 2018 and [she] had

---

[5] Although Plaintiff claims that "APM Kopf testified that she is aware that Schneider employees were permitted to work part-time" (Doc. No. [57], 16-17), the citation is to a statement of undisputed material fact pertaining to Torrence's tenure and supported by his deposition testimony (Doc. No. [5-2-, ¶ 4).

9

personal knowledge of this because she viewed the Fairburn calendar to which all employees had viewing access."  Doc. Nos. [50-3], ¶ 10; [52], ¶ 91. Defendant counters that Plaintiff's declaration does not establish sufficient personal knowledge of Torrence's days off because she did not always work the same shifts as Torrence[6], was out on leave from October 9, 2018 through January 2, 2019[7], and did not provide the calendar upon which she relied.[8] Doc. Nos. [52], ¶ 91; [60], 7 (citing Doc. No. [53], 54-55). Plaintiff admits that her declaration "is offered to show that Schneider permitted employees to work part-time[,]" but claims it is not hearsay because Torrence cannot dispute it and "it is reducible to admissible evidence at trial through the calendars that are exclusively in Schneider's control." Doc. No. [57], 17 (citing Macuba v. Deboer, 193 F.3d 1216, 1322 (11th Cir. 1999)).[9]

---

[6] It is undisputed that Plaintiff worked the third shift, while Torrence supervised second and third shift APMs and Driver Team Leaders. Doc. No. [52], ¶¶ 5-7, 9-10.

[7] It is undisputed that Plaintiff was on leave from October 9, 2018 through January 2019. Doc. Nos. [50-1], ¶¶ 33, 35-37; [52], ¶¶ 36-37.

[8] It is undisputed that no exhibits are attached to Plaintiff's declaration. Doc. No. [50-3].

[9] Plaintiff cited, without explanation, a case in which the court examined the admissibility of testimony (offered in both a witness deposition and subsequent affidavit) that plaintiff was on a hit list of employees to fire. Doc. No. [57], 17. While binding, this case does not advance Plaintiff's argument because the court found that such evidence was hearsay. Macuba, 193 F.3d 1325.

10

Hearsay is an out of court statement offered to prove the truth of the matter asserted, which does not fall under a hearsay exception. Fed. R. Evid. 801(c). An affidavit or declaration—which is an out of court statement--may contain hearsay if the statement is offered to prove the truth of the matter asserted. See 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2722, 58–60 (4th ed., 2021) ("affidavits are ex parte documents") (internal citations omitted). When submitted to support or oppose summary judgment, motions and affidavits or declarations that "must be made on personal knowledge, set out such facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff admits that her personal knowledge about Torrence's days worked is gleaned from a calendar. Doc. No. [52], ¶ 91. She further admits that she offers this fact "to show that Schneider permitted employees to work part-time" but does not assert any hearsay exceptions. Doc. No. [57], 17. Therefore, the R&R correctly concluded that Plaintiff's statements concerning Torrence working part-time are inadmissible hearsay. Doc. No. [53], 55.

The R&R also correctly concluded that because Plaintiff's personal knowledge of the Torrence's work schedule is based on the calendar and

11

Defendant objected to it, the Court can only consider it if Plaintiff sets forth other admissible facts. Doc. No. [53], 55 (citing McGowan v. AME Fin. Corp., 1:08-cvv-8976-BBM-LTW, 2009 WL 10666307, *15 (N.D. Ga. Dec. 18, 2009)).[10] Although Plaintiff objects that these calendars "are exclusively in Schneider's control" she does not explain whether they were sought or produced during an extended discovery period lasting almost a year. Doc. Nos. [15]; [32]; [42]; [57], 17.[11] As a

_____

[10] See also F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1179 (N.D. Ga. 2008), affirmed 356 F. App'x 358, rehearing and rehearing en banc denied 401 F. App'x 522, certiorari denied 562 U.S. 1003 (holding that the proper method to challenge an affidavit filed on a motion for summary judgment is to challenge the admissibility of the evidence contained therein); McLendon v. Ga. Kaolin Co., Inc., 782 F. Supp. 1548, 1558 (M.D. Ga. 1992) (holding that only competent and admissible evidence can be used to overcome motion for summary judgment; in particular, affidavit may only be considered in ruling on summary judgment if it is based on personal knowledge, sets forth facts admissible in evidence, and shows affiant to be competent to testify); Aurel v. Sch. Bd. of Miami-Dade Cnty. Pub. Schs., 261 F. Supp. 2d 1375, 1378 (S.D. Fla., 2003) (plaintiff failed to show he had personal competence to testify regarding other employees allegedly being treated differently, particularly with regard to the disciplinary action, and thus, his response to a summary judgment motion violated the rule governing summary judgment affidavits); 10A Wright & Miller, § 2722, 58–60 (affidavits offered on a summary-judgment motion are scrutinized carefully by the court to evaluate their probative value and to determine whether they meet the standards prescribed in Rule 56(c)(4) as to form and content, although the court may consider an insufficient affidavit if there is no objection to it.").

[11] See also Sch. Bd. of Okaloosa Cnty. v. Richardson, 332 F. Supp. 1263, 1269 (N.D. Fla. 1971) (affidavit in opposition to motion for summary judgment which is based on affiant's belief must, in addition to pointing out facts that are largely or exclusively within control of the moving party, describe the affiant's attempts to secure the facts and state why affiant has been unable to obtain facts not exclusively within movants' knowledge and contain the knowledge or information that affiant has warranting or justifying affiant's belief).

result, the R&R correctly concluded that Plaintiff's declaration statement concerning Torrence's part-time work is disputed hearsay and cannot be considered on summary judgment. Doc. No. [53], 55 (citing Doc. No. [47-2], 59:22-60:12).[12]

Even assuming, *arguendo*, that Plaintiff's declaration statement was admissible and considered on summary judgment, information about Torrence's work schedule does not weigh in Plaintiff's favor unless she can show that he performed a similar function to her. Samson, 746 F.3d 1201 (citing 29 C.F.R. § 1630.2(n)(3)(vii)). As the R&R noted, Torrence and Plaintiff held different positions. Doc. No. [53], 55. See also Doc. Nos. [50-1], ¶ 8; [52], ¶¶ 4-5. Consequently, absent Plaintiff's argument that Torrence and Plaintiff's positions perform similar functions, it is, at best, a neutral factor in assessing the essential nature of her full-time work.

### 4. *The Consequences of Plaintiff's Part-Time Role*

Additionally, the R&R examined the consequences of allowing Plaintiff to work part-time, finding that it was undisputed that Defendant's other employees had to cover her shift. Doc. No. [53], 54 (citing Doc. No. [50-1], ¶ 38). Plaintiff does

---

12

13

argues that there is "no evidence that there is no evidence that Ms. Geter working full-time caused her co-workers to work more than their scheduled 40 hours per week to cover for her, so it could not have been a burden to them[.]" Doc. No. [57], 20. However, that is directly contradicted by the undisputed material facts, wherein Plaintiff admitted that "[a]ny time no one is there everybody does twice as much work, no matter whether it's Sunday through Saturday. Whoever is on that third shift, if they're by their self, they're taking the workload of everybody, So yes, I do concur with that." Doc. No. [50-1], ¶¶ 49-51. Therefore, the R&R did not err in finding that the consequence of allowing Plaintiff's role to be performed part-time were more work for her coworkers, a factor which weighs in favor of finding that full-time work was essential to her role.

### 5. *Defendant's Judgment*

Lastly, the R&R considered "the employer's judgment as to what functions of a job are essential." Doc. No. [53], 40 (citing 42 § U.S.C. 12111(8); <u>Webb v. Wynne</u>, 2:07-cv-471-ID, 2008 WL 4831740, *6 (M.D. Ala., Nov. 3, 2008)). The R&R noted the Defendant's and supervisor's judgment that APMs "were expected to work full-time because Schneider needed to ensure it had the resources to sufficiently support driver and dispatch loads all hours of the day." Doc. No. [53],

14

54 (citing Doc. Nos. [50-1], ¶38; [50-4], ¶¶ 7-8; [46-3], ¶¶ 5-6, 10, 12-14; [46-6], 51-53, 67-68; [45-5], 16; [46-4], 69-70, 100-03, 109, 114, 139, 137, 146-48, 151-52, 154, 160, 162, 165; [5-3], ¶6). Although Plaintiff disputed this, she only cited the FWP to support her position. Doc. No. [51-1] (citing Doc. Nos. [50-5], 31:1-32:7; [50-9], 15:17-16:7). As these citations do not directly refute Defendant's cited facts, the Court will deem Defendant's fact admitted. LR 56.1(B), NDGa. Therefore, the employer's judgment that full-time work was an essential element of Plaintiff's position weighs in Defendant's favor.

Plaintiff argues that her case is distinguished from those upon which the R&R and Defendant reply because she "was still performing all the essential functions of her job[.]" Doc. No. [57], 20. This assertion is circular because it assumes the very same disputed legal premise—that working full-time is not an essential function of Plaintiff's job—for which it is offered. Plaintiff also claims, without explanation, that the R&R's citation to Medearis v. CVS Pharmacy, Inc., is distinguishable because she "was not seeking to have a duty removed." Id. (646 F. App'x 891, 896, (11th Cir. 2016). However, the R&R only cited Medearis for the proposition that substantial weight is given to "written descriptions [because they] are evidence of the employer's judgment regarding which functions of a job

15

are essential[.]" Doc. No. [53], 43. The R&R examined numerous factors in concluding that full-time work was essential to an APM position at Fairburn so, to the extent to that is relied on Medearis at all, such reliance was minimal and not error. Id. Similarly, Plaintiff claims, without explanation, that her case is distinguishable from Rabb v. Sch. Bd. of Orange Cnty., because she only "needed to work reduced hours temporarily until her planned full-time return to work on June 5, 2019[.]" 590 F. App'x 849, 842 (11th Cir. 2014)). However, the R&R did not cite to, let alone rely on, Rabb. Doc. No. [53]. As a result, Plaintiff's objections here are without merit.

On balance, the consequences of not requiring the employee to perform the function, and experience of other past or current individuals performing a similar function, and Defendant's judgment weigh in Defendant's favor concerning the essential function of full-time work as an APM. Even when construing all inferences from disputed material facts in Plaintiff's favor, only one factor—the job description omitting the term "full-time"—weighs in Plaintiff's favor. Ultimately Plaintiff did not meet her burden of citing to sufficiently specific and admissible facts in the record to refute the undisputed material facts submitted by Defendant's concerning the essential nature of full-time work for APMs at

Fairburn. See, e.g. Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (the non-movant must designate "specific facts showing there is no genuine issue for trial"); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("the existence of a mere scintilla of evidence" supporting the non-movant is insufficient to defeat a motion for summary judgment). Therefore, the R&R did not err by finding that full-time work was an essential function of Plaintiff's role.

The threshold inquiry in an ADA accommodation claim is whether a plaintiff is a qualified individual who can, with or without accommodation, perform the essential function of her job. 42 U.S.C. § 12111(8). It is undisputed that Plaintiff could not work a full-time schedule and, because the undisputed material facts show that this was an essential function of her job, she is not a qualified individual entitled to an accommodation under the ADA. See e.g. Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (citing Cramer v. Fla., 117 F.3d 1258, 1264 (11th Cir.1997)) (holding that if plaintiff is unable to perform an essential function of his job, even with an accommodation, he is not a covered individual under the ADA). Accordingly, the Court **ADOPTS** the

17

R&R's finding that Plaintiff was not a qualified individual requiring an accommodation under the ADA.

**B.      Plaintiff's Disability Discrimination and Retaliation Claims**

Plaintiff claims that the R&R erred in recommending dismissal of her ADA discrimination and retaliation claims because it "relies on the wrong standard, improperly addresses pretext even though Schneider failed to articulate any 'legitimate' reasons for its actions and relies in the pretext analysis on the same errors underlying the erroneous conclusion that [she] could not perform the essential functions of her job." Doc. No. [57], 4.

*1.  ADA Discrimination Claims*

As with ADA failure to accommodate claims, a disability discrimination claim requires that the plaintiff show she has a disability, was a qualified individual, and was discriminated against because of the same. Holly, 492 F.3d 1255.

Here, as in Plaintiff's failure to accommodate claim, it is undisputed that she was an individual with disability. Likewise, and the for the reasons previously discussed, the R&R correctly concluded that the Plaintiff was not a qualified individual because she could not perform the essential functions of her

18

job with or without an accommodation. See supra III.A. As a result, Plaintiff cannot make out her prima facie case for discrimination under the ADA. See, e.g. Jordan v. City of Union City, Ga., 94 F. Supp. 3d 1328, 1344 (N.D. Ga.2015) affirmed 646 F. App'x 736, 2016 WL 1127739 (no discrimination where police officer in training was terminated because he was not a qualified individual where his anxiety disordered prevented him performing essential functions of his position); Rogers v. Norman W. Fries, Inc., 418 F.Supp.3d 1295 (S.D. Ga. 2019) (no discrimination under the ADA where court determined that ADA was not qualified where her vision precluded her from performing the essential functions of her the job she sought). Accordingly, the Court **ADOPTS** the R&R's finding that Plaintiff was not a qualified individual under the ADA and cannot sustain her discrimination claims.

### 2. *ADA Retaliation Claims*

With regard to Plaintiff's retaliation claim, the R&R concluded that Plaintiff established a prima facie case. Doc. No. [53], 87. However, the R&R found that Defendant proffered a legitimate non-discriminatory reason for Plaintiff's termination because she could not perform the essential functions of her job. Id. at 97. Plaintiff objects that Defendant "failed to articulate any alleged

19

legitimate reason" for Plaintiff's termination so the R&R did so on Defendant's behalf. Doc. No. [57], 25. This is not so. Doc. No. [53], 97 (citing Doc. No. [46-1], 25).

To be sure, the legitimate non-discriminatory reason Defendant proffered was succinct and identical to the reasons proffered for finding that Plaintiff was not qualified. "However, the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir.1997) (internal citations omitted)). Consequently, the R&R did not err in determining that Defendant had a legitimate non-discriminatory reason for Plaintiff's termination and the burden shifted to the Plaintiff to show by a preponderance of evidence that Defendant's proffered reason was pretext. See, e.g. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997) ("we assess ADA retaliation claims under the same framework we employ for retaliation claims arising under

Title VII"); <u>Turner v. Inzer</u>, 521 F. App'x 762, 764 (11th Cir. 2013) (citing

<u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266 (11th Cir. 2001)).

To show that a defendant's proffered reason is not entitled to credence the

plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could find them unworthy of credence."

<u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation

omitted). "[A] reason is not pretext for [retaliation] 'unless it is shown both that

the reason was false, *and* that [retaliation] was the real reason.'" <u>Springer v.</u>

<u>Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007)

(quoting <u>Brooks v. Cnty. Comm'n of Jefferson Cnty.</u>, 446 F.3d 1160, 1163 (11th

Cir. 2006)) (emphasis in original). To show pretext, a plaintiff cannot "recast an

employer's proffered [] reason or substitute her business judgment for that of the

employer." <u>Chapman</u>, 229 F.3d 1030.

Notably, Plaintiff did not make any pretext arguments in her Response in

Opposition to Defendant's Motion for Summary Judgment. Doc. No. [50], 21-22

("the burden shifted to Schneider to articulate a legitimate non-retaliatory reason

for its termination . . . Schneider skips this step, has waived this argument, and

summary judgment must be denied"). The Court has discretion not to entertain arguments raised for the first time in objections to an R&R. Williams v. McNeil, 557 F.3d 1287, 1292 (11th Cir. 2009) (holding a district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge, allowing new arguments and evidence to be presented after the issuance of an R&R frustrates the purpose of the magistrate judge system).

On objection, Plaintiff claims, for the first time, that she can demonstrate pretext because "she was, in fact, capable of performing the essential functions of her job with her requested accommodation." Doc. No. [57], 26. Assuming, *arguendo*, that Plaintiff had asserted the pretext argument she now asserts in her objection, it is precisely the assertion the R&R rejected. Doc. No. [53], 100 (citing Doc. [50], 24-25) ("Plaintiff merely asserts that Defendant's articulated reason for her termination was pretextual because she has shown that she was capable of performing the functions of her job without her requested accommodations"). As a result, "Plaintiff merely rehashes the argument [which the Magistrate Judge effectively made for her] without offering any persuasive reasons why the Magistrate Judge was wrong." Snodgrass v. Indep. Physicians. Res., Inc., 1:13-

22

CV-3958-SCJ, 19 (N.D. Ga. Mar. 25, 2016). Accordingly, the Court **ADOPTS** the R&R's finding that Plaintiff has not met her burden to show that Defendant's reasons for terminating her were pretextual.

## IV.   CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the R&R and **ORDERS** that Plaintiff's case be **DISMISSED**.

**IT IS SO ORDERED** this _21st_ day of March, 2022.

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

23

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

CIERRA GETER,

                  Plaintiff(s),

    vs.

SCHNEIDER NATIONAL CARRIERS, INC.,

                Defendant(s).

CIVIL ACTION FILE

NO.  1:20-CV-1148-SCJ

## J U D G M E N T

      This action having come before the Court, Honorable Steve C. Jones, United States District Judge, for consideration of the Magistrate Judge's Report and Recommendation as to Defendant's Motion for Summary Judgment, and the Court having  said motion, it is

      **Ordered and Adjudged** that the plaintiff take nothing; that the defendant recover its costs of this action, and the action be, and the same hereby is, **dismissed**.

      Dated at Atlanta, Georgia, this 21st day of March, 2022.

                                 KEVIN P. WEIMER
                                 CLERK OF COURT

                        By:   s/ D. McGoldrick_____
                            Deputy  Clerk

Prepared, Filed, and Entered
in the Clerk's Office
March 21, 2022
Kevin P. Wiemer
Clerk of Court

By: s/ D. McGoldrick_____
         Deputy  Clerk

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 1, 2022, I filed Appellant Cierra Geter's Appendix of Exhibits Volumes I - VII with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record. I further certify that a copy of Appellant Cierra Geter's Appendix of Exhibits Volumes I - VII will be filed the Clerk of the Court via hand delivery within 24 hours of the electronic filing.

Peter Milianti
pmilianti@mcguirewoods.com

Matthew A. Fitzgerald
mfitzgerald@mcguirewoods.com

Meredith Laughlin Allen
mlallen@mcguirewoods.com

LEGARE, ATTWOOD & WOLFE, LLC

*s/ Cheryl B. Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Camille D. Jones
Georgia Bar No. 612930
cdjones@law-llc.com

125 Clairemont Avenue, Suite
380 Decatur, Georgia 30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212