No. 22-11285

In the

# United States Court of Appeals
## For the Eleventh Circuit

———————

CIERRA GETER,

*Plaintiff-Appellant,*

v.

SCHNEIDER NATIONAL CARRIERS, INC.,

*Defendant-Appellee.*

———————

On Appeal from the United States District Court for
the Northern District of Georgia
Case No. 1:20-cv-01148-SCJ
Honorable Steve C. Jones, U.S. District Judge
Honorable Justin S. Anand, U.S. Magistrate Judge

———————

## APPELLEE'S ANSWERING BRIEF

———————

Peter A. Milianti
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-2765

Matthew A. Fitzgerald
Katherine E. Lehnen
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

*Counsel for Defendant-Appellee Schneider National Carriers, Inc.*

*Cierra Geter v. Schneider National Carriers, Inc.*
Case No. 22-11285

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Schneider National Carriers, Inc. ("Schneider"), under 11th Cir. R. 26.1-1 through 26.1-3 and Fed. R. App. P. 26.1, hereby certifies that the following is a list of all trial judge(s), attorneys, associations of persons, firms, partnerships, or corporations having either an interest in the outcome of the above-captioned case, or financial or other interest which could be substantially affected by the outcome of this case:

1.  Allen, Meredith Laughlin (Counsel for Defendant-Appellee)

2.  Anand, Justin S., United States Magistrate Judge

3.  Fitzgerald, Matthew A. (Counsel for Defendant-Appellee)

4.  Geter, Cierra (Plaintiff-Appellant)

5.  Jones, Camille D. (Counsel for Plaintiff-Appellant)

6.  Jones, Steve C., United States District Court Judge

7.  Legare, Cheryl B. (Counsel for Plaintiff-Appellant)

8.  Legare, Attwood & Wolfe, LLC (Counsel for Plaintiff-Appellant)

9.  Lehnen, Katherine E. (Counsel for Defendant-Appellee)

10. McGuireWoods LLP (Counsel for Defendant-Appellee)

11. Milianti, Peter A. (Counsel for Defendant-Appellee)

12.    Schneider National, Inc. (NYSE: SNDR) (Parent Company of Defendant-Appellee)

13.    Schneider National Carriers, Inc. (Defendant-Appellee)

14.    Weiss, Melissa M. (Counsel for Defendant-Appellee)

Schneider National Carriers, Inc. is a wholly-owned subsidiary of Schneider National, Inc., which is publicly traded on the New York Stock Exchange under the symbol SNDR.  No publicly traded corporation owns more than 10% of Schneider National, Inc.'s stock.

Dated: September 2, 2022                */s/ Matthew A. Fitzgerald*
                                        Matthew A. Fitzgerald

                                        *Counsel for Defendant–Appellee*
                                        *Schneider National Carriers, Inc.*

## ORAL ARGUMENT STATEMENT

Appellee Schneider National Carriers, Inc. does not request oral argument.

No law is in dispute in this appeal and the facts are straightforward.  Even so, if the

Court prefers to hear oral argument, Schneider will readily participate.

## <u>TABLE OF CONTENTS</u>

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... C-1

ORAL ARGUMENT STATEMENT ................................................................. i

TABLE OF CITATIONS ................................................................................ iv

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................. 3

STATEMENT OF THE ISSUES .................................................................... 3

STATEMENT OF FACTS ............................................................................... 4

I.    Geter worked as a third-shift Area Planning Manager for Schneider. ......... 4

II.   Schneider granted Geter's request to work reduced hours. ........................... 6

III.  Schneider granted Geter's extensions of her part-time schedule and her request to work remotely. ....................................................................... 7

IV.   Schneider tried to work with Geter's restricted schedule. ............................ 8

V.    The APM role evolved after Geter's termination. ........................................ 9

PROCEDURAL HISTORY ........................................................................... 10

I.    The magistrate judge found that Geter's claims failed. ............................. 10

II.   The district court granted summary judgment for Schneider. .................... 12

STANDARD OF REVIEW ........................................................................... 13

SUMMARY OF THE ARGUMENT ............................................................. 13

ARGUMENT AND CITATIONS TO AUTHORITY ................................... 15

I.    Geter's ADA failure to accommodate claim fails because full-time work was an essential function of her job. .................................................. 16

      A.   In Schneider's judgment—which receives substantial weight— Geter's APM position required full-time work. ............................... 17

      B.   The APM job description does not undermine the essential nature of full-time work. .................................................................. 21

      C.   The consequences of allowing part-time work for Geter's position prove that full-time work was essential. ............................... 22

D.    The experiences of other APMs confirm that full-time work was essential. .................................................................... 25

E.    Geter's declaration about Torrence is irrelevant as well as inadmissible. ....................................................................... 26

II.    Alternatively, Geter's ADA failure to accommodate claim fails because in-person work was also an essential function of her job. .............. 30

A.    In Schneider's judgment, in-person attendance was essential to Geter's position. ................................................................. 30

B.    The consequences of allowing Geter to work remotely show that in-person work was essential. .................................................. 34

C.    The experience of other comparable APMs, at that time and later, confirms the essential nature of presence in the office. ............ 37

D.    Pandemic-era changes did not eliminate the in-person essential function of Geter's role. ...................................................... 40

III.    Geter's requested accommodations were not reasonable. ........................... 42

A.    Neither of Geter's proposed accommodations would allow her to perform full-time and in-person work. ........................................... 42

B.    Even if full-time work and in-person work were not essential functions, Geter's proposed accommodations are unreasonable. ...... 43

IV.    Geter's ADA retaliation claim fails for the same reasons. .......................... 49

CONCLUSION ....................................................................... 52

CERTIFICATE OF COMPLIANCE ............................................. 53

CERTIFICATE OF SERVICE .................................................... 54

# TABLE OF CITATIONS

Page(s)

Cases

*Abram v. Fulton Cty. Gov't,*
598 F. App'x 672 (11th Cir. 2015) .................................................. 32, 33, 35, 37

*Agee v. Mercedes–Benz U.S. Int'l, Inc.,*
646 F. App'x 870 (11th Cir. 2016) ................................................... 19

*Bratten v. SSI Servs., Inc.,*
185 F.3d 625 (6th Cir. 1999) ............................................................ 44

*Campbell v. KBRwyle Tech. Sols., LLC,*
No. 1:17-CV-00744-ACA,
2019 WL 1353965 (N.D. Ala. Mar. 26, 2019) ................................. 48

*Carlson v. Liberty Mut. Ins. Co.,*
237 F. App'x 446 (11th Cir. 2007) ............................................... 35, 36

*D'Onofrio v. Costco Wholesale Corp.,*
964 F.3d 1014 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1435 (2021) .............. 49

*Davis v. Fla. Power & Light Co.,*
205 F.3d 1301 (11th Cir. 2000) ........................................................ 27

*DeVito v. Chicago Park Dist.,*
270 F.3d 532 (7th Cir. 2001) ........................................................... 16

*E.E.O.C. v. Ford Motor Co.,*
782 F.3d 753 (6th Cir. 2015) ........................................................... 33

*Earl v. Mervyns, Inc.,*
207 F.3d 1361 (11th Cir. 2000) ........................................................ 49

*Ellis v. England,*
432 F.3d 1321 (11th Cir. 2005) ........................................................ 13

*Everett v. Grady Mem'l Hosp. Corp.,*
703 F. App'x 938 (11th Cir. 2017) .................................................... 44

iv

*Garrison v. City of Tallahassee*,
   664 F. App'x 823 (11th Cir. 2016) ........................................ 16, 23, 27

*Garrison v. City of Tallahassee*,
   No. 4:15-CV-44-RH/CAS, 2015 WL 13021684 (N.D. Fla. Dec.
   16, 2015), *aff'd*, 664 F. App'x 823 (11th Cir. 2016) ............................. 18, 32, 35

*Higgins v. Union Pac. R.R. Co.*,
   931 F.3d 664 (8th Cir. 2019) ................................................................ 47

*Holbrook v. City of Alpharetta, Ga.*,
   112 F.3d 1522 (11th Cir. 1997) .......................................................... 46

*Holly v. Clarison Indus., L.L.C.*,
   492 F.3d 1247 (11th Cir. 2007) .......................................................... 20

*Isaac v. Wal-Mart Stores E., LP*,
   1:16-CV-179, 2017 WL 6061533 (S.D. Ala. Dec. 7, 2017) ........................... 51

*Jackson v. Veterans Admin.*,
   22 F.3d 277 (11th Cir. 1994) ................................................................ 24

*Jerome v. Barcelo Crestline, Inc.*,
   No. 1:07-CV-0447-WSD-LTW,
   2009 WL 10657334 (N.D. Ga. June 17, 2009) ................................ 17

*Jones v. UPS Ground Freight*,
   683 F.3d 1283 (11th Cir. 2012) .......................................................... 28

*Lucas v. W.W. Grainger, Inc.*,
   257 F.3d 1249 (11th Cir. 2001) ........................................ 15, 30, 43, 51

*Macuba v. Deboer*,
   193 F.3d 1316 (11th Cir. 1999) .......................................................... 28

*Maffett v. City of Columbia*,
   No. 3:19-CV-832-MGL-KDW,
   2021 WL 4596659 (D.S.C. Apr. 19, 2021) ........................................ 40

*Mason v. Avaya Commc'ns, Inc.*,
   357 F.3d 1114 (10th Cir. 2004) ............................................... 21, 32

*Morris–Huse v. GEICO*,
  748 F. App'x 264 (11th Cir. 2018) ............................................. 36, 43

*Morris–Huse v. GEICO*,
  No. 8:16-CV-1353-T-36AEP,
  2018 WL 623675 (M.D. Fla. Jan. 30, 2018),
  *aff'd*, 748 F. App'x 264 (11th Cir. 2018).................................... 33, 35

*Mulloy v. Acushnet Co.*,
  460 F.3d 141 (1st Cir. 2006) .............................................................. 32

*Myers v. Hose*,
  50 F.3d 278 (4th Cir. 1995)................................................................ 45

*Patterson v. Georgia Pac., LLC*,
  38 F.4th 1336 (11th Cir. 2022) ......................................................... 50

*Rabb v. Sch. Bd. of Orange Cty., Fla.*,
  590 F. App'x 849 (11th Cir. 2014) ............................................... 16, 46

*Samson v. Fed. Exp. Corp.*,
  746 F.3d 1196 (11th Cir. 2014).................................................... 15, 34

*Solloway v. White*,
  No. 1:13-CV-3827-TWT, 2017 WL 1170895 (N.D. Ga. Feb. 15, 2017),
  *report and recommendation adopted*, 2017 WL 1134460 (N.D. Ga. Mar. 27,
  2017), *aff'd*, 738 F. App'x 985 (11th Cir. 2018) ................................. 36

*Spears v. Creel*,
  607 F. App'x 943 (11th Cir. 2015) ..................................................... 44

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
  117 F.3d 1278 (11th Cir. 1997)....................................... 43, 49, 50, 51

*Templeton v. Neodata Servs., Inc.*,
  162 F.3d 617 (10th Cir. 1998).......................................................... 49

*Terrell v. USAir*,
  132 F.3d 621 (11th Cir. 1998).................................................... 17, 18

*Treadwell v. Alexander*,
  707 F.2d 473 (11th Cir. 1983)...................................................... 44, 45

*Valdes v. City of Doral*,
  662 F. App'x 803 (11th Cir. 2016) .............................................. 22, 37

*Webb v. Donley*,
  347 F. App'x 443 (11th Cir. 2009) .......................................... 39, 40, 43

*Webb v. Wynne*,
  No. 2:07-CV-471-ID, 2008 WL 4831740 (M.D. Ala. Nov. 3, 2008),
  *aff'd sub nom. Webb v. Donley*, 347 F. App'x 443 (11th Cir. 2009)........ 22, 25, 37

*Williams v. Cadence Bank*,
  No. 5:16-cv-266, 2018 WL 7360632 (N.D. Fla. Oct. 9, 2018) ................. 24, 25

*Wood v. Green*,
  323 F.3d 1309 (11th Cir. 2003)..................................................... 46

*Young v. City of Palm Bay*,
  358 F.3d 859 (11th Cir. 2004)....................................................... 13

*Zuckerman v. GW Acquisition LLC*,
  No. 20-CV-8742 (VEC), 2021 WL 4267815 (S.D.N.Y. Sept. 20, 2021)....... 41

## Statutes

28 U.S.C. § 1291 ............................................................................... 3

28 U.S.C. § 1331 ............................................................................... 3

42 U.S.C. § 1981 ............................................................................. 3, 10

42 U.S.C. § 12112(b)(5)(A) ............................................................... 15

## Rules

Fed. R. App. P. 4(a)(1)(A) ................................................................. 3

Other Authorities

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated July 12, 2022), available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ..................... 40

## INTRODUCTION

Cierra Geter worked for several years as an Area Planning Manager for Schneider National Carriers, Inc.  Schneider is a 24/7 trucking operation and Geter was hired to work full-time on the overnight third shift in Fairburn, Georgia.

As an APM, Geter supported Schneider's drivers.  Her job involved dispatching drivers, taking their calls and messages, helping them find trucks, giving them keys from a lockbox, and printing paperwork for them.  The third shift was often staffed with only one employee, meaning Geter regularly worked alone in the office to respond to drivers' needs.

In 2018, Geter was diagnosed with post-traumatic stress disorder and panic disorder, and took twelve weeks of leave under the Family and Medical Leave Act ("FMLA").  When Geter returned from her FMLA leave, she asked for a temporary part-time schedule.  Schneider at first granted Geter's requests, and her supervisor and co-workers continued to absorb her overnight shifts.

Each month in early 2019, Schneider expected Geter to return to her full schedule.  Yet multiple times, she and her doctor extended her part-time restrictions.  Schneider accepted these extensions in January and again in February.  In March 2019, two months after Geter was expected to return to full-time, in-person work, she made another request: to work from home on Thursdays, Fridays, and any time

she was scheduled to work alone, in addition to continuing a part-time schedule. Schneider yet again granted her requests, even though it meant re-allocating resources to ensure that the Fairburn office was staffed around the clock to serve drivers.

Geter then sought to extend her restricted schedule a fourth time, into June 2019. At that point, Schneider determined that its other employees could no longer handle the additional burden of covering her shifts. Schneider therefore terminated her employment because Geter could not fulfill the essential functions of her job.

Geter sued, alleging disability and race-related claims, even though full-time and in-person work were essential functions of her job as a Schneider APM. Geter has never disputed that when she was out, or working remotely, someone else had to be present in the office to help drivers with paperwork, keys, finding trucks, and other trucking emergencies. After months of waiting and hoping that Geter could return and do her job again, Schneider had to move on.

The magistrate judge carefully analyzed each of Geter's claims in a 103-page opinion. Dkt. 53.[1] The magistrate judge found that summary judgment should be granted on multiple independent grounds. After de novo review, the district court

---

[1] "Dkt. __" citations are to the district court docket. Citations to all record pages are to the page numbers that appear in the header generated by the court's ECF system.

agreed. Order, Dkt. 61. It properly concluded that working full-time was an essential function of Geter's job, and no proposed accommodation would allow her to fulfill that function. Summary judgment for Schneider was proper and this Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331 because Geter brought federal statutory claims under the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981. The district court entered judgment on March 21, 2022, and Geter timely appealed on April 15, 2022. Fed. R. App. P. 4(a)(1)(A). This Court accordingly has jurisdiction over Geter's appeal of the judgment under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   Did the district court correctly conclude that full-time work is an "essential function" of an APM at Schneider's Fairburn location, so that Ms. Geter is not a "qualified individual" under the ADA? (Yes).

II.  In the alternative, is in-person work an "essential function of an APM at Schneider's Fairburn location, so that Ms. Geter is not a "qualified individual" under the ADA, as the magistrate judge ruled? (Yes).

III.   Even if full-time work and in-person work were not essential functions of the APM job, did Ms. Geter fail to propose a "reasonable accommodation" under the facts of this case, such that her ADA claim fails?  (Yes).

IV.   Did the district court correctly grant summary judgment against Ms. Geter's ADA retaliation claim, for all of the same reasons that her failure-to-accommodate claim failed?  (Yes.)

### STATEMENT OF FACTS

### I.   Geter worked as a third-shift Area Planning Manager for Schneider.

Schneider, a transportation and logistics company, hired Geter in 2014 as a full-time Dispatch Analyst, later called an APM, for the third shift at its Fairburn location.  Dkt. 46-3 ¶ 3; Dkt. 46-4 at 7, 71.  Schneider operates around the clock, and Geter's shifts ran from 11:00 p.m. to 10:00 a.m. on Wednesday, Thursday, Friday, and Sunday nights.  Dkt. 47-6 at 14; Dkt. 50-7 at 29; Dkt. 46-4 at 25.  She reported to Team Lead Travis Torrence, who worked under Director of Operations Marianne Biskey-Rose.  Dkt. 46-4 at 24.

APMs dispatched drivers with customer loads, helped drivers gather paperwork and load information, took calls and messages from drivers, and resolved any driver issues that arose.  Dkt. 46-4 at 10–12.  As an APM, Geter supported Schneider's drivers, which often required dealing with drivers face-to-face.  *Id.* at

12–13.  This interaction was necessary to develop relationships with drivers.  *Id.* at 14, 16; Dkt. 47-4 at 22–23.  Drivers expected APMs to be in the Fairburn office so their questions could be answered in real time on-site.  Dkt. 47-4 at 22-23.  APMs also needed to be in the office to help drivers find trucks and to give drivers keys secured in a lock box, which happened "pretty frequently."  *Id.* at 21–22; Dkt. 46-4 at 17–19; Dkt. 46-3 ¶ 10.  APMs also printed paperwork for drivers because the Fairburn printer was kept in a locked room to keep the documents confidential.  Dkt. 47-4 at 21–22.

Geter was hired for the third shift, which was staffed with only one or two APMs.  Dkt. 46-4 at 31, 71.  This meant that Geter regularly worked alone.  Dkt. 46-3 ¶ 5 (Torrence declaring Geter "frequently worked alone, especially on Sundays"); Dkt. 50-3 ¶ 6 (Geter attesting she worked alone on Thursdays).  This was unique to the third shift, as the first and second shifts were staffed with more APMs.  Dkt. 46-4 at 31–32.  Similarly, the first and second shifts were staffed with other team members to assist APMs, while the third shift had no support staff.  *Id.*

Schneider did not employ any part-time APMs at Fairburn during Geter's tenure, and Torrence did not supervise any part-time employees.  Dkt. 46-3 ¶¶ 7–8, 11.  Nor were Fairburn APMs regularly allowed to work remotely.  Dkt. 50-5 at 21; Dkt. 47-3 at 39–40.  Yet Geter requested both part-time and remote work.

Dkt. 46-4 at 88–98.

## II. Schneider granted Geter's request to work reduced hours.

In October 2018, Geter's psychiatrist, Dr. Cassandra Wanzo, diagnosed Geter with post-traumatic stress disorder and panic disorder. Dkt. 46-4 at 28–30. Schneider approved Geter's twelve-week FMLA leave through December 31, 2018. *Id.* at 34–35, 85–89. During Geter's leave, Torrence sometimes worked her Sunday night shift along with his own Team Lead duties. Dkt. 46-3 ¶¶ 12–13. Another APM, Audreianna Williams, also testified that she and APM Desmond Seymour "covered most of [Geter's] work" and that Torrence helped cover the Sunday shift "a handful of times." Dkt. 50-4 ¶¶ 7–8. Thus, during Geter's leave, her work was performed by other Schneider employees. Dkt. 47-2 at 69–70.

Geter was expected to return to work full-time on January 2, 2019. Dkt. 46-4 at 90. But Dr. Wanzo explained to Schneider that when Geter returned, she could only work three, not four, ten-hour days. *Id.* at 37, 90. Dr. Wanzo expected that Geter could return without restrictions on February 14, 2019. *Id.* at 38, 90. Schneider agreed to Geter's temporary reduced schedule. *Id.* at 38, 91. Geter asked to be excused from her Sunday night shift in particular because she needed to attend counseling sessions on Monday mornings, which Schneider also allowed. *Id.* at 39–40.

While Geter worked reduced hours, Torrence and other APMs continued to cover her shifts. Dkt. 46-4 at 40–41; Dkt. 46-3 ¶ 12; Dkt. 50-4 ¶¶ 7–8. Torrence did so on top of his other duties, which impaired his work and his health. Dkt. 46-3 ¶¶ 12, 14, 16. Geter acknowledged that missing shifts affected her coworkers. Dkt. 46-4 at 41–42 ("Any time no one is there everybody does twice as much work.").

### III. Schneider granted Geter's extensions of her part-time schedule and her request to work remotely.

Despite Dr. Wanzo's statement that Geter could return to work full-time without restrictions on February 14, 2019, Geter asked to extend her part-time schedule until March 20. Dkt. 46-4 at 43–44, 93. Schneider again agreed. *Id.* at 100. Schneider's employees continued to cover Geter's shifts. Dkt. 46-3 ¶¶ 12–13; Dkt. 50-4 ¶¶ 7–8. Otherwise, no one would have been in the Fairburn office during Geter's solo shifts. Dkt. 46-4 at 31–32, 71.

Geter did not return to work as expected on March 20, 2019. Instead, she submitted a request from Dr. Wanzo seeking another extension of her part-time schedule. Dkt. 46-4 at 95. Not only did Geter ask to keep working three, ten-hour days until April 30, but she also requested to work from home on Thursdays, Fridays, and any time she was scheduled to work alone. *Id.* at 51–52, 95.

But Geter's restrictions did not end on April 30, 2019. Instead, before her

previous request expired, Dr. Wanzo sought to extend Geter's restrictions to June 5, stating Geter still could work only three days a week, and that she also needed to work from home two days a week.  Dkt. 46-4 at 53–55, 96–97.

## IV.    Schneider tried to work with Geter's restricted schedule.

Because Schneider struggled to staff Fairburn's third shift while Geter worked part-time and remotely, Schneider considered several other options.  Dkt. 46-3 ¶ 16.

First, Schneider asked Geter if she could change her Monday counseling session, which prevented Geter from working her Sunday night shift.  Dkt. 50-5 at 25.  Geter said this was impossible because the other available counseling session conflicted with a doctor's appointment.  *Id.*

Second, Schneider asked Dr. Wanzo to answer some questions about Geter's restrictions so Schneider could continue to explore options for her.  Dkt. 46-9 at 6, 12-13.  Schneider asked if Geter could work another day of the week or eight-hour days (rather than ten-hour days) Monday through Friday.  *Id.* at 12.  Schneider also instructed Geter to have Dr. Wanzo answer its questions by April 8, 2019.  Dkt. 46-4 at 99.  Geter did not timely respond to Schneider, but later Dr. Wanzo concluded that Geter could not work any other proposed schedule.  Dkt. 46-4 at 101–03.  Dr. Wanzo also stated that Geter could not work in a fast-paced, high-pressure environment.  *Id.* at 102.

Third, Schneider considered hiring a temporary employee for Geter's Sunday shift, but this was not viable since the temporary employee would have to work alone without the knowledge and background needed to resolve issues. Dkt. 50-5 at 28; Dkt. 47-3 at 43 (explaining difficulties of training a temporary worker).

Finally, Schneider considered reassigning Geter to an open and available position for which she was qualified, but Fairburn had only full-time positions, and Geter's restrictions required her to work part-time. Dkt. 46-3 ¶ 17.

Schneider thus found no reasonable solution that would have allowed Geter to perform the essential functions of her job. Dkt. 46-3 ¶ 18. Schneider decided it could not extend Geter's part-time, remote schedule, which had been in place for months already beyond the end of her FMLA leave, for another two months. *Id.* ¶¶ 15–16. Schneider terminated Geter's employment on April 12, 2019. *Id.* ¶ 18.

## V.    The APM role evolved after Geter's termination.

When the COVID-19 pandemic began in 2020, a year after Geter's termination, Schneider allowed its staff to work remotely for their safety. Dkt. 47-2 at 25–26; Dkt. 47-3 at 25. During the pandemic, Schneider moved the printer to the driver lounge at Fairburn so employees could print paperwork remotely for drivers. Dkt. 47-6 at 29–30. Additionally, for a brief time during the pandemic, Fairburn was unlocked so drivers could access keys. *Id.* at 28–29. But the office has

been locked since employees returned to work in March 2021.  *Id.*

In April 2020, Schneider moved all APMs to its corporate office in Green Bay.  Dkt. 47-6 at 20; Dkt. 47-2 at 19, 25.  While APMs in Green Bay now perform dispatch services for Atlanta drivers, APMs no longer handle in-person driver needs. Dkt. 47-5 at 20.  Instead, Driver Team Leads and a new position called Senior Operating Specialists remain in Fairburn to assist drivers with the in-person duties that APMs used to handle.  Dkt. 47-4 at 26–27; Dkt. 47-6 at 26.

In other words, the "face-to-face interaction" with drivers that was required of APMs when Geter was employed is now fulfilled by other Schneider employees. Dkt. 47-5 at 32–33; Dkt. 50-15 at 13–14 ("driver functions," like meeting with and talking to drivers, fall to roles other than the APM).  There is now a Senior Operating Specialist to help drivers on each shift.  Dkt. 47-4 at 30.

## PROCEDURAL HISTORY

After her termination, Geter sued Schneider, asserting (1) failure to accommodate under the ADA; (2) ADA disability discrimination; (3) ADA retaliation; (4) race discrimination in violation of Title VII; and (5) race discrimination in violation of § 1981.  Dkt. 1 at 7–14.  Schneider moved for summary judgment on all of Geter's claims.  Dkt. 46.

## I.  The magistrate judge found that Geter's claims failed.

The magistrate judge reviewed the substantial record and issued an extensive

10

report recommending summary judgment for Schneider on all of Geter's claims.  *See* Dkt. 53 ("R&R").

As to her ADA failure to accommodate claim, the magistrate judge aptly determined that Geter could not perform the essential functions of the APM position with or without reasonable accommodation, meaning Geter was not a "qualified individual" under the ADA.  Dkt. 53 at 40, 70.  In particular, Geter could not perform three essential functions: (1) in-person work; (2) full-time work; and (3) working in a fast-paced, high-pressure environment.  *Id.* at 56, 70.

Similarly, Geter could not show ADA discrimination because she failed to prove she was a qualified individual.  Dkt. 53 at 79.  Nor did she present even circumstantial evidence to support any separate claim that Schneider terminated her because of her disability.  *Id.* at 81–82.

The magistrate judge also found that Schneider articulated a legitimate, nondiscriminatory reason for Geter's termination: because full-time, in-person work was essential to Geter's role, and her request to work part-time and remotely burdened other staff and drivers.  Dkt. 53 at 99.  Geter did not establish that Schneider's reason was pretextual.  *See id.* at 100.  As a result, her ADA retaliation claim failed.  *Id.* at 102.  In any event, Geter could not prove race discrimination because she did not identify any similarly situated employee who was treated better

11

based on their race.  *Id.* at 96–97.

## II.    The district court granted summary judgment for Schneider.

Geter timely objected to the recommended dismissal of her ADA claims. Dkt. 57.  The district court accordingly reviewed the ADA claims de novo.  Order, Dkt. 61 at 1-3.  Because Geter did not object to the R&R on her race discrimination claims, which lacked any evidentiary support, the district court reviewed those for clear error and adopted the recommendation to dismiss them.  *Id.* at 4.  Geter has abandoned her race discrimination claim in this appeal.

The district court agreed that full-time work was an essential function of Geter's job.  Order, Dkt. 61 at 16–17.  Because Geter could not work full-time, and proposed no accommodation that would allow her to work full-time, she was not a "qualified individual" and her ADA claims failed.  *Id.* at 17–19.  The district court also agreed that Schneider offered a legitimate, nondiscriminatory reason for Geter's termination.  *Id.* at 20.  Geter's assertion that she could perform the essential functions of her job with accommodation did not show that Schneider's reason was pretext for retaliation.  *See id.* at 21–22.  Her ADA retaliation claim therefore failed. *Id.* at 22.

For these reasons, the district court affirmed the R&R, dismissed all of Geter's claims, and entered judgment for Schneider.  Order, Dkt. 61 at 23; Dkt. 62.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004). Summary judgment is appropriate when there is no genuine issue of material fact. *Id.* While the Court views the facts in the light most favorable to the nonmoving party, "[i]f a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper." *Id.* A "mere scintilla" of evidence will not overcome a motion for summary judgment. *Id.* Instead, for a factual issue to be genuine, it "must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.*

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment for Schneider. First, summary judgment was appropriate because Geter was not qualified for her position. Third-shift APMs like Geter regularly were scheduled to work alone, meaning if Geter did not work all of her shifts, there would be no employee in the Fairburn office to meet in-person driver needs. Full-time work thus was essential to Geter's job. Because she could not work full-time, she was not a "qualified individual" under the ADA.

If the Court agrees that full-time work was essential, it need not reach a second essential function—working in the office—which is an alternative ground to affirm. Geter needed to be physically present to find keys for drivers, print paperwork, and answer driver questions and respond to driver issues face-to-face. Because Geter sought to work from home two days per week, she could not perform this in-person essential function either.

Given that full-time and in-person work were essential to Geter's role, her requests to work part-time and remotely were not reasonable accommodations that would have enabled her to perform her job. Indeed, if Geter was not in the office when she was scheduled to work alone, Fairburn would have been empty, and Schneider could not meet the needs of its drivers. Thus, because Geter could not perform at least one essential function of her job and failed to identify a reasonable accommodation that would enable her to do so, she was not a qualified individual under the ADA, and her accommodation and discrimination claims fail.

As for Geter's ADA retaliation claim, Schneider established a legitimate, non-retaliatory reason for her termination: it could not meet driver needs while Geter worked a restricted schedule. Unless Schneider reassigned employees to cover Geter's shifts or hired new employees—which the ADA does not require—drivers in Fairburn would have had no one to assist them while Geter worked part-time or

from home.  And Geter presented no evidence that Schneider's reason was pretext for retaliation.  Her ADA retaliation claim therefore fails as well.

## ARGUMENT AND CITATIONS TO AUTHORITY

The ADA requires employers to provide "reasonable accommodations" to qualified individuals with a disability.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. § 12112(b)(5)(A)).  To establish a prima facie ADA case, a plaintiff must show: (1) she is disabled; (2) she was a "qualified individual" at the relevant time, which means she could perform the "essential functions" of the job with or without reasonable accommodations; and (3) she was discriminated against because of her disability.  *Id.*

Essential functions are the "fundamental job duties" of the position, which are determined on a case-by-case basis.  *Lucas*, 257 F.3d at 1258.  Factors relevant to this analysis include: (1) the employer's judgment, which is given substantial weight; (2) any written job description; (3) the time spent performing the function; (4) consequences of not requiring the employee to perform the function; (5) terms of any collective bargaining agreement; (6) the work experience of past employees in the position; and (7) the current work experience of employees in similar jobs. *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014).

15

Geter was not a "qualified individual." She concedes that she could not work full-time and usually needed to work from home. Because full-time and in-office work were each "essential functions" of her job, Geter could not perform two separate "essential functions." On each ground separately, this Court can affirm: Geter was not a qualified individual under the ADA.[2]

## I. Geter's ADA failure to accommodate claim fails because full-time work was an essential function of her job.

Full-time work can be an essential function of an employee's job. The ADA "provide[s] relief only to persons who are capable . . . [of] the essential functions of their job, which in the case of a full-time job requires that they be capable of working full-time." *DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534 (7th Cir. 2001) (finding park laborer could not perform essential full-time function when he could only work part of each shift). *See also Garrison v. City of Tallahassee*, 664 F. App'x 823, 824, 826 (11th Cir. 2016) (district court did not err in concluding full-time presence was essential for purchasing agent who worked only 30 out of 40 expected hours); *Rabb v. Sch. Bd. of Orange Cty., Fla.*, 590 F. App'x 849, 851 (11th Cir. 2014) (full-time

---

[2] Geter has no viable ADA "discrimination" claim separate from her failure-to-accommodate claim. *See* Appellant Br. 51–53. Her arguments for both are identical, and both the R&R and district court aptly recognized that any "discrimination" claim failed for the same reason as her failure-to-accommodate claim: she was not a qualified individual. *See* Order, Dkt. 61 at 18–19; Dkt. 53 at 79.

attendance was essential to teacher's job). For these positions, an employee cannot "effectively perform [her] duties" unless she works full-time. *Jerome v. Barcelo Crestline, Inc.*, No. 1:07-CV-0447-WSD-LTW, 2009 WL 10657334, at *4 (N.D. Ga. June 17, 2009) (department head position required full-time work to fulfill supervisory duties).

Geter could not work full-time, and she does not dispute that full-time work can be a valid "essential function" for certain positions. She argues only that full-time work is not an essential function of the APM job in particular. But as the district court correctly concluded, the relevant factors establish that full-time work was an essential function of Geter's APM job.

## A. In Schneider's judgment—which receives substantial weight—Geter's APM position required full-time work.

The undisputed evidence shows that Schneider believed full-time work was essential for APMs at Fairburn, which was "only staffed by full-time employees so that Schneider could best meet the needs of its drivers." Dkt. 46-3 ¶ 7. In fact, "Schneider did not employ any part-time APMs at the Fairburn location" during Geter's employment. *Id.* ¶ 8. That no Fairburn APMs worked part-time shows that Schneider perceived full-time work as essential to this position. *See Jerome*, 2009 WL 10657334, at *4 (finding full-time presence essential for department head where no other department head worked part-time); *see also Terrell v. USAir*, 132 F.3d 621,

626 (11th Cir. 1998) (finding part-time work was not a reasonable accommodation where employer did not offer part-time positions).

Moreover, as Torrence, Geter's supervisor, attested, "[f]ull-time work is an essential function of the APM position" because Schneider had to "ensure it had the resources to sufficiently support drivers and to dispatch loads at all hours of the day." Dkt. 46-3 ¶ 6; *Garrison v. City of Tallahassee*, No. 4:15-CV-44-RH/CAS, 2015 WL 13021684, at *2 (N.D. Fla. Dec. 16, 2015), *aff'd*, 664 F. App'x 823 (11th Cir. 2016) (finding full-time presence essential based in part on supervisor testimony). Geter cannot refute that Schneider needed APMs around the clock. *See* Order, Dkt. 61 at 15.

But it was particularly important that Geter work full-time because she was a third shift APM, and the third shift was always thinly staffed. Dkt. 46-4 at 7–8, 71; Dkt. 46-4 at 31–32; Dkt. 50-3 ¶ 6 (third shift only had one or two APMs and no other team members). Because third-shift APMs often worked alone, Schneider needed Geter to work every shift for which she was scheduled—full-time, 40 hours, four shifts per week. Dkt. 46-4 at 35, 71. Otherwise, Fairburn would have no one to assist drivers overnight during Geter's shifts.

This evidence shows that Schneider viewed full-time work as necessary for APMs, which weighs heavily in favor of finding full-time work essential to Geter's

position.  *Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 874 (11th Cir. 2016) ("Substantial weight is accorded to the employer's judgment as to which functions are essential.").

Geter tries to challenge Schneider's judgment using the Flexible Work Arrangement ("FWA") Guidelines, but her efforts are futile.  Appellant Br. 28.  The FWA Guidelines represent a company-wide policy that applies differently to different jobs and circumstances.

Under the policy, flexible or part-time work was offered at Schneider's "sole discretion" on a "case-by-case basis."  Dkt. 50-6 at 1.  Schneider announcing that it would consider part-time work on a case-by-case does not undermine that full-time work was essential to Geter's particular position.  In fact, Geter's third-shift APM job was poorly suited for flexible work under the FWA guidelines.  Flexible work had to "meet the business needs of the position" based on factors like the work the associate performed; the needs of customers, co-workers, and direct reports; whether the arrangement was temporary; and how the employee would cover critical needs or emergencies when out of the office.  Dkt. 50-6 at 1–2.  Because Geter regularly worked alone, her inability to work full-time meant that team leaders like Torrence and co-workers like Williams and Seymour had to fill in or the needs of the drivers would not be met.  Dkt. 47-2 at 69–70; Dkt. 46-3 ¶ 13; Dkt. 50-4 ¶ 7; *see also* Dkt.

47-6 at 28 (Biskey-Rose testifying that Torrence and his team worked Geter's shifts). And after repeated extensions, Schneider perceived Geter's part-time schedule as no longer temporary but "a permanent need," which affected Schneider's ability to meet critical needs of drivers without overburdening other staff. Dkt. 46-4 at 99.

Lastly, Geter claims that *Holly v. Clarison Indus., L.L.C.*, 492 F.3d 1247, (11th Cir. 2007), shows that Schneider needed to give her preferential treatment under the FWA Guidelines. Appellant Br. 29–30. But *Holly* considered whether an employee could show discrimination based on the application of his employer's objective punctuality policy. 492 F.3d at 1261–63. Unlike in *Holly*, Geter invokes only a subjective policy that applies case-by-case, and does not make sense for Geter's position. *See* Order, Dkt. 61 at 8 n.4.

Thus, Schneider's discretionary FWA Guidelines do not undermine Schneider's judgment that full-time work was essential to Geter's position as a third-shift APM. *See* Appellant Br. 30. To the contrary—they highlight that Geter's role was uniquely *unqualified* for part-time work based on the various factors. Schneider's judgment weighs heavily in favor of finding full-time work essential.

### B. The APM job description does not undermine the essential nature of full-time work.

Although the job description for APMs did not state that the job was full-time, it was clear that the position required full-time work. Geter argues that the job description factor favors her position, and the district court agreed. But as the district court held, given the circumstances, this favor is hardly decisive. Order, Dkt. 61 at 16–17. Ultimately Geter was well-informed, and understood, up front, that her job was full-time.

The APM job description did identify Geter's role as "Exempt (Salaried)," which signals full-time status. Dkt. 46-9 at 8. Geter likewise understood that the APM position was full-time, 40 hours per week, and exempt. Dkt. 46-4 at 5 (Q. "[d]id you understand it to be a full-time position? [Geter:] A. Correct."). Schneider's offer letter to Geter also made clear that the position was "Full-time; 40 hours per week; Exempt." Dkt. 46-4 at 71.

The lack of the term "full-time" in the job description is unremarkable given what the description did say, what Geter understood, and what Schneider told her in her offer letter. Dkt. 46-4 at 5–7. The job description was not meant to be exhaustive, Dkt. 46-9 at 8, and after all, some job requirements are "a given." *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1121–22 (10th Cir. 2004) (employer "probably did not even consider informing its employees that they were actually

21

required to show up at the workplace . . . when it drafted the service coordinator job description").

Any form-over-substance argument that the APM job description did not list full-time work fails given that the description conveyed—and Geter well understood—that the job required full-time work.

### C. The consequences of allowing part-time work for Geter's position prove that full-time work was essential.

Allowing Geter to work part-time would hamper Schneider's operations. Because Geter regularly worked alone, to allow her to work part-time, Schneider would have to re-assign employees to cover shifts or hire new employees altogether.

The "burden" on Schneider from allowing part-time work "supports a finding" that full-time work was essential. *Valdes v. City of Doral*, 662 F. App'x 803, 810 (11th Cir. 2016) (finding a job function "essential" when excusing it would require the employer to "hire another [person] to work at the same time as [Plaintiff] or shift an undue burden on the City's only other [similar employee]"); *see also Webb v. Wynne*, No. 2:07-CV-471-ID, 2008 WL 4831740, at *6 (M.D. Ala. Nov. 3, 2008), *aff'd sub nom. Webb v. Donley*, 347 F. App'x 443 (11th Cir. 2009) (rejecting an ADA claim when allowing an employee to work four-hour days would require other employees to assume her responsibilities or employer to hire new personnel).

Third-shift APMs like Geter were often alone to answer driver questions, help drivers find trucks, retrieve keys from the lock box, and print paperwork. Dkt. 47-4 at 21–23; Dkt. 46-4 at 17–19, 32; Dkt. 46-3 ¶ 10. As Torrence attested, Schneider needed APMs to "support drivers and to dispatch loads *at all hours of the day.*" Dkt. 46-3 ¶ 6 (emphasis added).

Geter similarly testified that third shift APMs had to "deal[] with the driver issues" on a "one-on-one basis with the drivers." Dkt. 46-4 at 32. She also noted that "[w]hoever is on the third shift, if they're by their self, they're taking the workload of everybody." *Id.* at 41–42. And there were so many driver needs that Geter had trouble handling "the workload of usually two or three people for one person by myself at night." Dkt. 46-4 at 31. Thus, Geter's testimony confirms that if she did not work all of her shifts, Schneider's business needs would not be met. *See* Dkt. 46-4 at 31; *Garrison*, 664 F. App'x at 826 (affirming that a plaintiff was "unable to perform an essential function of her job—full-time physical attendance," based in part on her own testimony that her job required regular interaction with representatives and vendors).

Driver needs were also unpredictable, like when a truck broke down, would not start, or did not return to the yard in time for the next driver to use it. *See* Dkt. 46-8 at 9; *Garrison*, 664 F. App'x at 826 (full-time physical attendance essential

23

where representatives and vendors "would arrive at the office without prior notice"). Without an APM on duty, Schneider could not meet the real-time unexpected needs of drivers, which could not be "deferred until a later day." *Williams v. Cadence Bank*, No. 5:16-cv-266, 2018 WL 7360632, at *5 (N.D. Fla. Oct. 9, 2018) ("certain jobs by their very nature must be performed daily at a specific location; in such cases, full-time attendance is a 'necessary' function of the job." (quoting *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994)).

Thus, Geter failing to work all of her shifts meant that at times there would be no employee in the Fairburn office to meet drivers' needs—unless someone else filled the gap. Geter contends that Schneider could have transferred or assigned employees to cover for her, Appellant Br. 48, but that argument only highlights the need for full-time work because the fact that others had to cover for Geter shows Schneider's need to staff every shift. Dkt. 47-2 at 69–70; Dkt. 46-3 ¶ 13; Dkt. 50-4 ¶ 7. For instance, Torrence attested that he covered Geter's shift on top of his other duties, causing him to work 55–60 hours per week and affecting his ability to do his job, as well as his health. Dkt. 46-3 ¶¶ 12, 14; *id.* ¶ 16 (working Geter's shift was "physically exhausting, negatively impacted [Torrence's] ability to complete [his] Operations Team Leader tasks, and negatively impacted [his] health").

Geter argues that Torrence only "sporadically" covered her shift, and instead Seymour and Williams handled her shifts.  Appellant Br. 44–45.  But Geter just proves Schneider's point: someone else always has to cover her work.  As the R&R observed, no matter who covered Geter's shift, "it is clear that Schneider's employees needed to cover for [Geter] while she was working a reduced schedule, which is what is important to this analysis, instead of who was the specific person covering for her at any given time."  Dkt. 53 at 62–63; *see also* Order, Dkt. 61 at 14 (district court agreeing that the "consequence of allowing [Geter]'s role to be performed part-time [was] more work for her coworkers").

In other words, that allowing Geter to work part-time "would require other employees to assume some of [her] responsibilities, or the hiring of additional personnel," reveals that full-time work was required for her job.  *See Webb*, 2008 WL 4831740, at *6.

### D.    The experiences of other APMs confirm that full-time work was essential.

Schneider employed no part-time APMs at Fairburn.  Dkt. 46-3 ¶¶ 7–8. And Geter knew of no APMs who were hired part-time while she worked at Schneider.  Dkt. 47-1 at 84; *see Williams*, 2018 WL 7360632, at *4 (full-time presence essential where plaintiff testified she knew of no comparable employee who

worked part-time). Likewise, Torrence, who led Geter's team, supervised no part-time employees. Dkt. 46-3 ¶ 7–8.

To "dispute" the reality that there were no part-time APMs at Fairburn, Geter points out that she worked reduced hours after her FMLA leave. Dkt. 50-1 ¶ 15. But that Schneider temporarily allowed Geter to work a reduced schedule does not mean that Schneider employed part-time APMs. Geter also cites APM Sarah Kopf's vague testimony that she knew "there were people that were able to have [reduced schedules]," but that she did not know the "specifics." Dkt. 47-4 at 13. One of the people Kopf "knew" was Geter herself, and the other was APM Tiffany Kitchens. Dkt. 47-4 at 13. Kitchens testified that she took FMLA leave to care for her mother, but that she did not work a reduced schedule when she returned. Dkt. 47-5 at 15–16, 30; Dkt. 47-2 at 30.

Thus, as the district court observed, Geter's assertion that "other employees [were] permitted to work part-time is not supported by the record." Order, Dkt. 61 at 9. There were no part-time APMs at Fairburn.

### E.    Geter's declaration about Torrence is irrelevant as well as inadmissible.

Geter also argues that she believes Torrence took off more than 80 days in 2018. Her goal is to suggest that at least one Fairburn employee (her supervisor) *did*

26

work part time.  Appellant Br. 31, 33.  But Geter's point is both irrelevant and disputed, inadmissible hearsay.

First, the simplest problem with Geter's argument is that Torrence's work schedule has nothing to do with whether full-time work was essential to the APM role.  Torrence was not an APM.  He was a Team Lead to whom Geter reported. Dkt. 46-4 at 24.  Accordingly, even if Torrence were absent or working out of the office 80 days, *and* Geter had admissible evidence of that, it would not help her case. Dkt. 53 at 55–56; Order, Dkt. 61 at 13 ("information about Torrence's work schedule does not weigh in Plaintiff's favor unless she can show that he performed a similar function to her"); *see also Garrison*, 664 F. App'x at 826 (contrary to plaintiff's assertions, there was no evidence that similarly situated employees were allowed to work outside regular business hours).  The experience of "incumbents in the job"— here, APMs—is what matters in determining Geter's essential job functions.  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Second, Geter's argument that Torrence took so many days off or was out of the office is inadmissible hearsay.  Her allegation comes from allegedly reviewing the Fairburn office calendar.  Dkt. 50-3 ¶ 10.  But Geter's memory of a document absent from the record is not admissible, as both the R&R and the district court agreed. Dkt. 53 at 54–55; Order, Dkt. 61 at 11–13.

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). And "Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits that support or oppose summary judgment motions shall be made on personal knowledge." *Id.* at 1322–23. Geter no longer denies that her declaration about Torrence's calendar is hearsay. Instead, she claims it is admissible "even if it is hearsay because it can be reduced to admissible evidence at trial" by Torrence's testimony or Schneider's business records. Appellant Br. 32. Geter's arguments fail.

Geter cannot reduce her assertions to admissible evidence using Schneider's calendar, which was not provided on summary judgment and is not in evidence. As the district court noted, Geter never seems to have "sought or produced" the calendar "during an extended discovery period lasting almost a year." Order, Dkt. 61 at 12.

A court cannot consider inadmissible evidence based on the "possibility" that the calendars will "emerge" as evidence post-discovery. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012). "This is particularly true when the hearsay statement is rebutted by evidence that can be reduced to admissible form, such as deposition or affidavit testimony." *Id.* That is precisely the case here.

The actual evidence about Torrence's work rebuts Geter's assertions. Asked whether he missed more than 80 workdays in 2018 at his deposition, Torrence said

that was an "awfully high number" and added, "I don't believe that's accurate." Dkt. 47-2 at 59–60. Torrence also stated that he worked five days a week, normally 50 hours, "but the days that I worked varied." Dkt. 46-3 ¶ 4. He added that in the fall of 2018, when Geter was out on FMLA leave, he worked "on average 55-60 hours a week." *Id.* ¶ 14. Torrence's testimony is clear that he was not working part time during this period. Thus, the gist of Geter's assertion that he was part-time has no merit.

*        *        *

In sum, Schneider's judgment, the APM job description, the consequences of not requiring Geter to work full-time, and the experiences of similar employees during and after Geter's tenure show that full-time work was essential to Geter's position. And as the district court recognized, it is "undisputed that [Geter] could not work more than three ten-hour days a week." Order, Dkt. 61 at 6; *see also* Dkt. 46-4 at 90–106. So it is "undisputed that [Geter] could not work a full-time schedule," an essential function of the APM position. Order, Dkt. 61 at 17. Geter thus is not a "qualified individual" and cannot succeed on her ADA accommodation claim. Dkt. 53 at 56; Order, Dkt. 61 at 17. The Court can affirm on this ground alone.

II.    **Alternatively, Geter's ADA failure to accommodate claim fails because in-person work was also an essential function of her job.**

This Court could also affirm on a second, independent ground: Geter's job also required in-person work, which she could not perform. The R&R found that both full-time and in-person work were essential to Geter's role. Dkt. 53 at 56. While the district court did not reach the in-person essential function, this Court may affirm "on any ground that finds support in the record." *Lucas*, 257 F.3d at 1256. The undisputed facts show that in-person work was essential to Geter's job, but that Geter could not meet this requirement because she needed to work remotely at least two days per week. Geter's ADA accommodation claim fails for this separate reason as well.

A.    **In Schneider's judgment, in-person attendance was essential to Geter's position.**

In Schneider's view, Geter's position required presence in the office. Testimony from Geter's supervisor is clear on this point, several parts of the job description reflect it, and nothing in the Flexible Work Policy undermines it.

First, Schneider did not allow APMs at Fairburn to regularly work remotely. Dkt. 46-3 ¶ 11 (Torrence: "APMs under my supervision were not regularly permitted to work remotely"). Instead, Fairburn employees were only sometimes allowed to work from home on a "one-off basis" when something "last minute" came up, "like a sick child or someone at home that they need[ed] to be there for or a

30

doctor's appointment." Dkt. 50-5 at 21; *see also* Dkt. 50-5 at 21 (Fairburn employees worked from home only on a one-off basis). As a Schneider HR executive testified, leaders could allow remote work in "strictly one-off situations." Dkt. 47-3 at 39–40.

Geter argues that Torrence told her she could work from home because "everyone did it." Appellant Br. 36. Torrence acknowledged that he may have said something like that, and clarified that he would have been referring to "short-term" requests to work remotely that "popped up" due to "weather or a family issue." Dkt. 47-2 at 57; Dkt. 47-4 at 14 (APM Kopf citing one-day family emergencies and adding that "the few times I was able to work from home the power was out at the office."). That "everyone" may work from home on rare occasions when the power goes out, or a child is sick, does not mean that the job can be done mostly from home for months at a time. Again, Torrence was clear that "APMs under my supervision were not regularly permitted to work remotely." Dkt. 46-3 ¶ 11.

Second, Schneider needed third-shift APMs "to consistently work in the office so that the APMs could develop relationships with drivers and better assist them." Dkt. 46-3 ¶ 9. Torrence noted that assisting drivers meant retrieving keys from the secure lock box and printing paperwork, which required physical presence in the office. *Id.* ¶ 10. Torrence's testimony shows that Schneider believed in-person work was essential to Geter's job.

31

Third, the duties and responsibilities in the APM job description reflect the importance of presence in the office. The APM position required "[c]ustomer service skills," which involved the "[a]bility to develop relationships through interpersonal skills." Dkt. 46-9 at 8–10. In-person work has been deemed essential to positions that employers characterize as "customer-service oriented." *Garrison*, 2015 WL 13021684, at *2. APMs also needed to "work effectively in a team environment," "collaborate" and "coach." Dkt. 46-9 at 8–9. These duties reveal a level of in-person interaction that show presence in the office was essential. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 152 (1st Cir. 2006) (job duties that implied some level of interaction like "teamwork" and "supporting" showed presence was essential). And the description stated that APMs had to "[m]aintain regular and consistent attendance," which tracks Schneider's expectation that APMs work in the office. Dkt. 46-9 at 9.

The job description did not need to explicitly "provide that physical presence . . . was an essential function" to make clear that attendance was required. *Abram v. Fulton Cty. Gov't*, 598 F. App'x 672, 677 (11th Cir. 2015) (presence in the office essential even though written job description did not so state). Indeed, the "omission of physical attendance . . . from the job description [is] entirely unremarkable." *Mason*, 357 F.3d at 1122. This is because, "[a]s commonsense suggests," Schneider

"probably did not even consider informing its employees that they were actually required to show up at the workplace" when drafting the job description. *Id.* "Regular, in-person attendance is an essential function . . . of most jobs, especially the interactive ones." *Morris-Huse v. GEICO*, No. 8:16-CV-1353-T-36AEP, 2018 WL 623675, at *8 (M.D. Fla. Jan. 30, 2018), *aff'd*, 748 F. App'x 264 (11th Cir. 2018) (quoting *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015)) (collecting cases).

Fourth, Geter invokes Schneider's FWA Guidelines and Remote Work Policy to argue that physical attendance in the office was not essential. Appellant Br. 36. But Schneider's policies do not support Geter's argument.

Any flexible work—including remote work—had to "meet business needs" and was "at the sole discretion of Schneider" on a "case-by-case basis." Dkt. 50-6 at 1. The Guidelines were not a blanket approval of remote work. Indeed, for a company like Schneider, with thousands of employees, remote work will be well-suited for some and not others. For instance, it is easy to envision Schneider's accountants or in-house attorneys working from home, but not its truck drivers or those who directly support them. *See Abram*, 598 F. App'x at 676–77 (affirming that presence in the office was essential despite an employer's telework policy because there was no evidence that front-desk receptionists like plaintiff were allowed to

33

telework).  What matters is not that Schneider had a FWA policy, but whether Geter could fulfill her responsibilities from home—and the record is clear that she could not.

Moreover, contrary to Geter's view that Schneider's policies "expressly permit employees to work remotely," Appellant Br. 36, Schneider's Remote Work Policy provided the opposite: "Teleworking is *not* an associate benefit intended to be available to the entire organization."  Dkt. 50-6 at 10 (emphasis added).  While teleworking "*may* be appropriate for *some* associates and *some* jobs," it was "*not a Company-wide benefit*."  *Id.* at 9 (emphasis added).  And "Schneider reserve[d] the right to refuse to make teleworking available to an associate."  *Id.*  Thus, remote work was not available for all positions.  Schneider's policies do not support Geter's argument.

Thus, Schneider's judgment, which is entitled to "substantial weight," was that Geter's position required her to be in the office, and the APM job description and Schneider's FWA Policy do not contradict this point.  *Samson*, 746 F.3d at 1201.

## B.     The consequences of allowing Geter to work remotely show that in-person work was essential.

APMs at Fairburn were responsible for "certain essential tasks that needed to be completed in the office."  Dkt. 46-3 ¶ 11.  For instance, APMs needed to retrieve paperwork from a locked printer and to provide keys from a secured lockbox, which

happened "pretty frequently." Dkt. 47-4 at 21–22. Geter's suggestion that hubs other than Fairburn operated differently provides no reason to think that something all APMs at Fairburn routinely did was not an important part of their job. Drivers expected APMs to answer questions and deal with emergencies in-person. Dkt. 47-4 at 22–23. APMs also needed to be in the office to locate trucks for drivers, which Geter testified was a "key function" of her job. Dkt. 46-4 at 18–19; *see Abram*, 598 F. App'x at 677–78 (finding physical presence essential based in part on employee's own evidence that she covered the front desk regularly).

These duties reveal that Geter's role was an "interactive job" that required "regular, physical presence" to perform her duties. *Morris-Huse*, 2018 WL 623675, at *8–9 (finding presence was required in part to monitor calls and answer associate questions). Indeed, APMs performed a customer service role for drivers. And "[p]resence at the place of employment is generally an essential function of a customer-service position." *Garrison*, 2015 WL 13021684, at *2. Developing relationships with drivers was important to Geter's role. *See* Dkt. 46-4 at 14, 16; Dkt. 47-4 at 22. And Geter recognized that "the one-on-one with the drivers" required her to be in the office for "human to human interaction." Dkt. 46-4 at 12, 17. Because Geter's job "required interaction" to "develop[] working relationships" with drivers, in-person attendance was essential. *Carlson v. Liberty Mut. Ins. Co.*,

35

237 F. App'x 446, 449–50 (11th Cir. 2007) (at least some presence in office was essential to position that required interaction with case managers and claims adjusters); *Morris-Huse v. GEICO*, 748 F. App'x 264, 267 (11th Cir. 2018) (physical presence essential where job required regular interpersonal interaction).

Another thing about Geter's in-office responsibilities is that they were unpredictable. APMs had to perform these duties at a moment's notice and be ready to assist if a truck broke down, would not start, or was otherwise unavailable for a driver. *See* Dkt. 46-8 at 9; Dkt. 46-4 at 19–20, 76 (Geter describing a time when she had to "rush over to the office to find two drivers tractors" and that "that was what [she] had to do to get things done"). Geter's own account highlights that Schneider could not plan for drivers to need keys, another truck, or paperwork only when Geter was working in the office. Dkt. 46-4 at 95. Instead, these needs could arise at any time, and someone needed to be in the office to meet them when they did. *Solloway v. White*, No. 1:13-CV-3827-TWT, 2017 WL 1170895, at *16 (N.D. Ga. Feb. 15, 2017), *report and recommendation adopted*, 2017 WL 1134460 (N.D. Ga. Mar. 27, 2017), *aff'd*, 738 F. App'x 985 (11th Cir. 2018) (presence in office essential when it was needed "from time to time" and "at unpredictable intervals").

As the R&R observed, Geter "working remotely when she was scheduled to work alone would have meant that no employees would be in the office to assist

drivers," "including in cases of unanticipated emergencies." Dkt. 53 at 5, 52. If Geter worked a solo shift remotely, no one would be available to respond to the "unexpected problems or issues" that required in-person attention. *Webb*, 2008 WL 4831740, at *6 (presence essential where position required "a significant amount of responsive and reactive actions" to "unexpected problems or issues").

It does not matter that Geter claims she assisted only some of the drivers face-to-face. Appellant Br. 37. Schneider needed Geter in the office to handle unscheduled driver issues—whenever and however often they arose. *See Valdes*, 662 F. App'x at 810 (employee had to be able to respond to emergencies when they arose, even if "he might not spend much time actually engaged" in doing so).

For these reasons, Geter's role as a third-shift APM at Fairburn required her to work in person.

## C. The experience of other comparable APMs, at that time and later, confirms the essential nature of presence in the office.

Geter has pointed to no comparable APM who was able to consistently work from home, which is consistent with Schneider's evidence that APMs at Fairburn did not regularly work remotely. *See Abram*, 598 F. App'x at 677 (physical presence essential where record had no evidence that employer allowed comparable employees to telework).

Geter claims that Kitchens, an APM on the first shift, was allowed to

"continuously work remotely for at least four months." Appellant Br. 38. But as the R&R recognized, "the evidence does not reflect that Kitchens in fact worked remotely full-time for a period of four months or that she was similarly situated to [Geter]." Dkt. 53 at 69, 91–92. Kitchens requested intermittent FMLA leave and worked remotely as needed while her mother was in the hospital, then returned to the office full-time. Dkt. 47-5 at 15–18; Dkt. 47-6 at 34–35 (supervisor Biskey-Rose testifying that Kitchens "had some intermittent FMLA" and that "it was not [] every day working from the hospital or from home. It was as needed."). For Schneider to accept unique arrangements to satisfy the FMLA does not undermine the general essential functions of the job—after all, Schneider accommodated Geter's own FMLA leave as well. Equally important, Kitchens worked the first shift, so even when she worked remotely, there would have been other staff in the office to meet driver needs. Dkt. 47-5 at 21–22. That is not true of Geter's third shift, which required her to work alone.

A year after Geter was terminated, in 2020 Schneider moved all its APMs to Green Bay, Wisconsin. Geter argues that this shows in 2018-2019 her job functions could have been handled remotely. Appellant Br. 39. Her argument fails based on the way that APM duties were partitioned after the relocation.

The APM duties that required in-person work were simply shifted to other,

38

in-person personnel in 2020. Dkt. 47-5 at 20 (APMs are "completely removed from [] driver functions now"). Geter even concedes that not all of her duties are now performed remotely. Appellant Br. 40 ("*Most* of the duties APMs like Ms. Geter previously performed from Fairburn are being performed remotely by the APMs in Green Bay for the southeastern hub." (emphasis added)).

When Schneider relocated the APMs, it backfilled their essential in-person duties at the Fairburn office. Dkt. 47-4 at 26–27 (other associates now help drivers access keys); Dkt. 47-6 at 26 (Senior Operating Specialists now answer calls and handle other day-to-day activities). In fact, Schneider now places a Senior Operating Specialist on each shift to ensure these needs are met, which shows that it was critical to have APMs in that office on every shift during Geter's tenure. Dkt. 47-4 at 30. Some APMs who did not move to Green Bay even *became* Senior Operating Specialists. Dkt. 47-5 at 8 (former APM Kitchens explaining that since 2020 she has been a Senior Operating Specialist). Schneider's staffing of Fairburn since the APM relocation only underscores the in-person requirements of Geter's former APM job.

In sum, in-person work was required for Geter's job as a third-shift APM. And because Geter could not work full-time in the office, Dkt. 46-4 at 90–106, she was not a "qualified individual" under the ADA. *See Webb v. Donley*, 347 F. App'x

443, 446 (11th Cir. 2009) (affirming summary judgment for employer where "presence at the work site was an essential function").

### D.    Pandemic-era changes did not eliminate the in-person essential function of Geter's role.

Nor does the experience of APMs during the COVID-19 pandemic show that full-time work was not essential.  *See* Appellant Br. 40–41.

Geter's employment with Schneider ended in April 2019, nearly a year before the pandemic.  In any event, that Schneider allowed staff to work remotely during a once-in-a-lifetime pandemic does not dictate essential job functions pre- or post-pandemic.  *See, e.g.*, *Maffett v. City of Columbia*, No. 3:19-CV-832-MGL-KDW, 2021 WL 4596659, at *19 (D.S.C. Apr. 19, 2021), *report and recommendation adopted*, 2021 WL 4237189 (D.S.C. Sept. 17, 2021) ("The pandemic-era excusing of certain essential functions does not, however, mean that the essential functions have somehow changed.").  Even the EEOC has acknowledged that excusing an essential function during the pandemic "does not mean that the employer permanently changed a job's essential functions."  EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated July 12, 2022).[3]

---

[3] Available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

When Geter was an APM, the printer was in a locked office that drivers could not access, requiring an APM to be on site.  Dkt. 47-4 at 21–22.  It is irrelevant whether Geter now could print paperwork to the office from a remote location because when she worked for Schneider, someone needed to gather printed documents for drivers from a locked room.  And moving the printer because of the pandemic has posed new challenges with printing and faxing capabilities and raised confidentiality concerns, justifying why the printer was historically in a locked office. Dkt. 47-6 at 29–30.

Geter also claims that driver keys are no longer behind locked doors in Fairburn.  Appellant Br. 41.  This assertion is belied by the record, as the R&R recognized.  Dkt. 53 at 67–68.  Biskey-Rose testified that the keys have been in a locked office since employees returned full-time in March 2021.  Dkt. 47-4 at 17; Dkt. 47-6 at 28–29.

Thus, even if Schneider's pandemic practices were relevant, the brief unlocking of the office would not help Geter because employees still must provide keys to drivers.  And there are other in-person driver needs at Fairburn for which Schneider must staff employees around the clock.  Dkt. 47-4 at 30; Dkt. 46-5 at 11; Dkt. 46-3 ¶ 6; Dkt. 47-5 at 32; *see Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742 (VEC), 2021 WL 4267815, at *12 n.16 (S.D.N.Y. Sept. 20, 2021) (plaintiff

"allege[d] no facts from which the Court could infer that she could perform the essential functions of her job from home after her colleagues and other work contacts returned to their offices" after the pandemic). Geter's pandemic-related arguments therefore do not help her.

In sum, Geter's job as an APM required her to work in person at the office. If the Court even reaches this ground, Geter's ADA claims also fail because she was not qualified on this ground also—she could not fulfill the in-person essential function.

## III.    Geter's requested accommodations were not reasonable.

Geter proposes no accommodation that would allow her to perform her job full-time or in person. Thus, if the Court agrees that either full-time or in-person work are essential job functions for a third-shift APM, it need not even address Geter's arguments on this point. Appellant Br. 44–51.

Further, even if full-time and in person were not essential job functions, Geter proposed no accommodation that would qualify as reasonable. If the Court's analysis reaches this point, her ADA claim fails for this independent reason as well.

### A.    Neither of Geter's proposed accommodations would allow her to perform full-time and in-person work.

Geter argues that she should have been given an accommodation of remote work and reduced hours. Appellant Br. 44, 46. But an "accommodation can qualify

as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1255. The plaintiff must bear the burden of showing that the accommodation would allow her to perform the essential functions of the job. *Id.* at 1255–56.

Geter asked to work a part-time schedule of three ten-hour days and to work from home two days per week. Dkt. 46-4 at 97. Yet full-time work was essential to Geter's role, and so part-time work is not a reasonable accommodation. *Webb*, 347 F. App'x at 445 (part-time work unreasonable where full-time presence at work site was essential). Likewise, in-office work was essential to Geter's role, and therefore working remotely is not a reasonable accommodation. *See Morris-Huse*, 748 F. App'x at 267 (working remotely unreasonable where presence was an essential function).

## B. Even if full-time work and in-person work were not essential functions, Geter's proposed accommodations are unreasonable.

Even apart from the essential job functions, Geter's proposed accommodations are not reasonable. The requirement that any accommodation must be "reasonable" "connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). The record shows that Schneider made significant efforts to work with Geter and ultimately was

not required to do more.

First, Geter contends that Schneider could have transferred or assigned employees to cover for her. Appellant Br. 48. But the ADA does not require the employer to place important aspects of a job onto someone else. *Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 946 (11th Cir. 2017) (finding accommodation unreasonable where "[o]ther employees necessarily would have had to take on" aspects of the plaintiff's job while she worked from home). Nor are employers "required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job." *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999); *see also Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir. 1983); *Spears v. Creel*, 607 F. App'x 943, 949 (11th Cir. 2015) (accommodation unreasonable where it would have caused scheduling problems and employees to work additional shifts). As the magistrate judge determined, the "fact that hiring new employees may have been necessary to compensate for [Geter's] accommodation similarly supports a conclusion that her requested accommodation was not reasonable." R&R, Dkt. 53 at 64.

Instead, Schneider tried to devise a reasonable solution. Schneider asked if Geter could move a counseling session that precluded her from working her Sunday night shift, but Geter said she could not. Dkt. 50-5 at 25. Schneider also asked if

Geter could work another day of the week or eight-hour days Monday through Friday. Dkt. 46-9 at 12. Geter did not timely respond to this question, but Dr. Wanzo later concluded that Geter could not work any other proposed schedule. Dkt. 46-4 at 101–03.

Although the ADA does not require it, Schneider also considered hiring a temporary employee. *See Treadwell*, 707 F.2d at 478. But hiring a temporary employee was not a viable option. Because Geter worked the third shift, a temporary employee would have had to work alone overnight without the requisite knowledge or background to resolve driver issues and without any help from other employees. *See* Dkt. 50-5 at 28; Dkt. 47-3 at 43. And there was not enough time for a temporary employee to overcome this steep learning curve in the repeated four-week intervals that Geter requested to work a reduced schedule. Dkt. 47-3 at 43 (Schneider could not train someone without knowing how long Geter's restrictions would last); *id.* at 45 (Schneider initially believed Geter would return to full work after her first requests expired). Thus, Schneider could not hire and train a temporary worker given Geter's repeatedly-extended and ultimately indeterminate restrictions. *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (reasonable accommodation does not require employer to hire temporary help to hold a position open).

Second, nor could Schneider assign Geter to another position because

Fairburn had only full-time positions, and Geter requested part-time work. Dkt. 46-3 ¶ 17; Dkt. 46-4 at 95. As Geter recognized, there were only a handful of APMs on each shift, so there were limited APM positions in Fairburn. *See* Dkt. 46-4 at 31. Schneider was not required to create a part-time position for Geter where none existed. *See Rabb*, 590 F. App'x at 853 ("[A] part-time position that does not exist is not a 'reasonable' accommodation because the ADA imposes no duty on the employer to create a part-time position.").

Third, Geter contends that she worked reduced hours from January to April 2019 "with no issues." Appellant Br. 45. To begin with, that Schneider temporarily allowed Geter to work part-time and remotely does not matter. *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (holding that "prior accommodations do not make an accommodation reasonable" and rejecting the suggestion that prior "indefinite leaves of absence" justified future ones); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (no ADA violation where employer previously excused employee's inability to perform an essential function but continuing to do so would have required "reallocation" of his duties).

In any event, Geter's contention that her accommodation presented "no issues" conflicts with the record. Geter acknowledges that Torrence, Seymour, and Williams had to cover her shifts. Appellant Br. 45. Torrence testified that covering

for Geter took a toll on him.  Dkt. 46-3 ¶¶ 13–16.  Schneider's employees would have had to keep filling in for Geter if she kept working part-time.  *See Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 671 (8th Cir. 2019) (accommodation was unreasonable because employer would have to reassign other employees "to shifts that they would not have otherwise been scheduled to work").  And Schneider would have had to staff another employee in the Fairburn office when Geter worked from home to fulfill the drivers' in-person needs.

Fourth, Geter also claims that Schneider could have accommodated her by making the printer and keys available to drivers.  Appellant Br. 41.  But leaving the office unlocked during the pandemic posed obvious security concerns, Dkt. 53 at 68, and allowing drivers full access to the printer causes confidentiality issues.  Dkt. 47-6 at 29–30.  As the R&R put it, "the fact that these system-wide and necessity driven changes were made after [Geter's] termination does not support [her] argument that it would have been reasonable to make these changes to accommodate her before she was terminated."  Dkt. 53 at 68.

And even if Schneider had relocated the printer and keys during Geter's tenure, there still were job duties—like finding trucks and interacting with drivers— that Geter admitted required her to be in the office.  Dkt. 46-4 at 12, 14, 18–19.  Even today, Schneider staffs the Fairburn office with associates around the clock to

perform essential in-office duties.  Dkt. 47-4 at 30.

Fifth, Geter contends that her proposed accommodations were reasonable because they had a "clear end date."  Appellant Br. 15–16, 49.  But each time Dr. Wanzo projected an end date for Geter's restrictions, the doctor later extended those restrictions beyond her projection.  *See* Dkt. 46-4 at 90, 93, 95, 97.  For instance, although Dr. Wanzo said that there was a 95% chance that Geter could return to full duties after her fourth extension, she later extended the restrictions another three months even after Schneider terminated Geter.  Dkt. 46-4 at 106.  Because of the repeated extensions—from January 2019 to February, from February to March, from March to April, and from April to June—Schneider fairly perceived that Geter's restricted schedule was becoming permanent.  Dkt. 46-9 at 6 (noting Geter's request had "been extended 4 times and [was] appearing to be a permanent restriction"); *see Campbell v. KBRwyle Tech. Sols., LLC*, No. 1:17-CV-00744-ACA, 2019 WL 1353965, at *8 (N.D. Ala. Mar. 26, 2019) (accommodation unreasonable where "[a]s time passed, it became increasingly clear that these restrictions were not temporary").  Geter's alleged "end date" thus does not help her case.

Sixth, Geter's request for reasonable accommodation also fails—along with her ADA claim in general—because she caused a "breakdown of the interactive process" through which an employer determines whether a requested

accommodation is feasible. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1435 (2021).  Schneider asked Geter to provide more information from Dr. Wanzo after her fourth extension, but Geter failed to timely respond, submitting documentation from Dr. Geter nearly three weeks after Schneider's deadline.  Dkt. 46-4 at 99, 101.  Geter's "failure to provide medical information necessary to the interactive process preclude[s her] from claiming that [Schneider] violated the ADA." *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998).

As the R&R aptly observed, because Geter did not carry her burden to identify a reasonable accommodation, Schneider need not show undue hardship.  Dkt. 53 at 70.  Regardless, for all the same reasons that Geter's accommodations were unreasonable, allowing Geter to work part-time and remotely would impose undue hardship on Schneider.  *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).  Geter's failure to propose a reasonable accommodation is a third separate ground "fatal to her ADA claim." *Earl*, 207 F.3d at 1367.

## IV.   Geter's ADA retaliation claim fails for the same reasons.

Geter's ADA retaliation claim fares no better.  Schneider terminated Geter because it believed she could not perform essential functions of her job.  That is a legitimate, nondiscriminatory reason for Schneider's actions.  *Stewart*, 117 F.3d at

1287.

To survive summary judgment, Geter had to present evidence that Schneider's reason for terminating her was pretext for discrimination. Yet she never presented any such evidence. Order, Dkt. 61 at 21-22 ("Plaintiff did not make any pretext arguments" apart from asserting she could perform the essential functions of her job).

Geter's sole assertion for pretext is that Schneider should have accommodated her requests to work part-time and from home. Appellant Br. 53; Order, Dkt. 61 at 22 (noting that her argument merely "rehashes" earlier assertions). Her argument fails for two reasons.

First, at best, Geter "simply quarrel[s] with the wisdom" of Schneider's reason for termination, which is inadequate to show pretext for a retaliation claim. *Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (holding that an employee cannot show pretext by "simply quarreling with the wisdom" of the employer's reason for an adverse employment action, but where the employer's reason "might motivate a reasonable employer," the employee "must meet the reason head on and rebut it."). Geter offers nothing that casts any doubt on why she was terminated—no evidence of any ulterior motive by Schneider. After months of using other employees to handle Geter's job in her place, eventually the company had to

recognize that she could not do the job and move on. Indeed, that Schneider managed Geter's restrictions for as long as it did despite the burden they posed is "irreconcilable with any notion of . . . retaliation, and underscore[s the] inability to show pretext." *Isaac v. Wal-Mart Stores E., LP*, 1:16-CV-179, 2017 WL 6061533, at *6 (S.D. Ala. Dec. 7, 2017) (no pretext where employer made significant efforts to manage employee's limitations before the adverse employment action).

Second, Geter's argument for pretext (and thus retaliation) is no different from her argument that Schneider should have accommodated her, and fails for the same reasons. *E.g.*, *Lucas*, 257 F.3d at 1261 (rejecting a retaliation claim based on a failure to accommodate, because "this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected, and it fares no better in this garb"); *Stewart*, 117 F.3d at 1288 (rejecting a retaliation claim when the plaintiff's assertions "relate directly to her 'reasonable accommodation' discrimination claim").

In short, Geter cites no evidence from which a jury could find that Schneider's "real reason" was to retaliate against her, even apart from her reasonable accommodation claim. And even if she had such evidence, it collapses into her deficient reasonable accommodation claim. Geter's ADA retaliation claim fails.

## CONCLUSION

For these reasons, the district court correctly ruled that Geter's ADA claims fail as a matter of law. The Court should affirm summary judgment for Schneider on all counts.

Dated: September 2, 2022                    Respectfully submitted,

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald
Virginia Bar No. 76725
Katherine E. Lehnen
Virginia Bar No. 92357
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
F: (804) 698-2251
mfitzgerald@mcguirewoods.com
klehnen@mcguirewoods.com

Peter A. Milianti
Illinois Bar No. 6243501
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-2765
F: (312) 920-6137
pmilianti@mcguirewoods.com

*Counsel for Defendant–Appellee*
*Schneider National Carriers, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,774 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Adobe Caslon Pro font.


Dated: September 2, 2022              <u>*/s/ Matthew A. Fitzgerald*</u>
                                      Matthew A. Fitzgerald

                                      *Counsel for Defendant–Appellee*
                                      *Schneider National Carriers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022, I electronically filed this Brief with the Clerk of the Court using the CM/ECF system, which will send a notification of electronic filing to all counsel of record who are registered CM/ECF users.

I further certify that on the same day, four paper copies of this Brief were sent to the Clerk of this Court via Federal Express overnight delivery under 11th Circuit Rule 31-3.

Dated: September 2, 2022                  */s/ Matthew A. Fitzgerald*
                                          Matthew A. Fitzgerald

                                          *Counsel for Defendant–Appellee*
                                          *Schneider National Carriers, Inc.*

54